**KLESTADT WINTERS JURELLER**
  **SOUTHARD & STEVENS, LLP**
200 West 41st St., 17th Floor
New York, NY 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Sean C. Southard
Lauren C. Kiss

*Proposed Counsel to the Debtor and Debtor in*
  *Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re                                                          :          Chapter 11
                                                               :
DOWLING COLLEGE,                                               :          Case No. 16-75545(REG)
                                                               :
                                                               :
                                          Debtor.              :
-------------------------------------------------------------x

<div align="center">

**DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS**
**(I) AUTHORIZING DEBTOR (A) TO OBTAIN POST-PETITION SECURED,**
**SUPERPRIORITY FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND**
**364 AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (II)**
**GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED CREDITORS**
**PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364; AND (III) SCHEDULING A**
**FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND 4001(C)**

</div>

Dowling College (the "Debtor"), debtor and debtor-in-possession in the above-captioned

chapter 11 case (the "Chapter 11 Case"), hereby submits this motion for the entry of an interim

order (the "Interim Order") and a final order (the "Final Order," and together with the Interim

Order, the "Financing Orders") and other related relief, (the "Motion").  In support of this

Motion, the Debtor respectfully represents as follows:

<div align="center">

**SUMMARY OF RELIEF REQUESTED**

</div>

1.      The Debtor has an immediate need for post-petition financing to continue its

limited operations, to maintain its properties, and to pay the administrative costs of the Chapter

11 Case while it undertakes a process designed to maximize value for all of the Debtor's stakeholders. To that end, the Debtor has engaged in extensive, arms-length negotiations with the Prepetition Secured Parties (defined below) which negotiations culminated in the DIP Note (defined below) and other DIP Documentation (defined below). This Motion seeks approval of the financing and cash collateral arrangements set forth in the DIP Documentation. Pursuant to the DIP Note, the Debtor will request that UMB Bank, National Association, as agent for certain lenders, make certain term loans in accordance with the Budget (defined below).

2. Generally speaking, the structure and mechanics of the DIP Documentation, which involve four (4) separate tranches and commitments, reflects the extensive intercreditor negotiations over a lengthy prepetition period and the interrelationship of the Debtor's assets as collateral packages divided among and between the Prepetition Secured Parties and, if approved by this Court, the Term Loan Lenders. Overall then, the DIP Note is designed to track the separate funding requirements in relation to the necessary costs and expenses required to protect and preserve the segmented collateral packages and positions (Term Loan A through C) of the Term Loan Lenders (as defined below) and the prepetition security interests of the Prepetition Secured Parties, together with the general costs of administration of the Chapter 11 Case (Term Loan D).

3. As set forth in greater detail below and in the DIP Note, the DIP Note provides that each of the Term Loan Lenders (as defined in the DIP Note) will contribute up to certain individual limits (in the respective amounts set forth in Schedule 1 of the DIP Note) as well as an overall aggregate commitment of $1,302,146.00 on an interim basis (the "Interim Term Loan Commitments") and an aggregate commitment on a final basis of up to $4,974,779.00 (the "Final Term Loan Commitments," and together with the Interim Term Loan Commitments, the "Term

Loan Commitments"). The borrowings under the DIP Note will be administered by the UMB as DIP Agent (defined below) and sourced from various of the Term Loan Lenders through the four term loans up to the amount of the respective commitments (as defined in the DIP Note). As consideration for the Term Loan Commitments and to secure advances made in relation to the same, the Debtor proposes to provide the DIP Agent, for the ratable benefit of the DIP Lenders, a first position priority in respect of all the Debtor's assets, except for the Carve-Out (defined below) and as otherwise set forth herein.  In broad terms, the borrowings under the DIP Note are summarized as follow:

| Term Loan | Lender(s) | Interim/Final Commitments | Assets Associated with Term Loan: | Use of Proceeds |
|---|---|---|---|---|
| A | ACA Financial Guaranty Corporation | $645,671/$2,175,022 | DIP Priority A Collateral, including, among other assets, the Oakdale Campus and the Brookhaven Campus other than the Brookhaven Dorm. | Fund costs and expenses of the DIP Priority A Collateral. |
| B | UMB Bank, National Association as indenture trustee under the Series 2002 Bond Documents | $83,315/$311,913 | DIP Priority B Collateral, including, among other assets, the Brookhaven Dorm. | Fund costs and expenses of the DIP Priority B Collateral. |
| C | UMB Bank, National Association as indenture trustee under the Series 2015 Bond Documents | $42,818/$239,055 | DIP Priority C Collateral, including, among assets, the Residential Portfolio as created under the Series 2015 Bond Documents. | Fund costs and expenses of the DIP Priority C Collateral. |
| D | All of the Forgoing | $530,342/$2,248,789 | DIP Priority D Collateral, including all assets other than that captured by the foregoing. | Fund fees and expenses not otherwise captured by the foregoing (A - C), including working capital needs of the Debtor and for other general corporate purposes, including, without limitation, payment of Professional Fees.  Also for any fees and expenses of the DIP Priority D Collateral. |

4.     The Term Loan Commitments, based on the Budget, are expected to provide the financing the Debtor requires for an approximately thirty (30) week period following the Petition Date (defined below) with a maturity date of May 8, 2017.   The Debtor believes that confirmation of a chapter 11 plan within this timeframe is feasible.   The Debtor further believes that entry of the Financing Orders is in the best interest of the Debtor, its estate and creditors.

## RELIEF REQUESTED

5.     By this Motion, the Debtor seeks entry of the Financing Orders, pursuant to Sections 105(a), 361, 362, 363, 364(c) and 364(d) of Title 11, United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-5 of the Local Rules for the United States Bankruptcy Court for the Eastern District of New York (the "Local Rules"):

(a)     authorizing the Debtor to obtain secured postpetition superpriority financing (the "DIP Facility") on an interim basis  pursuant to the terms and conditions of that certain "Debtor-in-Possession Multi-Draw Term Loan Promissory Note" dated as of November 29, 2016, by and among the Debtor and each lender party thereto (collectively, the "DIP Lenders"), and UMB Bank, National Association ("UMB") in its capacity as agent (in such capacity, the "DIP Agent") on behalf of the DIP Lenders, attached hereto as Exhibit A (as amended, supplemented, restated or otherwise modified from time to time in accordance therewith, the "DIP Note" and together with the other documents, agreements and instruments delivered pursuant thereto or executed or filed in connection therewith, all as may be reasonably requested by the DIP Lenders (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "DIP Documentation");[1]

(b)     authorizing the Debtor to execute the DIP Documentation, and to perform such other acts as may be necessary or desirable in connection therewith;

(c)     granting to the DIP Agent, for itself and for the ratable benefit of the DIP Lenders, first priority security interests in and liens on all of the DIP Collateral (as defined below) to secure the DIP Facility and all obligations owing and outstanding thereunder and under the DIP Documentation, and this Interim Order and Final Order, as applicable (collectively, the "DIP Loan Obligations");

---

[1]    Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the DIP Note.

(d)     granting allowed superpriority administrative expense claims to the DIP Agent and the DIP Lenders;

(e)     authorizing the Debtor to use any cash collateral (as defined in Section 363(a) of the Bankruptcy Code, "<u>Cash Collateral</u>") and other Prepetition Collateral (as defined below);

(f)     authorizing the Debtor to grant adequate protection to (i) UMB, as successor indenture trustee (the "<u>Series 1996 Bond Trustee</u>") for those certain bonds (the "<u>Series 1996 Bonds</u>") issued by the Suffolk County Industrial Development Agency ("<u>SCIDA</u>") pursuant to that certain Indenture of Trust (the "<u>Series 1996 Indenture</u>") dated as of June 1, 1996 between SCIDA and the Series 1996 Bond Trustee and all other related documents evidencing and/or securing the Series 1996 Bonds and all other obligations under the Series 1996 Indenture and all related documents, (the "<u>Series 1996 Bond Documents</u>"); (ii) UMB, as successor indenture trustee (the "<u>Series 2002 Bond Trustee</u>") for those certain bonds (the "<u>Series 2002 Bonds</u>") issued by the Town of Brookhaven Industrial Development Agency ("<u>BIDA</u>") pursuant to that certain Indenture of Trust (the "<u>Series 2002 Indenture</u>") dated as of November 1, 2002 between BIDA and the Series 2002 Bond Trustee and all other related documents evidencing and/or securing the Series 2002 Bonds and all other obligations under the Series 2002 Indenture and all related documents, including but not limited to, that certain Conditional Funding Agreement (the "<u>Series 2002/2015 Funding Agreement</u>"), as amended, dated as of August 4, 2016 among the Debtor, the Series 2002 Bond Trustee, the Series 2015 Bond Trustee (defined below) and certain holders (the "<u>Series 2002 Bond Documents</u>"); (iii) Wilmington Trust, National Association ("<u>Wilmington Trust</u>"), as successor indenture trustee (the "<u>Series 2006 Bond Trustee</u>") for those certain bonds (the "<u>Series 2006 Bonds</u>") issued by SCIDA pursuant to that certain Indenture of Trust dated as of June 1, 2006 (the "<u>Series 2006 Indenture</u>") between SCIDA and the Series 2006 Bond Trustee and all other related documents evidencing and/or securing the Series 2006 Bonds and all other obligations under the Series 2006 Indenture and all related documents, including, but not limited to, that certain Conditional Funding Agreement (the "<u>Series 2006 Funding Agreement</u>"), as amended, dated as of August 4, 2016 among the Debtor, the Series 2006 Bond Trustee and ACA (the "<u>Series 2006 Bond Documents</u>"); and (iv) ACA Financial Guaranty Corporation ("<u>ACA</u>") as bond insurer in respect of the Series 2006 Bonds; and (v) UMB, as indenture trustee (the "<u>Series 2015 Bond Trustee</u>" and together with the Series 1996 Bond Trustee, the Series 2002 Bond Trustee, the Series 2006 Bond Trustee, ACA and the Series 2015 Bond Trustee, the "<u>Prepetition Secured Parties</u>") for the those certain bonds (the "<u>Series 2015 Bonds</u>") issued by the Debtor pursuant to that certain Indenture of Trust (the "<u>Series 2015 Indenture</u>") dated as of June 15, 2015 between the Debtor and UMB and the other documents evidencing and/or securing the Series 2015 Bonds and all other obligations under the Series 2016 Indenture, including but not limited to the Series 2002/2015 Funding Agreement the "<u>Series 2015 Bond Documents</u>") and together with the Series 1996 Bond Documents, the Series 2002 Bond

Documents, the Series 2006 Bond Documents, and the Series 2015 Bond Documents, the "Prepetition Financing Documents"); and

(g)    scheduling a hearing (the "Final Hearing"), pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to consider entry of a final order (the "Final Order"), *inter alia*, approving and authorizing the DIP Facility on a final basis.

6.    In support of the Motion, the Debtor relies upon and fully incorporates by reference the Declaration of Robert S. Rosenfeld, Chief Restructuring Officer (the "CRO") of the Debtor, Pursuant to Local Rule 1007-4 and in Support of the First Day Motions (the "First Day Declaration"), which the Debtor has filed concurrently herewith.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over the subject matter of this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This mater is a core proceeding under 28 U.S.C. §157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for relief requested herein are Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Rules 2002, 4001 and 9014 of the Bankruptcy Rules.

## BACKGROUND

8.    On November 28, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

9.    The Debtor continues to manage its property as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

10.    No trustee, examiner or official committee has been appointed in this Chapter 11 Case.

## PREPETITION SECURED DEBT

### A.    Prepetition Financing Documents

11.    The Debtor is party to certain series of bond offerings issued in 1996, 2002, 2006 and 2015 (previously defined as the "Prepetition Financings"). Each of the Prepetition Financings was for a different purpose and each was secured by varying collateral. The following is a summary of each of the Prepetition Financings, the collateral securing each of the Prepetition Financings[2], and the status of each of the Prepetition Financings as of the Petition Date.

(i) *Series 1996 Obligations.*

12.    To secure the obligations under the Series 1996 Bond Documents, the Debtor granted to the Series 1996 Bond Trustee, for itself and for the ratable benefit of the holders of the Series 1996 Bonds first priority liens on certain of the Debtor's assets as described in the Series 1996 Bond Documents (the "Series 1996 Collateral").  Also included within the scope of the Series 1996 Collateral, is a junior mortgage interest in the Residential Portfolio (defined below) which interest was granted in or about June, 2015 on a *pari passu* basis along with the Series 2002 Bond Trustee as additional collateral for repayment of the Series 2002 Bonds.[3]  As of the Petition Date, (a) the aggregate amount of the obligations owed to the Series 1996 Bond Trustee under the Series 1996 Bond Documents (collectively, the "Series 1996 Obligations") is $3,531,250.53, which is the sum of (x) principal of $3,115,000 and (y) accrued and unpaid interest of $416,250.53 through and including the Petition Date.

---

[2] A depiction of the Debtor's real estate assets as collateral is annexed hereto as Exhibit B.
[3] Apart from the junior mortgage on the Residences, the Series 1996 Bond Trustee holds perfected security interests in certain insurance and condemnation interests associated with the Debtor's Oakdale campus, all as provided in the Series 1996 Bond Documents.

(ii) *Series 2002 Obligations.*

13.    To secure the obligations under the Series 2002 Bond Documents, the Debtor granted to the Series 2002 Bond Trustee, for itself and for the ratable benefit of holders of the Series 2002 Bonds first priority liens on certain of the Debtor's assets including, but not limited to, that certain dormitory building located in the Town of Brookhaven, New York (the "Brookhaven Dorm"), as more fully described in the Series 2002 Bond Documents (the "Series 2002 Collateral").    Also included within the scope of the Series 2002 Collateral, is a junior mortgage interest in the Residential Portfolio (defined below) which interest was granted in or about June, 2015 on a *pari passu* basis along with the Series 1996 Bond Trustee as additional collateral for repayment of the Series 1996 Bonds.    As of the Petition Date, the aggregate amount of the Secured Bond Obligations[4] owed to the Series 2002 Bond Trustee under the Series 2002 Bond Documents is $11,122,497.92, which is the sum of (x) principal of $8,755,000 and (y) accrued and unpaid interest of $2,367,497.92 through and including the Petition Date.

(iii) *Series 2006 Obligations*.

14.    To secure the obligations under the Series 2006 Bond Documents, the Debtor granted to the Series 2006 Bond Trustee, for itself and for the ratable benefit of holders of the Series 2006 Bonds and to ACA first priority liens on certain of the Debtor's assets including, but not limited to, the real property and improvements comprising the Debtor's campuses located in the hamlet of Oakdale, New York (the "Oakdale Campus") and the Town of Brookhaven, New York (the "Brookhaven Campus"), each as more fully described in the Series 2006 Bond Documents (the "Series 2006 Collateral"), and a second priority lien on the Brookhaven Dorm.

---

[4] Secured Bond Obligations means all aggregate indebtedness of the Debtor under, in connection with, or with respect to the Prepetition Financing Documents and all related documents, whether for borrowed money, fees, expenses, or otherwise accrued and outstanding as of the Petition Date, owed to the Prepetition Secured Parties under the Prepetition Financing Documents.

As of the Petition Date, the aggregate amount of the Secured Bond Obligations owed to the Series 2006 Bond Trustee and ACA under the Series 2006 Bond Documents is $37,253,883.01, which is the sum of (x) principal of $33,855,000, (y) accrued and unpaid interest of $1,646,146.12 through and including the Petition Date and (z) protective advances made by the Series 2006 Bond Trustee and/or ACA of $1,752,736.89, including but not limited to advances made under the Series 2006 Funding Agreement.

(iv) *Series 2015 Obligations*.

15.     To secure the obligations under the Series 2015 Bond Documents, the Debtor granted to the Series 2015 Bond Trustee, for itself and for the ratable benefit of holders of the Series 2015 Bonds first priority liens on certain of the Debtor's assets including, but not limited to, those certain single family residential properties (the "Residential Portfolio") as more fully described in the Series 2015 Bond Documents (the "Series 2015 Collateral" and together with the Series 1996 Collateral, the Series 2002 Collateral, the Series 2006 Collateral, the Series 2006 Funding Agreement and the Series 2002/2015 Funding Agreement, the "Prepetition Collateral"). As of the Petition Date, the aggregate amount of the Secured Bond Obligations owed to the Series 2015 Bond Trustee under the Series 2015 Bond Documents is $6,998,243.06, which is the sum of (x) principal of $6,700,000 and (y) accrued and unpaid interest of $298,243.06 through and including the Petition Date.

**B.      Mechanics Liens, Judgments and UCC Financing Statements.**

16.     In addition to the foregoing, several parties have filed mechanics liens on one or both of the Oakdale Campus and Brookhaven Campus during 2016. Still other creditors have recently obtained state court judgments against the Debtor on account of otherwise unsecured obligations. A summary of such liens and judgments follows:

| Date | Claimant | Type | Amount |
|------|----------|------|--------|
| 3/18/16 | Deliliah Craig[5] | Judgment | $3,441.20 |
| 7/13/16 | Powerhouse Maintenance, Inc., d/b/a Powerhouse Paving | Judgment | $28,100.02 |
| 8/22/16 | Ultimate Power Inc. | Judgment | $258,213.74 |
| 9/27/16 | Commissioner of Labor | Warrant | $106,805.06 |
| 6/3/16 | A.O. Service Inc. | Mechanics Lien Oakdale Campus | $5,954.00 |
| 6/9/16 | T.M. Bier & Associates, Inc. | Mechanics Lien Oakdale Campus | $7,470.75 |
| 6/28/16 | Absolute Plumbing of Long Island, Inc. | Mechanics Lien Oakdale Campus | $13,695.00 |
| 7/28/16 | Carrier Corporation | Mechanics Liens (4) Oakdale Campus | $61,681.48 |
| 7/1/16 | Carrier Corporation | Mechanics Lien Oakdale Campus | $6,317.50 |
| 8/4/16 | Universal Temperature Controls Ltd. | Mechanics Lien Oakdale Campus | $7,830.03 |
| 7/29/16 | Simplex Grinnell LP | Mechanics Lien Brookhaven Campus | $25,095.00 |

17.    Finally, several other parties have filed UCC financing statements in connection with discrete equipment financings or leases.

### PROPOSED DIP LOAN FACILITY AND USE OF CASH COLLATERAL

**A.    The Need for Postpetition DIP Financing.**

18.    As described in greater detail in the First Day Declaration, the Debtor intends to sell or otherwise dispose of substantially all of its property during the course of the Chapter 11 Case (or otherwise complete such dispositions under the terms of a confirmed plan).  Absent the DIP Facility, the Debtor will not have sufficient working capital to continue its limited

---

[5] This judgment is against Dowling College Enterprise Foundation, Inc., a non-debtor. The Debtor disputes liability for this judgment and reserves all rights, including, without limitation, to object to this claim.

operations or otherwise fund the administrative expenses of the Chapter 11 Case, both of which are required to complete the asset disposition strategies contemplated by the Debtor.

19.     Given the Debtor's financial condition, current financing arrangements, and capital structure, the Debtor does not have any unencumbered funds and is unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense.  As detailed more fully below, financing on a postpetition unsecured or solely on a superpriority basis is not available.

20.     The DIP Lenders are willing to provide the DIP Facility pursuant to Section 364(c)(1) of the Bankruptcy Code, provided that the Lender has priority over any and all administrative expenses of the kinds specified in Sections 503(b) and 507(b) of the Bankruptcy Code other than as described below, and such indebtedness and obligations are secured by the interests in and the liens  upon the property described below pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code.  As set forth more fully in the First Day Declaration, the Debtor is unable to obtain the postpetition financing that it needs from another lender on terms more favorable in the aggregate than those offered by the DIP Lenders through the DIP Facility.

**B.**     **The Economic Terms of the Postpetition Financing;**
        **DIP Liens and Superpriority Claim**

21.     Under the proposed DIP Facility, the DIP Lenders will make cash advances and other extensions of credit through the DIP Agent in a maximum principal amount not to exceed the Term Loan Commitments on a multiple draw term loan basis.

22.     The proceeds of the DIP Facility will be used by the Debtor for: (i) general working capital purposes and general corporate purposes relating to postpetition operations; and (ii) the costs and expenses associated with this Chapter 11 Case, including the fees, costs, expenses and disbursements of professionals retained by the Debtor and any statutory committee

appointed in this Chapter 11 Case (the "Committee"), and other bankruptcy-related costs as allowed by the Court, including amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court, all in accordance with the terms of the budget (the "Budget"), annexed hereto as Exhibit C.

23.    If approved by the Court, the proposed DIP Facility will operate in two (2) stages. First, under the proposed Interim Order, the initial loans and advances will be used to pay for the Debtor's working capital needs and operating requirements prior to the entry of the Final Order, pursuant to the Budget and up to the Interim Term Loan Commitments. Upon approval at the final hearing (the "Final Hearing") and subject to and upon entry of the Final Order, the Debtor will obtain loans on a final basis up to the Final Term Loan Commitments.

24.    Some significant terms of the DIP Facility and DIP Documentation include the following[6]:

(a)    DIP Facility Commitments: Interim Term Loan Commitments of $1,302,146.00 and Final Term Loan Commitments of $4,974,779.00. Funding is based on the Budget.

(b)    Interest:   Interest on the unpaid principal amount shall accrue at a rate equal to 9% and shall be capitalized and paid in-kind by being added to the outstanding principal balance of each of the applicable Term Loans. Following an Event of Default, the interest rate shall increase by 3%.

(c)    Fees:   The Debtor will pay to the Agent, (i) for the benefit of the Term Loan Lenders, a non-refundable financing fee equal to $200,000.00; (ii) a non-refundable loan servicing set-up fee equal to $4,000.00; and (iii) a quarterly loan servicing fee equal to $9,000.00 each calendar quarter in advance.

(d)    Collateral for the DIP Facility:   To secure the DIP Loan Obligations, the DIP Agent, on behalf of itself and for the ratable benefit of the DIP Lenders, is granted, pursuant to Sections 364(c)(2), 364(c)(3) (solely as to the Permitted

---

[6] The terms and conditions set forth herein are qualified in their entirety by reference to the provisions of the DIP Documentation. The description of the terms of the DIP Documentation set forth in this Motion is provided for the convenience of the Court and the parties-in-interest. In the event of any inconsistency between the description of the terms of the DIP Documentation contained in this Motion and the actual DIP Documentation, the terms of the DIP Documentation shall govern. Capitalized terms not defined in this paragraph 24 shall have the meaning ascribed to them in the DIP Documentation.

Encumbrances), and 364(d)(1), and subject to the terms and conditions of the DIP Note, valid, enforceable and fully perfected, first priority priming liens on and senior security interests in (collectively, the "<u>DIP Liens</u>") all of the property, assets or interests in property or assets of the Debtor, of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including, without limitation, all property of the "estate" (within the meaning of the Bankruptcy Code) of the Debtor, and all Accounts, Inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases, all of the equity interests of each subsidiary of the Debtor, all of the equity interests of all other Persons directly owned by the Debtor, money, investment property, deposit accounts, all commercial tort claims and all causes of action arising under the Bankruptcy Code or otherwise (including, without limitation, all avoidance actions under chapter 5 of the Bankruptcy Code ("<u>Avoidance Actions</u>") and the proceeds thereof (subject to entry of the Final Order)), and all cash and non-cash proceeds, rents, products and profits of any of collateral described above, which for the avoidance of doubt, shall include, without limiting the generality of the foregoing, all assets of the Debtor that is collateral pursuant to the Prepetition Financing Documents, and all other property and assets including, without limitation, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and profits of any of the collateral described above (collectively, the "<u>DIP Collateral</u>"), subject only to (A) the Permitted Encumbrances, and (B) the Carve-Out.

(e)    <u>Superpriority Administrative Expense Claim</u>.    The DIP Lenders are granted an allowed superpriority administrative expense claim (the "<u>DIP Superpriority Claim</u>") pursuant to Section 364(c)(1) of the Bankruptcy Code in the Debtor's Chapter 11 Case and in any successor case under the Bankruptcy Code (including any case under chapter 7 of the Bankruptcy Code, the "<u>Successor Case</u>") for all DIP Loan Obligations, having priority over any and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under Sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claim shall be payable from and have recourse to all pre- and postpetition property of the Debtor and all proceeds thereof including, without limitation, upon entry of a Final Order, any proceeds or property recovered in connection with the pursuit of Avoidance Actions.  The DIP Superpriority Claim shall be subject and subordinate in priority of payment only to payment of the Carve-Out.  Except as set forth in the DIP Note, no other superpriority claims shall be granted or allowed in this Chapter 11 Case or in any Successor Case.  The DIP Superpriority Claim shall be senior in all respects to any superpriority claims granted in this Chapter 11 Case including, without limitation, on account of any break-up fee or expense reimbursement that may be

granted by the Court in connection with the sale of the Debtor's assets, unless expressly agreed to in writing by those DIP Lenders with a Prepetition Lien on the property being sold.

(f)     <u>Limitation on Use of Proceeds</u>.  Until the DIP Facility is satisfied in full, the DIP Facility, DIP Collateral, and Carve-Out, no proceeds of the DIP Facility, any DIP Collateral or Prepetition Collateral (including, without limitation, Cash Collateral) or any portion of the Carve-Out may be used to pay, any claims for services rendered by any of the professionals retained by the Debtor, any creditor or party in interest, any committee, any trustee appointed in the Chapter 11 Case or any Successor Case, or any other party to (i) request authorization to obtain postpetition loans or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than from the DIP Lenders in accordance with the DIP Documentation; or (ii) investigate (except as set forth in paragraph 13 of the Interim Order), assert, join, commence, support or prosecute any action or claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, any holders of the Series 1996 Bonds, Series 2002 Bonds, Series 2006 Bonds or Series 2015 Bonds or any of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, or action, including, without limitation, (A) any Avoidance Actions or other actions arising under chapter 5 of the Bankruptcy Code; (B) any action relating to any act, omission or aspect of the relationship between the any of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties, on the one hand, and the Debtor, on the other; (C) any action with respect to the validity and extent of the DIP Loan Obligations or the Secured Bond Obligations, or the validity, extent, and priority of the DIP Liens, the Prepetition Liens, or the Replacement Liens; (D) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Liens, the Prepetition Liens, or the Replacement Liens; and/or (E) except to contest the occurrence or continuance of any Termination Event as permitted in paragraph 15 of the Interim Order, any action that has the effect of preventing, hindering or delaying (whether directly or indirectly) the DIP Agent, the DIP Lenders or the Prepetition Secured Parties in respect of their liens and security interests in the DIP Collateral, Cash Collateral or the Prepetition Collateral; and/or (F) pay any "claim" of a "creditor" (as such terms are defined in the Bankruptcy Code) without the prior written consent of the DIP Lenders or the Prepetition Secured Parties; or (G) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted hereby, without the consent of the DIP Lenders.

(g)     <u>Events of Default</u>:  Each of the following, among other items set forth in the DIP Note, shall constitute a Default (an "<u>Event of Default</u>") under the DIP Documentation: (A) the Debtor (i) shall fail to make any payment of principal or interest on, or fees owing in respect of the Term Loan or any of the other Obligations when due and payable or (ii) shall fail to pay or reimburse the Agent

or any Term Loan Lender for any expense reimbursable or under any other Loan Document within three (3) Business Days following the Agent's or such Term Loan Lender's demand for such reimbursement or payment; (B) the Borrower shall fail or neglect to perform, keep or observe any of the provisions of (i) Sections 3, 18(a), 18(b), 19(b), 19(c), 19(d), 19(e), 19(f), 19(g), 19(h), 19(i), 19(j), 19(k) or 20 or (ii) Section 19(a) and such failure shall remain uncured for a period of three (3) Business Days after the earlier of the date a senior officer of the Debtor becomes aware of such failure and the date written notice of such default shall have been given by the Agent or any Term Loan Lender to the Debtor; (C) the Debtor shall fail or neglect to perform, keep or observe any other provision of the DIP Note or any of the other Loan Documents (other than any provision embodied in or covered by any other clause of Section 21 of the DIP Note) and the same, if capable of being remedied, shall remain unremedied for two (2) Business Days after the earlier of the date a senior officer of the Borrower becomes aware of such failure and the date written notice of such default shall have been given by the Agent or any Term Loan Lender to the Borrower; (D) any representation or warranty the DIP Note or in any other Loan Document or in any written statement, report, financial statement or certificate made or delivered to the Agent or any Term Loan Lender by the Borrower is untrue or incorrect in any material respect as of the date when made or deemed made; (E) the occurrence of any postpetition judgments, liabilities or events that remain unabated and, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect; (F) any provision of any Loan Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or the Borrower shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any Loan Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under any Loan Document shall cease to be a valid and perfected first priority Lien (except as otherwise permitted herein or therein) in any of the DIP Collateral purported to be covered thereby; (G) there shall be a material adverse change in the business, assets, operations or financial condition of the Debtor, taken as a whole, other than those customarily caused by the filing of a Chapter 11 Case; (H) a Material Adverse Deviation shall occur without the Required Lenders' written consent; (I) the Debtor shall directly or indirectly, by operation of law or otherwise, (i) form or acquire any subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or capital Stock of, or otherwise combine with or acquire, any Person; (J) the Interim Order Entry Date does not occur within three (3) calendar days after the Petition Date; (K) the Final Order Entry Date does not occur within thirty-two (32) calendar days after the Petition Date; (L) the Interim Order or the Final Order shall have been stayed, vacated, reversed, modified or amended without the Required Lenders' consent; (M) a Termination Event shall occur; (N) an order with respect to the Chapter 11 Case or any Successor Case shall have been entered by the Bankruptcy Court converting the Chapter 11 Case or such Successor Case to a case under Chapter 7 of the Bankruptcy Code; (O) an order with respect to the Chapter 11 Case or any Successor Case shall have been

entered by the Bankruptcy Court dismissing or suspending the Chapter 11 Case or such Successor Case, which does not contain a provision for termination of the Total Term Loan Commitment, and the payment in full in cash of all Obligations of the Debtor under the DIP Note and the other Loan Documents upon entry thereof; (P) an order with respect to the Chapter 11 Case or any Successor Case shall have been entered by the Bankruptcy Court appointing, or the Debtor filing an application for an order with respect to the Chapter 11 Case seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; and (Q) any adversary proceeding and/or a contested matter shall have been commenced by any Person in the Chapter 11 Case or any Successor Case challenging under any applicable law the amount, extent, validity, binding effect, enforceability, perfection and/or priority of the security interests, Liens and/or claims of the Lenders in and to the DIP Collateral.

(h)  Rights and Remedies on Default.  If any Event of Default shall have occurred and be continuing, then the Required Lenders and/or the Agent (at the written direction of the Required Lenders) may, upon written notice to the Borrower: (i) terminate or reduce any Term Loan Commitment, whereupon such Commitment shall immediately be so terminated or reduced, (ii) terminate the DIP Note and the Term Loan facility contemplated thereby with respect to further Term Loans, (iii) declare all or any portion of the Obligations, including without limitation, all or any portion of any Term Loan and the financing fee and/or any loan servicing fee payable pursuant to Section 13 of the DIP Note, to be forthwith due and payable and (iv) exercise any rights and remedies under the Loan Documents, the Interim Order or the Final Order (as applicable) or at law or in equity.

(i)  Relief from Automatic Stay. Subject to paragraph 16(c) of the Interim Order, the automatic stay provisions of Section 362 of the Bankruptcy Code are vacated and modified without the need for further Court order to: (a) permit the DIP Agent, for itself and on behalf of the DIP Lenders, or the DIP Lenders, as applicable, upon the occurrence of a Termination Event, and without any interference from the Debtor or any other party in interest but subject to five (5) business days' prior written notice (which may be delivered by electronic mail) (the "Remedies Notice Period") to the Debtor, its counsel, counsel to any Creditors' Committee and counsel to the U.S. Trustee, to exercise all rights and remedies provided for in the DIP Documentation, the Financing Orders or under other applicable bankruptcy and non-bankruptcy law including, without limitation, the right to (i) cease making loans under the DIP Facility and/or suspend or terminate the commitments under the DIP Documentation; (ii) declare all DIP Loan Obligations immediately due and payable; (iii) in the case of the DIP Agent, take any actions reasonably calculated to preserve or safeguard the DIP Collateral or to prepare the DIP Collateral for sale; (iv) in the case of the DIP Agent, foreclose or otherwise enforce its DIP Lien or Replacement Liens on any

16

or all of the DIP Collateral and/or the Prepetition Collateral; (v) exercise any other default-related rights and remedies under the under the DIP Documentation or the Financing Orders; and (b) permit the Prepetition Secured Parties, upon the occurrence of a Termination Event, and without any interference from the Debtor or any other party interest but subject to five (5) business days' prior written notice to the Debtor, its counsel, counsel to any Creditors' Committee and counsel to the U.S. Trustee, to exercise all rights and remedies provided for in the Prepetition Financing Documents, the Financing Orders or under other applicable bankruptcy and non-bankruptcy law.

**C.      Use of Cash Collateral**

25.      Substantially all of the proceeds of the Debtor's property constitute the cash collateral of certain of the Prepetition Secured Parties.  These funds had been used by the Debtor to fund ongoing operations.  By this Motion, the Debtor proposes to use the proceeds of the Cash Collateral in accordance with the Budget, and to provide Adequate Protection Liens (as defined below) to Prepetition Secured Parties with liens in Cash Collateral.

**D.      Prepayments and Application of Proceeds**

26.      As stated above, the Debtor intends to commence a sale process that will result in the sale or other disposition of substantially all of its assets during the Chapter 11 Case or under a confirmed plan of liquidation. Pursuant to paragraph 11 of the DIP Note, the Debtor has agreed to prepay the Term Loans (as defined in the DIP Note) immediately upon the receipt of the cash proceeds of any sale or other disposition of the Prepetition Collateral. Pursuant to paragraph 12 of the DIP Note, such proceeds are to be applied in accordance with an agreed priority waterfall (the "Sale Proceeds Waterfall").  In the first instance, the Sale Proceeds Waterfall seeks to honor the DIP Lenders' respective advances made under the DIP Facility, and then secondarily, to be consistent with their respective Prepetition Liens.  Under any circumstance, the DIP Agent fees or expenses outstanding are to be paid from the first proceeds available and the Debtor is to receive advance notice of proposed application of proceeds in accordance with the Sale Proceeds Waterfall by the DIP Agent.

**E.    Granting of Adequate Protection**

27.    As noted above, the Debtor's obligations under the DIP Documentation will be secured by (x) security interests in all of the Prepetition Collateral, pursuant to Sections 364(c)(2) and 364(c)(3) and (y) first priority security interests in all of the Prepetition Collateral pursuant to Section 364(d) of the Bankruptcy Code subject and junior only to the Carve-Out and Liens associated with the Premium Financing Agreement (as defined in the DIP Note).

28.    The Prepetition Secured Parties have consented to such priming liens and pursuant to Sections 361, 364 and 507(b) of the Bankruptcy Code, as adequate protection to the Prepetition Secured Parties against any diminution of value, the Debtor proposes to grant the Prepetition Secured Parties automatically perfected, replacement liens on the Prepetition Collateral (an "Adequate Protection Lien") to the same extent and priority of their respective Prepetition Liens.  The Adequate Protection Liens shall be deemed a Permitted Encumbrance within the meaning of the DIP Documentation.  The Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Chapter 11 Case or any Successor Case.

29.    The Adequate Protection Liens proposed to be granted to the Prepetition Secured Creditors shall not be (i) subject to any lien that is avoided and preserved for the benefit of the Debtor's estate under Section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien under Section 363 and 364 of the Bankruptcy Code.

**F.    Granting of Super-Priority Administrative Expense Claims**

30.    To the extent Adequate Protection Liens fail to protect the Prepetition Secured Creditors against any diminution in value, the Prepetition Secured Parties shall be entitled, pursuant to Sections 503(b) and 507(b) of the Bankruptcy Code, to an allowed superpriority administrative expense claim in the Chapter 11 Case or any Successor Case (the "Prepetition

Secured Parties' Superpriority Claims"). The Prepetition Secured Parties' Superpriority Claims, if permitted, shall be subordinate in payment and priority only to the DIP Loans, the DIP Superpriority Claims, Permitted Encumbrances and the Carve-Out, and shall (a) otherwise have priority over any and all administrative expenses and unsecured claims against the Debtor or its estate in the Chapter 11 Case and any Successor Case, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code §§ 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth herein), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code.

## G.    **Credit Bid**

31.    As further adequate protection, the Prepetition Secured Parties shall each have the right to "credit bid" their respective claims up to the full amount of their respective Secured Bond Obligations during any sale of all or any portion of the such Prepetition Secured Parties' Prepetition Collateral, as applicable, or any deposit in connection with such sale, including, without limitation, any sales occurring pursuant to Section 363 of the Bankruptcy Code or included as part of any liquidation plan subject to confirmation under Section 1129(b)(2)(A)(iii) of the Bankruptcy Code, and shall be deemed "qualified bidders" with respect to such collateral for such purposes. The Prepetition Secured Parties shall each have the absolute right to assign, sell, or otherwise dispose of its respective right to credit bid in connection with any credit bid.

## H.    **Carve-Out**

32.    Notwithstanding the granting of the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claims, and the Prepetition Secured Parties' Superpriority Claim, the Carve-Out shall have priority in payment over the claims of the Prepetition Secured Lenders and all

other secured creditors, such that all proceeds received by such parties shall be subject to the prior payment of the Carve-Out.

33.     The Carve-Out includes (i) fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Bankruptcy Court (the "Case Administration Fees"), plus (ii) unpaid professional fees and expenses ("Professional Fees") payable to each legal or financial advisor retained by the Debtor including for the avoidance of doubt the fees and expenses of the CRO and the Creditors' Committee that are incurred or accrued prior to the date of the occurrence of a Termination Event, but in all events in an amount not to exceed the aggregate amount(s) allocated to each such professional in the Approved Budget, and ultimately allowed by the Bankruptcy Court pursuant to sections 330, 331 and 503 of the Bankruptcy Code or any order of the Bankruptcy Court (whenever such fees may be actually incurred prior to the Termination Event, plus (iii) $25,000 (earmarked for use by a Chapter 7 Trustee in the event of conversion), plus (iv) up to an additional $10,000 following a Termination Event, plus (v) the Case Administration Fees accrued and unpaid on or after the occurrence of a Termination Event.

**I.      Disclosures Pursuant to Bankruptcy Rule 4001(b) and (c) and Local Rule 4001-5**

34.     Bankruptcy Rule 4001(b)(1)(B)(i)-(iv) are satisfied by the disclosures set forth in paragraphs 5(f) and 17-22 hereof.

35.     The provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi) are set forth at the following sections of the Interim Order and/or DIP Note, as applicable:

> (a)     Grant of Priority or a Lien on Property of the Estate: Interim Order ¶ 7; DIP Note ¶ 16.
>
> (b)     Adequate Protection for a Claim that Arose Before the Commencement of the Case: Interim Order: ¶ 10.
>
> (c)     Determination of the Validity, Enforceability, Priority, or Amount of a Claim that Arose before the Commencement of the Case, Subject to the Rights of a Creditors' Committee or Other Parties in Interest: Interim Order ¶¶ F and 13.

(d)    <u>Waiver or Modification of the Automatic Stay</u>: Interim Order ¶16; DIP Note ¶ 21.

(e)    <u>Establishment of Deadline to File a Plan, for Approval of a Disclosure Statement, for a Hearing on Confirmation or for Entry of a Confirmation Order</u>: Interim Order ¶ 10(f); DIP Note ¶ 19(j), Schedule 2.

(f)    <u>Indemnification of any party</u>: DIP Note ¶ 14.

(g)    <u>Release, Waiver, or Limitation on Rights under Section 506(c) Under Final Order</u>: Interim Order ¶¶ 17.

(h)    <u>Liens on Avoidance Actions</u>: Interim Order ¶ 7; DIP Note ¶ 16.

36.    Moreover, Rule 4001-5(a) of the Local Bankruptcy Rules for the Eastern District of New York (the "<u>Local Rules</u>") requires that certain provisions contained in a proposed financing be highlighted and that the Debtor provide justification for the inclusion of such highlighted provisions.  To the extent Local Rule 4001-5 is applicable, the Debtor discloses the following:

(a)    <u>Carve-Out</u>: Interim Order ¶ 11 and Budget.

(b)    <u>Secured Creditors' Fees</u>: Interim Order ¶ 10(d).

(c)    <u>Exclusion from Carve-Out for Professional Fees Related to Investigation</u>: Interim Order ¶ 12.

37.    The foregoing provisions are appropriate under the circumstances. First, the DIP Documentation does provide for a Carve-Out for the professionals of the Debtor and a creditors committee, in the amounts set forth in the Budget. The Budget sets forth different amounts for each professional, which amounts reflect the Debtor's estimate of anticipated fees for each of the Debtor's and a potential creditors' committee's professionals. To the extent that Rule 4001-5(a) is implicated by this treatment, the Debtor submits that such estimates were determined to be reasonable estimates for the different professionals given their anticipated tasks and overall role in this Chapter 11 Case.

38.     Second, the DIP Documentation provides that the Debtor is to pay fees and expenses of the DIP Lenders without any notice or review by the Office of the United States Trustee, a creditors' committee, or the Court. The payment of such fees is customary and would be required by any lender. The DIP Documentation provides that the DIP Lenders will provide a redacted invoice to the Debtor, and the Debtor in turn is to provide a copy of the same to any creditors' committee and the Office of the United States Trustee.

39.     Third, the DIP Documentation provides a $35,000.00 limitation on use of cash collateral to investigate the liens of the DIP Lenders in their capacity as Prepetition Lenders. The Debtor submits that this budget for the task is reasonable under the facts of this Chapter 11 Case.

40.     Therefore, the Debtor asserts that such provisions are justified and necessary in the context and circumstances of this case.

## BASIS FOR RELIEF REQUESTED

41.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or security.  If a debtor in possession cannot obtain postpetition credit on an unsecured basis, the court may authorize the debtor to obtain credit or incur debt, repayment of which is entitled to superpriority administrative expense status or is secured by a lien on unencumbered property, a junior lien on encumbered property, or a combination of these protections.  11 U.S.C. § 364(c).  A debtor in possession may also obtain postpetition credit secured by liens senior to prior existing liens pursuant to Section 364(d) of the Bankruptcy Code.  Section 363(c)(2) of the Bankruptcy Code also contemplates that the Bankruptcy Court may authorize the use of cash collateral without the

consent of secured parties.  Courts may authorize such use if adequate protection is provided pursuant to Section 363(e).

**J.    The DIP Facility Should be Approved Under Section 364 of the Bankruptcy Code**

42.    The statutory requirement for obtaining postpetition credit under Section 364(c) is a finding, made after notice and a hearing, that the debtor in possession is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the Bankruptcy Code as an administrative expense." 11 U.S.C. § 364(c).  See e.g., In re Photo Promotion Assocs., 89 B.R. 328, 333 (Bankr. S.D.N.Y. 1988) (Section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.)

43.    In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Bray v. Shenandoah Fed. Sav. & Loan Assn. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992).  A debtor need only demonstrate "a good faith effort that credit was not available without" the protections of section 364(c) and 364(d). See e.g. In re Snowshoe, 789 F.2d. at 1088.  When there are few lenders likely, able, or willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff' d sub nom, Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117,120 n.4 (N.D. Ga. 1989).

44.    As described in this Motion and the First Day Declaration, the Debtor's CRO has concluded after appropriate analysis that the DIP Lenders' proposal was the best, and only viable alternative available to it for postpetition financing required in relation to the liquidation of the Debtor's assets in this Chapter 11 Case.  Postpetition financing cannot realistically be procured on an unsecured basis.  Negotiations with the DIP Lenders and prospective alternative lenders

have been arms' length and conducted on a good faith basis. The DIP Lenders are only willing to extend postpetition financing on the terms outlined above, including the additional protections of liens and priming liens on the DIP Collateral subject only to the Carve-Out.

45.     Given the immediacy of the Debtor's financing needs, the Debtor was required to move quickly and in a targeted manner to ensure that the Debtor would be able to negotiate a new financing facility to preserve and maximize value. There is no reason to believe that a different postpetition lender offering terms more favorable than the DIP Lenders could have been located, and certainly not before all of the Debtor's limited resources were depleted.

46.     No alternative lender was willing to provide the necessary postpetition financing absent a first priority priming position in front of the Prepetition Secured Parties. At the same time, the Prepetition Secured Parties indicated a clear and consistent objection to being primed in their collateral positions and expressed an intention to vigorously contest any such effort that the Debtor might attempt. Given the liquidating nature of the Chapter 11 Case and difficulty in proving adequate protection, the Debtor attributed significant risk and cost in relation to a hypothetical contested financing and cash collateral effort.

47.     Setting aside the potential contest in relation to lien priming, all alternative lenders that discussed pricing with the Debtor's CRO indicated they would require an effective rate of interest of at least ten percent with fees and charges of at least another 2 percent. Each such alternative lender would also require diligence and other fees that the Debtor was unable to pay.

48.     As is evident from the terms of the proposed DIP Facility, DIP Lenders pricing is more attractive than any alternative available in the marketplace. Overall then, the Debtor

submits that its decision to proceed with the proposed DIP Facility with the DIP Lenders was a reasonable exercise of business judgment.

**K.**  **The Priming Lien Under the DIP Facility Should be Approved Under Section 364(d) of the Bankruptcy Code**

49.      The Debtor also seeks approval of the DIP Facility under Section 364(d)(1) of the Bankruptcy Code to permit the Debtor to grant priming liens on the Prepetition Collateral.  The statutory requirement for obtaining postpetition credit under Section 364(d)(1) of the Bankruptcy Code is a finding, made after notice and hearing, that the debtor in possession are "unable to obtain such credit otherwise."  In addition, unless the secured creditors whose liens are being "primed" by a new postpetition lender under Section 364(d) of the Bankruptcy Code consent to such treatment, they must be provided with adequate protection of their interests in collateral. See In re Swedeland Dev. Group, Inc., 16 F. 3d 552, 564 (3d Cir. 1994) (en banc) (noting that adequate protection is required under Section 364(d)(1)(B) of the Bankruptcy Code to ensure that the creditor receives the value for which it bargained pre-bankruptcy);  In re Dunes Casino, 69 B.R. 784, 793 (Bankr. D.N.J. 1986) (noting that '[a]dequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy").

50.      After reasonable inquiry of other potential lenders, the Debtor determined that no other financing is available on terms better than proposed under the DIP Documentation based on responses that the Debtor received.

51.      Under the circumstances here, the Debtor also believes that the DIP Facility is consistent with the rights of affected parties.

52.      In this case, the DIP Lenders, in their respective capacities as Prepetition Secured Lenders, have consented to the granting of the priming liens and, as set forth above, and will be granted Adequate Protection Liens to the extent of any diminution in value of their interests in

their prepetition collateral as well as a Prepetition Secured Lender Superpriority Claim. The Debtor submits that the foregoing suffices as adequate protection.

53. For any other affected party in the Chapter 11 Case, the principal purpose of adequate protection is to safeguard the interests of the secured creditor in the collateral against diminution in the value of that interest postpetition. See In re 495 Central Park Avenue Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (stating that the goal of adequate protection is to safeguard the secured creditor from diminution in value of its interest during the chapter 11 case); In re Continental Airlines, Inc., 154 B.R. 176, 180 (Bankr. D. Del. 1993) (same); In re Beker Indus Corp., 58 B.R. 725, 738 (Bankr. S.D.N.Y. 1986) (same).

54. Courts determine the means for providing adequate protection on a case by-case basis. See In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Realty Southwest Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725 (Bankr. S.D.N.Y. 1986); see also In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985).

55. The means by which adequate protection can be provided are addressed in Section 361 of the Bankruptcy Code. Section 361 sets forth three (3) non-exclusive forms of adequate protection: (a) lump sum cash payments to the extent the use of property results in a diminution in value of an entity's interest in property; (b) provision of additional or replacement liens to the extent the use of property results in a diminution in value of an entity's interest in property; and (c) such other relief as will result in a entity realizing the indubitable equivalent of its interest in property. 11 U.S.C. § 361. As the foregoing is neither exclusive nor exhaustive, there is a great deal of flexibility in terms of what may constitute adequate protection. In re O'Connor, 808 F.2d 1393, 1396-97 (10th Cir. 1987). Ultimately, adequate protection is determined on a case-by-

case basis in light of the particular facts and circumstances presented.  Id. (stating that "the courts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis);  In re 495 Central Park, 136 B.R. at 631 (stating that, although section 361 presents some specific illustrations of adequate protection, the statute is not exclusive and suggests a broad and flexible definition);  In re Constable Plaza Assocs., L.P. 125 B.R. 98, 105-06 (Bankr. S.D.N.Y. 1991) (authorizing debtor to use cash collateral to operate and maintain office building, thereby protecting secured lender's collateral and existing equity cushion);  Pagano v. Cooper (In re Cooper), 22 B.R. 718, 720 n. 3 (Bankr. E.D. Pa. 1982) ("While "adequate protection" is not defined in the Bankruptcy Code, the legislative history of section 361 reflects the intent of Congress to give the courts the flexibility to fashion the relief in light of the facts of each case and general equitable principles."  (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess.  339 (1977)).

**L.      The DIP Facility is Necessary to Preserve the Assets of the Debtor's Estate**

56.      The Debtor's need for immediate access to working capital is apparent. As described above and in the First Day Declaration, the immediate access to credit is necessary to meet the day-to-day operating needs associated with the Debtor's limited operations while the sale process progresses.  In the absence of immediate access to cash and credit, the Debtor's suppliers and third party vendors will likely refuse to sell critical supplies to the Debtor on reasonable trade terms on which the Debtor's business depend, and absent which the Debtor will be unable to meet its current obligations.

**M.      The Terms of the DIP Facility are Fair, Reasonable and Appropriate and Represent the Sound Exercise of Business Judgment**

57.      In the Debtor's business judgment, the DIP Facility was the best financing option available under the circumstances of the Chapter 11 Case.  The proposed terms of the DIP

Facility were negotiated in good faith and at arms' length among the parties. They are fair, reasonable, and adequate in that the terms do not prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, and they do not abridge the rights of other parties in interest. As contemplated by the policies underlying the Bankruptcy Code, the purpose of the DIP Facility is to enable the Debtor to maintain and maximize the value of its estate while formulating a confirmable plan under Chapter 11 of the Bankruptcy Code. See generally, In re First S. Sav. Assn, 820 F.2d 700, 710-15 (5th Cir. 1987).

58.    Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Banr. S.D. Ohio 1983) (Business judgments should be left to the board room and not to this Court.). See also, In re Curlew Valley Assocs., 14 B.R. 506, 511-14 (Bankr. D. Utah 1981) (In general, a bankruptcy court should defer to a debtor-in-possession's business judgment regarding the need for and proposed use of funds, unless such decision is arbitrary and capricious). Courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." Curlew Valley, 14 B.R. at 513-14 (footnotes omitted).

59.    The Debtor submits that it has exercised its sound business judgment in determining the merits and necessity of the DIP Facility and has aptly demonstrated that its terms are fair and reasonable and are in the best interests of the Debtor's estate. Accordingly, the Debtor should be granted the requested relief to borrow funds from the DIP Lenders on a secured and superpriority basis, pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code.

**N.**      **The Other Secured Parties are Adequately Protected**

60.     As described above, certain parties have filed mechanic's liens against certain of the Debtor's properties and other creditors have obtained judgments against the Debtor and recorded such judgments against certain of the Debtor's properties. These other secured parties (collectively, the "Other Secured Parties") are granted replacement liens by the Financing Orders in the same nature, extent, validity and priority as existed on the Petition Date. The Debtor submits that such replacement liens constitute adequate protections under the circumstances of this Chapter 11 Case.

61.     The focus of the adequate protection requirement is to protect a secured creditor from diminution in the value of its interest in collateral during the reorganization process, not to compensate the creditor for the delay imposed by the bankruptcy on its ability to pursue non-bankruptcy remedies against the property. See In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); In re Saypol, 31 B.R. 796, 799-802 (Bankr. S.D.N.Y. 1983).

62.     Furthermore, where a debtor's proposed use of cash collateral augments the value of the secured creditor's collateral, adequate protection exists.  See In re Pine Lake Village Apartment, 19 B.R. 819, 826 (Bankr. S.D.N.Y 1982) (creditor had adequate protection where the debtor used cash collateral to maintain and preserve the value of the collateral). In fact, such use would generally give rise to a claim under Section 506(c) of the Bankruptcy Code, which provides that a debtor may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving such property, to the extent of any benefit to the holder of such claim. 11 U.S.C. § 506(c); see also, In re Trim-X, Inc., 695 F.2d 296 (7th Cir. 1982).

63.     As described in the First Day Declaration, the Debtor intends to proceed with a robust sales program for its properties. The Debtor believes that these anticipated sale programs

will maximize the value of all of the Debtor's property and will augment such values above the values that could be obtained for the Debtor's properties in a fire sale or by surrendering such property to the Prepetition Secured Parties. This augmentation of value, combined with the replacement liens, constitutes adequate protection within the meaning of Section 361 of the Bankruptcy Code.

**O.      Modification of the Automatic Stay is Warranted**

64.     As set forth more specifically in the Interim Order and Final Order, the proposed DIP Facility contemplates a modification of the automatic stay pursuant to Section 362 of the Bankruptcy Code to permit the DIP Lenders, in their sole discretion, (a) to file financing statements, mortgages or other similar documents to evidence their respective security interests under the DIP Facility, the Interim Order, and the Final Order, (b) subject to certain notice requirements, to execute upon such security interests or exercise other remedies under the DIP Documentation following an Event of Default under, or other termination of, the DIP Facility, and (c) to take other actions required or permitted by the DIP Documentation.

**P.      The Debtor's Request for Interim Relief is Appropriate**

65.     Pending the Final Hearing, the Debtor requires immediate financing for, among other things, the funding of payroll obligations, maintenance of the Debtor's property, and other working capital needs. The Debtor's interim request represents the minimum amount of cash necessary to operate during the period prior to the Final Hearing.  It is essential that the Debtor maintain stability and continue paying ordinary operating expenses postpetition to facilitate the sale process, and maximize the value of its assets.

66.     Absent immediate financing for its continuing operations, the Debtor will not have any funding to pay expenses and, therefore, will be unable to continue to avoid an immediate liquidation pending the Final Hearing.  Consequently, if the emergency relief sought

herein is not obtained, the Debtor's attempt to continue operations and ultimately realize the maximum value for its assets will likely be immediately, if not irreparably, jeopardized, to the detriment of its estate, its creditors and other parties in interest.

67.     Accordingly, the Debtor requests that, pending the Final Hearing, the Court conduct an interim hearing (the "Interim Hearing") as soon as practicable to consider the Debtor's request for authorization to use Cash Collateral and to obtain the DIP Facility in accordance with and pursuant to the terms and conditions contained in the DIP Loan Documents and the Interim Order.

68.     Bankruptcy Rule 4001 (b) and (c) permits a court to approve a debtor's request for use of cash collateral or to incur postpetition financing during the 15-day period following the filing of a motion requesting such authorization the extent "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2) and (c)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions.  See, e.g., Simasko, 47 B.R. at 449.  After the 15-day period, a debtor is entitled to borrow those amounts that it believes prudent in the operation of its business.  See, e.g., Simasko, 47 B.R. at 449.   Under this standard, as described herein and in the First Day Declaration, the Debtor's request for entry of the Interim Order and Final Order, in the time periods and for the financing amounts requested herein, is appropriate.

## NOTICE

69.     As of the filing of this Motion, no trustee, examiner or creditors' committee has been appointed in this Chapter 11 Case.  Notice of this Motion will be given to (a) United States Trustee; (b) the Debtor's material prepetition and post-petition secured lenders or any agent therefore; (c) the holders of the 20 largest unsecured claims; (d) the following taxing and regulatory authorities: (i) the United States Attorney for the Eastern District of New York, (ii)

the Attorney General of the State of New York, (iii) United States Department of Education, (iv) New York State Department of Education, (v) the Internal Revenue Service, and (vi) the New York State Department of Taxation and Finance; and (e) all other parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtor submits that no other notice need be given.

## **NO PRIOR APPLICATION**

70.    No previous application for the relief sought herein has been made to this or to any other court.

WHEREFORE, the Debtor respectfully request that the Court (a) enter an Interim Order substantially in the form annexed hereto as **Exhibit D** and a Final Order after an Interim Hearing and Final Hearing, respectively, (i) authorizing the Debtor to obtain Postpetition Secured, Superpriority Financing and to use Cash Collateral, (ii) granting Liens (including Adequate Protection Liens) and Superpriority Claims, (iv) modifying the automatic stay to allow certain actions with respect to the Debtor's postpetition indebtedness, and (b) grant such other and further relief as the Court may deem just and proper.

Dated:   New York, New York
         November 29, 2016

                         **KLESTADT WINTERS JURELLER**
                         **SOUTHARD & STEVENS, LLP**


                    By:   *Sean C. Southard*
                         _____
                          Sean C. Southard
                          Lauren C. Kiss
                          200 West 41st Street, 17th Floor
                          New York, NY 10036
                          Tel: (212) 972-3000
                          Fax: (212) 972-2245
                          Email: ssouthard@klestadt.com

                          *Proposed Attorneys to the Debtor and Debtor -*
                          *in-Possession*

**Exhibit A**

**DIP Note**

# DOWLING COLLEGE
# DEBTOR-IN-POSSESSION
# MULTI-DRAW TERM LOAN PROMISSORY NOTE

$4,974,779.00                                         New York, New York
                                                Dated as of November 29, 2016

On November 29, 2016 (the "<u>Petition Date</u>"), Dowling College, a New York not-for-profit education corporation (the "<u>Borrower</u>"), has commenced a bankruptcy case (the "<u>Chapter 11 Case</u>") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*., as amended (the "<u>Bankruptcy Code</u>") with the United States Bankruptcy Court for the Eastern District of New York (the "<u>Bankruptcy Court</u>").  The Borrower continues to manage its properties as a debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  The Borrower has requested that UMB Bank, National Association ("<u>UMB</u>"), as agent (the "<u>Agent</u>") for the Term Loan A Lenders (as defined herein), the Term Loan B Lenders (as defined herein), the Term Loan C Lenders (as defined herein) and the Term Loan D Lenders (as defined herein), that make term loans from time to time evidenced by this Multi-Draw Term Loan Promissory Note (as the same may be amended, modified, renewed, restated or supplemented from time to time, this "<u>Note</u>").  The Borrower intends to utilize such term loans to fund the Chapter 11 Case, including fees and expenses related thereto and requirements through the conclusion of a sale of all or substantially all of its assets.  Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in Section 23.

1.    <u>Term Loan Commitments</u>.

(a)    Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Term Loan A Lender severally agrees, in accordance with its Term Loan A Commitment, and on the terms and conditions hereinafter set forth (including subject to the satisfaction (or waiver) of the conditions precedent set forth in Sections 4, 5 and 6, as applicable), (i) to make one or more term loans (each, an "<u>Interim Term Loan A</u>") to the Borrower during the Interim Period in an aggregate principal amount not to exceed such Term Loan A Lender's Interim Term Loan A Commitment in effect at such time and (ii) to make one or more term loans (each a "<u>Final Term Loan A</u>") to the Borrower during the Final Period in an aggregate principal amount not to exceed such Term Loan A Lender's Final Term Loan A Commitment in effect at such time.

(b)    Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Term Loan B Lender severally agrees, in accordance with its Term Loan B Commitment, and on the terms and conditions hereinafter set forth (including subject to the satisfaction (or waiver) of the conditions precedent set forth in Sections 4, 5 and 6, as applicable), (i) to make one or more term loans (each, an "<u>Interim Term Loan B</u>") to the Borrower during the Interim Period in an aggregate principal amount not to exceed such Term Loan B Lender's Interim Term Loan B Commitment in effect at such time and (ii) to make one or more term loans (each a "<u>Final Term Loan B</u>") to the Borrower during the Final Period in an

aggregate principal amount not to exceed such Term Loan B Lender's Final Term Loan B Commitment in effect at such time.

(c)     Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Term Loan C Lender severally agrees, in accordance with its Term Loan C Commitment, and on the terms and conditions hereinafter set forth (including subject to the satisfaction (or waiver) of the conditions precedent set forth in Sections 4, 5 and 6, as applicable), (i) to make one or more term loans (each an "Interim Term Loan C") to the Borrower during the Interim Period in an aggregate principal amount not to exceed such Term Loan C Lender's Interim Term Loan C Commitment in effect at such time and (ii) to make one or more term loans (each a "Final Term Loan C") to the Borrower during the Final Period in an aggregate principal amount not to exceed such Term Loan C Lender's Final Term Loan C Commitment in effect at such time.

(d)     Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Term Loan D Lender severally agrees, in accordance with its Term Loan D Commitment, and on the terms and conditions hereinafter set forth (including subject to the satisfaction (or waiver) of the conditions precedent set forth in Sections 4, 5 and 6, as applicable), (i) to make one or more term loans (each an "Interim Term Loan D") to the Borrower during the Interim Period in an aggregate principal amount not to exceed such Term Loan D Lender's Interim Loan D Commitment in effect at such time and (ii) to make one or more term loans (each a "Final Term Loan D") to the Borrower during the Final Period in an aggregate principal amount not to exceed such Term Loan D Lender's Final Term Loan D Commitment in effect at such time.

(e)     Notwithstanding the foregoing:

(1)     (i) During the Interim Period, the aggregate principal amount of the Interim Term Loans outstanding at any time to the Borrower shall not exceed the lesser of (A) the Total Interim Term Loan Commitment in effect on the Interim Facility Effective Date, less the sum of (x) the Case Administration and Professional Fee Reserve in effect at such time and (y) the Total Unrestricted Funds Amount as of such time and (B) the aggregate principal amount of the Interim Term Loans projected to be outstanding at the end of the next immediately succeeding two-week period during the Interim Period as set forth in the Approved Budget, less the aggregate amount of Unrestricted Funds deposited into the Designated Term Loan Accounts and/or the Borrower Disbursement Account that have not been applied to payment of outstanding fees and expenses in accordance with Section 3(h) at such time and (ii) during the Final Period, the aggregate principal amount of the Term Loans outstanding at any time to the Borrower shall not exceed the lesser of (A) the Total Term Loan Commitment in effect on the Interim Facility Effective Date, less the sum of (x) the Case Administration and Professional Fee Reserve in effect at such time and (y) the Total Unrestricted Funds Amount as of such time and (B) the aggregate principal amount of the Term Loans projected to be outstanding at the end of the next immediately succeeding two-week period during the Final Period as set forth in the Approved Budget, less the

aggregate amount of Unrestricted Funds deposited into the Designated Term Loan Accounts and/or the Borrower Disbursement Account that have not been applied to payment of outstanding fees and expenses in accordance with Section 3(h) at such time.

(2)    The Total Term Loan Commitment, the Total Interim Term Loan Commitment and the Total Final Term Loan Commitment, in each case, shall be automatically and permanently reduced by the Total Unrestricted Funds Amount at such time.

(3)    Each Interim Term Loan A made by a Term Loan A Lender shall automatically and permanently reduce the Interim Term Loan A Commitment of such Term Loan A Lender.  Each Final Term Loan A made by a Term Loan A Lender shall automatically and permanently reduce the Final Term Loan A Commitment of such Term Loan A Lender.  The Total Term Loan A Commitment, the Total Interim Term Loan A Commitment and the Total Final Term Loan A Commitment, in each case, shall be automatically and permanently reduced by the Term Loan A Unrestricted Funds Amount at such time.  Each Term Loan A Lender's Interim Term Loan A Commitment shall be automatically and permanently reduced by such Term Loan A Lender's Pro Rata Share of the Term Loan A Unrestricted Funds Amount at such time.  Each Term Loan A Lender's Final Term Loan A Commitment shall be automatically and permanently reduced by such Term Loan A Lender's Pro Rata Share of the Term Loan A Unrestricted Funds Amount at such time.  Any principal amount of any Term Loan A which is repaid or prepaid may not be reborrowed.

(4)    Each Interim Term Loan B made by a Term Loan B Lender shall automatically and permanently reduce the Interim Term Loan B Commitment of such Term Loan B Lender.  Each Final Term Loan B made by a Term Loan B Lender shall automatically and permanently reduce the Final Term Loan B Commitment of such Term Loan B Lender.  The Total Term Loan B Commitment, the Total Interim Term Loan B Commitment and the Total Final Term Loan B Commitment, in each case, shall be automatically and permanently reduced by the Term Loan B Unrestricted Funds Amount at such time.  Each Term Loan B Lender's Interim Term Loan B Commitment shall be automatically and permanently reduced by such Term Loan B Lender's Pro Rata Share of the Term Loan B Unrestricted Funds Amount at such time.  Each Term Loan B Lender's Final Term Loan B Commitment shall be automatically and permanently reduced by such Term Loan B Lender's Pro Rata Share of the Term Loan B Unrestricted Funds Amount at such time.  Any principal amount of any Term Loan B which is repaid or prepaid may not be reborrowed.

(5)    Each Interim Term Loan C made by a Term Loan C Lender shall automatically and permanently reduce the Interim Term Loan C Commitment of such Term Loan C Lender.  Each Final Term Loan C made by a Term Loan C Lender shall automatically and permanently reduce the Final Term Loan C Commitment of such Term Loan C Lender.  The Total Term Loan C Commitment, the Total Interim Term Loan C Commitment and the Total Final Term Loan C Commitment, in each case, shall be automatically and permanently reduced by the Term Loan C Unrestricted Funds Amount at such time.  Each Term Loan C Lender's Interim Term Loan C Commitment

shall be automatically and permanently reduced by such Term Loan C Lender's Pro Rata Share of the Term Loan C Unrestricted Funds Amount at such time. Each Term Loan C Lender's Final Term Loan C Commitment shall be automatically and permanently reduced by such Term Loan C Lender's Pro Rata Share of the Term Loan C Unrestricted Funds Amount at such time. Any principal amount of any Term Loan C which is repaid or prepaid may not be reborrowed.

(6)     Each Interim Term Loan D made by a Term Loan D Lender shall automatically and permanently reduce the Interim Term Loan D Commitment of such Term Loan D Lender. Each Final Term Loan D made by a Term Loan D Lender shall automatically and permanently reduce the Final Term Loan D Commitment of such Term Loan D Lender. The Total Term Loan D Commitment, the Total Interim Term Loan D Commitment and the Total Final Term Loan D Commitment, in each case, shall be automatically and permanently reduced by the Term Loan D Unrestricted Funds Amount at such time. Each Term Loan D Lender's Interim Term Loan D Commitment shall be automatically and permanently reduced by such Term Loan D Lender's Pro Rata Share of the Term Loan D Unrestricted Funds Amount at such time. Each Term Loan D Lender's Final Term Loan D Commitment shall be automatically and permanently reduced by such Term Loan D Lender's Pro Rata Share of the Term Loan D Unrestricted Funds Amount at such time. Any principal amount of any Term Loan D which is repaid or prepaid may not be reborrowed.

(7)     The Total Interim Term Loan Commitment shall terminate at 5:00 p.m. (New York time) on the Final Facility Effective Date.

2.     <u>Making the Term Loans</u>.

(a)     Each Term Loan shall be made on notice by the Borrower to the Agent and the Term Loan Lenders at the addresses specified in Section 25 or such other person or persons designated by the Agent and/or the Term Loan Lenders in writing to the Borrower. Any such notice must be given no later than 11:00 a.m. (New York time) on the date that is at least one (1) Business Day prior to the date of the proposed Term Loan; <u>provided</u>, <u>that</u>, initial Interim Term Loans may be made simultaneously with the execution of this Note by the Agent, the Term Loan Lenders and the Borrower. Each such notice (a "<u>Notice of Borrowing</u>") shall be given in writing (by electronic transmission or overnight courier) specifying (1) the type of such Term Loan, (2) the amount of such Term Loan, (3) the proposed date of such Term Loan, which must be a Business Day, (4) a certification by the Borrower's chief restructuring officer that such Term Loan is consistent with, and the proceeds of such Term Loan will be applied in accordance with, Section 3 and the Approved Budget, (5) a certification by the Borrower's chief restructuring officer that on the date of such Notice of Borrowing, all conditions precedent set forth in the Note have been satisfied with respect to such Term Loan and (6) such other information as may be reasonably required by the Agent. The Borrower shall not request the making of any Term Loan that would, after giving effect to all prior Term Loans, cause the aggregate principal amount of the Term Loans outstanding on such date to exceed the aggregate principal amount of the Term Loans projected to be outstanding at the end of the next immediately succeeding two-week

period as set forth in the Approved Budget, less the aggregate amount of Unrestricted Funds deposited into the Designated Term Loan Accounts and/or the Borrower Disbursement Account that have not been applied to payment of outstanding fees and expenses in accordance with Section 3(h) at such time.

(b)    Promptly after receipt of a Notice of Borrowing by the Agent and the Term Loan Lenders in accordance with Section 2(a) above, subject to the satisfaction of the conditions set forth in this Note with respect to any Term Loan requested therein, (1) each applicable Term Loan Lender shall promptly and proportionately to its Pro Rata Share of the applicable Term Loan Commitment, make the proceeds of such Term Loan available to the Agent by transferring immediately available funds equal to such proceeds to the Agent's Account and (2) promptly after receipt of any such Term Loan proceeds, the Agent shall promptly make such proceeds available to the Borrower by transferring immediately available funds equal to such proceeds to (A) in the case of any proceeds of the Term Loan A, the Term Loan A Account, (B) in the case of any proceeds of the Term Loan B, the Term Loan B Account, (C) in the case of any proceeds of the Term Loan C, the Term Loan C Account and (D) in the case of any proceeds of the Term Loan D, the Term Loan D Account; provided, that, (i) with respect to any Class of Term Loans, no Term Loan Lender with a Term Loan Commitment to make Term Loans in such Class shall be obligated to make a Term Loan in such Class more than one time in any consecutive two calendar week period, (ii) no Term Loan Lender shall be responsible for any default by any other Term Loan Lender in that other Term Loan Lender's obligation to make any Term Loan requested hereunder, (iii) no Term Loan Lender's Pro Rata Share of such applicable Term Loan Commitment shall be increased or decreased as a result of the default by any other Term Loan Lender in that other Term Loan Lender's obligation to make any Term Loan requested hereunder and (iv) each Term Loan Lender shall be obligated to make each Term Loan required to be made by it by the terms of this Note regardless of the failure by any other Term Loan Lender.  The entire unpaid balance of the Term Loans and all other Obligations shall be immediately due and payable in full in immediately available funds on the Maturity Date.

(c)    The Agent and each Term Loan Lender shall be entitled to rely upon, and shall be fully protected in relying upon, any Notice of Borrowing or similar notice believed by it to be genuine.  The Agent and each Term Loan Lender may assume that each Person executing and delivering any such notice was duly authorized, unless the responsible individual acting thereon has actual knowledge to the contrary.

3.    Designated Term Loan Accounts; Use of Proceeds.

(a)    The Borrower (1) shall maintain the Term Loan A Account and keep the Term Loan A Account separate and segregated from all of the Borrower's other accounts, (2) shall not co-mingle any of the Borrower's other cash or money (other than any Unrestricted Funds that relate to DIP Priority A Collateral) with the proceeds of the Term Loan A deposited in the Term Loan A Account and (3) shall not make any disbursements of any proceeds of the Term Loan A or any Unrestricted Funds that relate to DIP Priority A Collateral from the Term Loan A Account other

than to the Borrower Disbursement Account for disbursement in accordance with Sections 3(f) and/or 3(h) and Section 3(g) below or otherwise in accordance with Sections 3(f) or 3(h) below.

(b)    The Borrower (1) shall maintain the Term Loan B Account and keep the Term Loan B Account separate and segregated from all of the Borrower's other accounts, (2) shall not co-mingle any of the Borrower's other cash or money (other than any Unrestricted Funds that relate to DIP Priority B Collateral) with the proceeds of the Term Loan B deposited in the Term Loan B Account and (3) shall not make any disbursements of any proceeds of the Term Loan B or any Unrestricted Funds that relate to DIP Priority B Collateral from the Term Loan B Account other than to the Borrower Disbursement Account for disbursement in accordance with Sections 3(f) and/or 3(h) and Section 3(g) below or otherwise in accordance with Sections 3(f) or 3(h) below.

(c)    The Borrower (1) shall maintain the Term Loan C Account and keep the Term Loan C Account separate and segregated from all of the Borrower's other accounts, (2) shall not co-mingle any of the Borrower's other cash or money (other than any Unrestricted Funds that relate to DIP Priority C Collateral) with the proceeds of the Term Loan C deposited in the Term Loan C Account and (3) shall not make any disbursements of any proceeds of the Term Loan C or any Unrestricted Funds that relate to DIP Priority C Collateral from the Term Loan C Account other than to the Borrower Disbursement Account for disbursement in accordance with Sections 3(f) and/or 3(h) and Section 3(g) below or otherwise in accordance with Sections 3(f) or 3(h) below.

(d)    The Borrower (1) shall maintain the Term Loan D Account and keep the Term Loan D Account separate and segregated from all of the Borrower's other accounts, (2) shall not co-mingle any of the Borrower's other cash or money (other than any Unrestricted Funds that relate to DIP Priority D Collateral) with the proceeds of the Term Loan D deposited in the Term Loan D Account and (3) shall not make any disbursements of any proceeds of the Term Loan D or any Unrestricted Funds that relate to DIP Priority D Collateral from the Term Loan D Account other than to the Borrower Disbursement Account for disbursement in accordance with Sections 3(f) and/or 3(h) and Section 3(g) below or otherwise in accordance with Sections 3(f) or 3(h) below.

(e)    The Borrower (1) shall maintain the Borrower Disbursement Account and keep the Borrower Disbursement Account separate and segregated from all of the Borrower's other accounts, (2) shall not co-mingle any of the Borrower's other cash or money with the proceeds of the Term Loans and/or Unrestricted Funds deposited in the Borrower Disbursement Account pursuant to this Section 3 and (3) shall not make any disbursements of any proceeds of the Term Loans and/or Unrestricted Funds deposited into the Borrower Disbursement Account other than in accordance with Sections 3(f) and/or 3(h) and Section 3(g) below.

(f)    The proceeds of the Term Loans shall be used solely in accordance with the expenditure line items in the Approved Budget (1) in the case of any Term Loan A, to pay fees and expenses in connection with the DIP Priority A Collateral, (2) in the case of any Term Loan B, to pay fees and expenses in connection with the DIP Priority B Collateral, (3) in the case of any Term Loan C, to pay fees and expenses in connection with the DIP Priority C Collateral and (4) in the case of any Term Loan D, (A) to pay fees and expenses (other than fees and expenses described in the immediately preceding clauses (1) through (3)) in connection with the transactions contemplated hereby (including, without limitation, the payment of any of the costs and expenses that are payable by the Borrower, and other payments permitted by the terms of this Note, the other Loan Documents, the Bankruptcy Code, the Bankruptcy Court (by court order), the Interim Order and the Final Order), (B) to pay fees and expenses in connection with the DIP Priority D Collateral and (C) to fund working capital of the Borrower and for other general corporate purposes, including, without limitation, the payment of Case Administration Fees and Professional Fees.

(g)    The Borrower shall not (1) at any time after the Unrestricted Funds Disbursement Date, permit the aggregate amount of Unrestricted Funds in all of the Borrower's checking, savings and/or other accounts (other than any Designated Term Loan Account or the Borrower Disbursement Account) to exceed $10,000 or (2) at any time after the Petition Date, permit the amount of cash deposited into the Borrower Disbursement Account to exceed the amount of cash projected to be disbursed by the Borrower at the end of the next immediately succeeding two-week period as set forth in the Approved Budget, less the aggregate amount of Unrestricted Funds deposited into the Designated Term Loan Accounts and/or the Borrower Disbursement Account that have not been applied to payment of outstanding fees and expenses in accordance with Section 3(h) at such time.

(h)    After the Unrestricted Funds Disbursement Date, the Borrower shall apply all Unrestricted Funds as follows: (1) to the extent any such Unrestricted Funds relate to any DIP Priority A Collateral, (A) the Borrower shall deposit all such Unrestricted Funds into the Term Loan A Account and (B) thereafter apply such Unrestricted Funds to the payment of fees and/or expenses in connection with such DIP Priority A Collateral in accordance with Sections 3(f) and (g) above or otherwise in accordance with Section 3(f) above, (2) to the extent any such Unrestricted Funds relate to any DIP Priority B Collateral, (A) the Borrower shall deposit all such Unrestricted Funds into the Term Loan B Account and (B) thereafter apply such Unrestricted Funds to the payment of fees and/or expenses in connection with such DIP Priority B Collateral in accordance with Sections 3(f) and (g) above or otherwise in accordance with Section 3(f) above, (3) to the extent any such Unrestricted Funds relate to any DIP Priority C Collateral, (A) the Borrower shall deposit all such Unrestricted Funds into the Term Loan C Account and (B) thereafter apply such Unrestricted Funds to the payment of fees and/or expenses in connection with such DIP Priority C Collateral in accordance with Sections 3(f) and (g) above or otherwise in accordance with Section 3(f) above and (4) to the extent any such Unrestricted Funds relate to any DIP Priority D Collateral or such Unrestricted Funds do not relate to any DIP Priority A Collateral, DIP Priority B Collateral or DIP Priority C Collateral, (A) the Borrower shall deposit

all such Unrestricted Funds into the Term Loan D Account and (B) thereafter apply such Unrestricted Funds (i) to pay fees and expenses (other than fees and expenses described in the immediately preceding clauses (1)(B), (2)(B) and (3)(B)) in connection with the transactions contemplated hereby (including, without limitation, the payment of any of the costs and expenses that are payable by the Borrower, and other payments permitted by the terms of this Note, the other Loan Documents, the Bankruptcy Code, the Bankruptcy Court (by court order), the Interim Order and the Final Order), (ii) to pay fees and expenses in connection with the DIP Priority D Collateral and (iii) to fund working capital of the Borrower and for other general corporate purposes, including, without limitation, the payment of Case Administration Fees and Professional Fees.

4.    <u>Conditions Precedent to Interim Term Loans</u>.  The obligation of any Term Loan Lender to make any Interim Term Loan during the Interim Period is subject to the fulfillment, in a manner satisfactory to the applicable Term Loan Lender that would make any such Interim Term Loan, of each of the following conditions precedent:

(a)    the Borrower shall have duly executed and delivered this Note;

(b)    the Borrower shall have commenced the Chapter 11 Case;

(c)    (1) the Bankruptcy Court shall have entered the Interim Order and (2) the Interim Order shall not have been vacated, reversed, modified or amended without the Required Lenders' consent, and no appeal of any such order shall have been timely filed or a stay of such order pending appeal shall be presently effective;

(d)    the Agent and the Term Loan Lenders shall have received on or before the Petition Date, copies of the first day motions to be filed by the Borrower with the Bankruptcy Court in the Chapter 11 Cases, each of which shall be in form and substance satisfactory to the Required Lenders;

(e)    the Borrower shall have delivered the Approved Budget to the Agent and the Term Loan Lenders;

(f)    the Borrower shall have established a cash management system satisfactory to the Required Lenders (in their sole discretion), including each of the Designated Term Loan Accounts and

(g)    the Borrower shall have delivered corporate resolutions, incumbency certificates and similar documents, in form and substance satisfactory to the Required Lenders with respect to this Note and the other Loan Documents and the transactions contemplated hereby and thereby.

5.    <u>Conditions Precedent to Final Term Loans</u>.  The obligation of any Term Loan Lender to make any Final Term Loan during the Final Period is subject to the fulfillment, in a manner satisfactory to the applicable Term Loan Lender that would make any such Final Term Loan, of each of the following conditions precedent:

(a)    the Bankruptcy Court shall have entered the Final Order and

(b)    the Final Order shall not have been vacated, reversed, modified or amended without the Required Lenders' consent, and no appeal of any such order shall have been timely filed or a stay of such order pending appeal shall be presently effective.

6.    <u>Conditions Precedent to All Term Loans</u>.  The obligation of any Term Loan Lender to make any Interim Term Loan during the Interim Period and/or any Final Term Loan during the Final Period is subject to the fulfillment, in a manner satisfactory to the applicable Term Loan Lender that would make any such Term Loan, of each of the following conditions precedent:

(a)    the Borrower shall have paid any and all fees, costs and expenses then payable hereunder or under any Loan Document (including, without limitation, the fees, costs and expenses of counsel to the Agent and each Term Loan Lender) and shall have fully performed all of its obligations hereunder or under any other Loan Document;

(b)    any representation or warranty by the Borrower contained herein or in any other Loan Document shall be true or correct as of such date in any material respect, except to the extent that such representation or warranty expressly relates to an earlier date;

(c)    at the time of and after giving effect to the making of such Term Loan and the application of the proceeds thereof, no Default or Event of Default has occurred and is continuing or would result from the making of the Term Loan to be made on such date;

(d)    the Required Lenders shall be satisfied that the Agent has been granted, and holds for the benefit of the Agents and the Term Loan Lenders, a perfected, first priority Lien on, and security interest in, all of the DIP Collateral, subject only to Permitted Encumbrances and Permitted Priority Encumbrances;

(e)    no event or circumstance shall have occurred since the Petition Date that could reasonably be expected to have a Material Adverse Effect, as determined by the Required Lenders in their sole discretion; and

(f)    the Agent shall have received a Notice of Borrowing with respect to the applicable Term Loan.

7.    <u>Principal</u>.  FOR VALUE RECEIVED, the Borrower promises to pay to the Agent, for the account of the Agent and the account of the Term Loan Lenders, as applicable, in the manner and at the place hereinafter provided, the unpaid principal amount of all Term Loans made by the Term Loan Lenders pursuant to this Note to the Borrower on the Maturity Date.

8.    <u>Interest</u>.

(a)    Interest on the unpaid principal amount of each Term Loan A and each portion of the unpaid principal amount of the Term Loan D held by a Term Loan

D/A Lender (1) shall accrue from the date hereof until paid in full, in arrears, at a rate per annum equal to 9.0% and (2) shall be capitalized and paid in-kind by being added to the outstanding principal balance of such Term Loan A or the outstanding principal balance of such portion of the Term Loan D held by a Term Loan D/A Lender, as applicable, on each applicable Interest Payment Date.

(b)    Interest on the unpaid principal amount of each Term Loan B, each Term Loan C, each Term Loan D/B and each Term Loan D/C held by a Term Loan B Lender, Term Loan C Lender, Term Loan D/B Lender or Term Loan D/C Lender to the extent funded by any holder of Series 2002 Bonds, Series 2015 Bonds or any affiliate thereof (1) shall accrue from the date hereof until paid in full, in arrears, at a rate per annum equal to 9.0% and (2) shall be capitalized and paid in-kind by being added to the outstanding principal balance of such Term Loan, as applicable, on each applicable Interest Payment Date.  No interest shall otherwise accrue on, and/or be payable with respect to, the unpaid principal amount of any Term Loan B, any Term Loan C or any portion of the principal amount of any Term Loan D that is held by UMB as indenture trustee under the Series 2002 Bond Documents or UMB as indenture trustee under the Series 2015 Bond Documents.

(c)    If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(d)    All computations of fees and interest shall be made by the Agent on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable.

(e)    So long as an Event of Default shall have occurred and be continuing, and at the election of the Term Loan Lenders confirmed by written notice from the Agent to the Borrower, the interest rate applicable to the Obligations shall be increased by three percentage points (3.0%) per annum above the rate of interest otherwise applicable hereunder (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations.  Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is cured or waived and shall be payable upon demand.

(f)    Notwithstanding anything to the contrary set forth in this Section 8, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate.

9.    Payments, Generally.

(a)    All payments in respect of this Note shall be made in Dollars in same day funds to the Agent, for the account of the Agent and the account of the Term Loan Lenders, at the following account:

> Name of Bank: UMB Bank N.A., Kansas City, MO
> ABA No.: 101 000 695
> BNF Account No.: 98 000 068 23
> BNF Name: Trust Operations/CT-STL
> OBI Field: Dowling College DIP #145434 Davies/Roberson

or to such other account as shall be designated in a written notice delivered by the Agent to the Borrower at least two Business Days prior to the applicable payment date (the "Agent's Account").

(b)    Promptly after receipt of any payment proceeds by the Agent in the Agent's Account, the Agent shall promptly transfer such payment proceeds to the Agent, the Term Loan Lenders and/or any such Person, as applicable, in accordance with the terms of this Note.

(c)    The Borrower hereby authorizes the Agent to, and the Agent may, from time to time, charge the Loan Account of the Borrower with any amount due and then payable by the Borrower under this Note and any other Loan Document; provided that the Agent provides contemporaneous notice to the Borrower of such charge. The Borrower agrees that the Agent shall have the right to make such charges whether or not any Default or Event of Default shall have occurred and be continuing. Any amount charged to the Loan Account of the Borrower shall be deemed a Term Loan D hereunder made by the Term Loan Lenders to the Borrower. The Borrower confirms that any charges that the Agent may so make to the Loan Account of the Borrower as herein provided will be made as an accommodation to Borrower and solely at the Agent's discretion.

(d)    The Agent shall record on its books and records the amount of each Term Loan made, the interest rate applicable (if any), all payments of principal and interest thereon, the principal balance thereof from time to time outstanding, any amounts charged to the Loan Account that are deemed to be a Term Loan D and any Distributions made. The Agent shall deliver to the Borrower on a monthly basis (within 10 Business Days following the last day of each calendar month) a loan statement setting forth such record for the immediately preceding calendar month. Such record shall, absent manifest error, be conclusive evidence of the amount of the Term Loans made by the Term Loan Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so, or any failure to deliver such loan statement shall not limit or otherwise affect the Obligations of the Borrower hereunder to pay any amount owing with respect to the Term Loans or provide the basis for any claim against the Agent or any Term Loan Lender.

10.    <u>Optional Prepayments</u>.  The Borrower shall have the right at any time and from time to time to prepay the principal of this Note in whole or in part (without premium or penalty).

11.    <u>Mandatory Prepayments</u>.  Immediately upon receipt by the Borrower of any cash proceeds (other than proceeds of any Term Loan), the Borrower shall prepay the Term Loans in an amount equal to 100% of such proceeds.   Any such prepayment shall be applied in accordance with Section 12 below.

12.    <u>Apportionment of Payments</u>.

(a)    Except as specified in Sections 12(b) through 12(h) below, any payment made under this Note shall be applied <u>first</u>, to fees and reimbursable expenses and indemnified liabilities of the Agent then due and payable pursuant to any of the Loan Documents, <u>second</u>, on a pro rata basis among the Term Loan Lenders, to fees and reimbursable expenses and indemnified liabilities of the Term Loan Lenders then due and payable pursuant to any of the Loan Documents, <u>third</u>, on a pro rata basis among the Term Loan Lenders, to interest then due and payable on the Term Loans, <u>fourth</u>, on a pro rata basis among the Term Loan Lenders, to the principal balance of the Term Loans until the same has been paid in full, and <u>fifth</u>, to all other Obligations until the same has been paid in full.

(b)    Any mandatory prepayment of the Term Loans required to be made pursuant to Section 11 resulting from the use, lease, sale or other disposition of any DIP Priority A/Series 1996 Collateral shall be applied, <u>first</u>, to fees and reimbursable expenses and indemnified liabilities of the Agent then due and payable pursuant to any of the Loan Documents, <u>second</u>, to interest then due and payable on the Prepetition Series 1996 Obligations in accordance with the terms of the Series 1996 Bond Documents, <u>third</u>, to the principal balance of the Prepetition Series 1996 Obligations in accordance with the terms of the Series 1996 Bond Documents until the same has been paid in full, <u>fourth</u>, to all other Prepetition Series 1996 Obligations in accordance with the terms of the Series 1996 Bond Documents until the same has been paid in full and <u>fifth</u>, in accordance with clauses "second" through "eighth" of Section 12(c) below.

(c)    Any mandatory prepayment of the Term Loans required to be made pursuant to Section 11 resulting from the use, lease, sale or other disposition of any DIP Priority A Collateral (other than DIP Priority A/Series 1996 Collateral and/or DIP Priority A/B Collateral) shall be applied, <u>first</u>, to fees and reimbursable expenses and indemnified liabilities of the Agent then due and payable pursuant to any of the Loan Documents, <u>second</u>, to fees and reimbursable expenses and indemnified liabilities of the Term Loan A Lenders and the Term Loan D/A Lenders then due and payable pursuant to any of the Loan Documents, <u>third</u>, to interest then due and payable on the Term Loan A Term Loans and the Term Loan D Term Loans held by the Term Loan D/A Lenders, <u>fourth</u>, to the principal balance of the Term Loan A Term Loans and the Term Loan D Term Loans held by the Term Loan D/A Lenders until the same have been paid in full, <u>fifth</u>, to interest then due and payable on the Prepetition A Obligations

in accordance with the terms of the Series 2006 Bond Documents and the Series 2006 Funding Agreement, <u>sixth</u>, to the principal balance of the Prepetition A Obligations in accordance with the terms of the Series 2006 Bond Documents and the Series 2006 Funding Agreement until the same has been paid in full, <u>seventh</u>, to all other Prepetition A Obligations in accordance with the terms of the Series 2006 Bond Documents and the Series 2006 Funding Agreement until the same has been paid in full and <u>eighth</u>, in accordance with clauses "second" through "fifth" of Section 12(a) above.

(d)    Any mandatory prepayment of the Term Loans required to be made pursuant to Section 11 resulting from the use, lease, sale or other disposition of any DIP Priority A/B Collateral shall be applied, <u>first</u>, to fees and reimbursable expenses and indemnified liabilities of the Agent then due and payable pursuant to any of the Loan Documents, <u>second</u>, on a pro rata basis, to fees and reimbursable expenses and indemnified liabilities of the Term Loan B Lenders and the Term Loan D/B Lenders then due and payable pursuant to any of the Loan Documents, <u>third</u>, on a pro rata basis, to interest then due and payable on the Term Loan B Term Loans and the Term Loan D Term Loans held by the Term Loan D/B Lenders, <u>fourth</u>, on a pro rata basis, to the principal balance of the Term Loan B Term Loans and the Term Loan D Term Loans held by the Term Loan D/B Lenders until the same have been paid in full, <u>fifth</u>, on a pro rata basis, to interest then due and payable on the Prepetition B Obligations in accordance with the terms of the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement, <u>sixth</u>, on a pro rata basis, to the principal balance of the Prepetition B Obligations in accordance with the terms of the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full, <u>seventh</u>, on a pro rata basis, to all other Prepetition B Obligations in accordance with the terms of the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full, <u>eighth</u>, to fees and reimbursable expenses and indemnified liabilities of the Term Loan A Lenders and the Term Loan D/A Lenders then due and payable pursuant to any of the Loan Documents, <u>eighth</u>, to interest then due and payable on the Term Loan A Term Loans and the Term Loan D Term Loans held by the Term Loan D/A Lenders, <u>ninth</u>, to the principal balance of the Term Loan A Term Loans and the Term Loan D Term Loans held by the Term Loan D/A Lenders until the same have been paid in full, <u>tenth</u>, to interest then due and payable on the Prepetition A Obligations in accordance with the terms of the Series 2006 Bond Documents and the Series 2006 Funding Agreement, <u>eleventh</u>, to the principal balance of the Prepetition A Obligations in accordance with the terms of the Series 2006 Bond Documents and the Series 2006 Funding Agreement until the same has been paid in full, <u>twelfth</u>, to all other Prepetition A Obligations in accordance with the terms of the Series 2006 Bond Documents and the Series 2006 Funding Agreement until the same has been paid in full and <u>thirteenth</u>, in accordance with clauses "second" through "fifth" of Section 12(a) above.

(e)    Any mandatory prepayment of the Term Loans required to be made pursuant to Section 11 resulting from the use, lease, sale or other disposition of any DIP Priority B Collateral (other than any DIP Priority B/C/Series 1996 Collateral and/or DIP Priority A/B Collateral) shall be applied, <u>first</u>, to fees and reimbursable expenses and indemnified liabilities of the Agent then due and payable pursuant to any

of the Loan Documents, <u>second</u>, on a pro rata basis, to fees and reimbursable expenses and indemnified liabilities of the Term Loan B Lenders and the Term Loan D/B Lenders then due and payable pursuant to any of the Loan Documents, <u>third</u>, on a pro rata basis, to interest then due and payable on the Term Loan B Term Loans and the Term Loan D Term Loans held by the Term Loan D/B Lenders, <u>fourth</u>, on a pro rata basis, to the principal balance of the Term Loan B Term Loans and the Term Loan D Term Loans held by the Term Loan D/B Lenders until the same have been paid in full, <u>fifth</u>, on a pro rata basis, to interest then due and payable on the Prepetition B Obligations in accordance with the terms of the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement, <u>sixth</u>, on a pro rata basis, to the principal balance of the Prepetition B Obligations in accordance with the terms of the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full, <u>seventh</u>, on a pro rata basis, to all other Prepetition B Obligations in accordance with the terms of the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full and <u>eighth</u>, in accordance with clauses "second" through "fifth" of Section 12(a) above.

(f)    Any mandatory prepayment of the Term Loans required to be made pursuant to Section 11 resulting from the use, lease, sale or other disposition of any DIP Priority C Collateral (other than any DIP Priority B/C/Series 1996 Collateral) shall be applied, <u>first</u>, to fees and reimbursable expenses and indemnified liabilities of the Agent then due and payable pursuant to any of the Loan Documents, <u>second</u>, on a pro rata basis, to fees and reimbursable expenses and indemnified liabilities of the Term Loan C Lenders and the Term Loan D/C Lenders then due and payable pursuant to any of the Loan Documents, <u>third</u>, on a pro rata basis, to interest then due and payable on the Term Loan C Term Loans and the Term Loan D Term Loans held by the Term Loan D/C Lenders, <u>fourth</u>, on a pro rata basis, to the principal balance of the Term Loan C Term Loans and the Term Loan D Term Loans held by the Term Loan D/C Lenders until the same have been paid in full, <u>fifth</u>, on a pro rata basis, to interest then due and payable on the Prepetition C Obligations in accordance with the terms of the Series 2015 Bond Documents and the Series 2002/2015 Funding Agreement, <u>sixth</u>, on a pro rata basis, to the principal balance of the Prepetition C Obligations in accordance with the terms of the Series 2015 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full, <u>seventh</u>, on a pro rata basis, to all other Prepetition C Obligations in accordance with the terms of the Series 2015 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full and <u>eighth</u>, in accordance with clauses "second" through "fifth" of Section 12(a) above.

(g)    Any mandatory prepayment of the Term Loans required to be made pursuant to Section 11 resulting from the use, lease, sale or other disposition of any DIP Priority B/C/Series 1996 Collateral shall be applied, <u>first</u>, to fees and reimbursable expenses and indemnified liabilities of the Agent then due and payable pursuant to any of the Loan Documents, <u>second</u>, on a pro rata basis, to fees and reimbursable expenses and indemnified liabilities of the Term Loan C Lenders and the Term Loan D/C Lenders then due and payable pursuant to any of the Loan Documents, <u>third</u>, on a pro rata basis, to interest then due and payable on the Term Loan C Term

Loans and the Term Loan D Term Loans held by the Term Loan D/C Lenders, <u>fourth</u>, on a pro rata basis, to the principal balance of the Term Loan C Term Loans and the Term Loan D Term Loans held by the Term Loan D/C Lenders until the same have been paid in full, <u>fifth</u>, on a pro rata basis, to interest then due and payable on the Prepetition C Obligations in accordance with the terms of the Series 2015 Bond Documents and the Series 2002/2015 Funding Agreement, <u>sixth</u>, on a pro rata basis, to the principal balance of the Prepetition C Obligations in accordance with the terms of the Series 2015 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full, <u>seventh</u>, on a pro rata basis, to all other Prepetition C Obligations in accordance with the terms of the Series 2015 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full, <u>eighth</u>, on a pro rata basis, to fees and reimbursable expenses and indemnified liabilities of the Term Loan B Lenders and the Term Loan D/B Lenders then due and payable pursuant to any of the Loan Documents, <u>ninth</u>, on a pro rata basis, to interest then due and payable on the Term Loan B Term Loans and the Term Loan D Term Loans held by the Term Loan D/B Lenders, <u>tenth</u>, on a pro rata basis, to the principal balance of the Term Loan B Term Loans and the Term Loan D Term Loans held by the Term Loan D/B Lenders until the same have been paid in full, <u>eleventh</u>, on a pro rata basis, to interest then due and payable on (1) the Prepetition B Obligations in accordance with the terms of the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement and (2) the Prepetition Series 1996 Obligations in accordance with the Series 1996 Bond Documents, <u>twelfth</u>, on a pro rata basis, to the principal balance of (1) the Prepetition B Obligations in accordance with the terms of the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full and (2) the Prepetition Series 1996 Obligations in accordance with the Series 1996 Bond Documents until the same has been paid in full, <u>thirteenth</u>, on a pro rata basis, to all other (1) Prepetition B Obligations in accordance with the terms of the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full and (2) Prepetition Series 1996 Obligations in accordance with the Series 1996 Bond Documents until the same has been paid in full and <u>fourteenth</u>, in accordance with clauses "second" through "fifth" of Section 12(a) above.

(h)    Any mandatory prepayment of the Term Loans required to be made pursuant to Section 11 resulting from the use, lease, sale or other disposition of any DIP Priority D Collateral shall be applied <u>first</u>, to fees and reimbursable expenses and indemnified liabilities of the Agent then due and payable pursuant to any of the Loan Documents, <u>second</u>, on a pro rata basis, to fees and reimbursable expenses and indemnified liabilities of the Term Loan D Lenders then due and payable pursuant to any of the Loan Documents, <u>third</u>, on a pro rata basis, to interest then due and payable on the Term Loan D Term Loans, <u>fourth</u>, on a pro rata basis, to the principal balance of the Term Loan D Term Loans until the same has been paid in full and <u>fifth</u>, in accordance with clauses "second" through "fifth" of Section 12(a) above.

(i)    Any payment pursuant to any of Section 12(b), 12(c), 12(d), 12(e), 12(f), 12(g) or 12(h) above (each a "<u>Distribution</u>") shall be made upon at least 5 Business Days prior written notice (each a "<u>Distribution Notice</u>") by the Agent to each Term Loan Lender and the Borrower at the addresses specified in Section 25 or such

other person or persons designated by any such Term Loan Lender in writing to the Agent.  Any such Distribution Notice shall specify how the Agent proposes to apply any such Distribution in accordance with this Section 12.  No such Distribution shall be made by the Agent pursuant to this Section 12(i) without the prior written consent of the Required Lenders, which consent (1) shall not be unreasonably withheld, conditioned or delayed and (2) shall be deemed given if such Distribution is not positively denied by any Lender within 5 Business Days after the Term Loan Lenders' receipt of such Distribution Notice.  The Agent, the Term Loan Lenders and the Borrower agree that (A) the Bankruptcy Court shall have exclusive jurisdiction to resolve any dispute with respect to any Distribution and (B) any action with respect to any such dispute shall be brought in the Bankruptcy Court.

(j)    Notwithstanding anything to the contrary in this Section 12, if the aggregate amount of fees, reimbursable expenses and/or indemnified liabilities of the Agent that are paid pursuant to clause "first" of any of Sections 12(b) through Section 12(g) above exceeds the aggregate amount of fees, expenses and/or indemnified liabilities incurred by the Agent that are solely related to the distribution of the proceeds of the applicable DIP Priority Collateral required pursuant to such Section (any such excess fees and/or expenses, "<u>Non-Distribution Fees and Expenses</u>"), the Term Loan Lenders that do not hold priority prepetition Liens on the DIP Priority Collateral (vis a vis the other Term Loan Lenders) from which such distributed proceeds originated shall promptly pay their Pro Rata Share of such Non-Distribution Fees and Expenses to the Term Loan Lenders that hold priority prepetition Liens on such DIP Priority Collateral (vis a vis the other Term Loan Lenders) from which such distributed proceeds originated.

13.    <u>Fees</u>.

(a)    The Borrower shall pay to the Agent, for the benefit of the Term Loan Lenders, a non-refundable financing fee equal to $200,000, which fee shall be earned in full on the Interim Order Entry Date and due and payable on the Interim Facility Effective Date.

(b)    The Borrower shall pay to the Agent, for the benefit of the Agent, a non-refundable loan servicing set-up fee equal to $4,000, which fee shall be earned in full on the Interim Order Entry Date and due and payable on the Interim Facility Effective Date.  From and after the Interim Facility Effective Date and until the Maturity Date, the Borrower shall pay to the Agent, for the benefit of the Agent, a quarterly loan servicing fee equal to $9,000 each quarter, which shall be payable on the Interim Facility Effective Date (payable ratably based on the number of calendar days remaining in the calendar quarter in which the Interim Facility Effective Date occurs) and quarterly in advance thereafter on the first day of each calendar quarter commencing on January 1, 2017.

14.    <u>Indemnity</u>.  The Borrower shall indemnify and hold harmless the Agent, each Term Loan Lender, each holder, bond insurer and indenture trustee under the Series 1996 Bond Documents, Series 2002 Bond Documents, Series 2006 Bond Documents or Series 2015 Bond

Documents, and each of their respective affiliates, members, officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Note and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents (collectively, "Indemnified Liabilities"); provided, that the Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction. **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.**

15.    Adjustments for Withholding, Capital Adequacy Etc.

(a)    Notwithstanding anything to the contrary contained herein, all payments by the Borrower under this Note shall be made free and clear of and without deduction or withholding for any and all taxes, duties, levies, imposts, deductions, charges or withholdings and all related liabilities, including interest, penalties and additions to tax with respect thereto, excluding taxes imposed on the net income of the Agent or any Term Loan Lender by the jurisdiction in which such Term Loan Lender is organized or has its principal lending office (all such taxes, duties, levies, imposts, deductions, charges, withholdings and liabilities being referred to as "Taxes"). If the Borrower shall be required by applicable law to deduct or withhold any such Taxes from or in respect of any amount payable under this Note, then (1) the amount payable shall be increased as may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Note) each Term Loan Lender receives an amount equal to the amount it would have received if no such deduction or withholding had been made, (2) the Borrower shall make such deductions or withholdings and (3) the Borrower shall immediately pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

(b)    If the effect of the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (including without limitation any tax, duty, charge or withholding on or from payments due from the Borrower (but excluding taxation on the overall net income of any Term Loan Lender)), or any change therein or

in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of each Term Loan Lender with respect to this Note or to increase the cost to each Term Loan Lender of making or maintaining amounts available under this Note, the Borrower agrees to pay each Term Loan Lender such additional amount or amounts as will compensate such Term Loan Lender on an after-tax basis for such reduction or increase.

(c)    The Borrower agrees to immediately pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, financial institutions duties, debits taxes or similar levies (all such taxes, charges, duties and levies being referred to as "Other Taxes") which arise from any payment made by the Borrower under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note.

(d)    The Borrower shall indemnify each Term Loan Lender for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable by the Borrower hereunder) paid by each Term Loan Lender and any liability (including penalties, interest and expenses) arising from or with respect to such Taxes or Other Taxes, whether or not they were correctly or legally asserted.  Payment under this indemnification shall be made upon demand.  A certificate as to the amount of such Taxes or Other Taxes submitted to the Borrower by each Term Loan Lender shall be conclusive evidence, absent manifest error, of the amount due from the Borrower to each Term Loan Lender.

(e)    The Borrower shall furnish to each Term Loan Lender the original or a certified copy of a receipt evidencing payment of Taxes or Other Taxes made by the Borrower within thirty (30) days after the date of any payment of Taxes or Other Taxes.

16.    Priority of Obligations; the Term Loan Lenders' Liens; No Filings Required.  To secure all of the Borrower's Obligations now existing or hereafter arising, the Agent is granted, for the benefit of Term Loan Lenders, (a) the DIP Liens in the DIP Collateral and (b) the DIP Superpriority Claim.  The priority of the DIP Liens and the DIP Superpriority Claim are set forth in the Interim Order or Final Order (as applicable).  The DIP Liens shall be deemed valid and perfected by entry of the Interim Order and/or the Final Order (as applicable).  Neither the Agent nor any Term Loan Lender shall be required to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the DIP Liens granted by or pursuant to this Note, the Interim Order, the Final Order or any other Loan Document.

17.    Further Assurances.  The Borrower agrees that it shall, at the Borrower's expense and upon request of the Agent and/or the Required Lenders, duly execute and deliver or cause to be duty executed and delivered, to the Agent and the Term Loan Lenders such further instruments and do and cause to be done such further acts as may be reasonable and necessary to carry out more effectively the provisions and purposes of this Note or any other Loan Document, including, upon the Agent's and/or the Required Lenders' written request and in form and

substance reasonably satisfactory to the Required Lenders, security agreements, UCC-l financing statements, mortgages and other Collateral Documents granting to the Agent, for the benefit of the Agent and each Term Loan Lender, first priority Liens in the DIP Collateral to secure the Obligations.

18.    <u>Reports and Notices</u>.

(a)    The Borrower hereby agrees to deliver to the Agent and each Term Loan Lender not later than 5:00 p.m. (New York time) on the Thursday of each week commencing on December 8, 2016, a report in form and substance satisfactory to the Required Lenders (in their sole and absolute discretion) (the "<u>Approved Budget Compliance Report</u>"), that sets forth (1) on a cumulative, weekly roll-forward basis through the end of the immediately preceding week, a comparison of (A) the Borrower's actual cash receipts to the Borrower's projected cash receipts and (B) the Borrower's actual cash disbursements to the Borrower's projected cash disbursements, each as set forth in the Approved Budget for such period, together with a certification by an authorized officer of the Borrower submitting such Budget Compliance Report that no Material Adverse Deviation has occurred and (2) all disbursements made by the Borrower from any Designated Term Loan Account for such period.

(b)    The Borrower hereby agrees to deliver, or cause to be delivered to the Agent and each Term Loan Lender, each of the following, which shall be in form and detail reasonably acceptable to the Required Lenders:

(1)    substantially contemporaneously with any payment made by the Borrower pursuant to Section 9, the Borrower, in consultation with the Agent and the Lenders, shall provide to the Agent and each Term Loan Lender at the addresses specified in Section 25 or such other person or persons designated by such Term Loan Lender in writing to the Agent, a written report (in form and substance satisfactory to the Required Lenders in their sole discretion) specifically identifying the source of such payment, including whether such payment is from proceeds of DIP Priority A Collateral, DIP Priority A/B Collateral, DIP Priority A/Series 1996 Collateral, DIP Priority B Collateral, DIP Priority B/C/Series 1996 Collateral, DIP Priority C Collateral and/or DIP Priority D Collateral.

(2)    immediately after any officer of the Borrower obtains knowledge of the occurrence of any Default or Event of Default under any Loan Document, notice of such occurrence, together with a detailed statement by a responsible officer of the Borrower of the steps being taken by Borrower to cure the effect of such Default or Event of Default;

(3)    immediately upon any officer of the Borrower obtaining knowledge thereof, notice of any loss of or material damage to any DIP Collateral or of any substantial adverse change in any DIP Collateral or the prospect of payment thereof, or of the occurrence or existence of any other event or circumstance which has had or could reasonably be expected to have a Material Adverse Effect;

(4)    promptly upon receipt, or if filed by the Borrower, promptly upon filing, all motions, notices, reports, applications, objections, responses or other papers filed or served in the Chapter 11 Case;

(5)    (A) promptly after submission to any governmental authority, (I) all documents and information furnished to such governmental authority in connection with any investigation of the Borrower, other than routine inquiries by such governmental authority, and (II) copies of any periodic or special reports filed by the Borrower with any governmental authority, other than routine reports filed in the ordinary course of business and (B) as soon as available and in any event within five days of the execution, receipt or delivery thereof, copies of material notices and other material communications received from or sent to any governmental authority which specifically relate to the Borrower; and

(6)    promptly upon request, such other information concerning the condition or operations, financial or otherwise, of the Borrower as the Agent or any Term Loan Lender may reasonably request.

The Borrower authorizes any Term Loan Lender to make available to any Prepetition Bondholder, any document delivered by the Borrower to the Agent and the Term Loan Lenders pursuant to this Section 18(b).

(c)    The Borrower authorizes the Agent, each Term Loan Lender and each Prepetition Bondholder, to communicate directly with the Borrower's chief restructuring officer and the Borrower's independent certified public accountants and advisors, and authorizes and shall instruct such officer, accountants and advisors to disclose and make available to the Agent and the Term Loan Lenders as reasonably requested by the Agent or any Term Loan Lender, any and all financial statements and other supporting financial documents, schedules and information relating to the Borrower or any of its subsidiaries (including copies of any issued management letters) with respect to the business, financial condition and other affairs of the Borrower or any of their respective subsidiaries.

19.    <u>Affirmative Covenants</u>.

The Borrower agrees that:

(a)    The Borrower will keep accurate books of record and account pertaining to the DIP Collateral and pertaining to the Borrower's business and financial condition and such other matters as the Agent or any Term Loan Lender may from time to time reasonably request, in which true and complete entries will be made in accordance with GAAP and, upon request of the Agent or any Term Loan Lender, will permit any officer, employee, attorney or accountant or agent of the Agent or such Term Loan Lender to audit, review, make extracts from or copy, at the Borrower's expense, any and all corporate and financial and other books and records of the Borrower at all times during ordinary business hours, to send and discuss with account debtors and other obligors requests for verification of amounts owed to the Borrower,

and to discuss the Borrower's affairs with any of its directors, officers, employees, attorneys, or accountants; underlined provided, that the Agent or any Term Loan Lender shall notify the Borrower in advance of any anticipated communications with accountants. The Borrower will permit the Agent or any Term Loan Lender, or any of their respective officers, employees, accountants, attorneys or agents, to examine and inspect any DIP Collateral or any other property of the Borrower at any time during ordinary business hours and, so long as no Event of Default has occurred and is continuing, upon reasonable prior notice and in a manner not to disrupt the operation of the Borrower's business.

(b)    (i) The Borrower will, except as disclosed to and agreed by the Required Lenders, (A) comply with all requirements of law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect and (B) use and keep the DIP Collateral, and require that others use and keep the DIP Collateral, only for lawful purposes, without violation of any federal, state or local law, statute or ordinance and (ii) the Borrower will obtain, maintain in effect and comply with all permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted.

(c)    The Borrower will pay or discharge, when due (except for any pre-petition taxes and then in conjunction with the confirmation of a plan or Bankruptcy Court order), (i) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of the Borrower (including, without limitation, the DIP Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto (ii) all federal, state and local taxes required to be withheld by it and (iii) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any properties of the Borrower.

(d)    (i) The Borrower will keep and maintain the DIP Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) and will from time to time replace or repair any worn, defective or broken parts, (ii) the Borrower will defend the DIP Collateral against all claims or demands of all Persons (other than the Agent, the Term Loan Lenders and the Prepetition Bondholders acting directly or indirectly through the applicable indenture trustee or bond insurers) claiming the DIP Collateral or any interest therein and (iii) the Borrower will keep all DIP Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances.

(e)    The Borrower will conduct its business and affairs without infringement of or interference with any intellectual property of any other Person in any material respect and shall comply in all material respects with the terms of the written agreements governing the Borrower's use of any intellectual property licenses.

(f)    The Borrower will obtain and at all times maintain insurance with responsible and reputable insurers, in such amounts and against such risks as may from time to time be reasonably required by the Agent, but in all events in such amounts and

against such risks as is usually carried by companies engaged in a similar business and owning similar properties in the same general areas in which the Borrower operates. Without limiting the generality of the foregoing, the Borrower will at all times keep all tangible DIP Collateral insured against risks of fire (including so-called extended coverage), theft, collision (for DIP Collateral consisting of motor vehicles) and such other risks and in such amounts as the Required Lenders and/or the Agent may request, with any loss payable to the Agent to the extent of its interest, and all policies of such insurance shall contain a loss payable endorsement in favor of the Agent, for the benefit of Term Loan Lenders, in form and substance reasonably acceptable to the Required Lenders.  All policies of liability insurance required hereunder shall name the Agent, for the benefit of Term Loan Lenders, as an additional insured.

(g)    Subject to the actions of the Bankruptcy Court in connection with the Chapter 11 Case, the Borrower will preserve and maintain its existence and all of its rights, privileges and franchises necessary or desirable in the normal conduct of its business and shall conduct their business in an orderly, efficient and regular manner.

(h)    The Borrower shall at all times operate its business in a manner consistent with the Approved Budget except to the extent any variance from the Approved Budget has been approved in advance by the Required Lenders in their sole discretion.

(i)    The Borrower shall at all times, at the Borrower's sole cost and expense, retain a chief restructuring officer, in accordance with the terms of a retention agreement, whose identity and terms of retention shall be reasonably acceptable to the Required Lenders.

(j)    The Borrower shall satisfy, in form and substance satisfactory to the Required Lenders, each of the milestones (collectively, the "Chapter 11 Milestones") set forth on Schedule 2 by the date set forth opposite such Chapter 11 Milestone.

(k)    The Borrower shall comply with all terms, conditions, requirements and obligations set forth in the Interim Order or Final Order (as applicable).

20.    Negative Covenants.

The Borrower agrees that, without the prior written consent of the Required Lenders:

(a)    The Borrower shall not assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person, except the endorsement of negotiable instruments by the Borrower for the deposit or collection or similar transactions in the ordinary course of business.

(b)    The Borrower shall not consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to, the Interim Order or the Final Order.

(c)    The Borrower shall not cancel any claim or debt owing to it, except for reasonable consideration negotiated on an arm's-length basis and in ordinary course of its business consistent with past practices.

21.    <u>Events of Default; Rights and Remedies</u>.    Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

A.    The Borrower (i) shall fail to make any payment of principal or interest on, or fees owing in respect of the Term Loans or any of the other Obligations when due and payable or (ii) shall fail to pay or reimburse the Agent or any Term Loan Lender for any expense reimbursable hereunder or under any other Loan Document within three (3) Business Days following the Agent's or such Term Loan Lender's demand for such reimbursement or payment.

B.    The Borrower shall fail or neglect to perform, keep or observe any of the provisions of (i) Sections 3, 18(a), 18(b), 19(b), 19(c), 19(d), 19(e), 19(f), 19(g), 19(h), 19(i), 19(j), 19(k) or 20 or (ii)  Section 19(a) and such failure shall remain uncured for a period of three (3) Business Days after the earlier of the date a senior officer or the Borrower becomes aware of such failure and the date written notice of such default shall have been given by the Agent or any Term Loan Lender to the Borrower.

C.    The Borrower shall fail or neglect to perform, keep or observe any other provision of this Note or any of the other Loan Documents (other than any provision embodied in or covered by any other clause of this Section 21) and the same, if capable of being remedied, shall remain unremedied for two (2) Business Days after the earlier of the date a senior officer or the Borrower becomes aware of such failure and the date written notice of such default shall have been given by the Agent or any Term Loan Lender to the Borrower.

D.    Any representation or warranty herein or in any other Loan Document or in any written statement, report, financial statement or certificate made or delivered to the Agent or any Term Loan Lender by the Borrower is untrue or incorrect in any material respect as of the date when made or deemed made.

E.    The occurrence of any postpetition judgments, liabilities or events that remain unabated and, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

F.    Any provision of any Loan Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or the Borrower shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any Loan Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under any Loan Document shall cease to be a valid and perfected first priority Lien

(except as otherwise permitted herein or therein) in any of the DIP Collateral purported to be covered thereby.

G.      There shall be a material adverse change in the business, assets, operations or financial condition of the Borrower, taken as a whole, other than those customarily caused by the filing of a Chapter 11 Case.

H.      A Material Adverse Deviation shall occur without the Required Lenders' written consent.

I.      The Borrower shall directly or indirectly, by operation of law or otherwise, (i) form or acquire any subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or capital Stock of, or otherwise combine with or acquire, any Person.

J.      The Interim Order Entry Date does not occur on or before December 1, 2016.

K.      The Final Order Entry Date does not occur on or before December 30, 2016.

L.      The Interim Order or the Final Order shall have been stayed, vacated, reversed, modified or amended without the Required Lenders' consent.

M.      A Termination Event shall occur.

N.      An order with respect to the Chapter 11 Case or any Successor Case shall have been entered by the Bankruptcy Court converting the Chapter 11 Case or such Successor Case to a case under Chapter 7 of the Bankruptcy Code.

O.      An order with respect to the Chapter 11 Case or any Successor Case shall have been entered by the Bankruptcy Court dismissing or suspending the Chapter 11 Case or such Successor Case, which does not contain a provision for termination of the Total Term Loan Commitment, and the payment in full in cash of all Obligations of the Borrower hereunder and under the other Loan Documents upon entry thereof.

P.      An order with respect to the Chapter 11 Case or any Successor Case shall have been entered by the Bankruptcy Court appointing, or the Borrower shall file an application for an order with respect to the Chapter 11 Case seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code.

Q.      Any adversary proceeding and/or a contested matter shall have been commenced by any Person in the Chapter 11 Case or any Successor Case challenging under any applicable law the amount, extent, validity, binding effect, enforceability, perfection and/or priority of the security interests, Liens and/or claims of the Lenders in and to the DIP Collateral.

If any Event of Default shall have occurred and be continuing, then the Required Lenders and/or the Agent (at the written direction of the Required Lenders) may, upon written notice to the Borrower: (i) terminate or reduce any Term Loan Commitment, whereupon such Commitment shall immediately be so terminated or reduced, (ii) terminate this Note and the Term Loan facility contemplated hereby with respect to further Term Loans, (iii) declare all or any portion of the Obligations, including without limitation, all or any portion of any Term Loan and the financing fee and/or any loan servicing fee payable pursuant to Section 13, to be forthwith due and payable and (iv) exercise any rights and remedies under the Loan Documents, the Interim Order or the Final Order (as applicable) or at law or in equity.

Except as otherwise provided for in this Note or by applicable law, the Borrower waives: (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Agent on which Borrower may in any way be liable, and hereby ratifies and confirms whatever the Agent may do in this regard, (b) all rights to notice and a hearing prior to the Agent's taking possession or control of, or the Agent's replevy, attachment or levy upon, the DIP Collateral or any bond or security that might be required by any court prior to allowing the Agent to exercise any of its remedies and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, the Agent at the written direction of the Required Lenders is hereby authorized at any time or from time to time, without notice to the Borrower or to any other Person, any such notice being hereby expressly waived, to offset and to appropriate and to apply any and all balances held by it at any of its offices for the account of the Borrower (regardless of whether such balances are then due to the Borrower) and any other properties or assets at any time held or owing by the Agent to or for the credit or for the account of the Borrower against and on account of any of the Obligations that are not paid when due.

To the extent permitted by law and subject in all respects to the terms of the Interim Order or the Final Order (as applicable), the Agent's sole duty with respect to the custody, safekeeping and physical preservation of the DIP Collateral in its possession, under Section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as the Agent deals with similar securities and property as a secured Term Loan Lender in other transactions. The Agent's duty of care with respect to DIP Collateral in the custody or possession of a bailee or other third person shall be deemed fulfilled if it exercises reasonable care in the selection of the bailee or other third person, and the Agent need not otherwise preserve, protect, insure or care for any DIP Collateral, and the Agent shall not be obligated to preserve any rights the Borrower may have against prior parties.

22.    <u>Reference Agreements</u>. This Note evidences the Term Loans that may be made to the Borrower from time to time in the aggregate principal amount outstanding of up to $4,974,779.00 and is issued pursuant to and entitled to the benefits of the Interim Order and Final Order (as applicable) to which reference is hereby made for a more complete statement of

the terms and conditions under which the Term Loans evidenced by this Note are made and are to be repaid.

23.    <u>Definitions</u>.    The following terms used in this Note shall have the following meanings (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

"<u>ACA</u>" means ACA Financial Guaranty Corporation.

"<u>Accounts</u>" means all of the Borrower's now owned and hereafter acquired "accounts" (as defined in the UCC) whether owned or acquired prior to or after the Petition Date and all other rights to payment for goods sold or leased or for services rendered that are not evidenced by an Instrument or Chattel Paper, whether or not any such rights to payment have been earned by performance.

"<u>Agent's Account</u>" shall have the meaning given such term in Section 9(a).

"<u>Approved Budget</u>" means, collectively, the cash flow projections attached hereto as <u>Exhibit A</u>, which are prepared by or on behalf of the Borrower on a weekly basis for the weeks from the Petition Date through the Maturity Date.

"<u>Approved Budget Compliance Report</u>" shall have the meaning given such term in Section 18(a).

"<u>Avoidance Action</u>" means any cause of action arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code and any proceeds therefrom.

"<u>Bankruptcy Court</u>" shall have the meaning given such term in the recital to this Note

"<u>Borrower</u>" shall have the meaning given such term in the recital to this Note.

"<u>Borrower Disbursement Account</u>" means account number xxxx745448 maintained by the Borrower with Signature Bank, or such other deposit account of the Borrower (located in the United States) approved in writing by the Required Lenders.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close.

"<u>Carve-Out</u>" shall have the meaning given such term in the Interim Order or the Final Order, as applicable.

"<u>Case Administration and Professional Fee Reserve</u>" means a reserve against the Total Interim Term Loan Commitment and/or the Total Term Loan Commitment, as applicable, in respect of Case Administration Fees and/or Professional Fees implemented by the Agent at the written direction of the Required Lenders.

"Case Administration Fees" shall have the meaning given such term in the Interim Order or the Final Order, as applicable.

"Cash Management Motion" means the Motion for an Order (i) Authorizing the Closing and Balance Transfers of Certain Prepetition Bank Accounts and Related Relief and (ii) Granting a Limited Waiver of Section 345 Investment and Deposit Requirements filed by the Borrower in the Chapter 11 Case on the Petition Date.

"Cash Management Order" means the Interim Order (i) Authorizing the Closing and Balance Transfers of Certain Prepetition Bank Accounts and Related Relief and (ii) Granting a Limited Waiver of Section 345 Investment and Deposit Requirements entered by the Bankruptcy Court in the Chapter 11 Case.

"Chapter 11 Case" shall have the meaning given such term in the recital to this Note.

"Chapter 11 Milestones" shall have the meaning given such term in Section 19(j).

"Class" means (a) with respect to the Interim Term Loans, any of the following classes of Interim Term Loans: (1) Interim Term Loan A, (2) Interim Term Loan B, (3) Interim Term Loan C and (4) Interim Term Loan D and (b) with respect to the Final Term Loans, any of the following classes of Final Term Loans:  (1) Final Term Loan A, (2) Final Term Loan B, (3) Final Term Loan C and (4) Final Term Loan D.

"Collateral Documents" means any agreement entered into pursuant to Section 17 hereof and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations, including the Interim Order and the Final Order (as applicable).

"Contingent Obligation" means, with respect to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (ii) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (iii) any obligation of such Person, whether or not contingent, (A) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (C) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (D) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to

the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning given such term in Section 8(e).

"Defaulting Lender" means any Term Loan Lender that (i) has failed to (A) fund all or any portion of its Term Loan(s) within 5 Business Days of the date such Term Loan(s) were required to be funded under this Note, unless such Term Loan Lender notifies the Agent, the Borrower and the other Term Loan Lenders in writing that such failure is the result of such Term Loan Lender's good faith determination that one or more conditions precedent to funding has not been satisfied or such Term Loan Lender's good faith inability to determine whether all conditions precedent to funding have been satisfied (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) or (B) pay to the Agent any other amount required to be paid by it under this Note within 5 Business Days of the date when due, (ii) has notified the Borrower, the Agent or any other Term Loan Lender in writing that it does not intend to comply with its funding obligations under this Note, or has made a public statement to that effect (unless such writing or public statement relates to such Term Loan Lender's obligation to fund a Term Loan hereunder and states that such position is based on such Term Loan Lender's good faith determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied) or (iii) has failed, within 5 Business Days after written request by the Agent, the Borrower or any other Term Loan Lender, to confirm in writing to the Agent, the Borrower and the other Term Loan Lenders that it will comply with its prospective funding obligations under this Note.

"Designated Term Loan Account" means any of the Term Loan A Account, the Term Loan B Account, the Term Loan C Account or the Term Loan D Account.

"DIP Collateral" means all of the property, assets or interests in property or assets of the Borrower, of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including, without limitation, all property of the "estate" (within the meaning of the Bankruptcy Code) of the Borrower, and all Accounts, Inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases, all of the equity interests of each subsidiary of the Borrower, all of the equity interests of all other Persons directly owned by the Borrower, money, investment property, deposit accounts, all commercial tort claims and all causes of action arising under the Bankruptcy Code or otherwise (including, without limitation, all Avoidance Actions and the proceeds thereof), and all cash and non-cash proceeds, rents,

products and profits of any of collateral described above; <u>provided</u> that DIP Collateral shall not include funds held, as of the date hereof, under any Prepetition Financing Documents.

"<u>DIP Liens</u>" shall have the meaning set forth in the Interim Order or the Final Order (as applicable).

"<u>DIP Priority Collateral</u>" means, collectively, the DIP Priority A Collateral, the DIP Priority A/B Collateral, the DIP Priority A/Series 1996 Collateral, the DIP Priority B Collateral, the DIP Priority B/C/Series 1996 Collateral, the DIP Priority C Collateral and the DIP Priority D Collateral.

"<u>DIP Priority A Collateral</u>" means, the portion of the DIP Collateral securing the Borrower's obligations under the Series 2006 Bond Documents, including the DIP Collateral specified in the Series 2006 Funding Agreement.

"<u>DIP Priority A/B Collateral</u>" means, the portion of the DIP Collateral (a) securing the Prepetition A Obligations and the Prepetition B Obligations and (b) on which the Liens securing the Prepetition A Obligations are subordinate to the Liens securing the Prepetition B Obligations, if any.

"<u>DIP Priority A/Series 1996 Collateral</u>" means, the portion of the DIP Collateral (a) securing the Prepetition A Obligations and the Prepetition Series 1996 Obligations and (b) on which the Liens securing the Prepetition A Obligations are subordinate to the Liens securing the Prepetition Series 1996 Obligations, if any.

"<u>DIP Priority B Collateral</u>" means, the portion of the DIP Collateral securing the Borrower's obligations under the Series 2002 Bond Documents, including the DIP Collateral specified in the Series 2002/2015 Funding Agreement.

"<u>DIP Priority B/C/Series 1996 Collateral</u>" means, the portion of the DIP Collateral securing the Prepetition B Obligations, the Prepetition C Obligations and the Prepetition Series 1996 Obligations.

"<u>DIP Priority C Collateral</u>" means, the portion of the DIP Collateral securing the Borrower's obligations under the Series 2015 Bond Documents, including the DIP Collateral specified in the Series 2002/2015 Funding Agreement.

"<u>DIP Priority D Collateral</u>" means, all DIP Collateral other than DIP Priority A Collateral, DIP Priority B Collateral and DIP Priority C Collateral.

"<u>DIP Superpriority Claim</u>" means, any claim constituting allowed administrative expenses in the Chapter 11 Case, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, subject only to the prior payment of the Carve-Out.

"Distribution" shall have the meaning given such term in Section 12(i).

"Distribution Notice" shall have the meaning given such term in Section 12(i).

"Dollars" or "$" means lawful currency of the United States of America.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"Event of Default" shall have the meaning given such term in Section 21.

"Final Facility Effective Date" means the date on which all of the conditions precedent set forth in Sections 5 and 6 are satisfied with respect to the Final Term Loans.

"Final Order" means the final order of the Bankruptcy Court with respect to the Borrower, substantially in the form of the Interim Order and acceptable to the Required Lenders, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Required Lenders and the Borrower.

"Final Order Entry Date" means the date on which the Final Order shall have been entered by the Bankruptcy Court.

"Final Period" means the period commencing on the Final Facility Effective Date and ending on the Maturity Date.

"Final Term Loan" means, individually and collectively, each Final Term Loan A, each Final Term Loan B, each Final Term Loan C and each Final Term Loan D.

"Final Term Loan A" shall have the meaning given such term in Section 1.

"Final Term Loan A Commitment" means, with respect to each Term Loan A Lender, the commitment of such Term Loan A Lender to make a Final Term Loan A to the Borrower in the amount set forth in Schedule 1, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Final Term Loan B" shall have the meaning given such term in Section 1.

"Final Term Loan B Commitment" means, with respect to each Term Loan B Lender, the commitment of such Term Loan B Lender to make a Final Term Loan B to the Borrower in the amount set forth in Schedule 1, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Final Term Loan C" shall have the meaning given such term in Section 1.

"Final Term Loan C Commitment" means, with respect to each Term Loan C Lender, the commitment of such Term Loan C Lender to make a Final Term Loan C to the Borrower in the amount set forth in Schedule 1, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Final Term Loan D" shall have the meaning given such term in Section 1.

"Final Term Loan D Commitment" means, with respect to each Term Loan D Lender, the commitment of such Term Loan D Lender to make a Final Term Loan D to the Borrower in the amount set forth in Schedule 1, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"GAAP" means generally accepted accounting principles in the United States of America.

"Indebtedness" means, without duplication, with respect to any Person, (i) all indebtedness of such Person for borrowed money; (ii) all obligations of such Person for the deferred purchase price of property or services (other than trade payables, payables to vendors or other account payables incurred in the ordinary course of such Person's business and not past due for more than 90 days after the date such payable was created); (iii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (iv) all obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or the Agent or the Term Loan Lenders thereunder are limited to repossession or sale of such property; (v) all capitalized lease obligations of such Person; (vi) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (vii) all obligations and liabilities, calculated on a basis reasonably satisfactory to the Required Lenders and in accordance with accepted practice, of such Person under interest rate or currency swaps and other derivatives; (viii) all Contingent Obligations; (ix) all other items which, in accordance with GAAP, would be included as liabilities on the liability side of the balance sheet of such Person; and (x) all obligations referred to in clauses (i) through (ix) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness. The Indebtedness of any Person shall include the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer.

"Indemnified Person" shall have the meaning given such term in Section 14.

"Insurance Motion" means the Motion of Debtor and Debtor in Possession, Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, for an Order Authorizing the Debtor to (i) Continue its Existing Insurance Programs and Related Agreements, Including Premium Financing Agreement and (ii) Pay Certain Prepetition Insurance Premiums, Claims and Related Expenses filed by the Borrower in the Chapter 11 Case on the Petition Date.

"Interest Payment Date" means the first Business Day of each month to occur while any Term Loan A or Term Loan D is outstanding; provided that, in addition to the foregoing, each of (a) the date upon which all of the Term Loan A Term Loans and the Term Loan D Term Loans have been paid in full and (b) the Maturity Date shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued hereunder.

"Interim Facility Effective Date" means the date on which all of the conditions precedent set forth in Sections 4 and 6 are satisfied with respect to the Interim Term Loans.

"Interim Order" means the order of the Bankruptcy Court with respect to the Borrower, substantially in the form of Exhibit B as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Required Lenders and the Borrower.

"Interim Order Entry Date" means the date on which the Interim Order shall have been entered by the Bankruptcy Court.

"Interim Period" means the period commencing on the Interim Facility Effective Date and ending on the earlier to occur of (a) the Final Facility Effective Date and (b) the Maturity Date.

"Interim Term Loan" means, individually and collectively, each Interim Term Loan A, each Interim Term Loan B, each Interim Term Loan C and each Interim Term Loan D.

"Interim Term Loan A" shall have the meaning given such term in Section 1.

"Interim Term Loan A Commitment" means, with respect to each Term Loan A Lender, the commitment of such Term Loan A Lender to make an Interim Term Loan A to the Borrower in the amount set forth in Schedule 1, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Interim Term Loan B" shall have the meaning given such term in Section 1.

"Interim Term Loan B Commitment" means, with respect to each Term Loan B Lender, the commitment of such Term Loan B Lender to make an Interim Term Loan B to the Borrower in the amount set forth in Schedule 1, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Interim Term Loan C" shall have the meaning given such term in Section 1.

"Interim Term Loan C Commitment" means, with respect to each Term Loan C Lender, the commitment of such Term Loan C Lender to make an Interim Term Loan C to the Borrower in the amount set forth in Schedule 1, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Interim Term Loan D" shall have the meaning given such term in Section 1.

"Interim Term Loan D Commitment" means, with respect to each Term Loan D Lender, the commitment of such Term Loan D Lender to make an Interim Term Loan D to the Borrower in the amount set forth in Schedule 1, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Inventory" means, with respect to any Person, all goods and merchandise of such Person, including, without limitation, all raw materials, work-in-process, packaging, supplies,

materials and finished goods of every nature used or usable in connection with the shipping, storing, advertising or sale of such goods and merchandise, whether now owned or hereafter acquired, and all such other similar property the sale or other disposition of which would give rise to an account receivable or cash.

"Lien" means any (i) mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction) and (ii) DIP Lien.

"Liquidation Plan" means a plan of liquidation proposed by the Borrower or any other Person in the Chapter 11 Case.

"Loan Account" means an account maintained hereunder by the Agent on its books of account at the Payment Office, and with respect to the Borrower, in which the Borrower will be charged with all Term Loans made to, and all other Obligations incurred by, the Borrower.

"Loan Documents" means this Note, the Interim Order, the Final Order, the Collateral Documents and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of, the Agent or any Term Loan Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of the Borrower, or any employee of the Borrower, and delivered to the Agent or any Term Loan Lender in connection with this Note or the transactions contemplated thereby.  Any reference in this Note or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Material Adverse Deviation" means, as of the end of each week set forth in the Approved Budget, (i) a negative upward deviation with respect to the cumulative amount of the Approved Budget line item entitled "Total Cash Disbursements" of more than 10.0% or (ii) a negative upward deviation with respect to the cumulative amount of any other Approved Budget disbursement line item of more than 15.0%, in each case, above the cumulative amount permitted to be made for such applicable line item as set forth in the Approved Budget through such period; provided, however, with respect to any Approved Budget disbursement line item under each of the Approved Budget subsections entitled "Series 2006 Bonds/Term Loan A", "Series 2002 Bonds/Term Loan B", "Series 2015 Bonds/Term Loan C" or "Administrative Overhead/Term Loan D", the cumulative amount of disbursements permitted to be made in respect of any such line item or multiple line items in the aggregate may be increased, without duplication, by the amount by which the cumulative amount of disbursements permitted to be made under the heading "Other" in the applicable Approved Budget subsection exceeds the

cumulative amount of disbursements actually made under such heading "Other" in the same applicable Approved Budget subsection.

"Material Adverse Effect" means a material adverse effect on (i) the operations, business assets or properties or condition (financial or otherwise) of the Borrower (other than those resulting solely from the commencement of the Chapter 11 Case), (ii) the ability of the Borrower to perform any of its obligations under any Loan Document to which it is a party (other than those resulting solely from the commencement of the Chapter 11 Case), (iii) the legality, validity or enforceability of this Note or any other Loan Document, (iv) the rights and remedies of the Agent or any Term Loan Lender under any Loan Document or (v) the validity, perfection or priority of a Lien in favor of the Agent or any Term Loan Lender on any of the DIP Collateral.

"Maturity Date" means the earliest of: (i) May 8, 2017 and (ii) the date of the occurrence of a Termination Event.

"Maximum Lawful Rate" shall have the meaning given such term in Section 8(f).

"Non-Distribution Fees and Expenses" shall have the meaning given such term in Section 12(j).

"Notice of Borrowing" shall have the meaning given such term in Section 2.

"Obligations" means all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by the Borrower to the Term Loan Lenders, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under this Note or any of the other Loan Documents.  This term includes all principal, interest, fees, charges, expenses, attorneys' fees and any other sum chargeable to the Borrower under this Note or any of the other Loan Documents.

"Other Taxes" shall have the meaning given such term in Section 15.

"Participant Register" shall have the meaning given such term in Section 25.

"Payment Office" means such office or offices of the Agent as may be designated in writing from time to time by the Agent to the Borrower.

"Permitted Encumbrances" means the following encumbrances:  (a) Liens for taxes or assessments or other governmental charges not yet due and payable; (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding Liens under ERISA); (c) pledges or deposits of money securing use of utilities, bids, tenders, contracts (other than contracts for the payment of money) or leases to which the Borrower is a party as lessee made in the ordinary course of business; (d) inchoate and unperfected workers', mechanics' or similar liens arising in the ordinary course of business, so long as such Liens attach only to equipment, fixtures or real estate; (e) Liens existing on the Petition Date in respect of perfected

workers', mechanics' or similar Liens, as described on <u>Schedule 3</u>; (f) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which the Borrower is a party; (g) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto so long as the same do not materially impair the use, value, or marketability of such real estate; (h) purchase money security interests and capital leases incurred prior to the Petition Date; (i) Liens pursuant to and permitted under the Prepetition Financing Documents, (j) the Liens in favor of the Term Loan Lenders securing the Obligations and (k) Liens pursuant to the Premium Financing Agreement.

"<u>Permitted Priority Encumbrances</u>" means all Permitted Encumbrances other than the Liens permitted under clauses (a), (d), (e) and (i) of the definition of the term "Permitted Encumbrances."

"<u>Person</u>" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"<u>Petition Date</u>" shall have the meaning given such term in the recital to this Note.

"<u>Premium Financing Agreement</u>" shall have the meaning given such term in the Insurance Motion.

"<u>Prepetition A Obligations</u>" means, the Borrower's obligations under the Series 2006 Bond Documents and the Series 2006 Funding Agreement owing to the Term Loan A Lenders.

"<u>Prepetition B Obligations</u>" means, the Borrower's obligations under the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement owing to the Term Loan B Lenders.

"<u>Prepetition Bondholders</u>" means the bondholders party to the Prepetition Financing Documents.

"<u>Prepetition C Obligations</u>" means, the Borrower's obligations under the Series 2015 Bond Documents and the Series 2002/2015 Funding Agreement owing to the Term Loan C Lenders.

"<u>Prepetition Debt Obligations</u>" means, the Prepetition A Obligations, the Prepetition B Obligations and the Prepetition C Obligations.

"<u>Prepetition Financing Documents</u>" means the Series 1996 Bond Documents, Series 2002 Bond Documents, Series 2006 Bond Documents, Series 2015 Bond Documents, Series 2006 Funding Agreement and Series 2002/2015 Funding Agreement.

"<u>Prepetition Series 1996 Obligations</u>" means, the Borrower's obligations under the Series 1996 Bond Documents.

"Professional Fees" shall have the meaning set forth in the Interim Order or the Final Order (as applicable).

"Pro Rata Share" means

(a)    (i) with respect to a Term Loan A Lender's obligation to make an Interim Term Loan A and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (x) such Term Loan A Lender's Interim Term Loan A Commitment, by (y) the Total Interim Term Loan A Commitment, provided that if the Total Interim Term Loan A Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Term Loan A Lender's portion of the Interim Term Loan A Term Loans and the denominator shall be the aggregate unpaid principal amount of the Interim Term Loan A Term Loans, and (ii) with respect to a Term Loan A Lender's obligation to make a Final Term Loan A and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (x) such Term Loan A Lender's Final Term Loan A Commitment, by (y) the Total Final Term Loan A Commitment, provided that if the Total Final Term Loan A Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Term Loan A Lender's portion of the Final Term Loan A Term Loans and the denominator shall be the aggregate unpaid principal amount of the Final Term Loan A Term Loans;

(b)    (i) with respect to a Term Loan B Lender's obligation to make an Interim Term Loan B and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (x) such Term Loan B Lender's Interim Term Loan B Commitment, by (y) the Total Interim Term Loan B Commitment, provided that if the Total Interim Term Loan B Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Term Loan B Lender's portion of the Interim Term Loan B Term Loans and the denominator shall be the aggregate unpaid principal amount of the Interim Term Loan B Term Loans, and (ii) with respect to a Term Loan B Lender's obligation to make a Final Term Loan B and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (x) such Term Loan B Lender's Final Term Loan B Commitment, by (y) the Total Term Loan B Commitment, provided that if the Total Term Loan B Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Term Loan B Lender's portion of the Final Term Loan B Term Loans and the denominator shall be the aggregate unpaid principal amount of the Final Term Loan B Term Loans;

(c)    (i) with respect to a Term Loan C Lender's obligation to make an Interim Term Loan C and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (x) such Term Loan C Lender's Interim Term Loan C Commitment, by (y) the Total Interim Term Loan C Commitment, provided that if the Total Interim Term Loan C Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Term Loan C Lender's portion of the Interim Term Loan C Term Loans and the denominator shall be the aggregate unpaid principal amount of the Interim Term Loan C Term Loans, and (ii) with respect to a Term Loan C Lender's obligation to make a Final Term Loan C and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (x) such Term Loan Lender's Final Term Loan C

Commitment, by (y) the Total Term Loan C Commitment, <u>provided</u> that if the Total Term Loan C Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Term Loan C Lender's portion of the Final Term Loan C Term Loans and the denominator shall be the aggregate unpaid principal amount of the Final Term Loan C Term Loans,

(d)     (i) with respect to a Term Loan D Lender's obligation to make the Interim Term Loan D and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (x) such Term Loan D Lender's Interim Term Loan D Commitment, by (y) the Total Interim Term Loan D Commitment, <u>provided</u> that if the Total Interim Term Loan D Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Term Loan D Lender's portion of the Interim Term Loan D Term Loans and the denominator shall be the aggregate unpaid principal amount of the Interim Term Loan D Term Loans, and (ii) with respect to a Term Loan D Lender's obligation to make a Final Term Loan D and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (x) such Term Loan D Lender's Final Term Loan D Commitment, by (y) the Total Term Loan D Commitment, <u>provided</u> that if the Total Term Loan D Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Term Loan D Lender's portion of the Final Term Loan D Term Loans and the denominator shall be the aggregate unpaid principal amount of the Final Term Loan D Term Loans; and

(e)     with respect to all other matters regarding a Term Loan Lender, the percentage obtained by dividing (x) the sum of such Term Loan Lender's portion of the Total Term Loan Commitment and the unpaid principal amount of such Term Loan Lender's portion of the Term Loans, by (y) the sum of the Total Term Loan Commitment and the aggregate unpaid principal amount of the Term Loans, <u>provided</u>, that, if such Term Loan Lender's portion of the Total Term Loan Commitment shall have been reduced to zero, such Lender's portion of the Total Term Loan Commitment shall be deemed to be the aggregate unpaid principal amount of such Lender's Term Loans and if the Total Term Loan Commitment shall have been reduced to zero, the Total Term Loan Commitment shall be deemed to be the aggregate unpaid principal amount of all Term Loans.

"<u>PSA</u>" shall have the meaning given such term in the Debtor's Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 for an Order Authorizing the Debtor to Enter Into and Perform Under Plan Support Agreement, filed by the Borrower in the Chapter 11 Case on the Petition Date.

"<u>Register</u>" shall have the meaning given such term in Section 25.

"<u>Registered Loans</u>" shall have the meaning given such term in Section 25.

"<u>Related Fund</u>" means, with respect to any Person, an affiliate of such Person, or a fund or account managed by such Person or an affiliate of such Person.

"<u>Required Lenders</u>" means (a) in the case of any amendment, waiver and/or consent that solely affects the Term Loan A Term Loans or the DIP Priority A Collateral, ACA,

(b) in the case of any amendment, waiver and/or consent that solely affects the Term Loan B Term Loans or the DIP Priority B Collateral, Term Loan B Lenders whose Pro Rata Shares aggregate at least 50.1% of the Term Loan B Lenders, (c) in the case of any amendment, waiver and/or consent that solely affects the Term Loan C Term Loans or the DIP Priority C Collateral, Term Loan C Lenders whose Pro Rata Shares aggregate at least 50.1% of the Term Loan C Lenders, (d) in the case of any amendment, waiver and/or consent that directly affects the Term Loan D Term Loans or any DIP Priority D Collateral, Term Loan D Lenders whose Pro Rata Shares aggregate at least 90% of the Term Loan D Lenders and (e) in the case of any other amendment, waiver and/or consent not described in the immediately preceding clauses (a) through (d), Term Loan Lenders whose Pro Rata Shares (calculated in accordance with clause (e) of the definition thereof) aggregate at least 90% of the Term Loan Lenders.

"Restricted Funds" shall have the meaning given such term in the Cash Management Motion.

"Series 1996 Bond Documents" means, collectively, (a) the Indenture of Trust, dated as of June 1, 1996, between the Suffolk County Industrial Development Agency and UMB, as indenture trustee, (b) the bonds issued under the foregoing indenture, and (c) all other documents evidencing and/or securing the foregoing indenture and bonds.

"Series 1996 Collateral" means, the portion of the DIP Collateral securing the Borrower's obligations under the Series 1996 Bond Documents.

"Series 2002 Bond Documents" means, collectively, (a) the Indenture of Trust, dated as of November 1, 2002, between the Town of Brookhaven Industrial Development Agency and UMB, as indenture trustee, (b) the bonds issued under the foregoing indenture, and (c) all other documents evidencing and/or securing the foregoing indenture and bonds.

"Series 2002/2015 Funding Agreement" means that certain Conditional Funding Agreement, as amended, dated as of August 4, 2016, among the Borrower, UMB, as indenture trustee under the Series 2002 Bond Documents, UMB, as indenture trustee under the Series 2015 Bond Documents, and the holders of bonds under the Series 2002 Bond Documents and the Series 2015 Bond Documents.

"Series 2006 Bond Documents" means, collectively, (a) the Indenture of Trust, dated as of June 1, 2006, between the Suffolk County Industrial Development Agency and Wilmington Trust, as indenture trustee, (b) the bonds issued under the foregoing indenture, and (c) all other documents evidencing and/or securing the foregoing indenture and bonds.

"Series 2006 Funding Agreement" means that certain Conditional Funding Agreement, as amended, dated as of August 4, 2006, among the Borrower, Wilmington Trust, as indenture trustee under the 2006 Bond Documents, and ACA, as bond insurer under the 2006 Bond Documents.

"Series 2015 Bond Documents" means the Indenture of Trust, dated as of June 15, 2015, between the Borrower and UMB, as indenture trustee, (b) the bonds issued under the foregoing indenture, and (c) all other documents evidencing and/or securing the foregoing indenture and bonds.

"Stock" means all shares, options, warrants, general or limited partnership interests or other equivalents (regardless of how designated) of or in a corporation, partnership or equivalent entity whether voting or nonvoting, including common stock, preferred stock or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act).

"Stockholder" means with respect to any Person, each holder of Stock of such Person.

"Successor Case" shall have the meaning given such term in the Interim Order or the Final Order, as applicable.

"Taxes" shall have the meaning given such term in Section 10.

"Term Loan" and "Term Loans" means, individually and collectively, each Term Loan A, each Term Loan B, each Term Loan C and each Term Loan D.

"Term Loan A" means, individually and collectively, each Interim Term Loan A and each Final Term Loan A made by each Term Loan A Lender to the Borrower pursuant to Section 1.

"Term Loan A Account" means account number xxxx745456 maintained by the Borrower with Signature Bank, or such other deposit account of the Borrower (located in the United States) approved in writing by the Required Lenders.

"Term Loan A Commitment" means, with respect to each Term Loan Lender, the commitment of such Term Loan Lender to make the Term Loan A to the Borrower in the amount set forth in Schedule 1, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Term Loan A Lender" means ACA, Wilmington Trust and each other Term Loan Lender with a Term Loan A Commitment or a Term Loan A.

"Term Loan A Obligations" means any Obligations with respect to the Term Loan A (including, without limitation, the principal thereof, the interest thereon, and the fees and expenses specifically related thereto).

"Term Loan A Unrestricted Funds Amount" means, as of any date of determination, the sum of (x) the aggregate amount of Unrestricted Funds that the Borrower has deposited into the Term Loan A Account as of such date, plus, (y) the aggregate amount of Unrestricted Funds that the Borrower is required to deposit into the Term Loan A Account as of such date pursuant to Section 3, but has not deposited into such account as of such date.

"Term Loan B" means, individually and collectively, each Interim Term Loan B and each Final Term Loan B made by each Term Loan B Lender to the Borrower pursuant to Section 1.

"<u>Term Loan B Account</u>" means account number xxxx745464 maintained by the Borrower with Signature Bank, or such other deposit account of the Borrower (located in the United States) approved in writing by the Required Lenders.

"<u>Term Loan B Commitment</u>" means, with respect to each Term Loan Lender, the commitment of such Term Loan Lender to make the Term Loan B to the Borrower in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Term Loan B Lender</u>" means UMB (as indenture trustee under the Series 2002 Bond Documents) and each other Term Loan Lender with a Term Loan B Commitment or a Term Loan B.

"<u>Term Loan B Obligations</u>" means any Obligations with respect to the Term Loan B (including, without limitation, the principal thereof, the interest thereon, and the fees and expenses specifically related thereto).

"<u>Term Loan B Unrestricted Funds Amount</u>" means, as of any date of determination, the sum of (x) the aggregate amount of Unrestricted Funds that the Borrower has deposited into the Term Loan B Account as of such date, <u>plus</u>, (y) the aggregate amount of Unrestricted Funds that the Borrower is required to deposit into the Term Loan B Account as of such date pursuant to Section 3, but has not deposited into such account as of such date.

"<u>Term Loan C</u>" means, individually and collectively, each Interim Term Loan C and each Final Term Loan C made by each Term Loan C Lender to the Borrower pursuant to Section 1.

"<u>Term Loan C Account</u>" means account number xxxx745472 maintained by the Borrower with Signature Bank, or such other deposit account of the Borrower (located in the United States) approved in writing by the Required Lenders.

"<u>Term Loan C Commitment</u>" means, with respect to each Term Loan Lender, the commitment of such Term Loan Lender to make the Term Loan C to the Borrower in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Term Loan C Lender</u>" means UMB (as indenture trustee under the Series 2015 Bond Documents) and each other Term Loan Lender with a Term Loan C Commitment or a Term Loan C.

"<u>Term Loan C Obligations</u>" means any Obligations with respect to the Term Loan C (including, without limitation, the principal thereof, the interest thereon, and the fees and expenses specifically related thereto).

"<u>Term Loan C Unrestricted Funds Amount</u>" means, as of any date of determination, the sum of (x) the aggregate amount of Unrestricted Funds that the Borrower has deposited into the Term Loan C Account as of such date, <u>plus</u>, (y) the aggregate amount of

Unrestricted Funds that the Borrower is required to deposit into the Term Loan C Account as of such date pursuant to Section 3, but has not deposited into such account as of such date.

"Term Loan Commitment" means any Term Loan A Commitment, Term Loan B Commitment, Term Loan C Commitment and/or Term Loan D Commitment.

"Term Loan D" means, individually and collectively, each Interim Term Loan D and each Final Term Loan D made by each Term Loan D Lender to the Borrower pursuant to Section 1.

"Term Loan D/A Lender" means ACA, Wilmington Trust and any other Term Loan D Lender that is also a Term Loan A Lender.

"Term Loan D Account" means account number xxxx745480 maintained by the Borrower with Signature Bank, or such other deposit account of the Borrower (located in the United States) approved in writing by the Required Lenders.

"Term Loan D/B Lender" means UMB (as indenture trustee under the Series 2002 Bond Documents) and any other Term Loan D Lender that is also a Term Loan B Lender.

"Term Loan D/C Lender" means UMB, as indenture trustee under the Series 2002 Bond Documents and any other Term Loan D Lender that is also a Term Loan C Lender.

"Term Loan D Commitment" means, with respect to each Term Loan Lender, the commitment of such Term Loan Lender to make the Term Loan D to the Borrower in the amount set forth in Schedule 1, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Term Loan D Lender" means ACA, Wilmington Trust, UMB (as indenture trustee under the Series 2015 Bond Documents) and each other Term Loan Lender with a Term Loan D Commitment or a Term Loan D.

"Term Loan D Obligations" means any Obligations with respect to the Term Loan D (including, without limitation, the principal thereof, the interest thereon, and the fees and expenses specifically related thereto).

"Term Loan D Unrestricted Funds Amount" means, as of any date of determination, the sum of (x) the aggregate amount of Unrestricted Funds that the Borrower has deposited into the Term Loan D Account as of such date, plus, (y) the aggregate amount of Unrestricted Funds that the Borrower is required to deposit into the Term Loan D Account as of such date pursuant to Section 3, but has not deposited into such account as of such date.

"Term Loan Lender" means any Term Loan A Lender, Term Loan B Lender, Term Loan C Lender and/or Term Loan D Lender, as the context may require.

"Termination Event" shall have the meaning given such term in the Interim Order or the Final Order, as applicable.

"<u>Total Final Term Loan A Commitment</u>" means the sum of the amounts of the Term Loan A Lenders' Final Term Loan A Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Final Term Loan B Commitment</u>" means the sum of the amounts of the Term Loan B Lenders' Final Term Loan B Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Final Term Loan C Commitment</u>" means the sum of the amounts of the Term Loan C Lenders' Final Term Loan C Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Final Term Loan D Commitment</u>" means the sum of the amounts of the Term Loan D Lenders' Final Term Loan D Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Interim Term Loan A Commitment</u>" means the sum of the amounts of the Term Loan A Lenders' Interim Term Loan A Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Interim Term Loan B Commitment</u>" means the sum of the amounts of the Term Loan B Lenders' Interim Term Loan B Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Interim Term Loan C Commitment</u>" means the sum of the amounts of the Term Loan C Lenders' Interim Term Loan C Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Interim Term Loan Commitment</u>" means the sum of the amounts of the Term Loan Lenders' Total Interim Term Loan A Commitments, Total Interim Term Loan B Commitments, Total Interim Term Loan C Commitments and Total Interim Term Loan D Commitments, in the amounts set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Interim Term Loan D Commitment</u>" means the sum of the amounts of the Term Loan D Lenders' Interim Term Loan D Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Term Loan A Commitment</u>" means the sum of the amounts of the Term Loan A Lenders' Total Interim Term Loan A Commitments and Total Final Term Loan A

Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Term Loan B Commitment</u>" means the sum of the amounts of the Term Loan B Lenders' Total Interim Term Loan B Commitments and Total Final Term Loan B Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Term Loan C Commitment</u>" means the sum of the amounts of the Term Loan C Lenders' Total Interim Term Loan C Commitments and Total Final Term Loan C Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Term Loan Commitment</u>" means the sum of the amounts of the Term Loan Lenders' Total Term Loan A Commitments, Total Term Loan B Commitments, Total Term Loan C Commitments and Total Term Loan D Commitments, in the amounts set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Term Loan D Commitment</u>" means the sum of the amounts of the Term Loan D Lenders' Total Interim Term Loan D Commitments and Total Final Term Loan D Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Unrestricted Funds Amount</u>" means, as of any date of determination, the sum of (x) the aggregate amount of Unrestricted Funds that the Borrower has deposited into all Designated Term Loan Accounts as of such date, <u>plus</u>, (y) the aggregate amount of Unrestricted Funds that the Borrower is required to deposit into Designated Term Loan Accounts as of such date pursuant to Section 3, but has not deposited into such accounts as of such date.

"<u>UCC</u>" means the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of New York or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the DIP Collateral, the Uniform Commercial Code (or any successor statute) of such state.

"<u>UMB</u>" shall have the meaning given such term in the recital to this Note.

"<u>Unrestricted Funds</u>" means all cash or money of the Borrower as of the Petition Date that does not constitute Restricted Funds.

"<u>Unrestricted Funds Disbursement Date</u>" means the date that is 30 days after the Petition Date (or such later date specified in decretal paragraph 3 of the Cash Management Order).

"<u>Wilmington Trust</u>" means Wilmington Trust, National Association.

24.    <u>Representations and Warranties</u>.  The Borrower represents as follows:

(a)    the Borrower is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, except as affected by the commencement of the Chapter 11 Case;

(b)    the execution and delivery of this Note and the other Loan Documents and the performance by the Borrower of the Borrower's obligations hereunder and under the other Loan Documents are within its corporate powers, have been duly authorized by all necessary corporate action of the Borrower and its respective members, shareholders and affiliates, have received all necessary bankruptcy, insolvency or governmental approvals, and do not and will not contravene or conflict with any provisions of applicable law or of the Borrower's or any of its respective shareholders or affiliates corporate charter or by-laws or of any agreements binding upon or applicable to the Borrower or any of its respective affiliates or any of the Borrower's properties;

(c)    the Chapter 11 Case has been duly authorized by all necessary legal and corporate action by or on behalf of the Borrower and has been duly and properly commenced;

(d)    this Note and each other Loan Document is the legal, valid and binding obligation, enforceable against the Borrower in accordance with its terms except as limited by equitable principles relating to enforceability;

(e)    the Borrower has good and marketable title to, or valid leasehold or contractual interests in, all of its property and assets; none of the properties and assets of the Borrower are subject to any Liens other than Permitted Encumbrances and Permitted Priority Encumbrances, and there are no facts, circumstances conditions that may result in any Liens other than Permitted Encumbrances and Permitted Priority Encumbrances;

(f)    no information contained in this Note, any of the other Loan Documents, any projections, financial statements or collateral reports or other reports from time to time delivered hereunder or any written statement furnished by or on behalf of the Borrower to the Agent or any Term Loan Lender pursuant to the terms of this Note, any Loan Document or otherwise contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.  The Liens granted to the Term Loan Lenders pursuant to the Collateral Documents will at all times be fully perfected first priority Liens in and to the DIP Collateral described therein, subject, as to priority, only to Permitted Priority Encumbrances;

(g)    except for proceedings in the Chapter 11 Case, in connection with the entry of the Interim Order and Final Order, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of the Borrower, threatened against the Borrower before any governmental authority or before any arbitrator or panel of arbitrators that (i) challenges the Borrower's right or power to

enter into or perform any of its obligations under the Loan Documents to which it is a party, or the validity or enforceability of any Loan Document or any action taken thereunder or (ii) has a reasonable risk of being determined adversely to the Borrower and that, if so determined, could have a Material Adverse Effect;

(h)     to the best of the Borrower's knowledge, each of its Accounts, contracts, contract rights, tangible chattel paper, intangible or electronic chattel paper, documents, instruments, general intangibles, supporting obligations and other rights, remedies, obligations or other intangibles of any kind (i) is and will be genuine, and in all respects what it purports to be, and is not and will not be evidenced by a judgment, an instrument or chattel paper (unless such judgment shall have been assigned to the Agent in such manner as the Agent shall deem necessary or appropriate to perfect and preserve its first priority security interest therein and unless, if so requested by the Agent and/or the Required Lenders, such instrument shall have been endorsed and delivered to or at the direction of the Agent and/or the Required Lenders and, in the case of tangible chattel paper, if so requested by the Agent and/or the Required Lenders, delivered to the Agent and/or the Required Lenders); (ii) represents and will represent a bona fide transaction completed or in progress in accordance with the terms and provisions contained in the invoices and purchase orders relating thereto, and the underlying transactions giving rise thereto do not and will not in any way violate any requirements of law; and (iii) is and will be in the amount shown on the Borrower's records, which amount is and will be actually and absolutely owing to the Borrower and not contingent or subject to any rights of set-off or reduction for any reason other than regular discounts, credits or adjustments allowed by the Borrower in the ordinary course of its business;

(i)     except as disclosed to the Agent and the Term Loan Lenders, all Federal, state and local tax returns and other reports required by applicable law to be filed by the Borrower have been filed, or extensions have been obtained, and all taxes, assessments and other governmental charges imposed upon the Borrower or any property of the Borrower and which have become due and payable on or prior to the date hereof have been paid, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP;

(j)     the execution, delivery and performance of this Note and the other Loan Documents will not (immediately or with the giving of notice or passage of time, or both) (i) violate the articles of incorporation or bylaws of the Borrower, or violate any law or regulation; or (ii) result in the creation or imposition of any Lien upon any of the property of the Borrower, except in favor of the Agent; and

(k)     except for the Chapter 11 Case and other matters previously disclosed to the Term Loan Lenders, there is no order, notice, claim, litigation, proceeding or investigation pending or threatened against or in any way affecting (i) the Borrower, whether or not covered by insurance, that would reasonably be expected to have a Material Adverse Effect or (ii) this Note or any other Loan Document.

25.    <u>Miscellaneous</u>.

(a)    All notices and other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, telecopied, cabled or delivered as follows:

(1)    if to the Borrower, at Dowling College, c/o Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, New York, New York 10036-7203, Attn: Sean C. Southard, Esq., Facsimile: (212) 972-2245, with a copies to RSR Consulting, LLC, c/o Dowling College, 150 Idle Hour Blvd., Oakdale, New York 11769, Attn: Robert S. Rosenfeld, CPA, CFE, Facsimile: (212) 658-0347; and

(2)    if to the Agent and/or the Term Loan Lenders, at UMB Bank, National Association, 2 South Broadway, Suite 600, St. Louis, Missouri 63102, Attn: Laura Roberson, Senior Vice President, Facsimile: (314) 612-8499, with copies to (A) Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: P. Miyoko Sato, Esq., Facsimile: (617) 542-2241 and (B) Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Attention: Brian D. Pfeiffer, Esq., Facsimile: (212)-593-5955;

or in each case at such other address as shall be designated by the Agent, the Term Loan Lenders or the Borrower.  All such notices and communications shall, when mailed or sent by overnight courier, be effective when deposited in the mails or delivered to the overnight courier, as the case may be, or when sent by telecopier be effective when confirmation is received.

(b)    The Borrower shall reimburse the Agent and the Term Loan Lenders for all out-of-pocket expenses incurred in connection with the negotiation and preparation of the Loan Documents and the obtaining of approval of the Loan Documents by the Bankruptcy Court (including the fees and expenses of Schulte Roth & Zabel LLP and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., counsel for the Agent and the Term Loan Lenders, all of their special local counsel, advisors, consultants and auditors retained in connection with the Loan Documents and advice in connection therewith).  The Borrower shall reimburse the Agent and the Term Loan Lenders for all reasonable fees, costs and expenses, including the reasonable fees, costs and expenses of counsel or other advisors for advice, assistance, or other representation in connection with:

(1)    any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the Loan Documents or advice in connection with the administration of the Term Loans made pursuant hereto or its rights hereunder or thereunder;

(2)    the review of pleadings and documents related to the Chapter 11 Case and any subsequent Chapter 7 case, attendance at meetings related to the Chapter 11 Case and any subsequent Chapter 7 case, and general monitoring of the Chapter 11 Case and any subsequent Chapter 7 case;

(3)     any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Agent, the Term Loan Lenders, the Borrower or any other Person, and whether as a party, witness or otherwise) in any way relating to the DIP Collateral, any of the Loan Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against the Borrower or any other Person that may be obligated to the Agent or the Term Loan Lenders by virtue of the Loan Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(4)     any attempt to enforce any remedies of the Agent or the Term Loan Lenders against the Borrower or any other Person that may be obligated to the Agent or the Term Loan Lenders by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(5)     any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default; and

(6)     any efforts to (i) monitor the Term Loans or any of the other Obligations, (ii) evaluate, observe or assess the Borrower or its respective affairs, and (iii) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the DIP Collateral;

including, as to each of clauses (1) through (6) above, all attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 26(b), all of which shall be payable, on demand, by the Borrower to the Agent.  Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include:  fees, costs and expenses of accountants, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram or telecopy charges; secretarial overtime charges; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.  All expenses incurred by the Agent shall receive super priority administrative expense status per Section 364(c)(1) of the Bankruptcy Code.

(c)     No failure or delay on the part of the Agent or the Term Loan Lenders or any other holder of this Note (or any portion thereof) to exercise any right, power or privilege under this Note and no course of dealing between the Borrower and the Agent and Term Loan Lenders shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise

thereof or the exercise of any other right, power or privilege. The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that the Term Loan Lenders would otherwise have. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Term Loan Lenders to any other or further action in any circumstances without notice or demand.

(d) The Borrower and any endorser of this Note hereby consents to renewals and extensions of time at or after the maturity hereof without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind except as otherwise expressly provided herein and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(e) If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(f) **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF BORROWER, THE AGENT AND THE TERM LOAN LENDERS HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

(g) **THE BORROWER AND, BY THEIR ACCEPTANCE OF THIS NOTE, THE TERM LOAN LENDERS AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREES TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE TERM LOAN LENDERS'/BORROWER'S RELATIONSHIP THAT IS BEING ESTABLISHED**. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims. The Borrower and, by their acceptance of this Note, the Term Loan Lenders and any subsequent holder of this Note, each (i) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this relationship, and that each will continue to rely on this waiver in their related future dealings and (ii) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. **THIS WAIVER IS IRREVOCABLE,**

**MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS OF THIS NOTE**.  In the event of litigation, this provision may be filed as a written consent a trial by the court.

(h)    The Borrower hereby waives the benefit of any statute or rule of law or judicial decision which would otherwise require that the provisions of this Note be construed or interpreted most strongly against the party responsible for the drafting thereof.

(i)    The Borrower shall not have the right to assign its obligations or liabilities under this Note without the prior written consent of the Required Lenders. Subject to registration in accordance with paragraph (m) of this Section 25, each Term Loan Lender may assign to one or more entities (other than any Defaulting Lender) all or any part of, or may grant participation's to one or more entities (other than any Defaulting Lender) in or to all or any part of, the amounts outstanding hereunder, and to the extent of any such assignment or participation (unless otherwise stated therein) the assignee or participant shall have the same rights and benefits hereunder as it would have it were a Term Loan Lender hereunder.  The Agent shall notify the Borrower of any assignment granted hereunder, <u>provided</u>, <u>however</u>, that the Agent is not required to notify the Borrower in the event that (1) the assignment is to an affiliate of a Term Loan Lender or a Related Fund of a Term Loan Lender or (2) the transfer of the interest is in the form of a participation.

(j)    No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by the Borrower, the Agent and the Required Lenders.

(k)    Any provision of this Note which is prohibited or unenforceable shall be ineffective to the extent such prohibition or unenforceability without invalidating the remaining provisions hereof.

(l)    This Note, the other Loan Documents, and all Liens created hereby or pursuant to the Collateral Documents or any other Loan Document shall be binding upon the Borrower, the estate of the Borrower, and any trustee or successor in interest of the Borrower in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Note and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Term Loan Lenders and each of their respective assigns.  The Liens created by this Note, and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of the Borrower to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any DIP Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent or the Term

Loan Lenders file financing statements or otherwise perfect its security interests or Liens under applicable law.

(m)     The Agent shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain, or cause to be maintained at its office, a copy of each assignment delivered to and accepted by it and a register (the "<u>Register</u>") for the recordation of the names and addresses of the Term Loan Lenders and the principal amount of the Obligations (and stated interest thereon) (the "<u>Registered Loans</u>") owing to each Term Loan Lender from time to time.  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Agent and the Term Loan Lenders may treat each Person whose name is recorded in the Register as a Term Loan Lender hereunder for all purposes of this Note.  The Register shall be available for inspection by the Borrower and any Term Loan Lender at any reasonable time and from time to time upon reasonable prior notice.

A Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each registered note shall expressly so provide).  Any assignment or sale of all or part of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s).  Prior to the registration of assignment or sale of any Registered Loan (and the registered note, if any, evidencing the same), the Agent shall treat the Person in whose name such Registered Loan (and the registered note, if any, evidencing the same) is registered on the Register as the owner thereof for the purpose of receiving all payments thereon, notwithstanding notice to the contrary.

In the event that any Term Loan Lender sells participations in a Registered Loan, such Term Loan Lender shall, acting for this purpose as a non-fiduciary agent on behalf of the Borrower, maintain, or cause to be maintained, a register, on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "<u>Participant Register</u>").  A Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide).  Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register.  The Participant Register shall be available for inspection by the Borrower and any Term Loan Lender at any reasonable time and from time to time upon reasonable prior notice.

(n)    THIS WRITTEN PROMISSORY NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO

UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS PROMISSORY NOTE AND THE TERMS OF THE INTERIM ORDER OR THE FINAL ORDER (AS APPLICABLE), THE TERMS OF THE INTERIM ORDER OR THE FINAL ORDER (AS APPLICABLE) SHALL CONTROL.

26.  Agent.

(a)  Appointment.  Each Term Loan Lender (and each subsequent maker of the Term Loans by its making thereof) hereby irrevocably appoints and authorizes the Agent to perform the duties of the Agent as set forth in this Note including:  (i) to receive on behalf of the Agent and/or each Term Loan Lender, as applicable, any payment of principal of or interest on the Term Loans outstanding hereunder and all other amounts accrued hereunder for the account of the Term Loan Lenders and paid to the Agent, and to distribute promptly to the Agent, each Term Loan Lender and each other Person (as applicable) in accordance with Section 12, all payments so received; (ii) to distribute to each Term Loan Lender copies of all material notices and agreements received by the Agent and not required to be delivered to each Term Loan Lender pursuant to the terms of this Note, provided, that the Agent shall not have any liability to the Term Loan Lenders for the Agent's inadvertent failure to distribute any such notices or agreements to the Term Loan Lenders; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Term Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the DIP Collateral and related matters; (iv) to execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Note or any other Loan Document; (v) to make the Term Loans on behalf of the Term Loan Lenders as provided in this Note or any other Loan Document; (vi) to perform, exercise, and enforce any and all other rights and remedies of the Term Loan Lenders with respect to the Borrower, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by the Agent of the rights and remedies specifically authorized to be exercised by the Agent by the terms of this Note or any other Loan Document; (vii)  to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Note or any other Loan Document; and (viii) subject to Section 26(c), to take such action as the Agent deems appropriate on its behalf to administer the Term Loans and the Loan Documents and to exercise such other powers delegated to the Agent by the terms hereof or the other Loan Documents (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations) together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof. As to any matters not expressly provided for by this Note and the other Loan Documents (including, without limitation, enforcement or collection of the Term Loans), the Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Term Loan Lenders;

-51-

provided, however, that the Agent shall not be required to take any action which, in the reasonable opinion of the Agent, exposes the Agent to liability or which is contrary to this Note or any other Loan Document or applicable law.

(b)    Nature of Duties.    The Agent shall have no duties or responsibilities except those expressly set forth in this Note or in the other Loan Documents.  The duties of the Agent shall be mechanical and administrative in nature.  The Agent shall not have by reason of this Note or any other Loan Document a fiduciary relationship in respect of any Term Loan Lender.  Nothing in this Note or any other Loan Document, express or implied, is intended to or shall be construed to impose upon the Agent any obligations in respect of this Note or any other Loan Document except as expressly set forth herein or therein.  Each Term Loan Lender shall make its own independent investigation of the financial condition and affairs of the Borrower in connection with the making and the continuance of the Term Loans hereunder and shall make its own appraisal of the creditworthiness of the Borrower and the value of the DIP Collateral, and the Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Term Loan Lender with any credit or other information with respect thereto, whether coming into its possession before the Term Loans hereunder or at any time or times thereafter, provided that, upon the reasonable request of a Term Loan Lender, the Agent shall provide to such Term Loan Lender any documents or reports delivered to the Agent by the Borrower pursuant to the terms of this Note or any other Loan Document.  If the Agent seeks the consent or approval of the Term Loan Lenders to the taking or refraining from taking any action hereunder, the Agent shall send notice thereof to each Term Loan Lender.

(c)    Rights, Exculpation, Etc.    The Agent and its directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Note or the other Loan Documents, except for their own gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction.  Without limiting the generality of the foregoing, the Agent (i) may treat the payee of the Term Loans as the owner thereof until the Agent receives written notice of the assignment or transfer thereof, pursuant to Section 25(i) hereof, signed by such payee and in form satisfactory to the Agent; (ii) may consult with legal counsel (including, without limitation, counsel to the Agent or counsel to the Borrower), independent public accountants, and other experts selected by any of them and shall not be liable for any action taken or omitted to be taken in good faith by any of them in accordance with the advice of such counsel or experts; (iii) make no warranty or representation to any Term Loan Lender and shall not be responsible to any Term Loan Lender for any statements, certificates, warranties or representations made in or in connection with this Note or the other Loan Documents; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Note or the other Loan Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the DIP Collateral or other property (including, without limitation, the books and records) of any Person; (v) shall not be responsible to any Term Loan Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Note or the other Loan Documents or any

other instrument or document furnished pursuant hereto or thereto and (vi) shall not be deemed to have made any representation or warranty regarding the existence, value or collectibility of the DIP Collateral, the existence, priority or perfection of the Agent's Lien thereon, or any certificate prepared by the Borrower in connection therewith, nor shall the Agent be responsible or liable to the Term Loan Lenders for any failure to monitor or maintain any portion of the DIP Collateral.  The Agent shall not be liable for any apportionment or distribution of payments made in good faith pursuant to this Note, and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Term Loan Lender to whom payment was due but not made, shall be to recover from other Term Loan Lenders any payment in excess of the amount which they are determined to be entitled.  The Agent may at any time request instructions from the Term Loan Lenders with respect to any actions or approvals which by the terms of this Note or of any of the other Loan Documents the Agent is permitted or required to take or to grant, and if such instructions are promptly requested, the Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Loan Documents until it shall have received such instructions from the Term Loan Lenders.

(d)    Reliance.  The Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Note or any of the other Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

(e)    Indemnification.  To the extent that the Agent is not reimbursed and indemnified by the Borrower, the Term Loan Lenders will reimburse and indemnify the Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Note or any of the other Loan Documents or any action taken or omitted by the Agent under this Note or any of the other Loan Documents, in proportion to each Term Loan Lender's Pro Rata Share; provided, however, that no Term Loan Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final judicial determination that such liability resulted from the Agent's gross negligence or willful misconduct.  The obligations of the Term Loan Lenders under this Section shall survive the payment in full of the Term Loans and the cancellation of this Note.

(f)    Collateral Matters.

A.    The Term Loan Lenders hereby irrevocably authorize the Agent, at the written direction of the Required Lenders, to release any Lien granted to or held by the Agent upon any DIP Collateral upon cancellation of the Note and indefeasible payment and satisfaction of the Term Loans and all other Obligations which have matured and which the Agent and the Term Loan Lenders have been notified in writing are then due and payable; or constituting

property being sold or disposed of in the ordinary course of the Borrower's business and in compliance with the terms of this Note and the other Loan Documents; or constituting property in which the Borrower owned no interest at the time the Lien was granted or at any time thereafter; or if approved, authorized or ratified in writing by the Term Loan Lenders.  Upon request by the Agent at any time, the Term Loan Lenders will confirm in writing the Agent's authority to release particular types or items of DIP Collateral pursuant to this Section.

B.    Without in any manner limiting the Agent's authority to act without any specific or further authorization or consent by the Term Loan Lenders (as set forth in Section 26(f)(A)), each Term Loan Lender agrees to confirm in writing, upon request by the Agent, the authority to release DIP Collateral conferred upon the Agent under Section 26(f)(A).  Upon receipt by the Agent of confirmation from the Term Loan Lenders of its authority to release any particular item or types of DIP Collateral, and upon prior written request by the Borrower, the Agent shall (and is hereby irrevocably authorized by the Term Loan Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Agent for the benefit of the Term Loan Lenders upon such DIP Collateral; provided, however, that (i) the Agent shall not be required to execute any such document on terms which, in the Agent's opinion, would expose the Agent to liability or create any obligations or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Lien upon (or obligations of the Borrower in respect of) all interests in the DIP Collateral retained by the Borrower.

C.    The Agent shall have no obligation whatsoever to any Term Loan Lender to assure that the DIP Collateral exists or is owned by the Borrower, or is cared for, protected or insured or has been encumbered or that the Lien granted to the Agent pursuant to this Note or any other Loan Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Agent in this Section or in any other Loan Document, it being understood and agreed that in respect of the DIP Collateral, or any act, omission or event related thereto, the Agent may act in any manner it may deem appropriate, in its sole discretion, given the Agent's own interest in the DIP Collateral as one of the Term Loan Lenders and that the Agent shall have no duty or liability whatsoever to any other Term Loan Lender, except as otherwise provided herein.

(g)    Agency for Perfection.  Each Term Loan Lender hereby appoints the Agent and each other Term Loan Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the DIP Collateral in assets which, in accordance with Article 9 of the Uniform Commercial Code, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and the Agent and each Term Loan Lender hereby acknowledges that it holds possession of or otherwise controls any such DIP Collateral for the benefit of the Agent and the Term Loan Lenders as secured party.  Should any Term Loan Lender obtain possession or control of any such DIP Collateral, such Term Loan Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such DIP

Collateral to the Agent or in accordance with the Agent's instructions.  The Borrower by its execution and delivery of this Note hereby consents to the foregoing.

27.    Defaulting Lenders.  Notwithstanding anything to the contrary contained in this Note, if any Term Loan Lender becomes a Defaulting Lender, then, until such time as such Term Loan Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(a)    The Borrower and each other Term Loan Lender shall be entitled as of right to enforce the obligations of a Term Loan Lender that is alleged to be a Defaulting Lender by specific performance and neither the Borrower nor any Term Loan Lender shall object to any request for an emergency or expedited hearing in the Bankruptcy Court to seek appropriate orders in connection with the foregoing.  In connection with any application to the Bankruptcy Court under this subsection (a), the sole issues before the Bankruptcy Court shall be whether the Borrower has satisfied the conditions precedent to funding.  The parties acknowledge that the foregoing remedy shall be in addition to and not in lieu of any other remedy or claim that may arise against a Defaulting Lender.

(b)    Each Term Loan Lender other than a Defaulting Lender may elect, in its sole discretion and by written notice to all other parties, to fund all or any portion of any Term Loan a Defaulting Lender would have otherwise funded under any then-existing Approved Budget, in which event the Agent shall transfer any payments made by the Borrower to the Agent for such Defaulting Lender's benefit to each other Term Loan Lender making an additional Term Loan of a type described in this subsection (b) until all interest and principal on such additional Term Loan has been paid in full in cash.

(c)    Each Term Loan Lender other than a Defaulting Lender shall be entitled as of right to an order from the Bankruptcy Court directing the Agent to, after payment of all amounts described in subsection (b) above, transfer any payments made by the Borrower to the Agent for a Defaulting Lender's benefit to each such other Term Loan Lenders until any damages incurred by such Term Loan Lenders as assessed by the Bankruptcy Court against such Defaulting Lender based on its status as a Defaulting Lender have been paid in full in full in cash.  Neither the Borrower nor any Term Loan Lender shall object to any request for an emergency or expedited hearing in the Bankruptcy Court to seek appropriate orders in connection with the foregoing.  In connection with any application to the Bankruptcy Court under this subsection (c), the sole issues before the Bankruptcy Court shall be whether the Term Loan Lender alleged to be a Defaulting Lender is a Defaulting Lender and the amount of damages to be assessed.  The parties acknowledge that the foregoing remedy shall be in addition to and not in lieu of any other remedy or claim that may arise against a Defaulting Lender.

(d)    The operation of this Section 27 shall not be construed to increase or otherwise affect the Term Loan Commitments of any Term Loan Lender, to relieve or excuse the performance by such Defaulting Lender or any other Term Loan Lender of its duties and obligations hereunder, or to relieve or excuse the performance

by the Borrower of its duties and obligations under this Note to the Agent or to the Term Loan Lenders other than such Defaulting Lender.

(e)    This Section 27 shall remain effective with respect to such Defaulting Lender until (i) the non-Defaulting Lenders, the Agent, and the Borrower shall have waived such Defaulting Lender's default in writing or (ii) the Defaulting Lender makes its Pro Rata Share of the applicable defaulted Term Loans and pays to the Agent all amounts owing by such Defaulting Lender in respect thereof; provided, that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while such Term Loan Lender was a Defaulting Lender; provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to non-Defaulting Lender will constitute a waiver or release of any claim of any party under this Note arising from such Term Loan Lender's having been a Defaulting Lender.

28.    Electronic Copies  This Note and any amendments, waivers, consents or supplements hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same agreement. Facsimile or PDF signatures of this Note shall be treated as original signatures for all purposes.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, the Borrower has caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

BORROWER:

DOWLING COLLEGE

By: _Clotfel_

Name: ROBERT S. ROSENFELD

Title: CRO

AGENT:

UMB BANK NATIONAL ASSOCIATION

By: _____

Name: Gavin Wilkinson

Title: Senior Vice President

<u>TERM LOAN A LENDERS</u>:

ACA FINANCIAL GUARANTY CORPORATION

By: _____

Name:  Maria Cheng

Title:    Managing Director

TERM LOAN A LENDERS:

WILMINGTON TRUST, NATIONAL
ASSOCIATION

By: _____
Name: Jay Smith
Title: Vice President

TERM LOAN B LENDERS:

UMB BANK NATIONAL ASSOCIATION, as
indenture trustee under the Series 2002 Bond
Documents

By:
Name:     Gavin Wilkinson
Title:     Senior Vice President

TERM LOAN C LENDERS:

UMB BANK NATIONAL ASSOCIATION, as
indenture trustee under the Series 2015 Bond
Documents

By: _____

Name:

Title:        Gavin Wilkinson
              Senior Vice President

TERM LOAN D LENDERS:

ACA FINANCIAL GUARANTY CORPORATION

By: _____
Name:  Maria Cheng
Title:    Managing Director

TERM LOAN D LENDERS:

WILMINGTON TRUST, NATIONAL
ASSOCIATION

By: _____
Name: Jay Smith
Title: Vice President

TERM LOAN D LENDERS:

UMB BANK NATIONAL ASSOCIATION, as
indenture trustee under the Series 2002 Bond
Documents

By:
Name:    Gavin Wilkinson
Title:    Senior Vice President

UMB BANK NATIONAL ASSOCIATION, as
indenture trustee under the Series 2015 Bond
Documents

By:
Name:    Gavin Wilkinson
Title:    Senior Vice President

## SCHEDULE 1

## Term Loan Commitments

### I. Interim Term Loan Commitments

| Term Loan Lender | Interim Term Loan A Commitment | Interim Term Loan B Commitment | Interim Term Loan C Commitment | Interim Term Loan D Commitment | Total Interim Term Loan Commitment |
|---|---|---|---|---|---|
| ACA Financial Guaranty Corporation | $645,671 | $0 | $0 | $360,633 | $1,006,304 |
| Wilmington Trust, National Association | $0 | $0 | $0 | $0 | $0 |
| UMB Bank, National Association (as indenture trustee under the Series 2002 Bond Documents) | $0 | $83,315 | $0 | $96,522 | $179,837 |
| UMB Bank, National Association (as indenture trustee under the Series 2015 Bond Documents) | $0 | $0 | $42,818 | $73,187 | $116,005 |
| **Total** | **$645,671** | **$83,315** | **$42,818** | **$530,342** | **$1,302,146** |

### II. Final Term Loan Commitments

| Term Loan Lender | Final Term Loan A Commitment | Final Term Loan B Commitment | Final Term Loan C Commitment | Final Term Loan D Commitment | Total Final Term Loan Commitment |
|---|---|---|---|---|---|
| ACA Financial Guaranty Corporation | $1,529,351 | $0 | $0 | $1,168,544 | $2,697,895 |
| Wilmington Trust, National Association | $0 | $0 | $0 | $0 | $0 |
| UMB Bank, National Association (as indenture trustee under | $0 | $228,598 | $0 | $312,757 | $541,355 |

| Term Loan Lender | Final Term Loan A Commitment | Final Term Loan B Commitment | Final Term Loan C Commitment | Final Term Loan D Commitment | Total Final Term Loan Commitment |
|---|---|---|---|---|---|
| the Series 2002 Bond Documents) | | | | | |
| UMB Bank, National Association (as indenture trustee under the Series 2015 Bond Documents) | $0 | $0 | $196,237 | $237,146 | $433,383 |
| **Total** | **$1,529,351** | **$228,598** | **$196,237** | **$1,718,447** | **$3,672,633** |

## III.  Total Term Loan Commitments

| Term Loan Lender | Total Term Loan A Commitment | Total Term Loan B Commitment | Total Term Loan C Commitment | Total Term Loan D Commitment | Total Term Loan Commitment |
|---|---|---|---|---|---|
| ACA Financial Guaranty Corporation | $2,175,022 | $0 | $0 | $1,529,177 | $3,704,199 |
| Wilmington Trust, National Association | $0 | $0 | $0 | $0 | $0 |
| UMB Bank, National Association (as indenture trustee under the Series 2002 Bond Documents) | $0 | $311,913 | $0 | $409,279 | $721,192 |
| UMB Bank, National Association (as indenture trustee under the Series 2015 Bond Documents) | $0 | $0 | $239,055 | $310,333 | $549,388 |
| **Total** | **$2,175,022** | **$311,913** | **$239,055** | **$2,248,789** | **$4,974,779** |

**SCHEDULE 2**

**Chapter 11 Milestones**

| Chapter 11 Milestone | Completion Deadline |
|---|---|
| 1.  Petition Date | November 29, 2016 |
| 2.  Filing of Motion to Approve Sale Procedures for the Oakdale Campus | November 29, 2016 |
| 3.  Filing of Motion to Approve Sale Procedures for the Residential Portfolio | November 29, 2016 |
| 4.  Interim Order Entry Date | December 1, 2016 |
| 5.  Entry by the Bankruptcy Court of an Order Approving the Sale Procedures for the Oakdale Campus | December 13, 2016 |
| 6.  Entry by the Bankruptcy Court of an Order Approving the Sale Procedures for the Residential Portfolio | December 13, 2016 |
| 7.  Entry by the Bankruptcy Court of an Order Approving the PSA | December 30, 2016 |
| 8.  Final Order Entry Date | December 30, 2016 |
| 9.  Filing by the Borrower of the Proposed Liquidation Plan and Disclosure Statement | January 16, 2017 |
| 10.  Entry by the Bankruptcy Court of an Order Approving the Disclosure Statement | March 6, 2017 |
| 11.  Entry by the Bankruptcy Court of an Order Approving the Sale of the Oakdale Campus | April 10, 2017 |
| 12.  Entry by the Bankruptcy Court of an Order Confirming the Liquidation Plan | April 24, 2017 |
| 13.  Effective Date of the Liquidation Plan | May 8, 2017 |

## SCHEDULE 3

## Permitted Encumbrances

**Judgments**:

| Creditor | Address | Date | Amount, if Applicable |
|---|---|---|---|
| Deliliah Craig | 14 Dawn Crescent Central Islip, New York 11722 | March 18, 2016 | $3,441.20 |
| Powerhouse Maintenance, Inc. d/b/a Powerhouse Paving | 2 West Beech Street Islip, New York 11751 | July 13, 2016 | $28,100.02 |
| Ultimate Power Inc. | 45 Nancy Street West Babylon, New York 11704 | August 22, 2016 | $258,213.74 |

**Tax Warrants**:

| Creditor | Address | Date | Amount, if Applicable |
|---|---|---|---|
| New York State Department of Labor | Building 12 W.A. Harriman Campus Albany, New York 12240 | September 21, 2016 | $106,805.06 |

**Mechanic's Liens**:

| Creditor | Address | Date | Amount, if Applicable |
|---|---|---|---|
| A.O. Service Inc. | 8 New York Avenue Port Jefferson, New York 11776 | June 3, 2016 | $5,954.00 |
| T.M. Bier & Associates, Inc. | 79 Hazel Street Glen Cove, New York 11542 | June 9, 2016 | $7,470.75 |
| Absolute Plumbing of Long Island, Inc. | 90F Knickerbocker Avenue Bohemia, New York 11716 | June 28, 2016 | $13,695.00 |
| Carrier Corporation | PO Box 4808 TR-5 Office 401 Syracuse, New York | July 28, 2016 | $4,000.00 |

| | 13221 | | |
|---|---|---|---|
| Carrier Corporation | PO Box 4808 TR-5 Office 401 Syracuse, New York 13221 | July 28, 2016 | $34,200.00 |
| Carrier Corporation | PO Box 4808 TR-5 Office 401 Syracuse, New York 13221 | July 28, 2016 | $20,940.00 |
| Carrier Corporation | PO Box 4808 TR-5 Office 401 Syracuse, New York 13221 | July 28, 2016 | $2,541.48 |
| Universal Temperature Controls Ltd. | 1749 Julia Goldbach Avenue Ronkonkoma, New York 11779 | August 10, 2016 | $7,830.03 |
| Carrier Corporation | PO Box 4808 TR-5 Office 401 Syracuse, New York 13221 | August 17, 2016 | $6,317.50 |
| SimplexGrinnell LP | 50 Technology Drive Westminster, Massachusetts 01441 | September 1, 2016 | $25,095.00 |

## **UCC-1 Financing Statements**:

| Creditor | Address | Date | Amount, if Applicable |
|---|---|---|---|
| Toshiba Financial Services | 1961 Hirst Drive Moberly, Missouri 65270 | April 30, 2009 | N/A |
| Sterling National Bank | 42 Broadway New York, New York 10004 | November 21, 2011 | N/A |
| Xerox Financial Services | 45 Glover Avenue Norwalk, Connecticut 06856 | July 21, 2014 | N/A |
| Leaf Capital Funding LLC | 2005 Market Street, 14th Floor Philadelphia, Pennsylvania 19103 | July 23, 2014 | N/A |
| Univest Capital, Inc. | 3331 Street Road, Suite 325 Bensalem, Pennsylvania 19020 | April 30, 2015 | N/A |

| Teqlease, Inc. and Financial Pacific Leasing, Inc. | 23801 Calabasas Road, Suite 101 Calabasas, California 91302; 3455 South 344th Way, Suite 300 Federal Way, Washington 98001 | September 9, 2015 | N/A |

**<u>EXHIBIT A</u>**

**<u>Approved Budget</u>**

[See Attached.]

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST - BY BOND SERIES
FOR THE 30-WEEK PERIOD ENDING JUNE 23, 2017
USD

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Weeks 1-15 Subtotal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week #: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Subtotal |
| Period Ending Friday: | 12/2/2016 | 12/9/2016 | 12/16/2016 | 12/23/2016 | 12/30/2016 | 1/6/2017 | 1/13/2017 | 1/20/2017 | 1/27/2017 | 2/3/2017 | 2/10/2017 | 2/17/2017 | 2/24/2017 | 3/3/2017 | 3/10/2017 | |
| **Cash Disbursements: (1)** | | | | | | | | | | | | | | | | |
| **Administrative Overhead / Term Loan D** | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | 211,261 |
| General Insurance | 35,058 | - | - | - | 35,058 | - | - | - | 35,058 | - | - | - | 35,058 | - | | 140,233 |
| Professionals (2) | | | | | | | | | | | | | | | | |
| Klestadt | - | - | - | - | - | - | - | - | - | - | - | - | - | 60,000 | - | 60,000 |
| Ingerman Smith, L.L.P. | - | - | - | - | - | - | - | - | - | 32,000 | - | - | - | 16,000 | - | 48,000 |
| Special Counsel - ERISA - TBD | - | - | - | - | - | 10,000 | - | - | - | 5,000 | - | - | - | 5,000 | - | 20,000 |
| RSR Consulting, LLC | - | - | 5,000 | 35,000 | 35,000 | 15,000 | 20,000 | 35,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 320,000 |
| Chapter 11 Creditors Committee | - | - | - | - | - | - | - | - | - | 40,000 | - | - | - | 16,000 | - | 56,000 |
| Student Refunds / Records Scanning | - | - | - | 45,069 | - | - | - | - | - | - | - | - | - | - | - | 45,069 |
| Health, Medical, Unemployment Claims and Related | | | | | | | | | | | | | | | | |
| Claims Agent | - | - | 20,000 | - | - | - | - | 20,000 | - | - | - | 20,000 | - | - | - | 60,000 |
| Administrative | - | 1,700 | 500 | - | - | - | - | 500 | - | - | - | 500 | - | - | - | 3,200 |
| Adequate Assurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| U.S. Trustee Fees | - | - | - | - | - | - | 6,500 | - | - | - | - | - | - | - | - | 6,500 |
| All Other Professional Fees | - | - | - | - | - | 15,000 | - | - | 10,000 | - | - | - | - | - | - | 25,000 |
| DIP Interest and Fees | 89,735 | - | - | - | - | - | - | - | - | - | - | - | 4,399 | - | - | 94,134 |
| Other | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 56,250 |
| **Total Administrative Overhead / Term Loan D** | 154,951 | 5,450 | 55,658 | 38,750 | 110,226 | 63,808 | 71,658 | 59,250 | 65,158 | 140,808 | 55,158 | 49,250 | 59,556 | 160,808 | 55,158 | 1,145,646 |
| 2006 Bond Series - 66.0% | 105,367 | 3,706 | 37,847 | 26,350 | 74,954 | 43,390 | 48,727 | 40,290 | 44,307 | 95,750 | 37,507 | 33,490 | 40,498 | 109,350 | 37,507 | 779,039 |
| 2002 Bond Series - 18.2% | 28,201 | 992 | 10,130 | 7,053 | 20,061 | 11,613 | 13,042 | 10,784 | 11,859 | 25,627 | 10,039 | 8,964 | 10,839 | 29,267 | 10,039 | 208,508 |
| 2015 Bond Series - 13.8% | 21,383 | 752 | 7,681 | 5,348 | 15,211 | 8,806 | 9,889 | 8,177 | 8,992 | 19,432 | 7,612 | 6,797 | 8,219 | 22,192 | 7,612 | 158,099 |
| **Collateral Preservation** | | | | | | | | | | | | | | | | |
| **Series 2006 Bonds / Term Loan A** | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | 25,513 |
| General Insurance | 12,039 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 12,039 |
| Utilities | 21,706 | 67,476 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 371,366 |
| Security Personnel | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 302,264 |
| Property Management | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Outside Services | 10,554 | 13,077 | 7,406 | 60,750 | 5,904 | 15,577 | - | - | - | 23,306 | - | - | - | - | 98,796 | 235,368 |
| Facility Maintenance | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 15,000 |
| Real Estate Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Landscaping / Snow Removal | 8,528 | - | - | 8,528 | - | - | - | 8,528 | - | - | - | 8,528 | - | - | - | 34,111 |
| Sales Broker - Marketing | 43,559 | 13,845 | 5,867 | 4,839 | - | - | - | - | - | - | - | - | - | 31,658 | 13,845 | 113,613 |
| Brookhaven Site Planning | - | 8,000 | - | - | - | - | - | 9,600 | - | - | - | - | - | - | - | 17,600 |
| DIP Interest and Fees | 91,170 | - | - | - | - | - | - | - | - | - | - | - | 4,469 | - | - | 95,639 |
| Other | 3,779 | 6,572 | 3,139 | 3,779 | 3,139 | 3,139 | 3,139 | 3,779 | 3,139 | 3,139 | 3,139 | 3,779 | 3,139 | 3,139 | 3,139 | 53,081 |
| **Total Series 2006 Bonds / Term Loan A** | 215,675 | 130,121 | 62,459 | 120,753 | 55,000 | 61,573 | 49,186 | 64,764 | 49,186 | 69,302 | 49,186 | 55,164 | 53,655 | 77,655 | 161,826 | 1,275,593 |
| **Series 2002 Bonds / Term Loan B** | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| General Insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utilities | 2,194 | 6,214 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 36,924 |
| Security Personnel | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 27,976 |
| Property Management | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Outside Services | 5,783 | 7,600 | 500 | 500 | 2,813 | 13,300 | - | - | - | 12,713 | - | - | - | - | 24,564 | 67,771 |
| Facility Maintenance | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 7,500 |
| Real Estate Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Landscaping / Snow Removal | 1,975 | - | - | 1,975 | - | - | - | 1,975 | - | - | - | 1,975 | - | - | - | 7,889 |
| Sales Broker - Marketing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Brookhaven Site Planning | - | 2,000 | - | - | - | - | - | 2,400 | - | - | - | - | - | - | - | 4,400 |
| DIP Interest and Fees | 13,074 | - | - | - | - | - | - | - | - | - | - | - | 641 | - | - | 13,715 |
| Other | 453 | 606 | 304 | 453 | 304 | 304 | 304 | 453 | 304 | 304 | 304 | 453 | 304 | 304 | 304 | 5,460 |
| **Total Series 2002 Bonds / Term Loan B** | 25,843 | 18,785 | 5,363 | 7,486 | 7,676 | 18,163 | 4,863 | 9,386 | 4,863 | 17,576 | 4,863 | 6,986 | 5,504 | 4,863 | 29,427 | 171,645 |
| **Series 2015 Bonds / Term Loan C** | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| General Insurance | 17,962 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 17,962 |
| Utilities | 150 | 6,360 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 8,460 |
| Security Personnel | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Property Management | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Outside Services | 55 | - | - | - | - | - | - | - | - | - | - | - | - | - | 3,969 | 4,024 |
| Facility Maintenance | - | 500 | - | 500 | - | 500 | - | 500 | - | 500 | - | 500 | - | 500 | - | 3,500 |
| Real Estate Taxes | - | - | - | - | - | - | - | 87,181 | - | - | - | - | - | - | - | 87,181 |
| Landscaping / Snow Removal | 1,398 | - | - | 1,398 | - | - | - | 1,398 | - | - | - | 1,398 | - | - | - | 5,590 |
| Sales Broker - Marketing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Brookhaven Site Planning | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Interest and Fees | 10,020 | - | - | - | - | - | - | - | - | - | - | - | 491 | - | - | 10,512 |
| Other | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 8,438 |
| **Total Series 2015 Bonds / Term Loan C** | 30,148 | 7,423 | 713 | 2,610 | 713 | 1,213 | 87,893 | 2,610 | 713 | 1,213 | 713 | 2,610 | 1,204 | 1,213 | 4,682 | 145,666 |
| **Total Cash Disbursements** | 426,617 | 161,778 | 124,192 | 169,599 | 173,704 | 144,757 | 213,600 | 136,010 | 119,919 | 228,898 | 109,919 | 114,010 | 119,919 | 244,538 | 251,092 | 2,738,551 |

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST - BY BOND SERIES
FOR THE 30-WEEK PERIOD ENDING JUNE 23, 2017
USD

| | Week #: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Weeks 1-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Period Ending Friday: | 12/2/2016 | 12/9/2016 | 12/16/2016 | 12/23/2016 | 12/30/2016 | 1/6/2017 | 1/13/2017 | 1/20/2017 | 1/27/2017 | 2/3/2017 | 2/10/2017 | 2/17/2017 | 2/24/2017 | 3/3/2017 | 3/10/2017 | Subtotal |

**DIP TRANCHE SUMMARY**

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DIP FUNDING - WEEKLY** | | | | | | | | | | | | | | | | |
| Term Loan A / Series 2006 Bonds | 215,675 | 130,121 | 62,459 | 120,753 | 55,090 | 61,573 | 49,186 | 64,764 | 49,186 | 69,302 | 49,186 | 55,164 | 53,655 | 77,655 | 161,826 | 1,275,593 |
| Term Loan B / Series 2002 Bonds | 25,843 | 18,785 | 5,363 | 7,486 | 7,676 | 18,163 | 4,863 | 9,386 | 4,863 | 17,576 | 4,863 | 6,986 | 5,504 | 4,863 | 29,427 | 171,645 |
| Term Loan C / Series 2015 Bonds | 30,148 | 7,423 | 713 | 2,610 | 713 | 1,213 | 87,893 | 2,610 | 713 | 1,213 | 713 | 1,204 | 1,213 | 4,682 | | 145,666 |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | |
| Series 2006 Bonds  (68.0%) | 105,367 | 3,706 | 37,847 | 26,350 | 74,954 | 43,390 | 48,727 | 40,290 | 44,307 | 95,750 | 37,507 | 33,490 | 40,498 | 109,350 | 37,507 | 779,039 |
| Series 2002 Bonds  (18.2%) | 28,201 | 992 | 10,130 | 7,053 | 20,061 | 11,613 | 13,042 | 10,784 | 11,859 | 25,627 | 10,039 | 8,964 | 10,839 | 29,267 | 10,039 | 208,508 |
| Series 2015 Bonds  (13.8%) | 21,383 | 752 | 7,681 | 5,348 | 15,211 | 8,806 | 9,889 | 8,177 | 8,992 | 19,432 | 7,612 | 6,797 | 8,219 | 22,192 | 7,612 | 158,099 |
| Subtotal - Term Loan D | 154,951 | 5,450 | 55,658 | 38,750 | 110,226 | 63,808 | 71,658 | 59,250 | 65,158 | 140,808 | 55,158 | 49,250 | 59,556 | 160,808 | 55,158 | 1,145,646 |
| **Total DIP Funding - Weekly** | 426,617 | 161,778 | 124,192 | 169,599 | 173,704 | 144,757 | 213,600 | 136,010 | 119,919 | 228,898 | 109,919 | 114,010 | 119,919 | 244,538 | 251,092 | 2,738,551 |
| | | | | | | | | | | | | | | | | |
| **DIP FUNDING - CUMULATIVE** | | | | | | | | | | | | | | | | |
| Term Loan A / Series 2006 Bonds | 215,675 | 345,796 | 408,255 | 529,008 | 584,098 | 645,671 | 694,856 | 759,620 | 808,806 | 878,108 | 927,294 | 982,458 | 1,036,113 | 1,113,767 | 1,275,593 | 1,275,593 |
| Term Loan B / Series 2002 Bonds | 25,843 | 44,627 | 49,990 | 57,476 | 65,152 | 83,315 | 88,178 | 97,564 | 102,427 | 120,003 | 124,866 | 131,852 | 137,356 | 142,219 | 171,645 | 171,645 |
| Term Loan C / Series 2015 Bonds | 30,148 | 37,570 | 38,283 | 40,893 | 41,605 | 42,818 | 130,711 | 133,321 | 134,033 | 135,246 | 135,958 | 138,568 | 139,772 | 140,985 | 145,666 | 145,666 |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | |
| Series 2006 Bonds  (68.0%) | 105,367 | 109,073 | 146,920 | 173,270 | 248,224 | 291,613 | 340,340 | 380,630 | 424,938 | 520,687 | 558,194 | 591,684 | 632,183 | 741,532 | 779,039 | 779,039 |
| Series 2002 Bonds  (18.2%) | 28,201 | 29,193 | 39,323 | 46,375 | 66,436 | 78,049 | 91,091 | 101,875 | 113,733 | 139,360 | 149,399 | 158,363 | 169,202 | 198,469 | 208,508 | 208,508 |
| Series 2015 Bonds  (13.8%) | 21,383 | 22,135 | 29,816 | 35,164 | 50,375 | 59,180 | 69,069 | 77,246 | 86,237 | 105,669 | 113,281 | 120,077 | 128,296 | 150,487 | 158,099 | 158,099 |
| Subtotal - Term Loan D | 154,951 | 160,401 | 216,059 | 254,809 | 365,035 | 428,843 | 500,501 | 559,751 | 624,908 | 765,716 | 820,874 | 870,124 | 929,680 | 1,090,489 | 1,145,646 | 1,145,646 |
| **Total DIP Funding - Cumulative** | 426,617 | 588,394 | 712,586 | 882,185 | 1,055,889 | 1,200,646 | 1,414,246 | 1,550,256 | 1,670,175 | 1,899,073 | 2,008,992 | 2,123,002 | 2,242,921 | 2,487,459 | 2,738,551 | 2,738,551 |
| | | | | | | | | | | | | | | | | |
| **INCURRED/UNPAID PROFESSIONAL FEES** | | | | | | | | | | | | | | | | |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | |
| Series 2006 Bonds  (68.0%) | 10,710 | 21,420 | 33,830 | 46,240 | 61,030 | 69,020 | 82,960 | 96,900 | 113,390 | 77,520 | 94,010 | 110,500 | 126,990 | 75,480 | 89,080 | 89,080 |
| Series 2002 Bonds  (18.2%) | 2,867 | 5,733 | 9,055 | 12,376 | 16,335 | 18,473 | 22,204 | 25,935 | 30,349 | 20,748 | 25,162 | 29,575 | 33,989 | 20,202 | 23,842 | 23,842 |
| Series 2015 Bonds  (13.8%) | 2,174 | 4,347 | 6,866 | 9,384 | 12,386 | 14,007 | 16,836 | 19,665 | 23,012 | 15,732 | 19,079 | 22,425 | 25,772 | 15,318 | 18,078 | 18,078 |
| **Total Incurred/Unpaid Professional Fees** | 15,750 | 31,500 | 49,750 | 68,000 | 89,750 | 101,500 | 122,000 | 142,500 | 166,750 | 114,000 | 138,250 | 162,500 | 186,750 | 111,000 | 131,000 | 131,000 |
| | | | | | | | | | | | | | | | | |
| **TOTAL DIP COMMITMENT - CUMULATIVE** | | | | | | | | | | | | | | | | |
| Term Loan A / Series 2006 Bonds | 215,675 | 345,796 | 408,255 | 529,008 | 584,098 | 645,671 | 694,856 | 759,620 | 808,806 | 878,108 | 927,294 | 982,458 | 1,036,113 | 1,113,767 | 1,275,593 | 1,275,593 |
| Term Loan B / Series 2002 Bonds | 25,843 | 44,627 | 49,990 | 57,476 | 65,152 | 83,315 | 88,178 | 97,564 | 102,427 | 120,003 | 124,866 | 131,852 | 137,356 | 142,219 | 171,645 | 171,645 |
| Term Loan C / Series 2015 Bonds | 30,148 | 37,570 | 38,283 | 40,893 | 41,605 | 42,818 | 130,711 | 133,321 | 134,033 | 135,246 | 135,958 | 138,568 | 139,772 | 140,985 | 145,666 | 145,666 |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | |
| Series 2006 Bonds  (68.0%) | 116,077 | 130,493 | 180,750 | 219,510 | 309,254 | 360,633 | 423,300 | 477,530 | 538,328 | 598,207 | 652,204 | 702,184 | 759,173 | 817,012 | 868,119 | 868,119 |
| Series 2002 Bonds  (18.2%) | 31,068 | 34,926 | 48,377 | 58,751 | 82,771 | 96,522 | 113,295 | 127,810 | 144,082 | 160,108 | 174,561 | 187,938 | 203,190 | 218,671 | 232,350 | 232,350 |
| Series 2015 Bonds  (13.8%) | 23,557 | 26,482 | 36,682 | 44,548 | 62,760 | 73,187 | 85,905 | 96,911 | 109,249 | 121,401 | 132,359 | 142,502 | 154,067 | 165,805 | 176,177 | 176,177 |
| Subtotal - Term Loan D | 170,701 | 191,901 | 265,809 | 322,809 | 454,785 | 530,343 | 622,501 | 702,251 | 791,658 | 879,716 | 959,124 | 1,032,624 | 1,116,430 | 1,201,489 | 1,276,646 | 1,276,646 |
| **Total DIP Commitment - Cumulative** | 442,367 | 619,894 | 762,336 | 950,185 | 1,145,639 | 1,302,146 | 1,536,246 | 1,692,756 | 1,836,925 | 2,013,073 | 2,147,242 | 2,285,502 | 2,429,671 | 2,598,459 | 2,869,551 | 2,869,551 |
| | | | | | | | | | | | | | | | | |
| **MEMO: TOTAL DIP COMMITMENT - CUMULATIVE** | | | | | | | | | | | | | | | | |
| *Series 2006 Bonds* | *331,752* | *476,289* | *589,005* | *748,518* | *893,351* | *1,006,304* | *1,118,157* | *1,237,151* | *1,347,134* | *1,476,315* | *1,579,498* | *1,684,642* | *1,795,285* | *1,930,780* | *2,143,713* | *2,143,713* |
| *Series 2002 Bonds* | *56,910* | *79,553* | *98,368* | *116,227* | *147,923* | *179,837* | *201,473* | *225,374* | *246,509* | *280,111* | *299,426* | *319,789* | *340,546* | *360,890* | *403,995* | *403,995* |
| *Series 2015 Bonds* | *53,704* | *64,052* | *74,964* | *85,440* | *104,365* | *116,005* | *216,616* | *230,231* | *243,282* | *256,647* | *268,317* | *281,071* | *293,840* | *306,790* | *321,843* | *321,843* |
| ***Total DIP Commitment - Cumulative*** | ***442,367*** | ***619,894*** | ***762,336*** | ***950,185*** | ***1,145,639*** | ***1,302,146*** | ***1,536,246*** | ***1,692,756*** | ***1,836,925*** | ***2,013,073*** | ***2,147,242*** | ***2,285,502*** | ***2,429,671*** | ***2,598,459*** | ***2,869,551*** | ***2,869,551*** |

**NOTES:**

**(1)** The college is assumed to operate in bankruptcy on a zero cash basis with all required disbursements funded under the DIP loa n facility.  Any proceeds from the use or sale of collateral or any other  miscellaneous cash inflows are assumed to be swept by the lenders to repay DIP borrowings or secured debt and are not reflected in the budget.  If it is ultimately determined that the Debtor's cash of approximately $222,000 is deemed unrestricted, such funds will be utilized to fund budgeted disbursements prior to the use of DIP financing funds and will reduce the applicable DIP commitments on  a dollar-for-dollar basis.

**(2)** Refer to the Professional Fees supporting schedule (Schedule [OPEN]) on the next page for detail of professional fees expecte d to be incurred during the interim period. Schedule [OPEN] indicates  the amounts projected to be charged against existing retainers, the amounts to be paid in cash and the amounts incurred and projected to be unpaid at the end of the interim period due to timing of  disbursements, filing of fee applications and required holdback amounts.

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST - BY BOND SERIES
FOR THE 30-WEEK PERIOD ENDING JUNE 23, 2017
USD

| Week #: | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | Weeks 16-30 Subtotal | Weeks 1-30 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Ending Friday: | 3/17/2017 | 3/24/2017 | 3/31/2017 | 4/7/2017 | 4/14/2017 | 4/21/2017 | 4/28/2017 | 5/5/2017 | 5/12/2017 | 5/19/2017 | 5/26/2017 | 6/2/2017 | 6/9/2017 | 6/16/2017 | 6/23/2017 | | |
| **Cash Disbursements: (1)** | | | | | | | | | | | | | | | | | |
| **Administrative Overhead / Term Loan D** | | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 184,853 | 396,114 |
| General Insurance | - | - | 35,058 | - | - | - | - | 35,058 | - | - | - | 35,058 | - | - | - | 105,175 | 245,408 |
| Professionals (2) | | | | | | | | | | | | | | | | | |
| Klestadt | - | - | 36,000 | - | - | - | - | 83,000 | - | - | - | 36,000 | - | - | - | 155,000 | 215,000 |
| Ingerman Smith, L.L.P. | - | - | 16,000 | - | - | - | - | 32,000 | - | - | - | 12,000 | - | - | - | 60,000 | 108,000 |
| Special Counsel - ERISA - TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 20,000 |
| RSR Consulting, LLC | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 260,000 | 580,000 |
| Chapter 11 Creditors Committee | - | - | 12,000 | - | - | - | - | 29,000 | - | - | - | 12,000 | - | - | - | 53,000 | 109,000 |
| Student Refunds / Records Scanning | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 45,000 |
| Health, Medical, Unemployment Claims and Related | | | | | | | | | | | | | | | | | |
| Claims Agent | 20,000 | - | - | - | - | 20,000 | - | - | - | 20,000 | - | - | - | - | 20,000 | 80,000 | 140,000 |
| Administrative | 500 | - | - | - | - | 500 | - | - | - | 500 | - | - | - | - | 500 | 2,000 | 5,200 |
| Adequate Assurance | | | | | | | | | | | | | | | | | |
| U.S. Trustee Fees | - | - | - | - | 6,500 | - | - | - | - | - | - | - | 6,500 | - | - | 13,000 | 19,500 |
| All Other Professional Fees | - | - | - | - | - | - | - | - | 15,000 | - | - | - | - | 5,000 | - | 20,000 | 45,000 |
| DIP Interest and Fees | - | - | - | - | - | - | - | - | - | - | 4,399 | - | - | - | 1,466 | 5,865 | 99,999 |
| Other | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 56,250 | 112,500 |
| **Total Administrative Overhead / Term Loan D** | 44,250 | 50,158 | 87,750 | 85,216 | 30,250 | 70,658 | 23,750 | 224,216 | 33,750 | 65,658 | 23,149 | 140,216 | 25,250 | 50,158 | 40,716 | 995,143 | 2,140,789 |
| 2006 Bond Series - 68.0% | 30,090 | 34,107 | 59,670 | 57,947 | 20,570 | 48,047 | 16,150 | 152,467 | 22,950 | 44,647 | 15,741 | 95,347 | 17,170 | 34,107 | 27,687 | 676,697 | 1,455,737 |
| 2002 Bond Series - 18.2% | 8,054 | 9,129 | 15,971 | 15,509 | 5,506 | 12,860 | 4,323 | 40,807 | 6,143 | 11,950 | 4,213 | 25,519 | 4,596 | 9,129 | 7,410 | 181,116 | 389,624 |
| 2015 Bond Series - 13.8% | 6,107 | 6,922 | 12,110 | 11,760 | 4,175 | 9,751 | 3,278 | 30,942 | 4,658 | 9,061 | 3,195 | 19,350 | 3,485 | 6,922 | 5,619 | 137,330 | 295,429 |
| **Collateral Preservation** | | | | | | | | | | | | | | | | | |
| **Series 2006 Bonds / Term Loan A** | | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 22,324 | 47,837 |
| General Insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 12,039 |
| Utilities | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 325,596 | 696,962 |
| Security Personnel | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 302,264 | 604,528 |
| Property Management | | | | | | | | | | | | | | | | | |
| Other Outside Services | - | - | - | - | 23,781 | - | - | - | 23,306 | - | - | - | 23,306 | - | - | 70,392 | 305,760 |
| Facility Maintenance | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 15,000 | 30,000 |
| Real Estate Taxes | | | | | | | | | | | | | | | | | |
| Landscaping / Snow Removal | 8,528 | - | - | - | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 35,069 | 69,180 |
| Sales Broker - Marketing | 5,867 | 4,839 | - | - | - | - | - | - | - | - | - | - | - | - | - | 10,706 | 124,319 |
| Brookhaven Site Planning | - | 8,800 | - | - | - | - | - | - | - | - | 53,600 | - | - | - | - | 62,400 | 80,000 |
| DIP Interest and Fees | - | - | - | - | - | - | - | - | - | - | 4,469 | - | - | - | 1,490 | 5,959 | 101,598 |
| Other | 3,779 | 3,139 | 3,139 | 3,139 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 49,720 | 102,800 |
| **Total Series 2006 Bonds / Term Loan A** | 61,031 | 62,825 | 45,997 | 49,186 | 72,371 | 51,780 | 48,590 | 51,780 | 71,896 | 51,780 | 106,660 | 51,780 | 71,896 | 51,780 | 50,080 | 899,429 | 2,175,022 |
| **Series 2002 Bonds / Term Loan B** | | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| General Insurance | | | | | | | | | | | | | | | | | |
| Utilities | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 32,904 | 69,828 |
| Security Personnel | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 27,976 | 55,952 |
| Property Management | | | | | | | | | | | | | | | | | |
| Other Outside Services | - | - | - | - | 12,713 | - | - | - | 16,713 | - | - | - | 12,713 | - | - | 42,138 | 109,909 |
| Facility Maintenance | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 7,500 | 15,000 |
| Real Estate Taxes | | | | | | | | | | | | | | | | | |
| Landscaping / Snow Removal | 1,975 | - | - | - | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 8,121 | 16,019 |
| Sales Broker - Marketing | | | | | | | | | | | | | | | | | |
| Brookhaven Site Planning | - | 2,200 | - | - | - | - | - | - | - | - | 13,400 | - | - | - | - | 15,600 | 20,000 |
| DIP Interest and Fees | - | - | - | - | - | - | - | - | - | - | 641 | - | - | - | 214 | 855 | 14,570 |
| Other | 453 | 304 | 304 | 304 | 346 | 346 | 346 | 346 | 346 | 346 | 346 | 346 | 346 | 346 | 346 | 5,175 | 10,635 |
| **Total Series 2002 Bonds / Term Loan B** | 6,986 | 7,063 | 4,863 | 4,863 | 18,176 | 5,464 | 5,464 | 5,464 | 22,176 | 5,464 | 19,505 | 5,464 | 18,176 | 5,464 | 5,677 | 140,268 | 311,913 |
| **Series 2015 Bonds / Term Loan C** | | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | | | | | | | | | | | | | | | | | |
| General Insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 17,962 |
| Utilities | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 2,250 | 10,710 |
| Security Personnel | | | | | | | | | | | | | | | | | |
| Property Management | | | | | | | | | | | | | | | | | |
| Other Outside Services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 4,024 |
| Facility Maintenance | 500 | - | 500 | - | 500 | - | 500 | - | 500 | - | 500 | - | 500 | - | 500 | 4,000 | 7,500 |
| Real Estate Taxes | - | - | - | - | - | - | - | - | - | - | - | 72,298 | - | - | - | 72,298 | 159,479 |
| Landscaping / Snow Removal | 1,398 | - | - | 395 | 395 | 395 | 395 | 395 | 395 | 395 | 395 | 395 | 395 | 395 | 395 | 5,748 | 11,338 |
| Sales Broker - Marketing | | | | | | | | | | | | | | | | | |
| Brookhaven Site Planning | | | | | | | | | | | | | | | | | |
| DIP Interest and Fees | - | - | - | - | - | - | - | - | - | - | 491 | - | - | - | 164 | 655 | 11,167 |
| Other | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 8,438 | 16,875 |
| **Total Series 2015 Bonds / Term Loan C** | 2,610 | 713 | 1,213 | 713 | 1,608 | 1,108 | 1,608 | 1,108 | 1,608 | 1,108 | 2,099 | 73,406 | 1,608 | 1,108 | 1,772 | 93,388 | 239,054 |
| **Total Cash Disbursements** | 114,877 | 120,758 | 139,822 | 139,977 | 122,405 | 129,009 | 79,412 | 282,567 | 129,430 | 124,009 | 151,412 | 270,865 | 116,930 | 108,509 | 98,245 | 2,128,228 | 4,866,779 |

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST - BY BOND SERIES
FOR THE 30-WEEK PERIOD ENDING JUNE 23, 2017
USD

| | Week #: | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | Weeks 16-30 | Weeks 1-30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Period Ending Friday: | 3/17/2017 | 3/24/2017 | 3/31/2017 | 4/7/2017 | 4/14/2017 | 4/21/2017 | 4/28/2017 | 5/5/2017 | 5/12/2017 | 5/19/2017 | 5/26/2017 | 6/2/2017 | 6/9/2017 | 6/16/2017 | 6/23/2017 | Subtotal | TOTAL |
| **DIP TRANCHE SUMMARY** | | | | | | | | | | | | | | | | | | |
| **DIP FUNDING - WEEKLY** | | | | | | | | | | | | | | | | | | |
| Term Loan A / Series 2006 Bonds | | 61,031 | 62,825 | 45,997 | 49,186 | 72,371 | 51,780 | 48,590 | 51,780 | 71,896 | 51,780 | 106,660 | 51,780 | 71,896 | 51,780 | 50,080 | 899,429 | 2,175,022 |
| Term Loan B / Series 2002 Bonds | | 6,986 | 7,063 | 4,863 | 4,863 | 18,176 | 5,464 | 5,464 | 5,464 | 22,176 | 5,464 | 19,505 | 5,464 | 18,176 | 5,464 | 5,677 | 140,268 | 311,913 |
| Term Loan C / Series 2015 Bonds | | 2,610 | 713 | 1,213 | 713 | 1,608 | 1,108 | 1,608 | 1,108 | 1,608 | 1,108 | 2,099 | 73,406 | 1,608 | 1,108 | 1,772 | 93,388 | 239,054 |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | | | |
| Series 2006 Bonds (68.0%) | | 30,090 | 34,107 | 59,670 | 57,947 | 20,570 | 48,047 | 16,150 | 152,467 | 22,950 | 44,647 | 15,741 | 95,347 | 17,170 | 34,107 | 27,687 | 676,697 | 1,455,737 |
| Series 2002 Bonds (18.2%) | | 8,054 | 9,129 | 15,971 | 15,509 | 5,506 | 12,860 | 4,323 | 40,807 | 6,143 | 11,950 | 4,213 | 25,519 | 4,596 | 9,129 | 7,410 | 181,116 | 389,624 |
| Series 2015 Bonds (13.8%) | | 6,107 | 6,922 | 12,110 | 11,760 | 4,175 | 9,751 | 3,278 | 30,942 | 4,658 | 9,061 | 3,195 | 19,350 | 3,485 | 6,922 | 5,619 | 137,330 | 295,429 |
| Subtotal - Term Loan D | | 44,250 | 50,158 | 87,750 | 85,216 | 30,250 | 70,658 | 23,750 | 224,216 | 33,750 | 65,658 | 23,149 | 140,216 | 25,250 | 50,158 | 40,716 | 995,143 | 2,140,789 |
| **Total DIP Funding - Weekly** | | 114,877 | 120,758 | 139,822 | 139,977 | 122,405 | 129,009 | 79,412 | 282,567 | 129,430 | 124,009 | 151,412 | 270,865 | 116,930 | 108,509 | 98,245 | 2,128,228 | 4,866,779 |
| **DIP FUNDING - CUMULATIVE** | | | | | | | | | | | | | | | | | | |
| Term Loan A / Series 2006 Bonds | | 1,336,624 | 1,399,449 | 1,445,446 | 1,494,631 | 1,567,002 | 1,618,782 | 1,667,372 | 1,719,152 | 1,791,048 | 1,842,827 | 1,949,487 | 2,001,266 | 2,073,162 | 2,124,942 | 2,175,022 | | 2,175,022 |
| Term Loan B / Series 2002 Bonds | | 178,631 | 185,694 | 190,557 | 195,420 | 213,596 | 219,060 | 224,524 | 229,988 | 252,164 | 257,628 | 277,132 | 282,596 | 300,772 | 306,236 | 311,913 | | 311,913 |
| Term Loan C / Series 2015 Bonds | | 148,276 | 148,989 | 150,201 | 150,914 | 152,522 | 153,630 | 155,238 | 156,346 | 157,954 | 159,061 | 161,161 | 234,567 | 236,175 | 237,283 | 239,054 | | 239,054 |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | | | |
| Series 2006 Bonds (68.0%) | | 809,129 | 843,237 | 902,907 | 960,853 | 981,423 | 1,029,471 | 1,045,621 | 1,198,087 | 1,221,037 | 1,265,685 | 1,281,426 | 1,376,773 | 1,393,943 | 1,428,050 | 1,455,737 | | 1,455,737 |
| Series 2002 Bonds (18.2%) | | 216,561 | 225,690 | 241,660 | 257,170 | 262,675 | 275,535 | 279,857 | 320,665 | 326,807 | 338,757 | 342,970 | 368,489 | 373,085 | 382,213 | 389,624 | | 389,624 |
| Series 2015 Bonds (13.8%) | | 164,206 | 171,127 | 183,237 | 194,997 | 199,171 | 208,922 | 212,199 | 243,141 | 247,799 | 256,860 | 260,054 | 279,404 | 282,888 | 289,810 | 295,429 | | 295,429 |
| Subtotal - Term Loan D | | 1,189,896 | 1,240,054 | 1,327,804 | 1,413,020 | 1,443,270 | 1,513,927 | 1,537,677 | 1,761,893 | 1,795,643 | 1,861,301 | 1,884,450 | 2,024,665 | 2,049,915 | 2,100,073 | 2,140,789 | | 2,140,789 |
| **Total DIP Funding - Cumulative** | | 2,853,428 | 2,974,186 | 3,114,008 | 3,253,985 | 3,376,390 | 3,505,399 | 3,584,811 | 3,867,378 | 3,996,808 | 4,120,817 | 4,272,229 | 4,543,094 | 4,660,024 | 4,768,533 | 4,866,779 | | 4,866,779 |
| **INCURRED/UNPAID PROFESSIONAL FEES** | | | | | | | | | | | | | | | | | | |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | | | |
| Series 2006 Bonds (68.0%) | | 102,680 | 116,280 | 81,600 | 90,440 | 99,280 | 108,120 | 116,960 | 31,790 | 44,540 | 57,290 | 70,040 | 40,290 | 51,340 | 62,390 | 73,440 | | 73,440 |
| Series 2002 Bonds (18.2%) | | 27,482 | 31,122 | 21,840 | 24,206 | 26,572 | 28,938 | 31,304 | 8,509 | 11,921 | 15,334 | 18,746 | 10,784 | 13,741 | 16,699 | 19,656 | | 19,656 |
| Series 2015 Bonds (13.8%) | | 20,838 | 23,598 | 16,560 | 18,354 | 20,148 | 21,942 | 23,736 | 6,452 | 9,039 | 11,627 | 14,214 | 8,177 | 10,419 | 12,662 | 14,904 | | 14,904 |
| **Total Incurred/Unpaid Professional Fees** | | 151,000 | 171,000 | 120,000 | 133,000 | 146,000 | 159,000 | 172,000 | 46,750 | 65,500 | 84,250 | 103,000 | 59,250 | 75,500 | 91,750 | 108,000 | | 108,000 |
| **TOTAL DIP COMMITMENT - CUMULATIVE** | | | | | | | | | | | | | | | | | | |
| Term Loan A / Series 2006 Bonds | | 1,336,624 | 1,399,449 | 1,445,446 | 1,494,631 | 1,567,002 | 1,618,782 | 1,667,372 | 1,719,152 | 1,791,048 | 1,842,827 | 1,949,487 | 2,001,266 | 2,073,162 | 2,124,942 | 2,175,022 | | 2,175,022 |
| Term Loan B / Series 2002 Bonds | | 178,631 | 185,694 | 190,557 | 195,420 | 213,596 | 219,060 | 224,524 | 229,988 | 252,164 | 257,628 | 277,132 | 282,596 | 300,772 | 306,236 | 311,913 | | 311,913 |
| Term Loan C / Series 2015 Bonds | | 148,276 | 148,989 | 150,201 | 150,914 | 152,522 | 153,630 | 155,238 | 156,346 | 157,954 | 159,061 | 161,161 | 234,567 | 236,175 | 237,283 | 239,054 | | 239,054 |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | | | |
| Series 2006 Bonds (68.0%) | | 911,809 | 959,517 | 984,507 | 1,051,293 | 1,080,703 | 1,137,591 | 1,162,581 | 1,229,877 | 1,265,577 | 1,322,975 | 1,351,466 | 1,417,063 | 1,445,283 | 1,490,440 | 1,529,177 | | 1,529,177 |
| Series 2002 Bonds (18.2%) | | 244,043 | 256,812 | 263,500 | 281,376 | 289,247 | 304,473 | 311,161 | 329,173 | 338,728 | 354,090 | 361,716 | 379,273 | 386,826 | 398,912 | 409,280 | | 409,280 |
| Series 2015 Bonds (13.8%) | | 185,044 | 194,725 | 199,797 | 213,351 | 219,319 | 230,864 | 235,935 | 249,593 | 256,838 | 268,486 | 274,268 | 287,580 | 293,307 | 302,472 | 310,333 | | 310,333 |
| Subtotal - Term Loan D | | 1,340,896 | 1,411,054 | 1,447,804 | 1,546,020 | 1,589,270 | 1,672,927 | 1,709,677 | 1,808,643 | 1,861,143 | 1,945,551 | 1,987,450 | 2,083,915 | 2,125,415 | 2,191,823 | 2,248,789 | | 2,248,789 |
| **Total DIP Commitment - Cumulative** | | 3,004,428 | 3,145,186 | 3,234,008 | 3,386,985 | 3,522,390 | 3,664,399 | 3,756,811 | 3,914,128 | 4,062,308 | 4,205,067 | 4,375,229 | 4,602,344 | 4,735,524 | 4,860,283 | 4,974,779 | | 4,974,779 |
| **MEMO: TOTAL DIP COMMITMENT - CUMULATIVE** | | | | | | | | | | | | | | | | | | |
| *Series 2006 Bonds* | | 2,248,434 | 2,358,966 | 2,429,952 | 2,545,925 | 2,647,706 | 2,756,373 | 2,829,953 | 2,949,029 | 3,056,625 | 3,165,802 | 3,300,953 | 3,418,329 | 3,518,445 | 3,615,382 | 3,704,199 | | 3,704,199 |
| *Series 2002 Bonds* | | 422,674 | 442,506 | 454,058 | 476,796 | 502,844 | 523,533 | 535,685 | 559,161 | 590,892 | 611,718 | 638,848 | 661,868 | 687,598 | 705,148 | 721,193 | | 721,193 |
| *Series 2015 Bonds* | | 333,320 | 343,714 | 349,998 | 364,265 | 371,841 | 384,494 | 391,173 | 405,938 | 414,791 | 427,547 | 435,429 | 522,147 | 529,482 | 539,754 | 549,387 | | 549,387 |
| ***Total DIP Commitment - Cumulative*** | | 3,004,428 | 3,145,186 | 3,234,008 | 3,386,985 | 3,522,390 | 3,664,399 | 3,756,811 | 3,914,128 | 4,062,308 | 4,205,067 | 4,375,229 | 4,602,344 | 4,735,524 | 4,860,283 | 4,974,779 | | 4,974,779 |

**NOTES:**

(1) The college is assumed to operate in bankruptcy on a zero cash basis with all required disbursements funded under the DIP loan facility. Any proceeds from the use or sale of collateral or any other miscellaneous cash inflows are assumed to be swept by the lenders to repay DIP borrowings or secured debt and are not reflected in the budget. If it is ultimately determined that the Debtor's cash of approximately $222,000 is deemed unrestricted, such funds will be utilized to fund budgeted disbursements prior to the use of DIP financing funds and will reduce the applicable DIP commitments on a dollar-for-dollar basis.

(2) Refer to the Professional Fees supporting schedule (Schedule [OPEN]) on the next page for detail of professional fees expecte d to be incurred during the interim period. Schedule [OPEN] indicates the amounts projected to be charged against existing retainers, the amounts to be paid in cash and the amounts incurred and projected to be unpaid at the end of the interim period due to timing of disbursements, filing of fee applications and required holdback amounts.

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST
PROFESSIONAL FEES

| | Week #: 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Weeks 1-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Ending Friday: | 12/2/2016 | 12/9/2016 | 12/16/2016 | 12/23/2016 | 12/30/2016 | 1/6/2017 | 1/13/2017 | 1/20/2017 | 1/27/2017 | 2/3/2017 | 2/10/2017 | 2/17/2017 | 2/24/2017 | 3/3/2017 | 3/10/2017 | Subtotal |
| **Professional Fees Incurred** | | | | | | | | | | | | | | | | |
| Klestadt | 22,500 | 22,500 | 22,500 | 22,500 | 21,250 | 21,250 | 21,250 | 21,250 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 11,250 | 11,250 | 272,500 |
| Ingerman Smith, L.L.P. | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 5,000 | 5,000 | 70,000 |
| Special Counsel - ERISA - TBD | - | - | 2,500 | 2,500 | 2,500 | 2,500 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | - | 20,000 |
| RSR Consulting, LLC | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 15,000 | 20,000 | 35,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 420,000 |
| Chapter 11 Creditors Committee | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 3,750 | 3,750 | 77,500 |
| **Total Professional Fees Incurred** | 68,750 | 68,750 | 71,250 | 71,250 | 70,000 | 50,000 | 53,750 | 68,750 | 49,250 | 49,250 | 49,250 | 49,250 | 49,250 | 46,250 | 45,000 | 860,000 |
| **Professional Fees Cash Disbursements** | | | | | | | | | | | | | | | | |
| Klestadt | - | - | - | - | - | - | - | - | - | 32,000 | - | - | - | 60,000 | - | 60,000 |
| Ingerman Smith, L.L.P. | - | - | - | - | - | - | - | - | - | - | - | - | - | 16,000 | - | 48,000 |
| Special Counsel - ERISA - TBD | - | - | - | - | - | 10,000 | - | - | - | 5,000 | - | - | - | 5,000 | - | 20,000 |
| RSR Consulting, LLC | - | - | 5,000 | 35,000 | 35,000 | 15,000 | 20,000 | 35,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 320,000 |
| Chapter 11 Creditors Committee | - | - | - | - | - | - | - | - | - | 40,000 | - | - | - | 16,000 | - | 56,000 |
| **Total Professional Fees Cash Disbursements** | - | - | 5,000 | 35,000 | 35,000 | 25,000 | 20,000 | 35,000 | 25,000 | 102,000 | 25,000 | 25,000 | 25,000 | 122,000 | 25,000 | 504,000 |
| **Professional Fees Retainers Applied** | | | | | | | | | | | | | | | | |
| Klestadt | 18,000 | 18,000 | 18,000 | 18,000 | 13,250 | 13,250 | 13,250 | 13,250 | - | - | - | - | - | - | - | 125,000 |
| Ingerman Smith, L.L.P. | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Special Counsel - ERISA - TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| RSR Consulting, LLC | 35,000 | 35,000 | 30,000 | - | - | - | - | - | - | - | - | - | - | - | - | 100,000 |
| Chapter 11 Creditors Committee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Professional Fees Cash Disbursements** | 53,000 | 53,000 | 48,000 | 18,000 | 13,250 | 13,250 | 13,250 | 13,250 | - | - | - | - | - | - | - | 225,000 |
| **Professional Fees Incurred Not Paid Balance** | | | | | | | | | | | | | | | | |
| Klestadt | 4,500 | 9,000 | 13,500 | 18,000 | 26,000 | 34,000 | 42,000 | 50,000 | 65,000 | 80,000 | 95,000 | 110,000 | 125,000 | 76,250 | 87,500 | 87,500 |
| Ingerman Smith, L.L.P. | 5,000 | 10,000 | 15,000 | 20,000 | 25,000 | 30,000 | 35,000 | 40,000 | 44,000 | 16,000 | 20,000 | 24,000 | 28,000 | 17,000 | 22,000 | 22,000 |
| Special Counsel - ERISA - TBD | - | - | 2,500 | 5,000 | 7,500 | - | 1,250 | 2,500 | 3,750 | - | 1,250 | 2,500 | 3,750 | - | - | - |
| RSR Consulting, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Chapter 11 Creditors Committee | 6,250 | 12,500 | 18,750 | 25,000 | 31,250 | 37,500 | 43,750 | 50,000 | 54,000 | 18,000 | 22,000 | 26,000 | 30,000 | 17,750 | 21,500 | 21,500 |
| **Total Professional Fees Incurred Not Paid Balance** | 15,750 | 31,500 | 49,750 | 68,000 | 89,750 | 101,500 | 122,000 | 142,500 | 166,750 | 114,000 | 138,250 | 162,500 | 186,750 | 111,000 | 131,000 | 131,000 |

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST
PROFESSIONAL FEES

| | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | Weeks 16-30 Subtotal | Weeks 1-30 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week #: | | | | | | | | | | | | | | | | | |
| Period Ending Friday: | 3/17/2017 | 3/24/2017 | 3/31/2017 | 4/7/2017 | 4/14/2017 | 4/21/2017 | 4/28/2017 | 5/5/2017 | 5/12/2017 | 5/19/2017 | 5/26/2017 | 6/2/2017 | 6/9/2017 | 6/16/2017 | 6/23/2017 | | |
| **Professional Fees Incurred** | | | | | | | | | | | | | | | | | |
| Klestadt | $ 11,250 | $ 11,250 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 11,250 | $ 11,250 | $ 11,250 | $ 11,250 | $ 8,750 | $ 8,750 | $ 8,750 | $ 8,750 | $ 132,500 | 405,000 |
| Ingerman Smith, L.L.P. | 5,000 | 5,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 60,000 | 130,000 |
| Special Counsel - ERISA - TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 20,000 |
| RSR Consulting, LLC | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 260,000 | 680,000 |
| Chapter 11 Creditors Committee | 3,750 | 3,750 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 52,500 | 130,000 |
| **Total Professional Fees Incurred** | $ 40,000 | $ 40,000 | $ 33,000 | $ 33,000 | $ 33,000 | $ 33,000 | $ 33,000 | $ 33,750 | $ 33,750 | $ 33,750 | $ 33,750 | $ 31,250 | $ 31,250 | $ 31,250 | $ 31,250 | $ 505,000 | $ 1,365,000 |
| **Professional Fees Cash Disbursements** | | | | | | | | | | | | | | | | | |
| Klestadt | $ - | $ - | $ 36,000 | $ - | $ - | $ - | $ - | $ 83,000 | $ - | $ - | $ - | $ 36,000 | $ - | $ - | $ - | $ 155,000 | $ 215,000 |
| Ingerman Smith, L.L.P. | - | - | 16,000 | - | - | - | - | 32,000 | - | - | - | 12,000 | - | - | - | 60,000 | 108,000 |
| Special Counsel - ERISA - TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 20,000 |
| RSR Consulting, LLC | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 260,000 | 580,000 |
| Chapter 11 Creditors Committee | - | - | 12,000 | - | - | - | - | 29,000 | - | - | - | 12,000 | - | - | - | 53,000 | 109,000 |
| **Total Professional Fees Cash Disbursements** | $ 20,000 | $ 20,000 | $ 84,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 159,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 75,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 528,000 | $ 1,032,000 |
| **Professional Fees Retainers Applied** | | | | | | | | | | | | | | | | | |
| Klestadt | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 125,000 |
| Ingerman Smith, L.L.P. | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Special Counsel - ERISA - TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| RSR Consulting, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 100,000 |
| Chapter 11 Creditors Committee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Professional Fees Cash Disbursements** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 225,000 |
| **Professional Fees Incurred Not Paid Balance** | | | | | | | | | | | | | | | | | |
| Klestadt | $ 98,750 | $ 110,000 | $ 80,000 | $ 86,000 | $ 92,000 | $ 98,000 | $ 104,000 | $ 32,250 | $ 43,500 | $ 54,750 | $ 66,000 | $ 38,750 | $ 47,500 | $ 56,250 | $ 65,000 | $ 65,000 | $ 65,000 |
| Ingerman Smith, L.L.P. | 27,000 | 32,000 | 20,000 | 24,000 | 28,000 | 32,000 | 36,000 | 7,750 | 11,500 | 15,250 | 19,000 | 10,750 | 14,500 | 18,250 | 22,000 | 22,000 | 22,000 |
| Special Counsel - ERISA - TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| RSR Consulting, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Chapter 11 Creditors Committee | 25,250 | 29,000 | 20,000 | 23,000 | 26,000 | 29,000 | 32,000 | 6,750 | 10,500 | 14,250 | 18,000 | 9,750 | 13,500 | 17,250 | 21,000 | 21,000 | 21,000 |
| **Total Professional Fees Incurred Not Paid Balance** | $ 151,000 | $ 171,000 | $ 120,000 | $ 133,000 | $ 146,000 | $ 159,000 | $ 172,000 | $ 46,750 | $ 65,500 | $ 84,250 | $ 103,000 | $ 59,250 | $ 75,500 | $ 91,750 | $ 108,000 | $ 108,000 | $ 108,000 |

# **EXHIBIT B**

## **Interim Order**

This document has been included elsewhere in this pleading; this specific copy of this document has been omitted to avoid providing the Court multiple duplicate copies.

**Exhibit B**

**Collateral Depiction**



*Dowling College*
**Prepetition Collateral Depiction**



**Exhibit C**

**Approved Budget**

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST - BY BOND SERIES
FOR THE 6-WEEK PERIOD ENDING JANUARY 6, 2017
USD

| | Week #: | 1 | 2 | 3 | 4 | 5 | 6 | Weeks 1-6 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Period Ending Friday: | 12/2/2016 | 12/9/2016 | 12/16/2016 | 12/23/2016 | 12/30/2016 | 1/6/2017 | Total |
| **Cash Disbursements: (1)** | | | | | | | | |
| **Administrative Overhead / Term Loan D** | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | | 26,408 | - | 26,408 | - | 26,408 | - | 79,223 |
| General Insurance | | 35,058 | - | - | - | - | 35,058 | 70,117 |
| Professionals **(2)** | | | | | | | | |
| Klestadt | | - | - | - | - | - | - | - |
| Ingerman Smith, L.L.P. | | - | - | - | - | - | - | - |
| Special Counsel - ERISA - TBD | | - | - | - | - | - | 10,000 | 10,000 |
| RSR Consulting, LLC | | - | - | 5,000 | 35,000 | 35,000 | 15,000 | 90,000 |
| Chapter 11 Creditors Committee | | - | - | - | - | - | - | - |
| Student Refunds / Records Scanning | | - | - | - | - | 45,069 | - | 45,069 |
| Health, Medical, Unemployment Claims and Related | | - | - | - | - | - | - | |
| Claims Agent | | - | - | 20,000 | - | - | - | 20,000 |
| Administrative | | - | 1,700 | 500 | - | - | - | 2,200 |
| Adequate Assurance | | - | - | - | - | - | - | |
| U.S. Trustee Fees | | - | - | - | - | - | - | |
| All Other Professional Fees | | - | - | - | - | - | - | |
| DIP Interest and Fees | | 89,735 | - | - | - | - | - | 89,735 |
| Other | | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 22,500 |
| **Total Administrative Overhead / Term Loan D** | | 154,951 | 5,450 | 55,658 | 38,750 | 110,226 | 63,808 | 428,843 |
| *2006 Bond Series - 68.0%* | | *105,367* | *3,706* | *37,847* | *26,350* | *74,954* | *43,390* | *291,613* |
| *2002 Bond Series - 18.2%* | | *28,201* | *992* | *10,130* | *7,053* | *20,061* | *11,613* | *78,049* |
| *2015 Bond Series - 13.8%* | | *21,383* | *752* | *7,681* | *5,348* | *15,211* | *8,806* | *59,180* |
| | | | | | | | | |
| **Collateral Preservation** | | | | | | | | |
| **Series 2006 Bonds / Term Loan A** | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | | 3,189 | - | 3,189 | - | 3,189 | - | 9,567 |
| General Insurance | | 12,039 | - | - | - | - | - | 12,039 |
| Utilities | | 21,706 | 67,476 | 21,706 | 21,706 | 21,706 | 21,706 | 176,008 |
| Security Personnel | | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 120,906 |
| Property Management | | - | - | - | - | - | - | - |
| Other Outside Services | | 10,554 | 13,077 | 7,406 | 60,750 | 5,904 | 15,577 | 113,267 |
| Facility Maintenance | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 6,000 |
| Real Estate Taxes | | - | - | - | - | - | - | - |
| Landscaping / Snow Removal | | 8,528 | - | - | 8,528 | - | - | 17,055 |
| Sales Broker - Marketing | | 43,559 | 13,845 | 5,867 | 4,839 | - | - | 68,110 |
| Brookhaven Site Planning | | - | 8,000 | - | - | - | - | 8,000 |
| DIP Interest and Fees | | 91,170 | - | - | - | - | - | 91,170 |
| Other | | 3,779 | 6,572 | 3,139 | 3,779 | 3,139 | 3,139 | 23,548 |
| **Total Series 2006 Bonds / Term Loan A** | | 215,675 | 130,121 | 62,459 | 120,753 | 55,090 | 61,573 | 645,671 |
| | | | | | | | | |
| **Series 2002 Bonds / Term Loan B** | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | | - | - | - | - | - | - | - |
| General Insurance | | - | - | - | - | - | - | - |
| Utilities | | 2,194 | 6,214 | 2,194 | 2,194 | 2,194 | 2,194 | 17,182 |
| Security Personnel | | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 11,190 |
| Property Management | | - | - | - | - | - | - | - |
| Other Outside Services | | 5,783 | 7,600 | 500 | 500 | 2,813 | 13,300 | 30,495 |
| Facility Maintenance | | 500 | 500 | 500 | 500 | 500 | 500 | 3,000 |
| Real Estate Taxes | | - | - | - | - | - | - | - |
| Landscaping / Snow Removal | | 1,975 | - | - | 1,975 | - | - | 3,949 |
| Sales Broker - Marketing | | - | - | - | - | - | - | - |
| Brookhaven Site Planning | | - | 2,000 | - | - | - | - | 2,000 |
| DIP Interest and Fees | | 13,074 | - | - | - | - | - | 13,074 |
| Other | | 453 | 606 | 304 | 453 | 304 | 304 | 2,424 |
| **Total Series 2002 Bonds / Term Loan B** | | 25,843 | 18,785 | 5,363 | 7,486 | 7,676 | 18,163 | 83,315 |
| | | | | | | | | |
| **Series 2015 Bonds / Term Loan C** | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | | - | - | - | - | - | - | - |
| General Insurance | | 17,962 | - | - | - | - | - | 17,962 |
| Utilities | | 150 | 6,360 | 150 | 150 | 150 | 150 | 7,110 |
| Security Personnel | | - | - | - | - | - | - | - |
| Property Management | | - | - | - | - | - | - | - |
| Other Outside Services | | 55 | - | - | - | - | - | 55 |
| Facility Maintenance | | - | 500 | - | 500 | - | 500 | 1,500 |
| Real Estate Taxes | | - | - | - | - | - | - | - |
| Landscaping / Snow Removal | | 1,398 | - | - | 1,398 | - | - | 2,795 |
| Sales Broker - Marketing | | - | - | - | - | - | - | - |
| Brookhaven Site Planning | | - | - | - | - | - | - | - |
| DIP Interest and Fees | | 10,020 | - | - | - | - | - | 10,020 |
| Other | | 563 | 563 | 563 | 563 | 563 | 563 | 3,375 |
| **Total Series 2015 Bonds / Term Loan C** | | 30,148 | 7,423 | 713 | 2,610 | 713 | 1,213 | 42,818 |
| | | | | | | | | |
| **Total Cash Disbursements** | | 426,617 | 161,778 | 124,192 | 169,599 | 173,704 | 144,757 | 1,200,646 |

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST - BY BOND SERIES
FOR THE 6-WEEK PERIOD ENDING JANUARY 6, 2017
*USD*

| | Week #: | 1 | 2 | 3 | 4 | 5 | 6 | Weeks 1-6 |
|---|---|---|---|---|---|---|---|---|
| | Period Ending Friday: | **12/2/2016** | **12/9/2016** | **12/16/2016** | **12/23/2016** | **12/30/2016** | **1/6/2017** | **Total** |

**DIP TRANCHE SUMMARY**

**DIP FUNDING - WEEKLY**

| | 1 | 2 | 3 | 4 | 5 | 6 | Total |
|---|---|---|---|---|---|---|---|
| Term Loan A / Series 2006 Bonds | 215,675 | 130,121 | 62,459 | 120,753 | 55,090 | 61,573 | 645,671 |
| Term Loan B / Series 2002 Bonds | 25,843 | 18,785 | 5,363 | 7,486 | 7,676 | 18,163 | 83,315 |
| Term Loan C / Series 2015 Bonds | 30,148 | 7,423 | 713 | 2,610 | 713 | 1,213 | 42,818 |
| Term Loan D / Administrative Overhead: | | | | | | | |
| Series 2006 Bonds   (68.0%) | 105,367 | 3,706 | 37,847 | 26,350 | 74,954 | 43,390 | 291,613 |
| Series 2002 Bonds   (18.2%) | 28,201 | 992 | 10,130 | 7,053 | 20,061 | 11,613 | 78,049 |
| Series 2015 Bonds   (13.8%) | 21,383 | 752 | 7,681 | 5,348 | 15,211 | 8,806 | 59,180 |
| Subtotal - Term Loan D | 154,951 | 5,450 | 55,658 | 38,750 | 110,226 | 63,808 | 428,843 |
| **Total DIP Funding - Weekly** | **426,617** | **161,778** | **124,192** | **169,599** | **173,704** | **144,757** | **1,200,646** |

**DIP FUNDING - CUMULATIVE**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Term Loan A / Series 2006 Bonds | 215,675 | 345,796 | 408,255 | 529,008 | 584,098 | 645,671 | 645,671 |
| Term Loan B / Series 2002 Bonds | 25,843 | 44,627 | 49,990 | 57,476 | 65,152 | 83,315 | 83,315 |
| Term Loan C / Series 2015 Bonds | 30,148 | 37,570 | 38,283 | 40,893 | 41,605 | 42,818 | 42,818 |
| Term Loan D / Administrative Overhead: | | | | | | | |
| Series 2006 Bonds   (68.0%) | 105,367 | 109,073 | 146,920 | 173,270 | 248,224 | 291,613 | 291,613 |
| Series 2002 Bonds   (18.2%) | 28,201 | 29,193 | 39,323 | 46,375 | 66,436 | 78,049 | 78,049 |
| Series 2015 Bonds   (13.8%) | 21,383 | 22,135 | 29,816 | 35,164 | 50,375 | 59,180 | 59,180 |
| Subtotal - Term Loan D | 154,951 | 160,401 | 216,059 | 254,809 | 365,035 | 428,843 | 428,843 |
| **Total DIP Funding - Cumulative** | **426,617** | **588,394** | **712,586** | **882,185** | **1,055,889** | **1,200,646** | **1,200,646** |

**INCURRED/UNPAID PROFESSIONAL FEES**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Term Loan D / Administrative Overhead: | | | | | | | |
| Series 2006 Bonds   (68.0%) | 10,710 | 21,420 | 33,830 | 46,240 | 61,030 | 69,020 | 69,020 |
| Series 2002 Bonds   (18.2%) | 2,867 | 5,733 | 9,055 | 12,376 | 16,335 | 18,473 | 18,473 |
| Series 2015 Bonds   (13.8%) | 2,174 | 4,347 | 6,866 | 9,384 | 12,386 | 14,007 | 14,007 |
| **Total Incurred/Unpaid Professional Fees** | **15,750** | **31,500** | **49,750** | **68,000** | **89,750** | **101,500** | **101,500** |

**TOTAL DIP COMMITMENT - CUMULATIVE**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Term Loan A / Series 2006 Bonds | 215,675 | 345,796 | 408,255 | 529,008 | 584,098 | 645,671 | 645,671 |
| Term Loan B / Series 2002 Bonds | 25,843 | 44,627 | 49,990 | 57,476 | 65,152 | 83,315 | 83,315 |
| Term Loan C / Series 2015 Bonds | 30,148 | 37,570 | 38,283 | 40,893 | 41,605 | 42,818 | 42,818 |
| Term Loan D / Administrative Overhead: | | | | | | | |
| Series 2006 Bonds   (68.0%) | 116,077 | 130,493 | 180,750 | 219,510 | 309,254 | 360,633 | 360,633 |
| Series 2002 Bonds   (18.2%) | 31,068 | 34,926 | 48,377 | 58,751 | 82,771 | 96,522 | 96,522 |
| Series 2015 Bonds   (13.8%) | 23,557 | 26,482 | 36,682 | 44,548 | 62,760 | 73,187 | 73,187 |
| Subtotal - Term Loan D | 170,701 | 191,901 | 265,809 | 322,809 | 454,785 | 530,343 | 530,343 |
| **Total DIP Commitment - Cumulative** | **442,367** | **619,894** | **762,336** | **950,185** | **1,145,639** | **1,302,146** | **1,302,146** |

**MEMO: TOTAL DIP COMMITMENT - CUMULATIVE**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| *Series 2006 Bonds* | *331,752* | *476,289* | *589,005* | *748,518* | *893,351* | *1,006,304* | *1,006,304* |
| *Series 2002 Bonds* | *56,910* | *79,553* | *98,368* | *116,227* | *147,923* | *179,837* | *179,837* |
| *Series 2015 Bonds* | *53,704* | *64,052* | *74,964* | *85,440* | *104,365* | *116,005* | *116,005* |
| ***Total DIP Commitment - Cumulative*** | ***442,367*** | ***619,894*** | ***762,336*** | ***950,185*** | ***1,145,639*** | ***1,302,146*** | ***1,302,146*** |

**NOTES:**

**(1)** The college is assumed to operate in bankruptcy on a zero cash basis with all required disbursements funded under the DIP loan facility.  Any proceeds from the use or sale of collateral or any other miscellaneous cash inflows are assumed to be swept by the lenders to repay DIP borrowings or secured debt and are not reflected in the budget.  If it is ultimately determined that the Debtor's cash of approximately $222,000 is deemed unrestricted, such funds will be utilized to fund budgeted disbursements prior to the use of DIP financing funds and will reduce the applicable DIP commitments on a dollar-for-dollar basis.

**(2)** Refer to the Professional Fees supporting schedule (Schedule [OPEN]) on the next page for detail of professional fees expected to be incurred during the interim period. Schedule [OPEN] indicates the amounts projected to be charged against existing retainers, the amounts to be paid in cash and the amounts incurred and projected to be unpaid at the end of the interim period due to timing of disbursements, filing of fee applications and required holdback amounts.

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST - PROFESSIONAL FEES DETAIL
FOR THE 6-WEEK PERIOD ENDING JANUARY 6, 2017
*USD*

| | Week #: | 1 | 2 | 3 | 4 | 5 | 6 | | Weeks 1-6 |
|---|---|---|---|---|---|---|---|---|---|
| | Period Ending Friday: | 12/2/2016 | 12/9/2016 | 12/16/2016 | 12/23/2016 | 12/30/2016 | 1/6/2017 | | Total |
| **Professional Fees Incurred** | | | | | | | | | |
| Klestadt | | $ 22,500 | $ 22,500 | $ 22,500 | $ 22,500 | $ 21,250 | $ 21,250 | $ | 132,500 |
| Ingerman Smith, L.L.P. | | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | | 30,000 |
| Special Counsel - ERISA - TBD | | - | - | 2,500 | 2,500 | 2,500 | 2,500 | | 10,000 |
| RSR Consulting, LLC | | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 15,000 | | 190,000 |
| Chapter 11 Creditors Committee | | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | | 37,500 |
| **Total Professional Fees Incurred** | | $ 68,750 | $ 68,750 | $ 71,250 | $ 71,250 | $ 70,000 | $ 50,000 | $ | 400,000 |
| **Professional Fees Cash Disbursements** | | | | | | | | | |
| Klestadt | | $ - | $ - | $ - | $ - | $ - | $ - | $ | - |
| Ingerman Smith, L.L.P. | | - | - | - | - | - | - | | - |
| Special Counsel - ERISA - TBD | | - | - | - | - | - | 10,000 | | 10,000 |
| RSR Consulting, LLC | | - | - | 5,000 | 35,000 | 35,000 | 15,000 | | 90,000 |
| Chapter 11 Creditors Committee | | - | - | - | - | - | - | | - |
| **Total Professional Fees Cash Disbursements** | | $ - | $ - | $ 5,000 | $ 35,000 | $ 35,000 | $ 25,000 | $ | 100,000 |
| **Professional Fees Retainers Applied** | | | | | | | | | |
| Klestadt | | $ 18,000 | $ 18,000 | $ 18,000 | $ 18,000 | $ 13,250 | $ 13,250 | $ | 98,500 |
| Ingerman Smith, L.L.P. | | - | - | - | - | - | - | | - |
| Special Counsel - ERISA - TBD | | - | - | - | - | - | - | | - |
| RSR Consulting, LLC | | 35,000 | 35,000 | 30,000 | - | - | - | | 100,000 |
| Chapter 11 Creditors Committee | | - | - | - | - | - | - | | - |
| **Total Professional Fees Cash Disbursements** | | $ 53,000 | $ 53,000 | $ 48,000 | $ 18,000 | $ 13,250 | $ 13,250 | $ | 198,500 |
| **Professional Fees Incurred Not Paid Balance** | | | | | | | | | |
| Klestadt | | $ 4,500 | $ 9,000 | $ 13,500 | $ 18,000 | $ 26,000 | $ 34,000 | $ | 34,000 |
| Ingerman Smith, L.L.P. | | 5,000 | 10,000 | 15,000 | 20,000 | 25,000 | 30,000 | | 30,000 |
| Special Counsel - ERISA - TBD | | - | - | 2,500 | 5,000 | 7,500 | - | | - |
| RSR Consulting, LLC | | - | - | - | - | - | - | | - |
| Chapter 11 Creditors Committee | | 6,250 | 12,500 | 18,750 | 25,000 | 31,250 | 37,500 | | 37,500 |
| **Total Professional Fees Incurred Not Paid Balance** | | $ 15,750 | $ 31,500 | $ 49,750 | $ 68,000 | $ 89,750 | $ 101,500 | $ | 101,500 |

**Exhibit D**

**Interim Order**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re:<br><br>DOWLING COLLEGE<br><br>Debtor.[1] | Chapter 11<br><br>Case No.: 16-75545-REG<br><br>**Related Docket No. __** |

**INTERIM ORDER (I) AUTHORIZING DEBTOR TO OBTAIN
POSTPETITION FINANCING AND USE CASH COLLATERAL, (II) GRANTING
ADEQUATE PROTECTION, (III) SCHEDULING FINAL HEARING, AND (IV)
<u>GRANTING CERTAIN RELATED RELIEF</u>**

Upon the motion dated November 29, 2016 (the "<u>Motion</u>"), seeking entry of (I) an

interim order (this "<u>Interim Order</u>"), *inter alia,*

(a)     authorizing Dowling College (the "<u>Debtor</u>") to obtain secured postpetition
superpriority financing (the "<u>DIP Facility</u>") on an interim basis  pursuant to the
terms and conditions of that certain "Debtor-in-Possession Multi-Draw Term
Loan Promissory Note" dated as of November 29, 2016, by and among the
Debtor and each lender party thereto (collectively, the "<u>DIP Lenders</u>"), and UMB
Bank, National Association ("<u>UMB</u>") in its capacity as agent (in such capacity, the
"<u>DIP Agent</u>") on behalf of the DIP Lenders, attached hereto as <u>Exhibit A</u> (as
amended, supplemented, restated or otherwise modified from time to time in
accordance therewith, the "<u>DIP Note</u>" and together with the other documents,
agreements and instruments delivered pursuant thereto or executed or filed in
connection therewith, all as may be reasonably requested by the DIP Lenders (as
the same may be amended, supplemented, restated or otherwise modified from
time to time, the "<u>DIP Documentation</u>");[2]

(b)     authorizing the Debtor to execute the DIP Documentation, and to perform such
other acts as may be necessary or desirable in connection therewith;

(c)     granting to the DIP Agent, for itself and for the ratable benefit of the DIP
Lenders, first priority security interests in and liens on all of the DIP Collateral
(as defined below) to secure the DIP Facility and all obligations owing and

---

[1]   The last four digits of the Debtor's federal employer identification number are 7078.

[2]   Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the DIP
Note.

outstanding thereunder and under the DIP Documentation, and this Interim Order and Final Order, as applicable (collectively, the "<u>DIP Loan Obligations</u>");

(d)    granting allowed superpriority administrative expense claims to the DIP Agent and the DIP Lenders;

(e)    authorizing the Debtor to use Cash Collateral and other Prepetition Collateral (as defined below);

(f)    authorizing the Debtor to grant adequate protection to (i) UMB, as successor indenture trustee (the "<u>Series 1996 Bond Trustee</u>") for those certain bonds (the "<u>Series 1996 Bonds</u>") issued by the Suffolk County Industrial Development Agency ("<u>SCIDA</u>") pursuant to that certain Indenture of Trust (the "<u>Series 1996 Indenture</u>") dated as of June 1, 1996 between SCIDA and the Series 1996 Bond Trustee and all other related documents evidencing and/or securing the Series 1996 Bonds and all other obligations under the Series 1996 Indenture and all related documents, (the "<u>Series 1996 Bond Documents</u>"); (ii) UMB, as successor indenture trustee (the "<u>Series 2002 Bond Trustee</u>") for those certain bonds (the "<u>Series 2002 Bonds</u>") issued by the Town of Brookhaven Industrial Development Agency ("<u>BIDA</u>") pursuant to that certain Indenture of Trust (the "<u>Series 2002 Indenture</u>") dated as of November 1, 2002 between BIDA and the Series 2002 Bond Trustee and all other related documents evidencing and/or securing the Series 2002 Bonds and all other obligations under the Series 2002 Indenture and all related documents, including but not limited to, that certain Conditional Funding Agreement (the "<u>Series 2002/2015 Funding Agreement</u>"), as amended, dated as of August 4, 2016 among the Debtor, the Series 2002 Bond Trustee, the Series 2015 Bond Trustee (defined below) and certain holders (the "<u>Series 2002 Bond Documents</u>"); (iii) Wilmington Trust, National Association ("<u>Wilmington Trust</u>"), as successor indenture trustee (the "<u>Series 2006 Bond Trustee</u>") for those certain bonds (the "<u>Series 2006 Bonds</u>") issued by SCIDA pursuant to that certain Indenture of Trust dated as of June 1, 2006 (the "<u>Series 2006 Indenture</u>") between SCIDA and the Series 2006 Bond Trustee and all other related documents evidencing and/or securing the Series 2006 Bonds and all other obligations under the Series 2006 Indenture and all related documents, including but not limited to, that certain Conditional Funding Agreement (the "<u>Series 2006 Funding Agreement</u>"), as amended, dated as of August 4, 2016 among the Debtor, the Series 2006 Bond Trustee and ACA (the "<u>Series 2006 Bond Documents</u>"); (iv) ACA Financial Guaranty Corporation ("<u>ACA</u>") as bond insurer in respect of the Series 2006 Bonds; and (v) UMB, as indenture trustee (the "<u>Series 2015 Bond Trustee</u>" and together with the Series 1996 Bond Trustee, the Series 2002 Bond Trustee, the Series 2006 Bond Trustee, ACA and the Series 2015 Bond Trustee, the "<u>Prepetition Secured Parties</u>") for the those certain bonds (the "<u>Series 2015 Bonds</u>") issued by the Debtor pursuant to that certain Indenture of Trust (the "<u>Series 2015 Indenture</u>") dated as of June 15, 2015 between the Debtor and UMB and all other related documents evidencing and/or securing the Series 2015 Bonds and all other obligations under the Series 2015 Indenture, including but not limited to the Series 2002/2015 Funding Agreement (the "<u>Series 2015 Bond</u>

Documents" and together with the Series 1996 Bond Documents, the Series 2002 Bond Documents, the Series 2006 Bond Documents, and the Series 2015 Bond Documents, the "Prepetition Financing Documents"); and

(g)     scheduling a hearing (the "Final Hearing"), pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to consider entry of a final order (the "Final Order"), *inter alia*, approving and authorizing the DIP Facility on a final basis; and the interim hearing on the Motion (the "Interim Hearing") having been held on November [__], 2016; and upon all of the pleadings filed with the Court and the evidence proffered or adduced at the Interim Hearing;

and the Court having heard and resolved or overruled any and all objections to the interim relief requested in the Motion; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, and creditors; and upon the record herein; and after due deliberation thereon, and good and sufficient cause appearing therefor:

**IT IS HEREBY FOUND AND DETERMINED THAT:[3]**

A.     Petition Date.  On November 29, 2016 (the "Petition Date"), the Debtor commenced its chapter 11 case (the "Chapter 11 Case") by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York (the "Court").  The Debtor is managing its affairs as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner, or official committee of creditors holding unsecured claims (a "Creditors' Committee") has been appointed in this Chapter 11 Case.

B.     Jurisdiction; Venue.  The Court has jurisdiction over this Chapter 11 Case, the parties, and the Debtor's property pursuant to 28 U.S.C. § 1334.  This is a core proceeding

---

[3]     Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, as applicable, pursuant to Bankruptcy Rule 7052.

pursuant to 28 U.S.C. §157(b)(2)(D).  The Court is a proper venue of this Chapter 11 Case and the Motion under 28 U.S.C. §§ 1408 and 1409.

        C.     <u>Notice</u>.  Notice of the Motion, the relief requested therein and the Interim Hearing (the "<u>Notice</u>") has been served pursuant to Federal Rule of Bankruptcy Procedure 4001(c)(3) and was served by the Debtor on (i) the Debtor's twenty largest unsecured creditors on a consolidated basis, (ii) counsel to the DIP Lenders, the DIP Agent, and the Prepetition Secured Parties, (iii) any parties that have filed a notice of appearance in this Chapter 11 Case pursuant to Bankruptcy Rule 2002, (iv) all known holders of liens upon the Debtor's assets, (v) the United States Attorney for the Eastern District of New York, (vi) the Internal Revenue Service, and (vii) the United States Trustee for the Eastern District of New York.  Under the circumstances, the Notice constitutes good and sufficient notice of the relief requested, and no further notice of the relief sought at the Interim Hearing and the relief granted by this Interim Order is necessary or shall be required.

        D.     <u>Secured Bond Obligations</u>.  For purposes of this Interim Order, the term "<u>Secured Bond Obligations</u>" shall mean all aggregate indebtedness of the Debtor under, in connection with, or with respect to the Prepetition Financing Documents and all related documents, whether for borrowed money, fees, expenses, or otherwise accrued and outstanding as of the Petition Date, owed to the Prepetition Secured Parties under the Prepetition Financing Documents.

        E.     <u>Prepetition Liens</u>.  To secure the obligations under the Series 1996 Bond Documents, the Debtor granted to the Series 1996 Bond Trustee, for itself and for the ratable benefit of the holders of the Series 1996 Bonds first priority liens (the "<u>Series 1996 Liens</u>") on certain of the Debtor's assets as described in the Series 1996 Bond Documents (the "<u>Series 1996</u>

Collateral"). To secure the obligations under the Series 2002 Bond Documents, the Debtor

granted to the Series 2002 Bond Trustee, for itself and for the ratable benefit of holders of the

Series 2002 Bonds first priority liens (the "Series 2002 Liens") on certain of the Debtor's assets

including, but not limited to, that certain dormitory building located in the Town of Brookhaven,

New York (the "Brookhaven Dorm"), as more fully described in the Series 2002 Bond

Documents (the "Series 2002 Collateral"). To secure the obligations under the Series 2006 Bond

Documents, the Debtor granted to the Series 2006 Bond Trustee, for itself and for the ratable

benefit of holders of the Series 2006 Bonds and to ACA first priority liens (the "Series 2006

Priority Liens") on certain of the Debtor's assets including, but not limited to, the real property

and improvements comprising the Debtor's campuses located in the hamlet of Oakdale, New

York (the "Oakdale Campus") and the Town of Brookhaven, New York (the "Brookhaven

Campus"), each as more fully described in the Series 2006 Bond Documents (the "Series 2006

Collateral"), and a second priority lien (the "Series 2006 Second Liens" and together with the

Series 2006 Priority Liens, the "Series 2006 Liens") on the Brookhaven Dorm (the "Series 2006

Second Lien Collateral"). To secure the obligations under the Series 2015 Bond Documents, the

Debtor granted to the Series 2015 Bond Trustee, for itself and for the ratable benefit of holders of

the Series 2015 Bonds first priority liens (the "Series 2015 Liens") on certain of the Debtor's

assets including, but not limited to, those certain single family residential properties (the

"Houses") as more fully described in the Series 2015 Bond Documents (the "Series 2015

Collateral"). As additional security for the advances made under the Series 2006 Funding

Agreement (which are also secured by the Series 2006 Collateral) and the advances made under

the Series 2002/2015 Funding Agreement (which are also secured by the Series 2002 Collateral

and the Series 2015 collateral), the Debtor granted to the Series 2002 Bond Trustee, the Series

2006 Bond Trustee, ACA, and the Series 2015 Bond Trustee liens (the "Funding Agreement Liens" and together with the Series 1996 Liens, the Series 2002 Liens, the Series 2006 Liens, and the Series 2015 Liens, the "Prepetition Liens") on all of the Debtor's otherwise unencumbered assets, as more fully described in the Series 2006 Funding Agreement and the Series 2002/2015 Funding Agreement (the "Funding Agreement Additional Collateral" and together with the Series 1996 Collateral, the Series 2002 Collateral, the Series 2006 Collateral, the Series 2015 Collateral, the "Prepetition Collateral").

F.     Debtor's Acknowledgments and Stipulations.  In requesting the DIP Facility, and in exchange for and as a material inducement to the DIP Lenders to agree to provide the DIP Facility, the Debtor acknowledges, represents, stipulates, and agrees, subject to the challenge rights set forth in paragraph 13 herein, that:

(i)     Upon approval of this Interim Order by the Court, the Debtor has obtained all authorizations, consents and approvals required to be obtained from, and have made all filings with and given all notices required to be given to, all federal, state and local governmental agencies, authorities and instrumentalities in connection with the execution, delivery, validity and enforceability of the DIP Documentation and the use of Cash Collateral to which the Debtor is a party;

(ii)     until such time as all DIP Loan Obligations are indefeasibly paid in full in cash, the Debtor shall not in any way prime or seek to prime (or otherwise cause to be subordinated in any way) the liens provided to the DIP Agent, for itself and for the ratable benefit of the DIP Lenders by offering a subsequent lender or any party-in-interest a superior or *pari passu* lien or claim with respect to the DIP Collateral pursuant to section 364(d) of the Bankruptcy Code, or otherwise, except with respect to (a) permitted exceptions to be expressly

agreed upon in writing by each of the DIP Lenders in its sole and absolute discretion ("Permitted

Liens") and (b) the Carve-Out (as defined below);

(iii)    until such time as all DIP Loan Obligations are indefeasibly paid in

full in cash, the Debtor shall not in any way or at any time permit to exist an administrative

expense claim against the Debtor of any kind or nature whatsoever, including, without limitation,

claims for any administrative expenses (a) on account of any break-up fee and expense

reimbursement authorized to be paid to any person or entity, unless expressly agreed to in

writing by those DIP Lenders with a Prepetition Lien on the property being sold, or (b) of the

kind specified in, or arising or ordered under sections 105, 326, 328, 503(b), 506(c), 507(a),

507(b), 546(c), 552(b), 726, 1113 and 1114 of the Bankruptcy Code, that is superior to or *pari*

*passu* with the DIP Superiority Claim (as defined below) provided herein, except with respect

to the Carve-Out;

(iv)    the Prepetition Secured Parties are entitled, pursuant to sections

361, 363(e), and 364(d)(l) of the Bankruptcy Code, to adequate protection of their respective

interests in the Prepetition Collateral, including the Cash Collateral (a) in exchange for their

consent to allow the Debtor's use of such Prepetition Collateral and (b) for any diminution

resulting from the sale, lease or use by the Debtor (or other decline in value) of Cash Collateral

and any other Prepetition Collateral, the priming of the Prepetition Liens by the DIP Agent and

DIP Lenders pursuant to this Interim Order, and the imposition of the automatic stay pursuant to

section 362 of the Bankruptcy Code;

(v)    as of the Petition Date, (a) the aggregate amount of the Secured

Bond Obligations owed to the Series 1996 Bond Trustee under the Series 1996 Bond Documents

(collectively, the "Series 1996 Obligations") is $3,531,250.53  (which is the sum of (x) principal

of $3,115,000 and (y) accrued and unpaid interest of $416,250.53 through and including the Petition Date), which does not include fees, expenses and other amounts which are chargeable or otherwise reimbursable under the Series 1996 Bond Documents or any amounts under or in respect of any document or instrument other than the Series 1996 Bond Documents, or any amount payable to the Series 1996 Bond Trustee in its capacity as such, (b) all of the Series 1996 Obligations are unconditionally owing by the Debtor to the Series 1996 Bond Trustee, and (c) the Series 1996 Obligations are not subject to any avoidance, reductions, set-off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity, except as set forth in paragraph 13 herein;

                (vi)       as of the Petition Date, (a) the aggregate amount of the Secured Bond Obligations owed to the Series 2002 Bond Trustee under the Series 2002 Bond Documents (collectively, the "Series 2002 Obligations") is $11,122,497.92 (which is the sum of (x) principal of $8,755,000 and (y) accrued and unpaid interest of $2,367,497.92 through and including the Petition Date)), which does not include fees, expenses and other amounts which are chargeable or otherwise reimbursable under the Series 2002 Bond Documents or any amounts under or in respect of any document or instrument other than the Series 2002 Bond Documents, or any amount payable to the Series 2002 Bond Trustee in its capacity as such, (b) all of the Series 2002 Obligations are unconditionally owing by the Debtor to the Series 2002 Bond Trustee, and (c) the Series 2002 Obligations are not subject to any avoidance, reductions, set-off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity, except as set forth in paragraph 13 herein;

(vii)    as of the Petition Date, (a) the aggregate amount of the Secured

Bond Obligations owed to the Series 2006 Bond Trustee and ACA under the Series 2006 Bond

Documents (collectively, the "Series 2006 Obligations") is $37,253,883.01 (which is the sum of

(x) principal of $33,855,000, (y) accrued and unpaid interest of $1,646,146.12 through and

including the Petition Date, and (z) protective advances made by the Series 2006 Bond Trustee

and/or ACA of $1,752,736.89, including, but not limited to advances made under the Series 2006

Funding Agreement), which does not include fees, expenses and other amounts which are

chargeable or otherwise reimbursable under the Series 2006 Bond Documents or any amounts

under or in respect of any document or instrument other than the Series 2006 Bond Documents,

or any amount payable to the Series 2006 Bond Trustee in its capacity as such, (b) all of the

Series 2006 Obligations are unconditionally owing by the Debtor to the Series 2006 Bond

Trustee and ACA, and (c) the Series 2006 Obligations are not subject to any avoidance,

reductions, set-off, offset, recharacterization, subordination (whether equitable, contractual or

otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy

Code or any applicable law or regulation by any person or entity, except as set forth in paragraph

13 herein;

(viii)    as of the Petition Date, (a) the aggregate amount of the Secured

Bond Obligations owed to the Series 2015 Bond Trustee under the Series 2015 Bond Documents

(collectively, the "Series 2015 Obligations") is $6,998,243.06 (which is the sum of (x) principal

of $6,700,000 and (y) accrued and unpaid interest of $298,243.06 through and including the

Petition Date), which does not include fees, expenses and other amounts which are chargeable or

otherwise reimbursable under the Series 2015 Bond Documents or any amounts under or in

respect of any document or instrument other than the Series 2015 Bond Documents, or any

9

amount payable to the Series 2015 Bond Trustee in its capacity as such, (b) all of the Series 2015

Obligations are unconditionally owing by the Debtor to the Series 2015 Bond Trustee, and (c)

the Series 2015 Obligations are not subject to any avoidance, reductions, set-off, offset,

recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims,

cross-claims, defenses or any other challenges under the Bankruptcy Code or any applicable law

or regulation by any person or entity, except as set forth in paragraph 13 herein;

    (ix) the Prepetition Liens constitute valid, binding, enforceable, and

perfected liens with priority over any and all other liens and are not subject to any challenge or

defense, including, without limitation, respectively, avoidance, reductions, recharacterization,

subordination (whether equitable, contractual or otherwise), claims, counterclaims, cross-claims,

offsets, defenses or any other challenges under the Bankruptcy Code or any applicable law or

regulation by any person or entity, except as set forth in paragraph 13 herein;

    (x) the Debtor has waived, discharged and released any right it may

have to challenge the Secured Bond Obligations and the Prepetition Liens on the Prepetition

Collateral, and to assert any offsets, defenses, claims, objections, challenges, causes of action

and/or choses of action against the Prepetition Secured Parties, with respect to the Secured Bond

Obligations, the Prepetition Liens or the Prepetition Collateral;

    (xi) any payments made on account of the Secured Bond Obligations

within the ninety (90) days prior before the Petition Date were (a) payments out of the

Prepetition Collateral, and/or (b) made in the ordinary course of business and did not diminish

any property otherwise available for distribution to unsecured creditors;

(xii)    all of the Debtor's cash, including the cash in their deposit accounts and other accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral (as defined below); and

(xiii)    none of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties is a control person or insider of the Debtor by virtue of any of the actions taken by them in respect of or in connection with the DIP Loan Obligations or the Secured Bond Obligations.

G.    Cash Collateral.  For purposes of this Interim Order, the term "Cash Collateral" shall mean and include all "cash collateral," as defined in section 363 of the Bankruptcy Code, in or on which the Prepetition Secured Parties have a lien, security interest or other interest (including, without limitation, any adequate protection liens or security interests) whether existing on the Petition Date, arising pursuant to this Interim Order, or otherwise and shall include, without limitation:

(i)    all cash proceeds arising from the collection, sale, lease or other disposition, use or conversion of any property, insurance policies, or in or on which the Prepetition Secured Parties have a lien or a replacement lien, whether as part of the Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise, and whether such property has been converted to cash, existed as of the commencement of this Chapter 11 Case, or arose or was generated thereafter;

(ii)    all of the respective deposits, refund claims and rights in unused retainers of the Debtor's professionals returned to the Debtor on which the Prepetition Secured Parties have a lien or replacement lien, whether as part of the Prepetition Collateral or pursuant to an order of the Court or applicable law or otherwise;

11

(iii)    the proceeds of any sale of DIP Collateral or Prepetition Collateral in connection with any sale consummated prior to entry of the Final Order.

Nothing in this Interim Order shall entitle the Debtor to use any funds held under the Series 1996 Bond Documents, Series 2002 Bond Documents, Series 2006 Bond Documents or Series 2015 Bond Documents and no lien or other interest may be granted in such funds to any third party during the pendency of this Interim Order.

H.    <u>Adequate Protection</u>.  The Prepetition Secured Parties are each entitled, pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Collateral, including the Cash Collateral, in exchange for the Debtor's use of such Prepetition Collateral, to the extent of the diminution in value, if any, of the Prepetition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtor (or other decline in value) of Cash Collateral and any other Prepetition Collateral, the priming of the liens on and security interests of the Prepetition Secured Parties in the Prepetition Collateral by the DIP Agent or the DIP Lenders, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

I.    <u>Purpose and Necessity of Financing</u>.  As discussed in the Motion, the Debtor requires the DIP Facility (i) to maximize and preserve the value of its assets pending the sale of substantially all of its assets in an organized liquidation, and satisfy payroll obligations and other working capital and general purposes of the Debtor consistent with the terms set forth in the DIP Documentation and the Approved Budget (as defined below), (ii) to pay fees and expenses related to the DIP Documentation and this Chapter 11 Case, and (iii) for such other purpose as set forth in the DIP Documentation.  If the Debtor does not obtain authorization to borrow under the DIP Documentation, it will suffer immediate and irreparable harm.  The Debtor

12

is unable to obtain adequate unsecured credit allowable as an administrative expense under

section 503 of the Bankruptcy Code, or other sufficient financing under sections 364(c) or (d) of

the Bankruptcy Code, on equal or more favorable terms than those set forth in the DIP

Documentation, based on the totality of the circumstances.  A loan facility in the amount

provided by the DIP Documentation is not available to the Debtor without granting the DIP

Agent, for itself and for the ratable benefit of the DIP Lenders, superpriority claims, liens, and

security interests, pursuant to sections 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of the

Bankruptcy Code, as provided in this Interim Order and the DIP Documentation.  After

considering all alternatives, the Debtor has concluded, in the exercise of its sound business

judgment, that the DIP Facility represents the best financing available to it at this time.

       J.      <u>Good Cause Shown</u>.  Good cause has been shown for entry of this Interim

Order.  The ability of the Debtor to obtain sufficient working capital and liquidity under the DIP

Documentation is vital to the Debtor's estate and creditors.  The liquidity to be provided under

the DIP Documentation will enable the Debtor to preserve the value of the Debtor's assets.

Among other things, entry of this Interim Order is necessary to maximize the value of the

Debtor's assets and to avoid immediate and irreparable harm to the Debtor and its estate, and,

accordingly, is in the best interests of, the Debtor, its estate and its creditors.

       K.      <u>Sections 506(c) And 552(b) Waivers</u>.  In light of (i) the DIP Agent's and

the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out,

and in exchange for and as a material inducement to the DIP Lenders to agree to provide the DIP

Facility and (ii) the Prepetition Secured Parties' agreement to subordinate their liens and

superpriority claims to the Carve-Out and the DIP Liens (as defined below), and to permit the

use of their Cash Collateral for payments made in accordance with the Approved Budget and the

terms of this Interim Order, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties are each entitled to (1) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (2) subject to entry of the Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code.

L.    <u>Good Faith</u>.  The terms of the DIP Documentation are more favorable to the Debtor than those available from alternative sources.  Based upon the record before the Court, the DIP Documentation has been negotiated in good faith and at arm's-length among the Debtor, the DIP Agent, and the DIP Lenders.  Any loan under the DIP Facility and other financial accommodations made to the Debtor by the DIP Agent or the DIP Lenders pursuant to the DIP Documentation and this Interim Order shall be deemed to have been extended by the DIP Agent and the DIP Lenders, respectively, in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the DIP Agent and DIP Lenders shall be entitled to all protections and benefits afforded thereby.

M.    <u>Fair Consideration and Reasonably Equivalent Value</u>.  The Debtor has received and will receive fair consideration and reasonable value in exchange for access to the DIP Facility and all other financial accommodations provided under the DIP Documentation and this Interim Order.  The terms of the DIP Documentation are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

N.    <u>Immediate Entry of Interim Order</u>.  The Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  The permission granted herein to enter into the DIP Documentation and to obtain funds thereunder and to use Prepetition Collateral, including Cash Collateral, is necessary to avoid immediate and

irreparable harm to the Debtor and its assets.  This Court concludes that entry of this Interim

Order is in the best interests of the Debtor's estate and creditors as its implementation will,

among other things, allow for access to the financing necessary to facilitate the organized

liquidation of the Debtor's assets.  Based upon the foregoing findings, acknowledgements, and

conclusions, and upon the record made before this Court at the Interim Hearing, and good and

sufficient cause appearing therefor;

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. <u>Disposition</u>.  The Motion is granted on an interim basis on the terms set forth in

this Interim Order.  Any objection to the interim relief sought in the Motion that has not

previously been withdrawn or resolved, and all reservations of rights contained therein, are

hereby overruled on its merits.  The term of this Interim Order, the DIP Documentation, and the

use of Cash Collateral authorized hereunder shall expire, and the loans made pursuant to the this

Interim Order and the DIP Documentation will mature, and together with all interest thereon and

any other obligations accruing under the DIP Documentation, will become due and payable

(unless such obligations become due and payable earlier pursuant to the terms of the DIP

Documentation and this Interim Order by way of acceleration or otherwise) on the earlier of (a)

December 30, 2016 if the Final Order has not been entered by the Court prior to such date, and

(b) upon the occurrence of a Termination Event (as defined below).

**AUTHORIZATION FOR DIP FINANCING AND USE OF CASH COLLATERAL**

2. <u>Authorization For DIP Financing And Use of Cash Collateral</u>.

(a)    The Debtor is hereby authorized to use Cash Collateral and to incur the

DIP Loan Obligations subject to the terms of the Approved Budget, the DIP Documentation

and this Interim Order, with interim borrowings under the DIP Facility limited to the aggregate

principal amount of up to maximum amount of $1,302,146.00 (the "Maximum Borrowing")

payable as set forth in the DIP Documentation.

       (b)   Approved Budget.  The Debtor has delivered to the DIP Lenders a weekly

budget that has been approved by the Required Lenders and the Debtor (the "Approved

Budget") for the time period from and including the Petition Date through June 23, 2017.  A

copy of the Approved Budget is attached hereto as Exhibit B.  The Debtor shall provide to the

DIP Agent and each of the DIP Lenders updates to the Approved Budget and financial

reporting with respect to the Debtor in accordance with the terms of the DIP Documentation.

Funds borrowed under the DIP Documentation and DIP Collateral used under this Interim

Order shall be used by the Debtor in accordance with this Interim Order.  The consent of the

DIP Lenders, the DIP Agent, or the Prepetition Secured Parties to the Approved Budget shall

not be construed as a commitment to provide loans under the DIP Facility or to permit the use

of Cash Collateral after the occurrence of a Termination Event (as defined below), regardless

of whether the aggregate funds shown on the Approved Budget have been expended.

       (c)   Any amendments, supplements or modifications to the Approved Budget

must be consented to in writing by the Required Lenders in their sole discretion prior to the

implementation thereof and shall not require further notice, hearing, or court order.

       (d)   The DIP Agent, the DIP Lenders and the Prepetition Secured Parties (i)

may assume the Debtor will comply with the Approved Budget, (ii) shall have no duty to

monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the

DIP Collateral or Prepetition Collateral) any unpaid expenses incurred or authorized to be

incurred pursuant to the Approved Budget, except the Carve-Out.  All advances and

extensions of credit shall be based upon the terms and conditions of the DIP Documentation.

(e)    To the extent any court order is entered directing disgorgement of any payments  made by the Debtor to the Prepetition Secured Parties, either before or after the Petition Date, all proceeds recovered by the Debtor's estate in connection with such order(s) directing disgorgement shall be applied first to repayment of the DIP Loan Obligations until the DIP Loan Obligations are indefeasibly paid in full in cash.

3.    Authority to Execute and Deliver Necessary Documents.

(a)    The Debtor is authorized to negotiate, prepare, enter into, and deliver the DIP Documentation, including, without limitation, UCC financing statements, pledge and security agreements, and mortgages encumbering all of the DIP Collateral and securing all of the Debtor's obligations under the DIP Documentation, each as may be reasonably requested by the DIP Agent for itself of on behalf of the DIP Lenders.

(b)    The Debtor is further authorized to perform all of its obligations and acts required under the DIP Documentation, and such other agreements as may be required by the DIP Documentation to give effect to the terms of the financing provided for therein, and in this Interim Order.

4.    Valid and Binding Obligations.  All obligations under the DIP Documentation shall constitute valid and binding obligations of the Debtor, enforceable against it and its successors and assigns, in accordance with the terms of the DIP Documentation and this Interim Order, and no obligation, payment, transfer, or grant of a lien or security interest under the DIP Documentation or this Interim Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under section 502(d) of the Bankruptcy Code) or subject to any avoidance, reduction, set off, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims,

cross-claims, defenses, or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity.

5.    <u>Authorization for Payment of DIP Financing Fees and Expenses</u>.  All reasonable fees paid and payable, and costs and/or expenses reimbursed or reimbursable (including, without limitation, all reasonable fees, costs and expenses referred to in the DIP Documentation and the DIP Agent's and DIP Lenders' reasonable attorneys' fees and expenses), as set forth in the DIP Documentation, by the Debtor to the DIP Agent and the DIP Lenders are hereby approved.  The Debtor is hereby authorized and directed to pay all such fees, costs, and expenses in accordance with the terms of the DIP Documentation and this Interim Order, without any application, pleading, notice, or document with the Court for approval or payment of such reasonable fees, costs, or expenses.  The Debtor shall pay (a) all reasonable prepetition out of pocket costs and expenses of the DIP Agent and the DIP Lenders (including all reasonable fees, expenses and disbursements of outside counsel, including local counsel, and consultants) in connection with preparation, execution, and delivery of the DIP Documentation, this Interim Order, and any Final Order, and the funding under the DIP Facility and (b) all reasonable postpetition out of pocket costs and expenses of the DIP Agent and the DIP Lenders (including all reasonable fees, expenses and disbursements of outside counsel, including local counsel, and consultants) in connection with this Chapter 11 Case and any Successor Case (as defined below), including, without limitation, (1) preparation, execution, and delivery of the DIP Documentation, this Interim Order, and any Final Order, and the funding under the DIP Facility; (2) the administration of the DIP Facility and any amendment or waiver of any provision of the DIP Documentation, this Interim Order, and any Final Order; and (3) the enforcement or protection of any of their respective or collective rights and remedies under the DIP Documentation, this

Interim Order, and any Final Order.  Notwithstanding anything to the contrary herein, the fees,

costs and expenses of the DIP Agent and the DIP Lenders, whether incurred before or after the

Petition Date, including, without limitation, all fees referred to in the DIP Documentation, and all

attorneys' fees and expenses, shall be deemed fully earned and non-refundable as of the date of

this Interim Order.  None of the DIP Agent's or DIP Lenders' attorneys, financial advisors and

accountants' fees and disbursements shall be subject to the prior approval of this Court or the

guidelines of the Office of the United States Trustee for this region (the "U.S. Trustee"), and no

recipient of any such payment shall be required to file with respect thereto any interim or final

fee application with this Court.  Any such fees, costs and expenses shall be paid within ten (10)

business days of delivery of a summary invoice (redacted for privilege) to the Debtor (with a

copy of each such invoice (also redacted for privilege) to be delivered by the Debtor to the U.S.

Trustee and any Creditors' Committee) and without the need for further application to or order of

the Court.

        6.      <u>Amendments, Consents, Waivers, and Modifications</u>.  The Debtor, with the

express written consent of the Required Lenders in accordance with the DIP Documentation,

may enter into any non-material amendments, consents, waivers or modifications to the DIP

Documentation without the need for further notice and hearing or any order of this Court.

<div align="center">**DIP LIENS AND DIP SUPERPRIORITY CLAIMS**</div>

        7.      <u>DIP Lenders' Lien Priority</u>.

            (a)    To secure the DIP Loan Obligations, the DIP Agent, on behalf of itself

and for the ratable benefit of the DIP Lenders, is hereby granted, pursuant to sections

364(c)(2), 364(c)(3) (solely as to Permitted Liens), and 364(d)(1), and subject to the terms and

conditions of the DIP Note, valid, enforceable and fully perfected, first priority priming liens

on and senior security interests in (collectively, the "DIP Liens") all of the property, assets or interests in property or assets of the Debtor, of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including, without limitation, all property of the "estate" (within the meaning of the Bankruptcy Code) of the Debtor, and all Accounts, Inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases, all of the equity interests of each subsidiary of the Debtor, all of the equity interests of all other Persons directly owned by the Debtor, money, investment property, deposit accounts, all commercial tort claims and all causes of action arising under the Bankruptcy Code or otherwise (including, without limitation, all avoidance actions under chapter 5 of the Bankruptcy Code ("Avoidance Actions") and the proceeds thereof (subject to entry of the Final Order)), and all cash and non-cash proceeds, rents, products and profits of any of collateral described above, which for the avoidance of doubt, shall include, without limiting the generality of the foregoing, all assets of the Debtor that is collateral pursuant to the Prepetition Financing Documents, and all other property and assets including, without limitation, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, offspring and profits of any of the collateral described above (collectively, the "DIP Collateral"), subject only to (A) Liens granted by the Debtor in unearned premiums under the Premium Financing Agreement, and (B) the Carve-Out.

(b)    The DIP Liens shall be effective immediately upon the entry of this Interim Order and shall not at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date, or created under

sections 363 or 364(d) of the Bankruptcy Code or otherwise, other than (i) Liens granted by

the Debtor in unearned premiums under the Premium Financing Agreement; and (ii) the

Carve-Out.

                (c)    The DIP Liens shall be and hereby are deemed fully perfected liens and

security interests, effective and perfected upon the date of this Interim Order, without the

necessity of execution by the Debtor of mortgages, security agreements, pledge agreements,

financing agreements, financing statements or any other agreements or instruments, such that

no additional actions need be taken by the DIP Agent, the DIP Lenders, or any other person or

entity to perfect such interests.  Any provision of any lease, loan document, easement, use

agreement, proffer, covenant, license, contract, organizational document, or other instrument

or agreement that requires the consent or approval of one or more landlords, licensors or other

parties, or requires the payment of any fees or obligations to any governmental entity, non-

governmental entity or any other person, in order for the Debtor to pledge, grant, mortgage,

sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other

collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy

Code, and shall have no force or effect with respect to the transactions granting the DIP Agent,

for itself and for the ratable benefit of the DIP Lenders, a first priority security interest in such

fee, leasehold or other interest or other collateral or the proceeds of any assignment, sale or

other transfer thereof, by the Debtor in favor of the DIP Agent, on its own behalf and for the

ratable benefit of the DIP Lenders, in accordance with the terms of the DIP Documentation.

        8.     <u>DIP Lenders' Superpriority Claim</u>.  The DIP Lenders are hereby granted an

allowed superpriority administrative expense claim (the "<u>DIP Superpriority Claim</u>") pursuant to

section 364(c)(1) of the Bankruptcy Code in the Debtor's Chapter 11 Case and in any successor

cases under the Bankruptcy Code (including any case or cases under chapter 7 of the Bankruptcy Code, the "Successor Cases") for all DIP Loan Obligations, having priority over any and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kinds specified in or arising or ordered under sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 and any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed DIP Superpriority Claim shall be payable from and have recourse to all pre- and postpetition property of the Debtor and all proceeds thereof including, without limitation, upon entry of a Final Order, any proceeds or property recovered in connection with the pursuit of Avoidance Actions. The DIP Superpriority Claim granted in this paragraph shall be subject and subordinate in priority of payment only to payment of the Carve-Out. Except as set forth herein, no other superpriority claims shall be granted or allowed in this Chapter 11 Case or in any Successor Case. The DIP Superpriority Claim shall be senior in all respects to any superpriority claims granted in this Chapter 11 Case including, without limitation, on account of any break-up fee or expense reimbursement, unless expressly agreed to in writing by those DIP Lenders with a Prepetition Lien on the property being sold, that may be granted by the Court in connection with the sale of the Debtor's assets.

9. **Survival of DIP Liens and DIP Superpriority Claim**. The DIP Liens, DIP Superpriority Claim, and other rights and remedies granted under this Interim Order to the DIP Agent and the DIP Lenders, shall continue in this Chapter 11 Case and any Successor Cases and shall be valid and enforceable against any trustee appointed in the Debtor's Chapter 11 Case and/or upon the dismissal of the Debtor's Chapter 11 Case or any Successor Cases and such liens

and security interests shall maintain their first priority as provided in this Interim Order until all

the DIP Loan Obligations have been indefeasibly paid in full in cash and the DIP Lenders'

commitments have been terminated in accordance with the DIP Documentation.

## ADEQUATE PROTECTION

10.    <u>Adequate Protection for Prepetition Secured Parties</u>.  As adequate protection in

respect of any diminution in the value of the Prepetition Collateral, the incurrence of the DIP

Loan Obligations, the use of Cash Collateral, the granting of the DIP Liens and the DIP

Superpriority Claim or otherwise (for each Prepetition Secured Party, a "<u>Diminution Claim</u>"), the

Prepetition Secured Parties are hereby granted the following:

(a)    <u>Prepetition Secured Parties' Replacement Liens</u>.

(i)    To secure the Diminution Claim of the Series 1996 Bond Trustee,

the Series 1996 Bond Trustee is hereby granted (effective and perfected upon the date of this

Interim Order and without the necessity of execution by the Debtor of mortgages, security

agreements, pledge agreements, financing statements, and other agreements or instruments)

valid, perfected, postpetition security interests in and liens (the "<u>Series 1996 Replacement</u>

<u>Liens</u>") on the Series 1996 Collateral, <u>provided</u>, <u>however</u>, that, notwithstanding anything to the

contrary, the Series 1996 Replacement Liens shall only be and remain subject and subordinate to

(i) the DIP Liens and/or payment of any DIP Loan Obligations on account thereof, (ii) Permitted

Liens to the extent Permitted Liens have priority over the Series 1996 Collateral under applicable

law, and (iii) the Carve-Out.

(ii)    To secure the Diminution Claim of the Series 2002 Bond Trustee,

the Series 2002 Bond Trustee is hereby granted (effective and perfected upon the date of this

Interim Order and without the necessity of execution by the Debtor of mortgages, security

agreements, pledge agreements, financing statements, and other agreements or instruments) valid, perfected, postpetition security interests in and liens (the "Series 2002 Replacement Liens") on the Series 2002 Collateral, provided, however, that, notwithstanding anything to the contrary, the Series 2002 Replacement Liens shall be subject to Section 12 of the DIP Note, and otherwise only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Loan Obligations on account thereof, (ii) Permitted Liens to the extent Permitted Liens have priority over the Series 2002 Collateral under applicable law, and (iii) the Carve-Out.

        (iii)     To secure the Diminution Claims of the Series 2006 Bond Trustee and ACA, the Series 2006 Bond Trustee and ACA are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements, and other agreements or instruments) valid, perfected, postpetition security interests in and liens on the Series 2006 Collateral (the "Series 2006 Replacement Liens") and the Series 2006 Second Lien Collateral (the "Series 2006 Second Lien Replacement Liens"), provided, however, that, notwithstanding anything to the contrary, (A) the Series 2006 Replacement Liens shall be subject to Section 12 of the DIP Note , and otherwise only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Loan Obligations on account thereof, (ii) Permitted Liens to the extent Permitted Liens have priority over the Series 2006 Collateral under applicable law, and (iii) the Carve-Out and (B) the Series 2006 Second Lien Replacement Liens shall only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Loan Obligations on account thereof, (ii) Permitted Liens to the extent Permitted Liens have priority over the Series 2006 Collateral under applicable law, (iii) the Carve-Out and (iv) the Series 2002 Replacement Lien.

(iv)     To secure the Diminution Claim of the Series 2015 Bond Trustee, the Series 2015 Bond Trustee is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements, and other agreements or instruments) valid, perfected, postpetition security interests in and liens (the "Series 2015 Replacement Liens") on the Series 2015 Collateral, provided, however, that, notwithstanding anything to the contrary, the Series 2015 Replacement Liens shall be subject to Section 12 of the DIP Note , and otherwise only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Loan Obligations on account thereof, (ii) Permitted Liens to the extent Permitted Liens have priority over the Series 2015 Collateral under applicable law, and (iii) the Carve-Out.

(v)     To further secure the Diminution Claims of the Series 2002 Bond Trustee, the Series 2006 Bond Trustee, ACA and the Series 2015 Bond Trustee, the Series 2002 Bond Trustee, the Series 2006 Bond Trustee, ACA and the Series 2015 Bond Trustee are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements, and other agreements or instruments) valid, perfected, postpetition security interests in and liens (the "Funding Agreement Replacement Liens" and together with the Series 1996 Replacement Liens, the Series 2002 Replacement Liens, the Series 2006 Replacement Liens, the Series 2006 Second Lien Replacement Liens and the Funding Agreement Replacement Liens, the "Replacement Liens") on the Funding Agreement Additional Collateral, provided, however, that, notwithstanding anything to the contrary, the Funding Agreement Replacement Liens shall be subject to Section 12 of the DIP Note , and otherwise only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Loan Obligations on account thereof,

25

(ii) Permitted Liens to the extent Permitted Liens have priority under applicable law, and (iii) the Carve-Out.

        (vi)     For the avoidance of doubt, the Replacement Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code, or (ii) any lien arising after the Petition Date in favor of any federal, state, municipal or other governmental unit, commission, board or court for any tax liability of the Debtor.

        (b)   <u>Prepetition Secured Parties' Adequate Protection Superpriority Claims</u>. As further adequate protection for the Diminution Claims, the Prepetition Secured Parties are hereby granted superpriority claims with priority over all administrative expense claims and unsecured claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114 and any other provision of the Bankruptcy Code (the "<u>Prepetition Secured Parties' Superpriority Claims</u>"), <u>provided</u>, <u>however</u>, that, solely for the purposes of this Interim Order, the Prepetition Secured Parties' Superpriority Claims shall not attach to any proceeds from Avoidance Actions.  The Prepetition Secured Parties' Superpriority Claims shall be subject to Section 12 of the DIP Note  and otherwise be subordinate only to (i) the DIP Superpriority Claims and/or payment of any DIP Loan Obligations on account thereof, and (ii) the Carve-Out.

        (c)   <u>Collateral Proceeds</u>.  As further adequate protection for the Diminution Claims, Debtor shall consult regularly with the Secured Parties with respect to any sale, use or

disposition of Prepetition Collateral, and shall apply any proceeds from the sale, use or other disposition of any Prepetition Collateral in accordance with Section 12 of the DIP Note, which, *inter alia*, calls first for the payment of certain fees and expenses of the DIP Agent and DIP Lenders, then for the payment of the outstanding portion of the DIP Loan Obligations to which proceeds from such Prepetition Collateral are allocable under the DIP Documentation, and thereafter for the payment of the Secured Bond Obligations secured by such Prepetition Collateral in order of priority in accordance with applicable law.

(d)    Fees, Expenses And Interest.  As further adequate protection under sections 361, 363(e), and 364(d) of the Bankruptcy Code for the use of the Prepetition Collateral (including Cash Collateral) by the Debtor, the incurrence of the loans under the DIP Facility, the grant of the DIP Liens and the DIP Superpriority Claim, the Prepetition Secured Parties shall receive, as applicable, from the Debtor current cash payment of their reasonable fees, costs and expenses incurred after the Petition Date, including, all reasonable fees and disbursements of its counsel and such other professionals or consultants retained by the Prepetition Secured Parties with services performed during this Chapter 11 Case.  Any such fees, costs and expenses shall be paid within ten (10) business days of delivery of a summary invoice (redacted for privilege) to the Debtor (with a copy of each such invoice (also redacted for privilege) to be delivered by the Debtor to the U.S. Trustee and any Creditors' Committee) and without the need for further application to or order of the Court.  Notwithstanding anything to the contrary herein, (x) any and all such fees, costs and expenses (including the fees and expenses of counsel and other professionals for the Prepetition Secured Parties), shall be deemed fully earned and non-refundable as of the date of this Interim Order and (y) the

payment of any and all such fees shall not be subject to challenge, recharacterization or reduction pursuant to paragraph 13 hereof or otherwise.

(e)     <u>Bond Documents</u>.  As further adequate protection under sections 361, 363(e), and 364(d) of the Bankruptcy Code for the use of the Prepetition Collateral (including Cash Collateral) by the Debtor, the incurrence of the loans under the DIP Facility, the grant of the DIP Liens and the DIP Superpriority Claim, the Debtor shall comply with all covenants and provisions of the Prepetition Financing Documents relating to the care, protection, maintenance and insurance of the Prepetition Collateral.

(f)     <u>Milestones</u>.  As further adequate protection under sections 361, 363(e), and 364(d) of the Bankruptcy Code for the use of the Prepetition Collateral (including Cash Collateral) by the Debtor, the incurrence of the loans under the DIP Facility, the grant of the DIP Liens and the DIP Superpriority Claim, the Debtor shall comply with the Chapter 11 Milestones set forth in the DIP Note.

(g)     <u>No Impact on Right to Credit Bid</u>.  As further adequate protection under sections 361, 363(e), and 364(d) of the Bankruptcy Code for the use of the Prepetition Collateral (including Cash Collateral) by the Debtor, the incurrence of the loans under the DIP Facility, the grant of the DIP Liens and the DIP Superpriority Claim, the Prepetition Secured Parties shall each have the right to "credit bid" their respective claims up to the full amount of their respective Secured Bond Obligations during any sale of all or any portion of the such Prepetition Secured Parties' Prepetition Collateral, as applicable, or any deposit in connection with such sale, including, without limitation, any sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any liquidation plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code, and shall be deemed "qualified bidders"

with respect to such collateral for such purposes.  The Prepetition Secured Parties shall each have the absolute right to assign, sell, or otherwise dispose of its respective right to credit bid in connection with any credit bid.

(h)    <u>Consent to Priming and Adequate Protection</u>.  The Prepetition Secured Parties consent to use of Cash Collateral and the priming provided for herein; <u>provided</u>, <u>however</u>, that the Prepetition Secured Parties' consent to the priming, the use of Cash Collateral, and the sufficiency of the adequate protection provided for herein is expressly conditioned upon the entry of this Interim Order (in form and substance satisfactory to the Prepetition Secured Parties) relating to the DIP Documentation and DIP Facility set forth herein and such consent shall not be deemed to extend to any other replacement financing or debtor in possession financing other than the DIP Facility provided under the DIP Documentation; <u>provided</u>, <u>further</u>, that such consent shall be of no force and effect in the event this Interim Order is not entered or is vacated or is modified in any respect without the consent of the DIP Agent for the DIP Lenders and the DIP Documentation and DIP Facility as set forth herein and therein are not approved.

(i)    <u>Further Adequate Protection</u>.  Nothing in this Interim Order shall, or shall be deemed to, limit, abridge or otherwise affect the rights of the Prepetition Secured Parties to request at any time that the Court provide additional or further protection of their interests in the Prepetition Collateral (including the Cash Collateral), or to seek further or additional adequate protection in the event the adequate protection provided herein proves to be inadequate.

## <u>CARVE-OUT; RESTRICTIONS ON USE OF FUNDS</u>

11.    <u>Carve-Out</u>.

(a)    The DIP Liens, the DIP Superpriority Claim, the Replacement Liens, and Prepetition Secured Parties' Superpriority Claims shall be subject, in accordance with the priority as set forth herein and subordinate only to: (i) fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Bankruptcy Court (the "Case Administration Fees"), plus (ii) unpaid professional fees and expenses ("Professional Fees") payable to each legal or financial advisor retained by the Debtor including for the avoidance of doubt the fees and expenses of the CRO and the Creditors' Committee that are incurred or accrued prior to the date of the occurrence of a Termination Event (as defined below), but in all events in an amount not to exceed the aggregate amount(s) allocated to each such professional in the Approved Budget, and ultimately allowed by the Court pursuant to sections 330, 331 and 503 of the Bankruptcy Code or any order of the Court (whenever such fees may be actually incurred prior to the Termination Event), plus (iii)  $25,000 (earmarked for use by a Chapter 7 Trustee), plus (iv) $10,000, plus (v) the Case Administration Fees and Professional Fees accrued and unpaid on or after the date of the occurrence of a Termination Event ((i) through (v), collectively, the "Carve-Out").  Subject to the immediately preceding sentence, so long as a Termination Event (as defined below) has not occurred, the Debtor shall be permitted to pay Case Administration Fees and Professional Fees allowed and payable under Bankruptcy Code sections 330, 331 and 503, in accordance with the Approved Budget. After the occurrence of a Termination Event the payment of reasonable allowed professional fees and disbursements incurred by each professional of the Debtor (excluding any incurred and unpaid professional fees and expenses of the DIP Agent and the DIP Lenders payable pursuant to the Interim Order or the Final Order), and any statutory committees appointed in this Chapter 11 Case in an aggregate amount not in excess of the amounts set forth for each

such professional in the Approved Budget, shall permanently reduce the Carve-Out on a

dollar-for-dollar basis.  The DIP Lenders' obligation to permit the use of their Cash Collateral

to fund or to otherwise pay the Carve-Out expenses may be reserved against borrowing

availability under the DIP Documentation and shall be added to and made part of the DIP

Loan Obligations and secured by the DIP Collateral and otherwise entitled to the protections

granted under this Interim Order, the DIP Documentation, the Bankruptcy Code and applicable

law, as applicable.

       (b)    Nothing contained in this Interim Order shall be construed:  (i) to exempt

those persons hereafter receiving interim compensation payments or reimbursement of

expenses pursuant to any such Bankruptcy Court-approved procedure from the applicable

provisions of bankruptcy law, including the requirements that such compensation or

reimbursement be allowed on a final basis after the filing of appropriate fee applications, and,

if applicable, any subsequent order of this Court requiring that such payments be disgorged,

and/or (ii) as consent to the allowance of any fees and expenses referred to above, and shall

not affect any right of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties to

object to the reasonableness of such amounts.

     12.    <u>Restrictions on Use of Funds</u>.

       (a)    Notwithstanding anything to the contrary, no proceeds of the DIP Facility,

any DIP Collateral or Prepetition Collateral (including, without limitation, Cash Collateral) or

any portion of the Carve-Out may be used to pay, any claims for services rendered by any of

the professionals retained by the Debtor, any creditor or party in interest, any committee, any

trustee appointed under this Chapter 11 Case or any Successor Cases, or any other party to (i)

request authorization to obtain postpetition loans or other financial accommodations pursuant

to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than from the DIP Lenders

in accordance with the DIP Documentation; or (ii) investigate (except as set forth in paragraph

13 below), assert, join, commence, support or prosecute any action or claim, counter-claim,

action, proceeding, application, motion, objection, defense, or other contested matter seeking

any order, judgment, determination or similar relief against, or adverse to the interests of, in

any capacity, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, any holders of

the Series 1996 Bonds, Series 2002 Bonds, Series 2006 Bonds or Series 2015 Bonds or any of

their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or

successors, with respect to any transaction, occurrence, omission, or action, including, without

limitation, (A) any Avoidance Actions or other actions arising under chapter 5 of the

Bankruptcy Code; (B) any action relating to any act, omission or aspect of the relationship

between the any of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties, on the

one hand, and the Debtor, on the other; (C) any action with respect to the validity and extent of

the DIP Loan Obligations or the Secured Bond Obligations, or the validity, extent, and priority

of the DIP Liens, the Prepetition Liens, or the Replacement Liens; (D) any action seeking to

invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Liens, the Prepetition

Liens, or the Replacement Liens; and/or (E) except to contest the occurrence or continuance of

any Termination Event as permitted in paragraph 15, any action that has the effect of

preventing, hindering or delaying (whether directly or indirectly) the DIP Agent, the DIP

Lenders or the Prepetition Secured Parties in respect of their liens and security interests in the

DIP Collateral, Cash Collateral or the Prepetition Collateral; and/or (F) pay any "claim" of a

"creditor" (as such terms are defined in the Bankruptcy Code) without the prior written

consent of the DIP Lenders or the Prepetition Secured Parties; or (G) use or seek to use Cash

Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted hereby, without the consent of the DIP Lenders.

(b)    Not more than $35,000 in the aggregate of the Carve-Out, any DIP Collateral, any Prepetition Collateral, any Cash Collateral or proceeds of the DIP Facility may be used by the Creditors' Committee (to the extent such committee is appointed) to investigate (but not prosecute) the extent, validity, and priority of the Secured Bond Obligations, the Prepetition Liens, or any other claims against the Prepetition Secured Parties so long as such investigation occurs within the Challenge Period (as defined below).

13.    <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>.

(a)    The Debtor's acknowledgements and stipulations set forth in Paragraph F (the "<u>Debtor's Stipulations</u>") above shall be binding upon the Debtor in all circumstances upon entry of this Interim Order.  The Debtor's Stipulations shall be binding upon each other party in interest, including the Creditors' Committee, if any, unless such Creditors' Committee or any other party in interest other than the Debtor (or if this Chapter 11 Case is converted to a case under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), first, commences, by the earlier of (x) with respect to any Creditors' Committee, the earlier of sixty (60) calendar days from the date any Creditors' Committee selects counsel or seventy-five (75) calendar days following the date of entry of this Interim Order, and (y) solely if no Creditors' Committee is formed, with respect to other parties in interest with requisite standing other than the Debtor or any Creditors' Committee, seventy-five (75) calendar days following the date of entry of this Interim Order (such time period established by the earlier of clauses (x) and (y), shall be referred to as the "<u>Challenge Period</u>," and the date that is the next calendar day after the termination of the

Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a Challenge (as defined below), such Challenge is fully and finally adjudicated, shall be referred to as the "Challenge Period Termination Date"), (A) a contested matter, adversary proceeding, or other action or "claim" (as defined in the Bankruptcy Code) challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtor's Stipulations, or (B) a contested matter, adversary proceeding, or other action against any or all of the Prepetition Secured Parties in connection with or related to the Secured Bond Obligations, or the actions or inactions of any of the Prepetition Secured Parties arising out of or related to the Secured Bond Obligations or otherwise, including, without limitation, any claim against any or all of the Prepetition Secured Parties in the nature of a "lender liability" cause of action, setoff, counterclaim, or defense to the Secured Bond Obligations (including, but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code (but excluding, solely for the purpose of this Interim Order, those under 506(c)) or by way of suit against any of the Prepetition Secured Parties) ((A) and (B) collectively, the "Challenges" and, each individually, a "Challenge"), and second, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action; provided further, if a Challenge is timely made under this Section and properly filed, all potential claims and causes of action shall be and are waived and relinquished except for those claims and causes of action expressly asserted in accordance with this Section.

(b)    Upon the Challenge Period Termination Date and for all purposes in this Chapter 11 Case and any Successor Cases, (i) all payments made to or for the benefit of the

Prepetition Secured Parties pursuant to, or otherwise authorized by, this Interim Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, or avoidance, (ii) any and all such Challenges by any party in interest shall be deemed to be forever released, waived, and barred (iii) the Secured Bond Obligations shall be deemed to be fully allowed secured claims within the meaning of section 506 of the Bankruptcy Code, (iv) the Secured Bond Obligations shall be deemed to be fully allowed claims, and (v) the Debtor's stipulations in paragraph F and the releases in paragraph 14 shall be binding on all parties in interest, including any Creditors' Committee.

14.    <u>Release</u>.  The release, discharge, waivers, settlements, compromises, and agreements set forth in this paragraph 14 shall be deemed effective upon entry of this Interim Order and subject only to the rights set forth in paragraph 13 above.  The Debtor forever and irrevocably (i) releases, discharges, and acquits the Prepetition Secured Parties, all holders of the Series 1996 Bonds, Series 2002 Bonds, Series 2006 Bonds and Series 2015 Bonds and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "<u>Releasees</u>") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, including, without limitation, any claims arising from any actions relating to any aspect of the relationship between the Prepetition Secured Parties and the Debtor including any equitable subordination claims or defenses, with respect to or relating to the Secured Bond Obligations, the Prepetition Liens, the Prepetition Financing Documents, any and all claims and causes of action arising under title 11

of the United States Code, and any and all claims regarding the validity, priority, perfection or

avoidability of the liens or secured claims of the Prepetition Secured Parties; and (ii) waive any

and all defenses (including, without limitation, offsets and counterclaims of any nature or kind)

as to the validity, perfection, priority, enforceability and non-avoidability of the Secured Bond

Obligations and the Prepetition Liens.

**TERMINATION; REMEDIES; MODIFICATION OF AUTOMATIC STAY**

15.    Termination.  Upon the occurrence of an Event of Default (as defined in the DIP

Documentation), the Maturity Date (as defined in the DIP Documentation), or default by the

Debtor of any of its obligations under this Interim Order unless waived in writing by all of the

DIP Lenders, each in its sole discretion (the "Termination Event") (i) the Debtor's to use Cash

Collateral shall immediately and automatically terminate and (ii) the DIP Loan Obligations shall

be immediately due and payable.

16.    Remedies and Stay Modification.

(a)    Subject to paragraph 16(c) below, the automatic stay provisions of section

362 of the Bankruptcy Code are vacated and modified without the need for further Court order

to: (a) permit the DIP Agent, for itself and on behalf of the DIP Lenders, or the DIP Lenders,

as applicable, upon the occurrence of a Termination Event, and without any interference from

the Debtor or any other party interest but subject to five (5) business days' prior written notice

(which may be delivered by electronic mail) (the "Remedies Notice Period") to the Debtor, its

counsel, counsel to any Creditors' Committee and counsel to the U.S. Trustee, to exercise all

rights and remedies provided for in the DIP Documentation, this Interim Order or under other

applicable bankruptcy and non-bankruptcy law including, without limitation, the right to (i)

cease making loans under the DIP Facility and/or suspend or terminate the commitments under

the DIP Documentation; (ii) declare all DIP Loan Obligations immediately due and payable;

(iii) in the case of the DIP Agent, take any actions reasonably calculated to preserve or safeguard the DIP Collateral or to prepare the DIP Collateral for sale; (iv) in the case of the DIP Agent, foreclose or otherwise enforce its DIP Lien or Replacement Liens on any or all of the DIP Collateral and/or the Prepetition Collateral; (v) exercise any other default-related rights and remedies under the under the DIP Documentation or this Interim Order; and (b) permit the Prepetition Secured Parties, upon the occurrence of a Termination Event, and without any interference from the Debtor or any other party interest but subject to five (5) business days' prior written notice to the Debtor, its counsel, counsel to any Creditors' Committee and counsel to the U.S. Trustee, to exercise all rights and remedies provided for in the Prepetition Financing Documents, this Interim Order or under other applicable bankruptcy and non-bankruptcy law; provided that any proceeds of exercising such rights and remedies shall be subject to Section 12 of the DIP Note.

(b)    Immediately upon the occurrence of a Termination Event or a default by the Debtor of any of its obligations under this Interim Order, the DIP Agent, for itself and the ratable benefit of the DIP Lenders, may charge interest at the default rate set forth in the DIP Documentation without being subject to the Remedies Notice Period.

(c)    The automatic stay of section 362(a) of the Bankruptcy Code, to the extent applicable, shall be deemed terminated without the necessity of any further action by the Court in the event that the Debtor, the Creditors' Committee, if any, and/or the U.S. Trustee have not obtained an order from this Court to the contrary prior to the expiration of any Remedies Notice Period.  The Debtor, the Creditors' Committee, if any, and/or the U.S. Trustee shall have the burden of proof at any hearing on any request by them to reimpose or continue the automatic stay of section 362(a) of the Bankruptcy Code or to obtain any other injunctive

relief, and the sole issue at any hearing to re-impose the automatic stay or to obtain any other injunctive or other relief shall be limited to whether or not a Termination Event has occurred.

(d)    If either of the DIP Agent or any of the Prepetition Secured Parties is entitled, and has elected in accordance with the provisions hereof, to enforce its respective liens or security interests or exercise any other default-related remedies following expiration of the Remedies Notice Period, the Debtor shall cooperate with the DIP Agent, the DIP Lenders, the Prepetition Secured Parties (as applicable) in connection with such enforcement by, among other things, (i) providing at all reasonable times access to the Debtor's premises to representatives or agents of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties (including any collateral liquidator or consultant), (ii) providing the DIP Agent, the DIP Lenders and the Prepetition Secured Parties and their representatives or agents, at all reasonable times access to the Debtor's books and records and any information or documents requested by the DIP Agent, the DIP Lenders or the Prepetition Secured Parties or their respective representatives, (iii) performing all other obligations set forth in the DIP Documentation, and (iv) taking reasonable steps to safeguard and protect the DIP Collateral and the Prepetition Collateral, and the Debtor shall not otherwise interfere with or actively encourage others to interfere with the DIP Agent's, the DIP Lenders' or the Prepetition Secured Parties' enforcement of rights.

(e)    Upon the occurrence and during the continuance of Termination Event and the expiration of any Remedies Notice Period, the DIP Lenders shall have no further obligation to provide financing under the DIP Documentation and the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the continued use of Cash Collateral, provided, however, that for the avoidance of doubt, nothing in this

paragraph shall be deemed to modify or otherwise affect the Carve-Out provided for in paragraph 11 of this Interim Order.

(f)    The automatic stay of section 362 of the Bankruptcy Code is hereby vacated and modified insofar as necessary to permit the Prepetition Secured Parties to receive payments to be made by the Debtors to the Prepetition Secured Parties hereunder; apply, allocate or pay from any of the funds or accounts maintained by the Prepetition Secured Parties in accordance with the Prepetition Financing Documents; and to take any action authorized or contemplated by this Interim Order.

(g)    This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Interim Order and relating to the application, re-imposition or continuance of the automatic stay of section 362(a) of the Bankruptcy Code or other injunctive relief requested.

## **MISCELLANEOUS**

17.    <u>Limitation on Section 506(c) Claims</u>.  Upon entry of the Final Order, no costs or expenses of administration which have been or may be incurred in this Chapter 11 Case or any Successor Case at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against the DIP Agent, DIP Lenders or the Prepetition Secured Parties, any of their respective claims, the Carve-Out, the Prepetition Collateral or the DIP Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent, as applicable, of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties.  No action, inaction or acquiescence by the DIP Agent, the DIP Lenders or the Prepetition Secured Parties shall be deemed to be or shall be considered evidence of any alleged consent to a surcharge against the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, any of their respective claims, the Carve-Out, the Prepetition Collateral or the DIP Collateral.

18.     <u>No Marshaling</u>.  The DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral.  Without limiting the generality of the immediately preceding sentence, no party shall be entitled, directly or indirectly, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of the DIP Collateral after a Termination Event.

19.     <u>Equities of the Case Waiver</u>.  The DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.  No person may assert an "equities of the case" claim under section 552(b) of the Bankruptcy Code against the DIP Agent, the DIP Lenders or the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the DIP Collateral or the Prepetition Collateral.

20.     <u>Additional Perfection Measures</u>.  The DIP Liens and the Replacement Liens shall be perfected by operation of law immediately upon entry of this Interim Order.  None of the Debtor, the DIP Agent, the DIP Lenders or the Prepetition Secured Parties shall be required to enter into or obtain landlord waivers, mortgagee waivers, bailee waivers, warehouseman waivers or other waiver or consent, or to file or record financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including, trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property, or filings with any other federal agencies/authorities), or obtain consents from any licensor or similarly situated party-in-interest, or take any other action in order to validate and to perfect the DIP Liens or the Replacement Liens.

(a)    If the DIP Lenders, in their sole discretion, choose to take any action to obtain consents from any landlord, licensor or other party in interest, to file mortgages, financing statements, notices of lien or similar instruments, or to otherwise record or perfect such security interests and liens, such DIP Lenders are hereby authorized, but not directed to, take such action or to request that Debtor take such action on their behalf (and Debtor is hereby authorized and directed to take such action) and:

(i)    any such documents or instruments shall be deemed to have been recorded and filed as of the time and on the date of entry of this Interim Order; and

(ii)    no defect in any such act shall affect or impair the validity, perfection and enforceability of the liens granted hereunder.

(b)    In lieu of obtaining such consents or filing any such mortgages, financing statements, notices of lien or similar instruments, the DIP Agent may, in its sole discretion, choose to file a true and complete copy of this Interim Order in any place at which any such instruments would or could be filed, together with a description of collateral, and such filing by the DIP Agent shall have the same effect as if such mortgages, deeds of trust, financing statements, notices of lien or similar instruments had been filed or recorded at the time and on the date of entry of this Interim Order.

(c)    <u>Application of Collateral Proceeds</u>.  After a Termination Event and the expiration of the Remedies Notice Period, the Debtor is hereby authorized and directed to remit to the DIP Agent, for itself and for the ratable benefit of the DIP Lenders, as the case may be, one-hundred percent (100%) of all collections on, and proceeds of, the DIP Collateral, and the automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to permit the DIP Agent and the DIP Lenders to retain and apply all collections, remittances,

41

and proceeds of the DIP Collateral in accordance with the DIP Documentation except to the extent otherwise provided herein.  In furtherance of the foregoing, (a) all cash, securities, investment property and other items the Debtor deposited with any bank or other financial institution other than cash, securities, investment property or other items held by the Prepetition Secured Creditors (or any of them) shall be subject to a perfected, first priority security interest in favor of the DIP Agent (or its designee), (b) upon the occurrence and during the continuance of a Termination Event and the expiration of the Remedies Notice Period, each such bank or other financial institution with an account the Debtor is hereby authorized and instructed to (i) comply at all times with any instructions originated by the DIP Agent (or its designee) to such bank or financial institution directing the disposition of cash, securities, investment property and other items from time to time credited to such account, without further consent of the Debtor, including, without limitation, any instruction to send to the DIP Agent (or its designee) by wire transfer (to such account as the DIP Agent (or its designee) shall specify, or in such other manner as the DIP Agent (or its designee) shall direct) all such cash, securities, investment property and other items held by it, and (ii) waive any right of set off, banker's lien or other similar lien, security interest or encumbrance as against the DIP Agent (or its designee) and (c) any deposit account control agreement executed and delivered by any bank or other financial institution, the Debtor and the Prepetition Secured Parties prior to the Petition Date in connection with the Prepetition Financing Documents shall establish co-control in favor of the DIP Agent of any and all accounts subject thereto and any and all cash, securities, investment property and other items of the Debtor deposited therein to secure the DIP Loan Obligations (provided that primary control rights shall vest in the DIP Agent), and all rights thereunder in favor of the Prepetition Secured Parties shall inure also to

the benefit of, and shall be exercisable exclusively by, the DIP Agent, until all of the DIP Loan

Obligations have been indefeasibly paid in full, at which time exclusive control shall

automatically revert to the Prepetition Secured Parties.

21.    Cash Management Systems.  Subject to the Debtor's cash management order

entered by the Court, the Debtor is authorized and directed to maintain its cash management

system in a manner consistent with the DIP Documentation, this Interim Order, and the order of

this Court approving the maintenance of the Debtor's cash management system.

22.    Delivery of Documentation.  The Debtor (and/or its legal or financial advisors)

shall deliver to the DIP Agent, the DIP Lenders, the Prepetition Secured Parties and their

respective counsel and advisors, all financial reports, budgets, forecasts, and all other legal or

financial documentation, pleadings, and/or filings that are either (i) required to be provided (by

the Debtor and/or it legal or financial advisors) to the DIP Agent and the DIP Lenders, and/or the

DIP Agent's and the DIP Lenders' legal and financial advisors pursuant to the DIP

Documentation, or (ii) reasonably requested by the DIP Agent, the DIP Lenders or the

Prepetition Secured Parties (or their legal and financial advisors).

23.    Access to Books and Records.  The Debtor will, and as appropriate, the Debtor

will direct the Debtor's legal and financial advisors to (a) keep proper books, records and

accounts in which full, true and correct entries shall be made of all dealings and transactions in

relation to its activities, (b) cooperate, consult with, and provide to the DIP Agent and the DIP

Lenders all such information as required or allowed under the DIP Documentation, the

provisions of this Interim Order or that is afforded to the Creditors' Committee and/or the

Creditors' Committee's respective legal or financial advisors, (c) permit, upon one (1) business

days' notice, representatives of the DIP Agent and the DIP Lenders to visit and inspect any of

their respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtor's properties, and to discuss, and provide advice with respect to, its respective affairs, finances, properties, operations and accounts with its officers, employees and independent public accountants, if any, as often as may reasonably be desired, and (d) permit representatives of the DIP Agent and the DIP Lenders to consult with and advise the Debtor's officers and trustees on matters concerning the general status of the Debtor's financial condition and assets.

24.    <u>Lenders Not Responsible Persons</u>.  In (a) making the decision to provide the DIP Facility; (b) administering the DIP Facility; (c) extending other financial accommodations to the Debtor under the DIP Documentation; (d) making the decision to make the loans and financial accommodations under the Prepetition Financing Documents; (e) administering the loans and financial accommodations extended under the Prepetition Financing Documents; (f) extending other financial accommodations to the Debtor under the Prepetition Financing Documents; and (g) making the decision to collect the indebtedness and obligations of the Debtor, none of the DIP Agent, the DIP Lenders, nor the Prepetition Secured Parties shall be considered to be exercising control over the Debtor or acting in any way as a responsible person, or as an owner or operator under any applicable law, including without limitation, any environmental law (including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601, *et seq.*, the Resource Conservation and Recovery Act, 42 U.S.C. 6901, *et seq.*, as either may be amended from time to time, or any similar federal or state statute).

25.    <u>Successors and Assigns</u>.  The DIP Documentation and the provisions of this Interim Order shall be binding upon the Debtor, the DIP Agent, the DIP Lenders, the Prepetition

Secured Parties, and each of their respective successors and assigns, and shall inure to the benefit

of the Debtor, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties, and each of

their respective successors and assigns including, without limitation, any trustee, examiner with

expanded powers, responsible officer, estate administrator or representative, or similar person

appointed in a case for the Debtor under any chapter of the Bankruptcy Code.  The terms and

provisions of this Interim Order shall also be binding on all of the Debtor's creditors and all

other parties in interest, including, but not limited to a trustee appointed under chapter 7 or

chapter 11 of the Bankruptcy Code.

      26.    <u>Binding Nature of Agreement</u>.  The DIP Documentation to which the Debtor is a

party shall constitute legal, valid, and obligations of the Debtor, enforceable in accordance with

its terms.  The DIP Documentation has been or will be properly executed and delivered to the

DIP Agent and the DIP Lenders by the Debtor.  Unless otherwise consented to in writing, the

rights, remedies, powers, privileges, liens, and priorities of the DIP Agent, the DIP Lenders and

the Prepetition Secured Parties provided for in this Interim Order, the DIP Documentation, or

otherwise shall not be modified, altered or impaired in any manner by any subsequent order

(including a confirmation or sale order), by any plan of reorganization or liquidation in this

Chapter 11 Case, by the dismissal or conversion of this Chapter 11 Case or in any subsequent

case under the Bankruptcy Code unless and until the DIP Loan Obligations have first been

indefeasibly paid in full in cash and completely satisfied and the commitments terminated in

accordance with the DIP Documentation.

      27.    <u>Subsequent Reversal or Modification</u>.  This Interim Order is entered pursuant to

section 364 of the Bankruptcy Code, and Bankruptcy Rules 4001(b) and (c), granting the DIP

Lenders all protections and benefits afforded by section 364(e) of the Bankruptcy Code.  Any

financial accommodations made to the Debtor by the DIP Agent or the DIP Lenders pursuant to

this Interim Order and the DIP Documentation shall be deemed to have been made by the DIP

Agent and the DIP Lenders in good faith, as such term is used in section 364(e) of the

Bankruptcy Code.  If any or all of the provisions of this Interim Order are hereafter reversed,

modified, vacated or stayed, that action will not affect (i) the validity of any obligation,

indebtedness or liability incurred hereunder by the Debtor to the DIP Agent, the DIP Lenders and

the Prepetition Secured Parties, prior to the date of receipt by the DIP Agent and the Prepetition

Secured Parties of written notice of the effective date of such action or (ii) the validity and

enforceability of any lien or priority authorized or created under this Interim Order or pursuant to

the DIP Documentation.

      28.    <u>Collateral Rights</u>.  If any party who holds a lien or security interest in DIP

Collateral or Prepetition Collateral that is junior and/or subordinate to the DIP Liens, the

Replacement Liens or the Prepetition Liens in such DIP Collateral or Prepetition Collateral

receives or is paid the proceeds of such DIP Collateral or Prepetition Collateral, or receives any

other payment with respect thereto from any other source, prior to the indefeasible payment in

full in cash and the complete satisfaction of (a) all DIP Loan Obligations under the DIP

Documentation and termination of the commitment in accordance with the DIP Documentation,

and (b) the Secured Bond Obligations under the Prepetition Financing Documents, such junior or

subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such

DIP Collateral or Prepetition Collateral in trust for the DIP Lenders and the Prepetition Secured

Parties and shall immediately turn over such proceeds to the DIP Agent for application to repay

the DIP Loan Obligations and to the Prepetition Secured Parties for application to repay the

Secured Bond Obligations in accordance with the DIP Documentation, the Prepetition Financing

Documents and this Interim Order until indefeasibly paid in full.

29.    <u>No Waiver / Deemed Request for Stay Relief</u>.  This Interim Order shall not be

construed in any way as a waiver or relinquishment of any rights that the DIP Agent or DIP

Lenders or Prepetition Secured Parties may have to bring or be heard on any matter brought

before this Court.  This Interim Order shall be deemed to constitute a request by the Prepetition

Secured Parties for relief from the automatic stay with respect to the Prepetition Collateral, for

adequate protection for the use of Prepetition Collateral as of the Petition Date, and shall suffice

for all purposes of section 507(b) of the Bankruptcy Code.

30.    <u>Sale/Conversion/Dismissal</u>.

(a)    The Debtor shall not seek or support entry of any order that provides for

the sale of the assets of the Debtor under section 363 of the Bankruptcy Code to any party

unless, in connection with such event, the order approving such sales provides that the sale

proceeds shall be distributed in the order of priority of payments as described in the DIP

Documentation on the closing of such sale.

(b)    If an order dismissing or converting this Chapter 11 Case under sections

305 or 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall

provide that (a) the DIP Liens, the DIP Superpriority Claim, the Replacement Liens, and the

Prepetition Secured Parties' Superpriority Claims granted hereunder and in the DIP

Documentation shall continue in full force and effect, remain binding on all parties-in-interest,

and maintain their priorities as provided in this Interim Order and the DIP Documentation until

all DIP Loan Obligations are indefeasibly paid in full in cash and completely satisfied and the

commitments under the DIP Documentation are terminated in accordance with the DIP

Documentation and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the DIP Liens, the DIP Superpriority Claim, the Replacement Liens and the Prepetition Secured Parties' Superpriority Claims.

31.     <u>No Liability for Debtor's Acts or Omissions</u>.  Nothing in this Interim Order or in any of the DIP Documentation or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders or the Prepetition Secured Parties of any liability for any claims arising from any and all activities by the Debtor.

32.     <u>Priority of Terms</u>.  To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Documentation, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" "as set forth in" or "as more fully described in" the DIP Documentation (or words of similar import), the terms and provisions of this Interim Order shall govern.

33.     <u>No Third Party Beneficiary</u>.  Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary, <u>provided</u>, the holders of the Series 1996 Bonds, Series 2002 Bonds, Series 2006 Bonds and Series 2015 Bonds are third party beneficiaries of this Interim Order.

34.     <u>Survival</u>.  Except as otherwise provided herein, (a) the protections afforded under this Interim Order, and any actions taken pursuant thereto, shall survive the entry of an order (i) dismissing this Chapter 11 Case or (ii) converting this Chapter 11 Case into a case pursuant to chapter 7 of the Bankruptcy Code, and (b) the DIP Liens, the Replacement Liens, the DIP Superpriority Claim and the Prepetition Secured Parties' Superpriority Claims shall continue in

this Chapter 11 Case, in any such successor case or after any such dismissal.  Except as

otherwise provided herein, the DIP Liens, the Replacement Liens, the DIP Superpriority Claim

and the Prepetition Secured Parties' Superpriority Claims shall maintain their priorities as

provided in this Interim Order, the Final Order, and the DIP Documentation, and not be

modified, altered or impaired in any way by any other financing, extension of credit, incurrence

of indebtedness (except with respect to any additional financing to be provided by the DIP Agent

or the DIP Lenders in accordance with the Final Order), or any conversion of this Chapter 11

Case into a case pursuant to chapter 7 of the Bankruptcy Code or dismissal of any of this Chapter

11 Case, or by any other act or omission until all DIP Loan Obligations and Secured Bond

Obligations are indefeasibly paid in full in cash and completely satisfied, and the commitments

under the DIP Documentation are terminated in accordance therewith.

35.    <u>Adequate Notice/Scheduling of Final Hearing</u>.  The notice given by the Debtor of

the Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001(c) and the

local rules of this Court and, under the circumstances, was adequate and sufficient.  No further

notice of the request for the relief granted at the Interim Hearing is required.  The Debtor shall

promptly mail copies of this Interim Order and notice of the Final Hearing to any known party

affected by the terms of this Interim Order and/or Final Order and any other party requesting

notice after the entry of this Interim Order.  Any objection to the relief sought at the Final

Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed

with the Court and served so as to be *actually received* no later than seven (7) days prior to the

Final Hearing at 4:00 p.m. (Eastern) by the following: (a) counsel to the Debtor, Klestadt

Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, New York, NY 10036-7203

(Attn: Sean C. Southard); (b) counsel to ACA and the Series 2006 Bond Trustee, Schulte Roth &

Zabel LLP, 919 Third Avenue, New York, NY 10022 (attn: Brian D. Pfeiffer); (b) counsel to the

DIP Agent, the Series 1996 Bond Trustee, the Series 2002 Bond Trustee and the Series 2015

Bond Trustee, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center |

Boston, MA 02111 (attn: Miyoko Sato and Ian Hammel); (e) any Creditors' Committee

appointed herein; and (f) the Office of the United States Trustee, Alfonse D'Amato Federal

Courthouse, 560 Federal Plaza, Central Islip, NY 11722.  The Court shall conduct a Final

Hearing on the Motion commencing on [_____], 201[_] at [_____] a.m. (Eastern).

36.     <u>Immediate Binding Effect; Entry of Interim Order</u>.  This Interim Order shall not

be stayed and shall be valid and fully effective immediately upon entry, notwithstanding the

possible application of Bankruptcy Rules 6004(h), 7062, and 9014, or otherwise, and the Clerk

of the Court is hereby directed to enter this Interim Order on the Court's docket in this Chapter

11 Case.

37.     <u>Proofs of Claim</u>.  None of the Prepetition Secured Parties shall be required to file

proofs of claim in this Chapter 11 Case or any Successor Cases for any claim allowed herein.

The Debtor's Stipulations shall be deemed to constitute a timely filed proof of claim for the

Prepetition Secured Parties upon approval of this Interim Order, and the Prepetition Secured

Parties shall be treated under section 502(a) of the Bankruptcy Code as if they each have filed a

proof of claim.  Notwithstanding any order entered by the Court in relation to the establishment

of a bar date in this Chapter 11 Case or any Successor Cases to the contrary, the Prepetition

Secured Parties, are hereby authorized and entitled, each in its sole discretion, but not required,

to file (and amend and/or supplement, as they see fit) a proof of claim in this Chapter 11 Case or

Successor Cases for any claim allowed herein and shall not be required to include copies of any

Prepetition Financing Documents with any such filings.

38.    <u>Retention of Jurisdiction</u>.  This Court shall retain exclusive jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Interim Order.

EXHIBIT A

**DIP NOTE**

This document has been included elsewhere in this pleading; this specific copy of this document has been omitted to avoid providing the Court multiple duplicate copies.