**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, NY 10036-7203
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Sean C. Southard
Lauren C. Kiss

*Proposed Counsel to the Debtor and Debtor-in-*
*Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
In re                                                    :    Chapter 11
                                                         :
DOWLING COLLEGE,                                         :    Case No. 16-75545 (REG)
                                                         :
                                                         :
                                    Debtor.              :
------------------------------------------------------------------x

**DEBTOR'S *EX PARTE* APPLICATION FOR ENTRY OF A**
**SCHEDULING ORDER AND DEBTOR'S MOTION FOR ENTRY OF (I) AN**
**ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE**
**DEBTOR'S OAKDALE CAMPUS, (B) SCHEDULING AN AUCTION AND A SALE**
**HEARING RELATED THERETO, (C) APPROVING THE FORM OF NOTICE OF THE**
**AUCTION AND SALE HEARING, (D) APPROVING A TERMINATION FEE AND**
**EXPENSE REIMBURSEMENT; AND (II) AN ORDER (A) APPROVING SUCH SALE**
**OF THE OAKDALE CAMPUS FREE AND CLEAR OF LIENS, CLAIMS,**
**ENCUMBRANCES AND OTHER INTERESTS, (B) ALLOWING THE**
**PAYMENT OF CERTAIN VALID LIEN CLAIMS AND (C) RELATED RELIEF**

**TO THE HONORABLE ROBERT E. GROSSMAN,**
**UNITED STATES BANKRUPTCY JUDGE:**

Dowling College ("Dowling" or the "Debtor"), debtor and debtor-in-possession in the

above-captioned chapter 11 case (the "Chapter 11 Case"), by and through its proposed attorneys,

Klestadt Winters Jureller Southard & Stevens, LLP, hereby files a motion for the entry of the

pre-fixed scheduling order (the "Scheduling Order") and (I) the entry of an order substantially in

the form attached hereto as Exhibit A (the "Bidding Procedures Order") (a) approving bidding

procedures and bidder protections (the "Bidding Procedures") substantially in the form attached as Schedule 1 to the Bidding Procedures Order for the sale and potential auction (the "Auction") of the Oakdale Campus (as hereinafter defined); (b) scheduling an Auction, if necessary, and a hearing to approve the sale of the Oakdale Campus (the "Sale Hearing"); (c) approving the form and manner of the Notice of the Auction and Sale Hearing substantially in the form attached as Schedule 2 to the Bidding Procedures Order (the "Sale Notice"); and (d) approving the Termination Fee and Expense Reimbursement (as hereinafter defined); and (II) entry of an Order, substantially in the form attached hereto as Exhibit B (the "Sale Order"), (i) approving a sale of the Oakdale Campus, free and clear of all liens, claims and encumbrances, security interests and other interests pursuant to a Purchase Agreement (as hereinafter defined) to the Successful Bidder (as hereinafter defined) as determined by the Bidding Procedures; and (ii) related relief (the "Sale Motion").

## I.    SUMMARY OF RELIEF SOUGHT

1.    The relief sought by this Motion encompasses a two part request pursuant to which the Debtor is seeking to sell certain real property consisting of an estimated 23 acre campus located at 150 Idle Hour Boulevard, Oakdale, New York 11769 (the "Oakdale Campus") to the successful bidder (the "Successful Bidder"), derived from either from a Qualified Bid, Stalking Horse Bidder, or Auction bid (all hereinafter defined), pursuant to a proposed purchase agreement (the "Purchase Agreement").  A copy of the Purchase Agreement template is attached hereto as Exhibit C[1].

2.    As an initial matter, the Debtor is requesting entry of a Bidding Procedures Order, substantially in the form of Exhibit A hereto, approving among other things (i) the

---

[1] Capitalized terms used in this Motion, unless herein defined, are used with the meanings ascribed to such terms in the Purchase Agreement.

Bidding Procedures, (ii) the time, date, and place for a potential Auction of the Oakdale Campus and the Sale Hearing, (iii) the Sale Notice, annexed as <u>Schedule 2</u> to the Bidding Procedures Order, and (iv) approval of, and authorization to pay, if necessary in the discretion of the Debtor, a termination fee and expense reimbursement (the "<u>Termination Fee and Expense Reimbursement</u>") to a potential stalking horse bidder (the "<u>Stalking Horse Bidder</u>) in accordance with the terms of the proposed Purchase Agreement (the "<u>Bidding Procedures Motion</u>").

3.      By the second prong of this Motion the Debtor seeks entry of the Sale Order, substantially in the form of <u>Exhibit B</u>, approving, among other things, at the conclusion of the Sale Hearing, (i) the sale of the Oakdale Campus, free and clear of all liens, claims, encumbrances, and other interests with such liens, claims and encumbrances and other interests to attach to the proceeds of such sale; and (ii) the segregation of funds for the payment of the Termination Fee and Expense Reimbursement to a Stalking Horse Bidder, if necessary, and as may be allowed by the Court (the "<u>Sale</u>" or "<u>Sale Transaction</u>").

## II.    <u>JURISDICTION AND VENUE</u>

4.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of this motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The statutory predicates for the relief sought herein are Sections 105(a) and 363(b),(d) and (f), 365, 503 and 507 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), Rules 6004-1, 6006-1 and 9006-1 of the Local Rules of the Bankruptcy Court for the Eastern District of New York (the "<u>Local Rules</u>"), and General Order 557 of the Bankruptcy Court for the Eastern District of New York ("<u>General Order 557</u>").

### III.    BACKGROUND

#### A.    General

6.    On November 29, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of New York (the "Court").

7.    The Debtor continues to manage its property as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

8.    No trustee, examiner or official committee has been appointed in this Chapter 11 Case.

9.    Prior to the Petition Date, the Debtor retained Robert S. Rosenfeld of RSR Consulting, LLC to perform the functions and hold the title of Chief Restructuring Officer (the "CRO").  The CRO has taken over as the day-to-day manager of the Debtor and is responsible for managing the Debtor as debtor-in-possession in this Chapter 11 Case, assisting in the formulation, preparation and consummation of a plan of liquidation and performing such other duties customary to a chief restructuring officer.

10.    The factual background relating to the Debtor's commencement of this Chapter 11 Case and the facts and circumstances supporting the relief requested herein are set forth in greater detail in the *Declaration of Robert S. Rosenfeld, Chief Restructuring Officer to the Debtor, Pursuant to Local Bankruptcy Rule 1007-4 in Support of First Day Motions* (the "First Day Declaration").

#### B.    Summary of the Real Estate Assets

11.    The Debtor is the fee owner of the Oakdale Campus. The Oakdale Campus contains several improvements, including a former mansion of the Vanderbilt family, a student center, science center and dormitory building.  Within the neighborhood adjacent to the Oakdale

Campus are thirty-two parcels of predominantly residential property and associated personal property owned by Dowling, most of which are improved by single family residences Dowling historically leased to third party residential tenants, and some of which were used as faculty offices and for other functions ancillary to Dowling's former business (the "Residential Portfolio")[2].  Dowling is also the fee owner of approximately 105 acres of land located at 1300 William Floyd Parkway, Shirley, Town of Brookhaven, New York (the "Brookhaven Campus"), which was home to Dowling's School of Aviation and sports management program, Dowling's NCAA Division II athletic program, and a 289-bed dormitory facility located thereon (the "Brookhaven Dorm").

### C.    Summary of Secured Obligations on the Oakdale Campus

12.    Dowling's prepetition secured debt is primarily comprised of three (3) outstanding issuances of municipal bonds and one outstanding issuance of corporate bonds.[3]

13.    Certain improvements, construction and equipping of Dowling's athletic field complex on 33 acres of the Brookhaven Campus, the Brookhaven Campus cafeteria, and certain capital improvements on the Oakdale Campus, among other things, were financed with the proceeds of the issuance of those certain SCIDA Civic Facility Revenue Bonds, Series 2006A, in the principal amount of $34,910,000 and SCIDA Taxable Civic Facility Revenue Bonds, Series 2006B, in the principal amount of $4,000,000 (collectively, the "Series 2006 Bonds"), under that certain Trust Indenture (the "Series 2006 Indenture"), dated as of June 1, 2006, between SCIDA, as issuer, and The Bank of New York, as predecessor in interest to Wilmington Trust, National Association, as trustee (the "Series 2006 Trustee").  The "Series 2006 Bond Documents" shall

---

[2] Twenty four of these parcels were utilized as residential properties and either rented to third party tenants or otherwise occupied by faculty.  Seven of the parcels were used in the Debtor's operations.  One of the parcels is vacant land.

[3] A detailed summary of all of the Debtor's secured obligations is set forth in the First Day Declaration.  Only the secured obligations relevant to the Oakdale Campus are discussed herein.

refer collectively to the Series 2006 Indenture and all other documents evidencing or securing the Series 2006 Bonds.

14.     In terms of basic financing structure, the facilities financed by each of the bond issuances (as further described in the respective indentures, the "Facilities" and each a "Facility") were leased by Dowling to the respective issuer, SCIDA, and subleased by such issuers back to Dowling.  The Facilities financed pursuant to the Series 2006 Indenture serve as collateral for Dowling's respective obligations thereunder, as set forth in that certain Mortgage and Security Agreement, dated as of June 1, 2006, by Dowling and SCIDA in favor of the Series 2006 Bond Trustee, and duly recorded with the Office of the Clerk of Suffolk County on July 5, 2006.

15.     By no later than June 2015, Dowling had defaulted under various provisions of the trust indentures and entered into forbearance negotiations with the long term debt holders, including, among others, ACA Financial Guaranty Corp. (the "Series 2006 Bond Insurer" or "ACA") concerning the terms of its forbearance from payment and exercising remedies during the spring of 2015 (the "2015 Forbearance Agreements").  On or about June 15, 2015, Dowling entered into substantially similar forbearance agreements (previously defined as the 2015 Forbearance Agreements) with, among others, the Series 2006 Bond Trustee.

16.     More recently, beginning on or about August 4, 2016 and in accordance with the terms of certain substantially similar Conditional Funding Agreements (as defined below), as amended on or about September 7, 2016, the Series 2006 Bond Insurer, among others, made certain funding available to Dowling in exchange for a grant of additional collateral in the form of a blanket lien on all assets of Dowling to secure new advances of funds (the "Conditional Funding Agreements").

17.     As a result of the financing transactions set forth above and as more fully described in the First Day Declaration, all of Dowling's real property and substantially all of its

personal property (excluding restricted assets), including the Oakdale Campus, the Brookhaven Campus and the Residential Portfolio, are subject to the liens and security interests of Dowling's prepetition bondholders.  As relevant to this Motion, the Oakdale Campus, to the extent of the Series 2006 Indenture, is subject to the first liens and security interests of the Series 2006 Bond Trustee.

18.     In addition, Dowling is obligated under that certain U.S. Department of Education College Facilities Loan Program Loan Agreement (the "DOE Note"), dated as of February 18, 1990, between Dowling and the United States of America, acting by and through the Secretary of the Department of Education (the "DOE"), in the principal amount of up to $3,000,000, bearing interest at 5.5% and maturing in 2022.  Pursuant to the DOE Note, Dowling obtained funds from the DOE to finance the renovation and rehabilitation of its Kramer Science Building on the Oakdale Campus. Pursuant to that certain Mortgage Note, dated as of December 8, 1992, by Dowling in favor of the DOE, the DOE Note is purportedly secured by the real property financed by the loan proceeds, located on the Oakdale Campus in Oakdale, Suffolk County, New York. However, Dowling is not aware that the same is recorded or otherwise perfected and may not be deemed to be secured by the underlying property.

19.     In addition to the foregoing, several parties have filed mechanics liens on the Oakdale Campus.  Still other creditors have recently obtained judgments on account of otherwise unsecured obligations.

20.     As more specifically set forth in the First Day Declaration, following the commencement of this case, the Debtor anticipates pursuing a comprehensive sale strategy with regard to all of its real property.

21.     The instant Sale Motion seeks, *inter alia*, to approve the sale of the Oakdale Campus *only* to the Successful Bidder, pursuant to the proposed Purchase Agreement.  For the

avoidance of doubt, the sale of the Oakdale Campus includes the real property and all fixtures but does not include personal property located at the Oakdale Campus.

22.     The proposed Purchase Agreement contemplates that the Sale Transaction be consummated pursuant to the provisions of Section 363 of the Bankruptcy Code, and subject to higher and better offers.  In furtherance of that effort, the Debtor's Board voted to approve the filing of a Chapter 11 petition for the Debtor.

## IV.    **THE PROPOSED SALE**

### A.    **MARKETING OF THE OAKDALE CAMPUS**

23.     Contemporaneously with the filing of the instant motion, the Debtor is filing a motion seeking to retain A&G Realty Partners, LLC and Madison Hawk Partners, LLC (collectively, the "Campus Agents") to market and sell, among other things, the Oakdale Campus.

24.     The Campus Agents are diversified real estate consulting and advisory firms with offices located throughout the country.  The Campus Agents evaluate, restructure, facilitate the acquisition of, and dispose of all types of real estate.  Additionally, the Campus Agents have significant experience in the disposition and renegotiation of leases and properties in bankruptcy.  The Campus Agents' professionals have been retained as real estate consultants in a variety of bankruptcy cases involving issues relating to the review, analysis, renegotiation, and disposition of key real property and lease agreements.  Subject to the Court's approval, the Campus Agents will conduct a marketing process and solicit and manage offers to purchase the Oakdale Campus.

25.     To date, no Stalking Horse Bidder has been identified.  However, the Debtor reserves the right throughout the marketing process to enter into a Purchase Agreement with a

Stalking Horse Bidder[4] and thereafter proceed to an Auction, if necessary, to maximize the value that the Debtor may realize from the sale of the Oakdale Campus. The Campus Agents intend to initially solicit offers on the Oakdale Campus through a sealed bid process. As a result, parties are encouraged in the first instance to put forth their highest and best bid for the Oakdale Campus in the event an Auction does not occur. As further encouragement to interested parties to submit a competitive bid early, if an Auction is held, only the top three (3) bidders (or those within fifteen percent (15%) of the highest bid) will be permitted to attend and participate at the Auction.

26.    The Debtor's professionals and the Campus Agents believe that certain bid protections will likely be needed to secure a quality Stalking Horse Bidder. The Debtor therefore seeks authority to enter into an agreement with a Stalking Horse Bidder with bid protections to include a Termination Fee and Expense Reimbursement (collectively, the "Bidding Protections") not to exceed, in the aggregate, two percent (2%) of the proposed sale price of the Oakdale Campus.

27.    Any such Termination Fee and Expense Reimbursement would be payable in the event that a higher or better offer (a "Competing Bid") is accepted by the Debtor and the Bankruptcy Court issues an order approving a transaction with such alternative party or otherwise confirming a plan which does not involve the sale of the Oakdale Campus to the Stalking Horse Bidder (an "Alternate Transaction"). Separately, the Debtor envisions that the Expense Reimbursement may be payable if (i) the Purchase Agreement with the Stalking Horse Bidder is terminated because of a material breach of the Purchase Agreement by the Debtor or (ii) a Material Adverse Effect where the failure is due in whole or in part to any action or

---

[4] If the Debtor determines to proceed with a Stalking Horse Bidder, it will be to ensure that certain minimum thresholds will be achieved as part of any Auction.

inaction by the Debtor. The premise underlying any Termination Fee and Expense Reimbursement agreed to by the Debtor would be in consideration of the Stalking Horse Bidder having expended considerable time and effort in negotiating the Purchase Agreement and committing to certain base-level purchase price and financing.

28.     If the Debtor were to proceed with a Stalking Horse Bidder, the Debtor would request that the Termination Fee and Expense Reimbursement be granted an administrative expense priority pursuant to Sections 503(b) and 507(b) of the Bankruptcy Code and shall be payable solely from the first proceeds of such Alternate Transaction, or as set forth in the Purchase Agreement.

29.     The Debtor believes that, in the event of a Stalking Horse Bidder, (a) approval of the Termination Fee and Expense Reimbursement will be an integral part of the Purchase Agreement with the Stalking Horse Bidder, (b) without the Debtor's obligation to pay the Termination Fee and Expense Reimbursement, the Stalking Horse Bidder will not likely enter into the Purchase Agreement, (c) the entry of the Purchase Agreement with the Stalking Horse Bidder is necessary for preservation of the Debtor's estate and is beneficial to the Debtor, and (d) the Termination Fee and Expense Reimbursement are expected to be reasonable in relation to the Stalking Horse Bidder's expected efforts and to the magnitude of the transactions and consideration to be contemplated by the Stalking Horse Bidder.

**B.      Overview of the Purchase Agreement**

30.     The Successful Bidder of the Oakdale Campus will be party to the proposed Purchase Agreement with the Debtor. A copy of the Purchase Agreement template is attached hereto as <u>Exhibit C</u>. If the Debtor enters into a Purchase Agreement with a Stalking Horse Bidder prior to the Bid Deadline (as defined herein), the Debtor will file notice with the

Bankruptcy Court, the Notice Parties (as defined herein), and all Potential Bidders (as defined in the Bidding Procedures).

31.     The principal terms of the Purchase Agreement, as proposed, are summarized in the following chart:

| SUMMARY DESCRIPTION | |
|---|---|
| **Parties** | Seller:  Dowling College<br><br>Purchaser:  To Be Determined |
| **Asset** | Oakdale Campus:  the Debtor's real property consisting of an estimated 25 acre campus located at 150 Idle Hour Boulevard, Oakdale, New York 11769. |
| **Payment Amount** | Cash or cash equivalents at Closing. |
| **Conditions to Closing** | Entry of Sale Order substantially in the form annexed hereto as Exhibit B.   Receipt of customary consents and regulatory approvals that may be required in addition to the Sale Order. |
| **Approval Order and Closing Date** | Closing no later than thirty (30) days after entry of the Sale Order. |
| **Termination Fee and Expense Reimbursement** | If an Alternate Transaction with respect to the Oakdale Campus is consummated, the Stalking Horse Bidder shall be entitled to a Termination Fee and Expense Reimbursement not to exceed, in the aggregate two percent (2%) of the sale price of the Oakdale Campus, subject to this Court's approval. |

## V.     THE PROPOSED BIDDING PROCEDURES AND AUCTION

### A.     The Scheduling Order

32.     The Debtor seeks entry of the prefixed Scheduling Order setting the time and notice requirements for the hearing on the Bidding Procedures and the Termination Fee and

Expense Reimbursement.  Specifically, the Debtor requests that notice of the hearing on the Bidding Procedures, Termination Fee and Expense Reimbursement and related relief be sufficient if the Scheduling Order and the instant motion are served by (i) overnight mail, or (ii) electronic transmission followed by regular first class mail, within two (2) days of entry of the Scheduling Order on: (a) the Debtor's twenty (20) largest unsecured creditors and, upon its appointment, counsel for the official committee of unsecured creditors (the "Creditors' Committee"); (b) the Debtor's material prepetition and post-petition secured lenders and any agent therefore; (c) the Office of the United States Trustee for the Eastern District of New York; (d) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (e) the following taxing and regulatory authorities: (i) the United States Attorney for the Eastern District of New York, (ii) the Attorney General of the State of New York, (iii) United States Department of Education, (iv) New York State Department of Education, (v) the Internal Revenue Service, (vi) the New York State Department of Taxation and Finance, and (vii) the Securities and Exchange Commission; (f) all parties who are known to assert a lien, claim, encumbrance or other interest on any portion of the Debtor's assets; and (g) all parties identified by the Debtor as potentially having an interest in acquiring some or all of the Oakdale Campus (collectively, the "Notice Parties").

33.    The shortened notice period is necessary given the limited remaining resources of the Debtor and the surmounting losses being incurred by the Debtor on a continual basis.

B.    **Summary of the Bidding Procedures**

34.    The Bidding Procedures are intended to permit a fair and efficient competitive sale process. The Bidding Procedures (annexed as Schedule 1 to the Bidding Procedures Order) provide, in relevant part, as follows[5]:

Qualified Bidders:    In order to participate in the bidding process and to have a bid considered by the Debtor, each potential bidder (a "Potential Bidder") must deliver a written, irrevocable offer, for all of the Oakdale Campus, satisfying the below criteria. **A BID MUST BE MADE FOR ALL OF THE OAKDALE CAMPUS.** A "Qualified Bidder" is a Potential Bidder that delivers a binding bid that in the Debtor's discretion, after consultation with the 2006 Secured Parties[6] and the Creditors' Committee, satisfies the following (a "Qualified Bid"):

(a)    Bid Deadline. Each Bid Package (as defined below) must be delivered in written form to the following parties **so as to actually be received no later than 4:00 p.m. (prevailing Eastern Time) on March [27], 2017 (the "Bid Deadline")**[7]:

| Debtor | Proposed Counsel to the Debtor |
|---|---|
| Dowling College<br>150 Idle Hour Blvd.<br>Oakdale, New York 11769<br>Attn: Robert S. Rosenfeld<br>With a copy to:<br><br>RSR Consulting, LLC<br>1330 Avenue of the Americas, Suite 23A<br>New York, New York 10019<br>Attn: Robert S. Rosenfeld | Klestadt Winters Jureller Southard & Stevens, LLP<br>200 West 41st Street, 17th Floor<br>New York, New York 10036<br>Attn: Sean C. Southard, Esq. |
| **United States Trustee** | **Proposed Real Estate Advisor to the Debtor** |
| Office of the United States Trustee for the Eastern District of New York<br>Alfonse D'Amato Federal Courthouse<br>560 Federal Plaza<br>Central Islip, New York 11722<br>Attn: Stan Yang, Esq., Trial Attorney | A&G Realty Partners, LLC<br>445 Broadhollow Road, Suite 410<br>Melville, New York 11747<br>Attn: Andrew Graiser |

---

[5] To the extent there are any inconsistencies between the description of the Bidding Procedures contained herein and the Bidding Procedures, the terms of the Bidding Procedures control.

[6] The 2006 Secured Parties consist of the Series 2006 Bond Trustee, the Series 2006 Bond Insurer and counsel to the Series 2006 Bond Insurer.

[7] As set forth above, the Bid Deadline may be delayed at the discretion of the Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee.

| Proposed Real Estate Advisor to the Debtor | Series 2006 Bond Trustee |
|---|---|
| Madison Hawk Partners, LLC<br>575 Lexington Avenue, Suite 4017<br>New York, New York 10022<br>Attn: Jeffrey L. Hubbard | Wilmington Trust, National Association<br>25 South Charles Street, 11th Floor<br>Mail Code: MD2-CS58<br>Baltimore, Maryland 21201<br>Attn: Jay Smith |
| Series 2006 Bond Insurer | Counsel to the Series 2006 Bond Insurer |
| ACA Financial Guaranty Corp.<br>555 Theodore Fremd Avenue Suite C-205<br>Rye, New York 10580<br>Attn: Carl McCarthy, Esq. and Maria Cheng | Schulte Roth & Zabel LLP<br>919 Third Avenue<br>New York, New York 10022<br>Attn: Brian D. Pfeiffer, Esq. and Neil S. Begley, Esq. |
| Local Counsel to the<br>Series 2006 Bond Insurer | Counsel to the Series 1996,<br>Series 2002, and Series 2015 Bond Trustee |
| Certilman Balin Adler & Hyman, LLP<br>90 Merrick Avenue, 9th Floor<br>East Meadow, New York 11554<br>Attn: Richard J. McCord, Esq. and Thomas J. McNamara, Esq. | Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.<br>One Financial Center<br>Boston, Massachusetts 02111<br>Attn: P. Miyoko Sato, Esq.<br>Ian A. Hammel, Esq. |
| Proposed Counsel to the<br>Creditors' Committee | |

   (b) <u>Bid Package</u>.  Each bid must include (collectively, the "<u>Bid Package</u>"): (i) a written and signed irrevocable offer (x) stating that the bidder offers to consummate a sale transaction on terms and conditions set forth on the Modified Purchase Agreement (as defined below), (y) confirming that the bid will remain irrevocable until the earlier of (i) ninety (90) days following entry of the final Sale Order, and (ii) closing with the Successful Bidder and (z) stating that the Bidder has had the opportunity to conduct due diligence prior to its offer and does not require further due diligence, has relied solely upon its own independent review and investigation and did not rely on any written or oral representation except as expressly provided with the Modified Purchase Agreement; (ii) an executed copy of the Purchase Agreement as modified by the bidder in accordance with its bid (the "<u>Modified Purchase Agreement</u>")[8]; and (iii) an electronic markup of the agreement clearly showing the revisions in the Modified Purchase Agreement (formatted as a Microsoft Word document or such other word processing format acceptable to the Debtor).  The Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee, shall determine whether any Modified Purchase Agreement that modifies the Purchase Agreement in any respect beyond the identity of the purchaser and the purchase price under the agreement is a Qualified Bid.

---

[8] For the avoidance of doubt, the Purchase Agreement with a Stalking Horse Bidder is deemed a Modified Purchase Agreement.

(c)    <u>Minimum Bid</u>.  The amount of the purchase price in a bid for the Oakdale Campus must be one (1) of the three (3) highest and otherwise best bids, or within fifteen percent (15%) of the highest and otherwise best bid.

(d)    <u>Financial Information</u>.  The Bid Package must contain such financial and other information that will allow the Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee, to make a determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by such bid, including any proposed conditions to Closing.

(e)    <u>Additional Bid Protections</u>.  A bid (other than from a potential stalking horse bidder (the "<u>Stalking Horse Bidder</u>")) must not request or entitle the Potential Bidder to any termination fee, transaction or break-up fee, expense reimbursement, or similar type of payment.

(f)    <u>Identity of Bidders</u>.  Each Potential Bidder must fully disclose the identity of each entity that will be bidding for the Oakdale Campus, as well as disclose the organization, form and the business conducted by each entity and what, if any, connection the Potential Bidder has with the Debtor.  Potential Bidders shall be required to provide such additional information as the Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee, may require regarding the bidder's ability to satisfy the requirements of the transaction contemplated by the Modified Purchase Agreement.

(g)    <u>Due Diligence</u>.  Except for any required Regulatory Approvals, the bid must not contain any contingencies of any kind, including, among others, obtaining (i) financing; (ii) shareholder, board of directors or other approval; or (iii) the outcome or completion of due diligence.  Each Potential Bidder must also affirmatively acknowledge that the Potential Bidder (i) had an opportunity to conduct due diligence regarding the Oakdale Campus prior to making its offer and does not require further due diligence, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Oakdale Campus in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Oakdale Campus, or the completeness of any information provided in connection therewith except as expressly stated in these Bidding Procedures.

(h)    <u>Consents</u>.  Each Potential Bidder must represent that it obtained all necessary organizational (not regulatory) approvals to make its bid and to enter into and perform the Modified Purchase Agreement.

(i)    <u>Deposit(s)</u>.  A Potential Bidder must deposit not less than 5% of the initial purchase price set forth in the Modified Purchase Agreement with the Debtor in the form of a certified check or wire transfer on or before the Bid Deadline (the "<u>Deposit</u>").  In addition, if the Debtor proceeds with an Auction and a Stalking Horse Bidder is selected, each Potential Bidder must also deposit not less than the aggregate amount of their Deposit, plus the amount of the Bidding Protections with the Debtor in the form of a

certified check or wire transfer before the Auction (the "Additional Deposit" and together with the Deposit, the "Deposits").  The Potential Bidder or the Backup Bidder (defined below) shall forfeit the Deposit(s) if (i) the Potential Bidder or the Backup Bidder is determined to be a Qualified Bidder and withdraws or modifies its bid other than as provided herein before the Bankruptcy Court approves the Debtor's selection of the Successful Bidder, or (ii) the Potential Bidder or the Backup Bidder is a Successful Bidder (defined below) and (x) modifies or withdraws the bid without the Debtor's consent before the consummation of the sale contemplated by the bid, or (y) breaches any of the Modified Purchase Agreement.  The Deposit(s) shall be returned to the bidder (i) as soon as practicable if the bidder is not determined to be a Qualified Bidder or (ii) no later than five (5) business days after entry of the Sale Order if the bidder is a Qualified Bidder (who has not otherwise forfeited its Deposit), but is not the Successful Bidder or the Backup Bidder.  The Debtor will maintain any Deposit(s) in a non-interest bearing Debtor account.

(j)    As Is. Where Is.  Any Modified Purchase Agreement must provide that the Sale will be on an "as is, where is" basis and without representations or warranties of any kind except and solely to the extent expressly set forth in such agreement of the Successful Bidder.  Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Oakdale Campus prior to making its bid and that it has relied solely upon its own independent review and investigation in making its bid.

(k)    Debtor's Considerations.  The Debtor, after consultation with the 2006 Secured Parties and the Creditors' Committee, will have the right to determine that a bid is not a Qualified Bid if either of the following conditions is satisfied: (A) the ability of the Potential Bidder to use the Oakdale Campus is not consistent with the Debtor's mission; or (B) the terms of the bid are materially more burdensome or conditional than the terms of the proposed Purchase Agreement, which determination may take into consideration: (1) whether the bid requires any indemnification of such Qualified Bidder; (2) whether the bid does not provide sufficient cash consideration to pay transfer taxes, cure costs or other cash costs of the transaction (including professionals' fees and the Bidding Protections); (3) whether the bid may involve payment of consideration over time or otherwise impact the tax exempt nature of bonds that are issued and outstanding by the Debtor; (4) whether the bid includes a non-cash instrument or similar consideration that is not freely marketable; or (5) any other factors the Debtor, after consultation with the 2006 Secured Parties and the Creditors' Committee, may deem relevant.[9]

(l)    Sale to a Qualified Bidder Without Auction.  The Debtor, after consultation with the 2006 Secured Parties and the Creditors' Committee, will have the right to determine whether, after review of the Qualified Bids, it shall proceed with the Sale Hearing and seek approval of the Modified Purchase Agreement proposed by a

---

[9] Notwithstanding the qualifying bid procedures, the Debtor reserves the right to entertain bids for the Oakdale Campus that do not conform to one or more of the requirements set forth herein and in the Bidding Procedures.

Qualified Bidder and the transaction contemplated thereby or whether it should proceed to Auction.

(m)    <u>Potential for Stalking Horse Bidder</u>.    Though the Bidding Procedures contemplate that the Debtor will solicit sealed bids in connection with the Sealed Bid Process on or before the Bid Deadline, the Bidding Procedures permit the Debtor the flexibility to enter into a form of the Purchase Agreement before the Sale Hearing and/or Auction under terms and conditions acceptable to the 2006 Secured Parties and in consultation with the Creditors' Committee.    The Debtor contemplates that any Purchase Agreement with a Stalking Horse Bidder would nonetheless be subject to the receipt of higher or otherwise better bids in accordance with these Bidding Procedures and a potential Auction.    If the Debtor enters into a Purchase Agreement with a Stalking Horse Bidder before the Bid Deadline, all Potential Bidders (as defined herein) that provide the required documentation as set forth herein shall be notified of the Debtor's entrance into the Purchase Agreement with the Stalking Horse Bidder and terms defining such agreement, including Bidding Protections offered as part of the Purchase Agreement.

The Bidding Procedures Order approved, among other things, the provision of a termination fee (the "<u>Termination Fee</u>") and an expense reimbursement for a Stalking Horse Bidder's reasonable and documented out-of-pocket costs in connection with the Sale (the "<u>Expense Reimbursement</u>" and together with the Termination Fee, the "<u>Bidding Protections</u>") not to exceed, in the aggregate, two percent (2%) of the proposed sale price of the Oakdale Campus, which is potentially payable to the Stalking Horse Bidder in the event the Debtor enters into a Purchase Agreement with a Stalking Horse Bidder and the Bankruptcy Court approves the sale of the Oakdale Campus to a party other than the Stalking Horse Bidder in an Alternate Transaction or as otherwise provided under the terms set forth in the Purchase Agreement. The Termination Fee and Expense Reimbursement shall be paid from the first proceeds of an Alternate Transaction, including the Sale, or as otherwise set forth in the Purchase Agreement.

(n)    <u>Sale to the Stalking Horse Bidder</u>.    In the event of a Stalking Horse Bidder, the Purchase Agreement with the Stalking Horse Bidder shall be deemed a Qualified Bid and the Stalking Horse Bidder shall be deemed a Qualified Bidder.  If no Qualified Bid other than Stalking Horse Bidder's is submitted by the Bid Deadline, the Debtor shall not be required to proceed with an Auction, but shall proceed with the Sale Hearing and seek approval of the Purchase Agreement with the Stalking Horse Bidder and the transaction contemplated thereby.

(o)    <u>Auction</u>.  If the Debtor determines, after review of the Qualified Bids and consultation with the 2006 Secured Parties and the Creditors' Committee, that an Auction process will maximize the value that the Debtor may realize from the sale of the Oakdale Campus, the Debtor shall conduct the Auction with respect to the Oakdale Campus.  The Auction will take place at the offices of proposed counsel to the Debtor, Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10036, not later than March 31, 2017, starting at 11:00 a.m. (prevailing Eastern Time), or at such other date and time or other place, as may be determined by the Debtor at or prior to the Auction.  The Auction shall be governed by the following procedures:

(i)     Participation.  Except as otherwise provided by order of this Court, only the Qualified Bidders that have submitted a Qualified Bid and provided Deposit(s) will be eligible to participate in the Auction, and each Qualified Bidder shall appear in person at the Auction (and any attorney for a Qualified Bidder may appear at the Auction at the discretion of the Qualified Bidder).  In the event a Qualified Bidder does not attend the Auction, the relevant Qualified Bid shall nonetheless remain fully enforceable against that Qualified Bidder in accordance herewith.  The Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee, will evaluate all Qualified Bids received and will select the Qualified Bid that reflects the highest or best offer for the Oakdale Campus, and otherwise complies with the bid requirements set forth herein, as the "Starting Auction Bid."  The Debtor may consider a variety of factors to determine the Starting Auction Bid including changes to the Purchase Agreement and the Qualified Bidder's ability to consummate the Sale. At the Auction, the Debtor shall announce the material terms of each overbid and the basis for calculating the total consideration in each such overbid.

(ii)     Bidding.  Bidding at the Auction shall commence at the amount of the Starting Auction Bid.  Qualified Bidders may then submit successive bids in increments of $100,000 plus the amount of any Termination Fee and Expense Reimbursement (as may be established by the Court) (the "Bid Increment"); provided, however, that the Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee, shall retain the right to modify the Bid Increment at the Auction.  Any bid submitted after the conclusion of the Auction shall not be considered for any purpose.

(iii)     Higher and Better.  The Debtor reserves the right, in consultation with the 2006 Secured Parties and the Creditors' Committee, to determine whether any bid is better, if not higher, than another bid submitted during the Auction.  The Debtor may consider a variety of factors in making this decision, including without limitation, the ability of a Bidder to obtain any necessary Regulatory Approvals, whether the bid is materially more burdensome than the terms of the proposed Purchase Agreement, any proposed conditions to closing, whether the bid includes any non-cash components and provides significant cash consideration for the payment of required costs of the transaction, and any other factors deemed relevant.

(iv)     Successful Bid.  The Auction shall continue until there is only one offer for the Oakdale Campus, which the Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee, determines, subject to Court approval, is the highest or otherwise best offer from among the Qualified Bids submitted at the Auction (the "Successful Bid") and the Debtor announces that the Auction is closed.  The Qualified Bidder submitting such Successful Bid shall become the Successful Bidder and shall have such rights and responsibilities of the purchaser, as set forth in the Modified Purchase Agreement.  Within one (1) business day after the conclusion of the Auction (but in any event prior to the commencement of the Sale Hearing), the Successful Bidder shall (i) complete and execute the Modified Purchase Agreement, all contracts, instruments or other

18

documents evidencing and containing the terms and conditions upon which the Successful Bid was made, and (ii) supplement its Deposit by wire transfer or other immediately available funds so that, to the extent necessary, such Deposit equals five percent (5%) of the Successful Bid plus the amount required for the payment of the Bidding Protections, if any.

(v)     <u>Anti-Collusion</u>.  At the commencement of the Auction, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with any other Qualified Bidder or Potential Bidder with respect to the bidding or the Sale.

(vi)     <u>Conduct of Auction</u>.  The Auction may be conducted openly with the proceeding being transcribed and each Qualified Bidder being informed of the terms of the previous bid; the Debtor, its counsel, or the Creditors' Committee may meet privately with any Qualified Bidder to negotiate the terms of its bid. The Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee, may adopt other rules for the conduct of the Auction at the Auction which, in its judgment, will better promote the goals of the Auction.

(vii)     <u>Backup Bid</u>.  At the conclusion of the Auction, the Debtor will also announce the second highest or otherwise best bid from among the Qualified Bids submitted at the Auction (the "<u>Backup Bid</u>").  The Qualified Bidder submitting such Backup Bid shall become the "<u>Backup Bidder</u>," and subject to the rights of the Successful Bidder, shall have such rights and responsibilities as set forth in the Modified Purchase Agreement. The Backup Bid shall remain open and irrevocable until the earlier of (x) ninety (90) days following entry of the Sale Order and (y) Closing of the Sale.  The Backup Bidder's Deposit(s) will be returned by the Debtor upon consummation of the Sale of the Oakdale Campus to the Successful Bidder or will be otherwise applied or forfeited as provided in subsection (i) above if the Backup Bidder is determined to be the Successful Bidder.

(viii)    <u>Extensions/Adjournment</u>.  The Debtor reserves its rights, in the exercise of its judgment, in consultation with the 2006 Secured Parties and the Creditors' Committee, to modify any non-material provisions of the Bidding Procedures at or prior to the Auction, including, without limitation, extending the deadlines set forth in the Auction procedures, modifying bidding increments, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice consistent with the proposed Purchase Agreement and Bidding Procedures Order.

## C.     <u>Auction and Sale Hearing Notice</u>

35.     Within three (3) days after entry of the Bidding Procedures Order, the Debtor

shall cause to be served copies of the Bidding Procedures Order, the Bidding Procedures and the

Sale Notice (annexed as Schedule 2 to the Bidding Procedures Order) on the Notice Parties, all

creditors of the Debtor who are listed on the Schedules filed by the Debtor or who have filed proofs of claim against the Debtor's estate ("Scheduled and Filed Creditors").

36.    No later than twenty-one (21) days prior to the Sale Hearing, the Debtor shall supplement service by causing a copy of the Sale Notice to be served on any additional parties disclosed by the title reports as asserting a lien on or interest in the Oakdale Campus.  Further, as soon as practicable after the Petition Date, the Campus Agents' intend to market the Oakdale Campus by submitting print and digital ads to the following entities for publication[10]:  Wall Street Journal, New York Times, Jewish Week, Newsday, and Real Estate Weekly.  In addition, after entry of the Bidding Procedures Order, the Debtor proposes to publish the Sale Notice in the Wall Street Journal and either Newsday or Long Island Business News.

**D.    Objections to Bidding Procedures and Sale**

37.    The Debtor proposes that objections, if any: (i) to the Bidding Procedures shall be filed with this Court, so as to be received no later than 4:00 p.m. (prevailing Eastern Time) seven (7) days prior to the Bidding Procedures Hearing (the "Bidding Objection Deadline"), and (ii) to the Sale Motion shall be filed with this Court, so as to be received no later than 4:00 p.m. (prevailing Eastern Time) seven (7) days prior to the Sale Hearing (the "Sale Objection Deadline"), by: (a) the Office of the United States Trustee for the Eastern District of New York, Alfonse D'Amato Federal Courthouse, 560 Federal Plaza, Central Islip, NY 11722, Attn: Stan Yang, Esq., Trial Attorney; (b) proposed counsel to the Debtor:  Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, NY 10036, Attn:  Sean C. Southard, Esq.; (c) counsel to the Debtor's material prepetition and post-petition secured lenders: (i) Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C., One Financial Center, Boston,

---

[10] This list is only a sample of the places where the Campus Agents' intend to market the Oakdale Campus.

Massachusetts 02111, Attn: P. Miyoko Sato, Esq. and Ian A. Hammel, Esq., (ii) Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Attn: Brian D. Pfeiffer, Esq. and Neil S. Begley, Esq., (iii) Certilman Balin Adler & Hyman, LLP, 90 Merrick Avenue, 9th Floor, East Meadow, NY 11554, Attn: Richard J. McCord, Esq. and Thomas J. McNamara, Esq., and (iv) Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck, NY 11021, Attn: Adam T. Berkowitz, Esq.; and (d) counsel to the Creditors' Committee.

**E.**     **Sale Hearing**

38.     The Successful Bid and Backup Bid will each be subject to entry of the Sale Order after the Sale Hearing to be held on a date to be set by this Court. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court. Upon approval of the Backup Bid by the Court, the Backup Bid shall remain open and irrevocable until the consummation of the Successful Bid.

**VI.     EXTRAORDINARY PROVISIONS OF THE PROPOSED SALE ORDER**

39.     Pursuant to General Order 557, the Debtor is required to highlight any "extraordinary provisions" of the proposed Sale. The extraordinary provisions in the proposed Sale are as follows:

(a)     Use of Proceeds. In the event of a Stalking Horse Bidder, under the Purchase Agreement with the Stalking Horse Bidder, the first proceeds from the Sale pursuant to a Competing Bid will be used to pay the Termination Fee and Expense Reimbursement. The proposed form of Sale Order also provides that the liens existing on the Oakdale Campus will attach to the net proceeds of the sale to the same extent, validity and priority that existed prior to the sale after taking into account the costs of the Sale and the Debtor shall be authorized to use such proceeds to pay any such secured claims in the order of their relative priority, as allowed by the Court.

(b)     Relief from Bankruptcy Rule 6004(h). The proposed form of Sale Order contains a waiver of the stay imposed by Bankruptcy Rule 6004(h). The Debtor submits such relief is appropriate under the circumstances to maximize the value that the Debtor may realize from the sale of the Oakdale Campus, especially in light of the Debtor's remaining liquidity.

(c)    <u>Sale Free and Clear of Unexpired Leases</u>.  Though not anticipated to be an extraordinary provision, out of an abundance of caution, the Debtor is noting the following leasehold interest which arises out of the financing structure the Debtor entered into prepetition.  Pursuant to the Series 2006 Bond Documents, certain facilities of the Oakdale Campus were leased by the Debtor to SCIDA as issuer and subleased by SCIDA back to the Debtor.  The Oakdale Campus serves as collateral for the Debtor's respective obligations under the Series 2006 Bond Documents, as set forth in that certain Mortgage and Security Agreement, dated as of June 1, 2006, by Dowling and SCIDA in favor of the Series 2006 Bond Trustee, and duly recorded with the Office of the Clerk of Suffolk County on July 5, 2006.  The Debtor understands that the Series 2006 Bond Trustee consents to the sale of the Oakdale Campus free and clear of its liens and any rights in the leasehold interest created by the Series 2006 Bond Documents.

(d)    <u>Successor Liability</u>. The proposed form of Sale Order contains findings and provisions limiting the Successful Bidder's successor liability.  The parties intend that the transfer of the Oakdale Campus to the Successful Bidder will not subject the Successful Bidder to any liability and a finding that the Sale can be made free and clear of successor liability claims in the Sale Order complies with applicable principles of sales free and clear of successor liability claims pursuant to Section 363(f) of the Bankruptcy Code and applicable non-bankruptcy law.  The Debtor proposes to provide notice of the Sale in accordance with the notice procedures set forth herein and submits that such notice is appropriate and adequate under the circumstances.

## VII.    <u>THE BIDDING PROCEDURES ORDER SHOULD BE ENTERED</u>

### A.    <u>The Bidding Procedures Should be Approved</u>

40.    The Bidding Procedures, which are standard for the sale of assets in large chapter 11 cases, will ensure that the Debtor's estate receives the greatest benefit available from the sale of the Oakdale Campus.  The Bidding Procedures have been structured to attract the maximum number of Qualified Bids for the Oakdale Campus while allowing the Debtor the flexibility to select the bid or bids that provide the greatest overall value to the Debtor's estate giving weight to the Debtor's not-for-profit mission and the best likelihood of closing.  Finally, the Bidding Procedures set out a time frame that will allow potential purchasers sufficient time to construct and submit informed Qualified Bids, while still providing for the expeditious sale of the Oakdale Campus.

41.     The Debtor submits that the Bidding Procedures are reasonably designed to ensure that the Debtor's estate receives the maximum benefit available from the sale of the Oakdale Campus, and therefore warrant Court approval.

**B.      The Termination Fee and Expense Reimbursement Should Be Approved**

42.     The Debtor is also requesting approval of the Bidding Procedures regarding the Termination Fee and Expense Reimbursement, which together will not exceed two percent (2%) of the purchase price, in the event a Stalking Horse Bidder is selected.  The Termination Fee and Expense Reimbursement will be paid solely from the first proceeds of an Alternate Transaction, or as set forth in the Purchase Agreement with the Stalking Horse Bidder.

43.     As noted above, approval of the Termination Fee and Expense Reimbursement is an integral part of obtaining a quality Stalking Horse Bidder.  The Debtor submits that the Termination Fee and Expense Reimbursement are reasonable in relation to any potential Stalking Horse Bidder's efforts and to the magnitude of the transaction and consideration contemplated by the Stalking Horse Bidder.  Further, if a Stalking Horse Bidder is found, the Stalking Horse Bidder's bid will establish an appropriate floor value for the Oakdale Campus.

44.     Bankruptcy courts have approved bidding incentives similar to the Termination Fee and Expense Reimbursement under the "business judgment rule," and such arrangements are presumptively valid provided that (i) the trustee's or debtor's decision to agree to the termination fee and expense reimbursement is not tainted by bad faith or self-dealing, (ii) the termination fee and expense reimbursement do not hamper bidding, and (iii) the amount of the termination fee and expense reimbursement is reasonable.  See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656-57 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).  A termination fee or break-up fee and expense reimbursement serve as an "incentive payment" offered to an unsuccessful bidder who places the

debtor's property in a "sales configuration mode," thereby attracting other bidders to the auction. Specifically, termination fee and expense reimbursements are designed to "(i) attract or retain a potentially successful bid, (ii) to establish a bid standard or minimum for other bidders to follow, and (iii) to attract additional bidders." Id. at 661-62.

45.    In the instant case, the Termination Fee and Expense Reimbursement are believed to be necessary Bidding Protections in order to obtain a quality Stalking Horse Bidder. The Termination Fee and Expense Reimbursement will provide a material benefit to the estate by enabling the Debtor to obtain a commitment from the Stalking Horse Bidder which will expend money, time and effort formulating and negotiating an offer for the Oakdale Campus, notwithstanding the Purchase Agreement with the Stalking Horse Bidder will be subject to higher or better offers. In the Debtor's business judgment, the proposed Termination Fee and Expense Reimbursement are fair and reasonable when considering the potential amount of time, effort, cost, and expense that the Stalking Horse Bidder will likely incur in negotiating the Purchase Agreement, and necessary to reimburse the Stalking Horse Bidder for its costs and expenses in the event an Alternate Transaction is thereafter consummated.

46.    Moreover, the Termination Fee and Expense Reimbursement do not hamper any other party's ability to offer a higher or better bid for the Oakdale Campus. Given the size of the Termination Fee and Expense Reimbursement relative to the total amount of consideration provided for the Oakdale Campus pursuant to the Purchase Agreement with the Stalking Horse Bidder, and relative to the "overbid" requirements set forth in the Bidding Procedures, the Debtor submits that the fee is not so large as to have a "chilling effect" on other prospective bidders' interest in the Oakdale Campus. Because the Purchase Agreement put forth by the Stalking Horse Bidder will create a floor for any additional bids, the Stalking Horse Bidder will

have provided significant value to the Debtor's estate. The Debtor submits that the proposed Termination Fee and Expense Reimbursement are appropriate under these circumstances.

47.     Finally, the amount of the Termination Fee and Expense Reimbursement, not to exceed, in the aggregate, two percent (2%) of the purchase price, is reasonable under the facts and uncertainties of this transaction.   Courts in this District have approved termination or breakup fees in approximately the same amount as measured in proportion to the proposed purchase price offered for a debtor's assets. See In re Long Beach Medical Center, et al., Case No. 14-70593 (AST) (Bankr. E.D.N.Y. Mar. 13, 2014) (approving termination fee in the amount of $630,000 and expense reimbursement not to exceed $210,000, which together aggregated 4% of the proposed purchase price); In re Personal Communications Devices, LLC, et al., Case No. 13-74303 (AST) (Bankr. E.D.N.Y. Sept. 16, 2013) (approving termination fee in the amount of $3,500,000 million in transaction with a proposed purchase price of $105,250,000); In re Sound Shore Medical Center of Westchester, et al., Case No. 13-22840 (RDD) (Bankr. S.D.N.Y. June 25, 2013) (conditionally approving a break-up fee of 3% on a $58.75 million purchase price); In re New York Westchester Square Medical Center, Case No. 06-13050 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2013); (approving a break-up fee of 3% on a $15.3 million assets sale); In re Saint Vincent Catholic Medical Center, et al., Case No. 10-11963 (CGM) (Bankr S.D.N.Y, June 30, 2011) (approving a break-up fee of 2% on a $34 million sale of assets); In re Cabrini Med. Ctr., Case No. 09-14398 (AJG) (Bankr. S.D.N.Y. Dec. 30, 2009) (approving a break-up fee of 3.75% for an $80 million sale); In re Bearingpoint, Inc. et al., No. 09-10691 (REG) (Bank. S.D.N.Y. Apr. 7, 2009) (approving a break-up fee of approximately 3% on a $350 million sale).

C.    **The Auction and Sale Hearing Notice Should be Approved**

48.     Pursuant to Bankruptcy Rules 2002(c) and 6004, the Debtor is required to give 21 days' notice of any proposed sale of property not in the ordinary course of business.  Bankruptcy

Rule 2002(c) further provides that such notice must include the time and place of any auction, a sale hearing, and the time fixed for objections to the sale.  The Sale Notice sets forth all the information a potential bidder and any other party in interest should require about the bidding process for the Oakdale Campus, including: notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures; the Bid Deadline; the time, date, and location of the Auction; and the time, date and location of the Sale Hearing.

49.    The Debtor submits that the Sale Notice as proposed complies with Bankruptcy Rule 2002 and General Order 557, and constitutes good and adequate notice of the sale and the proceedings with respect thereto.  Because the Debtor is providing notice of this Motion, the Bidding Procedures and the Auction to all Notice Parties and Scheduled and Filed Creditors, the Debtor submits that the notice requirements of Bankruptcy Rules 2002(a)(2) and 6004 are satisfied.  The Debtor also proposes to publish the Auction and Sale Notice in The Wall Street Journal and Newsday pursuant to Bankruptcy Rule 2002(l).  Therefore, the Debtor respectfully requests that the Court approve the Auction and Sale Notice and the notice procedures proposed above.

## VIII.    THE SALE ORDER SHOULD BE ENTERED

### A.    Sales Outside the Ordinary Course of Business

50.    Section 363(b) of the Bankruptcy Code and Rule 6004 of the Bankruptcy Rules govern the sale of assets outside the ordinary course of business.  Section 363(b)(1) provides, in relevant part, that a debtor in possession may, after notice and hearing, "use, sell or lease, other than in the ordinary course of business, property of the estate."  See 11 U.S.C. § 363 (b)(1).

51.    The terms of such sale are generally within the sound discretion of the Debtor. See In re Ionosphere Clubs, Inc., 100 B.R. 670, 679 (Bankr. S.D.N.Y. 1989) (sale of Debtors' airline shuttle assets approved where representing the exercise of independent good faith and

26

non-coerced business judgment by the Debtors, the Debtors articulated a compelling business reason for the sale and represented fair value).

52. As recognized by the Second Circuit in <u>Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063, 1071 (2d Cir. 1983), a court may approve a section 363 application after expressly determining from the evidence presented at the hearing that a good business reason exists to grant such application.

53. Bankruptcy Rule 6004(f)(1) further provides that sales of property outside the ordinary course may be conducted by private sale or public auction. <u>See</u> FED. R. BANKR. P. 6004(f)(1). Generally, a bankruptcy court has wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under Section 363(b). <u>See</u> In re Ancor Exploration Co., 30 B.R. 802, 808 (Bankr. N.D. Okla. 1983). However, each proposed sale must be examined from its own facts to determine whether the proposed sale is justified with detailed factual findings being made in support thereof.

**B.     The Sale of the Oakdale Campus Represents**
**        <u>the Debtor's Sound Business Judgment</u>**

54. Under applicable law, a proposed sale must represent the reasonable exercise of business judgment on the part of a debtor-in-possession in order to be approved under section 363(b) of the Bankruptcy Code. <u>See, e.g.,</u> In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); <u>In re Lionel Corp.</u>, 772 F.2d at 1071. <u>See also</u> In re Integrated Res., Inc., 147 B.R. 650, 656 (Bankr.S.D.N.Y. 1992), <u>appeal dismissed,</u> 3 F.3d 49 (2d Cir. 1993) <u>quoting</u> Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985) (stating that the business judgment rule is applicable in bankruptcy and presumes that when making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company).

55.    Furthermore, Chapter 11 debtors may, in some circumstances, sell all or substantially all of their assets pursuant to section 363(b) prior to confirmation of a plan.  In re Lionel Corp., 722 F.2d at 1065, 1071.  Such a sale can even be made prior to filing a plan of reorganization.   In re Naron & Wagner, Chartered, 88 B.R. 85, 87 (Bankr. D. Md. 1988). However, in approving such a sale, a court must be able, based on the evidence, "to articulate sound business justifications for [its] decisions."  In re Lionel Corp., 722 F.2d at 1066.  A court should consider all of the salient factors and act to further the diverse interests of the debtors, creditors and equity holders alike.  Id. at 1071.  See also In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); In re Ionosphere Clubs, Inc., 100 B.R. at 675.

56.    The Second Circuit has indicated that the following factors should be considered during the sale approval process: (i) the proportionate value of the asset to the estate as a whole; (ii) the amount of elapsed time since the filing; (iii) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (iv) the effect of the proposed disposition on future plans of reorganization; (v) the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property; (vi) which of the alternatives of use, sale or lease the proposal envisions; and (vii) whether the asset is increasing or decreasing in value.  See Lionel, 722 F.2d at 1071.  The factors highlighted by the Lionel decision are often cited and applied by other courts when determining requests to approve a sale of all or substantially all of the assets of a debtor's estate.  See, e.g., In re GSC, Inc., 453 B.R. 132, 156 (Bankr. S.D.N.Y. 2011); In re CPJFK, LLC, 496 B.R. 290, 303–04 (Bankr. E.D.N.Y. 2011); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175–76 (D. Del. 1991); In re Thomson McKinnon Sec., Inc., 120 B.R. 301, 307–08 (Bankr. S.D.N.Y. 1990);

57.    As indicated above, the decision to sell the Oakdale Campus was one of necessity and resulted from a lack of remaining viable alternatives.  As set forth extensively in the First

Day Declaration, the Debtor previously attempted to find a counter-party that would permit the Debtor to continue as a going concern. Unfortunately, the Debtor has no option of that involves a continued operation as a higher education institution. Absent a negotiated sale of its Oakdale Campus to a third party in this Chapter 11 Case, the Debtor would likely be forced to surrender its assets, including the Oakdale Campus, to its creditors without the opportunity for any reasonable and appropriate market test of value. Indeed, a reasonably prompt marketing and sale of the Oakdale Campus is necessary because the Debtor has no independent liquidity and is operating at a significant cash burn even at the substantially reduced scale that it now exists.

58.     The Debtor has no cash reserves and limited postpetition financing options. Thus, an immediate sale is necessary if the Debtor is to be able to maintain its assets and limited operations until a closing can occur.

59.     The Debtor believes that by selling the Oakdale Campus in accordance with the Bidding Procedures, a significantly greater value can be captured from the assets than would be achieved through a forced liquidation.

60.     As contemplated, a Sale of the Oakdale Campus will result in the sale of a substantial portion of the Debtor's assets outside of a Chapter 11 plan. However, the Debtor intends to propose and file a plan of liquidation as soon as practicable following the Petition Date.

61.     To the extent the Sale is approved it is essential that the proposed sale be closed as quickly as reasonably possible to avoid continuing losses and maximize asset values. A reasonably prompt sale will ensure the greatest potential benefit to creditors.

**C.     Section 363(d) of the Bankruptcy Code is Satisfied**

62.     Pursuant to Section 363(d) of the Bankruptcy Code, a transfer of property by a not-for-profit entity must be made in compliance with applicable nonbankruptcy law governing

such transfer. Specifically, Section 363(d) provides that "[t]he trustee may use, sell or lease property under subsection (b) or (c) of this section – (1) in the case of a debtor that is a corporation or trust that is not a moneyed business, commercial corporation, or trust, only in accordance with nonbankruptcy law applicable to the transfer of property by a debtor that is such a corporation or trust." 11 U.S.C. § 363(d)(1).

63.    In accordance with these provisions, the Debtor and the Successful Bidder will request and expect to obtain, all required Regulatory Approvals for the Sale prior to the closing. The Debtor anticipates obtaining approvals either from this Court directly (taking into account applicable New York State law) or from the New York State Attorney General, as well as any other regulatory authority asserting jurisdiction over the Debtor. To the extent any regulatory body or governmental agency fails to provide approval for the Sale, the Debtor reserves all rights to challenge any such determination. The inclusion of Section 363(d) of the Bankruptcy Code was not intended to provide states with a "veto" of sales of a debtor's assets under the Bankruptcy Code that otherwise take into account legitimate interests of the state over the transfer or sale of a non-profit's assets. See H. REP. NO. 109-31, pt. 1, title XII (Judiciary. Comm.) (listing section 1221 of the BAPCPA under the heading "Technical Amendments").

64.    The proposed Purchase Agreement provides that the Successful Bidder shall, at its own cost and expense, promptly after entry of the Sale Order by the Court, submit to all Regulatory Authorities all applications for consents or licenses required for the transfer of the Oakdale Campus. The Debtor shall cooperate, to the extent necessary, in the preparation and prosecution of any such applications.

65.    Outside of bankruptcy, an insolvent not-for-profit corporation that is seeking to sell all or substantially all of its assets is required, pursuant to Sections 510 and 511 of the New York Not-for-Profit Corporation Law, to submit a verified petition to the supreme court where

the corporation has its principal office for approval of such sale transaction, on notice to the Attorney General.  The supreme court will approve the proposed sale transaction if it finds that "the consideration and the terms of the transaction are fair and reasonable to the corporation and that the purposes of the corporation or the interests of the members will be promoted."  N.Y. Not-for-Profit Corp. Law § 511(d).

66.     The Debtor submits that the Sale complies with applicable non-bankruptcy law and does not violate Sections 510 and 511 of the New York Not-for-Profit Corporation Law. The Oakdale Campus consists primarily of real estate and its transfer does not invoke specific regulatory requirements which might restrict the transfer of the property.  The Debtor thus submits that the terms of the Purchase Agreement comply with all applicable not-for-profit laws, including the not-for-profit laws of the State of New York, and any applicable federal laws. Accordingly, the proposed Purchase Agreement satisfies the requirements of Section 363(d) of the Bankruptcy Code.

## IX.     The Oakdale Campus Should be Sold Free and Clear of Liens

67.     Under Section 363(f) of the Bankruptcy Code, a debtor may sell property under the Bankruptcy Code free and clear of liens, claims and encumbrances, provided that: (i) applicable nonbankruptcy law permits the sale of the property free and clear of such interests; (ii) the entity holding the lien, claim or encumbrance consents to the sale; (iii) the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property; (iv) the interest is in bona fide dispute; or (v) the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest.  11 U.S.C. § 363(f). See In re Smart World Tech., LLC, 423 F.3d 166, 169 n. 3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims and interests.  It thus allows purchasers . . . to acquire assets without any accompanying liabilities."); In re Dundee Equity Corp., No. 89-B-10233,

1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale of the interest concerned may occur if any one of the conditions of § 363(f) have been met").

68.     In accordance with the provisions of the proposed Purchase Agreement and Section 363(f), the Debtor requests that it be authorized to conduct the Sale free and clear of all Liens, other than the Permitted Exceptions (as set forth in the Purchase Agreement).  All parties holding liens on the Debtor's assets, including the Oakdale Campus, will be provided notice of the proposed Sale and shall be granted an opportunity to object to the relief requested in the instant Motion and any such entity that does not object to the sale shall be deemed to have consented.  See, e.g., Futuresource LLC v. Reuters Ltd., 312 F.3d 281, 285–86 (7th Cir. 2002) (standing for the proposition that the lack of an objection to a proposed sale of assets counts as consent); Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); In re Elliot, 94 B.R. 343, 345–46 (E.D. Pa. 1988) citing In re Gabel, 61 B.R. 661, 667 (Bankr. W.D. La. 1985).  See also, In re Enron Corp., No. 01-16034 (AJG), 2003 WL 21755006 at *2 (AJG) (Bankr. S.D.N.Y July 28, 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)).

69.     Thus, to the extent any parties holding a lien on the Oakdale Campus fail to object to the relief requested in this motion, a sale of the Oakdale Campus free and clear of all Liens, with the exception of the Permitted Exceptions, satisfies Section 363(f)(2) of the Bankruptcy Code.

70.     Alternatively, Section 363(f)(5) is also satisfied and provides adequate cause for granting authorization to conduct the Sale free and clear of Liens.  Under the proposed Purchase Agreement, any party holding a Lien may be compelled to accept a monetary satisfaction of its

lien.  The Purchase Agreement also provides that Liens on the Assets shall attach to the proceeds

of the Sale, subject to any claims and defenses the Debtor may have with respect thereto.  Liens

which cannot be satisfied through a monetary judgment (if any) are included among the

Permitted Exceptions and will not attach to the proceeds of the Sale.  Therefore, it is submitted

that Section 363(f)(5) can be deemed satisfied upon a sale of the Assets being conducted free and

clear of all liens.

## X.    **<u>Successor Liability</u>**

71.    The Debtor is also seeking to sell the Oakdale Campus free and clear of any

successor liability claims relating to the Oakdale Campus.  Notwithstanding reference to the

conveyance free and clear of "any interest" in Section 363(f), that section has been interpreted to

allow the sale of a debtor's assets free and clear of successor liability claims as well.  <u>See</u>, <u>e.g.</u>, <u>In</u>

<u>re Long Beach Medical Center, et al.</u>, Case No. 14-70593 (AST) (Bankr. E.D.N.Y. May 22,

2014) (authorizing the sale of assets free and clear of successor liability claims); <u>In re Gen.</u>

<u>Motors Corp. et al.</u>, Case No. 09-50026 (REG) (Bankr. S.D.N.Y. Jul. 5, 2009) (same); <u>In re Old</u>

<u>Carco LLC (f/k/a Chrysler LLC)</u>, Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Jun. 1, 2009)

(same); <u>see also</u> <u>In re Trans World Airlines, Inc.</u>, 322 F.3d 283, 288–90 (3d Cir. 2003) (sale of

assets pursuant to section 363(f) barred successor liability claims for employment discrimination

and rights under travel voucher program).

72.    The ability of the Debtor to transfer the Oakdale Campus free and clear from

successor liability is critical to the sale transaction.  In order to dispose of its assets and induce

the Successful Bidder to proceed with the Sale, the Debtor must be able to convey the assets free

and clear of potential successor liability claims.  Absent such assurance, the Successful Bidder

may be unwilling to proceed and significant value for the Debtor's estate may be lost.  <u>See</u>

<u>Licensing by Paolo, Inc. v. Sinatra (In re Gucci)</u>, 126 F.3d 380, 387 (2d. Cir. 1997) (stating that a

sale pursuant to Section 363 of the Bankruptcy Code "maximizes the purchase price of assets because without this assurance of finality, purchasers could demand a large discount for investing in a property that is laden with the risk of endless litigation as to who has rights to estate property").

73.     Further, under New York State law as well as the principles of traditional common law, a purchaser of another company's assets will be found liable only for the seller's liabilities where (i) the successor expressly or impliedly assumes the predecessor's tort liability, (ii) the seller and purchaser merged or otherwise consolidated, (iii) the purchaser is a mere continuation of the seller, and (iv) the transaction is fraudulent.  See N.Y. v. Nat'l Serv. Indus., Inc., 460 F.3d 201, 209 (2d Cir. 2006).  None of these factors are applicable to the proposed Sale Transaction herein.  As such, the Court may authorize the transfer of the Oakdale Campus free and clear of any successor liability claims.  See Douglas v. Stamco, Case No. 09-1390-cv, 2010 WL 337043 (2d. Cir. Feb. 1, 2010) (holding that sale pursuant to Section 363 extinguished successor liability claims where there was no (i) assumption of such liability, (ii) merger of the parties, (iii) mere continuation of the seller, or (iv) fraud).

74.     Accordingly, based on the foregoing, the Debtor respectfully submits that the Oakdale Campus should be transferred to the Successful Bidder free and clear of all liens, claims, encumbrances and other interests, including rights or claims based on successor liability.

## XI.    The Successful Bidder Should be Afforded Protection Under Section 363(m)

75.     Section 363(m) affords protection to a good faith buyer in any interest in property purchased from the Debtor, notwithstanding that the sale conducted was later reversed or modified on appeal.  Section 363(m) provides, in pertinent part, as follows:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).  See Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (Bankr. S.D.N.Y. 1994)

("[s]ection 363(m) . . . provides that good faith transfers of property will not be affected by the

reversal or modification on appeal of an unstayed order, whether or not the transferee knew of

the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990)

("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale

on appeal unless there is a stay pending appeal.)

76.     The Second Circuit has held that a party would have to show fraud or collusion

between a purchaser and the debtor-in-possession or trustee in order to demonstrate a lack of

good faith.  See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill

Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the misconduct that would destroy a

good faith status at a judicial sale involves fraud, collusion between the purchaser and other

bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders"); see also,

In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

77.     Here, at or prior to the Sale Hearing the parties will have established that the

Successful Bidder is a good faith purchaser as required by Section 363(m) of the Bankruptcy

Code.  The Debtor expects the Modified Purchase Agreement to be the product of extensive,

good-faith arms' length negotiations between the Debtor, its advisors and the Successful Bidder.

Accordingly, the Debtor requests that the Court determine that the Successful Bidder was acting

in good faith and is entitled to the protections of a good faith purchaser under Section 363(m).

## XII.    THE SALE SHOULD BE EXEMPT FROM TRANSFER AND SIMILAR TAXES

78.     Pursuant to N.Y. Tax Law §1405(b)(8), the Debtor submits that the Sale is

exempt from New York State real estate transfer tax because it is being consummated under the

Bankruptcy Code.  Accordingly, the Debtor respectfully requests that the Court find that these

exemptions apply and that the Debtor's estate is exempt from real estate transfer taxes.

### XIII. THE COURT SHOULD WAIVE OR REDUCE THE REQUIREMENTS OF RULES 6004(H)

79.     Under Rule 6004(h) of the Bankruptcy Code, all orders authorizing the sale of property pursuant to Section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order, unless otherwise ordered by the Court. FED. R. BANKR. P. 6004(h). The stay period is intended to provide sufficient time for an objecting party to appeal before the order is implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

80.     Although little guidance is provided by either Rule 6004(h) or the Advisory Committee Notes as to when a court should "order otherwise", it has been suggested that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure". See 10 Collier on Bankruptcy § 6004.11. Colliers also proposes that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to seek a stay pending such appeal. Id. It is thus respectfully requested that the Court waive the 14 day stay period required under Rule 6004(h) or, in the alternative, if an objection is filed to the proposed Sale, reduce the stay period to the minimum amount of time reasonably necessary for the objecting party to file a stay pending appeal. This relief is both necessary and appropriate under the circumstances of this case given the importance of the successful purchaser's immediate need to obtain certain regulatory approvals.

### XIV. NO PRIOR REQUEST

81.     No previous request for the relief sought herein has been made to this or any other court.

### XV. CONCLUSION

82.     The case law cited herein provides ample authority and justification for the approval of the proposed transaction. The facts set forth herein also support a finding in favor of

an order approving the Sale.  For these reasons, it is submitted that the Sale should be approved on the terms and provisions to be set forth in the Purchase Agreement.

**WHEREFORE** the Debtor respectfully requests that the Court enter orders substantially similar to the proposed orders, attached hereto as Exhibit A and Exhibit B, granting the relief requested herein, and granting the Debtor such other and further relief as is just and proper.

Dated:   New York, New York
         November 29, 2016

**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**

By:   */s/ Sean C. Southard*
      Sean C. Southard
      Lauren C. Kiss
      200 West 41st Street, 17th Floor
      New York, NY 10036
      Tel: (212) 972-3000
      Fax: (212) 972-2245
      Email: ssouthard@klestadt.com
             lkiss@klestadt.com

      *Proposed Attorneys to the Debtor and Debtor
      in Possession*

# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------------x
In re                                          :        Chapter 11
                                               :
DOWLING COLLEGE,                               :        Case No. 16-75545 (REG)
                                               :
                                               :
                              Debtor.          :
---------------------------------------------------------------x

        Upon that portion (the "Bidding Procedures Motion") of the motion (the "Motion"[1]), dated November 29, 2016 of Dowling College ("Dowling" or the "Debtor"), debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), by and through its proposed attorneys, Klestadt Winters Jureller Southard & Stevens, LLP, for entry of an Order, pursuant to Sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002(a)(2) and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i) approving the proposed Bidding Procedures in the form of Schedule 1 hereto to be used in connection with the proposed Sale of the Oakdale Campus to the Successful Bidder; (ii) scheduling a potential auction (the "Auction") and a hearing to approve the Sale (the "Sale Hearing"); (iii) approving the form and manner of the Notice of the Auction and Sale Hearing (the "Sale Notice") substantially in the form attached as Schedule 2 hereto; and (d) approving the payment of the Termination Fee and Expense Reimbursement if a Stalking Horse Bidder is selected by the Debtor in the marketing process (collectively the "Bidding Protections") and certain overbid procedures; and this Court having held a hearing on the Bidding Procedures Motion on [_____], 2016 (the "Bidding Procedures Hearing"); and, based on the Bidding Procedures Motion and the record of the Bidding Procedures Hearing, it now appearing that the relief requested in the Bidding Procedures Motion is in the best interest of

---

[1] Capitalized terms used herein, unless herein defined, shall be used with the meanings ascribed to such terms in the Motion.

the Debtor's estate; and after due deliberation thereon and good cause appearing therefor, it is hereby:

## FOUND AND DETERMINED THAT:[2]

A.    This Court has jurisdiction over the Bidding Procedures Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of the Bidding Procedures Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    Good and sufficient notice of the relief sought in the Bidding Procedures Motion has been given and no further notice is required.  A reasonable opportunity to object or be heard regarding the relief requested in the Bidding Procedures Motion has been afforded to interested persons and entities, including: (a) the Debtor's twenty (20) largest unsecured creditors and, upon its appointment, counsel for the official committee of unsecured creditors (the "Creditors' Committee"); (b) the Debtor's material prepetition and postpetition secured lenders and any agent therefore; (c) the Office of the United States Trustee for the Eastern District of New York; (d) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (e) the following taxing and regulatory authorities: (i) the United States Attorney for the Eastern District of New York, (ii) the Attorney General of the State of New York, (iii) United States Department of Education, (iv) New York State Department of Education, (v) the Internal Revenue Service, (vi) the New York State Department of Taxation and Finance, and (vii) the Securities and Exchange Commission; (f) all parties who are known to assert a lien, claim, encumbrance or other interest on any portion of the Debtor's assets; and (g)

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact, when appropriate.  See Fed. R. Bankr. P. 7052.

all parties identified by the Debtor as potentially having an interest in acquiring some or all of the Oakdale Campus ("Notice Parties").

        C.     The proposed Sale Notice is good, appropriate, adequate, and sufficient, and is reasonably calculated to provide all interested parties, including the Notice Parties, together with all other parties identified by the Debtor or the Creditors' Committee as potentially having an interest in acquiring the Oakdale Campus, (collectively the "Potentially Interested Parties") and all creditors of the Debtor who are listed on the Schedules to be filed by the Debtor or who have filed proofs of claim against the Debtor's estate ("Scheduled and Filed Creditors"), with timely and proper notice of the Motion, the Auction, the Sale Hearing and the proposed Sale.

        D.     The Debtor has articulated good and sufficient reasons for this Court to grant the relief requested in the Bidding Procedures Motion, including this Court's (i) approval of the Bidding Procedures, attached hereto as Schedule 1, (ii) approval, if the Debtor selects a Stalking Horse Bidder, of payment of the Bidding Protections (as described below and modified herein) from the proceeds of any Alternate Transaction or as otherwise provided in the Purchase Agreement with a Stalking Horse Bidder, (iii) determination of final Cure Amounts in the manner described herein, and (iv) approval of the form and manner of service of the Sale Notice attached hereto as Schedule 2.

        E.     The Debtor has articulated good and sufficient reasons for, and the best interests of the Debtor's estate will be served by, this Court scheduling subsequent pre-Sale and Sale Hearings to consider whether to grant the remainder of the relief requested in the Motion, including approval of the proposed Sale in accordance with the proposed Purchase Agreement between the Debtor and the Successful Bidder, a template of which is attached as Exhibit C to

the Motion, free and clear of, among other things, all liens, claims, encumbrances, and interests (collectively, "Liens") (other than the Permitted Liens) with the same to attach to the proceeds thereof pursuant to Section 363 of the Bankruptcy Code.

F.    The Bidding Protections, to the extent payable under the circumstances set forth in the proposed Purchase Agreement, for an Alternate Transaction, is (i) an actual and necessary cost and expense of preserving the Debtor's estate within the meaning of Section 503(b) of the Bankruptcy Code, (ii) commensurate to the real and substantial benefit conferred upon the Debtor's estate by the Stalking Horse Bidder, (iii) reasonable and appropriate in light of the size and nature of the proposed Sale and comparable transactions, the commitments that will be made, and the efforts that will be expended by the Stalking Horse Bidder, and (iv) necessary to induce the Stalking Horse Bidder to pursue the Sale.

G.    The Debtor's authorization to pay the Bidding Protections, upon an Alternate Transaction, is an essential inducement and condition relating to the Stalking Horse Bidder's entry into the Purchase Agreement.    The Debtor's promise to pay the Bidding Protections, which will induce the Stalking Horse Bidder to submit its bid that will serve as a minimum or floor bid on which the Debtor can rely, provides a material benefit to the Debtor's estate, and its creditors by increasing the likelihood that the best possible purchase price for the Oakdale Campus will be received.    Accordingly, the Bidding Protections as to an Alternate Transaction for the Oakdale Campus, and the Bidding Procedures, are reasonable and appropriate.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.    All objections to entry of this Order or to the relief provided herein and requested in the Bidding Procedures Motion that have not been withdrawn, waived, resolved, or settled are hereby denied and overruled in their entirety.

### The Bidding Procedures

2.    The Bidding Procedures, as set forth on <u>Schedule 1</u> and incorporated herein by reference as if fully set forth herein, are hereby approved in all respects and shall govern all bids and bid proceedings relating to the Oakdale Campus.  Notwithstanding the above, on or before the Objection Deadline (defined below), any party in interest may object to the criteria used by the Debtor to select the highest or otherwise best offer for the Oakdale Campus.

3.    The deadline for submitting bids for the Oakdale Campus (the "<u>Bid Deadline</u>") shall be March [27], 2017, at 4:00 p.m. (EST).

4.    The Debtor is authorized to extend the deadlines set forth in this Order and/or adjourn, continue or suspend the Auction and/or the Sale Hearing for any reason.

5.    The Debtor is authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

### The Auction

6.    The Auction, if necessary, shall commence at 11:00 a.m. (EST) on March [31], 2017 at Klestadt Winters Jureller Southard & Stevens, LLP, or such other time or other place as decided by the Debtor, and the Debtor shall notify all Qualified Bidders of any such other time or place; <u>provided</u>, <u>however</u>, in the event that no Qualified Bids (other than that submitted by the Stalking Horse Bidder) are received by the Bid Deadline or if there is no Stalking Horse Bidder and the Debtor determines that one of the Qualified Bids submitted is the highest and best offer for the Oakdale Campus, the Debtor shall not be required to conduct an

Auction, and in such event the Debtor shall proceed with the approval of the Modified Purchase Agreement with the Qualified Bidder.

## The Bidding Protections

7.        Sections 6.1, 6.2, and 6.3 of the Purchase Agreement are approved and binding on the Debtor and its estate with respect to an Alternate Transaction for the Oakdale Campus.  The Debtor is authorized and directed to pay the Bidding Protections, to the extent incurred and solely in the event of the consummation of an Alternate Transaction for all of the Oakdale Campus from the first proceeds of such transaction or as otherwise set forth in the Purchase Agreement, without further order of the Court.

8.        The terms of the Purchase Agreement with the Stalking Horse Bidder shall govern (i) the conditions under which the bid of the Stalking Horse Bidder is terminable (which are terms and conditions for termination of the Purchase Agreement) and (ii) the Bidding Protections, in the event of an Alternate Transaction for the Oakdale Campus.

## [Pre-Sale Hearing

9.        If by 5:00 p.m. on [_____], 2017, the Debtor, the Creditors' Committee and/or any interested party notifies the Court of a dispute related to the qualification of a potential bidder or any other dispute relating to the Bid Procedures, a telephonic hearing shall be held before the Honorable Robert E. Grossman, United States Bankruptcy Judge, on, [_____], 2017 at [_____] (EST) at which time this Court shall consider any issues raised by the parties.  In the event of a dispute between the Debtor and the Creditors' Committee as to whether a bid should be deemed a Qualified Bid, the Bankruptcy Court may make the final determination.  In the event of such hearing, the Debtor shall provide a call in number to the Court, all secured creditors, the proposed bidder(s) at issue, and the United States Trustee, by

fax, email or overnight delivery by no later than 10:00 .m. on [_____], 2017, and shall simultaneously docket a letter containing such call in information.]

### Sale Hearing

10.     The Sale Hearing shall be held before the Honorable Robert E. Grossman, United States Bankruptcy Judge, on, April [10], 2017 at [_____] (EST) at the United States Bankruptcy Court for the Eastern District of New York, 290 Federal Plaza, Central Islip, NY 11722, Courtroom No. [___], at which time this Court shall consider (i) approval of the Sale to the Successful Bidder; (ii) the entry of the proposed sale order, substantially in the form attached to the Motion as Exhibit B (the "Sale Order"); (iii) any issues or objections that are timely interposed by any parties; and (iv) such other or further relief as this Court may deem just or proper.

11.     The Sale Hearing may be adjourned by the Court upon request of the Debtor, after consultation with the Creditors' Committee, without further order of this Court, in which event a notice of adjournment will be filed with this Court and served on all Qualified Bidders, or by announcing such adjournment on the record of the Sale Hearing.

### Notice

12.     The Sale Notice substantially in the form attached hereto as Schedule 2 hereto is hereby approved.

13.     By no later than [_____], 2016, the Debtor shall cause a copy of the Bidding Procedures, the Sale Notice and this Order to be served upon the Notice Parties and the Potentially Interested Parties via first class mail.

14.     By no later than December [16], 2016, the Debtor shall cause a copy of the [Bidding Procedures, this Order and] Sale Notice to be served upon the Scheduled and Filed Creditors via first class mail.

7

15.     As soon as practicable after entry of this Order, the Debtor shall submit the Sale Notice for publication once in the Wall Street Journal and either Newsday or Long Island Business News pursuant to Bankruptcy Rule 2002(l).

16.     The notices as set forth in the preceding paragraphs 12 through 15 and paragraphs 18 through 20 below shall constitute good and sufficient notice of the Motion, the Bidding Procedures, the Bidding Protections, the Auction, the sale of the Oakdale Campus, the Sale Hearing and the proposed Sale Order, and no other or further notice of the Motion, the Auction, the Sale Hearing and/or the proposed Sale Order shall be necessary or required.

## **Objections to Motion**

Objections, if any, to the Sale Motion must be made in writing, must state with particularity the reasons for the objection or response, must conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, must set forth the name of the objecting party, the nature and basis of the objection and the specific grounds therefore, and must be filed with the Clerk of the Bankruptcy Court (with a copy to be delivered to the Chambers of the Honorable Robert E. Grossman, United States Bankruptcy Judge, United States Bankruptcy Court for the Eastern District of New York, 290 Federal Plaza, Central Islip, NY 11722, Courtroom No. [__],) and shall be served so as to be <u>received</u> no later than 4:00 p.m. (EST) March [7], 2017 (the "<u>Objection Deadline</u>"), upon: (a) the Office of the United States Trustee for the Eastern District of New York, 560 Federal Plaza, Central Islip, New York 11722, Attn: Stan Yang, Esq., Trial Attorney (b) proposed counsel to the Debtor: Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, NY 10036, Attn:  Sean C. Southard, Esq.; (c) counsel to the post-petition lenders:  (i) Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn:  P. Miyoko Sato, Esq. and Ian A. Hammel, Esq., (ii) Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022,

8

Attn:  Brian D. Pfeiffer, Esq. and Neil S. Begley, Esq., (iii) Certilman Balin Adler & Hyman, LLP, 90 Merrick Avenue, 9th Floor, East Meadow, NY 11554, Attn:  Richard J. McCord, Esq. and Thomas J. McNamara, Esq., and (iv) Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck, NY 11021, Attn:  Adam T. Berkowitz, Esq.; and (d) counsel to the Creditors' Committee.

### Additional Provisions

17.    The Debtor is authorized and empowered to take such steps, incur and pay such costs and expenses, and do such things as may be reasonably necessary to fulfill the requirements established by this Order.

18.    Nothing contained in this Order precludes any party in interest from objecting to the Sale in accordance with the objections procedures set forth herein and no party shall be deemed to have consented to the Sale by virtue of not having objected to the Bidding Procedures Motion.

19.    The Debtor is hereby authorized to implement the Bidding Procedures and conduct the Auction, if necessary, without the necessity of complying with any state or local bulk transfers law or requirement or any similar law of any state or other jurisdiction which applies in any way to any of the transactions under the Purchase Agreement.

20.    This Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order, including to determine the proceeds to which a Lien attached.

21.    Notwithstanding Bankruptcy Rules 6004(g) and 6006(d), this Order shall not be stayed for fourteen (14) days after the entry hereof and shall be effective and enforceable immediately upon entry hereof.

# **<u>Schedule 1</u>**

## BIDDING PROCEDURES
## AND TERMS AND CONDITIONS OF SALE

Dowling College ("Dowling" or the "Debtor"), debtor and debtor-in-possession in this Chapter 11 case (the "Chapter 11 Case") is seeking to sell certain real property consisting of an estimated 25 acre campus located at 150 Idle Hour Boulevard, Oakdale, New York 11769 (the "Oakdale Campus"), free and clear of liens, claims and encumbrances.  The Debtor is currently soliciting bids for the sale of the Oakdale Campus (the "Sale").[1]  Parties are encouraged to submit their highest and best offer for the Oakdale Campus through the sealed bid process ("Sealed Bid Process") discussed herein and substantially in the form of the Purchase Agreement, as the sale of the Oakdale Campus may not ultimately result in an auction.

### A.    Bidding Procedures

Set forth below are the bidding procedures (the "Bidding Procedures") with respect to the Sale by the Debtor of the Oakdale Campus.  On [____], 2016, the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") entered an order (the "Bidding Procedures Order") granting the Debtor's motion (the "Bidding Procedures Motion") insofar as it sought the approval of the Bidding Procedures and the availability of Bid Protections (as hereinafter defined) to be offered in connection with a potential Stalking Horse Bidder (as hereinafter defined) and a potential auction (the "Auction") for the Sale of the Oakdale Campus following the contemplated Sealed Bid Process.

### B.    Relevant Dates (Subject To Adjustment As Indicated Below)

| | |
|---|---|
| **Sealed Bid Deadline:** | **March [27], 2017 (4:00 p.m. EST)** |
| **Potential Auction:** | **March [31], 2017 (11:00 a.m. EST)** |
| **Objection Deadline:** | **April [6], 2017 (4:00 p.m. EST)** |
| **Sale Hearing:** | **April [10], 2017 (10:00 a.m. EST)** |

The schedule set forth above may be delayed in the event that the Debtor, with the consent of the 2006 Secured Parties[2] and in consultation with the Creditors' Committee, determines that additional time will likely result in greater overall value for the Debtor's estate based on an expression(s) of interest or bid received from an identified party which the Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee, believes could be a Qualified Bid (as hereinafter defined).

---

[1] Capitalized terms, unless herein defined, shall have the meaning ascribed to them in the Purchase Agreement.
[2] The 2006 Secured Parties consist of the Series 2006 Bond Trustee, the Series 2006 Bond Insurer and counsel to the Series 2006 Bond Insurer.

C.      **Oakdale Campus to be Sold Free and Clear**

The Debtor is offering for Sale, all of the Oakdale Campus, as defined in the proposed Purchase Agreement or as otherwise set forth in the Debtor's schedule of assets and liabilities.  Except as otherwise provided in the Purchase Agreement with respect to the Sale, all of the Debtor's right, title and interest in and to the Oakdale Campus shall be sold free and clear of all liens, claims and encumbrances, security interests and other restrictions on transfers (collectively, the "Liens") to the extent permitted by Section 363 of the Bankruptcy Code and other applicable law (except as otherwise expressly provided in the Purchase Agreement) with such Liens to attach to the proceeds of the Sale.

Except as expressly provided in the Purchase Agreement, the Sale of the Oakdale Campus shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtor or its agents.

D.      **Mailing of Sale Notice**

The Debtor shall provide notice of the intended Sale of the Oakdale Campus (the "Sale Notice") together with a copy of these Bidding Procedures by first class mail, postage prepaid, to:  (a) the Debtor's twenty (20) largest unsecured creditors and, upon its appointment, counsel for the Creditors' Committee; (b) the Debtor's material prepetition and postpetition secured lenders and any agent therefore; (c) the Office of the United States Trustee for the Eastern District of New York; (d) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (e) the following taxing and regulatory authorities: (i) the United States Attorney for the Eastern District of New York, (ii) the Attorney General of the State of New York, (iii) United States Department of Education, (iv) New York State Department of Education, (v) the Internal Revenue Service, and (vi) the New York State Department of Taxation and Finance; (f) all parties who are known to assert a lien on the Oakdale Campus; and (g) all parties identified by the Debtor as potentially having an interest in acquiring some or all of the Oakdale Campus (collectively, the "Notice Parties"); and a copy of the Sale Notice to all creditors of the Debtor who are listed on the Schedules filed by the Debtor or who have filed proofs of claim against the Debtor's estate ("Scheduled and Filed Creditors").

Any other party in interest that wishes to receive a copy of the Bidding Procedures Order and/or the Bidding Procedures Motion may make such request in writing to Sean C. Southard, Esq., Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10036, by telephone (212) 972-3000, or via email at ssouthard@klestadt.com.

E.      **Confidentiality Agreement / Due Diligence**

Any entity that wishes to conduct due diligence with respect to the Oakdale Campus, must deliver to the Debtor an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtor.  Parties that desire to conduct due diligence beginning after [March 2], 2017 must deliver to the Debtor a written non-binding expression of interest to purchase the Oakdale Campus, in a form and containing terms that are reasonably acceptable to the Debtor, the 2006 Secured Parties, and the Creditors' Committee.

Interested parties that comply with the foregoing (each such entity referred to as a "Potential Bidder"), shall be permitted to conduct diligence with respect to the Oakdale Campus, provided however, that the Debtor shall not be obligated to furnish any due diligence information after the Bid Deadline (as defined below).

F.    **Qualification of Bids and Bidders**

In order to participate in the bidding process and to have a bid considered by the Debtor, each Potential Bidder must deliver a written, irrevocable offer for all of the Debtor's Oakdale Campus, satisfying the below criteria.  **A BID MUST BE MADE FOR ALL OF THE OAKDALE CAMPUS.**  A "Qualified Bidder" is a Potential Bidder that delivers a binding bid that in the Debtor's discretion, after consultation with the 2006 Secured Parties and the Creditors' Committee, satisfies the following (a "Qualified Bid"):

(a)    Bid Deadline. Each Bid Package (as defined below) must be delivered in written form to the following parties **so as to actually be received no later than 4:00 p.m. (prevailing Eastern Time) on March [27], 2017 (the "Bid Deadline")**[3]:

| Debtor | Proposed Counsel to the Debtor |
|---|---|
| Dowling College<br>150 Idle Hour Blvd.<br>Oakdale, New York 11769<br>Attn: Robert S. Rosenfeld<br><br>With a copy to:<br><br>RSR Consulting, LLC<br>1330 Avenue of the Americas, Suite 23A<br>New York, New York 10019<br>Attn:  Robert S. Rosenfeld | Klestadt Winters Jureller Southard & Stevens, LLP<br>200 West 41st Street, 17th Floor<br>New York, New York 10036<br>Attn:  Sean C. Southard, Esq. |
| **United States Trustee** | **Proposed Real Estate Advisor to the Debtor** |
| Office of the United States Trustee for the Eastern District of New York<br>Alfonse D'Amato Federal Courthouse<br>560 Federal Plaza<br>Central Islip, New York 11722<br>Attn:  Stan Yang, Esq., Trial Attorney | A&G Realty Partners, LLC<br>445 Broadhollow Road, Suite 410<br>Melville, New York 11747<br>Attn:  Andrew Graiser |

---

[3] As set forth above, the Bid Deadline may be delayed at the discretion of the Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee.

| Proposed Real Estate Advisor to the Debtor | Series 2006 Bond Trustee |
|---|---|
| Madison Hawk Partners, LLC<br>575 Lexington Avenue, Suite 4017<br>New York, New York 10022<br>Attn: Jeffrey L. Hubbard | Wilmington Trust, National Association<br>25 South Charles Street, 11th Floor<br>Mail Code: MD2-CS58<br>Baltimore, Maryland 21201<br>Attn:  Jay Smith |
| **Series 2006 Bond Insurer** | **Counsel to the Series 2006 Bond Insurer** |
| ACA Financial Guaranty Corp.<br>555 Theodore Fremd Avenue Suite C-205<br>Rye, New York 10580<br>Attn:  Carl McCarthy, Esq. and Maria Cheng | Schulte Roth & Zabel LLP<br>919 Third Avenue<br>New York, New York 10022<br>Attn:  Brian D. Pfeiffer, Esq. and Neil S. Begley, Esq. |
| **Local Counsel to the<br>Series 2006 Bond Insurer** | **Counsel to the Series 1996,<br>Series 2002, and Series 2015 Bond Trustee** |
| Certilman Balin Adler & Hyman, LLP<br>90 Merrick Avenue, 9th Floor<br>East Meadow, New York 11554<br>Attn:  Richard J. McCord, Esq. and Thomas J. McNamara, Esq. | Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.<br>One Financial Center<br>Boston, Massachusetts 02111<br>Attn: P. Miyoko Sato, Esq.<br>Ian A. Hammel, Esq. |
| **Proposed Counsel to the<br>Creditors' Committee** | |

(b)    Bid Package.  Each bid must include (collectively, the "Bid Package"): (i) a written and signed irrevocable offer (x) stating that the bidder offers to consummate a sale transaction on terms and conditions set forth on the Modified Purchase Agreement (as defined below), (y) confirming that the bid will remain irrevocable until the earlier of (i) ninety (90) days following entry of the final Sale Order, and (ii) closing with the Successful Bidder and (z) stating that the Bidder has had the opportunity to conduct due diligence prior to its offer and does not require further due diligence, has relied solely upon its own independent review and investigation and did not rely on any written or oral representation except as expressly provided with the Modified Purchase Agreement; (ii) an executed copy of the Purchase Agreement as modified by the bidder in accordance with its bid (the "Modified Purchase Agreement")[4]; and (iii) an electronic markup of the agreement clearly showing the revisions in the Modified Purchase Agreement (formatted as a Microsoft Word document or such other

---

[4] For the avoidance of doubt, the Purchase Agreement with the Stalking Horse Bidder is deemed a Modified Purchase Agreement.

word processing format acceptable to the Debtor). The Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee, shall determine whether any Modified Purchase Agreement that modifies the Purchase Agreement in any respect beyond the identity of the purchaser and the purchase price under the agreement is a Qualified Bid.

(c)     <u>Minimum Bid</u>. The amount of the purchase price in a bid for the Oakdale Campus must be one (1) of the three (3) highest and otherwise best bids, or within fifteen percent (15%) of the highest and otherwise best bid.

(d)     <u>Financial Information</u>. The Bid Package must contain such financial and other information that will allow the Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee, to make a determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by such bid, including any proposed conditions to Closing.

(e)     <u>Additional Bid Protections</u>. A bid (other than from a potential stalking horse bidder (the "<u>Stalking Horse Bidder</u>")) must not request or entitle the Potential Bidder to any termination fee, transaction or break-up fee, expense reimbursement, or similar type of payment.

(f)     <u>Identity of Bidders</u>. Each Potential Bidder must fully disclose the identity of each entity that will be bidding for the Oakdale Campus, as well as disclose the organization, form and the business conducted by each entity and what, if any, connection the Potential Bidder has with the Debtor. Potential Bidders shall be required to provide such additional information as the Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee, may require regarding the bidder's ability to satisfy the requirements of the transaction contemplated by the Modified Purchase Agreement.

(g)     <u>Due Diligence</u>. Except for required Regulatory Approvals, the bid must not contain any contingencies of any kind, including, among others, obtaining (i) financing; (ii) shareholder, board of directors or other approval; or (iii) the outcome or completion of due diligence. Each Potential Bidder must also affirmatively acknowledge that the Potential Bidder (i) had an opportunity to conduct due diligence regarding the Oakdale Campus prior to making its offer and does not require further due diligence, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Oakdale Campus in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Oakdale Campus, or the completeness of any information provided in connection therewith except as expressly stated in these Bidding Procedures.

(h)     <u>Consents</u>. Each Potential Bidder must represent that it obtained all necessary organizational (not regulatory) approvals to make its bid and to enter into and perform the Modified Purchase Agreement.

(i)    <u>Deposit(s)</u>. A Potential Bidder must deposit not less than 5% of the initial purchase price set forth in the Modified Purchase Agreement with the Debtor in the form of a certified check or wire transfer on or before the Bid Deadline (the "<u>Deposit</u>"). In addition, if the Debtor proceeds with an Auction and a Stalking Horse Bidder is selected, each Potential Bidder must also deposit not less than the aggregate amount of their Deposit, plus the amount of the Bidding Protections with the Debtor in the form of a certified check or wire transfer before the Auction (the "<u>Additional Deposit</u>" and together with the Deposit, the "<u>Deposits</u>"). The Potential Bidder or the Backup Bidder (defined below) shall forfeit the Deposit(s) if (i) the Potential Bidder or the Backup Bidder is determined to be a Qualified Bidder and withdraws or modifies its bid other than as provided herein before the Bankruptcy Court approves the Debtor's selection of the Successful Bidder, or (ii) the Potential Bidder or the Backup Bidder is a Successful Bidder (defined below) and (x) modifies or withdraws the bid without the Debtor's consent before the consummation of the sale contemplated by the bid, or (y) breaches any of the Modified Purchase Agreement. The Deposit(s) shall be returned to the bidder (i) as soon as practicable if the bidder is not determined to be a Qualified Bidder or (ii) no later than five (5) business days after entry of the Sale Order if the bidder is a Qualified Bidder (who has not otherwise forfeited its Deposit), but is not the Successful Bidder or the Backup Bidder. The Debtor will maintain any Deposit(s) in a non-interest bearing Debtor account.

(j)    <u>As Is. Where Is</u>. Any Modified Purchase Agreement must provide that the Sale will be on an "as is, where is" basis and without representations or warranties of any kind except and solely to the extent expressly set forth in such agreement of the Successful Bidder. Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Oakdale Campus prior to making its bid and that it has relied solely upon its own independent review and investigation in making its bid.

(k)    <u>Debtor's Considerations</u>. The Debtor, after consultation with the 2006 Secured Parties and the Creditors' Committee, will have the right to determine that a bid is not a Qualified Bid if either of the following conditions is satisfied: (A) the ability of the Potential Bidder to use the Oakdale Campus is not consistent with the Debtor's mission; or (B) the terms of the bid are materially more burdensome or conditional than the terms of the proposed Purchase Agreement, which determination may take into consideration: (1) whether the bid requires any indemnification of such Qualified Bidder; (2) whether the bid does not provide sufficient cash consideration to pay transfer taxes, cure costs or other cash costs of the transaction (including professionals' fees and the Bidding Protections); (3) whether the bid may involve payment of consideration over time or otherwise impact the tax exempt nature of bonds that are issued and outstanding by the Debtor; (4) whether the bid includes a non-cash instrument or similar consideration that is not freely marketable; or (5) any other factors the

Debtor, after consultation with the 2006 Secured Parties and the Creditors' Committee, may deem relevant.[5]

The Debtor is offering to sell the Oakdale Campus. The Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee, shall have the exclusive right to determine whether a bid is a Qualified Bid and shall notify bidders whether their respective bid has been determined to be a Qualified Bid prior to the Auction. The Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee, may reject any bid that is on terms more burdensome or conditional than the proposed Purchase Agreement or is otherwise contrary to the best interests of the Debtor's estate. In addition to the requirements above, the Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee, may request any additional information from any bidder to assist the Debtor in making a determination as to whether a bid is a Qualified Bid.

THE DEBTOR, IN CONSULTATION WITH THE 2006 SECURED PARTIES AND THE CREDITORS' COMMITTEE, RESERVES THE RIGHT, IN ITS DISCRETION, TO DETERMINE WHETHER ANY BID IS BETTER, IF NOT HIGHER, THAN ANOTHER BID SUBMITTED DURING THE BIDDING PROCESS AND/OR AUCTION. THE DEBTOR MAY CONSIDER, IN CONSULTATION WITH THE 2006 SECURED PARTIES AND THE CREDITORS' COMMITTEE, A VARIETY OF FACTORS IN MAKING THIS DECISION, INCLUDING WITHOUT LIMITATION, ANY PROPOSED CONDITIONS TO CLOSING, TIMING OF CLOSING OF THE PROPOSED TRANSACTION, AND THE LIKELIHOOD OF THE BIDDER TO OBTAIN REQUISITE BANKRUPTCY COURT AND ANY REQUIRED NON-BANKRUPTCY APPROVALS.

THE DEBTOR RESERVES THE RIGHT, IN ITS REASONABLE DISCRETION AND SUBJECT TO THE EXERCISE OF ITS BUSINESS JUDGMENT, AFTER CONSULTATION WITH THE 2006 SECURED PARTIES AND THE CREDITORS' COMMITTEE, TO ALTER OR TERMINATE THESE BIDDING PROCEDURES, TO WAIVE TERMS AND CONDITIONS SET FORTH HEREIN WITH RESPECT TO ALL POTENTIAL BIDDERS, EXTEND THE DEADLINES SET FORTH HEREIN, ALTER THE ASSUMPTIONS SET FORTH HEREIN, PROVIDE REASONABLE ACCOMMODATIONS TO THE STALKING HORSE BIDDER WITH RESPECT TO SUCH TERMS, CONDITIONS AND DEADLINES OF THE BIDDING AND AUCTION PROCESS TO PROMOTE FURTHER BIDS BY SUCH BIDDER AND/OR TO TERMINATE DISCUSSIONS WITH ANY AND ALL POTENTIAL BIDDERS AT ANY TIME AND WITHOUT SPECIFYING THE REASONS THEREFOR, IN EACH CASE TO THE EXTENT NOT MATERIALLY INCONSISTENT WITH THESE BIDDING PROCEDURES AND/OR THE BIDDING PROCEDURES ORDER; PROVIDED FURTHER THAT THE DEBTOR'S EXERCISE OF ITS DISCRETION IN EVALUATING BIDS AND ADMINISTERING THE BIDDING AND AUCTION PROCESS DOES NOT PERMIT, AND SHALL NOT BE CONSTRUED AS PERMITTING THE DETBOR TO MATERIALLY DEVIATE FROM THE PROCEDURES,

---

[5] Notwithstanding the qualifying bid procedures, the Debtor reserves the right to entertain bids for the Oakdale Campus that do not conform to one or more of the requirements set forth herein and in the Bidding Procedures.

7

TERMS, CONDITIONS AND PROTECTIONS SET FORTH IN THESE BIDDING PROCEDURES AND/OR THE BIDDING PROCEDURES ORDER.

### G.  **Sale to a Qualified Bidder Without Auction**

The Debtor, after consultation with the 2006 Secured Parties and the Creditors' Committee, will have the right to determine whether, after review of the Qualified Bids, it shall proceed with the Sale Hearing and seek approval of the Modified Purchase Agreement proposed by a Qualified Bidder and the transaction contemplated thereby or whether it should proceed to Auction.

### H.  **Potential for Stalking Horse Bidder**

Though the Bidding Procedures contemplate that the Debtor will solicit sealed bids in connection with the Sealed Bid Process on or before the Bid Deadline, the Bidding Procedures permit the Debtor the flexibility to enter into a form of the Purchase Agreement before the Sale Hearing and/or Auction under terms and conditions acceptable to the 2006 Secured Parties and in consultation with the Creditors' Committee.  The Debtor contemplates that any Purchase Agreement with a Stalking Horse Bidder would nonetheless be subject to the receipt of higher or otherwise better bids in accordance with these Bidding Procedures and a potential Auction.  If the Debtor enters into a Purchase Agreement with a Stalking Horse Bidder before the Bid Deadline, all Potential Bidders (as defined herein) that provide the required documentation as set forth herein shall be notified of the Debtor's entrance into the Purchase Agreement with the Stalking Horse Bidder and terms defining such agreement, including Bidding Protections offered as part of the Purchase Agreement.

The Bidding Procedures Order approved, among other things, the provision of a termination fee (the "Termination Fee") and an expense reimbursement for a Stalking Horse Bidder's reasonable and documented out-of-pocket costs in connection with the Sale (the "Expense Reimbursement" and together with the Termination Fee, the "Bidding Protections") not to exceed, in the aggregate, two percent (2%) of the proposed sale price of the Oakdale Campus, which is potentially payable to the Stalking Horse Bidder in the event the Debtor enters into a Purchase Agreement with a Stalking Horse Bidder and the Bankruptcy Court approves the sale of the Oakdale Campus to a party other than the Stalking Horse Bidder in an Alternate Transaction or as otherwise provided under the terms set forth in the Purchase Agreement. The Termination Fee and Expense Reimbursement shall be paid from the first proceeds of an Alternate Transaction, including the Sale, or as otherwise set forth in the Purchase Agreement.

### I.  **Sale to the Stalking Horse Bidder**

In the event of a Stalking Horse Bidder, the Purchase Agreement with the Stalking Horse Bidder shall be deemed a Qualified Bid and the Stalking Horse Bidder shall be deemed a Qualified Bidder.  If no Qualified Bid other than Stalking Horse Bidder's is submitted by the Bid Deadline, the Debtor shall not be required to proceed with an Auction, but shall proceed with the Sale Hearing and seek approval of the Purchase Agreement with the Stalking Horse Bidder and the transaction contemplated thereby.

J.    **Auction**

If the Debtor determines, after review of the Qualified Bids and consultation with the 2006 Secured Parties and the Creditors' Committee, that an Auction process will maximize the value that the Debtor may realize from the sale of the Oakdale Campus, the Debtor shall conduct the Auction with respect to the Oakdale Campus.  The Auction will take place at the offices of proposed counsel to the Debtor, Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10036, not later than March [31], 2017, starting at 11:00 a.m. (prevailing Eastern Time), or at such other date and time or other place, as may be determined by the Debtor at or prior to the Auction.  The Auction shall be governed by the following procedures:

(a) <u>Participation</u>.  Only the Qualified Bidders that have submitted a Qualified Bid and provided a Deposit(s) will be eligible to participate in the Auction, and each Qualified Bidder shall appear in person at the Auction (and any attorney for a Qualified Bidder may appear at the Auction at the discretion of the Qualified Bidder).  In the event a Qualified Bidder does not attend the Auction, the relevant Qualified Bid shall nonetheless remain fully enforceable against that Qualified Bidder in accordance herewith.  The Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee, will evaluate all Qualified Bids received and will select the Qualified Bid that reflects the highest or best offer for the Oakdale Campus, and otherwise complies with the bid requirements set forth herein, as the "<u>Starting Auction Bid</u>."  The Debtor may consider a variety of factors to determine the Starting Auction Bid including changes to the proposed Purchase Agreement and the Qualified Bidder's ability to consummate the Sale.  At the Auction, the Debtor shall announce the material terms of each overbid and the basis for calculating the total consideration offered in each such overbid.

(b) <u>Bidding</u>.  Bidding at the Auction shall commence at the amount of the Starting Auction Bid.  Qualified Bidders may then submit successive bids in increments of $100,000 plus the amount of any Termination Fee and Expense Reimbursement (as may be established by the Court)(the "<u>Bid Increment</u>"); <u>provided</u>, <u>however</u>, that the Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee, shall retain the right to modify the Bid Increment at the Auction.  Any bid submitted after the conclusion of the Auction shall not be considered for any purpose.

(c) <u>Higher and Better</u>.  The Debtor reserves the right, in consultation with the 2006 Secured Parties and the Creditors' Committee, to determine whether any bid is better, if not higher, than another bid submitted during the Auction.  The Debtor may consider a variety of factors in making this decision, including without limitation, the ability of a Bidder to obtain any necessary Regulatory Approvals, whether the bid is materially more burdensome than the terms of the proposed Purchase Agreement, any proposed conditions to closing, whether the bid includes any non-cash components and provides significant cash consideration for the payment of required costs of the transaction, and any other factors deemed relevant.

(d)    <u>Successful Bid</u>.  The Auction shall continue until there is only one offer for the Oakdale Campus, which the Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee, determines, subject to Court approval, is the highest or otherwise best offer from among the Qualified Bids submitted at the Auction (the "<u>Successful Bid</u>") and the Debtor announces that the Auction is closed.  The Qualified Bidder submitting such Successful Bid shall become the Successful Bidder and shall have such rights and responsibilities of the purchaser, as set forth in the Modified Purchase Agreement.  Within one (1) business day after the conclusion of the Auction (but in any event prior to the commencement of the Sale Hearing), the Successful Bidder shall (i) complete and execute the Modified Purchase Agreement, all contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made, and (ii) supplement its Deposit by wire transfer or other immediately available funds so that, to the extent necessary, such Deposit equals five percent (5%) of the Successful Bid plus the amount required for the payment of the Bidding Protections, if any.

(e)    <u>Anti-Collusion</u>.    At the commencement of the Auction, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with any other Qualified Bidder or Potential Bidder with respect to the bidding or the Sale.

(f)    <u>Conduct of Auction</u>.  The Auction may be conducted openly with the proceeding being transcribed and each Qualified Bidder being informed of the terms of the previous bid; the Debtor, its counsel, or the Creditors' Committee may meet privately with any Qualified Bidder to negotiate the terms of its bid.  The Debtor, in consultation with the 2006 Secured Parties and the Creditors' Committee, may adopt other rules for the conduct of the Auction at the Auction which, in its judgment, will better promote the goals of the Auction.

(g)    <u>Backup Bid</u>.  At the conclusion of the Auction, the Debtor will also announce the second highest or otherwise best bid from among the Qualified Bids submitted at the Auction (the "<u>Backup Bid</u>").  The Qualified Bidder submitting such Backup Bid shall become the "<u>Backup Bidder</u>," and subject to the rights of the Successful Bidder, shall have such rights and responsibilities as set forth in the Modified Purchase Agreement.  The Backup Bid shall remain open and irrevocable until the earlier of (x) ninety (90) days following entry of the Sale Order and (y) Closing of the Sale.  The Backup Bidder's Deposit(s) will be returned by the Debtor upon consummation of the Sale of the Oakdale Campus to the Successful Bidder or will be otherwise applied or forfeited as provided in Section F(i) above if the Backup Bidder is determined to be the Successful Bidder.

(h)    <u>Extensions/Adjournment</u>.  The Debtor reserves its rights, in the exercise of its judgment, in consultation with the 2006 Secured Parties and the Creditors' Committee, to modify any non-material provisions of the Bidding

Procedures at or prior to the Auction, including, without limitation, extending the deadlines set forth in the Auction procedures, modifying bidding increments, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice consistent with the proposed Purchase Agreement and Bidding Procedures Order.

### K.    **Sale Hearing and Return of Deposits**

The Successful Bid and the Backup Bid will be subject to approval by entry of an order (the "Sale Order") by the Bankruptcy Court after a hearing (the "Sale Hearing") that will take place [no later than April 10, 2017] at [___] (EST).  The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court.  Upon approval of the Backup Bid by the Bankruptcy Court, the Backup Bid shall remain open and irrevocable until the earlier of: (i) ninety (90) days following entry of the Sale Order, or (ii) the Closing of the Sale.

No offer shall be deemed accepted unless and until it is approved by the Bankruptcy Court.

Objections, if any, to the Sale Motion and any filed supplements thereto, shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Bankruptcy Court and simultaneously served on:  (a) the Office of the United States Trustee for the Eastern District of New York, Alfonse D'Amato Federal Courthouse, 560 Federal Plaza, Central Islip, NY 11722, Attn: Stan Yang, Esq., Trial Attorney; (b) proposed counsel to the Debtor: Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, NY 10036, Attn:  Sean C. Southard, Esq.; (c) counsel to the post-petition lenders:  (i) Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn:  P. Miyoko Sato, Esq.,  Ian A. Hammel, Esq. and Eric R. Blythe, Esq. and (ii) Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Attn: Brian D. Pfeiffer, Esq. and Neil S. Begley, Esq.; and (d) counsel to the Creditors' Committee, so as to be **actually received by 4:00 p.m. (EST) on April [6], 2017** (the "Objection Deadline").

### L.    **Consummation of the Sale**

Except as provided herein and in the Modified Purchase Agreement following the Sale Hearing, if for any reason a Successful Bidder fails to consummate the purchase of the Oakdale Campus, then a Backup Bidder will automatically be deemed to have submitted the highest or otherwise best bid. The Debtor and any Backup Bidder are authorized to effectuate the sale of the Oakdale Campus to such Backup Bidder as soon as is commercially reasonable without further order of the Bankruptcy Court.  If such failure to consummate the purchase is the result of a breach by a Successful Bidder, its Deposit(s) shall be forfeited to the Debtor and the Debtor specifically reserves the right to seek all available damages from the defaulting bidder.

### M.    **Jurisdiction**

The Bankruptcy Court shall retain exclusive jurisdiction over any matter or dispute relating to the Sale of the Oakdale Campus, the Bidding Procedures, the Sale Hearing,

the Auction, a Successful Bid, a Stalking Horse Bidder, a Backup Bid, and/or any other matter that in any way relates to the foregoing.  In particular, all Potential Bidders (including the Stalking Horse Bidder) shall be deemed to have (a) consented to the core jurisdiction of the Bankruptcy Court to enter any order or orders, which shall be binding in all respects, in any way relating to the Bidding Procedures, the Auction or the construction and enforcement of any agreement or any other documentation relating to the Sale; (b) waived any right to a jury trial in connection with any disputes relating to the Bidding Procedures, the Auction, or the construction and enforcement of any agreement or any other document relating to the Sale; and (c) consented to the entry of a final order or judgment in any way related to the Bidding Procedures, the Auction, or the construction or enforcement of any agreement or any other document relating to the Sale if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

# **Schedule 2**

| | |
|---|---|
| **BID DEADLINE DATE AND TIME:** | **MARCH [27], 2017 at 4:00 p.m. (EST)** |
| **POTENTIAL AUCTION DATE AND TIME:** | **MARCH [31], 2017 at 11:00 a.m. (EST)** |
| **OBJECTION DEADLINE DATE AND TIME:** | **APRIL [6], 2017 at 4:00 p.m. (EST)** |
| **SALE HEARING DATE AND TIME:** | **APRIL [10], 2017 at 10:00 a.m. (EST)** |

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DOWLING COLLEGE, | : | Case No. 16-75545 (REG) |
| | : | |
| | : | |
| Debtor. | : | |

-------------------------------------------------------------------x

### NOTICE OF [AUCTION AND] HEARING TO CONSIDER
### APPROVAL OF THE SALE OF THE DEBTOR'S OAKDALE CAMPUS

**NOTICE IS HEREBY GIVEN,** as follows:

1.      On November 29, 2016, Dowling College ("Dowling" or the "Debtor"), debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case") filed a motion (the "Motion")[1] which in pertinent part (the "Bidding Procedures Motion") sought entry of an order (the "Bidding Procedures Order") pursuant to Sections 105, 363 and 365 of Title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002(a)(2) and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"): (a) approving the proposed Bidding Procedures and the schedule to be used in connection with the proposed sale of the Oakdale Campus, free and clear of all liens, claims and encumbrances, security interests and other interests, to the Successful Bidder, (b) scheduling an Auction, if necessary, and a Sale Hearing to approve the Sale of the Oakdale Campus; (c) approving the form and manner of the notice of the potential Auction and Sale Hearing; and (d) approving the Bidding Protections in connection therewith.

---

[1] Capitalized terms used herein, unless herein defined, are used with the meanings ascribed to such terms in the Motion.

2.    A copy of the Motion, the Bidding Procedures, and the Bidding Procedures Order may be obtained by:  (i) accessing the Bankruptcy Court's website at www.nyeb.uscourts.gov (password required); (ii) accessing the Debtor's noticing and claims agent website, http://cases.gardencitygroup.com/dco, or upon request by contacting Garden City Group, LLC ("GCG") at (866) 459-2643; (iii) going in person to the Office of the Clerk of the Bankruptcy Court at the United States Bankruptcy Court, Eastern District of New York, Alfonse M. D'Amato U.S. Courthouse, 290 Federal Plaza, Central Islip, New York 11722; or (iv) contacting Sean C. Southard, Esq. of Klestadt Winters Jureller Southard & Stevens, LLP, proposed counsel to the Debtor, at 200 West 41st Street, 17th Floor, New York, New York 10036, by telephone at (212) 972-3000 or by email at ssouthard@klestadt.com.

3.    As set forth in the Bidding Procedures, the sale of the Oakdale Campus will be sold to the highest or best offer, subject to Bankruptcy Court approval.

4.    All interested parties are invited to make offers for all of the Oakdale Campus in accordance with the terms of the Bidding Procedures and Bidding Procedures Order.  The deadline to submit bids (the "Bid Deadline") is **March [27], 2017 at 4:00 p.m. (EST)**.  Pursuant to the Bidding Procedures Order, if the Debtor determines, after review of the Qualified Bids and consultation with the Creditors' Committee, that an Auction process will maximize the value that the Debtor may realize from the sale of the Oakdale Campus, the Debtor shall conduct an Auction with respect to the Oakdale Campus.  The Auction will take place at the offices of proposed counsel to the Debtor, Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10036, not later than **March [31], 2017**, starting at 11:00 a.m. (prevailing Eastern Time), or at such other later date and time or other place, as may be determined by the Debtor at or prior to the Auction.

5.     The Bidding Procedures Order further provides that a Sale Hearing will be held on **April [10], 2017** before the Honorable Robert E. Grossman, United States Bankruptcy Judge, at the United States Bankruptcy Court, Eastern District of New York, Alfonse M. D'Amato U.S. Courthouse, 290 Federal Plaza, Central Islip, New York 11722 (the "<u>Bankruptcy Court</u>"), which hearing may be adjourned from time to time, including, without limitation, by announcing such adjournment on the record at the Sale Hearing.

6.     At the Sale Hearing, the Debtor will request that the Bankruptcy Court enter an order, among other things, approving the highest and best bid for the Oakdale Campus, pursuant to which the Debtor will transfer the Oakdale Campus.  In addition, the Debtor requests that the Bankruptcy Court provide that the transfer of the Oakdale Campus be (i) free and clear of all liens, claims and interests, including successor liability claims, and (ii) exempt from any stamp tax or similar tax.

7.     At the Sale Hearing, the Bankruptcy Court may enter such orders as it deems appropriate under applicable law and as required by the circumstances and equities of this Chapter 11 Case.  Objections, if any, to the Sale Motion must be made in writing, must state with particularity the reasons for the objection or response, and must be filed with the Clerk of the Bankruptcy Court, with copies delivered to the Bankruptcy Court and received by the Chambers of the Honorable Robert E. Grossman, United States Bankruptcy Judge, United States Bankruptcy Court, Eastern District of New York, Alfonse M. D'Amato U.S. Courthouse, 290 Federal Plaza, Central Islip, New York 11722, must conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, must set forth the name of the objecting party, the nature and basis of the objection and the specific grounds therefore and must be served upon: the Office of the United States Trustee for the Eastern District of New York, Alfonse D'Amato Federal

Courthouse, 560 Federal Plaza, Central Islip, NY 11722, Attn: Stan Yang, Esq., Trial Attorney;

(b) proposed counsel to the Debtor: Klestadt Winters Jureller Southard & Stevens, LLP, 200

West 41st Street, 17th Floor, New York, NY 10036, Attn:  Sean C. Southard, Esq.; (c) counsel to

the post-petition lenders: (i) Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C., One

Financial Center, Boston, Massachusetts 02111, Attn:  P. Miyoko Sato, Esq. and Ian A. Hammel,

Esq., (ii) Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Attn:

Brian D. Pfeiffer, Esq. and Neil S. Begley, Esq., (iii) Certilman Balin Adler & Hyman, LLP, 90

Merrick Avenue, 9th Floor, East Meadow, NY 11554, Attn:  Richard J. McCord, Esq. and

Thomas J. McNamara, Esq., and (iv) Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck,

NY 11021, Attn:  Adam T. Berkowitz, Esq.; and (d) counsel to the Creditors' Committee, so as

to be actually received by 4:00 p.m. (EST) on **April [6], 2017**.

8.      Requests for information concerning the sale of the Oakdale Campus should be

directed by written or telephonic request to:  (i) A&G Realty Partners, LLC, 445 Broadhollow

Road, Suite 410 Melville, New York 11747, Attn: Andrew Graiser and (ii) Madison Hawk

Partners, LLC, 575 Lexington Avenue, Suite 4017, New York, New York 10022, Attn: Jeffrey

L. Hubbard.

Dated:   New York, New York
           _____, 2016

**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**

By:  _*DRAFT*_____
      Sean C. Southard
      Lauren C. Kiss
      200 West 41st Street, 17th Floor
      New York, NY 10036
      Tel: (212) 972-3000
      Fax: (212) 972-2245
      Email: ssouthard@klestadt.com

lkiss@klestadt.com

*Proposed Attorneys to the Debtor and Debtor
in Possession*

# **Exhibit B**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re                                :    Chapter 11

                                   :

DOWLING COLLEGE,            :    Case No. 16-75545 (REG)

                                 :

                                 :

                     Debtor.     :
-----------------------------------------------------------------x

**ORDER PURSUANT TO SECTIONS 105(a), 363,**
**AND 365 OF THE BANKRUPTCY CODE APPROVING SALE**
**OF THE DEBTOR'S OAKDALE CAMPUS FREE AND CLEAR**
**OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS**

Upon the motion [Docket No. __] (the "Sale Motion")[1] dated November 29, 2016,

of Dowling College ("Dowling" or the "Debtor"), debtor and debtor-in-possession in the above-

captioned chapter 11 case (the "Chapter 11 Case") for (i) an order pursuant to Sections 105(a),

363(b), (d) and (f), 365 and 1146(a) of Title 11 of the United States Code (the "Bankruptcy

Code") and Rules 2002(a)(2), 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") approving, inter alia, (i) the sale (the "Sale") of the Oakdale Campus, free

and clear of all liens, claims, encumbrances and other interests all as provided in the Purchase

Agreement  (the "Purchase Agreement") [Docket No. __] by and among the Debtor and the

Successful Bidder, and (iii) for related relief, all as further set forth and defined in the Sale

Motion and the Purchase Agreement; and this Court having reviewed the Sale Motion and the

Purchase Agreement and upon this Court's prior order, dated [_____], 2016 approving certain

bidding procedures and bidding protections, and scheduling a hearing (the "Sale Hearing") on

the Sale Motion (the "Bidding Procedures Order") [Docket No. __]; and a Sale Hearing having

---

[1] Unless otherwise indicated, capitalized terms used but not defined herein shall have the same meanings ascribed to them in the Sale Motion, Bidding Procedures Order (hereinafter defined), or the Purchase Agreement (hereinafter defined).  The definitions in the Purchase Agreement shall govern any inconsistency with the definitions in the Sale Motion and/or the Bidding Procedures Order (hereinafter defined).

been held on [_____], 2017; and the Declaration of [_____] having been filed on behalf of the

Debtor in support of the Sale [Docket No. __] (the "_____ Declaration"); and due notice of the

Sale Motion, the Bidding Procedures and the Sale Hearing having been given to all parties

entitled thereto;

NOW THEREFORE, upon the entire record of the hearings held on [_____],

2016 and [_____], 2017, and this Chapter 11 Case, including, without limitation, all proffers

and other evidence admitted at the Sale Hearing, and after due deliberation thereon and good

cause appearing therefor;

### IT IS HEREBY FOUND AND DETERMINED THAT:

A.    Jurisdiction and Venue.  The Court has subject matter jurisdiction over the

Sale Motion and the relief request therein pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is

a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (N).  Venue of this case and the

Sale Motion in this district is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    Notice.  Proper, timely, adequate and sufficient notice of the Sale Motion

and the relief requested therein, the Sale Hearing, the Sale, the Bidding Protections, as set forth

in the Bidding Procedures Order, and related transactions collectively described in the Purchase

Agreement (all such transactions being collectively referred to as the "Sale Transaction"), has

been provided in accordance with Sections 102(1), 363, and 365 of the Bankruptcy Code and

Bankruptcy Rules 2002, 6004, 6006, and 9007 and in compliance with the Bidding Procedures

Order, to all Notice Parties, Scheduled and Filed Creditors and the 2002 Parties being all of the

interested persons and entities required to receive notice, as evidenced by the Affidavit of

Service filed with the Court.  Such notice was good and sufficient, and appropriate under the

particular circumstances.

C.      <u>Opportunity to Object</u>.   A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities.

D.      <u>Sale is Appropriate</u>.   The sale of the Oakdale Campus pursuant to the Purchase Agreement is authorized pursuant to Section 363(b)(1) of the Bankruptcy Code and Bankruptcy Rule 6004(f).   A sale of the Oakdale Campus outside the ordinary course of business represents the sound business judgment of the Debtor and is appropriate in light of the facts and circumstances surrounding the Sale Transaction and the Chapter 11 Case.

E.      <u>Corporate Authority</u>.   The Debtor has full corporate power and authority to execute the Purchase Agreement and all other documents contemplated thereby, and to consummate the transactions contemplated therewith, and no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required for the Debtor to consummate the Sale Transaction.

F.      <u>Best Interests/Business Justification</u>.   Approval of the Purchase Agreement and the consummation of the Sale Transaction is in the best interests of the Debtor, its estate, creditors, and other parties in interest.   The Debtor has marketed the Oakdale Campus and conducted the sale process in compliance with the Bidding Procedures Order.   The terms and conditions of the Purchase Agreement are fair and reasonable.   The Successful Bidder's bid for the purchase of the Oakdale Campus, as set forth in the Purchase Agreement, is (i) fair and reasonable, (ii) the highest or otherwise best offer received for the Oakdale Campus, (iii) will provide a greater recovery for the Debtor's creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair

consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

G.      <u>Highest or Otherwise Best</u>.  The Successful Bidder's bid for the purchase of the Oakdale Campus, as set forth in the Purchase Agreement, is (i) fair and reasonable and (ii) the highest or otherwise best offer received for the Oakdale Campus.

H.      <u>Arm's Length Transaction</u>.  The Purchase Agreement was negotiated, proposed and entered into by and among the Debtor and the Successful Bidder without collusion, in good faith and from arm's-length bargaining positions.  The Successful Bidder is not an "insider" of the Debtor, as that term is defined in Section 101(31) of the Bankruptcy Code. Neither the Debtor nor the Successful Bidder has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under Bankruptcy Code Section 363(n). Specifically, the Successful Bidder has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement with unrelated third parties.

I.      <u>Free and Clear</u>. The Successful Bidder does not constitute a successor to the Debtor or its estate.  The sale of the Oakdale Campus does not amount to a consolidation, merger or *de facto* merger of the Successful Bidder and the Debtors or its estate.  The Successful Bidder is not merely a continuation of either of the Debtor or its estate; there is no substantial continuity between the Successful Bidder and the Debtor or its estate; and there is no continuity of enterprise between the Successful Bidder and the Debtors and its estate.  The Debtor has complied with Section 363(f) of the Bankruptcy Code because one or more of the standards set forth in Section 363(f)(1)-(5) has been satisfied with regard to each such lien, claim, interest, or other encumbrance.  Those non-Debtor parties with liens, claims, or other encumbrances in or with respect to the Oakdale Campus who did not file a timely objection, or who withdrew such

objections, are deemed to have consented to the sale of the Oakdale Campus free and clear of those non-Debtor parties' interests in the Oakdale Campus pursuant to Section 363(f)(2) of the Bankruptcy Code.  Except as provided in the Purchase Agreement, and with the exception of the Excluded Assets, the transfer of the Oakdale Campus will be a legal, valid, and effective transfer of the Oakdale Campus, and will vest the Successful Bidder with all right, title, and interest of the Debtor in and to the Oakdale Campus, pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, free and clear of all liens, claims, interests, obligations, rights, and encumbrances, except as otherwise specifically provided in the Purchase Agreement.  The Successful Bidder is not taking assignment of any contracts.  Therefore, except as specifically provided in the Purchase Agreement, and consistent with Section 363(f) of the Bankruptcy Code, the Successful Bidder shall have no liability for any claims arising out of or related to the Sale or transfer of the Oakdale Campus or arising from claims against the Debtor or its estate or any liabilities or obligations of the Debtor and/or its estate, under the laws of the United States, any state, territory, or possession thereof, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee or vicarious liability.  Except as specifically provided in the Purchase Agreement, all persons and entities asserting or holding any claims or interests in or with respect to the Oakdale Campus (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), howsoever arising, shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing such claims or interests against the Successful Bidder.

   J. <u>Avoidance of Successor Liability</u>.  Except as otherwise set forth in the Purchase Agreement, the transfer of the Oakdale Campus to the Successful Bidder will not

subject the Successful Bidder to any liability for any claims against the Debtor or the Oakdale Campus existing as of the closing of the Sale by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, ERISA, successor, transferee or vicarious liability, or require Successful Bidder to remedy any violation of the Debtor or subject Successful Bidder to any labor or employment related law remedy; provided however, that nothing in this paragraph shall be construed as limiting any party's rights to assert a claim against the Debtor, the Debtor's estate or proceeds of the Sale unless the liability for such claim was assumed by the Successful Bidder. Notwithstanding the foregoing, nothing in this Order or the Purchase Agreement releases, nullifies or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order.  Nothing contained in this Order or in the Purchase Agreement shall in any way (i) diminish the obligation of any entity to comply with environmental laws, or (ii) diminish the obligations of the Debtor to comply with environmental laws consistent with its rights and obligations as a debtor in possession under the Bankruptcy Code.  Notwithstanding anything to the contrary contained herein, nothing in this Order shall be interpreted to deem the Successful Bidder as the successor to the Debtor under any state law or federal law successor liability doctrine with respect to any liabilities under environmental laws or regulations for penalties or liable for any liability or obligation.  Nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not already exist under law.

K.    <u>Legal and Factual Bases</u>.  The legal and factual bases set forth in the Sale

Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

**<u>General Provisions</u>**

1.    <u>Findings of Fact; Conclusions of Law</u>.  The findings of fact set forth above

and conclusions of law stated herein shall constitute this Court's findings of fact and conclusions

of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to

Bankruptcy Rule 9014.

2.    <u>Objections</u>.  All objections, if any, to the Sale Motion or the relief granted

herein that have not been withdrawn, settled or waived, and all reservations of rights included in

such objections, are hereby overruled on the merits with prejudice.

3.    <u>Sale Approval</u>.  The Sale, and all of the terms and conditions and

transactions contemplated by the Purchase Agreement are hereby authorized and approved

pursuant to, <u>inter alia</u>, Sections 105(a) and 363(b) of the Bankruptcy Code.  The Successful

Bidder is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code.

Pursuant to Section 363(b) of the Bankruptcy Code, the Debtor is authorized and directed to

consummate the Sale Transaction pursuant to and in accordance with the terms and conditions of

the Purchase Agreement.  The Debtor is authorized and directed to execute and deliver, and

empowered to perform under, consummate, and implement the Purchase Agreement, together

with all additional instruments and documents that may be reasonably necessary or desirable to

implement the Purchase Agreement and effectuate the provisions of this Order and the

transactions approved hereby.

4.    <u>Transfer of the Purchased Assets.</u>  Except as otherwise provided in the

Purchase Agreement, pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, upon the

Closing, the Oakdale Campus (and good and marketable title to such Oakdale Campus) shall be transferred to the Successful Bidder free and clear of all liens, claims or encumbrances, with all such liens, claims or encumbrances to attach to the net proceeds of the Sale Transaction in the order of their priority, with the same validity, force and effect which they now have as against the Oakdale Campus, subject to any claims and defenses, setoffs or rights of recoupment the Debtor may possess with respect thereto.   Except as specifically provided in the Purchase Agreement, all persons and entities (and their respective successors and assigns) including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade, and other creditors, asserting or holding any claims or interests in or with respect to the Debtor, the Oakdale Campus, the operation of the Debtor's business prior to the Closing, or the transfer of the Oakdale Campus to the Successful Bidder (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), howsoever arising, hereby are forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such claims or interests against the Successful Bidder and/or its affiliates, designees, assignees, successors, properties, or assets.   Except as otherwise provided in the Purchase Agreement, effective upon the Closing, the Successful Bidder shall have no liability for any Claims (as defined in Section 101(5) of the Bankruptcy Code) against the Debtor or its estate.

5.      <u>Surrender of Assets and Real Property</u>.   All entities who are presently, or who as of the Closing may be, in possession of some or all of the Oakdale Campus hereby are directed to surrender possession of the Oakdale Campus to the Successful Bidder as of the Closing.

**Additional Provisions**

6.      Additional Documents.    Prior to or upon the Closing of the Sale Transaction, each of the Debtor's creditors are authorized and directed to execute such documents and take all other actions as may be necessary to release their interests, if any, in the Oakdale Campus as such interests, liens, claims and/or other encumbrances may have been recorded or may otherwise exist.

7.      Except as otherwise provided in the Purchase Agreement, this Order (a) shall be effective as a determination that, upon the Closing, all liens existing with respect to the Debtor and/or the Oakdale Campus prior to the Closing have been unconditionally released, discharged, and terminated as to the Successful Bidder and the Oakdale Campus, and that the conveyances described herein have been effected, and (b) shall be binding upon all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Oakdale Campus.

8.      Financing Statements.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens,* or other documents or agreements evidencing interests with respect to the Debtor and/or the Oakdale Campus shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the person or entity has with respect to the Debtor, the Oakdale Campus or otherwise, then

9

(a) the Debtor or the Successful Bidder is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Oakdale Campus and (b) the Successful Bidder and/or the Debtor is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all interests and liens in, against or with respect to the Debtor and/or the Oakdale Campus. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, and local governmental agency, department, or office.

9.      <u>Modifications</u>.    The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment or supplement does not (i) materially change the terms of the Purchase Agreement, (ii) modify the express terms of this Order, and (iii) have a material adverse effect on the Debtor's estate, and the Debtor shall provide reasonable advance notice of any such modification to counsel for the Creditors' Committee and the Office of the United States Trustee.

10.      <u>Automatic Stay</u>.    The automatic stay pursuant to Section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtor to the extent necessary, without further order of the Court to allow the Successful Bidder to (i) give the Debtor any notice provided for in the Purchase Agreement, and (ii) take any and all actions permitted by the Purchase Agreement and ancillary agreements in accordance with the terms and conditions thereof.

11.     <u>Recording</u>.  Each and every federal, state, and local governmental agency, recording office or department and all other parties, persons or entities is hereby directed to accept this Order and any and all documents and instruments necessary and appropriate for recordation as conclusive evidence of the free and clear and unencumbered transfer of title to the Oakdale Campus conveyed to the Successful Bidder.

12.     <u>Successors, Assigns</u>.    The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate, creditors, the Successful Bidder, and any of such parties' respective affiliates, designees, successors, and assigns, and shall be binding in all respects upon all of the Debtor's creditors, all prospective and actual bidders for the Oakdale Campus, and all persons and entities receiving notice of the Sale Motion, the Auction and/or the Sale Hearing notwithstanding any subsequent appointment of any trustee(s), examiner(s), or receiver(s) under any Chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtors, its estate,  creditors, or any trustee(s), examiner(s), or receiver(s).

13.     <u>Non-Severability/Failure to Specify</u>.  The provisions of this Order are non-severable and mutually dependent.  The failure specifically to include any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Purchase Agreement be authorized and approved in its entirety.

14.     <u>Order Immediately Effective</u>.  As provided by Bankruptcy Rules 6004(h), 6006(d) and 7062, this Order shall be effective and enforceable immediately upon its entry, and

the sale approved by this Order may close immediately upon entry of this Order, notwithstanding any otherwise applicable waiting periods.

15. <u>Retention of Jurisdiction</u>.  This Court retains jurisdiction on all matters pertaining to the relief granted herein, including to interpret, implement, and enforce the terms and provisions of this Order and the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects.

# **Exhibit C**

ASSET PURCHASE AGREEMENT


by and between


DOWLING COLLEGE


and


[_____]


Dated as of [_____], 201[_]

Table of Contents

Page

ARTICLE I  DEFINITIONS ...........................................................................................1
  1.1 Definitions..........................................................................................................1
  1.2 Other Definitional and Interpretative Provisions...............................................9
ARTICLE II  PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ........10
  2.1 Assets to be Sold to Buyer ................................................................................10
  2.2 Excluded Assets.................................................................................................11
  2.3 Excluded Liabilities ..........................................................................................11
ARTICLE III PURCHASE PRICE, MANNER OF PAYMENT AND CLOSING.....................12
  3.1 Payment of Purchase Price.................................................................................12
  3.2 Deposit….. .........................................................................................................12
  3.3 Closing and Closing Date ..................................................................................12
  3.4 Closing Deliveries..............................................................................................13
  3.5 Transfer Taxes ...................................................................................................14
  3.6 Delivery of Records and Contracts ....................................................................15
  3.7 Further Conveyances .........................................................................................15
  3.8 Bulk Sales Laws.................................................................................................15
  3.9 Allocation of Purchase Price..............................................................................15
  3.10 Time is of the Essence .....................................................................................15
ARTICLE IV SELLER'S REPRESENTATIONS AND WARRANTIES ................................15
  4.1 Organization of Seller .......................................................................................15
  4.2 Authorization of Transaction .............................................................................15
  4.3 Qualification ......................................................................................................16
  4.4 Non-Contravention ............................................................................................16
  4.5 Brokers' Fees .....................................................................................................16
  4.6 Events Subsequent .............................................................................................16
  4.7 Tax Matters ........................................................................................................17
  4.8 Property and Assets............................................................................................18
  4.9 Contracts   ..........................................................................................................19
  4.10 Seller's Consents and Approvals .....................................................................19
  4.11 Powers of Attorney ..........................................................................................20
  4.12 Litigation..........................................................................................................20
  4.13 Employees........................................................................................................21
  4.14 Foreign Operations...........................................................................................21
  4.15 Insurance Coverage..........................................................................................21
  4.16 Restrictions on Business Activities...................................................................21
  4.17 Environmental Matters......................................................................................21
  4.18 Full Disclosure .................................................................................................23
  4.19 No Other Representations or Warranties; Schedules.........................................23
ARTICLE V  BUYER'S REPRESENTATIONS AND WARRANTIES.................................23
  5.1 Organization of Buyer........................................................................................24
  5.2 Authorization of Transaction .............................................................................24
  5.3 Non-Contravention ............................................................................................24
  5.4 Brokers' Fees .....................................................................................................24
  5.5 Buyer's Consents and Approvals........................................................................24

5.6 Acknowledgement Regarding Condition of the Business ....................................................25
5.7 Financial Capability .............................................................................................................25
5.8 No Other Representations or Warranties; Schedules...........................................................25
ARTICLE VI  BANKRUPTCY COURT MATTERS ...................................................................23
6.1 Termination Fee and Expense Reimbursement ...................................................................26
6.2 Competing Transaction .........................................................................................................26
6.3 Treatment of Monetary Obligations.....................................................................................26
ARTICLE VII  PRE-CLOSING COVENANTS ...........................................................................27
7.1 General      ...........................................................................................................................26
7.2 Regulatory Approvals ...........................................................................................................26
7.3 Operation of Business ...........................................................................................................27
7.4 Access       ...........................................................................................................................28
7.5 Notice of Developments ........................................................................................................28
7.6 Employment Matters..............................................................................................................29
7.7 Removal of Excluded Assets from Real Property ...............................................................29
ARTICLE VIII POST-CLOSING COVENANTS .......................................................................29
8.1 General      ...........................................................................................................................29
8.2 Access to Records ..................................................................................................................29
8.3 Non-Disclosure ......................................................................................................................29
8.4 Further Assurances.................................................................................................................31
8.5 Sale of Certain Furniture and Equipment Acquired by Buyer............................................31
8.6 Removal of Student Records .................................................................................................31
ARTICLE IX EMPLOYEES ..........................................................................................................31
9.1 Buyer Not Assuming Seller's CBAs or Benefit Plans.........................................................31
9.2 No Obligation to Offer Employment ....................................................................................31
9.3 No Successor Liability ...........................................................................................................31
ARTICLE X CONDITIONS TO OBLIGATION TO CLOSE ....................................................31
10.1 Conditions to Buyer's Obligation .......................................................................................31
10.2 Conditions to Seller's Obligations ......................................................................................33
ARTICLE XI DISPUTE RESOLUTION .......................................................................................34
11.1 Dispute Resolution...............................................................................................................34
ARTICLE XII TERMINATION .....................................................................................................34
12.1 Termination of Agreement...................................................................................................34
12.2 Procedure For Termination ..................................................................................................35
12.3 Effect of Termination...........................................................................................................35
ARTICLE XIII TITLE INSURANCE; PERMITTED EXCEPTIONS; APPORTIONMENTS...36
13.1 Title Insurance .....................................................................................................................36
13.2 Permitted Exceptions ...........................................................................................................37
13.3 Apportionments....................................................................................................................37
ARTICLE XIV MISCELLANEOUS ..............................................................................................40
14.1 Survival  ...........................................................................................................................40
14.2 Press Releases and Public Announcements ........................................................................40
14.3 No Third-Party Beneficiaries...............................................................................................40
14.4 Entire Agreement .................................................................................................................40
14.5 Succession and Assignment.................................................................................................41
14.6 Counterparts ..........................................................................................................................41
14.7 Headings ...........................................................................................................................41
14.8 Notices    ...........................................................................................................................41

14.9 Governing Law; Waiver of Jury Trial ..............................................................................42
14.10 Submission to Jurisdiction; Consent to Service of Process .............................................42
14.11 Amendments ........................................................................................................................42
14.12 Severability .........................................................................................................................42
14.13 Expenses .............................................................................................................................43
14.14 Construction ........................................................................................................................43
14.15 Incorporation of Schedules ................................................................................................43
14.16 No Waiver ...........................................................................................................................43
14.17 Non-Recourse Liability ......................................................................................................43

## LIST OF SCHEDULES

| | |
|---|---|
| Schedule 1.1 | Knowledge |
| Schedule 3.4(a)(vi) | Certain Tenancies |
| Schedule 4.6 | Events Subsequent |
| Schedule 4.7(a) | Exceptions to Pre-Closing Tax Returns |
| Schedule 4.7(c) | Tax Compliance |
| Schedule 4.7(d) | Tax Jurisdictions |
| Schedule 4.7(e) | Lien or Claims for Taxes |
| Schedule 4.8(a)-1 | Owned Real Property |
| Schedule 4.8(d) | Violations |
| Schedule 4.9 | Contracts |
| Schedule 4.9(d) | Notices and Approval for Contracts |
| Schedule 4.10 | Consents and Approvals (Seller) |
| Schedule 4.12 | Litigation of Seller |
| Schedule 4.15 | Insurance Coverage |
| Schedule 4.17(a) | Environmental Matters |
| Schedule 4.17(b) | Environmental Permits |
| Schedule 5.5 | Consents and Approvals (Buyer) |
| Schedule 13.2(a) | Permitted Exceptions |

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of [_____], 2016, (the "Execution Date") is by and between DOWLING COLLEGE, a New York not-for-profit corporation ("Dowling" or "Seller"), and [_____] ("Buyer"), each a "Party" and collectively the "Parties."

RECITALS

WHEREAS, on November 29, 2016 (the "Petition Date"), Dowling (the "Debtor") filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 *et seq*. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") (the "Bankruptcy Case"); and

WHEREAS, on the Petition Date, the Debtor filed a motion seeking, *inter alia*, approval of the sale of the Debtor's 25 acre campus located at 150 Idle Hour Boulevard, Oakdale, New York 11769 (the "Oakdale Campus") to the successful bidder (the "Successful Bidder") as determined by the bidding procedures; and

WHEREAS, on [_____], 2016, an order was entered by the Bankruptcy Court, approving, *inter alia*, bidding procedures for the sale, and scheduling an auction ("Auction") and sale hearing in connection therewith (the "Bidding Procedures Order"); and

WHEREAS, after a marketing process and [as a result of the Auction held on March 31, 2017] the Buyer was deemed the Successful Bidder; and

WHEREAS, the transactions contemplated by this Agreement will be consummated pursuant to an order of the Bankruptcy Court, approving, *inter alia*, the sale of the Oakdale Campus to the Buyer (the "Sale Order"), consistent with terms, conditions and transactions contemplated by the Agreement; and

WHEREAS, Seller wishes to sell to Buyer and Buyer wishes to acquire from Seller the Acquired Assets as set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, agreements, representations and warranties herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

ARTICLE I
DEFINITIONS

1.1     Definitions.  The following terms, as used herein, have the following meanings:

"Acquired Assets" has the meaning set forth Section 2.1.

"Affiliate" means any person or entity which directly or indirectly controls, is controlled by, or is under common control with, any Person.

"<u>Agreement</u>" has the meaning set forth in the preface above.

"<u>Alternate Transaction</u>" means a transaction or series of related transactions consummated by Seller within one (1) year of the Execution Date pursuant to which Seller sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization, or bankruptcy plan of liquidation, or other similar transaction, including a Bankruptcy Court approved stand-alone plan of liquidation, all or substantially all of the Acquired Assets owned by Seller to a party or parties other than Buyer (or one or more designees of Buyer).

"<u>Applicable Law</u>" means, with respect to any Person, any foreign, federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, guidance, plan, order, injunction, judgment, decree, ruling, charge or other similar requirement, including any Labor and Employment Law and Requirements, enacted, adopted, or promulgated by a Governmental Authority that is binding upon such Person, as amended.

"<u>Auction</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Case</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to Section 2075 of title 28 of the United States Code and as applicable to the Bankruptcy Case.

"<u>Bidding Procedures Order</u>" has the meaning set forth in the recitals.

"<u>Board</u>" means the governing board of an entity, including the board of directors, board of governors, board of trustees, or board of managers, as applicable.

"<u>Business</u>" means the business operations of Seller as conducted following Seller's loss of accreditation and cessation of operations as a provider of educational services (not including the Excluded Liabilities).

"<u>Business Day</u>" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Applicable Law to close.

"<u>Buyer</u>" has the meaning set forth in the preface above.

"<u>Buyer Confidential Information</u>" has the meaning set forth in Section 8.3(b).

"<u>Buyer's Consents and Approvals</u>" has the meaning set forth in Section 5.5.

"<u>Buyer's Objection Notice</u>" has the meaning set forth in Section 13.1.

"Campus Agents" means A&G Realty Partners, LLC and Madison Hawk Partners, LLC.

"CBA" means collective bargaining agreement.

"Claim" has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 3.3(a).

"Closing Date" has the meaning set forth in Section 3.3(a).

"Closing Documents" has the meaning set forth in Section 3.4(a).

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Bid" has the meaning set forth in Section 6.2(a).

"Contemplated Transactions" has the meaning set forth in Section 2.1.

"Contract" means any legally binding oral or written commitment, contract, lease, sublease, license, sublicense or other agreement or arrangements of any kind relating to the Business, the Acquired Assets or the operation thereof to which Seller is a party or by which any of the Acquired Assets are bound.

"Covered Person" means a current or former Employee, officer, director or consultant of Seller.

"Creditors' Committee" means the official committee of unsecured creditors appointed in the Bankruptcy Case pursuant to Section 1102 of the Bankruptcy Code by the United States Trustee for the Eastern District of New York, as it may be reconstituted from time to time.

"Debt" means, with respect to Seller, the aggregate amounts of long-term and short-term indebtedness of Seller, including any amounts owing under any capital lease arrangement, amounts outstanding under notes payable to any financial institution or Governmental Authority, amounts owed to an Employee Benefit Plan or any Multiemployer Plan, amounts outstanding under lines of credit, amounts owing under notes or dividends or distributions payable or other amounts payable by Seller, any other amounts outstanding under notes payable, and any prepayment penalties or expenses payable in connection with the foregoing transactions, but excluding the accounts payable arising in the Ordinary Course of Business of Seller.

"Debtor" has the meaning set forth in the recitals.

"Deeds" has the meaning set forth in Section 3.4(a)(i).

"Deposit" has the meaning set forth in Section 3.2.

"Effective Time" has the meaning set forth in Section 3.3(b).

"Employee Benefit Plan" means any material "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other material bonus, profit sharing, pension, severance, deferred compensation, fringe benefit (as described in Code Section 132), insurance, welfare, post-retirement, health, life, tuition refund, service award, company car, scholarship, relocation disability, accident, sick, vacation, holiday, unemployment incentive, commission, retention change in control, non-competition, and other plans, agreements, policies, trust funds (a) established, maintained, sponsored or contributed to (or with respect to which any obligation to contribute has been undertaken) by Seller or an ERISA Affiliate, or (b) with respect to which Seller or any ERISA Affiliate has or has had any obligation, in each case, under which any Employee of Seller may receive benefits or may otherwise be subject and other than a Multiemployer Plan.

"Employees" means all individuals who are employed by Seller (including any employees not actively at work as of the Closing Date, as well as any employees who are on medical disability or leaves of absence and who worked for Seller immediately prior to such disability or leave).

"Environmental Claim" means any demand, assessment, Lien, investigation, claim, action or cause of action, complaint, citation, directive, information request issued by a Governmental Authority, legal proceeding, order, or notice of potential violation or potential responsibility arising under any applicable Environmental Law.

"Environmental Law" means any applicable statute, law, common law, rule, regulation, ordinance, or order of any federal, state, or local Government Authority in effect on or before the Closing Date relating to pollution, protection of human health (to the extent relating to exposure to Hazardous Materials) or the environment, or the processing, generation, management, distribution, use, handling, treatment, storage, transport, disposal, Remediation, or Release of Hazardous Materials.

"Environmental Permit" means any permit, registration, license, approval, identification number, exemption or other authorization required under or issued pursuant to any applicable Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, when used with respect to an Employee Benefit Plan, ERISA, the PBGC or a provision of the Code pertaining to employee benefit plans, any Person that is a member of any group of organizations within the meaning of Sections 414(b) or 414(c) of the Code (or, solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the Lien created under Section 302(f) of ERISA and Section 412(n) of the Code, or Sections 414(m) or 414(o) of the Code of which either Seller is a member).

"Exceptions" has the meaning set forth in Section 13.1.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" has the meaning set forth Section 2.3.

"Execution Date" has the meaning set forth in the preface above.

"Expense Reimbursement" means the reimbursement of the reasonable out-of-pocket costs, fees and expenses (including legal, financial advisory, accounting and other similar costs, fees and expenses) incurred by Buyer or its Affiliates in connection with the conduct of due diligence, the negotiation, documentation and implementation of this Agreement and the transactions contemplated hereby and all proceedings incident thereto; provided, that under no circumstances shall the amount of Expense Reimbursement exceed $[_____] in the aggregate.

"Facilities" means the locations at which the Business is, or within the past five (5) years was, conducted by Seller.

"Final Order" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for stay, new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay, new trial, reargument, or rehearing has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a stay, new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing shall have expired; *provided, however*, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure may be, but has not been, filed with respect to such order shall not cause such order not to be a Final Order.  As set forth in the Bidding Procedures, the Parties consent to the Bankruptcy Court issuing a Final Order in the Bankruptcy Case with respect to, among other things, any matter or dispute relating to the Sale of the Oakdale Campus, the Bidding Procedures, the Sale Hearing, the Auction, a Stalking Horse Bidder, a Backup Bid and/or any other matter that in any way relates to the foregoing.

"Furniture and Equipment" means all furniture, furnishings, machinery, appliances and other equipment owned by Seller and located on the Owned Real Property, including all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment and miscellaneous office furnishings.

"Governmental Authority" means any domestic or foreign federal, state or local governmental authority, department, court or government, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other division, subdivision, department or branch of any of the foregoing.

"Governmental Authorizations" means any approval, consent, license, permit, waiver, registration, accreditation or other authorization issued, granted, given, made available or otherwise required by any Governmental Authority or pursuant to Applicable Law.

"Hardware" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Hazardous Materials" means:  (i) any chemical, substance, material, or waste listed, defined, or classified as a "pollutant," "contaminant," "hazardous substance," "toxic substance," "solid waste," "hazardous waste," "hazardous material," or "special waste" under any applicable Environmental Law; (ii) any substance regulated under any applicable Environmental Law; (iii) petroleum or any derivative or by-product thereof; (iv) urea formaldehyde foam insulation, polychlorinated biphenyls, methyl tertiary butyl ethyl, radioactive material, or radon; (v) mold; and (vi) any asbestos-containing materials.

"Intellectual Property" means any rights and interests that Seller has in all copyrights (both registered and unregistered), mask works, trademarks (both registered and unregistered), trade names, service marks, service names, patents, patent applications, proprietary information, trade secrets, technical information and data, computer programs and program rights, domain names and other similar intangible property rights and interests (and any goodwill associated with any of the foregoing) arising under all Applicable Laws but excluding any derivatives of such marks, rights and interests.

"Knowledge" means actual knowledge, or such knowledge that a reasonably prudent person would have after due inquiry of those officers or Representatives of Buyer or of those officers of Seller or senior managers of the Business as of or prior to the Closing each of which is identified in Schedule 1.1.

"Labor and Employment Law and Requirements" means any federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, guidance, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, or promulgated by a Governmental Authority relating to: (a) hours of work and/or payment of wages, (b) notices to Employees, (c) discrimination, harassment and retaliation, (f) leaves of absence, (g) employee benefits, or (h) duty to bargain collectively with bargaining unit representative of Employees.

"Liabilities" means debts, obligations, contracts or other liabilities of any kind, character or description, accrued, absolute, contingent, determined, determinable or otherwise, whether presently in existence or arising hereafter.

"Licenses" means any licenses, approvals, authorizations, consents, permits, orders, registrations, certificates, decrees, franchises, permits variances, and similar rights obtained from any Governmental Authority.

"Lien" means any claim, charge, easement, encumbrance, encroachment, security interest, mortgage, lien, pledge or restriction, whether imposed by Contract, Applicable Law, equity or otherwise.

"Material Adverse Effect" or "Material Adverse Change" means any fact, circumstance, event, change, effect, condition or occurrence that, individually or in the aggregate, has or could be reasonably expected to have a material adverse effect on (a) the Business (as currently operated) or the material assets of Seller, (b) the value of the Acquired Assets, (c) a significant portion of the Owned Real Property is destroyed or damaged by fire or other casualty, or (d) the

ability of Seller to consummate the Contemplated Transactions on a timely basis, in each case as determined by Buyer.

["Material Contracts" has the meaning set forth in Section 4.9(b).]

"Material Development" means any change in the nature, scope, strategy, parties or other aspect of a Material Litigation or Proceeding that would have a Material Adverse Effect.

"Material Litigation or Proceeding" means any action, suit, investigation, proceeding or audit (a) the settlement or adjudication of which would (i) cause a material breach of this Agreement, (ii) have the effect of making the Contemplated Transactions illegal or (iii) materially prohibit or interfere with the consummation of the Contemplated Transactions.

"Multiemployer Plan" means a multiemployer plan as defined in Section 3 of ERISA to which Seller or an ERISA Affiliate contributes or has or had an obligation to contribute.

"Ordinary Course of Business" means the ordinary course of business of the Seller following its loss of accreditation and cessation of operations as a provider of educational services.

"Owned Real Property" has the meaning set forth in Section 4.8(a).

"Parties" has the meaning set forth in the preface above.

"Party" has the meaning set forth in the preface above.

"Permitted Exceptions" has the meaning set forth in Section 13.2.

"Petition Date" has the meaning set forth in the recitals.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity, or a Governmental Authority.

"Pre-Closing Tax Returns" has the meaning set forth in Section 4.7(a).

"Predecessor" means (a) any Person that has ever merged with or into Seller, (b) any Person, a majority of whose capital stock (or similar outstanding ownership interests) or equity securities has ever been sold, transferred or assigned by Seller and (iii) any Person that has had all or substantially all of its assets acquired by Seller.

"Purchase Price" has the meaning set forth in Section 3.1(a).

"Real Property" means the Owned Real Property.

"Real Property Laws" means all Applicable Laws relating to the Owned Real Property.

"Release" means any spilling, leaking, pumping, emitting, emptying, discharging, injecting, escaping, leaching, dumping, migrating, or disposing of Hazardous Materials into the

environment, including the ambient air, surface and subsurface soils, surface water and groundwater.

"Remediation" means any investigation, clean-up, removal action, remedial action, restoration, repair, response action, corrective action, monitoring, sampling and analysis, reclamation, closure, or post-closure in connection with the suspected, threatened or actual Release of Hazardous Materials.

"Representatives" means, with respect to any Person, any of its Affiliates, directors, trustees, officers, members, employees, consultants, agents, attorneys, advisors and other representatives.

"Restricted Assets" has the meaning set forth in Section 2.2(b).

"RE Tax Returns" means that returns, questionnaires, certificates, affidavits and other documents required by the Title Company in connection with the payment of any Transfer Taxes.

"Sale Order" has the meaning set forth in the Recitals.

"Seller" has the meaning set forth in the preface above.

"Seller Confidential Information" has the meaning set forth in Section 8.3(a).

"Seller's Consents and Approvals" has the meaning set forth in Section 4.9.

"Seller Plan" means any Employee Benefit Plan maintained by or with respect to which contributions are made by Seller or Seller has any liability.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock or membership interests entitled (without regard to the occurrence of any contingency) to vote in the election of or name directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (b) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of the partnership, limited liability company, or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons own a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director or general partner of such business entity (other than a corporation).  The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Supreme Court Approval" means approval of the Supreme Court of the State of New York pursuant to Sections 510 and 511 of the New York Not-for-Profit Corporation Law for the sale of all or substantially all of the assets of Seller.

"Survey" has the meaning set forth in Section 13.1.

"Tax" or "Taxes" means any federal, state, local, or foreign income, prohibited transaction, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital stock, franchise, net worth or capital, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Liability for Taxes of any other Person.

"Tax Return" means any return, declaration, statement, report, form, claim for refund, or similar statements or documents including information reporting forms (including Forms 941, 990, 1099 and W-2) and estimated tax returns and reports) relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Fee" means a fee in the amount of $[_____].

"Time is of the Essence" means with regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

"Title Company" has the meaning set forth in Section 13.1.

"Title Defect" has the meaning set forth in Section 13.1.

"Title Report" has the meaning set forth in Section 13.1.

"Transfer Taxes" means any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or Taxes or governmental charges payable in connection with the Contemplated Transactions.

"Withdrawal Liability" means any sum that may be assessed against Seller by a Multiemployer Plan providing pension benefits, under the Multiemployer Pension Plan Amendments Act of 1980, resulting from Seller ceasing to have an obligation to make contributions to such Multiemployer Plan.

1.2    Other Definitional and Interpretative Provisions.  The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The captions and headings used herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Articles, Sections, Exhibits and Schedules are to the Articles, Sections, Exhibits and Schedules, respectively, of this Agreement unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement.  The terms "Dollars," "dollars" and "$" shall mean United States

dollars. Any singular term in this Agreement shall be deemed to include the plural and any plural term the singular, and references herein to any gender shall include the other gender. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time at or prior to the Closing in accordance with the terms hereof and thereof; provided that with respect to any agreement or contract listed on any schedules hereto, any substantive amendments, modifications or supplements must also be listed in the appropriate schedule. References to any Person include the successors and permitted assigns of that Person. References herein to a Person in a particular capacity or capacities shall exclude such Person in any other capacity. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. Any reference to a code, act, statute or regulation means that law, code, act, statute or regulation as amended or supplemented from time to time and any corresponding provisions of successor laws, codes, acts, statutes or regulations and any reference to any law code, act or statute shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. References to a "day" or any number of "days" (without explicit qualification by the word "Business") shall be interpreted as a reference to a calendar day or number of calendar days. If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, the time for the giving of such notice or the performance of such act shall be extended to the next succeeding Business Day.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    <u>Assets to be Sold to Buyer</u>.  On the terms and subject to the conditions of this Agreement, and on the basis of the representations and warranties herein contained, Seller shall sell, transfer, convey, assign and deliver to Buyer, or to an entity or entities designated by Buyer, on the Closing Date, all of its right, title and interest in the assets described in this Section 2.1 (the "<u>Acquired Assets</u>"), free and clear of all Liens and Claims, other than Liens securing the Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code (the "<u>Contemplated Transactions</u>").  The Acquired Assets shall be comprised of the following assets of every description, whether real, personal or mixed, tangible or intangible, owned by Seller (other than Excluded Assets):

(a)    All Owned Real Property of Seller listed on <u>Schedule 4.8(a)-1</u> , including all fixtures, furnishings, and improvements owned by Seller and located on the Owned Real Property;

(b)    [Seller's Furniture and Equipment];

(c)    Subject to Seller's right to remediate any such damage with insurance proceeds, all proceeds or proceeds receivable of Seller's insurance and unliquidated or unsatisfied claims that relate to property damage with respect to the Real Property

occurring prior to the Closing, and all other insurance proceeds and insurance proceeds receivable (including applicable deductibles, co-payments or self-insured requirements) arising from any claim made under Seller's insurance policies with respect to the Acquired Assets; and

(d)     All rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to services provided, if any, after the Closing or to the extent affecting any Acquired Assets.

2.2     <u>Excluded Assets</u>.  The following assets are not intended by the Parties to be a part of the Contemplated Transactions and are excluded from the Acquired Assets (the "<u>Excluded Assets</u>"):

(a)     Seller's cash, cash equivalents, bank deposits and similar items;

(b)     Donor restricted assets and endowment funds held by, or for the benefit of, Seller, the income and/or corpus of which has been designated for use in support of, for the benefit of, or otherwise relating to, any of Seller's mission, operations, programs, services, assets and/or Facilities (collectively, the "<u>Restricted Assets</u>") to the extent transferable and subject to any approvals required by Applicable Law;

(c)     Seller's accounts receivable;

(d)     Organizational documents, corporate records and minute books of Seller;

(e)     Student records of Seller;

(f)     Any records which by Applicable Law Seller is required to retain in its possession; provided that Seller, at its expense, delivers copies of such records to Buyer at the Closing;

(g)     Seller's Furniture and Equipment;

(h)     Seller's Contracts;

(i)     All claims and causes of action of Seller, including counterclaims that may be asserted in response to any proofs of claim filed against Seller; and

(j)     Rights that will accrue to Seller under this Agreement.

2.3     <u>Excluded Liabilities</u>.  Notwithstanding any provision of this Agreement or any other document or instrument to the contrary, Buyer shall not have any obligation with respect to any other Liabilities of Seller, regardless of whether such obligation arises before, on or after the Closing Date (all of such other Liabilities, collectively, the "<u>Excluded Liabilities</u>").  It shall not affect the status of a Liability as an Excluded Liability to the extent Buyer affirmatively elects in its sole and absolute discretion to assume responsibility for a given Excluded Liability.

ARTICLE III
PURCHASE PRICE, MANNER OF PAYMENT AND CLOSING

3.1    <u>Payment of Purchase Price</u>.

(a)    <u>Consideration</u>.  Subject to the terms and conditions hereof, the aggregate consideration for the sale, assignment, transfer, conveyance and delivery of the Acquired Assets to Buyer (or its designee(s)) at Closing, shall be $[_____] (the "<u>Purchase Price</u>"), subject to the adjustments and credits described in Section 3.1(b) and Section 13.3.

(b)    <u>Payment</u>.  Subject to the terms and conditions hereof, on the Closing Date, Buyer shall pay to Seller the amount of the Purchase Price <u>less</u> the Deposit.

(c)    <u>Title Discharge</u>.  In the event there is any Lien or Title Defect which Seller is obligated or elects to pay and discharge at Closing, Seller may pay and discharge such Lien or Title Defect out of the balance of the Purchase Price, provided Seller has made arrangements with the Title Company in advance of Closing for Seller to deposit with the Title Company sufficient monies (which shall include all recording charges) required by the Title Company to issue an ALTA Owner's Title Policy to Buyer free of any such Lien or Title Defect.  The existence of any such Lien, Title Defect or real estate taxes shall not be deemed objections to title if Seller shall comply with the foregoing requirements.

3.2    <u>Deposit</u>.  Buyer shall have made a cash deposit in the aggregate amount of five percent (5%) of the Purchase Price plus the amount of the Termination Fee and Expense Reimbursement, if applicable (the "<u>Deposit</u>").   Seller shall retain the Deposit as liquidated damages, as its sole remedy, if this Agreement is properly terminated by Seller pursuant to Section 12.1(c)(ii) or upon the failure of Buyer to consummate the Sale, provided that all conditions precedent to Closing have been satisfied and there shall not have been a material breach by Seller of any representation, warranty or covenant contained in this Agreement.

3.3    <u>Closing and Closing Date</u>.

(a)    The closing of the Contemplated Transactions (the "<u>Closing</u>") shall take place at a location agreed upon by Buyer and Seller, within 10 days after satisfaction or waiver of all conditions to the obligations of Seller and Buyer, to consummate the Contemplated Transactions (other than conditions with respect to actions Seller and Buyer will take at the Closing) or such other date as Buyer and Seller may mutually determine in writing (the "<u>Closing Date</u>").

(b)    Unless otherwise agreed in writing by the Parties, the Contemplated Transactions shall be effective as of 12:00:01 a.m. on the calendar day immediately following the Closing Date (the "<u>Effective Time</u>").

3.4     Closing Deliveries.

(a)     Seller Deliveries.    At the Closing, contemporaneously with Buyer's delivery to Seller of all of the Closing Documents required to be delivered by Buyer hereunder, Seller shall deliver or cause to be delivered to Buyer, duly executed by Seller in recordable form, where applicable (the documents and other deliverables described in this Section 3.4(a) and in Section 3.4(b) and all other documents required to be delivered hereunder are referred to collectively as the "Closing Documents") the following items:

(i)     fully-executed and acknowledged deeds conveying the Owned Real Property to Buyer (or its designee(s))(the "Deeds") in a form reasonably acceptable to Buyer;

(ii)     copies of any reasonably required RE Tax Returns properly executed and acknowledged by Seller;

(iii)     a Certificate of Non-Foreign Status duly executed by Seller certifying that Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended;

(iv)     a fully-executed bill of sale from Seller in a form acceptable to Buyer;

(v)     to the extent in the possession of Seller or Seller's agents, all keys or key cards and alarm codes to, and all combinations to, any locks on, all entrance doors to, and any equipment and utility rooms located in, the Real Property, appropriately tagged for identification;

(vi)     delivery of possession of the Owned Real Property free of any tenancies (other than any tenancies where Buyer or its designee is the tenant);

(vii)     a good standing certificate for Seller from the appropriate offices of the State of New York, dated within 30 days prior to the Closing Date, and such evidence, delivered to Buyer and the Title Company, as reasonably required to evidence the due authorization, execution, and delivery by Seller of the Deeds and other Closing Documents to which Seller is a party;

(viii)     a certificate from an officer of Seller to the effect that each of the conditions specified in Section 10.1(a), Section 10.1(b), Section 10.1(c) and Section 10.1(d) is satisfied in all respects;

(ix)     a secretary's certificate of Seller dated as of the Closing Date (which shall include a certified copy of such Seller's certificate of incorporation, bylaws, relevant resolutions of Seller's Board approving the Contemplated Transactions and such other customary items as Buyer may reasonably request), in form and substance reasonably satisfactory to Buyer;

13

(x)    the closing and apportionment statement showing all adjustments in respect of the Purchase Price to be made at the Closing in accordance with the terms hereof, duly executed by Seller; and

(xi)    any other document, instrument, agreement or other item (A) required to be delivered by Seller at or prior to the Closing hereunder or (B) otherwise necessary to consummate the Contemplated Transactions as reasonably requested by Buyer or the Title Company; *provided, however*, that Seller shall not be obligated to cause the delivery of any such documentation under clause (B) to the extent it would increase or expand Seller's obligations or liability in any material respect.

(b)    <u>Buyer Deliveries</u>.    At the Closing, contemporaneously with Seller's delivery to Buyer of all of the Closing Documents required to be delivered by Seller hereunder, Buyer shall deliver or cause to be delivered to Seller the following items:

(i)    in accordance with and subject to adjustment as provided in this Agreement, the Purchase Price;

(ii)    copies of any reasonably required RE Tax Returns properly executed and acknowledged by Buyer;

(iii)    the closing and apportionment statement showing all adjustments in respect of the Purchase Price to be made at the Closing in accordance with the terms hereof, duly executed by Buyer;

(iv)    a certificate from an officer of Buyer to the effect that each of the conditions specified in Section 10.2(a) and Section 10.2(b) is satisfied in all respects;

(v)    a secretary's certificate of Buyer dated as of the Closing Date; (which shall include a certified copy of Buyer's certificate of incorporation, Buyer's bylaw, relevant resolutions of Buyer's Board approving the Contemplated Transactions and such other customary items as Seller may reasonably request), in form and substance reasonably satisfactory to Seller; and

(vi)    any other document, instrument, agreement or other item (A) required to be delivered by Buyer at or prior to the Closing hereunder or (B) otherwise necessary to consummate the Contemplated Transactions herein reasonably requested by Seller or the Title Company; *provided, however*, that Buyer shall not be obligated to cause the delivery of any such documentation under clause (B) to the extent it would increase or expand Buyer's obligations or liability in any material respect.

3.5    <u>Transfer Taxes</u>.    To the extent applicable, Buyer and Seller shall each pay at the Closing any Transfer Taxes (or any other transfer, conveyance or similar tax is imposed in connection with the sale, assignment, transfer and conveyance of the Owned Real Property) payable by it pursuant to Section 14.13.

14

3.6    <u>Delivery of Records and Contracts</u>.  Seller shall make available to Buyer at the premises of the Business on the Closing Date all business records, books, keys and other data in Seller's possession as of the Closing Date constituting the Acquired Assets under Section 2.1.

3.7    <u>Further Conveyances</u>.  From time to time following the Closing, each Party shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and the other Closing Documents, to ensure that Buyer is relieved of all Excluded Liabilities and to otherwise make effective the Contemplated Transactions.  If Buyer or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Buyer shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to Seller.  If Seller retains or receives any Acquired Assets (or any payments or proceeds related thereto) following the Closing, Seller shall promptly deliver such Acquired Assets (or any payments or proceeds related thereto) to Buyer.

3.8    <u>Bulk Sales Laws</u>.  The Parties hereby waive compliance by Seller with the requirements and provisions of any Applicable Law related to "bulk-transfer" of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

3.9    <u>Allocation of Purchase Price</u>.  The Purchase Price shall be allocated among the Acquired Assets in accordance with the allocation protocols (and amounts determined therefrom) as determined by Buyer; *provided, however*, such allocation shall not be binding on Seller's estate in the Bankruptcy Case.

3.10    <u>Time is of the Essence</u>.  With regard to all dates and time periods set forth or referred to in this Agreement, Time is of the Essence.

ARTICLE IV
SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Buyer that the statements contained in this ARTICLE IV are correct and complete as of the Execution Date and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the Execution Date throughout this ARTICLE IV).

4.1    <u>Organization of Seller</u>.  Seller (a) is duly organized, validly existing and in good standing under the laws of the State of New York, the jurisdiction of its formation, (b) has full corporate power and authority and all necessary government approvals to own, lease and operate its properties and assets, and (c) is duly qualified and is in good standing, in all jurisdictions (domestic and foreign) in which the character or the location of the assets owned or leased by it requires such licensing or qualification.

4.2    <u>Authorization of Transaction</u>.  Except for such authorization as is required by the Bankruptcy Court, Seller has full not-for-profit corporate power and authority to execute and

deliver this Agreement and, subject to such authorization as is required by the Bankruptcy Court and any required Supreme Court Approval to perform its obligations hereunder. Without limiting the generality of the foregoing, the Board of Seller has duly authorized the execution, delivery and performance of this Agreement by Seller. This Agreement constitutes, and any and all other Closing Documents to be executed by Seller pursuant hereto, when executed, will constitute, the valid and legally binding obligation of Seller, enforceable in accordance with their terms and conditions, except as enforceability against Seller may be restricted, limited or delayed by applicable bankruptcy, moratorium or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

4.3    Qualification. Seller is duly qualified or licensed to do business, and is in good standing, in the State of New York, which is the only jurisdiction (domestic and foreign) in which the character or the location of the assets owned or leased by it or the nature of the business presently conducted by it requires such licensing or qualification. Seller agrees to comply with the requirements of Sections 510 and 511 of the New York Not-for-Profit Corporation Law, made applicable hereto by Sections 1129(a)(16), 363(d) and 541(f) of the Bankruptcy Code.

4.4    Non-Contravention. Subject to Supreme Court Approval, if any, and Bankruptcy Court approval, neither the execution and delivery of this Agreement, the consummation of the Contemplated Transactions (including each Closing Document required to be delivered by Seller at Closing), nor the fulfillment of the terms hereof by Seller, will (i) violate any order or award of any court, administrative agency or governmental body applicable to Seller; (ii) result in the imposition of any Lien or Claim upon any Acquired Asset pursuant to the terms of any such mortgage, bond, indenture, lease, franchise or other instrument or obligation; (iii) constitute a violation by Seller of any Applicable Law; or (iv) conflict with or violate any charter document of Seller.

4.5    Brokers' Fees. Seller has engaged the Campus Agents and shall be solely responsible for the commission and expenses due the Campus Agents in accordance with that certain agreement dated October 19, 2016. For the avoidance of doubt, Seller has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Contemplated Transactions for which Buyer could become liable or obligated.

4.6    Events Subsequent. Except as set forth in Schedule 4.6, since _____, 2016, there have not been any of the following:

(a)    Any amendment or other modification or alteration (including through merger, liquidation, reorganization, or restructuring) of the articles of incorporation (or similar organizational documents) or corporate structure or ownership of Seller;

(b)    Any material damage to or destruction or loss of any Acquired Assets or Real Property, whether or not covered by insurance, material adversely affecting the Acquired Assets, Business, financial condition or prospects of Seller or the Business;

(c)     Any sale, transfer, lease to others or other disposition of any Acquired Asset unless in the Ordinary Course of Business or if such item has been rendered obsolete;

(d)     Any change in any Tax election or Tax status of Seller; or

(e)     Any claims made or actions, suits or proceedings or, to the Knowledge of Seller, any investigation by a Governmental Authority commenced or, to the Knowledge of Seller, threatened, against Seller or any institution except those that Seller has settled.

4.7     <u>Tax Matters</u>.

(a)     Seller has received a determination letter from the Internal Revenue Service to the effect that it is exempt from federal income taxation under Section 501(a) of the Code as an organization described in Section 501(c)(3) of the Code.  Such determination letter has never been amended or modified.  Such tax-exempt status has never been revoked or suspended, and there are not currently any proceedings to revoke or suspend such tax-exempt status.

(b)     Except as set forth in <u>Schedule 4.7(a)</u>, all Tax Returns with respect to Seller, the Acquired Assets, to the extent required to be filed with any Governmental Authority with respect to any period prior to Closing by or on behalf of Seller (collectively, the "<u>Pre-Closing Tax Returns</u>"), have been prepared in accordance with all Applicable Laws and have been filed when due (taking into account extensions of filing due dates) in accordance with all Applicable Laws, and all such Pre-Closing Tax Returns are true, correct and complete in all material respects.

(c)     Except as disclosed on <u>Schedule 4.7(c)</u>, Seller has duly and timely paid in accordance with all Applicable Law, all Taxes with respect to the Acquired Assets that are due and payable with respect to any period prior to Closing and has properly accrued on its books and records any Tax with respect to any such period that is not yet due and payable.  Except as disclosed on <u>Schedule 4.7(c)</u>, Seller has duly and timely withheld or collected, paid over and reported all Taxes with respect to the Acquired Assets required to be withheld or collected by it in any period prior to Closing.

(d)     <u>Schedule 4.7(d)</u> contains a list of all jurisdictions (whether foreign or domestic) to which (i) any Tax is properly payable or (ii) any Tax Return is required to be filed by Seller.

(e)     Except as disclosed on <u>Schedule 4.7(e)</u>, to Seller's Knowledge, there are no Liens or Claims for Taxes upon the Acquired Assets other than statutory Liens for Taxes not yet due or payable, and no issue has been raised by written inquiry of any Governmental Entity respecting Taxes, which, by application of the same principles, would reasonably be expected to result in a Lien or Claim on the Acquired Assets in any taxable period (or portion thereof) ending after the Closing Date.

(f)     No extension or waiver of the limitation period applicable to the assessment or collection of any Tax has been granted with respect to Seller; and Seller

has not entered into any agreement or arrangement with any Governmental Authority with regard to any Liability for any Tax affecting any Tax period for which the applicable statute of limitations, after giving effect to extensions or waivers, has not expired.

(g)    No Governmental Authority has asserted in writing or, to Seller's Knowledge, orally (i) an adjustment that could result in an additional Tax for which Seller is or may be liable or that could result in a Lien or Claim on the Acquired Assets or (ii) a threat to the tax-exempt status of Seller. There is no proceeding pending relating to any Liability for any Tax or asset of Seller or the tax-exempt status of Seller and, to Seller's Knowledge, no Governmental Authority has threatened any audit, examination, investigation, inquiry, dispute, proceeding or claim.

4.8    <u>Property and Assets</u>.

(a)    <u>Schedule 4.8(a)-1</u> contains a complete list of all real property which comprises the Oakdale Campus which is the subject of this Agreement and to which Seller owns fee simple title together with any material property rights ("<u>Owned Real Property</u>").  Seller has not received any written notice of any pending condemnation, expropriation, eminent domain or similar proceeding affecting all or any material portion of any such Real Property or, to Seller's Knowledge, that any such activities are currently being threatened.  There are no oral leases or subleases; there are no (x) written subleases or (y) written or oral licenses, concessions, occupancy agreements or other Contracts granting to any other Person the right of use or occupancy of the Real Property or any portion thereof; and there is no Person in possession of the Real Property or any portion thereof other than Seller.  The real property identified on <u>Schedule 4.8(a)-1</u> represents all of the real property owned, leased, subleased, licensed or otherwise occupied by Seller that comprises the Oakdale Campus and which is the subject of the Contemplated Transactions.

(b)    Seller has title to, or, in the case of personal property held under a lease or other Contract (subject to the terms of the lease or other Contract), an enforceable leasehold interest in, or right to use, the Acquired Assets, free and clear of all Liens and Claims other than Liens securing the Permitted Exceptions.  The foregoing notwithstanding, with respect to the Owned Real Property, Seller shall convey and Buyer shall accept such title as any reputable title company that is a member of the New York Board of Title Underwriters will be willing to approve and insure at standard rates in accordance with its standard form of title policy, clear of all Liens, except for Permitted Exceptions. Except as otherwise provided, the Owned Real Property shall be conveyed together with (a) all right, title and interest of Seller in and to all easements, rights of way, air or development rights, reservations, privileges, appurtenances, and other estates and rights of Seller, if any, pertaining to its interest in the Owned Real Property, and (b) all right, title and interest of Seller, if any, in and to all alleys adjoining its interest in the Owned Real Property and in and to the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining its interest in the Owned Real Property to the center line thereof, and (c) subject to apportionment if required hereunder, all right, title and interest of Seller, if any, in and to any award made for any taking by condemnation

or any damages to its interest in the Owned Real Property by reason of a change of grade of any street, road or avenue.

(c)     None of the Acquired Assets owned or leased by Seller is subject to any sublease or sublicense or any other agreement granting to any other Person by Seller any right to the use, occupancy or enjoyment of such property or any portion thereof.

(d)     To Seller's Knowledge, <u>Schedule 4.8(d)</u> lists all violations of law or municipal ordinances, orders or requirements noted in or issued by the departments of buildings, fire, labor, health or other federal, state, county, city or other departments and governmental authorities having jurisdiction against or affecting the Owned Real Property.

4.9     <u>Contracts</u>.

(a)     <u>Schedule 4.9</u> sets forth a complete and correct list of the following:

(i)     each Contract (or group of related Contracts), in each case, the performance of which relates to the Oakdale Campus and will extend over a period of more than one (1) year from the Execution Date or which provides for annual payments to or by Seller in excess of $50,000;

(ii)     each Contract that relates to the borrowing or lending by Seller of any money or that creates or continues any Lien or Claim against, or right of any third party with respect to, the Acquired Assets, except for those Liens and Claims not related to the borrowing of any money but arising in the Ordinary Course of Business;

(iii)     each Contract (or group of related Contracts) under which Seller has permitted any Acquired Asset to become encumbered; and

(iv)     each Contract by which Seller leases any real or personal property in relation to the Oakdale Campus or pursuant to which Seller is a lessor of, or permits any third party to operate, any real or personal property in relation to the Oakdale Campus.

(b)     As used in this Agreement, the term "<u>Material Contracts</u>" means all Contracts that are material to the Acquired Assets. Except (i) as otherwise provided in the Bankruptcy Code and (ii) for events of default arising as a result of Seller's filing of a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, all of the Material Contracts are in full force and effect, are valid and binding and are enforceable in accordance with their terms in favor of the Seller. Except for Cure Amounts, if any, there are no material Liabilities of any party to any Material Contract arising from any breach or default of any provision thereof and no event has occurred that, with the passage of time or the giving of notice or both, would constitute a breach or default by any party thereto.

(c)     Seller has used best efforts to deliver to Buyer true and complete copies of each Material Contract, in each case, as amended or otherwise modified and in effect as of the Execution Date.

(d)     Each Material Contract is enforceable against the applicable counterparty and is in full force and effect, and, subject to obtaining any necessary consents or delivering any necessary notices, as disclosed on <u>Schedule 4.9(d)</u>, will continue to be so enforceable and in full force and effect following the consummation of the Contemplated Transactions.

(e)     No Material Contract to which Seller is a party may be terminated by any other party thereto as a result of the Contemplated Transactions.

(f)     There are no notes receivable of Seller or any other amount payable to Seller owing by any director, officer, member or Employee of Seller.  Neither Seller nor any Employee, officer, director, or shareholder, no individual, related by blood, marriage or adoption to any such individual, and no entity in which any such Person or individual owns any beneficial interest is a party to any agreement, contract, commitment or transaction with Seller or any loan, arrangement, understanding, agreement or contract for or relating to indebtedness of Seller, or has any interest in any property, tangible or intangible, used by Seller.

4.10   <u>Seller's Consents and Approvals</u>.  <u>Schedule 4.9</u> lists all authorizations, approvals, waivers, filings or consents required to be obtained, and notices to be made (including any such authorizations, approvals, waivers, filings or consents required to be obtained from, and notices to be made to any Governmental Authority), by Seller to consummate the Contemplated Transactions (including this Agreement and each other Closing Document required to be delivered by Seller at Closing) (collectively, "<u>Seller's Consents and Approvals</u>"), other than (a) entry of the Sale Order, and (b) Supreme Court Approval, if any.

4.11   <u>Powers of Attorney</u>.  Except for accounts in connection with the Internal Revenue Service, there are no outstanding powers of attorney executed on behalf of Seller.

4.12   <u>Litigation</u>.

(a)     Except as set forth on <u>Schedule 4.12</u>, (i) there is no action, suit, investigation or proceeding pending or, to Seller's Knowledge, threatened (x) against Seller with respect to the Acquired Assets before any arbitrator or Governmental Authority, whether any of the same are covered by insurance or whether any applicable carrier has denied coverage or reserved rights with respect to or assumed the defense thereof and (y) that would reasonably be expected to prevent, hinder, delay or otherwise challenge the consummation of the Contemplated Transactions or that questions the validity, legality or propriety of the Contemplated Transactions or that could reasonably be expected to have a Material Adverse Effect; and (ii) Seller is not subject to any judgment, order or decree of any Governmental Authority with respect to the Acquired Assets involving an amount in excess of $50,000.

(b)     Seller has delivered to Buyer correct and complete copies of all correspondence, pleadings, and other relevant documents in connection with the actions, suits, investigations or proceedings set forth on Schedule 4.12.

4.13    Employees.

(a)     Seller shall be solely responsible for any notices to Employees that may be required under any CBA as a consequence of the Contemplated Transaction, and shall defend, indemnify and hold harmless Buyer against any liability resulting from failure to provide such notices as may be required.

(b)     Neither Seller, nor any of Seller's current or former Employees, consultants, officers, directors, distributors, resellers, vendors or customers owns, directly or indirectly, or has any right, title or interest (economic or otherwise), in whole or in part, in any Intellectual Property, proprietary asset or other rights claimed or used by Seller.

4.14    Foreign Operations.  Seller has no operations outside the United States.

4.15    Insurance Coverage.  Schedule 4.15 lists, and Seller has furnished to Buyer, true and complete copies of, all insurance policies (including any insurance renewal binders) and fidelity or surety bonds currently in force relating to the Acquired Assets.  The policy limits and deductibles of such policies are not subject to claims by any other entities.  Except as set forth on Schedule 4.15, all premiums currently due and payable under all such policies and bonds have been paid in full.  Schedule 4.15 lists all of Seller's current professional liability, commercial general liability and fiduciary liability coverages.

4.16    Restrictions on Business Activities.  There is no agreement, judgment, injunction, order or decree binding upon Seller or the Acquired Assets or, to Seller's Knowledge, threatened, that has or could reasonably be expected to have the effect of prohibiting or materially impairing the present use of the Acquired Assets or the acquisition of the Acquired Assets, in each case either individually or in the aggregate.

4.17    Environmental Matters.

(a)     Except as set forth on Schedule 4.17(a):

(i)     To Seller's Knowledge, Seller, its operation of the Facilities, and its ownership or leasing of the Real Property are, and at all times have been, in compliance in all material respects with all applicable Environmental Laws;

(ii)     Seller has not received any written notice from a Governmental Authority or other Person regarding any Environmental Claim related to or arising out of Seller's operation of the Facilities or its ownership or leasing of the Real Property that currently remains pending or unresolved and, to Seller's Knowledge, there are no events or conditions with respect to its operation of the Facilities or the ownership or leasing of the Real Property or otherwise existing or

occurring at the Real Property that could reasonably be expected to result in an Environmental Claim;

(iii)    All Environmental Permits required to operate the Facilities as they are currently being operated by Seller have been obtained by Seller and are currently in full force and effect.  Seller is in compliance in all material respects with such Environmental Permits and there is not now pending nor, to Seller's Knowledge, threatened, any action by or before any Governmental Authority to revoke, cancel, rescind, suspend, restrict, modify or refuse to renew any Environmental Permit, and all of the Environmental Permits are and shall be effective and in good standing now and as of the Closing Date;

(iv)    There has been no Release or threatened Release of Hazardous Materials at, on, under, to or from the Real Property required to be reported or subject to required Remediation, and Seller has not received any written notice from any Governmental Authority or other Person alleging that Seller has liability under any applicable Environmental Law with respect to the Release of Hazardous Materials at any real property off-site of the Real Property, including, where Hazardous Materials from the Real Property have been taken for disposal, nor, to Seller's Knowledge, are there any events or conditions with respect to off-site disposal of Hazardous Materials that are reasonably likely to result in such liability or in the issuance of such notice to Seller;

(v)    The Real Property contains no underground storage tanks that are owned or operated by Seller or any other underground storage tanks whether in use, closed or abandoned properly or not;

(vi)    There are no above-ground storage tanks for Hazardous Materials that are not in compliance with Environmental Law or are the source of a Release at, on, under, to or from the Real Property;

(vii)    None of the Real Property is listed on the National Priorities List or similar state lists.  No Remediation is pending or being conducted at the Real Property.  Seller has not received any notice from a Governmental Authority that Remediation is required at or about the Real Property, nor to Seller's Knowledge are there any events or conditions at, about or with respect to the Real Property that could reasonably be expected to result in the need for Remediation or in the issuance of such notice to Seller;

(viii)    To Seller's Knowledge, there has been no exposure of any Person to Hazardous Materials in connection with Seller's operation of the Facilities that would reasonably be expected to form the basis for a claim for damages or compensation; and

(ix)    Seller has delivered to Buyer copies of all assessment reports, audits, studies, and correspondence in Seller's possession or control relating to the environmental conditions of the Real Property, Environmental Claims,

Environmental Permits, Hazardous Materials, Releases, Remediation or Seller's compliance with or violation of Environmental Laws and related to the Facilities or the Real Property.

(b)     A list of all Environmental Permits pertaining to the operation of the Facilities, the Real Property and the Acquired Assets as they are currently being operated by Seller is set forth on Schedule 4.17(b).

(c)     None of the matters set forth on Schedule 4.17(a) could reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect.

4.18    Full Disclosure.  No representation or warranty made by Seller in this Agreement, or in any schedule, and no statement, schedule or certificate required to be furnished to Buyer pursuant to this Agreement, contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein not misleading.  Each of the separate representations and warranties set forth in ARTICLE IV is intended to be, and shall be interpreted as, an independent representation and warranty as to the matters referred to therein

4.19    No Other Representations or Warranties; Schedules.    Except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules), neither Seller nor any other Person makes any other representation or warranty whether express or implied, written or oral, with respect to Seller, the Business, the Acquired Assets, or the Contemplated Transactions, and Seller disclaims any other representations or warranties, whether made by Seller or any of its respective officers, directors, members, employees, agents, consultants or other Representatives.  Except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules), Seller (a) expressly disclaims any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer or its Representatives by any director, officer, member, employee, agent, consultant or other Representative of Seller).  Seller makes no implied representation or warranty as to the condition, merchantability, usage, suitability or fitness for any particular purpose with respect to the Acquired Assets except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules).

ARTICLE V
BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Seller that the statements contained in this ARTICLE V are correct and complete as of the Execution Date and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the Execution Date throughout this ARTICLE V).

5.1     Organization of Buyer.  Buyer (a) is duly organized, validly existing and in good standing under the laws of the State of [_____], the jurisdiction of its formation, (b) has full corporate power and authority and all necessary government approvals to own, lease and operate its properties and assets and to conduct its business as presently conducted, and (c) is duly qualified or licensed to do business, and is in good standing, in all jurisdictions (domestic and foreign) in which the character or the location of the assets owned or leased by it or the nature of the business conducted by it requires such licensing or qualification.

5.2     Authorization of Transaction.  Buyer has full power and authority to execute and deliver this Agreement and, subject to such authorizations as required by the Bankruptcy Court and Supreme Court Approval, if any, to perform its obligations hereunder.  The execution, delivery and performance of this Agreement and all other agreements contemplated hereby have been duly authorized by all requisite corporate action of Buyer.  This Agreement constitutes, and any and all other Closing Documents to be executed by Buyer pursuant hereto when executed will constitute, the valid and legally binding obligation of Buyer, enforceable in accordance with their terms and conditions, except as enforceability against Buyer may be restricted, limited or delayed by applicable bankruptcy, moratorium or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

5.3     Non-Contravention.

(a)     Subject to Supreme Court Approval, if any, and Bankruptcy Court approval, neither the execution and delivery of this Agreement, the consummation of the Contemplated Transactions (including each Closing Document required to be delivered by Buyer at Closing), nor the fulfillment of the terms hereof by Buyer, will (i) violate any Applicable Law to which Buyer is subject or any provision of its charter, bylaws, or other governing documents or (ii) conflict with, violate or result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets are subject.

(b)     Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Authority in order for the Parties to consummate the Contemplated Transactions (including each Closing Document required to be delivered by Buyer at Closing), except for such notices, consents and approvals as have already been given or obtained, those required under or in relation to those required by the Bankruptcy Court.

5.4     Brokers' Fees.    Buyer has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Contemplated Transactions.

5.5     Buyer's Consents and Approvals.  Schedule 5.5 lists all authorizations, approvals, waivers, filings or consents required to be obtained, and notices to be made (including any such authorizations, approvals, waivers, filings or consents required to be obtained from, and notices to be made to any Governmental Authority), by Buyer to consummate the Contemplated Transactions (including each Closing Document required to be delivered by Buyer at Closing)

(collectively, "Buyer's Consents and Approvals"), other than (a) entry of the Sale Order, and (b) Supreme Court Approval, if any.

5.6     Acknowledgement Regarding Condition of the Acquired Assets. Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges that Seller is not making any representations or warranties whatsoever, whether express or implied or written or oral, beyond those expressly given by it to Buyer in ARTICLE IV (as modified by the Schedules), and Buyer agrees that, except for the representations and warranties contained therein, the Acquired Assets are being transferred to Buyer on a "WHERE IS" and, as to condition, "AS IS" basis.

5.7     Financial Capability.  Buyer has or on the Closing Date will have the resources and capabilities (financial or otherwise) to perform its obligations hereunder.

5.8     No Other Representations or Warranties; Schedules.    Except for the representations and warranties contained in this ARTICLE V (as modified by the Schedules), neither Buyer nor any other Person makes any other representation or warranty, whether express or implied, written or oral, with respect to Buyer or the Contemplated Transactions, and Buyer disclaims any other representations or warranties, whether made by Buyer, any Affiliate of Buyer or any of their respective officers, directors, members, managers, employees, agents, consultants or other Representatives.  Except for the representations and warranties contained in this ARTICLE V (as modified by the Schedules), Buyer disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Seller or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to them by any director, officer, member, manager, employee, agent, consultant, or other Representative of Buyer or any of its Affiliates).

ARTICLE VI
BANKRUPTCY COURT MATTERS

6.1     Termination Fee and Expense Reimbursement.

(a)     In consideration for Buyer having expended considerable time and expense in connection with this Agreement and negotiation thereof and the identification and quantification of assets of the Seller, the Buyer is entitled to certain bid protections previously approved by the Bankruptcy Court.  Pursuant to the Bidding Procedures Order approving certain bidding procedures (the "Bidding Procedures"), if Buyer's bid embodied in this Agreement is exceeded by a Competing Bid, or Seller enters into an Alternate Transaction, then Seller shall, or shall cause the purchaser in an Alternate Transaction, as applicable, to pay to Buyer a Termination Fee and Expense Reimbursement, upon consummation of the Alternate Transaction from the proceeds of such Alternate Transaction paid at the closing thereof.

(b)     If this Agreement is terminated pursuant to Section 12.1(b)(i) (provided that the failure to close was due in whole or in part to any action or inaction by Seller); Section 12.1(b)(iii); Section 12.1(b)(iv); or Section 12.1(b)(v) (provided that the Title Defects at issue were willfully placed of record or consented to be placed of record by Seller after the date

hereof), then Seller shall pay to Buyer the Expense Reimbursement within five (5) Business Days after such termination.

6.2     Competing Transaction.

(a)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each, a "Competing Bid").

(b)     Notwithstanding the execution of this Agreement, Seller is permitted to cause its Representatives to market and initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Representatives) in connection with any sale or other disposition of all or any other asset of Seller.  In addition, Seller shall have the responsibility and obligation to respond to any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the assets of Seller to prospective purchasers.  Prior to Seller furnishing any non-public information to any Person in connection with an offer regarding the sale or other disposition of all or any part of the Acquired Assets, Seller must enter into a customary confidentiality agreement with such Person on terms no less favorable to the Seller than those contained in Section 8.3.

(c)     If a Competing Bid is selected in conjunction with an auction (the "Auction") but such bidder does not consummate the purchase of the Acquired Assets and Buyer is the second highest bidder (the "Backup Bidder"), Buyer shall be subject to the rights and responsibilities of the Backup Bidder as set forth in the Bidding Procedures.

6.3     Treatment of Monetary Obligations.    The Termination Fee and Expenses Reimbursement payable to Buyer under this Agreement shall be entitled to administrative expense priority in Seller's Bankruptcy Case pursuant to Sections 503(b) and 507(a) of the Bankruptcy Code.

ARTICLE VII
PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the Execution Date and the Closing:

7.1     General.  Each of the Parties will use its commercially reasonable efforts to take all actions and to do all things necessary in order to consummate and make effective the Contemplated Transactions (including satisfaction, but not waiver, of the Closing conditions set forth in ARTICLE IX) and to ensure that Buyer is relieved of all Excluded Liabilities in compliance with applicable non-bankruptcy law and in accordance with Sections 1129(a)(16), 363(d) and 541(f) of the Bankruptcy Code.

7.2     Regulatory Approvals.

(a)     In compliance with applicable non-bankruptcy law and in accordance with Sections 1129(a)(16), 363(d) and 541(f) of the Bankruptcy Code, Seller and Buyer will promptly confer with the appropriate federal, state and local regulators to obtain their

support for the approval of the Contemplated Transactions, including the Office of the New York State Attorney General Charities Bureau.

(b)    If necessary, each of Buyer and Seller shall use their reasonable best efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates in respect of the Contemplated Transactions under any Applicable Law, including such filings as are required to obtain the consents, approvals, authorizations, waivers, Orders, licenses or Permits or to provide the notices specified in Schedule 4.9 or Schedule 5.5, as promptly as practicable, (ii) comply at the earliest practicable date with any request for additional information, documents, or other materials received by each of them or any of their respective Affiliates from any Governmental Authority in respect of such filings or the Contemplated Transactions, and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by Applicable Law, providing copies of all such documents to the non-filing Parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any Governmental Authority under such Laws with respect to any such filing or any such transaction.

7.3    Operation of Business.  Seller will operate its Business and manage it properties in the Ordinary Course in accordance with any post-petition financing approved by the Bankruptcy Court.  Seller will maintain its tax-exempt status.  Without limiting the generality of the foregoing, Seller will not, without Buyer's prior written consent (which shall not be unreasonably withheld or delayed):

(a)    enter into or amend any Material Contract;

(b)    terminate any Material Contract other than upon the expiration of its term or for the counterparty's breach of such Material Contract;

(c)    fail to perform when due all material obligations under any Material Contracts except to the extent such performance is excused under the Bankruptcy Code, by the Bankruptcy Court, or by the counterparty's breach of such Material Contract;

(d)    fail to give prompt notice to Buyer of the commencement of or any Material Development of which Seller becomes aware;

(e)    fail to give prompt notice to Buyer of any Material Adverse Change;

(f)    sell, transfer, or convey any Acquired Asset (other than obsolete or worn out immaterial equipment disposed of in the Ordinary Course of Business and replaced if necessary with adequate replacement equipment);

(g)    adopt or propose any change to its governing documents;

(h)    merge or consolidate with any entity or acquire any assets from any entity (other than purchases of supplies in the Ordinary Course of Business);

(i)    except as permitted by the terms of any Material Contract pertaining to any Debt, incur any indebtedness for borrowed money or guarantee any such indebtedness or issue or sell any debt securities or guarantee any debt securities of others other than as disclosed to Buyer and excluding any accounts payable arising in the Ordinary Course of Business of a Seller;

(j)    enter into any operating lease;

(k)    terminate, fail to renew or materially reduce the amount of any insurance coverage provided by the existing insurance policies of Seller in relation to the Acquired Assets;

(l)    remove from Seller's premises or modify (other than in the Ordinary Course of Business) any books or records of Seller that are Acquired Assets;

(m)    fail to keep in full force and effect its Licenses; and

(n)    agree or commit to do any of the foregoing.

7.4    Access.  Seller will permit Representatives of Buyer (including its  accountants) to have access at all reasonable times, and in a manner so as not to interfere with the normal business operations of Seller, to the premises, properties, personnel, books, records (including Tax records, provided that those portions of any records or discussions pertaining to the entry into or consummation of the Contemplated Transactions may be withheld and/or redacted), contracts, and documents of or pertaining to Seller.

7.5    Notice of Developments.

(a)    Seller shall promptly notify Buyer of:

(i)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Contemplated Transactions;

(ii)    any notice or other communication from any Governmental Authority in connection with the Contemplated Transactions; or

(iii)    its obtaining Knowledge of (A) a breach or violation of any representation or warranty made by it contained in this Agreement that is qualified as to materiality becoming untrue or inaccurate in any respect or any such representation of warranty that is not so qualified becoming untrue or inaccurate in any material respect and (B) the failure of it to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it under this Agreement or any other Closing Document.

(b)    No notification under this Section 7.5 shall affect the representations, warranties or obligations of the Parties or the conditions to the obligations of the Parties

hereunder, or limit or otherwise affect the remedies available hereunder to the Party receiving such notice.

7.6    <u>Employment Matters</u>.  Buyer shall not be permitted to contact the Employees.

7.7    <u>Removal of Excluded Assets from Real Property</u>.  Prior to the Closing or as soon thereafter as is reasonably practical, Seller will remove from the Real Property all Excluded Assets, except that student records will be removed in accordance with Section 8.6.

ARTICLE VIII
POST-CLOSING COVENANTS

Seller and Buyer agree as follows with respect to the period following the Closing:

8.1    <u>General</u>.  After the Closing, each of Buyer and Seller will take such further action as is necessary on its part to carry out the purposes of this Agreement (including the execution and delivery of such further instruments and documents) as either may reasonably request, all at the sole cost and expense of the requesting Party (subject to such Party's indemnification rights for such expenses).  Without limiting the foregoing, each of Buyer and Seller will cooperate in providing access to all books, records, ledgers, files, documents, correspondence, lists and other documents and information related to the matters covered by this Agreement as the other may reasonably request, all at the sole cost and expense of the requesting Party (subject to such Party's indemnification rights for such expense).

8.2    <u>Access to Records</u>.    After the Closing Date, Seller shall retain for a period consistent with Seller's record-retention policies and practices and Applicable Law its books and records related to the Business that do not constitute part of the Acquired Assets

8.3    <u>Non-Disclosure</u>.

(a)    From and after the date hereof, Buyer shall, and shall direct its Representatives, to maintain in confidence, not disclose to any third party (other than their Representatives) without the prior written consent of Seller, and not use to the detriment of Seller, any Seller Confidential Information relating to or obtained from Seller or its Representatives.  For purposes of this Section 8.3(a), "<u>Seller Confidential Information</u>" means any information that is confidential or proprietary in nature that is related to the Acquired Assets, the Business, the Excluded Assets, or the Excluded Liabilities, including methods of operation, student information, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; *provided, however*, that Seller Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Buyer or any of its Representatives, (ii) becomes available to Buyer on a non-confidential basis from a source other than Seller or its Representatives, provided that such source is not known by Buyer to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Buyer from a third party having the right to disseminate the Seller Confidential Information without restriction on disclosure, or (iv) can be shown by Buyer

through written documents or evidence maintained by Buyer to have been independently developed by it without the use of Seller Confidential Information; and *provided further*, that upon the Closing, the restrictions contained in this Section 8.3(a) shall not apply to confidential or proprietary information related primarily to the Acquired Assets, or the Business. Buyer may disclose any of the Seller Confidential Information to its Representatives who need to know it for the purpose of effectuating the Transactions and who are directed to keep it confidential. Buyer shall instruct its Representatives having access to Seller Confidential Information of such obligation of confidentiality. If Buyer or anyone to whom it has transmitted Confidential Information subject to the confidentiality obligations herein is required by Applicable Law to disclose any of such Confidential Information, Buyer shall, to the extent permissible by Applicable Law, provide Seller with prompt notice prior to making any disclosure so that Seller may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or Seller waives compliance with the provisions of this Section 8.3(a), Buyer and its Representatives shall furnish only that portion of the Seller Confidential Information that it is advised by counsel is required by Applicable Law to be disclosed.

(b)    It is understood by the Parties that the information, documents and instruments delivered to Seller by Buyer or its Representatives in connection with the negotiation of this Agreement (the "<u>Buyer Confidential Information</u>") are of a confidential and proprietary nature. Seller agrees that both prior and subsequent to Closing it will maintain the confidentiality of all Buyer Confidential Information and only disclose such information, documents and instruments (x) to duly authorized Representatives, (y) as necessary to comply with Applicable Law, or (z) to assist or defend claims as provided herein. Buyer Confidential Information does not include any information that (i) becomes generally available to the public other than as a result of a disclosure by Seller, or any of its Representatives, (ii) becomes available to Seller on a non-confidential basis from a source other than Buyer or its Representatives, provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Buyer, (iii) is lawfully received by Seller from a third party having the right to disseminate the Buyer Confidential Information without restriction on disclosure, or (iv) can be shown by Seller through written documents or evidence maintained by them to have been independently developed by it without the use of Buyer Confidential Information. Seller further agrees that upon Buyer's written request, it will destroy or, or at Seller's option return to Buyer, all such documents and instruments and all copies thereof in its possession. If Seller or anyone to whom it has transmitted Buyer Confidential Information is required by Applicable Law to disclose any of such Buyer Confidential Information, Seller shall, to the extent permissible by Applicable Law, provide Buyer with prompt notice prior to making any disclosure so that Buyer may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or Buyer waives compliance with the provisions of this Section 8.3(b), Seller and its Representatives shall furnish only that portion of the Buyer Confidential Information that it is advised by counsel is required by Applicable Law to be disclosed.

(c)    The obligations contained in this Section 8.3 shall survive the Closing.

8.4    Further Assurances.  Each Party agrees to use all commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under Applicable Laws and regulations to effectuate the consummation of the Contemplated Transactions (including this Agreement and each other Closing Document required to be delivered by Seller at Closing).

8.5    Sale of Certain Furniture and Equipment Acquired by Buyer.  [Following/prior to] the Closing and after consultation with the Creditors' Committee, Seller will promptly market and sell by auction and sale process in a commercially reasonable manner all of the Furniture and Equipment that is not included among the Acquired Assets that are located at the Oakdale Campus.

8.6    Removal of Student Records.  Seller will use its best efforts, and will hire a records removal/storage company, to remove all required student records from the Real Property prior to the Closing Date.  Seller shall ensure that all student records are removed from the Real Property by no later than [_____].  If the student records are not removed by the Closing Date, then Seller shall ensure that the records removal/storage company has appropriate insurance coverage in place, naming Buyer and its designee as additional insureds, through the date on which the student records have been removed from the Real Property.

ARTICLE IX
EMPLOYEES

9.1    Buyer Not Assuming Seller's CBAs or Benefit Plans.  Buyer is not assuming any of Seller's CBAs or Employee Benefit Plans.

9.2    No Obligation to Offer Employment.  Buyer shall have no right or obligation to offer employment to any of the Employees.

9.3    No Successor Liability.  Buyer shall have no liability, as successor or otherwise, for any breach by Seller of any of its CBAs, nor for any arrears by Seller in payments to Employees for wages or otherwise, nor for contributions due to any Employee Benefit Plan or Multiemployer Plan pursuant to any such CBA or any trust agreement, nor for any liability or claim arising out of or relating to the termination of Seller's obligations under any CBA or any trust agreement, including termination of Seller's obligations to contribute to any Multiemployer Plan.  Seller shall remain liable for all of its pre-Petition Date and post-Petition Date arrears to any such Employee Benefit Plans and Multiemployer Plans and for any Withdrawal Liability associated with their ceasing to contribute to any Multiemployer Plan.

ARTICLE X
CONDITIONS TO OBLIGATION TO CLOSE

10.1    Conditions to Buyer's Obligation.  Buyer's obligation to consummate the Contemplated Transactions is subject to satisfaction of the following conditions:

(a)    The representations and warranties set forth in ARTICLE IV shall be true and correct in all material respects when made and at and as of the Closing Date, except to the extent that such representations and warranties are qualified by the term "material,"

31

or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects when made and at and as of the Closing Date.

(b)       Seller shall have performed and complied with all of its covenants and agreements hereunder in all material respects through the Closing, except to the extent that such covenants or agreements are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case Seller shall have performed and complied with all of such covenants and agreements (as so written, including the term "material" or "Material") in all respects through the Closing;

(c)       No breach or default on the part of Seller shall have occurred under any covenant or agreement hereunder or any Closing Document or any other agreement of the Parties;

(d)       No Material Adverse Change shall have occurred with respect to Seller;

(e)       No order shall have been entered in any action or proceeding before any Governmental Authority, and no preliminary or permanent injunction by any court or Governmental Authority shall have been issued that would have the effect of (i) making the Contemplated Transactions contemplated illegal or in violation of any Applicable Law, or (ii) otherwise preventing consummation of the Contemplated Transactions;

(f)       No Applicable Law shall have been enacted or promulgated by any Governmental Authority that directly prohibits the consummation of the Closing under this Agreement and the Contemplated Transactions;

(g)       Seller and Buyer shall have received all authorizations, consents, and approvals of, and no notices of objections from, those Governmental Authorities referred to in Section 4.9, Section 5.5 and Section 7.2, as applicable, all of which shall be in form and substance reasonably satisfactory to Buyer;

(h)       Seller shall have received all other Seller's Consents and Approvals;

(i)       No Governmental Authority or the Internal Revenue Service shall have objected to the sale of the Acquired Assets pursuant to the Sale Order or, if any Governmental Authority shall have objected to the sale of the Acquired Assets pursuant to the Sale Order, such objection shall have been overruled or consensually resolved;

(j)       The Sale Order shall have become a Final Order;

(k)       All actions to be taken by Seller in connection with consummation of the Contemplated Transactions and all certificates, opinions, instruments, and other documents required to effect the Contemplated Transactions shall be reasonably satisfactory in form and substance to Buyer;

(l)     Buyer shall have received reasonably acceptable assurances, in Buyer's sole discretion, from counsel and/or appropriate regulatory agencies that Buyer shall have no successor liability resulting from the Contemplated Transaction;

(m)     Buyer shall have received all of the Closing Documents described in Section 3.4(a);

(n)     the Title Company shall have irrevocably committed to issue a title policy to Buyer with respect to the Owned Real Property at standard rates in accordance with its standard form of title policy, clear of all Liens, subject to the Permitted Exceptions;

(o)     The Bankruptcy Court shall have approved and authorized Seller's assignment of any Assigned Contracts to, and the assumption thereof by, Buyer; and

(p)     Seller shall have (i) removed all Excluded Assets (other than the student records) from the Real Property, (ii) used best efforts to remove all student records from the Real Property, and (iii) entered into a written agreement (in a form reasonably acceptable to Buyer) with a records boxing/storage company to remove all student records from the Real Property.

Buyer may waive in its sole and absolute discretion any condition specified in this Section 10.1 if it executes a writing so stating at or prior to the Closing.  Seller will remain liable for damages proximately caused by Seller's breach of this Agreement which prevents the consummation of the Contemplated Transactions.

10.2    <u>Conditions to Seller's Obligations</u>.    Seller's obligations to consummate the Contemplated Transactions are subject to satisfaction of the following conditions:

(a)     The representations and warranties set forth in ARTICLE V shall be true and correct in all material respects when made and at and as of the Closing Date, except to the extent that such representations and warranties are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects when made and at and as of the Closing Date;

(b)     Buyer shall have performed and complied with all of its covenants and agreements hereunder in all material respects through the Closing, except to the extent that such covenants or agreements are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case Buyer shall have performed and complied with all of such covenants and agreements (as so written, including the term "material" or "Material") in all respects through the Closing;

(c)     No order shall have been entered in any action or proceeding before any Governmental Authority, and no preliminary or permanent injunction by any court or Governmental Authority shall have been issued that would have the effect of (i) making the Contemplated Transactions illegal or in violation of any Applicable Law, or (ii) otherwise preventing consummation of the Contemplated Transactions;

(d)     No Applicable Law shall have been enacted or promulgated by any Governmental Authority that directly prohibits the consummation of the Closing under this Agreement and the Contemplated Transactions;

(e)     Seller and Buyer shall have received all authorizations, consents, and approvals of, and no notices of objections from, those Governmental Authorities referred to in Section 4.10, Section 5.5 and Section 7.2, as applicable;

(f)     The Sale Order shall have become a Final Order;

(g)     Seller shall have received all of the Closing Documents described in Section 3.4(b); and

Seller may waive any condition specified in this Section 10.2 if it executes a writing so stating at or prior to the Closing.

## ARTICLE XI
## DISPUTE RESOLUTION

11.1     Dispute Resolution.  The Bankruptcy Court shall retain jurisdiction to adjudicate any dispute that arises under this Agreement.

## ARTICLE XII
## TERMINATION

12.1     Termination of Agreement.  In respect of the Contemplated Transactions, this Agreement may be terminated prior to the Closing as follows:

(a)     Termination Due to Events in Bankruptcy Case.  Buyer may terminate this Agreement immediately upon written notice to Seller if: (i) the Bankruptcy Case is dismissed or converted to a Chapter 7 bankruptcy case under the Bankruptcy Code, or an interim or permanent trustee is appointed in the Bankruptcy Case, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed in the Bankruptcy Case; (ii) relief from the automatic stay to permit foreclosure is granted or there is an exercise of other remedies on the Acquired Assets; or (iii) Seller consents to any modification of this Agreement without the prior written agreement of Buyer.

(b)     Termination by Buyer.  Buyer may terminate this Agreement immediately upon written notice to Seller of the occurrence of any of the following, at which time all obligations of Buyer hereunder shall be of no further force and effect:

(i)     Buyer is ready, willing, and able to perform and has properly served Seller with a Time is of the Essence demand and Seller has not properly rejected the same and not performed;

(ii)     if any of the conditions to the obligations of Buyer that are set forth in Section 10.1 shall have become incapable of fulfillment other than as a

result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer;

      (iii)    if there shall be a material breach by Seller of any material representation or warranty, or any material covenant or agreement contained in this Agreement, which breach cannot be cured or has not been cured within fifteen (15) Business Days after the giving of written notice by Buyer to Seller of such breach;

      (iv)    if there is a Material Adverse Effect; or

      (v)    as provided in Section 13.1.

      (c)    <u>Termination by Seller</u>.  Seller may terminate this Agreement upon written notice to Buyer of the occurrence of any of the following, unless Seller is in material breach of this Agreement prior to the occurrence of the following, at which time all obligations of Seller hereunder shall be of no further force and effect, except for those obligations specified in this Agreement to survive termination:

      (i)    if any of the conditions to the obligations of Seller to close that are set forth in Section 10.2 shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller; or

      (ii)    if there shall be a material breach by Buyer of any material representation or warranty, or by Buyer of any material covenant or agreement contained in this Agreement, which breach cannot be cured or has not been cured within 15 Business Days after the giving of written notice by Seller to Buyer of such breach.

      (d)    <u>Termination by Buyer or Seller</u>.  Subject to Bankruptcy Court approval, the Parties may terminate this Agreement by mutual written consent of Seller and Buyer.

      (e)    <u>Extension of Time Periods</u>.  The time periods for termination of this Agreement set forth in this Section 12.1 may be extended upon the written agreement of the Parties without the further approval of the Bankruptcy Court.

12.2    <u>Procedure For Termination</u>.  If this Agreement is terminated by Buyer or Seller, or both, pursuant to Section 12.1, written notice thereof shall promptly be given to the other Party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 12.1), the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by Section 12.3, without further action by the Parties.

12.3    <u>Effect of Termination</u>.  If either Seller or Buyer terminates this Agreement pursuant to Section 12.1, all rights and obligations of the Parties hereunder shall terminate without any liability of any Party to any other Party (except for any Liability of any Party then in breach of this Agreement); *provided* that if such termination is the result of a breach or default

hereunder by the non-terminating Party, then the non-breaching Party shall be entitled to seek any and all remedies available to the terminating Party at law or in equity.

ARTICLE XIII
TITLE INSURANCE; PERMITTED EXCEPTIONS; APPORTIONMENTS

13.1     Title Insurance.  Buyer (i) has ordered from [_____] (the "Title Company") a current title report with respect to the Owned Real Property, and Buyer shall request the Title Company to perform continuation searches of title prior to the Closing (collectively, the "Title Report"), and (ii) has ordered a current ALTA survey of the Owned Real Property (the "Survey").   Buyer has notified Seller, in writing (a "Buyer's Objection Notice"), of any exception, lien, mortgage, security interest, claim, charge, reservation, lease, tenancy, occupancy, easement, right of way, encroachment, restrictive covenant, condition, limitation or other encumbrance affecting the Owned Real Property (collectively, "Exceptions") disclosed by same that is not a Permitted Exception and to which Buyer objects.  Notwithstanding anything herein to the contrary, Buyer shall be deemed to have objected to and is not obligated to deliver a Buyer Objection Notice with respect to the following in order for same to constitute a Title Defect (defined below): (x) any and all monetary liens, including all mortgages and security interests securing any obligations of Seller (or any predecessor-in-interest to Seller), all judgments against Seller (or any predecessor-in-interest to Seller), all mechanics' liens recorded against the Owned Real Property (or any portion thereof), all monetary liens or penalties arising out of violations on the Owned Real Property and all real property taxes (other than real property taxes that constitute Permitted Exceptions), and (y) any and all tenancies.  Except as otherwise provided herein, Seller may elect (but shall not be obligated) to attempt to cure or remove any such title objections (collectively and individually, a "Title Defect") set forth in the Title Report, the Survey, a Buyer's Objection Notice or otherwise.  The Parties acknowledge that Seller may rely on the Sale Order to discharge certain Title Defects and hereby agree that the Title Company's issuance of a title insurance policy, in reliance on the Sale Order, without taking exception for those Title Defects shall be sufficient to constitute Seller's cure and removal of such Title Defects.  If Seller is obligated or elects to attempt to cure or remove any Title Defect and are unable to do so on or before the Closing Date, then Seller shall be entitled to adjourn the Closing in order to cure or remove such Title Defect for a period of not more than 30 days in the aggregate.  If Seller elects not to cure or remove, or after electing to cannot cure or remove, any Title Defect that Seller is not otherwise obligated to cure or remove pursuant to the terms of this Agreement or shall, for any reason, be unable to cure or remove any Title Defect that Seller is not otherwise obligated to cure or remove pursuant to the terms of this Agreement within the time periods set forth in the preceding sentence, then Seller shall notify Buyer in writing and Buyer shall have the right to either (i) terminate this Agreement or (ii) accept such title as Seller shall be able to convey without abatement in the Purchase Price and without any liability on the part of Seller.  Notwithstanding anything herein to the contrary, Seller shall, at or prior to Closing, cure or remove the following Exceptions:   (A) any and all monetary liens up to [$_____], including all mortgages and security interests securing any obligations of Seller (or any predecessor-in-interest to Seller), all judgments against Seller (or any predecessor-in-interest to Seller), all mechanics' liens recorded against the Owned Real Property and all real property taxes (other than real property taxes that constitute Permitted Exceptions); (B) any and all tenancies, other than the tenancies listed in Schedule 3.4(a)(vi) and any tenancies where Buyer or its designee is the tenant; and (C) without limitation of the Exceptions described in preceding

clauses (A) and (B), any and all of Title Defects objected (or deemed objected) to by Buyer that Seller willfully placed of record or expressly consented to be placed of record.

13.2    Permitted Exceptions.  "Permitted Exceptions" means:

(a)    all matters set forth on Schedule 13.2(a) attached hereto and made a part hereof;

(b)    building, zoning, subdivision and other governmental laws, codes and regulations, and landmark, historic and wetlands designations;

(c)    any state of facts that a current, accurate survey or visual inspection of the Owned Real Property would disclose, provided same do not render title uninsurable at standard rates and do not materially and adversely affect the use or development of the Owned Real Property in any manner permitted by current Applicable Law, including current zoning laws;

(d)    all rights and easements, for electricity, gas, telephone, water, cable television and any other utilities to maintain and operate lines, cables, poles and distribution boxes in, over and upon the Owned Real Property, provided the same are for the benefit of the Owned Real Property and do not materially and adversely affect the use or development of the Owned Real Property in any manner permitted by current Applicable Law, including current zoning laws;

(e)    any variations between the tax diagram or the tax map and the record description;

(f)    rights of the public and adjoining owners in highways, streets, roads and lanes crossing the Owned Real Property existing as of the date hereof, provided that the Title Company shall insure (at no additional cost to Buyer) that no third parties have any claims for adverse possession or easements by prescription by virtue of the use of such highways, streets, roads and lanes crossing the Owned Real Property;

(g)    real property taxes, water rates and charges, sewer taxes and rents, and similar items with respect to the Owned Real Property, not yet due and payable and subject to apportionment as provided herein; and

(h)    assessments or installments thereof arising after the date of Closing, whether or not a lien as of Closing, which are due and payable on or after Closing.

13.3    Apportionments.

(a)    Items Subject to Apportionment.  Subject to the terms of this Section 13.3, the following items, without duplication, are to be apportioned between Seller and Buyer with respect to the Owned Real Property 12:00:01 a.m. on the calendar day immediately following the Closing Date, and at the Closing the net amount thereof shall, as applicable, either be (x) paid by Buyer to Seller by wire transfer of immediately available federal

funds to a bank account designated by Seller or (y) credited by Seller against the Purchase Price:

> (i)     real property taxes and assessments;

> (ii)     water rates and charges;

> (iii)     sewer taxes and rents;

> (iv)     electricity, steam, gas and all other utilities, including, without limitation, taxes thereon;

> (v)     deposits on account with any utility company servicing the Property, to the extent transferred to Buyer;

> (vi)     deposits on account with any municipality having jurisdiction over the Property, to the extent transferred to Buyer; and

> (vii)     all other items that reasonably require apportionment in accordance with local custom and practice to effectuate the transactions contemplated hereby.

Seller and Buyer shall adjust any apportionments made under this Section 13.3 after the Closing to account for errors or incorrect estimates made as of the Closing Date (it being agreed that the Parties' aforesaid agreement to make such adjustments shall survive the Closing for a period of twelve (12) months).

> (b)     <u>Governmental Charges</u>.  Apportionment of real property taxes, water rates and charges, sewer taxes and rents and other similar items shall be made on the basis of the fiscal year for which assessed.  If the Closing Date occurs before the real property taxes, water rates and charges, sewer taxes and rents or similar items with respect to the Property are finally fixed for the fiscal year in which the Closing occurs, then the apportionments thereof made at the Closing shall be made on the basis of the real property taxes, water rates and charges, sewer taxes and rents or other similar items, as the case may be, for the preceding fiscal year applied to the latest assessed valuation. After the real property taxes, water rates and charges, sewer taxes and rents or similar items, as the case may be, are finally fixed for the fiscal year in which the Closing occurs, Seller and Buyer shall make a recalculation of the apportionment thereof based on the amounts finally fixed for the fiscal year in which the Closing occurs, and Seller or Buyer, as the case may be, shall make an appropriate payment to the other Party based on such recalculation.  Seller or its representatives shall have the right (x) at any time before the Closing, to institute tax reduction or other proceedings to reduce the assessed valuation of the Owned Real Property with respect to any tax period ending at or prior to the end of the tax year in which the Closing occurs and (y) to continue, after the Closing, any such proceedings commenced by Seller prior to the Closing; p*rovided, however*, that (A) Seller (or its representatives) shall notify Buyer of, and keep Buyer reasonably informed with respect to, any such proceedings and no such proceeding shall be finally settled by Seller without the prior consent of Buyer, which consent shall not be unreasonably withheld, and (B) upon notice to Seller, Buyer shall have the right to assume control of and

prosecute any such proceeding relating to the tax year in which the Closing occurs, provided that no such proceeding shall be finally settled by Buyer without the prior consent of Seller, which consent shall not be unreasonably withheld.  If Buyer, at any time following the Closing shall institute tax reduction or other proceedings to reduce the assessed valuation of the Owned Real Property with respect to the tax period ending at the end of the tax year in which the Closing occurs, such proceeding shall not be finally settled by Buyer without the prior consent of Seller, which consent shall not be unreasonably withheld.  If any refund of any real property tax, water rates and charges, sewer taxes and rents or similar items is issued after the Closing Date for any period ending prior to or including the Closing Date, such refund shall be applied as follows: first, to the cost incurred in obtaining such refund; and, second, the balance of such refund, if any, shall be apportioned between Seller, for the period prior to the Closing Date, and Buyer, for the period from and after the Closing Date.

(c)    Water Meters.  If there shall be any meters measuring water consumption at the Owned Real Property, Seller shall attempt to obtain meter readings to a date that is no more than thirty (30) days before the Closing, and, if such readings are obtained, the unfixed water rates and charges and sewer taxes and rents, if any, based thereon for the intervening time, shall be apportioned on the basis of such readings, or if such readings are not obtained, the unfixed water rates and charges and sewer taxes and rents, if any, shall be apportioned upon the last meter readings.

(d)    Payment of Certain Items.  The amount of any unpaid taxes, assessments, water rates and charges, sewer taxes and rents and any other similar items which Seller is obligated to pay and discharge with respect to the Owned Real Property, with interest and penalties thereon to the date which is three (3) Business Days following the Closing Date, may, at the option of Seller, be allowed to Buyer out of the Purchase Price, provided that official bills therefor with interest and penalties thereon are furnished to Buyer by Seller at the Closing.  Buyer, if request is made at least two (2) Business Days prior to the Closing, shall provide Seller at the Closing with separate wire transfers of immediately available federal funds, in an aggregate amount not exceeding the balance of the Purchase Price due to Seller at the Closing, to facilitate the satisfaction of any of the aforesaid taxes, assessments, water rates and charges, sewer taxes and rents and other similar items and any interest and penalties thereon to the Closing Date.  Without limiting the foregoing, Seller is solely obligated to pay and discharge any of the aforesaid taxes, assessments, water rates and charges, sewer taxes and rents and other similar items affecting the Owned Real Property that are delinquent as of the Closing Date, subject to apportionment as herein provided.

(e)    Utilities.  With respect to the utilities described in Section 13.3(a)(iv), where possible, Seller shall secure cutoff readings for all utilities as of the apportionment time.  To the extent that such cutoff readings are not available, at Closing the cost of such utilities shall be apportioned between the Parties as of the apportionment time on the basis of the most recent actual (not estimated) bill for such service, and, after Closing, upon determination of the final meter readings shall be readjusted based on same as of the apportionment time.  Buyer shall be responsible for causing such utilities and services to be changed to its name (or the name of any affiliate, manager or tenant of Buyer) as of

the Closing Date, and shall be liable for and shall pay all utility bills for services rendered after the apportionment time.  With respect to deposits of Seller on account with any utility company servicing the Owned Real Property, to the extent same are unconditionally transferred to Buyer at Closing, Seller shall receive an adjustment equal to the full amount of such deposits transferred to Buyer.  To the extent that any such deposits are not unconditionally transferred to Buyer, Seller shall have the right to a return of such deposits and Buyer shall be responsible for posting any deposits required from and after the Closing.

(f)    _Assessments_.  If, on the Closing Date, the Owned Real Property, or any part thereof, is affected by any real property tax assessments, then Seller shall pay such assessments; _provided, however_, that if such assessments are payable in installments, then Seller shall pay such installments due prior to the Closing Date, and Buyer shall pay such installments due after the Closing Date.

(g)    _Survival_.  The provisions of this Section 13.3 shall survive the Closing.

## ARTICLE XIV
## MISCELLANEOUS

14.1    _Survival_.    All representations, warranties, covenants and obligations in this Agreement and in the certificates delivered pursuant to this Agreement shall survive the Closing and the consummation of the Contemplated Transactions.  Any remedy based upon such representations, warranties, covenants and obligations shall not be affected by any investigation (including any environmental investigation or assessment) conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with any such representation, warranty, covenant or obligation.  The waiver of any condition based upon the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect such right to set-off or other remedy based upon such representations, warranties, covenants and obligations.

14.2    _Press Releases and Public Announcements_.  No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of the other Party, such approval not to be unreasonably withheld or delayed; _provided, however_, that any Party may make any public disclosure it believes in good faith is required by Applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement (in which case the disclosing Party will use its reasonable efforts consistent with such Applicable Law or Bankruptcy Court requirement to advise the other Party prior to making the disclosure).

14.3    _No Third-Party Beneficiaries_.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

14.4    _Entire Agreement_.  This Agreement and the other Closing Documents constitute the entire agreement among the Parties and supersedes any prior understandings, agreements, or

representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

14.5    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party; *provided, however*, that Buyer may (a) assign any or all of its rights and interests hereunder to one or more of its Affiliates, including any not-for-profit corporation of which Buyer is a member and which succeeds to the interest of Buyer in the Seller and (b) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder).

14.6    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  The delivery of an executed signature page of this Agreement or any other Closing Document by fax or portable document format (.pdf) shall have the same effect as the delivery of a manually executed counterpart hereof or thereof.

14.7    Headings.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

14.8    Notices.  All notices, requests, demands, claims, and other communications hereunder shall be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (iii) four Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Seller:            Dowling College
                         150 Idle Hour Boulevard
                         Oakdale, New York 11769
                         Attn:  Robert S. Rosenfeld

                         -and-

                         RSR Consulting, LLC
                         1330 Avenue of the Americas, Suite 23A
                         New York, New York 10019
                         Attn:  Robert S. Rosenfeld

Copy to:                 Klestadt Winters Jureller Southard & Stevens, LLP
                         200 West 41st Street, 17th Floor
                         New York, New York 10036
                         Attn:  Sean C. Southard, Esq.

If to Buyer:                [_____]

Copy to:                    [_____]

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

14.9    <u>Governing Law; Waiver of Jury Trial</u>.  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.

14.10    <u>Submission to Jurisdiction; Consent to Service of Process</u>.  Without limiting any Party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transactions, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 14.8 hereof; *provided, however*, that, if the Bankruptcy Case has closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Eastern District of New York sitting in Brooklyn, New York or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in Suffolk County and any appellate court from any thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each of the Parties hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 14.8.

14.11    <u>Amendments</u>.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Seller.  Seller may consent to any such amendment at any time prior to the Closing with the prior authorization of Seller's Board.

14.12    <u>Severability</u>.   Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

14.13  Expenses.    Except  with  respect  to  the  Termination  Fee  and  Expense Reimbursement, each of the Parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the Contemplated Transactions, except that Buyer on the one hand and Seller on the other hand shall each bear fifty percent (50%) of all Transfer Taxes payable with respect to the conveyance of the Owned Real Property, if any.

14.14  Construction.  The Parties participated fully in the negotiation and preparation of this Agreement with full benefit of counsel.  Accordingly, this Agreement is to be construed as if the Parties drafted it jointly and is not to be more strictly construed against any Party.

14.15  Incorporation of Schedules.    The Schedules identified in this Agreement are incorporated herein by reference and made a part hereof. The Parties acknowledge that the Schedules attached hereto may be updated after the Execution Date with Buyer's consent, which consent shall not be unreasonably withheld.

14.16  No Waiver.  The failure of any Party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.  The waiver of any such right with respect to particular facts and other circumstances shall not be deemed a waiver with respect to any other facts and circumstances and each such right shall be deemed an ongoing right that may be asserted at any time and from time to time.  No right, remedy or election given by any term of this Agreement shall be deemed exclusive but shall be cumulative with all of the rights, remedies and elections available at law or in equity.

14.17  Non-Recourse Liability.  All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement may be made only against (and expressly limited to) the persons that are expressly identified as Parties hereto or thereto (the "Contracting Parties" and each a "Contract Party").  In no event shall any Contract Party have any shared or vicarious liability for the actions or omissions of any other person.  No person who is not a Contracting Party, including a director, officer, employee, incorporator, member, partner, manager, stockholder, affiliate, agent, attorney or representative of, and any financial advisor or lender (including the financial sources) to, any of the foregoing (the "Non-Party Affiliates"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose liability of an entity party against its owners or affiliates) for any causes of action or liabilities arising under, out of, in connection with or related in any manner to this agreement or related agreements or their negotiations, execution, performance or breach; and, to the maximum extent permitted by law, each Contracting Party waives and releases all such causes of action and liabilities against any such Non-Party Affiliates. Without limited to the foregoing, to the maximum extent permitted by Law , (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose liability of a Contracting Party on any Non-party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims  any  reliance  upon  Non-Party  Affiliates  with  respect  to  the  performance  of  this

agreement or related agreements or any representation or warranty made in, in connection with, or as inducement to this agreement or related agreements. The Parties acknowledge and agreed that the Non-Party Affiliates are intended third-party beneficiaries of this Section.

*{signature page follows}*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

DOWLING COLLEGE

By:_____
Name:
Title:

[BUYER]

By:_____
Name:
Title: