**KLESTADT WINTERS JURELLER**
 **SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, NY 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Sean C. Southard
Stephanie R. Sweeney
Lauren C. Kiss

*Proposed Counsel to the Debtor and Debtor in*
 *Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re                                                        :          Chapter 11
                                                             :
DOWLING COLLEGE,                        :          Case No. 16-75545 (REG)
                                                             :
                                                             :
                                 Debtor.              :
-------------------------------------------------------------x

**DEBTOR'S MOTION PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 FOR AN ORDER
AUTHORIZING THE DEBTOR TO ENTER INTO AND PERFORM
UNDER PLAN SUPPORT AGREEMENT**

**TO THE HONORABLE ROBERT E. GROSSMAN,
UNITED STATES BANKRUPTCY JUDGE:**

Dowling College (the "Debtor"), debtor and debtor-in-possession in the above-captioned

chapter 11 case (the "Chapter 11 Case"), hereby submits this motion (the "Motion") for entry of

an Order, substantially in the form annexed hereto as Exhibit A (the "Order"), pursuant to

Sections 105(a) and 363(b) of title 11 of the United States Code (the "Bankruptcy Code") and

Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing

the Debtor to enter into and perform under that certain Plan Support Agreement, dated as of

November 29, 2016, by and among the Debtor, ACA[1], as the bond insurer for the Series 2006 Bonds, and the Holders of the Debtor's Series 1996 Bonds, Series 2002 Bonds, and Series 2015 Bonds (collectively, together with ACA, the "Consenting Creditors"), a copy of which is attached hereto as Exhibit B (as amended, supplemented, or amended and restated from time to time, and including the Plan Term Sheet attached thereto as Exhibit A and all other exhibits and schedules attached thereto and to the Plan Term Sheet, the "PSA"), and in support of the Motion respectfully represents as follows:

## PRELIMINARY STATEMENT

Prior to filing this Chapter 11 Case, the Debtor and its professionals worked together with stakeholders of Dowling's four outstanding bond issuances and their professionals to develop a consensual liquidation strategy intended to maximize the value of the Debtor's assets through a chapter 11 bankruptcy process. The PSA is the culmination of those efforts. It provides the framework for an orderly liquidation of the Debtor's real property interests and other unrestricted assets through a cooperative marketing and sale process, contemplates continued financial support from the Consenting Creditors in the form of debtor-in-possession financing and exit financing, provides the Debtor with assurances of the Consenting Creditors' support of a chapter 11 liquidating plan, and allows the Debtor to fulfill its fiduciary duties and charitable mission to the greatest extent possible under the circumstances.

The PSA was achieved through lengthy, good faith, arms' length negotiations and has received the support of all of the Debtor's major secured creditors that have liens on and security interests in substantially all of the Debtor's unrestricted assets. The Debtor believes, consistent with its good faith business judgment and the exercise of its fiduciary duties, that the PSA sets

---

[1] Terms capitalized but not defined herein shall have the meanings assigned to them in the Plan Support Agreement.

forth the best way to maximize value, is fair and reasonable, and is in the best interests of all creditors of the Debtor's estate.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue of this case and this Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019.

## BACKGROUND

### A.      The Chapter 11 Case

4.      On November 29, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of New York (this "Court").

5.      The Debtor continues to manage its property as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

6.      As of the date of the filing of this Motion, no trustee, examiner or committee has been requested or appointed.

7.      Prior to the Petition Date, the Debtor retained Robert S. Rosenfeld of RSR Consulting, LLC to perform the functions and hold the title of Chief Restructuring Officer (the "CRO") of the Debtor. A motion for approval of the CRO's retention is separately pending before this Court.

8.      A detailed description of the Debtor's business and the reasons for the filing of this Chapter 11 Case is set forth in the *Declaration of Robert S. Rosenfeld, Chief Restructuring*

*Officer of the Debtor, Pursuant to Local Bankruptcy Rule 1007-4 in Support of First Day Motions* filed before this Court and incorporated herein by reference.

### B.    Material Terms of the PSA

9.      The parties to the PSA include the Debtor, ACA, holders of a majority in principal amount of the Series 1996 Bonds, holders of all of the Series 2002 Bonds, and holders of all of the Series 2015 Bonds.

10.      Below is a summary of the salient terms of the PSA. This summary does not contain all of the terms and conditions of the PSA. To the extent of any inconsistency between this summary and the terms of the PSA, the terms of the PSA shall control.

| | |
|---|---|
| Commitment of the Consenting Creditors | Subject to receiving a Disclosure Statement and Plan consistent with the PSA, the Consenting Creditors will (i) timely vote their Claims in favor of the Plan and return duly-executed ballots in connection therewith, (ii) not object to confirmation or oppose the Plan or support any alternative liquidation or restructuring, (iii) not withdraw or change their vote with respect to the Plan and (iv) not take any other action inconsistent with, or that would materially hinder or delay the consummation of, the Plan and the Liquidation. |
| Commitment of the Debtor | The Debtor will, consistent with applicable fiduciary duties, (i) support and complete the Liquidation and all transactions contemplated by the PSA, (ii) take all necessary steps in furtherance of the Liquidation, (iii) complete the Liquidation within the timeframes outlined in the Term Sheet, (iv) take all commercially reasonable steps to obtain any regulatory or third party approvals necessary to consummate the Liquidation, (v) take all reasonable steps to obtain court approval of a debtor-in-possession financing facility (the "DIP Facility"), adequate protection terms and sale procedures satisfactory to the Consenting Creditors (collectively, the "Bankruptcy Documents"), (vi) not seek, consent to or participate in the formulation of any plan, dissolution, liquidation, reorganization or restructuring other than the Plan, or any disposition outside the Plan of all or a substantial portion of the Debtor's assets, or in any other action inconsistent with the PSA, (vii) not incur any |

4

| | |
|---|---|
| | debt with priority over the Bonds and (viii) not take any action that would result in entry of an order terminating the Debtor's exclusive right to file a plan. |
| Chief Restructuring Officer | The Debtor shall retain and shall, prior to the Effective Date, maintain a Chief Restructuring Officer acceptable to the Consenting Creditors.  The retention terms for any Chief Restructuring Officer shall be acceptable to the Consenting Creditors.  Prior to the Petition Date, the Debtor retained Robert S. Rosenfeld of RSR Consulting, LLC to perform the functions and hold the title of Chief Restructuring Officer. |
| Plan of Liquidation | As soon as practicable after the Petition Date and no later than January 16, 2016, the Debtor will file the Plan and Disclosure Statement and use its best efforts to seek (i) approval of the Disclosure Statement as containing adequate information and (ii) confirmation of the Plan.<br><br>The Debtor will work with the Consenting Creditors to prepare a Plan, Disclosure Statement and related documents (collectively the "<u>Plan Documents</u>") consistent with the Plan Term Sheet and Liquidation Plan Support Agreement and otherwise in form and substance acceptable to the Consenting Creditors.  The Plan Documents will not be amended without the Consenting Creditors' prior written consent. |
| DIP Financing and Use of Cash Collateral | On the Petition Date, the Debtor shall seek approval of a DIP Facility to be provided by the Consenting Creditors in accordance with the DIP Financing Agreement.<br><br>The Consenting Creditors will consent to the use of cash collateral on the terms and conditions set forth in the Interim DIP Order. |
| Exit Financing | Prior to the Effective Date, the Debtor and the DIP Lenders will negotiate in good faith the terms of an exit financing facility, to the extent necessary, in order to finance the Debtor's liquidation efforts from the Effective Date through Dissolution.<br><br>For purposes of clarity, the decision regarding whether to agree to borrow or lend under any potential Exit Facility shall be in the sole discretion of the Debtor and the DIP Lenders, as applicable, and nothing herein shall be construed to create any obligation to borrow or lend, or to enter into an Exit Facility. |
| Treatment of Claims under the Plan | <u>Administrative Claims</u> – paid in full, in cash on the |

| | |
|---|---|
| | Effective Date. |
| | <u>U.S. Trustee Fees</u> – paid in full, in cash, on the Effective Date. |
| | <u>DIP Facility Claims</u> – paid in full, in cash on the Effective Date in a manner consistent with the DIP Financing Agreement. |
| | <u>Consenting Creditors' Claims</u> – The Consenting Creditors (or, as applicable, any related indenture trustee) will receive (i) their respective collateral that is cash, (ii) the cash proceeds of the sale, use or other disposition of their respective collateral, and (iii) a Deficiency Claim for the remaining balance, if any. |
| | <u>Other Secured Claims</u> – paid from the proceeds from the sale of the relevant collateral with priority as set by applicable non-bankruptcy law. |
| | <u>Priority Unsecured Claims</u> – except to the extent any holder of an allowed claim entitled to priority under Section 507 of the Bankruptcy Code agrees to different treatment, each holders shall receive treatment specified in Section 1129(a)(9) of the Bankruptcy Code. |
| | <u>General Unsecured Claims</u> – after the creditors holding priority unsecured claims are paid in full, creditors holding general unsecured claims, including the Deficiency Claims, will receive proceeds from the sale of any of the Debtor's unencumbered assets and any remaining proceeds from the sale, use or other disposition of collateral after satisfaction of the relevant secured creditor claims. |
| Sale Process | On the Petition Date, the Debtor will file with the Bankruptcy Court applications to retain: |
| | A&G Realty Partners, LLC and Madison Hawk Partners, LLC, on terms acceptable to ACA to market the Oakdale Campus and the Brookhaven Campus (the "<u>Campus Agents</u>"); |
| | CBRE, Inc. on terms acceptable to the holders of the Series 2002 Bonds to market the Brookhaven Dorm (the "<u>Dorm Agent</u>"); and |
| | Douglas Elliman, on terms acceptable to the holders of the Series 2015 Bonds to market the Residential Portfolio (the "<u>Residential Agent</u>"). |
| | On or after the Petition Date, the Debtor will also retain |

additional real estate agents and brokers, on terms acceptable to the Consenting Creditors, to market the Debtor's other assets (the "General Agent" and together with the Campus Agents, the Dorm Agent and the Residential Agent, collectively, the "Agents" and, each, an "Agent").

During the pendency of the Chapter 11 Case, the Debtor will work with the Campus Agents and ACA to develop a procedure for the marketing and sale of the Oakdale Campus with such sale procedure concluding in the entry of an order by the Bankruptcy Court approving the sale of the Oakdale Campus no later than March 10, 2017.

The Debtor will work with the Campus Agents and ACA to develop appropriate procedures and timelines for the sale of the Brookhaven Campus other than the Brookhaven Dorm, including, without limitation, the retention of appropriate professionals needed to review and assist the Debtor with respect to any and all zoning and title actions to prepare the Brookhaven Campus for sale.

The Debtor will work with the Dorm Agent and holder of the Series 2002 Bonds to develop appropriate procedures and timelines for the sale of the Brookhaven Dorm, including, without limitation, the retention of appropriate professionals needed to review and assist the Debtor with respect to any and all zoning and title actions to prepare the Brookhaven Dorm for sale.

The Debtor will work with the Residential Agent and holders of the Series 2015 Bonds to develop appropriate procedures and timelines for the sale of the Residential Portfolio, including requests for emergency or expedited relief to consummate the sale of any parcel in the Residential Portfolio that is under contract for sale as of the Petition Date.

Any sale procedures proposed in the Chapter 11 Case and/or the Plan will provide that any Consenting Creditor (or, as applicable, any related indenture trustee) may, in its sole discretion, credit bid for the purchase of its collateral to the full amount and extent of its claim.

The Debtor will work with the General Agent to evaluate the Debtor's assets other than the Oakdale Campus, the Brookhaven Campus, the Brookhaven Dorm and the Residential Portfolio and to determine the

appropriate procedures and timelines for the sale of such assets.

To the extent that there are assets of the Debtor that remain unsold as of the Effective Date, the Debtor will retain, subject to the Consenting Creditors' consent, a restructuring or liquidation professional to oversee the implementation of the Plan and the sale process post-Effective Date (the "Liquidation Administrator").

The Plan will set forth a general process for marketing of the Debtor's remaining assets post-Effective Date on timelines as determined by the Liquidation Administrator, in consultation with the relevant Agents and Consenting Creditors, designed to maximize the return on the assets (the "Marketing Process"). The Liquidation Administrator will conduct a separate Marketing Process for each of the Debtor's remaining real property assets on terms acceptable to the applicable Consenting Creditors unless, in the reasonable judgment of the Liquidation Administrator, in consultation with the relevant Agents and subject to the consent of the relevant Consenting Creditors, it is determined that a combined Marketing Process for certain real property assets would yield a better outcome. The Liquidation Administrator may pursue any Marketing Process for the Debtor's non-real estate assets that, in the Plan Administrator's reasonable judgment, is expected to provide the best return in a cost-efficient manner, including, but not limited to, the retention of a reputable liquidation firm.

If acceptable to the applicable Consenting Creditors, the Marketing Process may include one or more stalking horse bidders, auction procedures, and sales of assets free and clear of all liens, claims and encumbrances.

To the extent that assets of the Debtor other than the Oakdale Campus, the Brookhaven Campus, the Brookhaven Dorm and the Residential Portfolio remain unsold as of the Effective Date, the Liquidation Administrator will pursue appropriate procedures and timelines for the sale of such assets, including, for example, under *de minimis* assets sale procedures as approved by the Bankruptcy Court.

| Milestones | The following milestones (the "<u>Milestones</u>") shall take place no later than the date indicated: |
|---|---|

| Milestone | Specified Deadline |
|---|---|
| Petition Date | November 29, 2016 |
| Entry by the Bankruptcy Court of the Interim DIP Order | December 1, 2016 |
| Filing of motion to approve sale procedures for the Oakdale Campus | November 29, 2016 |
| Filing of motion to approve sale procedures for the Residential Portfolio | November 29, 2016 |
| Entry by the Bankruptcy Court of an order approving the sale procedures for the Oakdale Campus | December 13, 2016 |
| Entry by the Bankruptcy Court of an order approving the sale procedures for the Residential Portfolio | December 13, 2016 |
| Entry by the Bankruptcy Court of the Final DIP Order | December 30, 2016 |
| Filing by the Debtor of the proposed Liquidation Plan and Disclosure Statement | January 16, 2017 |
| Entry of the Bankruptcy Court of an order approving the Disclosure Statement | March 6, 2017 |
| Entry by the Bankruptcy Court of an order approving the sale of the Oakdale Campus | April 10, 2017 |

| | | |
|---|---|---|
| | Entry by the Bankruptcy Court of an order confirming the Liquidation Plan | April 24, 2017 |
| | Effective Date | May 8, 2017 |
| Releases and Exculpation | The Plan shall include customary release and exculpation provisions, including, without limitation with respect to the current and former officers and trustees of the Debtor, the Debtor, and the Consenting Creditors (and any related indenture trustee), and their respective employees, agents and professionals (collectively, the "Released Parties").<br><br>In addition, the Plan will provide for third party releases of the Released Parties to the greatest extent permitted under applicable law, and each of the Released Parties will agree to such releases with respect to the other Released Parties. | |
| Termination | The PSA will terminate upon the occurrence of any of the following:<br><br>(i)    The PSA Effective Date does not occur on or before December 30, 2016 or such later date as may be agreed to in writing by the Consenting Creditors;<br><br>(ii)    The Debtor is in material breach of its obligations under the PSA or any other agreement governing the Liquidation, and such breach is not cured within applicable grace periods;<br><br>(iii)    Any of the Bankruptcy Documents is withdrawn or materially modified or the Plan is modified without the Consenting Creditors' consent;<br><br>(iv)    The Bankruptcy Court grants relief materially adverse to the Consenting Creditors' interests or materially inconsistent with the PSA or the Plan as determined by the Consenting Creditors;<br><br>(v)    The Debtor fails to timely file the Plan and Disclosure Statement, timely obtain approval of the Disclosure Statement by the Bankruptcy Court, or timely obtain entry of the Confirmation Order by the Bankruptcy | |

| | | |
|---|---|---|
| | | Court, in each case in accordance with the Milestones; |
| | (vi) | The Debtor moves to dismiss or convert the Chapter 11 Case or for appointment of a trustee or examiner, or a trustee or examiner is appointed, or the Chapter 11 Case is dismissed or converted; |
| | (vii) | The Debtor files or supports any pleading to disallow, subordinate or limit the rights and/or Claims of the Consenting Creditors; |
| | (viii) | The Effective Date does not occur before the fifteenth Business Day following entry of the Confirmation Order; |
| | (ix) | Any Consenting Creditor is in material breach of the PSA or any other agreement governing the Liquidation and (i) as a result of such breach, the Plan cannot be confirmed, and (ii) any such breach is not cured within applicable grace periods; or |
| | (x) | A court enters a final order preventing Liquidation, or Confirmation of the Plan is denied. |

## RELIEF REQUESTED

11.    By this Motion, the Debtor seeks entry of an order, substantially in the form attached hereto as Exhibit A, pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, authorizing the Debtor to execute and perform under the PSA.

## BASIS FOR RELIEF REQUESTED

### A. The PSA is Fair and Reasonable and in the Best Interests of the Debtor and its Estate and Should be Approved.

12.    Section 105(a) of the Bankruptcy Code states that the bankruptcy court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  The purpose of section 105(a) is to "assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the

exercise of its jurisdiction." In re Casse, 198 F.3d 327, 336 (2d Cir. 1999).  Section 105 is not limitless and thus "does not authorize the bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law." Solow v. Kalikow (In re Kalikow), 602 F.3d 82, 95–96 (2nd Cir. 2010) (internal quotations and citations omitted).  Rather, bankruptcy courts are empowered to utilize their equitable powers under section 105 where appropriate "to facilitate the implementation of other Bankruptcy Code provisions." Id. (quoting Bessette v. Avco Fin. Servs. Inc., 230 F.3d 439, 444 (1st Cir. 2000)).

13.  Approval of the Debtor's entry into the PSA will facilitate implementation of section 363 of the Bankruptcy Code, which permits the Debtor, upon approval from the Court after notice and a hearing, to use, sell or lease property of the estate outside the ordinary course of business in the sound exercise of its business judgment. See 11 U.S.C. § 363(b); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Fir. 1983) ("The rule we adopt requires that a judge determining a 363(b) application expressly find from the evidence presented before him a good business reason to grant the application.").

14.  Further, the Court has authority to approve the PSA pursuant to Bankruptcy Rule 9019, which permits courts to approve post-petition settlements of claims and controversies upon motion and a hearing. See Fed. R. Bankr. P. 9019. "As a general matter, settlements or compromises are favored in bankruptcy and, in fact, encouraged, because they minimize the costs of litigation and further the parties' interest in expediting the administration of a bankruptcy estate" In re McCoy, 496 B.R. 678, 683 (Bankr. E.D.N.Y. 2011) (internal quotations and citations omitted). "A bankruptcy court may approve a compromise and settlement pursuant to bankruptcy Rule 9019 if it is fair, reasonable and adequately based on the facts and

circumstances before the court." Id. (internal quotations omitted) (citing In re Hibbard Brown & Co., 217 B.R. 41, 45 (Bankr. S.D.N.Y. 1998)).

15.     Bankruptcy courts have relied upon Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 in granting debtors' requests for approval or assumption of plan and restructuring support agreements similar to the PSA currently before the Court. See, e.g., In re Residential Capital, LLC, Case No. 12-12020 (MG), 2013 WL 3286198, at *22 (Bankr. S.D.N.Y June 27, 2013) (memorandum and decision approving plan support agreement pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code); In re Chemtura Corp., Case No. 09-11233 (REG), Docket No. 3527 (Bankr. S.D.N.Y. Aug. 9, 2010) (order approving plan support agreement pursuant to, among other things, Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019); In re Intermet Corp., Case No. 08-11859 (KG), Docket No. 1066 (Bankr. S.D.N.Y. June 5, 2009) (order approving plan support agreement pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019).

16.     The Debtor submits that its entry into the PSA is supported by its sound business judgment and that the terms of the PSA are fair and reasonable and well within this Court's equitable powers to approve. The vast majority of the Debtor's unrestricted assets are subject to the first priority liens and security interests of the Consenting Creditors. Entering into the PSA will allow the Debtor to avoid needless litigation with most of its most significant stakeholders and reduce the time spent in chapter 11, streamlining these proceedings and reducing administrative costs for all creditors.[2] After diligently exploring all available options, the Debtor and the Debtor's CRO believe that the collaborative marketing and sales process proposed in the

---

[2] The PSA is not a solicitation of votes, which will occur only upon the Court's approval of a disclosure statement. The Debtor is not seeking the Court's approval of the Chapter 11 liquidating plan contemplated by the PSA at the hearing on the Motion. Nothing in the Motion precludes any party in interest from objecting to or being heard at a separate hearing to be held in connection with issues relating to the confirmation of the chapter 11 liquidating plan contemplated by the PSA.

PSA is the best means of maximizing the value of the Debtor's assets while avoiding undue delay and expense. The PSA provides for the Consenting Creditors' continued financial assistance in the form of debtor-in-possession financing and exit financing, to the extent necessary, to sustain the sale and plan process, which will preserve value for the benefit of not only the Debtor and the Consenting Creditors, but all parties in interest. The timelines set forth in the PSA are the result of good faith negotiation, and the Debtor believes they are fair and reasonable and designed to maximize the value of the Debtor's assets.

17.     For all of the foregoing reasons, the Debtor respectfully requests that the PSA and any actions required to effectuate the terms thereof be authorized and approved.

## MOTION PRACTICE

18.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this motion.  Moreover, in addition to all entities otherwise entitled to receive notice, the Debtor has given notice of this motion to all entities believed to have or be claiming an interest in the subject matter of the proposed order or who, it is believed, otherwise would be affected by the proposed order.  Accordingly, the Debtor submits that this motion satisfies Local Rule 9013-1.

## NOTICE

19.     As of the filing of this Motion, no trustee, examiner or creditors' committee has been appointed in this Chapter 11 Case.  Notice of this Motion will be given to (a) the United States Trustee; (b) the Debtor's material prepetition and post-petition secured creditors and any agent therefor; (c) the holders of the 20 largest unsecured claims; (d) the following taxing and regulatory authorities: (i) the United States Attorney for the Eastern District of New York, (ii) the Attorney General of the State of New York, (iii) the United States Department of Education, (iv) the New York State Department of Education, (v) the Internal Revenue Service, (vi) the

New York State Department of Taxation and Finance, and (vii) the Securities and Exchange Commission; and (e) all other parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtor submits that no other notice need be given.

**NO PRIOR REQUEST**

20.      No previous request for the relief sought herein has been made to this or any other Court.

**WHEREFORE,** the Debtor respectfully requests that the Court enter an order substantially in the form annexed hereto as Exhibit A granting the relief requested herein, and such other and further relief as may be just and proper.

Dated:   New York, New York
         November 29, 2016

**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**

By:   /s/ Sean C. Southard
      _____
      Sean C. Southard
      Stephanie R. Sweeney
      Lauren C. Kiss
      200 West 41st Street, 17th Floor
      New York, NY 10036
      Tel: (212) 972-3000
      Fax: (212) 972-2245
      Email: ssouthard@klestadt.com
             ssweeney@klestadt.com
             lkiss@klestadt.com

      *Proposed Attorneys to the Debtor and Debtor
      in Possession*

# **<u>Exhibit A</u>**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re                                                        :                    Chapter 11
                                                             :
DOWLING COLLEGE,                                             :                    Case No. 16-75545 (REG)
                                                             :
                                                             :
                                Debtor.                      :
---------------------------------------------------------------x

### ORDER PURSUANT TO 11 U.S.C. §§ 105, 363 AND FED R. BANKR. P. 9019 AUTHORIZING THE DEBTOR TO ENTER INTO AND PERFORM UNDER PLAN SUPPORT AGREEMENT

Upon the Motion (the "<u>Motion</u>")[1] of Dowling College (the "<u>Debtor</u>"), debtor and debtor-in-possession in the above-captioned chapter 11 case (the "<u>Chapter 11 Case</u>"), for entry of an Order pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules authorizing the Debtor to enter into and perform under the PSA with the Consenting Creditors, a copy of which is attached to the Motion as <u>Exhibit B</u>; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and this being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue of this proceeding and the Motion in this district being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that the relief requested in the Motion is fair and reasonable and in the best interests of the Debtor, its estate, its creditors, and other parties in interest; and due and proper notice of the Motion having been provided; and it appearing that no other or further notice need be given; and upon the record of the hearing held on the Motion (the "<u>Hearing</u>") and all proceedings heretofore had in this Chapter 11 Case; and any objections to the Motion having been withdrawn, resolved or overruled on the merits; and the Court having determined after due deliberation that the legal and factual bases set forth in the Motion and at the Hearing establish

---

[1] Terms capitalized but not defined herein have the meanings assigned to them in the Motion.

just cause for the relief requested in the Motion and granted herein; it is HEREBY ORDERED

THAT:

1. The Motion is granted as set forth herein.

2. The Debtor is authorized to enter into the PSA and to perform in accordance with its terms.

3. The PSA shall be binding and enforceable against each of the parties thereto in accordance with its terms.

4. Notwithstanding Bankruptcy Rule 6004(h), this Order shall be immediately effective and enforceable upon its entry.

5. The Debtor is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

6. This Court shall retain jurisdiction to enforce and interpret the terms of this Order.

# <u>Exhibit B</u>

# PLAN SUPPORT AGREEMENT

This PLAN SUPPORT AGREEMENT (this "Agreement") is made and entered into as of November 29, 2016 by and among Dowling College (the "College"), ACA Financial Guaranty Corporation ("ACA"), as the bond insurer for the Series 2006 Bonds (as defined below), and each of the undersigned holders of the Bonds (as defined below) (the "Holders" and, together with ACA, the "Consenting Creditors").  The College, each Consenting Creditor, and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred herein as the "Parties" and individually as a "Party."

# W H E R E A S

A.    Four series of bonds have been issued by or for the benefit of the College, from time to time, including: (a) the civic facility revenue refunding bonds issued in 1996 (the "Series 1996 Bonds") for the benefit of the College by the Suffolk County Industrial Development Agency ("SCIDA") pursuant to that certain Indenture of Trust (the "Series 1996 Indenture") dated as of June 1, 1996 between SCIDA and UMB Bank, National Association, as successor indenture trustee (the "Series 1996 Bond Trustee").  The Series 1996 Indenture and all other related documents evidencing and/or securing the Series 1996 Bonds and all other obligations under the Series 1996 Indenture and all related documents may be referred to herein as the "Series 1996 Bond Documents"; (b) the civic facility revenue bonds issued in 2002 (the "Series 2002 Bonds") for the benefit of the College by the Town of Brookhaven Industrial Development Agency ("BIDA") pursuant to that certain Indenture of Trust (the "Series 2002 Indenture") dated as of November 1, 2002 between BIDA and UMB Bank, National Association, as successor indenture trustee (the "Series 2002 Bond Trustee").  The Series 2002 Indenture and all other related documents evidencing and/or securing the Series 2002 Bonds and all other obligations under the Series 2002 Indenture and all related documents, including, but not limited to, that certain Conditional Funding Agreement (the "Series 2002/2015 Funding Agreement"), as amended, dated as of August 4, 2016 among the Debtor, the Series 2002 Bond Trustee and Series 2015 Bond Trustee (identified below) may be referred to herein as the "Series 2002 Bond Documents"; (c) the civic facility revenue refunding bonds issued in 2006 (the "Series 2006 Bonds") for the benefit of the College by SCIDA pursuant to that certain Indenture of Trust (the "Series 2006 Indenture") dated as of June 1, 2006 between SCIDA and Wilmington Trust National Association as successor indenture trustee (the "Series 2006 Bond Trustee").  The Series 2006 Indenture and all other related documents evidencing and/or securing the Series 2006 Bonds and all other obligations under the Series 2006 Indenture and all related documents, including, but not limited to, that certain Conditional Funding Agreement (the "Series 2006 Funding Agreement"), as amended, dated as of August 4, 2016 among the Debtor, the Series 2006 Bond Trustee and ACA may be referred to herein as the "Series 2006 Bond Documents"; and (d) the taxable revenue bonds issued by the College in 2015 (the "Series 2015 Bonds" and, collectively with the Series 1996 Bonds, Series 2002 Bonds and Series 2006 Bonds, the "Bonds") pursuant to that certain Indenture of Trust (the "Series 2015 Indenture") dated as of June 15, 2015 between the College and UMB Bank, National Association as indenture trustee (the "Series 2015 Bond Trustee").  The Series 2015 Indenture and all other related documents evidencing and/or securing the Series 2015 Bonds and all other obligations under the Series 2015 Indenture and all related documents, including, but not limited to, that certain Conditional Funding Agreement (the "Series 2002/2015 Funding Agreement"), as amended, dated as of

August 4, 2016 among the Debtor, the Series 2002 Bond Trustee and Series 2015 Bond Trustee may be referred to herein as the "Series 2015 Bond Documents" and together with the Series 1996 Bond Documents, Series 2002 Bond Documents and Series 2006 Bond Documents, the "Bond Documents";

B.      The Series 2006 Bonds are insured by ACA pursuant to Financial Guaranty Insurance Policy No. N10606-40 and, under the Series 2006 Bond Documents, ACA is entitled to control and direct the enforcement of all rights and remedies granted to holders of the Series 2006 Bonds or the Series 2006 Bond Trustee for the benefit of the holders of the Series 2006 Bonds;

C.      Each Holder holds debt arising out of or related to the Bonds, including, a majority in principal amount of the Series 1996 Bonds, 100 percent in principal amount of the Series 2002 Bonds, and 100 percent in principal amount of the Series 2015 Bonds.

D.      Defaults, potential defaults and events of default have occurred under the Bond Documents.

E.      Prior to the date hereof, representatives of the College and the Consenting Creditors, have engaged in arm's length, good faith negotiations regarding a liquidation of the College's assets.

F.      The College and the Consenting Creditors have agreed, solely on the terms and conditions set forth in the Term Sheet (as defined below) and this Agreement, to implement a liquidation of the College through a chapter 11 bankruptcy process (the "Liquidation").

G.      In the exercise of its business judgment and consistent with its fiduciary duties, the College has agreed, subject to Bankruptcy Court approval, to effect the Liquidation through the Plan (as defined below), which shall implement and otherwise be consistent with the terms and conditions set forth in the Term Sheet and this Agreement.

H.      Subject to the terms and conditions of the Term Sheet and this Agreement, the Consenting Creditors desire to support approval of the Disclosure Statement (as defined below) and confirmation of the Plan by the Bankruptcy Court (as defined below).

**NOW, THEREFORE,** in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Party, intending to be legally bound, hereby agrees as follows:

1.      Definitions.  The following terms shall have the following definitions:

"Ballot" means the ballot distributed with the Disclosure Statement for voting on the Plan.

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court having jurisdiction over the Chapter 11 Case.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"Chapter 11 Case" means the voluntary reorganization proceeding to be commenced by the College under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Claims" means all "claims" (as such term is defined in Section 101 of the Bankruptcy Code).

"Confirmation Order" means an order of the Bankruptcy Court confirming the Plan.

"Consenting Creditors" has the meaning set forth in the preamble hereof.

"Disclosure Statement" means the disclosure statement in respect of the Plan.

"Effective Date" means the effective date of the Plan.

"Liquidation Documents" has the meaning set forth in section 4 hereof.

"PSA Effective Date" has the meaning set forth in section 2 hereof.

"Outside Date" means the fifteenth (15th) Business Day following the date the Confirmation Order is entered by the Bankruptcy Court.

"Person" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group or any legal entity or association.

"Petition Date" means the date on which the College files a petition for relief under chapter 11 of the Bankruptcy Code.

"Plan" means a plan of liquidation for the College to be filed in the Chapter 11 Case on the terms and conditions set forth in the Term Sheet, as such plan may be amended, modified or otherwise supplemented from time to time; provided that any material modification that adversely impacts the treatment of a Consenting Creditor's Claims or collateral in any material respect shall require the prior written consent of such impacted Consenting Creditor.

"Term Sheet" means the term sheet attached hereto as Exhibit A, setting forth the material terms of the Liquidation.

"Termination Date" has the meaning set forth in section 9 hereof.

"Termination Event" has the meaning set forth in section 9 hereof.

"Transfer" has the meaning set forth in section 10 hereof.

"Transferee" has the meaning set forth in section 10 hereof.

2.    <u>PSA Effective Date</u>.  This Agreement shall be fully effective (the "<u>PSA Effective Date</u>") and bind each Consenting Creditor upon (a) the College's execution and delivery of this Agreement, (b) the execution and delivery of this Agreement by each Consenting Creditor, and (c) Bankruptcy Court approval.

3.    <u>Term Sheet</u>.  The Term Sheet is expressly incorporated herein and made part of this Agreement.  The general terms and conditions of the Liquidation are set forth in the Term Sheet (subject only to reasonable changes to reflect the occurrence of the Chapter 11 Case and the existence of the Plan); <u>provided</u>, <u>however</u>, that (a) the Term Sheet is supplemented by the terms and conditions of this Agreement, and (b) to the extent there is a conflict between the Term Sheet and this Agreement, the terms and provisions of this Agreement will govern.

4.    <u>Liquidation Documents</u>.  Promptly upon the PSA Effective Date, representatives of the College and the Consenting Creditors, together with their respective counsel, shall negotiate in good faith to prepare all definitive documentation (including, without limitation, the Disclosure Statement and the Plan) related to the Liquidation, all of which shall contain provisions consistent with the Term Sheet and this Agreement and such other provisions as are reasonably acceptable to the College and the Consenting Creditors (collectively, the "<u>Liquidation Documents</u>").

5.    <u>Commitment of the Consenting Creditors</u>.  Prior to the Termination Date and subject to the terms and conditions of this Agreement, each Consenting Creditor shall (severally and not jointly), subject to receipt by such Consenting Creditor of (i) a Disclosure Statement approved by the Bankruptcy Court that does not contain any information not previously known to the Consenting Creditor that would materially and adversely impact the feasibility of the Plan and (ii) a Plan consistent with this Agreement:

(a)    timely vote or cause to be voted all Claims of such Consenting Creditor, in favor of the Plan in accordance with the applicable procedures set forth in the Disclosure Statement and accompanying solicitation materials, and timely return a duly-executed Ballot in connection therewith;

(b)    not object (or support, directly or indirectly, any other Person in its objection) to confirmation of the Plan or object to, or otherwise commence (or encourage or support, directly or indirectly, any other Person in commencing) any proceeding to oppose or alter the Plan or support an alternative liquidation or restructuring;

(c)    not withdraw, change or revoke its vote (or cause its vote to be withdrawn, changed or revoked) with respect to the Plan, except as otherwise permitted herein; and

(d)    except as otherwise permitted herein, not take any other action, including, without limitation, initiating or joining any legal proceeding, that is inconsistent with, or that would materially prevent, hinder or delay the consummation of, the Plan and the Liquidation, including but not limited to, (i) solicitation, support, prosecution, encouragement or response in the affirmative to any plan of reorganization, sale,

proposal or offer of dissolution, winding up, liquidation, reorganization, merger or restructuring of the College or any of its subsidiaries or affiliates, or any other transaction, in each case, that is inconsistent with the Plan and the Liquidation or (ii) negotiation, entering into, consummation or otherwise participating in any such transaction.

Notwithstanding the foregoing, nothing in this Agreement shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Case so long as such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and the Liquidation and are not for the purpose of materially hindering, delaying or preventing the consummation of the Plan and the Liquidation. Each Consenting Creditor agrees that to the extent necessary it will, as applicable, direct the Series 1996 Bond Trustee, Series 2002 Bond Trustee, Series 2006 Bond Trustee and Series 2015 Bond Trustee to take actions consistent with this Agreement.

6.    <u>Commitment of the College</u>.    The College agrees, consistent with applicable fiduciary duties, to (a) support and complete the Liquidation and all transactions contemplated by the Term Sheet and this Agreement; (b) take any and all necessary and appropriate actions in furtherance of the Liquidation; (c) complete the Liquidation and all transactions contemplated by the Term Sheet and within the timeframes outlined therein; (d) take all commercially reasonable steps to obtain any and all requisite regulatory or third party approvals necessary to consummate the Liquidation; (e) take all reasonable steps to obtain Bankruptcy Court approval of debtor in possession financing, adequate protection terms, and sale procedures for assets of the College in form and substance satisfactory to the Consenting Creditors (the "<u>Bankruptcy Documents</u>"); (f) not directly or indirectly seek, solicit, support, consent to, or participate in the negotiation or formulation of (i) any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, or restructuring other than the Plan, (ii) any disposition outside of the Plan of all or any substantial portion of the assets of the College or (iii) any other action that is inconsistent with the Term Sheet and this Agreement, or that would delay or obstruct the proposed solicitation, confirmation, or consummation of, the Plan; (g) not incur any indebtedness with priority over the Bonds except with the prior written agreement of the Consenting Creditors; and (h) take no action that would result in the entry of an order terminating, whether in whole or in part, the College's exclusive right to file a chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code.

7.    <u>Certain Other Chapter 11 Matters</u>.    The College shall use reasonable best efforts to provide draft copies of all documents and pleadings the College intends to file with the Bankruptcy Court to counsel for Consenting Creditors at least five (5) Business Days before the date when the College intends to file such document or pleading and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court.    The College hereby agrees that all such motions, applications, other documents and pleadings shall be reasonably calculated to implement and advance the Plan and Liquidation.

8.    <u>Termination</u>.

(a)    This Agreement shall terminate automatically without any further required action or notice, unless the occurrence thereof is waived in writing by each of the Consenting Creditors, if:

(i)    the PSA Effective Date does not occur on or before the later to occur of (x) December 30, 2016, and (y) such other date as may be agreed to in writing by the Consenting Creditors;

(ii)    the College is in material breach of any of its obligations under this Agreement, including any of the College's commitments set forth in sections 6 or 7 above, or any other agreement governing the Liquidation to which the College and any Consenting Creditor are parties, and any such breach by the College is either not curable or, if curable, is not cured by the later of (A) five (5) Business Days after receipt of written notice from a Consenting Creditor specifying the nature of such breach or (B) the expiration of the cure period under the applicable agreement;

(iii)    Any of the Bankruptcy Documents is withdrawn or materially modified (except in the case of a document which is an interim order, by replacement with a final order that would otherwise meet the requirements of a Bankruptcy Document);

(iv)    the Bankruptcy Court grants relief that is materially adverse to the Consenting Creditors' interests or otherwise is materially inconsistent with this Agreement or the Plan, in each case, as determined by the Consenting Creditors;

(v)    the College fails to commence the Chapter 11 Case on or before November 28, 2016;

(vi)    the College fails to file the Plan and the Disclosure Statement on or before January 16, 2016;

(vii)    the College moves (1) to voluntarily dismiss the Chapter 11 Case, (2) for conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (3) for appointment of a trustee or an examiner with expanded powers pursuant to Section 1104 of the Bankruptcy Code in the Chapter 11 Case;

(viii)    a trustee or an examiner with expanded powers is appointed in the Chapter 11 Case or the Chapter 11 Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(ix)    The College files or supports any pleading in the Bankruptcy Court or other court seeking to disallow, subordinate or limit in any way the rights and/or Claims of the Consenting Creditors or any associated indenture trustee under the Bonds or Bond Documents;

(x)    the Effective Date has not occurred before the Outside Date; or

(xi)     the Plan is amended, modified or otherwise supplemented without the prior written consent of each Consenting Creditor, in a manner that requires the prior written consent of the Consenting Creditors under the definition of Plan;

(b)     This Agreement shall terminate automatically without any further required action or notice, unless the occurrence thereof is waived in writing by the College and each of the Consenting Creditors, if:

(i)     the Disclosure Statement shall have not been approved by the Bankruptcy Court on or before March 6, 2017; or

(ii)     the Confirmation Order shall have not been entered by the Bankruptcy Court on or before April 24, 2017.

(c)     This Agreement shall terminate automatically without any further required action or notice, unless the occurrence thereof is waived in writing by the College, if any Consenting Creditor is in material breach of any of its obligations under this Agreement, including any of the commitments set forth in section 5 above, or any other agreement governing the Liquidation to which any Consenting Creditor and the College are parties and (i) as a result of such breach the Plan cannot be confirmed, and (ii) any such breach (as a result of which the Plan cannot be confirmed) by such Consenting Creditor is either not curable or, if curable, is not cured by the later of (A) five (5) Business Days after receipt of written notice from the College or (B) the expiration of the cure period under the applicable agreement.

(d)     This Agreement shall terminate automatically without any further required action or notice, if:

(i)     any court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing, or prohibiting the Liquidation in a way that cannot reasonably be remedied by the College or the Consenting Creditors; or

(ii)     a court of competent jurisdiction shall have issued an order denying confirmation of the Plan.

The occurrence of a termination in accordance with the foregoing provisions shall be referred to as a "Termination Event" and the date on which the Termination Event occurs shall be referred to as the "Termination Date."  The giving of any notice or any act of termination by any Party pursuant to this Agreement shall not be a violation of the automatic stay of Section 362 of the Bankruptcy Code; provided, however, that nothing herein shall prejudice any Party's rights to argue that the termination was not proper under the terms of this Agreement.  Notwithstanding anything to the contrary contained in this section 8, if a date of determination or deadline set forth in this Agreement (including, this section 8 and in the defined terms used in this section 8) falls or ends on a date that is not a Business Day, then, such date of determination or deadline shall be extended to the next succeeding Business Day.

9.     <u>Transfer of Claims</u>.  If, following execution of this Agreement by a Consenting Creditor and prior to the Termination Date, such Consenting Creditor sells, gives, assigns, transfers or disposes of all or any portion of any Claims held by such Consenting Creditor (any of the foregoing, a "<u>Transfer</u>") to any Person (each such Person, a "<u>Transferee</u>"), the Transferee must, as a condition precedent to such Transfer execute a joinder agreement satisfactory, in form and substance, to the College and the other Consenting Creditors, in which the Transferee shall undertake to be bound by the terms of this Agreement and any applicable Liquidation Documents.  Any Transfer that is made in violation of the immediately preceding sentence shall be null and void *ab initio*.

10.     <u>Acquisition of Additional Claims</u>.  This Agreement does not restrict any Consenting Creditor from acquiring any additional Claims; <u>provided</u>, <u>however</u>, that any acquired Claims shall automatically be deemed to be subject to the terms of this Agreement.

11.     <u>Entire Agreement</u>.  This Agreement, the Term Sheet, and the documents and agreements contemplated hereby and thereby, including the exhibits, schedules and annexes hereto and thereto, constitute the entire agreement of the Parties with respect to the subject matter thereof, and supersedes all other prior negotiations, agreements and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

12.     <u>No Waiver</u>.  Nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, and the Parties expressly reserve any and all of their respective rights. Pursuant to Federal Rule of Evidence 408, state law equivalents and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

13.     <u>Reservation of Rights</u>.  This Agreement and the Liquidation are part of a proposed compromise and settlement of the Claims by and among the College and the Consenting Creditors.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Parties hereto to protect and preserve their rights, remedies and interests.  Except as expressly set forth herein, nothing herein shall be deemed an admission of any kind.  If the transactions contemplated herein are not consummated, or if this Agreement is terminated for any reason, the Parties hereto fully reserve any and all of their rights, pursuant to Federal Rule of Evidence 408 and any applicable state rules.  From and after the occurrence of the Termination Date, nothing herein shall be deemed to prohibit any Consenting Creditor from, subject to the terms of the Bond Documents, exercising any right or remedy for the enforcement, collection or recovery of any Claims against the College.

14.     <u>Representations and Warranties of all Parties</u>.  Each Party represents to each other Party that, as of the date of this Agreement, (a) such Party is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its organization, and has all requisite corporate, partnership or limited liability company power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement; (b) the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate or other action on its part; (c) the execution, delivery and performance of this

Agreement by such Party do not and shall not (i) violate any provision of law, rule or regulation applicable to it or any of its subsidiaries or its certificate of incorporation, bylaws or other organizational documents or those of any of its subsidiaries or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party or under its certificate of incorporation, by-laws or other organizational documents; and (d) such Party (i) is a sophisticated Person with respect to the matters set forth in this Agreement; (ii) has adequate information to make an informed decision to enter into this Agreement; and (iii) has independently and without reliance upon any other Party, and based on such information as such Party has deemed appropriate, made its own analysis and decision to enter into this Agreement.

15.　　Additional Representations and Warranties of College.　The College represents to each of the Consenting Creditors that, as of the date of this Agreement and to the best actual knowledge of the College, after reasonable diligence, the written information provided by the College to the Consenting Creditors in connection with the Liquidation did not, when provided, contain any untrue statement of a material fact nor did it fail to state any fact necessary in order to make such information not materially misleading.

16.　　No Solicitation.　Notwithstanding any other provisions of this Agreement, nothing in this Agreement is intended to be or constitute, and nothing in this Agreement shall be deemed to be or constitute, a solicitation of any vote for any plan of reorganization.

17.　　Counterparts.　This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

18.　　Amendments.　Except as otherwise provided herein, this Agreement may not be modified, amended or supplemented without prior written consent of the College and the Consenting Creditors.

19.　　Headings.　The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof.

20.　　Relationship Among Parties.　Notwithstanding anything herein to the contrary, the duties and obligations of the Parties under this Agreement shall be several, not joint.　It is understood and agreed that no Consenting Creditor has any fiduciary duty or other duty of trust or confidence in any form with any other Consenting Creditor or the College, and, except as provided in this Agreement and the Bond Documents, there are no commitments among or between them.　No prior history, pattern or practice of sharing confidences among or between the Consenting Creditors or a Consenting Creditor and the College shall in any way affect or negate this understanding and agreement.

21.　　Specific Performance.　It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including, without limitation, an order of the

Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

22.    <u>Governing Law</u>.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in the federal and state courts located in the County of New York, State of New York, and by execution and delivery of this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding.  Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Case is commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

23.    <u>WAIVER OF JURY TRIAL</u>.    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

24.    <u>Severability</u>.    If any provision of this Agreement is found by any court of competent jurisdiction to be invalid or unenforceable, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the fullest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Agreement so long as this Agreement as so modified continues to express, without material change, the original intentions of the Parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the Parties or the practical realization of the benefits that would otherwise be conferred upon the Parties.  The Parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

25.    <u>Notices</u>.    All notices, requests and other communications hereunder must be in writing and will be deemed to have been duly given only if delivered personally, by internationally recognized overnight courier service, by facsimile transmission, or by registered or certified mail (postage prepaid, return receipt requested) to the Parties at the following addresses or facsimile numbers:

If to the College:

Dowling College
c/o Robert S. Rosenfeld
RSR CONSULTING, LLC

1330 Avenue of the Americas, Suite 23A
New York, NY  10019
Tel:   516-308-3505
Fax:  212-658-0347
E-mail:  rsrosenfeld@rsrconsultingllc.com

with a copy to:

Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, NY 10036-7203
Attention:  Sean C. Southard
Telephone:  (212) 679-5320
Facsimile:  (212) 972-2245
E-mail:  ssouthard@klestadt.com

If to the Holders to:

UMB Bank, National Association
Attn: Laura Roberson, Senior Vice President 2 South Broadway, Suite 600
St. Louis, Missouri 63102
Telephone: 314-612-8484
E-mail: laura.roberson@umb.com

with a copy to:

Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111
Attention:  P. Miyoko Sato
Telephone:  (617) 348-1896
Facsimile:  (617) 542-2241
E-mail:  MSato@mintz.com

If to ACA:

ACA Financial Guaranty Corp
555 Theodore Fremd- Suite C-205
Rye, NY 10580
Attention:  Maria Cheng
Telephone:  (212) 375-2470
E-mail:  mcheng@aca.com

with a copy to:

Schulte Roth & Zabel LLP
919 Third Avenue

New York, NY  10022
Attention:  Brian D. Pfeiffer
Telephone:  (212) 756-2175
Facsimile:  (212) 593-5955
E-mail:  brian.pfeiffer@srz.com

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by facsimile shall be effective upon oral or machine confirmation of transmission.

26.     <u>Remedies Cumulative</u>.  All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such Party.

27.     <u>No Third-Party Beneficiaries</u>.  The terms and provisions of this Agreement are intended solely for the benefit of the Parties hereto and their respective successors and permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights upon any other Person.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed under seal as of the date first above written.

**DOWLING COLLEGE**

BY: _____

NAME: _ROBERT S. ROSENFELD_

TITLE: _CHIEF RESTRUCTURING OFFICER_

**ACA FINANCIAL GUARANTY CORPORATION, AS BOND INSURER FOR THE SERIES 2006 BONDS**

BY:_____

NAME: _____

TITLE: _____

**OPPENHEIMER ROCHESTER LIMITED TERM NEW YORK MUNICIPAL FUND, AS HOLDER OF CERTAIN SERIES 1996 AND SERIES 2015 BONDS**

BY:_____

NAME: _____

TITLE: _____

**OPPENHEIMER ROCHESTER SHORT TERM MUNICIPAL FUND, AS HOLDER OF CERTAIN SERIES 1996 BONDS**

BY:_____

NAME: _____

TITLE: _____

**OPPENHEIMER ROCHESTER AMT-FREE NEW YORK MUNICIPAL FUND, AS HOLDER OF CERTAIN SERIES 1996 BONDS, SERIES 2002 AND SERIES 2015 BONDS**

BY:_____

NAME: _____

TITLE: _____

13

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed under seal as of the date first above written.

**DOWLING COLLEGE**

By:_____

Name: _____

Title: _____

**ACA FINANCIAL GUARANTY CORPORATION, AS BOND INSURER FOR THE SERIES 2006 BONDS**

By:_____

Name: _Maria Cheng_____

Title: _Managing Director_____

**OPPENHEIMER ROCHESTER SHORT TERM MUNICIPAL FUND, AS HOLDER OF CERTAIN SERIES 1996 BONDS**

By:_____

Name: _____

Title: _____

**OPPENHEIMER ROCHESTER LIMITED TERM NEW YORK MUNICIPAL FUND, AS HOLDER OF CERTAIN SERIES 1996 AND SERIES 2015 BONDS**

By:_____

Name: _____

Title: _____

**OPPENHEIMER ROCHESTER AMT-FREE NEW YORK MUNICIPAL FUND, AS HOLDER OF CERTAIN SERIES 1996 BONDS, SERIES 2002 AND SERIES 2015 BONDS**

By:_____

Name: _____

Title: _____

13

**IN WITNESS WHEREOF,** the Parties hereto have caused this Agreement to be executed under seal as of the date first above written.

**DOWLING COLLEGE**

BY: _____

NAME: _____

TITLE: _____

**ACA FINANCIAL GUARANTY CORPORATION, AS BOND INSURER FOR THE SERIES 2006 BONDS**

BY: _____

NAME: _____

TITLE: _____

**OPPENHEIMER ROCHESTER LIMITED TERM NEW YORK MUNICIPAL FUND, AS HOLDER OF CERTAIN SERIES 1996 AND SERIES 2015 BONDS**

BY: _____

NAME: RICHARD STEIN

TITLE: VICE PRESIDENT

**OPPENHEIMER ROCHESTER SHORT TERM MUNICIPAL FUND, AS HOLDER OF CERTAIN SERIES 1996 BONDS**

BY: _____

NAME: RICHARD STEIN

TITLE: VICE PRESIDENT

**OPPENHEIMER ROCHESTER AMT-FREE NEW YORK MUNICIPAL FUND, AS HOLDER OF CERTAIN SERIES 1996 BONDS, SERIES 2002 AND SERIES 2015 BONDS**

BY: _____

NAME: RICHARD STEIN

TITLE: VICE PRESIDENT

DOC ID - 25088534.4

# Exhibit A

# DOWLING COLLEGE

## OUTLINE OF TERMS AND CONDITIONS
## FOR PROPOSED PLAN OF LIQUIDATION AND RELATED PLAN PROCESS
*For Discussion Purposes Only*[1]

### November 29, 2016

This term sheet (the "<u>Plan Term Sheet</u>")[2] sets forth the principal terms of a proposed plan of liquidation of Dowling College ("<u>Dowling</u>" or the "<u>Debtor</u>") and related process involving (i) the obligations under the Series 1996 Bonds, (ii) the obligations under the Series 2002 Bonds, (iii) the obligations under the Series 2006 Bonds, (iv) the obligations under those certain Series 2015 Bonds, and (v) Dowling's other obligations. The proposed liquidation described herein would be implemented by means of a plan of liquidation for Dowling with the attributes reflected below (the "<u>Plan</u>") under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and funded through a debtor-in-possession facility (the "<u>DIP Facility</u>") to be provided by the DIP Lenders in accordance with the DIP Financing Agreement attached as <u>Exhibit A</u>.  The transactions described in this Plan Term Sheet are subject in all respects to, among other things, execution of a liquidation plan support agreement (the "<u>Liquidation Plan Support Agreement</u>") by Dowling and the consenting creditors under the Prepetition Financing Documents (the "<u>Consenting Creditors</u>"), filing of the chapter 11 case by Dowling (the "<u>Chapter 11 Case</u>"), preparation of a disclosure statement (the "<u>Disclosure Statement</u>") and the Plan, and the approval and confirmation of the same by the Bankruptcy Court.

| Bankruptcy Filing Date | No later than November 29, 2016. |
|---|---|
| Debtor | Dowling College. |
| Chief Restructuring Officer | The Debtor shall retain and shall, prior to the Effective Date, maintain a Chief Restructuring Officer acceptable to the Consenting Creditors.  The retention terms for any Chief Restructuring Officer shall be acceptable to the Consenting Creditors.  Prior to the Petition Date, the Debtor retained Robert S. Rosenfeld of RSR Consulting, LLC to perform the functions and hold the title of Chief Restructuring Officer. |

---

[1] This Plan Term Sheet does not contain all of the terms, conditions, and other provisions of the Plan or related Plan process and the transactions contemplated in this Plan Term Sheet are subject to conditions to be set forth in definitive documents.  This Plan Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions and is therefore entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any other rule of similar import.  This Plan Term Sheet is not an offer or solicitation of votes for or against any chapter 11 plan, and is being presented for discussion and settlement purposes only.

[2] Capitalized terms have the meaning given to them herein of in the List of Defined Terms, attached hereto as <u>Schedule 1</u>.

| | |
|---|---|
| Plan of Liquidation | As soon as practicable after the Petition Date and no later than January 16, 2016, the Debtor will file the Plan and Disclosure Statement and use its best efforts to seek (i) approval of the Disclosure Statement as containing adequate information and (ii) confirmation of the Plan.<br><br>The Debtor will work with the Consenting Creditors to prepare a Plan, Disclosure Statement and related documents (collectively the "Plan Documents") consistent with this Plan Term Sheet and Liquidation Plan Support Agreement and otherwise in form and substance acceptable to the Consenting Creditors.  The Plan Documents will not be amended without the Consenting Creditors' prior written consent. |
| DIP Financing and Use of Cash Collateral | On the Petition Date, the Debtor shall seek approval of a debtor-in-possession financing facility (the "DIP Facility") to be provided by the Consenting Creditors in accordance with the DIP Financing Agreement.<br><br>The Consenting Creditors will consent to the use of cash collateral on the terms and conditions set forth in the Interim DIP Order, attached hereto as Exhibit B. |
| Exit Financing | Prior to the Effective Date, the Debtor and the DIP Lenders will negotiate in good faith the terms of a financing facility (the "Exit Facility"), to the extent necessary, in order to finance the Debtor's liquidation efforts from the Effective Date through Dissolution (as defined below).<br><br>For purposes of clarity, the decision regarding whether to agree to borrow or lend under any potential Exit Facility shall be in the sole discretion of the Debtor and the DIP Lenders, as applicable, and nothing herein shall be construed to create any obligation to borrow or lend, or to enter into an Exit Facility. |
| Treatment of Claims under the Plan | Administrative Claims – paid in full, in cash on the Effective Date.<br><br>U.S. Trustee Fees – paid in full, in cash, on the Effective Date.<br><br>DIP Facility Claims – paid in full, in cash on the Effective Date in a manner consistent with the DIP Financing Agreement.<br><br>Series 1996 Secured Party Claims - will receive (i) Series 1996 Collateral that is cash, (ii) cash proceeds of the sale, use or other disposition of Series 1996 |

Collateral and (iii) a Deficiency Claim for the remaining balance, if any. The Plan will provide that the claim of the Series 1996 Bond Trustee is allowed in the amount of $3,115,000 plus accrued and unpaid interest, fees and all other amounts outstanding under the Series 1996 Bond Documents subject to Sections 506(a) and (b) of the Bankruptcy Code.

Series 2002 Secured Party Claims – will receive (i) Series 2002 Collateral that is cash, (ii) cash proceeds of the sale, use or other disposition of Series 2002 Collateral and (iii) a Deficiency Claim for the remaining balance, if any. The Plan will provide that the claim of the Series 2002 Bond Trustee is allowed in the amount of $8,755,000 plus accrued and unpaid interest, fees and all other amounts outstanding under the Series 2002 Bond Documents, subject to Sections 506(a) and (b) of the Bankruptcy Code.

Series 2006 Secured Party Claims – will receive (i) Series 2006 Collateral that is cash, (ii) cash proceeds of the sale, use or other disposition of the Series 2006 Collateral, including without limitation, the Oakdale Campus, the Brookhaven Campus, and, to the extent that the Series 2002 Bonds have been paid in full, the Brookhaven Dorm and (iii) a Deficiency Claim for the remaining balance, if any. The Plan will provide that the claim of the Series 2006 Bond Trustee or ACA is allowed in the amount of $34,632,736.89 plus accrued and unpaid interest, fees and all other amounts outstanding under the Series 2006 Bond Documents, subject to Sections 506(a) and (b) of the Bankruptcy Code.

Series 2015 Secured Party Claims – will receive (i) Series 2015 Collateral that is cash, (ii) cash proceeds of the sale, use or other disposition of the Series 2015 Collateral, including without limitation, the Residential Portfolio and (iii) a Deficiency Claim for the remaining balance, if any. The Plan will provide that the claim of the Series 2015 Bond Trustee is allowed in the amount of $6,700,000 plus accrued and unpaid interest, fees and all other amounts outstanding under the Series 2015 Bond Documents, subject to Sections 506(a) and (b) of the Bankruptcy Code.

Other Secured Claims – paid with the proceeds from the sale of the relevant collateral with priority as set by

3

| | |
|---|---|
| | applicable non-bankruptcy law. |
| | Priority Unsecured Claims – except to the extent any holder of an allowed claim entitled to priority under Section 507 of the Bankruptcy Code agrees to different treatment, each holder of an allowed claim entitled to priority treatment under Section 507 of the Bankruptcy Code will receive treatment specified in Section 1129(a)(9) of the Bankruptcy Code. |
| | General Unsecured Claims – after the creditors holding priority unsecured claims are paid in full, creditors holding general unsecured claims, including the Deficiency Claims, will receive proceeds from the sale of any of the Debtor's unencumbered assets and any remaining proceeds from the sale, use or other disposition of collateral after satisfaction of the relevant secured creditor claims. |
| Sale Process | **On the Petition Date:** |
| | On the Petition Date, the Debtor will file with the Bankruptcy Court applications to retain: |
| | A&G Realty Partners, LLC and Madison Hawk Partners, LLC, on terms acceptable to ACA to market the Oakdale Campus and the Brookhaven Campus (the "Campus Agents"); |
| | CBRE, Inc. on terms acceptable to the holders of the Series 2002 Bonds to market the Brookhaven Dorm (the "Dorm Agent"); and |
| | Douglas Elliman, on terms acceptable to the holders of the Series 2015 Bonds to market the Residential Portfolio (the "Residential Agent"). |
| | On or after the Petition Date, the Debtor will also retain additional real estate agents and brokers, on terms acceptable to the Consenting Creditors, to market the Debtor's other assets (the "General Agent" and together with the Campus Agents, the Dorm Agent and the Residential Agent, collectively, the "Agents" and, each, an "Agent"). |
| | **During the Chapter 11 Case:** |
| | During the pendency of the Chapter 11 Case, the Debtor will work with the Campus Agents and ACA to develop a procedure for the marketing and sale of the Oakdale Campus with such sale procedure concluding in the entry of an order by the Bankruptcy Court approving the |

sale of the Oakdale Campus no later than March 10, 2017.

The Debtor will work with the Campus Agents and ACA to develop appropriate procedures and timelines for the sale of the Brookhaven Campus other than the Brookhaven Dorm, including, without limitation, the retention of appropriate professionals needed to review and assist the Debtor with respect to any and all zoning and title actions to prepare the Brookhaven Campus for sale.

The Debtor will work with the Dorm Agent and holder of the Series 2002 Bonds to develop appropriate procedures and timelines for the sale of the Brookhaven Dorm, including, without limitation, the retention of appropriate professionals needed to review and assist the Debtor with respect to any and all zoning and title actions to prepare the Brookhaven Dorm for sale.

The Debtor will work with the Residential Agent and holders of the Series 2015 Bonds to develop appropriate procedures and timelines for the sale of the Residential Portfolio, including requests for emergency or expedited relief to consummate the sale of any parcel in the Residential Portfolio that is under contract for sale as of the Petition Date.

Any sale procedures proposed in the Chapter 11 Case and/or the Plan will provide that any Consenting Creditor (or, as applicable, any related indenture trustee) may, in its sole discretion, credit bid for the purchase of its collateral to the full amount and extent of its claim.

The Debtor will work with the General Agent to evaluate the Debtor's assets other than the Oakdale Campus, the Brookhaven Campus, the Brookhaven Dorm and the Residential Portfolio and to determine the appropriate procedures and timelines for the sale of such assets.

| On and after the Effective Date of the Plan: |
|---|

To the extent that there are assets of the Debtor that remain unsold as of the Effective Date, the Debtor will retain, subject to the Consenting Creditors' consent, a restructuring or liquidation professional to oversee the implementation of the Plan and the sale process post-Effective Date (the "<u>Liquidation Administrator</u>").

The Plan will set forth a general process for marketing

|  | of the Debtor's remaining assets post-Effective Date on timelines as determined by the Liquidation Administrator, in consultation with the relevant Agents and Consenting Creditors, designed to maximize the return on the assets (the "Marketing Process"). The Liquidation Administrator will conduct a separate Marketing Process for each of the Debtor's remaining real property assets on terms acceptable to the applicable Consenting Creditors unless, in the reasonable judgment of the Liquidation Administrator, in consultation with the relevant Agents and subject to the consent of the relevant Consenting Creditors, it is determined that a combined Marketing Process for certain real property assets would yield a better outcome. The Liquidation Administrator may pursue any Marketing Process for the Debtor's non-real estate assets that, in the Plan Administrator's reasonable judgment, is expected to provide the best return in a cost-efficient manner, including, but not limited to, the retention of a reputable liquidation firm. |
|  | If acceptable to the applicable Consenting Creditors, the Marketing Process may include one or more stalking horse bidders, auction procedures, and sales of assets free and clear of all liens, claims and encumbrances. |
|  | To the extent that assets of the Debtor other than the Oakdale Campus, the Brookhaven Campus, the Brookhaven Dorm and the Residential Portfolio remain unsold as of the Effective Date, the Liquidation Administrator will pursue appropriate procedures and timelines for the sale of such assets, including, for example, under *de minimis* assets sale procedures as approved by the Bankruptcy Court. |
| Milestones | The following milestones (the "Plan Milestones") shall take place no later than the date indicated: |

| Milestone | Specified Deadline |
|---|---|
| Petition Date | November 29, 2016 |
| Entry by the Bankruptcy Court of the Interim DIP Order | December 1, 2016 |
| Filing of motion to approve sale procedures | November 29, 2016 |

| | | |
|---|---|---|
| | for the Oakdale Campus | |
| | Filing of motion to approve sale procedures for the Residential Portfolio | November 29, 2016 |
| | Entry by the Bankruptcy Court of an order approving the sale procedures for the Oakdale Campus | December 13, 2016 |
| | Entry by the Bankruptcy Court of an order approving the sale procedures for the Residential Portfolio | December 13, 2016 |
| | Entry by the Bankruptcy Court of the Final DIP Order | December 30, 2016 |
| | Filing by the Debtor of the proposed Liquidation Plan and Disclosure Statement | January 16, 2017 |
| | Entry of the Bankruptcy Court of an order approving the Disclosure Statement | March 6, 2017 |
| | Entry by the Bankruptcy Court of an order approving the sale of the Oakdale Campus | April 10, 2017 |
| | Entry by the Bankruptcy Court of an order confirming the Liquidation Plan | April 24, 2017 |
| | Effective Date | May 8, 2017 |
| Liquidation Plan Support Agreement | Prior to the Petition Date, the Consenting Creditors and the Debtor shall enter into a plan support agreement agreeing to support the Plan contemplated by this Plan Term Sheet. | |

| | |
|---|---|
| Releases and Exculpation | The Plan shall include customary release and exculpation provisions, including, without limitation with respect to the current and former officers and trustees of the Debtor, the Debtor, and the Consenting Creditors (and any related indenture trustee), and their respective employees, agents and professionals (collectively, the "Released Parties"). |
| | In addition, the Plan will provide for third party releases of the Released Parties to the greatest extent permitted under applicable law, and each of the Released Parties will agree to such releases with respect to the other Released Parties. |
| Dissolution | As soon as practical after the sale or abandonment of all of the assets of the Debtor, the Liquidation Administrator will take all such acts as necessary to dissolve the Debtor (the "Dissolution"). |
| Amendments and Waivers | Any amendments or waivers to the terms and conditions hereof, including, but not limited to, the dates of Plan Milestones, shall be subject to the prior written consent of the Debtor and each of the Consenting Creditors; provided, however that if such amendment or waiver affects only the collateral securing the interests of a particular Consenting Creditor such amendment or waiver shall be subject only to the written prior consent of the Debtor and such Consenting Creditor. |
| No Waiver | Nothing herein shall affect in any way, nor be deemed a waiver of, any of the rights of the Consenting Creditors under the Series 1996 Bond Documents, Series 2002 Bond Documents, Series 2006 Bond Documents, Series 2015 Bond Documents or under applicable law. Nothing herein is intended to waive, limit, or restrict the ability of any of the foregoing parties, in whatever capacity, to protect and preserve their rights, remedies against, and interests in the Debtor or any third party. |
| Other Terms | The Debtor shall commence the Chapter 11 Case in the Bankruptcy Court for the Eastern District of New York. |
| | This Plan Term Sheet, the DIP Financing Agreement, all motions and proposed orders filed by the Debtor in the Chapter 11 Case and all other definitive documents and agreements related to the transactions described herein shall be in form and substance acceptable to the Consenting Creditors and governed by the laws of the State of New York (except as governed by the |

| | Bankruptcy Code). |
| | The Debtor shall not incur and additional indebtedness for borrowed funds without the prior written consent of the Consenting Creditors. |

## SCHEDULE 1

### List of Defined Terms

"ACA" means ACA Financial Guaranty Corporation.

"Administrative Claims" means all allowed claims given administrative priority under the Bankruptcy Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of New York.

"BIDA" means the Town of Brookhaven Industrial Development Agency.

"Brookhaven Campus" means the Debtor's real property an improvements located in the Town of Brookhaven, New York, as more fully described in the Series 2006 Bond Documents, which forms part of the Series 2006 Collateral; provided that the Brookhaven Campus does not, for definitional purposes, include the Brookhaven Dorm.

"Brookhaven Dorm" means that certain dormitory building of the Debtor's located in the Town of Brookhaven, New York, as more fully described in the Series 2002 Bond Documents, which forms part of the Series 2002 Collateral.

"Deficiency Claims" means the general unsecured claims of any Secured Party to the extent that such Secured Party is not paid in full with the proceeds of the sale of its collateral.

"DIP Budget" shall have the meaning ascribed to it in the DIP Financing Agreement.

"DIP Facility Claims" means the claims of the DIP Lenders against the Debtor arising under the DIP Facility.

"DIP Financing Agreement" means that certain agreement setting forth the terms and conditions of the debtor-in-possession financing as attached to the Plan Term Sheet as Exhibit A.

"DIP Lenders" mean ACA, UMB Bank, National Association, as indenture trustee under the Series 2002 Bond Documents, UMB Bank, National Association, as indenture trustee under the Series 2015 Bond Documents, and any other parties then action as DIP Lender from time to time under the DIP Financing Agreement.

"Effective Date" means the effective date of the Plan as approved by the Bankruptcy Court.

"Final DIP Order" means an order of the Bankruptcy Court authorizing and approving the DIP Financing Agreement on a final basis, which order shall be (i) substantially in the form of the Interim DIP Order with customary amendments consistent with approval on a final basis, (ii) consistent with the terms of this Plan Term Sheet and the DIP Financing Agreement, and (iii)

10

shall otherwise be in form and substance acceptable to the DIP Lenders in their sole and absolute discretion.

"<u>Interim DIP Order</u>" means the order of the Bankruptcy Court substantially in the form attached hereto as <u>Exhibit B</u> approving the DIP Facility on an interim basis.

"<u>Oakdale Campus</u>" means the Debtor's real property an improvements located in the hamlet of Oakdale, New York, as more fully described in the Series 2006 Bond Documents, which forms part of the Series 2006 Collateral.

"<u>Petition Date</u>" means the date on which the Debtor commences the Chapter 11 Case in the Bankruptcy Court.

"<u>Prepetition Financing Documents</u>" means the Series 1996 Bond Documents, the Series 2002 Bond Documents, the Series 2006 Bond Documents, and the Series 2015 Bond Documents.

"<u>Residential Portfolio</u>" means the certain of the Debtor's real property and improvements as more fully described in the Series 2015 Bond Documents, which form part of the Series 2015 Collateral.

"<u>SCIDA</u>" means the Suffolk County Industrial Development Agency.

"<u>Consenting Creditors</u>" mean the Series 1996 Bond Trustee, the Series 2002 Bond Trustee, the Series 2006 Bond Trustee, the Series 2015 Bond Trustee, ACA, and the beneficial holders of the Series 1996 Bonds, Series 2002 Bonds and Series 2015 Bonds.

"<u>Series 1996 Bond Documents</u>" means the Series 1996 Indenture and all other documents evidencing or securing the Series 1996 Bonds.

"<u>Series 1996 Bonds</u>" means those certain bonds issued by the SCIDA pursuant to the Series 1996 Bond Documents.

"<u>Series 1996 Bond Trustee</u>" means UMB Bank, National Association as successor indenture trustee for the Series 1996 Bonds under the Series 1996 Indenture.

"<u>Series 1996 Collateral</u>" means funds held under the Series 1996 Bond Documents and assets of the Debtor that secured the Debtor's obligations under the Series 1996 Bond Documents.

"<u>Series 1996 Indenture</u>" means that certain Indenture of Trust dated as of June 1, 1996 between SCIDA and the Series 1996 Bond Trustee.

"<u>Series 1996 Secured Party Claims</u>" means the claims of the Series 1996 Bond Trustee against the Debtor arising under the Series 1996 Bond Documents.

"<u>Series 2002 Bond Documents</u>" means the Series 2002 Indenture and all other documents evidencing or securing the Series 2002 Bonds including, without limitation, the Series 2002/2015 Funding Agreement.

"<u>Series 2002 Bonds</u>" means those certain bonds issued by BIDA pursuant to the Series 2002 Bond Documents.

"<u>Series 2002 Bond Trustee</u>" means UMB Bank, National Association as successor indenture trustee for the Series 2002 Bonds under the Series 2002 Indenture.

"<u>Series 2002 Collateral</u>" means funds held under the Series 2002 Bond Documents and the assets of the Debtor that secured the Debtor's obligations under the Series 2002 Bond Documents, including, but not limited to, the Brookhaven Dorm.

"<u>Series 2002 Indenture</u>" that certain Indenture of Trust dated as of November 1, 2002 between BIDA and the Series 2002 Bond Trustee.

"<u>Series 2002 Secured Party Claims</u>" means the claims of the Series 2002 Bond Trustee against the Debtor arising under the Series 2002 Bond Documents.

"<u>Series 2006 Bond Documents</u>" means the Series 2006 Indenture and all other documents evidencing or securing the Series 2006 Bonds including, without limitation, the Series 2006 Funding Agreement.

"<u>Series 2006 Bonds</u>" means those certain bonds issued by SCIDA pursuant to the Series 2006 Bond Documents.

"<u>Series 2006 Bond Trustee</u>" means Wilmington Trust, National Association as successor indenture trustee for the Series 2006 Bonds under the Series 2006 Indenture.

"<u>Series 2006 Collateral</u>" means the assets of the Debtor that secured the Debtor's obligations under the Series 2006 Bond Documents, including, but not limited to the Oakdale Campus, the Brookhaven Campus, and, the extent that the Series 2002 Bonds have been paid in full, the Brookhaven Dorm.

"<u>Series 2006 Funding Agreement</u>" means that certain Conditional Funding Agreement, as amended, dated as of August 4, 2006 among Dowling, the Series 2006 Bond Trustee and ACA as bond insurer in respect of the Series 2006 Bonds.

"<u>Series 2006 Indenture</u>" that certain Indenture of Trust dated as of June 1, 2006 between SCIDA and the Series 2006 Bond Trustee.

"<u>Series 2006 Secured Party Claims</u>" means the claims of the Series 2006 Bond Trustee and ACA against the Debtor arising under the Series 2006 Bond Documents.

"<u>Series 2015 Bond Documents</u>" means the Series 2015 Indenture and all other documents evidencing or securing the Series 2015 Bonds including, without limitation, the Series 2002/2015 Funding Agreement.

"<u>Series 2015 Bonds</u>" means those certain bonds issued by Dowling pursuant to the Series 2015 Bond Documents.

"<u>Series 2015 Bond Trustee</u>" means UMB Bank, National Association as successor indenture trustee for the Series 2015 Bonds under the Series 2015 Indenture.

"<u>Series 2015 Collateral</u>" means funds held under the Series 2015 Bond Documents the assets of the Debtor that secure the Debtor's obligations under the Series 2015 Bond Documents, including, but not limited to the Residential Portfolio.

"<u>Series 2015 Indenture</u>" that certain Indenture of Trust dated as of June 15, 2015 between Dowling and the Series 2015 Bond Trustee.

"<u>Series 2015 Secured Party Claims</u>" means the claims of the Series 2015 Bond Trustee against the Debtor arising under the Series 2015 Bond Documents.

"<u>Series 2002/2015 Funding Agreement</u>" means that certain Conditional Funding Agreement, as amended, dated as of August 4, 2016 among Dowling, the Series 2002 Bond Trustee, the Series 2015 Bond Trustee and the holders of the Series 2002 Bonds and Series 2015 Bonds.

## EXHIBIT A

**DIP Financing Agreement**

[This document has been included as Exhibit A to the Debtor's motion to approve certain debtor-in-possession financing.  This specific copy of this document has been omitted to avoid providing the Court multiple duplicate copies of the same document.]

## **EXHIBIT B**

**Interim DIP Order**

[This document has been included as Exhibit D to the Debtor's motion to approve certain debtor-in-possession financing.  This specific copy of this document has been omitted to avoid providing the Court multiple duplicate copies of the same document.]