**KLESTADT WINTERS JURELLER**
  **SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, NY 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Sean C. Southard
Lauren C. Kiss

*Proposed Counsel to the Debtor and Debtor in*
  *Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
In re                                                    :           Chapter 11
                                                         :
DOWLING COLLEGE,                                         :           Case No. 16-75545 (REG)
                                                         :
                                                         :
                              Debtor.                    :
------------------------------------------------------------------x

### DECLARATION OF ROBERT S. ROSENFELD, CHIEF RESTRUCTURING OFFICER OF THE DEBTOR, PURSUANT TO LOCAL BANKRUPTCY RULE 1007-4 IN SUPPORT OF FIRST DAY MOTIONS

I, ROBERT S. ROSENFELD, declare, pursuant to section 1746 of title 28 of the United

States Code, as follows:

1.       I am the Chief Restructuring Officer (the "CRO") of the above-captioned debtor

and debtor in possession ("Dowling" or the "Debtor"), which filed a voluntary chapter 11

petition on November 29, 2016 (the "Petition Date") commencing the instant case (the "Chapter

11 Case").  I am also the founding and managing member of RSR Consulting, LLC ("RSR").

2.       I have over 32 years' experience advising and managing publicly-held and private

companies, in many aspects of distressed company situations, and such experience is applicable

to the circumstances here.  I have extensive experience in the reorganization, restructuring, and

liquidation of troubled companies, both out-of-court and in chapter 11 cases, and have advised

debtors, creditors, and equity constituencies in many complex financial restructurings.  I have served in the roles of Chief Restructuring Officer, Chapter 7 Trustee, Examiner, Liquidating Trustee, Responsible Officer and Plan Administrator.  In addition, I have received security clearance from the United States Department of Justice.   I am a Certified Public Accountant licensed in the State of New York, a Certified Fraud Examiner, and a Chartered Global Management Accountant.

3.      Relevant to my engagement in this case, I have been called upon in previous matters to: (a) provide advisory and fiduciary services for complex restructurings; (b) provide operational and financial restructuring support to companies; (c) preserve assets and enhance recoveries to parties in interest in connection with fiduciary services; and (d) provide forensic accounting services and expert testimony in various litigation cases.

4.      The companies that I have administered range in size from middle-market to multibillion dollar companies.  I have managed and advised on the liquidation and valuation of real estate throughout the New York metropolitan area and the United States for matters in bankruptcy and out of court.

5.      A sample of some of the matters where I have served in the role of fiduciary include bankruptcy court cases in the Southern and Eastern Districts of New York, the District of Delaware, the District of New Jersey, the Northern District of Illinois, and the District of Connecticut.  A sample of my appointments as a fiduciary include: Chief Restructuring Officer in *In re ATLS Acquisition, LLC et al*., Case No. 13-10262 (PJW) (Bankr. D. Del.); Chief Restructuring Officer in *In re ChemRX Corporation, et al.*, Case No. 10-11567 (MFW) (Bank. D. Del.); Chief Restructuring Officer in *In re Henry Dunay Designs, Inc.*, Case No. 09-13969 (SMB) (Bankr. S.D.N.Y.); Examiner in *In re Southampton Brick & Tile, LLC*, Case No. 11-

75928 (DTE) (Bankr. E.D.N.Y); Chapter 7 Trustee *in In re Bethny Place, LLC*, Case No. 09-13354 (CSS) (Bankr. D. Del.); and Chapter 7 Trustee in *In re Buttonwood Group Trading, LLC*, Case No. 13-06894 (DLT) (Bankr. N.D. Ill).

6.      On October 17, 2016, I was retained by the Board of Trustees of Dowling (the "Board")[1] as CRO given my experience as a strategic advisor and in the field of business restructuring.

7.      I submit this declaration (the "Declaration") in accordance with Rule 1007-4 of the Local Bankruptcy Rules for the Eastern District of New York ("LBR"), and in support of certain immediate relief being sought by the Debtor including authority to borrow funds, use cash collateral and other collateral, provide adequate protection to prepetition secured parties, retain professionals and real estate brokers, establish sale procedures, and pay certain pre-petition claims, including employee benefits and insurance (the "First Day Motions and Applications").

8.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with staff members of the Debtor, the Debtor's professional advisors, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtor's operations and financial affairs. If called upon to testify, I would testify to the facts set forth in this Declaration and that I am authorized to submit this Declaration on behalf of the Debtor.

9.      A copy of the Board's resolution authorizing the Chapter 11 filing is attached to the voluntarily petition and incorporated by reference herein.  As noted therein, the Board has elected to extend the definition of "Authorized Person" as defined in such resolution to include

---

[1]    The members of the Board are currently Dennis O'Doherty, Gerald J. Curtin, Jack O'Connor, John Racanelli, Joseph K. Posillico, Michael Puorro, Ronald Parr and Patricia Blake.

me.  Unless otherwise indicated, all financial information contained herein is presented on an estimated and unaudited basis.

10.    I have reviewed the Petition and all documents filed in connection therewith and I am generally familiar with the facts alleged and relief requested therein.

11.    I confirmed with the Debtor's proposed counsel, Klestadt Winters Jureller Southard & Stevens, LLP ("KWJS&S"), that it performed a PACER search which revealed that no other or prior bankruptcy case was filed by or against the Debtor.  I'm further advised by counsel that the Debtor does not qualify as a "small business" within the meaning of Title 11 of the United States Code (the "Bankruptcy Code").   No committee of unsecured creditors was organized prior to the order for relief in the Debtor's Chapter 11 Case.  It is anticipated that the United States Trustee (the "UST") will schedule an organizational meeting soon after the Petition Date and may form an official committee of unsecured creditors (a "Creditors' Committee") at that time.

## OVERVIEW OF THE DEBTOR

### A.  Required Contents of Declaration

i.    *Nature of the Debtor's Business and Charitable Mission*

12.     The Debtor is a not-for-profit educational corporation and registered 501(c)(3) corporation.  It was incorporated by the Board of Regents of the University of the State of New York upon issuance of an absolute charter in the first instance on September 27, 1968.

13.    Historically, Dowling operated as an independent comprehensive educational institution in the liberal arts tradition, the mission of which was to provide its students with a well-rounded education based upon innovative teaching, informed and engaging research, and a commitment to democratic citizenship with a community service component.  Dowling sought to foster an open and supportive learning environment that was based upon collaboration between

faculty and student body that were each diverse in interests, beliefs, culture, ethnicity, and geographic origin. Dowling and its faculty upheld the educational mission through teaching, learning and research in the arts and sciences, professions such as education, business and aviation, and by providing members of the community and Dowling alumni with opportunities for continuing education.

14. Most recently, Dowling provided undergraduate and graduate programs with significant concentrations in liberal arts, business, education and aviation.

15. During the last several years, Dowling also proudly participated in various NCAA Division II athletics programs.

ii. _Events Leading to Bankruptcy_

16. The circumstances which led to Dowling's determination to file for bankruptcy protection are complicated and difficult to quickly summarize, but effectively result from a combination of: (a) extreme liquidity challenges due to declining revenue year over year on account of declining admission of students which was its primary source of revenue; (b) loss of accreditation and cessation of active operations as a provider of educational services; and (c) costs of litigation and progression of collection activity by judgment creditors.

17. In addition, consensus was reached among Dowling and its major creditor parties and other parties in interest, that the maximization of value for Dowling's assets, primarily real estate holdings, would be best achieved through a controlled liquidation under the protections of this Chapter 11 Case. The Debtor believes that this Chapter 11 Case will allow the Debtor to run a fair process to maximize the value of its assets for all creditors.

a) <u>Financial and Operational Challenges</u>

18.    Dowling's traditional sources of revenues were primarily derived from student tuition and fees, often provided through loan programs subject to Title IV of the Higher Education Act of 1965 (the "<u>Federal Loan Program</u>").   Dowling also solicited and obtained certain donations by corporations and individuals for the purpose of furthering its charitable mission.

19.    During the last decade of operations, Dowling's expenses routinely exceeded revenue.  Peak revenue during this decade occurred in 2010 at approximately $78.5 million with a low of $43.8 million in 2014.  Like most private not-for-profit colleges, the primary component and driver of revenue was its enrollment[2].  Unfortunately, enrollment continued to decline for Dowling during this same period.  In 2012, enrollment was down to approximately 4,000 full time equivalent students.  By Spring of 2015, Dowling's enrollment was approximately 2,300, with the percentage of undergraduate students declining overall.

20.    Despite declining enrollment, I understand that Dowling's costs and expenses were not easily addressed by the Board or its administration.  Costly labor agreements, including with unionized[3] full-time[4] faculty and adjuncts[5], were the largest budget expenditure on an annual basis.  Further, in connection with various expansion and capital expenditure activities over the years, and to obtain working capital to sustain its business, Dowling engaged in tax exempt bond financings in 1996 (the "<u>Series 1996 Bonds</u>"), 2002 (the "<u>Series 2002 Bonds</u>") and 2006 (the "<u>Series 2006 Bonds</u>"), and a taxable bond financing in 2015 (the <u>Series 2015 Bonds</u>").

---

[2] Students were concentrated in four (4) core colleges: Arts and Science, Aviation, Business and Education.
[3] Dowling was party to six (6) collective bargaining agreements.
[4] Dowling's full time faculty at the fiscal year-ended 2015 was 46 with an average salary cost of approximately $92,000 and average tenure of 15.6 years and overall expense of over $4.2 million annually.
[5] Dowling's adjunct faculty force totaled 248 at the end of 2015 with an average salary cost of $6,182 and total expense of over $1.5 million annually.

Dowling's annual debt service from these obligations exceeded $4.5 million in 2015 and resulted in over $53 million in long term debt outstanding.

21.    As a higher education institution, Dowling was most recently accredited by Middle States Commission on Higher Education ("MSCHE").  In relation to accreditation, MSCHE is charged with the responsibility to periodically assess and then review its subject colleges based on a rubric measured with fourteen (14) categories or "standards of excellence."  Unfortunately, despite compliance with all other standards, Dowling was placed on warning status by MSCHE in relation to "Standard 3" in the Spring of 2014 related to "Institutional Resources."[6]  This very public warning sign from MSCHE was of significant concern to Dowling since a potential loss of accreditation for a higher education institution such as Dowling serves as a proverbial death knell in relation to its ability to enroll students.  This is so because the loss of accreditation automatically results in the loss of access to the Federal Loan Program that is otherwise available to qualified institutions under Title IV of the Higher Education Act.  Dowling's going concern operations, therefore, like the vast majority of its enrolled students, were highly dependent upon continued accreditation and related access to the Federal Loan Program.

22.    Leadership continuity was also a persistent challenge to Dowling in recent years, having most recently appointed a new interim President (Dr. Albert Inserra) in September, 2014 (its third president in three (3) years).[7]

b)    Forbearance Agreements

23.    During 2015, Dowling's leadership determined that forecasted revenue based on declining enrollment would mean that it was likely unable to meet all of its scheduled long term

---

[6] "Institutional Resources" is defined by MSCHE to mean that the "the human, financial, technical, physical facilities, and other resources necessary to achieve an institution's mission and goals are available and accessible.  In the context of the institution's mission, the effective and efficient uses of the institution's resources are analyzed as part of ongoing outcomes assessment."
[7] Dr. Inserra resigned the office of President effective August 19, 2016.

7

debt obligations. Thereafter, in the spring of 2015, Dowling successfully negotiated agreements with the long term debt holders, including the majority holders of the Series 1996 Bonds and Series 2002 Bonds (the "Majority Holders") and ACA Financial Guaranty Corp., as the bond insurer with respect to the Series 2006 Bonds (the "Series 2006 Bond Insurer" or "ACA", and together with the Majority Holders, and the Bond Trustees (defined below), the "Creditor Parties") concerning the terms of their forbearance from payment and exercising remedies (the "2015 Forbearance Agreements").

24.     As part of the conditions or requirements of the 2015 Forbearance Agreements, Dowling engaged CohnReznick Advisory Services as its special financial advisor (the "Special Advisor"). Soon thereafter, various financial and operational analysis and self-assessment was performed by Dowling with the aid of the Special Advisor. Several financial and operational challenges were identified through that process. Among other things, the potential for additional investment in personnel and technology was considered and discussed with the Special Advisor, the Creditor Parties, and Dowling's management and Board.

25.     Shortly thereafter, it was determined by and among the Board and the Creditor Parties that Dowling would be best positioned for long term success as a provider of educational services if it were able to secure a favorable transaction or partnership with a strong counter-party that would satisfy its accreditation risks.

c)     Going Concern Sale Efforts

26.     RBC Capital Markets LLC, a global investment bank ("RBC"), was retained in October, 2015 to assist Dowling in identifying and pursing its strategic options. With the assistance of RBC, Dowling conducted a thorough process that attempted to vet all potential strategic alternatives. RBC contacted over 80 potential transaction parties across non-profit,

international, for-profit and private equity firms and provided confidential information to 26 of those parties.[8]

27.    This marketing and bid solicitation process resulted in receipt of seven (7) letters of intent by mid-January, 2016.  Importantly, Dowling's major secured creditors, the Creditor Parties, were also involved in the review of proposals ultimately received by RBC on behalf of Dowling.  Ultimately, after vetting of interests and negotiations of various interested parties, Dowling selected Global University Systems ("GUS") to be its affiliation partner with the support of the Creditor Parties.  On or about February 17, 2016, Dowling and GUS entered into a corresponding letter of intent.  GUS was believed by Dowling to be a leading international academic institution that provided education to over 40,000 students worldwide, as an affiliation partner.  GUS was represented to possess expertise and economies of scale that would be relevant to improving the administrative operations of Dowling.  GUS was also thought to be a strong financial partner for Dowling, having purportedly participated in turnaround efforts with other academic institutions.  Ultimately, Dowling sought to negotiate an affiliation structure with GUS that would have permitted Dowling to remain independently governed and non-profit in nature.  Dowling worked extensively with New York State agencies and the major secured creditors to package an affiliation with GUS that would satisfy the important concerns of all those parties.

28.    In early May, 2016, the outline of a proposed affiliation with GUS was submitted to MSCHE for its consideration at the meeting scheduled on June 23, 2016 to consider the "Show Cause" status and whether MSCHE should terminate the accreditation of Dowling. Among the many meetings and conferences that took place in relation to the proposed affiliation

---

[8] On or about November 19, 2015, while early marketing efforts were underway, MSCHE placed Dowling on "Show Cause" status based, in large part, on lack of adequate financial resources.

with GUS, certain members of the Board, administrators, their counsel and GUS met with representatives from the New York State Attorney General ("NYSAG") and New York State Department of Education ("SED") during early June, 2016 to discuss and address matters of concern of those agencies.  At the time, Dowling submitted the outline of its proposed affiliation with GUS with the hope and expectation of a prompt closing of various transactions shortly after approval by MSCHE.

29.    Despite critically low cash levels, Dowling initiated significant staff reductions and deferred vendor payments to enable the school to graduate its last class of seniors in 2016 and otherwise avoid a mid-term shut down during the Spring, 2016 semester.  This had the practical effect of giving Dowling a relatively clean break point in the funding cycle in relation to the Federal Loan Program and tuition payments, etc.

30.    Throughout the Spring of 2016, Dowling's Board and management put great focus on the needs of students and did their best to plan for the worst-case scenario which was the loss of accreditation and the need to transition students for their continuing studies to alternative educational providers.

31.    Unfortunately, despite the extensive best efforts of Dowling, through its Board, administration and professionals, no definitive transaction documents were ever completed in relation to the GUS affiliation.  As a result of the failure to complete definitive documents and present a viable and sustainable Dowling, following its meeting on June 23, 2016, MSCHE voted to revoke Dowling's accreditation effective as of August 30, 2016.

d)    Cessation of Educational Services and Student Transition Efforts

32.    Dowling's Board considered the potential for appeal of MSCHE's determination to revoke accreditation and worked tirelessly to identify any reasonable alternatives to preserve its

accreditation.   Unfortunately, with no reasonable options available, Dowling's Board voted to cease providing educational services effective as of August 5, 2016 and accept the decision of MSCHE to revoke accreditation.  Dowling then informed the relevant state and federal agencies of the determination of the Board to cease active operations as an educational provider.

33.   Dowling negotiated with the Creditor Parties to provide it with the necessary funding to effectuate an orderly closure and provide as much in terms of transition services to its continuing students as possible under the circumstances.  Dowling worked closely with various regulators (such as SED, U.S. Department of Education, and NYSAG) attempting to protect students and their rights and interests and were ultimately benefited by several articulation agreements that Dowling was able to negotiate with various alternative educational providers, including Long Island University ("LIU").

34.   Pursuant to an articulation agreement, LIU is now the official repository for Dowling's students in relation to academic records, including transcripts.  Dowling's community of students and alumni were advised of this development and Dowling is thankful to the many institutions like LIU who came to the aid of its students.

   iii.   *Summary of Real Estate Assets*

35.   Dowling is the fee owner of the picturesque land on which its main campus was situated, located at 150 Idle Hour Boulevard, Oakdale, New York 11769 (the "Oakdale Campus").  The Oakdale Campus contains several improvements, including a former mansion of the Vanderbilt family, a student center, science center and dormitory building.  Within the neighborhood adjacent to the Oakdale Campus are thirty-two (32) parcels of predominantly residential property and associated personal property owned by Dowling, most of which are improved by single family residences.  Dowling historically leased these residential properties to

third party residential tenants, and some of which were used as faculty offices and for other functions ancillary to Dowling's former business (the "Residential Portfolio")[9].  Dowling is also the fee owner of approximately 103 acres of land located at 1300 William Floyd Parkway, Shirley, Town of Brookhaven, New York (the "Brookhaven Campus"), which was home to Dowling's School of Aviation and sports management program, Dowling's NCAA Division II athletic program, and a 289-bed dormitory facility located thereon (the "Brookhaven Dorm").

    iv.    *Summary of Secured Obligations*

36.    Dowling's prepetition secured debt is primarily comprised of three (3) outstanding issuances of municipal bonds and one (1) outstanding issuance of corporate bonds.

37.    Certain improvements and construction in relation to the Oakdale Campus science building and sewage treatment facility were financed by the Series 1996 Bonds, issued in the principal amount of $7,220,000 under that certain Trust Indenture (the "Series 1996 Indenture"), dated as of June 1, 1996, between the Suffolk County Industrial Development Agency ("SCIDA"), as issuer, and United States Trust Company of New York, as predecessor in interest to UMB Bank, National Association, as trustee (the "Series 1996 Bond Trustee").  The "Series 1996 Bond Documents" shall refer collectively to the Series 1996 Indenture and all other documents evidencing or securing the Series 1996 Bonds.

38.    The acquisition, renovation and equipping of Dowling's 72,000 square foot Brookhaven Dorm were financed by the Series 2002 Bonds, issued in the principal amount of $10,900,000 under that certain Trust Indenture (the "Series 2002 Indenture"), dated as of November 1, 2002, between, the Town of Brookhaven Industrial Development Agency ("TBIDA"), as issuer, and The Bank of New York, as predecessor in interest to UMB Bank,

---

[9] Twenty four of these parcels were utilized as residential properties and either rented to third party tenants or otherwise occupied by faculty.  Seven of the parcels were used in Dowling's operations.  One of the parcels is vacant land.

National Association, as trustee (the "Series 2002 Bond Trustee").  The "Series 2002 Bond Documents" shall refer collectively to the Series 2002 Indenture and all other documents evidencing or securing the Series 2002 Bonds.

39.    Certain improvements, construction and equipping of Dowling's athletic field complex on 33 acres of the Brookhaven Campus, the Brookhaven Campus cafeteria, and certain capital improvements on the Oakdale Campus, among other things, were financed by the Series 2006 Bonds, issued as Series 2006A bonds in the principal amount of $34,910,000 and Series 2006B bonds in the principal amount of $4,000,000 under that certain Trust Indenture (the "Series 2006 Indenture"), dated as of June 1, 2006, between SCIDA, as issuer, and The Bank of New York, as predecessor in interest to Wilmington Trust, National Association, as trustee (the "Series 2006 Bond Trustee").  The "Series 2006 Bond Documents" shall refer collectively to the Series 2006 Indenture and all other documents evidencing or securing the Series 2006 Bonds.

40.    The Series 1996 Bonds, Series 2002 Bonds and Series 2006 Bonds each share certain common financing structures.  In each, the facilities financed by each of the bond issuances (as further described in the respective indentures, the "Facilities" and each a "Facility") were leased by Dowling to the respective issuers (SCIDA and TBIDA) and subleased by such issuers back to Dowling.  The Facilities financed pursuant to the Series 2002 Indenture and the Series 2006 Indenture serve as collateral for Dowling's respective obligations thereunder, as set forth in that certain Mortgage and Security Agreement, dated as of November 1, 2002, by Dowling and TBIDA in favor of the Series 2002 Bond Trustee, and duly recorded with the Office of the Clerk of Suffolk County on December 17, 2002, and that certain Mortgage and Security Agreement, dated as of June 1, 2006, by Dowling and SCIDA in favor of the Series

2006 Bond Trustee, and duly recorded with the Office of the Clerk of Suffolk County on July 5, 2006, respectively.

41.    As alluded to in the prior recitation of financial troubles, by no later than June 2015, Dowling defaulted under various provisions of the trust indentures and entered into forbearance negotiations with the Creditor Parties, including the Bond Trustees.  On or about June 15, 2015, Dowling entered into substantially similar forbearance agreements (previously defined as the 2015 Forbearance Agreements) with the Majority Holders, Series 2006 Bond Trustee and ACA, as bond insurer in respect of the Series 2006 Bonds.

42.    Contemporaneously with its entry into the 2015 Forbearance Agreements, Dowling obtained additional funding to support working capital and other needs of Dowling pursuant to that certain Trust Indenture, dated as of June 15, 2015 (the "Series 2015 Indenture" and, together with the Series 1996 Indenture, the Series 2002 Indenture and the Series 2006 Indenture, the "Indentures"), between Dowling College, as Issuer, and UMB Bank, National Association, as Trustee (the "Series 2015 Bond Trustee" and, together with the Series 1996 Bond Trustee, the Series 2002 Bond Trustee and the Series 2006 Bond Trustee, the "Bond Trustees"), with respect to the issuance of the Dowling College Taxable Revenue Bonds, Series 2015A, in the aggregate principal amount of $6,700,000 (the "Series 2015 Bonds" and, together with the Series 1996 Bonds, the Series 2002 Bonds and the Series 2006 Bonds, the "Bonds").  The "Series 2015 Bond Documents" shall refer collectively to the Series 2015 Indenture and all other documents evidencing or securing the Series 2015 Bonds.  The proceeds of the Series 2015 Bonds were utilized to, among other things, refinance in full Dowling's obligations to TD Bank, N.A., which previously held a lien on the Residential Portfolio, and to provide certain working capital to fund operating expenses.  Pursuant to the Series 2015 Indenture, the Series 2015 Bonds

are secured by first position mortgage liens on all of the Residential Portfolio and all revenue pledged by Dowling to the Series 2015 Bond Trustee.  Additionally, in connection with the issuance of the Series 2015 Bonds, Dowling granted to the Series 1996 Bond Trustee and the Series 2002 Bond Trustee second position mortgage liens on the Residential Portfolio.  The mortgage liens on the Residential Portfolio are evidenced by: (a) a mortgage recorded December 12, 2003 in the office of the Suffolk County Clerk as Liber M0020593, page 721; (b) a mortgage recorded December 5, 2006 in the office of the Suffolk County Clerk as Liber M00021429, page 688; (c) a mortgage recorded June 26, 2016 in the office of the Suffolk County Clerk as Liber M00022603, page 965; and (d) a mortgage recorded June 26, 2016 in the office of the Suffolk County Clerk as Liber M00022603, page 967.

43.     More recently, beginning on or about August 4, 2016 and in accordance with the terms of certain substantially similar conditional funding agreements, (i) UMB, as trustee under that certain Conditional Funding Agreement, as amended, dated as of August 4, 2016 among Dowling, the Series 2002 Bond Trustee, the Series 2015 Bond Trustee and certain holders of the Series 2002 Bonds and Series 2015 Bonds (the "Series 2002/2015 Funding Agreement) and (ii) the Series 2006 Bond Trustee, as trustee and ACA, as bond insurer in respect of the Series 2006 Bonds under that certain Conditional Funding Agreement, as amended, dated as of August 4, 2016 among Dowling, the Series 2006 Bond Trustee and ACA (the "Series 2006 Funding Agreement"), made certain protective advances under the Series 2002 Bond Documents, the Series 2006 Bond Documents, and the Series 2015 Bond Documents available to Dowling in exchange for a grant of additional collateral in the form of a blanket lien on all assets of Dowling to secure new advances of funds. Based upon my review of bank statements and other information available to me, it is my understanding that through the Series 2002/2015 Funding

Agreement and Series 2006 Funding Agreement, approximately $1.2 million was advanced to pay expenses of Dowling for the period August 4, 2016 through September 20, 2016.

44.     Thereafter and on or about September 20, 2016, Dowling and the Bond Trustees, the Series 2006 Bond Insurer, and UMB Bank, N.A., as escrow agent (the "Escrow Agent"), entered into that certain Escrow Agreement, pursuant to which the Bond Trustees and Series 2006 Bond Insurer caused certain protective advances to be made under applicable loan facilities to pay expenses otherwise due by Dowling (the "Escrow Advance Agreement").  The terms of the Escrow Advance Agreement reflect that Dowling maintained no interest in the funds held by the Escrow Agent.  Based upon my review of bank statements and other information available to me, it is my understanding that, as of the Petition Date, approximately $2.8 million has been funded through the Escrow Advance Agreement to pay expenses of Dowling, including professional fee retainers for my firm and other professional firms.

45.     As a result of the foregoing financing transactions, all of Dowling's real property and substantially all of its personal property (excluding restricted assets), including the Oakdale Campus, the Brookhaven Campus, the Brookhaven Dorm, and the Residential Portfolio, are subject to the liens and security interests of Dowling's prepetition secured creditors.  It is my understanding that the Oakdale Campus and the Brookhaven Campus, to the extent of the Series 2006 Indenture, are subject to the first liens and security interests of the Series 2006 Bond Trustee, except that the Series 2006 Bond Trustee's liens are subordinate only to the Series 2002 Bond Trustee's first lien and security interest on the Brookhaven Dorm. The Residential Portfolio is subject to the first liens and security interests pursuant to the Series 2015 Indenture and the related mortgages, with a second mortgage lien granted in favor of the Series 1996 Bond Trustee and the Series 2002 Bond Trustee *pari passu*.

46.     In addition, Dowling is obligated under that certain U.S. Department of Education College Facilities Loan Program Loan Agreement (the "<u>DOE Note</u>"), dated as of February 18, 1990, between Dowling and the United States of America, acting by and through the Secretary of the Department of Education (the "<u>DOE</u>"), in the principal amount of up to $3,000,000, bearing interest at 5.5% and maturing in 2022.  Pursuant to the DOE Note, Dowling obtained funds from the DOE to finance the renovation and rehabilitation of its Kramer Science Building on the Oakdale Campus. Pursuant to that certain Mortgage Note, dated as of December 8, 1992, by Dowling in favor of the DOE, the DOE Note is purportedly secured by the real property financed by the loan proceeds, located on the Oakdale Campus in Oakdale, Suffolk County, New York. However, I am not aware that the same is recorded or otherwise perfected and may not be deemed to be secured by the underlying property.

47.     In addition to the foregoing, several parties have filed mechanics liens on one or both of the Oakdale Campus and Brookhaven Campus.  Still other creditors have recently obtained judgments on account of otherwise unsecured obligations.

v.     *The Debtor's Post-Petition Goals*

48.     The Debtor's immediate goals under my stewardship are to: (i) orderly liquidate the real property interests and other unrestricted assets in a way that maximizes value for the benefit of the Debtor's creditors; (ii) ensure that the Debtor's restricted assets are properly disposed of; (iii) fulfill the charitable mission to the extent permissible in relation to the foregoing; and (iv) work with the Creditor Parties, any Creditors' Committee formed and other creditors to ensure that the Debtor's financial affairs are properly organized and evaluated.

49.     To that end, following the commencement of this Chapter 11 Case, the Debtor anticipates pursuing a comprehensive sale strategy with regard to its real property that will include:

    a.  a prompt marketing and sale of the Residential Portfolio under Section 363 of the Bankruptcy Code;

    b.  a prompt marketing and sale of Oakdale Campus under Section 363 of the Bankruptcy Code;

    c.  to the extent feasible, a prompt marketing and sale of the Brookhaven Dorm under Section 363 of the Bankruptcy Code; and

    d.  initial site planning and approval work in relation to the Brookhaven Campus and evaluation of strategic disposition alternatives for the property.

50.     If feasible, the Debtor will also attempt to propose a Chapter 11 plan in order to complete the sale of its real property pursuant to the terms of a plan.

51.     The Debtor believes that the chapter 11 process affords a better opportunity to provide a greater return to its creditors than any alternative wind down or liquidation process.

    vi.   *Debtor's Case Was Not Originally Commenced Under Chapter 7*

52.     The Debtor's Chapter 11 Case was voluntarily commenced under Chapter 11 of the Bankruptcy Code.  Accordingly, LBR 1007-4(a)(iii) is inapplicable.

    vii.  *No Prepetition Creditors' Committee*

53.     In accordance with LBR 1007-4(a)(iv), to the best of the Debtor's knowledge, no pre-petition creditors' committee has been formed.

viii.   _Holders of the Twenty (20) Largest Unsecured Claims_

54.     In accordance with LBR 1007-4(a)(v), a list setting forth the Debtor's twenty (20) largest unsecured creditors excluding those persons who constitute "insiders" under Bankruptcy Code Section 101(31) of the Debtor is attached as **Exhibit A**.  As required by LBR 1007-4(a)(v), Exhibit A includes the creditors' names, addresses, telephone numbers (for persons familiar with the account, if available), amount of each claim, and an indication of whether the claims are contingent, unliquidated, disputed or partially secured.

ix.   _Holders of the Five Largest Secured Claims_

55.     In accordance with LBR 1007-4(a)(vi), a consolidated list setting forth the Debtor's five (5) largest secured creditors is annexed hereto as **Exhibit B**.  As required by LBR 1007-4(a)(vi), Exhibit B includes the creditors' names, addresses, telephone numbers (for persons familiar with the account, if available), amount of each claim, a description and an estimate of the value of the collateral securing the claim, and whether the claim or lien is disputed.

x.   _Summary of the Debtor's Asset and Liabilities_

56.     As required by LBR 1007-4(a)(vii) a summary of the Debtor's assets and liabilities is attached as **Exhibit C**.

xi.   _Publicly Held Securities_

57.     As a not-for-profit entity, the Debtor does not have any publicly held shares. However, as required by LBR 1007-4(a)(viii), the Debtor discloses here that there are publicly held securities related to the Debtor in the nature of bonds.  Annexed hereto as **Exhibit D** is a list of those publicly held bond series and where known, the number of record holders.

xii.    _Property Held by Others_

58.    As required by LBR 1007-4(a)(ix), to the best of my knowledge, the Debtor discloses that there is no property of the Debtor in the custody of any public officer, receiver, trustee, pledgee, assignee of rents, liquidator, secured creditor or agents of any such person, except for the following:

    a.    TD Bank, National Association ("TD")

        i.    approximately $900 on deposit with TD, which is being restrained based on restraints served by judgment creditors on TD;

        ii.    Flex Spending Account of approximately $16,200 on deposit with TD, which is being restrained based on restraints served by judgment creditors on TD;

        iii.    Sewage Treatment Plan reserves on deposit with TD, which are being restrained based on restrains served by judgment creditors for the following amounts:

            1.    approximately $60,550; and

            2.    approximately $60,510;

        iv.    Student Activity Account of approximately $368,200 on deposit with TD, which is being restrained based on restraints served by judgment creditors.

xiii.    _Debtor's Premises_

59.    As required by LBR 1007-4(a)(x), **Exhibit E** contains a list of each of the premises owned, leased or held under any other arrangement from which the Debtor operates its business.

xiv.    _Location of the Debtor's Assets and Books and Records_

60.    Pursuant to LBR 1007-4(a)(xi), the Debtor's significant assets and its books and records are located at the Oakdale Campus and Brookhaven Campus.  The Debtor does not have any assets held outside of the territorial limits of the United States.

xv.    _Pending or Threatened Actions_

61.    Pursuant to LBR 1007-4(a)(xii), **Exhibit F** contains a schedule identifying the nature and present status of pending or threatened actions against the Debtor.

xvi.    _Debtor's Senior Management_

62.    In accordance with LBR 1007-4(a)(xiii), the Debtor's senior management consists of:

| Name | Title | Tenure | Responsibility |
|------|-------|--------|----------------|
| Robert S. Rosenfeld | Chief Restructuring Officer | October 17, 2016 | Management of the Debtor and oversight of bankruptcy and wind down process |
| Ralph Cerullo | Chief Financial Officer and Treasurer | September 9, 2014 as CFO | Financial reporting of the Debtor and assisting in operations of the Debtor |

xvii.    _Payroll to Employees_

63.    Pursuant to LBR 1007-4(a)(xiv), for the thirty (30) day period following the Petition Date, the Debtor intends to pay employees (exclusive of officers, directors, stockholders, partners, and members) approximately $10,200 weekly, for a total of approximately $40,800.

xviii.    *Payroll to Officers and Directors*

64.    Pursuant to LBR 1007-4(a)(xv), for the thirty (30) day period following the Petition Date, the Debtor intends to pay the CFO approximately $4,400 weekly, for a total of approximately $18,000.  My compensation as Chief Restructuring Officer will be included in weekly billings from my firm, RSR, to the Debtor, pursuant to its proposed retention order under Section 363 of the Bankruptcy Code.

xix.    *Schedule of Receipts and Disbursements*

65.    In accordance with LBR 1007-4(a)(xvi), a schedule of estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue but remaining unpaid is annexed hereto as **Exhibit G**.

## B.  Summary of First Day Motions and Applications[10]

66.    Simultaneously with the filing of the Chapter 11 Petition, the Debtor filed its First Day Motions and Applications in order to minimize the adverse impact of the commencement of the Debtor's bankruptcy case on its limited operations and sale process.  I believe the approval of the First Day Motions and Applications is critical to maximizing value for the benefit of all the stakeholders of the Chapter 11 Case.  I have reviewed the factual background in support of each First Day Motions and Applications and certify the facts contained herein are true and correct to the best of my information, knowledge and belief.  A brief overview and summary of the more significant First Day Motions and Applications is set forth herein.[11]

---

[10] Capitalized terms used but not otherwise defined in this section shall have the meaning ascribed to them in the respective First Day Motion or Application.

[11] In the interests of brevity, summaries of all First Day Motions and Applications have not been included.

a) <u>Application to Retain Garden City Group, LLC as Claims and Noticing Agent for the Debtor</u>

67.     Pursuant to Sections 156(c) and 105(a) of the Bankruptcy Code, the Debtor is seeking the appointment of Garden City Group, LLC ("<u>GCG</u>") to act as the official claims and noticing agent for this Chapter 11 Case, and assume full responsibility for the distribution of notices and maintenance, processing and docketing of proofs of claim filed in the Debtor's Chapter 11 Case.  The Debtor anticipates that there will be hundreds of entities to be noticed in this case.  In view of the number of anticipated claimants and complexity of this case, the Debtor submits that the appointment of a claims and noticing agent is both necessary and in the best interests of the Debtor, its estate and all creditors.

68.     By appointing GCG as the Claims and Noticing Agent in this Chapter 11 Case, the distribution of notices and the processing of claims will be expedited, and the Clerk's office will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

69.     GCG has acted as the claims and noticing agent in numerous cases of comparable size in this District, many of which are currently pending before the Court.  GCG has significant expertise in these matters and is well qualified to act as the claims and noticing agent in this case.

b) Application to Retain RSR Consulting, LLC and
   <u>Robert S. Rosenfeld as Chief Restructuring Officer to the Debtor</u>

70.     Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, the Debtor is seeking an order authorizing RSR to provide the Debtor with the continued services of a Chief Restructuring Officer (the "<u>CRO</u>") and additional personnel and designating myself as CRO effective as of the Petition Date.

71.     The Debtor requires the continued services of a CRO with the necessary expertise to take over as the day-to-day manager of the Debtor.  As CRO I will be responsible for managing the Debtor as a debtor in possession in this Chapter 11 Case, assisting in the formulation, preparation and consummation of a plan of liquidation, and performing such other duties customary to a chief restructuring officer.

72.     As set forth herein, I have over 32 years' experience advising and managing publicly-held and private companies, in many aspects of distressed company situations.

73.     I, along with the other RSR personnel assigned to this case, have devoted substantial time and effort to come up to speed with the Debtor's business operations, financial affairs, debt structure, and other related matters.  Accordingly, RSR has developed relevant experience regarding the Debtor that will facilitate effective and efficient services in this Chapter 11 Case.

74.     If the Debtor is not permitted to retain RSR, the Debtor will be forced to retain a new restructuring advisor and CRO that will not be familiar with the Debtor's financial affairs.  The time expended in locating and retaining a new advisor and CRO and in bringing them up to speed likely would delay and hinder the Debtor's wind down activities.

75.     Given the level of RSR's involvement to date, they are well qualified and able to continue as restructuring advisor and CRO to the Debtor.  In addition, the Debtor has directed RSR to work cooperatively with the other professionals retained in this Chapter 11 Case to avoid duplication and inefficiency.

c)    DIP Financing and Cash Collateral Motion

76.     By its "DIP Financing Motion", the Debtor requests entry of interim and final orders: (a) authorizing the Debtor to obtain post-petition financing (the "DIP Facility") pursuant

to the terms and conditions of that certain "Debtor-in-Possession Multi-Draw Term Loan Promissory Note" dated as of November 29, 2016, by and among the Debtor and each lender party thereto (collectively, the "DIP Lenders"), and UMB Bank, National Association ("UMB") in its capacity as agent (in such capacity, the "DIP Agent") on behalf of the DIP Lenders in the amount of up to $1,302,146.00 on an interim basis and up to $4,974,779.00 on a final basis, as well as to use Cash Collateral and other collateral pursuant to Section 363 of the Bankruptcy Code; (b) approving the form of adequate protection provided to the Prepetition Secured Parties pursuant to Bankruptcy Code Sections 361 and 363; (c) scheduling a final hearing on the motion; and (d) granting related relief.

77.     The Debtor has an immediate need for additional working capital availability and use of Cash Collateral, including cash proceeds, to pay its ordinary business expenses, including, without limitation, payments to post-petition vendors, employee salaries, payroll, taxes and similar costs, and the payment of other costs and expenses of administering this Chapter 11 Case. All of these requirements for use of cash must be met to preserve and maintain the Debtor's asset values for the benefit of all parties in interest.

78.     Without access to post-petition financing, the Debtor will be unable to liquidate its properties in this Chapter 11 Case.  Without ability to borrow funds in accordance with the terms of the DIP Facility, and use such funds in accordance with the proposed budget, the Debtor would suffer immediate and irreparable harm by being forced to shut down its operations, terminate its remaining employees to the detriment of the Debtor, its estate and the stakeholders therein.

79.     The Debtor has engaged in extensive, arms-length negotiations with the DIP Lenders.  Pursuant to the DIP Note, the Debtor will request that the DIP Agent make certain term

loans in accordance with the Budget.  Generally speaking, the structure and mechanics of the DIP Documentation, which involve four (4) separate tranches and commitments, reflects the extensive intercreditor negotiations over a lengthy prepetition period and the interrelationship of the Debtor's assets as collateral packages divided among and between the Prepetition Secured Parties and, if approved by this Court, the DIP Lenders.  Overall then, the DIP Note is designed to track the separate funding requirements in relation to the necessary costs and expenses required to protect and preserve the segmented collateral packages and positions and the prepetition security interests of the Prepetition Secured Parties, together with the general costs of administration of the Chapter 11 Case.

80.    As set forth in greater detail therein, the DIP Note provides that each of the DIP Lenders will contribute up to certain individual limits (in the respective amounts set forth in Schedule 1 of the DIP Note). The borrowings under the DIP Note will be administered by the DIP Agent and sourced from various of the DIP Lenders. As consideration for the Term Loan Commitments and to secure advances made in relation to the same, the Debtor proposes to provide the DIP Agent, for the ratable benefit of the DIP Lenders, a first position priority in respect of all the Debtor's assets, except for Permitted Liens and the Carve-Out.  In broad terms, the borrowings under the DIP Note are summarized as follow:

| Term Loan | Lender(s) | Interim/Final Commitments | Assets Associated with Term Loan: | Use of Proceeds |
|---|---|---|---|---|
| A | ACA Financial Guaranty Corporation | $645,671/$2,175,022 | DIP Priority A Collateral, including, among other assets, the Oakdale Campus and the Brookhaven Campus other than the Brookhaven Dorm. | Fund costs and expenses of the DIP Priority A Collateral. |

| B | UMB Bank, National Association as indenture trustee under the Series 2002 Bond Documents | $83,315/$311,913 | DIP Priority B Collateral, including, among other assets, the Brookhaven Dorm. | Fund costs and expenses of the DIP Priority B Collateral. |
|---|---|---|---|---|
| C | UMB Bank, National Association as indenture trustee under the Series 2015 Bond Documents | $42,818/$239,055 | DIP Priority C Collateral, including, among assets, the Residential Portfolio as created under the Series 2015 Bond Documents. | Fund costs and expenses of the DIP Priority C Collateral. |
| D | All of the Forgoing | $530,342/$2,248,789 | DIP Priority D Collateral, including all assets other than that captured by the foregoing. | Fund fees and expenses not otherwise captured by the foregoing (A - C), including working capital needs of the Debtor and for other general corporate purposes, including, without limitation, payment of Professional Fees. Also for any fees and expenses of the DIP Priority D Collateral. |

81.     I believe, in preparing the Budget, that the costs of administration of this Chapter 11 Case will be adequately provided for and that the DIP Facility is expected to provide the financing the Debtor requires for an approximately thirty (30) week period following the Petition Date with a maturity date of May 8, 2017.  I believe that confirmation of a chapter 11 plan within this timeframe is feasible.

82.     In relation to the potential for alternative financing arrangements, six different lenders were contacted to determine whether they would be interested in providing financing to the Debtor during the Chapter 11 Case.  Four declined to make a proposal for financing.  Two of

the six would only lend based upon a priming, senior secured position with respect to all assets of the Debtor and at substantially higher interest rates than the interest rates proposed in the DIP Facility.    Importantly, the DIP Lenders informed the Debtor's professionals that they were unwilling to be primed on any basis in connection with this Chapter 11 Case in relation to their prepetition security interests.  I believe that a priming contest at the beginning of this Chapter 11 Case would be time consuming and likely very expensive based on the results of the Debtor's inquiries to alternative lenders and the position of the DIP Lenders in relation to the prepetition security interests.  Therefore, I concluded that no other financing was available on terms better than proposed under the DIP Documentation.

83.      I have reviewed the DIP Financing Motion and believe that the facts stated therein are accurate to the best of my knowledge, information and belief.  I further believe that the relief requested in the DIP Financing Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue its limited operations in chapter 11 without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the DIP Financing Motion should be granted.

d)  Cash Management Motion

84.      By its "Cash Management Motion", the Debtor seeks entry of interim and final orders (i) authorizing the Debtor to close certain Prepetition Bank Accounts and transfer funds held in such Prepetition Bank Accounts to the Debtor's newly created DIP Bank Accounts and (ii) granting a limited waiver of Section 345(b) of the Bankruptcy Code.

85.      Historically, when the Debtor operated as an educational institution, it utilized a cash management system consisting of multiple bank accounts (the "Prepetition Bank Accounts") through which the Debtor collected deposits and made disbursements in the ordinary

course of its operations. After it ceased active operations as an educational provider and for the several weeks leading up to the Petition Date, certain prepetition institutional secured creditors funded the Debtor's necessary operating expenses in accordance with an approved budget. Since early September, 2016, the Debtor's bank accounts and respective balances were essentially static with virtually no transfers being made out.

86. In relation to banking activity during this Chapter 11 Case, the Debtor intends to follow the applicable U.S. Trustee guidelines and open five (5) new debtor-in-possession bank accounts at Signature Bank, effective as of the Petition Date (the "DIP Bank Accounts", and together with the Prepetition Bank Accounts, the "Bank Accounts"). Signature Bank is an authorized depository institution by the United States Trustee for the Eastern District of New York.

87. The Debtor seeks authorization to close certain Prepetition Bank Accounts on and after the Petition Date which hold unrestricted funds, and transfer the balances as cash collateral to the DIP Bank Accounts in a manner consistent with applicable lien rights. As of the Petition Date, the Debtor continues to assess certain Prepetition Bank Accounts to determine whether these accounts contain restricted funds which must be safeguarded (the "Restricted Funds").

88. The Debtor shall endeavor to complete its assessment and report its findings to the Court through a statement to be filed with the Court within thirty (30) days after the Petition Date, and promptly thereafter transfer any unrestricted balances therein as cash collateral to the DIP Bank Accounts in a manner consistent with applicable lien rights.

89. For the avoidance of doubt, however, the Debtor is not seeking authority to transfer any Restricted Funds. The Debtor intends to essentially freeze Restricted Funds pending one or more further orders of this Court.

90.     In addition, in connection with the requirements of Section 345(b) of the Bankruptcy Code, to the extent any funds held in the DIP Bank Accounts are in excess of the amounts insured by the FDIC, the Debtor understands that Signature Bank will comply with the bond requirement in Section 345(b) of the Bankruptcy Code.

91.     With respect to the remaining Prepetition Bank Accounts that may contain Restricted Funds, the Debtor believes, subject to its continuing review, that these funds are held in trust for such donors and should not be subject to the requirements of Section 345(b) of the Bankruptcy Code.  It may potentially violate applicable law and donor restrictions were the Debtor to unilaterally transfer balances of endowed or restricted funds into another depository. Accordingly, the Debtor requests that the Court enter an order temporarily waiving such requirements for forty-five (45) days while it discusses with the U.S. Trustee any additional arrangements potentially necessary to adequately protect those estate funds.

92.     I have reviewed the Cash Management Motion and believe that the facts stated therein are accurate to the best of my knowledge, information and belief.  I further believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest.  Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be granted.

   e)  Employee Benefit Motion

93.     The Debtor's efforts in this Chapter 11 Case require the continued and uninterrupted service of its employees in order to support continuing operations.  By its "Employee Benefit Motion", to avoid significant risks of resignations and of further discontent or loss of morale among essential employees, it is necessary and appropriate that the Debtor be

granted the authorization to make all payments for which prepetition payroll deductions or withholdings were made and pay the required Union Obligations.

94.     The Debtor has a total of nine (9) employees, both union and non-union (the "Employees").  The Debtor's Employees are paid bi-weekly in the Debtor's ordinary course of business.  The Debtor's current payroll period runs from November 18, 2016 through December 1, 2016.  Payroll was funded to Automatic Data Processing, Inc. ("ADP") prior to the Petition Date, on November 23, 2016, and Employees will receive payment from ADP on December 1, 2016.  As a result, the Debtor does not owe any amounts on account of pre-petition wages.  The Debtor's average bi-weekly gross payroll is approximately $29,597.

95.     The Debtor is required by law to withhold from the wages of its Employees, and remit to the appropriate taxing authorities, all applicable federal, state, and local income taxes, state unemployment taxes and social security and Medicare taxes and in certain instances, to pay expenses related thereto (collectively, the "Trust Fund Taxes").  In addition, the Debtor also makes certain deductions from Employee paychecks for certain benefit programs, insurance, disability, child support, union dues, assistance and other similar programs (the "Deductions", and together with the Trust Fund Taxes, the "Withholdings").  Accordingly, the Debtor requests that it be authorized, but not directed, to transfer any Withholdings relating to the period prior to the Petition Date to the appropriate agencies, third parties and/or benefit providers in the ordinary course of business.

96.     Three (3) of the Debtor's Employees are union employees (the "Union Employees").  With respect to Union Employees, the Debtor makes contributions of approximately $1,000 per month to the union fund for a retirement plan, based upon the number

of biweekly pay periods in the month (the "Union Benefits").  The Debtor seeks authority to pay any pre-petition amounts it owes on account of the Union Benefits.

97.    The Debtor submits that the Employees will suffer undue hardship and, in many instances, serious financial difficulties without the relief requested herein.  Without the requested relief, the Debtor's stability would likely be seriously undermined at the outset of this Chapter 11 Case.  Any delay in paying prepetition payroll deductions or withholdings to the appropriate third party or the Union Benefits would seriously harm the Debtor's relationship with its Employees and could irreparably impair employee morale at the very time the deduction, confidence and cooperation of the Employees is most critical.

98.    I believe that the relief requested in the Employee Benefit Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11. Accordingly, on behalf of the Debtor, I respectfully submit that the Employee Benefit Motion should be approved.

f)    Insurance Finance Motion

99.    By its "Insurance Finance Motion" the Debtor seeks entry of an order, pursuant to Sections 105(a), 363(b) 1107 and 1108 of the Bankruptcy Code, authorizing the Debtor, subject to consultation with the indenture trustees and bond insurer for its prepetition funded debt, (a) to continue its existing insurance programs, including, among others, its workers compensation program, casualty, property, flood, general liability and non-profit directors and officers liability policy, and (b) to honor and renew, as necessary, its existing insurance programs and prepetition insurance Premium Financing Agreement in the ordinary course of its business, including the

payment of all required premiums and (c) to pay certain necessary prepetition, deductibles claims and related expenses.

100.    In the ordinary course of the Debtor's business, the Debtor maintains forty three (43) insurance policies which are administered through several private insurance carriers.  The polices provide coverage for, among other things, flood damage, casualty, property damage, crime, breach of duty by officers and directors, and various other insurance and risk control programs (the "Insurance Policies").  All of the Insurance Policies are essential to the Debtor's ongoing operations and sale of the Debtor's assets and real property.

101.    The premiums for most of the Insurance Programs (the "Insurance Premiums") are determined annually and are either paid by the Debtor directly or financed through a premium financing agreement with Premium Assignment Corporation ("PAC").  The Debtor finances premiums under six (6) of the Insurance Policies (the "Financed Policies"), since it is not economically advantageous or otherwise financially feasible for the Debtor to pay the premium on the Financed Policies, in full, on a lump sum or quarterly basis.  Accordingly, in the ordinary course of business, the Debtor finances the premiums on the Financed Policies in accordance with its premium financing agreement (the "Premium Financing Agreement") with PAC.

102.    To the extent Insurance Policies expire during the course of this Chapter 11 Case, the Debtor seeks authority to renew the Insurance Policies without further Court approval.  In accordance with any post-petition financing order entered in this Chapter 11 Case, the Debtor intends to renew six (6) flood insurance policies and one (1) short term disability policy before their terms expire at the end of this year.  The Debtor has also included the estimated payment of these amounts within its budget under the proposed DIP financing.

103.    If the Debtor was unable to continue honoring its obligations under the Premium Financing Agreement, PAC may seek relief from the automatic stay to terminate the Financed Policies and recoup its losses.   Should the agreement be terminated, the Debtor would be required to obtain replacement insurance on an expedited basis and likely at a significant cost to its estate.  Accordingly, among other things, the Debtor is seeking authority to continue honoring its obligations under the Premium Financing Agreement.

g)   Oakdale Campus Sale and Bidding Procedures Motion

104.    By its "Oakdale Campus Sale and Bidding Procedures Motion", the Debtor requests entry of an order pursuant to Sections 105(A), 363(b),(d) and (f), 365, 503 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004, LBR 6004-1, 6006-1 and 9006-1 and General Order 557 of the Bankruptcy Court for the Eastern District of New York, (A) (i) establishing bidding procedures (the "Oakdale Bidding Procedures") and bid protections in connection with the sale of the Oakdale Campus, (ii) scheduling an auction (the "Auction"), if necessary, and a hearing to approve the sale of the Oakdale Campus (the "Sale Hearing"), (iii) approving the form and manner of the notice of the Auction and Sale Hearing (the "Sale Notice"), (iv) approving a termination fee and expense reimbursement if a stalking horse bidder (the "Stalking Horse Bidder") is selected, and (B) (i) approving the sale of the Oakdale Campus, free and clear of all liens, claims and encumbrances, security interests and other interests pursuant to a proposed purchase agreement to the successful bidder as determined by the Oakdale Bidding Procedures (the "Sale").

105.    The Debtor needs to sell, among other things, its Oakdale Campus to maximize value for its estate.  To date, no Stalking Horse Bidder has been identified.  However, the Debtor reserves the right throughout the marketing process to enter into a Purchase Agreement with a

Stalking Horse Bidder and thereafter proceed to an Auction, if necessary, to maximize the value that the Debtor may realize from the sale of the Oakdale Campus.

106.    Further, as soon as practicable after the Petition Date, the Campus Agents' (as defined herein) intend to market the Oakdale Campus by submitting print and digital ads to the following entities for publication[12]:   Wall Street Journal, New York Times, Jewish Week, Newsday, and Real Estate Weekly.   The Campus Agents intend to initially solicit offers on the Oakdale Campus through a sealed bid process.   As a result, parties are encouraged in the first instance to put forth their highest and best bid for the Oakdale Campus in the event an Auction does not occur.   As further encouragement to interested parties to submit a competitive bid early, if an Auction is held, only the top three (3) bidders (or those within fifteen percent (15%) of the highest bid) will be permitted to attend and participate at the Auction.

107.    The Debtor proposes to provide the Sale Notice to (i) all of the Debtor's creditors; (ii) upon its appointment, counsel for the Creditors' Committee; (iii) the Debtor's material prepetition and post-petition secured lenders and any agent therefore; (iv) the Office of the United States Trustee for the Eastern District of New York; (v) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (vi) the following taxing and regulatory authorities: (a) the United States Attorney for the Eastern District of New York, (b) the Attorney General of the State of New York, (c) United States Department of Education, (d) New York State Department of Education, (e) the Internal Revenue Service, (f) the New York State Department of Taxation and Finance, and (g) the Securities and Exchange Commission; (vii) all parties who are known to assert a lien, claim, encumbrance or other interest on any portion of the Debtor's assets; and (viii) all parties identified by the Debtor as potentially having an interest in acquiring some or all of the Oakdale Campus.   In addition, the Debtor intends to publish notice

---

[12] This list is only a sample of the places where the Campus Agents' intend to market the Oakdale Campus.

of the Sale in the Wall Street Journal and Newsday to canvas the rest of the marketplace and ensure that all potentially interested parties are informed of the Debtor's intent to sell its Oakdale Campus and are able to participate in the bidding process if they desire. These efforts are designed to provide certainty that the Debtor will obtain the highest and best price possible for the Oakdale Campus.

108.    I have reviewed the Oakdale Campus Sale and Bidding Procedures Motion and believe that the facts stated therein are accurate to the best of my knowledge, information and belief. I further believe that the relief requested in the Oakdale Campus Sale and Bidding Procedures Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest. Accordingly, on behalf of the Debtor, I respectfully submit that the Oakdale Campus Sale and Bidding Procedures Motion should be granted.

109.    I believe that the solicitation process contemplated by the Oakdale Bidding Procedures is reasonable and appropriate and that the Debtor should promptly begin the process of soliciting bids and marketing through its agents as quickly as possible. The Campus Agents expect to spend substantial time and money marketing the Oakdale Campus within the first few weeks of this case. In addition, the Debtor has agreed to certain milestones with the Consenting Creditors (defined below) in connection with a consensual liquidation strategy intended to maximize the value of the Debtor's assets through this Chapter 11 Case. Accordingly, as it relates to the initial "first day" hearing before this Court, I request that the Court schedule a hearing to consider the Oakdale Bidding Procedures on shortened notice. I believe a hearing date approximately ten (10) to fourteen (14) days after the Petition Date is a reasonable period of time for parties in interest to consider the relief requested.

h) <u>Residential Portfolio Sale Motion</u>

110.    By its "<u>Residential Portfolio Sale Motion</u>", the Debtor requests the entry of interim and final orders pursuant to Sections 105(a) and 363(b), (d), (f), 365, 1107 and 1108 of Title 11 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 for an order (i) approving the Residential Sale Procedures to facilitate the sale of the Residential Portfolio and (ii) approving the sale of the Residential Portfolio free and clear of all liens, claims, encumbrances, security interests and other interests.

111.    As previously noted, the Debtor is seeking to sell thirty two (32) non-contiguous parcels of predominantly residential property owned by the Debtor and scattered through the neighborhood adjacent to the Oakdale Campus.

112.    To provide confidence and comfort to all of the Debtor's stakeholders concerning this sales effort, including creditors and existing and prospective Buyers, the Debtor seeks entry of a sale order authorizing the Debtor to (i) proceed to a closing with those Buyers currently under contract (the "<u>Pending Sales</u>") and (ii) enter into postpetition contracts for the sale of any parcel in the Residential Portfolio and to close on such sales (the "<u>Future Sales</u>").  Toward that end, the Debtor requests that the Court authorize the Residential Sale Procedures, which will permit the closing of the Residential Portfolio without the need for a specific hearing for each sale, in the event that the Creditors' Committee and the Secured Parties consent to such sale.

113.    As it relates to the initial "first day" hearing before this Court, the Debtor requests an interim order to consummate the sale of six (6) parcels within the Residential Portfolio where the scheduled closing date has already passed and to maintain marketing efforts that were in process as of the Petition Date pending further order from this Court.  I have reviewed the

Residential Portfolio Sale Motion and believe that the facts stated therein are accurate to the best of my knowledge, information and belief.

114.    As it relates to these six (6) parcels, the Debtor – due to creditor restraints served on the Debtor under state law before the Petition Date -- was unable to consummate these transactions prepetition and all six (6) parcels have closing dates under existing purchase contracts that have passed.   Many of the buyers for these parcels have expressed increasing concern and frustration with the status of their transactions.  For three (3) of these parcels, I have been advised by the Debtor's professionals that the buyers in question have interest rate locks for acquisition financing that could expire before a final hearing on the Residential Portfolio Sale Motion under more typical scheduling procedures.  I request that the Court schedule a hearing to consider the interim relief requested on shortened notice and as soon as possible.

115.    In connection with the interim relief requested therein, I've been further informed that failure to approve the Residential Sale Procedures on an interim basis may also harm on-going negotiations regarding the remaining Residential Portfolio by forcing the Debtor and other stakeholders to stand down in those negotiations pending approval by this Court.  Perhaps most concerning, as set forth above, any failure to consummate the Pending Sales may jeopardize confidence in the residential broker and buyer community and imperil the disposition process for the Residential Portfolio.  I further believe that the relief requested in the Residential Portfolio Sale Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest.   Accordingly, on behalf of the Debtor, I respectfully submit that the Residential Portfolio Sale Motion should be granted on an interim basis, and that a hearing be scheduled for a final hearing on this pleading.  In accordance with Bankruptcy Rule 6004(a), in advance of a

final hearing, the Debtor intends to give notice of the Residential Portfolio Sale Motion to all of the Debtor's creditors.

> i) Applications to Retain (i) A&G Realty Partners, LLC
> and Madison Hawk Partners, LLC, (ii) CBRE, Inc. and (iii)
> <u>Douglas Elliman as Real Estate Advisors and Brokers to the Debtor</u>

116.    As set forth herein, all of Dowling's real property and substantially all of its personal property (excluding restricted assets), including the Oakdale Campus, the Brookhaven Campus, the Brookhaven Dorm, and the Residential Portfolio, are subject to the liens and security interests of Dowling's prepetition bondholders.  The Debtor believes that this Chapter 11 Case will allow the Debtor to maximize the value of its assets for all creditors through a sale of the Oakdale Campus, the Brookhaven Campus, the Brookhaven Dorm, and the Residential Portfolio.  Toward that end, the Debtor is seeking to retain separate real estate advisors and brokers to market and sell each piece of collateral held by the prepetition lenders.

117.    First, pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, the Debtor is seeking to retain A&G Realty Partners, LLC and Madison Hawk Partners, LLC (collectively, the "<u>Campus Agents</u>") as its exclusive real estate advisors to assist with the sale and disposition of the Debtor's Oakdale Campus and Brookhaven Campus (collectively, the "<u>Series 2006 Collateral</u>").  For the avoidance of doubt, the Campus Agents will not serve as real estate advisors with respect to (i) the Residential Portfolio and (ii) the Brookhaven Dorm.

118.    As detailed in that real estate services agreement, dated October 19, 2016, between the Campus Agents and the Debtor (the "<u>Campus Agents Services Agreement</u>"), upon the sale of any parcel of the Series 2006 Collateral, the Debtor will pay to the Campus Agents a fee of four percent (4%) of the Gross Proceeds ("<u>Property Sale Fee</u>") of such sale.  Subject to the requirement that the Campus Agents file a final fee application with the Court, the Debtor

intends to pay the Campus Agents their Property Sale Fee directly from the sale proceeds of any parcel of the Series 2006 Collateral.

119.    Second, pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, the Debtor is seeking to retain CBRE, Inc. (the "Dorm Agent") as its exclusive real estate broker to assist with the sale and disposition of the Brookhaven Dorm.

120.    As detailed in that certain listing agreement, dated November 28, 2016, between the Debtor and the Dorm Agent (the "Dorm Agent Listing Agreement"), upon the sale of the Brookhaven Dorm, the Dorm Agent will be paid a commission (the "Dorm Agent Commission") equal to four percent (4%) of the Gross Proceeds of such sale.  Subject to the requirement that the Dorm Agent file a final fee application with the Court, the Debtor intends to pay the Dorm Agent its Dorm Agent Commission directly from the sale proceeds of the Brookhaven Dorm.

121.    Third, pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, the Debtor is seeking to retain Douglas Elliman (the "Residential Agent", and together with the Campus Agents and the Dorm Agent, the "Agents" and each an "Agent"), as its exclusive real estate broker to assist with the sale and disposition of the Residential Portfolio.

122.    As detailed in those certain listing agreements, dated November 22, 2016, between the Debtor and the Residential Agent (the "Residential Agent Listing Agreements"), upon the sale of any parcel of the Residential Portfolio, the Residential Agent will be paid a commission (the "Residential Agent Commission") equal to two and a half percent (2 ½ %) of the purchase price if sold to an existing tenant and the Residential Agent is the only agent involved in the transaction and otherwise four percent (4%) of the purchase price.   In addition, the Residential Agent will compensate any outside broker who dealt with the Residential Agent in representation of the purchaser in an amount equal to fifty percent (50%) of the Commission received by the Residential

40

Agent from the Debtor under the Listing Agreements.  Subject to the requirement that the Residential Agent file a final fee application with the Court, the Debtor intends to pay the Residential Agent its Commission directly from the sale proceeds of any parcel of the Residential Portfolio.

123.    In light of the unique circumstances and complexity of this Chapter 11 Case, the Debtor requires the services of skilled and experienced real estate brokers that are familiar with the Debtor's real property.  The Agents each have extensive experience in selling commercial and residential properties on Long Island.  The Debtor thus believes that each of the Agents is well qualified to act as its real estate broker in this Chapter 11 Case subject to its respective listing agreements and Court approval.

124.    The Debtor is requesting "first day" consideration of its applications to employ the Residential Agent and Campus Agents to the extent their services are related to the interim relief the Debtor is seeking on the Residential Portfolio Sale Motion and Oakdale Campus Sale and Bidding Procedures Motion, as previously discussed.

j)    <u>Application to Retain KWJS&S as General Bankruptcy Counsel to the Debtor</u>

125.    The Debtor seeks to employ and retain KWJS&S as its general bankruptcy counsel pursuant to Section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014.  The Debtor has been informed that the partners and associates of KWJS&S who will be engaged in this Chapter 11 Case and who will appear before this Court are admitted to practice before this Court. The Debtor has selected KWJS&S as its general bankruptcy counsel because KWJS&S and its attorneys have extensive experience and knowledge in the fields of debtor and creditor rights, corporate and not-for-profit debt restructuring and liquidation, and in representing debtors in chapter 11 bankruptcy cases.

126.    In the year leading up to the Chapter 11 filing, KWJS&S was actively involved in the Debtor's financial affairs, assisting the Debtor with the extreme liquidity challenges it was facing due to declining revenue.  In addition, KWJS&S devoted a substantial amount of time to prepare the filing, which included, among other things, the preparation of the petition, schedules, statement of financial affairs, ancillary documents and First Day Motions and Applications.

127.    Given the level of KWJS&S's involvement to date, the firm is uniquely and well qualified and able to continue to represent the Debtor for the matters in respect of which the firm is to be engaged in this Chapter 11 Case in a most efficient and timely manner.  If the Debtor is required to retain attorneys other than KWJS&S in connection with this Chapter 11 Case, the Debtor and its estate would be prejudiced by the time and expense necessary for such attorneys to become familiar with the Debtor's business operations.  In addition, the Debtor has directed KWJS&S to work cooperatively with the other professionals retained in this Chapter 11 Case to avoid duplication and inefficiency.

k)    Application to Retain Ingerman Smith, LLP as Special Counsel to the Debtor

128.    The Debtor seeks to employ and retain Ingerman Smith, LLP ("Ingerman"), pursuant to Section 327(e) of the Bankruptcy Code and Bankruptcy Rule 2014, as its special counsel in relation to education, landlord tenant, and labor law matters.  Prior to the Petition Date, Ingerman served as counsel to the Debtor providing legal services in connection with education, landlord tenant, labor law and related areas.

129.    The Debtor has selected Ingerman as its special counsel because of its extensive experience on a wide array of legal issues affecting educational providers, labor relations, and landlord tenant matters.  Ingerman is also long standing outside counsel to the Debtor and is fully

familiar with the Debtor and its legal affair and historical operations.  As such, the Debtor believes that Ingerman is well qualified to be special counsel in this matter.

l) <u>Application to Retain Smith & Downey, PA as Special Counsel</u>

130.    The Debtor seeks to employ and retain Smith & Downey, PA ("<u>Smith & Downey</u>"), pursuant to Section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014, as its special counsel in relation to employee compensation and benefits matters, including under the Employee Retirement Income Security Act of 1974 ("<u>ERISA</u>").

131.    The Debtor has selected Smith & Downey as its special counsel because of its extensive experience representing various entities, including charitable organizations, with ERISA and employee compensation and benefits matters.  As such, the Debtor believes that Smith & Downey is well qualified to be special counsel in this matter.

m) <u>Motion to Approve Plan Support Agreement</u>

132.    By its "<u>Motion to Approve PSA</u>", the Debtor seeks entry of an order authorizing it to enter into and perform under that certain Plan Support Agreement (the "<u>PSA</u>"), dated as of November 29, 2016, by and among the Debtor, ACA, as the bond insurer for the Series 2006 Bonds, and certain holders of the Debtor's Series 1996 Bonds, Series 2002 Bonds, and Series 2015 Bonds (collectively, together with ACA, the "<u>Consenting Creditors</u>").

133.    Prior to filing this Chapter 11 Case, the Debtor and its professionals worked together with stakeholders of Dowling's four outstanding bond issuances and their professionals to develop a consensual liquidation strategy intended to maximize the value of the Debtor's assets through a chapter 11 bankruptcy process.  The PSA is the culmination of those efforts. It provides the framework for an orderly liquidation of the Debtor's real property interests and other unrestricted assets through a cooperative marketing and sale process, contemplates

continued financial support from the Consenting Creditors in the form of debtor-in-possession financing and exit financing, provides the Debtor with assurances of the Consenting Creditors' support of a chapter 11 liquidating plan, and allows the Debtor to fulfill its fiduciary duties and charitable mission to the greatest extent possible under the circumstances.

134.    The PSA was achieved through lengthy, good faith, arms' length negotiations and has received the support of all of the Debtor's major secured creditors that have liens on and security interests in substantially all of the Debtor's unrestricted assets. The Debtor believes, consistent with its good faith business judgment and the exercise of its fiduciary duties, that the PSA sets forth the best way to maximize value, is fair and reasonable, and is in the best interests of all creditors of the Debtor's estate.

**C.  Conclusion**

135.    The Debtor reserves the right to amend or supplement any of the attached schedules in the event additional information is obtained by the Debtor.

136.    The Debtor believes that the protection of the Bankruptcy Code will enable it to maximize the value of its assets for the benefit of the estate and its creditors.

_/s/ Robert S. Rosenfeld_
Robert S. Rosenfeld
Chief Restructuring Officer

**Exhibit A**

**Twenty Largest General Unsecured Claims**

| Name of Creditor | Amount | Contingent, Unliquidated, Disputed, or Partially Secured |
|---|---|---|
| NYS Unemployment Insurance<br>PO Box 4301<br>Binghamton, NY 13902-4301 | $636,797.54 | Unliquidated |
| Cigna Health & Life Insurance Co.<br>900 Cottage Grove Road, B6LPA<br>Hartford, CT 06152 | $278,000.00 | |
| Ultimate Power, Inc.<br>45 Nancy Street<br>West Babylon, NY 11704 | $258,213.74 | Judgment Creditor |
| The Allen J Flood Companies, Inc.<br>Two Madison Avenue<br>Larchmont, NY 10538 | $195,944.00 | |
| American Express<br>PO Box 2855<br>New York, NY 10116 | $171,500.66 | |
| CohnReznick LLP<br>4 Becker Farm Road<br>Roseland, NJ 07068 | $141,697.30 | Unliquidated |
| PSEGLI<br>PO Box 888<br>Hicksville, NY 11802-0888 | $141,306.81 | |
| Ingerman Smith, L.L.P.<br>150 Motor Pkwy<br>Suite 400<br>Hauppauge, NY 11788 | $101,330.36 | |
| Capital One NA<br>PO Box 60024<br>New Orleans, LA 70160-0024 | $98,538.84 | |

| | | |
|---|---|---|
| Blackboard Inc.<br>650 Massachusetts Avenue NW<br>6th Floor<br>Washington, DC 20001 | $93,671.42 | |
| Carrier Commercial Service<br>P.O. Box 93844<br>Chicago, IL 60673-3844 | $93,296.50 | |
| We Drive You, Inc.<br>700 Airport Blvd<br>Suite 250<br>Burlingame, CA 94010 | $83,071.63 | |
| St. Johns University<br>Bernadette Lavin-MacDonald Ctr.<br>8000 Utopia Pkwy<br>Jamaica, NY 11439 | $76,500.00 | |
| Seyed Raji<br>24 Pleasant Lane<br>Southampton, NY 11968 | $75,200.58 | |
| Paul Abramson<br>6 Winside Ln<br>Coram, NY 11727 | $73,914.12 | |
| George Foundotos<br>4 Damin Circle,<br>St. James, NY 11780 | $72,355.08 | |
| Joseph Behar<br>9 Brown's River Rd<br>Sayville, NY 11782 | $67,518.36 | |
| Higher One<br>115 Munson Street<br>New Haven, CT 06511 | $64,162.35 | |
| Statewide Roofing Inc.<br>2120 Fifth Avenue<br>Ronkonkoma, NY 11779 | $60,123.61 | |
| Linda Ardito<br>5 Two Rod Road<br>Huntington, NY 11743 | $52,775.52 | |

## Exhibit B

## Five Largest Secured Claims

| Name of Creditor | Amount Secured | Value and Description of Collateral | Contingent, Unliquidated, or Disputed |
|---|---|---|---|
| Wilmington Trust, National Association, *as Indenture Trustee for the Series 2006 Bonds* Corporate Trust Services 25 South Charles Street 11th Floor Baltimore, MD 21201 | $37,253,883.01 | First Mortgage on Oakdale Campus and Brookhaven Campus, Second Mortgage on Brookhaven Dorm | |
| UMB Bank, National Association, *as Indenture Trustee for the Series 2002 Bonds* Corporate Trust Services 120 Sixth Street, Suite 1400 Minneapolis, MN 55402 | $11,122,497.92 | First Mortgage on Brookhaven Dorm and Second Mortgage (pari passu) on Residential Portfolio | |
| UMB Bank, National Association, *as Indenture Trustee for the Series 2015 Bonds* Corporate Trust Services 120 Sixth Street, Suite 1400 Minneapolis, MN 55402 | $6,998,243.06 | First Mortgage on Residential Portfolio | |

| | | | |
|---|---|---|---|
| UMB Bank, National Association, *as Indenture Trustee for the Series 1996 Bonds* Corporate Trust Services 120 Sixth Street, Suite 1400 Minneapolis, MN 55402 | $3,531,250.53 | Second Mortgage (pari passu) on Residential Portfolio | |
| U.S. Dept. of Ed. Financial Square 32 Old Slip, 25th Floor New York, NY 10005 | $1,256,267.73 | Purported Mortgage on Kramer Science Center | Disputed |

## Exhibit C

Exhibit C

*DRAFT - SUBJECT TO CHANGE*
**UNAUDITED**

### DOWLING COLLEGE
**Balance Sheet**
**October 31, 2016**

**Assets**

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 1,095,892 |
| Student accounts receivable (net of allowance for doubtful accounts) | | 858,974 |
| Contributions receivable, net | | 2,077,995 |
| Other receivables, net | | 165,827 |
| Prepaid expenses and other assets | | 3,054,389 |
| Investments | | 5,789,365 |
| Deposit with bond trustees | | 1,089,512 |
| Student loans receivable (net of allowance for doubtful loans) | | 1,688,457 |
| Land, buildings, equipment, and library books, net | | 49,362,153 |
| Total assets | $ | 65,182,563 |

**Liabilities and Net Assets**

| | | |
|---|---|---:|
| Liabilities: | | |
| Accounts payable and accrued expenses | $ | 9,854,148 |
| Long-term debt, net | | 54,588,978 |
| U.S. government grants refundable | | 1,774,795 |
| Total liabilities | | 66,217,920 |
| | | |
| Net assets: | | |
| Unrestricted | | (6,162,231) |
| Temporarily restricted | | 3,217,303 |
| Permanently restricted | | 1,909,571 |
| Total net assets | | (1,035,357) |
| Total liabilities and net assets | $ | 65,182,563 |

**Above information is subject to change.  The above analysis has been provided based on information available a the time.**

**See Note to Balance Sheet on Exhibit C-1.**

**Exhibit C-1**

**Dowling College**
**Note to Balance Sheet**
**Disclaimer**

The accompanying balance sheet is a preliminary draft and subject to change.  The Debtor and its agents, financial advisors and attorneys do not guarantee or warrant the accuracy, completeness, or currentness of the data that is provided herein and shall not be liable for any loss or injury arising out of or caused in whole or in part by the acts, errors or omissions, whether negligent or otherwise, in procuring, compiling, collecting, interpreting, reporting, communicating or delivering the information contained herein.   This document would not necessarily reveal any material misstatement, omission or error and does not constitute an audit, review, compilation or other attestation service in accordance with Generally Accepted Accounting Principles or other standards established by the American Institute of Certified Public Accountants.

In no event shall the Debtor or its agents, financial advisors and attorneys be liable to any third party for any direct, indirect, incidental, consequential or special damages (including, but not limited to, damages arising from the disallowance of a potential claim against the Debtor or damages to business reputation, lost business or lost profits), whether foreseeable or not and however caused, even if the Debtor or its agents, financial advisors and attorneys are advised of the possibility of such damages.

**Exhibit D**

**Publicly Held Bonds**

| Name of Series | Dated | PAAI | CUSIP | Maturity | Interest Rate | Status |
|---|---|---|---|---|---|---|
| Suffolk County NY Industrial Development Agency Civic Facility Revenue (NY) | 06/01/1996 | $5,740,000.00 | 864768BD7 | 12/01/2020 | 6.7% | Outstanding |
| Brookhaven NY Industrial Development Agency Civic Facility Revenue | 11/20/2002 | $9,235,000.00 | 113156CJ0 | 11/01/2032 | 6.75% | Outstanding |
| Suffolk County NY Industrial Development Agency Civic Facility Revenue Dowling College Series A (NY) | 06/26/2006 | $975,000.00<br>$1,020,000.00<br>$1,065,000.00<br>$1,115,000.00<br>$1,170,000.00<br>$1,220,000.00<br>$1,280,000.00<br>$1,340,000.00<br>$1,400,000.00<br>$1,470,000.00<br>$1,540,000.00<br>$1,610,000.00<br>$1,690,000.00<br>$1,775,000.00<br>$1,865,000.00<br>$1,960,000.00<br>$2,055,000.00<br>$2,160,000.00<br>$2,265,000.00<br>$2,380,000.00<br>$2,500,000.00 | 864768MW3<br>864768MX1<br>864768MY9<br>864768MZ6<br>864768NA0<br>864768NB8<br>864768NC6<br>864768NC6<br>864768NC6<br>864768NC6<br>864768NC6<br>864768ND4<br>864768ND4<br>864768ND4<br>864768ND4<br>864768ND4<br>864768ND4<br>864768ND4<br>864768ND4<br>864768ND4<br>864768ND4 | 06/01/2016<br>06/01/2017<br>06/01/2018<br>06/01/2019<br>06/01/2020<br>06/01/2021<br>06/01/2022<br>06/01/2023<br>06/01/2024<br>06/01/2025<br>06/01/2026<br>06/01/2027<br>06/01/2028<br>06/01/2029<br>06/01/2030<br>06/01/2031<br>06/01/2032<br>06/01/2033<br>06/01/2034<br>06/01/2035<br>06/01/2036 | 4.5%<br>4.5%<br>5.0%<br>4.5%<br>4.625%<br>4.625%<br>4.75%<br>4.75%<br>4.75%<br>4.75%<br>4.75%<br>5.0%<br>5.0%<br>5.0%<br>5.0%<br>5.0%<br>5.0%<br>5.0%<br>5.0%<br>5.0%<br>5.0% | Outstanding |
| Dowling College Taxable Revenue Bonds, Series 2015A | 06/15/2015 | $6,700,000.00 | 260674AA4 | 06/15/2018 | 7.50% | Outstanding |

## Exhibit E

### List of Premises

| Location | Interest | Use | Collateral For |
|---|---|---|---|
| 150 Idle Hour Blvd. Oakdale, New York 11769 | Fee simple ownership, subject to leasehold estates | Oakdale Campus | Series 2006 Bonds |
| 1300 William Floyd Pkwy Shirley, New York 11967 | Fee simple ownership, subject to leasehold estates | Brookhaven Campus (excluding Brookhaven Dorm) | Series 2006 Bonds |
| 1300 William Floyd Pkwy Shirley, New York 11967 | Fee simple ownership, subject to leasehold estates | Brookhaven Dorm | Series 2002 Bonds and Series 2006 Bonds |
| 96 Biltmore Ave. Oakdale, New York 11769 | Fee simple ownership | Visual Arts Center | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 87 Central Blvd. Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 88 Central Blvd. Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 89 Central Blvd. Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 121 Central Blvd. Oakdale, New York 11769 | Fee simple ownership | Security Offices | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 138 Central Blvd. Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 21 Chateau Drive Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |

| Location | Interest | Use | Collateral For |
|---|---|---|---|
| 27 Chateau Drive Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 39 Chateau Drive Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 47 Chateau Drive Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 64 Chateau Drive Oakdale, New York 11769 | Fee simple ownership | Veterans House | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 72 Chateau Drive Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 80 Chateau Drive Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 81 Chateau Drive Oakdale, New York 11769 | Fee simple ownership | Residence | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 94 Connetquot Drive Oakdale, New York 11769 | Fee simple ownership | Residence | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 102 Connetquot Drive Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 274 Connetquot Drive Oakdale, New York 11769 | Fee simple ownership | Lot | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 275 Connetquot Drive Oakdale, New York 11769 | Fee simple ownership | Music Department | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |

| Location | Interest | Use | Collateral For |
|---|---|---|---|
| 14 Elmsmere Drive Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 90 Elsmere Drive Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 8 Idle Hour Blvd. Oakdale, New York 11769 | Fee simple ownership | Offices | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 15 Idle Hour Blvd. Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 99 Idle Hour Blvd. Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 115 Idle Hour Blvd. Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 123 Idle Hour Blvd. Oakdale, New York 11769 | Fee simple ownership | Campus Offices | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 135 Idle Hour Blvd. Oakdale, New York 11769 | Fee simple ownership | Campus Offices | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 44 Van Bomel Blvd. Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 48 Van Bomel Blvd. Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 52 Van Bomel Blvd. Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |

| Location | Interest | Use | Collateral For |
|---|---|---|---|
| 56 Van Bomel Blvd. Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 64 Van Bomel Blvd. Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |
| 58 Woodlawn Ave. Oakdale, New York 11769 | Fee simple ownership | Residence For Profit Rental | Series 2015 Bonds, Series 2002 Bonds and Series 1996 Bonds |

**Exhibit F**

**List of Pending Legal or Administrative Proceedings**

The Debtor is a defendant in the following pending legal actions:

| Case Name & Case No. | Status |
|---|---|
| **Sans Technology, Inc. v. Dowling College (Index No. 613595/2015) Supreme Court of the State of New York, Suffolk County** | Suit for breach of contract. Pre-trial discovery phase. |
| **Martin Schoenshals v.  Dowling College Chapter, New York State United Teachers, Local #3890, New York State United Teachers AFT, AAFL-CIO and Dowling College (Civ. No. 15-cv-02044) U.S. District Court, E.D.N.Y. (Central Islip)** | Suit for wrongful termination. Pre-trial discovery phase. |

**Exhibit G**

**DOWLING COLLEGE**
**CASH FLOW FORECAST**
**30 Days following Ch. 11 Petition**

|  |  | $ |  |
|---|---|---|---|
| 1 | **Total Cash Receipts** | - | |
| | **Cash Disbursements:** | | |
| | Gross Wages/Salaries (incl. employer taxes) | $ | 59,193 |
| | General Insurance | $ | 65,059 |
| | Utilities | $ | 152,200 |
| | Security Personnel | $ | 88,064 |
| | Other Outside Services | $ | 106,224 |
| | Facility Maintenance | $ | 7,000 |
| | Landscaping / Snow Removal | $ | 23,800 |
| | Sales Broker - Marketing | $ | 68,110 |
| | Brookhaven Site Planning | $ | 10,000 |
| | Professionals | $ | 40,000 |
| | Claims Agent | $ | 20,000 |
| | Administrative | $ | 2,200 |
| | Other | $ | 36,334 |
| | DIP Interest & Fees | $ | 204,000 |
| | **Total Cash Disbursements** | $ | 902,185 |
| | | | |
| | **Net Cash Flow** | $ | (902,185) |

**BOND SERIES / DIP TRANCHE  SUMMARY**

| | | |
|---|---|---|
| Series 2006 Bonds / Term Loan A | $ | 529,008 |
| Series 2002 Bonds / Term Loan B | $ | 57,476 |
| Series 2015 Bonds / Term Loan C | $ | 40,893 |
| Administrative Overhead / Term Loan D | $ | 274,809 |
| **Total Cash Disbursements** | $ | 902,185 |

1  The College is not operating.  Income is limited to rent on several residential
properties owned by the college in Oakdale, all of which have expired leases
with holdover tenants.  Rental receipts have been sporadic since the college
closed and are being swept by the holder of the first mortgage on the
properties.  Other cash receipts are unpredictable and immaterial, relating to
past due student payment collections and other miscellaneous items.