# **<u>Exhibit B</u>**

# CBRE

# EXCLUSIVE SALES LISTING AGREEMENT

THIS EXCLUSIVE SALES LISTING AGREEMENT ("Agreement") is entered into as of the 28th day of November, 2016, by and between **CBRE, Inc.,** 200 Park Avenue, New York, New York 10166 ("CBRE") and **Dowling College**, 150 Idle Hour Boulevard, Oakdale, New York, 11769 ("Owner").

## RECITALS

WHEREAS, Owner owns certain land, buildings and improvements more fully described as **Brookhaven Residential Village** located on the Brookhaven Campus of the Owner at 1300 William Floyd Parkway, Shirley, New York 11967 (the "Property"), and

WHEREAS, the Property is pledged as collateral to a series of bonds issued in 2002 for the benefit of Owner (the "Bonds").  UMB Bank, National Association, as indenture trustee, serves as indenture trustee for the holders of the Bonds ("Trustee"), and

WHEREAS, Owner expects to engage in certain site planning and discussions with interested parties, including the Town of Brookhaven Planning Board, in relation to the Property and certain surrounding property (the "Planning"), and

WHEREAS, Owner has advised CBRE and Trustee that it believes that the efficient and effective marketing and disposition of the Property should await the completion of the Planning, and

WHEREAS, Owner desires to engage CBRE as its exclusive broker, and to grant to CBRE the exclusive right to list for sale the Property, and CBRE is agreeable to such engagement on the terms and conditions as set forth in this Agreement,

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and agreements of the parties hereinafter expressed, the parties hereto agree as follows:

## ARTICLE ONE

## APPOINTMENT

1.1     Exclusive Right to List for Sale.  Owner hereby appoints CBRE as its exclusive agent and grants CBRE the exclusive right to solicit and procure prospective purchasers for the Property. **CBRE** will act under this Agreement as Owner's fiduciary.  CBRE accepts the appointment and agrees to act in good faith and use diligent efforts to perform the services required by this Agreement.

1.2     Listing Price.  The listing price shall be **DETERMINED BY MARKET** and shall be on an "all cash" basis, or such other terms and conditions as acceptable to the Owner.

**ARTICLE TWO**

**TERM**

2.1 <u>Term of Agreement</u>. The term ("Term") of this Agreement shall commence on the date hereof and shall end at midnight, **December 31, 2017** unless sooner terminated or extended in accordance with the provisions of this Agreement. The Term shall be extended only by an agreement in writing signed by the parties hereto.

**ARTICLE THREE**

**CBRE'S REPRESENTATIONS AND DUTIES**

3.1 <u>Licensing</u>. CBRE hereby represents that it and its personnel providing services are, to the extent required by law, duly licensed. CBRE shall, at its expense, obtain and keep in full force and effect throughout the Term of this Agreement all licenses and permits required to be maintained by CBRE in connection with the rendering of the services.

3.2 <u>Performance of Services</u>. CBRE shall perform the services through able, qualified and trained personnel of CBRE in sufficient number to properly render the services in the manner appropriate for the Property as required by this Agreement. CBRE shall have the exclusive right to hire, direct, discipline, compensate and terminate the personnel of CBRE, and shall exercise complete and exclusive control over the conduct of CBRE's personnel. Such services shall include:

(a) <u>Inspection, Review and Analysis</u>. CBRE shall review the Property to determine its relative market appeal, quality of location, market and area trends, and potential for value enhancement prior to entering the market. CBRE shall be entitled to rely on information provided by Owner, Owner's agents, and any property manager for the Property, and shall not be responsible for verifying the accuracy or completeness of any such information.

(b) <u>Marketing Plan</u>. CBRE shall develop and prepare for the Owner's review and approval a detailed marketing plan (the "Marketing Plan") setting forth a comprehensive strategy for sale of the Property.

(c) <u>Offering Materials</u>. CBRE shall assemble and produce for the Owner's review and approval an offering brochure and/or other marketing materials of a type which is customary for similar properties. Owner shall provide the information in its possession, custody or control regarding the Property necessary for CBRE to prepare a professional offering brochure. The brochure shall include, as appropriate, property facts, photographs, high-quality graphics, cash flow projections, market competition data, descriptive area and location information, site plan, and other relevant information as available.

(d) <u>Marketing Efforts and Advertising</u>. Owner has authorized CBRE to advertise the Property for sale. CBRE shall expose the Property to a wide variety of purchasers via direct mail, print advertising, electronically and on the Internet, as deemed appropriate by CBRE. CBRE shall provide prospective purchasers with additional information and coordinate site visits. CBRE shall not disseminate any offering brochures or other

        written promotional materials, until approved by Owner in writing. Upon completion of the sale of the Property, CBRE may advertise or issue a press release or other public announcement regarding the sale, in form and content reasonably acceptable to the Owner. CBRE shall also open a data room that shall contain all information potential purchasers may require in reviewing the Property.

(e) <u>Prospective Purchaser Qualification and Inspections</u>. CBRE shall solicit and identify prospective purchasers of the Property, deliver the offering materials to such prospective purchasers and, in connection therewith, assist the Owner in qualifying prospective purchasers prior to recommending acceptance of an offer, provided, however, that the Owner shall have the ultimate responsibility for determining the financial condition and capabilities of any prospective purchaser. CBRE shall require each prospective purchaser to execute and deliver to CBRE a form confidentiality agreement. CBRE shall make the necessary arrangements with Owner or Owner's agent to permit prospective purchasers to physically inspect the Property.

(f) <u>Inquiries</u>. CBRE shall promptly inform the Owner of all offers and inquiries received from brokers, prospective purchasers or anyone else with respect to the Property.

(g) <u>Negotiations and Legal and Tax Advice</u>. All negotiations with prospective purchasers shall be conducted by CBRE in conjunction with the Owner and their counsel. The Owner and the Owner's counsel shall be responsible for determining the legal sufficiency of the purchase and sale agreement and all other documents relating to any transaction contemplated by this Agreement; and Owner and its financial advisors shall be solely responsible for determining the tax consequences of any transaction contemplated under this Agreement.

(h) <u>Closing</u>. At Owner's request, CBRE shall assist the Owner and its counsel in the preparation and execution of the closing checklist and provide information necessary to complete closing documentation, and shall coordinate with the property manager for the Property to secure all documents and information required for closing.

(i) <u>Other</u>. At Owner's request, CBRE shall assist Owner and its counsel with respect to zoning, permitting and similar municipal matters affecting the Property, and shall, at Owner's reasonable request, periodically attend meetings with municipal, county and state officials and their representatives and assist Owner in identifying professionals and consultants that may be necessary or appropriate in connection with the foregoing matters.

    3.3 <u>Staffing</u>. CBRE's listing team for purposes of implementing the obligations of CBRE hereunder shall consist of Charles Berger, Elli Klapper, Jay Gelbtuch, Richard Karson, Mark Silverman and Jon Cohen (the "Listing Team"). Owner and CBRE appoint the Listing Team as Owner's legal agent, to the exclusion of all other CBRE-affiliated brokers and salespersons (the "Non-Listing Team Agents"). The Listing Team shall assume primary responsibility for the initiation of all discussions and the conduct of all negotiations with prospective purchasers on the part of CBRE. CBRE may replace any member of the Listing Team during the Term in the event a member of the Listing Team dies, becomes incapacitated or terminates his/her employment with CBRE, provided such replacement individual has similar or greater experience than the replaced member and provided that Owner consents, which consent shall not be unreasonably withheld. Upon written request by Owner, any member of the Listing Team shall be replaced by another qualified salesperson employed by CBRE, subject to the Owner's

approval, which approval shall not be unreasonably withheld. For compensation purposes, Non-Listing Team Agents who represent prospective purchasers shall be treated as Cooperating Brokers under Section 3.6 below.

3.4 <u>Reports</u>. CBRE shall submit to the Owner, no later than the fifth (5th) day of each month, a monthly report on the marketing of the Property which shall include an updated list of all prospective purchasers and a summary of the status of any offers or negotiations.

3.5 <u>Confidentiality</u>.

(a) As used in this Agreement, the term "Confidential Information" means information provided by Owner or the Trustee to CBRE pertaining to the Property which Owner or Trustee believes in good faith contains legally protectable and/or otherwise confidential trade secrets, non-public research, development, or commercial information and that Owner or the Trustee designates in writing as confidential at the time it is provided to CBRE. Confidential Information does not include information that (i) was known to CBRE at the time it was provided by Owner or the Trustee (ii) was publicly available at the time it was provided by Owner or the Trustee or thereafter becomes publicly available without breach by CBRE of its obligations hereunder, (iii) becomes available to CBRE on a non-confidential basis from a source other than Owner or the Trustee or its representatives, (iv) can be shown to have been developed independently by CBRE, (v) is required to be disclosed by court order, regulation, or other law or legal process; or (vi) is approved for release by written agreement of Owner or the Trustee.

(b) For a period of two (2) years from the date of disclosure of any Confidential Information to CBRE, CBRE agrees to hold such Confidential Information in trust and confidence for Owner and the Trustee and agrees not to use Confidential Information other than as required in the performance of its obligations under this Agreement, which shall include disclosure to CBRE's personnel who have a need to know.

3.6 <u>Cooperating Brokers</u>. CBRE and the Listing Team are authorized to solicit and cooperate with other real estate brokers, including Non-Listing Team Agents, who represent prospective purchasers for the Property ("Cooperating Brokers"), provided such Cooperating Broker (i) represents the prospective purchaser pursuant to a written agreement, a copy of which is furnished to CBRE and (ii) executes and delivers to CBRE a confidentiality agreement, if required by Trustee and on Trustee's form. **Prospective Purchaser** shall be responsible to pay the fee or commission due to any such Cooperating Broker.

3.7 <u>Nondiscrimination</u>. Owner and CBRE agree that the Property will be offered in compliance with all applicable federal, state and local anti-discrimination laws and regulations.

3.8 <u>Compliance With Laws</u>. CBRE shall comply with all applicable federal, state and local laws, regulations, codes, ordinances and administrative orders having jurisdiction over the parties, the Property or the subject matter of this Agreement, including, but not limited to, the 1964 Civil Rights Act and all amendments thereto, the Foreign Investment in Real Property Tax Act, the Comprehensive Environmental Response Compensation and Liability Act, and The Americans With Disabilities Act.

**ARTICLE FOUR**

### CBRE'S AUTHORITY

Limitation of CBRE's Authority. Notwithstanding any designation of CBRE as "agent" in this Agreement, CBRE shall have no right, power or authority to enter into any agreement with any prospective purchaser, real estate broker or any other person in the name of, on behalf of, or otherwise binding upon Owner, nor may CBRE create any other obligations or liabilities binding on Owner, except as otherwise provided by applicable law.

### ARTICLE FIVE

### FEES AND EXPENSES

5.1  Calculation of Fee. CBRE's sole and exclusive compensation for its services hereunder (the "Fee") shall be **four percent (4.00%)** of the gross sale proceeds.

5.2  When Earned.

(a)  The Fee shall be earned for services rendered if, during the Term, the Property is sold to a purchaser procured by CBRE, Owner or anyone else, including without limitation, a purchaser affiliated with the Owner (it being understood that a "sale" shall include a contribution of all or part of the Property to a partnership, joint venture or other business entity, or if a controlling interest in the Owner is transferred by merger, purchase or otherwise in lieu of a sale).

(b)  In the event the sale of the Property fails to close for any reason whatsoever, including Owner's default, CBRE shall not be entitled to any fee, commission or other compensation.

5.3  When Payable. The Fee shall be payable hereunder at the time all sale proceeds (excluding any escrows agreed to by the Owner in its sole discretion) are paid to the Trustee for distribution to holders of the Bonds.

5.4  Rights After Term. Owner shall pay CBRE the Fee in accordance with the terms of this Agreement if, within one hundred twenty (120) calendar days after the expiration or earlier termination of the Term, the Property is sold to, or Owner enters into a contract of sale of the Property with, or negotiations continue, resume or commence and thereafter continue leading to a sale of the Property to, any person or entity (including his/her/its successors, assigns or affiliates) with whom CBRE has negotiated (either directly or through another broker or agent) or to whom the Property has been submitted prior to the expiration or termination of the Term. CBRE is authorized to continue negotiations with such persons or entities. CBRE shall submit a list of such persons or entities to Owner no later than fifteen (15) calendar days following the expiration or termination of the Term, provided, however, that if a written offer has been submitted, then it shall not be necessary to include the offeror's name on the list.

### ARTICLE SIX

### OWNER'S RIGHTS AND OBLIGATIONS

6.1  Refer All Inquiries. Owner shall cooperate with CBRE in bringing about a sale of the Property, shall provide all available information to permit CBRE to properly market the Property in

accordance with the terms of this Agreement, and shall immediately refer immediately to CBRE all offers and inquiries received from brokers, prospective purchasers or anyone else interested in the Property.

      6.2    <u>Termination By Owner For Cause</u>.  Owner shall have the right to terminate this Agreement upon not less than sixty (60) days' prior written notice to CBRE in the event of a material breach or default by CBRE of any of its obligations hereunder.  The notice shall specify with particularity the material breach or default with respect to which the notice is given and the acts which CBRE must undertake to remedy such failure and, in the event that such material breach or default is not cured by that date which is thirty (30) days from CBRE's receipt of said notice, this Agreement shall terminate upon CBRE's receipt of a second written notice from Owner declaring such termination.

      6.3    <u>FIRPTA</u>.  Owner represents that it is the owner of the Property and that, except as may be disclosed in writing to CBRE, no person or entity who has an ownership interest in the property is a foreign person as defined in the Foreign Investment in Real Property Tax Act (commonly known as "FIRPTA") attached hereto.

      6.4    <u>Hazardous Materials</u>.

(a) The Property is being sold in an "as is" condition, without representation or warranty of any kind, expressed or implied, oral or written, concerning the Property or any matter related thereto, including zoning, availability of access or utilities, the presence and location of asbestos, PCB transformers, other toxic, hazardous or contaminated substances, or underground storage tanks ("Hazardous Materials") in, on, or about the Property.  Prospective purchasers shall be advised of this fact and shall be allowed to make independent investigations of the Property made by their own experts, at their own expense.  Language reflecting the above shall be inserted into any purchase and sale agreement entered into by Owner, which language shall also disclaim any such representations regarding the condition of the Property by CBRE and any reliance on such representations by the prospective purchaser.

(b) Owner hereby releases and forever discharges CBRE, its directors, officers, employees, agents, successors and assigns from any and all actions, causes of action, suits, covenants, judgments, claims and demands whatsoever, in law or in equity, for or on account of or in any manner connected with Hazardous Materials in, on or about the Property and the violation of any federal, state or local law, statute, ordinance or regulation, any court or administrative order or decree or private agreement relating to the collection, storage, treatment or disposal of hazardous materials, excluding any such claims arising out of CBRE's gross negligence or intentional wrongful conduct.

      6.5    <u>Compliance with Laws</u>.  Owner agrees to comply with all applicable federal, state and local laws, regulations, codes, ordinances and administrative orders having jurisdiction over the parties, any Property that is the subject of an acquisition or proposed acquisition or the subject matter of this Agreement, including, but not limited to, the 1964 Civil Rights Act and all amendments thereto, the Foreign Investment in Real Property Tax Act, the Comprehensive Environmental Response Compensation and Liability Act, and The Americans With Disabilities Act.

      **6.6**    **<u>OFAC Screening.</u>  CBRE and Owner represent and warrant to the other that they are currently in compliance with, and shall use their best efforts at all times during the term of this Agreement (including any extension thereof) to remain in compliance with, the**

**regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury, and any statute, executive order or other governmental action relating thereto, including, but not limited to, Executive Order 13224 (dated September 23, 2001) "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism".**

## ARTICLE SEVEN

## CONFLICTS OF INTEREST

7.1     CBRE as Intermediary/Designation of Listing Team.  Owner acknowledges that CBRE is a national and international real estate services company and that, in some cases, it may represent prospective purchasers.  Owner may desire the Property to be presented to such prospective purchasers and Owner hereby consents and authorizes CBRE to act as an intermediary between the Owner and any such prospective purchaser.  **As an intermediary, CBRE's sole source of compensation shall be paid by Owner from sale proceeds; provided that if CBRE is a Cooperating Broker, CBRE's compensation in such role shall be as set forth in Section 3.6 hereof.**  CBRE shall act fairly and impartially and shall not disclose the confidential information (including without limitation, strategy and willingness to accept a certain price) of one principal to another.

If Broker acts as an intermediary, Broker may appoint one or more licensees associated with Broker to communicate with, carry out the instructions of, and provide options and advice to Owner and one or more other licensees associated with Broker to provide similar services for the prospective tenant.  Broker appoints **the "Listing Team"** to communicate with and carry out the instructions of Owner ("Owner's Agent(s)").  Broker reserves the right to change or appoint additional agents for Owner if, in Broker's reasonable judgment, such change becomes necessary or desirable.  In the event that Owner's Agent also represents the **Buyer** or prospective **Purchaser** in a prospective transaction with Owner, both Broker and Owner's Agent(s) may act in the capacity of intermediaries (and, as intermediaries, Owner's Agent(s) shall be prohibited from engaging in the acts described above), rather than as the sole representative of either party to the transaction.

In the event that the Listing Team has any potential conflict of interest (such as any member of the Listing Team acting for a prospective purchaser), then CBRE shall disclose such conflict to Owner in advance of any negotiations with a potential purchaser, and obtain Owner's written consent to act as an intermediary.

7.2     Other Interests.  Owner acknowledges that, from time to time, CBRE may provide to other persons or other properties services that are similar to or in conflict with those that are to be provided pursuant to this Agreement, including, for example, listing other properties which may be competitive with the Property and showing prospective purchasers other properties in addition to the Property.  Such other persons and/or properties may be in direct or indirect competition with Owner, and Owner consents thereto, provided that CBRE shall not disclose the confidential information of Owner.

7.3     CBRE Affiliated Entities.  Owner acknowledges that one or more CBRE Affiliated Entities may assist the Listing Team in structuring a sale or sales of the Property, and may assist prospective purchasers with financing such transactions.  Owner acknowledges and agrees that CBRE Affiliated Entities may earn fees or other compensation in connection with the financing of a sale or sales of the Property; however, in no circumstance shall Owner be liable for compensating such CBRE Affiliated Entities.  Owner also acknowledges and agrees that referral fees may be paid by CBRE to

CBRE Affiliated Entities, including CBRE Capital Markets; and/or CBRE Affiliated Entities, including CBRE Capital Markets, may pay referral fees to CBRE.

## ARTICLE EIGHT

## INDEMNIFICATION

8.1 <u>Indemnification By CBRE</u>. CBRE agrees to indemnify and defend Owner and the Trustee from and against all liability, damages, losses and expenses resulting from claims or causes of action by a third party (collectively, "Claims") based solely upon CBRE's wrongful act, failure to act, or intentional misrepresentation. Such obligation to defend and indemnify will not apply, however, if the claim or cause of action is based upon or arises in any way out of an act, failure to act or representation of any other person or entity, including, but not limited to, Owner providing to CBRE incorrect information or failing to disclose to CBRE information which should have otherwise been disclosed to such claimant or to CBRE. CBRE will have the sole and absolute right to select and employ an attorney or attorneys to defend against such Claim and Owner will cooperate with CBRE and its attorneys in connection with the resolution of any Claims.

8.2 <u>Indemnification By Owner</u>. Owner agrees to indemnify and defend CBRE from and against all Claims by a third party based solely upon Owner's wrongful act, failure to act, or intentional misrepresentation. Owner will have the sole and absolute right to select and employ an attorney or attorneys to defend against such Claim and CBRE will cooperate with Owner and with its attorneys.

8.3 <u>Procedure</u>. If any party indemnified as set forth in 8.1 or 8.2 (an "Indemnified Party") notifies the other party (the "Indemnifying Party") of any Claim for which the Indemnified Party is entitled to indemnification pursuant to his Article, the Indemnifying Party shall, within fifteen (15) days following receipt of such notice, notify the Indemnified Party whether it will assume defense of such Claim, assume defense of such Claim with a reservation of rights, or reject defense of such claim. If the Indemnifying Party fails or refuses to defend such Claim or fails to timely give the notice required by this section, the Indemnified Party shall then have the right to employ counsel at the expense of the Indemnifying Party. If an Indemnifying Party assumes the defense with a reservation of rights, the Indemnified Party shall have the right to employ counsel at its expense and participate in the defense with the full cooperation of the Indemnifying Party. With respect to any Claim for which an Indemnifying Party assumes defense without a reservation of rights, such Indemnifying Party shall have the right to defend such action, employ counsel of its choice, and negotiate and carry out any settlement of such action. Notwithstanding the foregoing, an Indemnifying Party shall not, without the prior written consent of the Indemnified Party, (i) settle or compromise any Claim or consent to the entry of any judgment in which the Indemnifying Party receives a more comprehensive release or hold harmless than the Indemnified Party, provided that such settlement, compromise or judgment shall not affect the continuing obligation of the Indemnifying Party to indemnify the Indemnified Party hereunder; or (ii) settle or compromise any action, suit, proceeding or claim in any manner that may adversely affect the Indemnified Party or obligate the Indemnified Party to pay any sum or perform any obligation.

## ARTICLE NINE

## NOTICES

9.1 <u>Notices</u>. All notices or other communications required or permitted under this Agreement shall be in writing and shall be sent by a nationally recognized courier service or personally delivered (including by means of professional messenger service), or sent by registered or certified mail,

postage prepaid, return receipt requested, or sent by facsimile or electronic transmission and promptly confirmed in writing, to the addresses set forth below, and shall be deemed received when actually received.

        To Owner:        Dowling College
150 Idle Hour Blvd.
Oakdale, NY 11769
Attn: Robert S. Rosenfeld, CRO
Phone: 516.241.2254
Fax: 212.658.0347
Email: rsrosenfeld@rsrconsultingllc.com

with a copy to:

Klestadt Winters Jureller Southard & Stevens, LLP
200 West 41st Street, 17th Floor
New York, NY 10036
Attn: Sean C. Southard, Esq.
Phone: 212.679.5320
Fax: 212.972.2245
Email: ssouthard@klestadt.com

        To Trustee        Gavin Wilkinson, Senior Vice President
UMB Bank, National Association
120 South Sixth Street, Suite 1400
Minneapolis, MN  55402
Telephone:  612-337-7001
Email:   gavin.wilkinson@umb.com

with a copy to:

P. Miyoko Sato, Esq.
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111
Phone: 617.348.1896
Fax: 617.542.2241

        To CBRE:        CBRE, Inc.
58 S. Service Road
Melville, NY  11747
Attn: Ellen Rudin

with a copy to:

CBRE, Inc.
200 Park Avenue
New York, NY  10166
Attn:  Senior Vice President, Legal

9.2    Change of Notice.  Notice of a change in address shall be given by notice in the manner set forth in this Article.

**ARTICLE TEN**

**GENERAL PROVISIONS**

10.1    Governing Law.  This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of New York, without regard to its conflicts of laws principles.

10.2    Disputes.

(a)    Any claim, controversy or dispute (a "Dispute"), whether sounding in contract, statute, tort, fraud, misrepresentation or other legal theory, related directly or indirectly to this Agreement, whenever brought and whether between the parties to this Agreement or between one of the parties to this Agreement and the employees, agents or affiliated businesses of the other party, shall be subject to this section.

(b)    The venue of any Dispute, in the case of any Dispute relating solely to one or more properties located within a single state, shall be the jurisdiction where the Property is located or in which the claim arose, and shall be any appropriate jurisdiction in all other instances.

(c)    Neither party shall be entitled to punitive damages, and the parties hereby waive all rights to, and claims for, relief other than for compensatory damages.  The prevailing party in any Dispute shall be entitled to recover its reasonable attorneys' fees, costs, and disbursements incurred in connection with any Dispute.

(d)    Each party waives its right to a trial by jury with respect to any Dispute.

10.3    Amendment, Modification and Termination.  This Agreement may be amended, modified or terminated only by written agreement of CBRE and the Owner, provided section 10.8 of this Agreement may only be amended, modified or terminated by written agreement of CBRE, Owner and the Trustee.

10.4    [RESERVED].

10.5    Rights Reserved By Owner.  Owner reserves the right to approve, modify or disapprove any and all proposals and offers regarding pricing, marketing and terms of sale of the Property, and to approve or reject any prospective purchaser.  Owner reserves the right to adjust the terms and conditions of any offer made or received, including, but not limited to, adjustment of the offering price for the Property upward or downward.

10.6    Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without the prior written consent of the other party and the Trustee.

10.7 Bankruptcy. CBRE and the Owner acknowledge that Owner is contemplating the filing of a voluntary petition as debtor under Chapter 11 of Title 11 of the United States Code (a "Bankruptcy Proceeding"). In the event of a Bankruptcy Proceeding, Owner agrees to use commercially reasonable efforts to promptly seek court approval to employ CBRE on the terms of this Agreement. In any Bankruptcy Proceeding, the fees and expenses of CBRE set forth herein shall be reimbursed and paid in accordance with the United States Bankruptcy Code and any fee procedures established by order of the bankruptcy court.

10.8 Trustee. CBRE shall, for so long as any Bonds remain outstanding, furnish copies of any Marketing Plan, offering brochures, other marketing materials, offers made for the Property and any material written communications from prospective buyers for the Property to the Trustee and owners of the Bonds as and when provided to Owner. Owner expressly agrees that the Trustee, owners of the Bonds and their representatives may discuss the marketing of the Properties with CBRE independent from the Owner.

10.9 Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.10 Headings. The headings of the Sections and Articles of this Agreement are inserted for convenience only and shall not constitute a part hereof or affect in any way the meaning or interpretation of this Agreement.

10.9 Due Authority. Each party warrants and represents to the other party that the individual signing this Agreement has the authority to execute this Agreement on such party's behalf and to bind such party to the terms hereof.

10.11 Severability. In the event any term or provision of this Agreement shall be determined by a court of competent jurisdiction to be illegal, invalid or unenforceable for any reason whatsoever, that provision shall be severed from this Agreement and shall not affect the validity of the remainder of the Agreement.

10.12 Third Parties. Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the parties hereto and their successors or assigns, any rights or remedies under or by reason of this Agreement; provided that the Trustee is an express third party beneficiary of Section 10.8 of this Agreement.

10.13 Entire Agreement. This Agreement, including the Exhibits hereto, sets forth the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein, and supersedes all prior agreements, promises, covenants, arrangements, communications, representations and warranties, whether oral or written, by any officer, employee or representative of any party hereto.

IN WITNESS WHEREOF, this Agreement has been executed by Owner and CBRE and acknowledged by the Trustee, through their duly authorized representatives, as of the day and year first above written.

**OWNER: DOWLING COLLEGE**

By: _[signature]_, CRO - Dowling College

Name: __Robert S. Rosenfeld_____

Title:    Chief Restructuring Officer_____

**CBRE, INC.**
**Licensed Real Estate Broker**
**Federal Tax ID No.:**

By: _____

Name: __Jeffrey Whelan_____

Title: _____

60435580v.3

IN WITNESS WHEREOF, this Agreement has been executed by Owner and CBRE and acknowledged by the Trustee, through their duly authorized representatives, as of the day and year first above written.

**OWNER: DOWLING COLLEGE**

By: _____

Name: __Robert S. Rosenfeld_____

Title: ___Chief Restructuring Officer_____

**CBRE, INC.**
**Licensed Real Estate Broker**
**Federal Tax ID No.:** 95-3743174

By: _____

Name: __Jeffrey Whelan_____
        Jeffrey R. Whelan
Title: ___An Authorized Signatory_____

60435580v.3

12