**KLESTADT WINTERS JURELLER**
  **SOUTHARD & STEVENS, LLP**
200 West 41st St., 17th Floor
New York, NY 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Sean C. Southard
Joseph C. Corneau
Lauren C. Kiss

*Attorneys to the Debtor and Debtor in*
  *Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re                                                                  :        Chapter 11
                                                                          :
DOWLING COLLEGE,                                            :        Case No. 16-75545(REG)
                                                                          :
                                                                          :
                                          Debtor.          :
-----------------------------------------------------------------x

**NOTICE OF FILING OF PROPOSED FINAL ORDER GRANTING DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR (A) TO OBTAIN POST-PETITION SECURED SUPERPRIORITY FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, AND 364 AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED CREDITORS PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364; AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND 4001(C)**

**PLEASE TAKE NOTICE,** that on November 29, 2016, Dowling College (the "Debtor")

filed the Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor (A) to

Obtain Post-Petition Secured, Superpriority Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363

and 364 and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate

Protection to Pre-Petition Secured Creditors Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; and

(III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c) (the "DIP Financing Motion") [DE 9].

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Second Emergency Order (I) Authorizing Debtor to Obtain Postpetition Financing and Use Cash Collateral, (II) Granting Adequate Protection, (III) Granting Adequate Protection, and (IV) Granting Certain Related Relief [DE 121], the Court scheduled a final hearing on the DIP Financing Hearing for January 10, 2017 at 10:00 a.m. (the "Final Hearing").

**PLEASE TAKE FURTHER NOTICE** that in advance of the Final Hearing, the Debtor hereby files a proposed order granting the DIP Financing Motion on a final basis (the "Proposed Final DIP Financing Order"). A copy of the Proposed Final DIP Financing Order is annexed hereto as **Exhibit A**.

Dated:   New York, New York
       January 9, 2017

**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**

By:  *Joseph C. Corneau*_____
     Sean C. Southard
     Joseph C. Corneau
     Lauren C. Kiss
     200 West 41st Street, 17th Floor
     New York, NY 10036
     Tel: (212) 972-3000
     Fax: (212) 972-2245
     Email: ssouthard@klestadt.com
            jcorneau@klestadt.com
            lkiss@klestadt.com

*Attorneys to the Debtor and Debtor -in-Possession*

**<u>EXHIBIT A</u>**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re                                                     :        Chapter 11
                                                          :
DOWLING COLLEGE,                                          :
f/d/b/a DOWLING INSTITUTE,                                :        Case No. 16-75545 (REG)
f/d/b/a DOWLING COLLEGE ALUMNI                            :
ASSOCIATION,                                              :
f/d/b/a CECOM,                                            :
a/k/a DOWLING COLLEGE, INC.,                              :
                                                          :
                                        Debtor.           :
-----------------------------------------------------------------x

## FINAL ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING AND USE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, AND (III) GRANTING CERTAIN RELATED RELIEF

Upon the motion dated November 29, 2016 seeking entry of interim and final orders with respect to postpetition financing and the use of cash collateral and other collateral of prepetition lenders (the "Motion")[1], the Court having held a first emergency hearing (the "First Emergency Hearing") on the Motion on December 2, 2016, and entered an emergency order thereon on December 2, 2016 [DE 63], the Court having held a second emergency hearing (the "Second Emergency Hearing") on the Motion on December 15, 2016, and entered a second emergency order thereon on December 22, 2016 [DE 121], and the Court having held a final hearing (the "Final Hearing") on the Motion on January 10, 2017, and having heard and resolved or overruled any and all objections to the relief requested in the Motion; and it appearing that the relief requested in the Motion is in the best interests of the Debtor, its estate, and creditors; and good and sufficient notice of the Motion having been provided to parties in interest; upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefor;

---

[1]  Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the DIP Motion and related exhibits.  Conclusions of law shall be construed as findings of fact, as applicable, pursuant to Bankruptcy Rule 7052.

Based upon the foregoing record made before this Court at the First Emergency Hearing, the Second Emergency Hearing and the Final Hearing, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.        Disposition.  The Motion is granted on a final basis on the terms set forth in this order (the "Final Order").

2.        Authorization For DIP Financing and Use of Cash Collateral. The Debtor is hereby authorized to use Cash Collateral and to incur the DIP Loan Obligations subject to the terms of the Approved Budget, the DIP Documentation, and this Final Order, with total borrowings under the DIP Facility limited to the aggregate maximum principal amount of $4,974,779.00 (the "Maximum Borrowing") payable as set forth in the DIP Documentation.  The Debtor has delivered to the DIP Lenders a weekly budget approved by the Required Lenders and the Debtor (the "Approved Budget") for the time period from the Petition Date through June 23, 2017.  A copy of the Approved Budget is attached hereto as Exhibit B.  Amendments to the Approved Budget must be consented to by the Required Lenders and the Official Committee of Unsecured Creditors (the "Creditors' Committee") prior to the implementation thereof and shall not require further notice, hearing or court order.  The use of Cash Collateral authorized hereunder shall expire, and the loans made pursuant the DIP Documentation[2] will mature on the earlier of (a) June 23, 2017 or (b) the occurrence of a Termination Event.

3.        Authority to Execute and Deliver Necessary Documents. The Debtor is authorized to enter into, deliver and perform all of its obligations and acts required under the DIP Documentation, and such other agreements as may be required by the DIP Documentation to give effect to the terms of the financing provided for therein, and in this Final Order.

---

[2] To the extent there are any inconsistencies between the DIP Documentation and this Final Order, this Final Order shall control.  A copy of the DIP Note is attached hereto as Exhibit A.

4.    <u>Valid and Binding Obligations</u>.    All obligations under the DIP Documentation shall constitute valid and binding obligations of the Debtor, enforceable against it and its successors and assigns, in accordance with the terms of the DIP Documentation and this Final Order.

5.    <u>Debtor's Acknowledgments and Stipulations</u>.    In requesting the DIP Facility, and in exchange for and as a material inducement to the DIP Lenders to agree to provide the DIP Facility, the Debtor acknowledges, represents, stipulates, and agrees, subject to the challenge rights set forth in paragraph 13 herein, that:

(a)    <u>Prepetition Liens</u>.    To secure the obligations under the Series 1996 Bond Documents, the Debtor granted to the Series 1996 Bond Trustee first priority liens (the "<u>Series 1996 Liens</u>") on certain of the Debtor's assets as described in the Series 1996 Bond Documents (the "<u>Series 1996 Collateral</u>").    To secure the obligations under the Series 2002 Bond Documents, the Debtor granted to the Series 2002 Bond Trustee first priority liens (the "<u>Series 2002 Liens</u>") on certain of the Debtor's assets including, but not limited to, that certain dormitory building located in the Town of Brookhaven, New York (the "<u>Brookhaven Dorm</u>"), as more fully described in the Series 2002 Bond Documents (the "<u>Series 2002 Collateral</u>").    To secure the obligations under the Series 2006 Bond Documents, the Debtor granted to the Series 2006 Bond Trustee first priority liens (the "<u>Series 2006 Priority Liens</u>") on certain of the Debtor's assets including, but not limited to, the real property and improvements comprising the Debtor's campuses located in the hamlet of Oakdale, New York (the "<u>Oakdale Campus</u>") and the Town of Brookhaven, New York (the "<u>Brookhaven Campus</u>"), each as more fully described in the Series 2006 Bond Documents (the "<u>Series 2006 Collateral</u>"), and a second priority lien (the "<u>Series 2006 Second Liens</u>" and together with the Series 2006 Priority Liens, the "<u>Series 2006</u>

Liens") on the Brookhaven Dorm (the "Series 2006 Second Lien Collateral").  To secure the obligations under the Series 2015 Bond Documents, the Debtor granted to the Series 2015 Bond Trustee first priority liens (the "Series 2015 Liens") on certain of the Debtor's assets including, but not limited to, those certain single family residential properties (the "Houses") as more fully described in the Series 2015 Bond Documents (the "Series 2015 Collateral").  As additional security for the advances made under the Series 2006 Funding Agreement (which are also secured by the Series 2006 Collateral) and the advances made under the Series 2002/2015 Funding Agreement (which are also secured by the Series 2002 Collateral and the Series 2015 collateral), the Debtor granted to the Series 2002 Bond Trustee, the Series 2006 Bond Trustee, ACA, and the Series 2015 Bond Trustee liens (the "Funding Agreement Liens" and together with the Series 1996 Liens, the Series 2002 Liens, the Series 2006 Liens, and the Series 2015 Liens, the "Prepetition Liens") on all of the Debtor's otherwise unencumbered assets, as provided in the Series 2006 Funding Agreement and the Series 2002/2015 Funding Agreement (the "Funding Agreement Additional Collateral" and together with the Series 1996 Collateral, the Series 2002 Collateral, the Series 2006 Collateral, the Series 2015 Collateral, the "Prepetition Collateral");

(b)  as of the Petition Date, (a) the aggregate amount of the Secured Bond Obligations owed to the Series 1996 Bond Trustee under the Series 1996 Bond Documents (collectively, the "Series 1996 Obligations") is $3,531,250.53  (which is the sum of (x) principal of $3,115,000 and (y) accrued and unpaid interest of $416,250.53 through and including the Petition Date), which does not include fees, expenses and other amounts which are chargeable or otherwise reimbursable under the Series 1996 Bond Documents or any amounts under or in respect of any document or instrument other than the Series 1996 Bond Documents, or any amount payable to the Series 1996 Bond Trustee in its capacity as such, (b) all of the Series 1996 Obligations are

unconditionally owing by the Debtor to the Series 1996 Bond Trustee, and (c) the Series 1996 Obligations are not subject to any avoidance, reductions, set-off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity;

(c)      as of the Petition Date, (a) the aggregate amount of the Secured Bond Obligations owed to the Series 2002 Bond Trustee under the Series 2002 Bond Documents (collectively, the "Series 2002 Obligations") is $11,122,497.92 (which is the sum of (x) principal of $8,755,000 and (y) accrued and unpaid interest of $2,367,497.92 through and including the Petition Date)), which does not include fees, expenses and other amounts which are chargeable or otherwise reimbursable under the Series 2002 Bond Documents or any amounts under or in respect of any document or instrument other than the Series 2002 Bond Documents, or any amount payable to the Series 2002 Bond Trustee in its capacity as such, (b) all of the Series 2002 Obligations are unconditionally owing by the Debtor to the Series 2002 Bond Trustee, and (c) the Series 2002 Obligations are not subject to any avoidance, reductions, set-off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity;

(d)      as of the Petition Date, (a) the aggregate amount of the Secured Bond Obligations owed to the Series 2006 Bond Trustee and ACA under the Series 2006 Bond Documents (collectively, the "Series 2006 Obligations") is $37,253,883.01 (which is the sum of (x) principal of $33,855,000, (y) accrued and unpaid interest of $1,646,146.12 through and including the Petition Date, and (z) protective advances made by the Series 2006 Bond Trustee and/or ACA of

$1,752,736.89, including, but not limited to advances made under the Series 2006 Funding Agreement), which does not include fees, expenses and other amounts which are chargeable or otherwise reimbursable under the Series 2006 Bond Documents or any amounts under or in respect of any document or instrument other than the Series 2006 Bond Documents, or any amount payable to the Series 2006 Bond Trustee in its capacity as such, (b) all of the Series 2006 Obligations are unconditionally owing by the Debtor to the Series 2006 Bond Trustee and ACA, and (c) the Series 2006 Obligations are not subject to any avoidance, reductions, set-off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity;

(e) as of the Petition Date, (a) the aggregate amount of the Secured Bond Obligations owed to the Series 2015 Bond Trustee under the Series 2015 Bond Documents (collectively, the "Series 2015 Obligations") is $6,998,243.06 (which is the sum of (x) principal of $6,700,000 and (y) accrued and unpaid interest of $298,243.06 through and including the Petition Date), which does not include fees, expenses and other amounts which are chargeable or otherwise reimbursable under the Series 2015 Bond Documents or any amounts under or in respect of any document or instrument other than the Series 2015 Bond Documents, or any amount payable to the Series 2015 Bond Trustee in its capacity as such, (b) all of the Series 2015 Obligations are unconditionally owing by the Debtor to the Series 2015 Bond Trustee, and (c) the Series 2015 Obligations are not subject to any avoidance, reductions, set-off, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity;

(f)      the Prepetition Liens constitute valid, binding, enforceable, and perfected liens with priority over any and all other liens and are not subject to any challenge or defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), claims, counterclaims, cross-claims, offsets, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity;

(g)      the Debtor has waived, discharged and released any right it may have to challenge the Secured Bond Obligations and the Prepetition Liens on the Prepetition Collateral, and to assert any offsets, defenses, claims, objections, challenges, causes of action and/or choses of action against the Prepetition Secured Parties, with respect to the Secured Bond Obligations, the Prepetition Liens or the Prepetition Collateral;

(h)      Any payments made on account of the Secured Bond Obligations within the ninety (90) days prior to the Petition Date that are based on rent from tenants of real property owned by the Debtor were (a) payments out of the Prepetition Collateral and/or (b) made in the ordinary course of business;

(i)      Subject to the statement to be filed with the Court by the Debtor in accordance with the Interim Order (I) Authorizing the Closing and Balance Transfers of Certain Prepetition Bank Accounts; (II) Granting a Limited Waiver of Section 345 Investment and Deposit Requirements; and (III) Granting Related Relief, all of the Debtor's cash, including the cash in their deposit accounts and other accounts, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral (as defined below); and

(j)       none of the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties is a control person or insider of the Debtor by virtue of any of the actions taken by them in respect of or in connection with the DIP Loan Obligations or the Secured Bond Obligations.

6.       <u>DIP Lenders' Lien Priority</u>.

(a)       To secure the DIP Loan Obligations solely with respect to Term Loan D, the DIP Agent, on behalf of itself and for the ratable benefit of the DIP Lenders, is hereby granted, pursuant to sections 364(c)(2), 364(c)(3) (solely as to Permitted Liens), and 364(d)(1), and subject to the terms and conditions of the DIP Note, valid, enforceable and fully perfected, first priority priming liens on and senior security interests in (collectively, the "<u>Term Loan D DIP Liens</u>") all of the property, assets or interests in property or assets of the Debtor, of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including, without limitation, all property of the "estate" (within the meaning of the Bankruptcy Code) of the Debtor, and all Accounts, Inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases, all of the equity interests of each subsidiary of the Debtor, all of the equity interests of all other Persons directly owned by the Debtor, money, investment property, deposit accounts, all commercial tort claims and the proceeds thereof, and all cash and non-cash proceeds, rents, products and profits of any collateral described above, excluding all causes of action arising under the Bankruptcy Code or otherwise, and all federal and state avoidance actions under Chapter 5 of the Bankruptcy Code ("<u>Avoidance Actions</u>") (collectively, the "<u>DIP Collateral</u>"), subject only to (A) Liens granted by the Debtor in unearned premiums under the Premium Financing Agreement, and (B) the Carve-Out.

(b)      To secure the DIP Loan Obligations under Term Loans A, B, and C, the DIP Agent, on behalf of each such respective DIP Lender is hereby granted pursuant to section 364(d)(1), and subject to the terms of the DIP Note, valid, enforceable and fully perfected first priority priming liens (collectively, the "Term Loan A/B/C DIP Liens" and, together with the Term Loan D DIP Liens, the "DIP Liens") on the DIP Collateral that secured such respective lender's prepetition indebtedness (including, for the purpose of clarity, any cash advanced by such DIP Lender under the DIP Facility prior to its disbursal by the Debtor), but excluding any Funding Agreement Additional Collateral.

(c)      The DIP Liens shall be effective immediately upon the entry of this Final Order and shall not at any time be made subject or subordinated to, or made *pari passu* with, any other lien, security interest or claim existing as of the Petition Date, or created under sections 363 or 364(d) of the Bankruptcy Code or otherwise, other than (i) Liens granted by the Debtor in unearned premiums under the Premium Financing Agreement; and (ii) the Carve-Out.

(d)      The DIP Liens shall be and hereby are deemed fully perfected liens and security interests, effective and perfected upon the date of this Final Order, without the necessity of execution by the Debtor of mortgages, security agreements, pledge agreements, financing agreements, financing statements or any other agreements or instruments, such that no additional actions need be taken by the DIP Agent, the DIP Lenders, or any other person or entity to perfect such interests.

7.      DIP Lenders' Superpriority Claim.   The DIP Lenders are hereby granted an allowed superpriority administrative expense claim (the "DIP Superpriority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code in the Debtor's Chapter 11 Case and in any successor cases under the Bankruptcy Code (including any case or cases under chapter 7 of the Bankruptcy

Code, the "<u>Successor Cases</u>") for all Term Loan D Obligations, having priority over any and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, excluding any net proceeds or property recovered as a result an of Avoidance Action; it being understood and agreed that the Debtor will repay from such proceeds or property any amounts borrowed under Term Loan D to prosecute such Avoidance Action.  The DIP Superpriority Claim granted in this paragraph shall be subject and subordinate in priority of payment only to payment of the Carve-Out.

8.      <u>DIP Lenders' Fees</u>.  All reasonable fees and costs and expenses of the DIP Lenders reimbursable under the DIP Documentation (including, without limitation, all reasonable attorneys' fees) shall be paid to the extent no objection thereto is received by the DIP Lenders within fifteen (15) business days after delivery of a summary invoice (redacted for privilege) to the Debtor (with a copy of each such invoice (also redacted for privilege) to be delivered by the Debtor to the U.S. Trustee and the Creditors' Committee) and without the need for further application to or order of the Court

9.      <u>Adequate Protection Liens for Prepetition Secured Parties</u>.  As adequate protection in respect of any diminution in the value of the Prepetition Collateral, the incurrence of the DIP Loan Obligations, the use of Cash Collateral, the granting of the DIP Liens and the DIP Superpriority Claim or otherwise (for each Prepetition Secured Party, a "<u>Diminution Claim</u>"), the Prepetition Secured Parties are hereby granted replacement liens on such Prepetition Secured Parties' Prepetition Collateral (the "<u>Replacement Liens</u>").  The foregoing liens shall be and hereby are (i) subject and subordinate only to the DIP Liens, Permitted Liens (to the extent Permitted Liens have priority over liens of such Prepetition Secured Parties) and the Carve-Out; and (ii) effective and perfected upon the date of this Final Order, without the necessity of

execution by the Debtor of mortgages, security agreements, pledge agreements, financing agreements, financing statements or any other agreements or instruments.

10.    <u>Other Adequate Protection for Prepetition Secured Parties</u>. As further adequate protection for the Prepetition Secured Parties (a) the Debtor shall, subject to applicable fiduciary duties, support and complete the liquidation of its assets in accordance with the agreed milestones and other covenants set forth in <u>Exhibit C</u> hereto; and (b) the Prepetition Secured Parties (or any successors thereof) shall each have the right to "credit bid" their respective claims up to the full amount of their respective Secured Bond Obligations during any sale of all or any portion of the such Prepetition Secured Parties' Prepetition Collateral, as applicable, or any deposit in connection with such sale, including, without limitation, any sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any liquidation plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code, and shall be deemed "qualified bidders" with respect to such collateral for such purposes.  The Prepetition Secured Parties shall also receive, as applicable, from the Debtor, upon compliance with the same procedures specified in paragraph 8, current cash payment of their reasonable fees, costs and expenses incurred after the Petition Date, including, all reasonable fees and disbursements of its counsel and such other professionals retained by the Prepetition Secured Parties with services performed during this Chapter 11 Case.

11.    <u>Carve-Out</u>.  The DIP Liens, the DIP Superpriority Claim, and the Replacement Liens shall be subject, in accordance with the priority as set forth herein and subordinate only to: (i) fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) or to the Clerk of the Bankruptcy Court (the "<u>Case Administration Fees</u>"), plus (ii) unpaid professional fees and expenses ("<u>Professional Fees</u>") payable to each legal or financial advisor retained by the Debtor

including for the avoidance of doubt the fees and expenses of the CRO and the Creditors' Committee that are incurred or accrued prior to the date of the occurrence of a Termination Event (as defined below), but in all events in an amount not to exceed the aggregate amount(s) allocated to each such professional in the Approved Budget, and ultimately allowed by the Court pursuant to sections 330, 331 and 503 of the Bankruptcy Code or any order of the Court (whenever such fees may be actually incurred prior to the Termination Event), plus (iii) $25,000 (earmarked for use by a Chapter 7 Trustee), plus (iv) $10,000, for the Case Administration Fees and Professional Fees accrued and unpaid on or after the date of the occurrence of a Termination Event ((i) through (iv), collectively, the "Carve-Out").

12.    Restrictions on Use of Funds.  No cash that is and remains subject to a lien of the DIP Lenders and/or the Prepetition Secured Lenders (including, without limitation, Cash Collateral), nor any portion of the Carve-Out, may be used to pay, any claims for services rendered by any of the professionals retained by the Debtor, any creditor or party in interest, the Creditors' Committee, any trustee appointed under this Chapter 11 Case or any Successor Cases, or any other party to (i) request authorization to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than from the DIP Lenders in accordance with the DIP Documentation; or (ii) investigate (except as set forth in paragraph 13 below), assert, join, commence, support or prosecute any action or claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, any holders of the Series 1996 Bonds, Series 2002 Bonds, Series 2006 Bonds or Series 2015 Bonds or any of their respective officers, directors, employees, agents, attorneys, affiliates,

assigns, or successors, with respect to any transaction, occurrence, omission, or action; and/or (iii) pay any "claim" of a "creditor" (as such terms are defined in the Bankruptcy Code) without the prior written consent of the DIP Lenders or the Prepetition Secured Parties; or (iv) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral, unless otherwise permitted hereby, without the consent of the DIP Lenders.  Not more than $35,000 in the aggregate of the Carve-Out or cash that is and remains subject to a lien of the DIP Lenders and/or the Prepetition Secured Lenders (including, without limitation, Cash Collateral), may be used by the Creditors' Committee to investigate (but not prosecute) the extent, validity, and priority of the Secured Bond Obligations, the Prepetition Liens, or any other claims against the Prepetition Secured Parties so long as such investigation occurs within the Challenge Period (as defined below).

13.   <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>.  The Debtor's acknowledgements and stipulations set forth in paragraph 5 (the "<u>Debtor's Stipulations</u>") above shall be binding upon the Debtor in all circumstances upon entry of this Final Order.   The Debtor's Stipulations shall be binding upon each other party in interest, including the Creditors' Committee, unless such Creditors' Committee or any other party in interest other than the Debtor (or if this Chapter 11 Case is converted to a case under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), first, commences, by February 21, 2017 (such time period shall be referred to as the "<u>Challenge Period</u>," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a Challenge (as defined below), such Challenge is fully and finally adjudicated, shall be referred to

as the "Challenge Period Termination Date"), (A) a contested matter, adversary proceeding, or other action or "claim" (as defined in the Bankruptcy Code) challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtor's Stipulations, or (B) a contested matter, adversary proceeding, or other action against any or all of the Prepetition Secured Parties in connection with or related to the Secured Bond Obligations, or the actions or inactions of any of the Prepetition Secured Parties arising out of or related to the Secured Bond Obligations or otherwise, including, without limitation, any claim against any or all of the Prepetition Secured Parties in the nature of a "lender liability" cause of action, setoff, counterclaim, or defense to the Secured Bond Obligations (including, but not limited to, those under sections 506, 544, 547, 548, 549, 550, and/or 552 of the Bankruptcy Code or by way of suit against any of the Prepetition Secured Parties) ((A) and (B) collectively, the "Challenges" and, each individually, a "Challenge"), and second, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action; provided further, if a Challenge is timely made under this Section and properly filed, all potential claims and causes of action shall be and are waived and relinquished except for those claims and causes of action expressly asserted in accordance with this Section and provided further, that if the Chapter 11 Case is converted to a case under Chapter 7 of the Bankruptcy Code before the Challenge Period Termination Date, the Challenge Period Termination Date shall be deemed extended for a period of seventy-five (75) days from the date of the appointment of a Chapter 7 trustee solely for such Chapter 7 trustee. If a Challenge is timely made, the Debtor's representations or waivers in paragraph 5 shall not constitute a defense to any such Challenge. The Creditors' Committee shall have standing to commence any such Challenge; provided that in doing so, the Creditors' Committee shall be

required to demonstrate that the pursuit of such Challenge is likely to provide a net benefit to the Debtor's estate. Upon the Challenge Period Termination Date and for all purposes in this Chapter 11 Case and any Successor Cases, (i) all payments made to or for the benefit of the Prepetition Secured Parties pursuant to, or otherwise authorized by, this Final Order or otherwise (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, or avoidance, (ii) any and all such Challenges by any party in interest shall be deemed to be forever released, waived, and barred (iii) the Secured Bond Obligations shall be deemed to be fully allowed secured claims within the meaning of section 506 of the Bankruptcy Code, (iv) the Secured Bond Obligations shall be deemed to be fully allowed claims, and (v) the Debtor's stipulations in paragraph 5 shall be binding on all parties in interest, including the Creditors' Committee.

14.    <u>Termination</u>.  Upon the occurrence of an Event of Default (as defined in the DIP Documentation), the Maturity Date (as defined in the DIP Documentation), or default by the Debtor of any of its obligations under this Final Order unless waived in writing by all of the DIP Lenders, each in its sole discretion (the "<u>Termination Event</u>") (i) the Debtor's to use Cash Collateral shall immediately and automatically terminate; (ii) the DIP Loan Obligations shall be immediately due and payable; (iii) the DIP Lenders shall have no further obligation to provide financing under the DIP Documentation or otherwise; and (iv) the Debtor, DIP Lenders, Prepetition Secured Parties or any of them may seek further relief from this Court and request emergency or expedited consideration thereof.

15.    <u>Held Funds</u>.  The automatic stay of section 362 of the Bankruptcy Code is hereby vacated and modified insofar as necessary to permit the Prepetition Secured Parties to allocate or

pay from any of the funds or accounts maintained by the Prepetition Secured Parties in accordance with the Prepetition Financing Documents.

16.     _Release_.     The release, discharge, waivers, settlements, compromises, and agreements set forth in this paragraph 16 shall be deemed effective upon entry of this Final Order and subject only to the rights set forth in paragraph 13 above.    The Debtor forever and irrevocably (i) releases, discharges, and acquits the Prepetition Secured Parties, all holders of the Series 1996 Bonds, Series 2002 Bonds, Series 2006 Bonds and Series 2015 Bonds and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "_Releasees_") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, including, without limitation, any claims arising from any actions relating to any aspect of the relationship between the Prepetition Secured Parties and the Debtor including any equitable subordination claims or defenses, with respect to or relating to the Secured Bond Obligations, the Prepetition Liens, the Prepetition Financing Documents, any and all claims and causes of action arising under title 11 of the United States Code, and any and all claims regarding the validity, priority, perfection or avoidability of the liens or secured claims of the Prepetition Secured Parties; and (ii) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability of the Secured Bond Obligations and the Prepetition Liens.

17.     _Limitation on Section 506(c) Claims_.    Except with respect to Term Loan D, no costs or expenses of administration which have been or may be incurred in this Chapter 11 Case

or any Successor Case at any time shall be surcharged against, and no person may seek to surcharge any costs or expenses of administration against the DIP Agent, DIP Lenders or the Prepetition Secured Parties, any of their respective claims, the Carve-Out, the Prepetition Collateral or the DIP Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise, without the prior written consent, as applicable, of the DIP Agent, the DIP Lenders or the Prepetition Secured Parties.  No action, inaction or acquiescence by the DIP Agent, the DIP Lenders or the Prepetition Secured Parties shall be deemed to be or shall be considered evidence of any alleged consent to a surcharge against the DIP Agent, the DIP Lenders or the Prepetition Secured Parties, any of their respective claims, the Carve-Out, the Prepetition Collateral or the DIP Collateral. To facilitate comprehensive settlement discussions, the DIP Lenders and the Creditors' Committee agree to the deferral to a future hearing of the Court's consideration of whether the limitation on section 506(c) claims in this Final Order should also apply to Term Loan D.

18.     <u>Equities of the Case Waiver</u>.  To facilitate comprehensive settlement discussions, the DIP Lenders and the Creditors' Committee agree to the deferral to a future hearing of the Court's consideration of whether the following provision should be added to this Final Order: "The DIP Agent, the DIP Lenders and the Prepetition Secured Parties are each entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.  No person may assert an "equities of the case" claim under section 552(b) of the Bankruptcy Code against the DIP Agent, the DIP Lenders or the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the DIP Collateral or the Prepetition Collateral."

19.     <u>Adequate Notice</u>.  The notice given by the Debtor of the Motion was given in accordance with Bankruptcy Rules 2002 and 4001(c) and the local rules of this Court and, under

the circumstances, was adequate and sufficient.  The Debtor shall promptly mail copies of this Final Order to any known party affected by the terms of this Final Order and any other party requesting notice after the entry of this Final Order.

20.    Good Faith.  Any loan under the DIP Facility and other financial accommodations made to the Debtor by the DIP Agent or the DIP Lenders pursuant to the DIP Documentation and this Final Order shall be deemed to have been extended by the DIP Agent and the DIP Lenders, respectively, in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and the DIP Agent and DIP Lenders shall be entitled to all protections and benefits afforded thereby.

21.    Immediate Binding Effect; Entry of Final Order.  This Final Order shall not be stayed and shall be valid and fully effective immediately upon entry, notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062, and 9014, or otherwise, and shall be binding upon any chapter 11 or chapter 7 trustee, and the Clerk of the Court is hereby directed to enter this Final Order on the Court's docket in this Chapter 11 Case.

22.    Proofs of Claim.  None of the Prepetition Secured Parties shall be required to file proofs of claim in this Chapter 11 Case or any Successor Cases for any claim described in the Debtor's Stipulations.  The Debtor's Stipulations shall be deemed to constitute a timely filed proof of claim for each of the Prepetition Secured Parties upon the entry of this Final Order, and the Prepetition Secured Parties shall be treated under section 502(a) of the Bankruptcy Code as if they each have filed a proof of claim.

EXHIBIT A

**DIP NOTE**

# DOWLING COLLEGE
# DEBTOR-IN-POSSESSION
# MULTI-DRAW TERM LOAN PROMISSORY NOTE

$4,974,779.00                                                      New York, New York
                                                      Dated as of November 29, 2016

On November 29, 2016 (the "Petition Date"), Dowling College, a New York not-for-profit education corporation (the "Borrower"), has commenced a bankruptcy case (the "Chapter 11 Case") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*., as amended (the "Bankruptcy Code") with the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court"). The Borrower continues to manage its properties as a debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. The Borrower has requested that UMB Bank, National Association ("UMB"), as agent (the "Agent") for the Term Loan A Lenders (as defined herein), the Term Loan B Lenders (as defined herein), the Term Loan C Lenders (as defined herein) and the Term Loan D Lenders (as defined herein), that make term loans from time to time evidenced by this Multi-Draw Term Loan Promissory Note (as the same may be amended, modified, renewed, restated or supplemented from time to time, this "Note"). The Borrower intends to utilize such term loans to fund the Chapter 11 Case, including fees and expenses related thereto and requirements through the conclusion of a sale of all or substantially all of its assets. Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in Section 23.

1.      Term Loan Commitments.

(a)      Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Term Loan A Lender severally agrees, in accordance with its Term Loan A Commitment, and on the terms and conditions hereinafter set forth (including subject to the satisfaction (or waiver) of the conditions precedent set forth in Sections 4, 5 and 6, as applicable), (i) to make one or more term loans (each, an "Interim Term Loan A") to the Borrower during the Interim Period in an aggregate principal amount not to exceed such Term Loan A Lender's Interim Term Loan A Commitment in effect at such time and (ii) to make one or more term loans (each a "Final Term Loan A") to the Borrower during the Final Period in an aggregate principal amount not to exceed such Term Loan A Lender's Final Term Loan A Commitment in effect at such time.

(b)      Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Term Loan B Lender severally agrees, in accordance with its Term Loan B Commitment, and on the terms and conditions hereinafter set forth (including subject to the satisfaction (or waiver) of the conditions precedent set forth in Sections 4, 5 and 6, as applicable), (i) to make one or more term loans (each, an "Interim Term Loan B") to the Borrower during the Interim Period in an aggregate principal amount not to exceed such Term Loan B Lender's Interim Term Loan B Commitment in effect at such time and (ii) to make one or more term loans (each a "Final Term Loan B") to the Borrower during the Final Period in an

aggregate principal amount not to exceed such Term Loan B Lender's Final Term Loan B Commitment in effect at such time.

(c)    Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Term Loan C Lender severally agrees, in accordance with its Term Loan C Commitment, and on the terms and conditions hereinafter set forth (including subject to the satisfaction (or waiver) of the conditions precedent set forth in Sections 4, 5 and 6, as applicable), (i) to make one or more term loans (each an "<u>Interim Term Loan C</u>") to the Borrower during the Interim Period in an aggregate principal amount not to exceed such Term Loan C Lender's Interim Term Loan C Commitment in effect at such time and (ii) to make one or more term loans (each a "<u>Final Term Loan C</u>") to the Borrower during the Final Period in an aggregate principal amount not to exceed such Term Loan C Lender's Final Term Loan C Commitment in effect at such time.

(d)    Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Term Loan D Lender severally agrees, in accordance with its Term Loan D Commitment, and on the terms and conditions hereinafter set forth (including subject to the satisfaction (or waiver) of the conditions precedent set forth in Sections 4, 5 and 6, as applicable), (i) to make one or more term loans (each an "<u>Interim Term Loan D</u>") to the Borrower during the Interim Period in an aggregate principal amount not to exceed such Term Loan D Lender's Interim Loan D Commitment in effect at such time and (ii) to make one or more term loans (each a "<u>Final Term Loan D</u>") to the Borrower during the Final Period in an aggregate principal amount not to exceed such Term Loan D Lender's Final Term Loan D Commitment in effect at such time.

(e)    Notwithstanding the foregoing:

(1)    (i) During the Interim Period, the aggregate principal amount of the Interim Term Loans outstanding at any time to the Borrower shall not exceed the lesser of (A) the Total Interim Term Loan Commitment in effect on the Interim Facility Effective Date, less the sum of (x) the Case Administration and Professional Fee Reserve in effect at such time and (y) the Total Unrestricted Funds Amount as of such time and (B) the aggregate principal amount of the Interim Term Loans projected to be outstanding at the end of the next immediately succeeding two-week period during the Interim Period as set forth in the Approved Budget, less the aggregate amount of Unrestricted Funds deposited into the Designated Term Loan Accounts and/or the Borrower Disbursement Account that have not been applied to payment of outstanding fees and expenses in accordance with Section 3(h) at such time and (ii) during the Final Period, the aggregate principal amount of the Term Loans outstanding at any time to the Borrower shall not exceed the lesser of (A) the Total Term Loan Commitment in effect on the Interim Facility Effective Date, less the sum of (x) the Case Administration and Professional Fee Reserve in effect at such time and (y) the Total Unrestricted Funds Amount as of such time and (B) the aggregate principal amount of the Term Loans projected to be outstanding at the end of the next immediately succeeding two-week period during the Final Period as set forth in the Approved Budget, less the

aggregate amount of Unrestricted Funds deposited into the Designated Term Loan Accounts and/or the Borrower Disbursement Account that have not been applied to payment of outstanding fees and expenses in accordance with Section 3(h) at such time.

(2)     The Total Term Loan Commitment, the Total Interim Term Loan Commitment and the Total Final Term Loan Commitment, in each case, shall be automatically and permanently reduced by the Total Unrestricted Funds Amount at such time.

(3)     Each Interim Term Loan A made by a Term Loan A Lender shall automatically and permanently reduce the Interim Term Loan A Commitment of such Term Loan A Lender.  Each Final Term Loan A made by a Term Loan A Lender shall automatically and permanently reduce the Final Term Loan A Commitment of such Term Loan A Lender.  The Total Term Loan A Commitment, the Total Interim Term Loan A Commitment and the Total Final Term Loan A Commitment, in each case, shall be automatically and permanently reduced by the Term Loan A Unrestricted Funds Amount at such time.  Each Term Loan A Lender's Interim Term Loan A Commitment shall be automatically and permanently reduced by such Term Loan A Lender's Pro Rata Share of the Term Loan A Unrestricted Funds Amount at such time. Each Term Loan A Lender's Final Term Loan A Commitment shall be automatically and permanently reduced by such Term Loan A Lender's Pro Rata Share of the Term Loan A Unrestricted Funds Amount at such time.  Any principal amount of any Term Loan A which is repaid or prepaid may not be reborrowed.

(4)     Each Interim Term Loan B made by a Term Loan B Lender shall automatically and permanently reduce the Interim Term Loan B Commitment of such Term Loan B Lender.  Each Final Term Loan B made by a Term Loan B Lender shall automatically and permanently reduce the Final Term Loan B Commitment of such Term Loan B Lender.  The Total Term Loan B Commitment, the Total Interim Term Loan B Commitment and the Total Final Term Loan B Commitment, in each case, shall be automatically and permanently reduced by the Term Loan B Unrestricted Funds Amount at such time.  Each Term Loan B Lender's Interim Term Loan B Commitment shall be automatically and permanently reduced by such Term Loan B Lender's Pro Rata Share of the Term Loan B Unrestricted Funds Amount at such time.  Each Term Loan B Lender's Final Term Loan B Commitment shall be automatically and permanently reduced by such Term Loan B Lender's Pro Rata Share of the Term Loan B Unrestricted Funds Amount at such time.  Any principal amount of any Term Loan B which is repaid or prepaid may not be reborrowed.

(5)     Each Interim Term Loan C made by a Term Loan C Lender shall automatically and permanently reduce the Interim Term Loan C Commitment of such Term Loan C Lender.  Each Final Term Loan C made by a Term Loan C Lender shall automatically and permanently reduce the Final Term Loan C Commitment of such Term Loan C Lender.  The Total Term Loan C Commitment, the Total Interim Term Loan C Commitment and the Total Final Term Loan C Commitment, in each case, shall be automatically and permanently reduced by the Term Loan C Unrestricted Funds Amount at such time.  Each Term Loan C Lender's Interim Term Loan C Commitment

shall be automatically and permanently reduced by such Term Loan C Lender's Pro Rata Share of the Term Loan C Unrestricted Funds Amount at such time.  Each Term Loan C Lender's Final Term Loan C Commitment shall be automatically and permanently reduced by such Term Loan C Lender's Pro Rata Share of the Term Loan C Unrestricted Funds Amount at such time.  Any principal amount of any Term Loan C which is repaid or prepaid may not be reborrowed.

(6)    Each Interim Term Loan D made by a Term Loan D Lender shall automatically and permanently reduce the Interim Term Loan D Commitment of such Term Loan D Lender.  Each Final Term Loan D made by a Term Loan D Lender shall automatically and permanently reduce the Final Term Loan D Commitment of such Term Loan D Lender.  The Total Term Loan D Commitment, the Total Interim Term Loan D Commitment and the Total Final Term Loan D Commitment, in each case, shall be automatically and permanently reduced by the Term Loan D Unrestricted Funds Amount at such time.  Each Term Loan D Lender's Interim Term Loan D Commitment shall be automatically and permanently reduced by such Term Loan D Lender's Pro Rata Share of the Term Loan D Unrestricted Funds Amount at such time.  Each Term Loan D Lender's Final Term Loan D Commitment shall be automatically and permanently reduced by such Term Loan D Lender's Pro Rata Share of the Term Loan D Unrestricted Funds Amount at such time.  Any principal amount of any Term Loan D which is repaid or prepaid may not be reborrowed.

(7)    The Total Interim Term Loan Commitment shall terminate at 5:00 p.m. (New York time) on the Final Facility Effective Date.

2.    <u>Making the Term Loans</u>.

(a)    Each Term Loan shall be made on notice by the Borrower to the Agent and the Term Loan Lenders at the addresses specified in Section 25 or such other person or persons designated by the Agent and/or the Term Loan Lenders in writing to the Borrower.  Any such notice must be given no later than 11:00 a.m. (New York time) on the date that is at least one (1) Business Day prior to the date of the proposed Term Loan; <u>provided</u>, <u>that</u>, initial Interim Term Loans may be made simultaneously with the execution of this Note by the Agent, the Term Loan Lenders and the Borrower.  Each such notice (a "<u>Notice of Borrowing</u>") shall be given in writing (by electronic transmission or overnight courier) specifying (1) the type of such Term Loan, (2) the amount of such Term Loan, (3) the proposed date of such Term Loan, which must be a Business Day, (4) a certification by the Borrower's chief restructuring officer that such Term Loan is consistent with, and the proceeds of such Term Loan will be applied in accordance with, Section 3 and the Approved Budget, (5) a certification by the Borrower's chief restructuring officer that on the date of such Notice of Borrowing, all conditions precedent set forth in the Note have been satisfied with respect to such Term Loan and (6) such other information as may be reasonably required by the Agent.  The Borrower shall not request the making of any Term Loan that would, after giving effect to all prior Term Loans, cause the aggregate principal amount of the Term Loans outstanding on such date to exceed the aggregate principal amount of the Term Loans projected to be outstanding at the end of the next immediately succeeding two-week

period as set forth in the Approved Budget, less the aggregate amount of Unrestricted Funds deposited into the Designated Term Loan Accounts and/or the Borrower Disbursement Account that have not been applied to payment of outstanding fees and expenses in accordance with Section 3(h) at such time.

(b)    Promptly after receipt of a Notice of Borrowing by the Agent and the Term Loan Lenders in accordance with Section 2(a) above, subject to the satisfaction of the conditions set forth in this Note with respect to any Term Loan requested therein, (1) each applicable Term Loan Lender shall promptly and proportionately to its Pro Rata Share of the applicable Term Loan Commitment, make the proceeds of such Term Loan available to the Agent by transferring immediately available funds equal to such proceeds to the Agent's Account and (2) promptly after receipt of any such Term Loan proceeds, the Agent shall promptly make such proceeds available to the Borrower by transferring immediately available funds equal to such proceeds to (A) in the case of any proceeds of the Term Loan A, the Term Loan A Account, (B) in the case of any proceeds of the Term Loan B, the Term Loan B Account, (C) in the case of any proceeds of the Term Loan C, the Term Loan C Account and (D) in the case of any proceeds of the Term Loan D, the Term Loan D Account; provided, that, (i) with respect to any Class of Term Loans, no Term Loan Lender with a Term Loan Commitment to make Term Loans in such Class shall be obligated to make a Term Loan in such Class more than one time in any consecutive two calendar week period, (ii) no Term Loan Lender shall be responsible for any default by any other Term Loan Lender in that other Term Loan Lender's obligation to make any Term Loan requested hereunder, (iii) no Term Loan Lender's Pro Rata Share of such applicable Term Loan Commitment shall be increased or decreased as a result of the default by any other Term Loan Lender in that other Term Loan Lender's obligation to make any Term Loan requested hereunder and (iv) each Term Loan Lender shall be obligated to make each Term Loan required to be made by it by the terms of this Note regardless of the failure by any other Term Loan Lender. The entire unpaid balance of the Term Loans and all other Obligations shall be immediately due and payable in full in immediately available funds on the Maturity Date.

(c)    The Agent and each Term Loan Lender shall be entitled to rely upon, and shall be fully protected in relying upon, any Notice of Borrowing or similar notice believed by it to be genuine. The Agent and each Term Loan Lender may assume that each Person executing and delivering any such notice was duly authorized, unless the responsible individual acting thereon has actual knowledge to the contrary.

3.    Designated Term Loan Accounts; Use of Proceeds.

(a)    The Borrower (1) shall maintain the Term Loan A Account and keep the Term Loan A Account separate and segregated from all of the Borrower's other accounts, (2) shall not co-mingle any of the Borrower's other cash or money (other than any Unrestricted Funds that relate to DIP Priority A Collateral) with the proceeds of the Term Loan A deposited in the Term Loan A Account and (3) shall not make any disbursements of any proceeds of the Term Loan A or any Unrestricted Funds that relate to DIP Priority A Collateral from the Term Loan A Account other

than to the Borrower Disbursement Account for disbursement in accordance with Sections 3(f) and/or 3(h) and Section 3(g) below or otherwise in accordance with Sections 3(f) or 3(h) below.

(b)    The Borrower (1) shall maintain the Term Loan B Account and keep the Term Loan B Account separate and segregated from all of the Borrower's other accounts, (2) shall not co-mingle any of the Borrower's other cash or money (other than any Unrestricted Funds that relate to DIP Priority B Collateral) with the proceeds of the Term Loan B deposited in the Term Loan B Account and (3) shall not make any disbursements of any proceeds of the Term Loan B or any Unrestricted Funds that relate to DIP Priority B Collateral from the Term Loan B Account other than to the Borrower Disbursement Account for disbursement in accordance with Sections 3(f) and/or 3(h) and Section 3(g) below or otherwise in accordance with Sections 3(f) or 3(h) below.

(c)    The Borrower (1) shall maintain the Term Loan C Account and keep the Term Loan C Account separate and segregated from all of the Borrower's other accounts, (2) shall not co-mingle any of the Borrower's other cash or money (other than any Unrestricted Funds that relate to DIP Priority C Collateral) with the proceeds of the Term Loan C deposited in the Term Loan C Account and (3) shall not make any disbursements of any proceeds of the Term Loan C or any Unrestricted Funds that relate to DIP Priority C Collateral from the Term Loan C Account other than to the Borrower Disbursement Account for disbursement in accordance with Sections 3(f) and/or 3(h) and Section 3(g) below or otherwise in accordance with Sections 3(f) or 3(h) below.

(d)    The Borrower (1) shall maintain the Term Loan D Account and keep the Term Loan D Account separate and segregated from all of the Borrower's other accounts, (2) shall not co-mingle any of the Borrower's other cash or money (other than any Unrestricted Funds that relate to DIP Priority D Collateral) with the proceeds of the Term Loan D deposited in the Term Loan D Account and (3) shall not make any disbursements of any proceeds of the Term Loan D or any Unrestricted Funds that relate to DIP Priority D Collateral from the Term Loan D Account other than to the Borrower Disbursement Account for disbursement in accordance with Sections 3(f) and/or 3(h) and Section 3(g) below or otherwise in accordance with Sections 3(f) or 3(h) below.

(e)    The Borrower (1) shall maintain the Borrower Disbursement Account and keep the Borrower Disbursement Account separate and segregated from all of the Borrower's other accounts, (2) shall not co-mingle any of the Borrower's other cash or money with the proceeds of the Term Loans and/or Unrestricted Funds deposited in the Borrower Disbursement Account pursuant to this Section 3 and (3) shall not make any disbursements of any proceeds of the Term Loans and/or Unrestricted Funds deposited into the Borrower Disbursement Account other than in accordance with Sections 3(f) and/or 3(h) and Section 3(g) below.

(f)    The proceeds of the Term Loans shall be used solely in accordance with the expenditure line items in the Approved Budget (1) in the case of any Term Loan A, to pay fees and expenses in connection with the DIP Priority A Collateral, (2) in the case of any Term Loan B, to pay fees and expenses in connection with the DIP Priority B Collateral, (3) in the case of any Term Loan C, to pay fees and expenses in connection with the DIP Priority C Collateral and (4) in the case of any Term Loan D, (A) to pay fees and expenses (other than fees and expenses described in the immediately preceding clauses (1) through (3)) in connection with the transactions contemplated hereby (including, without limitation, the payment of any of the costs and expenses that are payable by the Borrower, and other payments permitted by the terms of this Note, the other Loan Documents, the Bankruptcy Code, the Bankruptcy Court (by court order), the Interim Order and the Final Order), (B) to pay fees and expenses in connection with the DIP Priority D Collateral and (C) to fund working capital of the Borrower and for other general corporate purposes, including, without limitation, the payment of Case Administration Fees and Professional Fees.

(g)    The Borrower shall not (1) at any time after the Unrestricted Funds Disbursement Date, permit the aggregate amount of Unrestricted Funds in all of the Borrower's checking, savings and/or other accounts (other than any Designated Term Loan Account or the Borrower Disbursement Account) to exceed $10,000 or (2) at any time after the Petition Date, permit the amount of cash deposited into the Borrower Disbursement Account to exceed the amount of cash projected to be disbursed by the Borrower at the end of the next immediately succeeding two-week period as set forth in the Approved Budget, less the aggregate amount of Unrestricted Funds deposited into the Designated Term Loan Accounts and/or the Borrower Disbursement Account that have not been applied to payment of outstanding fees and expenses in accordance with Section 3(h) at such time.

(h)    After the Unrestricted Funds Disbursement Date, the Borrower shall apply all Unrestricted Funds as follows: (1) to the extent any such Unrestricted Funds relate to any DIP Priority A Collateral, (A) the Borrower shall deposit all such Unrestricted Funds into the Term Loan A Account and (B) thereafter apply such Unrestricted Funds to the payment of fees and/or expenses in connection with such DIP Priority A Collateral in accordance with Sections 3(f) and (g) above or otherwise in accordance with Section 3(f) above, (2) to the extent any such Unrestricted Funds relate to any DIP Priority B Collateral, (A) the Borrower shall deposit all such Unrestricted Funds into the Term Loan B Account and (B) thereafter apply such Unrestricted Funds to the payment of fees and/or expenses in connection with such DIP Priority B Collateral in accordance with Sections 3(f) and (g) above or otherwise in accordance with Section 3(f) above, (3) to the extent any such Unrestricted Funds relate to any DIP Priority C Collateral, (A) the Borrower shall deposit all such Unrestricted Funds into the Term Loan C Account and (B) thereafter apply such Unrestricted Funds to the payment of fees and/or expenses in connection with such DIP Priority C Collateral in accordance with Sections 3(f) and (g) above or otherwise in accordance with Section 3(f) above and (4) to the extent any such Unrestricted Funds relate to any DIP Priority D Collateral or such Unrestricted Funds do not relate to any DIP Priority A Collateral, DIP Priority B Collateral or DIP Priority C Collateral, (A) the Borrower shall deposit

all such Unrestricted Funds into the Term Loan D Account and (B) thereafter apply such Unrestricted Funds (i) to pay fees and expenses (other than fees and expenses described in the immediately preceding clauses (1)(B), (2)(B) and (3)(B)) in connection with the transactions contemplated hereby (including, without limitation, the payment of any of the costs and expenses that are payable by the Borrower, and other payments permitted by the terms of this Note, the other Loan Documents, the Bankruptcy Code, the Bankruptcy Court (by court order), the Interim Order and the Final Order), (ii) to pay fees and expenses in connection with the DIP Priority D Collateral and (iii) to fund working capital of the Borrower and for other general corporate purposes, including, without limitation, the payment of Case Administration Fees and Professional Fees.

4.      Conditions Precedent to Interim Term Loans.  The obligation of any Term Loan Lender to make any Interim Term Loan during the Interim Period is subject to the fulfillment, in a manner satisfactory to the applicable Term Loan Lender that would make any such Interim Term Loan, of each of the following conditions precedent:

(a)      the Borrower shall have duly executed and delivered this Note;

(b)      the Borrower shall have commenced the Chapter 11 Case;

(c)      (1) the Bankruptcy Court shall have entered the Interim Order and (2) the Interim Order shall not have been vacated, reversed, modified or amended without the Required Lenders' consent, and no appeal of any such order shall have been timely filed or a stay of such order pending appeal shall be presently effective;

(d)      the Agent and the Term Loan Lenders shall have received on or before the Petition Date, copies of the first day motions to be filed by the Borrower with the Bankruptcy Court in the Chapter 11 Cases, each of which shall be in form and substance satisfactory to the Required Lenders;

(e)      the Borrower shall have delivered the Approved Budget to the Agent and the Term Loan Lenders;

(f)      the Borrower shall have established a cash management system satisfactory to the Required Lenders (in their sole discretion), including each of the Designated Term Loan Accounts and

(g)      the Borrower shall have delivered corporate resolutions, incumbency certificates and similar documents, in form and substance satisfactory to the Required Lenders with respect to this Note and the other Loan Documents and the transactions contemplated hereby and thereby.

5.      Conditions Precedent to Final Term Loans.  The obligation of any Term Loan Lender to make any Final Term Loan during the Final Period is subject to the fulfillment, in a manner satisfactory to the applicable Term Loan Lender that would make any such Final Term Loan, of each of the following conditions precedent:

(a)      the Bankruptcy Court shall have entered the Final Order and

(b)    the Final Order shall not have been vacated, reversed, modified or amended without the Required Lenders' consent, and no appeal of any such order shall have been timely filed or a stay of such order pending appeal shall be presently effective.

6.    <u>Conditions Precedent to All Term Loans</u>.  The obligation of any Term Loan Lender to make any Interim Term Loan during the Interim Period and/or any Final Term Loan during the Final Period is subject to the fulfillment, in a manner satisfactory to the applicable Term Loan Lender that would make any such Term Loan, of each of the following conditions precedent:

(a)    the Borrower shall have paid any and all fees, costs and expenses then payable hereunder or under any Loan Document (including, without limitation, the fees, costs and expenses of counsel to the Agent and each Term Loan Lender) and shall have fully performed all of its obligations hereunder or under any other Loan Document;

(b)    any representation or warranty by the Borrower contained herein or in any other Loan Document shall be true or correct as of such date in any material respect, except to the extent that such representation or warranty expressly relates to an earlier date;

(c)    at the time of and after giving effect to the making of such Term Loan and the application of the proceeds thereof, no Default or Event of Default has occurred and is continuing or would result from the making of the Term Loan to be made on such date;

(d)    the Required Lenders shall be satisfied that the Agent has been granted, and holds for the benefit of the Agents and the Term Loan Lenders, a perfected, first priority Lien on, and security interest in, all of the DIP Collateral, subject only to Permitted Encumbrances and Permitted Priority Encumbrances;

(e)    no event or circumstance shall have occurred since the Petition Date that could reasonably be expected to have a Material Adverse Effect, as determined by the Required Lenders in their sole discretion; and

(f)    the Agent shall have received a Notice of Borrowing with respect to the applicable Term Loan.

7.    <u>Principal</u>.  FOR VALUE RECEIVED, the Borrower promises to pay to the Agent, for the account of the Agent and the account of the Term Loan Lenders, as applicable, in the manner and at the place hereinafter provided, the unpaid principal amount of all Term Loans made by the Term Loan Lenders pursuant to this Note to the Borrower on the Maturity Date.

8.    <u>Interest</u>.

(a)    Interest on the unpaid principal amount of each Term Loan A and each portion of the unpaid principal amount of the Term Loan D held by a Term Loan

D/A Lender (1) shall accrue from the date hereof until paid in full, in arrears, at a rate per annum equal to 9.0% and (2) shall be capitalized and paid in-kind by being added to the outstanding principal balance of such Term Loan A or the outstanding principal balance of such portion of the Term Loan D held by a Term Loan D/A Lender, as applicable, on each applicable Interest Payment Date.

(b)    Interest on the unpaid principal amount of each Term Loan B, each Term Loan C, each Term Loan D/B and each Term Loan D/C held by a Term Loan B Lender, Term Loan C Lender, Term Loan D/B Lender or Term Loan D/C Lender to the extent funded by any holder of Series 2002 Bonds, Series 2015 Bonds or any affiliate thereof (1) shall accrue from the date hereof until paid in full, in arrears, at a rate per annum equal to 9.0% and (2) shall be capitalized and paid in-kind by being added to the outstanding principal balance of such Term Loan, as applicable, on each applicable Interest Payment Date.  No interest shall otherwise accrue on, and/or be payable with respect to, the unpaid principal amount of any Term Loan B, any Term Loan C or any portion of the principal amount of any Term Loan D that is held by UMB as indenture trustee under the Series 2002 Bond Documents or UMB as indenture trustee under the Series 2015 Bond Documents.

(c)    If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(d)    All computations of fees and interest shall be made by the Agent on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable.

(e)    So long as an Event of Default shall have occurred and be continuing, and at the election of the Term Loan Lenders confirmed by written notice from the Agent to the Borrower, the interest rate applicable to the Obligations shall be increased by three percentage points (3.0%) per annum above the rate of interest otherwise applicable hereunder (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations.  Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is cured or waived and shall be payable upon demand.

(f)    Notwithstanding anything to the contrary set forth in this Section 8, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate.

9.    Payments, Generally.

(a)    All payments in respect of this Note shall be made in Dollars in same day funds to the Agent, for the account of the Agent and the account of the Term Loan Lenders, at the following account:

> Name of Bank: UMB Bank N.A., Kansas City, MO
> ABA No.: 101 000 695
> BNF Account No.: 98 000 068 23
> BNF Name: Trust Operations/CT-STL
> OBI Field: Dowling College DIP #145434 Davies/Roberson

or to such other account as shall be designated in a written notice delivered by the Agent to the Borrower at least two Business Days prior to the applicable payment date (the "Agent's Account").

(b)    Promptly after receipt of any payment proceeds by the Agent in the Agent's Account, the Agent shall promptly transfer such payment proceeds to the Agent, the Term Loan Lenders and/or any such Person, as applicable, in accordance with the terms of this Note.

(c)    The Borrower hereby authorizes the Agent to, and the Agent may, from time to time, charge the Loan Account of the Borrower with any amount due and then payable by the Borrower under this Note and any other Loan Document; provided that the Agent provides contemporaneous notice to the Borrower of such charge. The Borrower agrees that the Agent shall have the right to make such charges whether or not any Default or Event of Default shall have occurred and be continuing. Any amount charged to the Loan Account of the Borrower shall be deemed a Term Loan D hereunder made by the Term Loan Lenders to the Borrower. The Borrower confirms that any charges that the Agent may so make to the Loan Account of the Borrower as herein provided will be made as an accommodation to Borrower and solely at the Agent's discretion.

(d)    The Agent shall record on its books and records the amount of each Term Loan made, the interest rate applicable (if any), all payments of principal and interest thereon, the principal balance thereof from time to time outstanding, any amounts charged to the Loan Account that are deemed to be a Term Loan D and any Distributions made. The Agent shall deliver to the Borrower on a monthly basis (within 10 Business Days following the last day of each calendar month) a loan statement setting forth such record for the immediately preceding calendar month. Such record shall, absent manifest error, be conclusive evidence of the amount of the Term Loans made by the Term Loan Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so, or any failure to deliver such loan statement shall not limit or otherwise affect the Obligations of the Borrower hereunder to pay any amount owing with respect to the Term Loans or provide the basis for any claim against the Agent or any Term Loan Lender.

10.     <u>Optional Prepayments</u>.  The Borrower shall have the right at any time and from time to time to prepay the principal of this Note in whole or in part (without premium or penalty).

11.     <u>Mandatory Prepayments</u>.  Immediately upon receipt by the Borrower of any cash proceeds (other than proceeds of any Term Loan), the Borrower shall prepay the Term Loans in an amount equal to 100% of such proceeds.   Any such prepayment shall be applied in accordance with Section 12 below.

12.     <u>Apportionment of Payments</u>.

(a)     Except as specified in Sections 12(b) through 12(h) below, any payment made under this Note shall be applied <u>first</u>, to fees and reimbursable expenses and indemnified liabilities of the Agent then due and payable pursuant to any of the Loan Documents, <u>second</u>, on a pro rata basis among the Term Loan Lenders, to fees and reimbursable expenses and indemnified liabilities of the Term Loan Lenders then due and payable pursuant to any of the Loan Documents, <u>third</u>, on a pro rata basis among the Term Loan Lenders, to interest then due and payable on the Term Loans, <u>fourth</u>, on a pro rata basis among the Term Loan Lenders, to the principal balance of the Term Loans until the same has been paid in full, and <u>fifth</u>, to all other Obligations until the same has been paid in full.

(b)     Any mandatory prepayment of the Term Loans required to be made pursuant to Section 11 resulting from the use, lease, sale or other disposition of any DIP Priority A/Series 1996 Collateral shall be applied, <u>first</u>, to fees and reimbursable expenses and indemnified liabilities of the Agent then due and payable pursuant to any of the Loan Documents, <u>second</u>, to interest then due and payable on the Prepetition Series 1996 Obligations in accordance with the terms of the Series 1996 Bond Documents, <u>third</u>, to the principal balance of the Prepetition Series 1996 Obligations in accordance with the terms of the Series 1996 Bond Documents until the same has been paid in full, <u>fourth</u>, to all other Prepetition Series 1996 Obligations in accordance with the terms of the Series 1996 Bond Documents until the same has been paid in full and <u>fifth</u>, in accordance with clauses "second" through "eighth" of Section 12(c) below.

(c)     Any mandatory prepayment of the Term Loans required to be made pursuant to Section 11 resulting from the use, lease, sale or other disposition of any DIP Priority A Collateral (other than DIP Priority A/Series 1996 Collateral and/or DIP Priority A/B Collateral) shall be applied, <u>first</u>, to fees and reimbursable expenses and indemnified liabilities of the Agent then due and payable pursuant to any of the Loan Documents, <u>second</u>, to fees and reimbursable expenses and indemnified liabilities of the Term Loan A Lenders and the Term Loan D/A Lenders then due and payable pursuant to any of the Loan Documents, <u>third</u>, to interest then due and payable on the Term Loan A Term Loans and the Term Loan D Term Loans held by the Term Loan D/A Lenders, <u>fourth</u>, to the principal balance of the Term Loan A Term Loans and the Term Loan D Term Loans held by the Term Loan D/A Lenders until the same have been paid in full, <u>fifth</u>, to interest then due and payable on the Prepetition A Obligations

in accordance with the terms of the Series 2006 Bond Documents and the Series 2006 Funding Agreement, <u>sixth</u>, to the principal balance of the Prepetition A Obligations in accordance with the terms of the Series 2006 Bond Documents and the Series 2006 Funding Agreement until the same has been paid in full, <u>seventh</u>, to all other Prepetition A Obligations in accordance with the terms of the Series 2006 Bond Documents and the Series 2006 Funding Agreement until the same has been paid in full and <u>eighth</u>, in accordance with clauses "second" through "fifth" of Section 12(a) above.

(d)    Any mandatory prepayment of the Term Loans required to be made pursuant to Section 11 resulting from the use, lease, sale or other disposition of any DIP Priority A/B Collateral shall be applied, <u>first</u>, to fees and reimbursable expenses and indemnified liabilities of the Agent then due and payable pursuant to any of the Loan Documents, <u>second</u>, on a pro rata basis, to fees and reimbursable expenses and indemnified liabilities of the Term Loan B Lenders and the Term Loan D/B Lenders then due and payable pursuant to any of the Loan Documents, <u>third</u>, on a pro rata basis, to interest then due and payable on the Term Loan B Term Loans and the Term Loan D Term Loans held by the Term Loan D/B Lenders, <u>fourth</u>, on a pro rata basis, to the principal balance of the Term Loan B Term Loans and the Term Loan D Term Loans held by the Term Loan D/B Lenders until the same have been paid in full, <u>fifth</u>, on a pro rata basis, to interest then due and payable on the Prepetition B Obligations in accordance with the terms of the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement, <u>sixth</u>, on a pro rata basis, to the principal balance of the Prepetition B Obligations in accordance with the terms of the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full, <u>seventh</u>, on a pro rata basis, to all other Prepetition B Obligations in accordance with the terms of the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full, <u>eighth</u>, to fees and reimbursable expenses and indemnified liabilities of the Term Loan A Lenders and the Term Loan D/A Lenders then due and payable pursuant to any of the Loan Documents, <u>eighth</u>, to interest then due and payable on the Term Loan A Term Loans and the Term Loan D Term Loans held by the Term Loan D/A Lenders, <u>ninth</u>, to the principal balance of the Term Loan A Term Loans and the Term Loan D Term Loans held by the Term Loan D/A Lenders until the same have been paid in full, <u>tenth</u>, to interest then due and payable on the Prepetition A Obligations in accordance with the terms of the Series 2006 Bond Documents and the Series 2006 Funding Agreement, <u>eleventh</u>, to the principal balance of the Prepetition A Obligations in accordance with the terms of the Series 2006 Bond Documents and the Series 2006 Funding Agreement until the same has been paid in full, <u>twelfth</u>, to all other Prepetition A Obligations in accordance with the terms of the Series 2006 Bond Documents and the Series 2006 Funding Agreement until the same has been paid in full and <u>thirteenth</u>, in accordance with clauses "second" through "fifth" of Section 12(a) above.

(e)    Any mandatory prepayment of the Term Loans required to be made pursuant to Section 11 resulting from the use, lease, sale or other disposition of any DIP Priority B Collateral (other than any DIP Priority B/C/Series 1996 Collateral and/or DIP Priority A/B Collateral) shall be applied, <u>first</u>, to fees and reimbursable expenses and indemnified liabilities of the Agent then due and payable pursuant to any

of the Loan Documents, <u>second</u>, on a pro rata basis, to fees and reimbursable expenses and indemnified liabilities of the Term Loan B Lenders and the Term Loan D/B Lenders then due and payable pursuant to any of the Loan Documents, <u>third</u>, on a pro rata basis, to interest then due and payable on the Term Loan B Term Loans and the Term Loan D Term Loans held by the Term Loan D/B Lenders, <u>fourth</u>, on a pro rata basis, to the principal balance of the Term Loan B Term Loans and the Term Loan D Term Loans held by the Term Loan D/B Lenders until the same have been paid in full, <u>fifth</u>, on a pro rata basis, to interest then due and payable on the Prepetition B Obligations in accordance with the terms of the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement, <u>sixth</u>, on a pro rata basis, to the principal balance of the Prepetition B Obligations in accordance with the terms of the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full, <u>seventh</u>, on a pro rata basis, to all other Prepetition B Obligations in accordance with the terms of the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full and <u>eighth</u>, in accordance with clauses "second" through "fifth" of Section 12(a) above.

(f)     Any mandatory prepayment of the Term Loans required to be made pursuant to Section 11 resulting from the use, lease, sale or other disposition of any DIP Priority C Collateral (other than any DIP Priority B/C/Series 1996 Collateral) shall be applied, <u>first</u>, to fees and reimbursable expenses and indemnified liabilities of the Agent then due and payable pursuant to any of the Loan Documents, <u>second</u>, on a pro rata basis, to fees and reimbursable expenses and indemnified liabilities of the Term Loan C Lenders and the Term Loan D/C Lenders then due and payable pursuant to any of the Loan Documents, <u>third</u>, on a pro rata basis, to interest then due and payable on the Term Loan C Term Loans and the Term Loan D Term Loans held by the Term Loan D/C Lenders, <u>fourth</u>, on a pro rata basis, to the principal balance of the Term Loan C Term Loans and the Term Loan D Term Loans held by the Term Loan D/C Lenders until the same have been paid in full, <u>fifth</u>, on a pro rata basis, to interest then due and payable on the Prepetition C Obligations in accordance with the terms of the Series 2015 Bond Documents and the Series 2002/2015 Funding Agreement, <u>sixth</u>, on a pro rata basis, to the principal balance of the Prepetition C Obligations in accordance with the terms of the Series 2015 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full, <u>seventh</u>, on a pro rata basis, to all other Prepetition C Obligations in accordance with the terms of the Series 2015 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full and <u>eighth</u>, in accordance with clauses "second" through "fifth" of Section 12(a) above.

(g)     Any mandatory prepayment of the Term Loans required to be made pursuant to Section 11 resulting from the use, lease, sale or other disposition of any DIP Priority B/C/Series 1996 Collateral shall be applied, <u>first</u>, to fees and reimbursable expenses and indemnified liabilities of the Agent then due and payable pursuant to any of the Loan Documents, <u>second</u>, on a pro rata basis, to fees and reimbursable expenses and indemnified liabilities of the Term Loan C Lenders and the Term Loan D/C Lenders then due and payable pursuant to any of the Loan Documents, <u>third</u>, on a pro rata basis, to interest then due and payable on the Term Loan C Term

Loans and the Term Loan D Term Loans held by the Term Loan D/C Lenders, <u>fourth</u>, on a pro rata basis, to the principal balance of the Term Loan C Term Loans and the Term Loan D Term Loans held by the Term Loan D/C Lenders until the same have been paid in full, <u>fifth</u>, on a pro rata basis, to interest then due and payable on the Prepetition C Obligations in accordance with the terms of the Series 2015 Bond Documents and the Series 2002/2015 Funding Agreement, <u>sixth</u>, on a pro rata basis, to the principal balance of the Prepetition C Obligations in accordance with the terms of the Series 2015 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full, <u>seventh</u>, on a pro rata basis, to all other Prepetition C Obligations in accordance with the terms of the Series 2015 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full, <u>eighth</u>, on a pro rata basis, to fees and reimbursable expenses and indemnified liabilities of the Term Loan B Lenders and the Term Loan D/B Lenders then due and payable pursuant to any of the Loan Documents, <u>ninth</u>, on a pro rata basis, to interest then due and payable on the Term Loan B Term Loans and the Term Loan D Term Loans held by the Term Loan D/B Lenders, <u>tenth</u>, on a pro rata basis, to the principal balance of the Term Loan B Term Loans and the Term Loan D Term Loans held by the Term Loan D/B Lenders until the same have been paid in full, <u>eleventh</u>, on a pro rata basis, to interest then due and payable on (1) the Prepetition B Obligations in accordance with the terms of the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement and (2) the Prepetition Series 1996 Obligations in accordance with the Series 1996 Bond Documents, <u>twelfth</u>, on a pro rata basis, to the principal balance of (1) the Prepetition B Obligations in accordance with the terms of the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full and (2) Prepetition Series 1996 Obligations in accordance with the Series 1996 Bond Documents until the same has been paid in full, <u>thirteenth</u>, on a pro rata basis, to all other (1) Prepetition B Obligations in accordance with the terms of the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement until the same has been paid in full and (2) Prepetition Series 1996 Obligations in accordance with the Series 1996 Bond Documents until the same has been paid in full and <u>fourteenth</u>, in accordance with clauses "second" through "fifth" of Section 12(a) above.

(h)    Any mandatory prepayment of the Term Loans required to be made pursuant to Section 11 resulting from the use, lease, sale or other disposition of any DIP Priority D Collateral shall be applied <u>first</u>, to fees and reimbursable expenses and indemnified liabilities of the Agent then due and payable pursuant to any of the Loan Documents, <u>second</u>, on a pro rata basis, to fees and reimbursable expenses and indemnified liabilities of the Term Loan D Lenders then due and payable pursuant to any of the Loan Documents, <u>third</u>, on a pro rata basis, to interest then due and payable on the Term Loan D Term Loans, <u>fourth</u>, on a pro rata basis, to the principal balance of the Term Loan D Term Loans until the same has been paid in full and <u>fifth</u>, in accordance with clauses "second" through "fifth" of Section 12(a) above.

(i)    Any payment pursuant to any of Section 12(b), 12(c), 12(d), 12(e), 12(f), 12(g) or 12(h) above (each a "<u>Distribution</u>") shall be made upon at least 5 Business Days prior written notice (each a "<u>Distribution Notice</u>") by the Agent to each Term Loan Lender and the Borrower at the addresses specified in Section 25 or such

other person or persons designated by any such Term Loan Lender in writing to the Agent.  Any such Distribution Notice shall specify how the Agent proposes to apply any such Distribution in accordance with this Section 12.  No such Distribution shall be made by the Agent pursuant to this Section 12(i) without the prior written consent of the Required Lenders, which consent (1) shall not be unreasonably withheld, conditioned or delayed and (2) shall be deemed given if such Distribution is not positively denied by any Lender within 5 Business Days after the Term Loan Lenders' receipt of such Distribution Notice.  The Agent, the Term Loan Lenders and the Borrower agree that (A) the Bankruptcy Court shall have exclusive jurisdiction to resolve any dispute with respect to any Distribution and (B) any action with respect to any such dispute shall be brought in the Bankruptcy Court.

(j)    Notwithstanding anything to the contrary in this Section 12, if the aggregate amount of fees, reimbursable expenses and/or indemnified liabilities of the Agent that are paid pursuant to clause "first" of any of Sections 12(b) through Section 12(g) above exceeds the aggregate amount of fees, expenses and/or indemnified liabilities incurred by the Agent that are solely related to the distribution of the proceeds of the applicable DIP Priority Collateral required pursuant to such Section (any such excess fees and/or expenses, "<u>Non-Distribution Fees and Expenses</u>"), the Term Loan Lenders that do not hold priority prepetition Liens on the DIP Priority Collateral (vis a vis the other Term Loan Lenders) from which such distributed proceeds originated shall promptly pay their Pro Rata Share of such Non-Distribution Fees and Expenses to the Term Loan Lenders that hold priority prepetition Liens on such DIP Priority Collateral (vis a vis the other Term Loan Lenders) from which such distributed proceeds originated.

13.    <u>Fees</u>.

(a)    The Borrower shall pay to the Agent, for the benefit of the Term Loan Lenders, a non-refundable financing fee equal to $200,000, which fee shall be earned in full on the Interim Order Entry Date and due and payable on the Interim Facility Effective Date.

(b)    The Borrower shall pay to the Agent, for the benefit of the Agent, a non-refundable loan servicing set-up fee equal to $4,000, which fee shall be earned in full on the Interim Order Entry Date and due and payable on the Interim Facility Effective Date.  From and after the Interim Facility Effective Date and until the Maturity Date, the Borrower shall pay to the Agent, for the benefit of the Agent, a quarterly loan servicing fee equal to $9,000 each quarter, which shall be payable on the Interim Facility Effective Date (payable ratably based on the number of calendar days remaining in the calendar quarter in which the Interim Facility Effective Date occurs) and quarterly in advance thereafter on the first day of each calendar quarter commencing on January 1, 2017.

14.    <u>Indemnity</u>.  The Borrower shall indemnify and hold harmless the Agent, each Term Loan Lender, each holder, bond insurer and indenture trustee under the Series 1996 Bond Documents, Series 2002 Bond Documents, Series 2006 Bond Documents or Series 2015 Bond

Documents, and each of their respective affiliates, members, officers, directors, employees, attorneys, agents and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Note and the other Loan Documents and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents (collectively, "Indemnified Liabilities"); provided, that the Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction.  **NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.**

15.    Adjustments for Withholding, Capital Adequacy Etc.

(a)    Notwithstanding anything to the contrary contained herein, all payments by the Borrower under this Note shall be made free and clear of and without deduction or withholding for any and all taxes, duties, levies, imposts, deductions, charges or withholdings and all related liabilities, including interest, penalties and additions to tax with respect thereto, excluding taxes imposed on the net income of the Agent or any Term Loan Lender by the jurisdiction in which such Term Loan Lender is organized or has its principal lending office (all such taxes, duties, levies, imposts, deductions, charges, withholdings and liabilities being referred to as "Taxes").  If the Borrower shall be required by applicable law to deduct or withhold any such Taxes from or in respect of any amount payable under this Note, then (1) the amount payable shall be increased as may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Note) each Term Loan Lender receives an amount equal to the amount it would have received if no such deduction or withholding had been made, (2) the Borrower shall make such deductions or withholdings and (3) the Borrower shall immediately pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

(b)    If the effect of the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (including without limitation any tax, duty, charge or withholding on or from payments due from the Borrower (but excluding taxation on the overall net income of any Term Loan Lender)), or any change therein or

in the interpretation or administration thereof by any governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of each Term Loan Lender with respect to this Note or to increase the cost to each Term Loan Lender of making or maintaining amounts available under this Note, the Borrower agrees to pay each Term Loan Lender such additional amount or amounts as will compensate such Term Loan Lender on an after-tax basis for such reduction or increase.

(c)     The Borrower agrees to immediately pay any present or future stamp or documentary taxes or any other excise or property taxes, charges, financial institutions duties, debits taxes or similar levies (all such taxes, charges, duties and levies being referred to as "Other Taxes") which arise from any payment made by the Borrower under this Note or from the execution, delivery or registration of, or otherwise with respect to, this Note.

(d)     The Borrower shall indemnify each Term Loan Lender for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable by the Borrower hereunder) paid by each Term Loan Lender and any liability (including penalties, interest and expenses) arising from or with respect to such Taxes or Other Taxes, whether or not they were correctly or legally asserted.  Payment under this indemnification shall be made upon demand.  A certificate as to the amount of such Taxes or Other Taxes submitted to the Borrower by each Term Loan Lender shall be conclusive evidence, absent manifest error, of the amount due from the Borrower to each Term Loan Lender.

(e)     The Borrower shall furnish to each Term Loan Lender the original or a certified copy of a receipt evidencing payment of Taxes or Other Taxes made by the Borrower within thirty (30) days after the date of any payment of Taxes or Other Taxes.

16.     <u>Priority of Obligations; the Term Loan Lenders' Liens; No Filings Required</u>.  To secure all of the Borrower's Obligations now existing or hereafter arising, the Agent is granted, for the benefit of Term Loan Lenders, (a) the DIP Liens in the DIP Collateral and (b) the DIP Superpriority Claim.  The priority of the DIP Liens and the DIP Superpriority Claim are set forth in the Interim Order or Final Order (as applicable).  The DIP Liens shall be deemed valid and perfected by entry of the Interim Order and/or the Final Order (as applicable).  Neither the Agent nor any Term Loan Lender shall be required to file any financing statements, mortgages, certificates of title, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the DIP Liens granted by or pursuant to this Note, the Interim Order, the Final Order or any other Loan Document.

17.     <u>Further Assurances</u>.  The Borrower agrees that it shall, at the Borrower's expense and upon request of the Agent and/or the Required Lenders, duly execute and deliver or cause to be duly executed and delivered, to the Agent and the Term Loan Lenders such further instruments and do and cause to be done such further acts as may be reasonable and necessary to carry out more effectively the provisions and purposes of this Note or any other Loan Document, including, upon the Agent's and/or the Required Lenders' written request and in form and

substance reasonably satisfactory to the Required Lenders, security agreements, UCC-l financing statements, mortgages and other Collateral Documents granting to the Agent, for the benefit of the Agent and each Term Loan Lender, first priority Liens in the DIP Collateral to secure the Obligations.

18.  <u>Reports and Notices</u>.

(a)    The Borrower hereby agrees to deliver to the Agent and each Term Loan Lender not later than 5:00 p.m. (New York time) on the Thursday of each week commencing on December 8, 2016, a report in form and substance satisfactory to the Required Lenders (in their sole and absolute discretion) (the "<u>Approved Budget Compliance Report</u>"), that sets forth (1) on a cumulative, weekly roll-forward basis through the end of the immediately preceding week, a comparison of (A) the Borrower's actual cash receipts to the Borrower's projected cash receipts and (B) the Borrower's actual cash disbursements to the Borrower's projected cash disbursements, each as set forth in the Approved Budget for such period, together with a certification by an authorized officer of the Borrower submitting such Budget Compliance Report that no Material Adverse Deviation has occurred and (2) all disbursements made by the Borrower from any Designated Term Loan Account for such period.

(b)    The Borrower hereby agrees to deliver, or cause to be delivered to the Agent and each Term Loan Lender, each of the following, which shall be in form and detail reasonably acceptable to the Required Lenders:

(1)    substantially contemporaneously with any payment made by the Borrower pursuant to Section 9, the Borrower, in consultation with the Agent and the Lenders, shall provide to the Agent and each Term Loan Lender at the addresses specified in Section 25 or such other person or persons designated by such Term Loan Lender in writing to the Agent, a written report (in form and substance satisfactory to the Required Lenders in their sole discretion) specifically identifying the source of such payment, including whether such payment is from proceeds of DIP Priority A Collateral, DIP Priority A/B Collateral, DIP Priority A/Series 1996 Collateral, DIP Priority B Collateral, DIP Priority B/C/Series 1996 Collateral, DIP Priority C Collateral and/or DIP Priority D Collateral.

(2)    immediately after any officer of the Borrower obtains knowledge of the occurrence of any Default or Event of Default under any Loan Document, notice of such occurrence, together with a detailed statement by a responsible officer of the Borrower of the steps being taken by Borrower to cure the effect of such Default or Event of Default;

(3)    immediately upon any officer of the Borrower obtaining knowledge thereof, notice of any loss of or material damage to any DIP Collateral or of any substantial adverse change in any DIP Collateral or the prospect of payment thereof, or of the occurrence or existence of any other event or circumstance which has had or could reasonably be expected to have a Material Adverse Effect;

(4)     promptly upon receipt, or if filed by the Borrower, promptly upon filing, all motions, notices, reports, applications, objections, responses or other papers filed or served in the Chapter 11 Case;

(5)     (A) promptly after submission to any governmental authority, (I) all documents and information furnished to such governmental authority in connection with any investigation of the Borrower, other than routine inquiries by such governmental authority, and (II) copies of any periodic or special reports filed by the Borrower with any governmental authority, other than routine reports filed in the ordinary course of business and (B) as soon as available and in any event within five days of the execution, receipt or delivery thereof, copies of material notices and other material communications received from or sent to any governmental authority which specifically relate to the Borrower; and

(6)     promptly upon request, such other information concerning the condition or operations, financial or otherwise, of the Borrower as the Agent or any Term Loan Lender may reasonably request.

The Borrower authorizes any Term Loan Lender to make available to any Prepetition Bondholder, any document delivered by the Borrower to the Agent and the Term Loan Lenders pursuant to this Section 18(b).

(c)     The Borrower authorizes the Agent, each Term Loan Lender and each Prepetition Bondholder, to communicate directly with the Borrower's chief restructuring officer and the Borrower's independent certified public accountants and advisors, and authorizes and shall instruct such officer, accountants and advisors to disclose and make available to the Agent and the Term Loan Lenders as reasonably requested by the Agent or any Term Loan Lender, any and all financial statements and other supporting financial documents, schedules and information relating to the Borrower or any of its subsidiaries (including copies of any issued management letters) with respect to the business, financial condition and other affairs of the Borrower or any of their respective subsidiaries.

19.     <u>Affirmative Covenants</u>.

The Borrower agrees that:

(a)     The Borrower will keep accurate books of record and account pertaining to the DIP Collateral and pertaining to the Borrower's business and financial condition and such other matters as the Agent or any Term Loan Lender may from time to time reasonably request, in which true and complete entries will be made in accordance with GAAP and, upon request of the Agent or any Term Loan Lender, will permit any officer, employee, attorney or accountant or agent of the Agent or such Term Loan Lender to audit, review, make extracts from or copy, at the Borrower's expense, any and all corporate and financial and other books and records of the Borrower at all times during ordinary business hours, to send and discuss with account debtors and other obligors requests for verification of amounts owed to the Borrower,

and to discuss the Borrower's affairs with any of its directors, officers, employees, attorneys, or accountants; <u>provided</u>, that the Agent or any Term Loan Lender shall notify the Borrower in advance of any anticipated communications with accountants. The Borrower will permit the Agent or any Term Loan Lender, or any of their respective officers, employees, accountants, attorneys or agents, to examine and inspect any DIP Collateral or any other property of the Borrower at any time during ordinary business hours and, so long as no Event of Default has occurred and is continuing, upon reasonable prior notice and in a manner not to disrupt the operation of the Borrower's business.

(b)    (i) The Borrower will, except as disclosed to and agreed by the Required Lenders, (A) comply with all requirements of law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect and (B) use and keep the DIP Collateral, and require that others use and keep the DIP Collateral, only for lawful purposes, without violation of any federal, state or local law, statute or ordinance and (ii) the Borrower will obtain, maintain in effect and comply with all permits, licenses and similar approvals necessary for the operation of its business as now or hereafter conducted.

(c)    The Borrower will pay or discharge, when due (except for any pre-petition taxes and then in conjunction with the confirmation of a plan or Bankruptcy Court order), (i) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties of the Borrower (including, without limitation, the DIP Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto (ii) all federal, state and local taxes required to be withheld by it and (iii) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any properties of the Borrower.

(d)    (i) The Borrower will keep and maintain the DIP Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) and will from time to time replace or repair any worn, defective or broken parts, (ii) the Borrower will defend the DIP Collateral against all claims or demands of all Persons (other than the Agent, the Term Loan Lenders and the Prepetition Bondholders acting directly or indirectly through the applicable indenture trustee or bond insurers) claiming the DIP Collateral or any interest therein and (iii) the Borrower will keep all DIP Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances.

(e)    The Borrower will conduct its business and affairs without infringement of or interference with any intellectual property of any other Person in any material respect and shall comply in all material respects with the terms of the written agreements governing the Borrower's use of any intellectual property licenses.

(f)    The Borrower will obtain and at all times maintain insurance with responsible and reputable insurers, in such amounts and against such risks as may from time to time be reasonably required by the Agent, but in all events in such amounts and

against such risks as is usually carried by companies engaged in a similar business and owning similar properties in the same general areas in which the Borrower operates. Without limiting the generality of the foregoing, the Borrower will at all times keep all tangible DIP Collateral insured against risks of fire (including so-called extended coverage), theft, collision (for DIP Collateral consisting of motor vehicles) and such other risks and in such amounts as the Required Lenders and/or the Agent may request, with any loss payable to the Agent to the extent of its interest, and all policies of such insurance shall contain a loss payable endorsement in favor of the Agent, for the benefit of Term Loan Lenders, in form and substance reasonably acceptable to the Required Lenders.  All policies of liability insurance required hereunder shall name the Agent, for the benefit of Term Loan Lenders, as an additional insured.

(g)    Subject to the actions of the Bankruptcy Court in connection with the Chapter 11 Case, the Borrower will preserve and maintain its existence and all of its rights, privileges and franchises necessary or desirable in the normal conduct of its business and shall conduct their business in an orderly, efficient and regular manner.

(h)    The Borrower shall at all times operate its business in a manner consistent with the Approved Budget except to the extent any variance from the Approved Budget has been approved in advance by the Required Lenders in their sole discretion.

(i)    The Borrower shall at all times, at the Borrower's sole cost and expense, retain a chief restructuring officer, in accordance with the terms of a retention agreement, whose identity and terms of retention shall be reasonably acceptable to the Required Lenders.

(j)    The Borrower shall satisfy, in form and substance satisfactory to the Required Lenders, each of the milestones (collectively, the "Chapter 11 Milestones") set forth on Schedule 2 by the date set forth opposite such Chapter 11 Milestone.

(k)    The Borrower shall comply with all terms, conditions, requirements and obligations set forth in the Interim Order or Final Order (as applicable).

20.    Negative Covenants.

The Borrower agrees that, without the prior written consent of the Required Lenders:

(a)    The Borrower shall not assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person, except the endorsement of negotiable instruments by the Borrower for the deposit or collection or similar transactions in the ordinary course of business.

(b)    The Borrower shall not consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to, the Interim Order or the Final Order.

(c)    The Borrower shall not cancel any claim or debt owing to it, except for reasonable consideration negotiated on an arm's-length basis and in ordinary course of its business consistent with past practices.

21.    <u>Events of Default; Rights and Remedies</u>.    Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

A.    The Borrower (i) shall fail to make any payment of principal or interest on, or fees owing in respect of the Term Loans or any of the other Obligations when due and payable or (ii) shall fail to pay or reimburse the Agent or any Term Loan Lender for any expense reimbursable hereunder or under any other Loan Document within three (3) Business Days following the Agent's or such Term Loan Lender's demand for such reimbursement or payment.

B.    The Borrower shall fail or neglect to perform, keep or observe any of the provisions of (i) Sections 3, 18(a), 18(b), 19(b), 19(c), 19(d), 19(e), 19(f), 19(g), 19(h), 19(i), 19(j), 19(k) or 20 or (ii)  Section 19(a) and such failure shall remain uncured for a period of three (3) Business Days after the earlier of the date a senior officer or the Borrower becomes aware of such failure and the date written notice of such default shall have been given by the Agent or any Term Loan Lender to the Borrower.

C.    The Borrower shall fail or neglect to perform, keep or observe any other provision of this Note or any of the other Loan Documents (other than any provision embodied in or covered by any other clause of this Section 21) and the same, if capable of being remedied, shall remain unremedied for two (2) Business Days after the earlier of the date a senior officer or the Borrower becomes aware of such failure and the date written notice of such default shall have been given by the Agent or any Term Loan Lender to the Borrower.

D.    Any representation or warranty herein or in any other Loan Document or in any written statement, report, financial statement or certificate made or delivered to the Agent or any Term Loan Lender by the Borrower is untrue or incorrect in any material respect as of the date when made or deemed made.

E.    The occurrence of any postpetition judgments, liabilities or events that remain unabated and, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

F.    Any provision of any Loan Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or the Borrower shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any Loan Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under any Loan Document shall cease to be a valid and perfected first priority Lien

(except as otherwise permitted herein or therein) in any of the DIP Collateral purported to be covered thereby.

G. There shall be a material adverse change in the business, assets, operations or financial condition of the Borrower, taken as a whole, other than those customarily caused by the filing of a Chapter 11 Case.

H. A Material Adverse Deviation shall occur without the Required Lenders' written consent.

I. The Borrower shall directly or indirectly, by operation of law or otherwise, (i) form or acquire any subsidiary, or (ii) merge with, consolidate with, acquire all or substantially all of the assets or capital Stock of, or otherwise combine with or acquire, any Person.

J. The Interim Order Entry Date does not occur on or before December 1, 2016.

K. The Final Order Entry Date does not occur on or before December 30, 2016.

L. The Interim Order or the Final Order shall have been stayed, vacated, reversed, modified or amended without the Required Lenders' consent.

M. A Termination Event shall occur.

N. An order with respect to the Chapter 11 Case or any Successor Case shall have been entered by the Bankruptcy Court converting the Chapter 11 Case or such Successor Case to a case under Chapter 7 of the Bankruptcy Code.

O. An order with respect to the Chapter 11 Case or any Successor Case shall have been entered by the Bankruptcy Court dismissing or suspending the Chapter 11 Case or such Successor Case, which does not contain a provision for termination of the Total Term Loan Commitment, and the payment in full in cash of all Obligations of the Borrower hereunder and under the other Loan Documents upon entry thereof.

P. An order with respect to the Chapter 11 Case or any Successor Case shall have been entered by the Bankruptcy Court appointing, or the Borrower shall file an application for an order with respect to the Chapter 11 Case seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code.

Q. Any adversary proceeding and/or a contested matter shall have been commenced by any Person in the Chapter 11 Case or any Successor Case challenging under any applicable law the amount, extent, validity, binding effect, enforceability, perfection and/or priority of the security interests, Liens and/or claims of the Lenders in and to the DIP Collateral.

If any Event of Default shall have occurred and be continuing, then the Required Lenders and/or the Agent (at the written direction of the Required Lenders) may, upon written notice to the Borrower: (i) terminate or reduce any Term Loan Commitment, whereupon such Commitment shall immediately be so terminated or reduced, (ii) terminate this Note and the Term Loan facility contemplated hereby with respect to further Term Loans, (iii) declare all or any portion of the Obligations, including without limitation, all or any portion of any Term Loan and the financing fee and/or any loan servicing fee payable pursuant to Section 13, to be forthwith due and payable and (iv) exercise any rights and remedies under the Loan Documents, the Interim Order or the Final Order (as applicable) or at law or in equity.

Except as otherwise provided for in this Note or by applicable law, the Borrower waives:  (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Agent on which Borrower may in any way be liable, and hereby ratifies and confirms whatever the Agent may do in this regard, (b) all rights to notice and a hearing prior to the Agent's taking possession or control of, or the Agent's replevy, attachment or levy upon, the DIP Collateral or any bond or security that might be required by any court prior to allowing the Agent to exercise any of its remedies and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, the Agent at the written direction of the Required Lenders is hereby authorized at any time or from time to time, without notice to the Borrower or to any other Person, any such notice being hereby expressly waived, to offset and to appropriate and to apply any and all balances held by it at any of its offices for the account of the Borrower (regardless of whether such balances are then due to the Borrower) and any other properties or assets at any time held or owing by the Agent to or for the credit or for the account of the Borrower against and on account of any of the Obligations that are not paid when due.

To the extent permitted by law and subject in all respects to the terms of the Interim Order or the Final Order (as applicable), the Agent's sole duty with respect to the custody, safekeeping and physical preservation of the DIP Collateral in its possession, under Section 9-207 of the Uniform Commercial Code or otherwise, shall be to deal with it in the same manner as the Agent deals with similar securities and property as a secured Term Loan Lender in other transactions.  The Agent's duty of care with respect to DIP Collateral in the custody or possession of a bailee or other third person shall be deemed fulfilled if it exercises reasonable care in the selection of the bailee or other third person, and the Agent need not otherwise preserve, protect, insure or care for any DIP Collateral, and the Agent shall not be obligated to preserve any rights the Borrower may have against prior parties.

22.    <u>Reference Agreements</u>.  This Note evidences the Term Loans that may be made to the Borrower from time to time in the aggregate principal amount outstanding of up to $4,974,779.00 and is issued pursuant to and entitled to the benefits of the Interim Order and Final Order (as applicable) to which reference is hereby made for a more complete statement of

the terms and conditions under which the Term Loans evidenced by this Note are made and are to be repaid.

23.    <u>Definitions</u>.    The following terms used in this Note shall have the following meanings (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

"<u>ACA</u>" means ACA Financial Guaranty Corporation.

"<u>Accounts</u>" means all of the Borrower's now owned and hereafter acquired "accounts" (as defined in the UCC) whether owned or acquired prior to or after the Petition Date and all other rights to payment for goods sold or leased or for services rendered that are not evidenced by an Instrument or Chattel Paper, whether or not any such rights to payment have been earned by performance.

"<u>Agent's Account</u>" shall have the meaning given such term in Section 9(a).

"<u>Approved Budget</u>" means, collectively, the cash flow projections attached hereto as <u>Exhibit A</u>, which are prepared by or on behalf of the Borrower on a weekly basis for the weeks from the Petition Date through the Maturity Date.

"<u>Approved Budget Compliance Report</u>" shall have the meaning given such term in Section 18(a).

"<u>Avoidance Action</u>" means any cause of action arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code and any proceeds therefrom.

"<u>Bankruptcy Court</u>" shall have the meaning given such term in the recital to this Note

"<u>Borrower</u>" shall have the meaning given such term in the recital to this Note.

"<u>Borrower Disbursement Account</u>" means account number xxxx745448 maintained by the Borrower with Signature Bank, or such other deposit account of the Borrower (located in the United States) approved in writing by the Required Lenders.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close.

"<u>Carve-Out</u>" shall have the meaning given such term in the Interim Order or the Final Order, as applicable.

"<u>Case Administration and Professional Fee Reserve</u>" means a reserve against the Total Interim Term Loan Commitment and/or the Total Term Loan Commitment, as applicable, in respect of Case Administration Fees and/or Professional Fees implemented by the Agent at the written direction of the Required Lenders.

"Case Administration Fees" shall have the meaning given such term in the Interim Order or the Final Order, as applicable.

"Cash Management Motion" means the Motion for an Order (i) Authorizing the Closing and Balance Transfers of Certain Prepetition Bank Accounts and Related Relief and (ii) Granting a Limited Waiver of Section 345 Investment and Deposit Requirements filed by the Borrower in the Chapter 11 Case on the Petition Date.

"Cash Management Order" means the Interim Order (i) Authorizing the Closing and Balance Transfers of Certain Prepetition Bank Accounts and Related Relief and (ii) Granting a Limited Waiver of Section 345 Investment and Deposit Requirements entered by the Bankruptcy Court in the Chapter 11 Case.

"Chapter 11 Case" shall have the meaning given such term in the recital to this Note.

"Chapter 11 Milestones" shall have the meaning given such term in Section 19(j).

"Class" means (a) with respect to the Interim Term Loans, any of the following classes of Interim Term Loans: (1) Interim Term Loan A, (2) Interim Term Loan B, (3) Interim Term Loan C and (4) Interim Term Loan D and (b) with respect to the Final Term Loans, any of the following classes of Final Term Loans:  (1) Final Term Loan A, (2) Final Term Loan B, (3) Final Term Loan C and (4) Final Term Loan D.

"Collateral Documents" means any agreement entered into pursuant to Section 17 hereof and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations, including the Interim Order and the Final Order (as applicable).

"Contingent Obligation" means, with respect to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (ii) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (iii) any obligation of such Person, whether or not contingent, (A) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (C) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (D) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to

the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning given such term in Section 8(e).

"Defaulting Lender" means any Term Loan Lender that (i) has failed to (A) fund all or any portion of its Term Loan(s) within 5 Business Days of the date such Term Loan(s) were required to be funded under this Note, unless such Term Loan Lender notifies the Agent, the Borrower and the other Term Loan Lenders in writing that such failure is the result of such Term Loan Lender's good faith determination that one or more conditions precedent to funding has not been satisfied or such Term Loan Lender's good faith inability to determine whether all conditions precedent to funding have been satisfied (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) or (B) pay to the Agent any other amount required to be paid by it under this Note within 5 Business Days of the date when due, (ii) has notified the Borrower, the Agent or any other Term Loan Lender in writing that it does not intend to comply with its funding obligations under this Note, or has made a public statement to that effect (unless such writing or public statement relates to such Term Loan Lender's obligation to fund a Term Loan hereunder and states that such position is based on such Term Loan Lender's good faith determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied) or (iii) has failed, within 5 Business Days after written request by the Agent, the Borrower or any other Term Loan Lender, to confirm in writing to the Agent, the Borrower and the other Term Loan Lenders that it will comply with its prospective funding obligations under this Note.

"Designated Term Loan Account" means any of the Term Loan A Account, the Term Loan B Account, the Term Loan C Account or the Term Loan D Account.

"DIP Collateral" means all of the property, assets or interests in property or assets of the Borrower, of any kind or nature whatsoever, real or personal, now existing or hereafter acquired or created, including, without limitation, all property of the "estate" (within the meaning of the Bankruptcy Code) of the Borrower, and all Accounts, Inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, general intangibles, payment intangibles, letters of credit, letter-of-credit rights, supporting obligations, machinery and equipment, real property, fixtures, leases, all of the equity interests of each subsidiary of the Borrower, all of the equity interests of all other Persons directly owned by the Borrower, money, investment property, deposit accounts, all commercial tort claims and all causes of action arising under the Bankruptcy Code or otherwise (including, without limitation, all Avoidance Actions and the proceeds thereof), and all cash and non-cash proceeds, rents,

products and profits of any of collateral described above; <u>provided</u> that DIP Collateral shall not include funds held, as of the date hereof, under any Prepetition Financing Documents.

"<u>DIP Liens</u>" shall have the meaning set forth in the Interim Order or the Final Order (as applicable).

"<u>DIP Priority Collateral</u>" means, collectively, the DIP Priority A Collateral, the DIP Priority A/B Collateral, the DIP Priority A/Series 1996 Collateral, the DIP Priority B Collateral, the DIP Priority B/C/Series 1996 Collateral, the DIP Priority C Collateral and the DIP Priority D Collateral.

"<u>DIP Priority A Collateral</u>" means, the portion of the DIP Collateral securing the Borrower's obligations under the Series 2006 Bond Documents, including the DIP Collateral specified in the Series 2006 Funding Agreement.

"<u>DIP Priority A/B Collateral</u>" means, the portion of the DIP Collateral (a) securing the Prepetition A Obligations and the Prepetition B Obligations and (b) on which the Liens securing the Prepetition A Obligations are subordinate to the Liens securing the Prepetition B Obligations, if any.

"<u>DIP Priority A/Series 1996 Collateral</u>" means, the portion of the DIP Collateral (a) securing the Prepetition A Obligations and the Prepetition Series 1996 Obligations and (b) on which the Liens securing the Prepetition A Obligations are subordinate to the Liens securing the Prepetition Series 1996 Obligations, if any.

"<u>DIP Priority B Collateral</u>" means, the portion of the DIP Collateral securing the Borrower's obligations under the Series 2002 Bond Documents, including the DIP Collateral specified in the Series 2002/2015 Funding Agreement.

"<u>DIP Priority B/C/Series 1996 Collateral</u>" means, the portion of the DIP Collateral securing the Prepetition B Obligations, the Prepetition C Obligations and the Prepetition Series 1996 Obligations.

"<u>DIP Priority C Collateral</u>" means, the portion of the DIP Collateral securing the Borrower's obligations under the Series 2015 Bond Documents, including the DIP Collateral specified in the Series 2002/2015 Funding Agreement.

"<u>DIP Priority D Collateral</u>" means, all DIP Collateral other than DIP Priority A Collateral, DIP Priority B Collateral and DIP Priority C Collateral.

"<u>DIP Superpriority Claim</u>" means, any claim constituting allowed administrative expenses in the Chapter 11 Case, having priority over all administrative expenses of and unsecured claims against such Person now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, subject only to the prior payment of the Carve-Out.

"<u>Distribution</u>" shall have the meaning given such term in Section 12(i).

"<u>Distribution Notice</u>" shall have the meaning given such term in Section 12(i).

"<u>Dollars</u>" or "<u>$</u>" means lawful currency of the United States of America.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"<u>Event of Default</u>" shall have the meaning given such term in Section 21.

"<u>Final Facility Effective Date</u>" means the date on which all of the conditions precedent set forth in Sections 5 and 6 are satisfied with respect to the Final Term Loans.

"<u>Final Order</u>" means the final order of the Bankruptcy Court with respect to the Borrower, substantially in the form of the Interim Order and acceptable to the Required Lenders, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Required Lenders and the Borrower.

"<u>Final Order Entry Date</u>" means the date on which the Final Order shall have been entered by the Bankruptcy Court.

"<u>Final Period</u>" means the period commencing on the Final Facility Effective Date and ending on the Maturity Date.

"<u>Final Term Loan</u>" means, individually and collectively, each Final Term Loan A, each Final Term Loan B, each Final Term Loan C and each Final Term Loan D.

"<u>Final Term Loan A</u>" shall have the meaning given such term in Section 1.

"<u>Final Term Loan A Commitment</u>" means, with respect to each Term Loan A Lender, the commitment of such Term Loan A Lender to make a Final Term Loan A to the Borrower in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Final Term Loan B</u>" shall have the meaning given such term in Section 1.

"<u>Final Term Loan B Commitment</u>" means, with respect to each Term Loan B Lender, the commitment of such Term Loan B Lender to make a Final Term Loan B to the Borrower in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Final Term Loan C</u>" shall have the meaning given such term in Section 1.

"<u>Final Term Loan C Commitment</u>" means, with respect to each Term Loan C Lender, the commitment of such Term Loan C Lender to make a Final Term Loan C to the Borrower in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Final Term Loan D</u>" shall have the meaning given such term in Section 1.

"<u>Final Term Loan D Commitment</u>" means, with respect to each Term Loan D Lender, the commitment of such Term Loan D Lender to make  a Final Term Loan D to the Borrower in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>GAAP</u>" means generally accepted accounting principles in the United States of America.

"<u>Indebtedness</u>" means, without duplication, with respect to any Person, (i) all indebtedness of such Person for borrowed money; (ii) all obligations of such Person for the deferred purchase price of property or services (other than trade payables, payables to vendors or other account payables incurred in the ordinary course of such Person's business and not past due for more than 90 days after the date such payable was created); (iii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (iv) all obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or the Agent or the Term Loan Lenders thereunder are limited to repossession or sale of such property; (v) all capitalized lease obligations of such Person; (vi) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (vii) all obligations and liabilities, calculated on a basis reasonably satisfactory to the Required Lenders and in accordance with accepted practice, of such Person under interest rate or currency swaps and other derivatives; (viii) all Contingent Obligations; (ix) all other items which, in accordance with GAAP, would be included as liabilities on the liability side of the balance sheet of such Person; and (x) all obligations referred to in clauses (i) through (ix) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.  The Indebtedness of any Person shall include the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer.

"<u>Indemnified Person</u>" shall have the meaning given such term in Section 14.

"<u>Insurance Motion</u>" means the Motion of Debtor and Debtor in Possession, Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, for an Order Authorizing the Debtor to (i) Continue its Existing Insurance Programs and Related Agreements, Including Premium Financing Agreement and (ii) Pay Certain Prepetition Insurance Premiums, Claims and Related Expenses filed by the Borrower in the Chapter 11 Case on the Petition Date.

"<u>Interest Payment Date</u>" means the first Business Day of each month to occur while any Term Loan A or Term Loan D is outstanding; <u>provided</u> that, in addition to the foregoing, each of (a) the date upon which all of the Term Loan A Term Loans and the Term Loan D Term Loans have been paid in full and (b) the Maturity Date shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued hereunder.

"Interim Facility Effective Date" means the date on which all of the conditions precedent set forth in Sections 4 and 6 are satisfied with respect to the Interim Term Loans.

"Interim Order" means the order of the Bankruptcy Court with respect to the Borrower, substantially in the form of Exhibit B as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the Required Lenders and the Borrower.

"Interim Order Entry Date" means the date on which the Interim Order shall have been entered by the Bankruptcy Court.

"Interim Period" means the period commencing on the Interim Facility Effective Date and ending on the earlier to occur of (a) the Final Facility Effective Date and (b) the Maturity Date.

"Interim Term Loan" means, individually and collectively, each Interim Term Loan A, each Interim Term Loan B, each Interim Term Loan C and each Interim Term Loan D.

"Interim Term Loan A" shall have the meaning given such term in Section 1.

"Interim Term Loan A Commitment" means, with respect to each Term Loan A Lender, the commitment of such Term Loan A Lender to make an Interim Term Loan A to the Borrower in the amount set forth in Schedule 1, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Interim Term Loan B" shall have the meaning given such term in Section 1.

"Interim Term Loan B Commitment" means, with respect to each Term Loan B Lender, the commitment of such Term Loan B Lender to make an Interim Term Loan B to the Borrower in the amount set forth in Schedule 1, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Interim Term Loan C" shall have the meaning given such term in Section 1.

"Interim Term Loan C Commitment" means, with respect to each Term Loan C Lender, the commitment of such Term Loan C Lender to make an Interim Term Loan C to the Borrower in the amount set forth in Schedule 1, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Interim Term Loan D" shall have the meaning given such term in Section 1.

"Interim Term Loan D Commitment" means, with respect to each Term Loan D Lender, the commitment of such Term Loan D Lender to make an Interim Term Loan D to the Borrower in the amount set forth in Schedule 1, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Inventory" means, with respect to any Person, all goods and merchandise of such Person, including, without limitation, all raw materials, work-in-process, packaging, supplies,

materials and finished goods of every nature used or usable in connection with the shipping, storing, advertising or sale of such goods and merchandise, whether now owned or hereafter acquired, and all such other similar property the sale or other disposition of which would give rise to an account receivable or cash.

"Lien" means any (i) mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction) and (ii) DIP Lien.

"Liquidation Plan" means a plan of liquidation proposed by the Borrower or any other Person in the Chapter 11 Case.

"Loan Account" means an account maintained hereunder by the Agent on its books of account at the Payment Office, and with respect to the Borrower, in which the Borrower will be charged with all Term Loans made to, and all other Obligations incurred by, the Borrower.

"Loan Documents" means this Note, the Interim Order, the Final Order, the Collateral Documents and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of, the Agent or any Term Loan Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of the Borrower, or any employee of the Borrower, and delivered to the Agent or any Term Loan Lender in connection with this Note or the transactions contemplated thereby. Any reference in this Note or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Material Adverse Deviation" means, as of the end of each week set forth in the Approved Budget, (i) a negative upward deviation with respect to the cumulative amount of the Approved Budget line item entitled "Total Cash Disbursements" of more than 10.0% or (ii) a negative upward deviation with respect to the cumulative amount of any other Approved Budget disbursement line item of more than 15.0%, in each case, above the cumulative amount permitted to be made for such applicable line item as set forth in the Approved Budget through such period; provided, however, with respect to any Approved Budget disbursement line item under each of the Approved Budget subsections entitled "Series 2006 Bonds/Term Loan A", "Series 2002 Bonds/Term Loan B", "Series 2015 Bonds/Term Loan C" or "Administrative Overhead/Term Loan D", the cumulative amount of disbursements permitted to be made in respect of any such line item or multiple line items in the aggregate may be increased, without duplication, by the amount by which the cumulative amount of disbursements permitted to be made under the heading "Other" in the applicable Approved Budget subsection exceeds the

cumulative amount of disbursements actually made under such heading "Other" in the same applicable Approved Budget subsection.

"Material Adverse Effect" means a material adverse effect on (i) the operations, business assets or properties or condition (financial or otherwise) of the Borrower (other than those resulting solely from the commencement of the Chapter 11 Case), (ii) the ability of the Borrower to perform any of its obligations under any Loan Document to which it is a party (other than those resulting solely from the commencement of the Chapter 11 Case), (iii) the legality, validity or enforceability of this Note or any other Loan Document, (iv) the rights and remedies of the Agent or any Term Loan Lender under any Loan Document or (v) the validity, perfection or priority of a Lien in favor of the Agent or any Term Loan Lender on any of the DIP Collateral.

"Maturity Date" means the earliest of: (i) May 8, 2017 and (ii) the date of the occurrence of a Termination Event.

"Maximum Lawful Rate" shall have the meaning given such term in Section 8(f).

"Non-Distribution Fees and Expenses" shall have the meaning given such term in Section 12(j).

"Notice of Borrowing" shall have the meaning given such term in Section 2.

"Obligations" means all loans, advances, debts, liabilities and obligations for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by the Borrower to the Term Loan Lenders, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under this Note or any of the other Loan Documents. This term includes all principal, interest, fees, charges, expenses, attorneys' fees and any other sum chargeable to the Borrower under this Note or any of the other Loan Documents.

"Other Taxes" shall have the meaning given such term in Section 15.

"Participant Register" shall have the meaning given such term in Section 25.

"Payment Office" means such office or offices of the Agent as may be designated in writing from time to time by the Agent to the Borrower.

"Permitted Encumbrances" means the following encumbrances:  (a) Liens for taxes or assessments or other governmental charges not yet due and payable; (b) pledges or deposits of money securing statutory obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation (excluding Liens under ERISA); (c) pledges or deposits of money securing use of utilities, bids, tenders, contracts (other than contracts for the payment of money) or leases to which the Borrower is a party as lessee made in the ordinary course of business; (d) inchoate and unperfected workers', mechanics' or similar liens arising in the ordinary course of business, so long as such Liens attach only to equipment, fixtures or real estate; (e) Liens existing on the Petition Date in respect of perfected

workers', mechanics' or similar Liens, as described on <u>Schedule 3</u>; (f) deposits securing, or in lieu of, surety, appeal or customs bonds in proceedings to which the Borrower is a party; (g) zoning restrictions, easements, licenses, or other restrictions on the use of any real estate or other minor irregularities in title (including leasehold title) thereto so long as the same do not materially impair the use, value, or marketability of such real estate; (h) purchase money security interests and capital leases incurred prior to the Petition Date; (i) Liens pursuant to and permitted under the Prepetition Financing Documents, (j) the Liens in favor of the Term Loan Lenders securing the Obligations and (k) Liens pursuant to the Premium Financing Agreement.

"<u>Permitted Priority Encumbrances</u>" means all Permitted Encumbrances other than the Liens permitted under clauses (a), (d), (e) and (i) of the definition of the term "Permitted Encumbrances."

"<u>Person</u>" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"<u>Petition Date</u>" shall have the meaning given such term in the recital to this Note.

"<u>Premium Financing Agreement</u>" shall have the meaning given such term in the Insurance Motion.

"<u>Prepetition A Obligations</u>" means, the Borrower's obligations under the Series 2006 Bond Documents and the Series 2006 Funding Agreement owing to the Term Loan A Lenders.

"<u>Prepetition B Obligations</u>" means, the Borrower's obligations under the Series 2002 Bond Documents and the Series 2002/2015 Funding Agreement owing to the Term Loan B Lenders.

"<u>Prepetition Bondholders</u>" means the bondholders party to the Prepetition Financing Documents.

"<u>Prepetition C Obligations</u>" means, the Borrower's obligations under the Series 2015 Bond Documents and the Series 2002/2015 Funding Agreement owing to the Term Loan C Lenders.

"<u>Prepetition Debt Obligations</u>" means, the Prepetition A Obligations, the Prepetition B Obligations and the Prepetition C Obligations.

"<u>Prepetition Financing Documents</u>" means the Series 1996 Bond Documents, Series 2002 Bond Documents, Series 2006 Bond Documents, Series 2015 Bond Documents, Series 2006 Funding Agreement and Series 2002/2015 Funding Agreement.

"<u>Prepetition Series 1996 Obligations</u>" means, the Borrower's obligations under the Series 1996 Bond Documents.

"Professional Fees" shall have the meaning set forth in the Interim Order or the Final Order (as applicable).

"Pro Rata Share" means

(a)    (i) with respect to a Term Loan A Lender's obligation to make an Interim Term Loan A and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (x) such Term Loan A Lender's Interim Term Loan A Commitment, by (y) the Total Interim Term Loan A Commitment, provided that if the Total Interim Term Loan A Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Term Loan A Lender's portion of the Interim Term Loan A Term Loans and the denominator shall be the aggregate unpaid principal amount of the Interim Term Loan A Term Loans, and (ii) with respect to a Term Loan A Lender's obligation to make a Final Term Loan A and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (x) such Term Loan A Lender's Final Term Loan A Commitment, by (y) the Total Final Term Loan A Commitment, provided that if the Total Final Term Loan A Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Term Loan A Lender's portion of the Final Term Loan A Term Loans and the denominator shall be the aggregate unpaid principal amount of the Final Term Loan A Term Loans;

(b)    (i) with respect to a Term Loan B Lender's obligation to make an Interim Term Loan B and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (x) such Term Loan B Lender's Interim Term Loan B Commitment, by (y) the Total Interim Term Loan B Commitment, provided that if the Total Interim Term Loan B Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Term Loan B Lender's portion of the Interim Term Loan B Term Loans and the denominator shall be the aggregate unpaid principal amount of the Interim Term Loan B Term Loans, and (ii) with respect to a Term Loan B Lender's obligation to make a Final Term Loan B and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (x) such Term Loan B Lender's Final Term Loan B Commitment, by (y) the Total Term Loan B Commitment, provided that if the Total Term Loan B Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Term Loan B Lender's portion of the Final Term Loan B Term Loans and the denominator shall be the aggregate unpaid principal amount of the Final Term Loan B Term Loans;

(c)    (i) with respect to a Term Loan C Lender's obligation to make an Interim Term Loan C and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (x) such Term Loan C Lender's Interim Term Loan C Commitment, by (y) the Total Interim Term Loan C Commitment, provided that if the Total Interim Term Loan C Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Term Loan C Lender's portion of the Interim Term Loan C Term Loans and the denominator shall be the aggregate unpaid principal amount of the Interim Term Loan C Term Loans, and (ii) with respect to a Term Loan C Lender's obligation to make a Final Term Loan C and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (x) such Term Loan Lender's Final Term Loan C

Commitment, by (y) the Total Term Loan C Commitment, <u>provided</u> that if the Total Term Loan C Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Term Loan C Lender's portion of the Final Term Loan C Term Loans and the denominator shall be the aggregate unpaid principal amount of the Final Term Loan C Term Loans,

(d)    (i) with respect to a Term Loan D Lender's obligation to make the Interim Term Loan D and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (x) such Term Loan D Lender's Interim Term Loan D Commitment, by (y) the Total Interim Term Loan D Commitment, <u>provided</u> that if the Total Interim Term Loan D Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Term Loan D Lender's portion of the Interim Term Loan D Term Loans and the denominator shall be the aggregate unpaid principal amount of the Interim Term Loan D Term Loans, and (ii) with respect to a Term Loan D Lender's obligation to make a Final Term Loan D and receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (x) such Term Loan D Lender's Final Term Loan D Commitment, by (y) the Total Term Loan D Commitment, <u>provided</u> that if the Total Term Loan D Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Term Loan D Lender's portion of the Final Term Loan D Term Loans and the denominator shall be the aggregate unpaid principal amount of the Final Term Loan D Term Loans; and

(e)    with respect to all other matters regarding a Term Loan Lender, the percentage obtained by dividing (x) the sum of such Term Loan Lender's portion of the Total Term Loan Commitment and the unpaid principal amount of such Term Loan Lender's portion of the Term Loans, by (y) the sum of the Total Term Loan Commitment and the aggregate unpaid principal amount of the Term Loans, <u>provided</u>, that, if such Term Loan Lender's portion of the Total Term Loan Commitment shall have been reduced to zero, such Lender's portion of the Total Term Loan Commitment shall be deemed to be the aggregate unpaid principal amount of such Lender's Term Loans and if the Total Term Loan Commitment shall have been reduced to zero, the Total Term Loan Commitment shall be deemed to be the aggregate unpaid principal amount of all Term Loans.

"<u>PSA</u>" shall have the meaning given such term in the Debtor's Motion Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019 for an Order Authorizing the Debtor to Enter Into and Perform Under Plan Support Agreement, filed by the Borrower in the Chapter 11 Case on the Petition Date.

"<u>Register</u>" shall have the meaning given such term in Section 25.

"<u>Registered Loans</u>" shall have the meaning given such term in Section 25.

"<u>Related Fund</u>" means, with respect to any Person, an affiliate of such Person, or a fund or account managed by such Person or an affiliate of such Person.

"<u>Required Lenders</u>" means (a) in the case of any amendment, waiver and/or consent that solely affects the Term Loan A Term Loans or the DIP Priority A Collateral, ACA,

(b) in the case of any amendment, waiver and/or consent that solely affects the Term Loan B Term Loans or the DIP Priority B Collateral, Term Loan B Lenders whose Pro Rata Shares aggregate at least 50.1% of the Term Loan B Lenders, (c) in the case of any amendment, waiver and/or consent that solely affects the Term Loan C Term Loans or the DIP Priority C Collateral, Term Loan C Lenders whose Pro Rata Shares aggregate at least 50.1% of the Term Loan C Lenders, (d) in the case of any amendment, waiver and/or consent that directly affects the Term Loan D Term Loans or any DIP Priority D Collateral, Term Loan D Lenders whose Pro Rata Shares aggregate at least 90% of the Term Loan D Lenders and (e) in the case of any other amendment, waiver and/or consent not described in the immediately preceding clauses (a) through (d), Term Loan Lenders whose Pro Rata Shares (calculated in accordance with clause (e) of the definition thereof) aggregate at least 90% of the Term Loan Lenders.

"Restricted Funds" shall have the meaning given such term in the Cash Management Motion.

"Series 1996 Bond Documents" means, collectively, (a) the Indenture of Trust, dated as of June 1, 1996, between the Suffolk County Industrial Development Agency and UMB, as indenture trustee, (b) the bonds issued under the foregoing indenture, and (c) all other documents evidencing and/or securing the foregoing indenture and bonds.

"Series 1996 Collateral" means, the portion of the DIP Collateral securing the Borrower's obligations under the Series 1996 Bond Documents.

"Series 2002 Bond Documents" means, collectively, (a) the Indenture of Trust, dated as of November 1, 2002, between the Town of Brookhaven Industrial Development Agency and UMB, as indenture trustee, (b) the bonds issued under the foregoing indenture, and (c) all other documents evidencing and/or securing the foregoing indenture and bonds.

"Series 2002/2015 Funding Agreement" means that certain Conditional Funding Agreement, as amended, dated as of August 4, 2016, among the Borrower, UMB, as indenture trustee under the Series 2002 Bond Documents, UMB, as indenture trustee under the Series 2015 Bond Documents, and the holders of bonds under the Series 2002 Bond Documents and the Series 2015 Bond Documents.

"Series 2006 Bond Documents" means, collectively, (a) the Indenture of Trust, dated as of June 1, 2006, between the Suffolk County Industrial Development Agency and Wilmington Trust, as indenture trustee, (b) the bonds issued under the foregoing indenture, and (c) all other documents evidencing and/or securing the foregoing indenture and bonds.

"Series 2006 Funding Agreement" means that certain Conditional Funding Agreement, as amended, dated as of August 4, 2006, among the Borrower, Wilmington Trust, as indenture trustee under the 2006 Bond Documents, and ACA, as bond insurer under the 2006 Bond Documents.

"Series 2015 Bond Documents" means the Indenture of Trust, dated as of June 15, 2015, between the Borrower and UMB, as indenture trustee, (b) the bonds issued under the foregoing indenture, and (c) all other documents evidencing and/or securing the foregoing indenture and bonds.

"Stock" means all shares, options, warrants, general or limited partnership interests or other equivalents (regardless of how designated) of or in a corporation, partnership or equivalent entity whether voting or nonvoting, including common stock, preferred stock or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act).

"Stockholder" means with respect to any Person, each holder of Stock of such Person.

"Successor Case" shall have the meaning given such term in the Interim Order or the Final Order, as applicable.

"Taxes" shall have the meaning given such term in Section 10.

"Term Loan" and "Term Loans" means, individually and collectively, each Term Loan A, each Term Loan B, each Term Loan C and each Term Loan D.

"Term Loan A" means, individually and collectively, each Interim Term Loan A and each Final Term Loan A made by each Term Loan A Lender to the Borrower pursuant to Section 1.

"Term Loan A Account" means account number xxxx745456 maintained by the Borrower with Signature Bank, or such other deposit account of the Borrower (located in the United States) approved in writing by the Required Lenders.

"Term Loan A Commitment" means, with respect to each Term Loan Lender, the commitment of such Term Loan Lender to make the Term Loan A to the Borrower in the amount set forth in Schedule 1, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Term Loan A Lender" means ACA, Wilmington Trust and each other Term Loan Lender with a Term Loan A Commitment or a Term Loan A.

"Term Loan A Obligations" means any Obligations with respect to the Term Loan A (including, without limitation, the principal thereof, the interest thereon, and the fees and expenses specifically related thereto).

"Term Loan A Unrestricted Funds Amount" means, as of any date of determination, the sum of (x) the aggregate amount of Unrestricted Funds that the Borrower has deposited into the Term Loan A Account as of such date, plus, (y) the aggregate amount of Unrestricted Funds that the Borrower is required to deposit into the Term Loan A Account as of such date pursuant to Section 3, but has not deposited into such account as of such date.

"Term Loan B" means, individually and collectively, each Interim Term Loan B and each Final Term Loan B made by each Term Loan B Lender to the Borrower pursuant to Section 1.

"Term Loan B Account" means account number xxxx745464 maintained by the Borrower with Signature Bank, or such other deposit account of the Borrower (located in the United States) approved in writing by the Required Lenders.

"Term Loan B Commitment" means, with respect to each Term Loan Lender, the commitment of such Term Loan Lender to make the Term Loan B to the Borrower in the amount set forth in Schedule 1, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Term Loan B Lender" means UMB (as indenture trustee under the Series 2002 Bond Documents) and each other Term Loan Lender with a Term Loan B Commitment or a Term Loan B.

"Term Loan B Obligations" means any Obligations with respect to the Term Loan B (including, without limitation, the principal thereof, the interest thereon, and the fees and expenses specifically related thereto).

"Term Loan B Unrestricted Funds Amount" means, as of any date of determination, the sum of (x) the aggregate amount of Unrestricted Funds that the Borrower has deposited into the Term Loan B Account as of such date, plus, (y) the aggregate amount of Unrestricted Funds that the Borrower is required to deposit into the Term Loan B Account as of such date pursuant to Section 3, but has not deposited into such account as of such date.

"Term Loan C" means, individually and collectively, each Interim Term Loan C and each Final Term Loan C made by each Term Loan C Lender to the Borrower pursuant to Section 1.

"Term Loan C Account" means account number xxxx745472 maintained by the Borrower with Signature Bank, or such other deposit account of the Borrower (located in the United States) approved in writing by the Required Lenders.

"Term Loan C Commitment" means, with respect to each Term Loan Lender, the commitment of such Term Loan Lender to make the Term Loan C to the Borrower in the amount set forth in Schedule 1, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Term Loan C Lender" means UMB (as indenture trustee under the Series 2015 Bond Documents) and each other Term Loan Lender with a Term Loan C Commitment or a Term Loan C.

"Term Loan C Obligations" means any Obligations with respect to the Term Loan C (including, without limitation, the principal thereof, the interest thereon, and the fees and expenses specifically related thereto).

"Term Loan C Unrestricted Funds Amount" means, as of any date of determination, the sum of (x) the aggregate amount of Unrestricted Funds that the Borrower has deposited into the Term Loan C Account as of such date, plus, (y) the aggregate amount of

Unrestricted Funds that the Borrower is required to deposit into the Term Loan C Account as of such date pursuant to Section 3, but has not deposited into such account as of such date.

"Term Loan Commitment" means any Term Loan A Commitment, Term Loan B Commitment, Term Loan C Commitment and/or Term Loan D Commitment.

"Term Loan D" means, individually and collectively, each Interim Term Loan D and each Final Term Loan D made by each Term Loan D Lender to the Borrower pursuant to Section 1.

"Term Loan D/A Lender" means ACA, Wilmington Trust and any other Term Loan D Lender that is also a Term Loan A Lender.

"Term Loan D Account" means account number xxxx745480 maintained by the Borrower with Signature Bank, or such other deposit account of the Borrower (located in the United States) approved in writing by the Required Lenders.

"Term Loan D/B Lender" means UMB (as indenture trustee under the Series 2002 Bond Documents) and any other Term Loan D Lender that is also a Term Loan B Lender.

"Term Loan D/C Lender" means UMB, as indenture trustee under the Series 2002 Bond Documents and any other Term Loan D Lender that is also a Term Loan C Lender.

"Term Loan D Commitment" means, with respect to each Term Loan Lender, the commitment of such Term Loan Lender to make the Term Loan D to the Borrower in the amount set forth in Schedule 1, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Term Loan D Lender" means ACA, Wilmington Trust, UMB (as indenture trustee under the Series 2015 Bond Documents) and each other Term Loan Lender with a Term Loan D Commitment or a Term Loan D.

"Term Loan D Obligations" means any Obligations with respect to the Term Loan D (including, without limitation, the principal thereof, the interest thereon, and the fees and expenses specifically related thereto).

"Term Loan D Unrestricted Funds Amount" means, as of any date of determination, the sum of (x) the aggregate amount of Unrestricted Funds that the Borrower has deposited into the Term Loan D Account as of such date, plus, (y) the aggregate amount of Unrestricted Funds that the Borrower is required to deposit into the Term Loan D Account as of such date pursuant to Section 3, but has not deposited into such account as of such date.

"Term Loan Lender" means any Term Loan A Lender, Term Loan B Lender, Term Loan C Lender and/or Term Loan D Lender, as the context may require.

"Termination Event" shall have the meaning given such term in the Interim Order or the Final Order, as applicable.

"<u>Total Final Term Loan A Commitment</u>" means the sum of the amounts of the Term Loan A Lenders' Final Term Loan A Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Final Term Loan B Commitment</u>" means the sum of the amounts of the Term Loan B Lenders' Final Term Loan B Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Final Term Loan C Commitment</u>" means the sum of the amounts of the Term Loan C Lenders' Final Term Loan C Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Final Term Loan D Commitment</u>" means the sum of the amounts of the Term Loan D Lenders' Final Term Loan D Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Interim Term Loan A Commitment</u>" means the sum of the amounts of the Term Loan A Lenders' Interim Term Loan A Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Interim Term Loan B Commitment</u>" means the sum of the amounts of the Term Loan B Lenders' Interim Term Loan B Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Interim Term Loan C Commitment</u>" means the sum of the amounts of the Term Loan C Lenders' Interim Term Loan C Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Interim Term Loan Commitment</u>" means the sum of the amounts of the Term Loan Lenders' Total Interim Term Loan A Commitments, Total Interim Term Loan B Commitments, Total Interim Term Loan C Commitments and Total Interim Term Loan D Commitments, in the amounts set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Interim Term Loan D Commitment</u>" means the sum of the amounts of the Term Loan D Lenders' Interim Term Loan D Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Term Loan A Commitment</u>" means the sum of the amounts of the Term Loan A Lenders' Total Interim Term Loan A Commitments and Total Final Term Loan A

Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Term Loan B Commitment</u>" means the sum of the amounts of the Term Loan B Lenders' Total Interim Term Loan B Commitments and Total Final Term Loan B Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Term Loan C Commitment</u>" means the sum of the amounts of the Term Loan C Lenders' Total Interim Term Loan C Commitments and Total Final Term Loan C Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Term Loan Commitment</u>" means the sum of the amounts of the Term Loan Lenders' Total Term Loan A Commitments, Total Term Loan B Commitments, Total Term Loan C Commitments and Total Term Loan D Commitments, in the amounts set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Term Loan D Commitment</u>" means the sum of the amounts of the Term Loan D Lenders' Total Interim Term Loan D Commitments and Total Final Term Loan D Commitments in the amount set forth in <u>Schedule 1</u>, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"<u>Total Unrestricted Funds Amount</u>" means, as of any date of determination, the sum of (x) the aggregate amount of Unrestricted Funds that the Borrower has deposited into all Designated Term Loan Accounts as of such date, <u>plus</u>, (y) the aggregate amount of Unrestricted Funds that the Borrower is required to deposit into Designated Term Loan Accounts as of such date pursuant to Section 3, but has not deposited into such accounts as of such date.

"<u>UCC</u>" means the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of New York or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the DIP Collateral, the Uniform Commercial Code (or any successor statute) of such state.

"<u>UMB</u>" shall have the meaning given such term in the recital to this Note.

"<u>Unrestricted Funds</u>" means all cash or money of the Borrower as of the Petition Date that does not constitute Restricted Funds.

"<u>Unrestricted Funds Disbursement Date</u>" means the date that is 30 days after the Petition Date (or such later date specified in decretal paragraph 3 of the Cash Management Order).

"<u>Wilmington Trust</u>" means Wilmington Trust, National Association.

24.    <u>Representations and Warranties</u>.  The Borrower represents as follows:

(a)    the Borrower is a corporation duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, except as affected by the commencement of the Chapter 11 Case;

(b)    the execution and delivery of this Note and the other Loan Documents and the performance by the Borrower of the Borrower's obligations hereunder and under the other Loan Documents are within its corporate powers, have been duly authorized by all necessary corporate action of the Borrower and its respective members, shareholders and affiliates, have received all necessary bankruptcy, insolvency or governmental approvals, and do not and will not contravene or conflict with any provisions of applicable law or of the Borrower's or any of its respective shareholders or affiliates corporate charter or by-laws or of any agreements binding upon or applicable to the Borrower or any of its respective affiliates or any of the Borrower's properties;

(c)    the Chapter 11 Case has been duly authorized by all necessary legal and corporate action by or on behalf of the Borrower and has been duly and properly commenced;

(d)    this Note and each other Loan Document is the legal, valid and binding obligation, enforceable against the Borrower in accordance with its terms except as limited by equitable principles relating to enforceability;

(e)    the Borrower has good and marketable title to, or valid leasehold or contractual interests in, all of its property and assets; none of the properties and assets of the Borrower are subject to any Liens other than Permitted Encumbrances and Permitted Priority Encumbrances, and there are no facts, circumstances conditions that may result in any Liens other than Permitted Encumbrances and Permitted Priority Encumbrances;

(f)    no information contained in this Note, any of the other Loan Documents, any projections, financial statements or collateral reports or other reports from time to time delivered hereunder or any written statement furnished by or on behalf of the Borrower to the Agent or any Term Loan Lender pursuant to the terms of this Note, any Loan Document or otherwise contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.  The Liens granted to the Term Loan Lenders pursuant to the Collateral Documents will at all times be fully perfected first priority Liens in and to the DIP Collateral described therein, subject, as to priority, only to Permitted Priority Encumbrances;

(g)    except for proceedings in the Chapter 11 Case, in connection with the entry of the Interim Order and Final Order, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of the Borrower, threatened against the Borrower before any governmental authority or before any arbitrator or panel of arbitrators that (i) challenges the Borrower's right or power to

enter into or perform any of its obligations under the Loan Documents to which it is a party, or the validity or enforceability of any Loan Document or any action taken thereunder or (ii) has a reasonable risk of being determined adversely to the Borrower and that, if so determined, could have a Material Adverse Effect;

(h)     to the best of the Borrower's knowledge, each of its Accounts, contracts, contract rights, tangible chattel paper, intangible or electronic chattel paper, documents, instruments, general intangibles, supporting obligations and other rights, remedies, obligations or other intangibles of any kind (i) is and will be genuine, and in all respects what it purports to be, and is not and will not be evidenced by a judgment, an instrument or chattel paper (unless such judgment shall have been assigned to the Agent in such manner as the Agent shall deem necessary or appropriate to perfect and preserve its first priority security interest therein and unless, if so requested by the Agent and/or the Required Lenders, such instrument shall have been endorsed and delivered to or at the direction of the Agent and/or the Required Lenders and, in the case of tangible chattel paper, if so requested by the Agent and/or the Required Lenders, delivered to the Agent and/or the Required Lenders); (ii) represents and will represent a bona fide transaction completed or in progress in accordance with the terms and provisions contained in the invoices and purchase orders relating thereto, and the underlying transactions giving rise thereto do not and will not in any way violate any requirements of law; and (iii) is and will be in the amount shown on the Borrower's records, which amount is and will be actually and absolutely owing to the Borrower and not contingent or subject to any rights of set-off or reduction for any reason other than regular discounts, credits or adjustments allowed by the Borrower in the ordinary course of its business;

(i)     except as disclosed to the Agent and the Term Loan Lenders, all Federal, state and local tax returns and other reports required by applicable law to be filed by the Borrower have been filed, or extensions have been obtained, and all taxes, assessments and other governmental charges imposed upon the Borrower or any property of the Borrower and which have become due and payable on or prior to the date hereof have been paid, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP;

(j)     the execution, delivery and performance of this Note and the other Loan Documents will not (immediately or with the giving of notice or passage of time, or both) (i) violate the articles of incorporation or bylaws of the Borrower, or violate any law or regulation; or (ii) result in the creation or imposition of any Lien upon any of the property of the Borrower, except in favor of the Agent; and

(k)     except for the Chapter 11 Case and other matters previously disclosed to the Term Loan Lenders, there is no order, notice, claim, litigation, proceeding or investigation pending or threatened against or in any way affecting (i) the Borrower, whether or not covered by insurance, that would reasonably be expected to have a Material Adverse Effect or (ii) this Note or any other Loan Document.

25.     <u>Miscellaneous</u>.

(a)     All notices and other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, telecopied, cabled or delivered as follows:

(1)     if to the Borrower, at Dowling College, c/o Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, New York, New York 10036-7203, Attn: Sean C. Southard, Esq., Facsimile: (212) 972-2245, with a copies to RSR Consulting, LLC, c/o Dowling College, 150 Idle Hour Blvd., Oakdale, New York 11769, Attn: Robert S. Rosenfeld, CPA, CFE, Facsimile: (212) 658-0347; and

(2)     if to the Agent and/or the Term Loan Lenders, at UMB Bank, National Association, 2 South Broadway, Suite 600, St. Louis, Missouri 63102, Attn: Laura Roberson, Senior Vice President, Facsimile: (314) 612-8499, with copies to (A) Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: P. Miyoko Sato, Esq., Facsimile: (617) 542-2241 and (B) Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Attention: Brian D. Pfeiffer, Esq., Facsimile: (212)-593-5955;

or in each case at such other address as shall be designated by the Agent, the Term Loan Lenders or the Borrower.  All such notices and communications shall, when mailed or sent by overnight courier, be effective when deposited in the mails or delivered to the overnight courier, as the case may be, or when sent by telecopier be effective when confirmation is received.

(b)     The Borrower shall reimburse the Agent and the Term Loan Lenders for all out-of-pocket expenses incurred in connection with the negotiation and preparation of the Loan Documents and the obtaining of approval of the Loan Documents by the Bankruptcy Court (including the fees and expenses of Schulte Roth & Zabel LLP and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., counsel for the Agent and the Term Loan Lenders, all of their special local counsel, advisors, consultants and auditors retained in connection with the Loan Documents and advice in connection therewith).  The Borrower shall reimburse the Agent and the Term Loan Lenders for all reasonable fees, costs and expenses, including the reasonable fees, costs and expenses of counsel or other advisors for advice, assistance, or other representation in connection with:

(1)     any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the Loan Documents or advice in connection with the administration of the Term Loans made pursuant hereto or its rights hereunder or thereunder;

(2)     the review of pleadings and documents related to the Chapter 11 Case and any subsequent Chapter 7 case, attendance at meetings related to the Chapter 11 Case and any subsequent Chapter 7 case, and general monitoring of the Chapter 11 Case and any subsequent Chapter 7 case;

(3)     any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Agent, the Term Loan Lenders, the Borrower or any other Person, and whether as a party, witness or otherwise) in any way relating to the DIP Collateral, any of the Loan Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against the Borrower or any other Person that may be obligated to the Agent or the Term Loan Lenders by virtue of the Loan Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(4)     any attempt to enforce any remedies of the Agent or the Term Loan Lenders against the Borrower or any other Person that may be obligated to the Agent or the Term Loan Lenders by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(5)     any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default; and

(6)     any efforts to (i) monitor the Term Loans or any of the other Obligations, (ii) evaluate, observe or assess the Borrower or its respective affairs, and (iii) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the DIP Collateral;

including, as to each of clauses (1) through (6) above, all attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 26(b), all of which shall be payable, on demand, by the Borrower to the Agent.  Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include:   fees, costs and expenses of accountants, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram or telecopy charges; secretarial overtime charges; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.  All expenses incurred by the Agent shall receive super priority administrative expense status per Section 364(c)(1) of the Bankruptcy Code.

(c)     No failure or delay on the part of the Agent or the Term Loan Lenders or any other holder of this Note (or any portion thereof) to exercise any right, power or privilege under this Note and no course of dealing between the Borrower and the Agent and Term Loan Lenders shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise

thereof or the exercise of any other right, power or privilege. The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that the Term Loan Lenders would otherwise have. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Term Loan Lenders to any other or further action in any circumstances without notice or demand.

(d)    The Borrower and any endorser of this Note hereby consents to renewals and extensions of time at or after the maturity hereof without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind except as otherwise expressly provided herein and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(e)    If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(f)    **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF BORROWER, THE AGENT AND THE TERM LOAN LENDERS HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

(g)    **THE BORROWER AND, BY THEIR ACCEPTANCE OF THIS NOTE, THE TERM LOAN LENDERS AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREES TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE TERM LOAN LENDERS'/BORROWER'S RELATIONSHIP THAT IS BEING ESTABLISHED**. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims. The Borrower and, by their acceptance of this Note, the Term Loan Lenders and any subsequent holder of this Note, each (i) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this relationship, and that each will continue to rely on this waiver in their related future dealings and (ii) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel. **THIS WAIVER IS IRREVOCABLE,**

**MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS OF THIS NOTE**.  In the event of litigation, this provision may be filed as a written consent a trial by the court.

(h)    The Borrower hereby waives the benefit of any statute or rule of law or judicial decision which would otherwise require that the provisions of this Note be construed or interpreted most strongly against the party responsible for the drafting thereof.

(i)    The Borrower shall not have the right to assign its obligations or liabilities under this Note without the prior written consent of the Required Lenders.  Subject to registration in accordance with paragraph (m) of this Section 25, each Term Loan Lender may assign to one or more entities (other than any Defaulting Lender) all or any part of, or may grant participation's to one or more entities (other than any Defaulting Lender) in or to all or any part of, the amounts outstanding hereunder, and to the extent of any such assignment or participation (unless otherwise stated therein) the assignee or participant shall have the same rights and benefits hereunder as it would have it were a Term Loan Lender hereunder.  The Agent shall notify the Borrower of any assignment granted hereunder, <u>provided</u>, <u>however</u>, that the Agent is not required to notify the Borrower in the event that (1) the assignment is to an affiliate of a Term Loan Lender or a Related Fund of a Term Loan Lender or (2) the transfer of the interest is in the form of a participation.

(j)    No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by the Borrower, the Agent and the Required Lenders.

(k)    Any provision of this Note which is prohibited or unenforceable shall be ineffective to the extent such prohibition or unenforceability without invalidating the remaining provisions hereof.

(l)    This Note, the other Loan Documents, and all Liens created hereby or pursuant to the Collateral Documents or any other Loan Document shall be binding upon the Borrower, the estate of the Borrower, and any trustee or successor in interest of the Borrower in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Note and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Term Loan Lenders and each of their respective assigns.  The Liens created by this Note, and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of the Borrower to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any DIP Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Agent or the Term

Loan Lenders file financing statements or otherwise perfect its security interests or Liens under applicable law.

(m)        The Agent shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain, or cause to be maintained at its office, a copy of each assignment delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Term Loan Lenders and the principal amount of the Obligations (and stated interest thereon) (the "Registered Loans") owing to each Term Loan Lender from time to time.  The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Agent and the Term Loan Lenders may treat each Person whose name is recorded in the Register as a Term Loan Lender hereunder for all purposes of this Note. The Register shall be available for inspection by the Borrower and any Term Loan Lender at any reasonable time and from time to time upon reasonable prior notice.

A Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each registered note shall expressly so provide).  Any assignment or sale of all or part of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s).  Prior to the registration of assignment or sale of any Registered Loan (and the registered note, if any, evidencing the same), the Agent shall treat the Person in whose name such Registered Loan (and the registered note, if any, evidencing the same) is registered on the Register as the owner thereof for the purpose of receiving all payments thereon, notwithstanding notice to the contrary.

In the event that any Term Loan Lender sells participations in a Registered Loan, such Term Loan Lender shall, acting for this purpose as a non-fiduciary agent on behalf of the Borrower, maintain, or cause to be maintained, a register, on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "Participant Register").  A Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide).  Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register.  The Participant Register shall be available for inspection by the Borrower and any Term Loan Lender at any reasonable time and from time to time upon reasonable prior notice.

(n)   THIS WRITTEN PROMISSORY NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO

UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES. IN THE EVENT OF ANY CONFLICT BETWEEN THE TERMS OF THIS PROMISSORY NOTE AND THE TERMS OF THE INTERIM ORDER OR THE FINAL ORDER (AS APPLICABLE), THE TERMS OF THE INTERIM ORDER OR THE FINAL ORDER (AS APPLICABLE) SHALL CONTROL.

26.    <u>Agent</u>.

(a)    <u>Appointment</u>.    Each Term Loan Lender (and each subsequent maker of the Term Loans by its making thereof) hereby irrevocably appoints and authorizes the Agent to perform the duties of the Agent as set forth in this Note including:  (i) to receive on behalf of the Agent and/or each Term Loan Lender, as applicable, any payment of principal of or interest on the Term Loans outstanding hereunder and all other amounts accrued hereunder for the account of the Term Loan Lenders and paid to the Agent, and to distribute promptly to the Agent, each Term Loan Lender and each other Person (as applicable) in accordance with Section 12, all payments so received; (ii) to distribute to each Term Loan Lender copies of all material notices and agreements received by the Agent and not required to be delivered to each Term Loan Lender pursuant to the terms of this Note, <u>provided</u>, that the Agent shall not have any liability to the Term Loan Lenders for the Agent's inadvertent failure to distribute any such notices or agreements to the Term Loan Lenders; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Term Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the DIP Collateral and related matters; (iv) to execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Note or any other Loan Document; (v) to make the Term Loans on behalf of the Term Loan Lenders as provided in this Note or any other Loan Document; (vi) to perform, exercise, and enforce any and all other rights and remedies of the Term Loan Lenders with respect to the Borrower, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by the Agent of the rights and remedies specifically authorized to be exercised by the Agent by the terms of this Note or any other Loan Document; (vii)  to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Note or any other Loan Document; and (viii) subject to Section 26(c), to take such action as the Agent deems appropriate on its behalf to administer the Term Loans and the Loan Documents and to exercise such other powers delegated to the Agent by the terms hereof or the other Loan Documents (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations) together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof. As to any matters not expressly provided for by this Note and the other Loan Documents (including, without limitation, enforcement or collection of the Term Loans), the Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Term Loan Lenders;

_provided_, _however_, that the Agent shall not be required to take any action which, in the reasonable opinion of the Agent, exposes the Agent to liability or which is contrary to this Note or any other Loan Document or applicable law.

(b)    <u>Nature of Duties</u>.    The Agent shall have no duties or responsibilities except those expressly set forth in this Note or in the other Loan Documents.  The duties of the Agent shall be mechanical and administrative in nature.  The Agent shall not have by reason of this Note or any other Loan Document a fiduciary relationship in respect of any Term Loan Lender.  Nothing in this Note or any other Loan Document, express or implied, is intended to or shall be construed to impose upon the Agent any obligations in respect of this Note or any other Loan Document except as expressly set forth herein or therein.  Each Term Loan Lender shall make its own independent investigation of the financial condition and affairs of the Borrower in connection with the making and the continuance of the Term Loans hereunder and shall make its own appraisal of the creditworthiness of the Borrower and the value of the DIP Collateral, and the Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Term Loan Lender with any credit or other information with respect thereto, whether coming into its possession before the Term Loans hereunder or at any time or times thereafter, provided that, upon the reasonable request of a Term Loan Lender, the Agent shall provide to such Term Loan Lender any documents or reports delivered to the Agent by the Borrower pursuant to the terms of this Note or any other Loan Document.  If the Agent seeks the consent or approval of the Term Loan Lenders to the taking or refraining from taking any action hereunder, the Agent shall send notice thereof to each Term Loan Lender.

(c)    <u>Rights, Exculpation, Etc.</u>    The Agent and its directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Note or the other Loan Documents, except for their own gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction.  Without limiting the generality of the foregoing, the Agent (i) may treat the payee of the Term Loans as the owner thereof until the Agent receives written notice of the assignment or transfer thereof, pursuant to Section 25(i) hereof, signed by such payee and in form satisfactory to the Agent; (ii) may consult with legal counsel (including, without limitation, counsel to the Agent or counsel to the Borrower), independent public accountants, and other experts selected by any of them and shall not be liable for any action taken or omitted to be taken in good faith by any of them in accordance with the advice of such counsel or experts; (iii) make no warranty or representation to any Term Loan Lender and shall not be responsible to any Term Loan Lender for any statements, certificates, warranties or representations made in or in connection with this Note or the other Loan Documents; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Note or the other Loan Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the DIP Collateral or other property (including, without limitation, the books and records) of any Person; (v) shall not be responsible to any Term Loan Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Note or the other Loan Documents or any

other instrument or document furnished pursuant hereto or thereto and (vi) shall not be deemed to have made any representation or warranty regarding the existence, value or collectibility of the DIP Collateral, the existence, priority or perfection of the Agent's Lien thereon, or any certificate prepared by the Borrower in connection therewith, nor shall the Agent be responsible or liable to the Term Loan Lenders for any failure to monitor or maintain any portion of the DIP Collateral.  The Agent shall not be liable for any apportionment or distribution of payments made in good faith pursuant to this Note, and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Term Loan Lender to whom payment was due but not made, shall be to recover from other Term Loan Lenders any payment in excess of the amount which they are determined to be entitled.  The Agent may at any time request instructions from the Term Loan Lenders with respect to any actions or approvals which by the terms of this Note or of any of the other Loan Documents the Agent is permitted or required to take or to grant, and if such instructions are promptly requested, the Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Loan Documents until it shall have received such instructions from the Term Loan Lenders.

(d)  <u>Reliance</u>.  The Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Note or any of the other Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

(e)  <u>Indemnification</u>.  To the extent that the Agent is not reimbursed and indemnified by the Borrower, the Term Loan Lenders will reimburse and indemnify the Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Note or any of the other Loan Documents or any action taken or omitted by the Agent under this Note or any of the other Loan Documents, in proportion to each Term Loan Lender's Pro Rata Share; <u>provided</u>, <u>however</u>, that no Term Loan Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final judicial determination that such liability resulted from the Agent's gross negligence or willful misconduct.  The obligations of the Term Loan Lenders under this Section shall survive the payment in full of the Term Loans and the cancellation of this Note.

(f)  <u>Collateral Matters</u>.

A.  The Term Loan Lenders hereby irrevocably authorize the Agent, at the written direction of the Required Lenders, to release any Lien granted to or held by the Agent upon any DIP Collateral upon cancellation of the Note and indefeasible payment and satisfaction of the Term Loans and all other Obligations which have matured and which the Agent and the Term Loan Lenders have been notified in writing are then due and payable; or constituting

property being sold or disposed of in the ordinary course of the Borrower's business and in compliance with the terms of this Note and the other Loan Documents; or constituting property in which the Borrower owned no interest at the time the Lien was granted or at any time thereafter; or if approved, authorized or ratified in writing by the Term Loan Lenders. Upon request by the Agent at any time, the Term Loan Lenders will confirm in writing the Agent's authority to release particular types or items of DIP Collateral pursuant to this Section.

B.       Without in any manner limiting the Agent's authority to act without any specific or further authorization or consent by the Term Loan Lenders (as set forth in Section 26(f)(A)), each Term Loan Lender agrees to confirm in writing, upon request by the Agent, the authority to release DIP Collateral conferred upon the Agent under Section 26(f)(A). Upon receipt by the Agent of confirmation from the Term Loan Lenders of its authority to release any particular item or types of DIP Collateral, and upon prior written request by the Borrower, the Agent shall (and is hereby irrevocably authorized by the Term Loan Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Agent for the benefit of the Term Loan Lenders upon such DIP Collateral; provided, however, that (i) the Agent shall not be required to execute any such document on terms which, in the Agent's opinion, would expose the Agent to liability or create any obligations or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Lien upon (or obligations of the Borrower in respect of) all interests in the DIP Collateral retained by the Borrower.

C.       The Agent shall have no obligation whatsoever to any Term Loan Lender to assure that the DIP Collateral exists or is owned by the Borrower, or is cared for, protected or insured or has been encumbered or that the Lien granted to the Agent pursuant to this Note or any other Loan Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Agent in this Section or in any other Loan Document, it being understood and agreed that in respect of the DIP Collateral, or any act, omission or event related thereto, the Agent may act in any manner it may deem appropriate, in its sole discretion, given the Agent's own interest in the DIP Collateral as one of the Term Loan Lenders and that the Agent shall have no duty or liability whatsoever to any other Term Loan Lender, except as otherwise provided herein.

(g)       Agency for Perfection. Each Term Loan Lender hereby appoints the Agent and each other Term Loan Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the DIP Collateral in assets which, in accordance with Article 9 of the Uniform Commercial Code, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and the Agent and each Term Loan Lender hereby acknowledges that it holds possession of or otherwise controls any such DIP Collateral for the benefit of the Agent and the Term Loan Lenders as secured party. Should any Term Loan Lender obtain possession or control of any such DIP Collateral, such Term Loan Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such DIP

Collateral to the Agent or in accordance with the Agent's instructions.  The Borrower by its execution and delivery of this Note hereby consents to the foregoing.

27.    <u>Defaulting Lenders</u>.  Notwithstanding anything to the contrary contained in this Note, if any Term Loan Lender becomes a Defaulting Lender, then, until such time as such Term Loan Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(a)    The Borrower and each other Term Loan Lender shall be entitled as of right to enforce the obligations of a Term Loan Lender that is alleged to be a Defaulting Lender by specific performance and neither the Borrower nor any Term Loan Lender shall object to any request for an emergency or expedited hearing in the Bankruptcy Court to seek appropriate orders in connection with the foregoing.  In connection with any application to the Bankruptcy Court under this subsection (a), the sole issues before the Bankruptcy Court shall be whether the Borrower has satisfied the conditions precedent to funding.  The parties acknowledge that the foregoing remedy shall be in addition to and not in lieu of any other remedy or claim that may arise against a Defaulting Lender.

(b)    Each Term Loan Lender other than a Defaulting Lender may elect, in its sole discretion and by written notice to all other parties, to fund all or any portion of any Term Loan a Defaulting Lender would have otherwise funded under any then-existing Approved Budget, in which event the Agent shall transfer any payments made by the Borrower to the Agent for such Defaulting Lender's benefit to each other Term Loan Lender making an additional Term Loan of a type described in this subsection (b) until all interest and principal on such additional Term Loan has been paid in full in cash.

(c)    Each Term Loan Lender other than a Defaulting Lender shall be entitled as of right to an order from the Bankruptcy Court directing the Agent to, after payment of all amounts described in subsection (b) above, transfer any payments made by the Borrower to the Agent for a Defaulting Lender's benefit to each such other Term Loan Lenders until any damages incurred by such Term Loan Lenders as assessed by the Bankruptcy Court against such Defaulting Lender based on its status as a Defaulting Lender have been paid in full in cash.  Neither the Borrower nor any Term Loan Lender shall object to any request for an emergency or expedited hearing in the Bankruptcy Court to seek appropriate orders in connection with the foregoing.  In connection with any application to the Bankruptcy Court under this subsection (c), the sole issues before the Bankruptcy Court shall be whether the Term Loan Lender alleged to be a Defaulting Lender is a Defaulting Lender and the amount of damages to be assessed.  The parties acknowledge that the foregoing remedy shall be in addition to and not in lieu of any other remedy or claim that may arise against a Defaulting Lender.

(d)    The operation of this Section 27 shall not be construed to increase or otherwise affect the Term Loan Commitments of any Term Loan Lender, to relieve or excuse the performance by such Defaulting Lender or any other Term Loan Lender of its duties and obligations hereunder, or to relieve or excuse the performance

by the Borrower of its duties and obligations under this Note to the Agent or to the Term Loan Lenders other than such Defaulting Lender.

(e)    This Section 27 shall remain effective with respect to such Defaulting Lender until (i) the non-Defaulting Lenders, the Agent, and the Borrower shall have waived such Defaulting Lender's default in writing or (ii) the Defaulting Lender makes its Pro Rata Share of the applicable defaulted Term Loans and pays to the Agent all amounts owing by such Defaulting Lender in respect thereof; provided, that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while such Term Loan Lender was a Defaulting Lender; provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to non-Defaulting Lender will constitute a waiver or release of any claim of any party under this Note arising from such Term Loan Lender's having been a Defaulting Lender.

28.    Electronic Copies  This Note and any amendments, waivers, consents or supplements hereto may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same agreement. Facsimile or PDF signatures of this Note shall be treated as original signatures for all purposes.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, the Borrower has caused this Note to be executed and delivered by its duly authorized officer as of the day and year and at the place first above written.

BORROWER:

DOWLING COLLEGE

By: _Clifford_
Name: ROBERT S. ROSENFELD
Title: CRO

AGENT:

UMB BANK NATIONAL ASSOCIATION

By: _____

Name:   Gavin Wilkinson

Title:    Senior Vice President

TERM LOAN A LENDERS:

ACA FINANCIAL GUARANTY CORPORATION

By: _____
Name:  Maria Cheng
Title:   Managing Director

TERM LOAN A LENDERS:

WILMINGTON TRUST, NATIONAL
ASSOCIATION

By: _____
Name: Jay Smith
Title: Vice President

TERM LOAN B LENDERS:

UMB BANK NATIONAL ASSOCIATION, as
indenture trustee under the Series 2002 Bond
Documents

By: _____
Name:    Gavin Wilkinson
Title:    Senior Vice President

TERM LOAN C LENDERS:

UMB BANK NATIONAL ASSOCIATION, as indenture trustee under the Series 2015 Bond Documents

By: _____
Name:
Title:          Gavin Wilkinson
                Senior Vice President

TERM LOAN D LENDERS:

ACA FINANCIAL GUARANTY CORPORATION

By:

Name:  Maria Cheng

Title:    Managing Director

TERM LOAN D LENDERS:

WILMINGTON TRUST, NATIONAL
ASSOCIATION

By: _____
Name: Jay Smith
Title: Vice President

TERM LOAN D LENDERS:

UMB BANK NATIONAL ASSOCIATION, as
indenture trustee under the Series 2002 Bond
Documents

By:
Name:    Gavin Wilkinson
Title:    Senior Vice President

UMB BANK NATIONAL ASSOCIATION, as
indenture trustee under the Series 2015 Bond
Documents

By:
Name:    Gavin Wilkinson
Title:    Senior Vice President

DIP NOTE

## SCHEDULE 1

## Term Loan Commitments

### I. Interim Term Loan Commitments

| Term Loan Lender | Interim Term Loan A Commitment | Interim Term Loan B Commitment | Interim Term Loan C Commitment | Interim Term Loan D Commitment | Total Interim Term Loan Commitment |
|---|---|---|---|---|---|
| ACA Financial Guaranty Corporation | $645,671 | $0 | $0 | $360,633 | $1,006,304 |
| Wilmington Trust, National Association | $0 | $0 | $0 | $0 | $0 |
| UMB Bank, National Association (as indenture trustee under the Series 2002 Bond Documents) | $0 | $83,315 | $0 | $96,522 | $179,837 |
| UMB Bank, National Association (as indenture trustee under the Series 2015 Bond Documents) | $0 | $0 | $42,818 | $73,187 | $116,005 |
| **Total** | **$645,671** | **$83,315** | **$42,818** | **$530,342** | **$1,302,146** |

### II. Final Term Loan Commitments

| Term Loan Lender | Final Term Loan A Commitment | Final Term Loan B Commitment | Final Term Loan C Commitment | Final Term Loan D Commitment | Total Final Term Loan Commitment |
|---|---|---|---|---|---|
| ACA Financial Guaranty Corporation | $1,529,351 | $0 | $0 | $1,168,544 | $2,697,895 |
| Wilmington Trust, National Association | $0 | $0 | $0 | $0 | $0 |
| UMB Bank, National Association (as indenture trustee under | $0 | $228,598 | $0 | $312,757 | $541,355 |

| **Term Loan Lender** | **Final Term Loan A Commitment** | **Final Term Loan B Commitment** | **Final Term Loan C Commitment** | **Final Term Loan D Commitment** | **Total Final Term Loan Commitment** |
|---|---|---|---|---|---|
| the Series 2002 Bond Documents) | | | | | |
| UMB Bank, National Association (as indenture trustee under the Series 2015 Bond Documents) | $0 | $0 | $196,237 | $237,146 | $433,383 |
| **Total** | **$1,529,351** | **$228,598** | **$196,237** | **$1,718,447** | **$3,672,633** |

### III. Total Term Loan Commitments

| **Term Loan Lender** | **Total Term Loan A Commitment** | **Total Term Loan B Commitment** | **Total Term Loan C Commitment** | **Total Term Loan D Commitment** | **Total Term Loan Commitment** |
|---|---|---|---|---|---|
| ACA Financial Guaranty Corporation | $2,175,022 | $0 | $0 | $1,529,177 | $3,704,199 |
| Wilmington Trust, National Association | $0 | $0 | $0 | $0 | $0 |
| UMB Bank, National Association (as indenture trustee under the Series 2002 Bond Documents) | $0 | $311,913 | $0 | $409,279 | $721,192 |
| UMB Bank, National Association (as indenture trustee under the Series 2015 Bond Documents) | $0 | $0 | $239,055 | $310,333 | $549,388 |
| **Total** | **$2,175,022** | **$311,913** | **$239,055** | **$2,248,789** | **$4,974,779** |

**SCHEDULE 2**

**Chapter 11 Milestones**

| **Chapter 11 Milestone** | **Completion Deadline** |
|---|---|
| 1.  Petition Date | November 29, 2016 |
| 2.  Filing of Motion to Approve Sale Procedures for the Oakdale Campus | November 29, 2016 |
| 3.  Filing of Motion to Approve Sale Procedures for the Residential Portfolio | November 29, 2016 |
| 4.  Interim Order Entry Date | December 1, 2016 |
| 5.  Entry by the Bankruptcy Court of an Order Approving the Sale Procedures for the Oakdale Campus | December 13, 2016 |
| 6.  Entry by the Bankruptcy Court of an Order Approving the Sale Procedures for the Residential Portfolio | December 13, 2016 |
| 7.  Entry by the Bankruptcy Court of an Order Approving the PSA | December 30, 2016 |
| 8.  Final Order Entry Date | December 30, 2016 |
| 9.  Filing by the Borrower of the Proposed Liquidation Plan and Disclosure Statement | January 16, 2017 |
| 10.  Entry by the Bankruptcy Court of an Order Approving the Disclosure Statement | March 6, 2017 |
| 11.  Entry by the Bankruptcy Court of an Order Approving the Sale of the Oakdale Campus | April 10, 2017 |
| 12.  Entry by the Bankruptcy Court of an Order Confirming the Liquidation Plan | April 24, 2017 |
| 13.  Effective Date of the Liquidation Plan | May 8, 2017 |

# SCHEDULE 3

## Permitted Encumbrances

**Judgments**:

| Creditor | Address | Date | Amount, if Applicable |
|---|---|---|---|
| Deliliah Craig | 14 Dawn Crescent Central Islip, New York 11722 | March 18, 2016 | $3,441.20 |
| Powerhouse Maintenance, Inc. d/b/a Powerhouse Paving | 2 West Beech Street Islip, New York 11751 | July 13, 2016 | $28,100.02 |
| Ultimate Power Inc. | 45 Nancy Street West Babylon, New York 11704 | August 22, 2016 | $258,213.74 |

**Tax Warrants**:

| Creditor | Address | Date | Amount, if Applicable |
|---|---|---|---|
| New York State Department of Labor | Building 12 W.A. Harriman Campus Albany, New York 12240 | September 21, 2016 | $106,805.06 |

**Mechanic's Liens**:

| Creditor | Address | Date | Amount, if Applicable |
|---|---|---|---|
| A.O. Service Inc. | 8 New York Avenue Port Jefferson, New York 11776 | June 3, 2016 | $5,954.00 |
| T.M. Bier & Associates, Inc. | 79 Hazel Street Glen Cove, New York 11542 | June 9, 2016 | $7,470.75 |
| Absolute Plumbing of Long Island, Inc. | 90F Knickerbocker Avenue Bohemia, New York 11716 | June 28, 2016 | $13,695.00 |
| Carrier Corporation | PO Box 4808 TR-5 Office 401 Syracuse, New York | July 28, 2016 | $4,000.00 |

| | 13221 | | |
|---|---|---|---|
| Carrier Corporation | PO Box 4808 TR-5 Office 401 Syracuse, New York 13221 | July 28, 2016 | $34,200.00 |
| Carrier Corporation | PO Box 4808 TR-5 Office 401 Syracuse, New York 13221 | July 28, 2016 | $20,940.00 |
| Carrier Corporation | PO Box 4808 TR-5 Office 401 Syracuse, New York 13221 | July 28, 2016 | $2,541.48 |
| Universal Temperature Controls Ltd. | 1749 Julia Goldbach Avenue Ronkonkoma, New York 11779 | August 10, 2016 | $7,830.03 |
| Carrier Corporation | PO Box 4808 TR-5 Office 401 Syracuse, New York 13221 | August 17, 2016 | $6,317.50 |
| SimplexGrinnell LP | 50 Technology Drive Westminster, Massachusetts 01441 | September 1, 2016 | $25,095.00 |

**UCC-1 Financing Statements**:

| Creditor | Address | Date | Amount, if Applicable |
|---|---|---|---|
| Toshiba Financial Services | 1961 Hirst Drive Moberly, Missouri 65270 | April 30, 2009 | N/A |
| Sterling National Bank | 42 Broadway New York, New York 10004 | November 21, 2011 | N/A |
| Xerox Financial Services | 45 Glover Avenue Norwalk, Connecticut 06856 | July 21, 2014 | N/A |
| Leaf Capital Funding LLC | 2005 Market Street, 14th Floor Philadelphia, Pennsylvania 19103 | July 23, 2014 | N/A |
| Univest Capital, Inc. | 3331 Street Road, Suite 325 Bensalem, Pennsylvania 19020 | April 30, 2015 | N/A |

| Teqlease, Inc. and Financial Pacific Leasing, Inc. | 23801 Calabasas Road, Suite 101 Calabasas, California 91302; 3455 South 344th Way, Suite 300 Federal Way, Washington 98001 | September 9, 2015 | N/A |

# **EXHIBIT A**

## **Approved Budget**

[See Attached.]

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST - BY BOND SERIES
FOR THE 30-WEEK PERIOD ENDING JUNE 23, 2017
USD

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Weeks 1-15 |
| Week #: | | | | | | | | | | | | | | | | Subtotal |
| Period Ending Friday: | 12/2/2016 | 12/9/2016 | 12/16/2016 | 12/23/2016 | 12/30/2016 | 1/6/2017 | 1/13/2017 | 1/20/2017 | 1/27/2017 | 2/3/2017 | 2/10/2017 | 2/17/2017 | 2/24/2017 | 3/3/2017 | 3/10/2017 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Disbursements: (1)** | | | | | | | | | | | | | | | | |
| **Administrative Overhead / Term Loan D** | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | 211,261 |
| General Insurance | 35,058 | - | - | - | 35,058 | - | - | - | 35,058 | - | - | - | - | 35,058 | - | 140,233 |
| *Professionals (2)* | | | | | | | | | | | | | | | | |
| Klestadt | - | - | - | - | - | - | - | - | - | - | - | - | - | 60,000 | - | 60,000 |
| Ingerman Smith, L.L.P. | - | - | - | - | - | - | - | - | - | 32,000 | - | - | - | 16,000 | - | 48,000 |
| Special Counsel - ERISA - TBD | - | - | - | - | - | 10,000 | - | - | - | 5,000 | - | - | - | 5,000 | - | 20,000 |
| RSR Consulting, LLC | - | - | 5,000 | 35,000 | 35,000 | 15,000 | 20,000 | 35,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 320,000 |
| Chapter 11 Creditors Committee | - | - | - | - | - | - | - | - | - | 40,000 | - | - | - | 16,000 | - | 56,000 |
| Student Refunds / Records Scanning | - | - | - | - | 45,069 | - | - | - | - | - | - | - | - | - | - | 45,069 |
| Health, Medical, Unemployment Claims and Related | | | | | | | | | | | | | | | | |
| Claims Agent | - | - | 20,000 | - | - | - | - | 20,000 | - | - | - | 20,000 | - | - | - | 60,000 |
| Administrative | - | 1,700 | 500 | - | - | - | - | 500 | - | - | - | 500 | - | - | - | 3,200 |
| Adequate Assurance | | | | | | | | | | | | | | | | |
| U.S. Trustee Fees | - | - | - | - | - | - | 6,500 | - | - | - | - | - | - | - | - | 6,500 |
| All Other Professional Fees | - | - | - | - | - | - | 15,000 | - | 10,000 | - | - | - | - | - | - | 25,000 |
| DIP Interest and Fees | 89,735 | - | - | - | - | - | - | - | - | - | - | - | 4,399 | - | - | 94,134 |
| Other | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 56,250 |
| **Total Administrative Overhead / Term Loan D** | 154,951 | 5,450 | 35,658 | 38,750 | 110,226 | 63,808 | 71,658 | 59,250 | 65,158 | 140,808 | 55,158 | 49,250 | 59,556 | 160,808 | 55,158 | 1,145,646 |
| *2006 Bond Series - 68.0%* | 105,367 | 3,706 | 37,847 | 26,350 | 74,954 | 43,390 | 48,727 | 40,290 | 44,307 | 95,750 | 37,507 | 33,490 | 40,498 | 109,350 | 37,507 | 779,039 |
| *2002 Bond Series - 18.2%* | 28,201 | 992 | 10,130 | 7,053 | 20,061 | 11,613 | 13,042 | 10,784 | 11,859 | 25,627 | 10,039 | 8,964 | 10,839 | 29,267 | 10,039 | 208,508 |
| *2015 Bond Series - 13.8%* | 21,383 | 752 | 7,681 | 5,348 | 15,211 | 8,806 | 9,889 | 8,177 | 8,992 | 19,432 | 7,612 | 6,797 | 8,219 | 22,192 | 7,612 | 158,099 |
| | | | | | | | | | | | | | | | | |
| **Collateral Preservation** | | | | | | | | | | | | | | | | |
| **Series 2006 Bonds / Term Loan A** | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | 25,513 |
| General Insurance | 12,039 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 12,039 |
| Utilities | 21,706 | 67,476 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 371,366 |
| Security Personnel | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 302,264 |
| Property Management | | | | | | | | | | | | | | | | |
| Other Outside Services | 10,554 | 13,077 | 7,406 | 60,750 | 5,904 | 15,577 | - | - | - | 23,306 | - | - | - | - | 98,796 | 235,368 |
| Facility Maintenance | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 15,000 |
| Real Estate Taxes | | | | | | | | | | | | | | | | |
| Landscaping / Snow Removal | 8,528 | - | - | 8,528 | - | - | - | 8,528 | - | - | - | 8,528 | - | - | - | 34,111 |
| Sales Broker - Marketing | 43,559 | 13,845 | 5,867 | 4,839 | - | - | - | - | - | - | - | - | - | 31,658 | 13,845 | 113,613 |
| Brookhaven Site Planning | - | 8,000 | - | - | - | - | - | 9,600 | - | - | - | - | - | - | - | 17,600 |
| DIP Interest and Fees | 91,170 | - | - | - | - | - | - | - | - | - | - | - | 4,469 | - | - | 95,639 |
| Other | 3,779 | 6,572 | 3,139 | 3,779 | 3,139 | 3,139 | 3,139 | 3,779 | 3,139 | 3,139 | 3,139 | 3,779 | 3,139 | 3,139 | 3,139 | 53,081 |
| **Total Series 2006 Bonds / Term Loan A** | 215,675 | 130,121 | 62,459 | 120,753 | 55,000 | 61,573 | 49,186 | 64,764 | 49,186 | 69,302 | 49,186 | 55,164 | 53,655 | 77,655 | 161,826 | 1,275,593 |
| | | | | | | | | | | | | | | | | |
| **Series 2002 Bonds / Term Loan B** | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| General Insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utilities | 2,194 | 6,214 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 36,924 |
| Security Personnel | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 27,976 |
| Property Management | | | | | | | | | | | | | | | | |
| Other Outside Services | 5,783 | 7,600 | 500 | 500 | 2,813 | 13,300 | - | - | - | 12,713 | - | - | - | - | 24,564 | 67,771 |
| Facility Maintenance | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 7,500 |
| Real Estate Taxes | | | | | | | | | | | | | | | | |
| Landscaping / Snow Removal | 1,975 | - | - | 1,975 | - | - | - | 1,975 | - | - | - | 1,975 | - | - | - | 7,899 |
| Sales Broker - Marketing | | | | | | | | | | | | | | | | |
| Brookhaven Site Planning | - | 2,000 | - | - | - | - | - | 2,400 | - | - | - | - | - | - | - | 4,400 |
| DIP Interest and Fees | 13,074 | - | - | - | - | - | - | - | - | - | - | - | 641 | - | - | 13,715 |
| Other | 453 | 606 | 304 | 453 | 304 | 304 | 304 | 453 | 304 | 304 | 304 | 453 | 304 | 304 | 304 | 5,460 |
| **Total Series 2002 Bonds / Term Loan B** | 25,843 | 18,785 | 5,363 | 7,486 | 7,676 | 18,163 | 4,863 | 9,386 | 4,863 | 17,576 | 4,863 | 6,986 | 5,504 | 4,863 | 29,427 | 171,645 |
| | | | | | | | | | | | | | | | | |
| **Series 2015 Bonds / Term Loan C** | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| General Insurance | 17,962 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 17,962 |
| Utilities | 150 | 6,360 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 8,460 |
| Security Personnel | | | | | | | | | | | | | | | | |
| Property Management | | | | | | | | | | | | | | | | |
| Other Outside Services | 55 | - | - | - | - | - | - | - | - | - | - | - | - | - | 3,969 | 4,024 |
| Facility Maintenance | - | 500 | - | 500 | - | 500 | - | 500 | - | 500 | - | 500 | - | 500 | - | 3,500 |
| Real Estate Taxes | - | - | - | - | - | - | 87,181 | - | - | - | - | - | - | - | - | 87,181 |
| Landscaping / Snow Removal | 1,398 | - | - | 1,398 | - | - | - | 1,398 | - | - | - | 1,398 | - | - | - | 5,590 |
| Sales Broker - Marketing | | | | | | | | | | | | | | | | |
| Brookhaven Site Planning | | | | | | | | | | | | | | | | |
| DIP Interest and Fees | 10,020 | - | - | - | - | - | - | - | - | - | - | - | 491 | - | - | 10,512 |
| Other | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 8,438 |
| **Total Series 2015 Bonds / Term Loan C** | 30,148 | 7,423 | 713 | 2,610 | 713 | 1,213 | 87,893 | 2,610 | 713 | 1,213 | 713 | 2,610 | 1,204 | 1,213 | 4,682 | 145,666 |
| | | | | | | | | | | | | | | | | |
| **Total Cash Disbursements** | 426,617 | 161,778 | 124,192 | 169,599 | 173,704 | 144,757 | 213,600 | 136,010 | 119,919 | 228,898 | 109,919 | 114,010 | 119,919 | 244,538 | 251,092 | 2,738,551 |

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST - BY BOND SERIES
FOR THE 30-WEEK PERIOD ENDING JUNE 23, 2017
USD

| Week #: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Weeks 1-15 |
| Period Ending Friday: | 12/2/2016 | 12/9/2016 | 12/16/2016 | 12/23/2016 | 12/30/2016 | 1/6/2017 | 1/13/2017 | 1/20/2017 | 1/27/2017 | 2/3/2017 | 2/10/2017 | 2/17/2017 | 2/24/2017 | 3/3/2017 | 3/10/2017 | Subtotal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **DIP TRANCHE SUMMARY** | | | | | | | | | | | | | | | | |
| **DIP FUNDING - WEEKLY** | | | | | | | | | | | | | | | | |
| Term Loan A / Series 2005 Bonds | 215,675 | 130,121 | 62,459 | 120,753 | 55,090 | 61,573 | 49,186 | 64,764 | 49,186 | 69,302 | 49,186 | 55,164 | 53,655 | 77,655 | 161,826 | 1,275,593 |
| Term Loan B / Series 2002 Bonds | 25,843 | 18,785 | 5,363 | 7,486 | 7,676 | 18,163 | 4,863 | 9,386 | 4,863 | 17,576 | 4,863 | 6,986 | 5,504 | 4,863 | 29,427 | 171,645 |
| Term Loan C / Series 2015 Bonds | 30,148 | 7,423 | 713 | 2,610 | 713 | 1,213 | 87,893 | 2,610 | 713 | 1,213 | 713 | 1,204 | 1,213 | 4,682 | | 145,666 |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | |
| Series 2006 Bonds  (68.0%) | 105,367 | 3,706 | 37,847 | 26,350 | 74,954 | 43,790 | 48,727 | 40,290 | 44,307 | 95,750 | 37,507 | 33,490 | 40,498 | 109,350 | 37,507 | 779,059 |
| Series 2002 Bonds  (18.2%) | 28,201 | 992 | 10,130 | 7,053 | 20,061 | 11,613 | 13,042 | 10,784 | 11,859 | 25,627 | 10,039 | 8,964 | 10,839 | 29,267 | 10,039 | 208,508 |
| Series 2015 Bonds  (13.8%) | 21,383 | 752 | 7,681 | 5,348 | 15,211 | 8,806 | 9,389 | 8,177 | 8,992 | 19,432 | 7,612 | 6,797 | 8,219 | 22,192 | 7,612 | 158,099 |
| Subtotal - Term Loan D | 154,951 | 5,450 | 55,658 | 38,750 | 110,226 | 63,808 | 71,658 | 59,250 | 65,158 | 140,808 | 55,158 | 49,250 | 59,556 | 160,808 | 55,158 | 1,145,666 |
| **Total DIP Funding - Weekly** | **426,617** | **161,778** | **124,192** | **169,599** | **173,704** | **144,757** | **213,600** | **136,010** | **119,919** | **228,898** | **109,919** | **114,010** | **119,919** | **244,538** | **251,092** | **2,738,551** |
| **DIP FUNDING - CUMULATIVE** | | | | | | | | | | | | | | | | |
| Term Loan A / Series 2006 Bonds | 215,675 | 345,796 | 408,255 | 529,008 | 584,098 | 645,671 | 694,856 | 759,620 | 808,806 | 878,108 | 927,294 | 982,458 | 1,036,113 | 1,113,767 | 1,275,593 | 1,275,593 |
| Term Loan B / Series 2002 Bonds | 25,843 | 44,627 | 49,990 | 57,476 | 65,152 | 83,315 | 88,178 | 97,564 | 102,427 | 120,003 | 124,866 | 131,852 | 137,356 | 142,219 | 171,645 | 171,645 |
| Term Loan C / Series 2015 Bonds | 30,148 | 37,570 | 38,283 | 40,893 | 41,605 | 42,818 | 130,711 | 133,321 | 134,033 | 135,246 | 135,958 | 138,568 | 139,772 | 140,985 | 145,666 | 145,666 |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | |
| Series 2006 Bonds  (68.0%) | 105,367 | 109,073 | 146,920 | 173,270 | 248,224 | 291,613 | 340,340 | 380,630 | 424,938 | 520,687 | 558,194 | 591,684 | 632,183 | 741,532 | 779,039 | 779,039 |
| Series 2002 Bonds  (18.2%) | 28,201 | 29,193 | 39,323 | 46,375 | 66,436 | 78,049 | 91,091 | 101,875 | 113,733 | 139,360 | 149,399 | 158,363 | 169,202 | 198,469 | 208,508 | 208,508 |
| Series 2015 Bonds  (13.8%) | 21,383 | 22,135 | 29,816 | 35,164 | 50,375 | 59,180 | 69,069 | 77,246 | 86,237 | 105,669 | 113,281 | 120,077 | 128,296 | 150,487 | 158,099 | 158,099 |
| Subtotal - Term Loan D | 154,951 | 160,401 | 216,059 | 254,808 | 365,035 | 428,843 | 500,501 | 559,751 | 624,908 | 765,716 | 820,874 | 870,124 | 929,680 | 1,090,489 | 1,145,666 | 1,145,666 |
| **Total DIP Funding - Cumulative** | **426,617** | **588,394** | **712,586** | **882,185** | **1,055,889** | **1,200,646** | **1,414,246** | **1,550,256** | **1,670,175** | **1,899,073** | **2,008,992** | **2,123,002** | **2,242,921** | **2,487,459** | **2,738,551** | **2,738,551** |
| **INCURRED/UNPAID PROFESSIONAL FEES** | | | | | | | | | | | | | | | | |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | |
| Series 2006 Bonds  (68.0%) | 10,710 | 21,420 | 33,830 | 46,240 | 61,030 | 69,020 | 82,960 | 96,900 | 113,390 | 77,520 | 94,010 | 110,500 | 126,990 | 75,480 | 89,080 | 89,080 |
| Series 2002 Bonds  (18.2%) | 2,867 | 5,733 | 9,055 | 12,376 | 16,335 | 18,473 | 22,204 | 25,935 | 30,349 | 20,748 | 25,162 | 29,575 | 33,989 | 20,202 | 23,842 | 23,842 |
| Series 2015 Bonds  (13.8%) | 2,174 | 4,347 | 6,866 | 9,384 | 12,386 | 14,007 | 16,836 | 19,665 | 23,012 | 15,732 | 19,079 | 22,425 | 25,772 | 15,318 | 18,078 | 18,078 |
| **Total Incurred/Unpaid Professional Fees** | **15,750** | **31,500** | **49,750** | **68,000** | **89,750** | **101,500** | **122,000** | **142,500** | **166,750** | **114,000** | **138,250** | **162,500** | **186,750** | **111,000** | **131,000** | **131,000** |
| **TOTAL DIP COMMITMENT - CUMULATIVE** | | | | | | | | | | | | | | | | |
| Term Loan A / Series 2006 Bonds | 215,675 | 345,796 | 408,255 | 529,008 | 584,098 | 645,671 | 694,856 | 759,620 | 808,806 | 878,108 | 927,294 | 982,458 | 1,036,113 | 1,113,767 | 1,275,593 | 1,275,593 |
| Term Loan B / Series 2002 Bonds | 25,843 | 44,627 | 49,990 | 57,476 | 65,152 | 83,315 | 88,178 | 97,564 | 102,427 | 120,003 | 124,866 | 131,852 | 137,356 | 142,219 | 171,645 | 171,645 |
| Term Loan C / Series 2015 Bonds | 30,148 | 37,570 | 38,283 | 40,893 | 41,605 | 42,818 | 130,711 | 133,321 | 134,033 | 135,246 | 135,958 | 138,568 | 139,772 | 140,985 | 145,666 | 145,666 |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | |
| Series 2006 Bonds  (68.0%) | 116,077 | 130,493 | 180,750 | 219,510 | 309,254 | 360,633 | 423,300 | 477,530 | 538,328 | 598,207 | 652,204 | 702,184 | 759,173 | 817,012 | 868,119 | 868,119 |
| Series 2002 Bonds  (18.2%) | 31,068 | 34,926 | 48,377 | 58,751 | 82,771 | 96,522 | 113,295 | 127,810 | 144,082 | 160,108 | 174,561 | 187,938 | 203,190 | 218,671 | 232,350 | 232,350 |
| Series 2015 Bonds  (13.8%) | 23,557 | 26,482 | 36,682 | 44,548 | 62,760 | 73,187 | 85,905 | 96,911 | 109,249 | 121,401 | 132,359 | 142,502 | 154,067 | 165,805 | 176,177 | 176,177 |
| Subtotal - Term Loan D | 170,701 | 191,901 | 265,809 | 322,809 | 454,785 | 530,343 | 622,501 | 702,251 | 791,658 | 879,716 | 959,124 | 1,032,624 | 1,116,430 | 1,201,489 | 1,276,646 | 1,276,646 |
| **Total DIP Commitment - Cumulative** | **442,367** | **619,894** | **762,336** | **950,185** | **1,145,639** | **1,302,146** | **1,536,246** | **1,692,756** | **1,836,925** | **2,013,073** | **2,147,242** | **2,285,502** | **2,429,671** | **2,598,459** | **2,869,551** | **2,869,551** |
| **MEMO: TOTAL DIP COMMITMENT - CUMULATIVE** | | | | | | | | | | | | | | | | |
| Series 2006 Bonds | 331,752 | 476,289 | 589,005 | 748,518 | 893,351 | 1,006,304 | 1,118,157 | 1,237,151 | 1,347,134 | 1,476,315 | 1,579,498 | 1,684,642 | 1,795,285 | 1,930,780 | 2,143,713 | 2,143,713 |
| Series 2002 Bonds | 56,910 | 79,553 | 98,368 | 116,227 | 147,923 | 179,837 | 201,473 | 225,374 | 246,509 | 280,111 | 299,426 | 319,789 | 340,546 | 360,890 | 403,995 | 403,995 |
| Series 2015 Bonds | 53,704 | 64,052 | 74,964 | 85,440 | 104,365 | 116,005 | 216,616 | 230,231 | 243,282 | 256,647 | 268,317 | 281,071 | 293,840 | 306,790 | 321,843 | 321,843 |
| **Total DIP Commitment - Cumulative** | **442,367** | **619,894** | **762,336** | **950,185** | **1,145,639** | **1,302,146** | **1,536,246** | **1,692,756** | **1,836,925** | **2,013,073** | **2,147,242** | **2,285,502** | **2,429,671** | **2,598,459** | **2,869,551** | **2,869,551** |

**NOTES:**

**(1)** The college is assumed to operate in bankruptcy on a zero cash basis with all required disbursements funded under the DIP loan facility.  Any proceeds from the use or sale of collateral or any other  miscellaneous cash inflows are assumed to be swept by the lenders to repay DIP borrowings or secured debt and are not reflected in the budget.  If it is ultimately determined that the Debtor's cash of approximately $222,000 is deemed unrestricted, such funds will be utilized to fund budgeted disbursements prior to the use of DIP financing funds and will reduce the applicable DIP commitments on  a dollar-for-dollar basis.

**(2)** Refer to the Professional Fees supporting schedule (Schedule [OPEN]) on the next page for detail of professional fees expected to be incurred during the interim period. Schedule [OPEN] indicates  the amounts projected to be charged against existing retainers, the amounts to be paid in cash and the amounts incurred and projected to be unpaid at the end of the interim period due to timing of  disbursements, filing of fee applications and required holdback amounts.

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST - BY BOND SERIES
FOR THE 30-WEEK PERIOD ENDING JUNE 23, 2017
USD

| Week #: | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | Weeks 16-30 | Weeks 1-30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Ending Friday: | 3/17/2017 | 3/24/2017 | 3/31/2017 | 4/7/2017 | 4/14/2017 | 4/21/2017 | 4/28/2017 | 5/5/2017 | 5/12/2017 | 5/19/2017 | 5/26/2017 | 6/2/2017 | 6/9/2017 | 6/16/2017 | 6/23/2017 | Subtotal | TOTAL |
| **Cash Disbursements: (1)** | | | | | | | | | | | | | | | | | |
| **Administrative Overhead / Term Loan D** | | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 184,853 | 396,114 |
| General Insurance | - | - | - | 35,058 | - | - | - | 35,058 | - | - | - | 35,058 | - | - | - | 105,175 | 245,408 |
| Professionals (2) | | | | | | | | | | | | | | | | | |
| Klestadt | - | - | 36,000 | - | - | - | - | 83,000 | - | - | - | 36,000 | - | - | - | 155,000 | 215,000 |
| Ingerman Smith, L.L.P. | - | - | 16,000 | - | - | - | - | 32,000 | - | - | - | 12,000 | - | - | - | 60,000 | 108,000 |
| Special Counsel - ERISA - TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 20,000 |
| RSR Consulting, LLC | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 260,000 | 580,000 |
| Chapter 11 Creditors Committee | - | - | 12,000 | - | - | - | - | 29,000 | - | - | - | 12,000 | - | - | - | 53,000 | 109,000 |
| Student Refunds / Records Scanning | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 45,000 |
| Health, Medical, Unemployment Claims and Related | | | | | | | | | | | | | | | | | |
| Claims Agent | 20,000 | - | - | - | - | 20,000 | - | - | - | 20,000 | - | - | - | - | 20,000 | 80,000 | 140,000 |
| Administrative | 500 | - | - | - | - | 500 | - | - | - | 500 | - | - | - | - | 500 | 2,000 | 5,200 |
| Adequate Assurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| U.S. Trustee Fees | - | - | - | - | 6,500 | - | - | - | - | - | - | - | 6,500 | - | - | 13,000 | 19,500 |
| All Other Professional Fees | - | - | - | - | - | - | - | - | 15,000 | - | - | - | - | 5,000 | - | 20,000 | 45,000 |
| DIP Interest and Fees | - | - | - | - | - | - | - | - | - | - | 4,399 | - | - | - | 1,466 | 5,865 | 99,999 |
| Other | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 56,250 | 112,500 |
| **Total Administrative Overhead / Term Loan D** | 44,250 | 50,158 | 87,750 | 85,216 | 30,250 | 70,658 | 23,750 | 224,216 | 33,750 | 65,658 | 23,149 | 140,216 | 25,250 | 50,158 | 40,716 | 995,143 | 2,140,789 |
| *2006 Bond Series - 68.0%* | *30,090* | *34,107* | *59,670* | *57,947* | *20,570* | *48,047* | *16,150* | *152,467* | *22,950* | *44,647* | *15,741* | *95,347* | *17,170* | *34,107* | *27,687* | *676,697* | *1,455,737* |
| *2002 Bond Series - 18.2%* | *8,054* | *9,129* | *15,971* | *15,509* | *5,506* | *12,860* | *4,323* | *40,807* | *6,143* | *11,950* | *4,213* | *25,519* | *4,596* | *9,129* | *7,410* | *181,116* | *389,624* |
| *2015 Bond Series - 13.8%* | *6,107* | *6,922* | *12,110* | *11,760* | *4,175* | *9,751* | *3,278* | *30,942* | *4,658* | *9,061* | *3,195* | *19,350* | *3,485* | *6,922* | *5,619* | *137,330* | *295,429* |
| | | | | | | | | | | | | | | | | | |
| **Collateral Preservation** | | | | | | | | | | | | | | | | | |
| **Series 2006 Bonds / Term Loan A** | | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 22,324 | 47,837 |
| General Insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 12,039 |
| Utilities | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 325,596 | 696,962 |
| Security Personnel | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 302,264 | 604,528 |
| Property Management | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Outside Services | - | - | - | - | 23,781 | - | - | - | 23,306 | - | - | - | 23,306 | - | - | 70,392 | 305,760 |
| Facility Maintenance | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 15,000 | 30,000 |
| Real Estate Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Landscaping / Snow Removal | 8,528 | - | - | - | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 35,069 | 69,180 |
| Sales Broker - Marketing | 5,867 | 4,839 | - | - | - | - | - | - | - | - | - | - | - | - | - | 10,706 | 124,319 |
| Brookhaven Site Planning | - | 8,800 | - | - | - | - | - | - | - | - | - | 53,600 | - | - | - | 62,400 | 80,000 |
| DIP Interest and Fees | - | - | - | - | - | - | - | - | - | - | 4,469 | - | - | - | 1,490 | 5,959 | 101,598 |
| Other | 3,779 | 3,139 | 3,139 | 3,139 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 49,720 | 102,800 |
| **Total Series 2006 Bonds / Term Loan A** | 61,031 | 62,825 | 45,997 | 49,186 | 72,371 | 51,780 | 48,590 | 51,780 | 71,896 | 51,780 | 106,660 | 51,780 | 71,896 | 51,780 | 50,080 | 899,429 | 2,175,022 |
| | | | | | | | | | | | | | | | | | |
| **Series 2002 Bonds / Term Loan B** | | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| General Insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utilities | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 32,904 | 69,828 |
| Security Personnel | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 27,976 | 55,952 |
| Property Management | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Outside Services | - | - | - | - | 12,713 | - | - | - | 16,713 | - | - | - | 12,713 | - | - | 42,138 | 109,909 |
| Facility Maintenance | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 7,500 | 15,000 |
| Real Estate Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Landscaping / Snow Removal | 1,975 | - | - | - | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 8,121 | 16,019 |
| Sales Broker - Marketing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Brookhaven Site Planning | - | 2,200 | - | - | - | - | - | - | - | - | - | 13,400 | - | - | - | 15,600 | 20,000 |
| DIP Interest and Fees | - | - | - | - | - | - | - | - | - | - | 641 | - | - | - | 214 | 855 | 14,570 |
| Other | 453 | 304 | 304 | 304 | 346 | 346 | 346 | 346 | 346 | 346 | 346 | 346 | 346 | 346 | 346 | 5,175 | 10,635 |
| **Total Series 2002 Bonds / Term Loan B** | 6,986 | 7,063 | 4,863 | 4,863 | 18,176 | 5,464 | 5,464 | 5,464 | 22,176 | 5,464 | 19,505 | 5,464 | 18,176 | 5,464 | 5,677 | 140,268 | 311,913 |
| | | | | | | | | | | | | | | | | | |
| **Series 2015 Bonds / Term Loan C** | | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| General Insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 17,962 |
| Utilities | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 2,250 | 10,710 |
| Security Personnel | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Property Management | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Outside Services | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 4,024 |
| Facility Maintenance | 500 | - | 500 | - | - | 500 | - | 500 | - | 500 | - | 500 | - | - | 500 | 4,000 | 7,500 |
| Real Estate Taxes | - | - | - | - | - | - | - | - | - | - | - | 72,298 | - | - | - | 72,298 | 159,479 |
| Landscaping / Snow Removal | 1,398 | - | - | - | 395 | 395 | 395 | 395 | 395 | 395 | 395 | - | 395 | 395 | 395 | 5,748 | 11,338 |
| Sales Broker - Marketing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Brookhaven Site Planning | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Interest and Fees | - | - | - | - | - | - | - | - | - | - | 491 | - | - | - | 164 | 655 | 11,167 |
| Other | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 8,438 | 16,875 |
| **Total Series 2015 Bonds / Term Loan C** | 2,610 | 713 | 1,213 | 713 | 1,608 | 1,108 | 1,608 | 1,108 | 1,608 | 1,108 | 2,099 | 73,406 | 1,608 | 1,108 | 1,772 | 93,388 | 239,054 |
| | | | | | | | | | | | | | | | | | |
| **Total Cash Disbursements** | 114,877 | 120,758 | 139,822 | 139,977 | 122,405 | 129,009 | 79,412 | 282,567 | 129,430 | 124,009 | 151,412 | 270,865 | 116,930 | 108,509 | 98,245 | 2,128,228 | 4,866,779 |

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST - BY BOND SERIES
FOR THE 30-WEEK PERIOD ENDING JUNE 23, 2017
USD

| | Week #: | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | Weeks 16-30 | Weeks 1-30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Period Ending Friday: | 3/17/2017 | 3/24/2017 | 3/31/2017 | 4/7/2017 | 4/14/2017 | 4/21/2017 | 4/28/2017 | 5/5/2017 | 5/12/2017 | 5/19/2017 | 5/26/2017 | 6/2/2017 | 6/9/2017 | 6/16/2017 | 6/23/2017 | Subtotal | TOTAL |
| **DIP TRANCHE SUMMARY** | | | | | | | | | | | | | | | | | | |
| **DIP FUNDING - WEEKLY** | | | | | | | | | | | | | | | | | | |
| Term Loan A / Series 2005 Bonds | | 61,031 | 62,825 | 45,997 | 49,186 | 72,371 | 51,780 | 48,590 | 51,780 | 71,896 | 51,780 | 106,660 | 51,780 | 71,896 | 51,780 | 50,080 | 899,429 | 2,175,022 |
| Term Loan B / Series 2002 Bonds | | 6,986 | 7,063 | 4,863 | 4,863 | 18,176 | 5,464 | 5,464 | 5,464 | 22,176 | 5,464 | 19,505 | 5,464 | 18,176 | 5,464 | 5,677 | 140,268 | 311,913 |
| Term Loan C / Series 2015 Bonds | | 2,610 | 713 | 1,213 | 713 | 1,608 | 1,108 | 1,608 | 1,108 | 1,608 | 1,108 | 2,099 | 73,406 | 1,608 | 1,108 | 1,772 | 93,388 | 239,054 |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | | | |
| Series 2006 Bonds  (68.0%) | | 30,090 | 34,107 | 59,670 | 57,947 | 20,570 | 48,047 | 16,150 | 152,467 | 22,950 | 44,647 | 15,741 | 95,347 | 17,170 | 34,107 | 27,687 | 676,697 | 1,455,737 |
| Series 2002 Bonds  (18.2%) | | 8,054 | 9,129 | 15,971 | 15,509 | 5,506 | 12,860 | 4,323 | 40,807 | 6,143 | 11,950 | 4,213 | 25,519 | 4,596 | 9,129 | 7,410 | 181,116 | 389,624 |
| Series 2015 Bonds  (13.8%) | | 6,107 | 6,922 | 12,110 | 11,760 | 4,175 | 9,751 | 3,278 | 30,942 | 4,658 | 9,061 | 3,195 | 19,350 | 3,485 | 6,922 | 5,619 | 137,330 | 295,429 |
| Subtotal - Term Loan D | | 44,250 | 50,158 | 87,750 | 85,216 | 30,250 | 70,658 | 23,750 | 224,216 | 33,750 | 65,658 | 23,149 | 140,216 | 25,250 | 50,158 | 40,716 | 995,143 | 2,140,789 |
| **Total DIP Funding - Weekly** | | 114,877 | 120,758 | 139,822 | 139,977 | 122,405 | 129,009 | 79,412 | 282,567 | 129,430 | 124,009 | 151,412 | 270,865 | 116,930 | 108,509 | 98,245 | 2,128,228 | 4,866,779 |
| **DIP FUNDING - CUMULATIVE** | | | | | | | | | | | | | | | | | | |
| Term Loan A / Series 2005 Bonds | | 1,336,624 | 1,399,449 | 1,445,446 | 1,494,631 | 1,567,002 | 1,618,782 | 1,667,372 | 1,719,152 | 1,791,048 | 1,842,827 | 1,949,487 | 2,001,266 | 2,073,162 | 2,124,942 | 2,175,022 | | 2,175,022 |
| Term Loan B / Series 2002 Bonds | | 178,631 | 185,694 | 190,557 | 195,420 | 213,596 | 219,060 | 224,524 | 229,988 | 252,164 | 257,628 | 277,132 | 282,596 | 300,772 | 306,236 | 311,913 | | 311,913 |
| Term Loan C / Series 2015 Bonds | | 148,276 | 148,989 | 150,201 | 150,914 | 152,522 | 153,630 | 155,238 | 156,346 | 157,954 | 159,061 | 161,161 | 234,567 | 236,175 | 237,283 | 239,054 | | 239,054 |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | | | |
| Series 2006 Bonds  (68.0%) | | 809,129 | 843,237 | 902,907 | 960,853 | 981,423 | 1,029,471 | 1,045,621 | 1,198,087 | 1,221,037 | 1,265,685 | 1,281,426 | 1,376,773 | 1,393,943 | 1,428,050 | 1,455,737 | | 1,455,737 |
| Series 2002 Bonds  (18.2%) | | 216,561 | 225,690 | 241,660 | 257,170 | 262,675 | 275,535 | 279,857 | 320,665 | 326,807 | 338,757 | 342,970 | 368,489 | 373,085 | 382,213 | 389,624 | | 389,624 |
| Series 2015 Bonds  (13.8%) | | 164,206 | 171,127 | 183,237 | 194,997 | 199,171 | 208,922 | 212,199 | 243,141 | 247,799 | 256,860 | 260,054 | 279,404 | 282,888 | 289,810 | 295,429 | | 295,429 |
| Subtotal - Term Loan D | | 1,189,896 | 1,240,054 | 1,327,804 | 1,413,020 | 1,443,270 | 1,513,927 | 1,537,677 | 1,761,893 | 1,795,643 | 1,861,301 | 1,884,450 | 2,024,665 | 2,049,915 | 2,100,073 | 2,140,789 | | 2,140,789 |
| **Total DIP Funding - Cumulative** | | 2,853,428 | 2,974,186 | 3,114,008 | 3,253,985 | 3,376,390 | 3,505,399 | 3,584,811 | 3,867,378 | 3,996,808 | 4,120,817 | 4,272,229 | 4,543,094 | 4,660,024 | 4,768,533 | 4,866,779 | | 4,866,779 |
| **INCURRED/UNPAID PROFESSIONAL FEES** | | | | | | | | | | | | | | | | | | |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | | | |
| Series 2006 Bonds  (68.0%) | | 102,680 | 116,280 | 81,600 | 90,440 | 99,280 | 108,120 | 116,960 | 31,790 | 44,540 | 57,290 | 70,040 | 40,290 | 51,340 | 62,390 | 73,440 | | 73,440 |
| Series 2002 Bonds  (18.2%) | | 27,482 | 31,122 | 21,840 | 24,206 | 26,572 | 28,938 | 31,304 | 8,509 | 11,921 | 15,334 | 18,746 | 10,784 | 13,741 | 16,699 | 19,656 | | 19,656 |
| Series 2015 Bonds  (13.8%) | | 20,838 | 23,598 | 16,560 | 18,354 | 20,148 | 21,942 | 23,736 | 6,452 | 9,039 | 11,627 | 14,214 | 8,177 | 10,419 | 12,662 | 14,904 | | 14,904 |
| **Total Incurred/Unpaid Professional Fees** | | 151,000 | 171,000 | 120,000 | 133,000 | 146,000 | 159,000 | 172,000 | 46,750 | 65,500 | 84,250 | 103,000 | 59,250 | 75,500 | 91,750 | 108,000 | | 108,000 |
| **TOTAL DIP COMMITMENT - CUMULATIVE** | | | | | | | | | | | | | | | | | | |
| Term Loan A / Series 2005 Bonds | | 1,336,624 | 1,399,449 | 1,445,446 | 1,494,631 | 1,567,002 | 1,618,782 | 1,667,372 | 1,719,152 | 1,791,048 | 1,842,827 | 1,949,487 | 2,001,266 | 2,073,162 | 2,124,942 | 2,175,022 | | 2,175,022 |
| Term Loan B / Series 2002 Bonds | | 178,631 | 185,694 | 190,557 | 195,420 | 213,596 | 219,060 | 224,524 | 229,988 | 252,164 | 257,628 | 277,132 | 282,596 | 300,772 | 306,236 | 311,913 | | 311,913 |
| Term Loan C / Series 2015 Bonds | | 148,276 | 148,989 | 150,201 | 150,914 | 152,522 | 153,630 | 155,238 | 156,346 | 157,954 | 159,061 | 161,161 | 234,567 | 236,175 | 237,283 | 239,054 | | 239,054 |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | | | |
| Series 2006 Bonds  (68.0%) | | 911,809 | 959,517 | 984,507 | 1,051,293 | 1,080,703 | 1,137,591 | 1,162,581 | 1,229,877 | 1,265,577 | 1,322,975 | 1,351,466 | 1,417,063 | 1,445,283 | 1,490,440 | 1,529,177 | | 1,529,177 |
| Series 2002 Bonds  (18.2%) | | 244,043 | 256,812 | 263,500 | 281,376 | 289,247 | 304,473 | 311,161 | 329,173 | 338,728 | 354,090 | 361,716 | 379,273 | 386,826 | 398,912 | 409,280 | | 409,280 |
| Series 2015 Bonds  (13.8%) | | 185,044 | 194,725 | 199,797 | 213,351 | 219,319 | 230,864 | 235,935 | 249,593 | 256,838 | 268,486 | 274,268 | 287,580 | 293,307 | 302,472 | 310,333 | | 310,333 |
| Subtotal - Term Loan D | | 1,340,896 | 1,411,054 | 1,447,804 | 1,546,020 | 1,589,270 | 1,672,927 | 1,709,677 | 1,808,643 | 1,861,143 | 1,945,551 | 1,987,450 | 2,083,915 | 2,125,415 | 2,191,823 | 2,248,789 | | 2,248,789 |
| **Total DIP Commitment - Cumulative** | | 3,004,428 | 3,145,186 | 3,234,008 | 3,386,985 | 3,522,390 | 3,664,399 | 3,756,811 | 3,914,128 | 4,062,308 | 4,205,067 | 4,375,229 | 4,602,344 | 4,735,524 | 4,860,283 | 4,974,779 | | 4,974,779 |
| **MEMO: TOTAL DIP COMMITMENT - CUMULATIVE** | | | | | | | | | | | | | | | | | | |
| Series 2006 Bonds | | 2,248,434 | 2,358,966 | 2,429,952 | 2,545,925 | 2,647,706 | 2,756,373 | 2,829,953 | 2,949,029 | 3,056,625 | 3,165,802 | 3,300,953 | 3,418,329 | 3,518,445 | 3,615,382 | 3,704,199 | | 3,704,199 |
| Series 2002 Bonds | | 422,674 | 442,506 | 454,058 | 476,796 | 502,844 | 523,533 | 535,685 | 559,161 | 590,892 | 611,718 | 638,848 | 661,868 | 687,598 | 705,148 | 721,193 | | 721,193 |
| Series 2015 Bonds | | 333,320 | 343,714 | 349,998 | 364,265 | 371,841 | 384,494 | 391,175 | 405,938 | 414,791 | 427,547 | 435,429 | 522,147 | 529,482 | 539,754 | 549,387 | | 549,387 |
| **Total DIP Commitment - Cumulative** | | 3,004,428 | 3,145,186 | 3,234,008 | 3,386,985 | 3,522,390 | 3,664,399 | 3,756,811 | 3,914,128 | 4,062,308 | 4,205,067 | 4,375,229 | 4,602,344 | 4,735,524 | 4,860,283 | 4,974,779 | | 4,974,779 |

**NOTES:**

**(1)** The college is assumed to operate in bankruptcy on a zero cash basis with all required disbursements funded under the DIP loan facility.  Any proceeds from the use or sale of collateral or any other  miscellaneous cash inflows are assumed to be swept by the lenders to repay DIP borrowings or secured debt and are not reflected in the budget.  If it is ultimately determined that the Debtor's cash of approximately $222,000 is deemed unrestricted, such funds will be utilized to fund budgeted disbursements prior to the use of  DIP financing funds and will reduce the applicable DIP commitments on  a dollar-for-dollar basis.

**(2)** Refer to the Professional Fees supporting schedule (Schedule [OPEN] on the next page for detail of professional fees expecte d to be incurred during the interim period. Schedule [OPEN] indicates  the amounts projected to be charged against existing retainers, the amounts to be paid in cash and the amounts incurred and projected to be unpaid at the end of the interim period due to timing of  disbursements, filing of fee applications and required holdback amounts.

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST
PROFESSIONAL FEES

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Weeks 1-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week #: | | | | | | | | | | | | | | | | |
| Period Ending Friday: | 12/2/2016 | 12/9/2016 | 12/16/2016 | 12/23/2016 | 12/30/2016 | 1/6/2017 | 1/13/2017 | 1/20/2017 | 1/27/2017 | 2/3/2017 | 2/10/2017 | 2/17/2017 | 2/24/2017 | 3/3/2017 | 3/10/2017 | Subtotal |
| **Professional Fees Incurred** | | | | | | | | | | | | | | | | |
| Klestadt | 22,500 | 22,500 | 22,500 | 22,500 | 21,250 | 21,250 | 21,250 | 21,250 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 11,250 | 11,250 | 272,500 |
| Ingerman Smith, L.L.P. | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 5,000 | 5,000 | 70,000 |
| Special Counsel - ERISA - TBD | - | - | 2,500 | 2,500 | 2,500 | 2,500 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | - | 20,000 |
| RSR Consulting, LLC | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 15,000 | 20,000 | 35,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 420,000 |
| Chapter 11 Creditors Committee | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 6,250 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 3,750 | 3,750 | 77,500 |
| **Total Professional Fees Incurred** | 68,750 | 68,750 | 71,250 | 71,250 | 70,000 | 50,000 | 53,750 | 68,750 | 49,250 | 49,250 | 49,250 | 49,250 | 49,250 | 46,250 | 45,000 | 860,000 |
| **Professional Fees Cash Disbursements** | | | | | | | | | | | | | | | | |
| Klestadt | - | - | - | - | - | - | - | - | - | - | - | - | - | 60,000 | - | 60,000 |
| Ingerman Smith, L.L.P. | - | - | - | - | - | - | - | - | - | 32,000 | - | - | - | 16,000 | - | 48,000 |
| Special Counsel - ERISA - TBD | - | - | - | - | - | 10,000 | - | - | - | 5,000 | - | - | - | 5,000 | - | 20,000 |
| RSR Consulting, LLC | - | - | 5,000 | 35,000 | 35,000 | 15,000 | 20,000 | 35,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 320,000 |
| Chapter 11 Creditors Committee | - | - | - | - | - | - | - | - | - | 40,000 | - | - | - | 16,000 | - | 56,000 |
| **Total Professional Fees Cash Disbursements** | - | - | 5,000 | 35,000 | 35,000 | 25,000 | 20,000 | 35,000 | 25,000 | 102,000 | 25,000 | 25,000 | 25,000 | 122,000 | 25,000 | 504,000 |
| **Professional Fees Retainers Applied** | | | | | | | | | | | | | | | | |
| Klestadt | 18,000 | 18,000 | 18,000 | 18,000 | 13,250 | 13,250 | 13,250 | 13,250 | - | - | - | - | - | - | - | 125,000 |
| Ingerman Smith, L.L.P. | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Special Counsel - ERISA - TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| RSR Consulting, LLC | 35,000 | 35,000 | 30,000 | - | - | - | - | - | - | - | - | - | - | - | - | 100,000 |
| Chapter 11 Creditors Committee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| **Total Professional Fees Cash Disbursements** | 53,000 | 53,000 | 48,000 | 18,000 | 13,250 | 13,250 | 13,250 | 13,250 | - | - | - | - | - | - | - | 225,000 |
| **Professional Fees Incurred Not Paid Balance** | | | | | | | | | | | | | | | | |
| Klestadt | 4,500 | 9,000 | 13,500 | 18,000 | 26,000 | 34,000 | 42,000 | 50,000 | 65,000 | 80,000 | 95,000 | 110,000 | 125,000 | 76,250 | 87,500 | 87,500 |
| Ingerman Smith, L.L.P. | 5,000 | 10,000 | 15,000 | 20,000 | 25,000 | 30,000 | 35,000 | 40,000 | 44,000 | 16,000 | 20,000 | 24,000 | 28,000 | 17,000 | 22,000 | 22,000 |
| Special Counsel - ERISA - TBD | - | - | 2,500 | 5,000 | 7,500 | - | 1,250 | 2,500 | 3,750 | - | 1,250 | 2,500 | 3,750 | - | - | - |
| RSR Consulting, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Chapter 11 Creditors Committee | 6,250 | 12,500 | 18,750 | 25,000 | 31,250 | 37,500 | 43,750 | 50,000 | 54,000 | 18,000 | 22,000 | 26,000 | 30,000 | 17,750 | 21,500 | 21,500 |
| **Total Professional Fees Incurred Not Paid Balance** | 15,750 | 31,500 | 49,750 | 68,000 | 89,750 | 101,500 | 122,000 | 142,500 | 166,750 | 114,000 | 138,250 | 162,500 | 186,750 | 111,000 | 131,000 | 131,000 |

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST
PROFESSIONAL FEES

| | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | Weeks 16-30 Subtotal | Weeks 1-30 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Ending Friday: | 3/17/2017 | 3/24/2017 | 3/31/2017 | 4/7/2017 | 4/14/2017 | 4/21/2017 | 4/28/2017 | 5/5/2017 | 5/12/2017 | 5/19/2017 | 5/26/2017 | 6/2/2017 | 6/9/2017 | 6/16/2017 | 6/23/2017 | | |
| **Professional Fees Incurred** | | | | | | | | | | | | | | | | | |
| Klestadt | $ 11,250 | $ 11,250 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 6,000 | $ 11,250 | $ 11,250 | $ 11,250 | $ 11,250 | $ 8,750 | $ 8,750 | $ 8,750 | $ 8,750 | $ 132,500 | $ 405,000 |
| Ingerman Smith, L.L.P. | 5,000 | 5,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 60,000 | 130,000 |
| Special Counsel - ERISA - TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 20,000 |
| RSR Consulting, LLC | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 260,000 | 680,000 |
| Chapter 11 Creditors Committee | 3,750 | 3,750 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 52,500 | 130,000 |
| **Total Professional Fees Incurred** | $ 40,000 | $ 40,000 | $ 33,000 | $ 33,000 | $ 33,000 | $ 33,000 | $ 33,000 | $ 33,750 | $ 33,750 | $ 33,750 | $ 33,750 | $ 31,250 | $ 31,250 | $ 31,250 | $ 31,250 | $ 505,000 | $ 1,365,000 |
| **Professional Fees Cash Disbursements** | | | | | | | | | | | | | | | | | |
| Klestadt | $ - | $ - | $ 36,000 | $ - | $ - | $ - | $ - | $ 83,000 | $ - | $ - | $ - | $ 36,000 | $ - | $ - | $ - | $ 155,000 | $ 215,000 |
| Ingerman Smith, L.L.P. | | | 16,000 | | | | | 32,000 | | | | 12,000 | | | | 60,000 | 108,000 |
| Special Counsel - ERISA - TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 20,000 |
| RSR Consulting, LLC | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 260,000 | 580,000 |
| Chapter 11 Creditors Committee | - | - | 12,000 | | | | | 29,000 | | | | 12,000 | | | | 53,000 | 109,000 |
| **Total Professional Fees Retainers Applied** | $ 20,000 | $ 20,000 | $ 84,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 159,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 75,000 | $ 15,000 | $ 15,000 | $ 15,000 | $ 528,000 | $ 1,032,000 |
| **Professional Fees Retainers Applied** | | | | | | | | | | | | | | | | | |
| Klestadt | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 125,000 |
| Ingerman Smith, L.L.P. | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Special Counsel - ERISA - TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| RSR Consulting, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 100,000 |
| Chapter 11 Creditors Committee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Professional Fees Cash Disbursements** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 225,000 |
| **Professional Fees Incurred Not Paid Balance** | | | | | | | | | | | | | | | | | |
| Klestadt | $ 98,750 | $ 110,000 | $ 80,000 | $ 86,000 | $ 92,000 | $ 98,000 | $ 104,000 | $ 32,250 | $ 43,500 | $ 54,750 | $ 66,000 | $ 38,750 | $ 47,500 | $ 56,250 | $ 65,000 | $ 65,000 | $ 65,000 |
| Ingerman Smith, L.L.P. | 27,000 | 32,000 | 20,000 | 24,000 | 28,000 | 32,000 | 36,000 | 7,750 | 11,500 | 15,250 | 19,000 | 10,750 | 14,500 | 18,250 | 22,000 | 22,000 | 22,000 |
| Special Counsel - ERISA - TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| RSR Consulting, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Chapter 11 Creditors Committee | 25,250 | 29,000 | 20,000 | 23,000 | 26,000 | 29,000 | 32,000 | 6,750 | 10,500 | 14,250 | 18,000 | 9,750 | 13,500 | 17,250 | 21,000 | 21,000 | 21,000 |
| **Total Professional Fees Incurred Not Paid Balance** | $ 151,000 | $ 171,000 | $ 120,000 | $ 133,000 | $ 146,000 | $ 159,000 | $ 172,000 | $ 46,750 | $ 65,500 | $ 84,250 | $ 103,000 | $ 59,250 | $ 75,500 | $ 91,750 | $ 108,000 | $ 108,000 | $ 108,000 |

EXHIBIT B

**APPROVED BUDGET**

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST - BY BOND SERIES
FOR THE 30-WEEK PERIOD ENDING JUNE 23, 2017
USD

| | Week #: 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Weeks 1-15 Subtotal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Ending Friday: | 12/2/2016 | 12/9/2016 | 12/16/2016 | 12/23/2016 | 12/30/2016 | 1/6/2017 | 1/13/2017 | 1/20/2017 | 1/27/2017 | 2/3/2017 | 2/10/2017 | 2/17/2017 | 2/24/2017 | 3/3/2017 | 3/10/2017 | Subtotal |
| **Cash Disbursements: (1)** | | | | | | | | | | | | | | | | |
| **Cash Balance, Beginning of Period** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Cash Receipts: | | | | | | | | | | | | | | | | |
| Student Related | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Mandatory Repayments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| From Unrestricted Bank Accounts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Funding | 67,017 | 5,450 | 55,658 | 83,769 | 110,226 | 63,808 | 71,658 | 59,250 | 65,158 | 172,808 | 55,158 | 49,250 | 59,659 | 176,808 | 55,158 | 1,150,834 |
| **Total Cash Receipts, Net** | 67,017 | 5,450 | 55,658 | 83,769 | 110,226 | 63,808 | 71,658 | 59,250 | 65,158 | 172,808 | 55,158 | 49,250 | 59,659 | 176,808 | 55,158 | 1,150,834 |
| **Administrative Overhead / Term Loan D** | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | 211,261 |
| General Insurance | 35,058 | - | - | - | - | 35,058 | - | - | - | 35,058 | - | - | - | 35,058 | - | 140,233 |
| Professionals (2) | | | | | | | | | | | | | | | | |
| Klestadt | - | - | - | - | - | - | - | - | - | - | - | - | - | 60,000 | - | 60,000 |
| Ingerman Smith, L.L.P. | - | - | - | - | - | - | - | - | - | 32,000 | - | - | - | 16,000 | - | 48,000 |
| Special Counsel - ERISA - TBD | - | - | - | - | - | 10,000 | - | - | - | 5,000 | - | - | - | 5,000 | - | 20,000 |
| RSR Consulting, LLC | - | - | 5,000 | 35,000 | 35,000 | 15,000 | 20,000 | 35,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 320,000 |
| Chapter 11 Creditors Committee | - | - | - | - | - | - | - | - | - | 72,000 | - | - | - | 32,000 | - | 104,000 |
| Student Refunds / Records Scanning | - | - | - | - | 45,009 | - | - | - | - | - | - | - | - | - | - | 45,009 |
| Health, Medical, Unemployment Claims and Related | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Claims Agent | - | - | 20,000 | - | - | - | - | 20,000 | - | - | - | 20,000 | - | - | - | 60,000 |
| Administrative | - | 1,700 | 500 | - | - | - | - | 500 | - | - | - | 500 | - | - | - | 3,200 |
| Adequate Assurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| U.S. Trustee Fees | - | - | - | - | - | - | 6,500 | - | - | - | - | - | - | - | - | 6,500 |
| All Other Professional Fees | - | - | - | - | - | - | 15,000 | - | 10,000 | - | - | - | - | - | - | 25,000 |
| DIP Interest and Fees | 1,801 | - | - | 45,019 | - | - | - | - | - | - | - | - | 4,502 | - | - | 51,321 |
| Other | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 56,250 |
| **Total Administrative Overhead / Term Loan D** | 67,017 | 5,450 | 55,658 | 83,769 | 110,226 | 63,808 | 71,658 | 59,250 | 65,158 | 172,808 | 55,158 | 49,250 | 59,659 | 176,808 | 55,158 | 1,150,834 |
| **Cash Balance, End of Period** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2006 Bond Series - 68.0% | 45,571 | 3,706 | 37,847 | 56,963 | 74,954 | 43,390 | 48,727 | 40,290 | 44,307 | 117,510 | 37,507 | 33,490 | 40,568 | 120,230 | 37,507 | 782,567 |
| 2002 Bond Series - 18.2% | 12,197 | 992 | 10,130 | 15,246 | 20,061 | 11,613 | 13,042 | 10,784 | 11,859 | 31,451 | 10,039 | 8,964 | 10,858 | 32,179 | 10,039 | 209,452 |
| 2015 Bond Series - 13.8% | 9,248 | 752 | 7,681 | 11,560 | 15,211 | 8,806 | 9,889 | 8,177 | 8,992 | 23,848 | 7,612 | 6,797 | 8,233 | 24,400 | 7,612 | 158,815 |
| | | | | | | | | | | | | | | | | |
| **Collateral Preservation** | | | | | | | | | | | | | | | | |
| **Series 2006 Bonds / Term Loan A** | | | | | | | | | | | | | | | | |
| **Cash Balance, Beginning of Period** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Cash Receipts: | | | | | | | | | | | | | | | | |
| Rental Income | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Mandatory Repayments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| From Unrestricted Bank Accounts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Funding | 126,260 | 130,121 | 62,459 | 164,621 | 55,000 | 61,573 | 49,186 | 64,764 | 49,186 | 69,302 | 49,186 | 55,164 | 53,573 | 77,655 | 161,826 | 1,229,964 |
| **Total Cash Receipts, Net** | 126,260 | 130,121 | 62,459 | 164,621 | 55,000 | 61,573 | 49,186 | 64,764 | 49,186 | 69,302 | 49,186 | 55,164 | 53,573 | 77,655 | 161,826 | 1,229,964 |
| Cash Disbursements: (1) | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | 25,513 |
| General Insurance | 12,039 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 12,039 |
| Utilities | 21,706 | 67,476 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 371,366 |
| Security Personnel | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 302,264 |
| Property Management | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Outside Services | 10,554 | 13,077 | 7,406 | 60,750 | 5,904 | 15,977 | - | - | - | 23,306 | - | - | - | - | 98,796 | 235,368 |
| Facility Maintenance | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 15,000 |
| Real Estate Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Landscaping / Snow Removal | 8,528 | - | - | 8,528 | - | - | - | 8,528 | - | - | - | 8,528 | - | - | - | 34,111 |
| Sales Broker - Marketing | 43,559 | 13,845 | 5,867 | 4,839 | - | - | - | - | - | - | - | - | - | 31,658 | 13,845 | 113,613 |
| Brookhaven Site Planning | - | 8,000 | - | - | - | - | - | 9,600 | - | - | - | - | - | - | - | 17,600 |
| DIP Interest and Fees | 1,755 | - | - | 43,809 | - | - | - | - | - | - | - | - | 4,387 | - | - | 50,010 |
| Other | 3,779 | 6,572 | 3,139 | 3,779 | 3,139 | 3,139 | 3,139 | 3,779 | 3,139 | 3,139 | 3,139 | 3,779 | 3,139 | 3,139 | 3,139 | 53,081 |
| **Total Series 2006 Bonds / Term Loan A** | 126,260 | 130,121 | 62,459 | 164,621 | 55,000 | 61,573 | 49,186 | 64,764 | 49,186 | 69,302 | 49,186 | 55,164 | 53,573 | 77,655 | 161,826 | 1,229,964 |
| | | | | | | | | | | | | | | | | |
| **Series 2002 Bonds / Term Loan B** | | | | | | | | | | | | | | | | |
| **Cash Balance, Beginning of Period** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Cash Receipts: | | | | | | | | | | | | | | | | |
| Rental Income | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Mandatory Repayments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| From Unrestricted Bank Accounts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Funding | 13,020 | 18,785 | 5,363 | 13,777 | 7,676 | 18,163 | 4,863 | 9,386 | 4,863 | 17,576 | 4,863 | 6,986 | 5,492 | 4,863 | 29,427 | 165,102 |
| **Total Cash Receipts, Net** | 13,020 | 18,785 | 5,363 | 13,777 | 7,676 | 18,163 | 4,863 | 9,386 | 4,863 | 17,576 | 4,863 | 6,986 | 5,492 | 4,863 | 29,427 | 165,102 |
| Cash Disbursements: (1) | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| General Insurance | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utilities | 2,194 | 6,214 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 36,924 |
| Security Personnel | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 27,976 |
| Property Management | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Outside Services | 5,783 | 7,600 | 500 | 500 | 2,813 | 13,300 | - | - | - | 12,713 | - | - | - | - | 24,564 | 67,771 |
| Facility Maintenance | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 7,500 |
| Real Estate Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Landscaping / Snow Removal | 1,975 | - | - | 1,975 | - | - | - | 1,975 | - | - | - | 1,975 | - | - | - | 7,899 |
| Sales Broker - Marketing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Brookhaven Site Planning | - | 2,000 | - | - | - | - | - | 2,400 | - | - | - | - | - | - | - | 4,400 |
| DIP Interest and Fees | 252 | - | - | 6,291 | - | - | - | - | - | - | - | - | 629 | - | - | 7,172 |
| Other | 453 | 606 | 304 | 453 | 304 | 304 | 304 | 453 | 304 | 304 | 304 | 453 | 304 | 304 | 304 | 5,460 |
| **Total Series 2002 Bonds / Term Loan B** | 13,020 | 18,785 | 5,363 | 13,777 | 7,676 | 18,163 | 4,863 | 9,386 | 4,863 | 17,576 | 4,863 | 6,986 | 5,492 | 4,863 | 29,427 | 165,102 |
| **Cash Balance, End of Period** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST - BY BOND SERIES
FOR THE 30-WEEK PERIOD ENDING JUNE 23, 2017
USD

| | Week #: 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Weeks 1-15 Subtotal |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Ending Friday: | 12/2/2016 | 12/9/2016 | 12/16/2016 | 12/23/2016 | 12/30/2016 | 1/6/2017 | 1/13/2017 | 1/20/2017 | 1/27/2017 | 2/3/2017 | 2/10/2017 | 2/17/2017 | 2/24/2017 | 3/3/2017 | 3/10/2017 | |
| **Series 2015 Bonds / Term Loan C** | | | | | | | | | | | | | | | | |
| **Cash Balance, Beginning of Period** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Cash Receipts: | | | | | | | | | | | | | | | | |
| Rental Income | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Mandatory Repayments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| From Unrestricted Bank Accounts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Funding | 20,320 | 7,423 | 713 | 7,432 | 87,893 | 1,213 | 713 | 2,610 | 713 | 1,213 | 713 | 2,610 | 1,195 | 1,213 | 4,682 | 140,651 |
| **Total Cash Receipts, Net** | 20,320 | 7,423 | 713 | 7,432 | 87,893 | 1,213 | 713 | 2,610 | 713 | 1,213 | 713 | 2,610 | 1,195 | 1,213 | 4,682 | 140,651 |
| Cash Disbursements: (1) | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| General Insurance | 17,962 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 17,962 |
| Utilities | 150 | 6,360 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 8,460 |
| Security Personnel | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Property Management | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Outside Services | 55 | - | - | - | - | - | - | - | - | - | - | - | - | - | 3,969 | 4,024 |
| Facility Maintenance | - | 500 | - | 500 | - | 500 | - | 500 | - | 500 | - | 500 | - | 500 | - | 3,500 |
| Real Estate Taxes | - | - | - | - | 87,181 | - | - | - | - | - | - | - | - | - | - | 87,181 |
| Landscaping / Snow Removal | 1,398 | - | - | 1,398 | - | - | - | 1,398 | - | - | - | 1,398 | - | - | - | 5,590 |
| Sales Broker - Marketing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Brookhaven Site Planning | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Interest and Fees | 193 | - | - | 4,822 | - | - | - | - | - | - | - | - | 482 | - | - | 5,497 |
| Other | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 8,438 |
| **Total Series 2015 Bonds / Term Loan C** | 20,320 | 7,423 | 713 | 7,432 | 87,893 | 1,213 | 713 | 2,610 | 713 | 1,213 | 713 | 2,610 | 1,195 | 1,213 | 4,682 | 140,651 |
| Cash Balance, End of Period | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **SUMMARY** | | | | | | | | | | | | | | | | |
| **TOTAL Cash Balance, Beginning of Period** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **TOTAL Cash Receipts, Net** | 226,617 | 161,778 | 124,192 | 209,599 | 260,885 | 144,757 | 126,419 | 136,010 | 119,919 | 260,898 | 109,919 | 114,010 | 119,919 | 260,538 | 251,092 | 2,686,551 |
| **TOTAL Cash Disbursements** | 226,617 | 161,778 | 124,192 | 209,599 | 260,885 | 144,757 | 126,419 | 136,010 | 119,919 | 260,898 | 109,919 | 114,010 | 119,919 | 260,538 | 251,092 | 2,686,551 |
| **TOTAL Cash Balance, End of Period** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Restricted Cash, Reserve Accounts, Other Deposits** | | | | | | | | | | | | | | | | |
| **Beginning of Period** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Disbursements | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **End of Period** | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST - BY BOND SERIES
FOR THE 30-WEEK PERIOD ENDING JUNE 23, 2017
USD

| | Week #: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | Weeks 1-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Period Ending Friday: | 12/2/2016 | 12/9/2016 | 12/16/2016 | 12/23/2016 | 12/30/2016 | 1/6/2017 | 1/13/2017 | 1/20/2017 | 1/27/2017 | 2/3/2017 | 2/10/2017 | 2/17/2017 | 2/24/2017 | 3/3/2017 | 3/10/2017 | Subtotal |

**DIP TRANCHE SUMMARY**

**DIP FUNDING - WEEKLY** | | | | | | | | | | | | | | | | | |
| Term Loan A / Series 2005 Bonds | | 126,260 | 130,121 | 62,459 | 164,621 | 55,090 | 61,573 | 49,186 | 64,764 | 49,186 | 69,302 | 49,186 | 55,164 | 53,573 | 77,655 | 161,826 | 1,229,964 |
| Term Loan B / Series 2002 Bonds | | 13,020 | 18,785 | 5,363 | 13,777 | 7,676 | 18,163 | 4,863 | 9,386 | 4,863 | 17,576 | 4,863 | 6,986 | 5,492 | 4,863 | 29,427 | 165,102 |
| Term Loan C / Series 2015 Bonds | | 20,320 | 7,423 | 713 | 7,432 | 87,893 | 1,213 | 713 | 2,610 | 713 | 1,213 | 713 | 2,610 | 1,195 | 1,213 | 4,682 | 140,651 |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | | |
| Series 2006 Bonds   (68.0%) | | 45,571 | 3,706 | 37,847 | 56,963 | 74,954 | 43,390 | 48,727 | 40,290 | 44,307 | 117,510 | 37,507 | 33,490 | 40,568 | 120,230 | 37,507 | 782,567 |
| Series 2002 Bonds   (18.2%) | | 12,197 | 992 | 10,130 | 15,246 | 20,061 | 11,613 | 13,042 | 10,784 | 11,859 | 31,451 | 10,039 | 8,964 | 10,858 | 32,179 | 10,039 | 209,452 |
| Series 2015 Bonds   (13.8%) | | 9,248 | 752 | 7,681 | 11,560 | 15,211 | 8,806 | 9,889 | 8,177 | 8,992 | 23,848 | 7,612 | 6,797 | 8,233 | 24,400 | 7,612 | 158,815 |
| Subtotal - Term Loan D | | 67,017 | 5,450 | 55,658 | 83,769 | 110,226 | 63,808 | 71,658 | 59,250 | 65,158 | 172,808 | 55,158 | 49,250 | 59,659 | 176,808 | 55,158 | 1,150,834 |
| **Total DIP Funding - Weekly** | | **226,617** | **161,778** | **124,192** | **269,599** | **260,885** | **144,757** | **126,419** | **136,010** | **119,919** | **260,898** | **109,919** | **114,010** | **119,919** | **260,538** | **251,092** | **2,686,551** |

**DIP FUNDING - CUMULATIVE** | | | | | | | | | | | | | | | | | |
| Term Loan A / Series 2005 Bonds | | 126,260 | 256,381 | 318,840 | 483,461 | 538,551 | 600,124 | 649,310 | 714,074 | 763,259 | 832,561 | 881,747 | 936,911 | 990,484 | 1,068,138 | 1,229,964 | 1,229,964 |
| Term Loan B / Series 2002 Bonds | | 13,020 | 31,805 | 37,168 | 50,945 | 58,620 | 76,783 | 81,646 | 91,032 | 95,895 | 113,471 | 118,334 | 125,320 | 130,812 | 135,675 | 165,102 | 165,102 |
| Term Loan C / Series 2015 Bonds | | 20,320 | 27,742 | 28,455 | 35,887 | 123,780 | 124,992 | 125,705 | 128,315 | 129,027 | 130,240 | 130,952 | 133,562 | 134,757 | 135,970 | 140,651 | 140,651 |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | | |
| Series 2006 Bonds   (68.0%) | | 45,571 | 49,277 | 87,124 | 144,087 | 219,041 | 262,431 | 311,158 | 351,448 | 395,755 | 513,265 | 550,772 | 584,262 | 624,830 | 745,060 | 782,567 | 782,567 |
| Series 2002 Bonds   (18.2%) | | 12,197 | 13,189 | 23,319 | 38,565 | 58,626 | 70,239 | 83,280 | 94,064 | 105,923 | 137,374 | 147,412 | 156,376 | 167,234 | 199,413 | 209,452 | 209,452 |
| Series 2015 Bonds   (13.8%) | | 9,248 | 10,000 | 17,681 | 29,241 | 44,452 | 53,258 | 63,147 | 71,323 | 80,315 | 104,163 | 111,774 | 118,571 | 126,804 | 151,203 | 158,815 | 158,815 |
| **Total DIP Funding - Cumulative** | | **226,617** | **388,394** | **512,586** | **782,185** | **1,043,070** | **1,187,827** | **1,314,246** | **1,450,256** | **1,570,175** | **1,831,073** | **1,940,992** | **2,055,002** | **2,174,921** | **2,435,459** | **2,686,551** | **2,686,551** |

**INCURRED/UNPAID PROFESSIONAL FEES** | | | | | | | | | | | | | | | | | |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | | |
| Series 2006 Bonds   (68.0%) | | 14,960 | 29,920 | 46,580 | 63,240 | 80,580 | 91,120 | 107,610 | 124,100 | 143,310 | 88,400 | 107,610 | 126,820 | 146,030 | 86,190 | 102,340 | 102,340 |
| Series 2002 Bonds   (18.2%) | | 4,004 | 8,008 | 12,467 | 16,926 | 21,567 | 24,388 | 28,802 | 33,215 | 38,357 | 23,660 | 28,802 | 33,943 | 39,085 | 23,069 | 27,391 | 27,391 |
| Series 2015 Bonds   (13.8%) | | 3,036 | 6,072 | 9,453 | 12,834 | 16,353 | 18,492 | 21,839 | 25,185 | 29,084 | 17,940 | 21,839 | 25,737 | 29,636 | 17,492 | 20,769 | 20,769 |
| **Total Incurred/Unpaid Professional Fees** | | **22,000** | **44,000** | **68,500** | **93,000** | **118,500** | **134,000** | **158,250** | **182,500** | **210,750** | **130,000** | **158,250** | **186,500** | **214,750** | **126,750** | **150,500** | **150,500** |

**TOTAL DIP COMMITMENT - CUMULATIVE** | | | | | | | | | | | | | | | | | |
| Term Loan A / Series 2006 Bonds | | 126,260 | 256,381 | 318,840 | 483,461 | 538,551 | 600,124 | 649,310 | 714,074 | 763,259 | 832,561 | 881,747 | 936,911 | 990,484 | 1,068,138 | 1,229,964 | 1,229,964 |
| Term Loan B / Series 2002 Bonds | | 13,020 | 31,805 | 37,168 | 50,945 | 58,620 | 76,783 | 81,646 | 91,032 | 95,895 | 113,471 | 118,334 | 125,320 | 130,812 | 135,675 | 165,102 | 165,102 |
| Term Loan C / Series 2015 Bonds | | 20,320 | 27,742 | 28,455 | 35,887 | 123,780 | 124,992 | 125,705 | 128,315 | 129,027 | 130,240 | 130,952 | 133,562 | 134,757 | 135,970 | 140,651 | 140,651 |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | | |
| Series 2006 Bonds   (68.0%) | | 60,531 | 79,197 | 133,704 | 207,327 | 299,621 | 353,551 | 418,768 | 475,548 | 539,065 | 601,665 | 658,382 | 711,082 | 770,860 | 831,250 | 884,907 | 884,907 |
| Series 2002 Bonds   (18.2%) | | 16,201 | 21,197 | 35,786 | 55,491 | 80,193 | 94,627 | 112,082 | 127,279 | 144,279 | 161,034 | 176,214 | 190,319 | 206,318 | 222,482 | 236,843 | 236,843 |
| Series 2015 Bonds   (13.8%) | | 12,284 | 16,072 | 27,134 | 42,075 | 60,805 | 71,750 | 84,985 | 96,508 | 109,398 | 122,103 | 133,613 | 144,308 | 156,439 | 168,695 | 179,584 | 179,584 |
| Subtotal - Term Loan D | | 89,017 | 116,467 | 196,624 | 304,893 | 440,619 | 519,927 | 615,835 | 699,335 | 792,743 | 884,801 | 968,208 | 1,045,708 | 1,133,618 | 1,222,426 | 1,301,334 | 1,301,334 |
| **Total DIP Commitment - Cumulative** | | **248,617** | **432,394** | **581,086** | **875,185** | **1,161,570** | **1,321,827** | **1,472,496** | **1,632,756** | **1,780,925** | **1,961,073** | **2,099,242** | **2,241,502** | **2,389,671** | **2,562,209** | **2,837,051** | **2,837,051** |

**MEMO: TOTAL DIP COMMITMENT - CUMULATIVE** | | | | | | | | | | | | | | | | | |
| Series 2006 Bonds | | 186,791 | 335,578 | 452,544 | 690,788 | 838,172 | 953,675 | 1,068,077 | 1,189,621 | 1,302,324 | 1,434,226 | 1,540,129 | 1,647,993 | 1,761,344 | 1,899,388 | 2,114,871 | 2,114,871 |
| Series 2002 Bonds | | 29,221 | 53,002 | 72,953 | 106,435 | 138,813 | 171,410 | 193,728 | 218,311 | 240,174 | 274,505 | 294,548 | 315,639 | 337,130 | 358,157 | 401,944 | 401,944 |
| Series 2015 Bonds | | 32,604 | 43,815 | 55,589 | 77,962 | 184,585 | 196,742 | 210,690 | 224,823 | 238,426 | 252,342 | 264,565 | 277,870 | 291,196 | 304,664 | 320,235 | 320,235 |
| **Total DIP Commitment - Cumulative** | | **248,617** | **432,394** | **581,086** | **875,185** | **1,161,570** | **1,321,827** | **1,472,496** | **1,632,756** | **1,780,925** | **1,961,073** | **2,099,242** | **2,241,502** | **2,389,671** | **2,562,209** | **2,837,051** | **2,837,051** |

NOTES:

(1) The college is assumed to operate in bankruptcy on a zero cash basis with all required disbursements funded under the DIP loan facility.  Any proceeds from the use or sale of collateral or any other miscellaneous cash inflows are assumed to be swept by the lenders to repay DIP borrowings or secured debt and are not reflected in the budget.  If it is ultimately determined that the Debtor's cash of approximately $222,000 is deemed unrestricted, such funds will be utilized to fund budgeted disbursements prior to the use of DIP financing funds and will reduce the applicable DIP commitments on  a dollar-for-dollar basis.

(2) Refer to the Professional Fees supporting schedule (Schedule [OPEN]) on the next page for detail of professional fees expected to be incurred during the interim period. Schedule [OPEN] indicates  the amounts projected to be charged against existing retainers, the amounts to be paid in cash and the amounts incurred and projected to be unpaid at the end of the interim period due to timing of  disbursements, filing of fee applications and required holdback amounts.

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST - BY BOND SERIES
FOR THE 30-WEEK PERIOD ENDING JUNE 23, 2017
USD

| | Week #: | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | Weeks 16-30 Subtotal | Weeks 1-30 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Period Ending Friday: | 3/17/2017 | 3/24/2017 | 3/31/2017 | 4/7/2017 | 4/14/2017 | 4/21/2017 | 4/28/2017 | 5/5/2017 | 5/12/2017 | 5/19/2017 | 5/26/2017 | 6/2/2017 | 6/9/2017 | 6/16/2017 | 6/23/2017 | | |
| Cash Disbursements: (1) | | | | | | | | | | | | | | | | | | |
| **Cash Balance, Beginning of Period** | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Cash Receipts: | | | | | | | | | | | | | | | | | | |
| Student Related | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Mandatory Repayments | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| From Unrestricted Bank Accounts | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Funding | | 44,250 | 50,158 | 99,750 | 85,216 | 30,250 | 70,658 | 23,750 | 247,216 | 33,750 | 65,658 | 23,252 | 144,216 | 25,250 | 50,158 | 40,751 | 1,034,281 | 2,185,114 |
| **Total Cash Receipts, Net** | | 44,250 | 50,158 | 99,750 | 85,216 | 30,250 | 70,658 | 23,750 | 247,216 | 33,750 | 65,658 | 23,252 | 144,216 | 25,250 | 50,158 | 40,751 | 1,034,281 | 2,185,114 |
| Administrative Overhead / Term Loan D | | | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 26,408 | - | 184,853 | 396,114 |
| General Insurance | | - | - | 35,058 | - | - | - | 35,058 | - | - | - | 35,058 | - | - | - | - | 105,175 | 245,408 |
| Professionals (2) | | | | | | | | | | | | | | | | | | |
| Klestadt | | - | - | 36,000 | - | - | - | - | 83,000 | - | - | - | 36,000 | - | - | - | 155,000 | 215,000 |
| Ingerman Smith, L.L.P. | | - | - | 16,000 | - | - | - | - | 32,000 | - | - | - | 12,000 | - | - | - | 60,000 | 108,000 |
| Special Counsel - ERISA - TBD | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 20,000 |
| RSR Consulting, LLC | | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 260,000 | 580,000 |
| Chapter 11 Creditors Committee | | - | - | 24,000 | - | - | - | - | 52,000 | - | - | - | 16,000 | - | - | - | 92,000 | 196,000 |
| Student Refunds / Records Scanning | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 45,000 |
| Health, Medical, Unemployment Claims and Related | | | | | | | | | | | | | | | | | | |
| Claims Agent | | 20,000 | - | - | - | - | 20,000 | - | - | - | - | 20,000 | - | - | - | 20,000 | 80,000 | 140,000 |
| Administrative | | 500 | - | - | - | - | 500 | - | - | - | - | 500 | - | - | - | 500 | 2,000 | 5,200 |
| Adequate Assurance | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| U.S. Trustee Fees | | - | - | - | 6,500 | - | - | - | - | - | - | - | - | 6,500 | - | - | 13,000 | 19,500 |
| All Other Professional Fees | | - | - | - | - | - | - | - | - | 15,000 | - | - | - | - | 5,000 | - | 20,000 | 45,000 |
| DIP Interest and Fees | | - | - | - | - | - | - | - | - | - | - | 4,502 | - | - | - | 1,501 | 6,003 | 57,324 |
| Other | | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 56,250 | 112,500 |
| **Total Administrative Overhead / Term Loan D** | | 44,250 | 50,158 | 99,750 | 85,216 | 30,250 | 70,658 | 23,750 | 247,216 | 33,750 | 65,658 | 23,252 | 144,216 | 25,250 | 50,158 | 40,751 | 1,034,281 | 2,185,114 |
| **Cash Balance, End of Period** | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| *2006 Bond Series - 68.0%* | | *30,090* | *34,107* | *67,830* | *57,947* | *20,570* | *48,047* | *16,150* | *168,107* | *22,950* | *44,647* | *15,811* | *98,067* | *17,170* | *34,107* | *27,710* | *703,311* | *1,485,878* |
| *2002 Bond Series - 18.2%* | | *8,054* | *9,129* | *18,155* | *15,509* | *5,506* | *12,860* | *4,323* | *44,993* | *6,143* | *11,950* | *4,232* | *26,247* | *4,596* | *9,129* | *7,417* | *188,239* | *397,691* |
| *2015 Bond Series - 13.8%* | | *6,107* | *6,922* | *13,766* | *11,760* | *4,175* | *9,751* | *3,278* | *34,116* | *4,658* | *9,061* | *3,209* | *19,902* | *3,485* | *6,922* | *5,624* | *142,731* | *301,546* |
| **Collateral Preservation** | | | | | | | | | | | | | | | | | | |
| **Series 2006 Bonds / Term Loan A** | | | | | | | | | | | | | | | | | | |
| **Cash Balance, Beginning of Period** | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Cash Receipts: | | | | | | | | | | | | | | | | | | |
| Rental Income | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Mandatory Repayments | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| From Unrestricted Bank Accounts | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Funding | | 61,031 | 62,825 | 45,997 | 49,186 | 72,371 | 51,780 | 48,590 | 51,780 | 71,896 | 51,780 | 106,577 | 51,780 | 71,896 | 51,780 | 50,053 | 899,319 | 2,129,283 |
| **Total Cash Receipts, Net** | | 61,031 | 62,825 | 45,997 | 49,186 | 72,371 | 51,780 | 48,590 | 51,780 | 71,896 | 51,780 | 106,577 | 51,780 | 71,896 | 51,780 | 50,053 | 899,319 | 2,129,283 |
| Cash Disbursements: | | | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 3,189 | - | 22,324 | 47,837 |
| General Insurance | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 12,039 |
| Utilities | | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 21,706 | 325,596 | 696,962 |
| Security Personnel | | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 20,151 | 302,264 | 604,528 |
| Property Management | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Outside Services | | - | - | - | - | 23,781 | - | - | - | 23,306 | - | - | - | - | 23,306 | - | 70,392 | 305,760 |
| Facility Maintenance | | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 15,000 | 30,000 |
| Real Estate Taxes | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Landscaping / Snow Removal | | 8,528 | - | - | - | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 2,413 | 35,069 | 69,180 |
| Sales Broker - Marketing | | 5,867 | 4,839 | - | - | - | - | - | - | - | - | - | - | - | - | - | 10,706 | 124,319 |
| Brookhaven Site Planning | | - | 8,800 | - | - | - | - | - | - | - | - | 53,600 | - | - | - | - | 62,400 | 80,000 |
| DIP Interest and Fees | | - | - | - | - | - | - | - | - | - | - | 4,387 | - | - | - | 1,462 | 5,849 | 55,859 |
| Other | | 3,779 | 3,139 | 3,139 | 3,139 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 3,320 | 49,720 | 102,800 |
| **Total Series 2006 Bonds / Term Loan A** | | 61,031 | 62,825 | 45,997 | 49,186 | 72,371 | 51,780 | 48,590 | 51,780 | 71,896 | 51,780 | 106,577 | 51,780 | 71,896 | 51,780 | 50,053 | 899,319 | 2,129,283 |
| **Series 2002 Bonds / Term Loan B** | | | | | | | | | | | | | | | | | | |
| **Cash Balance, Beginning of Period** | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Cash Receipts: | | | | | | | | | | | | | | | | | | |
| Rental Income | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Mandatory Repayments | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| From Unrestricted Bank Accounts | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Funding | | 6,986 | 7,063 | 4,863 | 4,863 | 18,176 | 5,464 | 5,464 | 5,464 | 22,176 | 5,464 | 19,493 | 5,464 | 18,176 | 5,464 | 5,673 | 140,252 | 305,354 |
| **Total Cash Receipts, Net** | | 6,986 | 7,063 | 4,863 | 4,863 | 18,176 | 5,464 | 5,464 | 5,464 | 22,176 | 5,464 | 19,493 | 5,464 | 18,176 | 5,464 | 5,673 | 140,252 | 305,354 |
| Cash Disbursements: (1) | | | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| General Insurance | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utilities | | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 2,194 | 32,904 | 69,828 |
| Security Personnel | | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 1,865 | 27,976 | 55,952 |
| Property Management | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Outside Services | | - | - | - | - | 12,713 | - | - | - | 16,713 | - | - | - | - | 12,713 | - | 42,138 | 109,909 |
| Facility Maintenance | | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 7,500 | 15,000 |
| Real Estate Taxes | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Landscaping / Snow Removal | | 1,975 | - | - | - | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 559 | 8,121 | 16,019 |
| Sales Broker - Marketing | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Brookhaven Site Planning | | - | 2,200 | - | - | - | - | - | - | - | - | 13,400 | - | - | - | - | 15,600 | 20,000 |
| DIP Interest and Fees | | - | - | - | - | - | - | - | - | - | - | 629 | - | - | - | 210 | 839 | 8,011 |
| Other | | 453 | 304 | 304 | 304 | 346 | 346 | 346 | 346 | 346 | 346 | 346 | 346 | 346 | 346 | 346 | 5,175 | 10,635 |
| **Total Series 2002 Bonds / Term Loan B** | | 6,986 | 7,063 | 4,863 | 4,863 | 18,176 | 5,464 | 5,464 | 5,464 | 22,176 | 5,464 | 19,493 | 5,464 | 18,176 | 5,464 | 5,673 | 140,252 | 305,354 |
| **Cash Balance, End of Period** | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST - BY BOND SERIES
FOR THE 30-WEEK PERIOD ENDING JUNE 23, 2017
USD

| | Week #: | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | Weeks 16-30 | Weeks 1-30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Period Ending Friday: | 3/17/2017 | 3/24/2017 | 3/31/2017 | 4/7/2017 | 4/14/2017 | 4/21/2017 | 4/28/2017 | 5/5/2017 | 5/12/2017 | 5/19/2017 | 5/26/2017 | 6/2/2017 | 6/9/2017 | 6/16/2017 | 6/23/2017 | Subtotal | TOTAL |
| **Series 2015 Bonds / Term Loan C** | | | | | | | | | | | | | | | | | | |
| **Cash Balance, Beginning of Period** | $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - | $ - | $ - |
| Cash Receipts: | | | | | | | | | | | | | | | | | | |
| Rental Income | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Mandatory Repayments | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| From Unrestricted Bank Accounts | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Receipts | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Funding | | 2,610 | 713 | 1,213 | 713 | 1,608 | 1,108 | 1,608 | 1,108 | 1,608 | 1,108 | 2,090 | 73,406 | 1,608 | 1,108 | 1,769 | 93,376 | 234,027 |
| **Total Cash Receipts, Net** | | 2,610 | 713 | 1,213 | 713 | 1,608 | 1,108 | 1,608 | 1,108 | 1,608 | 1,108 | 2,090 | 73,406 | 1,608 | 1,108 | 1,769 | 93,376 | 234,027 |
| Cash Disbursements: (1) | | | | | | | | | | | | | | | | | | |
| Gross Wages/Salaries (incl. employer taxes) | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| General Insurance | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 17,962 |
| Utilities | | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 150 | 2,250 | 10,710 |
| Security Personnel | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Property Management | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Outside Services | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 4,024 |
| Facility Maintenance | | 500 | - | 500 | - | 500 | - | 500 | - | 500 | - | 500 | - | 500 | - | 500 | 4,000 | 7,500 |
| Real Estate Taxes | | - | - | - | - | - | - | - | - | - | - | - | 72,298 | - | - | - | 72,298 | 159,479 |
| Landscaping / Snow Removal | | 1,398 | - | - | 395 | 395 | 395 | 395 | 395 | 395 | 395 | 395 | 395 | 395 | 395 | 395 | 5,748 | 11,338 |
| Sales Broker - Marketing | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Brookhaven Site Planning | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Interest and Fees | | - | - | - | - | - | - | - | - | - | - | - | 482 | - | - | 161 | 643 | 6,139 |
| Other | | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 563 | 8,438 | 16,875 |
| **Total Series 2015 Bonds / Term Loan C** | | 2,610 | 713 | 1,213 | 713 | 1,608 | 1,108 | 1,608 | 1,108 | 1,608 | 1,108 | 2,090 | 73,406 | 1,608 | 1,108 | 1,769 | 93,376 | 234,027 |
| **Cash Balance, End of Period** | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **SUMMARY** | | | | | | | | | | | | | | | | | | |
| **TOTAL Cash Balance, Beginning of Period** | $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - | $ - | $ - |
| **TOTAL Cash Receipts, Net** | | 114,877 | 120,758 | 151,822 | 139,977 | 122,405 | 129,009 | 79,412 | 305,567 | 129,430 | 124,009 | 151,412 | 274,865 | 116,930 | 108,509 | 98,245 | 2,167,228 | 4,853,779 |
| **TOTAL Cash Disbursements** | | 114,877 | 120,758 | 151,822 | 139,977 | 122,405 | 129,009 | 79,412 | 305,567 | 129,430 | 124,009 | 151,412 | 274,865 | 116,930 | 108,509 | 98,245 | 2,167,228 | 4,853,779 |
| **TOTAL Cash Balance, End of Period** | $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - | $ - | $ - |
| **Restricted Cash, Reserve Accounts, Other Deposits** | | | | | | | | | | | | | | | | | | |
| **Beginning of Period** | $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - | $ - | $ - |
| Receipts | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Disbursements | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **End of Period** | $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - $ | - | $ - | $ - |

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST - BY BOND SERIES
FOR THE 30-WEEK PERIOD ENDING JUNE 23, 2017
USD

| | Week #: | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | Weeks 16-30 Subtotal | Weeks 1-30 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Period Ending Friday: | 3/17/2017 | 3/24/2017 | 3/31/2017 | 4/7/2017 | 4/14/2017 | 4/21/2017 | 4/28/2017 | 5/5/2017 | 5/12/2017 | 5/19/2017 | 5/26/2017 | 6/2/2017 | 6/9/2017 | 6/16/2017 | 6/23/2017 | | |
| **DIP TRANCHE SUMMARY** | | | | | | | | | | | | | | | | | | |
| **DIP FUNDING - WEEKLY** | | | | | | | | | | | | | | | | | | |
| Term Loan A / Series 2006 Bonds | | 61,031 | 62,825 | 45,997 | 49,186 | 72,371 | 51,780 | 48,590 | 51,780 | 71,896 | 51,780 | 106,577 | 51,780 | 71,896 | 51,780 | 50,053 | 899,319 | 2,129,283 |
| Term Loan B / Series 2002 Bonds | | 6,986 | 7,063 | 4,863 | 4,863 | 18,176 | 5,464 | 5,464 | 5,464 | 22,176 | 5,464 | 19,493 | 5,464 | 18,176 | 5,464 | 5,673 | 140,252 | 305,354 |
| Term Loan C / Series 2015 Bonds | | 2,610 | 713 | 1,213 | 713 | 1,608 | 1,108 | 1,608 | 1,108 | 1,608 | 1,108 | 2,090 | 73,406 | 1,608 | 1,108 | 1,769 | 93,376 | 234,027 |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | | | |
| Series 2006 Bonds  (68.0%) | | 30,090 | 34,107 | 67,830 | 57,947 | 20,570 | 48,047 | 16,150 | 168,107 | 22,950 | 44,647 | 15,811 | 98,067 | 17,170 | 34,107 | 27,710 | 703,311 | 1,485,878 |
| Series 2002 Bonds  (18.2%) | | 8,054 | 9,129 | 18,155 | 15,509 | 5,506 | 12,860 | 4,323 | 44,993 | 6,143 | 11,950 | 4,232 | 26,247 | 4,596 | 9,129 | 7,417 | 188,239 | 397,691 |
| Series 2015 Bonds  (13.8%) | | 6,107 | 6,922 | 13,766 | 11,760 | 4,175 | 9,751 | 3,278 | 34,116 | 4,658 | 9,061 | 3,209 | 19,902 | 3,485 | 6,922 | 5,624 | 142,731 | 301,546 |
| Subtotal - Term Loan D | | 44,250 | 50,158 | 99,750 | 85,216 | 30,250 | 70,658 | 23,750 | 247,216 | 33,750 | 65,658 | 23,252 | 144,216 | 25,250 | 50,158 | 40,751 | 1,034,281 | 2,185,114 |
| **Total DIP Funding - Weekly** | | 114,877 | 120,758 | 151,822 | 139,977 | 122,405 | 129,009 | 79,412 | 305,567 | 129,430 | 124,009 | 151,412 | 274,865 | 116,930 | 108,509 | 98,245 | 2,167,228 | 4,853,779 |
| **DIP FUNDING - CUMULATIVE** | | | | | | | | | | | | | | | | | | |
| Term Loan A / Series 2006 Bonds | | 1,290,995 | 1,353,820 | 1,399,817 | 1,449,002 | 1,521,373 | 1,573,153 | 1,621,743 | 1,673,523 | 1,745,419 | 1,797,198 | 1,903,776 | 1,955,555 | 2,027,451 | 2,079,231 | 2,129,283 | | 2,129,283 |
| Term Loan B / Series 2002 Bonds | | 172,088 | 179,151 | 184,014 | 188,877 | 207,053 | 212,517 | 217,980 | 223,444 | 245,620 | 251,084 | 270,577 | 276,041 | 294,217 | 299,680 | 305,354 | | 305,354 |
| Term Loan C / Series 2015 Bonds | | 143,261 | 143,974 | 145,186 | 145,899 | 147,507 | 148,615 | 150,223 | 151,331 | 152,938 | 154,046 | 156,137 | 229,543 | 231,150 | 232,258 | 234,027 | | 234,027 |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | | | |
| Series 2006 Bonds  (68.0%) | | 812,657 | 846,764 | 914,594 | 972,541 | 993,111 | 1,041,158 | 1,057,308 | 1,225,415 | 1,248,365 | 1,293,012 | 1,308,823 | 1,406,890 | 1,424,060 | 1,458,167 | 1,485,878 | | 1,485,878 |
| Series 2002 Bonds  (18.2%) | | 217,505 | 226,634 | 244,788 | 260,298 | 265,803 | 278,663 | 282,985 | 327,979 | 334,121 | 346,071 | 350,303 | 376,550 | 381,146 | 390,274 | 397,691 | | 397,691 |
| Series 2015 Bonds  (13.8%) | | 164,922 | 171,843 | 185,609 | 197,369 | 201,543 | 211,294 | 214,571 | 248,687 | 253,345 | 262,405 | 265,614 | 285,516 | 289,000 | 295,922 | 301,546 | | 301,546 |
| Subtotal - Term Loan D | | 1,195,084 | 1,245,241 | 1,344,991 | 1,430,207 | 1,460,457 | 1,531,115 | 1,554,865 | 1,802,081 | 1,835,831 | 1,901,488 | 1,924,740 | 2,068,956 | 2,094,206 | 2,144,364 | 2,185,114 | | 2,185,114 |
| **Total DIP Funding - Cumulative** | | 2,801,428 | 2,922,186 | 3,074,008 | 3,213,985 | 3,336,390 | 3,465,399 | 3,544,811 | 3,850,378 | 3,979,808 | 4,103,817 | 4,255,229 | 4,530,094 | 4,647,024 | 4,755,533 | 4,853,779 | | 4,853,779 |
| **INCURRED/UNPAID PROFESSIONAL FEES** | | | | | | | | | | | | | | | | | | |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | | | |
| Series 2006 Bonds  (68.0%) | | 118,490 | 154,640 | 93,160 | 103,360 | 113,560 | 123,760 | 133,960 | 34,000 | 47,600 | 61,200 | 74,800 | 43,180 | 55,080 | 66,980 | 78,880 | | 78,880 |
| Series 2002 Bonds  (18.2%) | | 31,714 | 36,036 | 24,934 | 27,664 | 30,394 | 33,124 | 35,854 | 9,100 | 12,740 | 16,380 | 20,020 | 11,557 | 14,742 | 17,927 | 21,112 | | 21,112 |
| Series 2015 Bonds  (13.8%) | | 24,047 | 27,324 | 18,906 | 20,976 | 23,046 | 25,116 | 27,186 | 6,900 | 9,660 | 12,420 | 15,180 | 8,763 | 11,178 | 13,593 | 16,008 | | 16,008 |
| **Total Incurred/Unpaid Professional Fees** | | 174,250 | 198,000 | 137,000 | 152,000 | 167,000 | 182,000 | 197,000 | 50,000 | 70,000 | 90,000 | 110,000 | 63,500 | 81,000 | 98,500 | 116,000 | | 116,000 |
| **TOTAL DIP COMMITMENT - CUMULATIVE** | | | | | | | | | | | | | | | | | | |
| Term Loan A / Series 2006 Bonds | | 1,290,995 | 1,353,820 | 1,399,817 | 1,449,002 | 1,521,373 | 1,573,153 | 1,621,743 | 1,673,523 | 1,745,419 | 1,797,198 | 1,903,776 | 1,955,555 | 2,027,451 | 2,079,231 | 2,129,283 | | 2,129,283 |
| Term Loan B / Series 2002 Bonds | | 172,088 | 179,151 | 184,014 | 188,877 | 207,053 | 212,517 | 217,980 | 223,444 | 245,620 | 251,084 | 270,577 | 276,041 | 294,217 | 299,680 | 305,354 | | 305,354 |
| Term Loan C / Series 2015 Bonds | | 143,261 | 143,974 | 145,186 | 145,899 | 147,507 | 148,615 | 150,223 | 151,331 | 152,938 | 154,046 | 156,137 | 229,543 | 231,150 | 232,258 | 234,027 | | 234,027 |
| Term Loan D / Administrative Overhead: | | | | | | | | | | | | | | | | | | |
| Series 2006 Bonds  (68.0%) | | 931,147 | 981,404 | 1,007,754 | 1,075,901 | 1,106,671 | 1,164,918 | 1,191,268 | 1,259,415 | 1,295,965 | 1,354,212 | 1,383,623 | 1,450,070 | 1,479,140 | 1,525,147 | 1,564,758 | | 1,564,758 |
| Series 2002 Bonds  (18.2%) | | 249,219 | 262,670 | 269,722 | 287,962 | 296,197 | 311,787 | 318,839 | 337,079 | 346,861 | 362,451 | 370,323 | 388,107 | 395,888 | 408,201 | 418,803 | | 418,803 |
| Series 2015 Bonds  (13.8%) | | 188,968 | 199,167 | 204,515 | 218,345 | 224,589 | 236,410 | 241,757 | 255,587 | 263,005 | 274,825 | 280,794 | 294,279 | 300,178 | 309,515 | 317,554 | | 317,554 |
| Subtotal - Term Loan D | | 1,369,334 | 1,443,241 | 1,481,991 | 1,582,207 | 1,627,457 | 1,713,115 | 1,751,865 | 1,852,081 | 1,905,831 | 1,991,488 | 2,034,740 | 2,132,456 | 2,175,206 | 2,242,864 | 2,301,114 | | 2,301,114 |
| **Total DIP Commitment - Cumulative** | | 2,975,678 | 3,120,186 | 3,211,008 | 3,365,985 | 3,503,390 | 3,647,399 | 3,741,811 | 3,900,378 | 4,049,808 | 4,193,817 | 4,365,229 | 4,593,594 | 4,728,024 | 4,854,033 | 4,969,779 | | 4,969,779 |
| **MEMO: TOTAL DIP COMMITMENT - CUMULATIVE** | | | | | | | | | | | | | | | | | | |
| Series 2006 Bonds | | 2,222,142 | 2,335,224 | 2,407,571 | 2,524,903 | 2,628,044 | 2,738,071 | 2,813,011 | 2,932,938 | 3,041,384 | 3,151,410 | 3,287,399 | 3,405,625 | 3,506,591 | 3,604,378 | 3,694,041 | | 3,694,041 |
| Series 2002 Bonds | | 421,306 | 441,821 | 453,736 | 476,838 | 503,250 | 524,304 | 536,820 | 560,523 | 592,481 | 613,535 | 640,900 | 664,148 | 690,104 | 707,882 | 724,157 | | 724,157 |
| Series 2015 Bonds | | 332,229 | 343,141 | 349,701 | 364,243 | 372,096 | 385,024 | 391,980 | 406,918 | 415,943 | 428,872 | 436,931 | 523,821 | 531,329 | 541,774 | 551,581 | | 551,581 |
| **Total DIP Commitment - Cumulative** | | 2,975,678 | 3,120,186 | 3,211,008 | 3,365,985 | 3,503,390 | 3,647,399 | 3,741,811 | 3,900,378 | 4,049,808 | 4,193,817 | 4,365,229 | 4,593,594 | 4,728,024 | 4,854,033 | 4,969,779 | | 4,969,779 |

**NOTES:**

**(1)** The college is assumed to operate in bankruptcy on a zero cash basis with all required disbursements funded under the DIP loan facility. Any proceeds from the use or sale of collateral or any other miscellaneous cash inflows are assumed to be swept by the lenders to repay DIP borrowings or secured debt and are not reflected in the budget. If it is ultimately determined that the Debtor's cash of approximately $222,000 is deemed unrestricted, such funds will be utilized to fund budgeted disbursements prior to the use of DIP financing funds and will reduce the applicable DIP commitments on a dollar-for-dollar basis.

**(2)** Refer to the Professional Fees supporting schedule (Schedule [OPEN]) on the next page for detail of professional fees expected to be incurred during the interim period. Schedule [OPEN] indicates the amounts projected to be charged against existing retainers, the amounts to be paid in cash and the amounts incurred and projected to be unpaid at the end of the interim period due to timing of disbursements, filing of fee applications and required holdback amounts.

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST
PROFESSIONAL FEES

| | | | | 86538.46154 | | | 69230.76923 | | | 69230.76923 | | | 51923.07692 | | | 43269.23077 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week #: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | **Weeks 1-15** | |
| Period Ending Friday: | 12/2/2016 | 12/9/2016 | 12/16/2016 | 12/23/2016 | 12/30/2016 | 1/6/2017 | 1/13/2017 | 1/20/2017 | 1/27/2017 | 2/3/2017 | 2/10/2017 | 2/17/2017 | 2/24/2017 | 3/3/2017 | 3/10/2017 | Subtotal | |
| **Professional Fees Incurred** | | | | | | | | | | | | | | | | | |
| Klestadt | 22,500 | 22,500 | 22,500 | 22,500 | 21,250 | 21,250 | 21,250 | 21,250 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 11,250 | 11,250 | 272,500 | |
| Ingerman Smith, L.L.P. | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 5,000 | 5,000 | 70,000 | |
| Special Counsel - ERISA - TBD | - | - | 2,500 | 2,500 | 2,500 | 2,500 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | 1,250 | - | 20,000 | |
| RSR Consulting, LLC | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 15,000 | 20,000 | 35,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 420,000 | |
| Chapter 11 Creditors Committee | 12,500 | 12,500 | 12,500 | 12,500 | 10,000 | 10,000 | 10,000 | 10,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 7,500 | 7,500 | 145,000 | |
| **Total Professional Fees Incurred** | 75,000 | 75,000 | 77,500 | 77,500 | 73,750 | 53,750 | 57,500 | 72,500 | 53,250 | 53,250 | 53,250 | 53,250 | 53,250 | 50,000 | 48,750 | 927,500 | |
| **Professional Fees Cash Disbursements** | | | | | | | | | | | | | | | | | |
| Klestadt | - | - | - | - | - | - | - | - | - | - | - | - | - | 60,000 | - | 60,000 | |
| Ingerman Smith, L.L.P. | - | - | - | - | - | - | - | - | - | 32,000 | - | - | - | 16,000 | - | 48,000 | |
| Special Counsel - ERISA - TBD | - | - | - | - | - | 10,000 | - | - | - | 5,000 | - | - | - | 5,000 | - | 20,000 | |
| RSR Consulting, LLC | - | - | 5,000 | 35,000 | 35,000 | 15,000 | 20,000 | 35,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 320,000 | |
| Chapter 11 Creditors Committee | - | - | - | - | - | - | - | - | - | 72,000 | - | - | - | 32,000 | - | 104,000 | |
| **Total Professional Fees Cash Disbursements** | - | - | 5,000 | 35,000 | 35,000 | 25,000 | 20,000 | 35,000 | 25,000 | 134,000 | 25,000 | 25,000 | 25,000 | 138,000 | 25,000 | 552,000 | |
| **Professional Fees Retainers Applied** | | | | | | | | | | | | | | | | | |
| Klestadt | 18,000 | 18,000 | 18,000 | 18,000 | 13,250 | 13,250 | 13,250 | 13,250 | - | - | - | - | - | - | - | 125,000 | |
| Ingerman Smith, L.L.P. | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | |
| Special Counsel - ERISA - TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | |
| RSR Consulting, LLC | 35,000 | 35,000 | 30,000 | - | - | - | - | - | - | - | - | - | - | - | - | 100,000 | |
| Chapter 11 Creditors Committee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | |
| **Total Professional Fees Cash Disbursements** | 53,000 | 53,000 | 48,000 | 18,000 | 13,250 | 13,250 | 13,250 | 13,250 | - | - | - | - | - | - | - | 225,000 | |
| **Professional Fees Incurred Not Paid Balance** | | | | | | | | | | | | | | | | | |
| Klestadt | 4,500 | 9,000 | 13,500 | 18,000 | 26,000 | 34,000 | 42,000 | 50,000 | 65,000 | 80,000 | 95,000 | 110,000 | 125,000 | 76,250 | 87,500 | 87,500 | |
| Ingerman Smith, L.L.P. | 5,000 | 10,000 | 15,000 | 20,000 | 25,000 | 30,000 | 35,000 | 40,000 | 44,000 | 16,000 | 20,000 | 24,000 | 28,000 | 17,000 | 22,000 | 22,000 | |
| Special Counsel - ERISA - TBD | - | - | 2,500 | 5,000 | 7,500 | - | 1,250 | 2,500 | 3,750 | - | 1,250 | 2,500 | 3,750 | - | - | - | |
| RSR Consulting, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Chapter 11 Creditors Committee | 12,500 | 25,000 | 37,500 | 50,000 | 60,000 | 70,000 | 80,000 | 90,000 | 98,000 | 34,000 | 42,000 | 50,000 | 58,000 | 33,500 | 41,000 | 41,000 | |
| **Total Professional Fees Incurred Not Paid Balance** | 22,000 | 44,000 | 68,500 | 93,000 | 118,500 | 134,000 | 158,250 | 182,500 | 210,750 | 130,000 | 158,250 | 186,500 | 214,750 | 126,750 | 150,500 | 150,500 | |

Draft - Confidential and Subject to Change

DOWLING COLLEGE
CHAPTER 11 CASH FLOW FORECAST
PROFESSIONAL FEES

34615.38462          34,615.38

| | Week #: 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | Weeks 16-30 Subtotal | Weeks 1-30 TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Period Ending Friday: | 3/17/2017 | 3/24/2017 | 3/31/2017 | 4/7/2017 | 4/14/2017 | 4/21/2017 | 4/28/2017 | 5/5/2017 | 5/12/2017 | 5/19/2017 | 5/26/2017 | 6/2/2017 | 6/9/2017 | 6/16/2017 | 6/23/2017 | | |
| **Professional Fees Incurred** | | | | | | | | | | | | | | | | | |
| Klestadt | 11,250 | 11,250 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 11,250 | 11,250 | 11,250 | 11,250 | 8,750 | 8,750 | 8,750 | 8,750 | 132,500 | 405,000 |
| Ingerman Smith, L.L.P. | 5,000 | 5,000 | 4,000 | 4,000 | 4,000 | 4,000 | 4,000 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 60,000 | 130,000 |
| Special Counsel - ERISA - TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 20,000 |
| RSR Consulting, LLC | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 260,000 | 680,000 |
| Chapter 11 Creditors Committee | 7,500 | 7,500 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 80,000 | 225,000 |
| **Total Professional Fees Incurred** | 43,750 | 43,750 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 32,500 | 32,500 | 32,500 | 32,500 | 532,500 | 1,460,000 |
| **Professional Fees Cash Disbursements** | | | | | | | | | | | | | | | | | |
| Klestadt | - | - | 36,000 | - | - | - | - | 83,000 | - | - | - | 36,000 | - | - | - | 155,000 | 215,000 |
| Ingerman Smith, L.L.P. | | | 16,000 | | | | | 32,000 | | | | 12,000 | | | | 60,000 | 108,000 |
| Special Counsel - ERISA - TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 20,000 |
| RSR Consulting, LLC | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 260,000 | 580,000 |
| Chapter 11 Creditors Committee | | | 24,000 | | | | | 52,000 | | | | 16,000 | | | | 92,000 | 196,000 |
| **Total Professional Fees Cash Disbursements** | 20,000 | 20,000 | 96,000 | 20,000 | 20,000 | 20,000 | 20,000 | 182,000 | 15,000 | 15,000 | 15,000 | 79,000 | 15,000 | 15,000 | 15,000 | 567,000 | 1,119,000 |
| **Professional Fees Retainers Applied** | | | | | | | | | | | | | | | | | |
| Klestadt | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 125,000 |
| Ingerman Smith, L.L.P. | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | |
| Special Counsel - ERISA - TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | |
| RSR Consulting, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | 100,000 |
| Chapter 11 Creditors Committee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | |
| **Total Professional Fees Cash Disbursements** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | | 225,000 |
| **Professional Fees Incurred Not Paid Balance** | | | | | | | | | | | | | | | | | |
| Klestadt | 98,750 | 110,000 | 80,000 | 86,000 | 92,000 | 98,000 | 104,000 | 32,250 | 43,500 | 54,750 | 66,000 | 38,750 | 47,500 | 56,250 | 65,000 | 65,000 | 65,000 |
| Ingerman Smith, L.L.P. | 27,000 | 32,000 | 20,000 | 24,000 | 28,000 | 32,000 | 36,000 | 7,750 | 11,500 | 15,250 | 19,000 | 10,750 | 14,500 | 18,250 | 22,000 | 22,000 | 22,000 |
| Special Counsel - ERISA - TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| RSR Consulting, LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Chapter 11 Creditors Committee | 48,500 | 56,000 | 37,000 | 42,000 | 47,000 | 52,000 | 57,000 | 10,000 | 15,000 | 20,000 | 25,000 | 14,000 | 19,000 | 24,000 | 29,000 | 29,000 | 29,000 |
| **Total Professional Fees Incurred Not Paid Balance** | 174,250 | 198,000 | 137,000 | 152,000 | 167,000 | 182,000 | 197,000 | 50,000 | 70,000 | 90,000 | 110,000 | 63,500 | 81,000 | 98,500 | 116,000 | 116,000 | 116,000 |

**Exhibit C**

## EXHIBIT C

## Chapter 11 Milestones and Covenants

| Chapter 11 Milestone | Completion Deadline |
|---|---|
| 1.  Petition Date | November 29, 2016 |
| 2.  Filing of Motion to Approve Sale Procedures for the Oakdale Campus[1] | November 29, 2016 |
| 3.  Filing of Motion to Approve Sale Procedures for the Residential Portfolio[2] | November 29, 2016 |
| 4.  Entry by the Bankruptcy Court of a Final Order Approving the DIP Loan and Adequate Protection | January 16, 2017 |
| 5.  Entry by the Bankruptcy Court of a Final Order Approving the Sale Procedures for the Residential Portfolio | January 16, 2017 |

---

[1] The Debtor will continue to retain A&G Realty Partners, LLC and Madison Hawk Partners, LLC, on terms acceptable to ACA to market the Oakdale Campus and the Brookhaven Campus (the "Campus Agents") and CBRE, Inc. on terms acceptable to the holders of the Series 2002 Bonds to market the Brookhaven Dorm (the "Dorm Agent"). In consultation with the Committee, the Debtor will work with the Campus Agents and ACA to develop a procedure for the marketing and sale of the Oakdale Campus with such sale procedure concluding in the entry of an order by the Bankruptcy Court approving the sale of the Oakdale Campus no later than April 10, 2017. In addition, the Debtor, in consultation with the Committee, will work with the Campus Agents and ACA to develop appropriate procedures and timelines for the sale of the Brookhaven Campus other than the Brookhaven Dorm, including, without limitation, the retention of appropriate professionals needed to review and assist the Debtor with respect to any and all zoning and title actions to prepare the Brookhaven Campus for sale.  The Debtor, in consultation with the Committee, will work with the Dorm Agent and holder of the Series 2002 Bonds to develop appropriate procedures and timelines for the sale of the Brookhaven Dorm, including, without limitation, the retention of appropriate professionals needed to review and assist the Debtor with respect to any and all zoning and title actions to prepare the Brookhaven Dorm for sale.

[2] The Debtor will continue to retain Douglas Elliman, on terms acceptable to the holders of the Series 2015 Bonds to market the Residential Portfolio (the "Residential Agent"). The Debtor, in consultation with the Committee, will work with the Residential Agent and holders of the Series 2015 Bonds to develop appropriate procedures and timelines for the sale of the Residential Portfolio, including requests for emergency or expedited relief to consummate the sale of any parcel in the Residential Portfolio that is under contract for sale as of the Petition Date.

| | |
|---|---|
| 6.  Entry by the Bankruptcy Court of an Order Approving the Sale Procedures for the Oakdale Campus | January 16, 2017 |
| 7.  Filing by the Borrower of the Proposed Liquidation Plan and Disclosure Statement | February 20, 2017 |
| 8.  Entry by the Bankruptcy Court of an Order Approving the Disclosure Statement | April 10, 2017 |
| 9.  Entry by the Bankruptcy Court of an Order Approving the Sale of the Oakdale Campus | April 10, 2017 |
| 10.  Entry by the Bankruptcy Court of an Order Confirming the Liquidation Plan | May 26, 2017 |
| 11.  Effective Date of the Liquidation Plan | June 5, 2017 |