1    UNITED STATES BANKRUPTCY COURT

2    EASTERN DISTRICT OF NEW YORK

3    Case No. 8-16-75545-reg

4    - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    DOWLING COLLEGE,

8

9              Debtor.

10

11    - - - - - - - - - - - - - - - - - - - -x

12

13                        United States Bankruptcy Court

14                        Long Island Federal Courthouse

15                        Central Islip, New York  11722

16

17                        January 10, 2017

18                        10:06 AM

19

20

21    B E F O R E:

22    HON. ROBERT E. GROSSMAN

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:   MT/DB

1    HEARING re [74] Order Scheduling Initial Case Management

2    Conference.

3

4    HEARING re [31] Final ADJ Order to Schedule Emergency Hearing

5    on  [9]  Motion for Authority to Obtain Credit Under Section

6    364(b), Rule 4001(c) or (d)  to Obtain Post-Petition Secured,

7    Superpriority Financing Pursuant to 11 U.S.C. Sections 105,

8    361, 362, 363, and 364 and (B) to Utilize Cash Collateral

9    Pursuant to 11 U.S.C. Section 363;  Adequate Protection to Pre-

10    Petition Secured Creditors Pursuant to 11 U.S.C. Sections 361,

11    362, 363 and 364 by Joseph Charles Corneau on behalf of Dowling

12    College.

13

14    HEARING re [38] ADJ Order to Schedule Emergency Hearing on

15    [14]  Motion to Sell Property of the Estate Free and Clear of

16    Liens under 11 U.S.C 363(f)  of the Debtor's Residential

17    Portfolio and Approving Such Sales of the Debtor's Residential

18    Portfolio Free and Clear of Liens, Claims and Encumbrances  by

19    Joseph Charles Corneau on behalf of Dowling College.

20

21    HEARING re [22] ADJ Motion to Authorize/Direct Pursuant to

22    Sections 105(a) and 363(b) of the Bankruptcy Code and

23    Bankruptcy Rule 9019 for an Order Authorizing the Debtor to

24    Enter Into and Perform Under Plan Support Agreement by Lauren

25    Catherine Kiss on behalf of Dowling College.

1

2   HEARING re [77] Application to Employ Application for an Order

3   Authorizing the Retention of CBRE, Inc. as Real Estate Broker

4   for the Debtor, Nunc Pro Tunc to the Petition by Lauren

5   Catherine Kiss on behalf of Dowling College.

6

7   HEARING re [126] Application to Employ Application for an Order

8   Approving the Retention of Eichen & DiMeglio, P.C., as

9   Accountants to the Debtor, Nunc Pro Tunc to the Petition Date

10   by Lauren Catherine Kiss on behalf of Dowling College.

11

12   HEARING re [127] Application to Employ Application for an Order

13   Approving the Retention of FPM Group, Ltd., as Consultants to

14   the Debtor, Nunc Pro Tunc to December 6, 2016 by Lauren

15   Catherine Kiss on behalf of Dowling College.

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
                                              Page 4

 1    A P P E A R A N C E S :

 2

 3    KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP

 4         Attorneys for Dowling College, Debtor

 5         200 West 41st Street

 6         17th Floor

 7         New York, NY 10036-7203

 8

 9    BY:   SEAN C. SOUTHARD

10

11    SILVERMANACAMPORA, LLP

12         Attorneys for Official Committee of Unsecured Creditors,

13    Creditor Committee

14         100 Jericho Quadrangle

15         Suite 300

16         Jericho, NY 11753

17

18    BY:   GERARD R. LUCKMAN

19         KENNETH P. SILVERMAN

20

21

22

23

24

25
```

1    GARFUNKEL WILD, P.C.

2          Attorneys for UMB Bank, National Association as Indenture

3          Trustee, Creditor

4          111 Great Neck Road

5          Great Neck, NY 11021

6

7    BY:   ADAM T. BERKOWITZ

8

9    MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.

10         Attorneys for UMB Bank as Bond Trustee

11         One Financial Center

12         Boston, MA 02111

13

14   BY:   DANIEL S. BLECK

15

16   CERTILMAN BALIN ADLER & HYMAN

17         Attorneys for ACA Financial Guaranty Corp., Creditor

18         90 Merrick Avenue

19         East Meadow, NY 11554

20

21   BY:   RICHARD J. MCCORD

22

23

24

25

1    SCHULTE ROTH & ZABEL, LLP.

2         Attorneys for ACA Financial

3         919 Third Avenue

4         New York, NY 10022

5

6    BY:   BRIAN PFEIFFER

7

8    STIM & WARMUTH, P.C.

9         Attorneys for Kimberly Dawn Poppiti, Creditor

10        2 Eighth Street

11        Farmingville, NY 11738

12

13   BY:   GLENN P. WARMUTH

14

15   MEYER SUOZZI ENGLISH & KLEIN, P.C.

16        Attorneys for Certain Members of the Dowling College

17        Board of Trustees, Interested Party

18        990 Stewart Avenue, Suite 300, PO Box 9194

19        Garden City, NY 11530-9194

20

21   BY:   HOWARD B. KLEINBERG

22

23

24

25

1    UNITED STATES DEPARTMENT OF JUSTICE

2         Attorney for the U.S. Trustee

3         560 Federal Plaza

4         Central Islip, NY 11722

5

6    BY:   CHRISTINE BLACK

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Good morning.  Please be seated.

 3              CLERK:  Matters on Dowling College.

 4              MR. SOUTHARD:  Good morning, Your Honor.

 5              THE COURT:  Good morning.

 6              MR. SOUTHARD:  Sean Southard of Klestadt Winters

 7    Jureller Southard & Stevens on behalf of Dowling College, the

 8    Debtor-In-Possession.  Your Honor, with me this morning is

 9    Robert Rosenfeld, the Chief Restructuring Officer of Dowling

10    College.

11              MR. KLEINBERG:  Good morning, Judge.  Howard

12    Kleinberg, Meyer Suozzi, for Dowling Board Members.

13              MR. LUCKMAN:  Good morning, Your Honor.  Gerard

14    Luckman, SilvermanAcampora, proposed counsel to the Official

15    Committee of Unsecured Creditors, and with me today is Kenneth

16    Silverman.

17              MR. SILVERMAN:  Good morning, Your Honor.

18              MR. PFEIFFER:  Good morning, Your Honor.  Brian

19    Pfeiffer from Schulte Roth & Zabel for ACA Financial.

20              MR. MCCORD:  Richard McCord, also.

21              MR. BERKOWITZ:  Good morning, Your Honor.  Adam

22    Berkowitz of Garfunkel Wild on behalf of the UMB Bank as Bond

23    Trustee, and I have with me today Daniel Bleck from Mintz

24    Levin, who is here on behalf of Mr. Hamill.  We would ask Your

25    Honor, given the timing, that Mr. Bleck be allowed to appear
```

Page 9

1      today.  I didn't have an opportunity --

2                THE COURT:  That's fine.

3                MR. BERKOWITZ:  Thank you.

4                THE COURT:  That's fine.

5                MR. BLECK:  Good morning, Your Honor, thank you.

6                THE COURT:  Good morning.

7                MS. BLACK:  Good morning, Your Honor, Christine

8      Black, Office of the United States Trustee.

9                MR. WARMUTH:  Glenn Warmuth, Stim & Warmuth for

10     Kimberly Poppiti.  Good morning, Your Honor.

11               THE COURT:  Okay.  Anybody on the phone?

12               CLERK:  No, that should be it.

13               THE COURT:  Okay.

14               MR. SOUTHARD:  Good morning, Your Honor.  Again, for

15     the record, Sean Southard on behalf of the Debtor.  Your Honor,

16     we filed a proposed agenda yesterday and with Your Honor's

17     permission, would propose to take matters in that order --

18               THE COURT:  Fine.

19               MR. SOUTHARD:  -- this morning.  Your Honor, first

20     and foremost, there is, scheduled this morning by Your Honor's

21     order, an initial case conference, which is designed to let

22     Your Honor and other parties understand various events that

23     have -- are taking place and are expected to take place in the

24     case.  Since we have been before Your Honor now on a couple of

25     occasions, with various substantive matters, I think many of

1   the items that are typically discussed at the case conference

2   have already been taken up and discussed with Your Honor.  But

3   I thought what might make some sense is to give Your Honor a

4   brief update on some items that have taken place since we were

5   last before you.

6          Your Honor, the -- Your Honor entered at the last

7   hearing, or following the last hearing, the order approving

8   certain bid procedures and a sale process for the Oakdale

9   Campus.  Your Honor, that notice, in relation to those bid

10  procedures and the sale process, has gone out very broadly by

11  the agents that were retained, both A&G Realty and Madison

12  Hawk, to sell that campus.  In addition, my office has caused

13  that sale notice to be published, as was required by Your

14  Honor's order, and we will soon be filing certificates to that

15  effect on the docket, evidencing that broad notice and

16  publication.  We have had a good deal of interest to date, and

17  continues to be more as we now are on the other side of the

18  holiday season, and we are hopeful that, with those good

19  efforts, we will have a very robust process to bring before

20  Your Honor, ultimately, in the latter part of March.

21         Your Honor, the creditors' meeting under § 341 was

22  held last Friday.  The Debtor appeared, through Mr. Rosenfeld,

23  and answered questions of the U.S. Trustee concerning the

24  Debtor's estate and financial matters.  There were also some

25  creditors, both individual creditors and through counsel who

1  appeared and asked various questions.  That meeting of

2  creditors was successfully closed at the conclusion of Friday's

3  proceeding.  Your Honor, today, later today, we expect to file

4  an initial report relative to the restricted assets that exist

5  in cash, or in securities, in various of the Debtor's bank

6  accounts.  Your Honor will recall that we had proposed, as part

7  of our cash management process, to, in essence, further

8  investigate the potential restrictions associated with certain

9  of those accounts and report to Your Honor and to other parties

10  in interest, including the New York State Attorney General's

11  Office, concerning our beliefs as to the restrictions.  And so,

12  today is the deadline for that to happen, and I do expect that

13  we will make an initial report in that respect.

14        We have also had various discussions with the New

15  York State Attorney General's Office concerning our initial

16  review of those restrictions, and they are very much involved

17  and interested in the outcome there.  So, I would expect we

18  will have further discussions before Your Honor, probably

19  outside of Your Honor's purview, concerning those restrictions

20  and ultimate disposition of those funds, but I wanted to bring

21  that to the Court's attention.

22        THE COURT:  All right.

23        MR. SOUTHARD:  Your Honor, we have recently filed a

24  motion to approve a claims bar date.  The proposed general bar

25  date in the motion is March 10th, and the governmental bar date

1    would be set by statute as May 30th of 2017.  That form of bar

2    date application has been reviewed by the creditors, both

3    unsecured and secured, and it's consented to inform, and we

4    would ask, at some point in the near future, that Your Honor

5    consider entering that order to establish that bar date.

6          Your Honor, in terms of other matters in the near

7    term, the Debtor, later this week, is due to answer the Warren

8    Act complaint in the adversary proceeding that was filed,

9    basically, on the second day of the case.  That answer is due

10    on Friday of this week.  At some point, I think we may consider

11    talking to Your Honor and our adversary about the potential for

12    mediation if we're unable to potentially resolve that matter,

13    but I think it's somewhat premature for us to discuss that at

14    this time.

15          THE COURT:  Well, part of the issues there is,

16    they're seeking a class certification.

17          MR. SOUTHARD:  They are, Your Honor, and I don't

18    think the Debtor is likely to have any opposition to the class

19    certification request.  It is, frankly, viewed as more

20    efficient by the Debtor for that to happen.  I think the

21    concern from the Debtor's perspective is one of resources and

22    ultimately where that claim will lie if and when allowed in

23    whatever amount it may be allowed at --

24          THE COURT:  I think a couple of years ago -- we

25    actually are one of the few courts that had some history with

1    class certifications.  So, it's not necessarily brand new to

2    us.

3            MR. SOUTHARD:  Okay.  Well, we will certainly look

4    into that further, Your Honor, but that matter is really the

5    only pending litigation before Your Honor at this point in time

6    in the context of the Chapter 11 case.

7            One other item that I bring to Your Honor's attention

8    in relation to this case status conference is, the Debtor has

9    sought, informally, and without formal process, information

10   from the third party administrators in relation to both the

11   healthcare plan, the self-funded healthcare plan, and the

12   dental plan, and unfortunately, we are unable to get the

13   information from those parties that we require informally, and

14   so, I believe in very short order, we will be filing a motion

15   seeking discovery under Bankruptcy Rule 2004 to obtain that --

16           THE COURT:  They won't give you your own information?

17           MR. SOUTHARD:  They have indicated, Your Honor, that

18   in order to complete the information processing and provide us

19   the information that they see fit, they need to be paid for

20   their services, and we are not presently in a position to pay

21   them what they believe to be due, most of which is pre-petition

22   in nature, and as a result, we are at a -- somewhat of a

23   crossroads, and believe that they have, however, information

24   that may be in raw form or unprocessed form that would

25   nonetheless be relevant to the Debtors and to the Committee,

1  frankly, in understanding the claims base.

2         THE COURT:  All right, well, that needs to be moved

3  quickly because the consequences of that obviously affect lots

4  of people and dollars.  So, if you can't resolve it, don't

5  waste a lot of time, just tee it up and we'll get it resolved.

6         MR. SOUTHARD:  Thank you, Your Honor.

7         THE COURT:  All right.

8         MR. SOUTHARD:  And that, Your Honor, concludes, at

9  least from the Debtor's perspective, what we wanted to discuss

10  at this case conference this morning, and unless any other

11  party wanted to be heard concerning the case status, or if Your

12  Honor had any questions for us, I would propose to move through

13  the agenda.

14         THE COURT:  Anybody wish to be heard on the general

15  issues?  Okay, let's go.

16         MR. SOUTHARD:  Thank you, Your Honor.  So, the first

17  motion on this morning's calendar is docketed at No. 77, and

18  that is the Debtor's application for an order authorizing the

19  retention of CBRE, Inc., as real estate broker for the Debtor

20  nunc pro tunc to the petition date.  Your Honor, we previously

21  discussed the different brokers that the Debtor was seeking to

22  retain at both the first day and, I think, the second day

23  hearings, and CBRE and its retention really focus on the

24  Debtor's dormitory facility that is located at the Brookhaven

25  campus.  As we've previously discussed with Your Honor, the

1    dormitory facility is approximately 72,000 square feet.  It's

2    located on two acres within the Debtor's Brookhaven campus, and

3    the proposal here to retain CBRE is really based on their

4    expertise in disposing of student housing and what we propose

5    is a retention under § 327 and § 328, similarly styled to the

6    retentions that Your Honor has previously approved for other

7    agents, with a 4 percent commission to be paid out of the sale

8    proceeds.  But that having been said, CBRE would nonetheless be

9    required to file a fee application with Your Honor and have

10   that be heard.  The -- we believe the terms of the retention to

11   be industry standard.  The Committee has reviewed the

12   application and has no objection.  Likewise, I understand the

13   U.S. Trustee's office has no objection to this retention, and

14   we would ask that Your Honor approve it.

15             THE COURT:  Anybody wish to be heard?  The Court will

16   grant the motion.

17             MR. SOUTHARD:  Thank you, Your Honor.  The next item

18   on this morning's calendar is the Debtor's motion docketed at

19   No. 126, and that is the Debtor's application for an order

20   approving the retention of Eichen & DiMeglio, P.C., as

21   accountants to the Debtor nunc pro tunc to the petition date.

22   Your Honor, the Eichen & DiMeglio retention relates to the

23   Debtor's need for audit and the preparation of financial

24   statements in relation to its defined contribution retirement

25   plan that it expects to wind down, and as a precursor to

1  winding that down, these audits and financial statements need

2  to be completed.  The proposed retention terms provide for

3  Eichen & DiMeglio to be paid a fixed fee of $15,000 per annual

4  audit for the years 2015 and 2016, which are the two years that

5  are required, and thereafter, to the extent they offer hourly

6  services outside the scope of those audits in relation to

7  termination and the wind down of the plan, that they be paid on

8  an hourly basis for those matters.

9           Your Honor, the -- like the CBRE retention, both the

10  Committee, and I believe the U.S. Trustee's office have had the

11  opportunity to review these applications and I understand there

12  is no objection, although I will note for the record, that the

13  Committee asked a question and I think it's a good one, about

14  whether or not there may be plan assets available in that

15  defined benefit plan to potentially pay the fees of Eichen &

16  DiMeglio in relation to the audit services, and I think the

17  Debtor's position on that is, to the extent there are such plan

18  assets under law that are available to pay those fees, that we

19  would first look to have those fees paid from the plan assets

20  before having this estate incur those fees.

21           THE COURT:  Yeah, I wrote a decision on this years

22  ago, in the Robert Plan, which I think is -- not all of it, was

23  adopted, and you can take a look there, and there are regs on

24  this.  It is a Byzantine world of, when DOJ believes --

25  Department of Labor, actually, believes they have a say in the

1    fees that are being paid to the folks who wind these down, and

2    they argued that I had no right to make that decision.  I

3    argued I did, and I think, at least in part, I'm right.  But

4    you will have no problem with the order, but just remember that

5    the Department of Labor oftentimes comes in and says, "Even

6    though you all agreed to pay X," and this number's not big

7    enough that I don't think it's going to matter to them.  But

8    they -- they believe, I think, that the right to set fees -- I

9    can retain them, but the right to set the fee is theirs.  We

10   have disagreed on that.  It hasn't come up again.  So, with

11   that caveat, if nobody objects, I'll grant the motion, but I

12   caution you as to that issue.

13            MR. SOUTHARD:  Thank you, Your Honor.  Your Honor,

14   the next item on this morning's calendar is the Debtor's

15   application docketed at No. 127 seeking an order approving the

16   retention of FPM Group, Ltd., as consultants to the Debtor,

17   nunc pro tunc, to December 6, which is the date of their

18   engagement agreement.  Your Honor, FPM Group, Ltd. is a

19   consulting group that is the Debtor's chosen consultant to

20   assist the Debtor in relation to certain planning that it

21   believes is required in order to maximize the value of the

22   Brookhaven campus.  The FPM Group, in terms of expected

23   services, will work with the Debtor to develop what it believes

24   to be the best alternative permitted uses for the Brookhaven

25   campus, and ultimately interface with the Debtor, the secured

1    creditors and the Committee, concerning those alternative uses

2    and options that it sees, and then ultimately work with and

3    discuss those options with the town planning board, with the

4    goal of coming up with alternative uses that will ultimately

5    maximize the value in relation to a sale process, which is

6    expected to occur after this initial planning and alternative

7    use investigation occurs.

8            The terms of FPM Group's retention are set forth in

9    the engagement agreement, as well as the application.  FPM will

10   ultimately require the assistance of a subcontractor, which is

11   VHB Engineering, Surveying and Landscape Architecture, P.C.

12   VHB will be paid certain -- for certain discrete services

13   related to the master planning, and related to a traffic plan

14   and concerning the environmental impact of these potential

15   alternative uses.  The Debtors are proposing to provide for VHB

16   as a subcontractor to be paid as an expense for FPM such that,

17   under the terms of Your Honor's interim compensation order,

18   those expenses to the subcontractor would be paid 100 percent,

19   as opposed to a holdback of 80 percent.  The concern there

20   derives from the fact that --

21           THE COURT:  Why are we doing, indirectly, what I told

22   you you can't do directly?  If a fee is to have an 80 -- a 20

23   percent holdback, converting what is a fee into something

24   called an expense and then saying the expense is 100 percent, I

25   don't understand why the UST or anybody else isn't objecting to

1    that.

2             MR. SOUTHARD:  Your Honor, there was -- there was

3    concern by FPM that they will not be able to secure the

4    services of this subcontractor, who is otherwise unfamiliar

5    with bankruptcy process and holdbacks and the like, and

6    ultimately, we may not be able to secure their services, which

7    are needed in relation to this plan.

8             THE COURT:  Well, the -- the people who want -- want

9    to get this done are the secured creditors.   The secured

10   creditors can tell FPM they'll be good for any spread, but to

11   change the entire process that we use by converting a

12   professional, in theory, and claiming that their -- that their

13   fees are expenses and therefore exempt from a holdback is not

14   something I'm -- I'm not going to change the whole world

15   because some guy is insecure about whether he's going to get 20

16   percent of his money.

17            MR. SOUTHARD:  I do understand Your Honor's viewpoint

18   on that.  We did -- we did spend time working with the

19   Committee and explaining why the Debtor felt this was going to

20   be needed and ultimately, I believe, that the Committee's

21   position was, so long as there was no markup by our retained

22   professional, which is FPM, of their subcontractor's services

23   for these discrete matters, that they were okay with this being

24   considered an expense as opposed to a fee.

25            THE COURT:  So, then you don't need my order.  Just

1    tell them that the Committee says it's okay and go ahead.

2            MR. SOUTHARD:  Well, I'm just explaining to Your

3    Honor, I'm not suggesting that Your Honor doesn't have --

4            THE COURT:  I know, and I'm not trying to be -- well,

5    I probably am.  No, I'm not changing the way the world works,

6    because if I do it once, then there's no reason not to have

7    somebody else say, "Let's do it again."  FHM or whatever the

8    name of this -- FPM, which I can't figure out whether they're

9    hourly or fixed fee, because the application is confusing --

10           MR. SOUTHARD:  It's a combination.

11           THE COURT:  -- they want to enga -- they want to

12   engage a sub to do work.

13           MR. SOUTHARD:  Yes.

14           THE COURT:  Assuming FPM is a legitimate company, FPM

15   can seek reimbursement for its expenses but they're on the hook

16   to the other one.  And if people can't live with that, then

17   tell them to go get somebody else.

18           MR. SOUTHARD:  I -- I understand Your Honor's

19   permission.  I think we need -- or Your Honor's position.  I

20   think we need to speak with FPM, but what I would ask for Your

21   Honor to do today is to approve the retention, subject to them

22   -- FPM and VHB, following the 80/20 protocol.

23           THE COURT:  Well, you're not asking me to retain -- I

24   don't think --

25           MR. SOUTHARD:  I am not asking you to retain VHB.

1    THE COURT:  VH -- so, I have nothing to do with them,

2    and there's nothing going to be in the FPM order that

3    indirectly accomplishes what I'm telling you you can't do.  So,

4    if you just want me to retain FPM, and you can clarify that

5    FPM, how they're being paid, that's fine.  But -- I mean, is it

6    your theory that I should approve VHB's fees?

7    MR. SOUTHARD:  Your Honor, no.  It's not -- it's not

8    our --

9    THE COURT:  But if it becomes an expense, I am.  And

10   why do I -- why am I going to start approving subs?  Why does

11   the Court -- going to retain the sub of FPM?

12   MR. SOUTHARD:  Your Honor -- so, a little background

13   is, perhaps, relevant.  We -- when we first had this proposed

14   retention and this issue to discuss, we considered the

15   possibility that these folks were in fact, more ordinary course

16   in nature of service providers, and discussed that view with

17   the U.S. Trustee's office.  Out of an abundance of caution, we

18   were urged to proceed under § 327, which we did.  We are, in

19   essence, trying to, you know, fit a square peg into a round

20   hole on this one, to a certain extent.

21   THE COURT:  Right.

22   MR. SOUTHARD:  So, you know, I think that what we

23   were trying to do with -- with -- with this retention was to

24   make clear that the subcontractor, again, could be treated as

25   an expense and -- by FPM and therefore, reimbursed at 100

1    percent, subject to a fee application that would have to take

2    place, ultimately, before Your Honor.  But if that position,

3    which we -- we wanted to bring to your attention and by no

4    means keep out of the record, was to be -- and I hear it to be

5    unacceptable, then I think what I would do is ask for Your

6    Honor to retain FPM, subject to standard procedures on the

7    interim compensation and ultimately a fee application --

8              THE COURT:  I don't have any problem with that.  Does

9    anybody object to that?  So, as long as we're divorcing the

10   question of the relationship of this VH -- I keep saying VH-1.

11   VH whatever this is.  FPM is fine, we'll grant that motion, and

12   you can figure out how to handle VHB, or they can.

13             MR. SOUTHARD:  Thank you, Your Honor.

14             THE COURT:  All right.

15             MR. SOUTHARD:  To the extent we have continuing

16   issues with those parties, we will undoubtedly talk to Your

17   Honor again about it, but I appreciate the approval.

18             Your Honor, moving along, then, to the next item on

19   the calendar, and this is a matter that Your Honor has

20   considered, in part, on prior occasions, and that is docketed

21   at No. 14, and that's the Debtor's motion seeking approval of

22   certain sale procedures related to the Debtor's residential

23   portfolio.  Your Honor, this is a motion that we have discussed

24   with Your Honor previously, and I would say, at the last

25   hearing, Your Honor was prepared to approved and did, in fact,

1    approve of the disposition and sale by pre-petition contracts,

2    eight of the 32 parcels that are included within the

3    residential portfolio.  What you were not prepared to do at the

4    last hearing was to approve proposed procedures, relative to

5    the future sale, post-petition sales, of the remaining 24

6    parcels.  And what we have done on the Debtor's side is discuss

7    that view and concerns with the Committee as well as with the

8    lender that has a first lien on those parcels, and have come up

9    with a slightly revised procedure that we have presented to

10   Chambers by proposed order, and we'd like to talk to Your Honor

11   about this morning, briefly.

12          Those proposed procedures really just make a couple

13   of changes, and what they do is, they make very clear that the

14   Debtor is going to be consulting with the Committee in relation

15   to the ultimate sales and the pricing for the listing of those

16   residences as part of these procedures.  The Committee, in

17   essence, is helping to assure that the Debtor's business

18   judgment is sound in relation to market value, by including

19   them clearly in the consultation.  In addition, what we propose

20   to do is, instead of just giving notice of that sale and the

21   pricing to sale, to the interested parties that are involved in

22   the case, instead, we would actually docket that notice, and it

23   would be on the docket for the world to see, with the same kind

24   of proposed ten-day deadline to lodge an objection, after

25   which, if there were no objection, the Debtor would certify,

1     again, by statement on the docket --

2              THE COURT:  Who has title to these houses?

3              MR. SOUTHARD:  The Debtor does, Your Honor.

4              THE COURT:  Who?

5              MR. SOUTHARD:  Dowling College.

6              THE COURT:  Dowling College owns 24 hours --

7              MR. SOUTHARD:  Correct.

8              THE COURT:  -- not an SP and not a --

9              MR. SOUTHARD:  Dowling College.

10             THE COURT:  So, the -- the name on the deed is what?

11    I mean, not generally, but --

12             MR. SOUTHARD:  Dowling College is conveying title

13    under the deeds.

14             THE COURT:  So, Dowling bought them?

15             MR. SOUTHARD:  Correct, Your Honor.

16             THE COURT:  And then Dowling gave a mortgage to

17    whomever?

18             MR. SOUTHARD:  Dowling provided a mortgage to the

19    2015 bond -- indentured Trustee for the 2015 bonds, and that

20    indenture --

21             THE COURT:  And who are the issuers of those bonds?

22             MR. SOUTHARD:  I'm sorry?

23             THE COURT:  Who is the issuer of those bonds?

24             MR. SOUTHARD:  Dowling is the issuer of those bonds.

25             THE COURT:  Yeah, but --

1          MR. SOUTHARD:  They -- those are the only taxable

2     bonds, as opposed to the tax exempt bonds that Dowling

3     otherwise is a party to.

4          THE COURT:  Is this the Town of Brookhaven?

5          MR. SOUTHARD:  No, the Town of Brookhaven issued --

6     was the issuer for the conduit bonds, or the tax exempt bonds,

7     for certain of Dowling series -- these are, in fact, taxable

8     and Dowling -- the 2015s are taxable, and Dowling was the

9     issuer of those bonds.

10          THE COURT:  So, Dowling bought the houses --

11          MR. SOUTHARD:  Your Honor, maybe this would be some

12     helpful background.

13          THE COURT:  The only reason I'm thinking about it is,

14     as we go forward, the assumption here, which everybody seems to

15     agree with but I can't figure out, is that the mortgagee on

16     these things now, on the -- all these houses, is one of these

17     bond offerings.  But the proceeds of the bond offering -- was

18     that what was used to buy the houses, or did they just loan

19     Dowling College money --

20          MR. SOUTHARD:  No --

21          THE COURT:  -- but which Dowling hocked, generically,

22     the homes?

23          MR. SOUTHARD:  Your Honor, this was the background I

24     wanted to give you, and that is that, prior to the 2015 taxable

25     bond financing, TD Bank had a first mortgage associated with

1    these same residences, and that, in 2015, Dowling required

2    financing to both provide working capital and to refinance the

3    TD mortgages that were outstanding.  In essence, TD was

4    unwilling to further lend against the -- what was considerable

5    value associated with those residences, and ultimately, the

6    2015 taxable bonds financing was effectuated and it took out

7    the TD loans and replaced TD's mortgages with mortgages in

8    favor of the 2015 indentured bond trustee.  It was -- it was,

9    in essence, a takeout of TD and, in addition to just taking out

10    TD for what was roughly $3 million dollars, there was an

11    additional, roughly, $6 million dollars in working capital made

12    available to Dowling --

13            THE COURT:  Was Dowling responsible for the real

14    estate taxes or was it tax exempt?

15            MR. SOUTHARD:  Dowling was responsible for the real

16    estate taxes for these particular parcels because of their use

17    in a commercial sense.  They were rented, they were not, like

18    the campuses, tax exempt.

19            THE COURT:  So, they're not-for-profit entered into a

20    for-profit transaction for which it paid real estate and other

21    taxes?

22            MR. SOUTHARD:  I don't know that I would characterize

23    it as a for-profit transaction, but the bond issuance was not

24    tax exempt.  It was a traditional, taxable bond issuance.

25            THE COURT:  And the proposal is that, upon sale, the

Page 27

1    proceeds of all of these houses go directly to whom?

2            MR. SOUTHARD:  To pay down the first lien debt, which

3    is the indentured trustee for the 2015 bonds.

4            THE COURT:  Because the Debtor and the Committee and

5    everybody else has satisfied themselves that the lien of the

6    bond of the trustee is in full force and effect?

7            MR. SOUTHARD:  The Debtor has satisfied itself to

8    that effect.  I believe that the Committee understands that

9    they still have their challenge right, by virtue of the DIP

10   financing, which we'll speak to Your Honor about very soon, and

11   so, subject to that challenge that is expected to exist in

12   relation to DIP financing, they are agreeable to the proceeds,

13   during the interim, being paid to the 2015 indentured trustee.

14           THE COURT:  And the financing, it was a traditional

15   mortgage?  Their mortgage was recorded on these things?

16           MR. SOUTHARD:  Correct, Your Honor.  There are

17   mortgages on each of the residences.  Indeed, there are,

18   actually, second mortgages on those residences, in favor of the

19   2002 and the 1996 bonds.

20           THE COURT:  Okay.  I mean, okay, I understand what

21   you're saying.  All I'm being asked to do today is approve a

22   process for liquidating this asset -- these assets -- and, at

23   least on eight of them, permitting the Debtor to transfer title

24   to individual homeowners?

25           MR. SOUTHARD:  That's correct, Your Honor.

1       THE COURT:  Anybody want to be heard?  Well, there's

2   no objections that have been -- well, actually, there was, but

3   we've dealt with that in the past.  There's a limited objection

4   by Powerhouse, but --

5       MR. SOUTHARD:  Yes, Your Honor.  There was a -- what

6   we've previously discussed was a -- a statement of rights, in

7   essence, and a request for adequate protection of that judgment

8   creditors' claim, and I think it -- to be fairly clearly

9   established that they're out of the money as it relates to

10  these sales.

11      THE COURT:  I'm still not -- it's my fault because I

12  don't understand it.  I understand how traditional financing

13  works and I understand bonds, to some degree.  But the bond

14  issuer, which is Dowling, granted a mortgage to itself.

15      MR. SOUTHARD:  No, Your Honor, it -- it granted --

16      THE COURT:  No, and it didn't, it granted the

17  mortgage to people who put up -- yeah, I got it

18  (indiscernible).

19      MR. SOUTHARD:  To the indentured trustee, Your Honor.

20      THE COURT:  I got it.  I'm -- okay.  If there's no

21  objection, the Court will grant that motion.

22      MR. SOUTHARD:  Thank you, Your Honor.  Your Honor,

23  and that, I believe, brings us to the last item that we intend

24  to proceed with this morning, Your Honor, on the calendar, and

25  that is the Debtor's motion to approve Debtor-In-Possession

1     financing and use of cash collateral, which the motion was

2     docketed at No. 9 on the docket.  Your Honor, the other item

3     that was on the calendar for today, which has essentially been

4     subsumed within the DIP financing was the Debtor's motion

5     docketed at No. 22, to approve a plan support agreement, and

6     the parties do not intend to go forward with that, on the

7     belief that that is now subsumed within the DIP financing

8     request.

9               Your Honor, the -- in relation to DIP financing and

10    use of cash collateral, the Debtor has consistently stated its

11    need for post-petition financing to continue the limited

12    operations that it has to maintain its properties and to pay

13    the administrative costs of the Chapter 11 case while it

14    undertakes this process that is designed to maximize value for

15    all involved in the Debtor's Chapter 11 case.  Your Honor has

16    previously approved and entered two orders related to this

17    motion, and those were styled as emergency orders.  The last

18    order entered provided that approval through today's hearing or

19    pending today's hearing on a -- based on a budget that

20    concludes at the end of this week.

21              Your Honor, the hearing for today was noticed as a

22    final hearing in relation to this request for financing, and

23    the Debtor docketed a proposed form of final order and a

24    revised budget for final -- for the final period in question,

25    yesterday.  That budget is approved in discussions with the

1   Committee and the DIP lenders and the major or material change

2   from the original version of that full budget that was filed

3   with the motion involves the reduction of the fee to be paid to

4   the DIP lenders, which was originally $200,000 is now $100,000,

5   as well as an increase to the line item associated with the

6   Committee professionals, so that they can do their work in the

7   case.

8           Your Honor, we have had extensive discussions among

9   the parties off the record related to the relief that the

10  Debtor seeks here with both the Committee and the DIP lenders,

11  and indeed, those discussions continued this morning before

12  this hearing.  All those parties, I'm sure, will and are

13  capable of speaking for themselves, but from the Debtor's

14  perspective, it seems that the DIP lenders here really desire

15  the finality associated with a final order to protect the

16  advances that they're making and in exchange for what they

17  consider to be pretty standard protections, including a

18  starting of the challenge clock consistent with the local

19  rules, 506(c) and 553 waivers, and that is, compared to the

20  Committee's view, which I think was stated in a limited

21  objection that was filed, and that is that, you know, the --

22  maybe it's too early for a final order at this time, and

23  perhaps, they suggested a more comprehensive case settlement or

24  a bargain should be struck before we go to a final order.  And

25  I think, you know, we have the sense, certainly, that Your

1    Honor has his own concerns about understanding, maybe, more of

2    the facts surrounding this motion and the requested relief.

3           So, what everyone has agreed to, at this point, other

4    than Your Honor, is a form of order that's really designed to

5    be a compromise in light of these present dynamics, and that

6    involves having the order be styled as a final, really, to,

7    among other things, formally start the challenge clock, which,

8    again, the Committee and the DIP lenders all agree to, and is

9    consistent with the local rules, but limit the application of

10   any waiver under § 506(c) and reserve, for a later date, any

11   552 waiver, I believe, under the theory that the Committee and

12   the lenders will continue to discuss, and hopefully, reach a

13   compromise between them, that I hope, on behalf of the estate,

14   will allow us all to, hopefully, pull oars in the same

15   direction in relation to the sales that we all need to see

16   accomplished here.

17          So, one of the other items that was discussed this

18   morning, and I think is now in agreement and it's the -- the

19   only real difference in the proposed form of order that was

20   docketed, and which Your Honor's Chambers has seen, that

21   involves the Debtor's stipulations associated with the

22   challenge period.  And what it -- what we're proposing, in

23   essence, is that, instead of having the Debtor stipulate and

24   acknowledge various, you know, extent, priority, validity, lien

25   challenge-type items, as enumerated in the order, what we would

1    instead do is treat those as lender assertions, and those

2    lender assertions would, in effect, go hard in the same sense

3    that they would as stipulations if no challenge is lodged by

4    the challenge deadline.  But that, I think, what it does is, it

5    takes the Debtor off of the stipulation on the front end --

6              THE COURT:  Let me ask you a question.  Four months

7    from now, if there's a class action, the adversary that's filed

8    is amended to want to include a provision that the lenders, in

9    this case, the bond -- should be equitably subordinated.  Can

10   they do it?

11             MR. SOUTHARD:  If, four months from now, that occurs

12   and the --

13             THE COURT:  No challenge was raised during the 6070,

14   can they do it?

15             MR. SOUTHARD:  I -- I don't believe they could if

16   this order is entered, Your Honor.

17             THE COURT:  So, you want me to preclude third

18   parties, unknown parties, in -- in a non-traditional case,

19   students, teachers, a universe of folks, who may not, at this

20   point, have had an ability, time, money, to study what issues

21   exist.  They come into this Court down the road and you want me

22   to say, "Sorry, you may have a good cause of action but it's

23   gone, because it was contained in an order that you entered,"

24   me, "four months ago."

25             MR. SOUTHARD:  I believe the proposed form of order

1    would -- would do that, Your Honor.

2              THE COURT:  All right.  And you all -- all of you,

3    seemingly agree that that is doable.  I mean, it's doable, I

4    can put my name on anything.  But that, to me, is a place that

5    I'm not going to unless I can be convinced, and I am not

6    convinced, even though everybody else seems to be, of the

7    purpose.  This isn't a cash collateral order.  There is no cash

8    collateral.  This thing doesn't produce a penny.  This is a DIP

9    order, and the DIP order is essentially to finance post-

10   petition interest -- that's not the right word, interest

11   payments, to the secured lenders, when I'm not sure they're

12   entitled to them in the first place.  Because nobody's

13   established whether this case is under water or not, and if

14   it's under water, they're not entitled to post-petition fees,

15   nor are they entitled to post-petition interest, and for the

16   Debtor to borrow it, pay a premium and then give up a whole

17   series of rights on behalf of creditors to get something it

18   doesn't need in the first place, troubles me.

19             I understand the administrative expenses, I

20   understand FPM or whatever this is.  I understand subdivisions,

21   I understand all those things that the Debtor needs, that can

22   increase the value of the property, and then whether or not

23   that results in a distribution, that's the game we all play.

24   It may or may not.  But, a normal person would say, "I don't

25   have the money to pay that, I'm going to borrow it, and for

1    that, I'm going to give that lender certain rights, because

2    he's the only person who will lend me the money."  But to go

3    beyond that and say, "And, I'm going to borrow money that is

4    absolutely, I can't see, of any benefit to a liquidating

5    Debtor, so that a secured creditor can credit on its own books

6    an interest payment that it loaned to itself so that it can

7    make a distribution to bondholders for whatever real" -- ever

8    purpose, I don't know the purpose, "let them just do it if they

9    want."  But I'm not convinced that this Court, knowing what I

10   know today, which is limited, in the embryonic stage of a case,

11   is prepared to grant that relief.  And if somebody wants to

12   say, "Then we'll destroy the," you know, people do it all the

13   time.  I can only do what I think is right.

14          So, I'm going to give you the opportunity, because

15   again, you all agree that this is okay.  It is generally a

16   business decision, it is generally the rights of the parties to

17   reach these conclusions, and if it's not a violation of some

18   statute or Congress says I should do, or some -- then the Court

19   can make its position known, going to build a record, and I

20   still always have the one piece that we always maintain, which

21   is I pay all the fees.  And so, I'm going to have a record, you

22   all are going to go on record as thinking this is a really good

23   idea, I'm going to look and see if I agree.  I may sign the

24   order, but I'm telling you today that my instincts are, this is

25   not a really good thing to do, and I'm telling you today that

1    if my instincts end up correct, I pay the fees, guys.  All of

2    it.  And anything you've gotten to date is an interim.  And

3    I've been clear about this for years, my view of lawyers -- and

4    I was on your side for many, many years, I understand the

5    process.  I don't think you should work for nothing, I don't

6    think you're a guarantor of results.

7            But in cases where the secured creditors exercise

8    this form of, to me, overreaching on potential litigation, not

9    protecting their money -- I understand protecting your money.

10   But if you read the adversary file, and I don't know it's

11   anything more than a novel.  I have no idea.  and they made

12   this appear.  But the tenor of that complaint raises questions

13   about both the administration of the college, its relationship

14   to the borrowings, the issuer's relationship.  Again, it could

15   be a novel.  I'm not giving it cred -- but they say it.  and

16   for them, because they haven't articulated the specific cause

17   of action but they've alluded to one, to say that I'm aware of

18   that and now going to sign an order that prevents them from

19   possibly moving on that cause of action, in a case which is not

20   -- this is not a traditional -- nor do you want it to be.

21           This is a not-for-profit case.  It is an unusual

22   case, we haven't had many similar kinds of universities or

23   colleges seek Chapter 11 relief.  There's a benefit to doing

24   the process because it's a tremendous amount of value that's

25   locked up in this land, and if you could put one house on it,

1    it's worth $1.80.  If you can put 400 houses on it, it's worth

2    a huge amount of money.  And the tension of how you get there

3    and how quickly you get here is why you're here.  It's the

4    right place to be, I think, to maximize value.  But let's not

5    be overly aggressive, in my mind, precluding people from having

6    rights that they may not realize yet, and knocking them out

7    before they realize they have them.  That's my problem.  It's a

8    due process question.  Now, you can tell me they got served,

9    and they did, I'm sure, and they can read and they have lawyers

10   and all of -- we've all been there.  And something changes, and

11   then somebody comes in and says, "You signed an order, Judge.

12   It's your order that I'm holding up in front of you as to why

13   these people's rights have been limited."

14          And I may.  I may.  That's the job I took.  So, I'm

15   not afraid to do that, but you all are going to put a record on

16   and have some -- and I'm not doing it by proffer, as to why the

17   Debtor needs all this money, what the consensus was, what the

18   negotiation was, and why you think what you're giving up to the

19   lender with regard to not the protection of his money, I

20   understand that.

21          Now, why he's getting protection if he's the secured

22   creditor on all the assets today and no one else has a position

23   that can get in between that, he's priming himself, which is

24   bizarre.  So, what he's worried about is there is somebody

25   else, that we don't know about, that can step in.  That's who

1    I'm worried about.  I'm not worried about the secured lender.

2    They're big boys, they can take care of themselves.  If they

3    have valid, enforceable liens, go with it.  I'm not even

4    worried about giving them a future lien, a replacement lien, on

5    administrative, on expenses that are necessary to the

6    development of the -- to the project.  I am concerned, when I

7    have a $5 million-dollar potential and three of that, or

8    approximately, is a bookkeeping entry.  I'm going to give you

9    money that I'm going to book in my account.  Is he even

10   transferring it to the Debtor or is it just on paper?

11             MR. SOUTHARD:  Your Honor, the -- the money is being

12   transferred to the Debtor.

13             THE COURT:  And then you're going to transfer it

14   back?

15             MR. SOUTHARD:  Well, we're spending the money that we

16   receive for various disbursements.

17             THE COURT:  So, I'm going to give you a check and

18   you're going to give it back to me.

19             MR. ROSENTHAL: No, Your Honor, no.

20             MR. SOUTHARD:  No, Your Honor.

21             THE COURT:  Who's getting the interest payments?

22             MR. SOUTHARD:  Well, the interest proposed under the

23   DIP financing is payment in kind, it's PIK interest, so it just

24   -- that is a -- in fact, a book entry.  There's no -- there's

25   no current pay interest.

1          THE COURT:  There are entries on -- and I may be

2     wrong.  There are entries on the budget that list $3 million

3     whatever the number is, over the course of this period, as

4     interest due on the loans.  Are you telling me that that is not

5     a real entry?

6          MR. SOUTHARD:  I'm not telling you that, Your Honor.

7     I'm telling you that I believe that to be an accrual and not an

8     actual outflow of funds.

9          THE COURT:  So, why are you showing it as a loan?  If

10    it's accrual, why are you borrow -- I don't understand that.

11         MR. SOUTHARD:  Perhaps we're talking past one

12    another, I apologize for that.

13         THE COURT:  Just -- no, it's my fault.  You

14    understand it better than I do.  I'm just asking, when I read

15    the budget, there are a series of issuers who are pari passu,

16    loaning you, loaning the Debtor, under the DIP financing, X

17    dollars.  The budget divides X dollars by showing payments to

18    you, potentially, to this gentleman, Creditor's Committee, a

19    variety of other expenses.  Keeping the building safe, denying

20    employees.  Then there's a line item, or line items, that make

21    up a significant portion of what I see as the total, for

22    payments of interest on bonds.  Are those not being made?  Is

23    that -- am I just reading the budget wrong?

24         MR. SOUTHARD:  Sorry, Your Honor, one moment.

25         MR. ROSENTHAL:  No, there's no -- you want me to -- I

1    don't know.  There's no interest payment --

2            THE COURT:  Just tell me.

3            MR. ROSENTHAL: There's no interest payments, no.

4            THE COURT:  What?

5            MR. ROSENTHAL: Everything on this budget, the cash

6    flow budget that you -- that was filed, is all operating

7    expenses and administrative expenses.  No interest is being

8    paid in this budget.

9            THE COURT:  So, $5 million dollars are needed for

10   operating expenses and administrative expenses between now and

11   June?  There's nine employees.

12           MR. ROSENTHAL: No, it's just -- it's real estate

13   taxes, it's utilities, it's security.  This -- and this is the

14   whole issue of why we want to market this because these assets

15   are incurring a lot of costs to keep (indiscernible).

16           THE COURT:  Give me the budget.  Go on, I'm sorry.

17   Go ahead.

18           MR. SOUTHARD:  Your Honor, if I might, we have a

19   larger font form of the budget --

20           THE COURT:  Oh, you mean one I can actually read?

21           MR. SOUTHARD:  Yes, Your Honor.  May I approach?

22           THE COURT:  Sure.  Thank you.

23           MR. SOUTHARD:  You're welcome.

24           MR. ROSENTHAL:  Can I say something?  Your Honor?

25           THE COURT:  The total -- just --

1          MR. ROSENTHAL:  Can I direct you to Page 3 of this

2     thing?  That's the total for the 30-week period.

3          THE COURT:  Let's -- sort of my simplistic mind --

4     everybody have one of these?  Do you guys have one?  Okay.

5     Maybe we can avoid my rantings if I can understand this.  Okay,

6     on Page 3, total cash disbursements, weeks 1 through 30,

7     $4,853,779 dollars.

8          MR. ROSENTHAL:  That's all the different term loans

9     combined.  That's term loan B, that's A, B, C and D.  That's

10    what's on this page here, and the totals -- and the total

11    that's repaid is $4.8 million dollars, on the bottom.

12         THE COURT:  And that $4.83 million dollars, is going

13    solely to the nine folks who work there, professionals, UST,

14    total administrative -- if you look on that cash disbursements,

15    administrative overhead, term D, $2,185,000 will have been paid

16    by term D loan and you're telling me that none of those

17    dollars, there's no dollars that are part of this $5 million

18    that represent payments on the bonds.

19         MR. SOUTHARD:  There is interest and fees, and as you

20    can -- on -- as you can see on --

21         THE COURT:  What are interest and fees?

22         MR. SOUTHARD:  I'm sorry?  Fees --

23         THE COURT:  What are in --

24         MR. SOUTHARD:  I'm sorry, I'm sorry.

25         THE COURT:  What are interest and fees?  Tell me what

1    that means.

2              MR. ROSENTHAL:  Basically, the -- the agreed upon fee

3    that was paid, the $100,000 that was paid --

4              THE COURT:  All right.

5              MR. ROSENTHAL:  -- pursuant to the DIP, and we broke

6    that out, as you can see, $57,000 of it is on the DIP interest

7    and fee line in the term D section for weeks 1 through 30.  You

8    have another $55,000 that is on term loan A, and then so,

9    smaller amounts, $8,000 and $16,000 of -- on term loan B and C,

10   and including in that hundred, in addition to it, there's the

11   agent fee that we had to pay, which I think was like, $7,000 --

12             THE COURT:  But none of that -- and again, I'm asking

13   --

14             MR. ROSENTHAL:  Yes.

15             THE COURT:  -- none of that represent payments to the

16   Trustee on behalf of the bondholders, other than the hundred

17   grand.

18             MR. ROSENTHAL:  That $107, because there's -- the

19   agent, $107 only is --

20             THE COURT:  So, what you're telling me is that --

21             MR. ROSENTHAL:  I'm sorry.

22             THE COURT:  $5 million dollars is needed, over the

23   next six months or whatever it is, to liquidate two pieces of

24   property.

25             MR. ROSENTHAL:  It's not two pieces of property, it's

1     many pieces of property.  You have one big -- you have a lot of

2     buildings located in Oakdale, you have several buildings

3     located in Brookhaven, you have 32 houses, twenty -- 24 houses

4     that we just talked about selling, plus there's another eight

5     commercial-type houses --

6              THE COURT:  But this doesn't cover that because the

7     proc --

8              MR. ROSENTHAL:  It covers everything.  This is --

9     this is the cost --

10             THE COURT:  So --

11             MR. ROSENTHAL:  I'm sorry, I don't want to cut you

12    off, but the -- I'm sorry.

13             THE COURT:  The house sells.  There are proceeds of

14    sale.  From the proceeds of sale, you pay the commissions.  So,

15    you don't need these dollars to do that.  There's a

16    commissioned salesman who's doing it.  I'm just trying to get

17    this.  I'm --

18             MR. ROSENTHAL:  No, I'm just -- no, the -- this -- by

19    the way, this does not include -- if we were to sell real

20    estate during this time, there may reduction of the -- there

21    may be a reduction of these costs as well.  This does not

22    assume, take into account, when these real estate -- these

23    properties are sold.  But basically, these costs are all the

24    costs to operate to protect these assets, to maintain them.  If

25    there's any leaks, any problems, if there's maintenance.  If

1    you look on -- a good example, if you look on term loan A, you

2    look two lines, there is utilities and security personnel.

3    Almost a million two just for that alone.

4              THE COURT:  A million two for buildings that are not

5    operating, where there are a total of nine employees and you

6    have one security guard 24 hours a day making sure the building

7    doesn't burn down.  What -- I -- I'm really --

8              MR. ROSENTHAL:  It's not just one security guard,

9    Your Honor.  There's -- you need -- these are -- there's 25

10   acres and many buildings on those 25 acres in Oakdale alone,

11   not including the houses.  You have -- you have hundreds --

12             THE COURT:  Nobody's going to steal the trees.  I

13   mean, I don't understand --

14             MR. ROSENTHAL:  No, but there are -- there are --

15   Your Honor, there are assets, there are -- there's libraries,

16   there's equipment, there's other assets on these buildings and

17   I don't think we would want to have people coming in and

18   destroying any of these buildings and they're -- we want to

19   protect these assets here.

20             THE COURT:  Okay, well, if the issue is, should you

21   have the money to do ordinary, necessary protection of the

22   asset and all that?  Sure.  I don't -- I mean, if you tell me

23   it's $5 million dollars, then -- and you can justify that, but

24   I was under the impression, because it's the only thing that

25   made sense to me, that a portion -- and again, I thought I saw

1    that in your earlier budgets, that there were line items to pay

2    the, going forward, interest payments due on the bonds.  You're

3    telling me that there's none of that, this is just $5 million

4    dollars to keep, and it's astounding to me but I will -- if

5    that's what you think it is, to keep -- I don't know what.  To

6    keep these buildings.  But -- aren't those dollars used to

7    protect the secured creditor's assets?

8            MR. ROSENTHAL:  Yes.

9            THE COURT:  I mean, if the -- the Debtor has no

10   money.  If the secured creditor says, "I'm not giving you any

11   money," what's going to happen to those buildings?  It's his

12   collateral.  What do you think happens?  Every -- I've done a

13   hundred thousand real estate deals when I was actually working.

14   What do you think the secured creditor does when the lender com

15   -- when the borrower comes in and says, "I don't care ,it's

16   your building.  Here are the keys.  I'm going to burn it.  I

17   don't want it."  Come on.

18           There's not a person here who hasn't been in that

19   case.  So, I don't object to you borrowing the money.  You all

20   can figure out how much you need.  They're not going to give

21   you more than you need.  Fine.  But I'm -- I'm at a loss as to

22   why, to protect this asset, which is at this point, maybe not

23   even worth more than their own claims, the estate is willing to

24   -- to -- on behalf of creditors, give up enormous rights when,

25   if you say you're not going to do it, in all likelihood,

1    they're going to put the same money up to protect the asset.

2          Now, that's their business decision, but -- and if

3    you tell me that it's in your -- you all believe that that's a

4    smart and correct thing to do, as representatives of creditors

5    and the estate, build that record and I may sign it.  You may

6    be right.  It doesn't make any sense to me because I think, in

7    the end, it's going to come back and hurt people.  People that

8    you haven't identified yet.  And the theory that it takes $5

9    million dollars to cover some acreage in Oakdale and some

10   buildings that nobody's in, when nobody's been in them for six

11   months, or since last year, and you all are getting -- how much

12   money do you get out of it?  Do you get like a half a million

13   dollars in this, your company?  How much are you making on

14   this?  I signed your retention agreement, so don't worry about

15   it.

16         MR. ROSENTHAL:  I -- I'm --

17         THE COURT:  Huh?

18         MR. ROSENTHAL:  I was -- I was trying to find it.  We

19   have 680 budgeted for the 30 weeks.

20         THE COURT:  $680,000?

21         MR. ROSENTHAL:  Yes.

22         THE COURT:  For that, you should sit out there and

23   make sure the buildings don't disappear.

24         MR. ROSENTHAL:  Okay, can I --

25         THE COURT:  I mean --

1          MR. ROSENTHAL:  Well --

2          THE COURT:  I'm being snarky myself on this because

3     it just bothers me.  So, what we're going to do is, I said I

4     wouldn't take a proffer on this, so I'm going to let you -- if

5     you're the -- you're the designated party, take the stand, you

6     can ask him the questions, I want a record as to the, this is

7     what you all want to do.  I'm going to ask each of these

8     parties who, apparently, other than the Committee, has a

9     limited objection which they've now -- been resolved, then I'll

10    decide what to do with the order.  But I want you on the record

11    on it.  I'm not going to take a proffer, and I want each of

12    you, to the extent you agree with this, to tell -- put that on

13    the record.

14         MR. SOUTHARD:  Your Honor, if I might, Sean Southard,

15    for the record.  Your Honor, could I request a brief recess --

16         THE COURT:  That would probably be a good idea.

17         MR. SOUTHARD:  -- that we -- the parties might have a

18    -- a brief discussion --

19         THE COURT:  But let me make myself clear.  I'm not

20    opposed to lenders getting protections for money they put up.

21    I think they have a right to it, I think you've clarified for

22    me that the money is not going to them, but you've raised this

23    other question about how this much money is needed.  It is all

24    being used to protect the collateral -- in other words, if a

25    third party came in and put this money up, they'd have a 506

1    claim.  They may or may not get it, but they have a 506 claim.

2    And yet, you're precluded from asking any third party to put

3    money up if I sign the DIP order, because it says in that, you

4    can't seek money from anybody else.  And so, fine.

5         My problem is, taking rights of people that I have

6    not yet identified.  That's the one.  If you want to give up

7    money, you know, it is what it is.  It's a business deal.  But

8    I'm very hesitant, in a transaction, which is unusual for all

9    of us.  We don't do these every day, these not-for-profit, if

10   this was a building in the middle of the city by some common

11   devel -- I'm -- you know, I could figure that one out.

12        I don't like to do things where I don't understand

13   the consequences of what I'm doing.  Doesn't mean I'm right all

14   the time, or most of the time, but at least I can figure out

15   the consequences.  I can't figure it out here, and therefore

16   I'm very hesitant to go beyond what I think is a normal

17   process.  The normal process is, you put a dollar up, I'll give

18   you protection for it.  But the rest of this -- and it's up to

19   them.  If they don't want to loan money to administrative

20   creditors, they also have rights to do that, then you have

21   other issues.  But I'm not going to -- I'm hesitant to sign an

22   order that takes care of everybody except the people who are

23   going to be hurt the worst in this case.

24        MR. SOUTHARD:  I -- I understand --

25        THE COURT:  And that may be where it comes out, but

1    you just --

2              MR. SOUTHARD:  Your Honor, I understand that, and I -

3    - I think that, to try to summarize, I think your primary

4    concern at this point is the scope of the challenge --

5              THE COURT:  Yeah.

6              MR. SOUTHARD:  -- that -- that we're talking about

7    implementing.

8              THE COURT:  Yeah.  Money I get.  I mean, you put a

9    dollar up, you have a right to be protected.

10             MR. SOUTHARD:  Priority and validity of liens is one

11   thing, but --

12             THE COURT:  That, we see every day.

13             MR. SOUTHARD:  Yeah.  I understand.

14             THE COURT:  Doesn't take a year to figure out whether

15   they have a valid lien or not.  But and the -- the Committee

16   can waive whatever it wants for itself.  But when you start

17   going to third parties, and people who I don't know, I mean,

18   you look at the ITT case they have now, they're now seeking a

19   class of all ex-students.  Will they have standing or not?  I

20   don't know.  I look at the GM case that came out of the Second

21   Circuit.  Judge Gerber issued an order there, the Circuit comes

22   back and says, "You should have done," which, if any of you

23   remember the GM case, there was a lot of things moving quickly

24   in that case and -- but I'm not sure they're wrong.  I can

25   foresee people here who are going to be hurt, and they may end

1   up getting hurt, but I'm going to understand why I did it so

2   that when somebody stands up and says, "Here's your order, you

3   can't -- these people have -- their rights have been gone," at

4   least I understand why I did it.  I may be wrong, but it'll be

5   a record as to why I did it.  Right now, I don't know why I'm

6   doing it.  All right, come back in -- quarter to twelve, half

7   hour.

8           MR. ROSENTHAL:  Thank you, Your Honor.

9           MR. SOUTHARD:  Thank you, Your Honor.

10       (Recess)

11          CLERK:  Continuation on Dowling College.

12          MR. SOUTHARD:  Your Honor, again, for the record,

13   Sean --

14          THE COURT:  Let me just -- if I came across a -- I

15   know I do.  I spent a lot of time thinking about this stuff and

16   I read everything and I wanted to make sure to convey what my

17   position is.  I have my own way of doing things like that so it

18   comes across.  It should not show any disrespect or lack of

19   respect for any of you guys.  I know most of you.  This is all

20   something we're trying to work through.  I know you're trying

21   to do the best you can, whether it's lenders, commit -- all of

22   you.  That's all we're trying to do, so, I apologize if I came

23   across in an aggressive fashion.  I'm sure I will do it again.

24       (LAUGHTER IN THE COURTROOM)

25          THE COURT:  It's not that I'm saying I won't, but I

1    just wanted to put that out.

2                MR. SOUTHARD:  Thank you, Your Honor.  Again, for the

3    record, Sean Southard on behalf of Dowling College.  So, I

4    think we had a productive discussion off the record, Your

5    Honor, in light of our on the record conversations, and what

6    the parties are proposing at this point, what the Debtor is

7    asking Your Honor to consider, based on the views of the

8    parties, is that we would propose to, in essence, roll forward

9    with an interim or perhaps even a further, third emergency

10   order, but an order of that ilk, until a date in the future

11   where it makes more sense, collectively, to -- to discuss final

12   relief with Your Honor, and that date that we are talking about

13   and we think makes some sense, would be a date that is after

14   the proposed bar date, which is March 10th, if that order were

15   to be entered as proposed.  And so, we are looking at, or were

16   looking at, rolling out this kind of interim relief until such

17   a date like that, and maybe March 17th, which is a -- which is

18   a Friday following the expected bar date, would be an

19   appropriate period --

20               THE COURT:  When are you going to have the bids?

21               MR. SOUTHARD:  We are going to have the bids, Your

22   Honor, bear with me one moment.

23               THE COURT:  Or do you think you're going to extend

24   that?

25               MR. ROSENTHAL:  So, when we talk about the bids,

1    we're obviously talking about the -- the Oakdale campus bids,

2    and I believe that's March 6th, Your Honor, but I need to

3    double check.

4              THE COURT:  Okay, so anything after that, because

5    you'll have some sense -- everybody will have a greater sense

6    of whether we're just arguing intellectually or there's

7    actually something to argue about.

8              MR. SOUTHARD:  Yeah.  I -- so I think the goal,

9    globally, would be, before we come back to you next time and

10   ask for final relief that there will be a -- some manner of

11   grand compromise reached between the unsecured creditors via

12   the Committee, and the secured creditors that --

13             THE COURT:  That's fine.

14             MR. SOUTHARD:  -- that will make a clear benefit to

15   the estate, kind of situation, that we would -- we would sort

16   of all package up in -- in one big picture with a bow.  That's

17   the goal, and -- and in the interim, we would propose to

18   continue in the status quo, in essence.  And so, the order that

19   we had proposed to Your Honor to dock -- and we docketed as a

20   final, we would -- we would go back and revise and submit to

21   Your Honor, you know, something that looks a good deal more

22   like the prior order that you entered, the last two orders that

23   you entered.

24             THE COURT:  Well, we continue -- we can now con -- if

25   you want, I can just continue the existing order, period, until

1    such date.  I don't need another order.

2            MR. SOUTHARD:  The only thing that --

3            THE COURT:  Unless you want something.

4            MR. SOUTHARD:  The only thing we do need to do is --

5    is supplement the record with the updated budget because our

6    current budget ends, under the last order, at the end of this

7    week.  So, we would need -- and what we would propose to do is,

8    once we pick that date, put our budget on file and truncate the

9    budget to whatever date makes sense, relative to the next

10   hearing that we expect to be before Your Honor.

11           THE COURT:  So, why don't I agree to continue the

12   existing order until such, pick the date, you'll supplement a

13   new budget, which will then become part of that order, and I'll

14   so order the record.  Save everybody time and money.

15           MR. ROSENTHAL:  That's (indiscernible) fine.

16           MR. SOUTHARD:  That's fine with the Debtor, Your

17   Honor.

18           THE COURT:  I don't want a gap here, for any of you

19   guys.

20           MR. SOUTHARD:  I appreciate that, Your Honor.  So, I

21   think that concludes what --

22           THE COURT:  And so, let me just do that.  With regard

23   to the interim or / final cash collateral order, the parties

24   have agreed and the Court will agree, to continue the existing

25   order in its current form until March -- what date you got?

1   What date -- do we have a date for them in March?  Beginning in

2   March?

3              MR. SOUTHARD:  I believe the last date we have from

4   Chambers is February 6th, so --

5              CLERK:  February 6th.

6              MR. SOUTHARD:  -- we would need --

7              THE COURT:  Do you need that?

8              MR. SOUTHARD:  -- we would need a new date.  We may

9   need it for the --

10             THE COURT:  All right, we'll keep that --

11             MR. SOUTHARD:  -- 2004 --

12             THE COURT:  -- and we'll then give you March -- that

13   first Tuesday.

14             CLERK:  March 7th.

15             THE COURT:  March 7th.  March 7th.  We'll continue

16   the existing interim order --

17             MAN 1:  Did you want to --

18             MAN 2:  I'm sorry, Your Honor, I don't mean to shake

19   my head.  I'm new to this party, and hopefully the last time

20   I'm here for this party, but with respect to the bar date, I

21   think people were trying to tee it off the bar date to get it -

22   -

23             THE COURT:  We're not changing the bar date.

24             MAN 1: No, no, that's what I'm saying, so the bar

25   date is March 10th, so we were hoping to get --

1          THE COURT:  Oh, okay.

2          MAN 1: -- the order subsequent to the bar date, Your

3     Honor.

4          THE COURT:  I was just reacting to him.

5          MAN 2: The bar date (indiscernible) all parties to be

6     informed.

7          THE COURT:  Give me a date after March --

8          CLERK:  (Indiscernible)

9          THE COURT:  For two weeks?  Maybe they want to try

10    the Oak Rock case and I'll do this.  The only date I then have

11    is March 28th because I've got a trial going on for two weeks.

12    That's too long.  What's -- give me a --

13          CLERK:  (indiscernible)

14          THE COURT:  No, put it on the morning.  Fine.  Give

15    me some morning.  A Tuesday morning, and I'll make --

16    (indiscernible).

17          CLERK:  (indiscernible)

18          THE COURT:  Yeah, 9:30?

19          CLERK:  March 14th?

20          THE COURT:  March 14th.

21          MR. SOUTHARD:  March 14th, right.

22          THE COURT:  And if you want, you can do telephonic,

23    most of you, if you need -- if you need to, and we'll continue

24    the cash collateral order as it currently forms, through that

25    date, to be supplemented with the new budget.  That new budget

1    is, once agreed upon by the parties, will be docketed and

2    become part of that order, and we'll so order the record on

3    that.

4            MR. SOUTHARD:  Thank you, Your Honor.

5            THE COURT:  Okay.  All right, good luck.  Thank you

6    all for putting up with us.

7            COUNSEL:  Thank you, Your Honor.

8            THE COURT:  Have a good day.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    I N D E X

2

3                         RULINGS

4    DESCRIPTION                              PAGE        LINE

5

6    Motion Authorizing the Retention of        15          15

7    CBRE, Inc. as Real Estate Broker for the Debtor Granted

8

9    Motion Approving the Retention of          17          11

10   Eichen & DiMeglio, P.C., as Accountants

11   to the Debtor Granted

12

13   Motion Approving the Retention of          22          11

14   FPM Group, Ltd., as Consultants to the Debtor Granted

15

16   Mortgage Motion Granted                    28          20

17

18   Motion to Approve Debtor-In-Possession     52          11

19   Financing and Use of Cash Collateral Continued

20

21   Continuation of Previous Order             54          19

22

23

24

25

1              C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5     Sonya

6     Ledanski Hyde

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde,
o=Veritext, ou,
email=digital@veritext.com, c=US
Date: 2017.01.26 09:50:33 -05'00'

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  January 25, 2017