# **Exhibit B**

ASSET PURCHASE AGREEMENT

by and between

DOWLING COLLEGE

and

Princeton Education Center LLC

Dated as of April 6, 2017

Table of Contents

Page

ARTICLE I  DEFINITIONS ...........................................................................................1
  1.1 Definitions...........................................................................................................1
  1.2 Other Definitional and Interpretative Provisions..................................................8
ARTICLE II  PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ..........9
  2.1 Assets to be Sold to Buyer ..................................................................................9
  2.2 Excluded Assets .................................................................................................10
  2.3 Excluded Liabilities ...........................................................................................11
ARTICLE III PURCHASE PRICE, MANNER OF PAYMENT AND CLOSING.....................11
  3.1 Payment of Purchase Price.................................................................................11
  3.2 Deposit….. .........................................................................................................12
  3.3 Closing and Closing Date ..................................................................................12
  3.4 Closing Deliveries..............................................................................................12
  3.5 Transfer Taxes ...................................................................................................14
  3.6 Delivery of Records and Contracts ....................................................................14
  3.7 Further Conveyances .........................................................................................14
  3.8 Bulk Sales Laws.................................................................................................14
  3.9 Allocation of Purchase Price..............................................................................15
  3.10 Time is of the Essence .....................................................................................15
ARTICLE IV SELLER'S REPRESENTATIONS AND WARRANTIES ...............................15
  4.1 Organization of Seller........................................................................................15
  4.2 Authorization of Transaction .............................................................................15
  4.3 Qualification ......................................................................................................15
  4.4 Non-Contravention ............................................................................................15
  4.5 Brokers' Fees .....................................................................................................16
  4.6 Events Subsequent .............................................................................................16
  4.7 Tax Matters ........................................................................................................16
  4.8 Property and Assets............................................................................................17
  4.9 Contracts   .........................................................................................................18
  4.10 Seller's Consents and Approvals ......................................................................18
  4.11 Powers of Attorney ..........................................................................................19
  4.12 Litigation..........................................................................................................19
  4.13 Employees.........................................................................................................20
  4.14 Foreign Operations...........................................................................................20
  4.15 Insurance Coverage...........................................................................................20
  4.16 Restrictions on Acquisition...............................................................................20
  4.17 Environmental Matters......................................................................................20
  4.18 Intentionally Omitted .......................................................**Error! Bookmark not defined.**
  4.19 No Other Representations or Warranties; Schedules..........................................22
ARTICLE V  BUYER'S REPRESENTATIONS AND WARRANTIES...................................22
  5.1 Organization of Buyer........................................................................................22
  5.2 Authorization of Transaction .............................................................................22
  5.3 Non-Contravention ............................................................................................23
  5.4 Brokers' Fees .....................................................................................................23
  5.5 Buyer's Consents and Approvals........................................................................23

5.6 Acknowledgement Regarding Condition of the Business ..................................................23
5.7 Financial Capability ...........................................................................................................23
5.8 No Other Representations or Warranties; Schedules........................................................23
ARTICLE VI  BANKRUPTCY COURT MATTERS ................................................................22
6.1 Intentionally Omitted .........................................................................................................24
6.2 Competing Transaction ......................................................................................................25
6.3 Intentionally Omitted .........................................................................................................25
ARTICLE VII  PRE-CLOSING COVENANTS ........................................................................27
7.1 General    ...........................................................................................................................24
7.2 Regulatory Approvals ........................................................................................................25
7.3 Operation of Business ........................................................................................................25
7.4 Access      ..........................................................................................................................26
7.5 Notice of Developments .....................................................................................................26
7.6 Employment Matters...........................................................................................................27
7.7 Removal of Excluded Assets from Owned Real Property..................................................27
ARTICLE VIII POST-CLOSING COVENANTS ......................................................................27
8.1 General    ...........................................................................................................................27
8.2 Intentionally Omitted .........................................................................................................27
8.3 Non-Disclosure ..................................................................................................................27
8.4 Further Assurances..............................................................................................................29
8.5 Sale of Certain Furniture and Equipment Acquired by Buyer............................................29
8.6 Removal of Necessary Records ..........................................................................................29
ARTICLE IX EMPLOYEES .......................................................................................................29
9.1 Buyer Not Assuming Seller's CBAs or Benefit Plans........................................................29
9.2 No Obligation to Offer Employment ..................................................................................29
9.3 No Successor Liability.........................................................................................................29
ARTICLE X CONDITIONS TO OBLIGATION TO CLOSE ...................................................30
10.1 Conditions to Buyer's Obligation .....................................................................................30
10.2 Conditions to Seller's Obligations ....................................................................................31
ARTICLE XI DISPUTE RESOLUTION .....................................................................................32
11.1 Dispute Resolution............................................................................................................32
ARTICLE XII TERMINATION ...................................................................................................32
12.1 Termination of Agreement .................................................................................................32
12.2 Procedure For Termination ...............................................................................................33
12.3 Effect of Termination.........................................................................................................33
ARTICLE XIII TITLE INSURANCE; PERMITTED EXCEPTIONS; APPORTIONMENTS...34
13.1 Title Insurance ...................................................................................................................34
13.2 Permitted Exceptions ........................................................................................................34
13.3 Apportionments..................................................................................................................35
ARTICLE XIV MISCELLANEOUS ...........................................................................................38
14.1 Survival  ............................................................................................................................38
14.2 Press Releases and Public Announcements ......................................................................38
14.3 No Third-Party Beneficiaries............................................................................................38
14.4 Entire Agreement ...............................................................................................................38
14.5 Succession and Assignment...............................................................................................38
14.6 Counterparts ......................................................................................................................38
14.7 Headings ............................................................................................................................39
14.8 Notices    ...........................................................................................................................39

14.9 Governing Law; Waiver of Jury Trial ........................................................................39
14.10 Submission to Jurisdiction; Consent to Service of Process ...............................................40
14.11 Amendments ........................................................................40
14.12 Severability ........................................................................40
14.13 Expenses ........................................................................40
14.14 Construction........................................................................40
14.15 Incorporation of Schedules ........................................................................40
14.16 No Waiver........................................................................41
14.17 Non-Recourse Liability........................................................................41

<u>LIST OF SCHEDULES</u>

| | |
|---|---|
| Schedule 1.1 | Knowledge |
| Schedule 4.6 | Events Subsequent |
| Schedule 4.7(b) | Tax Compliance |
| Schedule 4.7(c) | Lien or Claims for Taxes |
| Schedule 4.8(a) | Owned Real Property |
| Schedule 4.8(d) | Violations |
| Schedule 4.9(a) | Contracts |
| Schedule 4.9(d) | Notices and Approval for Contracts |
| Schedule 4.10 | Consents and Approvals (Seller) |
| Schedule 4.12 | Litigation of Seller |
| Schedule 4.15 | Insurance Coverage |
| Schedule 4.16 | Restrictions on Acquisition |
| Schedule 4.17(a) | Environmental Matters |
| Schedule 4.17(b) | Environmental Permits |
| Schedule 5.5 | Consents and Approvals (Buyer) |
| Schedule 13.2(a) | Permitted Exceptions |

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of April 6, 2017, (the "Execution Date") is by and between DOWLING COLLEGE, a New York not-for-profit corporation ("Dowling" or "Seller"), and Princeton Education Center LLC, a Delaware limited liability company ("Buyer"), each a "Party" and collectively the "Parties."

RECITALS

WHEREAS, on November 29, 2016 (the "Petition Date"), Dowling (the "Debtor") filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 *et seq*. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") (the "Bankruptcy Case"); and

WHEREAS, on the Petition Date, the Debtor filed a motion seeking, *inter alia*, approval of the sale of the Debtor's 25 acre campus located at 150 Idle Hour Boulevard, Oakdale, New York 11769 (the "Oakdale Campus") to the successful bidder (the "Successful Bidder") as determined by the bidding procedures; and

WHEREAS, on December 16, 2016, an order was entered by the Bankruptcy Court, approving, *inter alia*, bidding procedures for the sale, and scheduling an auction ("Auction") and sale hearing in connection therewith (the "Bidding Procedures Order"); and

WHEREAS, subject to the terms of the Bidding Procedures Order and the results of the Auction, the Buyer is prepared to acquire the Oakdale Campus on the terms and conditions set forth herein; and

WHEREAS, the transactions contemplated by this Agreement will be consummated pursuant to an order of the Bankruptcy Court, approving, *inter alia*, the sale of the Oakdale Campus to the Buyer (the "Sale Order"), consistent with terms, conditions and transactions contemplated by the Agreement; and

WHEREAS, subject to the terms and conditions of the Bidding Procedures Order, Seller wishes to sell to Buyer and Buyer wishes to acquire from Seller the Acquired Assets as set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, agreements, representations and warranties herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

ARTICLE I
DEFINITIONS

1.1    Definitions.  The following terms, as used herein, have the following meanings:

"Acquired Assets" has the meaning set forth Section 2.1.

"<u>Affiliate</u>" means any person or entity which directly or indirectly controls, is controlled by, or is under common control with, any Person.

"<u>Agreement</u>" has the meaning set forth in the preface above.

"<u>Applicable Law</u>" means, with respect to any Person, any foreign, federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, guidance, plan, order, injunction, judgment, decree, ruling, charge or other similar requirement, including any Labor and Employment Law and Requirements, enacted, adopted, or promulgated by a Governmental Authority that is binding upon such Person, as amended.

"<u>Auction</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Case</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to Section 2075 of title 28 of the United States Code and as applicable to the Bankruptcy Case.

"<u>Bidding Procedures Order</u>" has the meaning set forth in the recitals.

"<u>Board</u>" means the governing board of an entity, including the board of directors, board of governors, board of trustees, or board of managers, as applicable.

"<u>Business</u>" means the limited business operations of Seller as conducted following Seller's loss of accreditation and cessation of operations as a provider of educational services (not including the Excluded Liabilities).

"<u>Business Day</u>" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Applicable Law to close.

"<u>Buyer</u>" has the meaning set forth in the preface above.

"<u>Buyer Confidential Information</u>" has the meaning set forth in Section 8.3(b).

"<u>Buyer's Consents and Approvals</u>" has the meaning set forth in Section 5.5.

"<u>Buyer's Objection Notice</u>" has the meaning set forth in Section 13.1.

"<u>Campus Agents</u>" means A&G Realty Partners, LLC and Madison Hawk Partners, LLC.

"<u>CBA</u>" means collective bargaining agreement.

"<u>Claim</u>" has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code.

"<u>Closing</u>" has the meaning set forth in Section 3.3(a).

"<u>Closing Date</u>" has the meaning set forth in Section 3.3(a).

"<u>Closing Documents</u>" has the meaning set forth in Section 3.4(a).

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Competing Bid</u>" has the meaning set forth in Section 6.2(a).

"<u>Contemplated Transactions</u>" has the meaning set forth in Section 2.1.

"<u>Contract</u>" means any legally binding oral or written commitment, contract, lease, sublease, license, sublicense or other agreement or arrangements of any kind relating to Owned Real Property, the Acquired Assets or the operation thereof to which Seller is a party or by which any of the Acquired Assets are bound.

"<u>Covered Person</u>" means a current or former Employee, officer, director or consultant of Seller.

"<u>Creditors' Committee</u>" means the official committee of unsecured creditors appointed in the Bankruptcy Case pursuant to Section 1102 of the Bankruptcy Code by the United States Trustee for the Eastern District of New York, as it may be reconstituted from time to time.

"<u>Debt</u>" means, with respect to Seller, the aggregate amounts of long-term and short-term indebtedness of Seller, including any amounts owing under any capital lease arrangement, amounts outstanding under notes payable to any financial institution or Governmental Authority, amounts owed to an Employee Benefit Plan or any Multiemployer Plan, amounts outstanding under lines of credit, amounts owing under notes or dividends or distributions payable or other amounts payable by Seller, any other amounts outstanding under notes payable, and any prepayment penalties or expenses payable in connection with the foregoing transactions, but excluding the accounts payable arising in the Ordinary Course of Business of Seller.

"<u>Debtor</u>" has the meaning set forth in the recitals.

"<u>Deeds</u>" has the meaning set forth in Section 3.4(a)(i).

"<u>Deposit</u>" has the meaning set forth in Section 3.2.

"<u>Effective Time</u>" has the meaning set forth in Section 3.3(b).

"<u>Employee Benefit Plan</u>" means any material "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other material bonus, profit sharing, pension, severance, deferred compensation, fringe benefit (as described in Code Section 132), insurance, welfare, post-retirement, health, life, tuition refund, service award, company car, scholarship,

relocation disability, accident, sick, vacation, holiday, unemployment incentive, commission, retention change in control, non-competition, and other plans, agreements, policies, trust funds (a) established, maintained, sponsored or contributed to (or with respect to which any obligation to contribute has been undertaken) by Seller or an ERISA Affiliate, or (b) with respect to which Seller or any ERISA Affiliate has or has had any obligation, in each case, under which any Employee of Seller may receive benefits or may otherwise be subject and other than a Multiemployer Plan.

"Employees" means all individuals who are employed by Seller (including any employees not actively at work as of the Closing Date, as well as any employees who are on medical disability or leaves of absence and who worked for Seller immediately prior to such disability or leave).

"Environmental Claim" means any demand, assessment, Lien, investigation, claim, action or cause of action, complaint, citation, directive, information request issued by a Governmental Authority, legal proceeding, order, or notice of potential violation or potential responsibility arising under any applicable Environmental Law.

"Environmental Law" means any applicable statute, law, common law, rule, regulation, ordinance, or order of any federal, state, or local Government Authority in effect on or before the Closing Date relating to pollution, protection of human health (to the extent relating to exposure to Hazardous Materials) or the environment, or the processing, generation, management, distribution, use, handling, treatment, storage, transport, disposal, Remediation, or Release of Hazardous Materials.

"Environmental Permit" means any permit, registration, license, approval, identification number, exemption or other authorization required under or issued pursuant to any applicable Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, when used with respect to an Employee Benefit Plan, ERISA, the PBGC or a provision of the Code pertaining to employee benefit plans, any Person that is a member of any group of organizations within the meaning of Sections 414(b) or 414(c) of the Code (or, solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the Lien created under Section 302(f) of ERISA and Section 412(n) of the Code, or Sections 414(m) or 414(o) of the Code of which either Seller is a member).

"Exceptions" has the meaning set forth in Section 13.1.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" has the meaning set forth Section 2.3.

"Execution Date" has the meaning set forth in the preface above.

"Final Order" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for stay, new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay, new trial, reargument, or rehearing has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a stay, new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing shall have expired; *provided, however,* that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure may be, but has not been, filed with respect to such order shall not cause such order not to be a Final Order.  As set forth in the Bidding Procedures, the Parties consent to the Bankruptcy Court issuing a Final Order in the Bankruptcy Case with respect to, among other things, any matter or dispute relating to the Sale of the Oakdale Campus, the Bidding Procedures, the Sale Hearing, the Auction, a Stalking Horse Bidder, a Backup Bid and/or any other matter that in any way relates to the foregoing.

"Furniture and Equipment" means all furniture, furnishings, machinery, appliances and other equipment owned by Seller and located on the Owned Real Property, including all such desks, chairs, tables, Hardware, copiers, telephone lines, telecopy machines and other telecommunication equipment and miscellaneous office furnishings, but specifically excluding Non-Estate Property.

"Governmental Authority" means any domestic or foreign federal, state or local governmental authority, department, court or government, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other division, subdivision, department or branch of any of the foregoing.

"Governmental Authorizations" means any approval, consent, license, permit, waiver, registration, accreditation or other authorization issued, granted, given, made available or otherwise required by any Governmental Authority or pursuant to Applicable Law.

"Hardware" means any and all computer and computer-related hardware, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks.

"Hazardous Materials" means:  (i) any chemical, substance, material, or waste listed, defined, or classified as a "pollutant," "contaminant," "hazardous substance," "toxic substance," "solid waste," "hazardous waste," "hazardous material," or "special waste" under any applicable Environmental Law; (ii) any substance regulated under any applicable Environmental Law; (iii) petroleum or any derivative or by-product thereof; (iv) urea formaldehyde foam insulation, polychlorinated biphenyls, methyl tertiary butyl ethyl, radioactive material, or radon; (v) mold; and (vi) any asbestos-containing materials.

"Knowledge" means actual knowledge, or such knowledge that a reasonably prudent person would have after reasonable inquiry by the remaining officer of Seller as of or immediately prior to the Closing, which individual is identified in Schedule 1.1.

"Labor and Employment Law and Requirements" means any federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, guidance, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, or promulgated by a Governmental Authority relating to: (a) hours of work and/or payment of wages, (b) notices to Employees, (c) discrimination, harassment and retaliation, (f) leaves of absence, (g) employee benefits, or (h) duty to bargain collectively with bargaining unit representative of Employees.

"Liabilities" means debts, obligations, contracts or other liabilities of any kind, character or description, accrued, absolute, contingent, determined, determinable or otherwise, whether presently in existence or arising hereafter.

"Licenses" means any licenses, approvals, authorizations, consents, permits, orders, registrations, certificates, decrees, franchises, permits variances, and similar rights obtained from any Governmental Authority.

"Lien" means any claim, charge, easement, encumbrance, encroachment, security interest, mortgage, lien, pledge or restriction, whether imposed by Contract, Applicable Law, equity or otherwise.

"Material Adverse Effect" or "Material Adverse Change" means any fact, circumstance, event, change, effect, condition or occurrence that, individually or in the aggregate, has or could be reasonably expected to have a material adverse effect on (a) the value of the Acquired Assets, (b) a significant portion of the Owned Real Property is destroyed or damaged by fire or other casualty, or (c) the ability of Seller to consummate the Contemplated Transactions on a timely basis, in each case as determined by Buyer.

"Material Contracts" has the meaning set forth in Section 4.9(b).

"Material Development" means any change in the nature, scope, strategy, parties or other aspect of a Material Litigation or Proceeding that would have a Material Adverse Effect.

"Material Litigation or Proceeding" means any action, suit, investigation, proceeding or audit (a) the settlement or adjudication of which would (i) cause a material breach of this Agreement, (ii) have the effect of making the Contemplated Transactions illegal or (iii) materially prohibit or interfere with the consummation of the Contemplated Transactions.

"Multiemployer Plan" means a multiemployer plan as defined in Section 3 of ERISA to which Seller or an ERISA Affiliate contributes or has or had an obligation to contribute.

"Necessary Records" has the meaning set forth in Section 2.2(j).

"Non-Estate Property" means that certain personal property that is either not owned by the Seller or which may be a Restricted Asset.

"Ordinary Course of Business" means the ordinary course of business of the Seller following its loss of accreditation and cessation of operations as a provider of educational services.

"Owned Real Property" has the meaning set forth in Section 4.8(a).

"Parties" has the meaning set forth in the preface above.

"Party" has the meaning set forth in the preface above.

"Permitted Exceptions" has the meaning set forth in Section 13.2.

"Petition Date" has the meaning set forth in the recitals.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity, or a Governmental Authority.

"Pre-Closing Tax Returns" has the meaning set forth in Section 4.7(a).

"Predecessor" means (a) any Person that has ever merged with or into Seller, (b) any Person, a majority of whose capital stock (or similar outstanding ownership interests) or equity securities has ever been sold, transferred or assigned by Seller and (iii) any Person that has had all or substantially all of its assets acquired by Seller.

"Purchase Price" has the meaning set forth in Section 3.1(a).

"Release" means any spilling, leaking, pumping, emitting, emptying, discharging, injecting, escaping, leaching, dumping, migrating, or disposing of Hazardous Materials into the environment, including the ambient air, surface and subsurface soils, surface water and groundwater.

"Remediation" means any investigation, clean-up, removal action, remedial action, restoration, repair, response action, corrective action, monitoring, sampling and analysis, reclamation, closure, or post-closure in connection with the suspected, threatened or actual Release of Hazardous Materials.

"Representatives" means, with respect to any Person, any of its Affiliates, directors, trustees, officers, members, employees, consultants, agents, attorneys, advisors and other representatives.

"Restricted Assets" has the meaning set forth in Section 2.2(b).

"RE Tax Returns" means that returns, questionnaires, certificates, affidavits and other documents required by the Title Company in connection with the payment of any Transfer Taxes.

"Sale Order" has the meaning set forth in the Recitals.

"<u>Seller</u>" has the meaning set forth in the preface above.

"<u>Seller Confidential Information</u>" has the meaning set forth in Section 8.3(a).

"<u>Seller's Consents and Approvals</u>" has the meaning set forth in Section 4.9.

"<u>Supreme Court Approval</u>" means approval of the Supreme Court of the State of New York pursuant to Sections 510 and 511 of the New York Not-for-Profit Corporation Law for the sale of all or substantially all of the assets of Seller.

"<u>Survey</u>" has the meaning set forth in Section 13.1.

"<u>Tax</u>" or "<u>Taxes</u>" means any federal, state, local, or foreign income, prohibited transaction, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital stock, franchise, net worth or capital, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Liability for Taxes of any other Person.

"<u>Tax Return</u>" means any return, declaration, statement, report, form, claim for refund, or similar statements or documents including information reporting forms (including Forms 941, 990, 1099 and W-2) and estimated tax returns and reports) relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"<u>Time is of the Essence</u>" means with regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

"<u>Title Company</u>" has the meaning set forth in Section 13.1.

"<u>Title Defect</u>" has the meaning set forth in Section 13.1.

"<u>Title Report</u>" has the meaning set forth in Section 13.1.

"<u>Transfer Taxes</u>" means any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or Taxes or governmental charges payable in connection with the Contemplated Transactions.

"<u>Withdrawal Liability</u>" means any sum that may be assessed against Seller by a Multiemployer Plan providing pension benefits, under the Multiemployer Pension Plan Amendments Act of 1980, resulting from Seller ceasing to have an obligation to make contributions to such Multiemployer Plan.

1.2    <u>Other Definitional and Interpretative Provisions</u>.  The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as

a whole and not to any particular provision of this Agreement. The captions and headings used herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits and Schedules are to the Articles, Sections, Exhibits and Schedules, respectively, of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement. The terms "Dollars," "dollars" and "$" shall mean United States dollars. Any singular term in this Agreement shall be deemed to include the plural and any plural term the singular, and references herein to any gender shall include the other gender. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time at or prior to the Closing in accordance with the terms hereof and thereof; provided that with respect to any agreement or contract listed on any schedules hereto, any substantive amendments, modifications or supplements must also be listed in the appropriate schedule. References to any Person include the successors and permitted assigns of that Person. References herein to a Person in a particular capacity or capacities shall exclude such Person in any other capacity. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. Any reference to a code, act, statute or regulation means that law, code, act, statute or regulation as amended or supplemented from time to time and any corresponding provisions of successor laws, codes, acts, statutes or regulations and any reference to any law code, act or statute shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. References to a "day" or any number of "days" (without explicit qualification by the word "Business") shall be interpreted as a reference to a calendar day or number of calendar days. If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, the time for the giving of such notice or the performance of such act shall be extended to the next succeeding Business Day.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    <u>Assets to be Sold to Buyer</u>. On the terms and subject to the conditions of this Agreement, and on the basis of the representations and warranties herein contained, Seller shall sell, transfer, convey, assign and deliver to Buyer, or to an entity or entities designated by Buyer, on the Closing Date, all of its right, title and interest in the assets described in this Section 2.1 (the "<u>Acquired Assets</u>"), free and clear of all Liens and Claims, other than Liens securing the Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code (the "<u>Contemplated Transactions</u>"). The Acquired Assets shall be comprised of the following assets:

(a)    All Owned Real Property of Seller listed on <u>Schedule 4.8(a)</u>, including all fixtures and improvements owned by Seller and located on the Owned Real Property;

(b)    Subject to Seller's right to remediate any such damage with insurance proceeds, all proceeds or proceeds receivable of Seller's insurance and unliquidated or unsatisfied claims that relate to property damage with respect to the Owned Real Property occurring prior to the Closing, and all other insurance proceeds and insurance proceeds receivable (including applicable deductibles, co-payments or self-insured requirements) arising from any claim made under Seller's insurance policies with respect to the Acquired Assets; and

(c)    All rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to or affecting any Acquired Assets.

2.2    <u>Excluded Assets</u>.    For the avoidance of doubt, the following assets are not intended by the Parties to be a part of the Contemplated Transactions and are excluded from the Acquired Assets (the "<u>Excluded Assets</u>"):

(a)    Seller's cash, cash equivalents, bank deposits and similar items;

(b)    Any personal property that is not located on the grounds of the Owned Real Property;

(c)    Seller's Furniture and Equipment, including, without limitation,

(i)    all computer equipment containing or capable of containing data including, but not limited to, computer servers and related equipment (uninterruptable power supply devices, blade racks, cables, adaptors, etc.), desktop PCs, laptops, tablets, hard drives and other data and/or media storage devices (tapes, discs, floppy drives, etc.); and

(ii)    All cleaning and maintenance supplies, spare parts and other disposables located on the Owned Real Property and used in the ordinary course of the Seller's operations prior to the Closing Date;

(d)    All property and equipment that is leased by the Seller;

(e)    All intellectual property and intangible property including, but not limited to, computer software, licenses, maintenance or support contracts, related to excluded computer equipment, IPv4 addresses, patents, trademarks, copyrights, domain addresses, e-mail addresses and phone numbers;

(f)    All Non-Estate Property, including donor restricted assets (including, without limitation, special library collections, art collections or pottery) and endowment funds held by, or for the benefit of, Seller, the income and/or corpus of which has been designated for use in support of, for the benefit of, or otherwise relating to, any of Seller's mission, operations, programs, services, and/or assets (collectively, the "<u>Restricted Assets</u>") to the extent transferable and subject to any approvals required by Applicable Law;

(g)     Seller's accounts receivable;

(h)     Organizational documents, corporate records and minute books of Seller;

(i)     Any books and records which by Applicable Law or policy Seller is required to retain in its possession (the "Necessary Records");

(j)     Seller's Contracts, contract rights and receivables, rebates, credit balances and refunds due from third parties, pledges, commitments, available credit lines;

(k)     All claims and causes of action of Seller, including counterclaims that may be asserted in response to any proofs of claim filed against Seller;

(l)     Seller's charter, accreditation, or other authorization allowing it to operate an institution of higher education upon the Oakdale Campus; and

(m)     Rights that will accrue to Seller under this Agreement.

2.3     Excluded Liabilities.  Notwithstanding any provision of this Agreement or any other document or instrument to the contrary, Buyer shall not have any obligation with respect to any other Liabilities of Seller, regardless of whether such obligation arises before, on or after the Closing Date (all of such other Liabilities, collectively, the "Excluded Liabilities").  It shall not affect the status of a Liability as an Excluded Liability to the extent Buyer affirmatively elects in its sole and absolute discretion to assume responsibility for a given Excluded Liability.

ARTICLE III
PURCHASE PRICE, MANNER OF PAYMENT AND CLOSING

3.1     Payment of Purchase Price.

(a)     Consideration.  Subject to the terms and conditions hereof, the aggregate consideration for the sale, assignment, transfer, conveyance and delivery of the Acquired Assets to Buyer (or its designee(s)) at Closing, shall be Twenty-Six Million Five Hundred Thousand Dollars ($26,500,000) (the "Purchase Price"), subject to the adjustments and credits described in Section 3.1(b) and Section 13.3.

(b)     Payment.  Subject to the terms and conditions hereof, on the Closing Date, Buyer shall pay to Seller the amount of the Purchase Price less the Deposit.

(c)     Title Discharge.  In the event there is any Lien or Title Defect which Seller is obligated or elects to pay and discharge at Closing, Seller may pay and discharge such Lien or Title Defect out of the balance of the Purchase Price, provided Seller has made arrangements with the Title Company in advance of Closing for Seller to deposit with the Title Company sufficient monies (which shall include all recording charges) required by the Title Company to issue an ALTA Owner's Title Policy to Buyer free of any such Lien or Title Defect.  The existence of any such Lien, Title Defect or real estate taxes shall not be deemed objections to title if Seller shall comply with the foregoing requirements.

3.2     Deposit.  Buyer shall have made a cash deposit in the aggregate amount of five percent (5%) of the Purchase Price (the "Deposit").  Seller shall retain the Deposit as liquidated damages, as its sole remedy, if (i) this Agreement is properly terminated by Seller pursuant to Section 12.1(c)(ii), or (ii) Buyer is determined to have violated terms set forth in the Bidding Procedures Order. As set forth in the Bidding Procedures Order, the Deposit shall be returned to the bidder (i) as soon as practicable if the bidder is not determined to be a Qualified Bidder or (ii) no later than five (5) business days after entry of the Sale Order if the bidder is a Qualified Bidder (who has not otherwise forfeited its Deposit), but is not the Successful Bidder or the Backup Bidder. The Debtor, through its counsel's escrow, will maintain any Deposit(s) in a non-interest bearing Debtor account.

3.3     Closing and Closing Date.

(a)     The closing of the Contemplated Transactions (the "Closing") shall take place at a location agreed upon by Buyer and Seller, within 30 days after satisfaction or waiver of all conditions to the obligations of Seller and Buyer, to consummate the Contemplated Transactions (other than conditions with respect to actions Seller and Buyer will take at the Closing) or such other date as Buyer and Seller may mutually determine in writing (the "Closing Date").

(b)     Unless otherwise agreed in writing by the Parties, the Contemplated Transactions shall be effective as of 12:00:01 a.m. on the calendar day immediately following the Closing Date (the "Effective Time").

3.4     Closing Deliveries.

(a)     Seller Deliveries.   At the Closing, contemporaneously with Buyer's delivery to Seller of all of the Closing Documents required to be delivered by Buyer hereunder, Seller shall deliver or cause to be delivered to Buyer, duly executed by Seller in recordable form, where applicable (the documents and other deliverables described in this Section 3.4(a) and in Section 3.4(b) and all other documents required to be delivered hereunder are referred to collectively as the "Closing Documents") the following items:

(i)     fully-executed and acknowledged deeds conveying the Owned Real Property to Buyer (or its designee(s))(the "Deeds") in a form reasonably acceptable to Buyer;

(ii)    copies of any reasonably required RE Tax Returns properly executed and acknowledged by Seller;

(iii)   a Certificate of Non-Foreign Status duly executed by Seller certifying that Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended;

(iv)    a fully-executed bill of sale from Seller in a form acceptable to Buyer;

(v)    to the extent in the possession of Seller or Seller's agents, all keys or key cards and alarm codes to, and all combinations to, any locks on, all entrance doors to, and any equipment and utility rooms located in, the Owned Real Property, appropriately tagged for identification;

(vi)    delivery of possession of the Owned Real Property free of any tenancies (other than any tenancies where Buyer or its designee is the tenant);

(vii)    a good standing certificate for Seller from the appropriate offices of the State of New York, dated within 30 days prior to the Closing Date, and such evidence, delivered to Buyer and the Title Company, as reasonably required to evidence the due authorization, execution, and delivery by Seller of the Deeds and other Closing Documents to which Seller is a party;

(viii)    a certificate from an officer of Seller to the effect that each of the conditions specified in Section 10.1(a), Section 10.1(b), Section 10.1(c) and Section 10.1(d) is satisfied in all respects;

(ix)    a certificate from an officer of Seller dated as of the Closing Date (which shall include a certified copy of such Seller's certificate of incorporation, bylaws, relevant resolutions of Seller's Board approving the Contemplated Transactions and such other customary items as Buyer may reasonably request), in form and substance reasonably satisfactory to Buyer;

(x)    the closing and apportionment statement showing all adjustments in respect of the Purchase Price to be made at the Closing in accordance with the terms hereof, duly executed by Seller; and

(xi)    any other document, instrument, agreement or other item (A) required to be delivered by Seller at or prior to the Closing hereunder or (B) otherwise necessary to consummate the Contemplated Transactions as reasonably requested by Buyer or the Title Company; *provided, however*, that Seller shall not be obligated to cause the delivery of any such documentation under clause (B) to the extent it would increase or expand Seller's obligations or liability in any material respect.

(b)    Buyer Deliveries.    At the Closing, contemporaneously with Seller's delivery to Buyer of all of the Closing Documents required to be delivered by Seller hereunder, Buyer shall deliver or cause to be delivered to Seller the following items:

(i)    in accordance with and subject to adjustment as provided in this Agreement, the Purchase Price;

(ii)    copies of any reasonably required RE Tax Returns properly executed and acknowledged by Buyer;

(iii)    the closing and apportionment statement showing all adjustments in respect of the Purchase Price to be made at the Closing in accordance with the terms hereof, duly executed by Buyer;

(iv)    a certificate from an officer of Buyer to the effect that each of the conditions specified in Section 10.2(a) and Section 10.2(b) is satisfied in all respects;

(v)    a secretary's certificate of Buyer dated as of the Closing Date; (which shall include a certified copy of Buyer's certificate of incorporation, Buyer's bylaw, relevant resolutions of Buyer's Board approving the Contemplated Transactions and such other customary items as Seller may reasonably request), in form and substance reasonably satisfactory to Seller; and

(vi)    any other document, instrument, agreement or other item (A) required to be delivered by Buyer at or prior to the Closing hereunder or (B) otherwise necessary to consummate the Contemplated Transactions herein reasonably requested by Seller or the Title Company; *provided, however*, that Buyer shall not be obligated to cause the delivery of any such documentation under clause (B) to the extent it would increase or expand Buyer's obligations or liability in any material respect.

3.5    <u>Transfer Taxes</u>.  To the extent applicable, Buyer and Seller shall each pay at the Closing any Transfer Taxes (or any other transfer, conveyance or similar tax is imposed in connection with the sale, assignment, transfer and conveyance of the Owned Real Property) payable by it pursuant to Section 14.13.

3.6    <u>Delivery of Records and Contracts</u>.  Seller shall use reasonable efforts to make available to Buyer on the Closing Date all records, keys and other information in Seller's possession as of the Closing Date relating to the Acquired Assets under Section 2.1.

3.7    <u>Further Conveyances</u>.  From time to time following the Closing, each Party shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and the other Closing Documents, to ensure that Buyer is relieved of all Excluded Liabilities and to otherwise make effective the Contemplated Transactions.  If Buyer or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Buyer shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to Seller.  If Seller retains or receives any Acquired Assets (or any payments or proceeds related thereto) following the Closing, Seller shall promptly deliver such Acquired Assets (or any payments or proceeds related thereto) to Buyer.

3.8    <u>Bulk Sales Laws</u>.  The Parties hereby waive compliance by Seller with the requirements and provisions of any Applicable Law related to "bulk-transfer" of any jurisdiction

that may otherwise be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

3.9     <u>Allocation of Purchase Price</u>.  The Purchase Price shall be allocated among the Acquired Assets in accordance with the allocation protocols (and amounts determined therefrom) as determined by Buyer; *provided, however*, such allocation shall not be binding on Seller's estate in the Bankruptcy Case.

3.10     <u>Time is of the Essence</u>.  With regard to all dates and time periods set forth or referred to in this Agreement, Time is of the Essence.

ARTICLE IV
SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Buyer that the statements contained in this ARTICLE IV are correct and complete as of the Execution Date and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the Execution Date throughout this ARTICLE IV).

4.1     <u>Organization of Seller</u>.  Seller (a) is duly organized, validly existing under the laws of the State of New York, the jurisdiction of its formation, and (b) has full corporate power and authority and all necessary government approvals to own, lease and operate its properties and assets.

4.2     <u>Authorization of Transaction</u>.  Except for such authorization as is required by the Bankruptcy Court, Seller has full not-for-profit corporate power and authority to execute and deliver this Agreement and, subject to such authorization as is required by the Bankruptcy Court and any required Supreme Court Approval to perform its obligations hereunder.  Without limiting the generality of the foregoing, the Board of Seller has duly authorized the execution, delivery and performance of this Agreement by Seller.  This Agreement constitutes, and any and all other Closing Documents to be executed by Seller pursuant hereto, when executed, will constitute, the valid and legally binding obligation of Seller, enforceable in accordance with their terms and conditions, except as enforceability against Seller may be restricted, limited or delayed by applicable bankruptcy, moratorium or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

4.3     <u>Qualification</u>.  Seller is duly qualified or licensed to own and manage the Oakdale Campus, and is in good standing, in the State of New York, which is the only jurisdiction (domestic and foreign) in which the character or the location of the Acquired Assets requires such licensing or qualification.  To the extent necessary, Seller agrees to comply with the requirements of Sections 510 and 511 of the New York Not-for-Profit Corporation Law, made applicable hereto by Sections 1129(a)(16), 363(d) and 541(f) of the Bankruptcy Code.

4.4     <u>Non-Contravention</u>.  Subject to Supreme Court Approval, if any, and Bankruptcy Court approval, neither the execution and delivery of this Agreement, the consummation of the Contemplated Transactions (including each Closing Document required to be delivered by Seller at Closing), nor the fulfillment of the terms hereof by Seller, will (i) violate any order or award of any court, administrative agency or governmental body applicable to Seller; (ii) result in the

15

imposition of any Lien or Claim upon any Acquired Asset pursuant to the terms of any such mortgage, bond, indenture, lease, franchise or other instrument or obligation; (iii) constitute a violation by Seller of any Applicable Law; or (iv) conflict with or violate any charter document of Seller.

4.5    <u>Brokers' Fees</u>.    Seller has engaged the Campus Agents and shall be solely responsible for the commission and expenses due the Campus Agents in accordance with that certain agreement dated October 19, 2016.  For the avoidance of doubt, Seller has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Contemplated Transactions for which Buyer could become liable or obligated.

4.6    <u>Events Subsequent</u>.    Except as set forth in <u>Schedule 4.6</u>, since November 29, 2016, there have not been any of the following:

(a)    Any amendment or other modification or alteration (including through merger, liquidation, reorganization, or restructuring) of the articles of incorporation (or similar organizational documents) or corporate structure or ownership of Seller;

(b)    Any material damage to or destruction or loss of any Acquired Assets or Owned Real Property, whether or not covered by insurance, material adversely affecting the Acquired Assets;

(c)    Any sale, transfer, lease to others or other disposition of any Acquired Asset unless in the Ordinary Course of Business or if such item has been rendered obsolete;

(d)    Any change in any Tax election or Tax status of Seller; or

(e)    Any claims made or actions, suits or proceedings or, to the Knowledge of Seller, any investigation by a Governmental Authority commenced or, to the Knowledge of Seller, threatened, against Seller in relation to the Acquired Assets.

4.7    <u>Tax Matters</u>.

(a)    Seller has received a determination letter from the Internal Revenue Service to the effect that it is exempt from federal income taxation under Section 501(a) of the Code as an organization described in Section 501(c)(3) of the Code.  Such tax-exempt status has not been revoked or suspended, and to the Knowledge of Seller, there are not currently any proceedings to revoke or suspend such tax-exempt status.

(b)    Except as disclosed on <u>Schedule 4.7(b)</u>, Seller has duly and timely paid in accordance with all Applicable Law, all Taxes with respect to the Acquired Assets that are due and payable with respect to any period prior to Closing and has properly accrued on its books and records any Tax with respect to any such period that is not yet due and payable.  Except as disclosed on <u>Schedule 4.7(b)</u>, Seller has duly and timely withheld or collected, paid over and reported all Taxes with respect to the Acquired Assets required to be withheld or collected by it in any period prior to Closing.

(c)     Except as disclosed on Schedule 4.7(c), to Seller's Knowledge, there are no Liens or Claims for Taxes upon the Acquired Assets other than statutory Liens for Taxes not yet due or payable, and no issue has been raised by written inquiry of any Governmental Entity respecting Taxes, which, by application of the same principles, would reasonably be expected to result in a Lien or Claim on the Acquired Assets in any taxable period (or portion thereof) ending after the Closing Date.

(d)     No extension or waiver of the limitation period applicable to the assessment or collection of any Tax has been granted with respect to Seller; and Seller has not entered into any agreement or arrangement with any Governmental Authority with regard to any Liability for any Tax affecting any Tax period for which the applicable statute of limitations, after giving effect to extensions or waivers, has not expired.

(e)     No Governmental Authority has asserted in writing or, to Seller's Knowledge, orally (i) an adjustment that could result in an additional Tax for which Seller is or may be liable or that could result in a Lien or Claim on the Acquired Assets or (ii) a threat to the tax-exempt status of Seller. There is no proceeding pending relating to any Liability for any Tax or asset of Seller or the tax-exempt status of Seller and, to Seller's Knowledge, no Governmental Authority has threatened any audit, examination, investigation, inquiry, dispute, proceeding or claim.

4.8     Property and Assets.

(a)     Schedule 4.8(a) contains a complete list of all real property which comprises the Oakdale Campus which is the subject of this Agreement and to which Seller owns fee simple title together with any material property rights ("Owned Real Property"). Seller has not received any written notice of any pending expropriation, eminent domain or similar proceeding affecting all or any material portion of any such Owned Real Property or, to Seller's Knowledge, that any such activities are currently being threatened. There are no oral leases or subleases; there are no (x) written subleases or (y) written or oral licenses, concessions, occupancy agreements or other Contracts granting to any other Person the right of use or occupancy of the Owned Real Property or any portion thereof; and there is no Person in possession of the Owned Real Property or any portion thereof other than Seller. The real property identified on Schedule 4.8(a) represents all of the real property owned, leased, subleased, licensed or otherwise occupied by Seller that comprises the Oakdale Campus and which is the subject of the Contemplated Transactions.

(b)     Seller has good and valid title to the Acquired Assets. The foregoing notwithstanding, with respect to the Owned Real Property, Seller shall convey and Buyer shall accept such title as any reputable title company that is a member of the New York Board of Title Underwriters will be willing to approve and insure at standard rates in accordance with its standard form of title policy, clear of all Liens, except for Permitted Exceptions. Except as otherwise provided, the Owned Real Property shall be conveyed together with (a) all right, title and interest of Seller in and to all easements, rights of way, air or development rights, reservations, privileges, appurtenances, and other estates and rights of Seller, if any, pertaining to its interest in the Owned Real Property, and (b)

all right, title and interest of Seller, if any, in and to all alleys adjoining its interest in the Owned Real Property and in and to the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining its interest in the Owned Real Property to the center line thereof, and (c) subject to apportionment if required hereunder, all right, title and interest of Seller, if any, in and to any award made for any taking by condemnation or any damages to its interest in the Owned Real Property by reason of a change of grade of any street, road or avenue.

(c)     None of the Acquired Assets owned or leased by Seller is subject to any sublease or sublicense or any other agreement granting to any other Person by Seller any right to the use, occupancy or enjoyment of such property or any portion thereof.

(d)     To Seller's Knowledge, <u>Schedule 4.8(d)</u> lists all violations of law or municipal ordinances, orders or requirements noted in or issued by the departments of buildings, fire, labor, health or other federal, state, county, city or other departments and governmental authorities having jurisdiction against or affecting the Owned Real Property.

4.9    <u>Contracts</u>.

(a)     <u>Schedule 4.9 (a)</u> sets forth a complete and correct list of the following:

(i)     each Material Contract (or group of related Material Contracts), in each case, the performance of which relates to the Oakdale Campus and will extend over a period of more than one (1) year from the Execution Date or which provides for annual payments to or by Seller in excess of $50,000;

(ii)     each Contract that relates to the borrowing or lending by Seller of any money or that creates or continues any Lien or Claim against, or right of any third party with respect to, the Acquired Assets, except for those Liens and Claims not related to the borrowing of any money but arising in the Ordinary Course of Business;

(iii)     each Contract (or group of related Contracts) under which Seller has permitted any Acquired Asset to become encumbered; and

(iv)     each Contract by which Seller leases any real or personal property in relation to the Oakdale Campus or pursuant to which Seller is a lessor of, or permits any third party to operate, any real or personal property in relation to the Oakdale Campus.

(b)     As used in this Agreement, the term "<u>Material Contracts</u>" means all Contracts that are material to the Acquired Assets.  Except (i) as otherwise provided in the Bankruptcy Code and (ii) for events of default arising as a result of Seller's filing of a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, all of the Material Contracts are in full force and effect, are valid and binding and are enforceable in accordance with their terms in favor of the Seller.  Except for Cure Amounts, if any, there are no material Liabilities of any party to any Material Contract arising from any breach

or default of any provision thereof and no event has occurred that, with the passage of time or the giving of notice or both, would constitute a breach or default by any party thereto.

(c)     Intentionally Omitted.

(d)     Each Material Contract is enforceable against the applicable counterparty and is in full force and effect, and, subject to obtaining any necessary consents or delivering any necessary notices, as disclosed on Schedule 4.9(d), will continue to be so enforceable and in full force and effect following the consummation of the Contemplated Transactions.

(e)     No Material Contract to which Seller is a party may be terminated by any other party thereto as a result of the Contemplated Transactions.

(f)     There are no notes receivable of Seller or any other amount payable to Seller owing by any director, officer, member or Employee of Seller.  Neither Seller nor any Employee, officer, director, or shareholder, no individual, related by blood, marriage or adoption to any such individual, and no entity in which any such Person or individual owns any beneficial interest is a party to any agreement, contract, commitment or transaction with Seller or any loan, arrangement, understanding, agreement or contract for or relating to indebtedness of Seller, or has any interest in any property, tangible or intangible, used by Seller.

4.10    Seller's Consents and Approvals.  Schedule 4.9 lists all authorizations, approvals, waivers, filings or consents required to be obtained, and notices to be made (including any such authorizations, approvals, waivers, filings or consents required to be obtained from, and notices to be made to any Governmental Authority), by Seller to consummate the Contemplated Transactions (including this Agreement and each other Closing Document required to be delivered by Seller at Closing) (collectively, "Seller's Consents and Approvals"), other than (a) entry of the Sale Order, and (b) Supreme Court Approval, if any.

4.11    Powers of Attorney.  Except for accounts in connection with the Internal Revenue Service, there are no outstanding powers of attorney executed on behalf of Seller.

4.12    Litigation.

(a)     Except as set forth on Schedule 4.12, (i) there is no action, suit, investigation or proceeding pending or, to Seller's Knowledge, threatened (x) against Seller with respect to the Acquired Assets before any arbitrator or Governmental Authority, whether any of the same are covered by insurance or whether any applicable carrier has denied coverage or reserved rights with respect to or assumed the defense thereof and (y) that would reasonably be expected to prevent, hinder, delay or otherwise challenge the consummation of the Contemplated Transactions or that questions the validity, legality or propriety of the Contemplated Transactions or that could reasonably be expected to have a Material Adverse Effect; and (ii) Seller is not subject to any judgment, order or decree of any Governmental Authority with respect to the Acquired Assets involving an amount in excess of $50,000.00

(b)    Seller has delivered to Buyer correct and complete copies of all correspondence, pleadings, and other relevant documents in connection with the actions, suits, investigations or proceedings set forth on <u>Schedule 4.12</u>.

4.13    <u>Employees</u>.  Seller shall be solely responsible for any notices to Employees that may be required under any CBA as a consequence of the Contemplated Transaction, and shall defend, indemnify and hold harmless Buyer against any liability resulting from failure to provide such notices as may be required.

4.14    <u>Foreign Operations</u>.  Seller has no operations outside the United States.

4.15    <u>Insurance Coverage</u>.  <u>Schedule 4.15</u> lists, and Seller has furnished to Buyer, true and complete copies of, all insurance policies (including any insurance renewal binders) and fidelity or surety bonds currently in force relating to the Acquired Assets.  The policy limits and deductibles of such policies are not subject to claims by any other entities.  Except as set forth on <u>Schedule 4.15</u>, all premiums currently due and payable under all such policies and bonds have been paid in full.   <u>Schedule 4.15</u> lists all of Seller's current commercial general liability coverages.

4.16    <u>Restrictions on Acquisition</u>.  Except as set forth on <u>Schedule 4.16</u>, there is no agreement, judgment, injunction, order or decree binding upon Seller or the Acquired Assets or, to Seller's Knowledge, threatened, that has or could reasonably be expected to have the effect of prohibiting or materially impairing the acquisition of the Acquired Assets, in each case either individually or in the aggregate.

4.17    <u>Environmental Matters</u>.

(a)    To Seller's Knowledge and except as set forth on <u>Schedule 4.17(a)</u>:

(i)    Seller's ownership or leasing of the Owned Real Property are, and at all times have been, in compliance in all material respects with all applicable Environmental Laws;

(ii)    Seller has not received any written notice from a Governmental Authority or other Person regarding any Environmental Claim related to or arising out of Seller's ownership or leasing of the Owned Real Property that currently remains pending or unresolved and, to Seller's Knowledge, there are no events or conditions with respect to the ownership or leasing of the Owned Real Property or otherwise existing or occurring at the Owned Real Property that could reasonably be expected to result in an Environmental Claim;

(iii)    Seller is in compliance in all material respects with such Environmental Permits and there is not now pending nor, to Seller's Knowledge, threatened, any action by or before any Governmental Authority to revoke, cancel, rescind, suspend, restrict, modify or refuse to renew any Environmental Permit, and all of the Environmental Permits are and shall be effective and in good standing now and as of the Closing Date;

(iv)    There has been no Release or threatened Release of Hazardous Materials at, on, under, to or from the Owned Real Property required to be reported or subject to required Remediation, and Seller has not received any written notice from any Governmental Authority or other Person alleging that Seller has liability under any applicable Environmental Law with respect to the Release of Hazardous Materials at any real property off-site of the Real Property, including, where Hazardous Materials from the Owned Real Property have been taken for disposal, nor, to Seller's Knowledge, are there any events or conditions with respect to off-site disposal of Hazardous Materials that are reasonably likely to result in such liability or in the issuance of such notice to Seller;

(v)    The Owned Real Property contains no underground storage tanks that are owned or operated by Seller or any other underground storage tanks whether in use, closed or abandoned properly or not;

(vi)    There are no above-ground storage tanks for Hazardous Materials that are not in compliance with Environmental Law or are the source of a Release at, on, under, to or from the Real Property;

(vii)    None of the Owned Real Property is listed on the National Priorities List or similar state lists.    No Remediation is pending or being conducted at the Owned Real Property.  Seller has not received any notice from a Governmental Authority that Remediation is required at or about the Owned Real Property, nor to Seller's Knowledge are there any events or conditions at, about or with respect to the Owned Real Property that could reasonably be expected to result in the need for Remediation or in the issuance of such notice to Seller;

(viii)    There has been no exposure of any Person to Hazardous Materials in connection with Seller's ownership of the Owned Real Property that would reasonably be expected to form the basis for a claim for damages or compensation; and

(ix)    Seller has delivered to Buyer copies of all assessment reports, audits, studies, and correspondence in Seller's possession or control relating to the environmental conditions of the Owned Real Property, Environmental Claims, Environmental Permits, Hazardous Materials, Releases, Remediation or Seller's compliance with or violation of Environmental Laws and related to the Owned Real Property.

(b)    A list of all Environmental Permits pertaining to the Owned Real Property and the Acquired Assets as they are currently being operated by Seller is set forth on Schedule 4.17(b).

(c)    None of the matters set forth on Schedule 4.17(a) could reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect.

4.18    Intentionally Omitted.

4.19    <u>No Other Representations or Warranties; Schedules</u>.    Except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules), neither Seller nor any other Person makes any other representation or warranty whether express or implied, written or oral, with respect to Seller, the Business, the Acquired Assets, or the Contemplated Transactions, and Seller disclaims any other representations or warranties, whether made by Seller or any of its respective officers, directors, members, employees, agents, consultants or other Representatives.    Except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules), Seller (a) expressly disclaims any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer or its Representatives by any director, officer, member, employee, agent, consultant or other Representative of Seller).    Seller makes no implied representation or warranty as to the condition, merchantability, usage, suitability or fitness for any particular purpose with respect to the Acquired Assets except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules).

ARTICLE V<br>
BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Seller that the statements contained in this ARTICLE V are correct and complete as of the Execution Date and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the Execution Date throughout this ARTICLE V).

5.1    <u>Organization of Buyer</u>.    Buyer (a) is duly organized, validly existing and in good standing under the laws of the State of Delaware, the jurisdiction of its formation, (b) has full corporate power and authority and all necessary government approvals to own, lease and operate its properties and assets and to conduct its business as presently conducted, and (c) has identified all principals of Buyer entity on <u>Schedule 5.1 (c)</u>.

5.2    <u>Authorization of Transaction</u>.    Buyer has full power and authority to execute and deliver this Agreement and, subject to such authorizations as required by the Bankruptcy Court and Supreme Court Approval, if any, to perform its obligations hereunder.    The execution, delivery and performance of this Agreement and all other agreements contemplated hereby have been duly authorized by all requisite corporate action of Buyer.    This Agreement constitutes, and any and all other Closing Documents to be executed by Buyer pursuant hereto when executed will constitute, the valid and legally binding obligation of Buyer, enforceable in accordance with their terms and conditions, except as enforceability against Buyer may be restricted, limited or delayed by applicable bankruptcy, moratorium or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

5.3    <u>Non-Contravention</u>.

(a)    Subject to Supreme Court Approval, if any, and Bankruptcy Court approval, neither the execution and delivery of this Agreement, the consummation of the Contemplated Transactions (including each Closing Document required to be delivered by Buyer at Closing), nor the fulfillment of the terms hereof by Buyer, will (i) violate any Applicable Law to which Buyer is subject or any provision of its charter, bylaws, or other governing documents or (ii) conflict with, violate or result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets are subject.

(b)    Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Authority in order for the Parties to consummate the Contemplated Transactions (including each Closing Document required to be delivered by Buyer at Closing), except for such notices, consents and approvals as have already been given or obtained, those required under or in relation to those required by the Bankruptcy Court.

5.4    <u>Brokers' Fees</u>.    Buyer has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Contemplated Transactions.

5.5    <u>Buyer's Consents and Approvals</u>.  <u>Schedule 5.5</u> lists all authorizations, approvals, waivers, filings or consents required to be obtained, and notices to be made (including any such authorizations, approvals, waivers, filings or consents required to be obtained from, and notices to be made to any Governmental Authority), by Buyer to consummate the Contemplated Transactions (including each Closing Document required to be delivered by Buyer at Closing) (collectively, "<u>Buyer's Consents and Approvals</u>"), other than (a) entry of the Sale Order, and (b) Supreme Court Approval, if any.

5.6    <u>Acknowledgement Regarding Condition of the Acquired Assets</u>. Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges that (a) Buyer has had the opportunity to conduct due diligence prior to execution of this Agreement, (b) Buyer is relying solely upon Buyer's own independent review and investigation and not upon any written or oral representation of Seller, (c) Seller is not making any representations or warranties whatsoever, whether express or implied or written or oral, beyond those expressly given by it to Buyer in ARTICLE IV (as modified by the Schedules), and (d) Buyer agrees that, except for the representations and warranties contained therein, the Acquired Assets are being transferred to Buyer on a "WHERE IS" and, as to condition, "AS IS" basis.

5.7    <u>Financial Capability</u>.  Buyer has or on the Closing Date will have the resources and capabilities (financial or otherwise) to perform its obligations hereunder.

5.8    <u>No Other Representations or Warranties; Schedules</u>.    Except for the representations and warranties contained in this ARTICLE V (as modified by the Schedules), neither Buyer nor any other Person makes any other representation or warranty, whether express

23

or implied, written or oral, with respect to Buyer or the Contemplated Transactions, and Buyer disclaims any other representations or warranties, whether made by Buyer, any Affiliate of Buyer or any of their respective officers, directors, members, managers, employees, agents, consultants or other Representatives.  Except for the representations and warranties contained in this ARTICLE V (as modified by the Schedules), Buyer disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Seller or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to them by any director, officer, member, manager, employee, agent, consultant, or other Representative of Buyer or any of its Affiliates).

## ARTICLE VI
## BANKRUPTCY COURT MATTERS

6.1     Intentionally Omitted.

6.2     Competing Transaction.

(a)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each, a "Competing Bid").

(b)     Buyer acknowledges that Seller is permitted to cause its Representatives to further market and initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Representatives) in connection with any sale or other disposition of all or any other asset of Seller.  In addition, Seller shall have the responsibility and obligation to respond to any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the assets of Seller to prospective purchasers.  Prior to Seller furnishing any non-public information to any Person in connection with an offer regarding the sale or other disposition of all or any part of the Acquired Assets, Seller must enter into a customary confidentiality agreement with such Person on terms no less favorable to the Seller than those contained in Section 8.3.

(c)     If a Competing Bid is selected in conjunction with an auction (the "Auction") but such bidder does not consummate the purchase of the Acquired Assets and Buyer is the second highest bidder (the "Backup Bidder"), Buyer shall be subject to the rights and responsibilities of the Backup Bidder as set forth in the Bidding Procedures.

6.3     Intentionally Omitted.

## ARTICLE VII
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the Execution Date and the Closing:

7.1     General.  Each of the Parties will use its commercially reasonable efforts to take all actions and to do all things reasonably necessary in order to consummate and make effective

the Contemplated Transactions (including satisfaction, but not waiver, of the Closing conditions set forth in ARTICLE IX) and to reasonably ensure that Buyer is relieved of all Excluded Liabilities in compliance with applicable non-bankruptcy law and in accordance with Sections 1129(a)(16), 363(d) and 541(f) of the Bankruptcy Code.

7.2     Regulatory Approvals.

(a)     In compliance with applicable non-bankruptcy law and in accordance with Sections 1129(a)(16), 363(d) and 541(f) of the Bankruptcy Code, Seller and Buyer will promptly confer with the appropriate federal, state and local regulators to obtain their support for the approval of the Contemplated Transactions, including the Office of the New York State Attorney General Charities Bureau.

(b)     If necessary, each of Buyer and Seller shall use their reasonable best efforts to (i) make or cause to be made all filings required of each of them or any of their respective Affiliates in respect of the Contemplated Transactions under any Applicable Law, including such filings as are required to obtain the consents, approvals, authorizations, waivers, Orders, licenses or Permits or to provide the notices specified in Schedule 4.9 or Schedule 5.5, as promptly as practicable, (ii) comply at the earliest practicable date with any request for additional information, documents, or other materials received by each of them or any of their respective Affiliates from any Governmental Authority in respect of such filings or the Contemplated Transactions, and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by Applicable Law, providing copies of all such documents to the non-filing Parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any Governmental Authority under such Laws with respect to any such filing or any such transaction.

7.3     Operation of Business.  Seller will manage it properties in the Ordinary Course in accordance with any post-petition financing approved by the Bankruptcy Court.  Seller will maintain its tax-exempt status.  Without limiting the generality of the foregoing, Seller will not, without Buyer's prior written consent (which shall not be unreasonably withheld or delayed):

(a)     enter into or amend any Material Contract;

(b)     terminate any Material Contract other than upon the expiration of its term or for the counterparty's breach of such Material Contract;

(c)     fail to perform when due all material obligations under any Material Contracts except to the extent such performance is excused under the Bankruptcy Code, by the Bankruptcy Court, or by the counterparty's breach of such Material Contract;

(d)     fail to give prompt notice to Buyer of the commencement of or any Material Development of which Seller becomes aware;

(e)     fail to give prompt notice to Buyer of any Material Adverse Change;

(f)    sell, transfer, or convey any Acquired Asset (other than obsolete or worn out immaterial equipment disposed of in the Ordinary Course of Business and replaced if necessary with adequate replacement equipment);

(g)    adopt or propose any change to its governing documents;

(h)    merge or consolidate with any entity or acquire any assets from any entity (other than purchases of supplies in the Ordinary Course of Business);

(i)    except as permitted by the terms of any Material Contract pertaining to any Debt, incur any indebtedness for borrowed money or guarantee any such indebtedness or issue or sell any debt securities or guarantee any debt securities of others other than as disclosed to Buyer and excluding any accounts payable arising in the Ordinary Course of Business of a Seller;

(j)    enter into any operating lease;

(k)    terminate, fail to renew or materially reduce the amount of any insurance coverage provided by the existing insurance policies of Seller in relation to the Acquired Assets;

(l)    remove from Seller's premises or modify (other than in the Ordinary Course of Business) any books or records of Seller that are Acquired Assets;

(m)    fail to keep in full force and effect its Licenses; and

(n)    agree or commit to do any of the foregoing.

7.4    <u>Access</u>.  Seller will permit Representatives of Buyer (including its  accountants) to have access at all reasonable times, and in a manner so as not to interfere with the normal business operations of Seller, to the premises, properties, personnel, books, records (including Tax records, provided that those portions of any records or discussions pertaining to the entry into or consummation of the Contemplated Transactions may be withheld and/or redacted), contracts, and documents of or pertaining to Seller.  Seller will use best efforts to deliver to Buyer true and complete copies of each Material Contract, in each case, as amended or otherwise modified and in effect as of the Execution Date.

7.5    <u>Notice of Developments</u>.

(a)    Seller shall promptly notify Buyer of:

(i)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Contemplated Transactions;

(ii)    any notice or other communication from any Governmental Authority in connection with the Contemplated Transactions; or

(iii)    its obtaining Knowledge of (A) a breach or violation of any representation or warranty made by it contained in this Agreement that is qualified as to materiality becoming untrue or inaccurate in any respect or any such representation of warranty that is not so qualified becoming untrue or inaccurate in any material respect and (B) the failure of it to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it under this Agreement or any other Closing Document.

(b)    No notification under this Section 7.5 shall affect the representations, warranties or obligations of the Parties or the conditions to the obligations of the Parties hereunder, or limit or otherwise affect the remedies available hereunder to the Party receiving such notice.

7.6    <u>Employment Matters</u>.  Buyer shall not be permitted to contact the Employees.

7.7    <u>Removal of Excluded Assets from Owned Real Property</u>.  Prior to the Closing or as soon thereafter as is reasonably practical, Seller will remove from the Owned Real Property all Excluded Assets, except that Necessary Records will be removed in accordance with Section 8.6.

## ARTICLE VIII
## POST-CLOSING COVENANTS

Seller and Buyer agree as follows with respect to the period following the Closing:

8.1    <u>General</u>.  After the Closing, each of Buyer and Seller will take such further action as is necessary on its part to carry out the purposes of this Agreement (including the execution and delivery of such further instruments and documents) as either may reasonably request, all at the sole cost and expense of the requesting Party (subject to such Party's indemnification rights for such expenses).  Without limiting the foregoing, each of Buyer and Seller will cooperate in providing access to all books, records, ledgers, files, documents, correspondence, lists and other documents and information related to the matters covered by this Agreement as the other may reasonably request, all at the sole cost and expense of the requesting Party (subject to such Party's indemnification rights for such expense).

8.2    Intentionally Omitted.

8.3    <u>Non-Disclosure</u>.

(a)    From and after the date hereof, Buyer shall, and shall direct its Representatives, to maintain in confidence, not disclose to any third party (other than their Representatives) without the prior written consent of Seller, and not use to the detriment of Seller, any Seller Confidential Information relating to or obtained from Seller or its Representatives.  For purposes of this Section 8.3(a), "<u>Seller Confidential Information</u>" means any information that is confidential or proprietary in nature that is related to the Acquired Assets, the Business, the Excluded Assets, or the Excluded Liabilities, including methods of operation, student information, prices, fees, costs,

technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; *provided, however*, that Seller Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Buyer or any of its Representatives, (ii) becomes available to Buyer on a non-confidential basis from a source other than Seller or its Representatives, provided that such source is not known by Buyer to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Buyer from a third party having the right to disseminate the Seller Confidential Information without restriction on disclosure, or (iv) can be shown by Buyer through written documents or evidence maintained by Buyer to have been independently developed by it without the use of Seller Confidential Information; and *provided further*, that upon the Closing, the restrictions contained in this Section 8.3(a) shall not apply to confidential or proprietary information related primarily to the Acquired Assets, or the Business.  Buyer may disclose any of the Seller Confidential Information to its Representatives who need to know it for the purpose of effectuating the Transactions and who are directed to keep it confidential.  Buyer shall instruct its Representatives having access to Seller Confidential Information of such obligation of confidentiality.  If Buyer or anyone to whom it has transmitted Confidential Information subject to the confidentiality obligations herein is required by Applicable Law to disclose any of such Confidential Information, Buyer shall, to the extent permissible by Applicable Law, provide Seller with prompt notice prior to making any disclosure so that Seller may seek a protective order or other appropriate remedy.  If such protective order or other remedy is not obtained, or Seller waives compliance with the provisions of this Section 8.3(a), Buyer and its Representatives shall furnish only that portion of the Seller Confidential Information that it is advised by counsel is required by Applicable Law to be disclosed.

(b)    It is understood by the Parties that the information, documents and instruments delivered to Seller by Buyer or its Representatives in connection with the negotiation of this Agreement (the "<u>Buyer Confidential Information</u>") are of a confidential and proprietary nature.  Seller agrees that both prior and subsequent to Closing it will maintain the confidentiality of all Buyer Confidential Information and only disclose such information, documents and instruments (x) to duly authorized Representatives, (y) as necessary to comply with Applicable Law, or (z) to assist or defend claims as provided herein.  Buyer Confidential Information does not include any information that (i) becomes generally available to the public other than as a result of a disclosure by Seller, or any of its Representatives, (ii) becomes available to Seller on a non-confidential basis from a source other than Buyer or its Representatives, provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Buyer, (iii) is lawfully received by Seller from a third party having the right to disseminate the Buyer Confidential Information without restriction on disclosure, or (iv) can be shown by Seller through written documents or evidence maintained by them to have been independently developed by it without the use of Buyer Confidential Information.  Seller further agrees that upon Buyer's written request, it will destroy or, or at Seller's option return to Buyer, all such documents and instruments and all copies thereof in its possession.  If Seller or anyone to whom it has transmitted Buyer Confidential Information is required by Applicable Law to disclose

any of such Buyer Confidential Information, Seller shall, to the extent permissible by Applicable Law, provide Buyer with prompt notice prior to making any disclosure so that Buyer may seek a protective order or other appropriate remedy.  If such protective order or other remedy is not obtained, or Buyer waives compliance with the provisions of this Section 8.3(b), Seller and its Representatives shall furnish only that portion of the Buyer Confidential Information that it is advised by counsel is required by Applicable Law to be disclosed.

        (c)      The obligations contained in this Section 8.3 shall survive the Closing.

8.4    <u>Further Assurances</u>.  Each Party agrees to use all commercially reasonable efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under Applicable Laws and regulations to effectuate the consummation of the Contemplated Transactions (including this Agreement and each other Closing Document required to be delivered by Seller at Closing).

8.5    <u>Sale of Certain Furniture and Equipment</u>.  Seller will promptly market and sell by auction and sale process in a commercially reasonable manner all of the Furniture and Equipment.  Seller shall ensure that all Furniture and Equipment are removed from the Owned Real Property by no later than July 31, 2107. If the Furniture and Equipment is not removed by the Closing Date, then Seller shall ensure any agent responsible for marketing and selling the Furniture and Equipment has appropriate insurance coverage in place, naming Buyer and its designee as additional insureds, through the date which Furniture and Equipment has been removed from the Owned Real Property

8.6    <u>Removal of Necessary Records</u>.  Seller will use its best efforts, and will hire a records removal/storage company, to remove all required Necessary Records from the Owned Real Property prior to the Closing Date.  Seller shall ensure that all Necessary Records are removed from the Owned Real Property by no later than July 31, 2017.  If the Necessary Records are not removed by the Closing Date, then Seller shall ensure that the records removal/storage company has appropriate insurance coverage in place, naming Buyer and its designee as additional insureds, through the date on which the Necessary Records have been removed from the Owned Real Property.

ARTICLE IX
EMPLOYEES

9.1    <u>Buyer Not Assuming Seller's CBAs or Benefit Plans</u>.  Buyer is not assuming any of Seller's CBAs or Employee Benefit Plans.

9.2    <u>No Obligation to Offer Employment</u>.  Buyer shall have no right or obligation to offer employment to any of the Employees.

9.3    <u>No Successor Liability</u>.  Buyer shall have no liability, as successor or otherwise, for any breach by Seller of any of its CBAs, nor for any arrears by Seller in payments to Employees for wages or otherwise, nor for contributions due to any Employee Benefit Plan or Multiemployer Plan pursuant to any such CBA or any trust agreement, nor for any liability or claim arising out of or relating to the termination of Seller's obligations under any CBA or any

29

trust agreement, including termination of Seller's obligations to contribute to any Multiemployer Plan. Seller shall remain liable for all of its pre-Petition Date and post-Petition Date arrears to any such Employee Benefit Plans and Multiemployer Plans and for any Withdrawal Liability associated with their ceasing to contribute to any Multiemployer Plan.

ARTICLE X
CONDITIONS TO OBLIGATION TO CLOSE

10.1    <u>Conditions to Buyer's Obligation</u>.    Buyer's obligation to consummate the Contemplated Transactions is subject to satisfaction of the following conditions:

(a)    The representations and warranties set forth in ARTICLE IV shall be true and correct in all material respects when made and at and as of the Closing Date, except to the extent that such representations and warranties are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects when made and at and as of the Closing Date.

(b)    Seller shall have performed and complied with all of its covenants and agreements hereunder in all material respects through the Closing, except to the extent that such covenants or agreements are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case Seller shall have performed and complied with all of such covenants and agreements (as so written, including the term "material" or "Material") in all respects through the Closing;

(c)    No material breach or material default on the part of Seller shall have occurred under any covenant or agreement hereunder or any Closing Document or any other agreement of the Parties;

(d)    No Material Adverse Change shall have occurred with respect to Seller;

(e)    No order shall have been entered in any action or proceeding before any Governmental Authority, and no preliminary or permanent injunction by any court or Governmental Authority shall have been issued that would have the effect of (i) making the Contemplated Transactions contemplated illegal or in violation of any Applicable Law, or (ii) otherwise preventing consummation of the Contemplated Transactions;

(f)    No Applicable Law shall have been enacted or promulgated by any Governmental Authority that directly prohibits the consummation of the Closing under this Agreement and the Contemplated Transactions;

(g)    Seller and Buyer shall have received all authorizations, consents, and approvals of, and no notices of objections from, those Governmental Authorities referred to in Section 4.9, Section 5.5 and Section 7.2, as applicable, all of which shall be in form and substance reasonably satisfactory to Buyer;

(h)    Seller shall have received all other Seller's Consents and Approvals;

(i)    No Governmental Authority or the Internal Revenue Service shall have objected to the sale of the Acquired Assets pursuant to the Sale Order or, if any Governmental Authority shall have objected to the sale of the Acquired Assets pursuant to the Sale Order, such objection shall have been overruled or consensually resolved;

(j)    The Sale Order shall have become a Final Order;

(k)    All actions to be taken by Seller in connection with consummation of the Contemplated Transactions and all certificates, opinions, instruments, and other documents required to effect the Contemplated Transactions shall be reasonably satisfactory in form and substance to Buyer;

(l)    Buyer shall have received all of the Closing Documents described in Section 3.4(a);

(m)    the Title Company shall have irrevocably committed to issue a title policy to Buyer with respect to the Owned Real Property at standard rates in accordance with its standard form of title policy, clear of all Liens, subject to the Permitted Exceptions;

(n)    Seller shall have entered into a written agreement (in a form reasonably acceptable to Buyer) with a (i) records boxing/storage company to remove all Necessary Records from the Owned Real Property, and (ii) one or more agents for sale and/or removal of the Furniture and Equipment.

Buyer may waive in its sole and absolute discretion any condition specified in this Section 10.1 if it executes a writing so stating at or prior to the Closing.

10.2    <u>Conditions to Seller's Obligations</u>.    Seller's obligations to consummate the Contemplated Transactions are subject to satisfaction of the following conditions:

(a)    The representations and warranties set forth in ARTICLE V shall be true and correct in all material respects when made and at and as of the Closing Date, except to the extent that such representations and warranties are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects when made and at and as of the Closing Date;

(b)    Buyer shall have performed and complied with all of its covenants and agreements hereunder in all material respects through the Closing, except to the extent that such covenants or agreements are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case Buyer shall have performed and complied with all of such covenants and agreements (as so written, including the term "material" or "Material") in all respects through the Closing;

(c)    No order shall have been entered in any action or proceeding before any Governmental Authority, and no preliminary or permanent injunction by any court or Governmental Authority shall have been issued that would have the effect of (i) making

the Contemplated Transactions illegal or in violation of any Applicable Law, or (ii) otherwise preventing consummation of the Contemplated Transactions;

(d)      No Applicable Law shall have been enacted or promulgated by any Governmental Authority that directly prohibits the consummation of the Closing under this Agreement and the Contemplated Transactions;

(e)      Seller and Buyer shall have received all authorizations, consents, and approvals of, and no notices of objections from, those Governmental Authorities referred to in Section 4.10, Section 5.5 and Section 7.2, as applicable;

(f)      The Sale Order shall have become a Final Order; and

(g)      Seller shall have received all of the Closing Documents described in Section 3.4(b).

Seller may waive any condition specified in this Section 10.2 if it executes a writing so stating at or prior to the Closing.

## ARTICLE XI
## DISPUTE RESOLUTION

11.1    <u>Dispute Resolution</u>.  The Bankruptcy Court shall retain jurisdiction to adjudicate any dispute that arises under this Agreement.

## ARTICLE XII
## TERMINATION

12.1    <u>Termination of Agreement</u>.   In respect of the Contemplated Transactions, this Agreement may be terminated prior to the Closing as follows:

(a)      <u>Termination Due to Events in Bankruptcy Case</u>.  Buyer may terminate this Agreement immediately upon written notice to Seller if: (i) the Bankruptcy Case is dismissed or converted to a Chapter 7 bankruptcy case under the Bankruptcy Code, or an interim or permanent trustee is appointed in the Bankruptcy Case, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed in the Bankruptcy Case; (ii) relief from the automatic stay to permit foreclosure is granted or there is an exercise of other remedies on the Acquired Assets; or (iii) Seller consents to any modification of this Agreement without the prior written agreement of Buyer.

(b)      <u>Termination by Buyer</u>.  Buyer may terminate this Agreement immediately upon written notice to Seller of the occurrence of any of the following, at which time all obligations of Buyer hereunder shall be of no further force and effect:

(i)      Buyer is ready, willing, and able to perform and has properly served Seller with a Time is of the Essence demand and Seller has not properly rejected the same and not performed;

(ii)    if any of the conditions to the obligations of Buyer that are set forth in Section 10.1 shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer;

(iii)    if there shall be a material breach by Seller of any material representation or warranty, or any material covenant or agreement contained in this Agreement, which breach cannot be cured or has not been cured within fifteen (15) Business Days after the giving of written notice by Buyer to Seller of such breach;

(iv)    if there is a Material Adverse Effect; or

(v)    as provided in Section 13.1.

(c)    <u>Termination by Seller</u>.  Seller may terminate this Agreement upon written notice to Buyer of the occurrence of any of the following, unless Seller is in material breach of this Agreement prior to the occurrence of the following, at which time all obligations of Seller hereunder shall be of no further force and effect, except for those obligations specified in this Agreement to survive termination:

(i)    if any of the conditions to the obligations of Seller to close that are set forth in Section 10.2 shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller; or

(ii)    if there shall be a material breach by Buyer of any material representation or warranty, or by Buyer of any material covenant or agreement contained in this Agreement, which breach cannot be cured or has not been cured within 15 Business Days after the giving of written notice by Seller to Buyer of such breach.

(d)    <u>Termination by Buyer or Seller</u>.  Subject to Bankruptcy Court approval, the Parties may terminate this Agreement by mutual written consent of Seller and Buyer.

(e)    <u>Extension of Time Periods</u>.  The time periods for termination of this Agreement set forth in this Section 12.1 may be extended upon the written agreement of the Parties without the further approval of the Bankruptcy Court.

12.2    <u>Procedure For Termination</u>.  If this Agreement is terminated by Buyer or Seller, or both, pursuant to Section 12.1, written notice thereof shall promptly be given to the other Party, and upon the giving of such notice (or at such time as specified in the particular termination right set forth in Section 12.1), the Contemplated Transactions shall be abandoned and this Agreement shall terminate to the extent and with the effect provided by Section 12.3, without further action by the Parties.

12.3    <u>Effect of Termination</u>.  If either Seller or Buyer terminates this Agreement pursuant to Section 12.1, all rights and obligations of the Parties hereunder shall terminate

without any liability of any Party to any other Party (except for any Liability of any Party then in breach of this Agreement).

ARTICLE XIII
TITLE INSURANCE; PERMITTED EXCEPTIONS; APPORTIONMENTS

13.1    Title Insurance.  Buyer (i) has ordered from Advantage Title, 201 Old Country Road, Suite 200, Melville, NY 11747 (the "Title Company") a current title report with respect to the Owned Real Property, and Buyer shall request the Title Company to perform continuation searches of title prior to the Closing (collectively, the "Title Report"), and (ii) has ordered a current ALTA survey of the Owned Real Property (the "Survey").  Buyer has notified Seller, in writing (a "Buyer's Objection Notice"), of any exception, lien, mortgage, security interest, claim, charge, reservation, lease, tenancy, occupancy, easement, right of way, encroachment, restrictive covenant, condition, limitation or other encumbrance affecting the Owned Real Property (collectively, "Exceptions") disclosed by same that is not a Permitted Exception and to which Buyer objects.  Notwithstanding anything herein to the contrary, Buyer shall be deemed to have objected to and is not obligated to deliver a Buyer Objection Notice with respect to the following in order for same to constitute a Title Defect (defined below): (x) any and all monetary liens, including all mortgages and security interests securing any obligations of Seller (or any predecessor-in-interest to Seller), all judgments against Seller (or any predecessor-in-interest to Seller), all mechanics' liens recorded against the Owned Real Property (or any portion thereof), all monetary liens or penalties arising out of violations on the Owned Real Property and all real property taxes (other than real property taxes that constitute Permitted Exceptions), and (y) any and all tenancies.  Except as otherwise provided herein, Seller may elect (but shall not be obligated) to attempt to cure or remove any such title objections (collectively and individually, a "Title Defect") set forth in the Title Report, the Survey, a Buyer's Objection Notice or otherwise.  The Parties acknowledge that Seller may rely on the Sale Order to discharge certain Title Defects and hereby agree that the Title Company's issuance of a title insurance policy, in reliance on the Sale Order, without taking exception for those Title Defects shall be sufficient to constitute Seller's cure and removal of such Title Defects.  If Seller is obligated or elects to attempt to cure or remove any Title Defect and are unable to do so on or before the Closing Date, then Seller shall be entitled to adjourn the Closing in order to cure or remove such Title Defect for a period of not more than 30 days in the aggregate.  If Seller elects not to cure or remove, or after electing to cannot cure or remove, any Title Defect that Seller is not otherwise obligated to cure or remove pursuant to the terms of this Agreement or shall, for any reason, be unable to cure or remove any Title Defect that Seller is not otherwise obligated to cure or remove pursuant to the terms of this Agreement within the time periods set forth in the preceding sentence, then Seller shall notify Buyer in writing and Buyer shall have the right to either (i) terminate this Agreement or (ii) accept such title as Seller shall be able to convey without abatement in the Purchase Price and without any liability on the part of Seller.

13.2    Permitted Exceptions.  "Permitted Exceptions" means:

(a)    all matters set forth on Schedule 13.2(a) attached hereto and made a part hereof;

(b)    building, zoning, subdivision and other governmental laws, codes and regulations, and landmark, historic and wetlands designations;

(c)    any state of facts that a current, accurate survey or visual inspection of the Owned Real Property would disclose, provided same do not render title uninsurable at standard rates;

(d)    all rights and easements, for electricity, gas, telephone, water, cable television and any other utilities to maintain and operate lines, cables, poles and distribution boxes in, over and upon the Owned Real Property;

(e)    any variations between the tax diagram or the tax map and the record description;

(f)    rights of the public and adjoining owners in highways, streets, roads and lanes crossing the Owned Real Property existing as of the date hereof, provided that the Title Company shall insure (at no additional cost to Buyer) that no third parties have any claims for adverse possession or easements by prescription by virtue of the use of such highways, streets, roads and lanes crossing the Owned Real Property;

(g)    real property taxes, water rates and charges, sewer taxes and rents, and similar items with respect to the Owned Real Property, not yet due and payable and subject to apportionment as provided herein; and

(h)    assessments or installments thereof arising after the date of Closing, whether or not a lien as of Closing, which are due and payable on or after Closing.

13.3    <u>Apportionments</u>.

(a)    <u>Items Subject to Apportionment</u>.  Subject to the terms of this Section 13.3, the following items, without duplication, are to be apportioned between Seller and Buyer with respect to the Owned Real Property 12:00:01 a.m. on the calendar day immediately following the Closing Date, and at the Closing the net amount thereof shall, as applicable, either be (x) paid by Buyer to Seller by wire transfer of immediately available federal funds to a bank account designated by Seller or (y) credited by Seller against the Purchase Price:

(i)    real property taxes and assessments;

(ii)    water rates and charges;

(iii)    sewer taxes and rents;

(iv)    electricity, steam, gas and all other utilities, including, without limitation, taxes thereon;

(v)    deposits on account with any utility company servicing the Property, to the extent transferred to Buyer;

(vi)    deposits on account with any municipality having jurisdiction over the Property, to the extent transferred to Buyer; and

(vii)    all other items that reasonably require apportionment in accordance with local custom and practice to effectuate the transactions contemplated hereby.

Seller and Buyer shall adjust any apportionments made under this Section 13.3 after the Closing to account for errors or incorrect estimates made as of the Closing Date (it being agreed that the Parties' aforesaid agreement to make such adjustments shall survive the Closing for a period of six (6) months).

(b)    <u>Governmental Charges</u>.  Apportionment of real property taxes, water rates and charges, sewer taxes and rents and other similar items shall be made on the basis of the fiscal year for which assessed.  If the Closing Date occurs before the real property taxes, water rates and charges, sewer taxes and rents or similar items with respect to the Property are finally fixed for the fiscal year in which the Closing occurs, then the apportionments thereof made at the Closing shall be made on the basis of the real property taxes, water rates and charges, sewer taxes and rents or other similar items, as the case may be, for the preceding fiscal year applied to the latest assessed valuation.  After the real property taxes, water rates and charges, sewer taxes and rents or similar items, as the case may be, are finally fixed for the fiscal year in which the Closing occurs, Seller and Buyer shall make a recalculation of the apportionment thereof based on the amounts finally fixed for the fiscal year in which the Closing occurs, and Seller or Buyer, as the case may be, shall make an appropriate payment to the other Party based on such recalculation.  Seller or its representatives shall have the right (x) at any time before the Closing, to institute tax reduction or other proceedings to reduce the assessed valuation of the Owned Real Property with respect to any tax period ending at or prior to the end of the tax year in which the Closing occurs and (y) to continue, after the Closing, any such proceedings commenced by Seller prior to the Closing; p*rovided, however*, that (A) Seller (or its representatives) shall notify Buyer of, and keep Buyer reasonably informed with respect to, any such proceedings and no such proceeding shall be finally settled by Seller without the prior consent of Buyer, which consent shall not be unreasonably withheld, and (B) upon notice to Seller, Buyer shall have the right to assume control of and prosecute any such proceeding relating to the tax year in which the Closing occurs, provided that no such proceeding shall be finally settled by Buyer without the prior consent of Seller, which consent shall not be unreasonably withheld.  If Buyer, at any time following the Closing shall institute tax reduction or other proceedings to reduce the assessed valuation of the Owned Real Property with respect to the tax period ending at the end of the tax year in which the Closing occurs, such proceeding shall not be finally settled by Buyer without the prior consent of Seller, which consent shall not be unreasonably withheld.  If any refund of any real property tax, water rates and charges, sewer taxes and rents or similar items is issued after the Closing Date for any period ending prior to or including the Closing Date, such refund shall be applied as follows: <u>first</u>, to the cost incurred in obtaining such refund; and, <u>second</u>, the balance of such refund, if any, shall be apportioned between Seller, for the period prior to the Closing Date, and Buyer, for the period from and after the Closing Date.

(c)    <u>Water Meters</u>.  If there shall be any meters measuring water consumption at the Owned Real Property, Seller shall attempt to obtain meter readings to a date that is no more than thirty (30) days before the Closing, and, if such readings are obtained, the unfixed water rates and charges and sewer taxes and rents, if any, based thereon for the intervening time, shall be apportioned on the basis of such readings, or if such readings are not obtained, the unfixed water rates and charges and sewer taxes and rents, if any, shall be apportioned upon the last meter readings.

(d)    <u>Payment of Certain Items.</u>  The amount of any unpaid taxes, assessments, water rates and charges, sewer taxes and rents and any other similar items which Seller is obligated to pay and discharge with respect to the Owned Real Property, with interest and penalties thereon to the date which is three (3) Business Days following the Closing Date, may, at the option of Seller, be allowed to Buyer out of the Purchase Price, provided that official bills therefor with interest and penalties thereon are furnished to Buyer by Seller at the Closing.  Buyer, if request is made at least two (2) Business Days prior to the Closing, shall provide Seller at the Closing with separate wire transfers of immediately available federal funds, in an aggregate amount not exceeding the balance of the Purchase Price due to Seller at the Closing, to facilitate the satisfaction of any of the aforesaid taxes, assessments, water rates and charges, sewer taxes and rents and other similar items and any interest and penalties thereon to the Closing Date.  Without limiting the foregoing, Seller is solely obligated to pay and discharge any of the aforesaid taxes, assessments, water rates and charges, sewer taxes and rents and other similar items affecting the Owned Real Property that are delinquent as of the Closing Date, subject to apportionment as herein provided.

(e)    <u>Utilities</u>.  With respect to the utilities described in <u>Section 13.3(a)(iv)</u>, where possible, Seller shall secure cutoff readings for all utilities as of the apportionment time.  To the extent that such cutoff readings are not available, at Closing the cost of such utilities shall be apportioned between the Parties as of the apportionment time on the basis of the most recent actual (not estimated) bill for such service, and, after Closing, upon determination of the final meter readings shall be readjusted based on same as of the apportionment time.  Buyer shall be responsible for causing such utilities and services to be changed to its name (or the name of any affiliate, manager or tenant of Buyer) as of the Closing Date, and shall be liable for and shall pay all utility bills for services rendered after the apportionment time.  With respect to deposits of Seller on account with any utility company servicing the Owned Real Property, to the extent same are unconditionally transferred to Buyer at Closing, Seller shall receive an adjustment equal to the full amount of such deposits transferred to Buyer.  To the extent that any such deposits are not unconditionally transferred to Buyer, Seller shall have the right to a return of such deposits and Buyer shall be responsible for posting any deposits required from and after the Closing.

(f)    <u>Assessments</u>.  If, on the Closing Date, the Owned Real Property, or any part thereof, is affected by any real property tax assessments, then Seller shall pay such assessments; *provided, however*, that if such assessments are payable in installments, then Seller shall pay such installments due prior to the Closing Date, and Buyer shall pay such installments due after the Closing Date.

(g)    <u>Survival</u>.  The provisions of this Section 13.3 shall survive the Closing.

## ARTICLE XIV
## MISCELLANEOUS

14.1    <u>Survival</u>.    To the extent specified herein, the representations, warranties, covenants and obligations in this Agreement and in the certificates delivered pursuant to this Agreement shall survive the Closing and the consummation of the Contemplated Transactions. The waiver of any condition based upon the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect such right to set-off or other remedy based upon such representations, warranties, covenants and obligations.

14.2    <u>Press Releases and Public Announcements</u>.  No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of the other Party, such approval not to be unreasonably withheld or delayed; *provided, however*, that any Party may make any public disclosure it believes in good faith is required by Applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement (in which case the disclosing Party will use its reasonable efforts consistent with such Applicable Law or Bankruptcy Court requirement to advise the other Party prior to making the disclosure).

14.3    <u>No Third-Party Beneficiaries</u>.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

14.4    <u>Entire Agreement</u>.  This Agreement and the other Closing Documents constitute the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

14.5    <u>Succession and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party; *provided, however*, that Buyer may (a) assign any or all of its rights and interests herein, including but not limited to, any not-for-profit corporation of which Buyer is a member and which succeeds to the interest of Buyer in the Seller and (b) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder).

14.6    <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  The delivery of an executed signature page of this Agreement or any other Closing Document by fax or portable document format (.pdf) shall have the same effect as the delivery of a manually executed counterpart hereof or thereof.

14.7   Headings.   The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

14.8   Notices.   All notices, requests, demands, claims, and other communications hereunder shall be in writing.   Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (iii) four Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

| | |
|---|---|
| If to Seller: | Dowling College<br>150 Idle Hour Boulevard<br>Oakdale, New York 11769<br>Attn:  Robert S. Rosenfeld<br><br>-and-<br><br>RSR Consulting, LLC<br>1330 Avenue of the Americas, Suite 23A<br>New York, New York 10019<br>Attn:  Robert S. Rosenfeld |
| Copy to: | Klestadt Winters Jureller Southard & Stevens, LLP<br>200 West 41st Street, 17th Floor<br>New York, New York 10036<br>Attn:  Sean C. Southard, Esq. |
| If to Buyer: | Princeton Education Center LLC<br>1201 North Orange St. Suite 700-7550<br>Wilmington, DE 19801 |
| Copy to: | Liu, Zheng, Chen and Hoffman LLP<br>358 5th Ave, Suite 1003, New York, NY 10001<br>Attn: Jim Chengyu Hou, Esq. |

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

14.9   Governing Law; Waiver of Jury Trial.   This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES

ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.

14.10    <u>Submission to Jurisdiction; Consent to Service of Process</u>.  Without limiting any Party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Contemplated Transactions, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 14.8 hereof; *provided, however*, that, if the Bankruptcy Case has closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Eastern District of New York sitting in Central Islip, New York or the Commercial Division, Civil Branch of the Supreme Court of the State of New York sitting in Suffolk County and any appellate court from any thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each of the Parties hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 14.8.

14.11    <u>Amendments</u>.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and Seller.  Seller may consent to any such amendment at any time prior to the Closing with the prior authorization of Seller's Board.

14.12    <u>Severability</u>.    Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

14.13    <u>Expenses</u>.  Each of the Parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the Contemplated Transactions, except that Buyer on the one hand and Seller on the other hand shall each bear fifty percent (50%) of all Transfer Taxes payable with respect to the conveyance of the Owned Real Property, if any.

14.14    <u>Construction</u>.  The Parties participated fully in the negotiation and preparation of this Agreement with full benefit of counsel.  Accordingly, this Agreement is to be construed as if the Parties drafted it jointly and is not to be more strictly construed against any Party.

14.15    <u>Incorporation of Schedules</u>.  The Schedules identified in this Agreement are incorporated herein by reference and made a part hereof. The Parties acknowledge that the

Schedules attached hereto may be updated after the Execution Date with Buyer's consent, which consent shall not be unreasonably withheld.

14.16    No Waiver.  The failure of any Party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.  The waiver of any such right with respect to particular facts and other circumstances shall not be deemed a waiver with respect to any other facts and circumstances and each such right shall be deemed an ongoing right that may be asserted at any time and from time to time.  No right, remedy or election given by any term of this Agreement shall be deemed exclusive but shall be cumulative with all of the rights, remedies and elections available at law or in equity.

14.17    Non-Recourse Liability.  All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement may be made only against (and expressly limited to) the persons that are expressly identified as Parties hereto or thereto (the "Contracting Parties" and each a "Contract Party").   In no event shall any Contract Party have any shared or vicarious liability for the actions or omissions of any other person.   No person who is not a Contracting Party, including a director, officer, employee, incorporator, member, partner, manager, stockholder, affiliate, agent, attorney or representative of, and any financial advisor or lender (including the financial sources) to, any of the foregoing (the "Non-Party Affiliates"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose liability of an entity party against its owners or affiliates) for any causes of action or liabilities arising under, out of, in connection with or related in any manner to this agreement or related agreements or their negotiations, execution, performance or breach; and, to the maximum extent permitted by law, each Contracting Party waives and releases all such causes of action and liabilities against any such Non-Party Affiliates. Without limited to the foregoing, to the maximum extent permitted by Law , (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose liability of a Contracting Party on any Non-party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon Non-Party Affiliates with respect to the performance of this agreement or related agreements or any representation or warranty made in, in connection with, or as inducement to this agreement or related agreements. The Parties acknowledge and agreed that the Non-Party Affiliates are intended third-party beneficiaries of this Section.

*{signature page follows}*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

DOWLING COLLEGE

By: _____
Name:
Title:

PRINCETON EDUCATION CENTER LLC

By: _____
Name:  Jian Hua Li
Title:   Member

SCHEDULES TO

ASSET PURCHASE AGREEMENT


by and between


DOWLING COLLEGE


and


PRINCETON EDUCATION CENTER LLC


Dated as of April 6, 2017

THE SCHEDULES ARE CONFIDENTIAL AND HAVE BEEN REDACTED FOR FILING PURPOSES.