# <u>Exhibit E</u>

**Fill in this information to identify the case:**

Debtor 1    Dowling College

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the   Eastern District of New York

Case number   16-75545

CLERK
U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF
NEW YORK

2017 MAY 31  P 12: 04

RECEIVED/MR

FILED · 00482
EASTERN DISTRICT OF NEW YORK
DOWLING COLLEGE
16-75545/HONORABLE JUDGE ROBERT E. GROSSMAN

Garden City Group, LLC.
JUN – 2 2017

Official Form 410                    **CRT**

# Proof of Claim                                                    12/15

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attachments. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| **Part 1:** | **Identify the Claim** |
| --- | --- |

| | | |
| --- | --- | --- |
| 1. Who is the current creditor? | United States Department of Education | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor | |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes. From whom? | |
| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Natasha Varnovitsky<br>Name<br>400 Maryland Ave Ste, SW, Ste 6E215<br>Number    Street<br>Washington        DC        20202<br>City        State        ZIP Code<br><br>Contact phone  202 205-3529<br><br>Contact email  natasha.varnovitsky@ed.gov | **Where should payments to the creditor be sent?** (if different)<br><br>Name<br><br>Number    Street<br><br>City        State        ZIP Code<br><br>Contact phone<br><br>Contact email |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one): <br><br>__ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __ | |
| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____ | Filed on ____/____/_____<br>MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes    Who made the earlier filing? _____ | |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___  ___  ___  ___

---

**7. How much is the claim?**  $ _____ 22,899,773.37 . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Debtor's participation in Title IV of the HEA.  See attachment.

---

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**  $_____

**Amount of the claim that is secured:**  $_____

**Amount of the claim that is unsecured:**  $_____  (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**  $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

---

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.  $_____

---

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

Official Form 410    Proof of Claim    page 2

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | | | |
|---|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ No | | |
| | ☐ Yes. *Check all that apply:* | | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $_____ |
| | ☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use  11 U.S.C. § 507(a)(7). | | $_____ |
| | ☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | | $_____ |
| | * Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment. | | |

---

**Part 3:** **Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  05/26/2017
          MM / DD / YYYY

*David Z. Meill* (signature)
    Signature

Print the name of the person who is completing and signing this claim:

| | | | |
|---|---|---|---|
| Name | For    David Merrill    Sylvester Osineme | | |
| | First name         Middle name         Last name | | |
| Title | Supervisor, Accounts Receivable and Bank Management Group | | |
| Company | Office of the Chief Financial Officer, U.S. Department of Education | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer | | |
| Address | 550 12th SW | | |
| | Number       Street | | |
| | Washington, | DC | 20202 |
| | City | State | ZIP Code |
| Contact phone | 202 245-8081 | Email | sylvester.osineme@ed.gov |

---

**Attachment to the United States' Proof of Claim Filed by the
Department of Education in *In re Dowling College, Inc.*, Case No. 8-16-75545-reg**

1.      The United States Department of Education ("Education") makes grants and loans under student financial assistance programs authorized under Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070-1099c-2. At the time of its closing, debtor Dowling College, Inc. ("Daniel Webster") participated in the Title IV programs under a Program Participation Agreement ("PPA") , which, among other things, incorporates Education's regulations implementing the Title IV programs. As set forth below, Education's claims arise from Dowling's participation in the Title IV programs.

Closed-School Discharges

2.      Under Title IV, Education makes loans directly to students or their parents for the students to pursue higher education. Education sends proceeds of these loans to participating institutions. Generally, Education discharges direct student loans for students affected by a school's closure. "If a borrower who received, on or after January 1, 1986, a loan made, insured, or guaranteed under this part and the student borrower, or the student on whose behalf a parent borrowed, is unable to complete the program in which such student is enrolled due to the closure of the institution . . . , then the Secretary shall discharge the borrower's liability on the loan (including interest and collection fees) . . . ." 20 U.S.C. § 1087(c)(1); *see* 20 U.S.C. § 1087a(b)(2) (generally incorporating by reference into Education's direct loan program those statutory provisions for "loans made to borrowers under section 1078 of this title," i.e., under the Federal Family Education Loan Program). Thus, a borrower may obtain discharge of his or her "obligation to repay a Direct Loan . . . if the borrower (or the student on whose behalf a parent borrowed) did not complete the program of study for which the loan was made because the school at which the borrower (or student) was enrolled closed . . . ." 34 C.F.R. § 685.214(a)(1); *see also* 34 C.F.R. § 682.402(d). In applying for a discharge, among other things, the borrower must attest that the borrower (or the student on whose behalf a parent borrowed) "[d]id not complete the program of study through a teach-out at another school or by transferring academic credits or hours earned at the closed school to another school." 34 C.F.R. § 685.214(c)(1)(i)(C). If Education grants a discharge, the borrower is relieved of any obligation to repay the loan and is eligible for reimbursement of amounts already paid. *Id.* § 685.214(b).

3.      To date, Education has granted approximately **$ 2,629,452** in closed-school discharges of debt incurred by former Dowling students for direct loans. Moreover, Education continues to receive and review closed-school discharge applications and reserves the right to assess the liability for those discharges as they are granted.

4.      Dowling College is liable to Education for these discharges. Under Title IV, Education has a right to recover closed-school discharges from Dowling College. *See* 20 U.S.C. §§ 1087(c)(1) (requiring Secretary of Education to "pursue any claim available to [discharged borrower for student loan] against the institution") and 1087(c)(2) ("A borrower whose loan has

been discharged pursuant to this subsection shall be deemed to have assigned to the United States the right to a loan refund up to the amount discharged against the institution and its affiliates and principals."); 34 C.F.R. § 685.214(e)(1) (providing that upon Education's discharge of a borrower's loan, "the borrower is deemed to have assigned to and relinquished in favor of the Secretary [of Education] any right to a loan refund (up to the amount discharged) that the borrower (or student) may have by contract or applicable law with respect to the loan or the enrollment agreement for the program for which the loan was received, against the school"); *College of Visual Arts*, 2015 WL 6396241, at *8 (Dep't of Educ., Office of Hearings and Appeals, July 20, 2015) (holding, based on 20 U.S.C. §§ 1087(c) and 1099c(e)(1)(B), that Education has a direct claim to recover closed-school discharges). Dowling student borrowers who could not obtain a degree because Dowling closed had a right to recover from Dowling amounts of the direct loans made to them by Education, including without limitation because Dowling breached its enrollment agreements with the students and because Dowling was unjustly enriched by retaining these amounts. In addition, Education has a right to recover the closed-school discharges from Dowling as damages caused by Dowling's breach of the PPA, including without limitation its failure to provide an eligible program to students.

5.      Due to the ongoing process of receiving, reviewing, and deciding applications for these discharges, the full amount of Education's claim based upon closed-school discharge is unliquidated at this time.

Failure to Submit a Close-Out Audit Report

6.      When an institution's participation in Title IV ends, among other things, the institution must arrange for an independent audit of all Title IV funds received, and submit the resulting "close-out" audit report to Education within 90 days after the end of its participation. 34 C.F.R. § 668.26(b)(2); *see also* 34 C.F.R. § 668.82(b)(1) ("In the capacity of a fiduciary—(1) A participating institution is subject to the highest standard of care and diligence in administering the programs and in accounting to the Secretary for the funds received under those programs.").

7.      Dowling College ceased to participate in Title IV when it closed on August 31, 2016. A close-out audit report for the period of July 1, 2015 through June 31, 2016 was due to Education by March 31, 2017. To date, no audit report has been submitted. Until the audit report is submitted and approved by Education, Education has a claim against Dowling relating to Title IV funds received during the unaudited period.

8.      With respect to funds disbursed to Dowling College for Direct loans, Pell grants, Supplemental Educational Opportunity Grants ("SEOGs"), and Federal Work Study ("FWS") funds, Education has a claim against Dowling College arising from Dowling's obligation to repay such funds received during the unaudited period:

- Direct loans: ($13,930,698 for the 2015-2016 award year and $20,946 for the 2014-2015 award year).

- Pell grants: $2,033,770 ($6,630 for the 2014-2015 award year and $2,027,140 for the 2015-2016 award year).

- SEOGs: $101,000 for the 2015-2016 award year.

- FWS funds: $237,556 ($206,893for the 2015-2016 award year and $30,663.61for the 2014-2015 award year).

Perkins Funds

9.      Dowling College also participated in the Federal Perkins Loan Program, 20 U.S.C. §§ 1087aa-1087hh. An institution participating in the Federal Perkins Loan Program must establish and maintain a fund ("Perkins Fund") into which it deposits federal contributions allocated to such fund, as well as institutional contributions to the fund, together with any repayments of principal and interest and any other earnings on the assets. 34 C.F.R. § 674.8. If an institution responsible for the Perkins Fund closes, Education's regulations provide for a "capital distribution of the liquid assets of the Fund according to section 466(c) of the Act [i.e., 20 U.S.C. § 1087ff(c)]" and "assignment of the outstanding loans to the United States." 34 C.F.R. § 674.17(a). Furthermore, "[I]f an institution of higher education determines not to service and collect student loans made available from funds under this part ..., the institution will assign ... notes or evidence of obligations of student loans made from such funds to the Secretary." 20 U.S.C. §1087cc(a)(5).

10.      Dowling closed on August 5th, 2016.  On August 3, 2016 Education notified Dowling College of their obligation to return their Perkins loan portfolio to Education.  To date, Dowling College has not done so.  Education estimates the amount of Perkins loans held by Dowling College to be $2,425,446.

11.      Education has a claim for its share of the Perkins Fund, which it estimates to be $141,372.  In addition, Education has an unliquidated claim arising out of Dowling College's obligation to assign outstanding Perkins loans to the United States.

College Housing and Academic Facilities Loan.

12.      This claim states debtor's liability for a loan obtained by Dowling College from Education under the College Facilities Loan Program for the construction of Kramer Science Building, 150 Idle Hour Boulevard, Oakdale, NY 11769, on February 18, 1990. *See* Attachment A (Mortgage Note & Loan Agreement), on February 18, 1990. Dowling College signed a College Facilities Program Loan Agreement in the amount of $3,000,000. As part of the Loan Agreement Dowling College agreed to "sign and deliver to ED ... a security agreement and financing statement... covering all property ... purchased with loan proceeds." In accordance

3

with this agreement Dowling College executed a mortgage in favor of Education in the amount of $3,000,000. The current balance on that loan obligation is $1,296,990, including $1,179,667.71 in principal and $97,322.57 in interest. The Order approving the sale of this property was entered on April 12, 2017.

Miscellaneous Provisions

13.    The filing of this proof of claim is not:  (a) a waiver or release of Education's rights against any person, entity or property; (b) a waiver or release of any right or claim of Education arising out of any other claim, of any nature whatsoever, which Education has against Daniel Webster; (c) a waiver or release of any rights of Education under the regulations implementing Title IV, any provisions of the Bankruptcy Code or other applicable non-bankruptcy law; (d) an election of any remedy to the exclusion, express or implied, of any other remedy; (e) a waiver or release of any rights of Education to have any and all final orders in any and all noncore matters entered only after de novo review by a United States District Court; (f) a waiver or release of any rights of Education to trial by jury in any proceeding as to any and all matters so triable; or (g) a waiver or release of any rights of Education to have the reference in this matter withdrawn by the United States District Court in any matter or proceeding subject to mandatory or discretionary withdrawal.  All of such rights are hereby expressly reserved by Education, without exemption and with no purpose of confessing or conceding any of the foregoing in any way by this filing or by any other participation in this case.

14.    Education expressly reserves the right to amend or withdraw this proof of claim for any legally permissible reason whatsoever.

15.    Education preserves its rights to setoff and recoupment.

4

| | |
|---|---|
| U.S. DEPARTMENT OF EDUCATION<br><br>COLLEGE FACILITIES PROGRAM<br><br>LOAN AGREEMENT<br><br>(Note Financing) | PROJECT NUMBER:<br>P142A80123<br><br>NAME OF BORROWER:<br>Dowling College<br><br>ADDRESS AND ZIP CODE:<br>Idle Hour Boulevard<br>Oakdale, New York  11769-1999<br><br>DATE: ▓▓ ▓▓ ▓▓▓     FEB 1 8 1990 |

## PART I

THIS AGREEMENT, consisting of this Part I, including the Special Conditions attached hereto as Exhibit A and the Terms and Conditions forming Part II hereof (which Parts, together, are herein called the "Loan Agreement"), made and entered into on the date herein below specified, by and between Dowling College _____ (herein called the "Borrower") and the United States of America, acting by and through the Secretary of the Department of Education (herein called "ED") WITNESSETH:

WHEREAS the Borrower has made application for a loan to assist in financing housing, undergraduate academic facilities, or other educational facilities pursuant to Title VII-F of the Higher Education Act of 1965, as amended (herein called the "Project"),

NOW, THEREFORE, in consideration of the mutual covenants, promises and representations contained herein, the parties hereto do agree as follows:

1.  ED subject to the terms of this Agreement, will make a loan to the Borrower, to be advanced as hereinafter provided, in an amount not to exceed Three Million _____ Dollars ($3,000,000   ), or the total development cost of the Project, as determined by ED, whichever amount is the lesser.  The loan shall bear interest at the rate of five and one half per centum (5.5 %) per annum on the unpaid balance.  The principal and interest shall be payable in level semi-annual installments of $102,660.05 over a term of thirty years.  The loan shall be a general obligation of the Borrower, evidenced by a Mortgage Note (hereinafter called "Note") secured by a Mortgage or Deed of Trust (hereinafter called "Mortgage") which shall be a first lien on the project site and the improvements thereon, including the furniture, furnishings, and equipment therein owned by the Borrower.  The Note shall be payable from general revenues collected by the Borrower.

2.  The Project shall consist of renovation and rehabilitation of the Science Building to accommodate the instructional and growth needs of the institution.  The overall renovation calls for complete gutting of the building, improving the facade; providing up-to-date science laboratories, classrooms, and faculty and administrative office space; replacing and/or upgrading the HVAC and electrical systems;  and the building will be made fully accessible for the handicapped.

3.  The obligation of ED to make a loan to the Borrower is also subject to the following Special Conditions attached hereto and made a part hereof as Exhibit A.

IN WITNESS WHEREOF, this Agreement has been executed in the name of <u>Dowling College</u> by the undersigned official, and under its official seal, attested by its <u>Secretary</u>, and in the name and on behalf of the United States of America, Secretary of Department of Education.


(SEAL)


ATTEST:

_____          By: _____
        (Signature)                      (Signature)

Ronald J. Welebny, Secretary, Board of          Russell T. Lauper, Vice President & Treasurer
        (Type Name and Title) Trustees                  (Type Name and Title)



UNITED STATES OF AMERICA
**Secretary of Department of Education**

By: _____
    W. Stanley Kruger, Director
    Division of Higher Education
    Incentive Programs
TITLE: _____

DATE: _____
    MAR 2 9 1990
    (Date of Execution by ED)

NAME OF BORROWER: Dowling College, NY

PROJECT NUMBER: ~~J-A-0116-87~~ P/42A80123

## SPECIAL CONDITIONS FOR LOAN AGREEMENT

1.  Required Accounts

    a.  Debt Service Payment Account.  The Borrower shall establish in a bank which is a member of the Federal Deposit Insurance Corporation and maintain so long as the Note is outstanding, a separate account (herein called the "Debt Service Payment Account") into which the Borrower shall deposit on or before each April 15 and October 15 the sum of $102,661 in order to meet the payment to principal and interest due on each May 1 and November 1.

    b.  Debt Service Reserve Account.  The Borrower shall establish in a bank which is a member of the Federal Deposit Insurance Corporation and maintain so long as the Note is outstanding, a separate account (herein called the "Debt Service Reserve Account") into which the Borrower shall deposit on or before each April 15 and October 15, beginning April 15, 1992, the sum of $25,665 until $205,320 has been accumulated. Thereafter the Debt Service Reserve Account shall be maintained in the amount of $205,320.

    c.  Repair and Replacement Reserve Account.  As soon as the required reserve is accumulated in the Debt Service Reserve Account, the Borrower shall establish in a bank which is a member of the Federal Deposit Insurance Corporation, a separate Account called the "Repair and Replacement Reserve Account" into which shall be deposited on or before the close of each fiscal year the sum of $30,000 until the Account shall aggregate $300,000   and thereafter such sums but not more than $30,000  annually as may be required to restore and maintain the balance of $300,000 . In In the event the funds in the Debt Service Reserve Account should be reduced below the debt service reserve of $205,320, funds on deposit in the Repair and Replacement Reserve Account shall be transferred to the Debt Service Reserve Account to the extent required to eliminate the deficiency in that Account.

2.  Interest Earned on Investments During Construction.  In accordance with Section 12 of the standard Terms and Conditions for bond financing, and Section 3c. of the standard Terms and Conditions for note and mortage financing, any interest earned on the investment of idle funds in the Construction Account during the

Page 2 - Special Conditions

construction period shall be deposited in the Construction Account. Any such interest earned shall be credited against the interest expense accruing during the construction period.   In the event that interest earned exceeds interest expense, the excess shall be used to reduce the outstanding principal amount of the loan under this agreement.

3.   Mandatory Post-Closing Loan Reductions.   Where a loan reduction is required after final loan closing, either as a result of 2. above or a reduction of eligible project development cost, the following procedure will be used:

   a.   In the case of a bond, the loan prepayment, rounded to the next highest $1,000, shall be applied to the bond in inverse order of maturity.

   b. In the case of a note, the required prepayment must be made in addition to any regularly scheduled loan payments which may be due under the note. The reduced loan amount may be amortized over the remaining term of the note.

5.Penalties.   If an delinquency shall occur in the payment of either principal or interest due under the Note or bonds issued pursuant to the terms of this Loan Agreement, the Borrower shall be subject to the penalties provided for in the regulations published as Part 30 of Title 34 of the Code of Federal Regulations, and any subsequent revisions of the regulations as may be in effect at the time of the delinquency.

U.S. DEPARTMENT OF EDUCATION
COLLEGE FACILITIES LOAN PROGRAM
Terms and Conditions

(Note and Mortgage Financing)

Part II

Constituting Part of the Loan Agreement Providing for Financing the
Construction, Rehabilitation or Acquisition of College Housing, Undergraduate
Academic Facilities, or Other Educational Facilities Under Title VII, Part F,
of the Higher Education Act of 1965, as amended.

Section 1.  <u>Definitions</u>.  As used in these Terms and Conditions:

    a.  "Borrower" means the educational institution or other entity
       designated in Part I of the Loan Agreement.

    b.  "ED" means the United States of America, acting by and through the
       Secretary of Education or the Department of Education.

    c.  "Loan Agreement" means the contract between ED and the Borrower
       covering the Project and includes both these Terms and Conditions
       and Part I, together with any modifications and amendments thereto.

    d.  "Mortgage" includes "Deed of Trust", "Chattel Mortgage", and any
       other security for the Note identified herein.

    e.  "Mortgage Property" includes the land, with all buildings and
       improvements and all fixtures, including all furniture, furnishings
       and equipment used or furnished in connection with the Project
       and/or any other facility mortgaged as part of the security.

    f.  "Note" means an instrument signed by the Borrower evidencing the
       loan which ED has agreed to make under the Loan Agreement.

    g.  "Project" means the housing, undergraduate academic facilities,
       or other educational facilities described in Part I which ED has
       agreed to assist in financing under the Loan Agreement.

    h.  "Project Costs" or "Development Costs" mean the cost of land and
       site improvements, architectural and engineering services, con-
       struction, legal and administrative services, interest during
       construction, the cost of acquiring existing housing and related
       dining facilities, or existing academic facilities, and the cost
       of equipment both built-in and movable, all as approved by the
       Secretary.

Page 2

Section 2. <u>Drawings and Specifications</u>.

    a. The Borrower shall develop the Project in accordance with drawings
       and specifications which have been filed with and approved by ED.

    b. Changes in the drawings and specifications, or changes by altering or
       adding to the work contemplated, or orders for extra work must have the
       prior written approval of the Borrower's Architect. Evidence of such
       approval must be submitted to ED. Any such change or work order which
       will result in a net construction cost increase, or will change the
       design concept, or will result in a net cumulative construction cost
       decrease of more than two percent of the contract amount may be made
       only with the prior written approval of ED and under such conditions as
       ED may establish.

Section 3. <u>Construction Account</u>.

    a. The Borrower covenants that it will deposit the proceeds from the ED
       loan and the additional funds to be furnished by the Borrower in order
       to assure the payment of all Project Costs into a separate account
       called the "Construction Account", established by it in a bank or banks
       which are members of the Federal Deposit Insurance Corporation or, if
       legally required, with the fiscal agency of the Borrower fixed by law.
       Moneys in the Construction Account shall be expended only for the purposes
       for which loan disbursements are requested from and approved by ED.

    b. Until the Project is substantially completed or becomes revenue-producing,
       the Borrower shall pay to ED the amount due for interest on the Note from
       the Construction Account and/or from its general funds, if necessary.

    c. Where the moneys on deposit in the Construction Account exceed the
       estimated disbursements on account of the Project for the next 90 days,
       the Borrower may deposit such excess funds in time deposits in banks
       that are members of the Federal Deposit Insurance Corporation or may
       invest such excess funds in direct obligations of, or obligations the
       principal of and interest on which are guaranteed by, the United States
       Government, which shall mature not later than 18 months after the date
       of such investment and which shall be subject to redemption at any time
       by the holder thereof. The earnings from any such deposits or invest-
       ments shall be deposited in the Construction Account by the Borrower.
       The interest earned must be credited against the interest expense
       accruing during the construction period. In the event that interest
       earned exceeds interest expense, the excess must be used to reduce the
       outstanding principal amount of the loan.

    d. The Borrower shall not transfer, assign or pledge any right or interest
       in, or title to, any funds deposited in the Construction Account without
       the approval of ED.

Page 3

e. Any moneys remaining in the Construction Account after all costs of the Project have been paid shall be promptly used to reduce the outstanding loan amount; Provided, however, the Borrower shall have the right to withdraw any such moneys representing additional funds deposited into the Construction Account to finance the total project cost, which are found to be unnecessary for such purposes.

**Section 4.** Borrower's Participation in Total Project Costs.

The Borrower shall pay all Project Costs and furnish from sources other than the proceeds of the loan, and from sources and in a manner which will not jeopardize the security for the loan, the additional funds, if any, which will be sufficient to pay the total Project Costs.

**Section 5.** Furnishings and Equipment.

The Borrower shall, on or before substantial completion of the Project, provide the movable and/or built in furnishing and equipment necessary to the full enjoyment of the use, occupancy and operation of the Project.

**Section 6.** Project Site.

a. The Project shall be located on lands of the Borrower, at a site to be approved by ED, and the Borrower shall furnish ED with satisfactory evidence of its ownership of the Project site.

b. The Borrower shall provide or obtain the provision of streets and access roads to the Project deemed necessary by ED from sources other than the loan hereunder, and from sources and in a manner which will not jeapodize the security for the loan.

**Section 7.** Prompt Procedure-Economical Construction - Accident Prevention - Supervison and Inspection.

a. The Borrower convenants and agrees that it will proceed promptly with all matters necessary for the financing and development of the Project and will construct and complete the Project within a reasonable time after the date of this Agreement, as determined by ED, in accordance with plans and specifications approved by ED, and that the Project will be undertaken and developed in such a manner that economy will be promoted in such development and in the construction work; and that the project will not be of elaborate or extravagant design or materials.

b. The Borrower shall require of its contractors that precaution shall be exercised at all times for the protection of persons (including employees) and property, and that hazardous conditions shall be guarded against or eliminated.

    c. The Borrower shall provide and maintain on its own behalf competent and adequate architectural or engineering services covering the supervision and inspection of the development and construction of the Project.

## Section 8. Opinion of Counsel.

The Borrower shall furnish ED with an opinion of its counsel, who shall be satisfactory to ED, covering the authorization, execution, issuance and tender of the Note, and the security for the Note, and evidencing that: the Note when accepted by ED and disbursements are made thereunder, will constitute binding and legal obligations, payable and secured in accordance with their tenor; all proceedings for the financing and the acquisition, construction, and development of the Project preliminary to delivery of the Note to ED have been had and adopted in due time, form and manner as required by law; and that the validity and priority of the Note and Mortgage, revenue pledge and any other security for the loan are consistent with this Agreement.

## Section 9. Interim Construction Financing.

    a. The Borrower shall make every effort to obtain interim construction financing from private sources. However, should the Borrower demonstrate to the Secretary's satisfaction that interim construction financing is not available on reasonable terms the Secretary may consider requests for advances of the loan proceeds. Requests for advances shall be accompanied by such supporting data as the Secretary may require.

    b. Loan proceeds may be advanced to the Borrower during the construction period on the basis of the fully executed Loan Agreement. The final disbursement, however, must coincide with the loan closing at which time the Note will be executed and the Mortgage or Deed of Trust recorded. Prior to making any loan advances, the Borrower shall present satisfactory evidence that:

        1. It has deposited in the Construction Account such funds as are necessary together with the loan proceeds to assure completion of the project;

        2. It is able to provide the Project site free from all liens, including mechanic's liens, and encumbrances.

      c. Any funds advanced to the Borrower by the Secretary pursuant to this section shall bear interest at the rate specified for the loan in Part 1 of this Agreement. Interest on advances shall accrue from the date of each advance and shall be paid in full at the time of the loan closing.

**Section 10. <u>Mechanic's and Materialmen's Liens</u>.**

      a. The Borrower shall cause to be filed in the public records either this instrument or the construction contract under which the improvements are to be erected, if the effect thereof will be to relieve the mortgaged property from mechanic's and materialmen's liens. Before any advance hereunder, and concurrently with the final payment for the Project, ED may require the Borrower to obtain from the contractor and all subcontractors and materialmen dealing directly with the principal contractor acknowledgements of payment and release of lien down to the date covered by the last advance. Such acknowledgements and releases shall be in the form required by local lien laws and shall cover all work done, labor performed and materials (including equipment and fixtures) furnished for the Project.

      b. The Borrower shall immediately satisfy or release any mechanic's lien, attachment, judgment lien, or any other lien which attaches to the mortgaged property, and shall dismiss or have dismissed or vacated any receivership or petition in bankruptcy or assignment for benefit of creditors, creditors bill or insolvency proceeding involving the Project or the mortgaged property.

**Section 11. <u>Construction in Accordance with Ordinances, Statutes and Regulatory Requirements</u>.**

      The Borrower agrees that the Project shall be constructed strictly in accordance with all applicable ordinances and statutes, and in accordance with the requirements of all regulatory authorities, and any rating or inspection organization, bureau, association or office having jurisdiction. The Borrower further agrees that the Project shall be constructed entirely on the aforesaid property and will not encroach upon any easement or right-of-way, or the land of others; and that the Project when completed shall be wholly within the building restriction lines, however established, and will not violate applicable use or other restrictions contained in prior conveyances, zoning ordinances or regulations. The Borrower shall furnish from time to time such evidence with respect thereto as may be required by ED, and, upon completion of construction, shall furnish a survey, certified by a registered surveyor, which shows the Project to be entirely on said property and to be free from any such violations.

Section 12.  <u>Approvals and Permits</u>.

   The Borrower shall obtain all approvals and permits required by law as
a condition precedent to the acquisition, construction, development
and operation of the Project.

Section 13.  <u>Default Prior to Project Completion</u>.

  a.  If the Borrower at any time prior to the completion of the Project
abandons the same, or ceases work thereon for a period of more than 30
days, or fails to complete the Project strictly in accordance with the
drawings and specifications, or makes changes in the drawings and
specifications without first securing the written approval required by
Section 2 of Part II of the Loan Agreement, or otherwise fails to comply
with the terms hereof, any such failures shall be a default hereunder,
and  ED  at its option, may terminate this Agreement.

  b.  If  ED elects not to terminate this Agreement, it may enter into posses-
sion of the premises and perform any and all work and labor necessary to
complete the improvements substantially according to the drawings and
specifications, and employ watchmen to protect the premises from injury.
All sums so expended by ED  shall be deemed to have been paid to the
Borrower and secured by the Mortgage   For this purpose, the Borrower
hereby constitutes and appoints ED  its true and lawful attorney-in-fact,
with full power of substitution on the premises, to complete the project
in the name of the Borrower.  The Borrower hereby empowers said
attorney as follows:

   (1)  To use any balance of loan    proceeds held by the Borrower and
any funds which may remain unadvanced hereunder for the purpose
of completing the Project in the manner called for by the drawings
and specifications;

   (2)  To make such additions, changes and corrections in the drawings and
specifications as shall be necessary or desirable to complete the
Project in substantially the manner contemplated by the drawings
and specifications;

   (3)  To employ such contractors, subcontractors, agents, architects
and inspectors as shall be required for said purposes;

   (4)  To pay, settle or compromise all existing bills and claims which
may be liens against the mortgaged property, or as may be necessary
or desirable for the completion of the Project, or for clearance of
title;

   (5)  To execute all applications and certificates in the name of the
Borrower which may be required by any of the contract documents;

   (6)  To prosecute and defend all actions or proceedings in connection
with the mortgaged premises or the construction of the Project
and to take such action and require such performance as deemed
necessary under the accepted guaranty of completion;

      (7) To do any and every act which the Borrower might do in its own behalf.

  c. It is further understood and agreed that this power of attorney, which shall be deemed to be a power coupled with an interest, cannot be revoked. The Borrower hereby assigns and quitclaims to ED all sums unadvanced under the Mortgage and all sums on deposit in the Construction Account conditioned upon the use of said sums for the completion of the Project, such assignment to become effective only in case of the Borrower's default.

## Section 14.    Competitive Bidding.

    All work on the Project shall be done under contract and every opportunity shall be given for free, open, and competitive bidding for each and every construction, material and equipment contract. The Borrower shall give such publicity by advertisements or calls for bids by it for the furnishing to it of work, labor, materials, and equipment as required by ED and as will provide adequate competition; and the award of each contract therefor shall be made, after approval by ED to the lowest responsible bidder as soon as practicable; Provided, that in the selection of equipment or materials the Borrower may, in the interest of standardization or ultimate economy, if the advantage of such standardization or such ultimate economy is clearly evident, award a contract to a responsible bidder other than the bidder specifying the lowest price. The Borrower shall obtain the concurrence of ED before approving subcontracts relating to the Project.

## Section 15.    Prohibition on Use of Lead-Based Paint.

    Each contract entered into by the Borrower shall prohibit the use of, and the Borrower itself shall not use, any lead-based paint on any applicable surface in the construction or rehabilitation of any Project, in accordance with the Lead-Based Paint Poisoning Prevention Act (42 U.S.C. 4801 et seq.) and the regulations of the Government implementing that Act (42 C.F.R. Part 90, 24 C.F.R. Part 35, as amended). In addition, the Borrower shall require the inclusion of this prohibition against lead-based paint in each subcontract for construction or rehabilitation of any Project. The Borrower, also agrees that it shall prohibit the use of any lead-based paint on any applicable surface in the alteration, repair and maintenance of the Project or premises.

## Section 16.    Performance and Payment Bonds.

    The Borrower shall require each construction contractor to furnish a performance bond in an amount at least equal to 100 percent of the contract price as security for the faithful performance of the contract and also a payment bond in an amount not less than 50 percent of the contract price or in a penal sum not less than that prescribed by State, territorial, or local law, as security for the payment of all persons performing labor on the Project under the security contract and furnishing materials in connection with the contract. The performance bond and the payment bond may be in one or in separate instruments in accordance with local law. Said bonds shall run to ED as obligee.

Page 8

### Section 17.  Insurance During Construction.

The Borrower shall require that each of its contractors and all subcontractors shall maintain during the life of the contract Workers Compensation Insurance, Comprehensive General Liability including Manufacturers and Contractors, Products/Completed Operations and Contractual Liability (if needed) in amounts of at least $300,000 Bodily Injury and $10,000 Property Damage, including Broad Form Property Damage with no X, C, or U exclusions, and Automobile Liability Insurance including all owned, hired and non-owned vehicles in an amount of at least $100,000 per person, $300,000 per occurrence Bodily Injury, and $10,000 Property Damage.  Until the Project is completed and accepted by the Borrower, the Borrower is required to maintain, or to require the contractor to maintain, Builder's Risk Insurance (fire and extended coverage) on a 100 percent completed value basis on the insurable portion of the Project.  Such policies shall be endorsed with standard mortgage clauses making loss payable to ED or its assigns, and may be endorsed to make loss during construction payable to the prime contractor and all subcontractors, as interest may appear.  The contractor shall have evidence that these insurances are in force in the form of certificates of insurance supplied to the Borrower guaranteeing 30 days prior notice of any cancellation, non-renewal or material change in the insurance contract.

### Section 18.  Supervision and Inspection by ED

a.  ED and its authorized agents shall, at all times during construction, have the right of entry and free access to the Project and the right to inspect all work done, all materials, equipment and fixtures furnished, installed or stored in and about the Project.

b.  The Borrower shall require of its contractors that ED and its authorized agents be permitted, and itself permit them, to inspect all payrolls, records of personnel, invoices of materials and other relevant data and records appertaining to the development of the Project.

c.  The Borrower shall permit ED and its authorized agents to audit the books, records, and accounts of the Borrower appertaining to the loan and the development of the Project.

### Section 19.  Submission of Proceedings, Contracts and Other Documents.

The Borrower shall submit to ED such data, reports, records, and documents relating to the financing, construction, and operation of the Project and financial condition of the Borrower as ED may require. Approval of ED must be obtained prior to the assignment of any interest in or part of any contract relating to the Project.

### Section 20.  Security Agreement and Financing Statement.

The Borrower shall execute and deliver to ED , upon completion of the Project, a security agreement and financing statement, or other similar instrument, covering all property of any kind whatsoever purchased with loan    proceeds and concerning which there may be any doubt as

to such property's being subject to the lien of the Mortgage under the laws of the state in which the Project is situated.

Section 21. **Wage Rates and Work Hours.**

a.  Wages to be paid laborers and mechanics employed by contractors and subcontractors in the construction of the Project are required to be not less than the prevailing wage rates for corresponding classes of laborers and mechanics employed on construction of a similar character in the locality in which the work is to be performed, as determined by the Secretary of Labor with respect to this Project.

b.  Upon receipt of the list of wage rates determined by the Secretary of Labor in accordance with the Act of March 3, 1931 (Davis-Bacon Act, as amended), the Borrower shall include such list in all contracts calling for work on the Project and require adherence thereto. The Borrower shall also require of each of its contractors that such list shall be posted at appropriate conspicuous points on the site of the Project. Unless otherwise required by law, wage rates need not be listed for nonmanual workers, including executive, supervisory, administrative and clerical employees.

c.  If, after the award of the contract, it becomes necessary to employ any person in a trade or occupation not classified in the above list, such person shall be paid at not less than a rate to be determined by the Secretary of Labor. Such approved minimum rate shall be retroactive to the time of the initial employment of such person in such trade or occupation. The contractor shall notify the Borrower of its intention to employ persons in trades or occupations not classified in sufficient time for the Borrower to obtain approved rates for such trades or occupations.

d.  The Borrower shall comply with the provisions of the Contract Work Hours Standards Act (40 U.S.C. 327-332) and the applicable rules and regulations issued by the Secretary of Labor thereunder which are incorporated herein by reference. The Borrower shall cause to be inserted in each contract or subcontract subject to the Contract Work Hours Standards Act the specific provisions required by the above regulations.

e.  ED may waive the application of subsections 21. a, b, c and d in cases or classes of cases where laborers or mechanics, not otherwise employed at anytime in the construction of the Project, voluntarily donate their services without full compensation for the purpose of lowering the costs of construction and ED determines that any amounts saved thereby are fully credited to the Borrower.

Section 22. **Violation of Wage Rates or Labor Standards.**

The Borrower agrees that should any advances hereunder be ineligible for loan disbursement by reason of (1) the nonpayment of the said prevailing wage rates, or (2) violation of any of the applicable labor standards provisions of the regulations of the Secretary of Labor, ED

may withhold from the Borrower all payments or advances payable to the Borrower hereunder until the Borrower establishes to the satisfaction of ED that all laborers and mechanics or other persons employed in the construction of the Project have been paid said prevailing wage rates and that such violation of the said labor standards provisions no longer exists. The written statement of any officer of ED declining to make any advance of funds hereunder by reason of such nonpayment or violation shall be deemed conclusive proof that such advances are ineligible for loan disbursement.

Section 23.  <u>Payment of Employees</u>.

The Borrower shall require of its contractors that all employees engaged in work on the Project be paid in full (less deductions made mandatory by law) not less often than once each week.

Section 24.  <u>Wage Underpayments and Adjustments</u>.

The Borrower shall require of each of its contractors that, in cases of underpayment of wages by the contractor, the Borrower may withhold from such contractor out of payments due, an amount sufficient to pay workers employed on the work covered by the contract, and the wages actually paid such workers for the total number of hours worked, and may disburse such amounts so withheld by it for and on account of the contractor to the respective employees to whom they are due.

Section 25.  <u>Copeland Act</u>.

The Borrower shall comply with the provisions of the Copeland Act (Anti-Kickback) 48 Stat. 1948, as amended, and the applicable rules and regulations issued by the Secretary of Labor thereunder which are incorporated here in by reference. The Borrower shall cause to be inserted in each contract or subcontract subject to the Copeland Act the specific provisions required by the above regulations in the construction, prosecution, or completion of the Project to comply therewith, and to cause the subcontractors to do likewise.

Section 26.  <u>Nondiscrimination</u>.

a.  The Borrower hereby agrees to incorporate or cause to be incorporated into any contract, or modification thereof, for construction work paid for in whole or in part with funds obtained pursuant to this Agreement, the following equal opportunity clause:

"During the performance of this contract, the contractor agrees as follows:

(1)  The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment without regard to their race, color, religion, sex, or national origin. Such action shall include but not be limited to, the following: employment, upgrading, demotion or transfer; recruitment or recruitment advertising;

layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided setting forth the provisions of this Equal Opportunity clause.

(2) The contractor will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin.

(3) The contractor will send to each labor union or representative of workers with which he/she has a collective bargaining agreement or other contract or understanding, a notice to be provided advising the labor union or workers' representative of the contractor's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.

(4) The contractor will comply with all provisions of Executive Order No. 11246 of September 24, 1965, and of the rules, regulations, and relevant orders of the Secretary of Labor.

(5) The contractor will furnish all information and reports required by Executive Order No. 11246 of September 24, 1965, and by rules, regulations and orders of the Secretary of Labor, or pursuant thereto, and will permit access to the books, records, and accounts by the Department of Education and the Secretary of Labor for purposes of investigation to ascertain compliance with such rules, regulations and orders.

(6) In the event of the contractor's noncompliance with the Equal Opportunity clauses of this contract or with any of such rules, regulations, or orders, this contract may be canceled, terminated, or suspended in whole or in part and the contractor may be declared ineligible for further Government contracts or federally assisted construction contracts, in accordance with procedures authorized in Executive Order No. 11246 of September 24, 1965, and such other sanctions may be imposed and remedies invoked as provided in Executive Order No. 11246 of September 24, 1965, or by rule, regulations, or order of the Secretary of Labor, or as otherwise provided by law.

(7) The contractor will include the portion of the sentence immediately preceding paragraph (1) and the provision of paragraphs (1) through (7) in every subcontract or purchase order unless exempted by rules, regulations, or orders of the Secretary of Labor issued pursuant to Section 204 of Executive Order No. 11246 of September 24, 1965, so that such provisions will be binding upon each subcontractor or vendor. The contractor will take such action with respect to any subcontract or purchase order as the Department

of Education may direct as a means of enforcing such provisions, including sanctions for noncompliance: Provided, however, that in the event the contractor becomes involved in, or is threatened with, litigatin with a subcontractor or vendor as a result of such direction by the Department of Education the contractor may request the United States to enter into such litigation to protect the interests of the United States.

b.  The Borrower further agrees that it will be bound by the above Equal Opportunity clause in any federally assisted construction work which it performs itself other than through the permanent work force directly employed by an agency of government.

c.  The Borrower agrees that it will cooperate actively with ED and the Secretary of Labor in obtaining the compliance of contractors and subcontractors with the Equal Opportunity clause and the rules, regulations and relevant orders of the Secretary of Labor, that it will furnish ED and the Secretary of Labor such information as they may require for the supervision of such compliance, and that it will otherwise assist ED in the discharge of the Department's primary responsibility for securing compliance.  The Borrower further agrees that it will refrain from entering into any contract or contract modification subject to Executive Order 11246 with a contractor debarred from, or who has not demonstrated eligibility for, Government contracts and federally assisted construction contracts pursuant to Part II, Subpart D of Executive Order 11246, and will carry out such sanctions and penalties for violation of the Equal Opportunity clause as may be imposed upon contractors and subcontractors by ED or the Secretary of Labor pursuant to Part II, Subpart D of Executive Order 11246.

Section 27. State or Territorial Law.

Anything in this Agreement to the contrary notwithstanding, nothing in this Agreement shall require the Borrower to observe or enforce compliance with any provision thereof, perform any other act or do any other thing in contravention of any applicable State or territorial law: Provided, that if any of the provisions of this Agreement violate any applicable State or territorial law, or if compliance with the provisions of this Agreement would require the Borrower to violate any applicable State or territorial law, the Borrower will at once notify ED in writing in order that appropriate changes and modifications may be made by ED and the Borrower to the end that the Borrower may proceed as soon as possible with the construction of the Project.

Section 28. Rental Rates and Charges.

a.  The Borrower shall establish and maintain so long as the Note is outstanding, such rental rates and charges for the use of the Project and such other facilities the revenues of which are pledged to the payment of the Note as may be necessary together with any other funds herein pledged to provide:  the operating and maintenance expenses

of said facilities; the debt service on the Note; the required
reserve therefor; and the repair and replacement reserve.

b.  As security for the loan, for the required payments under this
Agreement into the Reserve Accounts herein provided for, and for all
other obligations of the Borrower under this Agreement, the Borrower
hereby assigns, pledges and mortgages to ED all its rights to the
income and charges of whatever sort which it may receive or be
entitled to receive from the operation of the mortgaged property,
subject, however, to any assignment of rents or project income in
the Mortgage referred to herein.  Until a default is declared
under this Agreement however, permission is granted to the Borrower
to collect and retain under the provisions of this Agreement such
rents, profits, income and charges, but upon default this permission
is terminated, as to all rents, profits, income and charges due or
collected thereafter.

Section 29.  Investment of Funds in Reserve Accounts.

Moneys deposited by the Borrower to the credit of the Debt Service
Payment and reserve account and the Repair and Replacement Reserve
Account may be invested by the Borrower in interest bearing accounts
insured by the United States Government or in direct obligations of,
or obligations the principal of and the interest on which are
guaranteed by, the United States Government.  Such investments shall
be deemed at all times to be a part of the respective reserve.  The
interest accruing thereon and any profit realized from such investments
shall be deposited into the respective reserve.

Section 30.  Insurance on Completed Projects.  -

a.  Upon receipt of funds acquired pursuant to the Loan Agreement, the
Borrower shall, if such insurance is not already in force, procure
and maintain on any of its buildings, which secure the Note or the
revenues of which are pledged to the security of the Note, the
following insurance coverage:

(1)  Fire and Extended Coverage Insurance to be in amounts sufficient
to prevent the Borrower from becoming a co-insurer and, in any
event, in amounts not less than eighty percent of the current
insurable value of such building.

(2)  Flood Insurance, under the National Flood Insurance Program,
must be purchased where available to cover any such buildings
located in a special flood hazard area as indicated by the
Federal Insurance Administration in an amount equal to (a) the
maximum insurance that can be purchased or (b) eighty percent
of the current value of the buildings, whichever is lesser.
(Communities in which such special flood hazard areas have been
identified have one year from the date of that identification
to participate in the program or be ineligible for such loans
if all or a portion of them would be used for buildings in such
special flood hazard areas.)

(3) Boiler Insurance covering steam boilers in a minimum amount of
$50,000 or 15 percent of the building value whichever is greater.

The foregoing insurance shall be maintained so long as the Note is
outstanding and each such insurance policy shall be acceptable to ED
and shall contain a standard mortgage clause naming as mortgagee the
United States of America acting by and through the Secretary of
Department of Education, his/her successors or assigns, as his/her
interest may appear.

In the event of any damage to or destruction of any said building or
buildings, the Borrower shall promptly arrange for the application of
the insurance proceeds for the repair or reconstruction of the damaged
or destroyed portion thereof, or repayment of the outstanding Note.

b. Upon receipt of any funds acquired pursuant to the Loan Agreement, the
Borrower shall, if such insurance and fidelity bonding is not already
in force, procure and maintain on all locations and operations of the
Borrower, so long as the Note is outstanding:

(1) Comprehensive General Liability Insurance including the hazards
of Independent Contractors and/or Contractual Liability (if
necessary) with limits of not less than $300,000 per occurrence
to protect the Borrower from claims for bodily injury and/or
death which may arise from the Borrower's operations.

(2) Comprehensive Automobile Liability Insurance with limits of not
less than $100,000 for one person and $300,000 for more than
one person involved in one occurrence to protect the Borrower
from claims for bodily injury and/or death, and not less than
$10,000 against claims for damage to property of others which
arise from the Borrower's operation of owned vehicles.

(3) Blanket Employers Non-Owned Automobile Liability for all
operations and locations with limits of not less than $100,000
for one person and $300,000 for more than one person involved
in one occurrence to protect the Borrower from claims for
bodily injury and/or death, and not less than $10,000 against
claims for damage to property of others which may arise from
the Borrower's employees' operation of vehicles on the Borrower's
business.

(4) Blanket Fidelity Bond covering all officials and employees,
during acquisition, construction and development of the Project,
in the amount of not less than $50,000 unless a greater amount
is required by the Borrower; and that after completion of the
Project such officials and employees shall be bonded in the
following amounts: (a) those who sign or countersign checks,
$50,000 or two months' gross revenues, whichever is greater;

      (b)  any other employees $50,000 or one month's gross revenues, whichever is the greater unless greater amounts are required by Borrower.

      (5)  Workmen's Compensation Insurance and/or Employer's Liability Insurance (statutory or voluntary) for all of its employees during acquisition, construction, development and operation of the Project.

**Section 31.** <u>Encumbrance, Transfer, or Change in Use of Project.</u>

The Borrower shall not without the written approval of ED:

a.  Transfer, dispose of or encumber any of the mortgaged property. Any such transfer shall be only to a person or persons or corporation satisfactory to and approved by ED, who shall, by legal and valid instrument in writing, to be recorded or filed in the same recording office in which conveyances of the property covered by the mortgage are required to be filed or recorded, duly assume all obligations under this Agreement and under the Note and Mortgage;

b.  Assign, transfer, dispose of, or encumber any personal property, including rents or charges, and shall not disburse or pay out any funds except as provided herein;

c.  Remodel, reconstruct, add to, or demolish any part of the mortgaged property or subtract from any real or personal property of the Project;

d.  Permit the use of any portion of the Project, or any other facility the revenues of which are pledged to secure the Note, for any purpose except that for which the loan was made.

**Section 32.** <u>Maintenance of Project and its Site:</u>

The Borrower shall maintain the mortgaged premises, accommodations and the grounds and equipment appurtenant thereto, in good and substantial repair and condition: Provided that, in the event all or any of the building covered by the mortgage shall be destroyed or damaged by fire or other casualty, the money derived from any insurance on the property shall be applied in accordance with the terms of the mortgage.

**Section 33.** <u>Bankruptcy.</u>

The Borrower shall not file any petition in bankruptcy, or for a receiver, or in insolvency, or for reorganization or composition, or make any assignment for the benefit of creditors or to a trustee for creditors; or permit an adjudication in bankruptcy, the taking posession of the mortgaged property or any part thereof by a receiver, or the seizure and sale of the mortgaged property or any part thereof under judicial process or pursuant to any power or sale, and fail to have such adverse actions set aside within 45 days.

Section 34.  Audit and Inspection.

    a.  The mortgaged property, equipment, buildings, plans, offices, devices, books, apparatus, contracts, records, documents, and other papers relating thereto shall at all times be maintained in reasonable condition for proper audit and subject to examination and inspection at any reasonable time by ED and its duly authorized agents.  The Borrower or its agents shall keep copies of all written contracts or other instruments which affect the mortgaged property, all or any of which may be subject to inspection and examination by ED or its duly authorized agents.

    b.  The Borrower covenants that it will keep accurate financial records and proper books in form and substance acceptable to ED relating to the Project, other facilities, the revenues of which are pledged to secure the Note and any other pledged revenue and sources.  Such books and records shall be open to inspection by ED.  The Borrower further covenants that not later than 90 days after the close of each fiscal year it will furnish to ED copies of audit reports prepared by an independent public accountant reflecting in reasonable detail the financial condition and record of operation of the Borrower, the Project, other pledged facilities, and other pledged revenue sources, including particularly the occupancy of, use of services provided by, rates charged for the use of, and insurance on, the Project and other pledged facilities, and the status of the several accounts and funds required by the Loan agreement.

    c.  At the request of ED, its agents, employees, or attorneys, the Borrower shall give specific answers to questions upon which information is desired from time to time relative to the income, assets, liabilities, contracts, operation and condition of the property and the status of the mortgage and any other information with respect to the Borrower or the mortgaged property and of the Project which may be requested.

Section 35.  Default Subsequent to Project Completion.

Upon a violation of any of the above provisions of this Agreement by the Borrower, ED may give written notice thereof to the Borrower by registered or certified mail.  If such violation is not corrected to the satisfaction of ED within 30 days after the date such notice is mailed or within such further time as ED determines it is necessary to correct the violation, without further notice ED may declare a default under this Agreement effective on the date of such declaration of default and upon such default ED may:

    a.  Take possession of the Project, bring any acton necessary to enforce any rights of the Borrower growing out of the Project operation, and operate the Project in accordance with the terms of this Agreement until such time as ED in its discretion determines that the Borrower is again in a position to operate the Project in accordance with the terms of this Agreement and in compliance with the requirements of the Note and Mortgage.

Page 17

    b. Collect all rents and charges in connection with the operation of the Project and use such collections to pay the Borrower's obligations under this Agreement and under the Note and Mortgage, and the necessary expenses of preserving the property and operating the Project.

    c. Declare the whole of said indebtedness immediately due and payable and then proceed with the foreclosure of the Mortgage.

    d. Apply to any court, State or Federal, for specific performance of this Agreement, an injunction against any violation of the Agreement, for the appointment of a receiver to take over and operate the Project in accordance with the terms of the Agreement, or for such other relief as may be appropriate, since the injury to ED arising from a default under any of the terms of this Agreement would be irreparable and the amount of damages would be difficult to ascertain.

    e. Terminate this Agreement without any further liability on the part of ED.

Section 36.  <u>Filing in Public Records.</u>

    The Borrower shall cause this instrument to be filed or recorded in the public records as a part of the Mortgage or Deed of Trust.

Section 37.  <u>Waivers.</u>

    Subject to applicable Federal law, any right or remedy which ED may have under this Agreement may be waived in writing by ED by a formal waiver and either with or without the execution of an amendatory or supplementary agreement, if, in the judgement of ED, this Agreement, as so modified, will still conform to the provisions and requirements of applicable law.

Section 38.  <u>Members of Congress.</u>

    No member of or delegate to the Congress of the United States shall be admitted to any share or part of this Agreement or to any benefit arising herefrom.

Section 39.  <u>Bonus or Commission.</u>

    By execution of this Agreement, the Borrower represents that it has not paid, and, also, agrees not to pay, any bonus, commission, or fee for the purpose of obtaining an approval of its application for the loan hereunder.

Section 40.  <u>Third Parties.</u>

    This Agreement is not for the benefit of third parties, and ED shall be under no obligation to any such parties, whether or not directly interested in said Agreement, to pay any charges or expenses incident to compliance by the Borrower with any of its duties or obligations hereunder.

## U.S. DEPARTMENT OF EDUCATION

**MORTGAGE NOTE**
(Under Title VII-F of the Higher Education Act of 1965, as Amended)

Project No. P142A80123

Name of Borrower: Dowling College

Address:   Idle Hour Blvd., Oakdale,
New York 11769-1999

$3,000,000.00                Date: December 8, 1992

FOR VALUE RECEIVED, the undersigned promises to pay to the order of the United States of America, acting by and through the Secretary of Education (Payee), or successor or assigns, at the Federal Reserve Bank of Richmond, Richmond, Virginia 23261, or, at Payee's option, at such other place as may be designated from time to time, the maximum principal sum of THREE MILLION ($3,000,000.00) DOLLARS, or such lesser amount as shall be endorsed on this instrument by the Payee, with interest on the unpaid balance computed from the date of delivery at the rate of five and one half per centum (5.5%) per annum, the payment of principal and interest to be made as follows:

Interest only shall be payable on __N/A__; then principal and interest shall be payable on the first days of June and December, each year in level semiannual installment beginning 1993 and ending 2022, on which date the entire balance of principal and interest, if any, shall be due and payable.  Each such installment shall be in the amount of $102,660.05 or such lesser amount as shall be endorsed on this instrument by the Payee.

Privilege is reserved to prepay the debt in whole or in part in multiples of $1,000.00, on the first day of any month prior to maturity, upon at least thirty (30) days prior written notice to the payee.  Partial prepayments shall be applied to scheduled principal payments in inverse order of scheduled payment dates and the amount of each level semiannual installment due after any such prepayment shall be reduced by the amount of interest on the principal amount prepaid which would otherwise have accrued to that installment date.

The Note is a general obligation of the borrower secured by a Mortgage herewith upon real estate in Oakdale, Suffolk County, New York and is to be construed according to the laws of the State of New York.

If default be made in the payment of any installment under the Note and if such default is not made good thirty (30) days after the due date thereof, the entire principal sum and accrued interest shall at once become due and payable without notice at the option of the holder of this Note. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of any subsequent default. In the event of default in the payment of this Note and if the same is collected by an attorney at law, the undersigned hereby agrees to pay all costs of collection including reasonable attorney's fee.

All parties to this Note, whether principal, surety, guarantor, or endorser, hereby waive presentment for payment, demand, protest, and notice of dishonor

IN WITNESS WHEREOF, the undersigned has caused this Notice to be executed in its name and on its behalf and under its seal by its President and its Secretary, and its seal to be hereunto affixed and attested by its Secretary, both thereunto duly authorized the day and year first above written.

ATTEST:                                    DOWLING COLLEGE

By: _____
                                               President

By: _____
                                               Secretary

I hereby certify that this is the Note described in, and secured by, mortgage of even date herewith and in the same principal amount as herein stated, on real estate in the County of Suffolk, State of New York.
Dated the ___8th___ day of December, 1992.

_____
Notary Public

MARYANNA B. McCARTHY
NOTARY PUBLIC, State of New York
No. 4754795
Qualified in Suffolk County
Commission expires November 30, 19_93_

-2-

12/01/92

DOWLING COLLEGE, P142A80123

Starting Loan Amount: $ 3,000,000.00
Amortization Method: US Rule, 360 D/Y     First Payment Date: 06-01-1993
Starting Interest Rate:  5.500 %     Starting Accrual Rate:  0.000 %

| PMT | Due Date | Payment Amount | Interest | Principal | Balance |
|-----|----------|----------------|----------|-----------|---------|
| 1 | 06-01-93 | 99,910.05 | 79,750.00 | 20,160.05 | 2,979,839.95 |
| 2 | 12-01-93 | 102,660.05 | 81,945.60 | 20,714.45 | 2,959,125.50 |
| 1993 totals | | 202,570.10 | 161,695.60 | 40,874.50 | |
| 3 | 06-01-94 | 102,660.05 | 81,375.95 | 21,284.10 | 2,937,841.40 |
| 4 | 12-01-94 | 102,660.05 | 80,790.64 | 21,869.41 | 2,915,971.99 |
| 1994 totals | | 205,320.10 | 162,166.59 | 43,153.51 | |
| 5 | 06-01-95 | 102,660.05 | 80,189.23 | 22,470.82 | 2,893,501.17 |
| 6 | 12-01-95 | 102,660.05 | 79,571.28 | 23,088.77 | 2,870,412.40 |
| 1995 totals | | 205,320.10 | 159,760.51 | 45,559.59 | |
| 7 | 06-01-96 | 102,660.05 | 78,936.34 | 23,723.71 | 2,846,688.69 |
| 8 | 12-01-96 | 102,660.05 | 78,283.94 | 24,376.11 | 2,822,312.58 |
| 1996 totals | | 205,320.10 | 157,220.28 | 48,099.82 | |
| 9 | 06-01-97 | 102,660.05 | 77,613.60 | 25,046.45 | 2,797,266.13 |
| 10 | 12-01-97 | 102,660.05 | 76,924.82 | 25,735.23 | 2,771,530.90 |
| 1997 totals | | 205,320.10 | 154,538.42 | 50,781.68 | |
| 11 | 06-01-98 | 102,660.05 | 76,217.10 | 26,442.95 | 2,745,087.95 |
| 12 | 12-01-98 | 102,660.05 | 75,489.92 | 27,170.13 | 2,717,917.82 |
| 1998 totals | | 205,320.10 | 151,707.02 | 53,613.08 | |
| 13 | 06-01-99 | 102,660.05 | 74,742.74 | 27,917.31 | 2,690,000.51 |
| 14 | 12-01-99 | 102,660.05 | 73,975.01 | 28,685.04 | 2,661,315.47 |
| 1999 totals | | 205,320.10 | 148,717.75 | 56,602.35 | |
| 15 | 06-01-00 | 102,660.05 | 73,186.18 | 29,473.87 | 2,631,841.60 |
| 16 | 12-01-00 | 102,660.05 | 72,375.64 | 30,284.41 | 2,601,557.19 |
| 2000 totals | | 205,320.10 | 145,561.82 | 59,758.28 | |
| 17 | 06-01-01 | 102,660.05 | 71,542.82 | 31,117.23 | 2,570,439.96 |
| 18 | 12-01-01 | 102,660.05 | 70,687.10 | 31,972.95 | 2,538,467.01 |
| 2001 totals | | 205,320.10 | 142,229.92 | 63,090.18 | |
| 19 | 06-01-02 | 102,660.05 | 69,807.84 | 32,852.21 | 2,505,614.80 |
| 20 | 12-01-02 | 102,660.05 | 68,904.41 | 33,755.64 | 2,471,859.16 |

12/01/92

| PMT | Due Date | Payment Amount | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 2002 | totals | 205,320.10 | 138,712.25 | 66,607.85 | |
| 21 | 06-01-03 | 102,660.05 | 67,976.13 | 34,683.92 | 2,437,175.24 |
| 22 | 12-01-03 | 102,660.05 | 67,022.32 | 35,637.73 | 2,401,537.51 |
| 2003 | totals | 205,320.10 | 134,998.45 | 70,321.65 | |
| 23 | 06-01-04 | 102,660.05 | 66,042.28 | 36,617.77 | 2,364,919.74 |
| 24 | 12-01-04 | 102,660.05 | 65,035.29 | 37,624.76 | 2,327,294.98 |
| 2004 | totals | 205,320.10 | 131,077.57 | 74,242.53 | |
| 25 | 06-01-05 | 102,660.05 | 64,000.61 | 38,659.44 | 2,288,635.54 |
| 26 | 12-01-05 | 102,660.05 | 62,937.48 | 39,722.57 | 2,248,912.97 |
| 2005 | totals | 205,320.10 | 126,938.09 | 78,382.01 | |
| 27 | 06-01-06 | 102,660.05 | 61,845.11 | 40,814.94 | 2,208,098.03 |
| 28 | 12-01-06 | 102,660.05 | 60,722.70 | 41,937.35 | 2,166,160.68 |
| 2006 | totals | 205,320.10 | 122,567.81 | 82,752.29 | |
| 29 | 06-01-07 | 102,660.05 | 59,569.42 | 43,090.63 | 2,123,070.05 |
| 30 | 12-01-07 | 102,660.05 | 58,384.43 | 44,275.62 | 2,078,794.43 |
| 2007 | totals | 205,320.10 | 117,953.85 | 87,366.25 | |
| 31 | 06-01-08 | 102,660.05 | 57,166.85 | 45,493.20 | 2,033,301.23 |
| 32 | 12-01-08 | 102,660.05 | 55,915.78 | 46,744.27 | 1,986,556.96 |
| 2008 | totals | 205,320.10 | 113,082.63 | 92,237.47 | |
| 33 | 06-01-09 | 102,660.05 | 54,630.32 | 48,029.73 | 1,938,527.23 |
| 34 | 12-01-09 | 102,660.05 | 53,309.50 | 49,350.55 | 1,889,176.68 |
| 2009 | totals | 205,320.10 | 107,939.82 | 97,380.28 | |
| 35 | 06-01-10 | 102,660.05 | 51,952.36 | 50,707.69 | 1,838,468.99 |
| 36 | 12-01-10 | 102,660.05 | 50,557.90 | 52,102.15 | 1,786,366.84 |
| 2010 | totals | 205,320.10 | 102,510.26 | 102,809.84 | |
| 37 | 06-01-11 | 102,660.05 | 49,125.09 | 53,534.96 | 1,732,831.88 |
| 38 | 12-01-11 | 102,660.05 | 47,652.88 | 55,007.17 | 1,677,824.71 |
| 2011 | totals | 205,320.10 | 96,777.97 | 108,542.13 | |
| 39 | 06-01-12 | 102,660.05 | 46,140.18 | 56,519.87 | 1,621,304.84 |
| 40 | 12-01-12 | 102,660.05 | 44,585.88 | 58,074.17 | 1,563,230.67 |
| 2012 | totals | 205,320.10 | 90,726.06 | 114,594.04 | |
| 41 | 06-01-13 | 102,660.05 | 42,988.84 | 59,671.21 | 1,503,559.46 |
| 42 | 12-01-13 | 102,660.05 | 41,347.89 | 61,312.16 | 1,442,247.30 |

12/01/92

| PMT | Due Date | Payment Amount | Interest | Principal | Balance |
|-----|----------|----------------|----------|-----------|---------|
| | | | | | |
| 2013 | totals | 205,320.10 | 84,336.73 | 120,983.37 | |
| | | | | | |
| 43 | 06-01-14 | 102,660.05 | 39,661.80 | 62,998.25 | 1,379,249.05 |
| 44 | 12-01-14 | 102,660.05 | 37,929.35 | 64,730.70 | 1,314,518.35 |
| 2014 | totals | 205,320.10 | 77,591.15 | 127,728.95 | |
| | | | | | |
| 45 | 06-01-15 | 102,660.05 | 36,149.25 | 66,510.80 | 1,248,007.55 |
| 46 | 12-01-15 | 102,660.05 | 34,320.21 | 68,339.84 | 1,179,667.71 |
| 2015 | totals | 205,320.10 | 70,469.46 | 134,850.64 | |
| | | | | | |
| 47 | 06-01-16 | 102,660.05 | 32,440.86 | 70,219.19 | 1,109,448.52 |
| 48 | 12-01-16 | 102,660.05 | 30,509.83 | 72,150.22 | 1,037,298.30 |
| 2016 | totals | 205,320.10 | 62,950.69 | 142,369.41 | |
| | | | | | |
| 49 | 06-01-17 | 102,660.05 | 28,525.70 | 74,134.35 | 963,163.95 |
| 50 | 12-01-17 | 102,660.05 | 26,487.01 | 76,173.04 | 886,990.91 |
| 2017 | totals | 205,320.10 | 55,012.71 | 150,307.39 | |
| | | | | | |
| 51 | 06-01-18 | 102,660.05 | 24,392.25 | 78,267.80 | 808,723.11 |
| 52 | 12-01-18 | 102,660.05 | 22,239.89 | 80,420.16 | 728,302.95 |
| 2018 | totals | 205,320.10 | 46,632.14 | 158,687.96 | |
| | | | | | |
| 53 | 06-01-19 | 102,660.05 | 20,028.33 | 82,631.72 | 645,671.23 |
| 54 | 12-01-19 | 102,660.05 | 17,755.96 | 84,904.09 | 560,767.14 |
| 2019 | totals | 205,320.10 | 37,784.29 | 167,535.81 | |
| | | | | | |
| 55 | 06-01-20 | 102,660.05 | 15,421.10 | 87,238.95 | 473,528.19 |
| 56 | 12-01-20 | 102,660.05 | 13,022.03 | 89,638.02 | 383,890.17 |
| 2020 | totals | 205,320.10 | 28,443.13 | 176,876.97 | |
| | | | | | |
| 57 | 06-01-21 | 102,660.05 | 10,556.98 | 92,103.07 | 291,787.10 |
| 58 | 12-01-21 | 102,660.05 | 8,024.15 | 94,635.90 | 197,151.20 |
| 2021 | totals | 205,320.10 | 18,581.13 | 186,738.97 | |
| | | | | | |
| 59 | 06-01-22 | 102,660.05 | 5,421.66 | 97,238.39 | 99,912.81 |
| 60 | 12-01-22 | 102,660.41 | 2,747.60 | 99,912.81 | 0.00 |
| 2022 | totals | 205,320.46 | 8,169.26 | 197,151.20 | |
| | | | | | |
| Grand | totals | $ 6,156,853.36 | $ 3,156,853.36 | $ 3,000,000.00 | |

Standard N.Y.B.T.U. Form 8011—20M.    at Mortgage –Individual or Corporation.

**CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT - THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY**

**THIS MORTGAGE,** made the 8th  day of December      , nineteen hundred and  ninety-two

**BETWEEN** DOWLING COLLEGE, an Educational Institution, with its principal campus at Idle Hour Blvd., Oakdale, New York,

and UNITED STATES DEPARTMENT OF EDUCATION, Washington, D.C. the mortgagor,

, the mortgagee,

**WITNESSETH,** that to secure the payment of an indebtedness in the sum of  THREE MILLION ($3,000,000.00)------------------------------------------------- dollars,

lawful money of the United States, to be paid as follows:  principal and interest at the rate of 5⅛% per annum shall be payable on the first days of May and November, each year in level semiannual installments beginning in 1993 and ending in 2022 on which date the entire balance of principal and interest, if any, shall be due and payable. Each such installment shall be in the amount of $102,660.05 or such lesser amount as shall be endorsed on this instrument by the Payee.

~~with interest thereon to be computed from the date hereof, at the rate of~~            ~~per centum~~
~~per annum, and to be paid on the~~         ~~day of~~          ~~19~~   ~~next ensuing~~ and
          thereafter,

according to a certain bond,
note or obligation bearing even date herewith, the mortgagor hereby mortgages to the mortgagee

**ALL** that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the

SEE DESCRIPTION ATTACHED

in connection with said premises, including but not limited to furnaces, boilers, oil burners, radiators and piping, coal stokers, plu g and bathroom fixtures, refrigeration, onditioning and sprinkler systems, wash tubs, sinks, gas and electric fixtures, stoves, ranges, awnings, screens, window shades, elevators, motors, dynamos, refrigerators, kitchen cabinets, incinerators, plants and shrubbery and all other equipment and machinery, appliances, fittings, and fixtures of every kind in or used in the operation of the buildings standing on said premises, together with any and all replacements thereof and additions thereto;

**TOGETHER** with all awards heretofore and hereafter made to the mortgagor for taking by eminent domain the whole or any part of said premises or any easement therein, including any awards for changes of grade of streets, which said awards are hereby assigned to the mortgagee, who is hereby authorized to collect and receive the proceeds of such awards and to give proper receipts and acquittances therefor, and to apply the same toward the payment of the mortgage debt, notwithstanding the fact that the amount owing thereon may not then be due and payable; and the said mortgagor hereby agrees, upon request, to make, execute and deliver any and all assignments and other instruments sufficient for the purpose of assigning said awards to the mortgagee, free, clear and discharged of any encumbrances of any kind or nature whatsoever.

**AND** the mortgagor covenants with the mortgagee as follows:

1. That the mortgagor will pay the indebtedness as hereinbefore provided.

2. That the mortgagor will keep the buildings on the premises insured against loss by fire for the benefit of the mortgagee; that he will assign and deliver the policies to the mortgagee; and that he will reimburse the mortgagee for any premiums paid for insurance made by the mortgagee on the mortgagor's default in so insuring the buildings or in so assigning and delivering the policies.

3. That no building on the premises shall be altered, removed or demolished without the consent of the mortgagee.

4. That the whole of said principal sum and interest shall become due at the option of the mortgagee: after default in the payment of any instalment of principal or of interest for fifteen days; or after default in the payment of any tax, water rate, sewer rent or assessment for thirty days after notice and demand; or after default after notice and demand either in assigning and delivering the policies insuring the buildings against loss by fire or in reimbursing the mortgagee for premiums paid on such insurance, as hereinbefore provided; or after default upon request in furnishing a statement of the amount due on the mortgage and whether any offsets or defenses exist against the mortgage debt, as hereinafter provided. An assessment which has been made payable in instalments at the application of the mortgagor or lessee of the premises shall nevertheless, for the purpose of this paragraph, be deemed due and payable in its entirety on the day the first instalment becomes due or payable or a lien.

5. That the holder of this mortgage, in any action to foreclose it, shall be entitled to the appointment of a receiver.

6. That the mortgagor will pay all taxes, assessments, sewer rents or water rates, and in default thereof, the mortgagee may pay the same.

7. That the mortgagor within five days upon request in person or within ten days upon request by mail will furnish a written statement duly acknowledged of the amount due on this mortgage and whether any offsets or defenses exist against the mortgage debt.

8. That notice and demand or request may be in writing and may be served in person or by mail.

9. That the mortgagor warrants the title to the premises.

10. That the fire insurance policies required by paragraph No. 2 above shall contain the usual extended coverage endorsement; that in addition thereto the mortgagor, within thirty days after notice and demand, will keep the premises insured against war risk and any other hazard that may reasonably be required by the mortgagee. All of the provisions of paragraphs No. 2 and No. 4 above relating to fire insurance and the provisions of Section 254 of the Real Property Law construing the same shall apply to the additional insurance required by this paragraph.

11. That in case of a foreclosure sale, said premises, or so much thereof as may be affected by this mortgage, may be sold in one parcel.

12. That if any action or proceeding be commenced (except an action to foreclose this mortgage or to collect the debt secured thereby), to which action or proceeding the mortgagee is made a party, or in which it becomes necessary to defend or uphold the lien of this mortgage, all sums paid by the mortgagee for the expense of any litigation to prosecute or defend the rights and lien created by this mortgage (including reasonable counsel fees), shall be paid by the mortgagor, together with interest thereon at the rate of six per cent. per annum, and any such sum and the interest thereon shall be a lien on said premises, prior to any right, or title to, interest in or claim upon said premises attaching or accruing subsequent to the lien of this mortgage, and shall be deemed to be secured by this mortgage. In any action or proceeding to foreclose this mortgage, or to recover or collect the debt secured thereby, the provisions of law respecting the recovering of costs, disbursements and allowances shall prevail unaffected by this covenant.

12/12/90   16:20                                                    @003

Exhibit A Page 3

PARCEL I contd.

to the point of beginning.  From said point of beginning running
thence South 64 degrees 54 minutes 30 seconds East 315.00 feet to
a point; running thence North 35 degrees 05 minutes 30 seconds
East 87.00 feet to a point; running thence North 16 degrees 32
minutes 13 seconds East 215.61 feet to a point on the southerly
boundary of the Map of Idle Hour; running thence South 64 degrees
41 minutes East along said boundary 60.00 feet to a point on the
westerly boundary of the Map of Connetquot Colony; running thence
southerly along said boundary and along the arc of a curve
bearing to the right, having a radius of 4,796.43 feet a distance
of 645.54 feet to a point; running thence South 88 degrees 14
minutes 00 seconds East through Lot 53 on said Map f Connetquot
Colony 150.01 feet to a point on the westerly side of Van Bomel
Boulevard; running thence southerly along the westerly side of
Van Bomel Boulevard and along the arc of a curve bearing to the
right, having a radius of 4,946.43 feet a distance of 50.00 feet
to a point; running thence North 88 degrees 14 feet 00 seconds
West 835.10 feet to a point; running thence Nort 1 degree 46
minutes 00 seconds East 299.35 feet to a point; running thence
South 87 degrees 37 minutes East 81.17 feet to a point; running
thence North 2 degrees 23 minutes East 100.00 feet to a point;
running thence South 87 degrees 37 East 18.13 feet to a point;
running thence North 32 degrees 35 minutes 30 seconds East 190.00
feet to the point or place of beginning; being the same premises
conveyed by the Dormitory Authority to Adelphi University by deed
dated June 17, 1971 and recorded July 28, 1971 in Liber 6975,
page 33 in the Suffolk County Clark's office.

PARCEL II:

    ALL that certain plot, piece or parcel of land, with the
buildings thereon erected, situate, lying and being at Oakdale,
in the Town of Islip, County of Suffolk and State of New York,
bounded and described as follows:
    BEGINNING at a monument at the corner formed by the
intersection of the northwesterly side of Idle Hour Boulevard
with the northeasterly side of Elsmere Avenue;
    RUNNING thence North 43 degrees 29 minutes West along the
northeasterly side of Elsmere Avenue 675.71 feet to the
Connetquot River;
    THENCE along the same the following 18 courses and distances:
    (1)   North 51 degrees 33 minutes 20 seconds East 29.96 feet
    (2)   North 49 degrees 17 minutes 50 seconds East 28.03 feet;
    (3)   North 48 degrees 22 minutes 40 seconds East 11.63 feet
    (4)   North 47 degrees 31 minutes 50 seconds East 28.55 feet;
    (5)   North 46 degrees 04 minutes 30 seconds East 28.64 feet
    (6)   North 44 degrees 43 minutes 30 seconds East 28.01 feet;
    (7)   North 43 degrees 44 minutes 50 seconds East 28.11 feet

Exhibit A Page 4

PARCEL II contd.

```
    (8)  North 41 degrees 51 minutes 40 seconds East 30.09 feet;
    (9)  North 40 degrees 33 minutes 10 seconds East 25.18 feet
    (10) North 39 degrees 14 minutes 45 seconds East 22.92 feet;
    (11) North 38 degrees 54 minutes 20 seconds East 30.76 feet
    (12) North 40 degrees 00 minutes 30 seconds East 29.65 feet;
    (13) North 39 degrees 29 minutes 30 seconds East 29.69 feet
    (14) North 37 degrees 58 minutes 20 seconds East 29.71 feet;
    (15) North 34 degrees 34 minutes 00 seconds East 29.98 feet
    (16) North 31 degrees 14 minutes 30 seconds East 30.44 feet;
    (17) North 35 degrees 09 minutes 20 seconds East 31.10 feet
    (18) North 39 degrees 44 minutes 20 seconds East 31.24 feet;
to the southerly side of Dean's Parcel;
```

THENCE along the southerly and easterly side of Dean's Parcel
the following two courses and distances:
    (1) South 43 degrees 29 minutes East 205.39 feet;
    (2) North 46 degrees 31 minutes East 200.40 feet to the
southerly side of Chateau Drive;

THENCE South 43 degrees 29 minutes East along the same 647.98
feet to a monument at the corner formed by the intersection of
the northwesterly side of Idle Hour Boulevard with the
southwesterly side of Chateau Drive;

THENCE along the northwesterly, northerly and northwesterly
side of Idle Hour Boulevard the following 4 courses and
distances:
    (1) South 45 degrees 05 minutes West 9.51 feet to a monument;
    (2) South 78 degrees 13 minutes West 406.57 feet to a
        monument;
    (3) South 33 degrees 06 minutes West 347.71 feet to a
        monument;
    (4) South 46 degrees 31 minutes West 6.39 feet to a monument;
        at the corner of the point or place of beginning.

Being the same premises conveyed by Adelphi College (now
Adelphi University) to the Dormitory Authority by deed dated
March 15, 1963 recorded March 29, 1963 in Liber 5326, page 434 in
the Suffolk County Clerk's office;

EXCEPTING THEREFROM all that certain tract, piece or parcel
of land, bounded and described as follows:

BEGINNING at a point on the southwesterly side of Chateau
Drive distant 497.98 feet westerly from the corner formed by the
intersection of the southwesterly side of Chateau Drive with the
westerly side of Idle Hour Boulevard;
from said point of beginning running thence South 46 degrees 31
minutes 00 seconds West 396.42 feet to a point; running thence
North 49 degrees 00 minutes 00 seconds West 331.72 feet to a

Exhibit A   Page 5

PARCEL II contd.

point on the general bulkhead line and to the Connetquot River;
running thence the following five courses and distances along the
general bulkhead line and along the Connetquot River;
    (1) North 37 degrees 58 minutes 20 seconds East 7.80 feet;
    (2) North 34 degrees 34 minutes 00 seconds East 29.98 feet;
    (3) North 31 degrees 14 minutes 30 seconds East 30.44 feet;
    (4) North 35 degrees 09 minutes 20 seconds East 31.10 feet;
    (5) North 39 degrees 44 minutes 20 seconds East 31.24 feet
to the southwesterly side of what is known as the "Dean's
Parcel"; running thence South 43 degrees 29 minutes 00 seconds
East along said "Dean's Parcel" 205.39 feet to a point; running
thence North 46 degrees 31 minutes 00 seconds East, still along
said "Dean's Parcel" 200.40 feet to a point on the southwesterly
side of Chateau Drive; running thence South 43 degrees 29 minutes
00 seconds East along the southwesterly side of Chateau Drive
150.00 feet to the point of beginning.

    Said parcel comprising 1.79 acres.

    Being the same premises conveyed by the Dormitory Authority
to Adelphi University by deed dated September 3, 1970 and
recorded September 17, 1970 at Liber 6808, page 357, in the
Suffolk County Clerk's office.

13.   That the mortgagor hereby assigns to the mortgagee the rents, issues and profits of the premises as further security        the payment of said indebtedness, and the mortg        grants to the mortgagee the right to enter upon a.        ke possession of the premises for the purpose of c        ing the same and to let the premises or any part thereof, and to apply the rents, issues and profits, after payment of all necessary charges and expenses, on account of said indebtedness. This assignment and grant shall continue in effect until this mortgage is paid. The mortgagee hereby waives the right to enter upon and take possession of said premises for the purpose of collecting said rents, issues and profits, and the mortgagor shall be entitled to collect and receive said rents, issues and profits until default under any of the covenants, conditions or agreements contained in this mortgage, and agrees to use such rents, issues and profits in payment of principal and interest becoming due on this mortgage and in payment of taxes, assessments, sewer rents, water rates and carrying charges becoming due against said premises, but such right of the mortgagor may be revoked by the mortgagee upon any default, on five days' written notice. The mortgagor will not, without the written consent of the mortgagee, receive or collect rent from any tenant of said premises or any part thereof for a period of more than one month in advance, and in the event of any default under this mortgage will pay monthly in advance to the mortgagee, or to any receiver appointed to collect said rents, issues and profits, the fair and reasonable rental value for the use and occupation of said premises or of such part thereof as may be in the possession of the mortgagor, and upon default in any such payment will vacate and surrender the possession of said premises to the mortgagee or to such receiver, and in default thereof may be evicted by summary proceedings.

14.   That the whole of said principal sum and the interest shall become due at the option of the mortgagee: (a) after failure to exhibit to the mortgagee, within ten days after demand, receipts showing payment of all taxes, water rates, sewer rents and assessments; or (b) after the actual or threatened alteration, demolition or removal of any building on the premises without the written consent of the mortgagee; or (c) after the assignment of the rents of the premises or any part thereof without the written consent of the mortgagee; or (d) if the buildings on said premises are not maintained in reasonably good repair; or (e) after failure to comply with any requirement or order or notice of violation of law or ordinance issued by any governmental department claiming jurisdiction over the premises within three months from the issuance thereof; or (f) if on application of the mortgagee two or more fire insurance companies lawfully doing business in the State of New York refuse to issue policies insuring the buildings on the premises; or (g) in the event of the removal, demolition or destruction in whole or in part of any of the fixtures, chattels or articles of personal property covered hereby, unless the same are promptly replaced by similar fixtures, chattels and articles of personal property at least equal in quality and condition to those replaced, free from chattel mortgages or other encumbrances thereon and free from any reservation of title thereto; or (h) after thirty days' notice to the mortgagor, in the event of the passage of any law deducting from the value of land for the purpose of taxation any lien thereon, or changing in any way the taxation of mortgages or debts secured thereby for state or local purposes; or (i) if the mortgagor fails to keep, observe and perform any of the other covenants, conditions or agreements contained in this mortgage.

15.   That the mortgagor will, in compliance with Section 13 of the Lien Law, receive the advances secured hereby and will hold the right to receive such advances as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

16.   That the execution of this mortgage has been duly authorized by the board of directors of the mortgagor.

     This mortgage may not be changed or terminated orally. The covenants contained in this mortgage shall run with the land and bind the mortgagor, the heirs, personal representatives, successors and assigns of the mortgagor and all subsequent owners, encumbrancers, tenants and subtenants of the premises, and shall enure to the benefit of the mortgagee, the personal representatives, successors and assigns of the mortgagee and all subsequent holders of this mortgage. The word "mortgagor" shall be construed as if it read "mortgagors" and the word "mortgagee" shall be construed as if it read "mortgagees" whenever the sense of this mortgage so requires.

**IN WITNESS WHEREOF**, this mortgage has been duly executed by the mortgagor.

In PRESENCE OF:                           DOWLING COLLEGE


                                    By: _____

                                          Albert E. Donor, Secretary

STATE OF NEW YORK, COUNTY OF                    SS:

On the          day of          19    , before me
personally came

to me known to be the individual     described in and who
executed the foregoing instrument, and acknowledged that
executed the same.

STATE OF NEW YORK, COUNTY OF                    SS:

On the          day of          19    , before me
personally came

to me known to be the individual     described in and who
executed the foregoing instrument, and acknowledged that
executed the same.

STATE OF NEW YORK, COUNTY OF *Suffolk*                    SS:

On the 4 day of *December* 19 92, before me
personally came *Albert E. Donor*
to me known, who, being by me duly sworn, did depose and
say that    he resides at No. *94 Connetquat Dr.*
*Oakdale NY 11769*                         ;
that    he is the *Secretary*
of *Dowling College*
, the corporation described
in and which executed the foregoing instrument; that    he
knows the seal of said corporation; that the seal affixed
to said instrument is such corporate seal; that it was so
affixed by order of the board of directors of said corpora-
tion, and that    he signed h    name thereto by like order.

*Notary Public : Maryanna B. McCarthy*

MARYANNA B. MCCARTHY
NOTARY PUBLIC, State of New York
No. 4754795
Qualified in Suffolk County
Commission expires November 30, 19 93

STATE OF NEW YORK, COUNTY OF                    SS:

On the          day of          19    , before me
personally came
the subscribing witness to the foregoing instrument, with
whom I am personally acquainted, who, being by me duly
sworn, did depose and say that    he resides at No.
;
that    he knows

to be the individual
described in and who executed the foregoing instrument;
that    he, said subscribing witness, was present and saw
execute the same; and that    he, said witness,
at the same time subscribed h    name as witness thereto.

# Mortgage

TITLE NO.

TO

STANDARD FORM OF NEW YORK BOARD OF TITLE UNDERWRITERS

*Distributed by*

## CHICAGO TITLE
## INSURANCE COMPANY

SECTION

BLOCK

LOT

COUNTY OR TOWN

Recorded at Request of
CHICAGO TITLE INSURANCE COMPANY

Return by Mail to

Zip No.

THIS SPACE FOR USE OF RECORDING OFFICE



1. Select the 'Print' button to print 1 copy of each label.
2. The Return Shipment instructions, which provide your recipient with information on the returns process, will be printed with the label(s).
3. After printing, select your next step by clicking one of the displayed buttons.

**Note:** To review or print individual labels, select the Label button under each label image above.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see FedEx Service Guide.

