**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, NY 10036-7203
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Sean C. Southard
Stephanie R. Sweeney

*Counsel to the Debtor and Debtor-in-Possession*

**Hearing Date: October 16, 2017**
**Hearing Time: 1:30 p.m. (EST)**

**Objection Deadline:**
**October 9, 2017 at 4:00 p.m. (EST)**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

--------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DOWLING COLLEGE, | : | |
| f/d/b/a DOWLING INSTITUTE, | : | Case No. 16-75545 (REG) |
| f/d/b/a DOWLING COLLEGE ALUMNI | : | |
| ASSOCIATION, | : | |
| f/d/b/a CECOM, | : | |
| a/k/a DOWLING COLLEGE, INC., | : | |
| Debtor. | : | |

--------------------------------------------------------------x

**NOTICE OF HEARING ON DEBTOR'S MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF THE DEBTOR'S BROOKHAVEN CAMPUS, (B) SCHEDULING AN AUCTION AND A SALE HEARING RELATED THERETO AND (C) APPROVING THE FORM OF NOTICE OF THE AUCTION AND SALE HEARING; AND (II) AN ORDER (A) APPROVING SUCH SALE OF THE BROOKHAVEN CAMPUS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS AND (B) GRANTING RELATED RELIEF**

**PLEASE TAKE NOTICE** that a hearing on a portion of the motion (the "Motion")[1] of Dowling College ("Dowling" or the "Debtor"), debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), for entry of (I) an order (A) approving bidding procedures for the sale of the Debtor's Brookhaven Campus, (B) scheduling an auction and a sale hearing related thereto and (C) approving the form of notice of the auction and sale hearing; and (II) an order (A) approving such sale of the Brookhaven Campus free and clear of liens, claims, encumbrances and other interests and (B) granting related relief has been scheduled before the Honorable Robert E. Grossman, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Eastern District of New York, Alfonse M. D'Amato Federal

---

[1] Terms capitalized but not defined herein shall have the meanings ascribed to them in the Motion.

Courthouse, 290 Federal Plaza, Courtroom 860, Central Islip, New York 11722 on **October 16, 2017 at 1:30 p.m.** (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that responses, if any, to the relief sought in the Motion shall be made in writing, filed with the Court by registered users of the Court's electronic case filing system and, by all other parties in interest, mailed to the Clerk of the United States Bankruptcy Court, Eastern District of New York, 271 Alfonse M. D'Amato Federal Courthouse, 290 Federal Plaza, Central Islip, New York 11722, on a 3.5 inch floppy disc or compact disc, preferably in portable document Format (PDF), Microsoft Word, or any other Windows Based word processing format, and served upon (i) The Office of the United States Trustee for the Eastern District of New York, Alfonse D'Amato Federal Courthouse, 560 Federal Plaza, Central Islip, New York 11722, Attn: Stan Yang, Esq., Trial Attorney; (ii) counsel to the Debtor: Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10036, Attn: Sean C. Southard, Esq.; (iii) counsel to the Debtor's material prepetition and post-petition secured lenders: (a) Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: P. Miyoko Sato, Esq. and Ian A. Hammel, Esq., (b) White & Case LLP, 1221 Avenue of the Americas, New York, New York 10020, Attn: Brian D. Pfeiffer, Esq., (c) Certilman Balin Adler & Hyman, LLP, 90 Merrick Avenue, 9th Floor, East Meadow, NY 11554, Attn: Richard J. McCord, Esq. and Thomas J. McNamara, Esq., and (d) Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck, NY 11021, Attn:  Adam T. Berkowitz, Esq.; and (iv) counsel to the Creditors' Committee:  SilvermanAcampora, LLP, 100 Jericho Quadrangle, Suite 300, Jericho, New York 11753, Attn: Ronald J. Friedman, Esq., **so as to be received no later than 4:00 p.m. (Prevailing Eastern Time) on October 9, 2017.**

**PLEASE TAKE FURTHER NOTICE** that the hearing on the Motion may be adjourned without further notice except as announced in open court at the Hearing, or at any adjourned hearing.

Dated:   New York, New York
           September 26, 2017

**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**

By:    _/s/ Sean C. Southard_____
         Sean C. Southard
         Stephanie R. Sweeney
         200 West 41st Street, 17th Floor
         New York, NY 10036
         Tel: (212) 972-3000
         Fax: (212) 972-2245
         Email: ssouthard@klestadt.com
                   ssweeney@klestadt.com

         *Counsel to the Debtor and Debtor in*
         *Possession*

**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, NY 10036-7203
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Sean C. Southard
Stephanie R. Sweeney

*Attorneys to the Debtor and Debtor-in-*
   *Possession*

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------------x
In re                                                       :        Chapter 11
                                                            :
DOWLING COLLEGE,                                            :        Case No. 16-75545 (REG)
                                                            :
                                                            :
                                    Debtor.                 :
---------------------------------------------------------------x

**DEBTOR'S MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING
BIDDING PROCEDURES FOR THE SALE OF THE DEBTOR'S BROOKHAVEN
CAMPUS, (B) SCHEDULING AN AUCTION AND A SALE HEARING RELATED
THERETO AND (C) APPROVING THE FORM OF NOTICE OF THE AUCTION
AND SALE HEARING; AND (II) AN ORDER (A) APPROVING SUCH SALE
OF THE BROOKHAVEN CAMPUS FREE AND CLEAR OF LIENS, CLAIMS,
ENCUMBRANCES AND OTHER INTERESTS AND
(B) GRANTING RELATED RELIEF**

**TO THE HONORABLE ROBERT E. GROSSMAN,
UNITED STATES BANKRUPTCY JUDGE:**

Dowling College ("Dowling" or the "Debtor"), debtor and debtor-in-possession in the

above-captioned chapter 11 case (the "Chapter 11 Case"), by and through its proposed attorneys,

Klestadt Winters Jureller Southard & Stevens, LLP, hereby files a motion for (I) the entry of an

order substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order") (a)

approving bidding procedures and bidder protections (the "Bidding Procedures") substantially in

the form attached as Schedule 1 to the Bidding Procedures Order for the sale and potential

auction (the "Auction") of the Brookhaven Campus (as hereinafter defined); (b) scheduling an Auction, if necessary, and a hearing to approve the sale of the Brookhaven Campus (the "Sale Hearing"); and (c) approving the form and manner of the Notice of the Auction and Sale Hearing substantially in the form attached as Schedule 2 to the Bidding Procedures Order (the "Sale Notice"); and (II) entry of an Order, substantially in the form attached hereto as Exhibit B (the "Sale Order"), (i) approving a sale of the Brookhaven Campus, free and clear of all liens, claims and encumbrances, security interests and other interests pursuant to a Purchase Agreement (as hereinafter defined) to the Successful Bidder (as hereinafter defined) as determined by the Bidding Procedures; and (ii) granting related relief (the "Sale Motion").

## I.    SUMMARY OF RELIEF SOUGHT

1.      The relief sought by this Sale Motion encompasses a two part request pursuant to which the Debtor is seeking to sell certain real property consisting of a 105.33 acre campus located in the Town of Brookhaven, County of Suffolk, at William Floyd Parkway, Shirley, New York 11967 (the "Brookhaven Campus"), including Dowling's 72,000 square foot, 289-bed dormitory facility located thereon (the "Brookhaven Dorm"), to the successful bidder (the "Successful Bidder"), derived from a Qualified Bid, Stalking Horse Bidder, or Auction bid (all hereinafter defined), pursuant to a proposed purchase agreement (the "Purchase Agreement"). A copy of the Purchase Agreement template[1] is attached hereto as Exhibit C[2].

2.      As an initial matter, the Debtor is requesting entry of a Bidding Procedures Order, substantially in the form of Exhibit A hereto, approving among other things (i) the Bidding Procedures, (ii) the time, date, and place for a potential Auction of the Brookhaven

---

[1] The template should not be construed as an offer and is subject to further review, comment and negotiation among the Debtor and its creditor constituents.

[2] Capitalized terms used in this Sale Motion, unless herein defined, are used with the meanings ascribed to such terms in the Purchase Agreement.

Campus and the Sale Hearing, and (iii) the Sale Notice, annexed as <u>Schedule 2</u> to the Bidding Procedures Order.

3.        By the second prong of this Sale Motion the Debtor seeks entry of the Sale Order, substantially in the form of <u>Exhibit B</u>, approving, among other things, at the conclusion of the Sale Hearing, (i) the sale of the Brookhaven Campus, free and clear of all liens, claims, encumbrances, and other interests with such liens, claims and encumbrances and other interests to attach to the proceeds of such sale; and (ii) the segregation of funds for the payment of any Bidding Protections (as defined below) which may later be approved in favor of a stalking horse bidder (a "<u>Stalking Horse Bidder</u>"), if necessary, and as may be allowed by the Court (the "<u>Sale</u>" or "<u>Sale Transaction</u>").

4.        The proposed Purchase Agreement contemplates that the Sale Transaction be consummated pursuant to the provisions of Section 363 of the Bankruptcy Code, and subject to higher and better offers. For the avoidance of doubt, the sale of the Brookhaven Campus includes the Brookhaven Dorm.

## II.        <u>JURISDICTION AND VENUE</u>

5.        This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of this motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

6.        The statutory predicates for the relief sought herein are Sections 105(a) and 363(b),(d) and (f), 365, 503 and 507 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), Rules 6004-1, 6006-1 and 9006-1 of the Local Rules of the Bankruptcy Court for the Eastern District of New York (the "<u>Local Rules</u>"), and General Order 557 of the Bankruptcy Court for the Eastern District of New York ("<u>General Order 557</u>").

III.    **BACKGROUND**

A.    **General**

7.      On November 29, 2016 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of New York (the "Court").

8.      The Debtor continues to manage its property as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

9.      No trustee or examiner has been appointed in this Chapter 11 Case.

10.      On December 9, 2016, the United States Trustee appointed Ultimate Power Inc., Linda Ardito and Lori Zaikowski to the Official Committee of Unsecured Creditors (the "Creditors' Committee").  Later that day, the Creditors' Committee selected SilvermanAcampora LLP as its general bankruptcy counsel.

11.      Prior to the Petition Date, the Debtor retained Robert S. Rosenfeld of RSR Consulting, LLC to perform the functions and hold the title of Chief Restructuring Officer (the "CRO").  The CRO has taken over as the day-to-day manager of the Debtor and is responsible for managing the Debtor as debtor-in-possession in this Chapter 11 Case, assisting in the formulation, preparation and consummation of a plan of liquidation and performing such other duties customary to a chief restructuring officer.

12.      The factual background relating to the Debtor's commencement of this Chapter 11 Case and the facts and circumstances supporting the relief requested herein are set forth in greater detail in the *Declaration of Robert S. Rosenfeld, Chief Restructuring Officer to the Debtor, Pursuant to Local Bankruptcy Rule 1007-4 in Support of First Day Motions* (the "First Day Declaration").

### B.      Description of the Brookhaven Campus

13.      The Debtor is the fee owner of the Brookhaven Campus, including the 72,000 square foot, 289-bed Brookhaven Dorm. The Brookhaven Campus was home to Dowling's School of Aviation, sports management program and NCAA Division II athletic program. Located on 33 acres of the Brookhaven Campus was Dowling's athletic field complex, featuring a multi-purpose stadium and baseball and softball fields. Also located on the Brookhaven Campus are three buildings that comprised the National Aviation and Transportation Center, as well as classrooms, computer labs, a cafeteria and a library.

### C.      Summary of Secured Obligations on the Brookhaven Campus

14.      Dowling's prepetition secured debt is primarily comprised of three (3) outstanding issuances of municipal bonds and one outstanding issuance of corporate bonds.[3]

15.      Certain improvements, construction and equipping of Dowling's athletic field complex and the Brookhaven Campus cafeteria, among other things, were financed with the proceeds of the issuance of those certain Suffolk County Industrial Development Agency ("SCIDA") Civic Facility Revenue Bonds, Series 2006A, in the principal amount of $34,910,000, and SCIDA Taxable Civic Facility Revenue Bonds, Series 2006B, in the principal amount of $4,000,000 (collectively, the "Series 2006 Bonds"), under that certain Trust Indenture (the "Series 2006 Indenture"), dated as of June 1, 2006, between SCIDA, as issuer, and The Bank of New York, as predecessor in interest to Wilmington Trust, National Association, as trustee (the "Series 2006 Trustee").  The "Series 2006 Bond Documents" shall refer collectively to the Series 2006 Indenture and all other documents evidencing or securing the Series 2006 Bonds.

---

[3] A detailed summary of all of the Debtor's secured obligations is set forth in the First Day Declaration. Only the secured obligations relevant to the Brookhaven Campus are discussed herein.

16.     The acquisition, renovation and equipping of the Brookhaven Dorm were financed by those certain Town of Brookhaven Industrial Development Agency ("TBIDA") Civic Facility Revenue Bonds, Series 2002, issued in the principal amount of $10,900,000 (the "Series 2002 Bonds") under that certain Trust Indenture (the "Series 2002 Indenture"), dated as of November 1, 2002, between the TBIDA, as issuer, and The Bank of New York, as predecessor in interest to UMB Bank, National Association, as trustee (the "Series 2002 Bond Trustee" and, together with the Series 2006 Bond Trustee, the "Bond Trustees").  The "Series 2002 Bond Documents" shall refer collectively to the Series 2002 Indenture and all other documents evidencing or securing the Series 2002 Bonds.

17.     In terms of basic financing structure, the facilities financed by each of the bond issuances (as further described in the respective indentures, the "Facilities" and each a "Facility") were leased by Dowling to the respective issuers, SCIDA and TBIDA, and subleased by such issuers back to Dowling.  The Facilities financed pursuant to the Series 2002 Indenture and the Series 2006 Indenture serve as collateral for Dowling's respective obligations thereunder, as set forth in that certain Mortgage and Security Agreement, dated as of November 1, 2002, by Dowling and TBIDA in favor of the Series 2002 Bond Trustee, and duly recorded with the Office of the Clerk of Suffolk County on December 17, 2002 (the "2002 Mortgage"), and that certain Mortgage and Security Agreement, dated as of June 1, 2006, by Dowling and SCIDA in favor of the Series 2006 Bond Trustee, and duly recorded with the Office of the Clerk of Suffolk County on July 5, 2006 (the "2006 Mortgage"), respectively.

18.     By no later than June 2015, Dowling had defaulted under various provisions of the trust indentures and entered into forbearance negotiations with the Bond Trustees and, with respect to the Series 2006 Bonds, ACA Financial Guaranty Corp. (the "Series 2006 Bond Insurer" or "ACA"), as bond insurer, concerning forbearance from payment and exercising

remedies.  On or about June 15, 2015, Dowling entered into substantially similar forbearance agreements with the Bond Trustees and ACA with respect to the Series 2006 Bonds and the Series 2002 Bonds.

19.    On or about August 4, 2016, in accordance with the terms of certain substantially similar conditional funding agreements, the Bond Trustees and ACA, among others, made certain protective advances under, among other things, the Series 2002 Bond Documents and the Series 2006 Bond Documents, in exchange for a grant of additional collateral in the form of a blanket lien on all assets of Dowling securing the new advances of funds.

20.    As a result of the financing transactions set forth above and others more fully described in the First Day Declaration, all of Dowling's real property and substantially all of its personal property (excluding restricted assets) are subject to the liens and security interests of Dowling's prepetition bondholders.  As relevant to this Sale Motion, the Brookhaven Campus (other than the Brookhaven Dorm[4]) is subject to the first liens and security interests of the Series 2006 Bond Trustee to the extent of the Series 2006 Indenture, and the Brookhaven Dorm is subject to the first liens and security interests of the Series 2002 Bond Trustee to the extent of the Series 2002 Indenture.

21.    In addition to the foregoing, several parties have filed mechanics liens on the Brookhaven Campus.  Still other creditors have obtained judgments on account of otherwise unsecured obligations before the Petition Date.

22.    Since the Petition Date, the Debtor has pursued a comprehensive sale strategy with regard to all of its real property. By example, the Debtor previously sought and obtained approval of the sale of its 23 acre campus located at 150 Idle Hour Boulevard, Oakdale, New

---

[4] As part of its collateral package, the liens of the Series 2002 Bond Trustee upon certain easement rights associated with the Brookhaven Dorms are further described in the 2002 Mortgage.

York 11769 (the "Oakdale Campus").  The sale of the Oakdale Campus closed on August 21, 2017.

23.     The instant Sale Motion seeks, inter alia, to approve the sale of the Brookhaven Campus to the Successful Bidder, pursuant to the proposed Purchase Agreement (as the same may be modified through further negotiations).

## IV.     THE PROPOSED SALE

### A.     Marketing of the Brookhaven Campus

24.     Pursuant to previous orders of this Court, the Debtor has retained A&G Realty Partners, LLC and Madison Hawk Partners, LLC to market and sell, among other things, the Brookhaven Campus (other than the Brookhaven Dorm) [Docket No. 114] and CBRE, Inc. to market and sell the Brookhaven Dorm [Docket No. 166] (collectively, the "Campus Agents").

25.     The Campus Agents are diversified real estate consulting and advisory firms with offices located throughout the country.  The Campus Agents evaluate, restructure, facilitate the acquisition of, and dispose of all types of real estate.  Additionally, the Campus Agents have significant experience in the disposition and renegotiation of leases and properties in bankruptcy.  The Campus Agents' professionals have been retained as real estate consultants in a variety of bankruptcy cases involving issues relating to the review, analysis, renegotiation, and disposition of key real property and lease agreements.  Subject to the Court's approval, the Campus Agents will conduct a marketing process and solicit and manage offers to purchase the Brookhaven Campus (including the Brookhaven Dorm).

26.     To date, no Stalking Horse Bidder has been identified.  However, the Debtor reserves the right throughout the marketing process to enter into a Purchase Agreement with a

Stalking Horse Bidder5 (subject to this Court's approval) and thereafter proceed to an Auction, if necessary, to maximize the value that the Debtor may realize from the sale of the Brookhaven Campus.  The Campus Agents intend to initially solicit offers on the Brookhaven Campus through a sealed bid process.  As a result, parties are encouraged in the first instance to put forth their highest and best bid for the Brookhaven Campus in the event an Auction does not occur. As further encouragement to interested parties to submit a competitive bid early, if an Auction is held, only the top five (5) bidders (or those within twenty-five percent (25%) of the highest bid) will be permitted to attend and participate at the Auction.

27.    The Debtor's professionals and the Campus Agents understand that certain bid protections will likely be needed to secure a quality Stalking Horse Bidder.  The Debtor therefore expects that if it seeks authority to enter into an agreement with a Stalking Horse Bidder, such an application will, after consultation with the Secured Parties and the Creditors' Committee, include a request for appropriate market-rate bid protections to include a termination fee and expense reimbursement (the "Bidding Protections").

**B.    Overview of the Purchase Agreement**

28.    The Successful Bidder for the Brookhaven Campus will be party to the proposed Purchase Agreement with the Debtor.  A copy of the Purchase Agreement template is attached hereto as Exhibit C.  If the Debtor enters into a Purchase Agreement with a Stalking Horse Bidder prior to the Bid Deadline (as defined herein), the Debtor will request approval from this Court on not less than seven (7) days' notice to the Notice Parties (as defined herein), and all Potential Bidders (as defined in the Bidding Procedures).

---

[5] If the Debtor determines to proceed with a Stalking Horse Bidder, it will be to ensure that certain minimum thresholds will be achieved as part of any Auction.

29.     The principal terms of the Purchase Agreement, as proposed, are summarized in

the following chart[6]:

| SUMMARY DESCRIPTION | |
|---|---|
| **Parties** | Seller:  Dowling College<br><br>Purchaser:  To Be Determined |
| **Asset** | The Brookhaven Campus (including the Brookhaven Dorm) |
| **Payment Amount** | Cash or cash equivalents at Closing. |
| **Conditions to Closing** | Entry of Sale Order substantially in the form annexed hereto as Exhibit B.  Receipt of customary consents and approvals that may be required in addition to the Sale Order. |
| **Approval Order and Closing Date** | Closing no later than fifteen (15) days after entry of the Sale Order (which shall not have been vacated or stayed). |

## V.     THE PROPOSED BIDDING PROCEDURES AND AUCTION

### A.     Summary of the Bidding Procedures

30.     The Bidding Procedures are intended to promote a fair and efficient competitive

sale process.  The Bidding Procedures (annexed as <u>Schedule 1</u> to the Bidding Procedures Order)

provide, in relevant part, as follows[7]:

> <u>Qualified Bidders</u>: In order to participate in the bidding process and to have a bid considered by the Debtor, each Potential Bidder must deliver a written, irrevocable offer for all of the Debtor's right, title and interest in and to the Brookhaven Campus and that otherwise satisfies the below criteria.  **For the avoidance of doubt, QUALIFIED BIDS MUST BE**

---

[6] In the event of any inconsistency between the Purchase Agreement and the summary contained in this Sale Motion, the terms of the Purchase Agreement shall control.

[7] To the extent there are any inconsistencies between the description of the Bidding Procedures contained herein and the Bidding Procedures, the terms of the Bidding Procedures control.

**MADE FOR ALL OF THE BROOKHAVEN CAMPUS (INCLUDING THE BROOKHAVEN DORM).**  A "Qualified Bidder" is a Potential Bidder that delivers a binding bid that in the Debtor's discretion, after consultation with the Secured Parties and the Creditors' Committee, satisfies the following (a "Qualified Bid"):

      (a)    Bid Deadline.  Each Bid Package (as defined below) must be delivered in written form to the following parties **so as to actually be received no later than 4:00 p.m. (prevailing Eastern Time) on December 5, 2017 (the "Bid Deadline")**[8]:

| Debtor | Counsel to the Debtor |
|---|---|
| Dowling College<br>c/o RSR Consulting, LLC<br>49 Roy Avenue<br>Massapequa, NY 11758<br>Attn: Robert S. Rosenfeld<br><br>With a copy to:<br><br>RSR Consulting, LLC<br>1330 Avenue of the Americas, Suite 23A<br>New York, New York 10019<br>Attn:  Robert S. Rosenfeld | Klestadt Winters Jureller<br>Southard & Stevens, LLP<br>200 West 41st Street, 17th Floor<br>New York, New York 10036<br>Attn:  Sean C. Southard, Esq.<br>ssouthard@klestadt.com[9] |
| **United States Trustee** | **Real Estate Advisor to the Debtor** |
| Office of the United States Trustee for the Eastern District of New York<br>Alfonse D'Amato Federal Courthouse<br>560 Federal Plaza<br>Central Islip, New York 11722<br>Attn:  Stan Yang, Esq., Trial Attorney | A&G Realty Partners, LLC<br>445 Broadhollow Road, Suite 410<br>Melville, New York 11747<br>Attn:  Andrew Graiser |
| **Real Estate Advisor to the Debtor** | **Real Estate Advisor to the Debtor** |
| Madison Hawk Partners, LLC<br>575 Lexington Avenue, Suite 4017<br>New York, New York 10022<br>Attn: Jeffrey L. Hubbard | CBRE, Inc.<br>200 Park Avenue<br>New York, New York 10166<br>Attn: Ellen Rudin |
| **Series 2006 Bond Trustee** | **Series 2006 Bond Insurer** |
| Wilmington Trust, National Association<br>25 South Charles Street, 11th Floor<br>Mail Code: MD2-CS58 | ACA Financial Guaranty Corp.<br>555 Theodore Fremd Avenue Suite C-205<br>Rye, New York 10580 |

---

[8] As set forth above, the Bid Deadline may be delayed or the qualifications for bidders relaxed at the discretion of the Debtor, in consultation with the Secured Parties and the Creditors' Committee.

[9] Bidders may request email addresses for parties required to received Bid Packages and deliver the bid packages to such parties via email (other than original or negotiable instruments that are required to be delivered to Debtor's counsel).

| | |
|---|---|
| Baltimore, Maryland 21201<br>Attn: Jay Smith | Attn: Carl McCarthy, Esq. and Maria Cheng |
| **Counsel to the Series 2006 Bond Insurer** | **Local Counsel to the<br>Series 2006 Bond Insurer** |
| White & Case LLP<br>1221 Avenue of the Americas<br>New York, New York 10020<br>Attn: Brian D. Pfeiffer, Esq. | Certilman Balin Adler & Hyman, LLP<br>90 Merrick Avenue, 9th Floor<br>East Meadow, New York 11554<br>Attn: Richard J. McCord, Esq. and Thomas J.<br>McNamara, Esq. |
| **Series 1996, Series 2002, and Series 2015<br>Bond Trustee** | **Counsel to the Series 1996,<br>Series 2002, and Series 2015 Bond Trustee** |
| Gavin Wilkinson, Senior Vice President<br>UMB Bank, National Association<br>120 South Sixth Street, Suite 1400<br>Minneapolis, MN 55402 | Mintz, Levin, Cohn, Ferris, Glovsky and<br>Popeo, P.C.<br>One Financial Center<br>Boston, Massachusetts 02111<br>Attn: P. Miyoko Sato, Esq.<br>Ian A. Hammel, Esq. |
| **Local Counsel to the<br>Series 1996, Series 2002, and Series 2015<br>Bond Trustee** | **Counsel to the Creditors' Committee** |
| Garfunkel Wild, P.C.<br>111 Great Neck Road<br>Suite 600<br>Great Neck, New York 11021<br>Attn: Adam T. Berkowitz, Esq. | Silverman Acampora LLP<br>100 Jericho Quadrangle, Suite 300<br>Jericho, New York 11753<br>Attn: Ronald J. Friedman, Esq. |

(b)  <u>Bid Package</u>.  Each bid must include (collectively, the "<u>Bid Package</u>"): (i) a written and signed irrevocable offer (x) stating that the bidder offers to consummate a sale transaction on terms and conditions set forth on the Modified Purchase Agreement (as defined below), (y) confirming that the bid will remain irrevocable until the earlier of (1) ninety (90) days following entry of the Sale Order[10] and (2) closing with the Successful Bidder and (z) stating that the bidder has had the opportunity to conduct due diligence prior to its offer and does not require further due diligence in accordance with subparagraph (g) below; (ii) an executed copy of the Purchase Agreement as modified by the bidder in accordance with its bid (the "<u>Modified Purchase Agreement</u>")[11]; and (iii) an

---

[10] For the avoidance of doubt, notification to the Backup Bidder within such period that the Debtor has terminated a transaction with the Successful Bidder and that the Debtor intends to proceed toward closing with the Backup Bidder based on the Backup Bid shall automatically extend the irrevocable nature of the Backup Bid in accordance with the terms of such Backup Bid.  For the further avoidance of doubt, it is not necessary that the Backup Bid actually close within such period.

[11] For the avoidance of doubt, the Purchase Agreement with any Stalking Horse Bidder is deemed a Modified Purchase Agreement.

electronic markup of the agreement clearly showing the revisions in the Modified Purchase Agreement (formatted as a Microsoft Word document or such other word processing format acceptable to the Debtor).  The Debtor, in consultation with the Secured Parties and the Creditors' Committee, shall determine whether any Modified Purchase Agreement that modifies the Purchase Agreement in any respect beyond the identity of the purchaser and the purchase price under the agreement is a Qualified Bid.

(c)     <u>Minimum Bid</u>.  The amount of the purchase price in a bid for the Brookhaven Campus must be one (1) of the five (5) highest and otherwise best bids, or within twenty-five percent (25%) of the highest and otherwise best bid. Each bid shall provide a single lump sum bid for the Brookhaven Campus.

(d)     <u>Financial Information</u>.  The Bid Package must contain such financial and other information that will allow the Debtor, in consultation with the Secured Parties and the Creditors' Committee, to make a determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by such bid, including any proposed conditions to Closing.

(e)     <u>Additional Bidding Protections</u>.  A bid (other than from a person selected as a stalking horse bidder in accordance with the Bidding Procedures (the "<u>Stalking Horse Bidder</u>")) must not request or entitle the Potential Bidder to any termination fee, transaction or break-up fee, expense reimbursement, or similar type of payment.

(f)     <u>Identity of Bidders</u>.  Each Potential Bidder must fully disclose the identity of each entity that will be bidding for the Brookhaven Campus, as well as disclose the organization, form and the business conducted by each entity and what, if any, connection the Potential Bidder has with the Debtor.  Potential Bidders shall be required to provide such additional information as the Debtor, in consultation with the Secured Parties and the Creditors' Committee, may require regarding the bidder's ability to satisfy the requirements of the transaction contemplated by the Modified Purchase Agreement.

(g)     <u>Due Diligence</u>.  Except for any required regulatory approvals, if any, the bid must not contain any contingencies of any kind, including, among others, obtaining (i) financing; (ii) shareholder, board of directors or other approval; or (iii) the outcome or completion of due diligence.  Each Potential Bidder must also affirmatively acknowledge that the Potential Bidder (i) had an opportunity to conduct due diligence regarding the Brookhaven Campus prior to making its offer and does not require further due diligence, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Brookhaven Campus in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Brookhaven Campus, or the completeness of any information provided in connection therewith except as expressly stated in these Bidding Procedures.

(h)    <u>Consents</u>.  Each Potential Bidder must represent that it obtained all necessary organizational approvals to make its bid and to enter into and perform the Modified Purchase Agreement.

(i)    <u>Deposit(s)</u>.  A Potential Bidder must deposit not less than five percent (5%) of the initial cash purchase price set forth in the Modified Purchase Agreement with the Debtor in the form of a certified check or wire transfer on or before the Bid Deadline (the "<u>Deposit</u>") with counsel to the Debtor.  In addition, if the Debtor proceeds with an Auction and a Stalking Horse Bidder is selected, each Potential Bidder must also deposit not less than the aggregate amount of their Deposit, plus the amount of any Court approved Bidding Protections with the Debtor in the form of a certified check or wire transfer before the Auction (the "<u>Additional Deposit</u>").  If selected as the Successful Bidder or the Backup Bidder (defined below) following the Auction, each of the Successful Bidder and the Backup Bidder shall increase its Additional Deposit equal to the sum of ten percent (10%) of the cash component of the Successful Bid or Backup Bid (as defined below), as applicable, plus the amount of the Bidding Protections (the "<u>Final Deposit</u>" and, together with the Deposit and the Additional Deposit, the "<u>Deposits</u>"). The Potential Bidder or the Backup Bidder shall forfeit the Final Deposit(s) if (i) the Potential Bidder or the Backup Bidder is determined to be a Qualified Bidder and withdraws or modifies its bid other than as provided herein before the Bankruptcy Court approves the Debtor's selection of the Successful Bidder, or (ii) the Potential Bidder or the Backup Bidder (x) modifies or withdraws the bid without the Debtor's consent before the consummation of the sale contemplated by the bid, or (y) breaches the Modified Purchase Agreement. The Deposit(s) shall be returned to the bidder (i) as soon as practicable if the bidder is not determined to be a Qualified Bidder or (ii) no later than five (5) business days after entry of the Sale Order if the bidder is a Qualified Bidder (who has not otherwise forfeited its Deposit), but is not the Successful Bidder or the Backup Bidder.  The Debtor's counsel will maintain any Deposit(s) in a non-interest bearing escrow account.

(j)    <u>As Is. Where Is</u>.  Any Modified Purchase Agreement must provide that the Sale will be on an "as is, where is" basis and without representations or warranties of any kind except and solely to the extent expressly set forth in such agreement of the Successful Bidder.  Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Brookhaven Campus prior to making its bid and that it has relied solely upon its own independent review and investigation in making its bid.

(k)    <u>Debtor's Considerations</u>.  The Debtor, after consultation with the Secured Parties and the Creditors' Committee, will have the exclusive right to determine that a bid is not a Qualified Bid and shall notify bidders whether their respective bid has been determined to be a Qualified Bid prior to the Auction. Moreover, the Debtor, after consultation with the Secured Parties and the Creditors' Committee, may reject any bid that is on terms more burdensome or conditional than the proposed Purchase Agreement or is otherwise contrary to the

best interests of the Debtor's estate. Without limiting the foregoing, the Debtor's determination as to qualification of bids, in consultation with the Secured Parties and the Creditors' Committee, may take into consideration: (1) whether the bid requires any indemnification of such Qualified Bidder; (2) whether the bid does not provide sufficient cash consideration to pay applicable transfer taxes, costs or other cash costs of the transaction (including professionals' fees and any Bidding Protections); (3) whether the bid may involve payment of consideration over time or otherwise impact the tax exempt nature of bonds that are issued and outstanding by the Debtor; (4) whether the bid includes a non-cash instrument or similar consideration that is not freely marketable; or (5) any other factors the Debtor, after consultation with the Secured Parties and the Creditors' Committee, may deem relevant.[12]

(l)        In addition to the requirements above, the Debtor, in consultation with the Secured Parties and the Creditors' Committee, may request any additional information from any bidder to assist the Debtor in making a determination as to whether a bid is a Qualified Bid.

Potential for Stalking Horse Bidder. Though the Bidding Procedures contemplate that the Debtor will solicit sealed bids in connection with the Sealed Bid Process on or before the Bid Deadline, the Bidding Procedures permit the Debtor the flexibility to seek to enter into a form of the Purchase Agreement before the Sale Hearing and/or Auction under terms and conditions acceptable to the Secured Parties and in consultation with the Creditors' Committee. The Debtor contemplates that any Purchase Agreement with a Stalking Horse Bidder would nonetheless be subject to the receipt of higher or otherwise better bids in accordance with these Bidding Procedures and a potential Auction. If the Debtor enters into a Purchase Agreement with a Stalking Horse Bidder before the Bid Deadline, all Potential Bidders (as defined herein) that provide the required documentation as set forth herein shall be notified of the Debtor's entrance into the Purchase Agreement with the Stalking Horse Bidder and terms defining such agreement, including Bidding Protections as may be approved by the Court and thereafter offered as part of the Purchase Agreement.

The Bidding Procedures Order permits the Debtor to present to this Court, on not less than seven (7) days' notice, a revised Purchase Agreement and related proposed Bidding Protections that the Debtor believes are necessary to induce a Stalking Horse Bidder to pursue the Sale (the "Bidding Protections").

Sale to a Stalking Horse Bidder. In the event of a Stalking Horse Bidder, the Purchase Agreement with the Stalking Horse Bidder shall be deemed a Qualified Bid and the Stalking Horse Bidder shall be deemed a Qualified Bidder. If no Qualified Bid other than Stalking

---

[12] Notwithstanding the qualifying bidding procedures, the Debtor reserves the right to entertain bids for the Brookhaven Campus that do not conform to one or more of the requirements set forth herein and in the Bidding Procedures. Further, notwithstanding any other term of these Bidding Procedures, subject to the terms of the Final Order (I) Authorizing Debtor to Obtain Postpetition Financing and Use Cash Collateral, (II) Granting Adequate Protection, and (III) Granting Certain Related Relief, each Secured Party may credit bid in connection with the sale of the Brookhaven Campus, may participate in any Auction, and any such bid shall constitute a "Qualified Bid" for purposes of these procedures.

Horse Bidder's is submitted by the Bid Deadline, the Debtor shall not be required to proceed with an Auction, but shall proceed with the Sale Hearing and seek approval of the Purchase Agreement with the Stalking Horse Bidder and the transaction contemplated thereby.

Auction. If the Debtor determines, after review of the Qualified Bids and consultation with the Secured Parties and the Creditors' Committee, that an Auction process will maximize the value that the Debtor may realize from the sale of the Brookhaven Campus, the Debtor shall conduct the Auction with respect to the Brookhaven Campus.  The Auction will take place at the offices of local counsel to the 2006 Bond Insurer, Certilman Balin Adler & Hyman, LLP 90 Merrick Avenue, East Meadow, New York 11554, not later than **December 7, 2017, starting at 10:00 a.m. (prevailing Eastern Time)**, or at such other date and time or other place, as may be determined by the Debtor at or prior to the Auction.  The Auction shall be governed by the following procedures:

(a)    Participation.  Only the Qualified Bidders that have submitted a Qualified Bid and provided a Deposit(s) will be eligible to participate in the Auction, and each Qualified Bidder shall appear in person at the Auction (and any attorney for a Qualified Bidder may appear at the Auction at the discretion of the Qualified Bidder).  In the event a Qualified Bidder does not attend the Auction, the relevant Qualified Bid shall nonetheless remain fully enforceable against that Qualified Bidder in accordance herewith.  The Debtor, in consultation with the Secured Parties and the Creditors' Committee, will evaluate all Qualified Bids received and will select the Qualified Bid that reflects the highest or best offer for the Brookhaven Campus, and otherwise complies with the bid requirements set forth herein, as the "Starting Auction Bid."  The Debtor may consider a variety of factors to determine the Starting Auction Bid including changes to the proposed Purchase Agreement and the Qualified Bidder's ability to consummate the Sale. At the Auction, the Debtor shall announce the material terms of each overbid and the basis for calculating the total consideration offered in each such overbid.

(b)    Bidding.  Bidding at the Auction shall commence at the amount of the Starting Auction Bid.  Qualified Bidders may then submit successive bids in increments of at least $100,000.00 plus the amount of any Bidding Protections (as may be established by the Court) (the "Bid Increment"); provided, however, that the Debtor, in consultation with the Secured Parties and the Creditors' Committee, shall retain the right to modify the Bid Increment at the Auction and to establish parameters for the number of rounds of bidding and the format thereof (open outcry, sealed bids, or otherwise).   Any bid first submitted after the conclusion of the Auction shall not be considered for any purpose.

(c)    Higher and Better.  The Debtor reserves the right, in consultation with the Secured Parties and the Creditors' Committee, to determine whether any bid is better, if not higher, than another bid submitted during the Auction.  The Debtor may consider a variety of factors in making this decision, including without limitation, the ability of a Bidder to obtain any necessary regulatory approvals, whether the bid is materially more burdensome than the terms of the proposed Purchase Agreement, any proposed conditions to closing, whether the bid includes any non-cash components and provides significant cash

consideration for the payment of required costs of the transaction, whether the ability of the Potential Bidder to use the Brookhaven Campus is consistent with applicable non-bankruptcy law and/or the Debtor's mission, and any other factors deemed relevant.

(d)    <u>Successful Bid</u>.  The Auction shall continue until there is only one offer for the Brookhaven Campus, which the Debtor, in consultation with the Secured Parties and the Creditors' Committee, determines, subject to Court approval, is the highest or otherwise best offer from among the Qualified Bids submitted at the Auction (the "<u>Successful Bid</u>") and the Debtor announces that the Auction is closed.  The Qualified Bidder submitting such Successful Bid shall become the Successful Bidder and shall have such rights and responsibilities of the Buyer, as set forth in the Modified Purchase Agreement.  Within one (1) business day after the conclusion of the Auction (but in any event prior to the commencement of the Sale Hearing), the Successful Bidder shall (i) complete, execute and deliver to the Debtor the Modified Purchase Agreement (as updated to conform to the Successful Bid) and all contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made, and (ii) supplement its Deposit by wire transfer or other immediately available funds so that, to the extent necessary, such Deposit equals ten percent (10%) of the cash component of the Successful Bid plus the amount required for the payment of the Bidding Protections, if any.

(e)    <u>Anti-Collusion</u>.    At the commencement of the Auction, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with any other Qualified Bidder or Potential Bidder with respect to the bidding or the Sale.

(f)    <u>Conduct of Auction.</u>  The Auction may be conducted openly with the proceeding being transcribed and each Qualified Bidder being informed of the terms of the previous bid; the Debtor, its counsel, counsel to the Creditors' Committee and counsel to the Secured Parties, may meet privately with any Qualified Bidder to negotiate the terms of its bid.  The Debtor, in consultation with the Secured Parties and the Creditors' Committee, may adopt other rules for the conduct of the Auction at the Auction which, in its judgment, will better promote the goals of the Auction.

(g)    <u>Backup Bid</u>.  At the conclusion of the Auction, the Debtor will also announce the second highest or otherwise best bid from among the Qualified Bids submitted at the Auction (the "<u>Backup Bid</u>").  The Qualified Bidder submitting such Backup Bid shall become the "<u>Backup Bidder</u>," and subject to the rights of the Successful Bidder, shall have such rights and responsibilities as set forth in the Modified Purchase Agreement. Within one (1) business day after the conclusion of the Auction (but in any event prior to the commencement of the Sale Hearing), the Backup Bidder shall (i) complete, execute and deliver to the Debtor the Modified Purchase Agreement (as updated to conform to the Backup Bid) and all contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made, and (ii) supplement its

Deposit by wire transfer or other immediately available funds so that, to the extent necessary, such Deposit equals ten percent (10%) of the cash component of the Backup Bid plus the amount required for the payment of the Bidding Protections, if any. The Backup Bid shall remain open and irrevocable until the earlier of (x) written notification to the Backup Bidder within ninety (90) days following entry of the Sale Order that the Debtor has terminated the Sale with the Successful Bidder and intends to proceed toward closing with the Backup Bidder based on the Backup Bid in accordance with the terms of these Bidding Procedures, and (y) Closing of the Sale.

(h)     The Backup Bidder's Deposit(s) will be returned by the Debtor upon consummation of the Sale of the Brookhaven Campus to the Successful Bidder or will be otherwise applied or forfeited as provided in section (i) above if the Backup Bidder is determined to be the Successful Bidder.

(i)     <u>Extensions/Adjournment</u>.  The Debtor reserves its rights, in the exercise of its judgment, in consultation with the Secured Parties and the Creditors' Committee, to modify any provisions of the Bidding Procedures at or prior to the Auction, including, without limitation, extending the deadlines set forth in the Auction procedures, modifying bidding increments, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice.

**B.     <u>Auction and Sale Hearing Notice</u>**

31.     Within three (3) days after entry of the Bidding Procedures Order, the Debtor shall cause to be served copies of the Bidding Procedures Order, the Bidding Procedures and the Sale Notice (annexed as Schedule 2 to the Bidding Procedures Order) on the Notice Parties, all creditors of the Debtor who are listed on the Schedules filed by the Debtor or who have filed proofs of claim against the Debtor's estate ("<u>Scheduled and Filed Creditors</u>").

32.     No later than twenty-one (21) days prior to the Sale Hearing, the Debtor shall supplement service by causing a copy of the Sale Notice to be served on any additional parties disclosed by the title reports as asserting a lien on or interest in the Brookhaven Campus. Further, the Campus Agents' intend to market the Brookhaven Campus by submitting print and

digital ads to the following entities for publication[13]:  Wall Street Journal, New York Times, Jewish Week, Newsday, and Real Estate Weekly.  In addition, after entry of the Bidding Procedures Order, the Debtor proposes to publish the Sale Notice in the Wall Street Journal and either Newsday or Long Island Business News.

## C.    **Objections to Bidding Procedures and Sale**

33.    The Debtor proposes that objections, if any: (i) to the Bidding Procedures shall be filed with this Court, so as to be received no later than 4:00 p.m. (prevailing Eastern Time) seven (7) days prior to the Bidding Procedures Hearing (the "Bidding Objection Deadline"), and (ii) to the Sale Motion shall be filed with this Court, so as to be received no later than 4:00 p.m. (prevailing Eastern Time) seven (7) days prior to the Sale Hearing (the "Sale Objection Deadline"), by: (a) the Office of the United States Trustee for the Eastern District of New York, Alfonse D'Amato Federal Courthouse, 560 Federal Plaza, Central Islip, NY 11722, Attn: Stan Yang, Esq., Trial Attorney; (b) proposed counsel to the Debtor:  Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, NY 10036, Attn:  Sean C. Southard, Esq.; (c) counsel to the Debtor's material prepetition and post-petition secured lenders:  (i) Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn:  P. Miyoko Sato, Esq. and Ian A. Hammel, Esq., (ii), White & Case LLP, 1221 Avenue of the Americas, New York, New York 10020, Attn:  Brian D. Pfeiffer, Esq. and Neil S. Begley, Esq., (iii) Certilman Balin Adler & Hyman, LLP, 90 Merrick Avenue, 9th Floor, East Meadow, NY 11554, Attn:  Richard J. McCord, Esq. and Thomas J. McNamara, Esq., and (iv) Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck, NY 11021, Attn:  Adam T. Berkowitz, Esq.; and (d) counsel to the Creditors' Committee.

---

[13] This list is only a sample of the places where the Campus Agents' intend to market the Brookhaven Campus.

### D.    Sale Hearing

34.    The Successful Bid and Backup Bid will each be subject to entry of the Sale Order after the Sale Hearing to be held on a date to be set by this Court.  The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court.  Upon approval of the Backup Bid by the Court, the Backup Bid shall remain open and irrevocable until the consummation of the Successful Bid.

## VI.    EXTRAORDINARY PROVISIONS OF THE PROPOSED SALE ORDER

35.    Pursuant to General Order 557, the Debtor is required to highlight any "extraordinary provisions" of the proposed Sale.  The extraordinary provisions in the proposed Sale are as follows:

(a)    Use of Proceeds.  In the event of a Stalking Horse Bidder, under the Purchase Agreement with the Stalking Horse Bidder, the first proceeds from the Sale pursuant to a Competing Bid will likely be used to pay the Bidding Protections.  The proposed form of Sale Order also provides that the liens existing on the Brookhaven Campus will attach to the net proceeds of the sale to the same extent, validity and priority that existed prior to the sale after taking into account the costs of the Sale and the Debtor shall be authorized to use such proceeds to pay any such secured claims in the order of their relative priority, as allowed by the Court.

(b)    Relief from Bankruptcy Rule 6004(h).  The proposed form of Sale Order contains a waiver of the stay imposed by Bankruptcy Rule 6004(h).  The Debtor submits such relief is appropriate under the circumstances to maximize the value that the Debtor may realize from the sale of the Brookhaven Campus, especially in light of the Debtor's remaining liquidity.

(c)    Sale Free and Clear of Unexpired Leases.  Though not anticipated to be an extraordinary provision, out of an abundance of caution, the Debtor is noting the following leasehold interests which arise out of the financing structure the Debtor entered into prepetition.  Pursuant to the Series 2006 Bond Documents and the Series 2002 Bond Documents, certain Facilities of the Brookhaven Campus were leased by the Debtor to SCIDA and TBIDA, respectively, as issuers, and subleased by SCIDA and TBIDA back to the Debtor.  The Brookhaven Campus and the Brookhaven Dorm serve as collateral for the Debtor's respective obligations under the Series 2006 Bond Documents and Series 2002 Bond Documents, as set forth in the 2006 Mortgage and the 2002 Mortgage.  The Debtor understands that the Bond Trustees and ACA consent to the sale of the Brookhaven Campus and the Brookhaven Dorm free and clear of their liens and any

rights in the leasehold interests created by the Series 2006 Bond Documents and the Series 2002 Bond Documents.

(d)     Successor Liability. The proposed form of Sale Order contains findings and provisions limiting the Successful Bidder's successor liability.  The parties intend that the transfer of the Brookhaven Campus to the Successful Bidder will not subject the Successful Bidder to any liability and a finding that the Sale can be made free and clear of successor liability claims in the Sale Order complies with applicable principles of sales free and clear of successor liability claims pursuant to Section 363(f) of the Bankruptcy Code and applicable non-bankruptcy law.  The Debtor proposes to provide notice of the Sale in accordance with the notice procedures set forth herein and submits that such notice is appropriate and adequate under the circumstances.

## VII.    THE BIDDING PROCEDURES ORDER SHOULD BE ENTERED

### A.    The Bidding Procedures Should be Approved

36.    The Bidding Procedures, which are standard for the sale of assets in large chapter 11 cases, will ensure that the Debtor's estate receives the greatest benefit available from the sale of the Brookhaven Campus.  The Bidding Procedures have been structured to attract the maximum number of Qualified Bids for the Brookhaven Campus while allowing the Debtor the flexibility to select the bid or bids that provide the greatest overall value to the Debtor's estate giving due consideration to the Debtor's not-for-profit mission and the best likelihood of closing. Finally, the Bidding Procedures set out a time frame that will allow potential purchasers sufficient time to construct and submit informed Qualified Bids, while still providing for the expeditious sale of the Brookhaven Campus.

37.    The Debtor submits that the Bidding Procedures are reasonably designed to ensure that the Debtor's estate receives the maximum benefit available from the sale of the Brookhaven Campus, and therefore warrant Court approval.

### B.    The Bidding Protections Should Be Approved

38.    The Debtor is also requesting approval of shortened time to present a future application seeking approval of Bidding Procedures in the event a Stalking Horse Bidder is selected.  The Debtor expects that such Bidding Protections would be paid solely from the first

21

proceeds of an Alternate Transaction, or as set forth in the Purchase Agreement with the Stalking Horse Bidder.

39.      As noted above, approval of the Bidding Protections is likely to be an integral part of obtaining a quality Stalking Horse Bidder and will likely require expedited consideration by this Court given the time frame contemplated by the Bidding Procedures.  As such, the Debtor requests that it be permitted to present any motion to approve Bidding Protections for a Stalking Horse Bidder for consideration by this Court on not less than seven (7) days' notice to the Notice Parties and other interested bidders.

40.      Bankruptcy courts have approved bidding incentives routinely under the "business judgment rule," and such arrangements are presumptively valid provided that (i) the trustee's or debtor's decision to agree to the bidding protections is not tainted by bad faith or self-dealing, (ii) the bidding protections do not hamper bidding, and (iii) the amount of the bidding protections is reasonable.  <u>See</u> <u>Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.</u>), 147 B.R. 650, 656-57 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).  Bidding protections such as a termination fee or break-up fee and expense reimbursement serve as an "incentive payment" offered to an unsuccessful bidder who places the debtor's property in a "sales configuration mode," thereby attracting other bidders to the auction.  Specifically, bidding protections are designed to "(i) attract or retain a potentially successful bid, (ii) to establish a bid standard or minimum for other bidders to follow, and (iii) to attract additional bidders."  <u>Id</u>. at 661-62.

41.      In the instant case, Bidding Protections are believed to likely be necessary in order to obtain a quality Stalking Horse Bidder.

**C.**    **The Auction and Sale Hearing Notice Should be Approved**

42.    Pursuant to Bankruptcy Rules 2002(c) and 6004, the Debtor is required to give 21 days' notice of any proposed sale of property not in the ordinary course of business.  Bankruptcy Rule 2002(c) further provides that such notice must include the time and place of any auction, a sale hearing, and the time fixed for objections to the sale.  The Sale Notice sets forth all the information a potential bidder and any other party in interest should require about the bidding process for the Brookhaven Campus, including: notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures; the Bid Deadline; the time, date, and location of the Auction; and the time, date and location of the Sale Hearing.

43.    The Debtor submits that the Sale Notice as proposed complies with Bankruptcy Rule 2002 and General Order 557, and constitutes good and adequate notice of the sale and the proceedings with respect thereto.  Because the Debtor is providing notice of this Sale Motion, the Bidding Procedures and the Auction to all Notice Parties and Scheduled and Filed Creditors, the Debtor submits that the notice requirements of Bankruptcy Rules 2002(a)(2) and 6004 are satisfied.  The Debtor also proposes to publish the Auction and Sale Notice in The Wall Street Journal and Newsday pursuant to Bankruptcy Rule 2002(l).  Therefore, the Debtor respectfully requests that the Court approve the Auction and Sale Notice and the notice procedures proposed above.

**VIII.**    **THE SALE ORDER SHOULD BE ENTERED**

**A.**    **Sales Outside the Ordinary Course of Business**

44.    Section 363(b) of the Bankruptcy Code and Rule 6004 of the Bankruptcy Rules govern the sale of assets outside the ordinary course of business.  Section 363(b)(1) provides, in relevant part, that a debtor in possession may, after notice and hearing, "use, sell or lease, other than in the ordinary course of business, property of the estate."  See 11 U.S.C. § 363 (b)(1).

45.     The terms of such sale are generally within the sound discretion of the Debtor. See In re Ionosphere Clubs, Inc., 100 B.R. 670, 679 (Bankr. S.D.N.Y. 1989) (sale of Debtors' airline shuttle assets approved where representing the exercise of independent good faith and non-coerced business judgment by the Debtors, the Debtors articulated a compelling business reason for the sale and represented fair value).

46.     As recognized by the Second Circuit in Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983), a court may approve a section 363 application after expressly determining from the evidence presented at the hearing that a good business reason exists to grant such application.

47.     Bankruptcy Rule 6004(f)(1) further provides that sales of property outside the ordinary course may be conducted by private sale or public auction.  See FED. R. BANKR. P. 6004(f)(1).  Generally, a bankruptcy court has wide latitude in approving even a private sale of all or substantially all of the estate assets not in the ordinary course of business under Section 363(b).  See In re Ancor Exploration Co., 30 B.R. 802, 808 (Bankr. N.D. Okla. 1983).  However, each proposed sale must be examined from its own facts to determine whether the proposed sale is justified with detailed factual findings being made in support thereof.

**B.      The Sale of the Brookhaven Campus Represents
         the Debtor's Sound Business Judgment**

48.     Under applicable law, a proposed sale must represent the reasonable exercise of business judgment on the part of a debtor-in-possession in order to be approved under section 363(b) of the Bankruptcy Code.  See, e.g., In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); In re Lionel Corp., 772 F.2d at 1071.  See also In re Integrated Res., Inc., 147 B.R. 650, 656 (Bankr.S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985) (stating that the business judgment rule is applicable in bankruptcy and presumes that when making a business decision the directors of a corporation

24

acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company).

49.     Furthermore, Chapter 11 debtors may, in some circumstances, sell all or substantially all of their assets pursuant to section 363(b) prior to confirmation of a plan.  In re Lionel Corp., 722 F.2d at 1065, 1071.  Such a sale can even be made prior to filing a plan of reorganization.   In re Naron & Wagner, Chartered, 88 B.R. 85, 87 (Bankr. D. Md. 1988). However, in approving such a sale, a court must be able, based on the evidence, "to articulate sound business justifications for [its] decisions."  In re Lionel Corp., 722 F.2d at 1066.  A court should consider all of the salient factors and act to further the diverse interests of the debtors, creditors and equity holders alike.  Id. at 1071.  See also In re Chateaugay Corp., 973 F.2d 141, 143 (2d Cir. 1992); In re Ionosphere Clubs, Inc., 100 B.R. at 675.

50.     The Second Circuit has indicated that the following factors should be considered during the sale approval process: (i) the proportionate value of the asset to the estate as a whole; (ii) the amount of elapsed time since the filing; (iii) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (iv) the effect of the proposed disposition on future plans of reorganization; (v) the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property; (vi) which of the alternatives of use, sale or lease the proposal envisions; and (vii) whether the asset is increasing or decreasing in value.  See Lionel, 722 F.2d at 1071.  The factors highlighted by the Lionel decision are often cited and applied by other courts when determining requests to approve a sale of all or substantially all of the assets of a debtor's estate.  See, e.g., In re GSC, Inc., 453 B.R. 132, 156 (Bankr. S.D.N.Y. 2011); In re CPJFK, LLC, 496 B.R. 290, 303–04 (Bankr. E.D.N.Y. 2011); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175–76 (D. Del. 1991); In re Thomson McKinnon Sec., Inc., 120 B.R. 301, 307–08 (Bankr. S.D.N.Y. 1990).

51.    As indicated above, the decision to sell the Brookhaven Campus was one of necessity and resulted from a lack of remaining viable alternatives.  As set forth extensively in the First Day Declaration, the Debtor previously attempted to find a counter-party that would permit the Debtor to continue as a going concern.  Unfortunately, the Debtor has no option of that involves a continued operation as a higher education institution.  Absent a negotiated sale of its Brookhaven Campus to a third party in this Chapter 11 Case, the Debtor would likely be forced to surrender its assets, including the Brookhaven Campus, to its creditors without the opportunity for any reasonable and appropriate market test of value.  Indeed, a reasonably prompt marketing and sale of the Brookhaven Campus is necessary because the Debtor has no independent liquidity and is operating at a significant cash burn even at the substantially reduced scale that it now exists.  In the instant case, all of the Debtor's major creditor constituencies support the proposed sale process for the Brookhaven Campus.

52.    The Debtor believes that by selling the Brookhaven Campus in accordance with the Bidding Procedures, a significantly greater value can be captured from the assets than would be achieved through a forced liquidation.

53.    As contemplated, a Sale of the Brookhaven Campus will result in the sale of a substantial portion of the Debtor's assets outside of a Chapter 11 plan.  However, the Debtor intends to propose and file a plan of liquidation as soon as practicable following the Petition Date.

54.    To the extent the Sale is approved it is essential that the proposed sale be closed as quickly as reasonably possible to avoid continuing losses and maximize asset values.  A reasonably prompt sale will ensure the greatest potential benefit to creditors.

C.    **Section 363(d) of the Bankruptcy Code is Satisfied**

55.    Pursuant to Section 363(d) of the Bankruptcy Code, a transfer of property by a not-for-profit entity must be made in compliance with applicable nonbankruptcy law governing such transfer.   Specifically, Section 363(d) provides that "[t]he trustee may use, sell or lease property under subsection (b) or (c) of this section – (1) in the case of a debtor that is a corporation or trust that is not a moneyed business, commercial corporation, or trust, only in accordance with nonbankruptcy law applicable to the transfer of property by a debtor that is such a corporation or trust."  11 U.S.C. § 363(d)(1).

56.    In accordance with these provisions, the Debtor and the Successful Bidder will expect to obtain any required regulatory approvals for the Sale prior to the closing.  To the extent any regulatory body or governmental agency fails to provide approval for the Sale, the Debtor reserves all rights to challenge any such determination.  The inclusion of Section 363(d) of the Bankruptcy Code was not intended to provide states with a "veto" of sales of a debtor's assets under the Bankruptcy Code that otherwise take into account legitimate interests of the state over the transfer or sale of a non-profit's assets.  See H. REP. NO. 109-31, pt. 1, title XII (Judiciary. Comm.) (listing section 1221 of the BAPCPA under the heading "Technical Amendments").

57.    Outside of bankruptcy, an insolvent not-for-profit corporation that is seeking to sell all or substantially all of its assets is required, pursuant to Sections 510 and 511 of the New York Not-for-Profit Corporation Law, to submit a verified petition to the supreme court where the corporation has its principal office for approval of such sale transaction, on notice to the Attorney General.  The supreme court will approve the proposed sale transaction if it finds that "the consideration and the terms of the transaction are fair and reasonable to the corporation and that the purposes of the corporation or the interests of the members will be promoted."  N.Y. Not-for-Profit Corp. Law § 511(d).

58.     However, separate state court approval is not necessary if the not-for-profit corporation is in bankruptcy.  Once in bankruptcy, a proposed sale of a debtor's assets is subject to various provisions of the Bankruptcy Code, in particular Sections 363(d)(1) and 541(f) of the Bankruptcy Code. As stated above, section 363 permits the bankruptcy court to authorize a sale "in the case of a debtor that is a corporation or trust that is not a moneyed business, commercial corporation, or trust, only in accordance with nonbankruptcy law applicable to the transfer of property by a debtor that is such a corporation or trust."  11 U.S.C. § 363(d)(1).  Similarly, Section 541(f) of the Bankruptcy Code provides that "property that is held by a debtor that is a corporation described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code may be transferred to an entity that is not such a corporation, but only under the same conditions as would apply if the debtor had not filed a case under this title."  11 U.S.C. § 541(f).

59.     In In re HHH Choices Health Plan, LLC, the Bankruptcy Court for the Southern District of New York determined that the bankruptcy court, rather than the state court, was the appropriate court to determine whether to approve the proposed sale transaction of an insolvent not-for-profit corporation under Sections 510 and 511 of the New York Not-for-Profit Corporation Law.  554 B.R. 697, 700 (Bankr. S.D.N.Y. 2016).  In its decision, the court relied on Section 1221(e) of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") when interpreting Sections 363(d)(1) and 541(f) of the Bankruptcy Code.  Section 1221(e) of BAPCPA provides, in relevant part:

> Nothing in this section shall be construed to require the court in which a case under chapter 11 of title 11, United States Code, is pending to remand or refer any proceeding, issue, or controversy to any other court or to require the approval of any other court for the transfer of property.

Pub. L. No. 109–8, § 1221(e)(2005).

60.    The court interpreted Section 1221(e) of BAPCPA to require the bankruptcy court, rather than the state court, to ensure that the requirements of the New York Not-for-Profit Corporation law are met in the case of an insolvent not-for-profit corporation seeking to sell all or substantially all of its assets.  Id. at 700–01.

61.    The Debtor submits that the instant Sale complies with applicable non-bankruptcy law and does not violate Sections 510 and 511 of the New York Not-for-Profit Corporation Law. The Brookhaven Campus consists primarily of real estate and its transfer does not invoke specific regulatory requirements which might restrict the transfer of the property.  Moreover, the Motion is clear that the proceeds of the Sale will be used to satisfy the debt obligations of the Debtor in the order of priority required by the Bankruptcy Code.  This intended repayment of lawful obligations is consistent with the corporate purposes of the Debtor and applicable nonbankruptcy law.  Further, the Bidding Procedures and notice requirements of the Bidding Procedures Order are specifically designed to ensure a true market test of the value of the Brookhaven Campus.  For example, the terms of sale will have been clearly established and on notice to potentially impacted creditors.  Most importantly, inherent to this Court's approval of the Sale will be the consideration offered to the Debtor and its estate by the Successful Bidder. Unless this Court determines the purchase price to be fair and reasonable, this Court will not approve the same.  As such, the Debtor will request that this Court find that the proposed Sale is consistent with the requirements of Sections 510 and 511 of the New York Not-for-Profit Corporation Law.

62.    Accordingly, the proposed Purchase Agreement satisfies the requirements of Section 363(d) of the Bankruptcy Code.

## IX.    THE BROOKHAVEN CAMPUS SHOULD BE SOLD FREE AND CLEAR OF LIENS

63.    Under Section 363(f) of the Bankruptcy Code, a debtor may sell property under the Bankruptcy Code free and clear of liens, claims and encumbrances, provided that: (i) applicable nonbankruptcy law permits the sale of the property free and clear of such interests; (ii) the entity holding the lien, claim or encumbrance consents to the sale; (iii) the interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on the property; (iv) the interest is in bona fide dispute; or (v) the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest.  11 U.S.C. § 363(f). See In re Smart World Tech., LLC, 423 F.3d 166, 169 n. 3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims and interests.  It thus allows purchasers . . . to acquire assets without any accompanying liabilities."); In re Dundee Equity Corp., No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale of the interest concerned may occur if any one of the conditions of § 363(f) have been met").

64.    In accordance with the provisions of the proposed Purchase Agreement and Section 363(f), the Debtor requests that it be authorized to conduct the Sale free and clear of all Liens, other than the Permitted Exceptions (as set forth in the Purchase Agreement).  All parties holding liens on the Debtor's assets, including the Brookhaven Campus, will be provided notice of the proposed Sale and shall be granted an opportunity to object to the relief requested in the instant Sale Motion and any such entity that does not object to the sale shall be deemed to have consented.  See, e.g., Futuresource LLC v. Reuters Ltd., 312 F.3d 281, 285–86 (7th Cir. 2002) (standing for the proposition that the lack of an objection to a proposed sale of assets counts as consent); Hargrave v. Township of Pemberton (In re Tabone, Inc.), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies

section 363(f)(2)); In re Elliot, 94 B.R. 343, 345–46 (E.D. Pa. 1988) citing In re Gabel, 61 B.R. 661, 667 (Bankr. W.D. La. 1985). See also, In re Enron Corp., No. 01-16034 (AJG), 2003 WL 21755006 at *2 (AJG) (Bankr. S.D.N.Y July 28, 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)).

65.     Thus, to the extent any parties holding a lien on the Brookhaven Campus fail to object to the relief requested in this Sale Motion, a sale of the Brookhaven Campus free and clear of all Liens, with the exception of the Permitted Exceptions, satisfies Section 363(f)(2) of the Bankruptcy Code.

66.     Alternatively, Section 363(f)(5) is also satisfied and provides adequate cause for granting authorization to conduct the Sale free and clear of Liens. Under the proposed Purchase Agreement, any party holding a Lien may be compelled to accept a monetary satisfaction of its Lien. The Purchase Agreement also provides that Liens on the Brookhaven Campus shall attach to the proceeds of the Sale, subject to any claims and defenses the Debtor may have with respect thereto. Liens which cannot be satisfied through a monetary judgment (if any) are included among the Permitted Exceptions and will not attach to the proceeds of the Sale. Therefore, it is submitted that Section 363(f)(5) can be deemed satisfied upon a sale of the Brookhaven Campus being conducted free and clear of all liens.

## X.     SUCCESSOR LIABILITY

67.     The Debtor is also seeking to sell the Brookhaven Campus free and clear of any successor liability claims relating to the Brookhaven Campus. Notwithstanding reference to the conveyance free and clear of "any interest" in Section 363(f), that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims as well. See, e.g., In re Long Beach Medical Center, et al., Case No. 14-70593 (AST) (Bankr. E.D.N.Y. May 22, 2014) (authorizing the sale of assets free and clear of successor liability claims); In re Gen.

31

Motors Corp. et al., Case No. 09-50026 (REG) (Bankr. S.D.N.Y. Jul. 5, 2009) (same); In re Old

Carco LLC (f/k/a Chrysler LLC), Case No. 09-50002 (AJG) (Bankr. S.D.N.Y. Jun. 1, 2009)

(same); see also In re Trans World Airlines, Inc., 322 F.3d 283, 288–90 (3d Cir. 2003) (sale of

assets pursuant to section 363(f) barred successor liability claims for employment discrimination

and rights under travel voucher program).

68.     The ability of the Debtor to transfer the Brookhaven Campus free and clear from

successor liability is critical to the Sale Transaction.  In order to dispose of its assets and induce

the Successful Bidder to proceed with the Sale, the Debtor must be able to convey the assets free

and clear of potential successor liability claims.  Absent such assurance, the Successful Bidder

may be unwilling to proceed and significant value for the Debtor's estate may be lost.  See

Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d. Cir. 1997) (stating that a

sale pursuant to Section 363 of the Bankruptcy Code "maximizes the purchase price of assets

because without this assurance of finality, purchasers could demand a large discount for

investing in a property that is laden with the risk of endless litigation as to who has rights to

estate property").

69.     Further, under New York State law as well as the principles of traditional

common law, a purchaser of another company's assets will be found liable only for the seller's

liabilities where (i) the successor expressly or impliedly assumes the predecessor's tort liability,

(ii) the seller and purchaser merged or otherwise consolidated, (iii) the purchaser is a mere

continuation of the seller, and (iv) the transaction is fraudulent.  See N.Y. v. Nat'l Serv. Indus.,

Inc., 460 F.3d 201, 209 (2d Cir. 2006).  None of these factors are applicable to the proposed Sale

Transaction herein.  As such, the Court may authorize the transfer of the Brookhaven Campus

free and clear of any successor liability claims.  See Douglas v. Stamco, Case No. 09-1390-cv,

2010 WL 337043 (2d. Cir. Feb. 1, 2010) (holding that sale pursuant to Section 363 extinguished

successor liability claims where there was no (i) assumption of such liability, (ii) merger of the parties, (iii) mere continuation of the seller, or (iv) fraud).

70.      Accordingly, based on the foregoing, the Debtor respectfully submits that the Brookhaven Campus should be transferred to the Successful Bidder free and clear of all liens, claims, encumbrances and other interests, including rights or claims based on successor liability.

## XI.   THE SUCCESSFUL BIDDER SHOULD BE AFFORDED PROTECTION UNDER SECTION 363(m)

71.      Section 363(m) affords protection to a good faith buyer in any interest in property purchased from the Debtor, notwithstanding that the sale conducted was later reversed or modified on appeal.  Section 363(m) provides, in pertinent part, as follows:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . .  such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m); see also Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (Bankr. S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal."); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("[P]ursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal.").

72.      The Second Circuit has held that a party would have to show fraud or collusion between a purchaser and the debtor-in-possession or trustee in order to demonstrate a lack of good faith.  See Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a good faith status at a judicial sale involves fraud, collusion between the purchaser and other

bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); see also, In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).

73.     Here, at or prior to the Sale Hearing, the parties will have established that the Successful Bidder is a good faith purchaser as required by Section 363(m) of the Bankruptcy Code.  The Debtor expects the Modified Purchase Agreement to be the product of extensive, good-faith arms' length negotiations between the Debtor, its advisors and the Successful Bidder. Accordingly, the Debtor requests that the Court determine that the Successful Bidder was acting in good faith and is entitled to the protections of a good faith purchaser under Section 363(m).

## XII.    THE SALE SHOULD BE EXEMPT FROM TRANSFER AND SIMILAR TAXES

74.     Pursuant to N.Y. Tax Law §1405(b)(8), the Debtor submits that the Sale is exempt from New York State real estate transfer tax because it is being consummated under the Bankruptcy Code.  To the extent that the Debtor satisfies the requirements of either section 1146(a) of the Bankruptcy Code or N.Y. Tax Law §1405(b)(8), the Debtor will respectfully request that the Court find that these exemptions apply and that the Debtor's estate is exempt from real estate transfer taxes.

## XIII.   NOTICE

75.     The Debtor will serve notice of this Sale Motion on: (a) counsel for the Creditors' Committee; (b) the Debtor's material prepetition and post-petition secured lenders and any agent therefor; (c) the Office of the United States Trustee for the Eastern District of New York; (d) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (e) the following taxing and regulatory authorities: (i) the United States Attorney for the Eastern District of New York, (ii) the Attorney General of the State of New York, (iii) United States Department of Education, (iv) New York State Department of Education, (v) counsel for the Town of Brookhaven, (vi) the Town of Brookhaven Industrial Development Agency, (vii) counsel for

Suffolk County, New York, (viii) the Suffolk County Industrial Development Agency, (ix) the Internal Revenue Service, (x) the New York State Department of Taxation and Finance, and (xi) the Securities and Exchange Commission; (f) all parties who are known to assert a lien, claim, encumbrance or other interest on any portion of the Debtor's assets; and (g) all parties identified by the Debtor as potentially having an interest in acquiring some or all of the Brookhaven Campus (collectively, the "Notice Parties").

## XIV.    THE COURT SHOULD WAIVE OR REDUCE THE REQUIREMENTS OF RULES 6004(h)

76.    Under Rule 6004(h) of the Bankruptcy Code, all orders authorizing the sale of property pursuant to Section 363 of the Bankruptcy Code are automatically stayed for 14 days after entry of the order, unless otherwise ordered by the Court. FED. R. BANKR. P. 6004(h).  The stay period is intended to provide sufficient time for an objecting party to appeal before the order is implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h).

77.    Although little guidance is provided by either Rule 6004(h) or the Advisory Committee Notes as to when a court should "order otherwise", it has been suggested that the 14-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure".  See 10 Collier on Bankruptcy § 6004.11. Colliers also proposes that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to seek a stay pending such appeal. Id.  It is thus respectfully requested that the Court waive the 14 day stay period required under Rule 6004(h) or, in the alternative, if an objection is filed to the proposed Sale, reduce the stay period to the minimum amount of time reasonably necessary for the objecting party to file a stay pending appeal.  This relief is both necessary and appropriate under the circumstances of this Chapter 11 Case given the importance of the successful purchaser's immediate need to obtain certain regulatory approvals.

## XV.    <u>NO PRIOR REQUEST</u>

78.     No previous request for the relief sought herein has been made to this or any other court.

## XVI.    <u>CONCLUSION</u>

79.     The case law cited herein provides ample authority and justification for the approval of the proposed transaction.  The facts set forth herein also support a finding in favor of an order approving the Sale.  For these reasons, it is submitted that the Sale should be approved on the terms and provisions to be set forth in the Purchase Agreement.

**WHEREFORE** the Debtor respectfully requests that the Court enter orders substantially similar to the proposed orders, attached hereto as Exhibit A and Exhibit B, granting the relief requested herein, and granting the Debtor such other and further relief as is just and proper.

Dated:  New York, New York
       September 26, 2017

**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**


By:  _/s/ Sean C. Southard_
    Sean C. Southard
    Stephanie R. Sweeney
    200 West 41st Street, 17th Floor
    New York, NY 10036
    Tel: (212) 972-3000
    Fax: (212) 972-2245
    Email: ssouthard@klestadt.com
           ssweeney@klestadt.com

    *Attorneys to the Debtor and Debtor in*
    *Possession*

EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------------x
In re                                                    :        Chapter 11
                                                         :
DOWLING COLLEGE,                                          :        Case No. 16-75545 (REG)
                                                         :
                                                         :
                                    Debtor.               :
--------------------------------------------------------------x

   Upon that portion (the "Bidding Procedures Motion") of the motion (the

"Motion"[1]), dated September 26, 2017, of Dowling College ("Dowling" or the "Debtor"), debtor

and debtor-in-possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), by and

through its attorneys, Klestadt Winters Jureller Southard & Stevens, LLP, for entry of an Order,

pursuant to Sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy

Code") and Rules 2002(a)(2) and 6004 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") (i) approving the proposed Bidding Procedures in the form of Schedule 1

hereto to be used in connection with the proposed Sale of the Brookhaven Campus to the

Successful Bidder; (ii) scheduling a potential auction (the "Auction") and a hearing to approve

the Sale (the "Sale Hearing"); and (iii) approving the form and manner of the Notice of the

Auction and Sale Hearing (the "Sale Notice") substantially in the form attached as Schedule 2

hereto; and this Court having held a hearing on the Bidding Procedures Motion on October 16,

2017 (the "Bidding Procedures Hearing"); and, based on the Bidding Procedures Motion and the

record of the Bidding Procedures Hearing, it now appearing that the relief requested in the

Bidding Procedures Motion is in the best interest of the Debtor's estate; and after due

deliberation thereon and good cause appearing therefor, it is hereby:

---

[1] Capitalized terms used herein, unless herein defined, shall be used with the meanings ascribed to such terms in the Motion.

**FOUND AND DETERMINED THAT**:[2]

A.    This Court has jurisdiction over the Bidding Procedures Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of the Bidding Procedures Motion and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    Good and sufficient notice of the relief sought in the Bidding Procedures Motion has been given and no further notice is required.  A reasonable opportunity to object or be heard regarding the relief requested in the Bidding Procedures Motion has been afforded to interested persons and entities, including: (a) counsel for the Creditors' Committee; (b) the Debtor's material prepetition and postpetition secured lenders and any agent therefore; (c) the Office of the United States Trustee for the Eastern District of New York; (d) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (e) the following taxing and regulatory authorities: (i) the United States Attorney for the Eastern District of New York, (ii) the Attorney General of the State of New York, (iii) United States Department of Education, (iv) New York State Department of Education, (v) counsel for the Town of Brookhaven, (vi) the Town of Brookhaven Industrial Development Agency, (vii) counsel for Suffolk County, New York, (viii) the Suffolk County Industrial Development Agency, (ix) the Internal Revenue Service, (x) the New York State Department of Taxation and Finance, and (xi) the Securities and Exchange Commission; (f) all parties who are known to assert a lien, claim, encumbrance or other interest on any portion of the Debtor's assets; and (g) all parties identified by the Debtor as potentially having an interest in acquiring some or all of the Brookhaven Campus ("Notice Parties").

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact, when appropriate.  See Fed. R. Bankr. P. 7052.

C.      The proposed Sale Notice is good, appropriate, adequate, and sufficient, and is reasonably calculated to provide all interested parties, including the Notice Parties, together with all other parties identified by the Debtor, the Creditors' Committee or the Secured Parties as potentially having an interest in acquiring the Brookhaven Campus (collectively the "Potentially Interested Parties") and all creditors of the Debtor who are listed on the Schedules filed by the Debtor or who have filed proofs of claim against the Debtor's estate ("Scheduled and Filed Creditors"), with timely and proper notice of the Motion, the Auction, the Sale Hearing and the proposed Sale.

D.      The Debtor has articulated good and sufficient reasons for this Court to grant the relief requested in the Bidding Procedures Motion, including this Court's (i) approval of the Bidding Procedures, attached hereto as Schedule 1, and (ii) approval of the form and manner of service of the Sale Notice attached hereto as Schedule 2.

E.      The Debtor has articulated good and sufficient reasons for, and the best interests of the Debtor's estate will be served by, this Court scheduling subsequent pre-Sale and Sale Hearings to consider whether to grant the remainder of the relief requested in the Motion, including approval of the proposed Sale in accordance with the proposed Purchase Agreement between the Debtor and the Successful Bidder, a template of which is attached as Exhibit C to the Motion, free and clear of, among other things, all liens, claims, encumbrances, and interests, with the same to attach to the proceeds thereof pursuant to Section 363 of the Bankruptcy Code.

F.      To the extent a Stalking Horse Bidder is selected, the Debtor shall be permitted to present to this Court on not less than seven (7) days' notice, a proposed form of agreement and related proposed Bidding Protections that the Debtor believes are necessary to induce the Stalking Horse Bidder to pursue the Sale.

G.      Accordingly, the Bidding Procedures are reasonable and appropriate.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      All objections to entry of this Order or to the relief provided herein and requested in the Bidding Procedures Motion that have not been withdrawn, waived, resolved, or settled are hereby denied and overruled in their entirety.

## The Bidding Procedures

2.      The Bidding Procedures, as set forth on <u>Schedule 1</u> and incorporated herein by reference as if fully set forth herein, are hereby approved in all respects and shall govern all bids and bid proceedings relating to the Brookhaven Campus.  Notwithstanding the above, on or before the Objection Deadline (defined below), any party in interest may object to the criteria used by the Debtor to select the highest or otherwise best offer for the Brookhaven Campus.

3.      The deadline for submitting bids for the Brookhaven Campus (the "<u>Bid Deadline</u>") shall be December 5, 2017, at 4:00 p.m. (EST).

4.      The Debtor, in consultation with the Creditors' Committee and the Secured Parties, is authorized to extend the deadlines set forth in this Order and/or adjourn, continue or suspend the Auction and/or the Sale Hearing for any reason.

5.      The Debtor, in consultation with the Creditors' Committee and the Secured Parties, is authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

## The Auction

6.      The Auction, if necessary, shall commence at 10:00 a.m. (EST) on December 7, 2017 at the offices of local counsel to the 2006 Bond Insurer, Certilman Balin

Adler & Human, LLP, 90 Merrick Avenue, East Meadow, New York 11554, or such other time or other place as decided by the Debtor, and the Debtor shall notify all Qualified Bidders of any such other time or place; provided, however, in the event that no Qualified Bids (other than that submitted by the Stalking Horse Bidder) are received by the Bid Deadline or if there is no Stalking Horse Bidder and the Debtor determines that one of the Qualified Bids submitted is the highest and best offer for the Brookhaven Campus, the Debtor shall not be required to conduct an Auction, and in such event the Debtor shall proceed with the approval of the Modified Purchase Agreement with the Qualified Bidder.

### The Bidding Protections

7.    In the event that the Debtor identifies a Stalking Horse Bidder, the Debtor is authorized to present to this Court, on not less than seven (7) days' notice, a proposed form of agreement and related proposed Bidding Protections that the Debtor believes are necessary to induce the Stalking Horse Bidder to pursue the Sale.

### Pre-Sale Hearing

8.    If by 5:00 p.m. on [_____], 2017, the Debtor, the Creditors' Committee, the Secured Parties and/or any interested party notifies the Court of a dispute related to the qualification of a potential bidder or any other dispute relating to the Bidding Procedures, a telephonic hearing shall be held before the Honorable Robert E. Grossman, United States Bankruptcy Judge, on, [_____], 2017 at [_____] (EST) at which time this Court shall consider any issues raised by the parties.  In the event of a dispute between the Debtor, the Creditors' Committee and/or the Secured Parties as to whether a bid should be deemed a Qualified Bid, the Bankruptcy Court may make the final determination.  In the event of such hearing, the Debtor shall provide a call in number to the Court, all secured creditors, the proposed bidder(s) at issue,

and the United States Trustee, by fax, email or overnight delivery by no later than 10:00 a.m. on

[_____], 2017, and shall simultaneously docket a letter containing such call in information.

### **Sale Hearing**

9.      The Sale Hearing shall be held before the Honorable Robert E. Grossman, United States Bankruptcy Judge, on [December 13, 2017] at _____.m. (EST) at the United States Bankruptcy Court for the Eastern District of New York, 290 Federal Plaza, Central Islip, NY 11722, Courtroom No. 860, at which time this Court shall consider (i) approval of the Sale to the Successful Bidder; (ii) the entry of the proposed sale order, substantially in the form attached to the Motion as Exhibit B (the "Sale Order"); (iii) any issues or objections that are timely interposed by any parties; and (iv) such other or further relief as this Court may deem just or proper.

10.      The Sale Hearing may be adjourned by the Court upon request of the Debtor, after consultation with the Creditors' Committee and the Secured Parties, without further order of this Court, in which event a notice of adjournment will be filed with this Court and served on all Qualified Bidders, or by announcing such adjournment on the record of the Sale Hearing.

### **Notice**

11.      The Sale Notice substantially in the form attached hereto as Schedule 2 hereto is hereby approved.

12.      Within three (3) days after entry of this Order, the Debtor shall cause a copy of the Bidding Procedures, the Sale Notice and this Order to be served upon the Notice Parties, the Potentially Interested Parties and the Scheduled and Filed Creditors via first class mail.

13.     As soon as practicable after entry of this Order, the Debtor shall submit the Sale Notice for publication once in the Wall Street Journal and either Newsday or Long Island Business News pursuant to Bankruptcy Rule 2002(l).

14.     The notices as set forth in the preceding paragraphs shall constitute good and sufficient notice of the Motion, the Bidding Procedures, the Auction, the sale of the Brookhaven Campus, the Sale Hearing and the proposed Sale Order, and no other or further notice shall be necessary or required.

**Backup Bidder Provisions**

15.     In the event a Backup Bidder is selected at the Auction, the Successful Bidder fails to timely close the Sale, time being of the essence, and the Debtor delivers a Termination Notice to the Successful Bidder in accordance with the terms of the Purchase Agreement, the Backup Bidder shall thereupon be deemed the Successful Bidder. For the avoidance of doubt, in the event the Backup Bidder is deemed the Successful Bidder, (i) all references in this Order or in the Sale Order to the "Successful Bidder" or the "Purchaser" or like terms shall automatically be deemed to refer to the Backup Bidder, and all references to the "Purchase Agreement" shall automatically be deemed to refer to the Modified Purchase Agreement of the Backup Bidder, and (ii) all of the terms, findings, conclusions of law, conditions, rights, benefits and obligations of the Successful Bidder set forth in this Order or in the Sale Order shall automatically be deemed to apply and inure to the Backup Bidder, in each case without further order or approval of this Court. The Backup Bid shall remain open and irrevocable until the earlier of (x) written notification to the Backup Bidder within ninety (90) days following entry of the Sale Order that the Debtor has terminated the Sale with the Successful Bidder and intends to proceed toward closing with the Backup Bidder based on the Backup Bid in accordance with the Bidding Procedures, and (y) the Closing of the Sale.

**Objections to Motion**

16.    Objections, if any, to the Sale Motion must be made in writing, must state with particularity the reasons for the objection or response, must conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, must set forth the name of the objecting party, the nature and basis of the objection and the specific grounds therefor, and must be filed with the Clerk of the Bankruptcy Court (with a copy to be delivered to the Chambers of the Honorable Robert E. Grossman, United States Bankruptcy Judge, United States Bankruptcy Court for the Eastern District of New York, 290 Federal Plaza, Central Islip, NY 11722, Courtroom No. 860, and shall be served so as to be <u>received</u> no later than **4:00 p.m. (EST) on December 8, 2017** (the "<u>Objection Deadline</u>") by: (a) the Office of the United States Trustee for the Eastern District of New York, 560 Federal Plaza, Central Islip, New York 11722, Attn: Stan Yang, Esq., Trial Attorney (b) counsel to the Debtor: Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, NY 10036, Attn:  Sean C. Southard, Esq.; (c) counsel to the Debtor's material prepetition and post-petition secured lenders: (i) Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn:  P. Miyoko Sato, Esq. and Ian A. Hammel, Esq., (ii) White & Case LLP, 1221 Avenue of the Americas, New York, New York 10020, Attn:  Brian D. Pfeiffer, Esq. and Neil S. Begley, Esq., (iii) Certilman Balin Adler & Hyman, LLP, 90 Merrick Avenue, 9th Floor, East Meadow, NY 11554, Attn:  Richard J. McCord, Esq. and Thomas J. McNamara, Esq., and (iv) Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck, NY 11021, Attn:  Adam T. Berkowitz, Esq.; and (d) counsel to the Creditors' Committee: Silverman Acampora, LLP, 100 Jericho Quadrangle, Suite 300, Jericho, New York 11753, Attn: Ronald J. Friedman, Esq.

## **Additional Provisions**

17.     The Debtor is authorized and empowered to take such steps, incur and pay such costs and expenses, and do such things as may be reasonably necessary to fulfill the requirements established by this Order.

18.     Nothing contained in this Order precludes any party in interest from objecting to the Sale in accordance with the objections procedures set forth herein, and no party shall be deemed to have consented to the Sale by virtue of not having objected to the Bidding Procedures Motion.

19.     The Debtor is hereby authorized to implement the Bidding Procedures and conduct the Auction, if necessary, without the necessity of complying with any state or local bulk transfers law or requirement or any similar law of any state or other jurisdiction which applies in any way to any of the transactions under the Purchase Agreement.

20.     This Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order, including to determine the proceeds to which a Lien attached.

21.     Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), this Order shall not be stayed for fourteen (14) days after the entry hereof and shall be effective and enforceable immediately upon entry hereof.

<u>**SCHEDULE 1**</u>

## BIDDING PROCEDURES
## AND TERMS AND CONDITIONS OF SALE

Dowling College ("Dowling" or the "Debtor"), debtor and debtor-in-possession in this Chapter 11 case is seeking to sell certain real property consisting of a 105.33 acre campus located in the Town of Brookhaven, County of Suffolk, at William Floyd Parkway, Shirley, New York (the "Brookhaven Campus"), including Dowling's 72,000 square foot, 289-bed dormitory facility located thereon (the "Brookhaven Dorm"), free and clear of liens, claims and encumbrances.  The Debtor is currently soliciting bids for the sale of the Brookhaven Campus (including the Brookhaven Dorm) (the "Sale").[1]  Parties are encouraged to submit their highest and best offer for the Brookhaven Campus through the sealed bid process ("Sealed Bid Process") discussed herein and substantially in the form of the Purchase Agreement template attached as Exhibit C to the Bidding Procedures Motion (as defined herein) (the "Purchase Agreement"), as the sale of the Brookhaven Campus may not ultimately result in an auction.

### A.    Bidding Procedures

Set forth below are the bidding procedures (the "Bidding Procedures") with respect to the Sale by the Debtor of the Brookhaven Campus.  On [October 16], 2017, the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") entered an order (the "Bidding Procedures Order") granting the Debtor's motion (the "Bidding Procedures Motion") insofar as it sought the approval of the Bidding Procedures and the availability of Bidding Protections (as hereinafter defined) to be offered in connection with a potential Stalking Horse Bidder (as hereinafter defined) and a potential auction (the "Auction") for the Sale of the Brookhaven Campus following the contemplated Sealed Bid Process.

### B.    Relevant Dates (Subject To Adjustment As Indicated Below)

**Sealed Bid Deadline:**         **December 5, 2017  (4:00 p.m. EST)**

**Potential Auction:**           **December 7, 2017  (10:00 a.m. EST)**

**Objection Deadline:**          **December 8, 2017  (4:00 p.m. EST)**

**Sale Hearing:**                **[December 13, 2017 (____.m. EST)]**

The schedule set forth above may be delayed and the qualification of bids may be relaxed in the event that the Debtor, with the consent of the Secured Parties[2] and in consultation with the Creditors' Committee, determines that additional time or adjustment to qualifications will likely result in greater overall value for the Debtor's estate based on an expression(s) of interest or bid received from an identified party which the Debtor, in consultation with the

---

[1] Capitalized terms, unless herein defined, shall have the meaning ascribed to them in the Purchase Agreement.

[2] The Secured Parties consist of the Series 2006 Bond Trustee, the Series 2006 Bond Insurer, counsel to the Series 2006 Bond Insurer, the Series 2002 Bond Trustee, and counsel to the Series 2002 Bond Trustee. The Series 2006 Bond Insurer and Series 2002 Bond Trustee may each be referred to herein as a "Secured Party".

Secured Parties and the Creditors' Committee, believes could be a Qualified Bid (as hereinafter defined).

### C.    **Brookhaven Campus to be Sold Free and Clear**

The Debtor is offering for Sale all of the Brookhaven Campus (including the Brookhaven Dorm), as defined in the proposed Purchase Agreement or as otherwise set forth in the Debtor's schedules of assets and liabilities.  Except as otherwise provided in the Purchase Agreement with respect to the Sale, all of the Debtor's right, title and interest in and to the Brookhaven Campus shall be sold free and clear of all liens, claims and encumbrances, security interests and other restrictions on transfers (collectively, the "Liens") to the extent permitted by Section 363 of the Bankruptcy Code and other applicable law (except as otherwise expressly provided in the Purchase Agreement) with such Liens to attach to the proceeds of the Sale.

Except as expressly provided in the Purchase Agreement, the Sale of the Brookhaven Campus shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtor or its agents.

### D.    **Mailing of Sale Notice**

The Debtor shall provide notice of the intended Sale of the Brookhaven Campus (the "Sale Notice") together with a copy of these Bidding Procedures by first class mail, postage prepaid, to:  (a) counsel for the Creditors' Committee; (b) the Debtor's material prepetition and postpetition secured lenders and any agent therefor; (c) the Office of the United States Trustee for the Eastern District of New York; (d) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (e) the following taxing and regulatory authorities: (i) the United States Attorney for the Eastern District of New York, (ii) the Attorney General of the State of New York, (iii) United States Department of Education, (iv) New York State Department of Education, (v) the Town of Brookhaven, (vi) the Internal Revenue Service, (vii) the New York State Department of Taxation and Finance, and (viii) the Securities and Exchange Commission; (f) all parties who are known to assert a lien, claim, encumbrance or other interest on any portion of the Debtor's assets; and (g) all parties identified by the Debtor as potentially having an interest in acquiring some or all of the Brookhaven Campus; and a copy of the Sale Notice to all creditors of the Debtor who are listed on the schedules filed by the Debtor or who have filed proofs of claim against the Debtor's estate.

Any other party in interest that wishes to receive a copy of the Bidding Procedures Order and/or the Bidding Procedures Motion may make such request in writing to Sean C. Southard, Esq. or Stephanie R. Sweeney, Esq., Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10036, by telephone (212) 972-3000, or via email at ssouthard@klestadt.com or ssweeney@klestadt.com.

### E.    **Confidentiality Agreement / Due Diligence**

Any entity that wishes to conduct due diligence with respect to the Brookhaven Campus must deliver to the Debtor an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtor.  Parties that desire to conduct due diligence first beginning

after November 24, 2017 must additionally deliver to the Debtor a written non-binding expression of interest to purchase the Brookhaven Campus, in a form and containing terms that are reasonably acceptable to the Debtor, the Secured Parties, and the Creditors' Committee.

Interested parties that comply with the foregoing (each such entity referred to as a "Potential Bidder"), shall be permitted to conduct diligence with respect to the Brookhaven Campus, provided however, that the Debtor shall not be obligated to furnish any due diligence information after the Bid Deadline (as defined below).

F.    **Qualification of Bids and Bidders**

In order to participate in the bidding process and to have a bid considered by the Debtor, each Potential Bidder must deliver a written, irrevocable offer for all of the Debtor's right, title and interest in and to the Brookhaven Campus and that otherwise satisfies the below criteria. **For the avoidance of doubt, QUALIFIED BIDS MUST BE MADE FOR ALL OF THE BROOKHAVEN CAMPUS (INCLUDING THE BROOKHAVEN DORM).**  A "Qualified Bidder" is a Potential Bidder that delivers a binding bid that in the Debtor's discretion, after consultation with the Secured Parties and the Creditors' Committee, satisfies the following (a "Qualified Bid"):

(a)    Bid Deadline. Each Bid Package (as defined below) must be delivered in written form to the following parties **so as to actually be received no later than 4:00 p.m. (prevailing Eastern Time) on December 5, 2017 (the "Bid Deadline")**[3]:

| Debtor | Counsel to the Debtor |
|---|---|
| Dowling College<br>c/o RSR Consulting, LLC<br>49 Roy Avenue<br>Massapequa, NY 11758<br>Attn: Robert S. Rosenfeld<br><br>With a copy to:<br><br>RSR Consulting, LLC<br>1330 Avenue of the Americas, Suite 23A<br>New York, New York 10019<br>Attn: Robert S. Rosenfeld | Klestadt Winters Jureller<br>Southard & Stevens, LLP<br>200 West 41st Street, 17th Floor<br>New York, New York 10036<br>Attn: Sean C. Southard, Esq.[4] |
| **United States Trustee** | **Real Estate Advisor to the Debtor** |

---

[3] As set forth above, the Bid Deadline may be delayed or the qualifications for bidders relaxed at the discretion of the Debtor, in consultation with the Secured Parties and the Creditors' Committee. Receipt of the Bid Package by email shall be considered adequate delivery (with original copies, if any, received by the counsel to the Debtor).

[4] Bidders may request email addresses for parties required to received Bid Packages and deliver the Bid Packages to such parties via email (other than original or negotiable instruments that are required to be delivered to Debtor's counsel).

| | |
|---|---|
| Office of the United States Trustee for the Eastern District of New York<br>Alfonse D'Amato Federal Courthouse<br>560 Federal Plaza<br>Central Islip, New York 11722<br>Attn: Stan Yang, Esq., Trial Attorney | A&G Realty Partners, LLC<br>445 Broadhollow Road, Suite 410<br>Melville, New York 11747<br>Attn: Andrew Graiser |
| **Real Estate Advisor to the Debtor** | **Real Estate Advisor to the Debtor** |
| Madison Hawk Partners, LLC<br>575 Lexington Avenue, Suite 4017<br>New York, New York 10022<br>Attn: Jeffrey L. Hubbard | CBRE, Inc.<br>200 Park Avenue<br>New York, New York 10166<br>Attn: Ellen Rudin |
| **Series 2006 Bond Trustee** | **Series 2006 Bond Insurer** |
| Wilmington Trust, National Association<br>25 South Charles Street, 11th Floor<br>Mail Code: MD2-CS58<br>Baltimore, Maryland 21201<br>Attn: Jay Smith | ACA Financial Guaranty Corp.<br>555 Theodore Fremd Avenue Suite C-205<br>Rye, New York 10580<br>Attn: Carl McCarthy, Esq. and Maria Cheng |
| **Counsel to the Series 2006 Bond Insurer** | **Local Counsel to the Series 2006 Bond Insurer** |
| White & Case LLP<br>1221 Avenue of the Americas<br>New York, New York 10020<br>Attn: Brian D. Pfeiffer, Esq. | Certilman Balin Adler & Hyman, LLP<br>90 Merrick Avenue, 9th Floor<br>East Meadow, New York 11554<br>Attn: Richard J. McCord, Esq. and Thomas J. McNamara, Esq. |
| **Series 1996, Series 2002, and Series 2015 Bond Trustee** | **Counsel to the Series 1996, Series 2002, and Series 2015 Bond Trustee** |
| Gavin Wilkinson, Senior Vice President<br>UMB Bank, National Association<br>120 South Sixth Street, Suite 1400<br>Minneapolis, MN 55402 | Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.<br>One Financial Center<br>Boston, Massachusetts 02111<br>Attn: P. Miyoko Sato, Esq.<br>     Ian A. Hammel, Esq. |
| **Local Counsel to the Series 1996, Series 2002, and Series 2015 Bond Trustee** | **Counsel to the Creditors' Committee** |
| Garfunkel Wild, P.C.<br>111 Great Neck Road<br>Suite 600<br>Great Neck, New York 11021<br>Attn: Adam T. Berkowitz, Esq. | Silverman Acampora LLP<br>100 Jericho Quadrangle, Suite 300<br>Jericho, New York 11753<br>Attn: Ronald J. Friedman, Esq. |

(b)    <u>Bid Package</u>.    Each bid must include (collectively, the "<u>Bid Package</u>"): (i) a written and signed irrevocable offer (x) stating that the bidder offers to consummate a sale transaction on terms and conditions set forth on the Modified Purchase Agreement (as defined below), (y) confirming that the bid will remain irrevocable until the earlier of (1) ninety (90) days following entry of the Sale Order[5] and (2) closing with the Successful Bidder and (z) stating that the bidder has had the opportunity to conduct due diligence prior to its offer and does not require further due diligence in accordance with subparagraph (g) below; (ii) an executed copy of the Purchase Agreement as modified by the bidder in accordance with its bid (the "<u>Modified Purchase Agreement</u>")[6]; and (iii) an electronic markup of the agreement clearly showing the revisions in the Modified Purchase Agreement (formatted as a Microsoft Word document or such other word processing format acceptable to the Debtor).  The Debtor, in consultation with the Secured Parties and the Creditors' Committee, shall determine whether any Modified Purchase Agreement that modifies the Purchase Agreement in any respect beyond the identity of the purchaser and the purchase price under the agreement is a Qualified Bid.

(c)    <u>Minimum Bid</u>.  The amount of the purchase price in a bid for the Brookhaven Campus must be one (1) of the five (5) highest and otherwise best bids, or within twenty-five percent (25%) of the highest and otherwise best bid. Each bid shall provide a single lump sum bid for the Brookhaven Campus.

(d)    For the avoidance of doubt, notification to the Backup Bidder within such period that the Debtor has terminated a transaction with the Successful Bidder and that the Debtor intends to proceed toward closing with the Backup Bidder based on the Backup Bid shall automatically extend the irrevocable nature of the Backup Bid in accordance with the terms of such Backup Bid.  For the further avoidance of doubt, it is not necessary that the Backup Bid actually close within such period.  <u>Financial Information</u>.  The Bid Package must contain such financial and other information that will allow the Debtor, in consultation with the Secured Parties and the Creditors' Committee, to make a determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by such bid, including any proposed conditions to Closing.

---

[5] For the avoidance of doubt, notification to the Backup Bidder within such period that the Debtor has terminated a transaction with the Successful Bidder and that the Debtor intends to proceed toward closing with the Backup Bidder based on the Backup Bid shall automatically extend the irrevocable nature of the Backup Bid in accordance with the terms of such Backup Bid.  For the further avoidance of doubt, it is not necessary that the Backup Bid actually close within such period.

[6] For the avoidance of doubt, the Purchase Agreement with any Stalking Horse Bidder is deemed a Modified Purchase Agreement.

(e)    <u>Additional Bidding Protections</u>.  A bid (other than from a person selected as a stalking horse bidder in accordance with these Bidding Procedures (the "<u>Stalking Horse Bidder</u>")) must not request or entitle the Potential Bidder to any termination fee, transaction or break-up fee, expense reimbursement, or similar type of payment.

(f)    <u>Identity of Bidders</u>.  Each Potential Bidder must fully disclose the identity of each entity that will be bidding for the Brookhaven Campus, as well as disclose the organization, form and the business conducted by each entity and what, if any, connection the Potential Bidder has with the Debtor.  Potential Bidders shall be required to provide such additional information as the Debtor, in consultation with the Secured Parties and the Creditors' Committee, may require regarding the bidder's ability to satisfy the requirements of the transaction contemplated by the Modified Purchase Agreement.

(g)    <u>Due Diligence</u>.  Except for any required regulatory approvals, if any, the bid must not contain any contingencies of any kind, including, among others, obtaining (i) financing; (ii) shareholder, board of directors or other approval; or (iii) the outcome or completion of due diligence.  Each Potential Bidder must also affirmatively acknowledge that the Potential Bidder (i) had an opportunity to conduct due diligence regarding the Brookhaven Campus prior to making its offer and does not require further due diligence, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Brookhaven Campus in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Brookhaven Campus, or the completeness of any information provided in connection therewith except as expressly stated in these Bidding Procedures.

(h)    <u>Consents</u>.  Each Potential Bidder must represent that it obtained all necessary organizational approvals to make its bid and to enter into and perform the Modified Purchase Agreement.

(i)    <u>Deposit(s)</u>. A Potential Bidder must deposit not less than five percent (5%) of the initial cash purchase price set forth in the Modified Purchase Agreement with the Debtor in the form of a certified check or wire transfer on or before the Bid Deadline (the "<u>Deposit</u>") with counsel to the Debtor.  In addition, if the Debtor proceeds with an Auction and a Stalking Horse Bidder is selected, each Potential Bidder must also deposit not less than the aggregate amount of their Deposit, plus the amount of any Court approved Bidding Protections with the Debtor in the form of a certified check or wire transfer before the Auction (the "<u>Additional Deposit</u>").  If selected as the Successful Bidder or the Backup Bidder (defined below) and within one (1) business day following the Auction, each of the Successful Bidder and the Backup Bidder shall increase its Additional Deposit to equal the sum of ten percent (10%) of the cash component of the Successful Bid or Backup Bid (as defined below), as applicable, plus the amount of the

Bidding Protections (the "Final Deposit" and, together with the Deposit and the Additional Deposit, the "Deposits"). The Potential Bidder or the Backup Bidder shall forfeit the Final Deposit(s) if (i) the Potential Bidder or the Backup Bidder is determined to be a Qualified Bidder and withdraws or modifies its bid other than as provided herein before the Bankruptcy Court approves the Debtor's selection of the Successful Bidder, or (ii) the Potential Bidder or the Backup Bidder (x) modifies or withdraws the bid without the Debtor's consent before the consummation of the sale contemplated by the bid, or (y) breaches the Modified Purchase Agreement.  The Deposit(s) shall be returned to the bidder (i) as soon as practicable if the bidder is not determined to be a Qualified Bidder or (ii) no later than five (5) business days after entry of the Sale Order if the bidder is a Qualified Bidder (who has not otherwise forfeited its Deposit), but is not the Successful Bidder or the Backup Bidder.  The Debtor's counsel will maintain any Deposit(s) in a non-interest bearing escrow account.

(j)    As Is. Where Is.  Any Modified Purchase Agreement must provide that the Sale will be on an "as is, where is" basis and without representations or warranties of any kind except and solely to the extent expressly set forth in such agreement of the Successful Bidder.  Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Brookhaven Campus prior to making its bid and that it has relied solely upon its own independent review and investigation in making its bid.

(k)    Debtor's Considerations.  The Debtor, after consultation with the Secured Parties and the Creditors' Committee, will have the exclusive right to determine that a bid is not a Qualified Bid and shall notify bidders whether their respective bid has been determined to be a Qualified Bid prior to the Auction. Moreover, the Debtor, after consultation with the Secured Parties and the Creditors' Committee, may reject any bid that is on terms more burdensome or conditional than the proposed Purchase Agreement or is otherwise contrary to the best interests of the Debtor's estate.  Without limiting the foregoing, the Debtor's determination as to qualification of bids, in consultation with the Secured Parties and the Creditors' Committee, may take into consideration: (1) whether the bid requires any indemnification of such Qualified Bidder; (2) whether the bid does not provide sufficient cash consideration to pay applicable transfer taxes, costs or other cash costs of the transaction (including professionals' fees and any Bidding Protections); (3) whether the bid may involve payment of consideration over time or otherwise impact the tax exempt nature of bonds that are issued and outstanding by the Debtor; (4) whether the bid includes a non-cash instrument or similar consideration that is not freely marketable; or (5) any other factors the

Debtor, after consultation with the Secured Parties and the Creditors' Committee, may deem relevant.[7]

        (l)     In addition to the requirements above, the Debtor, in consultation with the Secured Parties and the Creditors' Committee, may request any additional information from any bidder to assist the Debtor in making a determination as to whether a bid is a Qualified Bid.

THE DEBTOR, IN CONSULTATION WITH THE SECURED PARTIES AND THE CREDITORS' COMMITTEE, RESERVES THE RIGHT, IN ITS DISCRETION, TO DETERMINE WHETHER ANY BID IS BETTER, IF NOT HIGHER, THAN ANOTHER BID SUBMITTED DURING THE BIDDING PROCESS AND/OR AUCTION.  THE DEBTOR MAY CONSIDER, IN CONSULTATION WITH THE SECURED PARTIES AND THE CREDITORS' COMMITTEE, A VARIETY OF FACTORS IN MAKING THIS DECISION, INCLUDING WITHOUT LIMITATION, ANY PROPOSED CONDITIONS TO CLOSING, TIMING OF CLOSING OF THE PROPOSED TRANSACTION, AND THE LIKELIHOOD OF THE BIDDER TO OBTAIN REQUISITE BANKRUPTCY COURT AND ANY REQUIRED NON-BANKRUPTCY APPROVALS.

THE DEBTOR RESERVES THE RIGHT, IN ITS REASONABLE DISCRETION AND SUBJECT TO THE EXERCISE OF ITS BUSINESS JUDGMENT, AFTER CONSULTATION WITH THE SECURED PARTIES AND THE CREDITORS' COMMITTEE, TO ALTER OR TERMINATE THESE BIDDING PROCEDURES, TO WAIVE TERMS AND CONDITIONS SET FORTH HEREIN WITH RESPECT TO ALL POTENTIAL BIDDERS, EXTEND THE DEADLINES SET FORTH HEREIN, ALTER THE ASSUMPTIONS SET FORTH HEREIN, PROVIDE REASONABLE ACCOMMODATIONS TO A STALKING HORSE BIDDER WITH RESPECT TO SUCH TERMS, CONDITIONS AND DEADLINES OF THE BIDDING AND AUCTION PROCESS TO PROMOTE FURTHER BIDS BY SUCH BIDDER AND/OR TO TERMINATE DISCUSSIONS WITH ANY AND ALL POTENTIAL BIDDERS AT ANY TIME AND WITHOUT SPECIFYING THE REASONS THEREFOR, IN EACH CASE TO THE EXTENT NOT MATERIALLY INCONSISTENT WITH THESE BIDDING PROCEDURES AND/OR THE BIDDING PROCEDURES ORDER; PROVIDED FURTHER THAT THE DEBTOR'S EXERCISE OF ITS DISCRETION IN EVALUATING BIDS AND ADMINISTERING THE BIDDING AND AUCTION PROCESS DOES NOT PERMIT, AND SHALL NOT BE CONSTRUED AS PERMITTING THE DEBTOR TO MATERIALLY DEVIATE FROM THE PROCEDURES,

---

[7] Notwithstanding the qualifying bidding procedures, the Debtor reserves the right to entertain bids for the Brookhaven Campus that do not conform to one or more of the requirements set forth herein. Further, notwithstanding any other term of these Bidding Procedures, subject to the terms of the Final Order (I) Authorizing Debtor to Obtain Postpetition Financing and Use Cash Collateral, (II) Granting Adequate Protection, and (III) Granting Certain Related Relief, each Secured Party may credit bid in connection with the sale of the Brookhaven Campus, may participate in any Auction, and any such bid shall constitute a "Qualified Bid" for purposes of these procedures.

TERMS, CONDITIONS AND PROTECTIONS SET FORTH IN THESE BIDDING PROCEDURES AND/OR THE BIDDING PROCEDURES ORDER.

### G.      **Potential for Stalking Horse Bidder**

Though the Bidding Procedures contemplate that the Debtor will solicit sealed bids in connection with the Sealed Bid Process on or before the Bid Deadline, the Bidding Procedures permit the Debtor the flexibility to seek to enter into a form of the Purchase Agreement before the Sale Hearing and/or Auction under terms and conditions acceptable to the Secured Parties and in consultation with the Creditors' Committee.  The Debtor contemplates that any Purchase Agreement with a Stalking Horse Bidder would nonetheless be subject to the receipt of higher or otherwise better bids in accordance with these Bidding Procedures and a potential Auction.  If the Debtor enters into a Purchase Agreement with a Stalking Horse Bidder before the Bid Deadline, all Potential Bidders (as defined herein) that provide the required documentation as set forth herein shall be notified of the Debtor's entrance into the Purchase Agreement with the Stalking Horse Bidder and terms defining such agreement, including Bidding Protections as may be approved by the Court and thereafter offered as part of the Purchase Agreement.

The Bidding Procedures Order permits the Debtor to present to this Court, on not less than seven (7) days' notice, a revised Purchase Agreement and related proposed Bidding Protections that the Debtor believes are necessary to induce a Stalking Horse Bidder to pursue the Sale (the "Bidding Protections").

### H.      **Sale to a Stalking Horse Bidder**

In the event of a Stalking Horse Bidder, the Purchase Agreement with the Stalking Horse Bidder shall be deemed a Qualified Bid and the Stalking Horse Bidder shall be deemed a Qualified Bidder.  If no Qualified Bid other than Stalking Horse Bidder's is submitted by the Bid Deadline, the Debtor shall not be required to proceed with an Auction, but shall proceed with the Sale Hearing and seek approval of the Purchase Agreement with the Stalking Horse Bidder and the transaction contemplated thereby.

### I.      **Auction**

If the Debtor determines, after review of the Qualified Bids and consultation with the Secured Parties and the Creditors' Committee, that an Auction process will maximize the value that the Debtor may realize from the sale of the Brookhaven Campus, the Debtor shall conduct the Auction with respect to the Brookhaven Campus.  The Auction will take place at the offices of local counsel to the 2006 Bond Insurer, Certilman Balin Adler & Hyman, LLP 90 Merrick Avenue, East Meadow, New York 11554, not later than **December 7, 2017, starting at 10:00 a.m. (prevailing Eastern Time)**, or at such other date and time or other place, as may be determined by the Debtor at or prior to the Auction.  The Auction shall be governed by the following procedures:

(a) Participation.  Only the Qualified Bidders that have submitted a Qualified Bid and provided a Deposit(s) will be eligible to participate in the Auction, and each Qualified Bidder shall appear in person at the Auction (and any attorney for a

Qualified Bidder may appear at the Auction at the discretion of the Qualified Bidder). In the event a Qualified Bidder does not attend the Auction, the relevant Qualified Bid shall nonetheless remain fully enforceable against that Qualified Bidder in accordance herewith. The Debtor, in consultation with the Secured Parties and the Creditors' Committee, will evaluate all Qualified Bids received and will select the Qualified Bid that reflects the highest or best offer for the Brookhaven Campus, and otherwise complies with the bid requirements set forth herein, as the "Starting Auction Bid." The Debtor may consider a variety of factors to determine the Starting Auction Bid including changes to the proposed Purchase Agreement and the Qualified Bidder's ability to consummate the Sale. At the Auction, the Debtor shall announce the material terms of each overbid and the basis for calculating the total consideration offered in each such overbid.

(b)     Bidding. Bidding at the Auction shall commence at the amount of the Starting Auction Bid. Qualified Bidders may then submit successive bids in increments of at least $100,000.00 plus the amount of any Bidding Protections (as may be established by the Court) (the "Bid Increment"); provided, however, that the Debtor, in consultation with the Secured Parties and the Creditors' Committee, shall retain the right to modify the Bid Increment at the Auction and to establish parameters for the number of rounds of bidding and the format thereof (open outcry, sealed bids, or otherwise). Any bid first submitted after the conclusion of the Auction shall not be considered for any purpose.

(c)     Higher and Better. The Debtor reserves the right, in consultation with the Secured Parties and the Creditors' Committee, to determine whether any bid is better, if not higher, than another bid submitted during the Auction. The Debtor may consider a variety of factors in making this decision, including without limitation, the ability of a Bidder to obtain any necessary regulatory approvals, whether the bid is materially more burdensome than the terms of the proposed Purchase Agreement, any proposed conditions to closing, whether the bid includes any non-cash components and provides significant cash consideration for the payment of required costs of the transaction, whether the ability of the Potential Bidder to use the Brookhaven Campus is consistent with applicable non-bankruptcy law and/or the Debtor's mission, and any other factors deemed relevant.

(d)     Successful Bid. The Auction shall continue until there is only one offer for the Brookhaven Campus, which the Debtor, in consultation with the Secured Parties and the Creditors' Committee, determines, subject to Court approval, is the highest or otherwise best offer from among the Qualified Bids submitted at the Auction (the "Successful Bid") and the Debtor announces that the Auction is closed. The Qualified Bidder submitting such Successful Bid shall become the Successful Bidder and shall have such rights and responsibilities of the Buyer, as set forth in the Modified Purchase Agreement. Within one (1) business day after the conclusion of the Auction (but in any event prior to the commencement of the Sale Hearing), the Successful Bidder shall (i) complete, execute and deliver to the Debtor the Modified Purchase Agreement (as updated

to conform to the Successful Bid) and all contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made, and (ii) supplement its Deposit by wire transfer or other immediately available funds so that, to the extent necessary, such Deposit equals ten percent (10%) of the cash component of the Successful Bid plus the amount required for the payment of the Bidding Protections, if any.

   (e) <u>Anti-Collusion</u>. At the commencement of the Auction, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with any other Qualified Bidder or Potential Bidder with respect to the bidding or the Sale.

   (f) <u>Conduct of Auction</u>. The Auction may be conducted openly with the proceeding being transcribed and each Qualified Bidder being informed of the terms of the previous bid; the Debtor, its counsel, counsel to the Creditors' Committee and counsel to the Secured Parties, may meet privately with any Qualified Bidder to negotiate the terms of its bid. The Debtor, in consultation with the Secured Parties and the Creditors' Committee, may adopt other rules for the conduct of the Auction at the Auction which, in its judgment, will better promote the goals of the Auction.

   (g) <u>Backup Bid</u>. At the conclusion of the Auction, the Debtor will also announce the second highest or otherwise best bid from among the Qualified Bids submitted at the Auction (the "<u>Backup Bid</u>"). The Qualified Bidder submitting such Backup Bid shall become the "<u>Backup Bidder</u>," and subject to the rights of the Successful Bidder, shall have such rights and responsibilities as set forth in the Modified Purchase Agreement. Within one (1) business day after the conclusion of the Auction (but in any event prior to the commencement of the Sale Hearing), the Backup Bidder shall (i) complete, execute and deliver to the Debtor the Modified Purchase Agreement (as updated to conform to the Backup Bid) and all contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made, and (ii) supplement its Deposit by wire transfer or other immediately available funds so that, to the extent necessary, such Deposit equals ten percent (10%) of the cash component of the Backup Bid plus the amount required for the payment of the Bidding Protections, if any. The Backup Bid shall remain open and irrevocable until the earlier of (x) written notification to the Backup Bidder based on the Backup Bid within ninety (90) days following entry of the Sale Order that the Debtor has terminated the Sale with the Successful Bidder and intends to proceed toward closing with the Backup Bidder based on the Backup Bid in accordance with the terms of these Bidding Procedures, and (y) Closing of the Sale.

   (h) The Backup Bidder's Deposit(s) will be returned by the Debtor upon consummation of the Sale of the Brookhaven Campus to the Successful Bidder or will be otherwise applied or forfeited as provided in Section F(i) above if the Backup Bidder is determined to be the Successful Bidder.

(i)    Extensions/Adjournment.  The Debtor reserves its rights, in the exercise of its judgment, in consultation with the Secured Parties and the Creditors' Committee, to modify any provisions of the Bidding Procedures at or prior to the Auction, including, without limitation, extending the deadlines set forth in the Auction procedures, modifying bidding increments, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice.

J.    **Sale Hearing and Return of Deposits**

The Successful Bid and the Backup Bid will be subject to approval by entry of an order (the "Sale Order") by the Bankruptcy Court after a hearing (the "Sale Hearing") that will take place no later than **December 13, 2017**.  The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court.  Upon approval of the Backup Bid by the Bankruptcy Court, the Backup Bid shall remain open and irrevocable until the earlier of: (i) written notification to the Backup Bidder within ninety (90) days following entry of the Sale Order that the Debtor has terminated the Sale with the Successful Bidder and intends to proceed toward closing with the Backup Bidder based on the Backup Bid in accordance with the terms of these Bidding Procedures, and (ii) Closing of the Sale.

No offer shall be deemed accepted unless and until it is approved by the Bankruptcy Court.

Objections, if any, to the Sale Motion and any filed supplements thereto, shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Bankruptcy Court and simultaneously served on:  (a) the Office of the United States Trustee for the Eastern District of New York, Alfonse D'Amato Federal Courthouse, 560 Federal Plaza, Central Islip, NY 11722, Attn: Stan Yang, Esq., Trial Attorney; (b) counsel to the Debtor: Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, NY 10036, Attn:  Sean C. Southard, Esq.; (c) counsel to the post-petition lenders:  (i) Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn:  P. Miyoko Sato, Esq.,  Ian A. Hammel, Esq. and Eric R. Blythe, Esq. and (ii) White & Case, 1221 Avenue of the Americas, New York, NY 10020, Attn:  Brian D. Pfeiffer, Esq.; and (d) counsel to the Creditors' Committee: Silverman Acampora, LLP, 100 Jericho Quadrangle, Suite 300, Jericho, New York 11753, Attn: Ronald J. Friedman, Esq., so as to be **actually received by 4:00 p.m. (EST) on December 8, 2017** (the "Objection Deadline").

K.    **Consummation of the Sale**

Except as provided herein and in the Modified Purchase Agreement following the Sale Hearing, if for any reason a Successful Bidder fails to consummate the purchase of the Brookhaven Campus, then a Backup Bidder will automatically be deemed to have submitted the highest or otherwise best bid. The Debtor and any Backup Bidder are authorized to effectuate the sale of the Brookhaven Campus to such Backup Bidder as soon as is commercially reasonable without further order of the Bankruptcy Court.  If such failure to consummate the purchase is the

result of a breach by a Successful Bidder, its Deposit(s) shall be forfeited to the Debtor and the Debtor specifically reserves the right to seek all available damages from the defaulting bidder.

L.    **<u>Jurisdiction</u>**

The Bankruptcy Court shall retain exclusive jurisdiction over any matter or dispute relating to the Sale of the Brookhaven Campus, the Bidding Procedures, the Sale Hearing, the Auction, a Successful Bid, a Stalking Horse Bidder, a Backup Bid, and/or any other matter that in any way relates to the foregoing.  In particular, all Potential Bidders (including a Stalking Horse Bidder) shall be deemed to have (a) consented to the core jurisdiction of the Bankruptcy Court to enter any order or orders, which shall be binding in all respects, in any way relating to the Bidding Procedures, the Auction or the construction and enforcement of any agreement or any other documentation relating to the Sale; (b) waived any right to a jury trial in connection with any disputes relating to the Bidding Procedures, the Auction, or the construction and enforcement of any agreement or any other document relating to the Sale; and (c) consented to the entry of a final order or judgment in any way related to the Bidding Procedures, the Auction, or the construction or enforcement of any agreement or any other document relating to the Sale if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

SCHEDULE 2

| | |
|---|---|
| **BID DEADLINE DATE AND TIME:** | **December 5, 2017 at 4:00 p.m. (EST)** |
| **POTENTIAL AUCTION DATE AND TIME:** | **December 7, 2017 at 10:00 a.m. (EST)** |
| **OBJECTION DEADLINE DATE AND TIME:** | **December 8, 2017 at 4:00 p.m. (EST)** |
| **SALE HEARING DATE AND TIME:** | **[December 13, 2017] at ___ _.m. (EST)** |

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re                                                                           :          Chapter 11

                                                                                  :

DOWLING COLLEGE,                                           :          Case No. 16-75545 (REG)

                                                                                  :

                                                                                  :

                                                  Debtor.          :

---------------------------------------------------------------x

## NOTICE OF [AUCTION AND] HEARING TO CONSIDER
## <u>APPROVAL OF THE SALE OF THE DEBTOR'S BROOKHAVEN CAMPUS</u>

**NOTICE IS HEREBY GIVEN,** as follows:

1.      On September 26, 2017, Dowling College ("<u>Dowling</u>" or the "<u>Debtor</u>"), debtor

and debtor-in-possession in the above-captioned chapter 11 case (the "<u>Chapter 11 Case</u>"), filed a

motion (the "<u>Motion</u>")[1] which in pertinent part (the "<u>Bidding Procedures Motion</u>") sought entry

of an order (the "<u>Bidding Procedures Order</u>") pursuant to Sections 105, 363 and 365 of Title 11

of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 2002(a)(2) and 6004 of the

Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"): (a) approving the proposed

Bidding Procedures to be used in connection with the proposed sale of the Brookhaven Campus,

free and clear of all liens, claims and encumbrances, security interests and other interests, to the

Successful Bidder, (b) scheduling an Auction, if necessary, and a Sale Hearing to approve the

Sale of the Brookhaven Campus; and (c) approving the form and manner of the notice of the

potential Auction and Sale Hearing.

---

[1] Capitalized terms used herein, unless herein defined, are used with the meanings ascribed to such terms in the
Motion.

2.      A copy of the Motion, the Bidding Procedures, and the Bidding Procedures Order may be obtained by:  (i) accessing the Bankruptcy Court's website at www.nyeb.uscourts.gov (password required); (ii) accessing the Debtor's noticing and claims agent website, http://cases.gardencitygroup.com/dco, or upon request by contacting Garden City Group, LLC ("GCG") at (866) 459-2643; (iii) going in person to the Office of the Clerk of the Bankruptcy Court at the United States Bankruptcy Court, Eastern District of New York, Alfonse M. D'Amato U.S. Courthouse, 290 Federal Plaza, Central Islip, New York 11722; or (iv) contacting Sean C. Southard, Esq. of Klestadt Winters Jureller Southard & Stevens, LLP, counsel to the Debtor, at 200 West 41st Street, 17th Floor, New York, New York 10036, by telephone at (212) 972-3000 or by email at ssouthard@klestadt.com.

3.      As set forth in the Bidding Procedures, the sale of the Brookhaven Campus will be sold to the highest or best offer, subject to Bankruptcy Court approval.

4.      All interested parties are invited to make offers for all of the Brookhaven Campus in accordance with the terms of the Bidding Procedures and Bidding Procedures Order.  The deadline to submit bids (the "Bid Deadline") is **December 5, 2017 at 4:00 p.m. (EST)**.  Pursuant to the Bidding Procedures Order, if the Debtor determines, after review of the Qualified Bids and consultation with the Creditors' Committee and Secured Parties, that an Auction process will maximize the value that the Debtor may realize from the sale of the Brookhaven Campus, the Debtor shall conduct an Auction with respect to the Brookhaven Campus.  The Auction will take place at the offices of local counsel to the 2006 Bond Insurer, Certilman Balin Adler & Hyman, LLP 90 Merrick Avenue, East Meadow, New York 11554, not later than **December 7, 2017, starting at 10:00 a.m. (prevailing Eastern Time)**, or at such other later date and time or other place, as may be determined by the Debtor at or prior to the Auction.

5.      The Bidding Procedures Order further provides that a Sale Hearing will be held on **[December 13, 2017]** at _____.m. (EST) before the Honorable Robert E. Grossman, United States Bankruptcy Judge, at the United States Bankruptcy Court, Eastern District of New York, Alfonse M. D'Amato U.S. Courthouse, 290 Federal Plaza, Central Islip, New York 11722 (the "Bankruptcy Court"), which hearing may be adjourned from time to time, including, without limitation, by announcing such adjournment on the record at the Sale Hearing.

6.      At the Sale Hearing, the Debtor will request that the Bankruptcy Court enter an order, among other things, approving the highest and best bid for the Brookhaven Campus, pursuant to which the Debtor will transfer the Brookhaven Campus.   In addition, the Debtor requests that the Bankruptcy Court provide that the transfer of the Brookhaven Campus be (i) free and clear of all liens, claims and interests, including successor liability claims, and (ii) exempt from any stamp tax or similar tax.

7.      At the Sale Hearing, the Bankruptcy Court may enter such orders as it deems appropriate under applicable law and as required by the circumstances and equities of this Chapter 11 Case.  Objections, if any, to the Sale Motion must be made in writing, must state with particularity the reasons for the objection or response, and must be filed with the Clerk of the Bankruptcy Court, with copies delivered to the Bankruptcy Court and received by the Chambers of the Honorable Robert E. Grossman, United States Bankruptcy Judge, United States Bankruptcy Court, Eastern District of New York, Alfonse M. D'Amato U.S. Courthouse, 290 Federal Plaza, Central Islip, New York 11722, must conform to the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, must set forth the name of the objecting party, the nature and basis of the objection and the specific grounds therefore and must be served upon: the Office of the United States Trustee for the Eastern District of New York, Alfonse D'Amato Federal

Courthouse, 560 Federal Plaza, Central Islip, NY 11722, Attn: Stan Yang, Esq., Trial Attorney; (b) counsel to the Debtor: Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, NY 10036, Attn: Sean C. Southard, Esq.; (c) counsel to the Debtor's material prepetition and post-petition lenders: (i) Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: P. Miyoko Sato, Esq. and Ian A. Hammel, Esq., (ii) White & Case LLP, 1221 Avenue of the Americas, New York, NY 10020, Attn: Brian D. Pfeiffer, Esq. and Neil S. Begley, Esq., (iii) Certilman Balin Adler & Hyman, LLP, 90 Merrick Avenue, 9th Floor, East Meadow, NY 11554, Attn: Richard J. McCord, Esq. and Thomas J. McNamara, Esq., and (iv) Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck, NY 11021, Attn: Adam T. Berkowitz, Esq.; and (d) counsel to the Creditors' Committee: Silverman Acampora, LLP, 100 Jericho Quadrangle, Suite 300, Jericho, New York 11753, Attn: Ronald J. Friedman, Esq., so as to be actually received by **4:00 p.m. (EST) on December 8, 2017**.

8.      Requests for information concerning the sale of the Brookhaven Campus should be directed by written or telephonic request to:  (i) A&G Realty Partners, LLC, 445 Broadhollow Road, Suite 410 Melville, New York 11747, Attn: Andrew Graiser, (ii) Madison Hawk Partners, LLC, 575 Lexington Avenue, Suite 4017, New York, New York 10022, Attn: Jeffrey L. Hubbard and (iii) CBRE, Inc., 200 Park Avenue, New York, New York 10166, Attn: Ellen Rudin.

Dated:   New York, New York
              _____, 2017

**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**


By:   *DRAFT*_____
         Sean C. Southard
         Stephanie R. Sweeney
         200 West 41st Street, 17th Floor
         New York, NY 10036
         Tel: (212) 972-3000
         Fax: (212) 972-2245
         Email: ssouthard@klestadt.com
                   ssweeney@klestadt.com

         *Attorneys to the Debtor-in-Possession*

**EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re                                                  :        Chapter 11
                                                       :
DOWLING COLLEGE,                                       :        Case No. 16-75545 (REG)
                                                       :
                                                       :
                              Debtor.                  :
---------------------------------------------------------------x

### ORDER PURSUANT TO SECTIONS 105(a), 363,
### AND 365 OF THE BANKRUPTCY CODE APPROVING SALE
### OF THE DEBTOR'S BROOKHAVEN CAMPUS FREE AND CLEAR
### <u>OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS</u>

Upon the motion [Docket No. __] (the "<u>Sale Motion</u>")[1] dated [September 26,

2017], of Dowling College ("<u>Dowling</u>" or the "<u>Debtor</u>"), debtor and debtor-in-possession in the

above-captioned chapter 11 case (the "<u>Chapter 11 Case</u>") for an order pursuant to Sections

105(a), 363(b), (d) and (f), 365 and 1146(a) of Title 11 of the United States Code (the

"<u>Bankruptcy Code</u>") and Rules 2002(a)(2), 6004 and 6006 of the Federal Rules of Bankruptcy

Procedure (the "<u>Bankruptcy Rules</u>") approving, <u>inter</u> <u>alia</u>, (i) the sale (the "<u>Sale</u>") of the

Brookhaven Campus, free and clear of all Liens, Claims and Encumbrances (as defined below)

as provided in the Purchase Agreement  (the "<u>Purchase Agreement</u>") [Docket No. __] by and

among the Debtor and the Successful Bidder, and (iii) related relief, all as further set forth and

defined in the Sale Motion and the Purchase Agreement; and this Court having reviewed the Sale

Motion and the Purchase Agreement and upon this Court's prior order, dated [_____], 2017

approving certain bidding procedures and bidding protections, and scheduling a hearing (the

---

[1] Unless otherwise indicated, capitalized terms used but not defined herein shall have the same meanings ascribed to
them in the Sale Motion, Bidding Procedures Order (hereinafter defined), or the Purchase Agreement (hereinafter
defined).  The definitions in the Purchase Agreement shall govern any inconsistency with the definitions in the Sale
Motion and/or the Bidding Procedures Order (hereinafter defined).

"Sale Hearing") on the Sale Motion (the "Bidding Procedures Order") [Docket No. __]; and a

Sale Hearing having been held on [_____], 2017; and the Declaration of [_____] having been

filed on behalf of the Debtor in support of the Sale [Docket No. __] (the "_____ Declaration");

and due notice of the Sale Motion, the Bidding Procedures and the Sale Hearing having been

given to all parties entitled thereto;

        **NOW THEREFORE**, upon the entire record of the hearings held on [_____],

2017 and [_____], 2017, and this Chapter 11 Case, including, without limitation, all proffers

and other evidence admitted at the Sale Hearing, and after due deliberation thereon and good

cause appearing therefor;

        **IT IS HEREBY FOUND AND DETERMINED THAT**:

        A.     <u>Jurisdiction and Venue</u>.  The Court has subject matter jurisdiction over the

Sale Motion and the relief request therein pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is

a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (N).  Venue of this case and the

Sale Motion in this district is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

        B.     <u>Notice</u>.  Proper, timely, adequate and sufficient notice of the Sale Motion

and the relief requested therein, the Sale Hearing, the Sale, and the Bidding Protections, as set

forth in the Bidding Procedures Order, has been provided in accordance with Sections 102(1),

363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9007 and in

compliance with the Bidding Procedures Order, to all Notice Parties and Scheduled and Filed

Creditors being all of the interested persons and entities required to receive notice, as evidenced

by the Affidavit of Service filed with the Court.  Such notice was good and sufficient, and

appropriate under the particular circumstances.

C.      Opportunity to Object.  A reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been afforded to all interested persons and entities.

D.      Sale is Appropriate.  The sale of the Brookhaven Campus pursuant to the Purchase Agreement is authorized pursuant to Section 363(b)(1) of the Bankruptcy Code and Bankruptcy Rule 6004(f).  A sale of the Brookhaven Campus outside the ordinary course of business represents the sound business judgment of the Debtor and is appropriate in light of the facts and circumstances surrounding the Sale and the Chapter 11 Case.

E.      Corporate Authority.  The Debtor has full corporate power and authority to execute the Purchase Agreement and all other documents contemplated thereby, and to consummate the transactions contemplated therewith, and no consents or approvals, other than those expressly provided for in the Purchase Agreement, are required for the Debtor to consummate the Sale.

F.      Best Interests/Business Justification.   Approval of the Purchase Agreement and the consummation of the Sale are in the best interests of the Debtor, its estate, creditors, and other parties in interest.  The Debtor has marketed the Brookhaven Campus and conducted the sale process in compliance with the Bidding Procedures Order.  The terms and conditions of the Purchase Agreement are fair and reasonable.  The Successful Bidder's bid for the purchase of the Brookhaven Campus, as set forth in the Purchase Agreement, is (i) fair and reasonable, (ii) the highest or otherwise best offer received for the Brookhaven Campus, (iii) will provide a greater recovery for the Debtor's creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair

consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

G.    <u>Highest or Otherwise Best</u>.  The Successful Bidder's bid for the purchase of the Brookhaven Campus, as set forth in the Purchase Agreement, is (i) fair and reasonable and (ii) the highest or otherwise best offer received for the Brookhaven Campus.

H.    <u>Arm's Length Transaction</u>.  The Purchase Agreement was negotiated, proposed and entered into by and among the Debtor and the Successful Bidder without collusion, in good faith and from arm's-length bargaining positions.  The Successful Bidder is not an "insider" of the Debtor, as that term is defined in Section 101(31) of the Bankruptcy Code. Neither the Debtor nor the Successful Bidder has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under Bankruptcy Code Section 363(n). Specifically, the Successful Bidder has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement with unrelated third parties.

I.    <u>Free and Clear</u>. The Successful Bidder does not constitute a successor to the Debtor or its estate.  The sale of the Brookhaven Campus does not amount to a consolidation, merger or *de facto* merger of the Successful Bidder and the Debtor or its estate.  The Successful Bidder is not merely a continuation of either of the Debtor or its estate; there is no substantial continuity between the Successful Bidder and the Debtor or its estate; and there is no continuity of enterprise between the Successful Bidder and the Debtor and its estate.  The Debtor has complied with Section 363(f) of the Bankruptcy Code because one or more of the standards set forth in Section 363(f)(1)-(5) has been satisfied with regard to each such Lien, Claim and Encumbrance.  Those non-Debtor parties with Liens, Claims and Encumbrances in or with respect to the Brookhaven Campus who did not file a timely objection, or who withdrew such

objections, are deemed to have consented to the sale of the Brookhaven Campus free and clear of those non-Debtor parties' interests in the Brookhaven Campus pursuant to Section 363(f)(2) of the Bankruptcy Code.  Except as provided in the Purchase Agreement, and with the exception of the Excluded Assets, the transfer of the Brookhaven Campus will be a legal, valid, and effective transfer of the Brookhaven Campus, and will vest the Successful Bidder with all right, title, and interest of the Debtor in and to the Brookhaven Campus, pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, free and clear of all Liens, Claims and Encumbrances, except as otherwise specifically provided in the Purchase Agreement.  The Successful Bidder is not taking assignment of any contracts.   Therefore, except as specifically provided in the Purchase Agreement, and consistent with Section 363(f) of the Bankruptcy Code, the Successful Bidder shall have no liability for any claims arising out of or related to the Sale or transfer of the Brookhaven Campus or arising from claims against the Debtor or its estate or any liabilities or obligations of the Debtor and/or its estate, under the laws of the United States, any state, territory, or possession thereof, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, successor, transferee or vicarious liability.  Except as specifically provided in the Purchase Agreement, all persons and entities asserting or holding any Liens, Claims or Encumbrances in or with respect to the Brookhaven Campus shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing such Liens, Claims and Encumbrances against the Successful Bidder.

    J.  <u>Compliance with New York Not-for-Profit Corporation Law</u>.  The Sale complies with applicable non-bankruptcy law, including Sections 510 and 511 of the New York Not-for-Profit Corporation Law.  The consideration and the terms of the Sale are fair and

reasonable to the Debtor.  The Sale contemplates repayment of lawful obligations of the Debtor consistent with the corporate purposes of the Debtor and applicable nonbankruptcy law. No further regulatory or state court approval is necessary for the transfer of the Brookhaven Campus to the Successful Bidder in accordance with the terms of the Purchase Agreement.

K.    No Successor Liability.    Except as otherwise set forth in the Purchase Agreement, the transfer of the Brookhaven Campus to the Successful Bidder will not subject the Successful Bidder to any liability for any claims against the Debtor or the Brookhaven Campus existing as of the closing of the Sale by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, based, in whole or in part, directly or indirectly, in any theory of law or equity including, without limitation, any laws affecting antitrust, ERISA, successor, transferee or vicarious liability, or require Successful Bidder to remedy any violation of the Debtor or subject Successful Bidder to any labor or employment related law remedy; provided however, that nothing in this paragraph shall be construed as limiting any party's rights to assert a claim against the Debtor, the Debtor's estate or proceeds of the Sale unless the liability for such claim was assumed by the Successful Bidder.  Notwithstanding the foregoing, nothing in this Order or the Purchase Agreement releases, nullifies or enjoins the enforcement of any liability to a governmental unit under environmental laws or regulations (or any associated liabilities for penalties, damages, cost recovery or injunctive relief) that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order.  Nothing contained in this Order or in the Purchase Agreement shall in any way (i) diminish the obligation of any entity to comply with environmental laws, or (ii) diminish the obligations of the Debtor to comply with environmental laws consistent with its rights and obligations as a debtor in possession under the Bankruptcy Code.  Notwithstanding anything to

6

the contrary contained herein, nothing in this Order shall be interpreted to deem the Successful

Bidder as the successor to the Debtor under any state law or federal law successor liability

doctrine with respect to any liabilities under environmental laws or regulations for penalties or

liable for any liability or obligation.  Nothing in this paragraph should be construed to create for

any governmental unit any substantive right that does not already exist under law.

          L.      <u>Legal and Factual Bases</u>.  The legal and factual bases set forth in the Sale

Motion and at the Sale Hearing establish just cause for the relief granted herein.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

**<u>General Provisions</u>**

          1.      <u>Findings of Fact; Conclusions of Law</u>.  The findings of fact set forth above

and conclusions of law stated herein shall constitute this Court's findings of fact and conclusions

of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to

Bankruptcy Rule 9014.

          2.      <u>Objections</u>.  All objections, if any, to the Sale Motion or the relief granted

herein that have not been withdrawn, settled or waived, and all reservations of rights included in

such objections, are hereby overruled on the merits with prejudice.

          3.      <u>Approval of Successful Bidder and Backup Bidder</u>. The Debtor's

designations of _____ as the Successful Bidder and _____ as the Backup

Bidder are approved in all respects.

          4.      <u>Sale Approval</u>.  The Sale, and all of the terms and conditions and

transactions contemplated by the Purchase Agreement are hereby authorized and approved

pursuant to, <u>inter alia</u>, Sections 105(a) and 363(b) of the Bankruptcy Code.  The Successful

Bidder is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code.

Pursuant to Section 363(b) of the Bankruptcy Code, the Debtor is authorized and directed to

7

consummate the Sale pursuant to and in accordance with the terms and conditions of the Purchase Agreement.  The Debtor is authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and effectuate the provisions of this Order and the transactions approved hereby.

                5.     <u>Backup Bidder Provisions</u>. If the Successful Bidder fails to timely close the Sale, time being of the essence, and the Debtor delivers a Termination Notice to the Successful Bidder in accordance with the terms of the Purchase Agreement, the Backup Bidder shall thereupon be deemed the Successful Bidder. For the avoidance of doubt, in the event the Backup Bidder is deemed the Successful Bidder, (i) all references in this Order or in the Bidding Procedures Order to the "Successful Bidder" or the "Purchaser" or like terms shall automatically be deemed to refer to the Backup Bidder, and all references to the "Purchase Agreement" shall automatically be deemed to refer to the Modified Purchase Agreement of the Backup Bidder, and (ii) all of the terms, findings, conclusions of law, conditions, rights, benefits and obligations of the Successful Bidder set forth in this Order or in the Bidding Procedures Order shall automatically be deemed to apply and inure to the Backup Bidder, in each case without further order or approval of this Court. The Backup Bid shall remain open and irrevocable until the earlier of (x) written notification to the Backup Bidder within ninety (90) days following entry of this Sale Order that the Debtor has terminated the Sale with the Successful Bidder and intends to proceed toward closing with the Backup Bidder based on the Backup Bid in accordance with the Bidding Procedures and (y) the Closing of the Sale.

6.      <u>Transfer of the Purchased Assets.</u>  Except as otherwise provided in the

Purchase Agreement, pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, upon the

Closing, the Brookhaven Campus (and good and marketable title to such Brookhaven Campus)

shall be transferred to the Successful Bidder free and clear of any and all liens, claims (including,

any "claim" as defined in section 101(5) of the Bankruptcy Code), encumbrances, interests,

security interests, mortgages, pledges, charges, easements, encroachments, servitudes, deeds of

trust, options, rights of first refusal, rights of reversion, judgments, leases, guarantees,

contingencies, hypothecations, demands, licenses, sublicenses, assignments, and restrictions, in

each case of whatever kind, nature or description and howsoever arising, whether imposed by

Contract, Applicable Law, equity or otherwise, whether arising prior to, on or after the Petition

Date, whether known or unknown, of record or not of record, direct or indirect, absolute or

contingent, choate or inchoate, matured or unmatured, liquidated or unliquidated, senior or

subordinated, secured or unsecured, in, against or with respect to all or any part of the

Brookhaven Campus (collectively, "<u>Liens, Claims and Encumbrances</u>"), with all such Liens,

Claims and Encumbrances to attach to the net proceeds of the Sale in the order of their priority,

with the same validity, force and effect which they now have as against the Brookhaven Campus,

subject to any claims, defenses, setoffs or rights of recoupment the Debtor may possess with

respect thereto.  Except as specifically provided in the Purchase Agreement, all persons and

entities (and their respective successors and assigns) including, but not limited to, all debt

security holders, equity security holders, governmental, tax, and regulatory authorities, lenders,

trade, and other creditors, asserting or holding any Liens, Claims or Encumbrances in or with

respect to the Debtor, the Brookhaven Campus, the operation of the Debtor's business prior to

the Closing, or the transfer of the Brookhaven Campus to the Successful Bidder, hereby are

forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such claims or interests against the Successful Bidder and/or its affiliates, designees, assignees, successors, properties, or assets.   Except as otherwise provided in the Purchase Agreement, effective upon the Closing, the Successful Bidder shall have no liability for any Claims (as defined in Section 101(5) of the Bankruptcy Code) against the Debtor or its estate.

7.      <u>Compliance with New York Not-for-Profit Corporation Law</u>.  The Sale complies with applicable non-bankruptcy law, including Sections 510 and 511 of the New York Not-for-Profit Corporation Law, and no further regulatory or state court approval is necessary for the transfer of the Brookhaven Campus to the Successful Bidder in accordance with the terms of the Purchase Agreement.

8.      <u>Surrender of Assets and Real Property</u>.  All entities who are presently, or who as of the Closing may be, in possession of some or all of the Brookhaven Campus hereby are directed to surrender possession of the Brookhaven Campus to the Successful Bidder as of the Closing.

**<u>Additional Provisions</u>**

9.      <u>Additional Documents</u>.  Prior to or upon the Closing of the Sale, each of the Debtor's creditors are authorized and directed to execute such documents and take all other actions as may be necessary to release their Liens, Claims and Encumbrances, if any, in the Brookhaven Campus as such Liens, Claims and Encumbrances may have been recorded or may otherwise exist.

10.      Except as otherwise provided in the Purchase Agreement, this Order (a) shall be effective as a determination that, upon the Closing, all Liens, Claims and Encumbrances existing with respect to the Debtor and/or the Brookhaven Campus prior to the

Closing have been unconditionally released, discharged, and terminated as to the Successful Bidder and the Brookhaven Campus, and that the conveyances described herein have been effected, and (b) shall be binding upon all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Brookhaven Campus.

11.    <u>Financing Statements</u>.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens,* or other documents or agreements evidencing Liens, Claims or Encumbrances with respect to the Debtor and/or the Brookhaven Campus shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all such Liens, Claims and Encumbrances which the person or entity has with respect to the Debtor, the Brookhaven Campus or otherwise, then (a) the Debtor or the Successful Bidder is hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Brookhaven Campus and (b) the Successful Bidder and/or the Debtor is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims and Encumbrances.  This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, and local governmental agency, department, or office.

12.    <u>Modifications</u>.   The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment or supplement does not (i) materially change the terms of the Purchase Agreement, (ii) modify the express terms of this Order, and (iii) have a material adverse effect on the Debtor's estate, and the Debtor shall provide reasonable advance notice of any such modification to counsel for the Creditors' Committee, the Secured Parties and the Office of the United States Trustee. Notwithstanding the foregoing and any provision of the Purchase Agreement, any material amendment of the Purchase Agreement may be implemented solely upon the prior written consent of the Creditors' Committee and the Secured Parties or by further order of this Court after notice to the Creditors' Committee and the Secured Parties and an opportunity for hearing thereon.

13.    <u>Automatic Stay</u>.   The automatic stay pursuant to Section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtor to the extent necessary, without further order of the Court, to allow the Successful Bidder to (i) give the Debtor any notice provided for in the Purchase Agreement, and (ii) take any and all actions permitted by the Purchase Agreement and ancillary agreements in accordance with the terms and conditions thereof.

14.    <u>Recording</u>.   Each and every federal, state, and local governmental agency, recording office or department and all other parties, persons or entities is hereby directed to accept this Order and any and all documents and instruments necessary and appropriate for recordation as conclusive evidence of the free and clear and unencumbered transfer of title to the Brookhaven Campus conveyed to the Successful Bidder.

15. <u>Successors, Assigns</u>.    The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtor, its estate, creditors, the Successful Bidder, and any of such parties' respective affiliates, designees, successors, and assigns, and shall be binding in all respects upon all of the Debtor's creditors, all prospective and actual bidders for the Brookhaven Campus, and all persons and entities receiving notice of the Sale Motion, the Auction and/or the Sale Hearing notwithstanding any subsequent appointment of any trustee(s), examiner(s), or receiver(s) under any Chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtor, its estate,  creditors, or any trustee(s), examiner(s), or receiver(s).

16. <u>Non-Severability/Failure to Specify</u>.  The provisions of this Order are non-severable and mutually dependent.  The failure specifically to include any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Purchase Agreement be authorized and approved in its entirety.

17. <u>Order Immediately Effective</u>.  As provided by Bankruptcy Rules 6004(h), 6006(d) and 7062, this Order shall be effective and enforceable immediately upon its entry, and the sale approved by this Order may close immediately upon entry of this Order, notwithstanding any otherwise applicable waiting periods.

18. <u>Retention of Jurisdiction</u>.  This Court retains jurisdiction on all matters pertaining to the relief granted herein, including to interpret, implement, and enforce the terms and provisions of this Order and the Purchase Agreement, all amendments thereto, any waivers

and consents thereunder, and of each of the agreements executed in connection therewith in all respects.

**EXHIBIT C**

ASSET PURCHASE AGREEMENT

by and between

DOWLING COLLEGE

and

Dated as of _____, 2017

Table of Contents

Page

ARTICLE I  DEFINITIONS ...................................................................................................2
  1.1 Definitions..............................................................................................................2
  1.2 Other Definitional and Interpretative Provisions...................................................9
ARTICLE II  PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ........10
  2.1 Assets to be Sold to Buyer .................................................................................10
  2.2 Excluded Assets .................................................................................................11
  2.3 Excluded Liabilities ...........................................................................................11
ARTICLE III PURCHASE PRICE, MANNER OF PAYMENT AND CLOSING.....................11
  3.1 Payment of Purchase Price..................................................................................11
  3.2 Deposit….............................................................................................................12
  3.3 Closing and Closing Date ...................................................................................12
  3.4 Closing Deliveries...............................................................................................12
  3.5 Transfer Taxes ...................................................................................................14
  3.6 Delivery of Records ...........................................................................................14
  3.7 Further Conveyances .........................................................................................14
  3.8 Bulk Sales Laws.................................................................................................14
  3.9 Allocation of Purchase Price...............................................................................15
  3.10 Time is of the Essence ......................................................................................15
ARTICLE IV SELLER'S REPRESENTATIONS AND WARRANTIES ...................................15
  4.1 Organization of Seller.........................................................................................15
  4.2 Authorization of Transaction ..............................................................................15
  4.3 Qualification .......................................................................................................15
  4.4 Non-Contravention .............................................................................................15
  4.5 Brokers' Fees .....................................................................................................16
  4.6 Events Subsequent .............................................................................................16
  4.7 Tax Matters .......................................................................................................16
  4.8 Property and Assets.............................................................................................17
  4.9 Contracts    .......................................................................................................18
  4.10 Seller's Consents and Approvals ......................................................................18
  4.11 Powers of Attorney ..........................................................................................19
  4.12 Litigation..........................................................................................................19
  4.13 Employees.........................................................................................................19
  4.14 Foreign Operations............................................................................................19
  4.15 Insurance Coverage...........................................................................................19
  4.16 Environmental Matters.......................................................................................19
  4.17 No Other Representations or Warranties; Schedules...........................................20
ARTICLE V  BUYER'S REPRESENTATIONS AND WARRANTIES....................................20
  5.1 Organization of Buyer.........................................................................................20
  5.2 Authorization of Transaction ..............................................................................21
  5.3 Non-Contravention .............................................................................................21
  5.4 Brokers' Fees .....................................................................................................21
  5.5 Buyer's Consents and Approvals........................................................................21
  5.6 Acknowledgement Regarding Condition of the Business ...................................21
  5.7 Financial Capability ...........................................................................................22

5.8 No Other Representations or Warranties; Schedules .......................................................... 22
ARTICLE VI  BANKRUPTCY COURT MATTERS ................................................................. 23
5.1 Termination Fee and Expense Reimbursement ............................................................... 23
6.2 Competing Transaction ................................................................................................... 23
6.3 Treatment of Monetary Obligations ............................................................................... 24
ARTICLE VII  PRE-CLOSING COVENANTS ...................................................................... 24
7.1 General ........................................................................................................................... 23
7.2 Operation of Business ..................................................................................................... 23
7.3 Access ............................................................................................................................. 24
7.4 Notice of Developments .................................................................................................. 24
7.5 Employment Matters ....................................................................................................... 25
7.6 Removal of Excluded Assets from Real Property ........................................................... 25
7.7 Removal of Necessary Records ....................................................................................... 26
7.8 Non-Disclosure ............................................................................................................... 26
ARTICLE VIII EMPLOYEES .................................................................................................. 27
8.1 Buyer Not Assuming Seller's CBAs or Benefit Plans ..................................................... 27
8.2 No Obligation to Offer Employment ............................................................................... 27
8.3 No Successor Liability ..................................................................................................... 27
ARTICLE IX CONDITIONS TO OBLIGATION TO CLOSE ................................................. 28
9.1 Conditions to Buyer's Obligations ................................................................................... 28
9.2 Conditions to Seller's Obligations ................................................................................... 28
ARTICLE X TERMINATION ................................................................................................... 30
10.1 Termination of Agreement ............................................................................................. 30
10.2 Procedure For Termination ............................................................................................ 31
10.3 Effect of Termination .................................................................................................... 31
ARTICLE XI TITLE INSURANCE; PERMITTED EXCEPTIONS; APPORTIONMENTS ..... 31
11.1 Title Insurance ............................................................................................................... 31
11.2 Permitted Exceptions ..................................................................................................... 32
11.3 Apportionments ............................................................................................................. 33
ARTICLE XII MISCELLANEOUS .......................................................................................... 36
12.1 Survival ......................................................................................................................... 36
12.2 Press Releases and Public Announcements .................................................................... 36
12.3 No Third-Party Beneficiaries ......................................................................................... 36
12.4 Entire Agreement ........................................................................................................... 36
12.5 Succession and Assignment ........................................................................................... 36
12.6 Counterparts ................................................................................................................... 36
12.7 Headings ........................................................................................................................ 37
12.8 Notices ........................................................................................................................... 37
12.9 Governing Law; Waiver of Jury Trial ............................................................................ 38
12.10 Submission to Jurisdiction; Consent to Service of Process .......................................... 38
12.11 Amendments ................................................................................................................. 38
12.12 Severability .................................................................................................................. 38
12.13 Expenses ...................................................................................................................... 39
12.14 Construction ................................................................................................................. 39
12.15 Incorporation of Schedules .......................................................................................... 39
12.16 No Waiver .................................................................................................................... 39
12.17 Non-Recourse Liability ................................................................................................ 39

<u>LIST OF SCHEDULES</u>

| | |
|---|---|
| Schedule 1.1 | Knowledge |
| Schedule 4.6 | Events Subsequent |
| Schedule 4.7(a) | Tax Compliance |
| Schedule 4.7(b) | Lien or Claims for Taxes |
| Schedule 4.8(a) | Real Property |
| Schedule 4.8(d) | Violations |
| Schedule 4.9(a) | Contracts |
| Schedule 4.10 | Consents and Approvals (Seller) |
| Schedule 4.12 | Litigation of Seller |
| Schedule 4.15 | Insurance Coverage |
| Schedule 4.16(a) | Environmental Matters |
| Schedule 4.16(b) | Environmental Permits |
| Schedule 5.1(c) | Principals of Buyer |
| Schedule 5.5 | Consents and Approvals (Buyer) |
| Schedule 11.2(a) | Permitted Exceptions |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of _____, 2017, (the "Execution Date") is by and between DOWLING COLLEGE, a New York not-for-profit corporation ("Dowling" or "Seller"), and _____("Buyer"), each a "Party" and collectively the "Parties."

## RECITALS

WHEREAS, on November 29, 2016 (the "Petition Date"), Dowling (the "Debtor") filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 *et seq*. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") (the "Bankruptcy Case"); and

WHEREAS, on September 26, 2017, the Debtor filed a motion seeking, *inter alia*, approval of the sale of the Debtor's 105.33 acre campus located in the Town of Brookhaven, County of Suffolk, at William Floyd Parkway, Shirley, New York (the "Brookhaven Campus") to the successful bidder (the "Successful Bidder") as determined by the bidding procedures for the sale (the "Bidding Procedures") [approved by the Bankruptcy Court in the Bidding Procedures Order (as defined below); and]

[WHEREAS, on _____, 2017, an order was entered by the Bankruptcy Court, approving, *inter alia*, the Bidding Procedures and scheduling an auction ("Auction") and sale hearing in connection therewith (the "Bidding Procedures Order"); and]

[WHEREAS, the Bidding Procedures Order provided Seller with flexibility to seek to enter into a form of "stalking horse" agreement under terms and conditions acceptable to the Secured Parties (as defined therein) and after consultation with the Official Committee of Unsecured Creditors formed in the Bankruptcy Case; and]

[WHEREAS, after Seller's initial marketing process and subject to the terms of the Bidding Procedures Order and the results of the Auction scheduled for _____, 2017, Buyer is prepared to acquire the Brookhaven Campus on the terms and conditions set forth herein; and]

[WHEREAS, the transactions contemplated by this Agreement will be consummated pursuant to an order of the Bankruptcy Court, approving, *inter alia*, the sale of the Brookhaven Campus to Buyer (the "Sale Order"), consistent with terms, conditions and transactions contemplated by the Agreement; and]

WHEREAS, subject to the terms and conditions of the Bidding Procedures Order, Seller wishes to sell to Buyer and Buyer wishes to acquire from Seller the Acquired Assets (defined below) as set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, agreements, representations and warranties herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

ARTICLE I
DEFINITIONS

1.1    <u>Definitions</u>.  The following terms, as used herein, have the following meanings:

"<u>Acquired Assets</u>" has the meaning set forth Section 2.1.

"<u>Affiliate</u>" means any person or entity which directly or indirectly controls, is controlled by, or is under common control with, any Person.

"<u>Agreement</u>" has the meaning set forth in the preface above.

"<u>Alternate Transaction</u>" means a transaction or series of related transactions consummated by Seller within one (1) year of the Execution Date pursuant to which Seller sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization, or bankruptcy plan of liquidation, or other similar transaction, including a Bankruptcy Court approved stand-alone plan of liquidation, all or substantially all of the Acquired Assets owned by Seller to a party or parties other than Buyer (or one or more designees of Buyer).

"<u>Applicable Law</u>" means, with respect to any Person, any foreign, federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, guidance, plan, order, injunction, judgment, decree, ruling, charge or other similar requirement, including any Labor and Employment Law and Requirements, enacted, adopted, or promulgated by a Governmental Authority that is binding upon such Person, as amended.

"<u>Auction</u>" has the meaning set forth in the recitals.

"<u>Backup Bidder</u>" has the meaning set forth in Section 6.2(c).

"<u>Bankruptcy Case</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to Section 2075 of title 28 of the United States Code and as applicable to the Bankruptcy Case.

"<u>Bidding Procedures</u>" has the meaning set forth in the recitals.

"<u>Bidding Procedures Order</u>" has the meaning set forth in the recitals.

"<u>Board</u>" means the governing board of an entity, including the board of directors, board of governors, board of trustees, or board of managers, as applicable.

"Business" means the limited business operations of Seller as conducted following Seller's loss of accreditation and cessation of operations as a provider of educational services (not including the Excluded Liabilities).

"Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Applicable Law to close.

"Buyer" has the meaning set forth in the preface above.

"Buyer Confidential Information" has the meaning set forth in Section 7.8(b).

"Buyer's Consents and Approvals" has the meaning set forth in Section 5.5.

"Buyer's Objection Notice" has the meaning set forth in Section 11.1.

"Campus Agents" means A&G Realty Partners, LLC, Madison Hawk Partners, LLC and CBRE, Inc.

"CBA" means collective bargaining agreement.

"Claim" has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 3.3(a).

"Closing Date" has the meaning set forth in Section 3.3(a).

"Closing Documents" has the meaning set forth in Section 3.4(a).

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Bid" has the meaning set forth in Section 6.2(a).

"Contract" means any legally binding oral or written commitment, contract, lease, sublease, license, sublicense or other agreement or arrangements of any kind relating to the Acquired Assets or the operation thereof to which Seller is a party or by which any of the Acquired Assets are bound.

"Covered Person" means a current or former Employee, officer, director or consultant of Seller.

"Creditors' Committee" means the official committee of unsecured creditors appointed in the Bankruptcy Case pursuant to Section 1102 of the Bankruptcy Code by the United States Trustee for the Eastern District of New York, as it may be reconstituted from time to time.

"Debt" means, with respect to Seller, the aggregate amounts of long-term and short-term indebtedness of Seller, including any amounts owing under any capital lease arrangement, amounts outstanding under notes payable to any financial institution or Governmental Authority,

amounts owed to an Employee Benefit Plan or any Multiemployer Plan, amounts outstanding under lines of credit, amounts owing under notes or dividends or distributions payable or other amounts payable by Seller, any other amounts outstanding under notes payable, and any prepayment penalties or expenses payable in connection with the foregoing transactions, but excluding the accounts payable arising in the Ordinary Course of Business of Seller.

"Debtor" has the meaning set forth in the recitals.

"Deeds" has the meaning set forth in Section 3.4(a)(i).

"Deposit" has the meaning set forth in Section 3.2.

"Effective Time" has the meaning set forth in Section 3.3(b).

"Employee Benefit Plan" means any material "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other material bonus, profit sharing, pension, severance, deferred compensation, fringe benefit (as described in Code Section 132), insurance, welfare, post-retirement, health, life, tuition refund, service award, company car, scholarship, relocation disability, accident, sick, vacation, holiday, unemployment incentive, commission, retention change in control, non-competition, and other plans, agreements, policies, trust funds (a) established, maintained, sponsored or contributed to (or with respect to which any obligation to contribute has been undertaken) by Seller or an ERISA Affiliate, or (b) with respect to which Seller or any ERISA Affiliate has or has had any obligation, in each case, under which any Employee of Seller may receive benefits or may otherwise be subject and other than a Multiemployer Plan.

"Employees" means all individuals who are employed by Seller (including any employees not actively at work as of the Closing Date, as well as any employees who are on medical disability or leaves of absence and who worked for Seller immediately prior to such disability or leave).

"Environmental Claim" means any demand, assessment, Lien, investigation, claim, action or cause of action, complaint, citation, directive, information request issued by a Governmental Authority, legal proceeding, order, or notice of potential violation or potential responsibility arising under any applicable Environmental Law.

"Environmental Law" means any applicable statute, law, common law, rule, regulation, ordinance, or order of any federal, state, or local Government Authority in effect on or before the Closing Date relating to pollution, protection of human health (to the extent relating to exposure to Hazardous Materials) or the environment, or the processing, generation, management, distribution, use, handling, treatment, storage, transport, disposal, Remediation, or Release of Hazardous Materials.

"Environmental Permit" means any permit, registration, license, approval, identification number, exemption or other authorization required under or issued pursuant to any applicable Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"<u>ERISA Affiliate</u>" means, when used with respect to an Employee Benefit Plan, ERISA, the PBGC or a provision of the Code pertaining to employee benefit plans, any Person that is a member of any group of organizations within the meaning of Sections 414(b) or 414(c) of the Code (or, solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the Lien created under Section 302(f) of ERISA and Section 412(n) of the Code, or Sections 414(m) or 414(o) of the Code of which either Seller is a member).

"<u>Exceptions</u>" has the meaning set forth in Section 11.1.

"<u>Excluded Assets</u>" has the meaning set forth in Section 2.2.

"<u>Excluded Liabilities</u>" has the meaning set forth Section 2.3.

"<u>Execution Date</u>" has the meaning set forth in the preface above.

["<u>Expense Reimbursement</u>" means the reimbursement of the reasonable out-of-pocket costs, fees and expenses (including legal, financial advisory, accounting and other similar costs, fees and expenses) incurred by Buyer or its Affiliates in connection with the conduct of due diligence, the negotiation, documentation and implementation of this Agreement and the transactions contemplated hereby and all proceedings incident thereto; provided, that under no circumstances shall the amount of Expense Reimbursement exceed _____ Dollars ($_____.00) in the aggregate.]

"<u>Final Order</u>" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction that has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for stay, new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, stay, new trial, reargument, or rehearing has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a stay, new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and (ii) the time to take any further appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing shall have expired; *provided, however*, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure may be, but has not been, filed with respect to such order shall not cause such order not to be a Final Order.  As set forth in the Bidding Procedures, the Parties consent to the Bankruptcy Court issuing a Final Order in the Bankruptcy Case with respect to, among other things, any matter or dispute relating to the Sale of the Brookhaven Campus, the Bidding Procedures, the sale hearing, the Auction, a stalking horse bidder, a backup bid and/or any other matter that in any way relates to the foregoing.

"<u>Furniture, Fixtures and Equipment</u>" means all furniture, furnishings, light fixtures, apparatus, machinery, appliances, equipment desks, chairs, tables, copiers, telephone lines, telecopy machines and other telecommunication equipment, miscellaneous office furnishings, cleaning and maintenance supplies, spare parts and other disposables and all other items of

personal property owned by Seller and located on the Real Property, but specifically excluding the Simulators, Hardware and Non-Estate Property.

"Governmental Authority" means any domestic or foreign federal, state or local governmental authority, department, court or government, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other division, subdivision, department or branch of any of the foregoing.

"Hardware" means any and all computer and computer-related hardware and equipment, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks, hard drives and other data and/or media storage devices (tapes, discs, floppy drives, etc.).

"Hazardous Materials" means:  (i) any chemical, substance, material, or waste listed, defined, or classified as a "pollutant," "contaminant," "hazardous substance," "toxic substance," "solid waste," "hazardous waste," "hazardous material," or "special waste" under any applicable Environmental Law; (ii) any substance regulated under any applicable Environmental Law; (iii) petroleum or any derivative or by-product thereof; (iv) urea formaldehyde foam insulation, polychlorinated biphenyls, methyl tertiary butyl ethyl, radioactive material, or radon; (v) mold; and (vi) any asbestos-containing materials.

"Knowledge" means actual knowledge, or such knowledge that a reasonably prudent person would have after reasonable inquiry by the remaining officer of Seller as of or immediately prior to the Closing, which individual is identified in Schedule 1.1.

"Labor and Employment Law and Requirements" means any federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, guidance, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, or promulgated by a Governmental Authority relating to: (a) hours of work and/or payment of wages, (b) notices to Employees, (c) discrimination, harassment and retaliation, (f) leaves of absence, (g) employee benefits, or (h) duty to bargain collectively with bargaining unit representative of Employees.

"Liabilities" means debts, obligations, contracts or other liabilities of any kind, character or description, accrued, absolute, contingent, determined, determinable or otherwise, whether presently in existence or arising hereafter.

"Licenses" means any licenses, approvals, authorizations, consents, permits, orders, registrations, certificates, decrees, franchises, permits variances, and similar rights obtained from any Governmental Authority.

"Lien" means any claim, charge, easement, encumbrance, encroachment, right of reversion, security interest, mortgage, lien, pledge or restriction, whether imposed by Contract, Applicable Law, equity or otherwise.

"Material Adverse Effect" or "Material Adverse Change" means any fact, circumstance, event, change, effect, condition or occurrence that, individually or in the aggregate, has or could be reasonably expected to have a material adverse effect on (a) the value of the Acquired Assets,

(b) a significant portion of the Real Property is destroyed or damaged by fire or other casualty, or (c) the ability of Seller to consummate the Sale on a timely basis, in each case as determined by Buyer.

"Material Contracts" means all Contracts material to the Acquired Assets that will extend over a period of more than one (1) year from the Execution Date or that provide for annual payments to or by Seller in excess of $50,000.

"Material Development" means any change in the nature, scope, strategy, parties or other aspect of a Material Litigation or Proceeding that would have a Material Adverse Effect.

"Material Litigation or Proceeding" means any action, suit, investigation, proceeding or audit (a) the settlement or adjudication of which would (i) cause a material breach of this Agreement, (ii) have the effect of making the Sale illegal or (iii) materially prohibit or interfere with the consummation of the Sale.

"Multiemployer Plan" means a multiemployer plan as defined in Section 3 of ERISA to which Seller or an ERISA Affiliate contributes or has or had an obligation to contribute.

"Necessary Records" means any books and records which by Applicable Law or policy Seller is required to retain in its possession.

"Non-Estate Property" means that certain personal property that is either not owned by Seller or which may be a Restricted Asset.

"Ordinary Course of Business" means the ordinary course of business of Seller following its loss of accreditation and cessation of operations as a provider of educational services.

"Parties" has the meaning set forth in the preface above.

"Party" has the meaning set forth in the preface above.

"Permitted Exceptions" has the meaning set forth in Section 11.2.

"Petition Date" has the meaning set forth in the recitals.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity, or a Governmental Authority.

"Purchase Price" has the meaning set forth in Section 3.1(a).

"Real Property" means the real property comprising the Brookhaven Campus, including any and all improvements and buildings thereon and appurtenances thereto, together with any material property rights.

"Release" means any spilling, leaking, pumping, emitting, emptying, discharging, injecting, escaping, leaching, dumping, migrating, or disposing of Hazardous Materials into the

environment, including the ambient air, surface and subsurface soils, surface water and groundwater.

"<u>Remediation</u>" means any investigation, clean-up, removal action, remedial action, restoration, repair, response action, corrective action, monitoring, sampling and analysis, reclamation, closure, or post-closure in connection with the suspected, threatened or actual Release of Hazardous Materials.

"<u>Representatives</u>" means, with respect to any Person, any of its Affiliates, directors, trustees, officers, members, employees, consultants, agents, attorneys, advisors and other representatives.

"<u>Restricted Assets</u>" means donor restricted assets (including, without limitation, special library collections, art collections or pottery) and endowment funds held by, or for the benefit of, Seller, the income and/or corpus of which has been designated for use in support of, for the benefit of, or otherwise relating to, any of Seller's mission, operations, programs, services, and/or assets.

"<u>RE Tax Returns</u>" means that returns, questionnaires, certificates, affidavits and other documents required by the Title Company in connection with the payment of any Transfer Taxes.

"<u>Sale</u>" has the meaning set forth in Section 2.1.

"<u>Sale Order</u>" has the meaning set forth in the Recitals.

"<u>Seller</u>" has the meaning set forth in the preface above.

"<u>Seller Confidential Information</u>" has the meaning set forth in Section 7.3(a).

"<u>Seller's Consents and Approvals</u>" has the meaning set forth in Section 4.10.

"<u>Simulators</u>" means those certain air traffic control simulators located at the Brookhaven Campus, including the Raytheon FIRSTplus Air Traffic Control Simulator and the NASA/VAST Simulator.

"<u>Successful Bidder</u>" has the meaning set forth in the recitals.

"<u>Survey</u>" has the meaning set forth in Section 11.1.

"<u>Tax</u>" or "<u>Taxes</u>" means any federal, state, local, or foreign income, prohibited transaction, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital stock, franchise, net worth or capital, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty, or addition thereto, whether disputed or not and including any

obligation to indemnify or otherwise assume or succeed to the Liability for Taxes of any other Person.

"Tax Return" means any return, declaration, statement, report, form, claim for refund, or similar statements or documents including information reporting forms (including Forms 941, 990, 1099 and W-2) and estimated tax returns and reports) relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

["Termination Fee" means a fee in the amount of _____Dollars ($_____).]

"Termination Notice" means written notice delivered to a Party at its address for notices specified herein setting forth the other Party's intent to immediately terminate this Agreement and the section and subsection of this Agreement providing the basis for the terminating Party's right to terminate, and signed by the terminating party.

"Time is of the Essence" means with regard to all dates and time periods set forth or referred to in this Agreement, failure by a Party to perform on such date or within such time periods, as applicable, shall constitute an incurable breach of this Agreement.  A written demand from one Party to the other under this Agreement shall state whether Time is of the Essence.

"Title Company" has the meaning set forth in Section 11.1.

"Title Defect" has the meaning set forth in Section 11.1.

"Title Report" has the meaning set forth in Section 11.1.

"Transfer Taxes" means any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or Taxes or governmental charges payable in connection with the Sale.

"Withdrawal Liability" means any sum that may be assessed against Seller by a Multiemployer Plan providing pension benefits, under the Multiemployer Pension Plan Amendments Act of 1980, resulting from Seller ceasing to have an obligation to make contributions to such Multiemployer Plan.

1.2     Other Definitional and Interpretative Provisions.  The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The captions and headings used herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof.  References to Articles, Sections, Exhibits and Schedules are to the Articles, Sections, Exhibits and Schedules, respectively, of this Agreement unless otherwise specified.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement.  The terms "Dollars," "dollars" and "$" shall mean United States dollars.  Any singular term in this Agreement shall be deemed to include the plural and any plural term the singular, and references herein to any gender shall include the other gender. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact

followed by those words or words of like import.  "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form.  References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time at or prior to the Closing in accordance with the terms hereof and thereof; provided that with respect to any agreement or contract listed on any schedules hereto, any substantive amendments, modifications or supplements must also be listed in the appropriate schedule.  References to any Person include the successors and permitted assigns of that Person.  References herein to a Person in a particular capacity or capacities shall exclude such Person in any other capacity.  References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.  Any reference to a code, act, statute or regulation means that law, code, act, statute or regulation as amended or supplemented from time to time and any corresponding provisions of successor laws, codes, acts, statutes or regulations and any reference to any law code, act or statute shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  References to a "day" or any number of "days" (without explicit qualification by the word "Business") shall be interpreted as a reference to a calendar day or number of calendar days.  If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, the time for the giving of such notice or the performance of such act shall be extended to the next succeeding Business Day.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    Assets to be Sold to Buyer.  On the terms and subject to the conditions of this Agreement, and on the basis of the representations and warranties herein contained, Seller shall sell, transfer, convey, assign and deliver to Buyer, or to an entity or entities designated by Buyer, on the Closing Date, all of its right, title and interest in the assets described in this Section 2.1 (the "Acquired Assets"), free and clear of all Liens and Claims, other than Liens securing the Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code (the "Sale").  The Acquired Assets shall be comprised of the following assets:

(a)    The Real Property;

(b)    The Furniture, Fixtures and Equipment;

(c)    Subject to Seller's right to remediate any such damage with insurance proceeds, all proceeds or proceeds receivable of Seller's insurance and unliquidated or unsatisfied claims that relate to property damage with respect to the Real Property occurring after the date of this Agreement and prior to the Closing; and

(d)    All rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to services provided, if any, after the Closing or to the extent affecting any Acquired Assets.

2.2     Excluded Assets.   For the avoidance of doubt, Buyer is only acquiring the Acquired Assets and no others.  Further, the following assets are not intended by the Parties to be a part of the Sale and are excluded from the Acquired Assets (the "Excluded Assets"):

(a)     Seller's cash, cash equivalents, bank deposits and similar items;

(b)     Any personal property and equipment that does not constitute Furniture, Fixtures and Equipment, including any such property and equipment that is leased by Seller or not located on the grounds of the Real Property;

(c)     All intellectual property and intangible property including, but not limited to, computer software, licenses, maintenance or support contracts, IPv4 addresses, patents, trademarks, copyrights, domain addresses, e-mail addresses and phone numbers;

(d)     All Non-Estate Property and Restricted Assets;

(e)     Seller's accounts receivable;

(f)     Organizational documents, corporate records and minute books of Seller;

(g)     The Necessary Records;

(h)     Seller's Contracts, contract rights and receivables, rebates, credit balances and refunds due from third parties, pledges, commitments, and available credit lines;

(i)     All claims and causes of action of Seller, including counterclaims that may be asserted in response to any proofs of claim filed against Seller; and

(j)     Rights that will accrue to Seller under this Agreement.

2.3     Excluded Liabilities.   Notwithstanding any provision of this Agreement or any other document or instrument to the contrary, Buyer shall not have any obligation with respect to any other Liabilities of Seller, regardless of whether such obligation arises before, on or after the Closing Date (all of such other Liabilities, collectively, the "Excluded Liabilities").  It shall not affect the status of a Liability as an Excluded Liability to the extent Buyer affirmatively elects in its sole and absolute discretion to assume responsibility for a given Excluded Liability.

ARTICLE III
PURCHASE PRICE, MANNER OF PAYMENT AND CLOSING

3.1     Payment of Purchase Price.

(a)     Consideration.   Subject to the terms and conditions hereof, the aggregate consideration for the sale, assignment, transfer, conveyance and delivery of the Acquired Assets to Buyer (or its designee(s)) at Closing, shall be _____Dollars ($_____) (the "Purchase Price"), subject to the adjustments and credits described in Section 3.1(b) and Section 11.3.

(b)    Payment.  Subject to the terms and conditions hereof, on the Closing Date, Buyer shall pay to Seller the amount of the Purchase Price less the Deposit.

(c)    Title Discharge.  In the event there is any Lien or Title Defect which Seller is obligated or elects to pay and discharge at Closing, Seller may pay and discharge such Lien or Title Defect out of the balance of the Purchase Price, provided Seller has made arrangements with the Title Company in advance of Closing for Seller to deposit with the Title Company sufficient monies (which shall include all recording charges) required by the Title Company to issue an ALTA Owner's Title Policy to Buyer free of any such Lien or Title Defect.  The existence of any such Lien, Title Defect or real estate taxes shall not be deemed objections to title if Seller shall comply with the foregoing requirements.

3.2    Deposit.  Buyer shall have made a cash deposit in the aggregate amount of not less than five percent (5%) of its initial purchase price as set forth in its Modified Purchase Agreement (as defined in the Bidding Procedures), which Buyer shall increase to not less than ten percent (10%) of the Purchase Price at such time as Buyer is selected as the Successful Bidder or Backup Bidder in accordance with the Bidding Procedures (the "Deposit").  Seller shall retain the Deposit as liquidated damages, as its sole remedy, if this Agreement is properly terminated by Seller pursuant to Section 10.1(c)(iii) or upon the failure of Buyer to consummate the Sale, provided that all conditions precedent to Closing have been satisfied and there shall not have been a material breach by Seller of any representation, warranty or covenant contained in this Agreement.

3.3    Closing and Closing Date.

(a)    The closing of the Sale (the "Closing") shall take place at a location agreed upon by Buyer and Seller, within fifteen (15) days after satisfaction or waiver of all conditions to the obligations of Seller and Buyer to consummate the Sale, except those conditions permitted to be satisfied on the Closing Date set forth in Sections 9.1(g), (j), (k) and (l) and Sections 9.2(e) and (g), or such other date as Buyer and Seller may mutually determine in writing (the "Closing Date").

(b)    Unless otherwise agreed in writing by the Parties, the Sale shall be effective as of 12:00:01 a.m. on the calendar day immediately following the Closing Date (the "Effective Time").

3.4    Closing Deliveries.

(a)    Seller Deliveries.  At the Closing, contemporaneously with Buyer's delivery to Seller of all of the Closing Documents required to be delivered by Buyer hereunder, Seller shall deliver or cause to be delivered to Buyer, duly executed by Seller in recordable form, where applicable (the documents and other deliverables described in this Section 3.4(a) and in Section 3.4(b) and all other documents required to be delivered hereunder are referred to collectively as the "Closing Documents") the following items:

(i)        fully-executed and acknowledged deeds conveying the Real Property to Buyer (or its designee(s)) (the "<u>Deeds</u>") in a form reasonably acceptable to Buyer;

(ii)       copies of any reasonably required RE Tax Returns, if any, properly executed and acknowledged by Seller;

(iii)      a Certificate of Non-Foreign Status duly executed by Seller certifying that Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended;

(iv)      a fully-executed bill of sale from Seller in a form acceptable to Buyer;

(v)       to the extent in the possession of Seller or Seller's agents, all keys or key cards and alarm codes to, and all combinations to, any locks on, all entrance doors to, and any equipment and utility rooms located in, the Real Property, appropriately tagged for identification;

(vi)      delivery of possession of the Real Property free of any tenancies (other than any tenancies where Buyer or its designee is the tenant);

(vii)     a good standing certificate for Seller from the appropriate offices of the State of New York, dated within 30 days prior to the Closing Date, and such evidence, delivered to Buyer and the Title Company, as reasonably required to evidence the due authorization, execution, and delivery by Seller of the Deeds and other Closing Documents to which Seller is a party;

(viii)    a certificate from an officer of Seller to the effect that each of the conditions specified in Sections 9.1(a), (b), (c) and (d) is satisfied in all respects;

(ix)      a certificate from an officer of Seller dated as of the Closing Date (which shall include a certified copy of such Seller's certificate of incorporation, bylaws, relevant resolutions of Seller's Board approving the Sale and such other customary items as Buyer may reasonably request), in form and substance reasonably satisfactory to Buyer;

(x)       the closing and apportionment statement showing all adjustments in respect of the Purchase Price to be made at the Closing in accordance with the terms hereof, duly executed by Seller; and

(xi)      any other document, instrument, agreement or other item required to be delivered by Seller at or prior to the Closing hereunder.

(b)       <u>Buyer Deliveries</u>.   At the Closing, contemporaneously with Seller's delivery to Buyer of all of the Closing Documents required to be delivered by Seller hereunder, Buyer shall deliver or cause to be delivered to Seller the following items:

(i)      in accordance with and subject to adjustment as provided in this Agreement, the Purchase Price in immediately available funds;

(ii)      copies of any reasonably required RE Tax Returns properly executed and acknowledged by Buyer;

(iii)      the closing and apportionment statement showing all adjustments in respect of the Purchase Price to be made at the Closing in accordance with the terms hereof, duly executed by Buyer;

(iv)      a certificate from an officer of Buyer to the effect that each of the conditions specified in Sections 9.2(a), (b), (c) and (d) is satisfied in all respects;

(v)      a secretary's certificate of Buyer dated as of the Closing Date; (which shall include a certified copy of Buyer's certificate of incorporation, Buyer's bylaw, relevant resolutions of Buyer's Board approving the Sale and such other customary items as Seller may reasonably request), in form and substance reasonably satisfactory to Seller; and

(vi)      any other document, instrument, agreement or other item required to be delivered by Buyer at or prior to the Closing hereunder.

3.5      <u>Transfer Taxes</u>.  To the extent applicable, Seller shall pay at the Closing any Transfer Taxes (or any other transfer, conveyance or similar tax is imposed in connection with the sale, assignment, transfer and conveyance of the Real Property) payable by it pursuant to Section 12.13.

3.6      <u>Delivery of Records</u>.  Seller shall make available to Buyer on the Closing Date all records, keys and other information in Seller's possession as of the Closing Date relating to the Acquired Assets under Section 2.1.

3.7      <u>Further Conveyances</u>.  From time to time following the Closing, each Party shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and the other Closing Documents, to ensure that Buyer is relieved of all Excluded Liabilities and to otherwise make effective the Sale.  If Buyer or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Buyer shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to Seller.  If Seller retains or receives any Acquired Assets (or any payments or proceeds related thereto) following the Closing, Seller shall promptly deliver such Acquired Assets (or any payments or proceeds related thereto) to Buyer.

3.8      <u>Bulk Sales Laws</u>.  The Parties hereby waive compliance by Seller with the requirements and provisions of any Applicable Law related to "bulk-transfer" of any jurisdiction

that may otherwise be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

3.9    Allocation of Purchase Price.  The Purchase Price may be allocated among the Acquired Assets by each of Seller and Buyer individually in accordance with its own allocation protocols (and amounts determined therefrom). In no event shall any Party's allocation be deemed to be binding on the other Party or on Seller's estate in the Bankruptcy Case for any purpose.

3.10    Time is of the Essence.  With regard to all dates and time periods set forth or referred to in this Agreement, Time is of the Essence.

## ARTICLE IV
## SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Buyer that the statements contained in this ARTICLE IV are correct and complete as of the Execution Date and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the Execution Date throughout this ARTICLE IV).

4.1    Organization of Seller.  Seller (a) is duly organized, validly existing under the laws of the State of New York, the jurisdiction of its formation, and (b) has full corporate power and authority and all necessary government approvals to own, lease and operate its properties and assets.

4.2    Authorization of Transaction.  Except for such authorization as is required by the Bankruptcy Court, Seller has full not-for-profit corporate power and authority to execute and deliver this Agreement.  Without limiting the generality of the foregoing, the Board of Seller has duly authorized the execution, delivery and performance of this Agreement by Seller.  This Agreement constitutes, and any and all other Closing Documents to be executed by Seller pursuant hereto, when executed, will constitute, the valid and legally binding obligation of Seller, enforceable in accordance with their terms and conditions, except as enforceability against Seller may be restricted, limited or delayed by applicable bankruptcy, moratorium or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

4.3    Qualification.  Seller is duly qualified or licensed to own and manage the Brookhaven Campus, and is in good standing, in the State of New York, which is the only jurisdiction (domestic and foreign) in which the character or the location of the Acquired Assets requires such licensing or qualification.  To the extent necessary, Seller agrees to comply with the requirements of Sections 510 and 511 of the New York Not-for-Profit Corporation Law, made applicable hereto by Sections 1129(a)(16), 363(d) and 541(f) of the Bankruptcy Code.

4.4    Non-Contravention.  Subject to Bankruptcy Court approval, neither the execution and delivery of this Agreement, the consummation of the Sale (including each Closing Document required to be delivered by Seller at Closing), nor the fulfillment of the terms hereof by Seller, will (i) violate any order or award of any court, administrative agency or governmental body applicable to Seller; (ii) result in the imposition of any Lien or Claim upon any Acquired

Asset pursuant to the terms of any such mortgage, bond, indenture, lease, franchise or other instrument or obligation; (iii) constitute a violation by Seller of any Applicable Law; or (iv) conflict with or violate any charter document of Seller.

4.5     <u>Brokers' Fees</u>.    Seller has engaged the [Campus Agents and shall be solely responsible for the commission and expenses due the Campus Agents in accordance with those certain agreements approved by the Bankruptcy Court].    For the avoidance of doubt, Seller has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Sale for which Buyer could become liable or obligated.

4.6     <u>Events Subsequent</u>.    Except as set forth in <u>Schedule 4.6</u>, since November 29, 2016, there have not been any of the following:

(a)     Any amendment or other modification or alteration (including through merger, liquidation, reorganization, or restructuring) of the articles of incorporation (or similar organizational documents) or corporate structure or ownership of Seller;

(b)     Any material damage to or destruction or loss of any Acquired Assets, whether or not covered by insurance, material adversely affecting the Acquired Assets;

(c)     Any sale, transfer, lease to others or other disposition of any Acquired Asset unless in the Ordinary Course of Business or if such item has been rendered obsolete;

(d)     Any change in any Tax election or Tax status of Seller; or

(e)     Any claims made or actions, suits or proceedings or, to the Knowledge of Seller, any investigation by a Governmental Authority commenced or, to the Knowledge of Seller, threatened, against Seller in relation to the Acquired Assets.

4.7     <u>Tax Matters</u>.

(a)     Except as disclosed on <u>Schedule 4.7(a)</u>, Seller has duly and timely paid in accordance with all Applicable Law, all Taxes with respect to the Acquired Assets that are due and payable with respect to any period prior to Closing and has properly accrued on its books and records any Tax with respect to any such period that is not yet due and payable.    Except as disclosed on <u>Schedule 4.7(a)</u>, Seller has duly and timely withheld or collected, paid over and reported all Taxes with respect to the Acquired Assets required to be withheld or collected by it in any period prior to Closing.

(b)     Except as disclosed on <u>Schedule 4.7(b)</u>, to Seller's Knowledge, there are no Liens or Claims for Taxes upon the Acquired Assets other than statutory Liens for Taxes not yet due or payable, and no issue has been raised by written inquiry of any Governmental Entity respecting Taxes, which, by application of the same principles, would reasonably be expected to result in a Lien or Claim on the Acquired Assets in any taxable period (or portion thereof) ending after the Closing Date.

(c)     No extension or waiver of the limitation period applicable to the assessment or collection of any Tax has been granted with respect to Seller; and Seller has not entered into any agreement or arrangement with any Governmental Authority with regard to any Liability for any Tax affecting any Tax period for which the applicable statute of limitations, after giving effect to extensions or waivers, has not expired.

(d)     No Governmental Authority has asserted in writing or, to Seller's Knowledge, orally (i) an adjustment that could result in an additional Tax for which Seller is or may be liable or that could result in a Lien or Claim on the Acquired Assets or (ii) a threat to the tax-exempt status of Seller. There is no proceeding pending relating to any Liability for any Tax or asset of Seller or the tax-exempt status of Seller and, to Seller's Knowledge, no Governmental Authority has threatened any audit, examination, investigation, inquiry, dispute, proceeding or claim.

4.8     <u>Property and Assets</u>.

(a)     <u>Schedule 4.8(a)</u> contains a description of the Real Property.  Seller has not received any written notice of any pending expropriation, eminent domain or similar proceeding affecting all or any material portion of any such Real Property or, to Seller's Knowledge, that any such activities are currently being threatened.  There are no written or oral licenses, concessions, occupancy agreements or other Contracts granting to any other Person the right of use or occupancy of the Real Property or any portion thereof; and there is no Person in possession of the Real Property or any portion thereof other than Seller.  The Real Property identified on <u>Schedule 4.8(a)</u> represents all of the real property owned, leased, subleased, licensed or otherwise occupied by Seller that comprises the Brookhaven Campus and which is the subject of the Sale.

(b)     Seller has title to, or, in the case of personal property held under a lease or other Contract (subject to the terms of the lease or other Contract), an enforceable leasehold interest in, or right to use, the Acquired Assets, free and clear of all Liens and Claims other than Liens securing the Permitted Exceptions.  The foregoing notwithstanding, with respect to the Real Property, Seller shall convey and Buyer shall accept such title as any reputable title company that is a member of the New York Board of Title Underwriters will be willing to approve and insure at standard rates in accordance with its standard form of title policy, clear of all Liens, except for Permitted Exceptions.  Except as otherwise provided, the Real Property shall be conveyed together with (a) all right, title and interest of Seller in and to all easements, rights of way, air or development rights, reservations, privileges, appurtenances, and other estates and rights of Seller, if any, pertaining to its interest in the Real Property, and (b) all right, title and interest of Seller, if any, in and to all alleys adjoining its interest in the Real Property and in and to the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining its interest in the Real Property to the center line thereof, and (c) subject to apportionment if required hereunder, all right, title and interest of Seller, if any, in and to any award made for any taking by condemnation or any damages to its interest in the Real Property by reason of a change of grade of any street, road or avenue.

(c)     None of the Acquired Assets owned or leased by Seller is subject to any agreement granting to any other Person by Seller any right to the use, occupancy or enjoyment of such property or any portion thereof.

(d)     To Seller's Knowledge, <u>Schedule 4.8(d)</u> lists all violations of law or municipal ordinances, orders or requirements noted in or issued by the departments of buildings, fire, labor, health or other federal, state, county, city or other departments and governmental authorities having jurisdiction against or affecting the Real Property. Except for such violations, Seller shall deliver the Real Property free and clear of all such violations at Closing.

4.9     <u>Contracts</u>.

(a)     <u>Schedule 4.9(a)</u> sets forth a complete and correct list of all Material Contracts.

(b)     Except as set forth on <u>Schedule 4.9(b)</u> or (i) as otherwise provided in the Bankruptcy Code and (ii) for events of default arising as a result of Seller's filing of a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, all of the Material Contracts are in full force and effect, are valid and binding and are enforceable in accordance with their terms in favor of Seller.

4.10     <u>Seller's Consents and Approvals</u>.     <u>Schedule 4.910</u> lists all authorizations, approvals, waivers, filings or consents required to be obtained, and notices to be made (including any such authorizations, approvals, waivers, filings or consents required to be obtained from, and notices to be made to any Governmental Authority), by Seller to consummate the Sale (including this Agreement and each other Closing Document required to be delivered by Seller at Closing) (collectively, "<u>Seller's Consents and Approvals</u>"), other than entry of the Sale Order.

4.11     <u>Powers of Attorney</u>. Except for accounts in connection with the Internal Revenue Service, there are no outstanding powers of attorney executed on behalf of Seller.

4.12     <u>Litigation</u>.

(a)     Except as set forth on <u>Schedule 4.12</u>, (i) there is no action, suit, investigation or proceeding pending or, to Seller's Knowledge, threatened (x) against Seller with respect to the Acquired Assets before any arbitrator or Governmental Authority, whether any of the same are covered by insurance or whether any applicable carrier has denied coverage or reserved rights with respect to or assumed the defense thereof and (y) that would reasonably be expected to prevent, hinder, delay or otherwise challenge the consummation of the Sale or that questions the validity, legality or propriety of the Sale or that could reasonably be expected to have a Material Adverse Effect; and (ii) Seller is not subject to any judgment, order or decree of any Governmental Authority with respect to the Acquired Assets involving an amount in excess of $50,000.00

(b)     Seller has delivered to Buyer correct and complete copies of all correspondence, pleadings, and other relevant documents in connection with the actions, suits, investigations or proceedings set forth on <u>Schedule 4.12</u>.

4.13    <u>Employees</u>.  Seller shall be solely responsible for any notices to Employees that may be required under any CBA as a consequence of the Sale, and shall defend, indemnify and hold harmless Buyer against any liability resulting from failure to provide such notices as may be required.

4.14    <u>Foreign Operations</u>.  Seller has no operations outside the United States.

4.15    <u>Insurance Coverage</u>.  <u>Schedule 4.15</u> lists, and Seller has furnished to Buyer, true and complete copies of, all insurance policies (including any insurance renewal binders) and fidelity or surety bonds currently in force relating to the Acquired Assets.  The policy limits and deductibles of such policies are not subject to claims by any other entities.  Except as set forth on <u>Schedule 4.15</u>, all premiums currently due and payable under all such policies and bonds have been paid in full.  <u>Schedule 4.15</u> lists all of Seller's current commercial general liability coverages.

4.16    <u>Environmental Matters</u>.

(a)     To Seller's Knowledge and except as set forth on <u>Schedule 4.16(a)</u>:

(i)     Seller's ownership or leasing of the Real Property are, and at all times have been, in compliance in all material respects with all applicable Environmental Laws;

(ii)     Seller has not received any written notice from a Governmental Authority or other Person regarding any Environmental Claim related to or arising out of Seller's ownership or leasing of the Real Property that currently remains pending or unresolved and, to Seller's Knowledge, there are no events or conditions with respect to the ownership or leasing of the Real Property or otherwise existing or occurring at the Real Property that could reasonably be expected to result in an Environmental Claim;

(iii)     Seller is in compliance in all material respects with such Environmental Permits and there is not now pending nor, to Seller's Knowledge, threatened, any action by or before any Governmental Authority to revoke, cancel, rescind, suspend, restrict, modify or refuse to renew any Environmental Permit, and all of the Environmental Permits are and shall be effective and in good standing now and as of the Closing Date;

(iv)     There has been no Release or threatened Release of Hazardous Materials at, on, under, to or from the Real Property required to be reported or subject to required Remediation, and Seller has not received any written notice from any Governmental Authority or other Person alleging that Seller has liability under any applicable Environmental Law with respect to the Release of

Hazardous Materials at any real property off-site of the Real Property, including, where Hazardous Materials from the Real Property have been taken for disposal;

(v)    Seller has delivered to Buyer copies of all assessment reports, audits, studies, and correspondence in Seller's possession or control relating to the environmental conditions of the Real Property

(vi)    all Property, Environmental Claims, Environmental Permits, Hazardous Materials, Releases, Remediation or Seller's compliance with or violation of Environmental Laws related to the Real Property.

(b)    A list of all Environmental Permits pertaining to the Real Property and the Acquired Assets as they are currently being operated by Seller is set forth on Schedule 4.16(b).

(c)    None of the matters set forth on Schedule 4.16(a) could reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect.

4.17    No Other Representations or Warranties; Schedules.    Except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules), neither Seller nor any other Person makes any other representation or warranty whether express or implied, written or oral, with respect to Seller, the Business, the Acquired Assets, or the Sale, and Seller disclaims any other representations or warranties, whether made by Seller or any of its respective officers, directors, members, employees, agents, consultants or other Representatives. Except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules), Seller (a) expressly disclaims any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer or its Representatives by any director, officer, member, employee, agent, consultant or other Representative of Seller). Seller makes no implied representation or warranty as to the condition, merchantability, usage, suitability or fitness for any particular purpose with respect to the Acquired Assets except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules).

## ARTICLE V
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Seller that the statements contained in this ARTICLE V are correct and complete as of the Execution Date and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the Execution Date throughout this ARTICLE V).

5.1    Organization of Buyer.  Buyer (a) is duly organized, validly existing and in good standing under the laws of the State of [New York], the jurisdiction of its formation, (b) has full

corporate power and authority and all necessary government approvals to own, lease and operate its properties and assets and to conduct its business as presently conducted, and (c) has identified all principals of Buyer entity on Schedule 5.1(c).

5.2    Authorization of Transaction.  Buyer has full power and authority to execute and deliver this Agreement and, subject to such authorizations as required by the Bankruptcy Court, to perform its obligations hereunder.  The execution, delivery and performance of this Agreement and all other agreements contemplated hereby have been duly authorized by all requisite corporate action of Buyer.  This Agreement constitutes, and any and all other Closing Documents to be executed by Buyer pursuant hereto when executed will constitute, the valid and legally binding obligation of Buyer, enforceable in accordance with their terms and conditions, except as enforceability against Buyer may be restricted, limited or delayed by applicable bankruptcy, moratorium or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

5.3    Non-Contravention.

(a)    Subject to Bankruptcy Court approval, neither the execution and delivery of this Agreement, the consummation of the Sale (including each Closing Document required to be delivered by Buyer at Closing), nor the fulfillment of the terms hereof by Buyer, will (i) violate any Applicable Law to which Buyer is subject or any provision of its charter, bylaws, or other governing documents or (ii) conflict with, violate or result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets are subject.

(b)    Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Authority in order for the Parties to consummate the Sale (including each Closing Document required to be delivered by Buyer at Closing), except for such notices, consents and approvals as have already been given or obtained, those required under or in relation to those required by the Bankruptcy Court.

5.4    Brokers' Fees.  Buyer has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Sale.

5.5    Buyer's Consents and Approvals.  Schedule 5.5 lists all authorizations, approvals, waivers, filings or consents required to be obtained, and notices to be made (including any such authorizations, approvals, waivers, filings or consents required to be obtained from, and notices to be made to any Governmental Authority), by Buyer to consummate the Sale (including each Closing Document required to be delivered by Buyer at Closing) (collectively, "Buyer's Consents and Approvals"), other than entry of the Sale Order.

5.6    Acknowledgement Regarding Condition of the Acquired Assets. Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges that (a) Buyer has had the opportunity to conduct due diligence prior to execution of this Agreement,

(b) Buyer is relying solely upon Buyer's own independent review and investigation and not upon any written or oral representation of Seller, (c) Seller is not making any representations or warranties whatsoever, whether express or implied or written or oral, beyond those expressly given by it to Buyer in ARTICLE IV (as modified by the Schedules), and (d) Buyer agrees that, except for the representations and warranties contained therein, the Acquired Assets are being transferred to Buyer on a "WHERE IS" and, as to condition, "AS IS" basis.

      5.7   <u>Financial Capability</u>.  Buyer (i) has or on the Closing Date shall have the resources and capabilities (financial or otherwise), including immediately available funds, to consummate the Closing on the Closing Date and otherwise perform its obligations hereunder, (ii) has not incurred, and shall not incur, any obligation, commitment, restriction or liability of any kind that would impair or adversely affect such resources, capabilities or funds and (iii) shall from time to time between the Execution Date and the Closing Date, upon request of Seller, provide copies of bank statements or other proof of funds evidencing Buyer's financial capability to consummate the Sale on the Closing Date.

      5.8   <u>No Other Representations or Warranties; Schedules</u>.  Except for the representations and warranties contained in this ARTICLE V (as modified by the Schedules), neither Buyer nor any other Person makes any other representation or warranty, whether express or implied, written or oral, with respect to Buyer or the Sale, and Buyer disclaims any other representations or warranties, whether made by Buyer, any Affiliate of Buyer or any of their respective officers, directors, members, managers, employees, agents, consultants or other Representatives.  Except for the representations and warranties contained in this ARTICLE V (as modified by the Schedules), Buyer disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Seller or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to them by any director, officer, member, manager, employee, agent, consultant, or other Representative of Buyer or any of its Affiliates).

ARTICLE VI<br>BANKRUPTCY COURT MATTERS

      6.1   <u>[Termination Fee and Expense Reimbursement]</u>.

      (a)   [In consideration for Buyer having expended considerable time and expense in connection with this Agreement and negotiation thereof and the identification and quantification of assets of Seller, Seller believes that Buyer is entitled to certain bid protections to be approved by the Bankruptcy Court.  Seller agrees to promptly seek approval of the bid protections set forth in this Agreement following due execution of the same by Buyer.  Subject to approval by the Bankruptcy Court, if Seller enters into an Alternate Transaction, and Buyer was not then in material breach of this Agreement, then Seller shall, or shall cause the purchaser in an Alternate Transaction, as applicable, to pay to Buyer the Termination Fee, together with the Expense Reimbursement, upon consummation of the Alternate Transaction from the proceeds of such Alternate Transaction paid at the closing thereof.]

(b)     [If this Agreement is terminated pursuant to Section 10.1(b)(i) (provided that the failure to close was due in whole or in part to any action or inaction by Seller); Section 10.1(b)(iii); Section 10.1(b)(iv); or Section 10.1(b)(v) (provided that the Title Defects at issue were willfully placed of record or consented to be placed of record by Seller after the date hereof), then Seller shall pay to Buyer the Expense Reimbursement within five (5) Business Days after such termination.]

6.2     Competing Transaction.

(a)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each, a "Competing Bid").

(b)     Notwithstanding the execution of this Agreement, Seller is permitted to cause its Representatives to further market and initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Representatives) in connection with any sale or other disposition of all or any other asset of Seller.  In addition, Seller shall have the responsibility and obligation to respond to any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the assets of Seller to prospective purchasers.  Prior to Seller furnishing any non-public information to any Person in connection with an offer regarding the sale or other disposition of all or any part of the Acquired Assets, Seller must enter into a customary confidentiality agreement with such Person on terms no less favorable to Seller than those contained in Section 7.8.

(c)     If a Competing Bid is selected in conjunction with the Auction but such bidder does not consummate the purchase of the Acquired Assets and Buyer is the second highest bidder (the "Backup Bidder"), Buyer shall be subject to the rights and responsibilities of the Backup Bidder as set forth in the Bidding Procedures.

6.3     [Treatment of Monetary Obligations.  The Termination Fee and Expenses Reimbursement payable to Buyer under this Agreement shall be entitled to administrative expense priority in Seller's Bankruptcy Case pursuant to Sections 503(b) and 507(a) of the Bankruptcy Code.]

ARTICLE VII
PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the Execution Date and the Closing:

7.1     General.  Each of the Parties will use its commercially reasonable efforts to take all actions and to do all things reasonably necessary in order to consummate and make effective the Sale (including satisfaction, but not waiver, of the Closing conditions set forth in ARTICLE IX).

7.2     Operation of Business.  Seller will manage the Acquired Assets in the Ordinary Course of Business in accordance with any post-petition financing or other orders approved by

the Bankruptcy Court.  Without limiting the generality of the foregoing, Seller will not, without Buyer's prior written consent (which shall not be unreasonably withheld or delayed):

        (a)     fail to give prompt notice to Buyer of the commencement of or any Material Development of which Seller becomes aware;

        (b)     fail to give prompt notice to Buyer of any Material Adverse Change;

        (c)     sell, transfer, or convey any Acquired Asset (other than obsolete or worn out immaterial equipment disposed of in the Ordinary Course of Business);

        (d)     adopt or propose any change to its governing documents;

        (e)     merge or consolidate with any entity or acquire any assets from any entity (other than purchases of supplies in the Ordinary Course of Business);

        (f)     except as permitted by the terms of any Material Contract pertaining to any Debt, incur any indebtedness for borrowed money or guarantee any such indebtedness or issue or sell any debt securities or guarantee any debt securities of others other than as disclosed to Buyer and excluding any accounts payable arising in the Ordinary Course of Business of Seller;

        (g)     enter into any operating lease;

        (h)     terminate, fail to renew or materially reduce the amount of any insurance coverage provided by the existing insurance policies of Seller in relation to the Acquired Assets; or

        (i)     remove from Seller's premises or modify (other than in the Ordinary Course of Business) any books or records of Seller that are Acquired Assets.

     7.3    <u>Access</u>.  Seller will permit Representatives of Buyer to have access at all reasonable times during normal business hours, and in a manner so as not to interfere with the normal business operations of Seller, to the premises, properties, personnel, books, records (including Tax records, provided that those portions of any records or discussions pertaining to the entry into or consummation of the Sale may be withheld and/or redacted), contracts, and documents of or pertaining to Seller.  Seller will used best efforts to deliver to Buyer true and complete copies of each Material Contract, in each case, as amended or otherwise modified and in effect as of the Execution Date.

     7.4    <u>Notice of Developments</u>.

        (a)     Seller shall promptly notify Buyer of:

            (i)     any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Sale;

(ii)    any notice or other communication from any Governmental Authority in connection with the Sale; or

(iii)    its obtaining Knowledge of (A) a breach or violation of any representation or warranty made by it contained in this Agreement that is qualified as to materiality becoming untrue or inaccurate in any respect or any such representation of warranty that is not so qualified becoming untrue or inaccurate in any material respect and (B) the failure of it to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it under this Agreement or any other Closing Document.

(b)    No notification under this Section 7.4 shall affect the representations, warranties or obligations of the Parties or the conditions to the obligations of the Parties hereunder, or limit or otherwise affect the remedies available hereunder to the Party receiving such notice.

7.5    <u>Employment Matters</u>.  Buyer shall not be permitted to contact the Employees.

7.6    <u>Removal of Excluded Assets from Real Property</u>.  Prior to the Closing or as soon thereafter as is reasonably practical, Seller will remove from the Real Property all Excluded Assets[, except that Necessary Records will be removed in accordance with Section 7.7.]

7.7    <u>Removal of Necessary Records</u>.  [Seller will use its best efforts, and will hire a records removal/storage company, to remove all required Necessary Records from the Real Property prior to the Closing Date.  Seller shall ensure that all Necessary Records are removed from the Real Property by no later than [January 30, 2018].  If the Necessary Records are not removed by the Closing Date, then Seller shall ensure that the records removal/storage company has appropriate insurance coverage in place, naming Buyer and its designee as additional insureds, through the date on which the Necessary Records have been removed from the Real Property.]

7.8    <u>Non-Disclosure</u>.

(a)    From and after the date hereof, Buyer shall, and shall direct its Representatives, to maintain in confidence, not disclose to any third party (other than their Representatives) without the prior written consent of Seller, and not use to the detriment of Seller, any Seller Confidential Information relating to or obtained from Seller or its Representatives.  For purposes of this Section 7.8(a), "<u>Seller Confidential Information</u>" means any information that is confidential or proprietary in nature that is related to the Acquired Assets, the Business, the Excluded Assets, or the Excluded Liabilities, including methods of operation, student information, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; *provided, however*, that Seller Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Buyer or any of its Representatives, (ii)

becomes available to Buyer on a non-confidential basis from a source other than Seller or its Representatives, provided that such source is not known by Buyer to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Buyer from a third party having the right to disseminate the Seller Confidential Information without restriction on disclosure, or (iv) can be shown by Buyer through written documents or evidence maintained by Buyer to have been independently developed by it without the use of Seller Confidential Information; and *provided further*, that upon the Closing, the restrictions contained in this Section 7.8(a) shall not apply to confidential or proprietary information related primarily to the Acquired Assets, or the Business.   Buyer may disclose any of the Seller Confidential Information to its Representatives who need to know it for the purpose of effectuating the Transactions and who are directed to keep it confidential.   Buyer shall instruct its Representatives having access to Seller Confidential Information of such obligation of confidentiality.   If Buyer or anyone to whom it has transmitted Confidential Information subject to the confidentiality obligations herein is required by Applicable Law to disclose any of such Confidential Information, Buyer shall, to the extent permissible by Applicable Law, provide Seller with prompt notice prior to making any disclosure so that Seller may seek a protective order or other appropriate remedy.   If such protective order or other remedy is not obtained, or Seller waives compliance with the provisions of this Section 7.8(a), Buyer and its Representatives shall furnish only that portion of the Seller Confidential Information that it is advised by counsel is required by Applicable Law to be disclosed.

(b)     It is understood by the Parties that the information, documents and instruments delivered to Seller by Buyer or its Representatives in connection with the negotiation of this Agreement (the "Buyer Confidential Information") are of a confidential and proprietary nature.   Seller agrees that both prior and subsequent to Closing it will maintain the confidentiality of all Buyer Confidential Information and only disclose such information, documents and instruments (x) to duly authorized Representatives, (y) as necessary to comply with Applicable Law, or (z) to assist or defend claims as provided herein.   Buyer Confidential Information does not include any information that (i) becomes generally available to the public other than as a result of a disclosure by Seller, or any of its Representatives, (ii) becomes available to Seller on a non-confidential basis from a source other than Buyer or its Representatives, provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Buyer, (iii) is lawfully received by Seller from a third party having the right to disseminate the Buyer Confidential Information without restriction on disclosure, or (iv) can be shown by Seller through written documents or evidence maintained by them to have been independently developed by it without the use of Buyer Confidential Information.   Seller further agrees that upon Buyer's written request, it will destroy or, at Seller's option return to Buyer, all such documents and instruments and all copies thereof in its possession.   If Seller or anyone to whom it has transmitted Buyer Confidential Information is required by Applicable Law to disclose any of such Buyer Confidential Information, Seller shall, to the extent permissible by Applicable Law, provide Buyer with prompt notice prior to making any disclosure so that Buyer may seek a protective order or other appropriate remedy.   If such protective order or other remedy is not obtained, or Buyer waives compliance with the provisions of this Section 7.8(b), Seller and its Representatives shall furnish only that portion of the Buyer

Confidential Information that it is advised by counsel is required by Applicable Law to be disclosed.

(c)       The obligations contained in this Section 7.8 shall survive the Closing.

ARTICLE VIII
EMPLOYEES

8.1       <u>Buyer Not Assuming Seller's CBAs or Benefit Plans</u>.  Buyer is not assuming any of Seller's CBAs or Employee Benefit Plans.

8.2       <u>No Obligation to Offer Employment</u>.  Buyer shall have no right or obligation to offer employment to any of the Employees.

8.3       <u>No Successor Liability</u>.  Buyer shall have no liability, as successor or otherwise, for any breach by Seller of any of its CBAs, nor for any arrears by Seller in payments to Employees for wages or otherwise, nor for contributions due to any Employee Benefit Plan or Multiemployer Plan pursuant to any such CBA or any trust agreement, nor for any liability or claim arising out of or relating to the termination of Seller's obligations under any CBA or any trust agreement, including termination of Seller's obligations to contribute to any Multiemployer Plan.  Seller shall remain liable for all of its pre-Petition Date and post-Petition Date arrears to any such Employee Benefit Plans and Multiemployer Plans and for any Withdrawal Liability associated with their ceasing to contribute to any Multiemployer Plan.

ARTICLE IX
CONDITIONS TO OBLIGATION TO CLOSE

9.1       <u>Conditions to Buyer's Obligation</u>.  Buyer's obligation to consummate the Sale is subject to satisfaction of the following conditions; *provided, however*, that notwithstanding anything set forth in this Agreement to the contrary, the conditions set forth in Sections 9.1(h), (g), (i), (j) and (k) may be satisfied on the Closing Date:

(a)       The representations and warranties set forth in ARTICLE IV shall be true and correct in all material respects when made and at and as of the Closing Date, except to the extent that such representations and warranties are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects when made and at and as of the Closing Date.

(b)       Seller shall have performed and complied with all of its covenants and agreements hereunder in all material respects through the Closing, except to the extent that such covenants or agreements are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case Seller shall have performed and complied with all of such covenants and agreements (as so written, including the term "material" or "Material") in all respects through the Closing;

27

(c)    No breach or default on the part of Seller shall have occurred under any covenant or agreement hereunder or any Closing Document or any other agreement of the Parties;

(d)    No order shall have been entered in any action or proceeding before any Governmental Authority, and no preliminary or permanent injunction by any court or Governmental Authority shall have been issued that would have the effect of (i) making the Sale contemplated illegal or in violation of any Applicable Law, or (ii) otherwise preventing consummation of the Sale;

(e)    No Applicable Law shall have been enacted or promulgated by any Governmental Authority that directly prohibits the consummation of the Closing under this Agreement and the Sale;

(f)    Seller shall have received all Seller's Consents and Approvals, if any;

(g)    The Sale Order shall have been entered and shall not have been vacated or stayed;

(h)    All actions to be taken by Seller in connection with consummation of the Sale and all certificates, opinions, instruments, and other documents required to effect the Sale shall be reasonably satisfactory in form and substance to Buyer;

(i)    Buyer shall have received all of the Closing Documents described in Section 3.4(a);

(j)    the Title Company shall have irrevocably committed to issue a title policy to Buyer with respect to the Real Property at standard rates in accordance with its standard form of title policy, clear of all Liens, subject to the Permitted Exceptions; and

(k)    [Seller shall have entered into a written agreement (in a form reasonably acceptable to Buyer) with a records boxing/storage company to remove all Necessary Records from the Real Property.]

Buyer may waive in its sole and absolute discretion any condition specified in this Section 9.1 if it executes a writing so stating at or prior to the Closing.

9.2    <u>Conditions to Seller's Obligations</u>.  Seller's obligations to consummate the Sale are subject to satisfaction of the following conditions; *provided, however*, that notwithstanding anything set forth in this Agreement to the contrary, the conditions set forth in Section 9.2(e) and (g) may be satisfied on the Closing Date:

(a)    The representations and warranties set forth in ARTICLE V shall be true and correct in all material respects when made and at and as of the Closing Date, except to the extent that such representations and warranties are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which  case  such  representations  and  warranties  (as  so  written,  including  the  term

"material" or "Material") shall be true and correct in all respects when made and at and as of the Closing Date;

(b)     Buyer shall have performed and complied with all of its covenants and agreements hereunder in all material respects through the Closing, except to the extent that such covenants or agreements are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case Buyer shall have performed and complied with all of such covenants and agreements (as so written, including the term "material" or "Material") in all respects through the Closing;

(c)     No order shall have been entered in any action or proceeding before any Governmental Authority, and no preliminary or permanent injunction by any court or Governmental Authority shall have been issued that would have the effect of (i) making the Sale illegal or in violation of any Applicable Law, or (ii) otherwise preventing consummation of the Sale;

(d)     No Applicable Law shall have been enacted or promulgated by any Governmental Authority that directly prohibits the consummation of the Closing under this Agreement and the Sale;

(e)     Seller and Buyer shall have received all authorizations, consents, and approvals of, and no notices of objections from, those Governmental Authorities referred to in Section 4.10 and Section 5.5, as applicable;

(f)     The Sale Order shall have been entered and shall not have been vacated or stayed; and

(g)     Seller shall have received all of the Closing Documents described in Section 3.4(b).

Seller may waive any condition specified in this Section 9.2 if it executes a writing so stating at or prior to the Closing.

ARTICLE X
TERMINATION

10.1    <u>Termination of Agreement</u>.    In respect of the Sale, this Agreement may be terminated prior to the Closing as follows:

(a)     <u>Termination Due to Events in Bankruptcy Case</u>.  Buyer may terminate this Agreement immediately upon delivery of a Termination Notice to Seller if: (i) the Bankruptcy Case is dismissed or converted to a Chapter 7 bankruptcy case under the Bankruptcy Code, or an interim or permanent trustee is appointed in the Bankruptcy Case, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed in the Bankruptcy Case; (ii) relief from the automatic stay to permit foreclosure is granted or there is an exercise of other remedies on the Acquired Assets; or

(iii) Seller consents to any modification of this Agreement without the prior written agreement of Buyer.

(b)    <u>Termination by Buyer</u>.  Buyer may terminate this Agreement immediately upon delivery of a Termination Notice to Seller upon the occurrence of any of the following, unless Buyer is in material breach of this agreement prior to the occurrence of the following, except for those obligations specified in this Agreement to survive termination:

(i)    Buyer is ready, willing, and able to perform and has properly served Seller with a written demand indicating that Time is of the Essence to close the Sale by the Closing Date and Seller has not performed;

(ii)    if any of the conditions to the obligations of Buyer that are set forth in Section 9.1 shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer;

(iii)    if there shall be a material breach by Seller of any material representation or warranty, or any material covenant or agreement contained in this Agreement, which breach cannot be cured or has not been cured within fifteen (15) Business Days after the giving of written notice by Buyer to Seller of such breach; or

(iv)    as provided in Section 11.1.

(c)    <u>Termination by Seller</u>.  Seller may terminate this Agreement immediately upon delivery of a Termination Notice to Buyer upon the occurrence of any of the following, unless Seller is in material breach of this Agreement prior to the occurrence of the following, except for those obligations specified in this Agreement to survive termination:

(i)    Seller is ready, willing, and able to perform and has properly served Buyer with a written demand indicating that Time is of the Essence to close the Sale by the Closing Date and Buyer has failed to perform;

(ii)    if any of the conditions to the obligations of Seller to close that are set forth in Section 9.2 shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller; or

(iii)    if there shall be a material breach by Buyer of any material representation or warranty, or by Buyer of any material covenant or agreement contained in this Agreement, which breach cannot be cured or has not been cured within fifteen (15) Business Days after the giving of written notice by Seller to Buyer of such breach. Time is of the Essence with respect to such period to cure such material breach.

        (d)    <u>Termination by Buyer or Seller</u>.  Subject to Bankruptcy Court approval, the Parties may terminate this Agreement by mutual written consent of Seller and Buyer.

        (e)    <u>Extension of Time Periods</u>.  The time periods for termination of this Agreement set forth in this Section 10.1 may be extended upon the written agreement of the Parties without the further approval of the Bankruptcy Court.

    10.2    <u>Procedure For Termination</u>.  If this Agreement is terminated by Buyer or Seller or both pursuant to Section 10.1, as of the date of delivery of the Termination Notice, unless disputed in writing by the non-terminating party within two (2) Business Days of delivery, the Sale shall be abandoned, and this Agreement shall terminate to the extent and with the effect provided by Section 10.3, without further action by the Parties or the Bankruptcy Court. The Bankruptcy Court shall have exclusive jurisdiction over any dispute with respect to termination of this Agreement.

    10.3    <u>Effect of Termination</u>.  If either Seller or Buyer terminates this Agreement pursuant to Sections 10.1 and 10.2, all rights and obligations of the Parties hereunder shall terminate without any liability of any Party to any other Party (except for any Liability of any Party then in breach of this Agreement); *provided* that if such termination is the result of a breach or default hereunder by the non-terminating Party, then the terminating Party shall be entitled to seek any and all rights and remedies available to it at law or in equity, including, but not limited to, Seller's right to retain the Deposit and Buyer's right to the return of the Deposit, without further notice to or action by the Parties or the Bankruptcy Court.

ARTICLE XI
TITLE INSURANCE; PERMITTED EXCEPTIONS; APPORTIONMENTS

    11.1    <u>Title Insurance</u>.  Seller has delivered to Buyer (i) from Advantage Title, 201 Old Country Road, Suite 200, Melville, NY 11747 (the "<u>Title Company</u>") a current title report #17-CS-52600 with respect to the Real Property, and Buyer shall request the Title Company to perform continuation searches of title prior to the Closing (collectively, the "<u>Title Report</u>"), and (ii) a current ALTA survey of the Real Property (the "<u>Survey</u>").  Buyer has notified Seller, in writing (a "<u>Buyer's Objection Notice</u>"), of any exception, lien, mortgage, security interest, claim, charge, reservation, lease, tenancy, occupancy, easement, right of way, encroachment, restrictive covenant, condition, limitation, open permit or other encumbrance affecting the Real Property (collectively, "<u>Exceptions</u>") disclosed by same that is not a Permitted Exception and to which Buyer objects.  Notwithstanding anything herein to the contrary, Buyer shall be deemed to have objected to and is not obligated to deliver a Buyer Objection Notice with respect to the following in order for same to constitute a Title Defect (defined below): (x) any and all monetary liens, including all mortgages and security interests securing any obligations of Seller (or any predecessor-in-interest to Seller), all judgments against Seller (or any predecessor-in-interest to Seller), all mechanics' liens recorded against the Real Property (or any portion thereof), all monetary liens or penalties arising out of violations on the Real Property and all real property taxes (other than real property taxes that constitute Permitted Exceptions), and (y) any and all tenancies.  Except as otherwise provided herein, Seller may elect (but shall not be obligated) to attempt to cure or remove any such title objections (collectively and individually, a "<u>Title Defect</u>") set forth in the Title Report, the Survey, a Buyer's Objection Notice or otherwise.  The

Parties acknowledge that Seller may rely on the Sale Order to discharge certain Title Defects and hereby agree that the Title Company's issuance of a title insurance policy, in reliance on the Sale Order, without taking exception for those Title Defects shall be sufficient to constitute Seller's cure and removal of such Title Defects.  If Seller is obligated or elects to attempt to cure or remove any Title Defect and are unable to do so on or before the Closing Date, then Seller shall be entitled to adjourn the Closing in order to cure or remove such Title Defect for a period of not more than 30 days in the aggregate.  If Seller elects not to cure or remove, or after electing to cannot cure or remove, any Title Defect that Seller is not otherwise obligated to cure or remove pursuant to the terms of this Agreement or shall, for any reason, be unable to cure or remove any Title Defect that Seller is not otherwise obligated to cure or remove pursuant to the terms of this Agreement within the time periods set forth in the preceding sentence, then Seller shall notify Buyer in writing and Buyer shall have the right to either (i) terminate this Agreement or (ii) accept such title as Seller shall be able to convey without abatement in the Purchase Price and without any liability on the part of Seller.

11.2    <u>Permitted Exceptions</u>.  "<u>Permitted Exceptions</u>" means:

(a)    all matters set forth on <u>Schedule 11.2(a)</u> attached hereto and made a part hereof;

(b)    building, zoning, subdivision and other governmental laws, codes and regulations, and landmark, historic and wetlands designations;

(c)    any state of facts that a current, accurate survey or visual inspection of the Real Property would disclose, provided same do not render title uninsurable at standard rates;

(d)    all rights and easements for electricity, gas, telephone, water, cable television and any other utilities to maintain and operate lines, cables, poles and distribution boxes in, over and upon the Real Property;

(e)    any variations between the tax diagram or the tax map and the record description, provided same does not render title uninsurable at standard rates;

(f)    rights of the public and adjoining owners in highways, streets, roads and lanes crossing the Real Property existing as of the date hereof, provided that the Title Company shall insure (at no additional cost to Buyer) that no third parties have any claims for adverse possession or easements by prescription by virtue of the use of such highways, streets, roads and lanes crossing the Real Property;

(g)    real property taxes, water rates and charges, sewer taxes and rents, and similar items with respect to the Real Property, not yet due and payable and subject to apportionment as provided herein; and

(h)    assessments or installments thereof arising after the date of Closing, whether or not a lien as of Closing, which are due and payable on or after Closing.

11.3    Apportionments.

(a)    Items Subject to Apportionment.  Subject to the terms of this Section 11.3, the following items, without duplication, are to be apportioned between Seller and Buyer with respect to the Real Property 12:00:01 a.m. on the calendar day immediately following the Closing Date, and at the Closing the net amount thereof shall, as applicable, either be (x) paid by Buyer to Seller by wire transfer of immediately available federal funds to a bank account designated by Seller or (y) credited by Seller against the Purchase Price:

(i)    real property taxes and assessments;

(ii)    water rates and charges;

(iii)    sewer taxes and rents;

(iv)    electricity, steam, gas and all other utilities, including, without limitation, taxes thereon;

(v)    deposits on account with any utility company servicing the Property, to the extent transferred to Buyer;

(vi)    deposits on account with any municipality having jurisdiction over the Property, to the extent transferred to Buyer; and

(vii)    all other items that reasonably require apportionment in accordance with local custom and practice to effectuate the transactions contemplated hereby.

Seller and Buyer shall adjust any apportionments made under this Section 11.3 after the Closing to account for errors or incorrect estimates made as of the Closing Date (it being agreed that the Parties' aforesaid agreement to make such adjustments shall survive the Closing for a period of three (3) months).

(b)    Governmental Charges.  Apportionment of real property taxes, water rates and charges, sewer taxes and rents and other similar items shall be made on the basis of the fiscal year for which assessed.  If the Closing Date occurs before the real property taxes, water rates and charges, sewer taxes and rents or similar items with respect to the Property are finally fixed for the fiscal year in which the Closing occurs, then the apportionments thereof made at the Closing shall be made on the basis of the real property taxes, water rates and charges, sewer taxes and rents or other similar items, as the case may be, for the preceding fiscal year applied to the latest assessed valuation. After the real property taxes, water rates and charges, sewer taxes and rents or similar items, as the case may be, are finally fixed for the fiscal year in which the Closing occurs, Seller and Buyer shall make a recalculation of the apportionment thereof based on the amounts finally fixed for the fiscal year in which the Closing occurs, and Seller or Buyer, as the case may be, shall make an appropriate payment to the other Party based on such recalculation.  Seller or its representatives shall have the right (x) at any time before the Closing, to institute tax reduction or other proceedings to reduce the assessed valuation of

33

the Real Property with respect to any tax period ending at or prior to the end of the tax year in which the Closing occurs and (y) to continue, after the Closing, any such proceedings commenced by Seller prior to the Closing; p*rovided, however*, that (A) Seller (or its representatives) shall notify Buyer of, and keep Buyer reasonably informed with respect to, any such proceedings and no such proceeding shall be finally settled by Seller without the prior consent of Buyer, which consent shall not be unreasonably withheld, and (B) upon notice to Seller, Buyer shall have the right to assume control of and prosecute any such proceeding relating to the tax year in which the Closing occurs, provided that no such proceeding shall be finally settled by Buyer without the prior consent of Seller, which consent shall not be unreasonably withheld.  If Buyer, at any time following the Closing shall institute tax reduction or other proceedings to reduce the assessed valuation of the Real Property with respect to the tax period ending at the end of the tax year in which the Closing occurs, such proceeding shall not be finally settled by Buyer without the prior consent of Seller, which consent shall not be unreasonably withheld.  If any refund of any real property tax, water rates and charges, sewer taxes and rents or similar items is issued after the Closing Date for any period ending prior to or including the Closing Date, such refund shall be applied as follows:  <u>first</u>, to the cost incurred in obtaining such refund; and, <u>second</u>, the balance of such refund, if any, shall be apportioned between Seller, for the period prior to the Closing Date, and Buyer, for the period from and after the Closing Date.

(c)  <u>Water Meters</u>.  If there shall be any meters measuring water consumption at the Real Property, Seller shall attempt to obtain meter readings to a date that is no more than thirty (30) days before the Closing, and, if such readings are obtained, the unfixed water rates and charges and sewer taxes and rents, if any, based thereon for the intervening time, shall be apportioned on the basis of such readings, or if such readings are not obtained, the unfixed water rates and charges and sewer taxes and rents, if any, shall be apportioned upon the last meter readings.

(d)  <u>Payment of Certain Items.</u>  The amount of any unpaid taxes, assessments, water rates and charges, sewer taxes and rents and any other similar items which Seller is obligated to pay and discharge with respect to the Real Property, with interest and penalties thereon to the date which is three (3) Business Days following the Closing Date, may, at the option of Seller, be allowed to Buyer out of the Purchase Price, provided that official bills therefor with interest and penalties thereon are furnished to Buyer by Seller at the Closing.  Buyer, if request is made at least two (2) Business Days prior to the Closing, shall provide Seller at the Closing with separate wire transfers of immediately available federal funds, in an aggregate amount not exceeding the balance of the Purchase Price due to Seller at the Closing, to facilitate the satisfaction of any of the aforesaid taxes, assessments, water rates and charges, sewer taxes and rents and other similar items and any interest and penalties thereon to the Closing Date.  Without limiting the foregoing, Seller is solely obligated to pay and discharge any of the aforesaid taxes, assessments, water rates and charges, sewer taxes and rents and other similar items affecting the Real Property that are delinquent as of the Closing Date, subject to apportionment as herein provided.

(e)    Utilities.   With respect to the utilities described in Section 11.3(a)(iv), where possible, Seller shall secure cutoff readings for all utilities as of the apportionment time.  To the extent that such cutoff readings are not available, at Closing the cost of such utilities shall be apportioned between the Parties as of the apportionment time on the basis of the most recent actual (not estimated) bill for such service, and, after Closing, upon determination of the final meter readings shall be readjusted based on same as of the apportionment time.  Buyer shall be responsible for causing such utilities and services to be changed to its name (or the name of any affiliate, manager or tenant of Buyer) as of the Closing Date, and shall be liable for and shall pay all utility bills for services rendered after the apportionment time.  With respect to deposits of Seller on account with any utility company servicing the Real Property, to the extent same are unconditionally transferred to Buyer at Closing, Seller shall receive an adjustment equal to the full amount of such deposits transferred to Buyer.  To the extent that any such deposits are not unconditionally transferred to Buyer, Seller shall have the right to a return of such deposits and Buyer shall be responsible for posting any deposits required from and after the Closing.

(f)    Assessments.   If, on the Closing Date, the Real Property, or any part thereof, is affected by any real property tax assessments, then Seller shall pay such assessments; *provided, however*, that if such assessments are payable in installments, then Seller shall pay such installments due prior to the Closing Date, and Buyer shall pay such installments due after the Closing Date.

(g)    Survival.  The provisions of this Section 11.3 shall survive the Closing.

ARTICLE XII
MISCELLANEOUS

12.1    Survival.   Except as specifically referenced in Sections 7.8 and 11.3 herein, the representations, warranties, covenants and obligations in this Agreement and in the certificates delivered pursuant to this Agreement shall not survive the Closing and the consummation of the Sale. The waiver of any condition based upon the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect such right to set-off or other remedy based upon such representations, warranties, covenants and obligations.

12.2    Press Releases and Public Announcements.   No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of the other Party, such approval not to be unreasonably withheld or delayed; *provided, however*, that any Party may make any public disclosure it believes in good faith is required by Applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement (in which case the disclosing Party will use its reasonable efforts consistent with such Applicable Law or Bankruptcy Court requirement to advise the other Party prior to making the disclosure).

12.3   <u>No Third-Party Beneficiaries</u>.   This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

12.4   <u>Entire Agreement</u>.   This Agreement and the other Closing Documents constitute the entire agreement among the Parties and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

12.5   <u>Succession and Assignment</u>.   This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party; *provided, however*, that Buyer may (a) assign any or all of its rights and interests including any not-for-profit corporation of which Buyer is a member and which succeeds to the interest of Buyer in Seller and (b) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder). If Buyer assigns this Agreement or designates an Affiliate to perform its obligations hereunder as permitted above, Buyer's Deposit shall be deemed assigned to such assignee or Affiliate without further action.

12.6   <u>Counterparts</u>.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  The delivery of an executed signature page of this Agreement or any other Closing Document by fax or portable document format (.pdf) shall have the same effect as the delivery of a manually executed counterpart hereof or thereof.

12.7   <u>Headings</u>.   The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

12.8   <u>Notices</u>.   All notices, requests, demands, claims, and other communications hereunder shall be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (iii) four Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Seller:            Dowling College
                         c/o RSR Consulting, LLC
                         49 Roy Avenue
                         Massapequa, New York 11758
                         Attn:  Robert S. Rosenfeld
                         Fax: 212-658-0347
                         Email: rrosenfeld@rsrconsultingllc.com

-and-

RSR Consulting, LLC
1330 Avenue of the Americas, Suite 23A
New York, New York 10019
Attn:  Robert S. Rosenfeld
Fax: 212-658-0347
Email: rrosenfeld@rsrconsultingllc.com

Copy to:          Klestadt Winters Jureller Southard & Stevens, LLP
                  200 West 41st Street, 17th Floor
                  New York, New York 10036
                  Attn:  Sean C. Southard, Esq.
                  Fax: 212-972-2245
                  Email: ssouthard@klestadt.com


If to Buyer:
                  [Name]
                  [Address]
                  [Fax]
                  [Email]
Copy to:          [Name]
                  [Address]
                  [Fax]
                  [Email]


Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

   12.9    Governing Law; Waiver of Jury Trial.  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE SALE.

   12.10    Submission to Jurisdiction; Consent to Service of Process.  Without limiting any Party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Sale, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations

as indicated in Section 12.8 hereof; *provided, however*, that, if the Bankruptcy Case has closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Eastern District of New York sitting in Central Islip, New York, and any appellate court thereof, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each of the Parties hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 12.8.

12.11    Amendments.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and, upon consultation with the Secured Parties and the Creditors' Committee, Seller.  Seller may consent to any such amendment at any time prior to the Closing with the prior authorization of Seller's Board.

12.12    Severability.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

12.13    Expenses.  [Except with respect to the Termination Fee and Expense Reimbursement,] each of the Parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the Sale, it being expressly understood that Seller shall pay all Transfer Taxes payable with respect to the conveyance of the Real Property, if any.

12.14    Construction.  The Parties participated fully in the negotiation and preparation of this Agreement with full benefit of counsel.  Accordingly, this Agreement is to be construed as if the Parties drafted it jointly and is not to be more strictly construed against any Party.

12.15    Incorporation of Schedules.  The Schedules identified in this Agreement are incorporated herein by reference and made a part hereof. The Parties acknowledge that the Schedules attached hereto may be updated after the Execution Date with Buyer's consent, which consent shall not be unreasonably withheld.

12.16    No Waiver.  The failure of any Party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.  The waiver of any such right with respect to particular facts and other circumstances shall not be deemed a waiver with respect to any other facts and circumstances and each such right shall be deemed an ongoing right that may be asserted at any time and from time to time.  No right, remedy or election given by any term of this Agreement shall be deemed exclusive but shall be cumulative with all of the rights, remedies and elections available at law or in equity.

12.17   <u>Non-Recourse Liability</u>.  All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement may be made only against (and expressly limited to) the persons that are expressly identified as Parties hereto or thereto (the "<u>Contracting Parties</u>" and each a "<u>Contract Party</u>").   In no event shall any Contract Party have any shared or vicarious liability for the actions or omissions of any other person.   No person who is not a Contracting Party, including a director, officer, employee, incorporator, member, partner, manager, stockholder, affiliate, agent, attorney or representative of, and any financial advisor or lender (including the financial sources) to, any of the foregoing (the "<u>Non-Party Affiliates</u>"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose liability of an entity party against its owners or affiliates) for any causes of action or liabilities arising under, out of, in connection with or related in any manner to this agreement or related agreements or their negotiations, execution, performance or breach; and, to the maximum extent permitted by law, each Contracting Party waives and releases all such causes of action and liabilities against any such Non-Party Affiliates. Without limited to the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose liability of a Contracting Party on any Non-party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon Non-Party Affiliates with respect to the performance of this agreement or related agreements or any representation or warranty made in, in connection with, or as inducement to this agreement or related agreements. The Parties acknowledge and agreed that the Non-Party Affiliates are intended third-party beneficiaries of this Section.

*{signature page follows}*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

DOWLING COLLEGE

By:_____
Name:
Title:

By:_____
Name:
Title: