**ADVOCATES FOR JUSTICE,**
**CHARTERED ATTORNEYS**
*Counsel to Martin Schoenhals, Creditor*
225 Broadway, Suite 1902
New York, NY 10007
Tel.: (212) 285-1400
Fax: (212) 285-1410
Arthur Z. Schwartz
Laine A. Armstrong

**Hearing Date:  December 18, 2017**
**Hearing Time:  1:30 pm Eastern Time**

**Objection Deadline:  December 11, 2017**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------ x

In re:                                                      :          Chapter 11
                                                            :
DOWLING COLLEGE,                                            :
f/d/b/a/ DOWLING INSTITUTE,                                 :          Case No. 16-75545 (REG)
f/d/b/a/ DOWLING COLLEGE ALUMNI                             :
ASSOCIATION,                                                :
f/d/b/a CECOM,                                              :
a/k/a DOWLING COLLEGE, INC.,                                :
                                                            :
                                          Debtor.   :

------------------------------------------------------------ x

## NOTICE OF HEARING ON CREDITOR'S MOTION
## FOR RELIEF FROM AN AUTOMATIC STAY
### IMPOSED PURSUANT TO 11 U.S.C. § 362(a)

**PLEASE TAKE NOTICE** that a hearing on the motion of Creditor Martin Schoenhals

in the above-captioned chapter 11 case for an order pursuant to Section 362(d) of Title 11 of the

United States Code granting an order vacating the automatic stay imposed on Schoenhals'

Federal and State age discrimination claims against Dowling College (the "Motion"), has been

scheduled before the Honorable Robert E. Grossman, United States Bankruptcy Judge, at the

United States Bankruptcy Court for the Eastern District of New York, Alfonse M. D'Amato

Federal Courthouse, 290 Federal Plaza, Courtroom 860, Central Islip, New York 11722, on

**December 18, 2017 at 1:30 p.m.** (the "Hearing").

**PLEASE TAKE FURTHER NOTICE** that responses, if any, to the relief sought in the Motion shall be made in writing, filed with the Court by registered users of the Court's electronic case filing system and, by all other parties in interest, mailed to the Clerk of the United States Bankruptcy Court, Eastern District of New York, 271 Alfonse M. D'Amato Federal Courthouse, 290 Federal Plaza, Central Islip, New York 11722, on a 3.5 inch floppy disc or a compact disc, preferably in portable document format (PDF), Microsoft Word, or any other Windows-based word processing format, and served upon (i) the Office of the United Trustee for the Eastern District of New York, Alfonse D'Amato Federal Courthouse, 560 Federal Plaza, Central Islip, New York 11722, Attn: Stan Yang, Esq., Trial Attorney, and (ii) counsel to Creditor: Advocates for Justice, Chartered Attorneys, 225 Broadway, Suite 1902, New York, New York, 10007, Attn: Arthur Z. Schwartz, Esq., **so as to be received no later than 4:00 p.m. (Eastern Time) on December 11, 2017.**

**PLEASE TAKE FURTHER NOTICE** that the hearing on the Motion may be adjourned without further notice except as announced in open court at the Hearing, or at any adjourned hearing.

Dated: November 15, 2017
       New York, New York

                                        ADVOCATES FOR JUSTICE,
                                        CHARTERED ATTORNEYS
                                        *Attorneys for Plaintiffs*


                                        By:_____/s/_____
                                             Arthur Z. Schwartz
                                             Laine A. Armstrong
                                        225 Broadway, Suite 1902
                                        New York, New York 10007
                                        (212) 285-1400

**ADVOCATES FOR JUSTICE,**
**CHARTERED ATTORNEYS**
*Counsel to Martin Schoenhals, Creditor*
225 Broadway, Suite 1902
New York, NY 10007
Tel.: (212) 285-1400
Fax: (212) 285-1410
Arthur Z. Schwartz
Laine A. Armstrong

Hearing Date:  December 18, 2017
Hearing Time:  1:30 pm Eastern Time

Objection Deadline:  December 11, 2017

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------- x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| DOWLING COLLEGE, | : | |
| f/d/b/a/ DOWLING INSTITUTE, | : | Case No. 16-75545 (REG) |
| f/d/b/a/ DOWLING COLLEGE ALUMNI | : | |
| ASSOCIATION, | : | |
| f/d/b/a CECOM, | : | |
| a/k/a/ DOWLING COLLEGE, INC., | : | |
| | : | |
| Debtor. | : | |

------------------------------------------------------------- x

## MOTION REQUESTING RELIEF FROM AUTOMATIC STAY
## IMPOSED PURSUANT TO 11 U.S.C. § 362(a)

TO THE HONORABLE ROBERT E. GROSSMAN
UNITED STATES BANKRUPTCY JUDGE:

Creditor Martin Schoenhals (the "Movant"), by and through his undersigned counsel,

hereby moves the court for relief from the automatic stay imposed pursuant to 11 U.S.C.

§ 362(a) on his Age Discrimination in Employment Act ("ADEA") claims against Dowling

College. The Movant is entitled to "for cause" relief pursuant to 11 U.S.C. § 362(d)(1).

### BACKGROUND

1.      On April 15, 2015, Creditor Martin Schoenhals commenced a lawsuit in the United

States District Court for the Eastern District of New York against Dowling College Chapter,

New York State United Teachers, Local #3890 (the "Local Union"), New York State United

Teachers, AFT, AFL-CIO ("NYSUT"), and Dowling College (the "College") (collectively

"Defendants"), challenging the College's termination of his employment, which had been tenured. The Complaint is annexed as Exhibit A.

2.    The abovementioned lawsuit included claims against the Local Union and NYSUT for Breach of the Duty of Fair Representation, and against the College for Breach of the Collective Bargaining Agreement.

3.    On February 17, 2016, Creditor Martin Schoenhals moved to file the First Amended Complaint. Exhibit B.

4.    In his First Amended Complaint, Schoenhals dismissed the complaint against NYSUT but maintained all of his claims against the remaining Defendants.

5.    In addition, in his First Amended Complaint, Schoenhals added claims alleging that his termination from his tenured professorship at Defendant Dowling College occurred because of his age. Plaintiff brought this claim under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., and also under section 296 of the New York State Human Rights Law.

6.    Schoenhals' Federal and State age discrimination claims appear in his First Amended Complaint as the 4th and 5th causes of action.

7.    Dowling opposed Schoenhals' Motion to Amend.

8.    On September 13, 2016, Schoenhals agreed by stipulation to dismiss his claims against Defendants NYSUT and the Local Union.

9.    On September 14, 2016, United States District Judge Arthur D. Spatt signed an Order dismissing the action against NYSUT and the Union based on the September 13, 2016 stipulation entered into by the parties. See Exhibit C.

10.    After Schoenhals' dismissal against NYSUT and the Local Union, the only remaining Defendant in the lawsuit is Defendant Dowling College.

11.    On November 29, 2016, before Judge Spatt ruled on the Motion to File the Amended

Complaint, Defendant Dowling College filed a Notice of Chapter 11 Bankruptcy. See Exhibit D.

12.    Under 11 U.S.C. § 362(a), the filing of Chapter 11 Bankruptcy imposes an

automatic stay against most collection activities by creditors.

13.    On April 14, 2017, United States District Judge Arthur D. Spatt signed an Order

imposing the automatic stay because of the bankruptcy proceeding. The action is stayed pending

the outcome of Defendant Dowling College's Bankruptcy proceeding. See Exhibit E.

14.    On December 21, 2016, Schoenhals filed a Proof of Claim, which includes a claim

for damages for age discrimination as a result of his termination from the College. See Exhibit F.

## JURISDICTION

15.    This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334,

and 11 U.S.C. § 105(a).

## RELIEF REQUESTED

16.    The Movant, requests that the Automatic Stay imposed pursuant to 11 U.S.C.

§ 362(a) on his age discrimination claims, as opposed to his breach of contract claims, be vacated.

17.    The Movant is entitled to the relief requested under 11 U.S.C. § 362(d)(1) because

his age discrimination claims in his lawsuit can be addressed and remedied without any impact

on the funds being marshalled by the Trustees in the Bankruptcy matter, to wit, the age

discrimination claims are covered by an insurance policy, which not only addresses the damages

Schoenhals seeks, but also pays for court fees.

18.    Counsel for Dowling College has confirmed that Dowling College is insured

through an employment practices insurance policy similar, or identical, to the Employment

Practices Liability Insurance Policy (the "Policy"). A copy is annexed as Exhibit G.

19.    The Policy covers the College for claims arising from an Employment Practices Wrongful Act, including discrimination against an employee because of such person's age. See page 1 of Exhibit G, sections I(A) and II(B)(1), and page 2 of Exhibit G, Sections II(D) and II(F).

20.    Therefore, because the College's Employment Practices Liability Insurance Policy insures against age discrimination, the Movant's Federal and State age discrimination claims against the College can be resolved without any impact on the College's Chapter 11 filing, so long as the automatic stay is lifted only to the extent that the Policy provides coverage.

## NOTICE

21.    Notice of this Motion will be given to (a) United States Trustee and (b) counsel to Debtor. Mr. Schoenhals submits that in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

22.    No previous request for the relief sought herein has been made by Mr. Schoenhals to this or any other Court.

WHEREFORE, Martin Schoenhals respectfully requests entry of an order lifting the stay on his age discrimination claims in the U.S. District Court for the Eastern District of New York, with the understanding that Schoenhals' recovery is limited by the coverage in the Chubb Employment Practices Insurance Policy.

Dated: November 15, 2017
     New York, New York

                                        ADVOCATES FOR JUSTICE,
                                        CHARTERED ATTORNEYS
                                        *Counsel to Martin Schoenhals, Creditor*

                                        By:_____/s/_____
                                          Arthur Z. Schwartz
                                          Laine A. Armstrong
                                          225 Broadway, Suite 1902
                                          New York, New York 10007
                                          (212) 285-1400

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------- x

| | |
|---|---|
| In re: | : |
| | : |
| DOWLING COLLEGE, | : |
| f/d/b/a/ DOWLING INSTITUTE, | : |
| f/d/b/a/ DOWLING COLLEGE ALUMNI | : |
| ASSOCIATION, | : |
| f/d/b/a CECOM, | : |
| a/k/a/ DOWLING COLLEGE, INC., | : |
| | : |
| Debtor. | : |

Chapter 11

Case No. 16-75545 (REG)

------------------------------------------------------------- x

## ORDER GRANTING REQUEST TO VACATE AUTOMATIC STAY

Upon the motion (the "Motion") of Creditor Martin Schoenhals for entry of an order (this "Order") vacating the automatic stay pursuant to sections 11 U.S.C. § 362(d)(1), and notice of the Motion having been given as set forth in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. § 105(a); and due and proper notice of the Motion being adequate and appropriate under the particular circumstances; and a hearing having been held on Monday, December 18, 2017, to consider the relief requested in the Motion; and after due deliberation and sufficient cause appearing therefore, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.    The Motion is granted to the extent set forth herein.

2.    The Movant is granted relief from the automatic stay on his Federal and State age discrimination claims in the U.S. District Court for the Eastern District of New York, with the understanding that the Movant's recovery is limited to the coverage in the Chubb Employment Practices Insurance Policy.

3.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion.

4.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

# EXHIBIT A

# CV 15    2044

LAW OFFICE OF RACHEL J. MINTER
Rachel J. Minter (RM-8052)
Attorneys for Plaintiff
345 Seventh Avenue, 21st floor
New York, New York 10001
(212) 643-0966
rminter@rjminterlaw.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

—————————————————————
MARTIN SCHOENHALS,                              :    Civil Action No.
                        Plaintiff,              :
                                                :
       - against -                              :
                                                :    **COMPLAINT**
DOWLING COLLEGE CHAPTER, NEW YORK STATE :
UNITED TEACHERS, LOCAL # 3890, NEW YORK         :    **Jury Trial Demanded**
STATE UNITED TEACHERS, AFT, AFL-CIO and         :
DOWLING COLLEGE,                                :
                                                :
                        Defendants.             :
—————————————————————

       Plaintiff, MARTIN SCHOENHALS, by his attorneys, The Law Office of Rachel J. Minter,

as and for his complaint against Defendants, DOWLING COLLEGE CHAPTER, NEW YORK

STATE UNITED TEACHERS, LOCAL # 3890, NEW YORK STATE UNITED TEACHERS, AFT,

AFL-CIO and DOWLING COLLEGE, alleges as follows:

## Jurisdiction and Venue

       1.      This is an action arising under § 301 of the Labor Management Relations Act, as

amended, 29 U.S.C. § 185.  This Court has jurisdiction pursuant to 28 U.S.C. §1331.

       2.      Venue is appropriate in the Eastern District of New York, pursuant to 28 U.S.C. §

1391(b), as the primary actions complained of herein occurred in Suffolk County and Defendants

Dowling College Chapter, New York State United Teachers, Local #3890, and Dowling College,

operate in Suffolk County.

## Parties

3.      Martin Schoenhals ("Plaintiff" or "Dr. Schoenhals") is, and at all relevant times was, a citizen of the State and City of New York and of Kings County.

4.      Dowling College Chapter, New York State United Teachers, Local #3890 ("the Union") is, and at all relevant times was, a labor organization which represents employees in an industry affecting interstate commerce within the meaning of 29 U.S.C. § 185, with its principal place of business at 233 Hill Rise, #502RC in the State of New York, Town of Calverton and County of Suffolk.

5.      New York State United Teachers, AFT, AFL-CIO ("NYSUT") is, and at all relevant times was, a labor organization which represents employees in an industry affecting interstate commerce within the meaning of 29 U.S.C. § 185, with its principal place of business at 800 Troy-Schenectady Road in the State of New York, Town of Latham and County of Albany.  NYSUT is the parent body of the Union.

6.      Dowling College ("the College") is a not-for-profit organization authorized by the New York State Education Department to operate a private institution of higher learning, with its principal campus located in the State of New York, Town of Oakdale, County of Suffolk.

## Facts

7.      Dr. Schoenhals was hired by the College in September of 1993 as a full-time, tenure-track Assistant Professor of Anthropology and Chair of the Anthropology Department.  He received tenure and was promoted to Associate Professor in 1999.  He became a full Professor in 2006.

-2-

8.      The Union represents a bargaining unit comprised of full-time members of the faculty at the College.  According to its Constitution, the Union is governed at the local level by an Executive Council ("EC") comprised of the president, secretary-treasurer, negotiating committee chair, liaison committee chair, the immediate past president, four Members of the Negotiating Committee, one from each of the schools and three Members of the Liaison Committee.

9.      Dr. Schoenhals has been at all relevant times a member of the Dowling College faculty bargaining unit.

10.      The Union is a local affiliate of NYSUT, which according to its website provides each local bargaining unit with a labor relations specialist who is a NYSUT employee. During all relevant periods the labor relations specialist assigned by NYSUT to the Dowling College local was Sean Callahan. NYSUT also provides attorneys who represent members in arbitrations and other legal matters. Upon information and belief, the NYSUT Legal Department is involved in any decision as to whether a local member's grievance should be pursued and taken to arbitration. The NYSUT Legal Department has been actively involved in consideration of Dr. Schoenhals' grievance.

11.      Dowling College has experienced an unprecedented degree of administrative chaos, exemplified by the fact that it has had seven presidents in the past decade, and has had to pay out huge sums from College funds in severance pay each time a president has been terminated; the IRS Form 990s filed by the College reflect that, as of 2013, the severance payments totaled more than $2 million.

12.      In addition, upon information and belief the College's Board of Trustees ("BOT") has significantly depleted its operating funds on less-than-arms-length transactions with college administrators or trustees.  Upon information and belief the BOT sold College property to a former

-3-

President at a price that was so much lower than market value that this man sold it only three months later at a profit of over 125%. The College also ostensibly sold another parcel of College property to a Trustee for $1.9 million, but Plaintiff and his colleagues were unable to find that transaction in local property records and have been unable to locate where the proceeds of the sale went.

13. The BOT engaged in open and notorious self-interest. According to *Newsday*, a local newspaper, the College did approximately $4.6 million in business with companies that had ties to Trustees or their family members over a period of five years. *Newsday* quoted one Trustee, whose son-in-law was a director of a company that received a substantial amount of business from the College, explaining that his colleagues on the BOT approved that contract because he had voted to approve work by businesses with ties to other BOT members. Asked if there had been competitive bidding for that contract, the Trustee would say only that private colleges have "more leeway" in selecting contractors than government agencies.

14. In 2012 the College administration asked to re-open the collective bargaining agreement ("CBA") between the Union and the College that was in effect at the time, claiming that it was necessary because of the College's financial problems. Approximately 100 non-faculty staff members were laid off and then-President of the College, Jeremy Brown, threatened to terminate all tenured faculty. The Memorandum of Agreement ("MOA") that would replace the faculty CBA then in effect was debated at faculty meetings in the Spring of 2012. A NYSUT representative told the faculty that the College could close down "tomorrow" if the Union did not agree to management's demands. Dr. Schoenhals was an outspoken and highly-visible opponent of the re-opener and voted against it. Richard Wilkens, who would be elected to the union Executive Council in 2013, and be appointed to the College administration in 2014, was an outspoken and highly-visible *pro*ponent.

-4-

Brian Stipelman, a junior, untenured faculty member those employment was among those most at risk, also advocated for the new MOA; he was elected to the EC in 2013 and appointed to an administrative position with the College in 2014.

15.    The 2012 MOA was approved by the faculty, because of fears about job security. Ultimately, the untenured faculty positions were saved but the faculty's pay and health benefits were cut and the College ceased to make contributions to the retirement plan. The 2012 MOA did provide that the College could not reduce faculty unless certain specified "financial exigencies" occurred.

16.    In or about June of 2012 Dr. Schoenhals filed an unfair labor practice charge against the Union alleging breach of the duty of fair representation (known as a "DFR charge") based on its pressuring faculty to agree to the College's demands and weakening the provisions of the original CBA that required the College to produce supporting data if claiming that financial circumstances warranted a change in the contract. That charge was dismissed. He also filed a complaint with the New York State Attorney General's Office Charities Bureau about financial mismanagement at the College and breach of fiduciary duty by the BOT. That complaint remains open.

17.    A situation has existed at Dowling that is possibly unique in higher education labor relations – a "revolving door" whereby officers of the Union are appointed to administrative positions with the College and begin to advocate for measures that are antithetical to unionism, detrimental to members of the bargaining unit that the Union represents and amount to attacks on faculty tenure, the most sacred right of college faculty, which protects those who exercise academic freedom from retaliation and loss of livelihood.

18.    Union officers and Executive Committee members were elected to a term running from February 1, 2014 - January 31, 2015. The names that are of most relevance to the events that

next transpire are Albert Inserra, who as Chair of the Negotiating Committee was in charge of collective bargaining with the College on behalf of the Union; Brian Stipelman, Chair of the Liaison Committee, and Richard Wilkens, a Liaison Committee Member. Inserra, Stipelman and Wilkens also positions on the EC for the prior term, February 1, 2013 - January 31, 2014.

19.    In July 2014 the then-incumbent president of the College was terminated. In August, the BOT appointed Albert Inserra, *who was the local union's chief negotiator*, as Interim President. Inserra, in turn, appointed Richard Wilkens, a Member of the Union Executive Council, as Interim Provost, and Brian Stipelman, Liaison Committee Chair, as Interim Dean of Arts and Sciences. Wilkens and Stipelman had strongly advocated the administration's position *vis á vis* the 2012 re-opener and MOA. As is the norm at Dowling, administrative positions – particularly that of President – are well paid and come with entertainment budgets and other perquisites.

20.    Chapter President Seidel resigned September 1, 2014 and was replaced by Mark Greer. Ironically, Greer had not been a member of the union for many years, having resigned in the mid-1990s because he disagreed with the position of the incumbent union president that faculty tenure should be defended. Greer had been very vocal in the past about his anti-union sentiments and upon information and belief had to be pressured into running for union president at that time.

21.    The subsequent CBA between the Union and the College was to have run from September 1, 2012 through August 31, 2016. However, with two years still to run on the contract, in or about October 2014 the College administration began to pressure the Union into agreeing to re-open the CBA.

22.    On or about October 15, 2014, the faculty met to consider whether to re-open the contract. Greer urged the members to vote in favor. He represented that the college was in financial

-6-

difficulty, but did not provide any figures to support that assertion. When several members, including Dr. Schoenhals, asked that the Union conduct an audit of the College's finances, Greer told them that there was not enough time. The reason for this urgency was never explained. The faculty voted to re-open the CBA. The union and the administration begin to negotiate terms of a new MOA. Which was presented to the faculty, and ratified, at their November 12 meeting.

23.        The MOA – negotiated by the Union negotiating committee with its former chair, now the College President – was a wholesale abrogation of union rights and protections. The new document that replaced the 2012-2016 CBA contained several draconian changes:

(a)    The Union surrendered its right to verify claims of financial exigency made by the College with new language containing a blanket acknowledgment by the Union that it accepts the College's claims;

(b) The MOA eliminated the requirements of notice to a terminated faculty member and severance pay linked to years of service, including one year's salary for tenured professors;

(c) The MOA required that savings of almost $5 million had to be realized in a period of only eight months and obtained exclusively from the faculty budget line – with $2,600,000 of the savings to come from faculty reductions in force – without any plans to cut operating costs or reduce salary and benefits of over-paid administrative staff.

24.        Worst of all, the MOA simply removed the entire section of the CBA providing for tenure for senior faculty. It is almost unheard of for an educational union to surrender tenure rights without putting up any kind of fight.

-7-

25.     At the November 12 faculty meeting, Greer urged the members to ratify the MOA. He represented that the college was in financial difficulty, but did not provide any figures to support that assertion. When several members, including Dr. Schoenhals, asked that the Union conduct an audit of the College's finances, Greer told them that there is not enough time. The reason for this urgency is never explained. The faculty voted to ratify the MOA at the November 12 meeting.

26.     Among the provisions in the MOA was an Early Retirement Incentive Program ("ERIP") that provides certain financial benefits to full-time faculty members who have achieved a minimum of 40, 25 or 15 years of service. There is very little detail in the MOA about the specifics of the ERIP, other than a stated percentage of base salary (depending on years of service) to be paid out over four years. To request an ERIP, the unit member must submit an irrevocable resignation effective January 2, 2015 *before November 17, 2014.*

27.     However, according to the time frame set forth in the MOA that was negotiated with the College by the Union, the lists of positions to be reduced will be released by the College on November 18, 2014. Thus, unit members who elect the ERIP must gamble – not knowing if they are to be terminated, but losing the opportunity for the ERIP if not elected by the cut-off date.

28.     The MOA timetable further provides that from November 18 to November 21, 2014, individuals who might have been eligible for ERIP but did not elect to request one before November 17, and who now learn that they are to be terminated, can elect an ERIP with much less favorable financial terms (the "Secondary Incentive" or "ERIP II"). Those persons had until November 21, only three days, to elect ERIP II.

29.     Appendix B to the new MOA is "Summary\Synopsis of Methodology for Determining Full-Time Faculty Reductions." It is a rather complicated system that sets up certain

-8-

criteria that are to be applied to determine which faculty members will be laid off. One criterion is an analysis of enrollment trends by department, utilizing a formula of students enrolled against number of faculty, number of students majoring and minoring in this subject and number of classes and class size.

30.    Dr. Schoenhals calculated his own Appendix B metrics, which indicated that he should not be a candidate for termination. The College could not have been utilizing the contractual methodology, because his department, Anthropology, had one of the highest number of majors per full-time faculty, and strong enrollment figures, and the administration failed in his case to adjust for the "sabbatical" component that was part of the formula. It also appeared from this analysis that the underlying source of the data the administration was using -- the College's "Banner" system -- was faulty. The administration was aware of that problem, because the previous Chapter President had informed the former Provost of numerous errors, including one instance in which a faculty member with 200 students was credited with only 20.

31.    However, subsequent examination of those faculty members who were and were not terminated reveals that the College failed to apply the very metrics it bargained for to that determination. Faculty in President Inserra's Education School, for example, were not terminated even though their metrics were, upon information and belief, lower than those of Dr. Schoenhals. David Racanelli, a faculty member in the Music Department, was not let go although he is only an Assistant Professor, has been at Dowling only half the time that Dr. Schoenhals has, and has very low metrics; Racanelli is, however, the nephew of a BOT member.

32.    On or about November 19, 2014 President Inserra's secretary called Dr. Schoenhals, six other senior faculty and seven junior faculty, arranging individual appointments for each with

-9-

the President. Dr. Schoenhals' meeting was scheduled for the following day, November 20.

33.     Expecting that this might be a termination meeting, Dr. Schoenhals called Sean
Callahan, the NYSUT labor relations specialist assigned to the Dowling College local union. When
Dr. Schoenhals identified himself to Callahan, Callahan replied, in these words or words to this
effect, "I know who you are, you filed a DFR charge against the union in 2012."

34.     On November 20, 2014 Dr. Schoenhals reported to President Inserra's office with two
colleagues; they are not admitted but he is told to find Mark Greer, Chapter President. He and Greer
then met with Inserra and Interim Provost Richard Wilkens (who until recently had been chapter
union officers). When Dr. Schoenhals asks why he is being selected for termination, Wilkens would
not tell him. Dr. Schoenhals explained that he had calculated his metrics based on the MOA, they
are good, and he should not have been selected. When he started to explain his reasoning, Wilkens
interrupted and told Inserra that Greer must be the one to present the numbers.

35.     Greer went with Dr. Schoenhals to his office and they reviewed the numbers. Greer
told him that his numbers were "healthy." They returned to Inserra's office and Greer read them the
numbers. Wilkens and Inserra told Dr. Schoenhals, in these words or words to this effect, that they
must "stop the clock" and recheck their calculations. Wilkens asked Dr. Schoenhals to leave and
Greer stayed behind.

36.     At 5 p.m. Greer re-appeared and told Dr. Schoenhals that they should go to the office
of Brian Stipelman – another former Union colleague now in administration – to get his calculations
and see where mistakes might have been made. However, Stipelman had left for the day and his
office was locked.

37.     The following day, November 21, 2014, was the deadline for electing ERIP II.

-10-

However, having been led to believe that the administration, together with Chapter President Greer, was evaluating his claim that he had been incorrectly designated for termination, Dr. Schoenhals did not elect ERIP II. Over the next week he sent emails to Greer and to Inserra, Wilkens and Stipelman with further calculations that show mistakes.

38.    On December 5, Dr. Schoenhals received a letter, dated November 21, 2014 and postmarked December 2, 2015, terminating his employment effective January 2, 2015.

39.    Dr. Schoenhals was informed in January 2015 that the NYSUT Legal Department declined to proceed with a grievance concerning his termination.

### AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of the Duty of Fair Representation- Dowling College Chapter)

40.    The allegations contained in paragraphs 1-39 are incorporated by reference as though fully set forth herein.

41.    The Union owed Plaintiff a duty to fairly represent him, in good faith, with integrity and in a manner that was disinterested and independent of the influence of the employer.

42.    The Union made no effort  to ensure that it officers and Executive Council members represented the best interests of the membership, rather than the interests of the employer, or even that they were supporters, rather than opponents, of union principles.

43.    By negotiating away tenure – the most fundamental right of an academic – the Union's conduct was so far outside the range of reasonableness as to be irrational.

44.    The Union acted arbitrarily and in bad faith by pressuring members to agree quickly to contract terms favored by the employer, where there was no evidence of an objective need for urgency, and by agreeing to a timetable that forced members to make major decisions affecting their

financial futures in a matter of days.

45.    The Union abrogated its responsibility as exclusive bargaining representative to investigate the College's claims of financial exigency, initiate an independent audit and/or provide union members with data allowing for an informed decision on the MOA.

46.    As a result of the aforesaid actions, Plaintiff has suffered the loss of employment as well as back pay, front pay and benefits that he would have received had he continued as a tenured professor at Dowling.

47.    The Union discriminated against Plaintiff because he was a vocal opponent of decisions and actions by Union leadership, by misleading him into believing that the Union was engaged in a good faith review of his metrics with the College administration and that no decision on his employment status would be made while that review was pending. As a result of his reliance on the Union's false assertions, Plaintiff missed the deadline for electing ERIP II.

48.    As a result of the aforesaid actions, Plaintiff has suffered loss of employment as well as back pay, front pay and benefits that he would have received had he continued as a tenured professor at Dowling, or in the alternative, the amount he would have received had he elected ERIP.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of the Duty of Fair Representation- NYSUT)

49.    The allegations contained in paragraphs 1-48 are incorporated by reference as though fully set forth herein.

50.    NYSUT, as the parent union of the Dowling College Chapter, had oversight responsibility for actions by the Union that breached its duty of fair representation to bargaining unit members at Dowling College, as well as liability for the actions of its own staff members.

-12-

51.     NYSUT, through its regional labor relations specialist, Sean Callahan, discriminated against Plaintiff because he had previously filed an unfair labor practice charge against the union, when he failed to respond to Plaintiff's requests for assistance and advice regarding his possible termination.

52.     NYSUT acted arbitrarily and breached its duty to members of its local union where it knew or should have known of the practice by which Chapter officers and EC members, including the union's lead negotiator, went from trusted positions with the union, where they acquired confidential information, to well-paid and secure posts within the Dowling College administration.

53.     NYSUT, through its Legal Department, discriminated against Plaintiff because he had previously filed an unfair labor practice charge against the union, by refusing to take the grievance challenging his termination to arbitration.

54.     As a result of the aforesaid actions, Plaintiff has suffered loss of employment as well as back pay, front pay and benefits that he would have received had he continued as a tenured professor at Dowling, or in the alternative, the amount he would have received had he elected ERIP.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Breach of the Collective Bargaining Agreement- Dowling College)

55.     The allegations contained in paragraphs 1-54 are incorporated by reference as though fully set forth herein.

56.     The employer, Dowling College, breached the collective bargaining agreement when it failed to properly apply its own metrics in deciding to terminate Plaintiff, while retaining junior, less-accomplished faculty with less service at Dowling and lower metrics, in departments with declining enrollments and fewer majors than Anthropology.

-13-

57.    As a result of the aforesaid acts, Plaintiff has suffered loss of his position as a Professor of Anthropology and department chair, back pay, front pay and benefits that he would have received had he continued employment at Dowling and/or in the alternative, the financial benefits that he would have received had he elected ERIP in lieu of lay-off.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands Judgment in his favor and against Defendants, individually and/or jointly and severally, for back pay, front pay and benefits, the amounts to be determined at trial but in no event less than $450,000, or in the alternative, the amount to which Plaintiff would have been entitled had he elected ERIP, together with interest, attorney's fees to the extent allowable, and the costs and disbursements of this action, as well as such other and further relief as this Court deems necessary and proper.

**PLAINTIFF DEMANDS TRIAL BY JURY**

Dated:    April 15, 2015
          New York, New York

                                    **LAW OFFICE OF RACHEL J. MINTER**
                                    Attorneys for Plaintiff

                                    By:

                                    _____
                                    Rachel J. Minter (RM-8052)
                                    345 Seventh Avenue, 21st floor
                                    New York, New York 10001
                                    (212) 643-0966
                                    rminter@rjminterlaw.com

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **MARTIN SCHOENHALS,**<br>**Plaintiff,** | **15 Civ. 2044 (ADS)(ARL)** |
| | **NOTICE OF MOTION FOR**<br>**LEAVE TO AMEND THE** |
| - against - | **COMPLAINT** |
| **DOWLING COLLEGE CHAPTER,**<br>**NEW YORK STATE UNITED TEACHERS,**<br>**LOCAL # 3890; NEW YORK STATE**<br>**UNITED TEACHERS, AFT, AFL-CIO; and**<br>**DOWLING COLLEGE,** | |
| **Defendants.** | |

COUNSEL:

PLEASE TAKE NOTICE that, upon the Declaration of Laine A. Armstrong, and dated February 17, 2016, and the memorandum of law included herewith, plaintiff shall move this Court for an Order, pursuant to Rule 15, FRCP, on the _____ day of _____, 2016, at the Courthouse, 330 Cadman Plaza East, Brooklyn, New York, permitting the filing of a First Amended Complaint.

Dated: New York, New York
      February 17, 2016

                                 ADVOCATES FOR JUSTICE
                                 CHARTERED ATTORNEYS
                                 Attorneys for Plaintiff


By:_____/s_____
                    Laine A. Armstrong
225 Broadway, Suite 1902
New York, New York 10007
(212) 285-1400 x707
laine@advocatesny.com

1

TO:    NEW YORK STATES UNITED TEACHERS
       Office of General Counsel
       Attorneys for Defendants Dowling College Chapter,
         New York State United Teachers Local 3890 and
         New York State United Teachers
       Mitchell Rubinstein
       Lori M. Smith
       52 Broadway , 9th Floor
       New York, NY 10004
       212-533-6300
       Fax: 212-995-2347

       INGERMAN SMITH, L.L.P.
       Attorneys for Defendant Dowling College
       Christopher J. Clayton
       David Ferdinand Kwee
       150 Motor Parkway, Suite 400
       Hauppauge, NY 11788

2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

MARTIN SCHOENHALS,                                    15 Civ. 2044 (ADS)(ARL)
Plaintiff,


                                                      **FIRST AMENDED**
          - against -                                 **COMPLAINT**

DOWLING COLLEGE CHAPTER,
NEW YORK STATE UNITED TEACHERS,
LOCAL # 3890; and DOWLING COLLEGE,

Defendants.

---

Plaintiff dismisses his complaint against the New York State United Teachers and restates the caption as set forth above. Plaintiff, MARTIN SCHOENHALS, by his attorneys, Advocates for Justice Chartered Attorneys, as and for his First Amended Complaint against Defendants, DOWLING COLLEGE CHAPTER, NEW YORK STATE UNITED TEACHERS, LOCAL # 3890 and DOWLING COLLEGE, alleges as follows:

## INTRODUCTION

1.      Plaintiff brings this suit to address his termination from a tenured professorship at Defendant Dowling College as part of a college reorganization.  Plaintiff asserts that the action taken with his union's unlawful support violated his contractual rights and amounted to unlawful discrimination.

## JURISDICTION AND VENUE

2.      This is an action arising under § 301 of the Labor Management Relations Act, as amended, 29 U.S.C. § 185, the Age Discrimination in Employment Act 29 U.S.C. § 621 *et seq.*, and the New York State Human Rights Law.  This Court has jurisdiction pursuant to 28 U.S.C. §

1331.

3.    Venue is appropriate in the Eastern District of New York, pursuant to 28 U.S.C. § 1391 (b), as the primary actions complained of herein occurred in Suffolk County and Defendants Dowling College Chapter, New York State United Teachers, Local #3890, and Dowling College, operate in Suffolk County.

## PARTIES

4.    Plaintiff, Martin Schoenhals ("Plaintiff" or "Dr. Schoenhals") is, and at all relevant times was, a resident of Brooklyn, New York.  Dr. Schoenhals is presently 54 years old, and at all relevant times was over 40 years of age.

5.    Defendant Dowling College Chapter, New York State United Teachers, Local #3890 ("the Union") is, and at all relevant times was, a labor organization which represents employees in an industry affecting interstate commerce within the meaning of 29 U.S.C. § 185, with its principal place of business at 233 Hill Rise, #502RC in the State of New York, Town of Calverton and County of Suffolk.

6.    Defendant Dowling College ("the College") is a not-for-profit corporation authorized by the New York State Education Department to operate a private institution of higher learning, with its principal campus located in Oakdale, New York.

## FACTS RELEVANT TO ALL CLAIMS

7.    Dr. Schoenhals was hired by the College in September of 1993 as a full-time, tenure-track Assistant Professor of Anthropology and Chair of the Anthropology Department. He received tenure and was promoted to Associate Professor in 1999. He became a full Professor in 2006.

8.     From the time he was hired, until he was terminated, Dr. Schoenhals was an active member of the Union, which represents a bargaining unit comprised of full-time members of the faculty at the College in negotiating and enforcing the terms of their employment.

9.     According to its Constitution, the Union is governed at the local level by an Executive Council ("EC") panel of faculty Union members, including: the Union president, secretary-treasurer, negotiating committee chair, liaison committee chair, and the immediate past president. The Negotiating Committee includes a Chair from any School or Department, and four members, one from each of the College's schools. The Liaison Committee consists of a Chair and three members.

10.    The Union is a local affiliate of Defendant New York State United Teachers, AFT, AFL-CIO ("NYSUT"), which according to its website provides each local bargaining unit with a labor relations specialist who is a NYSUT employee. During all relevant periods the labor relations specialist assigned by NYSUT to the College local was Sean Callahan. NYSUT also provides attorneys who represent members in arbitrations and other legal matters as requested by a local union.

11.    The circumstances relevant to this Complaint occurred during a time of unprecedented chaos for the College caused by the College's administration and Board of Trustees ("BOT"), the body responsible for oversight and governance of the College, including adoption and enforcement of all reasonable rules, regulations, bylaws, policies, budgets, long-range plans, selecting the president, and evaluates his/her effectiveness.

12.    The College's administrative positions are substantially well-paid in comparison to industry standard, as well as in comparison to the faculty and staff. The BOT protects these

4

high-salaries, and often rewards the administrators with benefits and perks, regardless of poor performance, thereby funneling College resources to administrators and away from the faculty and staff.

13.    The College has had seven presidents since 2005, and, regardless of the short-length of each president's tenure, the College has paid out huge sums in severance pay each time a president has been terminated by the BOT; the IRS Form 990s filed by the College reflect that, as of 2013, the annual severance payments totaled more than $2 million.

14.    In addition, the BOT has significantly misused the College's operating funds on less-than-arms-length transactions with College administrators or trustees. For example, upon information and belief, the BOT sold College property to a former President at a price that was so much lower than market value that this man sold it only three months later at a profit of over 125%.

15.    The BOT has also engaged in open and notorious self-interested dealings. According to *Newsday,* a local newspaper, the College did approximately $4.6 million in business with companies that had ties to Trustees or their family members over a period of five years. *Newsday* quoted one Trustee, whose son-in-law was a director of a company that received a substantial amount of business from the College, asked if there had been competitive bidding for that contract, the Trustee would say only that private colleges have "more leeway" in selecting contractors than government agencies.

16.    In 2012, upon information and belief, to protect the administrators' bloated salaries and maintain the BOT's financial perks, the College administration commenced a course of conduct that sought to weaken the Union's bargaining position, deplete the ranks of tenured,

experienced, full-time faculty, deprive faculty of negotiated for benefits, and decimate the faculty's job security.

17.     In April 2012, the College administration sought to re-open the collective bargaining agreement ("CBA") between the Union and the College that was in effect through from 2007-2012, even though the CBA would nevertheless have been renegotiated in July or August 2012. The College claimed renegotiation was necessary because of the College's alleged financial problems, but never provided proof of these purported financial exigencies to the faculty or Union. Then-President of the College, Jeremy Brown, had laid-off approximately 100 non-faculty staff members in January 2012, and threatened to similarly terminate all non-tenured faculty if the Union did not agree to re-open the CBA.

18.     As a consequence of the afore-described re-opening, the Union agreed to a modification of the Memorandum of Agreement ("2012 MOA") that would amend the CBA was debated at faculty meetings in the Spring of 2012. The then Union president, without regard to his duty to vigorously advocate for Union members, told the faculty that the College could close down "tomorrow" if the Union did not agree to management's demands. Sean Callahan, the NYSUT labor relations specialist assigned to the Union, told the faculty that the College would "Yeshiva" them, or break the Union, if the faculty did not consent to renegotiate the CBA on the terms presented.

19.     Even though the CBA required financial disclosures if the College claimed that financial circumstances warranted a change in the contract, the administration did not provide, and the Union did not require, any such disclosures.

20.     Dr. Schoenhals was an outspoken and highly-visible opponent of the 2012 MOA

and voted against it.

21.    Richard Wilkens, who was the Union's Liaison Committee Chair in 2012, and was appointed to the College administration in 2014, was an outspoken and highly-visible *proponent* of the 2012 MOA.

22.    Brian Stipelman, a junior, untenured faculty member whose employment was among those most at risk, also advocated for the 2012 MOA; he was elected to a vacancy on the EC in 2013 and was also appointed to an administrative position with the College in 2014.

23.    The 2012 MOA was approved by the faculty members of the Union because of fears about job security. Ultimately, the untenured faculty positions were saved but the 2012 MOA provided that all faculty's pay and health benefits were cut and the College ceased to make contributions to the faculty retirement plan. The 2012 MOA did provide that the College could not reduce faculty in the future unless certain specified "financial exigencies" occurred.

24.    In or about June 2012, Dr. Schoenhals filed an unfair labor practice charge against the Union with the National Labor Relations Board alleging breach of the duty of fair representation (known as a "DFR charge") based on its pressuring faculty to agree to the College's demands and weakening the provisions of the CBA and that requires the College to produce supporting data if claiming that financial circumstances warranted a change in the contract. That charge was dismissed.

25.    Dr. Schoenhals also filed a complaint with the New York State Attorney General's Office Charities Bureau (the "Bureau") about financial mismanagement at the College and breach of fiduciary duty by the BOT. That complaint is still being investigated by the Bureau.

26.    Coexistent with the afore-described attack on the Union represented faculty, a

situation came to exist at the College that laid the basis for further erosion of faculty rights – a "revolving door" for Union officers into administrative positions with the College. On a number of occasions after being elected to *represent* the faculty, several Union officers were rewarded with higher-paying administrative positions with the College; then, they begin to represent the College, and advocate for measures that are antithetical to unionism, and detrimental to members of the bargaining unit that the Union represents.

27.     One of the most damaging actions of the former Union representatives that have been rewarded with positions in the College's administration has been to attack faculty tenure - the most sacred right of college faculty – a contractual protection which attracts teachers to academia and protects their livelihood.

28.     In 2014, Union officers and EC members were elected to a term running from February 1, 2014-January 31, 2015. Albert Inserra was elected Chair of the Negotiating Committee in charge of collective bargaining with the College on behalf of the Union. Brian Stipelman was elected Chair of the Liaison Committee. Richard Wilkens was elected a Liaison Committee Member. Inserra, Stipelman and Wilkens had also been elected to positions on the EC for the prior term, February 1, 2013 - January 31, 2014.

29.     In July 2014, the BOT terminated Jeremy Brown as the College's President. In August 2014, the BOT packed the administration with former Union-members. They appointed Inserra, *who was then the local union's chief negotiator,* as Interim President. Inserra, in turn, appointed Wilkens, *a Member of the Union EC,* as Interim Provost, and Stipelman, *Liaison Committee Chair,* as Interim Dean of Arts and Sciences. Wilkens and Stipelman had strongly advocated support for the administration's position *vis-a-vis* the 2012 MOA. As is the norm at

the College, these administrative positions -- particularly that of President – are paid far more than Faculty positions.

30.    Then Union President Russell Seidel resigned September 1, 2014 and was replaced by vote of the EC with Mark Greer.  Greer had not been a member of the Union for many years, having resigned in the mid-1990s because he disagreed that faculty tenure should be defended. Greer had been very vocal in the past about his anti-Union sentiments.

31.    After Greer's election, the College's attacks on the faculty intensified.

32.    The CBA between the Union and the College, which incorporated the terms of the 2012 MOA, was to have run from September 1, 2012 through August 31, 2016. However, with two years still to run on the contract, in or about October 2014, the College administration (now led by former Union officers) began to pressure the Union into agreeing to again re-open the CBA.

33.    On or about October 15, 2014, the faculty met to consider whether to re-open the contract.  Greer urged the members to vote in favor. He represented that the College was in financial difficulty, but did not provide any figures to support that assertion. When several members, including Dr. Schoenhals, asked that the Union conduct an audit of the College's finances, Greer told them that there was not enough time. The reason for this urgency was never explained, and, upon information and belief, it is because the College is not, in fact, in financial difficulty, but because the administration and BOT sought to hide their improprieties. The faculty voted to re-open the CBA. The Union and the College administration began to negotiate terms of a new MOA (the "2014 MOA").  The 2014 MOA was presented to the faculty, and ratified, at a November 12, 2014 meeting.

34.    The 2014 MOA – negotiated by the Union negotiating committee with its former chair, now the College President – was a wholesale abrogation of union rights and protections. The new document that replaced the 2012-2016 CBA contained several draconian changes:

(a)    The worst was that the MOA simply omitted the entire section of the CBA providing for tenure for senior faculty. It was unprecedented for a faculty union to surrender tenure rights;

(b)    The Union surrendered its right to verify claims of financial exigency made by the College with new language containing a blanket acknowledgment by the Union that it accepts the College' s claims;

(c)    The 2014 MOA eliminated the requirements of notice to a terminated faculty member and severance pay linked to years of service;

(d) The 2014 MOA required that savings of almost $5 million per year had to be realized in a period of only eight months and obtained exclusively from the faculty budget line — with $2,600,000 of the savings to come from a faculty reduction-in-force ("RIF") – without any plans to cut operating costs or reduce salary and benefits of over-paid administrative staff.

35.    At the November 12, 2014 faculty meeting, Greer urged the Union members to ratify the 2014 MOA. The faculty present at the meeting voted to do so.

36.    Among the provisions in the 2014 MOA detrimental to the faculty was an Early Retirement Incentive Program ("ERIP") that provided certain financial benefits to full-time faculty members who have achieved a minimum of 40, 25 or 15 years of service. There is very

little detail in the MOA about the specifics of the ERIP, other than a stated percentage of base salary (depending on years of service) to be paid out over four years for faculty who retire early. To request an ERIP, Union members were required to submit an irrevocable resignation *before November 17, 2014.*

37.    However, according to the timeframe set forth in the 2014 MOA, the lists of employees who the College administration intended to terminate would not be released by the College until *November 17, 2014.* Thus, Union members who elected the ERIP had to gamble – not knowing if they were to be terminated, but losing the opportunity for the ERIP if they did not make a retirement election by the cut-off date.

38.    The 2014 MOA timetable further provided that from November 18 to November 21, 2014, individuals who did not elect ERIP before November 17, and who now learn they are likely to be terminated, could elect an ERIP with much less favorable financial terms (the "Secondary Incentive" or "ERIP II"). ERIP II was issued on November 20, 2014 and employees, including Plaintiff, had until November 21, 2014, only one day, to elect ERIP II.

39.    Appendix B to the 2014 MOA was titled "Summary\Synopsis of Methodology for Determining Full-Time Faculty Reductions." It is a complicated evaluation system that set up certain criteria that were to be applied to determine which faculty members would be laid off. One criterion was an analysis of enrollment trends by department, utilizing a formula of students enrolled against number of faculty, number of students majoring and minoring in this subject, and number of classes and class size.

40.    Despite its inclusion in the 2014 MOA, the College administration did not apply this methodology to identify faculty for termination. Instead, the administration targeted the

longest term, highest paid, older faculty, whom were the most qualified professors.

41.     Dr. Schoenhals calculated his own Appendix B metrics, which indicated that he should not be a candidate for termination. He determined his department, Anthropology, had one of the highest number of majors per full-time faculty and strong enrollment figures.

42.     In fact, the College did not apply the metrics in determining who to lay off.  In Plaintiff's case, enrollment data was ignored, and the administration failed to adjust for the "sabbatical" component that was part of the formula. It also appeared that the underlying source of the data the administration was using -the College's "Banner" system – was faulty. The administration was aware of that problem, because the previous Union President had informed the former Provost of numerous errors, including one instance in which a faculty member with 200 students was credited with only 20.

43.     Subsequent examination of those faculty members who were and were not terminated reveals that the College failed to apply the very metrics it bargained for to any of these determinations.   Instead, the College administration, without any resistance from the Union, essentially marked all previously tenured faculty for termination, and kept younger, less experienced, lower-paid faculty members.

44.     For example, Professor Guannan Li, a history professor who specializes in China (Dr. Schoenhals's field) is younger than Dr. Schoenhals and had lower metrics, but he was not terminated.

45.     As another example, Professor Nathalia Rogers, Associate Professor, Sociology, is younger than Dr. Schoenhals and had lower metrics, but she was not terminated.

46.     Similarly, David Racanelli, a faculty member in the Music Department, who has

been at the College only half the time that Dr. Schoenhals has, is younger than Dr. Schoenhals, and has very low metrics, was not terminated - Racanelli is, however, the nephew of a BOT member.

47.     Richard Wilkins, Associate Professor of Biology, who was also appointed to an interim administrative position, is younger than Dr. Schoenhals and has lower metrics, but he was not terminated.

48.     Brian Stipelman, Associate Professor of Political Science and interim Dean of the College, is younger than Dr. Schoenhals and had lower metrics, but he was not terminated.  In fact, in his position as interim dean, Stipelman stated that he thought it was acceptable to "get rid" of older faculty to make room for younger members.

49.     Faculty in President Inserra's Education School, who, upon information and belief, were all younger than Dr. Schoenhals, were not terminated even though their metrics were, upon information and belief, lower than those of Dr. Schoenhals.

50.      On or about November 19, 2014 President Inserra's secretary called Dr. Schoenhals, six other senior faculty and seven junior faculty, arranging individual appointments for each with the President.  Dr. Schoenhals' meeting was scheduled for the following day, November 20.

51.     Expecting that this might be a termination meeting, Dr. Schoenhals called Sean Callahan, the NYSUT labor relations specialist assigned to the Union. When Dr. Schoenhals identified himself to Callahan, Callahan replied, in these words or words to this effect, "I know who you are, you filed a DFR charge against the union in 2012."

52.     On November 20, 2014, Dr. Schoenhals reported to President Inserra's office with

13

two colleagues; they were not allowed in, but instead Dr. Schoenhals was told to find Mark Greer, Union Chapter President. He and Greer then met with Inserra and Interim Provost Wilkens (who until recently had been Union officers). When Dr. Schoenhals asked why he was being selected for termination, Wilkens would not tell him. Dr. Schoenhals explained that he had calculated his metrics based on the 2014 MOA, they were good, and he should not have been selected. When he started to explain his reasoning, Wilkens interrupted and told Inserra that Greer must be the one to present the numbers.

53.    Greer went with Dr. Schoenhals to his office and they reviewed the numbers. Greer told him that his numbers were "healthy." They returned to Inserra' s office and Greer read them the numbers. Wilkens and Inserra told Dr. Schoenhals, in these words or words to this effect, that they must "stop the clock" and recheck their calculations. Wilkens asked Dr. Schoenhals to leave and Greer stayed behind.

54.    At 5 p.m. Greer re-appeared and told Dr. Schoenhals that they should go to the office of Stipelman —another former Union colleague now in administration — to get his calculations and see where mistakes might have been made. However, Stipelman had left for the day and his office was locked.

55.    The following day, November 21, 2014, was the deadline for electing ERIP II. Having been led to believe that the administration, together with Union Chapter President Greer, was re-evaluating his claim that he had been incorrectly designated for termination, Dr. Schoenhals, who had not elected ERIP I, did not elect ERIP II. Over the next week he sent emails to Greer and to Inserra, Wilkens and Stipelman with further calculations that show mistakes.

56.     On December 5, 2014 Dr. Schoenhals received a letter, dated November 21, 2014 and postmarked December 2, 2015, terminating his employment effective January 2, 2015.

57.     Dr. Schoenhals was informed in January 2015 that the NYSUT Legal Department declined to proceed with a grievance concerning his termination.  He could not avail himself of ERIP I or ERIP II. .

58.     After ERIP, ERIP II, and the subsequent terminations, the College's faculty was significantly depleted.  To replace the older, experienced senior faculty who had been targeted by the RIF, the college hired less experienced adjunct professors.

59.     The College also effectively demoted several of the older, more experienced faculty member who were terminated during the RIF, by hiring them back as adjunct professors or assistant adjunct professor who are paid per class taught at a rate significantly lower than their salaries as tenured professors, and who do not receive the benefits they received as tenured professors.

60.     For example, Kendell Thorton, who was a tenured psychology professor at the College, was terminated during the RIF, only to be hired the next semester as an Assistant Adjunct Professor to teach the same courses he was scheduled to teach before the RIF.  Daniel Ness, who was a tenured education professor at the College, was terminated during the RIF, only to be hired the next semester as an Adjunct Professor to teach the same courses he was scheduled to teach before the RIF.

### AS AND FOR A FIRST
### CAUSE OF ACTION
**(Breach of the Duty of Fair Representation- Dowling College Chapter)**

61.     The allegations contained in paragraphs 1-60 are incorporated by reference as though fully set forth herein.

62.     The Union owed Plaintiff, and all faculty of the College, a duty to fairly represent them, in good faith, with integrity and in a manner that was disinterested and independent of the influence of the employer.

63.     The Union made no effort to ensure that its officers and EC members represented the best interests of the membership, rather than the interests of the employer, or even that they were supporters, rather than opponents, of union principles. In fact, the revolving door from the Union to administration was the result of an underlying ethical problem in the Union which led to its fundamental inability to represent faculty interests.

64.     By negotiating away tenure – the most fundamental right of an academic – the Union's conduct was so far outside the range of reasonableness as to be irrational.

65.     The Union acted arbitrarily and in bad faith by pressuring members to agree quickly to contract terms favored by the employer, where there was no evidence of an objective need for urgency, and by agreeing to a timetable that forced members to make major decisions affecting their financial futures in a matter of days.

66.     The Union abrogated its responsibility as exclusive bargaining representative to investigate the College's claims of financial exigency, initiate an independent audit and/or provide Union members with data allowing for an informed decision on the MOAs.

67.     The Union discriminated against Plaintiff because he was a vocal opponent of decisions and actions by Union leadership, by misleading him into believing that the Union was engaged in a good faith review of his metrics with the College administration and that no decision on his employment status would be made while that review was pending. The Union further acted discriminatorily and in bad faith by refusing to allow Dr. Schoenhals to proceed

with a grievance covering his termination.

68.    As a result of the aforesaid actions, Plaintiff has suffered loss of employment as well as back pay, front pay and benefits that he would have received had he continued as a tenured professor at Dowling, or in the alternative, the amount he would have received had he elected ERIP.

**AS AND FOR A SECOND**
**CAUSE OF ACTION**
**(Breach of the Collective Bargaining Agreement- Dowling College)**

69.    The allegations contained in paragraphs 1-68 are incorporated by reference as though fully set forth herein.

70.    The employer, Dowling College, breached the collective bargaining agreement when it failed to properly apply its own metrics in deciding to terminate Plaintiff, while retaining junior, less-accomplished faculty with less service at Dowling and lower metrics, in departments with declining enrollments and fewer majors than Anthropology.

71.    As a result of the aforesaid acts, Plaintiff has suffered loss of his position as a Professor of Anthropology and department chair, back pay, front pay and benefits that he would have received had he continued employment at Dowling.

**AS AND FOR A THIRD**
**CAUSE OF ACTION**
**(Breach of Contract - Dowling College)**

72.    The allegations contained in paragraphs 1-71 are incorporated by reference as though fully set forth herein.

73.    The employer, Dowling College, breached the collective bargaining

17

agreement by stripping its long-term, senior faculty, who had all been previously granted

tenure protection for the duration of their careers, of tenure.    Tenure is an enforceable

contractual right the terms of which are career-long, and once it has been granted, it remains a

contractual right of the professor.    The College breached this contractual right by negotiating a

contract that effectively stripped its tenured faculty of tenure protections.

74.    As a result of the aforesaid acts, Plaintiff has suffered loss of his position as a

Professor of Anthropology and department chair, back pay, front pay and benefits that he would

have received had he continued tenured employment at Dowling.

**AS AND FOR A FOURTH**
**CAUSE OF ACTION**
**(Violation of 29 U.S.C. § 621 *et seq* ("ADEA") – Dowling College)**

75.    The allegations contained in paragraphs 1-74 are incorporated by reference as

though fully set forth herein.

76.    The employer, Dowling College, purposely targeted and terminated the oldest

members of their previously tenured faculty, including Plaintiff.

77.    The employer, Dowling College, took this action against the oldest members of

their previously tenured faculty, including Plaintiff, because of their age.

78.    By its discharge of Plaintiff because of his age, defendant Dowling College

violated plaintiff's rights under the Age Discrimination in Employment Act ("ADEA"), 29 USC

§621 *et seq.*

18

## AS AND FOR A FIFTH
## CAUSE OF ACTION
### (Violation of NYSHRL–Dowling College)

79.    The allegations contained in paragraphs 1-78 are incorporated by reference as though fully set forth herein.

80.    By its discharge of Plaintiff because of his age, defendant Dowling College violated Plaintiff's rights under section 296 of the New York State Human Rights Law.

## AS AND FOR A SIXTH
## CAUSE OF ACTION
### (Violation of NYSHRL– Dowling College Chapter)

81.    The allegations contained in paragraphs 1-80 are incorporated by reference as though fully set forth herein.

82.    The Union has a duty to fairly represent its members, including Plaintiff, in good faith, with integrity and in a manner that is disinterested and independent of the influence of the employer.

83.    By failing to effectively participate in negotiation, ratification, and administration of the discriminatory CBA and MOAs in the best interest of it's members, the Union has aided and abetted the College's discrimination against the Plaintiff in violation of § 296 of the New York State Human Rights Law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands Judgment in his favor and against Defendants, individually and/or jointly and severally, for back pay, reinstatement, or front pay and the value of all lost benefits, the amounts to be determined at trial but in no event less than $1,000,000.

Dated: New York, New York
      February 17, 2015

                                    ADVOCATES FOR JUSTICE
                                    CHARTERED ATTORNEYS
                                    Attorneys for Plaintiff


                                    By:_____/s_____
                                              Arthur Z. Schwartz
                                    225 Broadway, Suite 1902
                                    New York, New York 10007
                                    (212) 285-1400
                                    aschwartz@afjlaw.com


                                    By:_____/s_____
                                              Laine A. Armstong
                                    225 Broadway, Suite 1902
                                    New York, New York 10007
                                    (212) 285-1400
                                    laine@advocatesny.com

# EXHIBIT C

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★    SEP 14 2016    ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MARTIN SCHOENHALS,

                                        Plaintiff,

                    -v-

DOWLING COLLEGE CHAPTER, NEW YORK
STATE UNITED TEACHERS, LOCAL 3890;
NEW YORK STATE UNITED TEACHERS,
AFT, AFL-CIO; and DOWLING COLLEGE,

                                        Defendants.

**STIPULATION OF
DISCONTINUANCE**


**Case No. 15-CV-2044
(ADS)(ARL)**

    **IT IS HEREBY STIPULATED AND AGREED,** by and between the undersigned as

attorneys of record for Defendants New York State United Teachers ("NYSUT") and Dowling

College Chapter, New York State United Teachers, Local #3890 (the "Union") and the attorney

of record for the Plaintiff Martin Schoenhals ("Schoenhals"), in the above-entitled action that,

the above-referenced proceeding is hereby discontinued as to Defendants NYSUT and the

Union, with prejudice, and without costs to the below-signed as against each other or their

respective clients. This stipulation may be filed without further notice with the Clerk of the

Court.

Law Office of Richard E. Casagrande
Attorneys for Defendants
New York State United
Teachers and Dowling College Chapter,
New York State United Teachers,
Local #3890
52 Broadway, 9th Floor
New York, New York 10004
(212) 533-6300
By: _____ 8/12/16
    Mitchell Rubinstein    Dated

Advocates for Justice Chartered Attorneys
Attorneys for Plaintiff
Martin Schoenhals
225 Broadway, Suite 1902
New York, New York 10007
(212) 285-1400



By: _____ 8/25/2016
    Laine Armstrong    Dated

NYClegal: 182989

11

ORDER: The above stipulation discontinuing this action as against the Defendant Dowling College Chapter, NYS United Teachers, Local #3890 (the "Union") and the Defendant NYS United Teachers AFT, AFL-CIO ("NYSUT") is So Ordered. The Clerk of the Court is respectfully directed to terminate the Union and NYSUT as parties in this action and to amend the official caption as follows:

> ----------------------------------------x
> Martin Schoenhals, Plaintiff,
> -against-
> Dowling College, Defendant.
> ----------------------------------------x

In light of this stipulation, the Court is advancing the deadline for the Plaintiff to reinstate his previously-filed motion to amend, DE [27], to 9/20/2016. The modified discovery schedule entered by Judge Lindsay on 7/19/2016 shall remain in effect as to the remaining parties until further Order of the Court.

Dated:  Central Islip, NY
       September 14, 2016        */s/ Arthur D. Spatt*_____
                            Arthur D. Spatt, U.S.D.J.

# EXHIBIT D

Case 2:15-cv-02044-ADS-ARL   Document 53   Filed 11/29/16   Page 1 of 2 PageID #: 755

| Information to identify the case: | | | |
|---|---|---|---|
| Debtor | DOWLING COLLEGE<br>Name | EIN | 11 - 2157078 __ __ |
| United States Bankruptcy Court for the: | EASTERN District of NY<br>(State) | [Date case filed for chapter 11 | 11/29/2016<br>MM / DD / YYYY   OR |
| Case number: | 8-16-75545-reg | [Date case filed in chapter ____ | ____<br>MM / DD / YYYY |
| | | Date case converted to chapter 11 | ____ ]<br>MM / DD / YYYY |

## Official Form 309F (For Corporations or Partnerships)

# Notice of Chapter 11 Bankruptcy Case          12/15

**For the debtor listed above, a case has been filed under chapter 11 of the Bankruptcy Code. An order for relief has been entered.**

**This notice has important information about the case for creditors, debtors, and trustees, including information about the meeting of creditors and deadlines. Read both pages carefully.**

The filing of the case imposed an automatic stay against most collection activities. This means that creditors generally may not take action to collect debts from the debtor or the debtor's property. For example, while the stay is in effect, creditors cannot sue, assert a deficiency, repossess property, or otherwise try to collect from the debtor. Creditors cannot demand repayment from the debtor by mail, phone, or otherwise. Creditors who violate the stay can be required to pay actual and punitive damages and attorney's fees.

Confirmation of a chapter 11 plan may result in a discharge of debt. A creditor who wants to have a particular debt excepted from discharge may be required to file a complaint in the bankruptcy clerk's office within the deadline specified in this notice. (See line 11 below for more information.)

To protect your rights, consult an attorney. All documents filed in the case may be inspected at the bankruptcy clerk's office at the address listed below or through PACER (Public Access to Court Electronic Records at www.pacer.gov).

**The staff of the bankruptcy clerk's office cannot give legal advice.**

**Do not file this notice with any proof of claim or other filing in the case.**

| | | | |
|---|---|---|---|
| 1. | **Debtor's full name** | DOWLING COLLEGE | |
| 2. | **All other names used in the last 8 years** | Dowling College, Inc. d/b/a Dowling Institute d/b/a Dowling College Alumni Association d/b/a Cecom | |
| 3. | **Address** | 150 Idle Hour Blvd., Oakdale, New York 11769 | |
| 4. | **Debtor's attorney**<br>Name and address | Sean Southard, Esq., Klestadt Winters et al., 200 W. 41st St., 17th Floor<br>New York, NY 10036 | Contact phone  212-972-3000<br>Email  ssouthard@klestadt.com |
| 5. | **Bankruptcy clerk's office**<br>Documents in this case may be filed at this address.<br>You may inspect all records filed in this case at this office or online at www.pacer.gov. | 100 Federal Plaza, Central Islip, NY 11722 | Hours open  9:00 a.m. - 4:30 p.m.<br>Contact phone  (631) 712-6200 |
| 6. | **Meeting of creditors**<br>The debtor's representative must attend the meeting to be questioned under oath.<br>Creditors may attend, but are not required to do so. | _____ at _____<br>Date       Time<br><br>The meeting may be continued or adjourned to a later date. If so, the date will be on the court docket. | Location: |

For more information, see page 2 ▶

| Debtor | DOWLING COLLEGE | Case number (if known) | 8-16-75545-reg |
|--------|-----------------|------------------------|----------------|
|        | Name            |                        |                |

| | | |
|---|---|---|
| **7. Proof of claim deadline** | **Deadline for filing proof of claim:** | [Not yet set. If a deadline is set, the court will send you another notice.] or |
| | | [date, if set by the court)] |
| | A proof of claim is a signed statement describing a creditor's claim. A proof of claim form may be obtained at www.uscourts.gov or any bankruptcy clerk's office. | |
| | Your claim will be allowed in the amount scheduled unless: | |
| |   ☐ your claim is designated as *disputed*, *contingent*, or *unliquidated*; | |
| |   ☐ you file a proof of claim in a different amount; or | |
| |   ☐ you receive another notice. | |
| | If your claim is not scheduled or if your claim is designated as *disputed*, *contingent*, or *unliquidated*, you must file a proof of claim or you might not be paid on your claim and you might be unable to vote on a plan. You may file a proof of claim even if your claim is scheduled. | |
| | You may review the schedules at the bankruptcy clerk's office or online at www.pacer.gov. | |
| | Secured creditors retain rights in their collateral regardless of whether they file a proof of claim. Filing a proof of claim submits a creditor to the jurisdiction of the bankruptcy court, with consequences a lawyer can explain. For example, a secured creditor who files a proof of claim may surrender important nonmonetary rights, including the right to a jury trial. | |
| **8. Exception to discharge deadline** The bankruptcy clerk's office must receive a complaint and any required filing fee by the following deadline. | You must start a judicial proceeding by filing a complaint if you want to have a debt excepted from discharge under 11 U.S.C. § 1141(d)(6)(A). | |
| | **Deadline for filing the complaint:**       _____ | |
| **9. Creditors with a foreign address** | If you are a creditor receiving notice mailed to a foreign address, you may file a motion asking the court to extend the deadlines in this notice. Consult an attorney familiar with United States bankruptcy law if you have any questions about your rights in this case. | |
| **10. Filing a Chapter 11 bankruptcy case** | Chapter 11 allows debtors to reorganize or liquidate according to a plan. A plan is not effective unless the court confirms it. You may receive a copy of the plan and a disclosure statement telling you about the plan, and you may have the opportunity to vote on the plan. You will receive notice of the date of the confirmation hearing, and you may object to confirmation of the plan and attend the confirmation hearing. Unless a trustee is serving, the debtor will remain in possession of the property and may continue to operate its business. | |
| **11. Discharge of debts** | Confirmation of a chapter 11 plan may result in a discharge of debts, which may include all or part of your debt. See 11 U.S.C. § 1141(d). A discharge means that creditors may never try to collect the debt from the debtor except as provided in the plan. If you want to have a particular debt owed to you excepted from the discharge under 11 U.S.C. § 1141(d)(6)(A), you must start a judicial proceeding by filing a complaint and paying the filing fee in the bankruptcy clerk's office by the deadline. | |

# EXHIBIT E

| Information to identify the case: | | |
|---|---|---|
| Debtor __DOWLING COLLEGE__<br>Name | EIN __11__ _2157078___ | |
| United States Bankruptcy Court for the: __EASTERN__ District of __NY__ (State) | [Date case filed for chapter 11 __11/29/2016__<br>MM / DD / YYYY  OR | |
| Case number: __8-16-75545-reg__ | [Date case filed in chapter _____<br>MM / DD / YYYY | |
| | Date case converted to chapter 11 _____<br>MM / DD / YYYY | |

## Official Form 309F (For Corporations or Partnerships)
# Notice of Chapter 11 Bankruptcy Case
12/15

**For the debtor listed above, a case has been filed under chapter 11 of the Bankruptcy Code. An order for relief has been entered.**

**This notice has important information about the case for creditors, debtors, and trustees, including information about the meeting of creditors and deadlines. Read both pages carefully.**

The filing of the case imposed an automatic stay against most collection activities. This means that creditors generally may not take action to collect debts from the debtor or the debtor's property. For example, while the stay is in effect, creditors cannot sue, assert a deficiency, repossess property, or otherwise try to collect from the debtor. Creditors cannot demand repayment from the debtor by mail, phone, or otherwise. Creditors who violate the stay can be required to pay actual and punitive damages and attorney's fees.

Confirmation of a chapter 11 plan may result in a discharge of debt. A creditor who wants to have a particular debt excepted from discharge may be required to file a complaint in the bankruptcy clerk's office within the deadline specified in this notice. (See line 11 below for more information.)

To protect your rights, consult an attorney. All documents filed in the case may be inspected at the bankruptcy clerk's office at the address listed below or through PACER (Public Access to Court Electronic Records at www.pacer.gov).     IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

**The staff of the bankruptcy clerk's office cannot give legal advice.**

**Do not file this notice with any proof of claim or other filing in the case.**     ★   APR 14 2017   ★

| | | | |
|---|---|---|---|
| 1. Debtor's full name | DOWLING COLLEGE | | LONG ISLAND OFFICE |
| 2. All other names used in the last 8 years | Dowling College, Inc. d/b/a Dowling Institute d/b/a Dowling College Alumni Association d/b/a Cecom | | |
| 3. Address | 150 Idle Hour Blvd., Oakdale, New York 11769 | | |
| 4. Debtor's attorney<br>Name and address | Sean Southard, Esq., Klestadt Winters et al., 200 W. 41st St., 17th Floor<br>New York, NY 10036 | Contact phone<br>Email | 212-972-3000<br>ssouthard@klestadt.com |
| 5. Bankruptcy clerk's office<br>Documents in this case may be filed at this address.<br>You may inspect all records filed in this case at this office or online at www.pacer.gov. | 100 Federal Plaza, Central Islip, NY 11722 | Hours open<br>Contact phone | 9:00 a.m. - 4:30 p.m.<br>(631) 712-6200 |
| 6. Meeting of creditors<br>The debtor's representative must attend the meeting to be questioned under oath.<br>Creditors may attend, but are not required to do so. | _____ at _____<br>Date      Time<br>The meeting may be continued or adjourned to a later date. If so, the date will be on the court docket. | | Location: |

For more information, see page 2 ▶

| Debtor | DOWLING COLLEGE | Case number (if known) | 8-16-75545-reg |
| --- | --- | --- | --- |
| | Name | | |

| | | |
| --- | --- | --- |
| 7. **Proof of claim deadline** | **Deadline for filing proof of claim:** | [Not yet set. If a deadline is set, the court will send you another notice.] or<br><br>[date, if set by the court)] |

A proof of claim is a signed statement describing a creditor's claim. A proof of claim form may be obtained at www.uscourts.gov or any bankruptcy clerk's office.

Your claim will be allowed in the amount scheduled unless:

- your claim is designated as *disputed, contingent,* or *unliquidated;*
- you file a proof of claim in a different amount; or
- you receive another notice.

If your claim is not scheduled or if your claim is designated as *disputed, contingent,* or *unliquidated,* you must file a proof of claim or you might not be paid on your claim and you might be unable to vote on a plan. You may file a proof of claim even if your claim is scheduled.

You may review the schedules at the bankruptcy clerk's office or online at www.pacer.gov.

Secured creditors retain rights in their collateral regardless of whether they file a proof of claim. Filing a proof of claim submits a creditor to the jurisdiction of the bankruptcy court, with consequences a lawyer can explain. For example, a secured creditor who files a proof of claim may surrender important nonmonetary rights, including the right to a jury trial.

| | | |
| --- | --- | --- |
| 8. **Exception to discharge deadline**<br><br>The bankruptcy clerk's office must receive a complaint and any required filing fee by the following deadline. | You must start a judicial proceeding by filing a complaint if you want to have a debt excepted from discharge under 11 U.S.C. § 1141(d)(6)(A).<br><br>**Deadline for filing the complaint:** _____ | |

| | | |
| --- | --- | --- |
| 9. **Creditors with a foreign address** | If you are a creditor receiving notice mailed to a foreign address, you may file a motion asking the court to extend the deadlines in this notice. Consult an attorney familiar with United States bankruptcy law if you have any questions about your rights in this case. | |

| | | |
| --- | --- | --- |
| 10. **Filing a Chapter 11 bankruptcy case** | Chapter 11 allows debtors to reorganize or liquidate according to a plan. A plan is not effective unless the court confirms it. You may receive a copy of the plan and a disclosure statement telling you about the plan, and you may have the opportunity to vote on the plan. You will receive notice of the date of the confirmation hearing, and you may object to confirmation of the plan and attend the confirmation hearing. Unless a trustee is serving, the debtor will remain in possession of the property and may continue to operate its business. | |

| | | |
| --- | --- | --- |
| 11. **Discharge of debts** | Confirmation of a chapter 11 plan may result in a discharge of debts, which may include all or part of your debt. See 11 U.S.C. § 1141(d). A discharge means that creditors may never try to collect the debt from the debtor except as provided in the plan. If you want to have a particular debt owed to you excepted from the discharge under 11 U.S.C. § 1141(d)(6)(A), you must start a judicial proceeding by filing a complaint and paying the filing fee in the bankruptcy clerk's office by the deadline. | |

ORDER:  This action is stayed pending the outcome of the Defendant Dowling College's bankruptcy proceeding.  The parties shall notify the Court within ten days of any decision by the Bankruptcy Court that may affect this stay.  SO ORDERED:

s/ Arthur D. Spatt

_____        4/14/17
Arthur D. Spatt, U.S.D.J.                                 Date

# EXHIBIT F

**Fill in this information to identify the case:**

Debtor 1   Dowling College

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court   **Eastern District of New York**

Case number:  **16-75545**

FILED
U.S. Bankruptcy Court
Eastern District of New York
12/21/2016
Robert A. Gavin, Clerk

## Official Form 410
# Proof of Claim

04/16

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| **Part 1:** | **Identify the Claim** |
|---|---|

**1. Who is the current creditor?**

Martin Schoenhals

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Martin Schoenhals

Name

c/o Laine A. Armstrong
Advocates for Justice
225 Broadway, Suite 1902
New York, NY 10007

Contact phone   212-285-1400 x707

Contact email   laine@advocatesny.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

Where should payments to the creditor be sent? (if different)

Name

Contact phone

Contact email

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known)          Filed on ____ MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing?

**Part 2:**  **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No <br> ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |
| 7. **How much is the claim?** | $ _____1397147.03_____  **Does this amount include interest or other charges?** <br> ☑ No <br> ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). <br> Limit disclosing information that is entitled to privacy, such as healthcare information. <br><br> Breach of contract, wrongful termination, and age discrimination |
| 9. **Is all or part of the claim secured?** | ☑ No <br> ☐ Yes. The claim is secured by a lien on property. <br> **Nature of property:** <br> ☐ Real estate.   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.* <br> ☐ Motor vehicle <br> ☐ Other. Describe: _____ <br><br> **Basis for perfection:** _____ <br><br> Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.) <br><br> **Value of property:** $ _____ <br><br> **Amount of the claim that is secured:** $ _____ <br><br> **Amount of the claim that is unsecured:** $ _____  (The sum of the secured and unsecured amounts should match the amount in line 7.) <br><br> **Amount necessary to cure any default as of the date of the petition:** $ _____ <br><br> **Annual Interest Rate** (when case was filed) _____ % <br><br> ☐ Fixed <br> ☐ Variable |
| 10. **Is this claim based on a lease?** | ☑ No <br> ☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____ |
| 11. **Is this claim subject to a right of setoff?** | ☑ No <br> ☐ Yes. Identify the property: _____ |

Official Form 410                     Proof of Claim                     page 2

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☐ No ☑ Yes. *Check all that apply:* | | Amount entitled to priority |
|---|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $ |
| | ☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $ |
| | ☑ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $ 12850.00 |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies | | $ |
| | * Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment. | | |

## Part 3: Sign Below

| The person completing this proof of claim must sign and date it. FRBP 9011(b). If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571. | Check the appropriate box: |
|---|---|
| | ☐ I am the creditor. |
| | ☑ I am the creditor's attorney or authorized agent. |
| | ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. |
| | ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |
| | I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt. |
| | I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct. |
| | I declare under penalty of perjury that the foregoing is true and correct. |
| | Executed on date    12/21/2016 MM / DD / YYYY |
| | /s/  Laine A. Armstrong Signature |
| | Print the name of the person who is completing and signing this claim: |
| | Name    Laine A. Armstrong First name    Middle name    Last name |
| | Title    Principal |
| | Company    Advocates for Justice, Chartered Attorneys Identify the corporate servicer as the company if the authorized agent is a servicer |
| | Address    225 Broadway, Suite 1902 Number  Street |
| | New York, NY 10007 City  State  ZIP Code |
| | Contact phone    2122851400 x707    Email    laine@advocatesny.com |

# EXHIBIT G



# Employment Practices Liability

Insurance Policy

**Executive Risk Indemnity Inc.**
*Home Office:*
1013 Centre Road
Wilmington, Delaware 19808

*Administrative Offices/Mailing Address:*
82 Hopmeadow Street
Simsbury, Connecticut 06070-7683
Phone: 860.408.2000
Fax: 860.408.2002
Email: info@chubb.com
Web Site: www.chubb.com

THIS IS A CLAIMS MADE POLICY
WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY.
PLEASE READ THE ENTIRE POLICY CAREFULLY.

EXECUTIVE RISK INDEMNITY INC.

EMPLOYMENT PRACTICES LIABILITY INSURANCE POLICY

**Executive Risk Indemnity Inc. (the "Underwriter") and the Insureds, subject to all of the terms, conditions, and limitations of this Policy, agree as follows:**

I.    **INSURING AGREEMENTS**

(A)    The Underwriter will pay on behalf of the **Insureds** that percentage of **Defense Expenses** and **Loss** set forth in ITEM 4 of the Declarations in excess of the applicable retention set forth in ITEM 5 of the Declarations resulting from **Claims** first made against any **Insured** during the **Policy Period** or, if applicable, the Extended Reporting Period, for **Employment Practices Wrongful Acts** occurring subsequent to the Retroactive Date stated in ITEM 6 of the Declarations and before the expiration of the **Policy Period**.

(B)    The Underwriter will have the right and duty to defend any covered **Claim**, even if the allegations thereof are groundless, false, or fraudulent; provided, that the Underwriter's obligation to defend is subject to the applicable coinsurance, retention and Limits of Liability provisions as set forth in CONDITION (E) below.

II.    **DEFINITIONS**

(A)    "**Application**" means the application attached to and forming part of this Policy, including any materials submitted in connection with such application, all of which are on file with the Underwriter and are a part of this Policy, as if physically attached.

(B)    "**Claim**" means:

    (1)    any written notice received by an **Insured** that any person or entity intends to hold an **Insured** responsible for an **Employment Practices Wrongful Act**;

(2)     any judicial, administrative or other proceeding, including any criminal proceeding, against any **Insured** for an **Employment Practices Wrongful Act**, including but not limited to any such proceeding brought by or in association with the Equal Employment Opportunity Commission or any other state or federal agency or authority with jurisdiction over the **Named Insured's** or a covered **Subsidiary's** employment practices; or

(3)     any written request to toll or waive a statute of limitations relating to a potential judicial, administrative or other proceeding against any **Insured** for an **Employment Practices Wrongful Act**;

provided, that **Claim** does not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement.

(C)     "**Defense Expenses**" means reasonable legal fees and expenses incurred through counsel of the Underwriter's choice in the investigation, defense or appeal of any **Claim** (including, with the consent of the Underwriter, fees for appeal bonds and expert witnesses); provided, that **Defense Expenses** does not include remuneration, salaries, wages, fees, expenses, overhead, or benefit expenses of any **Insured**.

(D)     "**Discrimination**" means any failure or refusal to hire any person, any failure or refusal to promote any person, the demotion or discharge of any person, wrongful failure to grant tenure, or any limitation, segregation or classification of **Employees** or applicants for employment in any way that would deprive or tend to deprive any person of employment opportunities or otherwise adversely affect his or her status as an **Employee**, because of such person's race, color, religion, age, sex, national origin, disability, pregnancy, sexual orientation or preference, or other status that is protected pursuant to any applicable federal, state, or local statute or ordinance.

(E)     "**Employee**" means any individual whose labor or service is engaged by and directed by the **Named Insured** or by a covered **Subsidiary**. This includes part-time, seasonal, and temporary **Employees** as well as volunteers. **Employee** shall include any leased employee or independent contractor working solely for the **Named Insured** for conduct within his or her duties as such, but only if the **Named Insured** provides indemnification to such individual in the same manner as that provided to the **Named Insured's Employees**.

(F)     "**Employment Practices Wrongful Act**" means any actual or alleged: (1) **Wrongful Termination**; (2) **Discrimination**; (3) **Harassment**; (4) **Retaliation**; (5) **Workplace Tort**; (6) **Third Party Discrimination**; or (7) **Third Party Sexual Harassment**.

(G)  "**Harassment**" means:

   (1)  unwelcome sexual advances, requests for sexual favors, or other verbal, visual, or physical conduct of a sexual nature that is made a condition of employment with the **Named Insured** or a covered **Subsidiary**, is used as a basis for employment decisions with the **Named Insured** or a covered **Subsidiary**, creates a work environment with the **Named Insured** or a covered **Subsidiary** that interferes with performance, or creates an intimidating, hostile, or offensive working environment; or

   (2)  workplace harassment (i.e., harassment of a non-sexual nature) which creates a work environment with the **Named Insured** or a covered **Subsidiary** that interferes with performance, or creates an intimidating, hostile, or offensive working environment.

(H)  "**Insured**" means the persons and entities described below:

   (1)  **Individual**.  If the **Named Insured** is shown in the Declarations as an individual, the **Named Insured** is an **Insured** only for the conduct of a business of which the **Named Insured** is the sole owner.

   (2)  **Corporation**.  If the **Named Insured** is shown in the Declarations as a corporation or organization other than a partnership or joint venture, the **Named Insured**, and any **Subsidiary** which is identified in the Declarations or by endorsement to this policy (a "covered **Subsidiary**"), are **Insureds**. The **Named Insured's** and such covered **Subsidiary's** directors and officers are **Insureds**, but only with respect to their duties in the operation of the **Named Insured's** or the covered **Subsidiary's** business.

   (3)  **Partnerships**.  If the **Named Insured** shown in the Declarations is a partnership or joint venture, the **Named Insured** is an **Insured**.  The **Named Insured's** partners are also **Insureds** but only for the conduct of the **Named Insured's** business.  However, no person or organization is covered for the conduct of any current or past partnership not named in the Declarations.

   (4)  **Employees**.  **Employees** of the **Named Insured** and of any covered **Subsidiary** are **Insureds** but only for the conduct of the **Named Insured's** or the covered **Subsidiary's** business within the scope of their employment.

(5) **Limitation on Coverage for Subsidiaries**. Notwithstanding the foregoing, any covered **Subsidiary** and any director, officer, or **Employee** who is an **Insured** by virtue of his or her affiliation with a covered **Subsidiary**, is an **Insured** only with respect to **Claims** based solely on **Employment Practices Wrongful Acts** occurring wholly subsequent to the date on which the covered **Subsidiary** became a **Subsidiary**.

(I) "**Loss**" means any damages (including back pay awards, front pay awards, compensatory damages and punitive or exemplary damages if insurable under the law pursuant to which this policy is construed), pre-judgment interest, post-judgment interest, and settlements which an **Insured** is legally obligated to pay as a result of a **Claim**; provided, that **Loss** does not include:

(1) civil or criminal fines, sanctions, liquidated damages, taxes or penalties, the multiplied portion of any multiplied damage award (except for multiplied damages awarded pursuant to the Age Discrimination in Employment Act and the Equal Pay Act), or matters which are uninsurable under the law pursuant to which this Policy is construed;

(2) any costs associated with the modification of any building or property in order to provide any reasonable accommodations required by, made as a result of, or to conform with the requirements of, the Americans with Disabilities Act and any amendments thereto or any similar federal, state or local statute, regulation, or common law;

(3) any other non-monetary relief awarded against any **Insured**, including without limitation any costs associated with compliance with any injunctive relief of any kind or nature;

(4) severance pay or damages determined to be owing under an express written contract of employment or an express written obligation to make payments in the event of the termination of employment;

(5) payment of insurance plan benefits; and

(6) amounts awarded pursuant to a labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement.

(J) "**Named Insured**" means the person or entity named in ITEM 1 of the Declarations.

(K) "**Policy Period**" means the period from the Inception Date to the Expiration Date in ITEM 2 of the Declarations or to any earlier cancelation date.

(L)     "**Potential Claim**" means any person alleging an **Employment Practices Wrongful Act**. "Alleging" as used in this paragraph means lodging a complaint or charge that does not constitute a **Claim**, but which may subsequently give rise to a **Claim**, with a **Supervisory Employee**, the **Named Insured's** or a covered **Subsidiary's** human resources department or the **Named Insured's** or a covered **Subsidiary's** department that provides a similar function to a human resources department.

(M)     "**Related Claims**" means all **Claims** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions, or events of **Employment Practices Wrongful Acts**.

(N)     "**Retaliation**" means retaliatory treatment against an **Employee** of the **Named Insured** or of a covered **Subsidiary** on account of such **Employee's** exercise or attempted exercise of his or her rights under law.

(O)     "**Subsidiary**" means any entity of whose outstanding securities representing the present right to vote for the election of directors more than fifty percent (50%) are owned by the **Named Insured** and/or one or more of its **Subsidiaries**, subject, however, to the provisions of CONDITION (B) of this Policy.

(P)     "**Supervisory Employee**" means a partner, principal, director, officer, in-house counsel, risk manager, human resources representative, personnel director or any other **Employee** of the **Named Insured** or of a covered **Subsidiary** having management-level responsibility for personnel matters.

(Q)     "**Third Party**" means any person(s), other than an individual **Insured**, with whom an **Insured** interacts.

(R)     "**Third Party Discrimination**" means discrimination, including unfair or disparate treatment, by an **Insured** against a **Third Party** based on such **Third Party's** race, color, religion, age, sex, national origin, disability, pregnancy, sexual orientation or preference, or other status that is protected pursuant to any applicable federal, state or local statute or ordinance.

(S)     "**Third Party Sexual Harassment**" means unwelcome sexual advances, requests for sexual favors, or other verbal, visual or physical conduct of a sexual nature committed by an **Insured** against a **Third Party**.

(T)     "**Workplace Tort**" means employment-related: misrepresentation, defamation (including libel and slander), invasion of privacy, false imprisonment, negligent evaluation, negligent training, or supervision, wrongful discipline, or wrongful deprivation of career opportunity.

(U)     "**Wrongful Termination**" means the actual or constructive termination of the employment of, or demotion of, or failure or refusal to promote, any **Employee** which is in violation of law or is against public policy, or breach of an implied contract or agreement relating to employment, whether arising out of any personnel manual, employee handbook, policy statement, or other representation.

## III.   EXCLUSIONS

The Underwriter will not pay **Defense Expenses** or **Loss** for any **Claim**:

(A)     for any liability arising out of any actual or alleged violation of the Employee Retirement Income Security Act of 1974 and any amendments thereto or any similar provisions of any federal, state or local statutes, ordinances, regulations, or common law;

(B)     for any liability arising out of any actual or alleged violation of the Workers' Adjustment and Retraining Notification Act and any amendments thereto, or any similar provisions of any federal, state or local statutes, ordinances, regulations, or common law;

(C)     for any liability arising out of any actual or alleged violation of any workers' compensation law, any unemployment compensation law, any social security law, the Consolidated Omnibus Budget Reconciliation Act of 1985 and any amendments thereto, any disability benefits law, or any similar provisions of any federal, state or local statutes, ordinances, regulations, or common law;

provided that exclusions (A), (B), and (C) above shall not apply to any actual or alleged **Retaliation** against an **Employee** for exercising his or her rights under any such law(s);

(D)     arising out of any actual or alleged bodily injury to, or sickness, loss of consortium, disease or death of any person, or damage to or destruction of property, including the loss of use thereof; provided, that this EXCLUSION (D) does not apply to **Claims** for emotional distress, mental anguish or humiliation actually or allegedly resulting from an **Employment Practices Wrongful Act**;

(E)     seeking only injunctive or non-monetary relief, regardless of whether a prevailing claimant may be entitled to recover attorneys' fees and costs; provided, that the Policy will provide coverage, subject to all of its other terms, conditions, limitations, and endorsements, for **Defense Expenses** incurred in connection with such **Claims**;

(F)     arising out of:

    (1)     any **Claim** or fact, circumstance, situation, transaction, or event of **Employment Practices Wrongful Acts** which, before the Inception Date of this Policy as set forth in ITEM 2 of the Declarations, was the subject of any notice given under any other insurance policy, including but not limited to any policy of which this Policy is a renewal or replacement, or which was identified in any summary or statement of claims or potential claims submitted in connection with the **Application** or an application for any policy of which this Policy is a renewal or replacement; or

    (2)     any fact, circumstance, situation, transaction, or event of **Employment Practices Wrongful Acts** about which any **Supervisory Employee** had knowledge prior to the inception date of the first Employment Practices Liability Insurance Policy issued to the **Named Insured** and continuously renewed by the Underwriter;

provided, however, if EXCLUSION (F)(2) is applicable because of any **Employment Practices Wrongful Act** committed by a **Supervisory Employee**, and if no other **Supervisory Employee** had knowledge thereof prior to the inception date of the first Employment Practices Liability Insurance Policy issued to the **Named Insured** and continuously renewed by the Underwriter, EXCLUSION (F)(2) shall apply only to the **Supervisory Employee** who committed such **Employment Practices Wrongful Act** and shall not bar coverage for any other **Insured**;

(G)     resulting in **Loss** that an **Insured** is obligated to pay by reason of the assumption of another person's liability for an **Employment Practices Wrongful Act** in a contract or agreement; provided, that this EXCLUSION (G) will not apply to **Loss** resulting from an **Employment Practices Wrongful Act** that would have been sustained even in the absence of such contract or agreement; and

(H)     for any liability arising out of a lockout, strike, picket line, hiring of replacement workers, or other similar actions in connection with labor disputes or labor negotiations.

## IV.    EXTENSIONS OF COVERAGE

(A)    **Extended Reporting Period:**

    (1)    In the event that the Underwriter fails or refuses to renew this Policy, or in the event the **Named Insured** cancels or declines to renew this Policy, the **Named Insured** may purchase for an additional premium an Extended Reporting Period for a period of two (2) years following the expiration of the **Policy Period**.  The coverage otherwise afforded under this Policy will be extended to apply for the Extended Reporting Period, subject to all of this Policy's terms, conditions, limitations, and endorsements, to **Defense Expenses** and **Loss** from **Claims** first made against any **Insured** during the Extended Reporting Period for **Employment Practices Wrongful Acts** occurring subsequent to the Retroactive Date set forth in ITEM 6 of the Declarations and before the expiration of the **Policy Period**.  The additional premium for such Extended Reporting Period will be the amount set forth in ITEM 8 of the Declarations.  The **Named Insured** must notify the Underwriter in writing by certified mail at the address set forth in the Declarations of its decision to purchase such an Extended Reporting Period, and must pay the additional premium, within thirty (30) days after the end of the **Policy Period**.  Payment of the full additional premium by the due date is a strict condition precedent to the right to purchase an Extended Reporting Period.

    (2)    The maximum aggregate Limit of Liability set forth in ITEM 3(b) of the Declarations shall be the maximum aggregate Limit of Liability for the **Policy Period** and, if applicable, the Extended Reporting Period.  The Policy's maximum aggregate Limit of Liability is not increased, reinstated or renewed by virtue of the applicability of any Extended Reporting Period.

(B)    **Changes in Risk:**

    (1)    If, during the **Policy Period**, the **Named Insured** acquires any other entity or acquires substantially all of the assets of another entity, or acquires or assumes substantially all of the liabilities of another entity, or merges with another entity such that the **Named Insured** is the surviving entity, or acquires or creates a **Subsidiary** (collectively, a "transaction"), and, at the time of such transaction, the total number of employees of the entity so acquired, merged with, or created exceeds twenty percent (20%) of the total number of employees of the **Named Insured** as indicated on the most recent **Application**, this Policy will provide coverage with respect to such newly acquired or created entity, or any persons who become **Insureds** as a result of any such transaction, for a period of ninety (90) days after the date of such transaction.  There will be no coverage under this Policy in

respect of any **Claim** against the **Insureds** which is first made more than ninety (90) days after the transaction unless the Underwriter has received written notice containing full details of such transaction and the Underwriter, at its sole discretion, has agreed by written endorsement to provide such coverage upon such terms, conditions and limitations as it may require.  No coverage will be afforded under this Policy, by reason of this EXTENSION OF COVERAGE (B), for any **Claim** against any such newly acquired or created entity, or any persons who become **Insureds** as a result of any such transaction, based in whole or in part on any **Employment Practices Wrongful Act** occurring on or before the date of such transaction.

(2)    In the event any covered **Subsidiary** ceases to be a **Subsidiary**, whether through sale, dissolution or otherwise, prior to the Expiration Date of this Policy as stated in ITEM 2 of the Declarations, this Policy shall continue to apply with respect to such **Subsidiary** but only in respect of **Claims** against **Insureds** based solely on **Employment Practices Wrongful Acts** occurring wholly prior to the date such **Subsidiary** ceases to be a **Subsidiary**.

(3)    Immediately upon the happening of any of the following events:

   (a)    the acquisition of the **Named Insured** by another entity, or the merger of the **Named Insured** into another entity such that the **Named Insured** is not the surviving entity, or the consolidation of the **Named Insured** with another entity, or the acquisition of substantially all of the assets of the **Named Insured** by another entity;

   (b)    the appointment of a receiver, conservator, trustee, liquidator, or rehabilitator, or any similar official, for or with respect to the **Named Insured**; or

   (c)    the acquisition at any time or over a period of time during the **Policy Period** of record or beneficial ownership or control by any person, entity, or affiliated group of persons or entities of fifty percent (50%) or more of the outstanding securities representing the present right to vote for the election of directors of the **Named Insured**;

no coverage shall be afforded with respect to any **Claim** made against any **Insured** based in whole or in part on any **Employment Practices Wrongful Act** occurring subsequent to the date of such happening.

(4)   Upon the happening of any of the events described in EXTENSION OF
COVERAGE (B)(3), and subject to the provisions thereof, the premium
shall be deemed fully earned, the **Policy Period** shall remain unaltered,
and the **Named Insured** and its successor shall retain the right, if any, to
purchase Extended Reporting Period coverage pursuant to EXTENSION
OF COVERAGE (A).

(5)   In the event of the death, incapacity or bankruptcy of an **Insured**, a **Claim**
against the estate, heirs, legal representatives, or assigns of such **Insured**
will be deemed to be a **Claim** against such **Insured**.

(6)   Bankruptcy or insolvency of an **Insured** or an **Insured's** estate will not
relieve the Underwriter of any of its obligations hereunder.

## V.   CONDITIONS

(A)   **Territory:**

This Policy applies to any **Employment Practices Wrongful Act** occurring and
any **Claim** made anywhere in the world.

(B)   **Reporting of Claims and Potential Claims:**

(1)   If a **Claim** is made against any **Insured**, the **Insured** shall give written
notice thereof to the Underwriter as soon as practicable and in no event
later than thirty (30) days after the expiration of the **Policy Period**, and
shall immediately forward to the Underwriter every demand, notice,
summons, complaint, or other process received by any **Insured** or
his/her/its representatives.  Compliance with this notice requirement is a
strict condition precedent to coverage under this Policy.

(2)   If during the **Policy Period** an **Insured** becomes aware of a **Potential
Claim**, and the **Insured** during the **Policy Period**:

(a)   gives the Underwriter written notice of such **Potential Claim**,
including a description of the **Potential Claim** in question, the
identities of the potential claimants, the consequences which have
resulted or may result from such **Potential Claim**, the damages
which may result from such **Potential Claim** and the circumstances
by which the **Insured** first became aware of such **Potential Claim**;
and

(b)   requests coverage under this Policy for any **Claim** subsequently
resulting from such **Potential Claim**;

then the Underwriter will treat any such subsequently resulting **Claim** as if it had been made against the **Insured** during the **Policy Period**. Notice of any such subsequently resulting **Claim** must be given to the Underwriter as soon as practicable, but in no event later than sixty (60) days after such **Claim** is first made.

(3)      All notices of **Claims** and **Potential Claims** must be sent by certified mail to the address set forth in the Declarations.

(C)      **Timing and Interrelationship of Claims:**

(1)      A **Claim** as defined in DEFINITIONS (B)(1) and (B)(3) is first made when any **Insured** receives a written notice or request as set forth therein, and a **Claim** as defined in DEFINITION (B)(2) is first made when any **Insured** first becomes aware, through service of process or otherwise, of the filing of a complaint, motion for judgment, or similar document or pleading commencing a judicial, administrative, or other proceeding against an **Insured**.

(2)      All **Related Claims** will be treated as a single **Claim** made at the time the first of such **Related Claims** was made in accordance with CONDITION (C)(1), or when the first of such **Related Claims** is treated as having been made in accordance with CONDITION (B)(2), whichever is earlier.

(D)      **Defense and Settlement of Claims:**

(1)      No **Insured** may incur any **Defense Expenses** or admit any liability for or settle any **Claim** without the Underwriter's consent. The Underwriter will have the right to make investigations and conduct negotiations and, with the consent of the **Insureds**, to enter into such settlement of any **Claim** as the Underwriter deems appropriate. If the **Insureds** refuse to consent to a settlement acceptable to the claimant in accordance with the Underwriter's recommendation (a "Proposed Settlement"), then the Underwriter's liability for such **Claim** will not exceed:

(a)      the amount of the Proposed Settlement plus **Defense Expenses** incurred with the Underwriter's consent up to the date of the **Insured's** refusal to settle such **Claim** (Proposed Settlement Amount); plus

(b) seventy percent (70%) of any **Loss** and/or **Defense Expenses** incurred with the Underwriter's consent in excess of the Proposed Settlement Amount incurred in connection with such **Claim**: subject in all events to the available Limit of Liability set for in ITEM 3 of the Declarations. The remaining thirty percent (30%) of all amounts in excess of the Proposed Settlement Amount will be carried by the **Insured** at its own risk and will be uninsured.

(2) The Underwriter may, in its sole discretion and without any obligation to do so, undertake investigations and conduct negotiations with respect to any **Potential Claim** and, with the consent of the **Insured**, retain defense counsel and enter into such settlement of any **Potential Claim** as the Underwriter deems appropriate. Any such settlement of a **Potential Claim** shall be treated as the settlement of a **Claim** made during the **Policy Period** in which the **Potential Claim** was reported to the Underwriter. If an **Insured** refuses to consent to a settlement acceptable to the potential claimant in accordance with the Underwriter's recommendation, then the Underwriter's liability for any **Claim** resulting from such **Potential Claim** will be limited as set forth in paragraph (1) above.

(E) **Coinsurance; Limits of Liability; Retention:**

(1) Subject to Condition (E)(2), the Underwriter shall be liable to pay as the result of each **Claim** or **Related Claims** for which this Policy provides coverage the applicable percentage of **Defense Expenses** and **Loss** as shown under ITEM 4 of the Declarations in excess of the retention, up to the maximum Limit of Liability for each **Claim** shown under ITEM 3(a) of the Declarations.

(2) The amount stated in ITEM 3(b) of the Declarations will be the maximum Limit of Liability of the Underwriter under this Policy for all **Defense Expenses** and **Loss** from all **Claims** for which this Policy provides coverage, regardless of the number of **Claims**, the number of persons or entities included within the definition of "**Insured**," the number of claimants who make **Claims** against the **Insureds**, or the number of **Insureds** named as defendants in any **Claim**.

(3)     **Defense Expenses** will be part of and not in addition to such Limit of Liability, and payment of **Defense Expenses** by the Underwriter will reduce, and may exhaust, the Limit of Liability.  If the Limit of Liability is exhausted prior to the conclusion of any **Claim**, the Underwriter shall have the right to withdraw from the defense of the **Claim** by tendering control of the defense to the **Insureds** against whom the **Claim** is made, and in that event the Underwriter will have no further obligations of any kind or nature whatsoever under this Policy.

(4)     The obligation of the Underwriter to pay **Defense Expenses** and **Loss** in connection with any **Claim** will only be in excess of the retention and then only for the applicable percentage of **Defense Expenses** and **Loss** set forth in ITEM 4 of the Declarations.  The **Insureds** must bear the amount of retention and the uninsured percentage of **Defense Expenses** and **Loss** set forth in ITEM 4 of the Declarations.  The Underwriter will have no obligation whatsoever, either to the **Insureds** or to any other person or entity, to pay all or any portion of the uninsured percentage of **Defense Expenses** and **Loss** or of the retention amount on behalf of any **Insured**.  The Underwriter will, however, at its sole discretion, have the right and option to do so, in which event the **Insureds** must repay the Underwriter any such amounts promptly upon demand.

(F)     **Cancelation:**

(1)     The Underwriter may not cancel this Policy except for failure to pay a premium when due, in which case twenty (20) days' written notice will be given.

(2)     The **Named Insured** may cancel this Policy by surrendering this Policy or by mailing or delivering to the Underwriter written notice stating when thereafter such cancelation will be effective.  If this Policy is canceled by the **Named Insured**, the earned premium will be computed in accordance with the customary short rate table and procedure.  Premium adjustment may be made either at the time cancelation is effective or as soon as practicable after cancelation becomes effective.

(3)     The Underwriter will not be required to renew this Policy upon its expiration.  If the Underwriter elects not to renew this Policy, the Underwriter will deliver or mail to the **Named Insured** written notice to that effect at least sixty (60) days before the Expiration Date set forth in ITEM 2(b) of the Declarations.

(G)    **Exhaustion:**

If the Limit of Liability is exhausted by the payment of **Defense Expenses** and/or **Loss**, all obligations of the Underwriter under this Policy will be completely fulfilled and exhausted, and the Underwriter will have no further obligations of any kind or nature whatsoever under this Policy, and the premium will be fully earned.

(H)    **Cooperation and Subrogation:**

(1)    In the event of a **Claim**, or after giving the Underwriter notice of a **Potential Claim**, the **Insureds** must provide the Underwriter with all information, assistance, and cooperation as the Underwriter may reasonably request.

(2)    The **Insureds** may do nothing to prejudice the Underwriter's position or the Underwriter's potential or actual rights of recovery in the event of a **Claim**.

(3)    In the event of payment under this Policy, the Underwriter will be subrogated to, and entitled to an assignment of, all of the rights of recovery of the **Insureds**.  The **Insureds** shall execute all papers and do everything that may be necessary to secure such rights, including the execution of such documents as may be necessary to enable the Underwriter effectively to pursue and enforce such rights and to bring suit in the name of the **Insureds**.

(4)    The obligations of the **Insureds** under this CONDITION (H) will survive the Policy.

(I)    **Representations:**

The **Insureds** represent that the particulars and statements contained in the **Application** are true, accurate and complete, and agree that this Policy is issued in reliance on the truth of that representation, and that such particulars and statements, which are deemed to be incorporated into and to constitute a part of this Policy, are the basis of this Policy and are material to the Underwriter's acceptance of this risk.  This Policy shall not, however, be voided as to any **Insured** on account of the untruth of the particulars and statements contained in the **Application** unless:

(1)    such **Insured** knew of the untruth of such particular or statement, in which event such knowledge shall be imputed only to such **Insured**; or

    (2)    the person providing such particular or making such statement in the **Application** knew of its untruth, in which event such knowledge shall be imputed to all **Insureds**.

(J)    **No Action against the Underwriter:**

    (1)    No action may be taken against the Underwriter unless, as conditions precedent thereto, there has been full compliance with all of the terms of this Policy and the amount of the obligation of the **Insureds** to pay has been finally determined either by judgment against the **Insureds** after adjudicatory proceedings, or by written agreement of the **Insureds**, the claimant and the Underwriter.

    (2)    No person or entity will have any right under this Policy to join the Underwriter as a party to any **Claim** against any **Insured** to determine the liability of such **Insured**; nor may the Underwriter be impleaded by any **Insured** or any **Insured's** legal representative in any such **Claim**.

(K)    **Arbitration of Coverage Disputes:**

Notwithstanding CONDITION (J), any coverage dispute or other controversy regarding the rights or obligations of the Underwriter and the **Insureds** under this Policy shall be submitted to binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA"). The Underwriter or the **Insureds** may invoke this arbitration procedure by giving written notice to that effect by certified mail to the other party. The Underwriter and the **Insureds** will attempt to agree upon a single arbitrator. If agreement regarding selection of a single arbitrator is not reached within thirty (30) days after the initial demand for arbitration, each party shall, within thirty (30) days thereafter, name an arbitrator. Those two arbitrators shall, within thirty (30) days after they both have been named, select a third arbitrator, who shall serve as the Chair of the arbitration panel. If the two party-selected arbitrators are unable to agree upon a third arbitrator, then the AAA shall appoint a person who is neutral to the parties to act as the Chair of the arbitration panel. None of the arbitrators may be former or current partners, principals, directors, officers, shareholders or **Employees** of the Underwriter or of any **Insured**.

The Underwriter and the **Insureds** each shall file a written submission with supporting documents to the single arbitrator or, if applicable, to the arbitration panel (hereinafter, references to "arbitration panel" shall include a single arbitrator agreed upon by the parties) within ninety (90) days after appointment of the last member of the arbitration panel, which period may be extended by the arbitration panel. The arbitration hearing shall be held at a site and at a time designated by the arbitration panel, at which time the arbitration panel will receive oral evidence.

The parties shall have at their disposal the same pre-trial discovery rights available under the Federal Rules of Civil Procedure and the Local Rules of United States District Court for that jurisdiction; provided that the arbitration panel may shorten the time permitted by those Rules for any discovery procedure in light of the ninety (90) day timetable for the parties' submissions specified above, and provided further that any dispute regarding discovery shall be submitted for decision to the arbitration panel. The arbitration panel shall be relieved of judicial formality and need not adhere to formal rules of evidence. The majority of the arbitration panel will issue a written decision resolving the controversy within thirty (30) days after the close of the hearing, which decision will state the facts reviewed, conclusions reached and reasons for the conclusions. The decision will be binding upon the Underwriter and the **Insureds** in any court of competent jurisdiction, and will not be subject to appeal. The arbitration panel also shall allocate the fees and expenses of the arbitration panel between the Underwriter and the **Insureds**. Any finding of liability by the arbitration panel against the Underwriter shall not exceed the Policy's applicable remaining Limit of Liability after deduction of all **Defense Expenses** and **Loss** that the Underwriter has paid or is obligated to pay, plus the fees and expenses of the arbitration panel to the extent allocated solely to the Underwriter by the arbitration panel.

(L)    **Authorization and Notices:**

    (1)    The **Named Insured** will act on behalf of the **Insureds** with respect to all matters under this Policy, including but not limited to giving and receiving notices and other communications, effecting or accepting any endorsements to or cancelation of this Policy, the payment of premium and the receipt of any return premiums, and the purchase of any Extended Reporting Period.

    (2)    Unless otherwise specified, all notices permitted or required by this Policy shall be given in writing and shall be sent by first class or certified mail to the respective addresses of the **Named Insured**, if to the **Insureds**, or of the Underwriter, if to the Underwriter, as set forth in the Declarations.

(M)    **Changes:**

Notice to any agent or knowledge possessed by any agent or other person acting on behalf of the Underwriter will not effect a waiver or change in any part of this Policy or estop the Underwriter from asserting any right under its terms, conditions, and limitations.

(N)    **No Transfer or Assignment of Insured Interest:**

No transfer or assignment of interest under this Policy or of any cause of action against the Underwriter arising out of its performance of, or alleged failure to perform in accordance with, the terms and conditions of this Policy will be effective without the Underwriter's written consent.

(O)    **Headings:**

The descriptions in the headings and sub-headings of this Policy are solely for convenience, and form no part of the terms, conditions, and limitations of the Policy.

(P)    **Entire Agreement:**

The **Insureds** agree that this Policy, including the **Application** and any endorsements, constitutes the entire agreement existing between the **Insureds** and the Underwriter or any of its agents relating to this insurance, and that the terms, conditions, limitations, and endorsements of this Policy may not be waived or changed except by written endorsement issued to form a part of this Policy.

(Q)    **Underwriter's Signature:**

**In witness whereof the Underwriter has caused this Policy to be executed by its authorized officers, but this Policy will not be valid unless countersigned on the Declarations Page by a duly authorized representative of the Underwriter.**

_____          _____
                *Secretary*                                              *President*