# **<u>Exhibit A</u>**

ASSET PURCHASE AGREEMENT

by and between

DOWLING COLLEGE

and

TRIPLE FIVE AVIATION INDUSTRIES LLC

Dated as of May 11, 2018

Table of Contents

Page

ARTICLE I  DEFINITIONS ............................................................................................2
  1.1 Definitions.............................................................................................................2
  1.2 Other Definitional and Interpretative Provisions..................................................8
ARTICLE II  PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ..........9
  2.1 Assets to be Sold to Buyer ....................................................................................9
  2.2 Excluded Assets.....................................................................................................9
  2.3 Excluded Liabilities .............................................................................................10
ARTICLE III PURCHASE PRICE, MANNER OF PAYMENT AND CLOSING.....................10
  3.1 Payment of Purchase Price...................................................................................10
  3.2 Deposit…................................................................................................................11
  3.3 Closing and Closing Date .....................................................................................11
  3.4 Closing Deliveries..................................................................................................11
  3.5 Transfer Taxes .......................................................................................................13
  3.6 Delivery of Records ...............................................................................................13
  3.7 Further Conveyances .............................................................................................13
  3.8 Bulk Sales Laws.....................................................................................................13
  3.9 Allocation of Purchase Price..................................................................................13
  3.10 Time is of the Essence ..........................................................................................13
ARTICLE IV SELLER'S REPRESENTATIONS AND WARRANTIES ................................14
  4.1 Organization of Seller............................................................................................14
  4.2 Authorization of Transaction .................................................................................14
  4.3 Qualification ...........................................................................................................14
  4.4 Non-Contravention .................................................................................................14
  4.5 Brokers' Fees ..........................................................................................................14
  4.6 Events Subsequent ..................................................................................................15
  4.7 Tax Matters .............................................................................................................15
  4.8 Property and Assets.................................................................................................16
  4.9 Contracts    ...............................................................................................................17
  4.10 Seller's Consents and Approvals ..........................................................................17
  4.11 Powers of Attorney ...............................................................................................19
  4.12 Litigation...............................................................................................................19
  4.13 Employees.............................................................................................................19
  4.14 Foreign Operations...............................................................................................19
  4.15 Insurance Coverage..............................................................................................19
  4.16 Environmental Matters..........................................................................................19
  4.17 No Other Representations or Warranties; Schedules.............................................20
ARTICLE V  BUYER'S REPRESENTATIONS AND WARRANTIES....................................19
  5.1 Organization of Buyer.............................................................................................19
  5.2 Authorization of Transaction ..................................................................................19
  5.3 Non-Contravention ..................................................................................................20
  5.4 Brokers' Fees ...........................................................................................................20
  5.5 Buyer's Consents and Approvals.............................................................................20
  5.6 Acknowledgement Regarding Condition of the Business .......................................20
  5.7 Financial Capability ................................................................................................20

5.8 No Other Representations or Warranties; Schedules........................................................21
ARTICLE VI  BANKRUPTCY COURT MATTERS ...............................................................23
6.1 Intentionally Omitted ...................................................................................................23
6.2 Competing Transaction ................................................................................................23
6.3 Intentionally Omitted ...................................................................................................24
ARTICLE VII  PRE-CLOSING COVENANTS ......................................................................24
7.1 General .........................................................................................................................22
7.2 Operation of Business ..................................................................................................22
7.3 Access ..........................................................................................................................22
7.4 Notice of Developments ...............................................................................................23
7.5 Employment Matters.....................................................................................................23
7.6 Removal of Excluded Assets from Real Property ........................................................23
7.7 Removal of Necessary Records ....................................................................................26
7.8 Non-Disclosure .............................................................................................................26
ARTICLE VIII EMPLOYEES ...............................................................................................27
8.1 Buyer Not Assuming Seller's CBAs or Benefit Plans..................................................27
8.2 No Obligation to Offer Employment ...........................................................................27
8.3 No Successor Liability ..................................................................................................27
ARTICLE IX CONDITIONS TO OBLIGATION TO CLOSE ..............................................28
9.1 Conditions to Buyer's Obligations................................................................................28
9.2 Conditions to Seller's Obligations ...............................................................................26
ARTICLE X TERMINATION ...............................................................................................30
10.1 Termination of Agreement...........................................................................................30
10.2 Procedure For Termination ..........................................................................................29
10.3 Effect of Termination...................................................................................................31
ARTICLE XI TITLE INSURANCE; PERMITTED EXCEPTIONS; APPORTIONMENTS .....29
11.1 Title Insurance .............................................................................................................29
11.2 Permitted Exceptions ..................................................................................................30
11.3 Apportionments............................................................................................................31
ARTICLE XII MISCELLANEOUS........................................................................................36
12.1 Survival .......................................................................................................................36
12.2 Press Releases and Public Announcements .................................................................36
12.3 No Third-Party Beneficiaries ......................................................................................36
12.4 Entire Agreement .........................................................................................................36
12.5 Succession and Assignment.........................................................................................36
12.6 Counterparts.................................................................................................................36
12.7 Headings ......................................................................................................................37
12.8 Notices .........................................................................................................................37
12.9 Governing Law; Waiver of Jury Trial .........................................................................38
12.10 Submission to Jurisdiction; Consent to Service of Process ......................................38
12.11 Amendments ..............................................................................................................38
12.12 Severability ................................................................................................................38
12.13 Expenses ....................................................................................................................39
12.14 Construction...............................................................................................................39
12.15 Incorporation of Schedules........................................................................................39
12.16 No Waiver ..................................................................................................................39
12.17 Non-Recourse Liability..............................................................................................39

## LIST OF SCHEDULES

Schedule 1.1          Knowledge
Schedule 4.6          Events Subsequent
Schedule 4.7(a)       Tax Compliance
Schedule 4.7(b)       Lien or Claims for Taxes
Schedule 4.8(a)       Real Property
Schedule 4.8(d)       Violations
Schedule 4.9(a)       Contracts
Schedule 4.10         Consents and Approvals (Seller)
Schedule 4.12         Litigation of Seller
Schedule 4.15         Insurance Coverage
Schedule 4.16(a)      Environmental Matters
Schedule 4.16(b)      Environmental Permits
Schedule 5.1(c)       Principals of Buyer
Schedule 5.5          Consents and Approvals (Buyer)
Schedule 11.2(a)      Permitted Exceptions

ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>"), dated as of May 11, 2018, (the "<u>Execution Date</u>") is by and between DOWLING COLLEGE, a New York not-for-profit corporation ("<u>Dowling</u>" or "<u>Seller</u>"), and TRIPLE FIVE AVIATION INDUSTRIES LLC ("<u>Buyer</u>"), a Delaware limited liability company, and each a "<u>Party</u>" and collectively the "<u>Parties</u>."

RECITALS

WHEREAS, on November 29, 2016 (the "<u>Petition Date</u>"), Dowling (the "<u>Debtor</u>") filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 *et seq.* (the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Eastern District of New York (the "<u>Bankruptcy Court</u>") (the "<u>Bankruptcy Case</u>"); and

WHEREAS, on September 26, 2017, the Debtor filed a motion seeking, *inter alia*, approval of the sale of the Debtor's 105.33 acre campus located in the Town of Brookhaven, County of Suffolk, at William Floyd Parkway, Shirley, New York (the "<u>Brookhaven Campus</u>") to the successful bidder (the "<u>Successful Bidder</u>") as determined by the bidding procedures for the sale (the "<u>Bidding Procedures</u>") approved by the Bankruptcy Court in the Bidding Procedures Order (as defined below); and

WHEREAS, on October 17, 2017, an order was entered by the Bankruptcy Court, approving, *inter alia*, the Bidding Procedures and scheduling an auction ("<u>Auction</u>") and sale hearing in connection therewith (the "<u>Bidding Procedures Order</u>"); and

WHEREAS, the Seller adjourned the Auction initially conducted on January 31, 2018, without date pending further negotiations with various interested parties; and

WHEREAS, subject to the terms of the Bidding Procedures Order and, Buyer is prepared to acquire the Brookhaven Campus on the terms and conditions set forth herein; and

WHEREAS, the transactions contemplated by this Agreement will be consummated pursuant to an order of the Bankruptcy Court, approving, *inter alia*, the sale of the Brookhaven Campus to Buyer (the "<u>Sale Order</u>"), consistent with terms, conditions and transactions contemplated by the Agreement; and

WHEREAS, subject to the terms and conditions of the Bidding Procedures Order, Seller wishes to sell to Buyer and Buyer wishes to acquire from Seller the Acquired Assets (defined below) as set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants, agreements, representations and warranties herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

# ARTICLE I
## DEFINITIONS

1.1     <u>Definitions</u>.  The following terms, as used herein, have the following meanings:

"<u>Acquired Assets</u>" has the meaning set forth Section 2.1.

"<u>Affiliate</u>" means any person or entity which directly or indirectly controls, is controlled by, or is under common control with, any Person.

"<u>Agreement</u>" has the meaning set forth in the preface above.

"<u>Applicable Law</u>" means, with respect to any Person, any foreign, federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, guidance, plan, order, injunction, judgment, decree, ruling, charge or other similar requirement, including any Labor and Employment Law and Requirements, enacted, adopted, or promulgated by a Governmental Authority that is binding upon such Person, as amended.

"<u>Auction</u>" has the meaning set forth in the recitals.

"<u>Backup Bidder</u>" has the meaning set forth in Section 6.2(c).

"<u>Bankruptcy Case</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to Section 2075 of title 28 of the United States Code and as applicable to the Bankruptcy Case.

"<u>Bidding Procedures</u>" has the meaning set forth in the recitals.

"<u>Bidding Procedures Order</u>" has the meaning set forth in the recitals.

"<u>Board</u>" means the governing board of an entity, including the board of directors, board of governors, board of trustees, or board of managers, as applicable.

"<u>Business</u>" means the limited business operations of Seller as conducted following Seller's loss of accreditation and cessation of operations as a provider of educational services (not including the Excluded Liabilities).

"<u>Business Day</u>" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Applicable Law to close.

"<u>Buyer</u>" has the meaning set forth in the preface above.

"<u>Buyer Confidential Information</u>" has the meaning set forth in Section 7.8(b).

"Buyer's Consents and Approvals" has the meaning set forth in Section 5.5.

"Buyer's Objection Notice" has the meaning set forth in Section 11.1.

"Campus Agents" means A&G Realty Partners, LLC, Madison Hawk Partners, LLC and CBRE, Inc.

"CBA" means collective bargaining agreement.

"Claim" has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 3.3(a).

"Closing Date" has the meaning set forth in Section 3.3(a).

"Closing Documents" has the meaning set forth in Section 3.4(a).

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Bid" has the meaning set forth in Section 6.2(a).

"Contract" means any legally binding oral or written commitment, contract, lease, sublease, license, sublicense or other agreement or arrangements of any kind relating to the Acquired Assets or the operation thereof to which Seller is a party or by which any of the Acquired Assets are bound.

"Covered Person" means a current or former Employee, officer, director or consultant of Seller.

"Creditors' Committee" means the official committee of unsecured creditors appointed in the Bankruptcy Case pursuant to Section 1102 of the Bankruptcy Code by the United States Trustee for the Eastern District of New York, as it may be reconstituted from time to time.

"Debt" means, with respect to Seller, the aggregate amounts of long-term and short-term indebtedness of Seller, including any amounts owing under any capital lease arrangement, amounts outstanding under notes payable to any financial institution or Governmental Authority, amounts owed to an Employee Benefit Plan or any Multiemployer Plan, amounts outstanding under lines of credit, amounts owing under notes or dividends or distributions payable or other amounts payable by Seller, any other amounts outstanding under notes payable, and any prepayment penalties or expenses payable in connection with the foregoing transactions, but excluding the accounts payable arising in the Ordinary Course of Business of Seller.

"Debtor" has the meaning set forth in the recitals.

"Deeds" has the meaning set forth in Section 3.4(a)(i).

"Deposit" has the meaning set forth in Section 3.2.

"Effective Time" has the meaning set forth in Section 3.3(b).

"Employee Benefit Plan" means any material "employee benefit plan" within the meaning of Section 3(3) of ERISA and any other material bonus, profit sharing, pension, severance, deferred compensation, fringe benefit (as described in Code Section 132), insurance, welfare, post-retirement, health, life, tuition refund, service award, company car, scholarship, relocation disability, accident, sick, vacation, holiday, unemployment incentive, commission, retention change in control, non-competition, and other plans, agreements, policies, trust funds (a) established, maintained, sponsored or contributed to (or with respect to which any obligation to contribute has been undertaken) by Seller or an ERISA Affiliate, or (b) with respect to which Seller or any ERISA Affiliate has or has had any obligation, in each case, under which any Employee of Seller may receive benefits or may otherwise be subject and other than a Multiemployer Plan.

"Employees" means all individuals who are employed by Seller (including any employees not actively at work as of the Closing Date, as well as any employees who are on medical disability or leaves of absence and who worked for Seller immediately prior to such disability or leave).

"Environmental Claim" means any demand, assessment, Lien, investigation, claim, action or cause of action, complaint, citation, directive, information request issued by a Governmental Authority, legal proceeding, order, or notice of potential violation or potential responsibility arising under any applicable Environmental Law.

"Environmental Law" means any applicable statute, law, common law, rule, regulation, ordinance, or order of any federal, state, or local Government Authority in effect on or before the Closing Date relating to pollution, protection of human health (to the extent relating to exposure to Hazardous Materials) or the environment, or the processing, generation, management, distribution, use, handling, treatment, storage, transport, disposal, Remediation, or Release of Hazardous Materials.

"Environmental Permit" means any permit, registration, license, approval, identification number, exemption or other authorization required under or issued pursuant to any applicable Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, when used with respect to an Employee Benefit Plan, ERISA, the PBGC or a provision of the Code pertaining to employee benefit plans, any Person that is a member of any group of organizations within the meaning of Sections 414(b) or 414(c) of the Code (or, solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the Lien created under Section 302(f) of ERISA and Section 412(n) of the Code, or Sections 414(m) or 414(o) of the Code of which either Seller is a member).

"Exceptions" has the meaning set forth in Section 11.1.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Liabilities" has the meaning set forth Section 2.3.

"Execution Date" has the meaning set forth in the preface above.

"Furniture, Fixtures and Equipment" means all furniture, furnishings, light fixtures, apparatus, machinery, appliances, equipment desks, chairs, tables, copiers, telephone lines, telecopy machines and other telecommunication equipment, miscellaneous office furnishings, cleaning and maintenance supplies, spare parts and other disposables and all other items of personal property owned by Seller and located on the Real Property, but specifically excluding the Simulators, Hardware and Non-Estate Property.

"Governmental Authority" means any domestic or foreign federal, state or local governmental authority, department, court or government, commission, tribunal or organization or any regulatory, administrative or other agency, or any political or other division, subdivision, department or branch of any of the foregoing.

"Hardware" means any and all computer and computer-related hardware and equipment, including computers, file servers, facsimile servers, scanners, color printers, laser printers and networks, hard drives and other data and/or media storage devices (tapes, discs, floppy drives, etc.).

"Hazardous Materials" means:  (i) any chemical, substance, material, or waste listed, defined, or classified as a "pollutant," "contaminant," "hazardous substance," "toxic substance," "solid waste," "hazardous waste," "hazardous material," or "special waste" under any applicable Environmental Law; (ii) any substance regulated under any applicable Environmental Law; (iii) petroleum or any derivative or by-product thereof; (iv) urea formaldehyde foam insulation, polychlorinated biphenyls, methyl tertiary butyl ethyl, radioactive material, or radon; (v) mold; and (vi) any asbestos-containing materials.

"Knowledge" means actual knowledge, or such knowledge that a reasonably prudent person would have after reasonable inquiry by the remaining officer of Seller as of or immediately prior to the Closing, which individual is identified in Schedule 1.1.

"Labor and Employment Law and Requirements" means any federal, state or local law (statutory, common or otherwise), constitution, treaty, convention, ordinance, code, rule, regulation, guidance, order, injunction, judgment, decree, ruling or other similar requirement enacted, adopted, or promulgated by a Governmental Authority relating to: (a) hours of work and/or payment of wages, (b) notices to Employees, (c) discrimination, harassment and retaliation, (f) leaves of absence, (g) employee benefits, or (h) duty to bargain collectively with bargaining unit representative of Employees.

"Liabilities" means debts, obligations, contracts or other liabilities of any kind, character or description, accrued, absolute, contingent, determined, determinable or otherwise, whether presently in existence or arising hereafter.

"Licenses" means any licenses, approvals, authorizations, consents, permits, orders, registrations, certificates, decrees, franchises, permits variances, and similar rights obtained from any Governmental Authority.

"Lien" means any claim, charge, easement, encumbrance, encroachment, right of reversion, security interest, mortgage, lien, pledge or restriction, whether imposed by Contract, Applicable Law, equity or otherwise.

"Material Adverse Effect" or "Material Adverse Change" means any fact, circumstance, event, change, effect, condition or occurrence that, individually or in the aggregate, has or could be reasonably expected to have a material adverse effect on (a) the value of the Acquired Assets, (b) a significant portion of the Real Property is destroyed or damaged by fire or other casualty, or (c) the ability of Seller to consummate the Sale on a timely basis, in each case as determined by Buyer.

"Material Contracts" means all Contracts material to the Acquired Assets that will extend over a period of more than one (1) year from the Execution Date or that provide for annual payments to or by Seller in excess of $50,000.

"Material Development" means any change in the nature, scope, strategy, parties or other aspect of a Material Litigation or Proceeding that would have a Material Adverse Effect.

"Material Litigation or Proceeding" means any action, suit, investigation, proceeding or audit (a) the settlement or adjudication of which would (i) cause a material breach of this Agreement, (ii) have the effect of making the Sale illegal or (iii) materially prohibit or interfere with the consummation of the Sale.

"Multiemployer Plan" means a multiemployer plan as defined in Section 3 of ERISA to which Seller or an ERISA Affiliate contributes or has or had an obligation to contribute.

"Necessary Records" means any books and records which by Applicable Law or policy Seller is required to retain in its possession.

"Non-Estate Property" means that certain personal property that is either not owned by Seller or which may be a Restricted Asset.

"Ordinary Course of Business" means the ordinary course of business of Seller following its loss of accreditation and cessation of operations as a provider of educational services.

"Parties" has the meaning set forth in the preface above.

"Party" has the meaning set forth in the preface above.

"Permitted Exceptions" has the meaning set forth in Section 11.2.

"Petition Date" has the meaning set forth in the recitals.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity, or a Governmental Authority.

"Purchase Price" has the meaning set forth in Section 3.1(a).

"Real Property" means the real property comprising the Brookhaven Campus, including any and all improvements and buildings thereon and appurtenances thereto, together with any material property rights.

"Release" means any spilling, leaking, pumping, emitting, emptying, discharging, injecting, escaping, leaching, dumping, migrating, or disposing of Hazardous Materials into the environment, including the ambient air, surface and subsurface soils, surface water and groundwater.

"Remediation" means any investigation, clean-up, removal action, remedial action, restoration, repair, response action, corrective action, monitoring, sampling and analysis, reclamation, closure, or post-closure in connection with the suspected, threatened or actual Release of Hazardous Materials.

"Representatives" means, with respect to any Person, any of its Affiliates, directors, trustees, officers, members, employees, consultants, agents, attorneys, advisors and other representatives.

"Restricted Assets" means donor restricted assets (including, without limitation, special library collections, art collections or pottery) and endowment funds held by, or for the benefit of, Seller, the income and/or corpus of which has been designated for use in support of, for the benefit of, or otherwise relating to, any of Seller's mission, operations, programs, services, and/or assets.

"RE Tax Returns" means that returns, questionnaires, certificates, affidavits and other documents required by the Title Company in connection with the payment of any Transfer Taxes.

"Sale" has the meaning set forth in Section 2.1.

"Sale Order" has the meaning set forth in the Recitals.

"Seller" has the meaning set forth in the preface above.

"Seller Confidential Information" has the meaning set forth in Section 7.3(a).

"Seller's Consents and Approvals" has the meaning set forth in Section 4.10.

"Simulators" means those certain air traffic control simulators located at the Brookhaven Campus, including the Raytheon FIRSTplus Air Traffic Control Simulator and the NASA/VAST Simulator.

"Successful Bidder" has the meaning set forth in the recitals.

"Survey" has the meaning set forth in Section 11.1.

"Tax" or "Taxes" means any federal, state, local, or foreign income, prohibited transaction, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code §59A), customs duties, capital stock, franchise, net worth or capital, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any

interest, penalty, or addition thereto, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Liability for Taxes of any other Person.

"<u>Tax Return</u>" means any return, declaration, statement, report, form, claim for refund, or similar statements or documents including information reporting forms (including Forms 941, 990, 1099 and W-2) and estimated tax returns and reports) relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"<u>Termination Notice</u>" means written notice delivered to a Party at its address for notices specified herein setting forth the other Party's intent to immediately terminate this Agreement and the section and subsection of this Agreement providing the basis for the terminating Party's right to terminate, and signed by the terminating party.

"<u>Time is of the Essence</u>" means with regard to all dates and time periods set forth or referred to in this Agreement, failure by a Party to perform on such date or within such time periods, as applicable, shall constitute an incurable breach of this Agreement. A written demand from one Party to the other under this Agreement shall state whether Time is of the Essence.

"<u>Title Company</u>" has the meaning set forth in Section 11.1.

"<u>Title Defect</u>" has the meaning set forth in Section 11.1.

"<u>Title Report</u>" has the meaning set forth in Section 11.1.

"<u>Transfer Taxes</u>" means any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or Taxes or governmental charges payable in connection with the Sale.

"<u>Withdrawal Liability</u>" means any sum that may be assessed against Seller by a Multiemployer Plan providing pension benefits, under the Multiemployer Pension Plan Amendments Act of 1980, resulting from Seller ceasing to have an obligation to make contributions to such Multiemployer Plan.

1.2    <u>Other Definitional and Interpretative Provisions</u>. The words "hereof," "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The captions and headings used herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits and Schedules are to the Articles, Sections, Exhibits and Schedules, respectively, of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall have the meaning as defined in this Agreement. The terms "Dollars," "dollars" and "$" shall mean United States dollars. Any singular term in this Agreement shall be deemed to include the plural and any plural term the singular, and references herein to any gender shall include the other gender. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import. "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any agreement or

contract are to that agreement or contract as amended, modified or supplemented from time to time at or prior to the Closing in accordance with the terms hereof and thereof; provided that with respect to any agreement or contract listed on any schedules hereto, any substantive amendments, modifications or supplements must also be listed in the appropriate schedule.  References to any Person include the successors and permitted assigns of that Person.  References herein to a Person in a particular capacity or capacities shall exclude such Person in any other capacity.  References from or through any date mean, unless otherwise specified, from and including or through and including, respectively.  Any reference to a code, act, statute or regulation means that law, code, act, statute or regulation as amended or supplemented from time to time and any corresponding provisions of successor laws, codes, acts, statutes or regulations and any reference to any law code, act or statute shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  References to a "day" or any number of "days" (without explicit qualification by the word "Business") shall be interpreted as a reference to a calendar day or number of calendar days.  If the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, the time for the giving of such notice or the performance of such act shall be extended to the next succeeding Business Day.

ARTICLE II
PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1     <u>Assets to be Sold to Buyer</u>.   On the terms and subject to the conditions of this Agreement, and on the basis of the representations and warranties herein contained, Seller shall sell, transfer, convey, assign and deliver to Buyer, or to an entity or entities designated by Buyer, on the Closing Date, all of its right, title and interest in the assets described in this Section 2.1 (the "<u>Acquired Assets</u>"), free and clear of all Liens and Claims, other than Liens securing the Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code (the "<u>Sale</u>").  The Acquired Assets shall be comprised of the following assets:

      (a)     The Real Property;

      (b)     The Furniture, Fixtures and Equipment;

      (c)     Subject to Seller's right to remediate any such damage with insurance proceeds, all proceeds or proceeds receivable of Seller's insurance and unliquidated or unsatisfied claims that relate to property damage with respect to the Real Property occurring after the date of this Agreement and prior to the Closing; and

      (d)     All rights of Seller under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to services provided, if any, after the Closing or to the extent affecting any Acquired Assets.

2.2     <u>Excluded Assets</u>.  For the avoidance of doubt, Buyer is only acquiring the Acquired Assets and no others.  Further, the following assets are not intended by the Parties to be a part of the Sale and are excluded from the Acquired Assets (the "<u>Excluded Assets</u>"):

      (a)     Seller's cash, cash equivalents, bank deposits and similar items;

9

(b)    Any personal property and equipment that does not constitute Furniture, Fixtures and Equipment, including any such property and equipment that is leased by Seller or not located on the grounds of the Real Property;

(c)    All intellectual property and intangible property including, but not limited to, computer software, licenses, maintenance or support contracts, IPv4 addresses, patents, trademarks, copyrights, domain addresses, e-mail addresses and phone numbers;

(d)    All Non-Estate Property and Restricted Assets;

(e)    Seller's accounts receivable;

(f)    Organizational documents, corporate records and minute books of Seller;

(g)    The Necessary Records;

(h)    Seller's Contracts, contract rights and receivables, rebates, credit balances and refunds due from third parties, pledges, commitments, and available credit lines;

(i)    All claims and causes of action of Seller, including counterclaims that may be asserted in response to any proofs of claim filed against Seller; and

(j)    Rights that will accrue to Seller under this Agreement.

2.3    <u>Excluded Liabilities</u>.  Notwithstanding any provision of this Agreement or any other document or instrument to the contrary, Buyer shall not have any obligation with respect to any other Liabilities of Seller, regardless of whether such obligation arises before, on or after the Closing Date (all of such other Liabilities, collectively, the "<u>Excluded Liabilities</u>").  It shall not affect the status of a Liability as an Excluded Liability to the extent Buyer affirmatively elects in its sole and absolute discretion to assume responsibility for a given Excluded Liability.

ARTICLE III<br>PURCHASE PRICE, MANNER OF PAYMENT AND CLOSING

3.1    <u>Payment of Purchase Price</u>.

(a)    <u>Consideration</u>.  Subject to the terms and conditions hereof, the aggregate consideration for the sale, assignment, transfer, conveyance and delivery of the Acquired Assets to Buyer (or its designee(s)) at Closing, shall be Fourteen Million Dollars ($14,000,000.00) (the "<u>Purchase Price</u>"), subject to the adjustments and credits described in Section 3.1(b) and Section 11.3.

(b)    <u>Payment</u>.  Subject to the terms and conditions hereof, on the Closing Date, Buyer shall pay to Seller the amount of the Purchase Price <u>less</u> the Deposit.

(c)    <u>Title Discharge</u>.  In the event there is any Lien or Title Defect which Seller is obligated or elects to pay and discharge at Closing, Seller may pay and discharge such Lien or Title Defect out of the balance of the Purchase Price, provided Seller has made

arrangements with the Title Company in advance of Closing for Seller to deposit with the Title Company sufficient monies (which shall include all recording charges) required by the Title Company to issue an ALTA Owner's Title Policy to Buyer free of any such Lien or Title Defect.  The existence of any such Lien, Title Defect or real estate taxes shall not be deemed objections to title if Seller shall comply with the foregoing requirements.

3.2     <u>Deposit</u>.  Buyer shall have made a cash deposit in the aggregate amount of not less than five percent (5%) of its initial purchase price as set forth in its Modified Purchase Agreement (as defined in the Bidding Procedures), which Buyer shall increase to not less than ten percent (10%) of the Purchase Price on or before May 21, 2018 (the "<u>Deposit</u>").  Seller shall retain the Deposit as liquidated damages, as its sole remedy, if this Agreement is properly terminated by Seller pursuant to Section 10.1(c)(iii) or upon the failure of Buyer to consummate the Sale, provided that all conditions precedent to Closing have been satisfied and there shall not have been a material breach by Seller of any representation, warranty or covenant contained in this Agreement.

3.3     <u>Closing and Closing Date</u>.

(a)     The closing of the Sale (the "<u>Closing</u>") shall take place at a location agreed upon by Buyer and Seller, within forty-five (45) days after satisfaction or waiver of all conditions to the obligations of Seller and Buyer to consummate the Sale, except those conditions permitted to be satisfied on the Closing Date set forth in Sections 9.1(g), (j), (k), (l) and (i), and Sections 9.2(e) and (g), or such other date as Buyer and Seller may mutually determine in writing (the "<u>Closing Date</u>").

(b)     Unless otherwise agreed in writing by the Parties, the Sale shall be effective as of 12:00:01 a.m. on the calendar day immediately following the Closing Date (the "<u>Effective Time</u>").

3.4     <u>Closing Deliveries</u>.

(a)     <u>Seller Deliveries</u>.  At the Closing, contemporaneously with Buyer's delivery to Seller of all of the Closing Documents required to be delivered by Buyer hereunder, Seller shall deliver or cause to be delivered to Buyer, duly executed by Seller in recordable form, where applicable (the documents and other deliverables described in this Section 3.4(a) and in Section 3.4(b) and all other documents required to be delivered hereunder are referred to collectively as the "<u>Closing Documents</u>") the following items:

(i)     fully-executed and acknowledged deeds conveying the Real Property to Buyer (or its designee(s)) (the "<u>Deeds</u>") in a form reasonably acceptable to Buyer;

(ii)     copies of any reasonably required RE Tax Returns, if any, properly executed and acknowledged by Seller;

(iii)     a Certificate of Non-Foreign Status duly executed by Seller certifying that Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended;

(iv)    a fully-executed bill of sale from Seller in a form acceptable to Buyer;

(v)    to the extent in the possession of Seller or Seller's agents, all keys or key cards and alarm codes to, and all combinations to, any locks on, all entrance doors to, and any equipment and utility rooms located in, the Real Property, appropriately tagged for identification;

(vi)    delivery of possession of the Real Property free of any tenancies (other than any tenancies where Buyer or its designee is the tenant);

(vii)    a good standing certificate for Seller from the appropriate offices of the State of New York, dated within 30 days prior to the Closing Date, and such evidence, delivered to Buyer and the Title Company, as reasonably required to evidence the due authorization, execution, and delivery by Seller of the Deeds and other Closing Documents to which Seller is a party;

(viii)    a certificate from an officer of Seller to the effect that each of the conditions specified in Sections 9.1(a), (b), (c) and (d) is satisfied in all respects;

(ix)    a certificate from an officer of Seller dated as of the Closing Date (which shall include a certified copy of such Seller's certificate of incorporation, bylaws, relevant resolutions of Seller's Board approving the Sale and such other customary items as Buyer may reasonably request), in form and substance reasonably satisfactory to Buyer;

(x)    the closing and apportionment statement showing all adjustments in respect of the Purchase Price to be made at the Closing in accordance with the terms hereof, duly executed by Seller; and

(xi)    any other document, instrument, agreement or other item required to be delivered by Seller at or prior to the Closing hereunder.

(b)    <u>Buyer Deliveries</u>.    At the Closing, contemporaneously with Seller's delivery to Buyer of all of the Closing Documents required to be delivered by Seller hereunder, Buyer shall deliver or cause to be delivered to Seller the following items:

(i)    in accordance with and subject to adjustment as provided in this Agreement, the Purchase Price in immediately available funds;

(ii)    copies of any reasonably required RE Tax Returns properly executed and acknowledged by Buyer;

(iii)    the closing and apportionment statement showing all adjustments in respect of the Purchase Price to be made at the Closing in accordance with the terms hereof, duly executed by Buyer;

(iv)    a certificate from an officer of Buyer to the effect that each of the conditions specified in Sections 9.2(a), (b), (c) and (d) is satisfied in all respects;

(v)    a secretary's certificate of Buyer dated as of the Closing Date; (which shall include a certified copy of Buyer's certificate of incorporation, Buyer's bylaw, relevant resolutions of Buyer's Board approving the Sale and such other customary items as Seller may reasonably request), in form and substance reasonably satisfactory to Seller; and

(vi)    any other document, instrument, agreement or other item required to be delivered by Buyer at or prior to the Closing hereunder.

3.5    <u>Transfer Taxes</u>.  To the extent applicable, Seller shall pay at the Closing any Transfer Taxes (or any other transfer, conveyance or similar tax is imposed in connection with the sale, assignment, transfer and conveyance of the Real Property) payable by it pursuant to Section 12.13.

3.6    <u>Delivery of Records</u>.  Seller shall make available to Buyer on the Closing Date all records, keys and other information in Seller's possession as of the Closing Date relating to the Acquired Assets under Section 2.1.

3.7    <u>Further Conveyances</u>.  From time to time following the Closing, each Party shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions and releases and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and the other Closing Documents, to ensure that Buyer is relieved of all Excluded Liabilities and to otherwise make effective the Sale.  If Buyer or its Affiliates receives any Excluded Assets (or any payments or proceeds related thereto) following the Closing, Buyer shall promptly deliver such Excluded Assets (or any payments or proceeds related thereto) to Seller.  If Seller retains or receives any Acquired Assets (or any payments or proceeds related thereto) following the Closing, Seller shall promptly deliver such Acquired Assets (or any payments or proceeds related thereto) to Buyer.

3.8    <u>Bulk Sales Laws</u>.  The Parties hereby waive compliance by Seller with the requirements and provisions of any Applicable Law related to "bulk-transfer" of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Acquired Assets to Buyer.

3.9    <u>Allocation of Purchase Price</u>.  The Purchase Price may be allocated among the Acquired Assets by each of Seller and Buyer individually in accordance with its own allocation protocols (and amounts determined therefrom). In no event shall any Party's allocation be deemed to be binding on the other Party or on Seller's estate in the Bankruptcy Case for any purpose.

3.10    <u>Time is of the Essence</u>.  With regard to all dates and time periods set forth or referred to in this Agreement, Time is of the Essence.

## ARTICLE IV
## SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Buyer that the statements contained in this ARTICLE IV are correct and complete as of the Execution Date and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the Execution Date throughout this ARTICLE IV).

4.1     Organization of Seller.  Seller (a) is duly organized, validly existing under the laws of the State of New York, the jurisdiction of its formation, and (b) has full corporate power and authority and all necessary government approvals to own, lease and operate its properties and assets.

4.2     Authorization of Transaction.  Except for such authorization as is required by the Bankruptcy Court, Seller has full not-for-profit corporate power and authority to execute and deliver this Agreement.  Without limiting the generality of the foregoing, the Board of Seller has duly authorized the execution, delivery and performance of this Agreement by Seller.  This Agreement constitutes, and any and all other Closing Documents to be executed by Seller pursuant hereto, when executed, will constitute, the valid and legally binding obligation of Seller, enforceable in accordance with their terms and conditions, except as enforceability against Seller may be restricted, limited or delayed by applicable bankruptcy, moratorium or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

4.3     Qualification.   Seller is duly qualified or licensed to own and manage the Brookhaven Campus, and is in good standing, in the State of New York, which is the only jurisdiction (domestic and foreign) in which the character or the location of the Acquired Assets requires such licensing or qualification.  To the extent necessary, Seller agrees to comply with the requirements of Sections 510 and 511 of the New York Not-for-Profit Corporation Law, made applicable hereto by Sections 1129(a)(16), 363(d) and 541(f) of the Bankruptcy Code.

4.4     Non-Contravention.  Subject to Bankruptcy Court approval, neither the execution and delivery of this Agreement, the consummation of the Sale (including each Closing Document required to be delivered by Seller at Closing), nor the fulfillment of the terms hereof by Seller, will (i) violate any order or award of any court, administrative agency or governmental body applicable to Seller; (ii) result in the imposition of any Lien or Claim upon any Acquired Asset pursuant to the terms of any such mortgage, bond, indenture, lease, franchise or other instrument or obligation; (iii) constitute a violation by Seller of any Applicable Law; or (iv) conflict with or violate any charter document of Seller.

4.5     Brokers' Fees.   Seller has engaged the Campus Agents and shall be solely responsible for the commission and expenses due the Campus Agents in accordance with those certain agreements approved by the Bankruptcy Court. For the avoidance of doubt, Seller has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Sale for which Buyer could become liable or obligated.

14

      4.6    <u>Events Subsequent</u>.  Except as set forth in <u>Schedule 4.6</u>, since November 29, 2016, there have not been any of the following:

      (a)    Any amendment or other modification or alteration (including through merger, liquidation, reorganization, or restructuring) of the articles of incorporation (or similar organizational documents) or corporate structure or ownership of Seller;

      (b)    Any material damage to or destruction or loss of any Acquired Assets, whether or not covered by insurance, material adversely affecting the Acquired Assets;

      (c)    Any sale, transfer, lease to others or other disposition of any Acquired Asset unless in the Ordinary Course of Business or if such item has been rendered obsolete;

      (d)    Any change in any Tax election or Tax status of Seller; or

      (e)    Any claims made or actions, suits or proceedings or, to the Knowledge of Seller, any investigation by a Governmental Authority commenced or, to the Knowledge of Seller, threatened, against Seller in relation to the Acquired Assets.

      4.7    <u>Tax Matters</u>.

      (a)    Except as disclosed on <u>Schedule 4.7(a)</u>, Seller has duly and timely paid in accordance with all Applicable Law, all Taxes with respect to the Acquired Assets that are due and payable with respect to any period prior to Closing and has properly accrued on its books and records any Tax with respect to any such period that is not yet due and payable.  Except as disclosed on <u>Schedule 4.7(a)</u>, Seller has duly and timely withheld or collected, paid over and reported all Taxes with respect to the Acquired Assets required to be withheld or collected by it in any period prior to Closing.

      (b)    Except as disclosed on <u>Schedule 4.7(b)</u>, to Seller's Knowledge, there are no Liens or Claims for Taxes upon the Acquired Assets other than statutory Liens for Taxes not yet due or payable, and no issue has been raised by written inquiry of any Governmental Entity respecting Taxes, which, by application of the same principles, would reasonably be expected to result in a Lien or Claim on the Acquired Assets in any taxable period (or portion thereof) ending after the Closing Date.

      (c)    No extension or waiver of the limitation period applicable to the assessment or collection of any Tax has been granted with respect to Seller; and Seller has not entered into any agreement or arrangement with any Governmental Authority with regard to any Liability for any Tax affecting any Tax period for which the applicable statute of limitations, after giving effect to extensions or waivers, has not expired.

      (d)    No Governmental Authority has asserted in writing or, to Seller's Knowledge, orally (i) an adjustment that could result in an additional Tax for which Seller is or may be liable or that could result in a Lien or Claim on the Acquired Assets or (ii) a threat to the tax-exempt status of Seller. There is no proceeding pending relating to any Liability for any Tax or asset of Seller or the tax-exempt status of Seller and, to Seller's

Knowledge, no Governmental Authority has threatened any audit, examination, investigation, inquiry, dispute, proceeding or claim.

4.8     Property and Assets.

(a)     Schedule 4.8(a) contains a description of the Real Property. Seller has not received any written notice of any pending expropriation, eminent domain or similar proceeding affecting all or any material portion of any such Real Property or, to Seller's Knowledge, that any such activities are currently being threatened. There are no written or oral licenses, concessions, occupancy agreements or other Contracts granting to any other Person the right of use or occupancy of the Real Property or any portion thereof; and there is no Person in possession of the Real Property or any portion thereof other than Seller. The Real Property identified on Schedule 4.8(a) represents all of the real property owned, leased, subleased, licensed or otherwise occupied by Seller that comprises the Brookhaven Campus and which is the subject of the Sale.

(b)     Seller has title to, or, in the case of personal property held under a lease or other Contract (subject to the terms of the lease or other Contract), an enforceable leasehold interest in, or right to use, the Acquired Assets, free and clear of all Liens and Claims other than Liens securing the Permitted Exceptions. The foregoing notwithstanding, with respect to the Real Property, Seller shall convey and Buyer shall accept such title as any reputable title company that is a member of the New York Board of Title Underwriters will be willing to approve and insure at standard rates in accordance with its standard form of title policy, clear of all Liens, except for Permitted Exceptions. Except as otherwise provided, the Real Property shall be conveyed together with (a) all right, title and interest of Seller in and to all easements, rights of way, air or development rights, reservations, privileges, appurtenances, and other estates and rights of Seller, if any, pertaining to its interest in the Real Property, and (b) all right, title and interest of Seller, if any, in and to all alleys adjoining its interest in the Real Property and in and to the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining its interest in the Real Property to the center line thereof, and (c) subject to apportionment if required hereunder, all right, title and interest of Seller, if any, in and to any award made for any taking by condemnation or any damages to its interest in the Real Property by reason of a change of grade of any street, road or avenue.

(c)     None of the Acquired Assets owned or leased by Seller is subject to any agreement granting to any other Person by Seller any right to the use, occupancy or enjoyment of such property or any portion thereof.

(d)     To Seller's Knowledge, Schedule 4.8(d) lists all violations of law or municipal ordinances, orders or requirements noted in or issued by the departments of buildings, fire, labor, health or other federal, state, county, city or other departments and governmental authorities having jurisdiction against or affecting the Real Property. Except for such violations, Seller shall deliver the Real Property free and clear of all such violations at Closing.

4.9    Contracts.

(a)    Schedule 4.9(a) sets forth a complete and correct list of all Material Contracts.

(b)    Except as set forth on Schedule 4.9(b) or (i) as otherwise provided in the Bankruptcy Code and (ii) for events of default arising as a result of Seller's filing of a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, all of the Material Contracts are in full force and effect, are valid and binding and are enforceable in accordance with their terms in favor of Seller.

4.10    Seller's Consents and Approvals.    Schedule 4.910 lists all authorizations, approvals, waivers, filings or consents required to be obtained, and notices to be made (including any such authorizations, approvals, waivers, filings or consents required to be obtained from, and notices to be made to any Governmental Authority), by Seller to consummate the Sale (including this Agreement and each other Closing Document required to be delivered by Seller at Closing) (collectively, "Seller's Consents and Approvals"), other than entry of the Sale Order.

4.11    Powers of Attorney.  Except for accounts in connection with the Internal Revenue Service, there are no outstanding powers of attorney executed on behalf of Seller.

4.12    Litigation.

(a)    Except as set forth on Schedule 4.12, (i) there is no action, suit, investigation or proceeding pending or, to Seller's Knowledge, threatened (x) against Seller with respect to the Acquired Assets before any arbitrator or Governmental Authority, whether any of the same are covered by insurance or whether any applicable carrier has denied coverage or reserved rights with respect to or assumed the defense thereof and (y) that would reasonably be expected to prevent, hinder, delay or otherwise challenge the consummation of the Sale or that questions the validity, legality or propriety of the Sale or that could reasonably be expected to have a Material Adverse Effect; and (ii) Seller is not subject to any judgment, order or decree of any Governmental Authority with respect to the Acquired Assets involving an amount in excess of $50,000.00

(b)    Seller has delivered to Buyer correct and complete copies of all correspondence, pleadings, and other relevant documents in connection with the actions, suits, investigations or proceedings set forth on Schedule 4.12.

4.13    Employees.  Seller shall be solely responsible for any notices to Employees that may be required under any CBA as a consequence of the Sale, and shall defend, indemnify and hold harmless Buyer against any liability resulting from failure to provide such notices as may be required.

4.14    Foreign Operations.  Seller has no operations outside the United States.

4.15    Insurance Coverage.  Schedule 4.15 lists, and Seller has furnished to Buyer, true and complete copies of, all insurance policies (including any insurance renewal binders) and fidelity or surety bonds currently in force relating to the Acquired Assets.  The policy limits and

deductibles of such policies are not subject to claims by any other entities.  Except as set forth on Schedule 4.15, all premiums currently due and payable under all such policies and bonds have been paid in full.  Schedule 4.15 lists all of Seller's current commercial general liability coverages.

    4.16   Environmental Matters.

    (a)   To Seller's Knowledge and except as set forth on Schedule 4.16(a):

    (i)   Seller's ownership or leasing of the Real Property are, and at all times have been, in compliance in all material respects with all applicable Environmental Laws;

    (ii)   Seller has not received any written notice from a Governmental Authority or other Person regarding any Environmental Claim related to or arising out of Seller's ownership or leasing of the Real Property that currently remains pending or unresolved and, to Seller's Knowledge, there are no events or conditions with respect to the ownership or leasing of the Real Property or otherwise existing or occurring at the Real Property that could reasonably be expected to result in an Environmental Claim;

    (iii)   Seller is in compliance in all material respects with such Environmental Permits and there is not now pending nor, to Seller's Knowledge, threatened, any action by or before any Governmental Authority to revoke, cancel, rescind, suspend, restrict, modify or refuse to renew any Environmental Permit, and all of the Environmental Permits are and shall be effective and in good standing now and as of the Closing Date;

    (iv)   There has been no Release or threatened Release of Hazardous Materials at, on, under, to or from the Real Property required to be reported or subject to required Remediation, and Seller has not received any written notice from any Governmental Authority or other Person alleging that Seller has liability under any applicable Environmental Law with respect to the Release of Hazardous Materials at any real property off-site of the Real Property, including, where Hazardous Materials from the Real Property have been taken for disposal;

    (v)   Seller has delivered to Buyer copies of all assessment reports, audits, studies, and correspondence in Seller's possession or control relating to the environmental conditions of the Real Property

    (vi)   all Property, Environmental Claims, Environmental Permits, Hazardous Materials, Releases, Remediation or Seller's compliance with or violation of Environmental Laws related to the Real Property.

    (b)   A list of all Environmental Permits pertaining to the Real Property and the Acquired Assets as they are currently being operated by Seller is set forth on Schedule 4.16(b).

(c)    None of the matters set forth on <u>Schedule 4.16(a)</u> could reasonably be expected to result, either individually or in the aggregate, in a Material Adverse Effect.

4.17    <u>No Other Representations or Warranties; Schedules</u>.  Except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules), neither Seller nor any other Person makes any other representation or warranty whether express or implied, written or oral, with respect to Seller, the Business, the Acquired Assets, or the Sale, and Seller disclaims any other representations or warranties, whether made by Seller or any of its respective officers, directors, members, employees, agents, consultants or other Representatives.  Except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules), Seller (a) expressly disclaims any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Acquired Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (b) disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Buyer or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to Buyer or its Representatives by any director, officer, member, employee, agent, consultant or other Representative of Seller).  Seller makes no implied representation or warranty as to the condition, merchantability, usage, suitability or fitness for any particular purpose with respect to the Acquired Assets except for the representations and warranties contained in this ARTICLE IV (as modified by the Schedules).

## ARTICLE V
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Seller that the statements contained in this ARTICLE V are correct and complete as of the Execution Date and will be correct and complete as of the Closing Date (as though made then and as though the Closing Date were substituted for the Execution Date throughout this ARTICLE V).

5.1    <u>Organization of Buyer</u>.  Buyer (a) is duly organized, validly existing and in good standing under the laws of the State of Delaware, the jurisdiction of its formation, (b) has full corporate power and authority and all necessary government approvals to own, lease and operate its properties and assets and to conduct its business as presently conducted, and (c) has identified all principals of Buyer entity on <u>Schedule 5.1(c)</u>.

5.2    <u>Authorization of Transaction</u>.  Buyer has full power and authority to execute and deliver this Agreement and, subject to such authorizations as required by the Bankruptcy Court, to perform its obligations hereunder.  The execution, delivery and performance of this Agreement and all other agreements contemplated hereby have been duly authorized by all requisite corporate action of Buyer.  This Agreement constitutes, and any and all other Closing Documents to be executed by Buyer pursuant hereto when executed will constitute, the valid and legally binding obligation of Buyer, enforceable in accordance with their terms and conditions, except as enforceability against Buyer may be restricted, limited or delayed by applicable bankruptcy, moratorium or other Laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

5.3     <u>Non-Contravention</u>.

(a)     Subject to Bankruptcy Court approval, neither the execution and delivery of this Agreement, the consummation of the Sale (including each Closing Document required to be delivered by Buyer at Closing), nor the fulfillment of the terms hereof by Buyer, will (i) violate any Applicable Law to which Buyer is subject or any provision of its charter, bylaws, or other governing documents or (ii) conflict with, violate or result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets are subject.

(b)     Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent, or approval of any Governmental Authority in order for the Parties to consummate the Sale (including each Closing Document required to be delivered by Buyer at Closing), except for such notices, consents and approvals as have already been given or obtained, those required under or in relation to those required by the Bankruptcy Court.

5.4     <u>Brokers' Fees</u>.  Buyer has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the Sale.

5.5     <u>Buyer's Consents and Approvals</u>.  <u>Schedule 5.5</u> lists all authorizations, approvals, waivers, filings or consents required to be obtained, and notices to be made (including any such authorizations, approvals, waivers, filings or consents required to be obtained from, and notices to be made to any Governmental Authority), by Buyer to consummate the Sale (including each Closing Document required to be delivered by Buyer at Closing) (collectively, "<u>Buyer's Consents and Approvals</u>"), other than entry of the Sale Order.

5.6     <u>Acknowledgement Regarding Condition of the Acquired Assets</u>.  Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges that (a) Buyer has had the opportunity to conduct due diligence prior to execution of this Agreement, (b) Buyer is relying solely upon Buyer's own independent review and investigation and not upon any written or oral representation of Seller, (c) Seller is not making any representations or warranties whatsoever, whether express or implied or written or oral, beyond those expressly given by it to Buyer in ARTICLE IV (as modified by the Schedules), and (d) Buyer agrees that, except for the representations and warranties contained therein, the Acquired Assets are being transferred to Buyer on a "WHERE IS" and, as to condition, "AS IS" basis.

5.7     <u>Financial Capability</u>.  Buyer (i) has or on the Closing Date shall have the resources and capabilities (financial or otherwise), including immediately available funds, to consummate the Closing on the Closing Date and otherwise perform its obligations hereunder, (ii) has not incurred, and shall not incur, any obligation, commitment, restriction or liability of any kind that would impair or adversely affect such resources, capabilities or funds and (iii) shall from time to time between the Execution Date and the Closing Date, upon request of Seller, provide copies of bank statements or other proof of funds evidencing Buyer's financial capability to consummate the Sale on the Closing Date.

5.8     No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this ARTICLE V (as modified by the Schedules), neither Buyer nor any other Person makes any other representation or warranty, whether express or implied, written or oral, with respect to Buyer or the Sale, and Buyer disclaims any other representations or warranties, whether made by Buyer, any Affiliate of Buyer or any of their respective officers, directors, members, managers, employees, agents, consultants or other Representatives.  Except for the representations and warranties contained in this ARTICLE V (as modified by the Schedules), Buyer disclaims all Liability and responsibility for any representation, warranty, projection, forecast, statement, or information made, communicated, or furnished (orally or in writing) to Seller or its Representatives (including any opinion, information, projection, or advice that may have been or may be provided to them by any director, officer, member, manager, employee, agent, consultant, or other Representative of Buyer or any of its Affiliates).

ARTICLE VI
BANKRUPTCY COURT MATTERS

6.1     Intentionally Omitted.


6.2     Competing Transaction.

(a)     This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids (each, a "Competing Bid").

(b)     Notwithstanding the execution of this Agreement, Seller is permitted to cause its Representatives to further market and initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Representatives) in connection with any sale or other disposition of all or any other asset of Seller. In addition, Seller shall have the responsibility and obligation to respond to any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the assets of Seller to prospective purchasers.  Prior to Seller furnishing any non-public information to any Person in connection with an offer regarding the sale or other disposition of all or any part of the Acquired Assets, Seller must enter into a customary confidentiality agreement with such Person on terms no less favorable to Seller than those contained in Section 7.8.

(c)     If a Competing Bid is selected in conjunction with the Auction but such bidder does not consummate the purchase of the Acquired Assets and Buyer is the second highest bidder (the "Backup Bidder"), Buyer shall be subject to the rights and responsibilities of the Backup Bidder as set forth in the Bidding Procedures.

6.3     Intentionally Omitted.

## ARTICLE VII
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the Execution Date and the Closing:

7.1     <u>General</u>.  Each of the Parties will use its commercially reasonable efforts to take all actions and to do all things reasonably necessary in order to consummate and make effective the Sale (including satisfaction, but not waiver, of the Closing conditions set forth in ARTICLE IX).

7.2     <u>Operation of Business</u>.  Seller will manage the Acquired Assets in the Ordinary Course of Business in accordance with any post-petition financing or other orders approved by the Bankruptcy Court.  Without limiting the generality of the foregoing, Seller will not, without Buyer's prior written consent (which shall not be unreasonably withheld or delayed):

(a)     fail to give prompt notice to Buyer of the commencement of or any Material Development of which Seller becomes aware;

(b)     fail to give prompt notice to Buyer of any Material Adverse Change;

(c)     sell, transfer, or convey any Acquired Asset (other than obsolete or worn out immaterial equipment disposed of in the Ordinary Course of Business);

(d)     adopt or propose any change to its governing documents;

(e)     merge or consolidate with any entity or acquire any assets from any entity (other than purchases of supplies in the Ordinary Course of Business);

(f)     except as permitted by the terms of any Material Contract pertaining to any Debt, incur any indebtedness for borrowed money or guarantee any such indebtedness or issue or sell any debt securities or guarantee any debt securities of others other than as disclosed to Buyer and excluding any accounts payable arising in the Ordinary Course of Business of Seller;

(g)     enter into any operating lease;

(h)     terminate, fail to renew or materially reduce the amount of any insurance coverage provided by the existing insurance policies of Seller in relation to the Acquired Assets; or

(i)     remove from Seller's premises or modify (other than in the Ordinary Course of Business) any books or records of Seller that are Acquired Assets.

7.3     <u>Access</u>.  Seller will permit Representatives of Buyer to have access at all reasonable times during normal business hours, and in a manner so as not to interfere with the normal business operations of Seller, to the premises, properties, personnel, books, records (including Tax records, provided that those portions of any records or discussions pertaining to the entry into or consummation of the Sale may be withheld and/or redacted), contracts, and documents of or

pertaining to Seller.  Seller will used best efforts to deliver to Buyer true and complete copies of each Material Contract, in each case, as amended or otherwise modified and in effect as of the Execution Date.

7.4     <u>Notice of Developments</u>.

(a)     Seller shall promptly notify Buyer of:

(i)     any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Sale;

(ii)     any notice or other communication from any Governmental Authority in connection with the Sale; or

(iii)     its obtaining Knowledge of (A) a breach or violation of any representation or warranty made by it contained in this Agreement that is qualified as to materiality becoming untrue or inaccurate in any respect or any such representation of warranty that is not so qualified becoming untrue or inaccurate in any material respect and (B) the failure of it to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or satisfied by it under this Agreement or any other Closing Document.

(b)     No notification under this Section 7.4 shall affect the representations, warranties or obligations of the Parties or the conditions to the obligations of the Parties hereunder, or limit or otherwise affect the remedies available hereunder to the Party receiving such notice.

7.5     <u>Employment Matters</u>.  Buyer shall not be permitted to contact the Employees.

7.6     <u>Removal of Excluded Assets from Real Property</u>.  Prior to the Closing or as soon thereafter as is reasonably practical, Seller will remove from the Real Property all Excluded Assets, except that Necessary Records will be removed in accordance with Section 7.7.

7.7     <u>Removal of Necessary Records</u>.  Seller will use its best efforts, and will hire a records removal/storage company, to remove all required Necessary Records from the Real Property prior to the Closing Date.  Seller shall ensure that all Necessary Records are removed from the Real Property by no later than two (2) weeks following the Closing Date.  If the Necessary Records are not removed by the Closing Date, then Seller shall ensure that the records removal/storage company has appropriate insurance coverage in place, naming Buyer and its designee as additional insureds, through the date on which the Necessary Records have been removed from the Real Property.

7.8     <u>Non-Disclosure</u>.

(a)     From and after the date hereof, Buyer shall, and shall direct its Representatives, to maintain in confidence, not disclose to any third party (other than their Representatives) without the prior written consent of Seller, and not use to the detriment of Seller, any Seller Confidential Information relating to or obtained from Seller or its

Representatives. For purposes of this Section 7.8(a), "<u>Seller Confidential Information</u>" means any information that is confidential or proprietary in nature that is related to the Acquired Assets, the Business, the Excluded Assets, or the Excluded Liabilities, including methods of operation, student information, prices, fees, costs, technology, software, know-how, marketing methods, plans, personnel, suppliers, competitors, markets or other specialized information or proprietary matters; *provided, however*, that Seller Confidential Information does not include, and there shall be no obligation hereunder with respect to, information that (i) becomes generally available to the public other than as a result of a disclosure by Buyer or any of its Representatives, (ii) becomes available to Buyer on a non-confidential basis from a source other than Seller or its Representatives, provided that such source is not known by Buyer to be bound by a confidentiality agreement with, or other obligation of secrecy to, Seller, (iii) is lawfully received by Buyer from a third party having the right to disseminate the Seller Confidential Information without restriction on disclosure, or (iv) can be shown by Buyer through written documents or evidence maintained by Buyer to have been independently developed by it without the use of Seller Confidential Information; and *provided further*, that upon the Closing, the restrictions contained in this Section 7.8(a) shall not apply to confidential or proprietary information related primarily to the Acquired Assets, or the Business. Buyer may disclose any of the Seller Confidential Information to its Representatives who need to know it for the purpose of effectuating the Transactions and who are directed to keep it confidential. Buyer shall instruct its Representatives having access to Seller Confidential Information of such obligation of confidentiality. If Buyer or anyone to whom it has transmitted Confidential Information subject to the confidentiality obligations herein is required by Applicable Law to disclose any of such Confidential Information, Buyer shall, to the extent permissible by Applicable Law, provide Seller with prompt notice prior to making any disclosure so that Seller may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, or Seller waives compliance with the provisions of this Section 7.8(a), Buyer and its Representatives shall furnish only that portion of the Seller Confidential Information that it is advised by counsel is required by Applicable Law to be disclosed.

(b)     It is understood by the Parties that the information, documents and instruments delivered to Seller by Buyer or its Representatives in connection with the negotiation of this Agreement (the "<u>Buyer Confidential Information</u>") are of a confidential and proprietary nature. Seller agrees that both prior and subsequent to Closing it will maintain the confidentiality of all Buyer Confidential Information and only disclose such information, documents and instruments (x) to duly authorized Representatives, (y) as necessary to comply with Applicable Law, or (z) to assist or defend claims as provided herein. Buyer Confidential Information does not include any information that (i) becomes generally available to the public other than as a result of a disclosure by Seller, or any of its Representatives, (ii) becomes available to Seller on a non-confidential basis from a source other than Buyer or its Representatives, provided that such source is not known by Seller to be bound by a confidentiality agreement with, or other obligation of secrecy to, Buyer, (iii) is lawfully received by Seller from a third party having the right to disseminate the Buyer Confidential Information without restriction on disclosure, or (iv) can be shown by Seller through written documents or evidence maintained by them to have been independently developed by it without the use of Buyer Confidential Information. Seller

further agrees that upon Buyer's written request, it will destroy or, at Seller's option return to Buyer, all such documents and instruments and all copies thereof in its possession.  If Seller or anyone to whom it has transmitted Buyer Confidential Information is required by Applicable Law to disclose any of such Buyer Confidential Information, Seller shall, to the extent permissible by Applicable Law, provide Buyer with prompt notice prior to making any disclosure so that Buyer may seek a protective order or other appropriate remedy.  If such protective order or other remedy is not obtained, or Buyer waives compliance with the provisions of this Section 7.8(b), Seller and its Representatives shall furnish only that portion of the Buyer Confidential Information that it is advised by counsel is required by Applicable Law to be disclosed.

(c)     The obligations contained in this Section 7.8 shall survive the Closing.

## ARTICLE VIII
## EMPLOYEES

8.1     <u>Buyer Not Assuming Seller's CBAs or Benefit Plans</u>.  Buyer is not assuming any of Seller's CBAs or Employee Benefit Plans.

8.2     <u>No Obligation to Offer Employment</u>.  Buyer shall have no right or obligation to offer employment to any of the Employees.

8.3     <u>No Successor Liability</u>.  Buyer shall have no liability, as successor or otherwise, for any breach by Seller of any of its CBAs, nor for any arrears by Seller in payments to Employees for wages or otherwise, nor for contributions due to any Employee Benefit Plan or Multiemployer Plan pursuant to any such CBA or any trust agreement, nor for any liability or claim arising out of or relating to the termination of Seller's obligations under any CBA or any trust agreement, including termination of Seller's obligations to contribute to any Multiemployer Plan.  Seller shall remain liable for all of its pre-Petition Date and post-Petition Date arrears to any such Employee Benefit Plans and Multiemployer Plans and for any Withdrawal Liability associated with their ceasing to contribute to any Multiemployer Plan.

## ARTICLE IX
## CONDITIONS TO OBLIGATION TO CLOSE

9.1     <u>Conditions to Buyer's Obligation</u>.  Buyer's obligation to consummate the Sale is subject to satisfaction of the following conditions; *provided, however*, that notwithstanding anything set forth in this Agreement to the contrary, the conditions set forth in Sections 9.1(g), (i), (j) and (k) may be satisfied on the Closing Date:

(a)     The representations and warranties set forth in ARTICLE IV shall be true and correct in all material respects when made and at and as of the Closing Date, except to the extent that such representations and warranties are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects when made and at and as of the Closing Date.

(b)     Seller shall have performed and complied with all of its covenants and agreements hereunder in all material respects through the Closing, except to the extent that such covenants or agreements are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case Seller shall have performed and complied with all of such covenants and agreements (as so written, including the term "material" or "Material") in all respects through the Closing;

(c)     No breach or default on the part of Seller shall have occurred under any covenant or agreement hereunder or any Closing Document or any other agreement of the Parties;

(d)     No order shall have been entered in any action or proceeding before any Governmental Authority, and no preliminary or permanent injunction by any court or Governmental Authority shall have been issued that would have the effect of (i) making the Sale contemplated illegal or in violation of any Applicable Law, or (ii) otherwise preventing consummation of the Sale;

(e)     No Applicable Law shall have been enacted or promulgated by any Governmental Authority that directly prohibits the consummation of the Closing under this Agreement and the Sale;

(f)     Seller shall have received all Seller's Consents and Approvals, if any;

(g)     The Sale Order shall have been entered and shall not have been vacated or stayed, and any and all conditions contained therein shall have been satisfied;

(h)     All actions to be taken by Seller in connection with consummation of the Sale and all certificates, opinions, instruments, and other documents required to effect the Sale shall be reasonably satisfactory in form and substance to Buyer;

(i)     Buyer shall have received all of the Closing Documents described in Section 3.4(a);

(j)     the Title Company shall have irrevocably committed to issue a title policy to Buyer with respect to the Real Property at standard rates in accordance with its standard form of title policy, clear of all Liens, subject to the Permitted Exceptions; and

(k)     Seller shall have entered into a written agreement (in a form reasonably acceptable to Buyer) with a records boxing/storage company to remove all Necessary Records from the Real Property.

Buyer may waive in its sole and absolute discretion any condition specified in this Section 9.1 if it executes a writing so stating at or prior to the Closing.

9.2     <u>Conditions to Seller's Obligations</u>.  Seller's obligations to consummate the Sale are subject to satisfaction of the following conditions; *provided, however*, that notwithstanding anything set forth in this Agreement to the contrary, the conditions set forth in Section 9.2(e) and (g) may be satisfied on the Closing Date:

(a)     The representations and warranties set forth in ARTICLE V shall be true and correct in all material respects when made and at and as of the Closing Date, except to the extent that such representations and warranties are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case such representations and warranties (as so written, including the term "material" or "Material") shall be true and correct in all respects when made and at and as of the Closing Date;

(b)     Buyer shall have performed and complied with all of its covenants and agreements hereunder in all material respects through the Closing, except to the extent that such covenants or agreements are qualified by the term "material," or contain terms such as "Material Adverse Effect" or "Material Adverse Change," in which case Buyer shall have performed and complied with all of such covenants and agreements (as so written, including the term "material" or "Material") in all respects through the Closing;

(c)     No order shall have been entered in any action or proceeding before any Governmental Authority, and no preliminary or permanent injunction by any court or Governmental Authority shall have been issued that would have the effect of (i) making the Sale illegal or in violation of any Applicable Law, or (ii) otherwise preventing consummation of the Sale;

(d)     No Applicable Law shall have been enacted or promulgated by any Governmental Authority that directly prohibits the consummation of the Closing under this Agreement and the Sale;

(e)     Seller and Buyer shall have received all authorizations, consents, and approvals of, and no notices of objections from, those Governmental Authorities referred to in Section 4.10 and Section 5.5, as applicable;

(f)     The Sale Order shall have been entered and shall not have been vacated or stayed, and any and all conditions contained therein shall have been satisfied; and

(g)     Seller shall have received all of the Closing Documents described in Section 3.4(b).

Seller may waive any condition specified in this Section 9.2 if it executes a writing so stating at or prior to the Closing.

## ARTICLE X
## TERMINATION

10.1    <u>Termination of Agreement</u>.   In respect of the Sale, this Agreement may be terminated prior to the Closing as follows:

(a)     <u>Termination Due to Events in Bankruptcy Case</u>.  Buyer may terminate this Agreement immediately upon delivery of a Termination Notice to Seller if: (i) the Bankruptcy Case is dismissed or converted to a Chapter 7 bankruptcy case under the Bankruptcy Code, or an interim or permanent trustee is appointed in the Bankruptcy Case,

or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed in the Bankruptcy Case; (ii) relief from the automatic stay to permit foreclosure is granted or there is an exercise of other remedies on the Acquired Assets; or (iii) Seller consents to any modification of this Agreement without the prior written agreement of Buyer.

(b)    Termination by Buyer.  Buyer may terminate this Agreement immediately upon delivery of a Termination Notice to Seller upon the occurrence of any of the following, unless Buyer is in material breach of this agreement prior to the occurrence of the following, except for those obligations specified in this Agreement to survive termination:

(i)    Buyer is ready, willing, and able to perform and has properly served Seller with a written demand indicating that Time is of the Essence to close the Sale by the Closing Date and Seller has not performed;

(ii)    if any of the conditions to the obligations of Buyer that are set forth in Section 9.1 shall have become incapable of fulfillment other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer;

(iii)    if there shall be a material breach by Seller of any material representation or warranty, or any material covenant or agreement contained in this Agreement, which breach cannot be cured or has not been cured within fifteen (15) Business Days after the giving of written notice by Buyer to Seller of such breach; or

(iv)    as provided in Section 11.1.

(c)    Termination by Seller.  Seller may terminate this Agreement immediately upon delivery of a Termination Notice to Buyer upon the occurrence of any of the following, unless Seller is in material breach of this Agreement prior to the occurrence of the following, except for those obligations specified in this Agreement to survive termination:

(i)    Seller is ready, willing, and able to perform and has properly served Buyer with a written demand indicating that Time is of the Essence to close the Sale by the Closing Date and Buyer has failed to perform;

(ii)    if any of the conditions to the obligations of Seller to close that are set forth in Section 9.2 shall have become incapable of fulfillment other than as a result of a breach by Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by Seller; or

(iii)    if there shall be a material breach by Buyer of any material representation or warranty, or by Buyer of any material covenant or agreement contained in this Agreement, which breach cannot be cured or has not been cured within fifteen (15) Business Days after the giving of written notice by Seller to

Buyer of such breach. Time is of the Essence with respect to such period to cure such material breach.

(d)    Termination by Buyer or Seller.  Subject to Bankruptcy Court approval, the Parties may terminate this Agreement by mutual written consent of Seller and Buyer.

(e)    Extension of Time Periods.   The time periods for termination of this Agreement set forth in this Section 10.1 may be extended upon the written agreement of the Parties without the further approval of the Bankruptcy Court.

10.2    Procedure For Termination.  If this Agreement is terminated by Buyer or Seller or both pursuant to Section 10.1, as of the date of delivery of the Termination Notice, unless disputed in writing by the non-terminating party within two (2) Business Days of delivery, the Sale shall be abandoned, and this Agreement shall terminate to the extent and with the effect provided by Section 10.3, without further action by the Parties or the Bankruptcy Court. The Bankruptcy Court shall have exclusive jurisdiction over any dispute with respect to termination of this Agreement.

10.3    Effect of Termination.  If either Seller or Buyer terminates this Agreement pursuant to Sections 10.1 and 10.2, all rights and obligations of the Parties hereunder shall terminate without any liability of any Party to any other Party (except for any Liability of any Party then in breach of this Agreement); *provided* that if such termination is the result of a breach or default hereunder by the non-terminating Party, then the terminating Party shall be entitled to seek any and all rights and remedies available to it at law or in equity, including, but not limited to, Seller's right to retain the Deposit and Buyer's right to the return of the Deposit, without further notice to or action by the Parties or the Bankruptcy Court.

ARTICLE XI
TITLE INSURANCE; PERMITTED EXCEPTIONS; APPORTIONMENTS

11.1    Title Insurance.  Seller has delivered to Buyer (i) from Advantage Title, 201 Old Country Road, Suite 200, Melville, NY 11747 (the "Title Company") a current title report #17-CS-52600 with respect to the Real Property, and Buyer shall request the Title Company to perform continuation searches of title prior to the Closing (collectively, the "Title Report"), and (ii) a current ALTA survey of the Real Property (the "Survey").  Buyer has notified Seller, in writing (a "Buyer's Objection Notice"), of any exception, lien, mortgage, security interest, claim, charge, reservation, lease, tenancy, occupancy, easement, right of way, encroachment, restrictive covenant, condition, limitation, open permit or other encumbrance affecting the Real Property (collectively, "Exceptions") disclosed by same that is not a Permitted Exception and to which Buyer objects.  Notwithstanding anything herein to the contrary, Buyer shall be deemed to have objected to and is not obligated to deliver a Buyer Objection Notice with respect to the following in order for same to constitute a Title Defect (defined below): (x) any and all monetary liens, including all mortgages and security interests securing any obligations of Seller (or any predecessor-in-interest to Seller), all judgments against Seller (or any predecessor-in-interest to Seller), all mechanics' liens recorded against the Real Property (or any portion thereof), all monetary liens or penalties arising out of violations on the Real Property and all real property taxes (other than real property taxes that constitute Permitted Exceptions), and (y) any and all tenancies. Except as otherwise provided herein, Seller may elect (but shall not be obligated) to attempt to

cure or remove any such title objections (collectively and individually, a "Title Defect") set forth in the Title Report, the Survey, a Buyer's Objection Notice or otherwise. The Parties acknowledge that Seller may rely on the Sale Order to discharge certain Title Defects and hereby agree that the Title Company's issuance of a title insurance policy, in reliance on the Sale Order, without taking exception for those Title Defects shall be sufficient to constitute Seller's cure and removal of such Title Defects. If Seller is obligated or elects to attempt to cure or remove any Title Defect and are unable to do so on or before the Closing Date, then Seller shall be entitled to adjourn the Closing in order to cure or remove such Title Defect for a period of not more than 30 days in the aggregate. If Seller elects not to cure or remove, or after electing to cannot cure or remove, any Title Defect that Seller is not otherwise obligated to cure or remove pursuant to the terms of this Agreement or shall, for any reason, be unable to cure or remove any Title Defect that Seller is not otherwise obligated to cure or remove pursuant to the terms of this Agreement within the time periods set forth in the preceding sentence, then Seller shall notify Buyer in writing and Buyer shall have the right to either (i) terminate this Agreement or (ii) accept such title as Seller shall be able to convey without abatement in the Purchase Price and without any liability on the part of Seller.

11.2    Permitted Exceptions. "Permitted Exceptions" means:

(a)    all matters set forth on Schedule 11.2(a) attached hereto and made a part hereof;

(b)    building, zoning, subdivision and other governmental laws, codes and regulations, and landmark, historic and wetlands designations;

(c)    any state of facts that a current, accurate survey or visual inspection of the Real Property would disclose, provided same do not render title uninsurable at standard rates;

(d)    all rights and easements for electricity, gas, telephone, water, cable television and any other utilities to maintain and operate lines, cables, poles and distribution boxes in, over and upon the Real Property;

(e)    any variations between the tax diagram or the tax map and the record description, provided same does not render title uninsurable at standard rates;

(f)    rights of the public and adjoining owners in highways, streets, roads and lanes crossing the Real Property existing as of the date hereof, provided that the Title Company shall insure (at no additional cost to Buyer) that no third parties have any claims for adverse possession or easements by prescription by virtue of the use of such highways, streets, roads and lanes crossing the Real Property;

(g)    real property taxes, water rates and charges, sewer taxes and rents, and similar items with respect to the Real Property, not yet due and payable and subject to apportionment as provided herein; and

(h)    assessments or installments thereof arising after the date of Closing, whether or not a lien as of Closing, which are due and payable on or after Closing.

11.3    Apportionments.

(a)    Items Subject to Apportionment.  Subject to the terms of this Section 11.3, the following items, without duplication, are to be apportioned between Seller and Buyer with respect to the Real Property 12:00:01 a.m. on the calendar day immediately following the Closing Date, and at the Closing the net amount thereof shall, as applicable, either be (x) paid by Buyer to Seller by wire transfer of immediately available federal funds to a bank account designated by Seller or (y) credited by Seller against the Purchase Price:

(i)    real property taxes and assessments;

(ii)    water rates and charges;

(iii)    sewer taxes and rents;

(iv)    electricity, steam, gas and all other utilities, including, without limitation, taxes thereon;

(v)    deposits on account with any utility company servicing the Property, to the extent transferred to Buyer;

(vi)    deposits on account with any municipality having jurisdiction over the Property, to the extent transferred to Buyer; and

(vii)    all other items that reasonably require apportionment in accordance with local custom and practice to effectuate the transactions contemplated hereby.

Seller and Buyer shall adjust any apportionments made under this Section 11.3 after the Closing to account for errors or incorrect estimates made as of the Closing Date (it being agreed that the Parties' aforesaid agreement to make such adjustments shall survive the Closing for a period of three (3) months).

(b)    Governmental Charges.  Apportionment of real property taxes, water rates and charges, sewer taxes and rents and other similar items shall be made on the basis of the fiscal year for which assessed.  If the Closing Date occurs before the real property taxes, water rates and charges, sewer taxes and rents or similar items with respect to the Property are finally fixed for the fiscal year in which the Closing occurs, then the apportionments thereof made at the Closing shall be made on the basis of the real property taxes, water rates and charges, sewer taxes and rents or other similar items, as the case may be, for the preceding fiscal year applied to the latest assessed valuation.  After the real property taxes, water rates and charges, sewer taxes and rents or similar items, as the case may be, are finally fixed for the fiscal year in which the Closing occurs, Seller and Buyer shall make a recalculation of the apportionment thereof based on the amounts finally fixed for the fiscal year in which the Closing occurs, and Seller or Buyer, as the case may be, shall make an appropriate payment to the other Party based on such recalculation.  Seller or its representatives shall have the right (x) at any time before the Closing, to institute tax reduction or other proceedings to reduce the assessed valuation of the Real Property with respect to any tax period ending at or prior to the end of the tax year in which the Closing

31

occurs and (y) to continue, after the Closing, any such proceedings commenced by Seller prior to the Closing; p*rovided, however*, that (A) Seller (or its representatives) shall notify Buyer of, and keep Buyer reasonably informed with respect to, any such proceedings and no such proceeding shall be finally settled by Seller without the prior consent of Buyer, which consent shall not be unreasonably withheld, and (B) upon notice to Seller, Buyer shall have the right to assume control of and prosecute any such proceeding relating to the tax year in which the Closing occurs, provided that no such proceeding shall be finally settled by Buyer without the prior consent of Seller, which consent shall not be unreasonably withheld. If Buyer, at any time following the Closing shall institute tax reduction or other proceedings to reduce the assessed valuation of the Real Property with respect to the tax period ending at the end of the tax year in which the Closing occurs, such proceeding shall not be finally settled by Buyer without the prior consent of Seller, which consent shall not be unreasonably withheld. If any refund of any real property tax, water rates and charges, sewer taxes and rents or similar items is issued after the Closing Date for any period ending prior to or including the Closing Date, such refund shall be applied as follows: <u>first</u>, to the cost incurred in obtaining such refund; and, <u>second</u>, the balance of such refund, if any, shall be apportioned between Seller, for the period prior to the Closing Date, and Buyer, for the period from and after the Closing Date.

(c)     <u>Water Meters</u>.  If there shall be any meters measuring water consumption at the Real Property, Seller shall attempt to obtain meter readings to a date that is no more than thirty (30) days before the Closing, and, if such readings are obtained, the unfixed water rates and charges and sewer taxes and rents, if any, based thereon for the intervening time, shall be apportioned on the basis of such readings, or if such readings are not obtained, the unfixed water rates and charges and sewer taxes and rents, if any, shall be apportioned upon the last meter readings.

(d)     <u>Payment of Certain Items.</u>  The amount of any unpaid taxes, assessments, water rates and charges, sewer taxes and rents and any other similar items which Seller is obligated to pay and discharge with respect to the Real Property, with interest and penalties thereon to the date which is three (3) Business Days following the Closing Date, may, at the option of Seller, be allowed to Buyer out of the Purchase Price, provided that official bills therefor with interest and penalties thereon are furnished to Buyer by Seller at the Closing. Buyer, if request is made at least two (2) Business Days prior to the Closing, shall provide Seller at the Closing with separate wire transfers of immediately available federal funds, in an aggregate amount not exceeding the balance of the Purchase Price due to Seller at the Closing, to facilitate the satisfaction of any of the aforesaid taxes, assessments, water rates and charges, sewer taxes and rents and other similar items and any interest and penalties thereon to the Closing Date. Without limiting the foregoing, Seller is solely obligated to pay and discharge any of the aforesaid taxes, assessments, water rates and charges, sewer taxes and rents and other similar items affecting the Real Property that are delinquent as of the Closing Date, subject to apportionment as herein provided.

(e)     <u>Utilities</u>.  With respect to the utilities described in <u>Section 11.3(a)(iv)</u>, where possible, Seller shall secure cutoff readings for all utilities as of the apportionment time. To the extent that such cutoff readings are not available, at Closing the cost of such utilities shall be apportioned between the Parties as of the apportionment time on the basis of the

most recent actual (not estimated) bill for such service, and, after Closing, upon determination of the final meter readings shall be readjusted based on same as of the apportionment time. Buyer shall be responsible for causing such utilities and services to be changed to its name (or the name of any affiliate, manager or tenant of Buyer) as of the Closing Date, and shall be liable for and shall pay all utility bills for services rendered after the apportionment time. With respect to deposits of Seller on account with any utility company servicing the Real Property, to the extent same are unconditionally transferred to Buyer at Closing, Seller shall receive an adjustment equal to the full amount of such deposits transferred to Buyer. To the extent that any such deposits are not unconditionally transferred to Buyer, Seller shall have the right to a return of such deposits and Buyer shall be responsible for posting any deposits required from and after the Closing.

(f)      Assessments. If, on the Closing Date, the Real Property, or any part thereof, is affected by any real property tax assessments, then Seller shall pay such assessments; *provided, however*, that if such assessments are payable in installments, then Seller shall pay such installments due prior to the Closing Date, and Buyer shall pay such installments due after the Closing Date.

(g)      Survival. The provisions of this Section 11.3 shall survive the Closing.

## ARTICLE XII
## MISCELLANEOUS

12.1    Survival. Except as specifically referenced in Sections 7.8 and 11.3 herein, the representations, warranties, covenants and obligations in this Agreement and in the certificates delivered pursuant to this Agreement shall not survive the Closing and the consummation of the Sale. The waiver of any condition based upon the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect such right to set-off or other remedy based upon such representations, warranties, covenants and obligations.

12.2    Press Releases and Public Announcements. No Party shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of the other Party, such approval not to be unreasonably withheld or delayed; *provided, however*, that any Party may make any public disclosure it believes in good faith is required by Applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement (in which case the disclosing Party will use its reasonable efforts consistent with such Applicable Law or Bankruptcy Court requirement to advise the other Party prior to making the disclosure).

12.3    No Third-Party Beneficiaries. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

12.4    Entire Agreement. This Agreement and the other Closing Documents constitute the entire agreement among the Parties and supersede any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

12.5    Succession and Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns.  No Party may assign either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other Party; *provided, however*, that Buyer may (a) assign any or all of its rights and interests including any not-for-profit corporation of which Buyer is a member and which succeeds to the interest of Buyer in Seller and (b) designate one or more of its Affiliates to perform its obligations hereunder (in any or all of which cases Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder). If Buyer assigns this Agreement or designates an Affiliate to perform its obligations hereunder as permitted above, Buyer's Deposit shall be deemed assigned to such assignee or Affiliate without further action.

12.6    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.  The delivery of an executed signature page of this Agreement or any other Closing Document by fax or portable document format (.pdf) shall have the same effect as the delivery of a manually executed counterpart hereof or thereof.

12.7    Headings.  The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

12.8    Notices.   All notices, requests, demands, claims, and other communications hereunder shall be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), or (iii) four Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to Seller:        Dowling College
                     c/o RSR Consulting, LLC
                     49 Roy Avenue
                     Massapequa, New York 11758
                     Attn:  Robert S. Rosenfeld
                     Fax: 212-658-0347
                     Email: rrosenfeld@rsrconsultingllc.com

                     -and-

                     RSR Consulting, LLC
                     1330 Avenue of the Americas, Suite 23A
                     New York, New York 10019
                     Attn:  Robert S. Rosenfeld
                     Fax: 212-658-0347
                     Email: rrosenfeld@rsrconsultingllc.com

Copy to:             Klestadt Winters Jureller Southard & Stevens, LLP
                     200 West 41st Street, 17th Floor

New York, New York 10036
Attn:  Sean C. Southard, Esq.
Fax: 212-972-2245
Email: ssouthard@klestadt.com

If to Buyer:

Triple Five Aviation Industries LLC
%Triple Five Worldwide
One Meadowlands Plaza
3rd Floor
East Rutherford, NJ 07073
Att: Stuart Bienenstock
Email: stuart@T5funding.com

Copy to:

Alan J. Pomerantz, Esq.
Pillsbury Winthrop Shaw Pittman
4 Embaradero
San Francisco, CA 94111
Fax: 415.983.1200
Email: Alanpomertanz@pillsburylaw.com

Any Party may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner herein set forth.

12.9    Governing Law; Waiver of Jury Trial.  This Agreement shall be governed by and construed in accordance with the domestic laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE SALE.

12.10    Submission to Jurisdiction; Consent to Service of Process.  Without limiting any Party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Sale, and (b) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.8 hereof; *provided, however*, that, if the Bankruptcy Case has closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Eastern District of New York sitting in Central Islip, New York, and any appellate court thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by Applicable Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any

defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each of the Parties hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 12.8.

12.11    Amendments.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by Buyer and, upon consultation with the Secured Parties and the Creditors' Committee, Seller.  Seller may consent to any such amendment at any time prior to the Closing with the prior authorization of Seller's Board.

12.12    Severability.    Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

12.13    Expenses.  Each of the Parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the Sale, it being expressly understood that Seller shall pay all Transfer Taxes payable with respect to the conveyance of the Real Property, if any.

12.14    Construction.  The Parties participated fully in the negotiation and preparation of this Agreement with full benefit of counsel.  Accordingly, this Agreement is to be construed as if the Parties drafted it jointly and is not to be more strictly construed against any Party.

12.15    Incorporation of Schedules.    The Schedules identified in this Agreement are incorporated herein by reference and made a part hereof. The Parties acknowledge that the Schedules attached hereto may be updated after the Execution Date with Buyer's consent, which consent shall not be unreasonably withheld.

12.16    No Waiver.  The failure of any Party to this Agreement to assert any of its rights under this Agreement or otherwise shall not constitute a waiver of such rights.  The waiver of any such right with respect to particular facts and other circumstances shall not be deemed a waiver with respect to any other facts and circumstances and each such right shall be deemed an ongoing right that may be asserted at any time and from time to time.  No right, remedy or election given by any term of this Agreement shall be deemed exclusive but shall be cumulative with all of the rights, remedies and elections available at law or in equity.

12.17    Non-Recourse Liability.  All claims or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or related in any manner to this Agreement may be made only against (and expressly limited to) the persons that are expressly identified as Parties hereto or thereto (the "Contracting Parties" and each a "Contract Party").  In no event shall any Contract Party have any shared or vicarious liability for the actions or omissions of any other person.  No person who is not a Contracting Party, including a director, officer, employee, incorporator, member, partner, manager, stockholder, affiliate, agent, attorney or representative of, and any financial advisor or lender (including the financial sources) to, any of the foregoing (the "Non-

<u>Party Affiliates</u>"), shall have any liability (whether in contract or in tort, in law or in equity, or granted by statute or based upon any theory that seeks to impose liability of an entity party against its owners or affiliates) for any causes of action or liabilities arising under, out of, in connection with or related in any manner to this agreement or related agreements or their negotiations, execution, performance or breach; and, to the maximum extent permitted by law, each Contracting Party waives and releases all such causes of action and liabilities against any such Non-Party Affiliates. Without limited to the foregoing, to the maximum extent permitted by Law, (a) each Contracting Party hereby waives and releases any and all rights, claims, demands, or causes of action that may otherwise be available at law or in equity, or granted by statute, to avoid or disregard the entity form of a Contracting Party or otherwise impose liability of a Contracting Party on any Non-party Affiliate, whether granted by statute or based on theories of equity, agency, control, instrumentality, alter ego, domination, sham, single business enterprise, piercing the veil, unfairness, undercapitalization, or otherwise; and (b) each Contracting Party disclaims any reliance upon Non-Party Affiliates with respect to the performance of this agreement or related agreements or any representation or warranty made in, in connection with, or as inducement to this agreement or related agreements. The Parties acknowledge and agreed that the Non-Party Affiliates are intended third-party beneficiaries of this Section.

*{signature page follows}*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

DOWLING COLLEGE

By: _____
Name: Robert S. Rosenfeld
Title: Chief Restructuring Officer

TRIPLE FIVE AVIATION INDUSTRIES LLC

By: _____
Name:  Syd Ghermezian
Title:   Managing Member

SCHEDULES TO

ASSET PURCHASE AGREEMENT


by and between


DOWLING COLLEGE


and


TRIPLE FIVE AVIATION INDUSTRIES LLC


Dated as of May 11, 2018

Schedule 1.1        Knowledge

Robert S. Rosenfeld is Chief Restructuring Officer of Seller and sole officer of Seller.

Schedule 4.6          Events Subsequent



Schedule 4.7        Tax Matters

(a) 

(b)
  1.
  2.

(c)
  1.
  2.

3. 

4.

Schedule 4.8(a)          Owned Real Property

<u>Description of Real Property:</u>

| | |
|---|---|
| **Address:** | William Floyd Parkway Shirley, New York |
| **Unit No.:** | |
| **County:** | Suffolk |
| **Town:** | Brookhaven |
| **City:** | |
| **Village:** | |
| **District:** | 0200 |
| **Section:** | 710.00 |
| **Block:** | 01.00 |
| **Lot:** | 001.003 |

Reference is made to those certain leasehold interests identified in Report #17-CS-52600 prepared by Advantage Title and effective as of 9:00 a.m. on December 15, 2017, as updated and amended on January 28, 2018. The only leases currently in effect with regard to the Real Property are identified therein and below and relate to tax exempt bond financings provided to Seller in 2002 and 2006 and involve leases by Dowling to both the Town of Brookhaven Industrial Development Agency and Suffolk County Industrial Development Agency (the "<u>IDA's</u>"), respectively, and subleases back to Dowling from the same agencies which create an interest in the respective IDA's that qualify the tax exempt bond financing simultaneously issued. Each of the IDA's has been provided with notice of the proposed sale to Buyer and Seller expects to sell the Real Property to Buyer free and clear of such leasehold interests by operation of Section 363(f) of the Bankruptcy Code.

- Lease made by and between Dowling College, as Lessor and Town of Brookhaven Industrial Development Agency, as Lessee, dated November 1, 2002 and recorded on December 17, 2002 in Liber 12225 Page 841.

- Sublease Agreement made by and between Town of Brookhaven Industrial Development Agency, as Lessor and Dowling College, as Lessee, dated November 1, 2002 and recorded on December 17, 2002 in Liber 12225 Page 837.

- Lease made by and between Dowling College, as the College and Suffolk County Industrial Development Agency, as Issuer, dated as of June 1, 2006, a memorandum of which was recorded on July 5, 2006 in Liber 12457 Page 820.

- Sublease Agreement made by and between Suffolk County Industrial Development Agency, as Lessor and Dowling College, as Lessee, dated as of June 1, 2006 a Memorandum of which was recorded on July 5, 2006 in Liber 12457 Page 821.

Schedule 4.8(d)          Violations

Schedule 4.9          Contracts

(a) 

(b) Reference is made to each loan and security agreement referenced in that certain Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Debtor (A) to Obtain Post-Petition Secured, Superpriority Financing Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, and 364 and (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. Section 363; (II) Granting Adequate Protection to Pre-Petition Secured Creditors Pursuant to 11 U.S.C. Sections 361, 362, 363 and 364; and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c) [Docket No. 9] and related pleadings (the "<u>DIP Financing Motion Papers</u>"), as well as in that certain Declaration of Robert S. Rosenfeld, Chief Restructuring Officer of the Debtor, Pursuant to Local Bankruptcy Rule 1007-4 in Support of First Day Motions [Docket No. 23] (the "<u>First Day Declaration</u>") filed in the Bankruptcy Case.

(c) Further specific reference is made to:

Those certain Permitted Encumbrances set forth on Schedule 3 to DIP Note attached as Exhibit A of the DIP Financing Motion Papers; and

Five Largest Secured Claims set forth on Exhibit B to the First Day Declaration.

Publicly Held Bonds set forth on Exhibit D to the First Day Declaration.

Schedule 4.10           Consents and Approvals (Seller)

By virtue of that certain Memorandum of Understanding dated as of April 9, 2003, seller agreed to notify the U.S. Department of Energy, the New York State Department of Environmental Conservation and the Environmental Protection Agency, by certified mail at least 30 days prior to any conveyance, of Seller's intent to convey title, easement or other interest in any of Seller's property affected by Agreement, which includes portions of the Brookhaven Campus ("Brookhaven National Laboratory MOU").

Schedule 4.12        Litigation of Seller

Reference is made to those certain Permitted Encumbrances set forth on Schedule 3 to DIP Note attached as Exhibit A of the DIP Financing Motion Papers.

Schedule 4.15          Insurance Coverage

| Coverage | Company | Expires | Policy Number | Annual Premium |
|---|---|---|---|---|
| Property | ███ | ████ | ████ | ███ |
| Umbrella | ███ | ████ | ████ | ████ |
| General Liability | █████ | ████ | ████ | ████ |
| Commercial Package (Auto) | █████ | ████ | ████ | ████ |
| Workers Compensation | █████ | ████ | ████ | ███ |
| Employee Disability | ███████ | ████ | ██ | ██ |
| Flood Insurance (Dorm) | ██████ | ████ | ████ | ████ |
| Flood Insurance (Nat Ctr) | ██████ | ████ | ████ | ████ |

Schedule 4.16(a)          Environmental Matters

Reference is made to that certain Memorandum of Understanding dated as of April 9, 2003, by and among Brookhaven Science Associates, LLC under contract with the U.S. Department of Energy to manage and operation the Brookhaven National Laboratory, the U.S. Department of Energy, Town of Brookhaven, and Dowling College and the contents of the same.

Schedule 4.16(b)        Environmental Permits

Seller is beneficiary of a SPDES Permit [#0238317] issued by County of Suffolk, Department of Health Services in relation to sewerage facilities for the Brookhaven Campus.

Schedule 5.1(c)          Consents and Approvals (Buyer)

The Managing Member of Buyer is: Syd Ghermezian.

Schedule 11.2(a)          Permitted Exceptions

