**SILVERMANACAMPORA LLP**
Attorneys for the Committee
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
Anthony C. Acampora

**Hearing Date: September 24, 2018**
**Time:  1:30 p.m.**

**Objections Due: September 17, 2018**
**Time:  4:00 p.m.**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:

DOWLING COLLEGE f/d/b/a DOWLING
INSTITUTE f/d/b/a DOWLING COLLEGE
ALUMNI ASSOCIATION f/d/b/a CECOM
a/k/a DOWLING COLLEGE, INC.,

Chapter 11

Case No. 16-75545 (REG)

Debtor.
-----------------------------------------------------------x

### NOTICE OF HEARING ON CREDITORS' COMMITTEE'S MOTION FOR AN ORDER GRANTING LEAVE, STANDING, AND AUTHORITY TO PROSECUTE CLAIMS ON BEHALF OF DOWLING'S ESTATE

**PLEASE TAKE NOTICE** that the Official Committee of Unsecured Creditors (the "Committee") of Dowling College, *f/d/b/a* Dowling Institute, *f/d/b/a* Dowling College Alumni Association, *f/d/b/a* Cecom, *a/k/a* Dowling College, Inc., the above-captioned debtor and debtor in possession (the "Debtor"), filed a motion (the "Motion") seeking entry of an order pursuant to §§105(a), 1103(c), and 1109(b), of title 11 of the United States Code (the "Bankruptcy Code") granting leave, standing, and authority to the Committee and any successor thereto to commence adversary proceedings on behalf of the Debtor's estate, and will move before the Honorable Robert E. Grossman, United States Bankruptcy Judge, United States Bankruptcy Court for the Eastern District of New York, Alfonse M. D'Amato U.S. Courthouse, 290 Federal Plaza, Central Islip, New York, on **September 24, 2018** at **1:30 p.m.** (the "**Hearing**"), or as soon thereafter as counsel can be heard, concerning the relief sought in the Motion.

**PLEASE TAKE FURTHER NOTICE**, that objections to the Motion, if any, must be filed with the Court electronically in accordance with General Order 559 by registered users of the Court's electronic case filing system and, by all other parties in interest, mailed to the Clerk of the United States Bankruptcy Court for the Eastern District of New York, Alfonse M. D'Amato U.S. Courthouse, 290 Federal Plaza, Central Islip, New York, with a hard copy delivered directly to the Chambers of the Honorable Robert E. Grossman, and

served in accordance with General Order 559 or other form upon: (i) attorneys for the Committee, SilvermanAcampora LLP, 100 Jericho Quadrangle, Suite 300, Jericho, New York, 11753, Attn: Anthony C. Acampora; (ii) the Office of the United States Trustee for Region 2, 560 Federal Plaza, Central Islip, New York 11722, Attn: Stan Yang; (iii) counsel to the Debtor, Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10036, Attn: Sean C. Southard; and (iv) counsel to the Debtor's material prepetition and post-petition secured lenders: (a) Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: P. Miyoko Sato and Ian A. Hammel, (b) Schulte Roth & Zabel LLP, 919 Third Avenue, New York, New York 10022, Attn: Brian D. Pfeiffer and Neil S. Begley, (c) Certilman Balin Adler & Hyman, LLP, 90 Merrick Avenue, 9th Floor, East Meadow, NY 11554, Attn: Richard J. McCord, Esq. and Thomas J. McNamara, and (d) Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck, NY 11021, Attn: Adam T. Berkowitz, so as to be filed and received by no later than **September 17, 2018** at **4:00 p.m.**

   **PLEASE TAKE FURTHER NOTICE**, that the Hearing may be adjourned without further notice other than the announcement of such adjournment in open Court, or the filing of a notice of adjournment on the docket of the Debtor's case.

Dated: Jericho, New York
   August 28, 2018        **SILVERMANACAMPORA LLP**
                   Attorneys for the Committee

                   By: *s/Anthony C. Acampora*
                     Anthony C. Acampora
                   Member of the Firm
                   100 Jericho Quadrangle, Suite 300
                   Jericho, New York 11753
                   (516) 479-6300

**SILVERMANACAMPORA LLP**
Attorneys for the Official Committee of
Unsecured Creditors of Dowling College
f/d/b/a Dowling Institute f/d/b/a Dowling
College Alumni Association f/d/b/a Cecom
a/k/a Dowling College, Inc.
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
Anthony C. Acampora
Ronald J. Friedman

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re:

   DOWLING COLLEGE f/d/b/a DOWLING
   INSTITUTE f/d/b/a DOWLING COLLEGE
   ALUMNI ASSOCIATION f/d/b/a CECOM
   a/k/a DOWLING COLLEGE, INC.,

                                        Debtor.
-----------------------------------------------------------x

Chapter 11

Case No. 16-75545 (REG)

## CREDITORS' COMMITTEE'S MOTION FOR AN
## ORDER GRANTING LEAVE, STANDING, AND AUTHORITY
## TO PROSECUTE CLAIMS ON BEHALF OF DOWLING'S ESTATE

The Official Committee of Unsecured Creditors of Dowling College f/d/b/a Dowling Institute f/d/b/a Dowling College Alumni Association f/d/b/a Cecom a/k/a Dowling College, Inc. (the "Committee"), by its attorneys, SilvermanAcampora LLP, in support of its motion (the "Motion") pursuant to §§105(a), 1103(c), and 1109(b), of title 11 of the United States Code (the "Bankruptcy Code") granting leave, standing, and authority to the Committee and any successor thereto to commence adversary proceedings on behalf of the estate of Dowling College f/d/b/a Dowling Institute f/d/b/a Dowling College Alumni Association f/d/b/a Cecom a/k/a Dowling College, Inc. ("Dowling") as anticipated by the proposed Chapter 11 plan of reorganization and

granting such other and further relief as the Court deems just and proper, respectfully represents as follows:[1]

## PRELIMINARY STATEMENT

1. The Committee seeks entry of an order granting derivative standing and authority to commence adversary proceedings on behalf of all unsecured creditors as contemplated by the proposed plan of reorganization which, when confirmed, will vest those litigation rights in an unsecured creditor trust (the "Creditor Trust") administered by an unsecured creditor trustee and overseen by Creditor Trust oversight committee. Under the proposed plan, on the effective date, Dowling will transfer to the Creditor Trust, among other things, all of Dowling's avoidance actions and claims for relief and the Creditors' Trustee will be automatically deemed to be substituted as the plaintiff in any pending adversary proceedings or actions.

2. The instant motion is intended to accelerate the commencement of viable and colorable claims on behalf of Dowling which will inure to the benefit of Dowling's creditors. As such, allowing the Committee to commence adversary proceedings immediately would unquestionably be in the best interest of the estate.

## BACKGROUND

3. On November 29, 2016, Dowling filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court. On December 9, 2016, the Office of the United States Trustee (the "U.S. Trustee") held an organizational meeting of Dowling's creditors for the purpose of the formation of the Committee. On December 9, 2016, the U.S. Trustee filed a *Notice of Appointment of Creditors' Committee* (ECF Doc. No. 85) appointing Ultimate Power,

---

[1] This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§157 and 1334. Venue is proper pursuant to 28 U.S.C. §§1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. §157(b).

Inc., Linda Ardito, and Lori Zaikowski to the Committee. The Committee selected SilvermanAcampora LLP as its counsel and that selection has been approved by the Court.

4. Dowling was established on September 27, 1968 as a private, not-for-profit 501(c)(3) educational corporation which, until 2016, provided undergraduate and graduate programs with significant concentrations in liberal arts, business, education, and aviation.

5. Dowling's traditional sources of revenues were primarily student tuition and fees often provided through loan programs subject to Title IV of the Higher Education Act of 1965 ("Federal Loan Program") and through donations from corporations and individuals solicited by Dowling. Dowling was accredited by the Middle States Commission on Higher Education ("MSCHE") which is responsible for periodically assessing and reviewing subject colleges based upon fourteen (14) "standards of excellence."

6. At the time of its financial collapse, Dowling owned its main campus located at 150 Idle Hour Boulevard, Oakdale, New York 11769 which contained several improvements, including the former Vanderbilt mansion (subsequently renamed Fortunoff Hall), a student center, the Kramer Science Center, a dormitory, and the Racanelli Learning Resource Center (the "Rudolph Campus").[2]

7. Dowling also owned thirty-two (32) parcels of predominantly residential real property and associated personal property within the neighborhood adjacent to the Rudolph Campus, most of which were improved by single family residences (the "Residential Real Property"). Historically, Dowling either leased the Residential Real Property to third parties or used it for faculty offices and ancillary college functions.

---

[2] The Oakdale campus was renamed the "Rudolph Campus" in honor of Board Trustee and eventual Dowling interim President, Scott Rudolph.

8. In 1994, Dowling purchased the approximately 103 acres of land located at 1300 William Floyd Parkway, Shirley, Town of Brookhaven, New York (the "Brookhaven Campus"). The Brookhaven Campus was home to (a) Dowling's School of Aviation and sports management program, (b) Dowling's NCAA Division II athletic program, and (c) a 289-bed dormitory facility.

9. In 1996, Dowling engaged in a tax-exempt bond funding (the "Series 1996 Bonds") in the principal amount of $7.22 million under a Trust Indenture dated June 1, 1996, among (a) Dowling, (b) the Suffolk County Industrial Development Agency ("SCIDA"), as issuer, and (c) United States Trust Company of New York ("US Trust"), as trustee. US Trust was eventually succeeded as trustee by the Bank of New York Mellon Trust Company, N.A. ("BNY") which was succeeded by UMB Bank, N.A. ("UMB"). The 1996 Series Bonds were used to finance certain improvements and construction relating to the Rudolph Campus Kramer Science Center and to the Rudolph Campus sewage treatment facility.

10. As early as 1999, Dowling's then Board of Trustees was concerned about flagging undergraduate enrollment because tuition and other student generated revenues accounted for approximately 90% of Dowling's income. The 27-member Board was also concerned about the inability or disinclination of Dowling's then president, Dr. Victor Meskill, to fundraise on Dowling's behalf. The year 1999 represented the high point in Dowling's student enrollment with 6,746 undergraduate and graduate students.

11. In 2002, Dowling engaged in another tax-exempt bond funding (the "Series 2002 Bonds") in the principal amount of $10.9 million under a Trust Indenture dated November 1, 2002 (the "2002 Indenture") among (a) Dowling, (b) the Brookhaven Industrial Development Agency ("BID"), as issuer, and (c) BNY at trustee. BNY was eventually succeeded as trustee by

UMB. Dowling used the 2002 Series Bonds to finance the acquisition, renovation, and equipping of Dowling's 72,000 square foot Brookhaven Dorm and the renovation of the Brookhaven Campus.

12.     In 2006, Dowling engaged in its final round of tax-exempt bond funding (the "Series 2006 Bonds") to finance certain improvements, construction, and equipping of (a) Dowling's athletic field complex on 33 acres of the Brookhaven Campus, (b) the Brookhaven Campus cafeteria, and (c) certain capital improvements on the Rudolph Campus. The Series 2006 Bonds, issued as Series 2006A bonds in the principal amount of $34,910,000 and Series 2006B bonds in the principal amount of $4,000,000 under a Trust Indenture dated June 1, 2006 (the "Series 2006 Indenture"), among (a) Dowling, (b) SCIDA, as issuer, and (c) BNY. Eventually Wilmington Trust, N.A. ("Wilmington") succeeded BNY as trustee.

13.     In October 2006, former Suffolk County Executive, Robert Gaffney, became the President of Dowling College. At the time that Gaffney took office, the total industrial development bond debt carried by Dowling exceeded $57 million.

14.     On February 2, 2006, Moody's Investors Service ("Moody's") downgraded Dowling's long-term rating from Ba3 to Ba2 and noted that Dowling's outlook remained *negative*. That negative outlook continued for a decade with Moody's as well as Standard & Poors steadily downgrading Dowling's bonds and placing Dowling on watch lists.

15.     During the ten years between 2006 and 2016, Dowling's Board of Trustees shrunk dramatically. Dowling was unable to attract board trustees who would either fundraise or financially support the institution. Indeed, the concerns expressed by Dowling's board in 1999 continued to plague the college – enrollment was seriously declining and was dragging revenue down with it. Dowling lost tens of millions of dollars of revenue and became increasingly

unstable financially after 2006 while its board and administration continued to struggle with rapidly declining enrollment and negative publicity which further impacted enrollment.

16.     After Robert Gaffney's departure as president in 2010, Dowling had a revolving door of presidents – five in six years. Three of the five presidents were interim replacements who had close ties to Dowling. Two were professional higher education "troubleshooters" who had been retained to stem Dowling's financial and reputational slide. All failed.

17.     Throughout the period from 2006 through the day that Dowling closed its doors for the last time, KPMG LLP ("KPMG") acted as Dowling's independent auditors. KPMG has a particular expertise in the higher education arena having co-authored the series *Strategic Financial Analysis for Higher Education* (formerly entitled *Ratio Analysis in Higher Education*) ("*Strategic Financial Analysis*") since 1995.[3] *Strategic Financial Analysis* has been widely acknowledged by leaders in the higher education industry as an important financial publication and has been used extensively by board trustees, senior managers, financial analysts, and credit analysts.

18.     Interestingly, despite Dowling's steady financial decline, KPMG did not issue a going concern qualification for any of its audits until 2016.

19.     On its face, Dowling's ultimate loss of MSCHE accreditation and financial collapse could appear to be precipitous. In actuality, Dowling's collapse was the culmination of innumerable professional and business failures. The Committee has extensively investigated the facts and circumstances regarding Dowling's demise and has determined that there are significant claims against a number of parties. Dowling and its counsel recognize that Dowling possesses substantial claims which should be pursued. The Committee now seeks permission to

---

[3] The investment banking firm of Prager & Co., LLC, (formerly, Prager, McCarthy & Sealy, LLC and Prager, Sealy & Co., LLC) is KPMG's co-author.

commence that litigation ahead of the confirmation of the proposed plan of reorganization and in advance of the appointment of the Creditor Trust.

## ARGUMENT

### I.

### THE COMMITTEE SHOULD BE GRANTED STANDING
### TO PROSECUTE CLAIMS ON BEHALF OF THE ESTATE

20. Bankruptcy Code §544(b) gives a trustee, and by extension, a debtor-in-possession in chapter 11 cases, both the power and the responsibility to bring actions against third parties to maximize the value of the bankruptcy estate. *See Louisiana World Exposition v. Federal Ins. Co. ("LWE II")*, 858 F.2d 233, 249-50 (5th Cir. 1988).

21. In *Unsecured Creditors Committee of Debtor STN Enterprises, Inc. v. Noyes (In re STN Enterprises)*, 779 F.2d 901 (2d Cir. 1985), the United States Court of Appeals for the Second Circuit held that Bankruptcy Code §§1103(c)(5) and 1109(b) imply a qualified right for creditors' committees to bring actions on behalf of the estate if the debtor itself "unjustifiably failed to bring suit." *Id*. at 904.[4] *See also Official Comm. of Equity Sec. Holders v. Official Comm. of Unsecured Creditors (In re Adelphia Communs. Corp.*), 544 F.3d 420, 424 (2d Cir. 2008) ("debtor-in-possession may not always fulfill its responsibilities, and we have recognized that a debtor-in-possession may unjustifiably fail to bring valid claims or abuse its discretion by not suing"), *citing STN Enters.*; *In re Smart World Tech., LLC*, 423 F.3d 166, 177 (2d Cir. 2005) ("STN thus makes clear that derivative standing in the bankruptcy context is analogous to derivative standing in shareholder suits; it arises when the debtor [in possession] unjustifiably refuses to pursue a cause of action. … [I]t usually involves a claim against the debtor's principals

---

[4] "A bankruptcy court exercises its section 105 equitable power to confer derivative standing in order to carry out sections 1103(c)(5) and 1109(b) of the Code." *Official Comm. Of Equity Sec. Holders v. Adelphia Communs. Corp. (In re Adelphia Communs. Corp.*), 371 B.R. 660, n.29 (*citing Smart World*, 423 F.3d at 184).

ACA/2201619.2/066648

themselves, who refuse to litigate out of self-interest."); *In re Commodore Int'l Ltd.,* 262 F.3d 96 (2d Cir. 2001) (action may be maintained if court finds that action is in the best interests of the bankruptcy estate and is necessary and beneficial to the fair and efficient resolution of the case); *In re Milazzo*, 450 B.R. 363, 370-371 (Bankr. D. Conn. 2011); *Geron v. Levine (In re Levine)*, 2007 Bankr. LEXIS 2395, *14-15 (Bankr. S.D.N.Y. July 10, 2007).

22. To demonstrate a debtor's "unjustifiable failure" to bring the suit, a creditor does not have to establish that a debtor has an improper motive for the failure. *Adelphia Communs. Corp. v. Bank of Am. (In re Adelphia Communs. Corp.*), 330 B.R. 364, 374 (Bankr. S.D.N.Y. 2005). Rather, a court may hold that a debtor unjustifiably failed to bring a claim when (a) the creditor "presents a colorable claim for relief that on appropriate proof would support a recovery," and (b) "an action asserting such claim(s) is likely to benefit the estate." *In re STN Enterprises*, 779 F.2d at 904-05. *See also Official Committee of Unsecured Creditors v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 374 n.19 (Bankr. S.D.N.Y. 2002), *appeal dismissed*, 287 B.R. 861 (S.D.N.Y. 2003).

23. The ability of a creditor to obtain derivative standing is often critical to the preservation of estate assets and serves important interests, particularly in the context of a Chapter 11 reorganization. As the Third Circuit held in *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery ("Cybergenics II")*:

> In Chapter 11 cases where no trustee is appointed, §1107(a) provides that debtor-in-possession, *i.e.*, the debtor's management, enjoys the powers that would otherwise vest in the bankruptcy trustee. Along with those powers, of course, comes the trustee's fiduciary duty to maximize the value of the bankruptcy estate.
>
> This situation immediately gives rise to the proverbial problem of the fox guarding the henhouse. If no trustee is appointed, the debtor -- really, the debtor's management -- bears a fiduciary duty to avoid fraudulent transfers that it itself made. One suspects that if

> managers can devise any opportunity to avoid bringing a claim that would amount to reputational self-immolation, they will seize it. … For that reason, courts and commentators have acknowledged that the debtor-in-possession "often acts under the influence of conflicts of interest." … These conflicts of interest can arise even in situations where there is no concern that a debtor's management is trying to save its own skin. For example, a debtor may be unwilling to pursue claims against individuals or businesses, such as critical suppliers, with whom it has an ongoing relationship that it fears damaging. … Finally, even if a bankrupt debtor is willing to bring an avoidance action, it might be too financially weakened to advocate vigorously for itself. In any of these situations, the real losers are the unsecured creditors whose interests avoidance actions are designed to protect.
>
> The possibility of a derivative suit by a creditors' committee provides a critical safeguard against lax pursuit of avoidance actions. …

330 F.3d 548, 573-74 (3d Cir. 2003) (internal citations omitted). *See also Adelphia Communs. Corp. v. Bank of Am. (In re Adelphia Communs. Corp.), 330 B.R. 364, 373* (Bankr. S.D.N.Y. 2005) ("The practice [of authorizing the prosecution of actions on behalf of an estate by creditors] which has been established in the Second Circuit under the *STN* Trilogy and countless lower court cases, is a salutary (and many might say essential) element of the chapter 11 process.").

24. As detailed herein, adequate grounds exist for granting the relief requested by the Committee.

### A. **Colorable Claims**

25. There are viable and colorable claims against a wide variety of parties including certain insiders and certain vendors and professionals who worked for and with Dowling. Since the litigation against those parties will undoubtedly be brought by the Creditor Trust and due to the sensitive nature of the claims and the parties involved, the Committee has not to annexed proposed pleadings to the instant motion. However, the Committee and its counsel is prepared to

provide the Court, *in camera*, with a draft of at least one proposed pleading from which the Court can determine the nature and viability of those claims.

26. "When a court determines whether a colorable claim exists, the court should not conduct a mini-trial." *In re Dewey & Leboeuf LLP*, 2012 Bankr. LEXIS 5536, *16 (Bankr. S.D.N.Y. Nov. 29, 2012) (citing *STN Enters.*, 779 F.2d at 905-06). *See also Adelphia*, 330 B.R. at 369. "A committee seeking standing need not lay bare its complete proof, but rather is required only to describe a facially valid claim, which will be evaluated under a standard 'much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim.'" *In re Dewey & Leboeuf LLP*, 2012 Bankr. LEXIS 5536 (quoting *Official Comm. of Unsecured Creditors of Am.'s Hobby Ctr., Inc. (In re Am.'s Hobby Ctr., Inc.*), 223 B.R. 275, 282 (Bankr. S.D.N.Y. 1998)). The required showing that any claims be "colorable" is a "relatively easy one to make." *Adelphia*, 330 B.R. at 376. *See also In re Hydrogen L.L.C.*, 2009 Bankr. LEXIS 1038, *3-4 (Bankr. S.D.N.Y. May 7, 2009).

27. As one Court has observed:

> It is plain that on …[an] STN motion[] the [creditor does] not have to show a likelihood of success on the merits. Rather, those proposing to pursue litigation on behalf of an estate must give the Court comfort that their litigation will be a sensible expenditure of estate resources. That means, as a practical matter, providing the Court with a predicate for concluding that the claims will, if proven, provide a basis for recovery, and that the proposed litigation will not be a hopeless fling. It also means, as a practical matter, that the prospective rewards can reasonably be expected to be commensurate with the litigation's foreseeable cost. But no more than that is required, and the Court must be mindful of the purposes for its inquiry. It is not for the protection of defendants sued or to be sued by a committee on behalf of an estate, whose defenses can be fully and fairly considered in the plenary litigation to be prosecuted-just as they would if the defendants had been sued by a debtor (or a nondebtor) directly. Rather, the purpose of the bankruptcy court's gatekeeper role is to protect the estate, to ensure that the litigation reasonably can be expected to be a

> sensible expenditure of estate resources, and will not impair reorganization.

*In re Adelphia Communs. Corp.*, 330 B.R. at 386.

28. The claims eventually transferred to the Creditor Trust are supported by indisputable evidence of the timing, nature, and circumstances surrounding Dowling's economic failure.

### B. Benefit to the Estate

29. The litigation that the Committee seeks to commence will undoubtedly benefit Dowling's estate.

30. This factor requires a cost/benefit analysis which includes a consideration of the costs to the estate of prosecuting the action. The Second Circuit stated in *In re STN Enterprises*:

> The creditors who [are bringing the action] may agree themselves to be responsible for all attorneys' fees, but if they seek to impose such fees on other creditors or the chapter 11 estate, whether by contingency fee arrangement or otherwise, that would obviously affect the cost-benefit analysis the court must make in determining whether to grant lease to sue. Hence, fee arrangements should be carefully examined by the court as it makes that determination …. Of course, if the [creditor bringing the action] represents that its fee arrangement with its attorneys will in no event impose a net burden on the bankruptcy estate (because the [creditor] will pay the fee and seek reimbursement only out of any recovery), the preliminary inquiry can be limited to ascertaining whether the proposed lawsuit has a colorable basis on which to proceed.

*Id.* at 905-06. Derivative standing is appropriate in this case. *STN*, 779 F.2d at 906.

### C. Demand Futility

31. No demand is necessary in this case because the Debtor has already agreed, pursuant to the Plan, that the claims that the Committee seeks to pursue immediately will be transferred to the Creditor Trust. Moreover, to the extent that the Committee seeks to assert

claims against the Debtor's current or former board members, such a demand upon the Debtor would be futile. Consequently, a demand is not necessary in this instance.[5]

## **CONCLUSION**

For the foregoing reasons, the Committee respectfully request that the Court grant its Motion for an order (a) pursuant to Bankruptcy Code §§105(a), 1103(c) and 1109(b) granting leave, standing and authority to the Committee to prosecute claims on behalf of Dowling's estate; and (b) granting such other and further relief as the Court deems just and proper.

Dated: Jericho, New York
      August 27, 2018

                                        **SILVERMANACAMPORA LLP**
                                        Attorneys for The Official Committee
                                        of Unsecured Creditors

                                        By: */s/ Anthony C. Acampora*
                                              Anthony C. Acampora
                                        Member of the Firm
                                        100 Jericho Quadrangle, Suite 300
                                        Jericho, New York 11753
                                        (516) 479-6300

---

[5] Courts have recognized an exception to the demand requirement where it is plain from the record that no action on the part of the debtor would have been forthcoming. *See, e.g., Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co*.), 326 B.R. 532, 544-545 (W.D. Pa. 2005) (bankruptcy court did not commit error in excusing a creditors' committee's failure to formally request a debtor to file suit); *La. World Exposition, Inc. v. Fed. Insurance Co.(In re La. World Exposition, Inc.),* 832 F.2d 1391, 1397-98 (5th Cir. 1987) (formal demand not required where there was "no reason to believe" that the debtor would have commenced the action if requested); *In re First Capital Holdings Corp*., 146 B.R. 7, 13 (C.D. Cal. 1992) (creditors' committee would be excused from making a demand on a debtor to pursue action against its officers, directors and controlling shareholders where such a demand would be futile). The policy concerns underlying the general requirement of a formal demand are to ensure that the debtor is (i) informed of the committee's intent to assert the subject claims and (ii) afforded an opportunity to explain its reasons, if any, for declining to pursue the claims itself. *See In re Catwil Corp*., 175 B.R. 362, 364-65 (Bankr. E.D. Cal. 1994); *In re Chemical Separations Corp*., 32 B.R. 816, 819 (Bankr. E.D. Tenn. 1983). In this way, courts can more effectively oversee adversary proceedings and thereby promote "the fair and orderly administration of the bankruptcy estate." *Catwil*, 175 B.R. at 364.