**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DOWLING COLLEGE, | : | |
| f/d/b/a DOWLING INSTITUTE, | : | Case No. 16-75545 (REG) |
| f/d/b/a DOWLING COLLEGE ALUMNI | : | |
| ASSOCIATION, | : | |
| f/d/b/a CECOM, | : | |
| a/k/a DOWLING COLLEGE, INC., | : | |
| | : | |
| Debtor. | : | |

---------------------------------------------------------------x

**FIRST AMENDED DISCLOSURE STATEMENT FOR FIRST AMENDED PLAN OF LIQUIDATION OF DOWLING COLLEGE PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE, AS MODIFIED[1]**

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245
Sean C. Southard
Joseph C. Corneau
Lauren C. Kiss

*Attorneys for Dowling College, Debtor and*
*Debtor-In-Possession*

Dated:  New York, New York
        October 31, 2018

---

[1] The Disclosure Statement was modified following the hearing to consider approval of the Disclosure Statement held on November 5, 2018 and before solicitation of votes on the Plan.

## **TABLE OF CONTENTS**

I.      PURPOSES AND LIMITATIONS OF DISCLOSURE STATEMENT ............................1

        A.  Purpose of Disclosure Statement ...................................................................1

        B.  Definitions and Exhibits ...............................................................................1

        C.  Enclosures ....................................................................................................2

        D.  Representations and Limitations ...................................................................2

        E.  Important Dates ............................................................................................3

        F.  Solicitation Procedures .................................................................................4

        G.  Recommendation ..........................................................................................4

        H.  Inquiries .......................................................................................................4

II.     BACKGROUND ......................................................................................................5

        A.  History of the Debtor ....................................................................................5

        B.  Events Preceding the Chapter 11 Filing........................................................5

                1.  Financial and Operational Challenges ..................................................5

                2.  Accreditation Challenges ......................................................................7

                3.  Forbearance Agreements ......................................................................8

                4.  Going Concern Sale Efforts ..................................................................8

                5.  Cessation of Education Services and Student Transition Efforts ............9

                6.  Summary of Real Estate Assets and Associated Secured Obligations ..................10

III.    SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE ....................................12

        A.  The Appointment of the Creditors' Committee ...........................................12

        B.  Retention of Professionals ..........................................................................12

        C.  Schedules of Assets and Liabilities, Statement of Financial Affairs ...........14

D.  DIP Financing and Use of Cash Collateral ................................................................14

E.  Bar Date for Filing of Claims Arising Prior to the Petition Date ..............................15

F.  Omnibus Claims Objections .......................................................................................16

G.  Disposition of Assets During the Case .......................................................................16

    1.  Residential Portfolio ............................................................................................16

    2.  Oakdale Campus ..................................................................................................17

    3.  Oakdale Campus F&E .........................................................................................19

    4.  Brookhaven Campus and F&E .............................................................................19

    5.  Simulators ............................................................................................................21

    6.  IPv4 Addresses....................................................................................................21

    7.  Student Accounts Receivable ..............................................................................21

    8.  Prepetition Bank Accounts ..................................................................................21

H.  Significant Case Resolutions and Settlements............................................................22

    1.  Unsecured Creditor Settlement............................................................................22

    2.  WARN Act Litigation and Employee Settlement Motion....................................24

    3.  Negotiations with the United States Department of Education ............................26

I.  Disposition of Records and Non-Estate Property .......................................................27

    1.  Debtor's Records .................................................................................................28

    2.  Non-Estate Property.............................................................................................29

    3.  The Special Collections .......................................................................................29

J.  Creditors' Committee Standing Motion......................................................................30

IV.  SUMMARY OF THE PLAN OF LIQUIDATION .........................................................31

A.  General Plan Objectives..............................................................................................31

    B. Provisions Governing Order and Method for Distributions under the Plan ...............31

    C. Classes of Claims ...................................................................................................32

        1. Administrative Expense Claims...........................................................................32

        2. The DIP Term Loans .........................................................................................33

        3. Priority Tax Claims............................................................................................33

        4. Professional Fee Claims.....................................................................................34

        5. Class 1 (Prepetition Series 1996 Bonds).............................................................35

        6. Class 2 (Prepetition Series 2002 Bonds).............................................................35

        7. Class 3 (Prepetition Series 2006 Bonds).............................................................36

        8. Class 4 (Prepetition Series 2015 Bonds).............................................................37

        9. Class 5 (Other Secured Claims)..........................................................................37

        10. Class 6 (Priority Non-Tax Claims) ....................................................................38

        11. Class 7 (General Unsecured Claims) .................................................................38

V.     MEANS OF IMPLEMENTING THE PLAN.....................................................................39

    A. Plan Funding .........................................................................................................39

    B. Plan Administrator .................................................................................................39

        1. Appointment of Plan Administrator......................................................................39

        2. Bond.................................................................................................................39

        3. Governance .......................................................................................................39

        4. Succession Matters.............................................................................................39

        5. Funding of Plan Administrator's Activities ..........................................................40

        6. Indemnification ..................................................................................................40

        7. Powers and Duties..............................................................................................40

C.  Unsecured Creditor Trust ................................................................................42

    1.  Appointment of Unsecured Creditor Trustee .........................................42

    2.  Bond ......................................................................................................42

    3.   Unsecured Creditor Trust Oversight Committee ..................................42

    4.  Governance ...........................................................................................42

    5.  Succession Matters ................................................................................42

    6.  Funding of Unsecured Creditor Trust ...................................................43

    7.  Transfer of Certain Estate Assets to Unsecured Creditor Trust ............43

    8.   Purpose of Unsecured Creditor Trust ..................................................43

    9.  Federal Income Tax Treatment of the Unsecured Creditor Trust .........43

    10. Indemnification .....................................................................................44

    11. Powers and Duties .................................................................................44

D.  Cooperation Between Plan Administrator and Unsecured Creditor Trust ........................46

E.  Establishment of Reserves ...............................................................................46

    1.  Administrative Reserve ..........................................................................46

    2.  Disputed Claim Reserves .......................................................................46

F.  Preservation of Causes of Action .....................................................................47

G.  Disposition of Records .....................................................................................47

H.  General Disposition of Assets ..........................................................................47

I.  Administrative Expense Claims Bar Date .........................................................47

J.  Deadline for Filing Applications for Payment of Professional Fee Claims .......................47

K.  Execution of Documents to Effectuate Plan .....................................................48

L.  Dissolution .......................................................................................................48

1.  Automatic Dissolution ...........................................................................48

2.  Dissolution of Board of Trustees and Authority of Plan Administrator ...............48

M.  Post-Confirmation Reports and Fees ................................................................48

1.  Reporting to Office of the United States Trustee.....................................................48

2.  Reporting to Prepetition Bond Trustees..................................................................49

N.  Creditors' Committee...........................................................................................49

O.  Insurance Preservation .........................................................................................49

P.  Claims Administration Responsibility..................................................................49

1.  Reservation of Rights...............................................................................49

2.  Objections to Claims.................................................................................49

3.   Filing Objections.....................................................................................50

4.  Determination of Claims...........................................................................50

Q.  Disallowance of Claims without Further Order of the Court ............................50

R.  Timing of Distributions on Disputed Claims Subsequently Allowed ...............50

S.  Payment or Distribution of Disputed Claim ......................................................51

T.  Disputed Claims...................................................................................................51

U.  Limitations on Funding of Disputed Claims Reserve ........................................52

V.  Tax Requirements for Income Generated by Disputed Claims Reserve ...........52

VI.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES .........................52

A.  General Provisions................................................................................................52

B.  Notice of Deemed Rejection/Rejection Bar Date ..............................................52

C.  Compensation and Benefit Programs...................................................................52

VII.   INJUNCTIONS; STAYS; RELEASE; EXCULPATIONS...............................53

A. General Injunctions ................................................................. 53

    1. Injunctions against Interference with Consummation or
       Implementation of Plan ................................................. 53

    2. Plan Injunction ................................................................. 53

    3. Release of Collateral ....................................................... 53

B. Releases and Exculpations ................................................... 54

    1. Releases by Debtor ......................................................... 54

    2. Release by ACA and Prepetition Bond Trustees ............ 54

    3. Exculpation ...................................................................... 55

C. No Bar to Claims Against Third Parties ............................... 56

D. All Distributions Received in Full and Final Satisfaction ........... 56

E. No Modification of Res Judicata Effect ............................... 56

F. Cancellation of Prepetition Bonds and Prepetition Bond Documents ........ 56

    1. Cancellation of Prepetition Bonds .................................. 56

    2. Survival of Portions of the Prepetition Bond Documents ........ 56

G. No Discharge ...................................................................... 57

VIII. CONDITIONS PRECEDENT .................................................... 57

A. Conditions Precedent to Confirmation of the Plan ............... 57

B. Conditions Precedent to the Effective Date ......................... 57

C. Waiver of Conditions Precedent .......................................... 58

IX. PROCEDURES FOR DISTRIBUTIONS UNDER PLAN ............... 58

A. Distributions by Plan Administrator and Unsecured Creditor Trust ........... 58

    1. Generally ......................................................................... 58

2.   Distributions on Account of Prepetition Bonds ...................................................58

B.  Indefeasibility of Distributions ...................................................................................58

C.  Frequency of Distributions ..........................................................................................59

D.  Payments in U.S. Dollars .............................................................................................59

E.  Claims in U.S. Dollars .................................................................................................59

F.  Distributions only on Business Days ...........................................................................59

G.  Transmittal of Payments and Notices .........................................................................59

H.  Record Date for Distributions .....................................................................................59

I.  Unclaimed Distributions ..............................................................................................60

J.  No Payments of Fractional Cents or Distributions of Less
than One Hundred Dollars ...........................................................................................61

K.  Setoff and Recoupment ................................................................................................60

L.  Payment of Taxes on Distributions Received Pursuant to the Plan ............................61

M.  Compliance with Tax Withholding and Reporting Requirements ...............................61

N.  Disputed Distribution ...................................................................................................61

X.      RETENTION OF JURISDICTION BY BANKRUPTCY COURT .................................62

XI.     CERTAIN TAX CONSEQUENCES OF THE PLAN ......................................................62

A.  General ..........................................................................................................................62

B.  Tax Consequences of Payment of Allowed Claims Pursuant to Plan Generally .........63

1.   Recognition of Gain or Loss .................................................................................63

2.   Bad Debt or Worthless Security Deduction ..........................................................64

3.   Receipt of Interest ..................................................................................................64

XII.    CONFIRMATION OF PLAN – REQUIREMENTS .........................................................64

A.  Absolute Priority Rule ..................................................................................................65

B.  Best Interest of Creditors Test; Liquidation Analysis...................................................65

XIII.   PLAN RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION
        AND COSUMMATION OF THE PLAN ........................................................................66

        A.  Certain Bankruptcy-Related Considerations................................................................66

            1.   Parties in Interest May Object to the Debtors' Classification of Claims...............66

            2.   Risk of Plan not Being Confirmed......................................................................67

            3.   Nonconsensual Confirmation.............................................................................67

            4.   Risks that Conditions to Effectiveness will not be Satisfied ...............................67

            5.   Actual Plan Distributions may be less than Estimated for Purposes of the
                 Disclosure Statement ............................................................................................67

            6.   Claims Objections/Reconciliation Process .........................................................68

        B.  Alternatives to the Plan and Consequences of Rejection...........................................68

            1.   Alternative Plans.................................................................................................68

            2.   Chapter 7 Liquidation ........................................................................................68

XIV.    PROCEDURES FOR VOTING ON PLAN ....................................................................68

XV.     CONFIRMATION HEARING .........................................................................................70

XVI.    RECOMMENDATION ...................................................................................................71

Exhibit A:      Liquidation Analysis

**PLEASE READ THIS DISCLOSURE STATEMENT CAREFULLY. THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN WHICH IS ENCLOSED WITH THIS DISCLOSURE STATEMENT. THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALLOWED CLAIMS AGAINST THE DEBTOR.**

Dowling College (the "Debtor" or "Dowling") submits this first amended disclosure statement (the "Disclosure Statement") pursuant to § 1125 of the Bankruptcy Code to accompany its First Amended Plan of Liquidation of Dowling College Pursuant to Chapter 11 of the United States Bankruptcy Code dated October 31, 2018 (the "Plan"), which has been filed with the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court").

## I.    PURPOSES AND LIMITATIONS OF DISCLOSURE STATEMENT

### A.    Purpose of Disclosure Statement

The purpose of the Disclosure Statement is to set forth information that (i) summarizes the Plan and alternatives to the Plan, (ii) advises holders of Claims[2] of their rights under the Plan, (iii) assists creditors entitled to vote in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

You are urged to read the Disclosure Statement in order to determine what rights you may have to vote on or object to the Plan and before making any decision on any such course of action. Particular attention should be directed to the provisions of the Plan affecting or impairing your rights as they existed before the institution of this Chapter 11 Case. Please note, however, that this Disclosure Statement cannot tell you everything about your rights. For instance, this Disclosure Statement cannot and does not provide a complete description of the financial status of the Debtor, all of the applicable provisions of the Bankruptcy Code, or other matters that may be deemed significant by creditors and other parties in interest. You are also encouraged to consult with your lawyers and/or advisors as you review and consider the Disclosure Statement and the Plan to enable you to obtain more specific advice on how the Plan will affect you.

### B.    Definitions and Exhibits

Definitions    Unless otherwise defined herein, capitalized terms used in this Disclosure Statement will have the meanings ascribed to such terms in the Plan.

Exhibits    The following exhibits are annexed hereto and expressly incorporated herein:

Exhibit A:    Liquidation Analysis.

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

## C. **Enclosures**

The following materials are included with this Disclosure Statement:

1.  A copy of the Plan;

2.  A copy of an order approving the Disclosure Statement (the "<u>Disclosure Statement Approval Order</u>"), which states: (a) the date by which objections to confirmation of the Plan must be served and filed, (b) the date by which all votes with respect to the Plan must be cast, (c) the date of the hearing in the Bankruptcy Court to consider confirmation of the Plan, and (d) other relevant information;

3.  Notice of Confirmation Hearing.  A copy of the notice of the deadline for submitting ballots to accept or reject the Plan and, among other things, the date, time and place of the Confirmation Hearing and the deadline for filing objections to confirmation of the Plan (the "<u>Confirmation Hearing Notice</u>"); and

4.  A ballot (and return envelope) for voting to accept or reject the Plan; and

## D. **Representations and Limitations**

**NO PERSON IS AUTHORIZED IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF VOTES THEREON TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ANNEXED HERETO OR INCORPORATED HEREIN BY REFERENCE OR REFERRED TO HEREIN, AND IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR.**

**NO REPRESENTATIONS CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS TO SECURE YOUR ACCEPTANCE OF THE PLAN OTHER THAN AS CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY YOU.**

**THE INFORMATION CONTAINED HEREIN HAS BEEN PREPARED BY THE DEBTOR IN GOOD FAITH, BASED UPON UNAUDITED INFORMATION AVAILABLE TO THE DEBTOR AS OF THE DATE HEREOF.  ALTHOUGH THE DEBTOR HAS USED BEST EFFORTS TO ENSURE THAT SUCH INFORMATION IS ACCURATE, THE INFORMATION CONTAINED HEREIN IS UNAUDITED.  THE DEBTOR BELIEVES THAT THIS DISCLOSURE STATEMENT COMPLIES WITH THE REQUIREMENTS OF THE BANKRUPTCY CODE.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS SET FORTH**

HEREIN SINCE THE DATE OF THIS DISCLOSURE STATEMENT AND/OR THE DATE THAT THE MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED.

THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST THE DEBTOR.

THE DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN ITSELF.   EACH CREDITOR IS ENCOURAGED TO READ, CONSIDER AND CAREFULLY ANALYZE THE TERMS AND PROVISIONS OF THE PLAN.

### E.  <u>Important Dates</u>

The Bankruptcy Court approved this Disclosure Statement by and through the Disclosure Statement Approval Order entered on November 6, 2018 after notice and hearing and in accordance with section 1125 of the Bankruptcy Code.  The Bankruptcy Court found that the information contained herein is of the kind, and is sufficiently detailed, to enable a hypothetical, reasonable investor typical of the class being solicited to make an informed judgment concerning the Plan. **HOWEVER, THE BANKRUPTCY COURT HAS NOT CONFIRMED THE PLAN, NOR IS THIS DISCLOSURE STATEMENT OR THE DISCLOSURE STATEMENT APPROVAL ORDER TO BE CONSTRUED AS APPROVAL OR ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.**

As stated in the Disclosure Statement Approval Order, the Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for December 17, 2018 at 1:30 p.m. Holders of Claims and other parties in interest may attend this hearing. Objections to confirmation of the Plan must be filed on or before December 10, 2018 at 4:00 p.m. as set forth in the Disclosure Statement Approval Order.

All Ballots with respect to the Plan must be completed in full and signed to be counted in the tabulation of the votes and must be received by the Voting Agent no later than 4:00 p.m. on December 10, 2018.

Completed and signed Ballots should be returned by first class mail to the Voting Agent at the below address in the enclosed self-addressed return envelope:

*By First Class Mail:*
Dowling College Case Administration
c/o GCG
PO Box 10342
Dublin, OH 43017-5542

Completed and signed Ballots may also be returned by overnight mail or hand delivery to the below address:

*By Overnight/Hand Delivery:*
Dowling College Case Administration
c/o GCG
5151 Blazer Parkway, Suite A
Dublin, OH 43017-5542

## F.   **Solicitation Procedures**

Creditors holding Claims that are impaired have the right to vote to accept or reject the Plan. Generally speaking, a Claim is impaired if the Plan alters the legal, contractual or equitable rights of the holder of the Claim.  A Class of creditors accepts the Plan when creditors holding two-thirds in amount of such class and more than one-half in number of the Claims in such class who actually cast their ballots vote to accept the Plan.

In this Chapter 11 Case, the Plan contains seven (7) Classes of Claims.  The Plan provides that holders of Claims in six (6) Classes are impaired in that the Plan alters the legal, contractual and equitable rights of the holders of such Claims.

## G.   **Recommendation**

In the opinion of the Debtor, the treatment of creditors under the Plan contemplates a greater recovery than that which is likely to be achieved under any other alternative for the liquidation of the Debtor's assets under chapter 11 or chapter 7 of the Bankruptcy Code. Accordingly, the Debtor believes that confirmation of the Plan is in the best interests of the Debtor's creditors and recommends that all holders of Claims entitled to vote on the Plan vote to accept the Plan.

## H.   **Inquiries**

If you have any questions about the packet of materials that you have received, please contact Dowling College Case Administration, c/o GCG, 5151 Blazer Parkway, Suite A, Dublin, OH 43017-5542 or by telephone at (866) 459-2643 during normal business hours.

## II.    BACKGROUND

### A.    History of the Debtor

The Debtor is a not-for-profit educational corporation and registered 501(c)(3) corporation. It was incorporated by the Board of Regents of the University of the State of New York upon issuance of an absolute charter in the first instance on September 27, 1968.

Historically, Dowling operated as an independent comprehensive educational institution in the liberal arts tradition, the mission of which was to provide its students with a well-rounded education based upon innovative teaching, informed and engaging research, and a commitment to democratic citizenship with a community service component.  Dowling sought to foster an open and supportive learning environment that was based upon collaboration between faculty and student body that were each diverse in interests, beliefs, culture, ethnicity, and geographic origin. Dowling and its faculty upheld the educational mission through teaching, learning and research in the arts and sciences, professions such as education, business and aviation, and by providing members of the community and Dowling alumni with opportunities for continuing education.

Most recently, Dowling provided undergraduate and graduate programs with significant concentrations in liberal arts, business, education and aviation.  Dowling also proudly participated in various NCAA Division II athletics programs.

### B.    Events Preceding the Chapter 11 Filing

In the view of the Debtor and its professionals, the circumstances which led to Dowling's determination to file for bankruptcy protection are complicated and difficult to summarize quickly, but effectively result from a combination of: (a) extreme liquidity challenges due to declining enrollment of students and associated revenue; (b) loss of accreditation and cessation of active operations as a provider of educational services; and (c) costs of litigation and progression of collection activity by judgment creditors.

Following its loss of accreditation and cessation of educational services, consensus was reached among Dowling and its major creditor parties and other parties in interest, that the maximization of value for Dowling's assets, primarily real estate holdings, would be best achieved through a controlled liquidation under the protections of this Chapter 11 Case.  This decision was reached after Dowling and its constituents first considered and discussed the potential for a dissolution proceeding under New York not-for-profit corporation law.  For several reasons, including the benefits of section 363 of the Bankruptcy Code with respect to any sales and the well-known procedures of the Bankruptcy Court, commencing this Chapter 11 Case was viewed as a better means of maximizing value between the two available options.

1.    *Financial and Operational Challenges*

Historically, Dowling's primary sources of revenues were derived from student tuition and fees, often provided through loan programs subject to Title IV of the Higher Education Act of 1965 (the "Federal Loan Program").  Though Dowling also solicited and obtained certain

donations by corporations and individuals for the purpose of furthering its charitable mission, such fundraising at Dowling was only sporadically successful and generally covered a small fraction of expenses on an annual basis.

During the last decade of operations, Dowling's expenses routinely exceeded revenue. Peak revenue during this decade occurred in 2010 at approximately $78.5 million with a low of $43.8 million in 2014. As with most private not-for-profit colleges, the primary component and driver of revenue was its enrollment.[3] Unfortunately, enrollment continued to decline for Dowling during this same period. In 2012, enrollment was down to approximately 4,000 full time equivalent students. By spring of 2015, Dowling's enrollment was approximately 2,300, with the percentage of undergraduate students declining overall.

From Dowling's perspective and in hindsight, many different forces combined to push down student enrollment during the years leading up to its loss of accreditation. Following the onset of the financial 2008-09recession, public perceptions about the relative value received from a traditional four-year college education as compared to its cost began to change. Smaller private liberal arts-based schools were among the institutions being affected the most as a result of this change in perceptions. Further, employers are perceived to have become less interested in liberal arts education and appear to find greater value in hiring specifically trained persons under specialty certificate programs. During this same period of time, online educational providers also began to gain market share and disrupt traditional brick-and-mortar college program offerings. Probably most acute of all the factors for Dowling during the post-recession period was the significant contraction in the local school budgets (Nassau and Suffolk counties) for hiring primary and secondary educators, who, as master's degree students in education made up the largest percentage of Dowling's enrollment in 2010. In the Debtor's hindsight view now, all of these forces appear to have been combining to push down Dowling's enrollment and associated revenue during these important periods.

Despite declining enrollment during this period, Dowling's costs and expenses were not easily addressed by the Board of Trustees of Dowling (the "Board") or its administration. Costly labor agreements, including with unionized[4] full-time[5] faculty and adjuncts[6], were the largest budget expenditure on an annual basis. Difficult negotiations with unionized faculty routinely created challenges to obtaining labor concessions that would have helped to control costs, including salary, healthcare and other benefits. Strict tenure, consent and control rights in favor of the faculty meant that, among other things, elimination of stale and unprofitable courses and major offerings was nearly impossible. Moreover, cost overruns in favor of faculty and based on "overload" charges were all too often a problem due to poor class scheduling. In addition, legacy obligations in the collective bargaining agreement created financial obligations that proved difficult to control. For example, longstanding sabbatical rights and a scheduling process that

---

[3] Students were concentrated in four (4) core colleges: Arts and Science, Aviation, Business and Education.

[4] Dowling was party to six (6) collective bargaining agreements.

[5] Dowling's full-time faculty at the fiscal year-ended 2015 was 46 with an average salary cost of approximately $92,000 and average tenure of 15.6 years and overall expense of over $4.2 million annually.

[6] Dowling's adjunct faculty force totaled 248 at the end of 2015 with an average salary cost of $6,182 and total expense of over $1.5 million annually.

permitted substantial faculty input resulted in cost centers difficult to control regardless of budgetary constraints.

Further, in connection with various expansion and capital expenditure activities during the years prior to the recession, and to obtain working capital to sustain its business, Dowling engaged in tax-exempt bond financings in 1996 (the "Prepetition Series 1996 Bonds"), 2002 (the "Prepetition Series 2002 Bonds") and 2006 (the "Prepetition Series 2006 Bonds"), and a taxable bond financing in 2015 (the "Prepetition Series 2015 Bonds," and together with the Prepetition Series 1996 Bonds, the Prepetition Series 2002 Bonds, and the Prepetition Series 2006 Bond, the "Prepetition Bonds"). Although the revenue declines steepened and revenue dropped accordingly after the recession, Dowling's annual debt service on the Prepetition Bonds remained constant, exceeding $4.5 million in 2015 and resulted in over $53 million in long term debt outstanding prior to commencement of the Chapter 11 Case.

During this same period, leadership continuity was also a persistent challenge to Dowling. Dowling, having most recently appointed a new interim President (Dr. Albert Inserra) in September, 2014 (he was its third president in three (3) years).[7] As alluded to above, fundraising and development efforts were also challenging as Dowling was without a significant base of wealthy donors and its total endowment funds were never significant as compared to annual expenses.

        2.     *Accreditation Challenges*

As a higher education institution, Dowling was most recently accredited by Middle States Commission on Higher Education ("MSCHE") during periods of active operation. In relation to accreditation, MSCHE is charged with the responsibility to periodically assess and then review its subject colleges based on a rubric measured with fourteen (14) categories or "standards of excellence." Unfortunately, beginning in the spring of 2014, despite compliance with all other standards, Dowling was placed on warning status by MSCHE in relation to "Standard 3" in the related to "Institutional Resources."[8] This very public warning sign from MSCHE was of significant concern to Dowling since management knew that a potential loss of accreditation for a higher education institution such as Dowling serves as a proverbial death knell in relation to its ability to enroll students. This is so because the loss of accreditation automatically results in the loss of access to the Federal Loan Program that is otherwise available to qualified institutions under Title IV of the Higher Education Act. Dowling's going concern operations, therefore, like the vast majority of its enrolled students, were highly dependent upon continued accreditation and related access to the Federal Loan Program.

---

[7] Dr. Inserra resigned the office of President effective August 19, 2016.

[8] "Institutional Resources" is defined by MSCHE to mean that the "the human, financial, technical, physical facilities, and other resources necessary to achieve an institution's mission and goals are available and accessible. In the context of the institution's mission, the effective and efficient uses of the institution's resources are analyzed as part of ongoing outcomes assessment."

3.    *Forbearance Agreements*

After the MSCHE warning and during 2015, Dowling's leadership determined that forecasted revenue based on declining enrollment would mean that it was likely unable to meet all of its scheduled long-term debt obligations.  Thereafter, in the spring of 2015, Dowling successfully negotiated agreements with certain of the long term debt holders, including the majority holders of the Prepetition Series 1996 Bonds and Prepetition Series 2002 Bonds (the "Majority Holders") and ACA, as the bond insurer with respect to the Prepetition Series 2006 Bonds (the "Series 2006 Bond Insurer," and together with the Majority Holders, and the Bond Trustees (defined below), the "Prepetition Secured Parties") concerning the terms of their forbearance from payment and exercising remedies (the "2015 Forbearance Agreements").

As part of the conditions or requirements of the 2015 Forbearance Agreements, Dowling engaged CohnReznick Advisory Services as its special financial advisor (the "Special Advisor").  Soon thereafter, various financial and operational analysis and self-assessment was performed by Dowling with the aid of the Special Advisor.  Several financial and operational challenges were identified through that process.  Among other things, the potential for additional investment in personnel and technology was considered and discussed with the Special Advisor, the Prepetition Secured Parties, and Dowling's management and Board.

Shortly thereafter, it was determined by and among the Board and the Prepetition Secured Parties that Dowling would be best positioned for long term success as a provider of educational services if it were able to secure a favorable transaction or partnership with a strong counter-party that would satisfy its accreditation risks.

4.    *Going Concern Sale Efforts*

RBC Capital Markets LLC, a global investment bank ("RBC"), was retained in October, 2015 to assist Dowling in identifying and pursing its strategic options.  With the assistance of RBC, Dowling conducted a thorough process that attempted to vet all potential strategic alternatives.  RBC contacted over 80 potential transaction parties across non-profit, international, for-profit and private equity firms and provided confidential information to 26 of those parties.[9]

This marketing and bid solicitation process resulted in receipt of seven (7) letters of intent by mid-January, 2016.  Importantly, Dowling's major secured creditors, the Prepetition Secured Parties, were also involved in the review of proposals ultimately received by RBC on behalf of Dowling.  Ultimately, after vetting of interests and negotiations of various interested parties, Dowling selected Global University Systems ("GUS") to be its affiliation partner with the support of the Prepetition Secured Parties.  On or about February 17, 2016, Dowling and GUS entered into a corresponding letter of intent.  GUS was believed by Dowling to be a leading international academic institution that provided education to over 40,000 students worldwide, as an affiliation partner.  GUS was represented to possess expertise and economies of scale that would be relevant to improving the administrative operations of Dowling.  GUS was also thought to be a strong financial partner for Dowling, having purportedly participated in turnaround efforts with other

---

[9] On or about November 19, 2015, while early marketing efforts were underway, MSCHE placed Dowling on "Show Cause" status based, in large part, on lack of adequate financial resources.

academic institutions. Ultimately, Dowling sought to negotiate an affiliation structure with GUS that would have permitted Dowling to remain independently governed and non-profit in nature. Dowling worked extensively with New York State agencies and the Prepetition Secured Parties to package an affiliation with GUS that would satisfy the important concerns of all those parties.

In early May, 2016, the outline of a proposed affiliation with GUS was submitted to MSCHE for its consideration at the meeting scheduled on June 23, 2016 to consider the "Show Cause" status and whether MSCHE should terminate the accreditation of Dowling. Among the many meetings and conferences that took place in relation to the proposed affiliation with GUS, certain members of the Board, administrators, their counsel and GUS met with representatives from the New York State Attorney General ("NYSAG") and New York State Department of Education ("SED") during early June, 2016 to discuss and address matters of concern of those agencies. At the time, Dowling submitted the outline of its proposed affiliation with GUS with the hope and expectation of a prompt closing of various transactions shortly after approval by MSCHE.

Due to critically low cash levels in April and May, 2016, Dowling initiated significant staff reductions and deferred vendor payments to enable the school to graduate its last class of seniors in 2016 and otherwise avoid a mid-term shut down during the Spring, 2016 semester. This had the practical effect of giving Dowling a relatively clean break point in the funding cycle in relation to the Federal Loan Program and tuition payments, etc.

Throughout the spring of 2016, Dowling's Board and management put great focus on the needs of students and did their best to plan for the worst-case scenario which was the loss of accreditation and the need to transition students for their continuing studies to alternative educational providers.

Unfortunately, despite the extensive best efforts of Dowling, through its Board, administration and professionals, as well as the support of the Prepetition Secured Parties, no definitive transaction documents were ever completed in relation to the GUS affiliation. As a result of GUS's apparent unwillingness to proceed with the contemplated transaction, MSCHE could not recognize Dowling as a viable and sustainable institution. As such, following its meeting on June 23, 2016, MSCHE voted to revoke Dowling's accreditation effective as of August 30, 2016.

5.      *Cessation of Educational Services and Student Transition Efforts*

Dowling's Board considered the potential for appeal of MSCHE's determination to revoke accreditation and worked tirelessly to identify any reasonable alternatives to preserve its accreditation. Unfortunately, with no reasonable options available, Dowling's Board voted to cease providing educational services effective as of August 5, 2016 and accept the decision of MSCHE to revoke accreditation. Dowling then informed the relevant state and federal agencies of the determination of the Board to cease active operations as an educational provider.

Dowling negotiated with the Prepetition Secured Parties to provide it with the necessary funding to effectuate an orderly closure and provide as much in terms of transition services to its

continuing students as possible under the circumstances. Dowling worked closely with various regulators (such as SED, U.S. Department of Education, and NYSAG) in an effort to protect students and their rights and interests and were ultimately benefited by several articulation agreements that Dowling was able to negotiate with various alternative educational providers, including Long Island University ("LIU").

Pursuant to the LIU Agreement (as defined in Section III.I.1, below), LIU is now the official repository for Dowling's student transcript records. Dowling's community of students and alumni were advised of this development and Dowling is thankful to the many institutions like LIU who came to the aid of its students.

6.    *Summary of Real Estate Assets and Associated Secured Obligations*

Following cessation of operations as a going concern, Dowling still possessed significant real estate assets that required management and care. As of the Petition Date, Dowling was the fee owner of the picturesque land on which its main campus was situated, located at 150 Idle Hour Boulevard, Oakdale, New York 11769 (the "Oakdale Campus"). The Oakdale Campus contains several improvements, including a former mansion of the Vanderbilt family, a student center, science center and dormitory building. Within the neighborhood adjacent to the Oakdale Campus are thirty-two (32) parcels of predominantly residential property and associated personal property that were also owned by Dowling, most of which are improved by single family residences. Dowling historically leased the residential properties to third party residential tenants and some of them were used as faculty offices or for other functions ancillary to Dowling's former educational operations (the "Residential Portfolio"). As of the Petition Date, Dowling was also the fee owner of approximately 105.33 acres of land located at 1300 William Floyd Parkway, Shirley, Town of Brookhaven, New York (the "Brookhaven Campus"), which was home to Dowling's School of Aviation and sports management program, Dowling's NCAA Division II athletic program, and a 289-bed dormitory facility located thereon (the "Brookhaven Dorm").

As of the Petition Date, each of the foregoing real estate interests of Dowling served as collateral for certain of the Prepetition Bonds.

Certain improvements and construction in relation to the Oakdale Campus science building and sewage treatment facility were financed by the Prepetition Series 1996 Bonds, issued by the Suffolk County Industrial Development Agency ("SCIDA").

The acquisition, renovation and equipping of Dowling's 72,000 square foot Brookhaven Dorm were financed by the Prepetition Series 2002 Bonds.

Certain improvements, construction and equipping of Dowling's athletic field complex on 33 acres of the Brookhaven Campus, the Brookhaven Campus cafeteria, and certain capital improvements on the Oakdale Campus, among other things, were financed by the Prepetition Series 2006 Bonds.

The Prepetition Series 1996 Bonds, Prepetition Series 2002 Bonds and Prepetition Series 2006 Bonds each share certain common financing structures. In each, the facilities financed by

10

each of the bond issuances (as further described in the respective indentures, the "<u>Facilities</u>" and each a "<u>Facility</u>") were leased by Dowling to the respective issuers and subleased by such issuers back to Dowling. The Facilities financed by the Prepetition Series 2002 Bonds and the Prepetition Series 2006 Bonds serve as collateral for Dowling's respective obligations with respect thereto.

As described above, by June 2015, Dowling had defaulted under certain of the Prepetition Bond Documents and entered into forbearance negotiations with the related Prepetition Secured Parties. On or about June 15, 2015, Dowling entered into substantially similar forbearance agreements (the "<u>Forbearance Agreements</u>") with certain of the Prepetition Secured Parties.

Contemporaneously with its entry into the Forbearance Agreements, Dowling obtained additional financing to support working capital and other needs by the Prepetition Series 2015 Bonds. The proceeds of the Prepetition Series 2015 Bonds were utilized to, among other things, refinance in full Dowling's obligations to TD Bank, N.A., which previously held a lien on the Residential Portfolio, and to provide certain working capital to fund operating expenses. The Prepetition Series 2015 Bonds are secured by first position mortgage liens on all of the Residential Portfolio and all revenue pledged by Dowling to the Prepetition Series 2015 Bond Trustee. Additionally, in connection with the issuance of the Prepetition Series 2015 Bonds, Dowling granted to the Prepetition Series 1996 Bond Trustee and the Prepetition Series 2002 Bond Trustee second position mortgage liens on the Residential Portfolio.

Beginning on or about August 4, 2016 and in accordance with the terms of certain substantially similar conditional funding agreements, (i) UMB, as trustee under that certain Conditional Funding Agreement, as amended, dated as of August 4, 2016 among Dowling, the Prepetition Series 2002 Bond Trustee, the Prepetition Series 2015 Bond Trustee and certain holders of the Prepetition Series 2002 Bonds and Prepetition Series 2015 Bonds (the "<u>Series 2002/2015 Funding Agreement</u>") and (ii) the Prepetition Series 2006 Bond Trustee, as trustee and ACA, as bond insurer of the Prepetition Series 2006 Bonds under that certain Conditional Funding Agreement, as amended, dated as of August 4, 2016 among Dowling, the Prepetition Series 2006 Bond Trustee and ACA (the "<u>Series 2006 Funding Agreement</u>"), made certain protective advances under the Prepetition Bond Documents in exchange for a grant of additional collateral in the form of a blanket lien on all assets of Dowling to secure new advances of funds. Through the Series 2002/2015 Funding Agreement and Series 2006 Funding Agreement, approximately $1.2 million was advanced to pay expenses of Dowling for the period August 4, 2016 through September 20, 2016.

Thereafter and on or about September 20, 2016, Dowling and the Prepetition Bond Trustees, ACA, and UMB Bank, N.A., as escrow agent (the "<u>Escrow Agent</u>"), entered into that certain Escrow Agreement, pursuant to which the Prepetition Bond Trustees and ACA caused certain protective advances to be made under applicable loan facilities to pay expenses otherwise due by Dowling (the "<u>Escrow Advance Agreement</u>"). The terms of the Escrow Advance Agreement reflect that Dowling maintained no interest in the funds held by the Escrow Agent. As of the Petition Date, approximately $2.8 million has been funded through the Escrow Advance Agreement to pay expenses of Dowling, including professional fee retainers.

As a result of the foregoing financing transactions, all of Dowling's real property and substantially all of its personal property (excluding Non-Estate Property), including the Oakdale Campus, the Brookhaven Campus, the Brookhaven Dorm, and the Residential Portfolio, are subject to the liens and security interests of the Prepetition Secured Parties.  The Oakdale Campus and the Brookhaven Campus, to the extent of the Prepetition Series 2006 Bonds, are subject to the first liens and security interests of the Prepetition Series 2006 Bond Trustee, except that the Prepetition Series 2006 Bond Trustee's liens are subordinate only to the Prepetition Series 2002 Bond Trustee's first lien and security interest on the Brookhaven Dorm. The Residential Portfolio is subject to the first liens and security interests of the Prepetition Series 2015 Bond Trustee, and a *pari passu* second mortgage lien granted in favor of the Prepetition Series 1996 Bond Trustee and the Prepetition Series 2002 Bond Trustee.

In addition to the foregoing, several parties have filed mechanics liens on one or both of the Oakdale Campus and Brookhaven Campus.  Still other creditors obtained judgments on account of otherwise unsecured obligations shortly before the Petition Date.

## III.    SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

### A.    The Appointment of the Creditors' Committee

On December 9, 2016, the United States Trustee appointed the Creditors' Committee to represent the interests of the unsecured creditors in the Chapter 11 Case.  The Creditors' Committee is comprised of the following members: Ultimate Power Inc., Linda Ardito and Lori Zaikowski.

### B.    Retention of Professionals

On December 6, 2016, the Bankruptcy Court entered an order authorizing the employment of Garden City Group, LLC as claims and noticing agent [Dkt. No. 70].

On December 16, 2016, the Bankruptcy Court entered a final order granting the application to employ Robert S. Rosenfeld as Chief Restructuring Officer (the "CRO") to the Debtor effective as of the Petition Date [Dkt. No. 106].

On December 20, 2016, the Bankruptcy Court entered an order granting the application to employ A&G Realty Partners, LLC and Madison Hawk Partners, LLC (collectively, the "Campus Agents") as real estate advisors to the Debtor, *nunc pro tunc* to the Petition Date [Dkt. No. 114].

On December 20, 2016, the Bankruptcy Court entered an order granting the application to employ Douglas Elliman as real estate broker to the Debtor, *nunc pro tunc* to the Petition Date [Dkt. No. 115].

On January 5, 2017, the Bankruptcy Court entered an order granting the application to employ Klestadt Winters Jureller Southard & Stevens, LLP as general bankruptcy counsel to the Debtor, *nunc pro tunc* to the Petition Date [Dkt. No. 136].

On January 13, 2017, the Bankruptcy Court entered an order granting the application to employ Eichen & DiMeglio, P.C. as accountants to the Debtor, *nunc pro tunc* to the Petition Date [Dkt. No. 165].

On January 13, 2017, the Bankruptcy Court entered an order granting the application to employ CBRE, Inc. as real estate broker to the Debtor, *nunc pro tunc* to the Petition Date [Dkt. No. 166].

On January 30, 2017, the Bankruptcy Court entered an order granting the application to employ FPM Group, Ltd., as consultants to the Debtor, *nunc pro tunc* to December 6, 2016 [Dkt. No. 189]

On February 17, 2017, the Bankruptcy Court entered an order granting the application to employ SilvermanAcampora LLP as counsel to the Creditors' Committee effective as of December 12, 2016 [Dkt. No. 206].

On February 27, 2017, the Bankruptcy Court entered an order granting the application to employ Smith & Downey, PA as special counsel to the Debtor in relation to employee compensation and benefits matters, including under the Employee Retirement Income Security Act of 1974, *nunc pro tunc* to the Petition Date [Dkt. No. 215].

On April 12, 2017, the Bankruptcy Court entered an Order granting the application to employ Hilco Streambank as broker for the Debtor for the sale of IP Addresses, *nunc pro tunc* to March 14, 2017 [Dkt. No. 284].

On May 26, 2017, the Bankruptcy Court entered an Order granting the application to employ Farrell Fritz, P.C., as special counsel to the Debtor to assist with obtaining from the Town of Brookhaven a change of the zoning classification for the Brookhaven Campus, *nunc pro tunc* to March 28, 2017 [Dkt. 340].

On October 17, 2017 the Bankruptcy Court entered an Order granting the application to employ Receivable Collection Services, LLC in conjunction with Forster & Garbus LLP to collect the Debtor's student accounts receivable [Dkt. No. 421].

On October 17, 2017 the Bankruptcy Court entered an Order granting the application to employ Baker Tilly Virchow Krause, LLP, as consultants to the Debtor with respect to Department of Education requirements and as tax accountants to the Debtor, *nunc pro tunc* to September 27, 2017 [Dkt. No. 423][10].

On February 13, 2018, the Bankruptcy Court entered an Order granting the application to employ Ingerman Smith, LLP as special counsel to the Debtor in relation to education, landlord tenant, and labor law matters, *nunc pro tunc* to the Petition Date [Dkt. No. 495].

---

[10] Baker Tilly Virchow Krause, LLP was employed by the faculty negotiating team prior to the Petition Date to evaluate the cash flow analysis and supporting documentation provided by the Debtor in negotiations over labor concessions.

### C.    Schedules of Assets and Liabilities, Statement of Financial Affairs

On December 13, 2016, the Debtor filed schedules of assets and liabilities and a statement of the Debtor's financial affairs [Dkt. No. 93] and on February 23, 2017 the Debtor filed amended schedules [Dkt. No. 211].

### D.    DIP Financing and Use of Cash Collateral

As of the Petition Date, the Debtor had an immediate need for post-petition financing to continue its limited operations, to maintain its properties, and to pay the administrative costs of the Chapter 11 Case while proceeding with the controlled liquidation of its assets.  Prior to the Petition Date, the Debtor engaged in extensive negotiations with the Prepetition Secured Parties, which negotiations culminated in a consensual proposed financing of the Chapter 11 Case.  On the Petition Date, the Debtor filed a motion seeking approval of the financing and cash collateral arrangements as reached with the Prepetition Bond Trustees (the "DIP Financing Motion") [Dkt. No. 9].

Generally speaking, the structure and mechanics of the DIP Documentation (as defined in the DIP Financing Motion), involved four (4) separate tranches and commitments and reflected the interrelationship of the Debtor's assets as collateral packages divided among and between the Prepetition Secured Parties.  Overall, the form of DIP Note was designed to track the separate funding requirements in relation to the necessary costs and expenses required to protect and preserve the segmented collateral packages and positions (DIP Term Loan A, DIP Term Loan B and DIP Term Loan C, respectively), together with the general costs of administration of the Chapter 11 Case (DIP Term Loan D).

As described below and in the DIP Note, the DIP Note provided that each of the DIP Term Loan Lenders would contribute up to certain individual limits (in the respective amounts set forth in Schedule 1 of the DIP Note). The borrowings under the DIP Note have been administered by the DIP Agent and sourced from the DIP Term Loan Lenders.

Following extensive negotiations between the Debtor, the Creditors' Committee, and the DIP Term Loan Lenders, the Bankruptcy Court entered orders allowing the DIP Financing Motion on an emergency and/or interim basis on December 5, 2016 [Dkt. No. 63], December 22, 2016 [Dkt. No. 121], January 10, 2017 [Dkt. No. 151], March 15, 2017 [Dkt. No. 235], April 12, 2017 [Dkt. No. 280], May 26, 2017 [Dkt. No. 339], and June 23, 2017 [Dkt. No. 352].  On July 14, 2017, the Bankruptcy Court entered an order (the "Final DIP Order") [Dkt. No. 367] granting the DIP Financing Motion on a final basis, which authorized the Debtor to obtain post-petition superpriority DIP financing in an original principal amount of up to $4,974,779 pursuant to the DIP Note.

Among other things, the Final DIP Order (i) resolved the Creditors' Committee's objection to the DIP Financing Motion through the terms set forth on that certain term sheet annexed thereto, which terms are incorporated into the Plan and described in Section H, below; (ii) authorized DIP financing and use of prepetition collateral; and (iii) fixed the obligations owed under the Prepetition Bond Documents as of the Petition Date.  The Final DIP Order also permitted the

Debtor to use cash collateral subject to the terms of an approved budget, and any amendments to the approved budget required the consent of the DIP Term Loan Lenders and the Creditors' Committee and consultation with the United States Trustee.  In addition, the Debtor stipulated and agreed that the following amounts were owed under the Prepetition Bond Documents:  (i) $3,615,730.91 on account of the Prepetition Series 1996 Bonds (the "Prepetition Series 1996 Bond Obligations"); (ii) $11,692,882.29 on account of the Prepetition Series 2002 Bonds (the "Prepetition Series 2002 Bond Obligations"); (iii) $38,541,422.60 on account of  the Prepetition Series 2006 Bonds (the "Prepetition Series 2006 Bond Obligations"); and (iv) $7,254,229.97 on account of the Prepetition Series 2015 Bonds (the "Prepetition Series 2015 Bond Obligations").  Finally, the Final DIP Order makes clear that (i) none of the aforementioned amounts are subject to any avoidance, reduction, or set-off by any person or entity and (ii) the prepetition liens granted to the Prepetition Bond Trustees by the Debtor constitute valid, binding, enforceable, and perfected liens.

Due in part to the values realized for the Oakdale Campus and the Brookhaven Campus, the DIP Term Loan Lenders and the Committee agreed to certain modifications to the Unsecured Creditor Settlement embodied in the DIP Order. A stipulation embodying such modifications will be submitted to the Bankruptcy Court for approval prior to the hearing to consider approval of the Disclosure Statement.

### E.    Bar Date for Filing of Claims Arising Prior to the Petition Date

On January 13, 2017, the Bankruptcy Court entered an order (the "Bar Date Order") [Dkt. No. 167] (i) fixing a deadline (the "Bar Date") and establishing procedures for filing proofs of claim against the Debtor and its Estate pursuant to Federal Rule of Bankruptcy Procedure 3003(c)(3) and approving the form and manner of service thereof (the "Bar Date Notice").  The Bar Date Order approved as adequate and sufficient, the service of the Bar Date Notice by first class mail and publication of the Bar Date Notice in the New York edition of the Wall Street Journal, and either Newsday or Long Island Business News.  The Bar Date Order fixed March 10, 2017, at 5:00 P.M. as the Bar Date by which all Claims against the Debtor which arose prior to November 29, 2016, other than those types of Claims specifically excepted thereby, had to be filed. The Bar Date Order also set a Bar Date of May 30, 2017, with respect to governmental entities.

The Bar Date Notice was served by first class regular mail upon (a) the U.S. Trustee, (b) counsel for the Creditors' Committee, (c) all persons or entities that have filed claims, (d) counsel for the Office of the Attorney General of the State of New York and the United States Attorney for the Eastern District of New York, (e) all creditors and other known holders of claims, (f) all parties known to the Debtor as having potential claims against the Debtor's estate, (g) all counterparties to the Debtor's executory contracts and unexpired leases, (h) attorneys of record and/or parties to any pending litigation against the Debtor, (i) the Internal Revenue Service, the Securities and Exchange Commission and any other required governmental units, (j) all parties who had requested notice of the proceedings in the Chapter 11 Case at that time; and (k) all other parties to whom the Debtor is required to give notice pursuant to this Court's administrative order establishing case management procedures dated December 6, 2016.  Except for the holders of certain specifically excluded Claims, every Creditor was required to file a proof of claim on or

before the applicable Bar Date so that the Debtor could ascertain with certainty the total amount of pre-petition Claims outstanding.

In accordance with Federal Rule of Bankruptcy Procedure 3003(c)(2), holders of Claims who failed to comply with the terms of the Bar Date Order are forever barred from (i) filing a proof of claim with respect to such Claim, (ii) asserting such Claims against the Debtor or its Estate and/or property, (iii) voting on any plan filed in this Chapter 11 Case and (iv) participating in any Distribution in the Chapter 11 Case on account of such Claims.

Approximately five hundred (500) claims were filed against the Debtor's estate.  In the aggregate, the claims asserted the following amounts: (i) administrative claims in the amount of $182.47; (ii) 503(b)(9) claims in the amount of $32,249.00; (iii) secured claims in the amount of $96,291,148.66; (iv) priority claims in the amount of $8,813,471.04; and (v) unsecured claims in the amount of $36,578,406.88.

The Schedules filed by the Debtor listed the following amounts outstanding: (i) secured claims totaling $61,264,658.65; (ii) priority claims totaling $138,394.07; and (iii) unsecured claims totaling $4,392,934.41.  Certain of these scheduled claim amounts were listed as contingent, disputed or unliquidated.

The Debtor has been working to reconcile the Claims set forth in the Schedules and the filed Claims. The Debtor believes that the filed Claims may include, among other things, certain invalid, overstated, duplicative, misclassified and/or otherwise objectionable Claims.  As a result, the Debtor has filed certain omnibus claims objections, described below, and the Debtor expects that additional objections to certain Claims will be filed, and believes that the Claim amounts referenced above will likely be reduced.  As set forth in the Plan, the Debtor, the Creditors' Committee, the Plan Administrator and Unsecured Creditor Trust, as applicable, shall have the right to object to Claims in accordance with section 502(a) of the Bankruptcy Code.

**F.      Omnibus Claims Objections**

On August 11, 2018, the Debtor filed the Debtor's First Omnibus Objection to Certain Proofs of Claim (Claims that are Incorrectly Classified or Amended or Superceded) (the "First Omnibus Claims Objection") [Dkt. No. 585] and the Debtor's Second Omnibus Objection to Certain Proofs of Claim (Claims filed by Former Dowling Students that are Incorrectly Classified) (the "Second Omnibus Claims Objection") [Dkt. No. 586]. On September 26, 2018, the Bankruptcy Court entered orders granting the First Omnibus Claims Objection and the Second Omnibus Claims Objection [Dkt. Nos. 606 and 607, respectively].

**G.      Disposition of Assets During the Case**

1.      *Residential Portfolio*

On December 16, 2016, the Bankruptcy Court entered an order (the "First Residential Sale Order") [Dkt. No. 105] authorizing the Debtor to consummate the sale of eight (8) parcels within the Residential Portfolio free and clear of all liens, claims, interests and encumbrances.  On January

16

13, 2017, the Bankruptcy Court entered a second order (the "Second Residential Sale Order") [Dkt. No. 164] approving certain sale procedures for the remaining twenty-four (24) parcels within the Residential Portfolio free and clear of all liens, claims, interests and encumbrances. The sale procedures approved by the Bankruptcy Court permitted the closing of the Residential Portfolio without the need for a specific hearing for each sale, in the event the Creditors' Committee and the Prepetition Bond Trustees consented to such sale. As of the date of this Disclosure Statement, all but one parcel in the Residential Portfolio has been sold, with the remaining parcel expected to be sold prior to the hearing to consider approval of the Disclosure Statement. After payment of closing costs and realtor commissions, the Debtor has paid substantially all of the net proceeds to the DIP Agent, for application to DIP Term Loan C and the Prepetition Series 2015 Bond Obligations, totaling approximately $10 million.

2.    *Oakdale Campus*

On December 16, 2016, the Court entered an order (the "Oakdale Campus Bidding Procedures Order") [Dkt. No. 111], which set forth, among other things, the following schedule in connection with the sale of the Oakdale Campus:

| | |
|---|---|
| Sealed Bid Deadline: | March 27, 2017 (4:00 p.m. EST) |
| Auction: | March 31, 2017 (11:00 a.m. EST) |
| Objection Deadline: | April 6, 2017 (4:00 p.m. EST) |
| Sale Hearing: | April 10, 2017 (10:00 a.m. EST) |

Through its extensive marketing process, the Debtor and the Campus Agents identified Vanderbilt Palace LLC ("VPLLC") as a potential stalking horse bidder and entered into negotiations with VPLLC. As a result of those negotiations, on March 24, 2017, the Debtor filed an application (the "Stalking Horse Application") [Dkt. No. 246] for entry of an order approving a termination fee in the amount of $80,000 and expense reimbursement to VPLLC not to exceed $80,000, in accordance with the terms of that certain Asset Purchase Agreement dated as of March 22, 2017 for the sale of the Oakdale Campus. The proposed purchase price to VPLLC was $8,000,000.

On March 30, 2017, the Court held a hearing on shortened notice to consider the Stalking Horse Application and on April 5, 2017 entered an order denying the Stalking Horse Application [Dkt. No. 266].

On March 27, 2017, after consultation with the necessary creditor groups, the Debtor filed an amended notice of bid deadline and auction for the sale of the Oakdale Campus [Dkt. No. 250], which set forth the following schedule:

| | |
|---|---|
| Amended Sealed Bid Deadline: | March 29, 2017 (4:00 p.m. EST) |
| Amended Auction: | April 4, 2017 (11:00 a.m. EST) |
| Objection Deadline: | April 6, 2017 (4:00 p.m. EST) |
| Sale Hearing: | April 10, 2017 (10:00 a.m. EST) |

As of the March 29, 2017 deadline to submit sealed bids, the Debtor received five (5) bids for the Oakdale Campus.  Thereafter the Debtor, in consultation with the Creditors' Committee and the DIP Term Loan Lenders, designated the five (5) bidders as Qualified Bidders and conducted the auction on April 4, 2017 at the law office of Certilman Balin Adler & Hyman LLP in East Meadow, New York, commencing at approximately 11:00 a.m.

The auction was very successful and resulted in a high bid of $26,500,000, submitted by Princeton Education Center LLC ("Princeton").  The second highest bid was $26,100,000, submitted by NCF Capital Limited ("NCF").  Each of the three highest bids was made by an educational end user.  Each of the fourth and fifth highest bids was made by a redeveloper.

On April 6, 2017, the Debtor, after extensive consideration by and consultation with representatives of the Creditors' Committee and the DIP Term Loan Lenders, determined to close the auction formally and designated Princeton to be the successful bidder and NCF to be the backup bidder, subject to confirmation by the Board.

After the auction, in accordance with the Oakdale Campus Bidding Procedures Order, Princeton increased the deposit being held by the Debtor such that it equaled 5% of the purchase price, which amounted to $1,325,000.00 (the "Princeton Deposit").

On April 12, 2017, the Court entered an order [Dkt. No. 285] (the "Oakdale Campus Sale Order") approving the sale of the Oakdale Campus free and clear of all liens, claims, encumbrances and other interests to Princeton pursuant to the Asset Purchase Agreement between the Debtor and Princeton, dated April 6, 2017 (the "Princeton APA").

The Princeton APA provided, *inter alia*, that the closing would take place within thirty (30) days after satisfaction or waiver of all conditions to the obligations of the Debtor and Princeton, which date was May 26, 2017 (the "Closing Date"), time being of the essence.  Princeton failed to close on the Closing Date and requested a three-week extension of the Closing Date.  On May 26, 2017, the Debtor served Princeton with a breach notice (the "Breach Notice").  The Breach Notice provided, *inter alia*, that due to Princeton's failure to close by the Closing Date, the Debtor intended to terminate the Princeton APA effective fifteen (15) days from the date of the Breach Notice, *i.e.*, June 20, 2017 (the "Termination Date").  Princeton failed to cure the breaches set forth in the Breach Notice by the Termination Date.  As a result, the Debtor, in consultation with the DIP Term Loan Lenders and the Creditors' Committee, terminated the Princeton APA and determined to proceed with NCF as the backup bidder pursuant to the Asset Purchase Agreement between the Debtor and NCF (the "NCF APA").  On July 12, 2017, NCF gave the Debtor notice that it had assigned all of its rights and obligations in and to the NCF APA to Mercury International, LLC ("Mercury").

On July 14, 2017, the Bankruptcy Court entered an order (the "Supplemental Oakdale Campus Sale Order") [Dkt. No. 366] (i) approving the Debtor's decision to (a) terminate the Princeton APA as a valid exercise of its business judgment and (b) retain the Princeton Deposit pursuant to the Princeton APA as liquidated damages; (ii) authorizing the Debtor to enter into and perform pursuant to the NCF APA; (iii) approving NCF's assignment of the NCF APA to Mercury; and (iv) confirming Mercury, as assignee of NCF, as the successful bidder and replacing and

superseding Princeton as the successful bidder pursuant to the Oakdale Campus Bidding Procedures Order and Oakdale Campus Sale Order for all purposes.

Pursuant to the Final DIP Order, during August 2017, the Princeton Deposit was transferred to the DIP Agent as required by the DIP Note.

The sale of the Oakdale Campus to Mercury closed on August 21, 2017 with the Debtor receiving approximately $24,968,400 in net proceeds after payment of broker's commissions, title fees and other escrows.  On September 29, 2017, the Bankruptcy Court entered an order (the "Oakdale Campus Remittance Order") [Dkt. No. 414] (i) approving the remittance of $20,000,000 of the net proceeds from the sale of the Oakdale Campus to the DIP Agent as required by the DIP Note, for distribution to ACA and the Prepetition Series 2006 Bond Trustee for the pay down of a corresponding amount of Prepetition Series 2006 Bonds on a pro rata basis; (ii) approving a reserve fund of approximately $1.1 million; and (iii) deeming the remaining net proceeds as cash collateral not to be disbursed absent a further court order.

### 3. *Oakdale Campus F&E*

The sale to Mercury specifically excluded the Furniture and Equipment (as defined in the NCF APA) (the "Oakdale Campus F&E").  On April 28, 2017, after the Bankruptcy Court's entry of the Oakdale Campus Sale Order, the Debtor filed a motion (the "Tiger Sale and Retention Application") [Dkt. No. 317] seeking an order, *inter alia*, (i) approving procedures for the sale of the Oakdale Campus F&E and (ii) authorizing the employment and compensation of Tiger Capital Group, LLC ("Tiger") as liquidation agent.  The compensation structure payable to Tiger included a guaranteed amount to the Debtor, then reimbursement of Tiger's expected costs and finally a sharing mechanism between the Debtor and Tiger.  On May 22, 2017, the Court held a hearing to consider, among other things, the Tiger Sale and Retention Application and denied the relief sought therein.

Prior to Princeton's breach of the Princeton APA, the Debtor entered into an asset purchase agreement with Princeton for the sale of the Oakdale Campus F&E for $90,000 (the "Princeton F&E APA").  The Princeton F&E APA permitted Princeton to terminate the Princeton F&E APA if for any reason Princeton was unable to close on the sale of the Oakdale Campus pursuant to the Princeton APA.  After Princeton failed to close on the sale of the Oakdale Campus, NCF agreed to match the $90,000 offer made by Princeton for the Oakdale Campus F&E on substantially the same terms and conditions (the "NCF F&E APA").  On July 14, 2017, the Bankruptcy Court entered an order (the "Oakdale Campus F&E Sale Order") [Dkt. No. 365] approving the sale of the Oakdale Campus F&E to Mercury, as assignee of NCF, free and clear of all liens, claims and encumbrances pursuant to the NCF F&E APA.

### 4. *Brookhaven Campus and F&E*

On October 17, 2017, the Court entered an order (the "Brookhaven Campus Bidding Procedures Order") [Dkt. No. 425], which set forth, among other things, the following schedule in connection with the sale of the Brookhaven Campus:

| Sealed Bid Deadline: | December 4, 2017 (4:00 p.m. EST) |
| Auction: | December 7, 2017 (10:00 a.m. EST) |
| Objection Deadline: | December 8, 2017 (4:00 p.m. EST) |
| Sale Hearing: | December 18, 2017 (1:30 p.m. EST) |

The sale of the Brookhaven Campus included the Brookhaven Dorm. On November 30, 2017, after consultation with the necessary creditor groups, the Debtor filed an amended notice of bid deadline, auction, objection deadline and sale hearing for the sale of the Brookhaven Campus [Dkt. No. 455], which set forth the following amended schedule:

| Amended Sealed Bid Deadline: | January 25, 2018 (4:00 p.m. EST) |
| Amended Auction: | January 31, 2018 (10:00 a.m. EST) |
| Amended Objection Deadline: | February 2, 2018 (4:00 p.m. EST) |
| Amended Sale Hearing: | February 5, 2018 (1:30 p.m. EST) |

On January 31, 2018, the Debtor conducted the auction for the Brookhaven Campus. After all bidding was completed the Debtor, in consultation with the Debtor's professionals and the necessary creditor groups, determined to adjourn the auction without a date given the lack of creditor support for values obtained at auction that day. Following the auction, the Debtor, its professionals and the Creditors' Committee engaged in extensive marketing, meetings, and negotiations with interested parties in an effort to further canvas the local developer market, better understand the likely permissible development options at the Brookhaven Campus, and achieve a greater value for all creditors. As a result of these efforts, a bid was submitted by Triple Five Aviation Industries LLC ("Triple Five") for the sum of $14,000,000.00.

On May 17, 2018, the Board convened and approved a resolution which authorized the CRO of the Debtor to execute the asset purchase agreement (the "Brookhaven Campus APA") with Triple Five. On June 19, 2018 the Bankruptcy Court entered an order approving the sale of the Brookhaven Campus to Triple Five [Dkt. No. 544].

Pursuant to the Brookhaven Campus APA, the deadline for Triple Five to close the sale of the Brookhaven Campus was August 3, 2018. The closing did not occur on that date.

On August 2, 2018, the Debtor and Triple Five entered into an Amendment to Asset Purchase Agreement (the "Brookhaven Campus APA Amendment") with the consent of ACA, the Prepetition Bond Trustees and the Creditors' Committee. Pursuant to the Brookhaven Campus APA Amendment, the Closing Date (as defined by the Brookhaven Campus APA) was extended and certain milestones established. Moreover, the Brookhaven Campus APA Amendment required Triple Five to advance funds sufficient to pay for the Debtor's carrying costs related to the continued ownership of the Brookhaven Campus, and Triple Five agreed to increase its deposit in two (2) five percent (5%) increments, among other things.

On September 21, 2018, the sale of the Brookhaven Campus closed.

5.    *Simulators*

Certain air traffic control simulators located at the Brookhaven Campus, including the Raytheon FIRSTplus Air Traffic Control Simulator and the NASA/VAST Simulator (collectively, the "Simulators") were excluded from the sale of the Brookhaven Campus.  On July 25, 2018, the Bankruptcy Court entered an order approving the sale of the Simulators to Farmingdale State College for a purchase price of $45,000 [Dkt. No. 567].

6.    *IPv4 Addresses*

On April 12, 2017, the Bankruptcy Court entered an order (the "IP Sale Procedures Order") [Dkt. No. 282] establishing procedures for the sale of the Debtor's internet protocol numbers (the "IP Addresses"), without obtaining further approval of the Bankruptcy Court.  On July 26, 2017, the Debtor filed a notice of proposed sale of the IP Addresses to SendGrid, Inc. for a purchase price of $851,968.00 (the "Notice of IP Sale") [Dkt. No. 372].  No objections were received to the Notice of IP Sale, and as a result, in accordance with the IP Sale Procedures Order, the sale of the IP Addresses to SendGrid, Inc. became effective on August 9, 2017.  After payment of the broker's commission, Dowling realized $800,849.92 in net proceeds for the IP Addresses.

7.    *Student Accounts Receivable*

Prior to the Petition Date, the Debtor worked with a number of collections agencies to seek to recover amounts owed to the Debtor by students on account of unpaid tuition, fees, and other amounts incurred in connection with their attendance at Dowling (the "Student AR").  On October 17, 2017, the Bankruptcy Court entered an order (the "Student AR Order") [Dkt. No. 421] which, among other things, approved the establishment of a segregated trust account for the deposit of collections (the "Collections Account") and directed the Debtor to transfer at the end of each month, eighty percent (80%) of the balance of the Collections Account remaining after the withdrawal of professionals' fees and expenses for their fee in collecting the Debtor's student accounts receivable.  As of July 30, 2018, $48,287.05 has been collected.  Collection of remaining Student AR is in doubt, and the Debtor believes any further recovery to be of nominal benefit to the Debtor's Estate.

8.    *Prepetition Bank Accounts*

When the Debtor operated as an educational institution, it utilized a cash management system consisting of thirty-three (33) bank accounts (the "Prepetition Bank Accounts") through which the Debtor collected deposits and made disbursements in the ordinary course of its operations.  On December 16, 2016, the Bankruptcy Court enter a final order (the "Cash Management Order") [Dkt. No. 110] authorizing the Debtor to close twenty-four (24) Prepetition Bank Accounts which held unrestricted funds, and transfer the balances as cash collateral to the DIP Bank Accounts (as defined in the Cash Management Order) in a manner consistent with applicable lien rights.  However, as of the Petition Date, nine (9) Prepetition Bank Accounts contained potentially restricted funds which had to be safeguarded (the "Restricted Funds"), and as a result, the Cash Management Order prohibited the Debtor from utilizing the Restricted Funds in any manner pending one or more further court orders.

On January 10, 2017 the Debtor filed its initial report on potentially restricted assets (the "Initial Report") [Dkt. No. 147], wherein it set forth its initial findings on Restricted Funds. On January 5, 2018, after the Debtor and its professionals completed their review of the Prepetition Bank Accounts to determine whether such accounts contained Restricted Funds, the Debtor filed a second report on potentially restricted assets (the "Second Report") [Dkt. No. 475]. As set forth in the Initial Report and Second Report, the Debtor determined that five (5) Prepetition Bank Accounts contained unrestricted funds (the "Unrestricted Prepetition Bank Accounts") and should be included as property of the Estate. On January 29, 2018, the Bankruptcy Court entered an order [Dkt. No. 484], authorizing the Debtor to use the funds in the Unrestricted Prepetition Bank Accounts, totaling approximately $570,000, as cash collateral in a manner consistent with applicable lien rights.

In addition, the Debtor concluded in the Initial Report and Second Report that the remaining Prepetition Bank Accounts contained Restricted Funds which are not property of the Estate. Those accounts were identified as (1) account number ending in 1467 at US Bank, NA (the "Perkins Loan Account"), (2) account number ending in 6012 at TD Wealth (the "Restricted Vico Italian Chair Money Market") and (3) account number ending in 5014 at TD Wealth (the "Restricted Money Market").

The Debtor's intended disposition of Perkins Loan Account is discussed hereinafter. The balance of the Restricted Funds amount to charitable assets which the Debtor will need to provide for transfer to successor charitable institutions. The Debtor has reviewed its records and compiled a spreadsheet reflecting the list of endowments and the CRO's allocation recommendations based upon the requirements of each one. Overall, the CRO has attempted to best align the Restricted Funds to programs at successor institutions that appeared to be the best fit at one of the recommended institutions. The Debtor has discussed its intentions and shared the spreadsheet with the Charities Bureau of the Office of the Attorney General for the State of New York (the "Charities Bureau"). The Charities Bureau has not objected to the Debtor's proposed disposition scheme and discussions continue concerning the most appropriate method of transfer, whether by separate *cy pres* proceeding under applicable non-bankruptcy law, or possibly pursuant to an Order of the Bankruptcy Court.

### H.    Significant Case Resolutions and Settlements

The Debtor, with the assistance of its professionals and the Creditors' Committee, has resolved certain causes of action, claims and litigations affecting the Estate during the Chapter 11 Case. Following is a brief summary of the more significant resolved matters.

### 1.    *Unsecured Creditor Settlement*

As discussed in Section D, as part of the Final DIP Order, the Creditors' Committee and the DIP Term Loan Lenders reached a settlement according to the terms set forth in that certain term sheet annexed to the Final DIP Order, as amended by the Stipulation and Order Amending Final Order (I) Authorizing Debtor to Obtain Postpetition Financing and Use Cash Collateral, (II) Granting Adequate Protection, and (III) Granting Related Relief (the "Unsecured Creditor

Settlement"").    The Unsecured Creditor Settlement provides, among other things, that certain proceeds from the disposition of assets are to be reserved for the benefit of unsecured creditors before being applied in accordance with the provisions of the DIP Note.  The Unsecured Creditor Settlement, as modified, provides for the following categories and payment priorities:

1) Tier I:  all assets of the Debtor other than those specified in Tier II, Tier III, or Tier IV, *i.e.*, the IP Addresses, the Student AR and funds in the Unrestricted Prepetition Bank Accounts.  The sale proceeds from the disposition of the aforementioned assets are to be applied first to pay costs, commission and expenses of such sales, second $200,000 for payment of Allowed Priority Non-Tax Claims and Allowed Priority Tax Claims, third to the DIP Term Loan Lenders to satisfy any unpaid portion of DIP Term Loan D, fourth in allocation of 50% to Prepetition Bond Trustees and 50% for payment of Allowed Priority Non-Tax Claims and Allowed Priority Tax Claims until the obligations of the Debtor under the Prepetition Bond Documents are paid in full, and fifth for payment of Allowed General Unsecured Claims.

2) Tier II:   real property and improvements consisting of the Oakdale Campus and Brookhaven Campus, excluding the Brookhaven Dorm.  The sale proceeds from the Oakdale Campus and Brookhaven Campus, excluding the Brookhaven Dorm, are to be applied first to pay costs, commissions and expenses of such sales, second $174,000 for the Unsecured Creditor Trust Initial Funding, third $300,000 for payment of Allowed Priority Non-Tax Claims and Allowed Priority Tax Claims, fourth to the DIP Term Loan Lenders to satisfy any unpaid portion of DIP Term Loan A and that portion of DIP Term Loan D funded by the Prepetition Series 2006 Bonds or ACA, fifth to the Prepetition Series 2006 Bond Trustee in an amount sufficient to satisfy up to 70% of the outstanding balance of the Prepetition Series 2006 Bond Obligations as of the Petition Date, then sixth in allocation of 90% to Prepetition Bond Trustees and DIP Term Loan Lenders and 10% for payment of Allowed Priority Non-Tax Claims and Allowed Priority Tax Claims until the obligations of the Debtor under the Prepetition Bond Documents are paid in full, and seventh for payment of Allowed General Unsecured Claims.

3) Tier III:  real property and improvements consisting of the Brookhaven Dorm and associated real property.  The sale proceeds from the Brookhaven Dorm are to be applied first to pay costs, commissions and expenses of such sale, second $71,662.50 for the Unsecured Creditor Trust Initial Funding, third to the DIP Term Loan Lenders to satisfy any unpaid portion of DIP Term Loan B and that portion of DIP Term Loan D funded by the Prepetition Series 2002 Bond Trustee in full, fourth to the Prepetition Series 2002 Bond Trustee in an amount sufficient to satisfy up to 70% of the outstanding balance of the Prepetition Series 2002 Bond Obligations as of the Petition Date, fifth in allocation of 90% to Prepetition Bond Trustees and DIP Term Loan Lenders and 10% for payment of Allowed Priority Non-Tax Claims and Allowed Priority Tax Claims until the obligations of the Debtor under the Prepetition Bond

Documents are paid in full, and sixth for payment of Allowed General Unsecured Claims.

4) Tier IV:  real property and improvements consisting of the Residential Portfolio.  The sale proceeds from the Residential Portfolio are to be applied first to pay costs, commissions and expenses of such sales, second $54,337.50 for the Unsecured Creditor Trust Initial Funding, third $150,000 for payment of Allowed Priority Non-Tax Claims and Allowed Priority Tax Claims, fourth to the DIP Term Loan Lenders to satisfy any unpaid portion of DIP Term Loan C and that portion of Term Loan D funded by the Prepetition Series 2015 Bond Trustee, fifth to the Prepetition Series 2015 Bond Trustee in an amount sufficient to satisfy up to 85% of the outstanding balance of the Prepetition Series 2015 Bond Obligations as of the Petition Date, sixth in allocation of 90% to Prepetition Bond Trustees and 10% for payment of Allowed Priority Non-Tax Claims and Allowed Priority Tax Claims until the Prepetition Secured Parties and DIP Term Loans are paid in full, and seventh for payment of Allowed General Unsecured Claims.

2.  *WARN Act Litigation and Employee Settlement Motion*

On December 1, 2016, a former employee on behalf of herself and a putative class of similarly situated former employees of the Debtor commenced an adversary proceeding by the filing of a class action complaint (as amended from time to time, the "WARN Complaint") against the Debtor, which alleged, among other things, that the Debtor did not provide sixty (60) days' advance written notice of a mass layoff as required by the Worker Adjustment and Retraining Notification Act (the "WARN Act").  Plaintiff asserted, as a consequence of this alleged failure, she and other former employees are entitled to an award of 60 days' wages and benefits (the "WARN Act Claims") and monies owed by the Debtor to former employees for unpaid wage, vacation, sick, medical and dental claims (the "Non-WARN Act Claims").  On January 13, 2017, the Debtor filed an answer to the WARN Complaint and asserted various affirmative defenses.

On May 25, 2017, the Bankruptcy Court entered an order (the "Class Certification Order") [Adv. Pro. No. 16-08178, Dkt. No. 15] wherein, among other things, the Bankruptcy Court (i) defined and certified the class (the "Class"); (ii) appointed Lori Zaikowski as class representative (the "Class A Representative") in accordance with Rule 23 of the Federal Rules of Civil Procedure, as made applicable by Rule 7023 of the Federal Rules of Bankruptcy Procedure; and (iii) appointed Outten & Golden LLP as class counsel ("Class Counsel").

Following entry of the Class Certification Order and in an effort to resolve all aspects of the WARN Complaint, upon the consent of the Class A Representative and the Debtor, the Bankruptcy Court entered an order on June 27, 2017 (the "Mediation Order") [Adv. Pro. No. 16-08178, Dkt. No. 17] referring the dispute to mediation (the "Mediation").  The Bankruptcy Court appointed Yann Geron to serve as the mediator.  The Mediation commenced in person on July 11, 2017 and continued for some time thereafter with the assistance of the mediator via email and

telephone.  While the parties were not able to resolve the dispute during the formal Mediation, the parties continued to engage in extensive settlement discussions for several months thereafter.

There exists a complex interrelationship between the WARN Act Claims and Non-WARN Act Claims as it relates to each particular class member's priority level claim entitlements and the aggregate general unsecured claims of such parties. Counsel to the Debtor and Class Counsel recognized this interrelationship and determined that a comprehensive settlement involving holders of both WARN Act Claims and Non-WARN Act Claims was the most efficient and appropriate manner to proceed before the Bankruptcy Court under the circumstances of this Chapter 11 Case.  To that end, the Debtor and Class Counsel entered into negotiations to certify, for settlement purposes only, a second class of former employees who do not fit within the definition of the original class, but who hold Non-WARN Act Claims.

In terms of Non-WARN Act Claims, approximately one hundred and twenty-six (126) individual claims were filed by class members against the Debtor's estate. In the aggregate, the claims asserted the following amounts: (i) secured claims in the amount of $14,943.35; (ii) priority claims in the amount of $5,338,462.43; and (v) unsecured claims in the amount of $2,391,458.66. The Schedules filed by the Debtor listed the following amounts outstanding in favor of individual class members (i) priority claims totaling $102,100.67; and (iii) unsecured claims totaling $1,323,037.00. Certain of these scheduled claim amounts were listed as contingent, disputed or unliquidated.

While employed, the Debtor's former employees had the option of participating in the Dowling College Employee Benefit Plan (the "Health Plan"), which is a self-insured plan, funded through a combination of employer and employee contributions.  Cigna Health and Life Insurance Company ("Cigna") provided claims administrative service and stop loss insurance for medical, pharmacy and vision coverage for the Debtor's former employees. Healthplex, Inc. ("Healthplex") provided claims administration service for dental claims for the Debtor's former employees.

Prior to the Petition Date, the United States Department of Labor (the "DOL") opened an investigation into the Health Plan after it received complaints that health benefits submitted for coverage under the Health Plan were not being paid.  On February 27, 2017, the DOL filed a proof of claim against the Debtor's estate for $983,769.86 (the "DOL Claim") on account of unpaid medical claims which the Debtor allegedly failed to pay and which were covered under the terms of the Health Plan during the period of April 18, 2014 through September 7, 2016.  The DOL asserted that some of the claims may be entitled to priority treatment.

The DOL Claim was calculated based on documentation provided by CIGNA and Healthplex (each a third-party administrator previously in contract with the Debtor) and asserts the potential for priority treatment in relation to certain of the 163 participants and beneficiaries of the Benefit Plan referenced in the U.S. DOL Claim.

On February 14, 2017, the Bankruptcy Court entered orders (the "2004 Orders") [Dkt. Nos. 202 and 203] authorizing the Debtor to serve subpoenas upon Cigna and Healthplex which sought information on claims incurred by former employees that were managed by Cigna and Healthplex, respectively, but not paid.  Thereafter, the Debtor hired a consultant to act as a third-party

25

administrator to assist the Debtor in processing the unpaid claims and non-processed claims, which amounts formed the basis for the amounts set forth in the Employee Settlement.

The Debtor and U.S. DOL have engaged in extensive discussion and negotiation concerning the DOL Claim and the interrelated nature of termination-based claims of class members, including those asserted on their behalf by and through the DOL Claim.

Ultimately, on August 31, 2018, the Debtor reached a comprehensive agreement (the "Employee Settlement") and filed a joint motion with Class Counsel (the "Employee Settlement Motion") pursuant to Section 105 of the Bankruptcy Code, Rule 9019 of the Bankruptcy Rules and Rule 23 of the Federal Rules of Civil Procedure, made applicable hereto by Bankruptcy Rule 7023, for the entry of orders: (a) approving the *Settlement and Release Agreement* (the "Employee Settlement Agreement") among the Debtor and the class members pursuant to Bankruptcy Rule 9019; (b) certifying Class B for settlement purposes only, appointing Class Counsel as counsel for Class B, appointing Cathryn Mooney as the Class B Representative, and preliminarily approving the Employee Settlement Agreement pursuant to Civil Rule 23(c); (c) approving the form and manner of notice of the conditional class certification to Class B members and settlement to class members; (d) scheduling a final hearing to consider final approval of the Employee Settlement Agreement pursuant to Civil Rule 23; (e) after the Final Hearing, approving the Employee Settlement Agreement on a final basis pursuant to Civil Rule 23; and (f) granting related relief. A preliminary hearing on the Employee Settlement Motion is set for hearing on September 24, 2018 and a final hearing for approval is expected to be set at that time.

If approved by the Bankruptcy Court, the Employee Settlement Agreement will resolve substantially all of the foregoing claims either filed or asserted by or on behalf of the Debtor's former employees, including the WARN Act Claims, Non-WARN Act Claims and the DOL Claim and will result in class members holding Allowed Priority Non-Tax Claims in the aggregate amount of approximately $1.43 million and Allowed General Unsecured Claims in the aggregate amount of approximately $6.2 million.

3.    *Negotiations with the United States Department of Education*

As set forth above, Dowling's primary sources of revenues were derived from student tuition and fees, often provided through the Federal Loan Program. The United States Department of Education (the "DOE") filed the single largest General Unsecured Claim in this case (the "DOE Claim") asserting aggregate claims of not less than approximately $22,899,773.37. The DOE Claim asserts liability on behalf of the Debtor for (1) closed school discharges of former student debt obligations ("Loan Discharge Claims") of at least $2,629,452.00, (2) failure to account by way of close out audit for (a) direct loans of at least $13,951,644.00, (b) Pell grants of at least $2,033,770.00, (c) Supplemental Educational Opportunity Grants of at least $101,000.00 and (d) Federal Work Study funds of at least $237,556.00, (3) the DOE's share of the student loan funds calculated to be at least $141,372.00 in relation to the Federal Perkins Loan Program (the "Perkins Program"), (4) and a facilities loan of $1,296,990.00.

The Debtor engaged in various discussions and negotiations with representatives from DOE and the Office of the U.S. Attorney following commencement of the Chapter 11 Case. As a

first priority, DOE sought to address the Debtor's prior participation in and termination from the Perkins Program. Federal Perkins Loans consist of low-interest federal student loans for undergraduate and graduate students with exceptional financial need. The Perkins Program is a campus-based program where the United States Treasury, through the DOE, and the participating institution each contribute capital into a revolving fund that is used to make loans to qualifying students. Beginning in 1969, the Debtor participated in the Perkins Program. Based upon annual filings made by the Debtor, the Federal Capital Contribution to the revolving fund was $1,774,874 and the Institutional Capital Contribution to the revolving fund was $330,067. In addition, the Debtor made short term loans to the revolving fund in varying amounts to meet student loan demand in excess of the available balance in the revolving loan fund.

As of the Petition Date, the Debtor's Perkins Program revolving student loan funds consisted of $264,066.65 (the "Student Loan Funds") and the Debtor held approximately 775 outstanding Federal Perkins Loans totaling approximately $1,805,533.04 (the "Student Loans"). During the Chapter 11 Case, the Debtor and its professionals continued to collect outstanding student account receivables, and as a result, the balance of the Student Loan Funds increased. As of July 31, 2018, the Student Loan Funds totaled $460,122.81.

After it lost its accreditation, Dowling became ineligible for further participation in the Perkins Program and was provided with notice from the DOE on August 3, 2016 and again on May 18, 2017, wherein the DOE demanded that the Debtor assign its Federal Perkins loan portfolio to the DOE. The Debtor acknowledged its obligation to liquidate the Perkins Program and has worked closely with the DOE to develop procedures for the same.

On September 27, 2017, the Bankruptcy Court entered an interim order (the "Interim Perkins Approval Order") [Dkt. No. 407] approving and authorizing certain procedures for turnover of the Debtor's Federal Perkins Loan Portfolio. The Interim Perkins Approval Order (i) permitted the Debtor to assign the Student Loans to the DOE and (ii) prohibited the Debtor from transferring any of the Student Loan Funds without further court order. As of July 31, 2018, a total of 649 Student Loans have been assigned and accepted by the DOE.

The Debtor has continued to negotiate with and continues to assign the Student Loans to the DOE. The Debtor is currently negotiating a stipulation with the DOE that is expected to substantially reduce the aggregate amount of the DOE Claim and provide for consensual transfer of a portion of the Student Loan Funds to DOE. Once completed, the stipulation will be presented to the Bankruptcy Court for approval.

## I.    Disposition of Records and Non-Estate Property

After considering potentially applicable rules, regulations and requirements applicable to operating institutions of higher education, the Debtor developed strategies and procedures for the disposal of certain of (i) the Debtor's records, which are property of the Debtor's estate, and (ii) items of personal property that were in Dowling's possession as of the Petition Date, which items were properly characterized as non-estate property ("NEP") because they did not constitute property of the estate in accordance with the meaning of section 541 of the Bankruptcy Code, including personal property that was deemed restricted because the personal property was donated

to the Debtor subject to donor-imposed restrictions (each such item of property being a "Restricted Asset").

        1.    *Debtor's Records*

      As described above, the Debtor entered into various arrangements with LIU during July, 2016 prior to the Debtor's official loss of accreditation with respect to transcripts and related grade reports for former students of the Debtor (the "LIU Agreement"). By virtue of the LIU Agreement, LIU agreed to act as custodian of the Debtor's academic transcripts and the Debtor agreed to grant LIU the right to use the Dowling College seal for purposes of issuing transcripts to former students. Notwithstanding the existence of the LIU Agreement, the Debtor continued to receive inquiries in relation to grades, degrees, transcripts and other related student records matters from former students of the Debtor after the Petition Date. To the best of its ability and with the cooperation of former Debtor personnel, the Debtor responded to such continuing inquiries. However, as of the Effective Date of the Plan, the Plan Administrator shall have no obligation to and will not be responsible for answering or responding to inquiries by former students related to grades, degrees, transcripts or any other related student record matters.

      The Debtor's records consisted of both hardcopy records and electronic records. The Debtor's hardcopy files and records contained information relating to its former operations and were largely stored at buildings located on both the Oakdale Campus and Brookhaven Campus, with a small percentage of files stored at certain parcels of the Residential Portfolio (the "Hardcopy Records"). The Hardcopy Records consisted of several thousand large banker boxes. The Debtor's electronic records consisted of data on numerous computer servers, operating systems, databases, hard drives and other storage devices and media (the "Electronic Records"). The Debtor maintained physical computer servers and backup servers (the "Servers") for the Electronic Records. In addition, the Debtor maintained approximately 1,400 boxes of records off-site at Iron Mountain and Astro Moving & Storage (the "Off-Site Records" and together with the Hardcopy Records and Electronic Records, the "Records").

      During the Chapter 11 Case, the Debtor and its professionals reviewed the Records to identify those records which (i) might be necessary to the administration of the Chapter 11 Case or (ii) should be preserved for a minimum period of time in order to best comply with various legal or regulatory requirements or other guidelines applicable to operating institutions of higher education (collectively, the "Necessary Records"). Records not identified as Necessary Records were deemed unnecessary records (the "Unnecessary Records").

      On May 26, 2017, the Bankruptcy Court entered an order (the "Document Disposition Order") [Dkt. No. 341] approving and authorizing procedures for the disposition of the Debtor's Records (the "Record Disposition Procedures"). The Record Disposition Procedures allowed the Debtor to maintain Necessary Records for the appropriate retention period under applicable rules, regulations and requirements of operating institutions of higher education and to abandon and dispose of the Unnecessary Records. In addition, the Debtor agreed to keep the Servers operational for a period of eighteen (18) months following the effective date of the Plan and then retain only the backup tapes for a period of five (5) years from the effective date of the Plan. Prior to any

proposed destruction of backup tapes relating to data existing in the Banner system[11], the Debtor is required to provide SED with not less than fourteen (14) days written notice of the proposed destruction and offer to provide those tapes or copies of the same for continued preservation by SED.

Substantially all of the Unnecessary Records have been destroyed consistent with the Document Disposition Order. All Necessary Records will be retained by the Debtor until they need not be retained consistent with the Document Disposition Order.

### 2.    *Non-Estate Property*

Non-Estate Property, including Restricted Assets, was located at both the Oakdale Campus and Brookhaven Campus.   During the Chapter 11 Case, the Debtor received various inquiries, demands or claims in relation to specific NEP, including Restricted Assets from former employees, lessors and other owners ("Property Requests").   Property Requests made in relation to Restricted Assets have generally been made by donors or relatives of donors inquiring as to return or other status of personal property donated as gifts or bequests provided by such original donor.

On April 12, 2017 the Bankruptcy Court entered an order (the "Non-Estate Property Procedures Order") [Dkt. No. 283] approving and authorizing certain procedures for identification of and potential disposition of certain personal property (the "Property Disposition Procedures"). The Property Disposition Procedures permitted the Debtor to implement certain basic notice procedures whereby the Debtor disposed of certain of the personal property (other than Restricted Assets) that was subject to a Property Request.   Shortly after the Non-Estate Property Procedures Order was entered, the Debtor caused a notice to be sent to former students, former employees, vendors, donors and current and former board of trustee members, informing them of the Property Disposition Procedures and the deadline to assert a claim or other entitlement to NEP, including a Restricted Asset.   Thereafter, to the extent NEP was identified by an interested party and the Debtor was able to locate the NEP and verify the interested party's rights to the property, the interested party was given an opportunity to obtain the NEP.   NEP which was not claimed by any party after the relevant deadline was deemed abandoned.

### 3.    *The Special Collections*

The Debtor maintained at the Oakdale Campus certain collections of books, manuscripts, photographs, paintings, periodicals and related items (collectively, the "Special Collections"). With the assistance of a former Dowling librarian, the Debtor determined that all of the items contained in the Special Collections were either donated on an unrestricted basis, purchased by the Debtor or originated by the Debtor, and therefore not subject to the Non-Estate Property Procedures Order or the Property Disposition Procedures. Notwithstanding, since the cessation of operations as an educational institution, the Debtor had no use for the Special Collections, and

---

[11] Banner is the enterprise resource planning (ERP) system used by the Debtor.  The ERP is a system of integrated applications used to manage the business and automate many back-office functions, including all student, human resources and financial records and processes.  The Banner system, as utilized by the Debtor, contains eight modules including:  student, financial aid, accounts receivable, finance, human resources, position control, advancement, and general.

storing the Special Collections would be costly and without any corresponding benefit to the Estate.

Commencing November 2017, the Debtor sought to sell the Special Collections and toward that end, contacted several book collectors, dealers, and auction houses. Only one offer for $6,000.00 was made for all of the Special Collections. Since the administrative and legal costs associated with obtaining approval of this offer would result in little or no value left for the Debtor's estate, the Debtor rejected the offer. Lack of interest demonstrated that although somewhat unique, the Special Collections were of limited, if any, resale value in the open market.

With no reasonable opportunity to sell the Special Collections, the CRO, with the assistance of a former Dowling librarian, contacted various educational institutions in the region in an effort to find a new home for the Special Collections. Again, interest in acquiring the Special Collections was limited, even at no cost.

Ultimately, local institutions Adelphi University and Saint Joseph's College agreed to take certain portions of the Special Collections. Mercury, which acquired the Oakdale Campus, and which intends to operate a higher education institution in the future, has agreed to take other portions of the Special Collections and return them to the library at the former Oakdale Campus.

To effectuate the transfer of the Special Collections, the Debtor filed the Debtor's Motion for an Order Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code Authorizing Transfer of Special Collections to Other Educational Institutions [Dkt. No. 570], which was granted by order of the Bankruptcy Court entered on August 22, 2018 [Dkt. No. 587].

**J.      Creditors' Committee Standing Motion**

The Creditors' Committee determined that it would investigate potential causes of action on behalf of the Debtor's Estate.

To that end, on March 21, 2017, the Creditors' Committee filed the Committee's Application for Entry of Order Directing Examination of KPMG LLP, by an Authorized Partner or Person with Knowledge of Debtor's Business Transactions and Production of Documents Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Committee 2004 Motion") [Dkt. No. 243], which was resolved by a stipulation and order entered by the Bankruptcy Court on April 12, 2017 [Dkt. No. 281].

The Creditors' Committee obtained and reviewed information from KPMG LLP and also from the Debtor in relation to its investigation of potential causes of action. As a result of its investigation, the Creditors' Committee believes that the Debtor's Estate possesses meritorious causes of action against several third parties, which will be prosecuted by the Unsecured Creditor Trust for the benefit of Class 7 General Unsecured Creditors.

On August 28, 2018, the Creditors' Committee filed the Creditors' Committee's Motion for an Order Granting Leave, Standing, and Authority to Prosecute Claims on Behalf of Dowling's Estate (the "Committee Standing Motion") [Dkt. 591].

On September 17, 2018, the members of the Board of Trustees of Dowling (the "Trustees") filed their Reservation of Rights of Board of Trustee Members to Committee's Motion for Standing and Authority to Prosecute Claims on Behalf of Estate (the "Board Response") [Dkt. 598]. By the Board Response, the Trustees, *inter alia*, reserved all rights as to the factual recitation and the legal and factual merits of claims or causes of action referenced in the Committee Standing Motion.

The Trustees have advised the Debtor that in authorizing the filing of the Plan and Disclosure Statement, the Trustees reserve all rights with the same force and effect as set forth in the Board Response, and that nothing in the Plan or Disclosure Statement should be construed as an admission to any fact asserted therein or herein.

The Committee Standing Motion was granted by order of the Bankruptcy Court entered on September 28, 2018 [Dkt. No. 611].

## IV.    SUMMARY OF THE PLAN OF LIQUIDATION

### A.    General Plan Objectives.

Chapter 11 is the chapter of the Bankruptcy Code primarily used for business reorganization. Asset sales, stock sales, and other liquidation efforts, however, can also be conducted during a chapter 11 case or pursuant to a chapter 11 plan. Under chapter 11, a company endeavors to restructure its finances such that it maximizes recovery to its creditors.

Formulation of a chapter 11 plan is the primary purpose of a chapter 11 case. A chapter 11 plan sets forth and governs the treatment and rights to be afforded to creditors with respect to their claims against the debtor. According to section 1125 of the Bankruptcy Code, acceptances of a chapter 11 plan may be solicited by the proponent of a plan only after a written disclosure statement has been provided to each creditor or shareholder who is entitled to vote on the plan.

The Plan is a plan of liquidation. In general, a chapter 11 plan of liquidation (i) divides claims into separate classes, (ii) specifies the property that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the Plan. Under the Bankruptcy Code, "claims" are classified rather than "creditors" because such entities may hold claims in more than one class.

### B.    Provisions Governing Order and Method for Distributions Under the Plan

The Plan divides Claims against the Debtor into seven (7) categories or "Classes" according to the underlying basis and subsequent treatment for each. Claims within the same Class are treated identically and each Class is treated differently.

Administrative Expense Claims, the DIP Term Loans, Priority Tax Claims and Professional Fee Claims, are not classified but are treated in the manner set forth in Article 2 of the Plan and summarized below.

### C.    Classes of Claims

The following classes of Claims are designated pursuant to and in accordance with section 1123(a)(1) of the Bankruptcy Code, which Classes shall be mutually exclusive:

| Class | Claim | Treatment | Status | Voting Rights | Estimated Distribution |
|---|---|---|---|---|---|
| Class 1 | Prepetition Series 1996 Bonds | Plan § 4.1 | Impaired | Entitled to Vote | See treatment of Class 7 |
| Class 2 | Prepetition Series 2002 Bonds | Plan § 4.2 | Impaired | Entitled to Vote | 28% |
| Class 3 | Prepetition Series 2006 Bonds | Plan § 4.3 | Impaired | Entitled to Vote | 63% |
| Class 4 | Prepetition Series 2015 Bonds | Plan § 4.4 | Impaired | Entitled to Vote | 100% |
| Class 5 | Other Secured Claims | Plan § 4.5 | Impaired | Entitled to Vote | See treatment of Class 7 |
| Class 6 | Priority Non-Tax Claims | Plan § 4.6 | Not Impaired | Not Entitled to Vote | 100% |
| Class 7 | General Unsecured Claims | Plan § 4.7 | Impaired | Entitled to Vote | <1%[12] |

1.    *Administrative Expense Claims*

Administrative Expense Claims are not classified consistent with section 1123(a)(1) of the Bankruptcy Code. All Allowed Administrative Expense Claims, other than Professional Fee Claims, shall be paid by the Plan Administrator from the Administrative Reserve, in full, in Cash, in such amounts as are incurred in the ordinary course of the liquidation of the Debtor, or in such amounts as may be Allowed by the Bankruptcy Court (a) as soon as practicable following the later of the Effective Date or the date upon which the Court enters a Final Order allowing any such Administrative Expense Claim, or (b) upon such other terms as may exist in accordance with the ordinary course of the Debtor's liquidation or (c) as may be agreed upon between the holder of any such Administrative Expense Claim and the Debtor.  In the event there exists any Disputed Administrative Expense Claims on the Effective Date, the Plan Administrator shall at all times

---

[12] This estimate is based solely on the Unsecured Creditor Trust Initial Funding and does not include recoveries on Causes of Action pursued by the Creditors' Committee or Unsecured Creditor Trust, if any. As described above, the Creditors' Committee believes that the Debtor's Estate possesses meritorious Causes of Action against multiple third parties, which will be prosecuted by the Unsecured Creditor Trust for the benefit of Class 7 Creditors. If the Unsecured Creditor Trust is successful in the prosecution of such Causes of Action, distributions to holders of Class 7 Claims will likely be substantially higher than the estimate provided herein.

hold and maintain Cash in an amount equal to that portion of a Disputed Claims Reserve attributable to all Disputed Administrative Expense Claims. Administrative Expense Claims are not Impaired by the Plan.

As of the filing of this Disclosure Statement, only one claimant has filed or otherwise asserted Administrative Expense Claims in the aggregate amount of approximately $200. However, it is important to note that no bar date for Administrative Expense Claims has yet been established in this Chapter 11 Case.  Moreover, though the Debtor believes it has timely paid the necessary and beneficial costs of administering this Chapter 11 Case, it is possible that Administrative Expense Claims may be asserted in the future. Pursuant to Section 5.11 of the Plan, a bar date for Administrative Expense Claims is established as thirty (30) days after mailing of notice that the Effective Date (as defined in the Plan) has occurred. The Debtor is not aware of any material unpaid Administrative Expense Claims.

2.     *The DIP Term Loans*

The DIP Term Loans are not classified consistent with section 1123(a)(1) of the Bankruptcy Code. The DIP Term Loan Lenders will receive one or more distributions of Cash equal to the Allowed amount of each DIP Term Loan as soon as practicable following the (a) the Effective Date, or (b) the date on which Collateral securing each DIP Term Loan is liquidated or reduced to Cash, in accordance with the Unsecured Creditor Settlement. Each DIP Term Loan is an Allowed Claim.  The DIP Term Loans are not Impaired by the Plan.

As of August 31, 2018, the aggregate outstanding amount of DIP Term Loans are set forth in the below chart:

| DIP Tranche | Principal | Accrued Interest | Total |
|---|---|---|---|
| Term Loan A | $456,552.64 | $3,320.51 | $459,873.15 |
| Term Loan B | $424,496.73 | $1,411.37 | $425,908.09 |
| Term Loan C | $1,275.00 | - | $1,275.00 |
| Term Loan D | $2,205,351.00 | $13,309.60 | $2,218,660.61 |
| Total | $3,087,675.37 | $18,041.48 | $3,105,716.85 |

3.     *Priority Tax Claims*

Priority Tax Claims are not classified consistent with section 1123(a)(1) of the Bankruptcy Code. On the Effective Date, or as soon thereafter as is reasonably practical, in full and final satisfaction of such Allowed Priority Tax Claim, each holder of an Allowed Priority Tax Claim shall receive (a) an amount in Cash equal to the Allowed amount of such Priority Tax Claim, or (b) such other treatment as to which the Debtor and the holder of such Allowed Priority Tax Claim shall have agreed upon in writing.  In the event any Disputed Priority Tax Claims exist on the Effective Date, the Debtor shall hold and maintain Cash in an amount equal to that portion of a Disputed Claims Reserve attributable to all Disputed Priority Tax Claims until such dispute is resolved consensually or by order of the Bankruptcy Court.  Priority Tax Claims are not Impaired by the Plan.

For the avoidance of doubt, the treatment of Priority Tax Claims that are secured by tax liens or warrants shall be treated consistent with section 1129(a)(9)(D) of the Bankruptcy Code.

As of the filing of this Disclosure Statement, only two parties have filed or otherwise asserted Priority Tax Claims in the aggregate and non-duplicate amount of not more than $1.2 million.  The Debtor estimates that after reconciliation of such claims is complete and either negotiations or objections are concluded, the aggregate amount of Priority Tax Claims will be not more than $1.2 million.

### 4.    *Professional Fee Claims*

Professional Fee Claims are not classified consistent with section 1123(a)(1) of the Bankruptcy Code. The Plan Administrator shall pay all Professional Fee Claims as soon as practicable after a Final Order has awarded such compensation and reimbursement of expenses pursuant to proper application in accordance with Section 5.12 of the Plan.  In the event any Disputed Professional Fee Claims exist on the Effective Date, the Plan Administrator shall hold and maintain Cash in an amount equal to that portion of a Disputed Claims Reserve attributable to all Disputed Professional Fee Claims until such dispute is resolved consensually or by order of the Bankruptcy Court. Professional Fee Claims are not Impaired by the Plan.

As of August 31, 2018, the outstanding and unpaid Professional Fee Claims are set forth in the below chart.

| Firm | Interim Holdbacks | Current Accrued Holdbacks (through July 31, 2018) | Total Unpaid |
|---|---|---|---|
| Klestadt Winters Jureller Southard & Stevens, LLP | $325,171.77 | $84,141.55 | $409,313.32 |
| SilvermanAcampora LLP | $103,076.50 | $18,996.09 | $122,072.59 |
| Ingerman Smith, LLP | $9,084.00 | $5,345.18 | $14,429,18 |
| FPM Group, Ltd. | $8,245.29 | $0.00 | $8,245.29 |
| Smith & Downey, P.A. | $3,062.75 | $0.00 | $3,062.75 |
| Eichen & DiMeglio CPA's P.C. | $8,510.00 | $0.00 | $8,510.00 |
| Farrell Fritz, P.C. | $5,306.40 | $0.00 | $5,306.40 |
| Baker Tilly Virchow Krause, LLP | $6,646.80 | $0.00 | $6,646.80 |
| Garden City Group, LLC | $0.00 | $0.00 | $0.00 |
| **Totals** | **$469,103.51** | **$108,482.82** | **$563,157.15** |

As of the date of this Disclosure Statement, the Campus Agents also assert Professional Fee Claims due as a result of the closing of the Brookhaven Campus for commissions due in an aggregate amount of no greater than $560,000 (or 4% of $14,000,000 purchase price of the Brookhaven Campus and related furniture and equipment).

5.    *Class 1 (Prepetition Series 1996 Bonds)*

Holders of Allowed Class 1 Claims shall receive one or more distributions from the proceeds of Collateral securing the Prepetition Series 1996 Bonds on and after the Effective Date in accordance with the DIP Order and the Unsecured Creditor Settlement, up to one hundred percent (100%) of such Allowed Claim, plus any amounts Allowed pursuant to section 506(b) of the Bankruptcy Code. Allowed Class 1 Prepetition Series 1996 Bonds are Allowed pursuant to the Final DIP Order. The Liens that secure the Prepetition Series 1996 Bonds are valid, binding, enforceable, and perfected liens with priority over any and all Other Secured Claims and are not subject to any challenge or defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), claims, counterclaims, cross-claims, offsets, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any Person. If the Prepetition Series 1996 Bond Trustee comes to hold a Deficiency Claim due to the lack of Collateral or otherwise resulting from the aforesaid treatment, the Prepetition Series 1996 Bond Trustee shall not receive a distribution on account of such Deficiency Claim as a holder of a Class 7 General Unsecured Claim until the distribution to holders of Class 7 General Unsecured Claims (not including the Prepetition Bond Trustees or ACA) exceeds five percent (5%) of the Allowed amount of such Claims. The Allowed Class 1 Claim of the Prepetition Series 1996 Bond Trustee shall supercede and override individual Claims filed by Registered Holders or beneficial owners of Prepetition Series 1996 Bonds, and such individual Claims are deemed expunged. Each Distribution on account of the Prepetition Series 1996 Bonds shall be made by wire transfer to the Prepetition Series 1996 Bond Trustee.

Pursuant to the DIP Order, the Debtor stipulated and agreed that as of the Petition Date, the Debtor's obligations under the Prepetition Series 1996 Bonds totaled $3,615,730.91 as of the Petition Date.

Based upon the Liquidation Analysis, the proceeds of the Collateral securing the Prepetition Series 1996 Bonds will be insufficient to satisfy the more senior Prepetition Series 2015 Bond obligations in full. Pursuant to section 506(a)(1) of the Bankruptcy Code, Class 1 Prepetition Series 1996 Bonds are rendered unsecured as a result. Class 1 Prepetition Series 1996 Bonds shall be treated as a Deficiency Claim and receive distributions as Class 7 General Unsecured Claims, provided that, for the avoidance of doubt, distributions will not be made to Class 1 Prepetition Series 1996 Bonds until holders of General Unsecured Claims other than the Prepetition Bond Trustees receive distributions exceeding five percent (5%) consistent with the Unsecured Creditor Trust Settlement.

6.    *Class 2 (Prepetition Series 2002 Bonds)*

Holders of Allowed Class 2 Claims shall receive one or more distributions from the proceeds of Collateral securing the Prepetition Series 2002 Bonds on and after the Effective Date in accordance with the DIP Order and Unsecured Creditor Settlement, up to one hundred percent (100%) of such Allowed Claim, plus any amounts Allowed pursuant to section 506(b) of the Bankruptcy Code. Class 2 Prepetition Series 2002 Bonds are Allowed pursuant to the Final DIP Order. The Liens that secure the Prepetition Series 2002 Bonds are valid, binding, enforceable, and perfected liens with priority over any and all Other Secured Claims and are not subject to any

challenge or defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), claims, counterclaims, cross-claims, offsets, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any Person. If the Prepetition Series 2002 Bond Trustee comes to hold a Deficiency Claim due to the lack of Collateral or otherwise resulting from the aforesaid treatment, the Prepetition Series 2002 Bond Trustee shall not receive a distribution on account of such Deficiency Claim as a holder of a Class 7 General Unsecured Claim until the distribution to holders of Class 7 General Unsecured Claims (not including the Prepetition Bond Trustees or ACA) exceeds five percent (5%) of the Allowed amount of such Claims. The Allowed Class 2 Claim of the Prepetition Series 2002 Bond Trustee shall supercede and override individual Claims filed by Registered Holders or beneficial owners of Prepetition Series 2002 Bonds, and such individual Claims are deemed expunged. Each Distribution on account of the Prepetition Series 2002 Bonds shall be made by wire transfer to the Prepetition Series 2002 Bond Trustee.

Pursuant to the DIP Order, the Debtor stipulated and agreed that as of the Petition Date, the Debtor's obligations under the Prepetition Series 2002 Bonds totaled $11,692,882.29 as of the Petition Date.

### 7.    *Class 3 (Prepetition Series 2006 Bonds)*

Holders of Allowed Class 3 Claims shall receive one or more distributions from the proceeds of Collateral securing the Prepetition Series 2006 Bonds on and after the Effective Date in accordance with the DIP Order and Unsecured Creditor Settlement, up to one hundred percent (100%) of such Allowed Claim, plus any amounts Allowed pursuant to section 506(b) of the Bankruptcy Code. Class 3 Prepetition Series 2006 Bonds are Allowed pursuant to the Final DIP Order. The Liens that secure the Prepetition Series 2006 Bonds are valid, binding, enforceable, and perfected liens with priority over any and all Other Secured Claims and are not subject to any challenge or defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), claims, counterclaims, cross-claims, offsets, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any Person. If the Prepetition Series 2006 Bond Trustee (or ACA) comes to hold a Deficiency Claim due to the lack of Collateral or otherwise resulting from the aforesaid treatment, the Prepetition Series 2006 Bond Trustee (or ACA) shall not receive a distribution on account of such Deficiency Claim as a holder of a Class 7 General Unsecured Claim until the distribution to holders of Class 7 General Unsecured Claims (not including the Prepetition Bond Trustees or ACA) exceeds five percent (5%) of the Allowed amount of such Claims. The Allowed Class 3 Claim of the Prepetition Series 2006 Bond Trustee shall supercede and override individual Claims filed by Registered Holders or beneficial owners of Prepetition Series 2006 Bonds, and such individual Claims are deemed expunged. Each Distribution on account of the Prepetition Series 2006 Bonds shall be made by wire transfer to ACA.

Pursuant to the DIP Order, the Debtor stipulated and agreed that as of the Petition Date, the Debtor's obligations under the Prepetition Series 2006 Bonds totaled $38,541,422.60 as of the Petition Date.

After the Effective Date and in connection with the distributions ACA receives on account of the Prepetition Series 2006 Bonds, ACA intends to pay off the outstanding Prepetition Series 2006 Bonds with such distributions pursuant to the applicable insurance policy[13].

### 8.    *Class 4 (Prepetition Series 2015 Bonds)*

Holders of Allowed Class 4 Claims shall receive one or more distributions from the proceeds of Collateral securing the Prepetition Series 2015 Bonds on and after the Effective Date in accordance with the DIP Order and Unsecured Creditor Settlement, up to one hundred percent (100%) of such Allowed Claim, plus any amounts Allowed pursuant to section 506(b) of the Bankruptcy Code. Class 4 Prepetition Series 2015 Bonds are Allowed pursuant to the Final DIP Order. The Liens that secure the Prepetition Series 2015 Bonds are valid, binding, enforceable, and perfected liens with priority over any and all Other Secured Claims and are not subject to any challenge or defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), claims, counterclaims, cross-claims, offsets, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any Person. If the Prepetition Series 2015 Bond Trustee comes to hold a Deficiency Claim due to the lack of Collateral or otherwise resulting from the aforesaid treatment, the Prepetition Series 2015 Bond Trustee shall not receive a distribution on account of such Deficiency Claim as a holder of a Class 7 General Unsecured Claim until the distribution to holders of Class 7 General Unsecured Claims (not including the Prepetition Bond Trustees or ACA) exceeds five percent (5%) of the Allowed amount of such Claims. The Allowed Class 4 Claim of the Prepetition Series 2015 Bond Trustee shall supercede and override individual Claims filed by Registered Holders or beneficial owners of Prepetition Series 2015 Bonds, and such individual Claims are deemed expunged. Each Distribution on account of the Prepetition Series 2015 Bonds shall be made by wire transfer to the Prepetition Series 2015 Bond Trustee.

Pursuant to the DIP Order, the Debtor stipulated and agreed that as of the Petition Date, the Debtor's obligations under the Prepetition Series 2015 Bonds totaled $7,254,229.97 as of the Petition Date.

### 9.    *Class 5 (Other Secured Claims)*

The proceeds of the Collateral securing the Prepetition Senior Secured Claims and the DIP Term Loans is insufficient to satisfy such claims in full. Pursuant to section 506(a)(1) of the Bankruptcy Code, Other Secured Claims are rendered unsecured as a result. Other Secured Claims shall be treated as a Deficiency Claim and receive distributions as Class 7 General Unsecured Claims.

As of the Bar Date, approximately 60 parties have filed or otherwise hold scheduled Class 5 Claims in the aggregate amount of approximately $1,134,398.16. The Debtor estimates that after reconciliation of such claims is complete and either negotiations or objections are concluded, remaining Other Secured Claims totaling approximately $150,000 will be treated as Class 7 General Unsecured Claims consistent with section 506(a)(1) of the Bankruptcy Code.

---

[13] ACA reserves all rights with respect to payments on the Prepetition Series 2006 Bonds.

10.    *Class 6 (Priority Non-Tax Claims)*

On the Effective Date, or as soon thereafter as is reasonably practical, in full and final satisfaction of such Allowed Priority Non-Tax Claim, each holder of an Allowed Priority Non-Tax Claim shall receive (a) an amount in Cash equal to the Allowed amount of such Priority Non-Tax Claim, or (b) such other treatment as to which the Debtor and the holder of such Allowed Priority Non-Tax Claim shall have agreed upon in writing.

As of the date of this Disclosure Statement, approximately 170 parties have filed or otherwise asserted Class 6 Claims in the aggregate amount of approximately $11.6 million.

As set forth hereinabove, approximately one hundred and twenty-six (126) individual claims were filed by former employee class members against the Debtor's estate. In the aggregate, the claims asserted the following amounts: (i) secured claims in the amount of $14,943.35; (ii) priority claims in the amount of $5,338,462.43; and (v) unsecured claims in the amount of $2,391,458.66.   The Schedules filed by the Debtor listed the following amounts outstanding in favor of individual class members (i) priority claims totaling $102,100.67; and (iii) unsecured claims totaling $1,323,037.00. Certain of these scheduled claim amounts were listed as contingent, disputed or unliquidated.   The DOL also filed a proof of claim against the Debtor's estate for $983,769.86 as set forth above on account of unpaid medical claims which the Debtor allegedly failed to pay and which were covered under the terms.   As part of the Employee Settlement, if approved, each of the foregoing Claims will be resolved and Class 6 Claims in the aggregate of approximately $1.43 million will be allowed.

The Debtor estimates that after reconciliation of such claims is complete and either negotiations or objections are concluded, the aggregate amount of Class 6 Claims will be approximately $1.87 million.

11.    *Class 7 (General Unsecured Claims)*

Each Holder of an Allowed General Unsecured Claim shall receive one or more distributions from the Unsecured Creditor Trust, on a *pro rata* basis, up to one hundred percent (100%) of such Allowed General Unsecured Claim, in full and final satisfaction of such Allowed General Unsecured Claim. Distributions to holders of Class 7 General Unsecured Claims shall be made solely from the Unsecured Creditor Trust from Unsecured Creditor Trust Assets as provided in Section 4.7 of the Plan, and neither the Debtor nor ACA or the Prepetition Bond Trustees shall have any responsibility to pay any portion of any Allowed General Unsecured Claim.

As of the filing of this Disclosure Statement, approximately 630 parties have filed or otherwise hold scheduled Class 7 Claims in the aggregate amount of approximately $35 million. The Debtor estimates that after reconciliation of such claims is complete and either negotiations or objections are concluded, the aggregate amount of Class 7 Claims will be between approximately $16 million and $20 million, excluding Deficiency Claims which total approximately $26.4 million.

## V.    MEANS OF IMPLEMENTING THE PLAN

### A.    Plan Funding

The Plan shall be funded by a combination of the proceeds of sale of certain of the Debtor's Assets, additional funding and/or use of cash collateral of ACA and the Prepetition Bond Trustees in accordance with the Unsecured Creditor Settlement, the Priority Claim Contribution, and as set forth in the Plan.

### B.    Plan Administrator

1.    *Appointment of Plan Administrator.* The Confirmation Order shall provide for the appointment of the Plan Administrator. The Plan Administrator shall be deemed the Estate's exclusive representative in accordance with § 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified under §§ 704 and 1106 of the Bankruptcy Code.

2.    *Bond.* The Plan Administrator shall serve without a bond. The Prepetition Bond Trustees may, at their option, after consultation with the Committee or the Unsecured Creditor Trustee, as applicable, require the Plan Administrator to obtain a bond, provided that there is sufficient Cash available in the Debtor's Estate to purchase a bond.

3.    *Governance.* The Plan Administrator shall be governed by the Plan and the Plan Administrator Agreement.

4.    *Succession Matters.* In the event the Plan Administrator dies, is terminated, or resigns for any reason, the Prepetition Bond Trustees and ACA, in consultation with the Unsecured Creditor Trustee, shall designate a successor. If the Prepetition Bond Trustees and ACA cannot agree on a successor Plan Administrator, each of the Prepetition Bond Trustees and ACA may nominate a successor Plan Administrator and request by motion on notice required by the Bankruptcy Rules that the Bankruptcy Court appoint a successor Plan Administrator from such nominees. Such successor Plan Administrator shall be deemed to succeed the Plan Administrator in all respects, without need for further order of the Bankruptcy Court. In the event of resignation or removal of the Plan Administrator, the departing Plan Administrator shall promptly (a) execute and deliver such documents, instruments and other writings as reasonably requested by the successor Plan Administrator or as ordered by the Bankruptcy Court; (b) turn over to the successor Plan Administrator all property of the Debtor's Estate (other than Unsecured Creditor Trust Assets) in his or her possession, custody and control, including, but not limited to all funds held in bank accounts, and all files, books and records and other documents and information related to the Debtor; and (c) otherwise assist and cooperate in affecting the assumption of his or her obligations and functions by the successor Plan Administrator. The successor Plan Administrator may, in his or her discretion, retain such professionals as he or she deems necessary, including the Professionals of the departing Plan Administrator. If the Plan Administrator is replaced, the Professionals retained by the Plan Administrator shall be entitled to payment of their reasonable, undisputed fees and expenses from the Debtor's Estate through the date of the Plan Administrator's replacement.

5.     *Funding of Plan Administrator's Activities.* The Plan Administrator, Prepetition Bond Trustees and ACA shall agree to a reasonable wind-down budget (the "Wind-Down Budget") on or before the Effective Date. The duties and obligations of the Plan Administrator hereunder are subject to the Wind-Down Budget.

6.     *Indemnification.* The Plan Administrator and his or her designees, employees or professionals or any duly designated agent or representative of the Plan Administrator shall not be liable for any act or omission taken or omitted to be taken in their respective capacities other than for acts or omissions resulting from willful misconduct, gross negligence, or fraud as determined by Final Order of the Bankruptcy Court.   The Plan Administrator may, in connection with the performance of his functions, and in his sole and absolute discretion, consult with attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such attorneys, accountants, financial advisors and agents, or any Final Order of the Bankruptcy Court.  Notwithstanding such authority, the Plan Administrator shall not be under any obligation to consult with attorneys, accountants, financial advisors or agents, and his determination not to do so shall not result in the imposition of liability, unless such determination is based on willful misconduct, gross negligence or fraud as determined by Final Order of the Bankruptcy Court.  The Debtor's Estate shall indemnify and hold harmless the Plan Administrator and his or her designees and Professionals, and all duly designated agents and representatives (in their capacity as such) from and against all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties or the implementation or administration of the Plan; provided however, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

7.     *Powers and Duties.* On the Effective Date, the Plan Administrator shall succeed to all of the rights of the Debtor and the Estate, except for those matters delegated to the Unsecured Creditor Trust and Unsecured Creditor Trustee pursuant to Section 5.3 of the Plan and as otherwise provided herein, with all powers necessary to protect, conserve, and liquidate all Estate Assets, including, without limitation, control over (including the right to waive) all attorney-client privileges, work-product privileges, accountant-client privileges and any other evidentiary privileges relating to the Estate Assets (other than Unsecured Creditor Trust Assets) that, prior to the Effective Date, belonged to the Debtor pursuant to applicable law. The powers and duties of the Plan Administrator shall include, without further order of the Court, except where expressly stated otherwise, the rights:

i.     to invest Cash in accordance with § 345 of the Bankruptcy Code, and withdraw and make distributions of Cash to Holders of Allowed Claims (other than General Unsecured Claims, which authority is vested in the Unsecured Creditor Trust) and pay taxes and other obligations owed by the Debtor in connection with the wind-down of the Estate in accordance with the Plan;

ii.     to engage attorneys, consultants, agents, employees and all professional persons, to assist the Plan Administrator with respect to the Plan Administrator's responsibilities;

iii.  to execute and deliver all documents, and take all actions, necessary to consummate the Plan and wind-down the Debtor's Estate;

iv.  with the consent of the DIP Lenders and Prepetition Bond Trustees that have a Lien on remaining Assets (other than Unsecured Creditor Trust Assets) and on notice to (a) the other DIP Lenders, (b) Prepetition Bond Trustees, and (c) parties that have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 9010(b), to dispose of, and deliver title to or otherwise realize the value of, all the remaining Assets (other than Unsecured Creditor Trust Assets);

v.  to coordinate the storage and maintenance of the Debtor's books and records;

vi.  to oversee compliance with the Debtor's accounting, finance and reporting obligations;

vii.  to prepare monthly operating reports and financial statements and United States Trustee quarterly reports;

viii.  to oversee the filing of final tax related filings, audits and other corporate dissolution documents if required;

ix.  subject to Section 9.15 of the Plan, to object to Claims against the Debtor;

x.  subject to Section 9.15 of the Plan, upon agreement with the Unsecured Creditor Trustee, to compromise and settle Claims by and against the Debtor;

xi.  to perform any additional corporate actions as necessary to carry out the wind-down, liquidation and ultimate dissolution of the Debtor;

xii.  to implement and/or enforce all provisions of the Plan;

xiii.  to implement and/or enforce all agreements entered into prior to the Effective Date;

xiv.  abandon any Assets (other than Unsecured Creditor Trust Assets) without the need for approval of the Court, and upon such abandonment, such Assets shall cease to be Assets of the Estate; provided, however, that with respect to Non-Estate Assets and Restricted Assets, any such abandonment is subject to the Non-Estate Property Procedures Order;

xv.  to use such other powers as may be vested in or assumed by the Plan Administrator pursuant to the Plan or Order of the Bankruptcy Court or as may be necessary and proper to carry out the provisions of the Plan; and

xvi.  to the extent the Debtor retains any Cash after satisfaction of all of its and the Plan Administrator's obligations pursuant to the Plan, and only if the Unsecured Creditor Trust has not yet paid all Unsecured Claims in full, to transfer such remaining Cash to the Unsecured Creditor Trust.

In carrying out the powers and obligations of the Plan, the Plan Administrator shall reasonably consult with the Prepetition Bond Trustees, ACA, and the Unsecured Creditor Trustee, and with respect to matters set forth herein that requires that the Plan Administrator to obtain the consent of the Prepetition Bond Trustees or the Unsecured Creditor Trustee, shall obtain such consent prior to carrying out such powers and obligations. The duties and obligations of the Plan Administrator hereunder are subject to the Wind-Down Budget.

### C.    **Unsecured Creditor Trust**

1.    *Appointment of Unsecured Creditor Trustee.* The Confirmation Order shall provide for the appointment of the Unsecured Creditor Trustee. The Unsecured Creditor Trustee shall be deemed the Unsecured Creditor Trust's exclusive representative in accordance with § 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified under §§ 704 and 1106 of the Bankruptcy Code.

2.    *Bond*. The Unsecured Creditor Trustee shall serve without a bond. The Unsecured Creditor Trust Oversight Committee may, at its option, after consultation with the Prepetition Bond Trustees, require the Unsecured Creditor Trust to obtain a bond, provided that there is sufficient Cash available in the Unsecured Creditor Trust to purchase a bond.

3.    *Unsecured Creditor Trust Oversight Committee*. On or before the Effective Date, the Unsecured Creditor Trust Oversight Committee shall be appointed and shall consist of three (3) members willing to serve on the Unsecured Creditor Trust Oversight Committee. The Unsecured Creditor Trust Oversight Committee shall have the authority specified in the Unsecured Creditor Trust Agreement. The Unsecured Creditor Trustee shall consult with and provide information to the Unsecured Creditor Trust Oversight Committee with respect to any material action to be taken or not to be taken by the Unsecured Creditor Trust, and such other matters designated by the Unsecured Creditor Trust Oversight Committee.

4.    *Governance*. The Unsecured Creditor Trust shall be governed by the Unsecured Creditor Trust Agreement, subject to the oversight of the Unsecured Creditor Trust Oversight Committee.

5.    *Succession Matters*.  In the event the Unsecured Creditor Trustee dies, is terminated, or resigns for any reason, the Unsecured Creditor Trust Oversight Committee shall designate a successor. If the Unsecured Creditor Trust Oversight Committee cannot agree on a successor Unsecured Creditor Trustee, each of the members may nominate a successor Unsecured Creditor Trustee and request by motion on notice required by the Bankruptcy Rules that the Bankruptcy Court appoint a successor Unsecured Creditor Trustee from such nominees. Such successor Unsecured Creditor Trustee shall be deemed to succeed the Unsecured Creditor Trustee in all respects, including, but not limited to all litigation and other matters related to prosecution of the Causes of Action, without need for further order of the Bankruptcy Court. In the event of resignation or removal of the Unsecured Creditor Trustee, the departing Unsecured Creditor Trustee shall promptly (a) execute and deliver such documents, instruments and other writings as reasonably requested by the successor Unsecured Creditor Trustee or as ordered by the Bankruptcy

Court; (b) turn over to the successor Unsecured Creditor Trustee all property of the Unsecured Creditor Trust in his or her possession, custody and control, including, but not limited to all funds held in bank accounts, and all files, books and records and other documents and information related to the Unsecured Creditor Trust Assets and to the Debtor; and (c) otherwise assist and cooperate in affecting the assumption of his or her obligations  and functions by the successor Unsecured Creditor Trustee. The successor Unsecured Creditor Trustee may, in his or her discretion, retain such Professionals as he or she deems necessary, including the Professionals of the departing Unsecured Creditor Trustee. If the Unsecured Creditor Trustee is replaced, the professionals retained by the Unsecured Creditor Trustee shall be entitled to payment of their reasonable, undisputed fees and expenses from the Unsecured Creditor Trust Assets through the date of the Unsecured Creditor Trustee's replacement as approved by the Unsecured Creditor Trust Oversight Committee or otherwise allowed by order of the Bankruptcy Court.

6.      *Funding of Unsecured Creditor Trust*. The Unsecured Creditor Trust shall be funded by the Unsecured Creditor Trust Assets.

7.      *Transfer of Certain Estate Assets to Unsecured Creditor Trust*. On the Effective Date, the Debtor, on behalf of its itself and the Estate, shall transfer to the Unsecured Creditor Trust all of its right, title, and interest the Unsecured Creditor Trust Assets, including, without limitation, all Avoidance Actions and Causes of Action. For avoidance of doubt, the Causes of Action shall be deemed to have been automatically assigned and transferred to the Unsecured Creditor Trust on the Effective Date without the need for any further conveyance or assignment document. Upon the Effective Date, the Unsecured Creditor Trust shall be deemed to be substituted for, without further order of any court, the plaintiff in such claims and causes of action. Any recoveries on account of the Claims and Causes of Action transferred to the Unsecured Creditor Trust shall be distributed in accordance with the Plan.

8.      *Purpose of the Unsecured Creditor Trust*. The Unsecured Creditor Trust shall be established for the sole purpose of liquidating and distributing the Unsecured Creditor Trust Assets and the proceeds thereof through the activities set forth in section 5.5 of the Plan and consistent with Treasury Regulation section 301.7701-4(d) and Revenue Procedure 94-45, with no objective to continue or engage in the conduct of a trade or business.

9.      *Federal Income Tax Treatment of the Unsecured Creditor Trust*. The Unsecured Creditor Trust is intended to qualify as a liquidating trust for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity for U.S. federal income tax purposes, but is instead treated as a grantor trust, i.e., a pass-through entity. All parties must treat the transfer of the Unsecured Creditor Trust Assets to the Unsecured Creditor Trust as a transfer of such assets directly to the Unsecured Creditor Trust beneficiaries, followed by the transfer of such assets by the beneficiaries to the Unsecured Creditor Trust. Consistent therewith, all parties must treat the Unsecured Creditor Trust as a grantor trust of which the Unsecured Creditor Trust beneficiaries are the owners and grantors. The Unsecured Creditor Trust beneficiaries (and any subsequent holders of interests in the Unsecured Creditor Trust) generally should be treated for U.S. federal income tax purposes as the direct owners of an undivided interest in the Unsecured Creditor Trust Assets. The Unsecured Creditor Trustee shall determine the fair market value of the

43

Unsecured Creditor Trust Assets as soon as possible after the Effective Date, and all parties must consistently use this valuation for all U.S. federal income tax purposes.

10. *Indemnification*. The Unsecured Creditor Trustee and the Unsecured Creditor Trust Oversight Committee, and each of their respective designees, employees or professionals, or any duly designated agent or representative of the Unsecured Creditor Trustee or Unsecured Creditor Trust Oversight Committee, shall not be liable for any act or omission taken or omitted to be taken in their respective capacities other than for acts or omissions resulting from willful misconduct, gross negligence, or fraud as determined by Final Order of the Bankruptcy Court. The Unsecured Creditor Trust, Unsecured Creditor Trustee and the Unsecured Creditor Trust Oversight Committee may, in connection with the performance of their respective functions, and in their respective sole and absolute discretion, consult with attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such attorneys, accountants, financial advisors and agents, or any Final Order of the Bankruptcy Court. Notwithstanding such authority, the Unsecured Creditor Trust, Unsecured Creditor Trustee and Unsecured Creditor Trust Oversight Committee shall not be under any obligation to consult with attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability, unless such determination is based on willful misconduct, gross negligence or fraud as determined by Final Order of the Bankruptcy Court. The Unsecured Creditor Trust shall indemnify and hold harmless the Unsecured Creditor Trustee and the Unsecured Creditor Trust Oversight Committee and each of their respective designees and Professionals, and all duly designated agents and representatives thereof (in their capacity as such) from and against all liabilities, losses, damages, claims, costs and expenses, including, but not limited to attorneys' fees and costs arising out of or due to such actions or omissions, or consequences of their actions or omissions with respect or related to the performance of their duties or the implementation or administration of the Plan; provided however, that no such indemnification will be made to such Persons for such actions or omissions as a result of willful misconduct, gross negligence or fraud.

11. *Powers and Duties*. On the Effective Date, the Unsecured Creditor Trustee shall succeed to all of the rights of the Debtor with respect to the Unsecured Creditor Trust Assets necessary to protect, conserve, and liquidate all Unsecured Creditor Trust Assets, including, without limitation, control over (including the right to waive) all attorney-client privileges, work-product privileges, accountant-client privileges and any other evidentiary privileges relating to the Unsecured Creditor Trust Assets that, prior to the Effective Date, belonged to the Debtor pursuant to applicable law. The powers and duties of the Unsecured Creditor Trustee shall include, without further order of the Court, except where expressly stated otherwise, the rights:

i.      to invest Cash in accordance with § 345 of the Bankruptcy Code, and withdraw and make distributions of Cash to Holders of Allowed General Unsecured Claims and pay taxes and other obligations incurred by the Unsecured Creditor Trust in accordance with the Plan;

ii.     to receive, manage, invest, supervise, and protect the Unsecured Creditor Trust Assets, including paying taxes or other obligations incurred in connection with administering the Unsecured Creditor Trust Assets;

iii.    subject to the approval of the Unsecured Creditor Trust Oversight Committee, to engage attorneys, consultants, agents, employees and all professional persons, to assist the Unsecured Creditor Trust with respect to the Unsecured Creditor Trust's responsibilities;

iv.    subject to the approval of the Unsecured Creditor Trust Oversight Committee to pay the fees and expenses for the attorneys, consultants, agents, employees and professional persons engaged by the Unsecured Creditor Trust and the Unsecured Creditor Trust Oversight Committee and to pay all other expenses in connection with administering the Unsecured Creditor Trust Assets;

v.    to execute and deliver all documents, and take all actions, necessary to consummate the Plan and the responsibilities of the Unsecured Creditor Trust;

vi.    subject to the approval of the Unsecured Creditor Trust Oversight Committee, to dispose of, and deliver title to others of, or otherwise realize the value of, Unsecured Creditor Trust Assets;

vii.    subject to Section 9.15 of the Plan, to object to Claims against the Debtor;

viii.    subject to Section 9.15 of the Plan, upon agreement with the Plan Administrator, to compromise and settle Claims by and against the Debtor;

ix.    to act on behalf of the Unsecured Creditor Trust in all adversary proceedings and contested matters (including, without limitation, any Avoidance Actions and Causes of Action) assigned to the Unsecured Creditor Trust, then pending or that can be commenced in the Court and in all actions and proceedings pending or commenced elsewhere, and to settle, retain, enforce, or dispute any adversary proceedings or contested matters (including, without limitation, any Causes of Action) and otherwise pursue actions involving Unsecured Creditor Trust Assets that could arise or be asserted at any time under the Bankruptcy Code or otherwise, unless otherwise specifically waived or relinquished in the Plan, provided, however, that settlements by the Unsecured Creditor Trust of Causes of Action shall be subject to the approval of the Unsecured Creditor Trust Oversight Committee. The Unsecured Creditor Trust shall be authorized to enter into settlements of Causes of Action without a hearing or Court approval;

x.    with the approval of the Unsecured Creditor Trust Oversight Committee, abandon any Unsecured Creditor Trust Assets without the need for approval of the Court, and upon such abandonment, such Assets shall cease to be Unsecured Creditor Trust Assets; and

xi.    to the extent the Unsecured Creditor Trust retains any Cash after satisfaction of all of its obligations pursuant to the Plan, to transfer such remaining Cash to the Debtor.

In carrying out the powers and obligations in Section 5.5 of the Plan, the Unsecured Creditor Trustee shall reasonably consult with the Plan Administrator and Prepetition Bond Trustees, and with respect to matters set forth herein that require that the Unsecured Creditor Trustee to obtain the consent of the Plan Administrator or Prepetition Bond Trustees, shall obtain such consent prior to carrying out such powers and obligations.

### D.    Cooperation Between Plan Administrator and Unsecured Creditor Trust

The Plan Administrator and Unsecured Creditor Trust shall cooperate with one another, in good faith, and each shall make available to other, documents and data in the possession of one or the other as needed by the Plan Administrator and Unsecured Creditor Trust to carry out the purposes of the Plan.

### E.    Establishment of Reserves

1.    *Administrative Reserve.* On or prior to the Effective Date, the Administrative Reserve shall be established by the Plan Administrator with the consent of the Prepetition Bond Trustees, ACA, and the Committee or the Unsecured Creditor Trustee, as applicable. If the Plan Administrator determines that additional funding of the Administrative Reserve is required, from time to time, following the Effective Date, such funding shall be made from available Cash, if any, with the prior consent of the Prepetition Bond Trustees and ACA. The Administrative Reserve shall be used to pay the Post-Confirmation Expenses, including, without limitation, costs and expenses of professionals or other advisors retained by the Plan Administrator. For the avoidance of doubt, the fees and expenses of the Unsecured Creditor Trust, the Unsecured Creditor Trustee, and the Unsecured Creditor Trust Oversight Committee, and their respective professionals, shall be paid solely from the Unsecured Creditor Trust Assets.

2.    *Disputed Claim Reserves.* As soon as practicable following the Effective Date, Disputed Claim Reserves shall be established by the Plan Administrator and the Unsecured Creditor Trustee, if and as required; provided, however, that neither the Plan Administrator nor Unsecured Creditor Trustee shall have any obligation to fund the Disputed Claim Reserves until, at the latest, immediately prior to the making of a Distribution to holders of Allowed Claims. The Disputed Claim Reserves shall be funded from available Cash in the Debtor's Estate in the case of the Plan Administrator and from Unsecured Creditor Trust Assets in the case of the Unsecured Creditor Trustee, in an amount equal to the amount holders of Disputed Claims would have otherwise been entitled but for the dispute. The assets in the Disputed Claim Reserves shall be held separately from other assets held by the Plan Administrator and Unsecured Creditor Trustee, as applicable, subject to an allocable share of all expenses and obligations, on account of Disputed Claims. Funds shall be removed from the Disputed Claims Reserves as the Disputed Claims are resolved, which funds shall be distributed as provided in Section 9.20 of the Plan. Notwithstanding any other provision of the Plan to the contrary, subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary, the Plan Administrator and Unsecured Creditor Trustee may treat any assets allocable to, or retained on account of, the Disputed Claims Reserves as held by one or more discrete entities for federal, and applicable state, local or other, income tax purposes, and may determine that such entity or entities shall constitute "disputed ownership funds" under, and may make the election permitted by, Treasury Regulation

1.468B-9, or any successor provision thereto. All recipients of Distributions under the Plan shall be bound by, and shall report consistent with, such income tax treatment.

### F.      Preservation of Causes of Action

Except as otherwise provided in the Plan or in any contract, instrument, release or agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, all Claims or Causes of Action that the Debtor, the Committee, or the Estate may have against any person or entity are preserved, including without limitation any and all Causes of Action under sections 502, 510, 522(f), 522(h), 542, 543, 544, 545, 547, 548, 549, 550, 551, 553 and 724(a) of the Bankruptcy Code and as described in the Committee Standing Motion.

### G.      Disposition of Records

The Plan Administrator shall dispose of the Debtor's Records (as defined in the Records Disposition Order) consistent with the Records Disposition Order.

### H.      General Disposition of Assets

Pursuant to section 1123(a)(5) of the Bankruptcy Code and subject to the terms of the Plan, as soon as is reasonably practicable following the Effective Date, the Plan Administrator shall sell or otherwise dispose of, and liquidate to or otherwise convert to Cash, any non-Cash Assets (other than Unsecured Creditor Trust Assets) in such manner as the Plan Administrator shall determine is in the best interests of the Estate. For the avoidance of doubt, the disposition of Non-Estate Property and Restricted Assets is subject to the Non-Estate Property Procedures Order and such other further orders of the Bankruptcy Court.

### I.      Administrative Expense Claims Bar Date

With the exception of Professional Fee Claims, persons asserting and Administrative Expense Claim must file a request for payment of such Administrative Expense Claim on or before 5:00 p.m. prevailing Eastern Time on the date that is 30 days after notice of the Effective Date has been mailed (the "Administrative Expense Claims Bar Date"). No payment or Distributions will be made on account of any Administrative Expense Claim until such Claim becomes an Allowed Claim. Any person asserting an Administrative Expense Claim that fails to file and serve an Administrative Expense Claim on or before the Administrative Expense Claims Bar Date shall be forever barred from asserting any such right to payment as against the Debtor, its Estate and the Unsecured Creditor Trust.

### J.      Deadline for Filing Applications For Payment of Professional Fee Claims

All parties seeking payment of Professional Fee Claims arising prior to the Effective Date must file with the Bankruptcy Court a final application and/or an application for payment of reasonable fees and expenses on the date that is 30 days after notice of the Effective Date has been mailed (the "Fee Application Deadline"). Any Professional failing to file and serve such

application on or before the Fee Application Deadline shall be forever barred from asserting any such right to payment against the Debtor, its Estate and the Unsecured Creditor Trust.

### K.        Execution of Documents to Effectuate Plan

From and after the Effective Date, the Plan Administrator shall have the exclusive power and authority to execute any instrument or document to effectuate the provisions of the Plan, with the exception of any instrument or document relating to or intended to be prepared by the Unsecured Creditor Trust. Entry of the Confirmation Order shall authorize the Plan Administrator to take, or cause to be taken, all actions necessary or appropriate to consummate and implement the provisions of the Plan.  All such actions shall be deemed to have occurred and shall be in effect pursuant to applicable non-bankruptcy law and the Bankruptcy Code, without any requirement of further action.

### L.        Dissolution

1.        *Automatic Dissolution*.  Subject to earlier application by the Debtor and Order of this Court, as of August 15, 2019, the Debtor and its charter as an education corporation shall be deemed dissolved in accordance with applicable Sections of the Education Law of the State of New York.  Notwithstanding any prior stays or provisions of this Plan to the contrary and following August 15, 2019, the Board of Regents is permitted to take such administrative actions as it may deem appropriate to formally recognize the Debtor's dissolution and termination of its charter in accordance with the terms of this Plan.  No further notice, filings, payments, or other actions shall be required in furtherance of such dissolution by the Debtor or the Board of Regents. Notwithstanding dissolution as provided for herein, in accordance with Section 220(5) of the Education Law of the State of New York, the Plan Administrator is empowered to continue to settle the affairs of the Debtor in accordance with the terms of this Plan.

2.        *Dissolution of Board of Trustees and Authority of Plan Administrator*. Upon the Effective Date, the Debtor's Board of Trustees shall be dissolved and the members thereof shall have no further obligation or duty with respect to the Debtor, the Estate or the Chapter 11 Case.  Following the Effective Date, the Debtor, through the activities of the Plan Administrator, shall continue in existence for the purposes of, among other things, completing the liquidation of its Assets, winding up its affairs and making all appropriate tax related filings.  Upon the Effective Date, the Plan Administrator shall have exclusive authority to act for the Debtor in accordance with the terms of this Plan.

### M.        Post-Confirmation Reports and Fees

1.        *Reporting to Office of the United States Trustee*. Following the Effective Date and until the Chapter 11 Case is closed, not less than once every ninety (90) days, the Plan Administrator shall file all post-Effective Date reports required during such periods and shall pay from the Administrative Reserve all post-Effective Date fees charged or assessed against the Estate under 28 U.S.C. §1930 during such periods together with applicable interest pursuant to 31 U.S.C. § 3717. The Unsecured Creditor Trustee shall provide the Plan Administrator with records relating to its receipts and disbursements reasonably necessary for the Plan Administrator to comply with Section 5.16 of the Plan. The Unsecured Creditors Trust shall be responsible for its pro rata share

of post-Effective Date fees based upon its disbursements, and shall promptly remit such share of post-Effective Date fees to the Plan Administrator upon written request.

2.    *Reporting to Prepetition Bond Trustees*.  Unless otherwise agreed by the Plan Administrator and the Prepetition Bond Trustees, following the Effective Date and until the Chapter 11 Case is closed or the Claims in Classes 1, 2, 3, 4, 5, and 6 are paid in full, whichever comes first, the Plan Administrator shall provide periodic reports in a form reasonably agreed to by the Prepetition Bond Trustees, on a monthly basis, or upon reasonable request, with respect to the disposition of Assets remaining in the Estate, the Estate's current Cash, the costs incurred in completing the wind-down of the Estate, and such other information reasonably requested by the Prepetition Bond Trustees or any one of them.

## N.    Creditors' Committee

On the Effective Date, the Creditors' Committee shall be deemed to be dissolved and the members of the Creditors' Committee shall be released and discharged from all duties and obligations arising from or related to the Chapter 11 Case, provided, however, that the Creditors' Committee shall remain in existence for the purpose of reviewing and approving fee applications of its Professionals.

## O.    Insurance Preservation

Nothing in the Plan shall diminish or impair the enforceability of any Insurance Policies that may cover Claims against the Debtor, the Board of Trustees, or any other Person.

## P.    Claims Administration Responsibility

1.    *Reservation of Rights*.  Unless a Claim is specifically Allowed prior to or after the Effective Date, prior to the Effective Date, the Debtor and the Creditors' Committee, and after the Effective Date, the Plan Administrator and Unsecured Creditor Trust, reserve any and all objections to any and all Claims and motions or requests for the payment of Claims, whether administrative expense, secured or unsecured, including without limitation any and all objections to the validity or amount of any and all alleged Administrative Expense Claims, Priority Tax Claims, or Priority Non-Tax Claims, liens and security interests (except as to the Liens on the Collateral securing the Prepetition Bonds, which rights were waived by the Debtor pursuant to the DIP Order and relinquished by the Creditors' Committee pursuant to the Unsecured Creditor Settlement), whether under the Bankruptcy Code, other applicable law or contract.  The failure to object to any Claim prior to the Effective Date shall be without prejudice to the Plan Administrator and Unsecured Creditors Trust's rights to contest or otherwise defend against such Claim in the Bankruptcy Court when and if such Claim is sought to be enforced by the holder of the Claim.

2.    *Objections to Claims*.  Prior to the Effective Date, the Debtor and the Creditors' Committee shall be responsible for pursuing any objection to the allowance of any Claim.  From and after the Effective Date, the Plan Administrator and the Unsecured Creditor Trust may dispute, object to, compromise or otherwise resolve all Claims, in accordance with Sections 5.3 and 5.4 of the Plan.  Any compromise shall be approved by both the Plan

Administrator and Unsecured Creditor Trust. Unless otherwise provided in the Plan or ordered by the Bankruptcy Court, all objections to Claims shall be filed and served no later than one hundred eighty (180) days after the Effective Date, provided that the Plan Administrator or Unsecured Creditor Trust may request (and the Bankruptcy Court may grant) an extension of time by filing a motion with the Bankruptcy Court.

> 3.    *Filing Objections*.  An objection to a Claim shall be deemed properly served on the claimant if the Debtor, Committee, Plan Administrator or Unsecured Creditor Trust, as applicable, effect service of any such objection in accordance with Rule 3007 of the Bankruptcy Rules by mailing or otherwise delivering the objection and a notice of hearing thereon to the claimant at the address set forth on such claimant's proof of claim at least thirty (30) days prior to the hearing thereon. The Debtor, the Committee, the Plan Administrator or the Unsecured Creditor Trust, as applicable, may also effectuate service of an objection to a claim: (i) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (ii) to the extent counsel for a claimant is unknown, by first class mail, postage prepaid, to the signatory on the proof of claim or interest or other representative identified on the proof of claim or interest or any attachment thereto or; (iii) by first class mail, postage prepaid, on counsel that has appeared on the behalf of the claimant in the Chapter 11 Case.

> 4.    *Determination of Claims*.  Except as otherwise agreed by the Debtor, Committee, Plan Administrator or Unsecured Creditor Trust, any Claim as to which a proof of claim or motion or request for payment was timely filed in the Chapter 11 Case may be determined and liquidated after the Effective Date pursuant to (i) an order of the Bankruptcy Court (which order has not been stayed, reversed or amended and as to which determination or any revision, modification or amendment thereof, and the time to appeal or seek review or rehearing thereof, has expired, and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending), or (ii) applicable non-bankruptcy law.  Any Claim determined to be an Allowed Claim after the Effective Date pursuant to Section 9.15 of the Plan shall be treated as an Allowed Claim in accordance with the Plan.

### Q.    Disallowance of Claims without Further Order of the Court

As of the Effective Date, any Scheduled Claim designated as disputed, contingent or unliquidated in amount, and for which a proof of Claim has not been filed by the Creditor, shall be deemed disallowed and expunged.  All Scheduled Claims that correspond to a proof of Claim filed by a particular Creditor shall be deemed to have been superseded by such later filed proof of Claim and the Scheduled Claims, regardless of priority, and shall be expunged from the claims register; provided however, that such proofs of Claim shall be subject to objection in accordance with Section 9.15 of the Plan.

### R.    Timing of Distributions on Disputed Claims Subsequently Allowed

In the event that a Disputed Claim is Allowed, in whole or in part, after the Effective Date, a Distribution shall be made on account of such Allowed Claim on the next Distribution Date that is at least fifteen (15) business days after such Claim is Allowed.

**S.**    **Payment or Distribution of Disputed Claim**

Notwithstanding any provision of the Plan to the contrary, no payments or other Distributions shall be made on account of any Disputed Claim, or any portion thereof, unless and until such Claim or some portion thereof is allowed by Final Order of the Bankruptcy Court.  For the avoidance of doubt, no portion of any Disputed Claim is entitled to a Distribution.  Holders of Disputed Claims shall be bound, obligated and governed in all respects by the Plan.

**T.**    **Disputed Claims**

1.    Except to the extent the Court determines that a lesser amount is adequate, the Plan Administrator or Unsecured Creditor Trust, as applicable, shall, on each Distribution Date, deposit in a Disputed Claims Reserve, Cash equal to the Distributions that would have been made to holders of Disputed Claims if such Claims were Allowed Claims in their full amounts or such lower amount as to which the holder of such Claim has agreed in writing or, in the case where any such Claim is unliquidated and/or contingent, the greater of (i) $1, and (ii) such other amount as is reserved by order of the Bankruptcy Court made upon motion of the Debtor, the Unsecured Creditor Trust, or the holder of such Claim.

2.    For purposes of effectuating the provisions of Section 9.17 of the Plan and the Distributions to holders of Allowed Claims, the Court, upon the request of any holder of a Claim, on the one hand, or the Debtor or Committee, on the other hand, may liquidate the amount of Disputed Claims pursuant to section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated shall be deemed to be the aggregate amounts of the Disputed Claims pursuant to section 502(c) of the Bankruptcy Code for purposes of Distribution under the Plan and for purposes of the Disputed Claims Reserve.

3.    When a Disputed Claim becomes an Allowed Claim, there shall be distributed to the holder of such Allowed Claim, in accordance with the provisions of the Plan (but in no event later than the next succeeding Distribution Date), Cash in the amount of all Distributions to which such holder would have been entitled if such holder's Claim were Allowed on the Effective Date, to the extent of available Cash to make such Distribution.

4.    In no event shall any holder of any Disputed Claim be entitled to receive (under the Plan or otherwise) any Cash payment which is greater than the amount reserved, if any, for such Disputed Claim pursuant to Section 9.17 of the Plan.  In no event shall the Plan Administrator or Unsecured Creditor Trust have any responsibility or liability for any loss to or of any amount reserved under the Plan unless such loss is the result of that party's fraud, willful misconduct, or gross negligence.  In no event may any Creditor whose Disputed Claim is subsequently allowed, pursue or recover or from any other Creditor in respect of any funds received as Distributions under the Plan.

5.    To the extent that a Disputed Claim ultimately becomes an Allowed Claim and is entitled to a Distribution in an amount less than the amount reserved for such Disputed Claim, then on the next succeeding Distribution Date, the Plan Administrator or Unsecured Creditor Trust, as

applicable, shall make, in accordance with the terms of the Plan, a Distribution of the excess amount reserved for such Disputed Claim.

6.      Any Disputed Claims Reserve shall be treated as a disputed ownership fund, within the meaning of Treasury Regulation section 1.468B-9, for all purposes associated with taxation.

### U.      Limitations on Funding of Disputed Claims Reserve

Except as expressly set forth in the Plan, or otherwise agreed to in writing or ordered by the Court, neither the Plan Administrator nor the Unsecured Creditor Trust shall have any duty to fund the Disputed Claims Reserve.

### V.      Tax Requirements for Income Generated by Disputed Claims Reserve

The Plan Administrator or Unsecured Creditor Trust, as applicable, shall pay, or cause to be paid, out of the funds held in a Disputed Claims Reserve, any tax imposed by any federal, state, or local taxing authority on the income generated by the funds or property held in a Disputed Claims Reserve.   The Plan Administrator and Unsecured Creditor Trust, as applicable, shall file, or cause to be filed, any tax or information return related to a Disputed Claims Reserve that is required by any federal, state, or local taxing authority.

## VI.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.      General Provisions

All executory contracts and unexpired leases of the Debtor shall be deemed rejected as of the Effective Date, unless a particular executory contract or unexpired lease (i) has previously been assumed or rejected pursuant to order of the Bankruptcy Court or applicable provisions of the Bankruptcy Code, or (ii) has expired or otherwise terminated pursuant to its terms.

### B.      Notice of Deemed Rejection/Rejection Bar Date

Any party to an executory contract or unexpired lease that is rejected in accordance with Section 6.1 of the Plan shall file a proof of Claim for damages from such rejection no later than thirty (30) days after notice of the Effective Date is mailed.   The failure to timely file a proof of Claim shall be deemed a waiver of any Claim in connection with the rejection of such contract or lease.

### C.      Compensation and Benefit Programs

To the extent not previously terminated, all employment and severance agreements and policies, and all employee compensation and benefit plans, policies and programs of the Debtor applicable generally to its employees or officers in effect on the Effective Date, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit plans, incentive plans and life, accidental death and dismemberment insurance plans, shall be terminated as of the Effective Date.

## VII.    INJUNCTIONS; STAYS; RELEASE; EXCULPATIONS

### A.    General Injunctions

The following provisions shall apply and shall be fully set forth in the Confirmation Order.

### 1.    Injunctions Against Interference with Consummation or Implementation of Plan

All holders of Claims shall be enjoined from commencing or continuing any judicial or administrative proceeding or employing any process against the Debtor, the Estate, the Plan Administrator, the Unsecured Creditor Trust, the Unsecured Creditor Trustee, or the Unsecured Creditor Trust Oversight Committee with the intent or effect of interfering with the consummation and implementation of the Plan and the transfers, payments and Distributions to be made hereunder.

### 2.    Plan Injunction

Except as otherwise specifically provided for by the Plan, as of and from the Effective Date, all Persons shall be enjoined from (i) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order; (ii) the creation, perfection or enforcement of any encumbrance of any kind; and/or (iii) the assertion of any right of setoff, counterclaim, exculpation, or subrogation of any kind, in each case against the Debtor, the Estate, the Plan Administrator, the Unsecured Creditor Trust, the Unsecured Creditor Trustee, or the Unsecured Creditor Trust Oversight Committee (and its members) to the fullest extent authorized or provided by the Bankruptcy Code.

### 3.    Release of Collateral

Except as expressly provided otherwise in the Plan, unless a Holder of a Secured Claim receives a return of its Collateral in respect of such Claim under the Plan, each Holder of (A) an Allowed Secured Claim; and (B) an Allowed Claim that is purportedly secured, on the Effective Date shall (x) turn over and release to the Debtor any and all property that secures or purportedly secures such Claim; and (y) execute such documents and instruments as the Debtor requires to evidence such claimant's release of such property; and (ii) on the Effective Date, all claims, rights, title and interest in such property shall revert to the Debtor, free and clear of all Claims against the Debtor, including (without limitation) liens, charges, pledges, encumbrances and/or security interests of any kind. No Distribution hereunder shall be made to or on behalf of any Holder of such Claim unless and until such Holder executes and delivers to the Debtor such release of liens. Any such Holder that fails to execute and deliver such release of liens within 60 days of any demand thereof shall be deemed to have no further Claim and shall not participate in any Distribution hereunder. Notwithstanding the immediately preceding sentence, a Holder of a Disputed Claim shall not be required to execute and deliver such release of liens until the time such Claim is Allowed or Disallowed. In lieu of the foregoing, each Prepetition Bond Trustee shall execute documents and instruments as the Debtor or Plan Administrator reasonably requires from time to time to evidence the release of liens in Collateral.

B.    **Releases and Exculpations**

1.    **Releases by Debtor**

Upon the Effective Date, the Debtor, on behalf of itself and the Estate, conclusively, absolutely, unconditionally, irrevocably and forever releases and discharges each of the Debtor Released Parties of and from any and all past, present and future legal actions, causes of action, choses in action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, amounts paid in settlement, costs, fees, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind, character or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under applicable non bankruptcy law, and any and all alter-ego, lender liability, indemnification or contribution theories of recovery, and interest or other costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may have heretofore accrued, occurring from the beginning of time to and including the Effective Date and/or related in any way to, directly or indirectly, and/or arising out of and/or connected with, the Debtor and its Estate, the Chapter 11 Case,  the DIP Note, the Prepetition Bond Documents, the Debtor's financial statements and/or the Debtor's cessation of operations (including any such claims based on theories of alleged negligence, misrepresentation, nondisclosure or breach of fiduciary duty); provided, however, that nothing in Section 8.2(a) of the Plan shall (i) affect the liability of any Person due to fraud, willful misconduct, or gross negligence, as determined by a Final Order; and (ii) liability for any debt owed to the United States Government, any state, city or municipality arising under (a) the Internal Revenue Code or any state, city or municipal tax code, (b) the environmental laws  of the United States or any state, city or municipality, (c) laws regarding the regulation of securities administered by the Securities and Exchange Commission or (d) any criminal laws of the United States, any state, city or municipality, provided, further, for the avoidance of doubt, that nothing herein shall be deemed or construed to release any Causes of Action transferred to the Unsecured Creditor Trust as provided in section 5.4(g) of the Plan.   From and after the Effective Date, a copy of the Confirmation Order and the Plan shall constitute, and may be submitted as, a complete defense to any claim or liability released pursuant to the Plan.

2.    **Release by ACA and Prepetition Bond Trustees**

Upon the Effective Date, ACA and each of the Prepetition Bond Trustees conclusively, absolutely, unconditionally, irrevocably and forever releases and discharges each of the Prepetition Bond Trustees' Released Parties of and from any and all past, present and future legal actions, causes of action, choses in action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, amounts paid in settlement, costs, fees, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind, character or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under applicable non bankruptcy law, and any and all alter-ego, lender liability, indemnification or contribution theories of recovery, and

interest or other costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may have heretofore accrued, occurring from the beginning of time to and including the Effective Date and/or related in any way to, directly or indirectly, and/or arising out of and/or connected with, the Debtor and its Estate, the Chapter 11 Case, the DIP Note, the Prepetition Bond Documents, the Debtor's financial statements and/or the Debtor's cessation of operations (including any such claims based on theories of alleged negligence, misrepresentation, nondisclosure or breach of fiduciary duty); **provided**, **however**, that nothing in Section 8.2(b) of the Plan shall (i) affect the liability of any Person due to fraud, willful misconduct, or gross negligence, as determined by a Final Order; and (ii) liability for any debt owed to the United States Government, any state, city or municipality arising under (a) the Internal Revenue Code or any state, city or municipal tax code, (b) the environmental laws of the United States or any state, city or municipality, (c) laws regarding the regulation of securities administered by the Securities and Exchange Commission or (d) any criminal laws of the United States, any state, city or municipality. From and after the Effective Date, a copy of the Confirmation Order and the Plan shall constitute, and may be submitted as, a complete defense to any claim or liability released pursuant to the Plan.

3.  **Exculpation**

As of the Confirmation Date, the Debtor, its directors, trustees (including the Board of Trustees), officers, employees, and professionals (including professional firms and individuals within such firms) shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. To the fullest extent permitted by section 1125(e) of the Bankruptcy Code, the Debtor, its directors, trustees (including the Board of Trustees), officers, employees, and professionals (including professional firms and individuals within such firms), the DIP Lenders, ACA, the Prepetition Bond Trustees, the Creditors' Committee, and their respective members (acting in such capacity), employees and professionals (including professional firms and individuals within such firms), shall not have or incur any liability to any holder of any Claim or any other Person for any act or omission taken or not taken in good faith in connection with, or arising out of, the Chapter 11 Case, the Disclosure Statement, the Plan, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any act taken or omitted to be taken during the Chapter 11 Case, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, including, without limitation, the steps taken to effectuate the transactions described in Article 5 of the Plan, the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions constituting fraud, willful misconduct or gross negligence as determined by a Final Order; and in all respects such parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

### C.     No Bar to Claims Against Third Parties

Except as set forth in the Plan, Holders of Claims against the Debtor are not barred or otherwise enjoined by the Plan from pursuing any recovery against Persons that are not the Debtor.

### D.     All Distributions Received in Full and Final Satisfaction

Except as otherwise set forth in the Plan, all payments, all Distributions to be made in accordance with the Plan on account of Claims, and all rights conferred under the Plan shall be received in full and final satisfaction of the Estate's obligations for such Claims as against the Debtor, its property and the Estate.

### E.     No Modification of Res Judicata Effect

The provisions of Article 8 of the Plan are not intended, and shall not be construed, to modify the res judicata effect of any order entered in the Chapter 11 Case, including, without limitation, the Confirmation Order and any order finally determining Professional Fee Claims to any Professional.

### F.     Cancellation of Prepetition Bonds and Prepetition Bond Documents

#### 1.     *Cancellation of Prepetition Bonds*

On the Effective Date, or as soon thereafter as reasonably practicable, except as described in Section VII.F.2, below, the Prepetition Bonds shall be cancelled contemporaneously with the distribution of assets to Registered Holders of such Prepetition Bonds by the Prepetition Bond Trustees.

#### 2.     *Survival of Portions of the Prepetition Bond Documents*

On the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, the Prepetition Bonds and Prepetition Bond Documents, including the Prepetition Indentures, shall be deemed cancelled as permitted by section 1123(a)(5)(f) of the Bankruptcy Code (a) with respect to all rights and obligations of the Debtor under such Prepetition Bond Documents and (b) with respect to the rights and obligations of the Prepetition Bond Trustees under the Prepetition Bond Documents with respect to the holders of Prepetition Bonds. Notwithstanding the foregoing, the Prepetition Bond Documents shall remain in effect solely to the extent they relate to and are necessary to (i) allow applicable distributions pursuant to the Plan, (ii) permit each of the Prepetition Bond Trustees (and ACA, with respect to the Prepetition Series 2006 Bonds) to be compensated for fees and reimbursed for expenses including expenses of their respective professionals, assert their respective charging liens, enforce their respective indemnities and other rights and protections with respect to and pursuant to the Prepetition Bond Documents, (iii) permit each of the Prepetition Bond Trustees (and ACA, with respect to the Prepetition Series 2006 Bonds) to set one or more record dates and distribution dates with respect to the distribution of funds to beneficial holders of the Prepetition Bonds, as applicable, (iv) otherwise govern the relationship between each of the Prepetition Bond Trustees (and ACA, with respect to the

Prepetition Series 2006 Bonds) and the respective Registered Holders and beneficial owners of the Prepetition Bonds, (v) permit each of the Prepetition Bond Trustees (and ACA, with respect to the Prepetition Series 2006 Bonds) to appear in the Chapter 11 Case, (vi) solely with respect to the Prepetition Series 2006 Bonds, to permit Registered Holders thereof to continue to receive the benefit of the ACA Insurance Policy, and (vii) permit each of the Prepetition Bond Trustees (and ACA, with respect to the Prepetition Series 2006 Bonds) to perform any functions that are necessary in connection with the foregoing clauses (i) through (vi).

### G.      No Discharge

Pursuant to Bankruptcy Code § 1141(d)(3), the Confirmation Order will not discharge the Debtor of any debts.

## VIII.   <u>CONDITIONS PRECEDENT</u>

### A.      <u>Conditions Precedent to Confirmation of the Plan</u>

The following conditions must be satisfied, or otherwise waived in accordance with Section 7.3 of the Plan, on or before the Confirmation Date:

1.      The Disclosure Statement Approval Order shall have been entered and shall have become a Final Order; and

2.      The entry of the Confirmation Order shall be in form and substance reasonably satisfactory to the Debtor, the Prepetition Bond Trustees, and the Creditors' Committee, and shall contain provisions that, among other things: (i) authorize the implementation of the Plan in accordance with its terms; (ii) approve in all respects the other settlements, transactions, and agreements to be effected pursuant to the Plan; (iii) find that the Plan complies with all applicable provisions of the Bankruptcy Code, including that the Plan was proposed in good faith and that the Confirmation Order was not procured by fraud; (iv) approve the Plan Administrator Agreement; (v) approve the Unsecured Creditor Trust Agreement; and (vi) establish the Administrative Expense Claims Bar Date.

### B.      <u>Conditions Precedent to the Effective Date</u>

The Effective Date shall not occur and no obligations under the Plan shall come into existence, unless each of the following conditions is met or, alternatively, is waived in accordance with Section 7.3 of the Plan, on or before the Effective Date:

1.      The closing of the sale of the Brookhaven Campus sale shall have occurred;

2.      The Confirmation Order shall have been entered and no stay of its effectiveness of the same shall have been issued within fourteen (14) days following the entry of the Confirmation Order;

3.      The Confirmation Order shall have authorized and approved the appointment of the Plan Administrator, the Unsecured Creditor Trustee and the Unsecured Creditor Trust Oversight Committee;

4.      The Debtor shall have sufficient Cash on hand to pay all Administrative Expense Claims and fund the Administrative Reserve; and

5.      The Wind-Down Budget shall be agreed to by the Plan Administrator and the Prepetition Bond Trustees.

### C.      <u>Waiver of Conditions Precedent</u>

Each of the conditions precedent in Sections 7.1 and 7.2 of the Plan may be waived or modified without further Court approval, in whole or in part, but only with the consent of each of the Debtor, the Prepetition Bond Trustees, ACA, and the Creditors' Committee.

## IX.    <u>PROCEDURES FOR DISTRIBUTIONS UNDER PLAN</u>

Article 9 of the Plan establishes the procedures and guidelines for Distributions to be made to the terms of the Plan to the holders of Claims, including the timing, procedures and notice provisions related to same.  Distributions shall be made by the Plan Administrator and Unsecured Creditor Trust as follows.

### A.      **Distributions by Plan Administrator and Unsecured Creditor Trust**

1.      *Generally*

The Plan Administrator shall make Distributions on account of Administrative Expense Claims, the DIP Term Loans, Priority Tax Claims, Professional Fee Claims, Class 1 (Prepetition Series 1996 Bonds), Class 2 (Prepetition Series 2002 Bonds), Class 3 (Prepetition Series 2006 Bonds), Class 4 (Prepetition Series 2015 Bonds), Class 5 (Other Secured Claims) and Class 6 (Priority Non-Tax Claims) in accordance with Article 4 of the Plan. The Unsecured Creditor Trust shall make Distributions on account of Class 7 (General Unsecured Claims) in accordance with Article 4 of the Plan. The foregoing responsibilities are mutually exclusive. The Plan Administrator and Unsecured Creditor Trustee may each use the services of a third party to aid in the Distributions required to be made under the Plan, including the Distribution Agent. If the Plan Administrator and Unsecured Creditor Trustee each choose to use the Distribution Agent or another single agent, each of the Estate (for Distributions made by the Plan Administrator) and the Unsecured Creditor Trust (for Distributions made by the Unsecured Creditors Trust) shall contract separately with such third party and shall be responsible for the payment of fees and costs related to such services rendered to the Plan Administrator and Unsecured Creditors Trust, respectively.

2.      *Distributions on Account of Prepetition Bonds*

Distributions on account of the Prepetition Bonds shall be made to the applicable Prepetition Bond Trustee in accordance with the applicable Prepetition Indenture. Distributions on account of such claims shall be deemed complete upon delivery to the applicable Prepetition Bond Trustee. Notwithstanding the foregoing, Distributions on account of the Prepetition 2006 Bonds shall be made to ACA, as subrogee of the Prepetition Series 2006 Bond Trustee.

### B.    Indefeasibility of Distributions

All Distributions made under the Plan shall be indefeasible.

### C.    Frequency of Distributions

The Plan Administrator and Unsecured Creditor Trust, as applicable, shall make distributions not less than two times per year, or such other times that they determine appropriate, in their discretion.

### D.    Payments in U.S.  Dollars

All Cash payments required under the Plan shall be made in U.S. dollars by checks drawn on domestic bank(s) selected by the Plan Administrator or the Unsecured Creditor Trustee in accordance with the Plan or by wire transfer from a domestic bank.

### E.    Claims In U.S. Dollars

Any Claims asserted in foreign currencies shall be converted to United States Dollars in accordance with the prevailing exchange rates published by the Wall Street Journal on the Confirmation Date.

### F.    Distributions Only on Business Days

Notwithstanding the foregoing provisions, if any Distribution called for under the Plan is due on a day other than a Business Day, then such Distribution shall instead be due the next Business Day.

### G.    Transmittal of Payments and Notices

Except as otherwise provided in the Plan, all Distributions shall be made to the holder of a Claim by regular first-class mail, postage prepaid, in an envelope addressed to such holder at the address listed on its proof of Claim filed with the Bankruptcy Court or, if no proof of Claim was filed, (i) at the address listed on the Debtor's Schedules, or (ii) at such address that a holder of a Claim provides the Plan Administrator or Unsecured Creditor Trust, as applicable, after the Effective Date in writing at least fifteen (15) business days prior to a Distribution Date. Neither the Plan Administrator nor the Unsecured Creditor Trustee shall have any duty to ascertain the mailing address of any holder of a Claim other than as set forth herein. The date of payment or delivery shall be deemed to be the date of mailing. Payments made in accordance with the provisions of this Section shall be deemed made to the holder regardless of whether such holder actually receives the payment.

### H.    Record Date for Distributions

Except as otherwise provided in a Final Order of the Bankruptcy Court, transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 with appropriate filings ("Claim Transfer Document") made on or before the Effective Date (the "Distribution Record Date") shall

be treated as the holders of those Claims for all purposes of the Plan, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer(s) may not have expired prior to the Distribution Record Date.  Neither the Plan Administrator nor the Unsecured Creditor Trust shall have any obligation to recognize any transfer of any Claim occurring after the Distribution Record Date.    In making a Distribution with respect to any Claim, the Plan Administrator or Unsecured Creditor Trust, as applicable, shall be entitled to recognize and deal for all purposes hereunder only with the Person who is listed on the proof of claim filed with respect to such Claim, on the Debtor's Schedules as the holder thereof, and upon such other evidence or record of transfer or assignment filed as of the Distribution Record Date. For the avoidance of doubt, the foregoing shall not apply to distributions any Prepetition Bond Trustee may make to beneficial owners of Prepetition Bonds from funds it receives based on its Allowed Claims under the Plan. Each Prepetition Bond Trustee may set record and distribution dates with respect to distributions it makes to beneficial owners of Prepetition Bonds under the Prepetition Indentures.

### I.    Unclaimed Distributions

Unclaimed Distributions (including Distributions made by checks that fail to be cashed or otherwise negotiated within ninety (90) days after the Distribution Date or which Distributions are returned to the Plan Administrator or Unsecured Creditor Trust as undeliverable to the addresses of record as of the Record Date, shall be canceled (by a stop payment order or otherwise), the Claim(s) relating to such Distribution(s) shall be deemed forfeited and expunged without any further action or order of the Bankruptcy Court.  Any such Unclaimed Distributions shall, as soon as is practicable, be redistributed pursuant to the provisions of the Plan.

### J.    No Payments of Fractional Cents or Distributions of Less Than One Hundred Dollars

1.    Notwithstanding any provision to the contrary in the Plan, for purposes of administrative convenience, no payment of fractional cents shall be made pursuant to the Plan. Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding of such fraction to the nearest whole penny (up or down), with a half-penny or less being rounded down and fractions in excess of half of a penny being rounded up.

2.    Notwithstanding any provision to the contrary herein, for purposes of administrative convenience, no Distribution of less than One Hundred Dollars ($100) shall be made pursuant to the Plan.   Whenever any Distribution of less than One Hundred Dollars ($100) under the Plan would otherwise be required, such funds will be retained by the Plan Administrator or Unsecured Creditor Trust, as applicable, for the account of the recipient until such time that successive Distributions aggregate to One Hundred Dollars ($100), at which time such payment shall be made, and if successive Distributions do not ever reach One Hundred Dollars ($100) in the aggregate, then such Distributions shall revert to the Estate or Unsecured Creditor Trust, as applicable, and redistributed in accordance with the Plan.

### K.      Setoff and Recoupment

Except as otherwise provided in the Plan, the Plan Administrator and Unsecured Creditor Trust may, but shall not be required to, set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims, defenses or Causes of Action of any nature whatsoever that the Plan Administrator may have, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Plan Administrator or the Unsecured Creditor Trust of any right of setoff or recoupment against the holder of any Claim.

### L.      Payment of Taxes on Distributions Received Pursuant to the Plan

1.      Notwithstanding any provision to the contrary herein, as a condition to payment of any Distribution to a Creditor under the Plan, each Creditor shall provide a valid tax identification or social security number (collectively the "Tax Information") for purposes of tax reporting by the Plan Administrator or Unsecured Creditor Trust, as applicable.  All Persons that receive Distributions under the Plan shall be responsible for reporting and paying, as applicable, any taxes on account of their Distributions.

2.      At such time as the Plan Administrator or the Unsecured Creditor Trust, as applicable, believes that Distributions to a particular Class of Claims is likely, the Plan Administrator or Unsecured Creditor Trust, as applicable, shall request Tax Information in writing from Creditors (the "Tax Information Request").  Any Creditor who fails to respond to Tax Information Request within ninety (90) days from the date posted on the Tax Information Request, shall forfeit all Distributions such Creditor may otherwise be entitled to under the Plan and such forfeited funds will revert to the Debtor or Unsecured Creditor Trust, as applicable, to be disbursed in accordance with the terms and priorities established in the Plan; provided, however that section 9.12 of the Plan shall not apply to any Creditor who receives a Distribution pursuant to the Employee Settlement Agreement.

### M.      Compliance With Tax Withholding and Reporting Requirements

With respect to all Distributions made under the Plan, the Debtor and the Unsecured Creditor Trust will comply with all withholding and reporting requirements of any federal, state, local or foreign taxing authority.

### N.      Disputed Distribution

If a dispute arises as to the identity of a holder of an Allowed Claim who is to receive a Distribution, the Plan Administrator or Unsecured Creditor Trust, as applicable, may, in lieu of making such Distribution to such holder, hold such amount until the dispute is resolved by Final Order of the Bankruptcy Court or by written agreement among the parties to such dispute.

## X.    RETENTION OF JURISDICTION BY BANKRUPTCY COURT

From the Confirmation Date until entry of a final decree closing the Chapter 11 Case, the Bankruptcy Court shall retain such jurisdiction as is legally permissible over the Chapter 11 Case for the following purposes:

(a) to hear and determine any and all objections to the allowance of any Claim, or any controversy as to the classification of Claims or any matters which may directly, indirectly or contingently affect the obligations of the Debtor or Unsecured Creditor Trust to any Creditors, holders of Claims, or other parties in interest;

(b) to hear and determine any and all applications for compensation and reimbursement of expenses by Professionals;

(c) to hear and determine any and all pending motions for the assumption or rejection of executory contracts and unexpired leases, and to fix any Claims resulting therefrom;

(d) to adjudicate through final judgment such contested matters and adversary proceedings as may be pending or subsequently initiated in the Court including, but not limited to, the Causes of Action. For the avoidance of doubt, the Bankruptcy Court shall retain jurisdiction to hear and determine compromises and settlements of any and all Causes of Action;

(e) to enforce and interpret the provisions of the Plan, the Confirmation Order, the Plan Administrator Agreement and the Unsecured Creditor Trust Agreement;

(f) to hear and determine any matters relating to the appointment and replacement of the Plan Administrator and Unsecured Creditor Trustee;

(g) to issue any injunction or other relief appropriate to implement the intent of the Plan, and to enter such further orders enforcing any injunctions or other relief issued under the Plan or pursuant to the Confirmation Order;

(h) to modify the Plan pursuant to section 1127 of the Bankruptcy Code and the applicable Bankruptcy Rules;

(i) to correct any defect, cure any omission, or reconcile any inconsistency in the Plan, the Confirmation Order, the Plan Administrator Agreement, or the Unsecured Creditor Trust Agreement as may be necessary to carry out the purposes and the intent of the Plan;

(j) to interpret and determine such other matters as the Confirmation Order may provide for, or as may be authorized under the Bankruptcy Code; and

(k) to enter and implement such orders as may be appropriate in the event the Confirmation Order is, for any reason, stayed, reversed, revoked, modified or vacated.

## XI.    CERTAIN TAX CONSEQUENCES OF THE PLAN

### A.    General

**THE DESCRIPTION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN PROVIDED BELOW IS LIMITED TO THE SPECIFIC FEDERAL INCOME TAX MATTERS DESCRIBED HEREIN.    IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE FEDERAL INCOME**

TAX CONSEQUENCES OF THE PLAN OR OTHER FEDERAL INCOME TAX MATTERS DISCUSSED HEREIN AND THIS DISCUSSION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES. EACH TAXPAYER IS STRONGLY URGED TO SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM SUCH TAXPAYER'S INDEPENDENT TAX ADVISOR.

THE DESCRIPTION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN PROVIDED BELOW IS SOLELY FOR THE PURPOSE OF COMPLIANCE WITH SECTION 1125(a) OF THE BANKRUPTCY CODE. THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "INTERNAL REVENUE CODE") TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION MAY HAVE RETROACTIVE EFFECT, WHICH MAY CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW. NO RULING HAS BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE (THE "IRS") AND NO LEGAL OPINION HAS BEEN REQUESTED FROM COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN, AND NO TAX OPINION OR ADVICE IS GIVEN BY THIS DISCLOSURE STATEMENT.

This description does not cover all aspects of federal income taxation that may be relevant to the Debtor or Holders of Claims.  For example, the description does not address issues of special concern to certain types of taxpayers, such as dealers in securities, life insurance companies, financial institutions, tax exempt organizations and foreign taxpayers, nor is it intended to address all of the possible federal income tax consequences to Holders of Claims against the Debtor. This description also does not discuss the possible state tax or non-U.S. tax consequences that might apply to the Debtor or to Holders of Claims.

**B.**     **Tax Consequences of Payment of Allowed Claims**
           **Pursuant to Plan Generally**

The federal income tax consequences of the implementation of the Plan to the Holders of Allowed Claims will depend, among other things, on the consideration to be received by the Holder, whether the Holder reports income on the accrual or cash method, whether the Holder's Claim is Allowed or Disputed on the Effective Date, and whether the Holder has taken a bad debt deduction or a worthless security deduction with respect to its Claim.  All Holders of Claims are urged to consult with their tax advisors concerning the tax consequences applicable under the Plan. Nothing contained herein shall be relied upon as tax advice.

1.     *Recognition of Gain or Loss*

In general, a Holder of an Allowed Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the Holder's tax basis in the Claim. Any

gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the Holder, the length of time the Holder held the Claim and whether the Claim was acquired at a market discount or premium. If the Holder realizes a capital loss, the Holder's deduction of the loss may be subject to limitation. The Holder's tax basis for any property received under the Plan generally will equal the amount realized.

### 2. *Bad Debt or Worthless Security Deduction*

A Holder who receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166 of the Internal Revenue Code. The rules governing the availability, character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### 3. *Receipt of Interest*

The Plan does not address the allocation of the aggregate consideration to be distributed to Holders between principal and interest and the Debtor cannot make any representations as to how the IRS will address the allocation of consideration under the Plan. In general, to the extent that any amount of consideration received by a Holder is treated as received in satisfaction of unpaid interest that accrued during such Holder's holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income and not otherwise exempt from U.S. federal income tax). Conversely, a Holder may be allowed a bad debt deduction to the extent any accrued interest was previously included in its gross income but subsequently not paid in full. However, the IRS may take the position that any such loss must be characterized based on the character of the underlying obligation, such that the loss will be a capital loss if the underlying obligation is a capital asset. Again, Holders of Allowed Claims should address all potential tax implications with their own tax advisors.

## XII. <u>CONFIRMATION OF PLAN – REQUIREMENTS</u>

In order for the Plan to be confirmed, the Bankruptcy Code requires, among other things, that the Plan be proposed in good faith, that the Debtor disclose specified information concerning payments made or promised to insiders, and that the Plan comply with the applicable provisions of chapter 11 of the Bankruptcy Code. Section 1129(a) of the Bankruptcy Code also requires that at least one Class of Claims has accepted the Plan ("<u>Minimum Voting Threshold</u>"), that Confirmation of the Plan is not likely to be followed by the need for further financial reorganization, and that the Plan be fair and equitable with respect to each Class of Claims that is impaired under the Plan. The Bankruptcy Court can confirm the Plan if it finds that all of the requirements of section 1129(a) have been met. The Debtor believes that the Plan meets all of these required elements. With respect to the so-called "feasibility" test (i.e., that the Plan is not likely to be followed by the need for further financial reorganization), the Plan provides for an

orderly liquidation of the Debtor's assets and the Debtor believes that it will be able to consummate the Plan fully.

In the event that a Class of Claims votes to reject the Plan, the Plan does not satisfy all of the requirements of Section 1129(a) of the Bankruptcy Code.  Although the Minimum Voting Threshold is not met, the Bankruptcy Court nevertheless may confirm the Plan under the "cram down" provisions of Section 1129(b) of the Bankruptcy Code if all of the other provisions of Section 1129(a) of the Bankruptcy Code are met.  Thus, the Debtor presently intends, to the extent necessary, (i) to undertake to have the Bankruptcy Court confirm the Plan under the "cram down" provisions of Section 1129(b) of the Bankruptcy Code, and (ii) to amend the Plan to the extent necessary to obtain entry of the Confirmation Order.

In order to confirm a Plan over the dissenting vote of an impaired Class under Section 1129(b) of the Bankruptcy Code that satisfies the remaining provisions of Section 1129(a) of the Bankruptcy Code, the Bankruptcy Court, on request of the proponent of a plan, "shall" confirm the Plan if the Plan does not discriminate unfairly, and is fair and equitable with respect to each Class of Claims that is impaired under, and has not accepted, the Plan.  For purposes of Section 1129(b) of the Bankruptcy Code, a Plan is "fair and equitable" with respect to a class of unsecured Creditors if, at a minimum, it satisfies the "absolute "priority rule" and the "best interests of creditors test."

### A.    Absolute Priority Rule

To satisfy the absolute priority rule, the Plan must provide that the holder of any Claim that is junior to the Claims of the dissenting Class will not receive or retain under the Plan on account of such junior Claim any property unless the Claims of the dissenting Class are paid in full.

The Debtor believes that the Plan satisfies the absolute priority rule.  The Debtor further believes that all non-accepting impaired Classes will receive or retain payment or Distribution, as the case may be, on account of their Claims, sufficient to permit full satisfaction of such Claims before junior Classes receive or retain any property on account of such junior Claims.

### B.    Best Interest of Creditors Test; Liquidation Analysis

Under the best interest of creditors test, the Plan is confirmable if, with respect to each impaired Class of Claims, each holder of an Allowed Claim in such Class has either (i) accepted the Plan, or (ii) receives or retains under the Plan, on account of its Claim, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtor were to be liquidated under chapter 7 of the Bankruptcy Code.

To determine what the holders of each Class of Claims would receive if the Debtor were to be liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets in a chapter 7 liquidation case.  The amount that would be available for satisfaction of the Allowed Claims of the Debtor would consist of the proceeds resulting from the disposition of the assets of the Debtor augmented by the cash held by the Debtor at the time of the commencement of the chapter 7 case.

Such amounts would be reduced by the costs and expenses of the liquidation and by such additional Administrative Expense Claims and other priority Claims that might result from the chapter 7 case.

Here, the Debtor's primary assets, namely the Oakdale Campus and the Brookhaven Campus, have been liquidated or are in the process of being liquidated as of the date of this Disclosure Statement. The Plan contemplates the creation of a Plan Administrator to continue the wind-down of the Debtor's estate, and the Unsecured Creditor Trust to liquidate the Unsecured Creditor Trust Assets, including the pursuit of Causes of Action. The Debtor believes that a conversion of the Chapter 11 Case to chapter 7 would simply duplicate an orderly plan process, and that Creditors would be harmed by the delay and expense that would result.

To determine if the Plan, as proposed, is in the best interests of Creditors, the present value of the Distribution likely to be made to each class in a liquidating case are compared with the present value of the Distribution to each impaired Class provided for by the Plan.

In applying the best interest test, it is possible that Claims in a chapter 7 case may not be classified in the same manner as provided for by the Plan. Priorities and order of Distribution of estate assets are established by the applicable provisions of chapter 7. Under those provisions, each class of Claims is paid in a descending order of priority. No junior classes of Claims are paid until all senior classes have received payment in full. In the event that available assets are insufficient to pay all members of such class in full, then each member of the class shares on a pro rata basis.

The Debtor believes that the primary advantages of the Plan over a chapter 7 liquidation is that Creditors will likely receive more under the Plan than they would in a chapter 7 case and receive their Distributions earlier. Costs would increase by the amount of the additional administrative expenses likely to be incurred in such a chapter 7 case, including the costs of time-consuming investigations and discovery. The process of other Claims resolution will proceed without the necessity for additional investigation by a chapter 7 trustee and its separate and new professionals, the Plan offers the opportunity to avoid additional administrative costs and the resulting delay which would result from a chapter 7 liquidation. The Debtor therefore believes that the Plan will result in lower total administrative costs, and higher recoveries for Creditors than would the liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code. A liquidation analysis that demonstrates the lower recovery for creditors in a chapter 7 liquidation is annexed hereto as **Exhibit A**.

Thus, the Debtor believe the Plan satisfies the "best interests of creditors test," and, indeed, that the Plan is in the best interests of Creditors.

## XIII.  PLAN RELATED RISK FACTORS AND ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.  Certain Bankruptcy-Related Considerations

1.  *Parties in Interest May Object to the Debtor's Classification of Claims*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim in a particular class only if such claim is substantially similar to the other claims in such class. The Debtor believes that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. *Risk of Plan Not Being Confirmed*

Although the Debtor believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications of the Plan will not be required for Confirmation, that any negotiations regarding such modifications would not adversely affect the holders of the Allowed Claims or that any such modifications would not necessitate the re-solicitation of votes.

### 3. *Nonconsensual Confirmation*

As set forth above, in the event any impaired class of claims does not accept a plan, a bankruptcy court may nevertheless confirm such plan of liquidation at the proponent's request if at least one impaired class has accepted the plan of liquidation (with such acceptance being determined without including the acceptance of any "insider" in such class) and, as to each impaired class which has not accepted the plan of liquidation, the bankruptcy court determines that the plan of liquidation "does not discriminate unfairly" and is "fair and equitable" with respect to non-accepting impaired classes.

In the event that any Impaired Class of Claims fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code, the Debtor reserves the right to seek nonconsensual confirmation of the Plan in accordance with section 1129(b) of the Bankruptcy Code.

### 4. *Risks that Conditions to Effectiveness Will Not Be Satisfied*

Article 7 of the Plan contains certain conditions precedent to the effectiveness of the Plan. There can be no assurances that the conditions contained in Article 7 of the Plan will be satisfied.

### 5. *Actual Plan Distributions May Be Less Than Estimated for Purposes of the Disclosure Statement*

The Debtor projects that the Claims asserted against the Debtor will be resolved in and reduced to an amount that approximates the estimates set forth herein. However, there can be no assurances that these estimates will prove accurate. In the event that the allowed amounts of such Claims are materially higher than the projected estimates, actual distributions to Holders of Allowed Claims could be materially less than estimated herein.

6.      *Claims Objections/Reconciliation Process*

The Debtor, the Plan Administrator, the Creditors' Committee and the Unsecured Creditor Trust, as applicable, reserve the right to object to the amount of any Claim, except as provided in the Plan.  The estimates set forth herein cannot be relied on by any Holder of a Claim whose Claim is subject to an objection.  Any such Holder of a Claim many not receive its specified share of the estimated distributions described in the Disclosure Statement.

### B.    **Alternatives to the Plan and Consequences of Rejection**

Among the possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan are the following: (i) an alternative plan could be proposed or confirmed; or (ii) the Chapter 11 Case could be converted to a liquidation case under chapter 7 of the Bankruptcy Code.

1.      *Alternative Plans*

With respect to an alternative plan, the Debtor has explored various alternative scenarios and believes that the Plan enables the Holders of Claims to realize the maximum recovery under the circumstances.  The Debtor believes that the Plan is the best plan that can be proposed and serves the best interests of the Debtor and other parties-in-interest.

2.      *Chapter 7 Liquidation*

As discussed above, with respect to each Class of Impaired Claims, either each Holder of a Claim of such Class has accepted the Plan, or will receive under the Plan on account of such Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtor was liquidated on such date under chapter 7 of the Bankruptcy Code. The Debtor believes that significant costs would be incurred by the Debtor as a result of the delay that would be caused by conversion of the Chapter 11 Case to a case under chapter 7, resulting in a reduced distribution to all Creditors.

## XIV.   **PROCEDURES FOR VOTING ON PLAN**

As noted above, pursuant to the Bankruptcy Code, a plan groups various claims into classes, each consisting of parties having similar legal rights in relation to a debtor.  Each class may then be treated as either "impaired" or "unimpaired" under a plan.  There are three ways in which a plan may leave a claim or interest "unimpaired." First, a plan may not propose to alter the legal, equitable or contractual rights of the holder of the claim or interest.  Second, all defaults (excluding those covered by Section 365(b)(2) of the Bankruptcy Code) may be cured and the original terms of the obligation reinstated.  Third, a plan may provide for the payment in full of the obligation to the holder of the claim or interest.  If a class is unimpaired, then it is conclusively presumed to vote in favor of a plan.

An impaired class that would receive nothing under a plan is deemed to have rejected such a plan.

An impaired class that is proposed to receive any Distribution (whether in Cash, securities or other property) has the right to vote, as a class, to accept or reject the plan. A class of Creditors accepts a plan if more than one-half (1/2) of the ballots that are timely received from members of such class, representing at least two thirds (2/3) of the dollar amount of Claims for which ballots are timely received, vote in favor of such plan. Section 1126(e) of the Bankruptcy Code provides that a Creditor's vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that the Creditor's vote either to accept or reject a plan was not solicited or cast in good faith, or in compliance with the Bankruptcy Code. A plan under which any class of Claims is impaired may be confirmed by the Bankruptcy Court only if it has been accepted by at least one such class.

Each holder of an Allowed Claim in an impaired Class which retains or receives property under the Plan shall be entitled to vote separately to accept or reject the Plan and shall indicate such vote on a duly executed and delivered Ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

Holders of Claims in an impaired Class entitled to vote will receive, together with this Disclosure Statement, a Ballot to be used in voting to accept or reject the Plan. Voting instructions will accompany the Ballot.

Each Creditor should first carefully review this Disclosure Statement and the Plan. The Creditor should then complete the portions of the Ballot indicating the Class or Classes in which the Creditor's Claim falls and the total dollar amount of the Claim. If the Creditor's Claim falls into more than one Class, then the Creditor should list each Class and state the dollar amount of the Claim which belongs in each Class. It is critical that the Class(es) and amounts(s) of the Claim be correctly stated on the Ballot, so that the Creditor's vote can be properly counted.

Next, the Creditor should mark in the space provided on the Ballot whether the Creditor wishes to accept or to reject the Plan. Please be sure to fill in the name of the Creditor for whom the Ballot is being filed. Finally, the Ballot must be signed by the Creditor, or by an officer, partner, or other authorized agent of the Creditor. Please note that the Debtor reserves the right to object to the allowance, designation of Class and/or allowable amount of any Claim set forth in a Ballot for purposes of voting and/or Distribution under the Plan.

Completed and signed Ballots should be returned by first class mail to the Voting Agent at the below address in the enclosed self-addressed return envelope:

_By First Class Mail:_
Dowling College Case Administration
c/o GCG
PO Box 10342
Dublin, OH 43017-5542

Completed and signed Ballots may also be returned by overnight mail or hand delivery to the below address:

>  *By Overnight/Hand Delivery:*
>  Dowling College Case Administration
>  c/o GCG
>  5151 Blazer Parkway, Suite A
>  Dublin, OH 43017-5542

Completed Ballots should be returned as soon as possible, and in any event so that they are RECEIVED NO LATER THAN DECEMBER 10, 2018 AT 4:00 P.M. ANY BALLOTS WHICH ARE RECEIVED BY THE VOTING AGENT AFTER DECEMBER 10, 2018 AT 4:00 P.M. SHALL NOT BE COUNTED IN DETERMINING ACCEPTANCE OR REJECTION OF THE PLAN.

## XV.    **CONFIRMATION HEARING**

The Confirmation Hearing will be held by the Honorable Robert E. Grossman, United States Bankruptcy Judge, on December 17, 2018 at 1:30 a.m./p.m., in the United States Bankruptcy Court, Eastern District Of New York, Alfonse M. D'Amato Federal Courthouse, 290 Federal Plaza, Courtroom 860, Central Islip, New York 11722. At that hearing, the Bankruptcy Court will decide whether the Plan should be confirmed, and will hear and decide any and all objections to the Plan. Any Creditor, or other party in interest who wishes to object to Confirmation of the Plan, or to the classification of Claims provided in the Plan, must, not later than 4:00 p.m. on December 10, 2018, file an objection with the Clerk of the United States Bankruptcy Court, Eastern District of New York, Alfonse M. D'Amato Federal Courthouse, 290 Federal Plaza, Central Islip, New York 11722, and serve a copy of the objection on the following persons: (i) The Office of the United States Trustee for the Eastern District of New York, Alfonse D'Amato Federal Courthouse, 560 Federal Plaza, Central Islip, New York 11722, Attn: Stan Yang, Esq., Trial Attorney; (ii) counsel to the Debtor: Klestadt Winters Jureller Southard & Stevens, LLP, 200 West 41st Street, 17th Floor, New York, New York 10036, Attn: Sean C. Southard, Esq.; (iii) counsel to the Debtor's material prepetition and post-petition secured lenders: (a) Mintz, Levin, Cohn, Ferris, Glovsky, and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, Attn: P. Miyoko Sato, Esq. and Ian A. Hammel, Esq., (b) White & Case LLP, 1221 Avenue of the Americas, New York, New York 10020, Attn: Brian D. Pfeiffer, Esq., (c) Certilman Balin Adler & Hyman, LLP, 90 Merrick Avenue, 9th Floor, East Meadow, NY 11554, Attn: Richard J. McCord, Esq. and Thomas J. McNamara, Esq., and (d) Garfunkel Wild, P.C., 111 Great Neck Road, Great Neck, NY 11021, Attn:   Adam T. Berkowitz, Esq.; and (iv) counsel to the Creditors' Committee: SilvermanAcampora, LLP, 100 Jericho Quadrangle, Suite 300, Jericho, New York 11753, Attn: Ronald J. Friedman, Esq.

Any objections to the Plan which are not filed and served by the above date may not be considered by the Bankruptcy Court. Any person or entity who files an objection to Confirmation of the Plan or to the classification of Claims provided in the Plan must also attend the Confirmation Hearing, either in person or through counsel.

If the Plan is confirmed, its provisions will bind the Estate and any and all Persons, including all holders of Claims, whether or not the Claim of such Holder is impaired under the Plan and whether or not the Holder has, either individually or by a Class, voted to accept the Plan.

## XVI.    **RECOMMENDATION**

The Debtor believes that the Plan provides for the fair and equitable treatment of the Debtor's Creditors and therefore recommends that Creditors vote to accept the Plan.

[remainder of page intentionally blank]

Dated: New York, New York
      October 31, 2018

Dowling College
Debtor and Debtor-in-Possession

By: _/s/ Robert S. Rosenfeld_____
      Robert S. Rosenfeld
      Chief Restructuring Officer

Approved as to form:

By: _/s/ Sean C. Southard_____
      Sean C. Southard
      Joseph C. Corneau
      Lauren C. Kiss

Klestadt Winters Jureller Southard &
Stevens, LLP
200 West 41st Street, 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Fax: (212) 972-2245

*Attorneys for Dowling College,*
*Debtor and Debtor-in-Possession*

**<u>Exhibit A</u>**

**Liquidation Analysis**

|  | | Plan | | | Ch. 7 | |
|---|---|---|---|---|---|---|
| | **Assets:** | | | | | |
| 1 | Cash | $ | 5,760,000 | | $ | 5,760,000 |
| 2 | Brookhaven Campus Real Estate | $ | 12,830,000 | | $ | 12,830,000 |
| 3 | Oakdale Residential Real Estate | $ | 912,800 | | $ | 912,800 |
| 4 | Other Assets | $ | 170,000 | | $ | 170,000 |
| | | $ | 19,672,800 | | $ | 19,672,800 |
| | | | | | | |
| 5 | **DIP Facility Outstanding Balance** | $ | (3,150,000) | | $ | (3,150,000) |
| | | | | | | |
| | **Administrative Claims** | | | | | |
| 6 | Costs through Confirmation | $ | (750,000) | | $ | (750,000) |
| 7 | Professional Fees | $ | (675,000) | | $ | (675,000) |
| 8 | Post Confirmation Wind Down Budget | $ | (750,000) | | $ | (750,000) |
| 9 | U.S. Trustee Fees | $ | (50,000) | | n/a | |
| | | | | | | |
| | **Ch. 7 Expenses** | | | | | |
| 10 | Chapter 7 Trustee Commissions | n/a | | | $ | (650,000) |
| 11 | Chapter 7 Trustee Legal Counsel | n/a | | | $ | (250,000) |
| 12 | Chapter 7 Trustee Financial Advisor | n/a | | | $ | (50,000) |
| 13 | Estimated Wind Down Costs | n/a | | | $ | (225,000) |
| | | | | | | |
| | Net Available for Distribution | $ | 14,297,800 | | $ | 13,172,800 |

| | | $ Recovery | % Recovery | $ Recovery | % Recovery |
|---|---|---|---|---|---|
| 14 | Prepetition Senior Secured Claims | $ 10,997,800 | 58% | $ 13,172,800 | 61% |
| 15 | Other Secured Claims | $ 0 | 0% | $ 0 | 0% |
| 16 | Priority Tax Claims | $ 1,200,000 | 100% | $ 0 | 0% |
| 17 | Priority Non-Tax Claims | $ 1,800,000 | 100% | $ 0 | 0% |
| 18 | General Unsecured Claims | $ 300,000 | < 1% | $ 0 | 0% |

Notes:

1       From MOR less Department of Education share of Perkins Funds.

2       Projected net proceeds after broker commissions, real estate tax pro-ration and other closing expenses.

3       Projected net proceeds after broker commissions, real estate tax pro-ration and other closing expenses.

4       Estimated mid-point value of remaining miscellaneous assets for liquidation.

5       Based upon DIP facility outstanding as of August 31, 2018.

6       Estimated costs and professional fees from August 31, 2018 through plan confirmation (funded through the DIP Facility).

7       Reflects 20% retained professional holdback amounts (actual through 8-31-18 plus projected through Plan confirmation).

8       Estimated costs to complete post-confirmation winddown including expenses and Debtor's professional fees.

9       U.S. Trustee fees based upon actual and projected disbursements through Plan confirmation.

10      Chapter 7 Trustee fees based upon actual and projected disbursements through Plan confirmation.

11      Estimated fees of Chapter 7 Trustee legal counsel.

12      Estimated fees of Chapter 7 Trustee financial advisor.

13      Estimated costs to complete post-confirmation winddown excluding expenses and Debtor's professional fees.

14      Stipulated claim amounts as per Unsecured Creditor Settlement, less net proceeds applied during the Chapter 11 case through August 31, 2018.

|  | Prepetition Series 1996 Bonds | Prepetition Series 2002 Bonds | Prepetition Series 2006 Bonds | Prepetition Series 2015 Bonds | Total |
|---|---|---|---|---|---|
| Secured Claim Amt | $  3,615,731 | $ 11,692,882 | $ 39,701,471 | $ 7,598,310 | $ 62,608,394 |
| Prior Repayments | $         - | $         - | $(17,494,170) | $ (7,598,310) | $(25,092,480) |
| Net Claims at 8-31-18 | $  3,615,731 | $ 11,692,882 | $ 22,207,300 | $         - | $ 37,515,913 |

15      No excess collateral value after Prepetition Senior Secured Claims available to Other Secured Claims. Will be treated as General Unsecured Claims.

16      Priority Tax Claims are being funded out of secured debt collateral under the Plan pursuant to the Unsecured Creditor Settlement. The Prepetition Bond Trustees' and ACA's contribution to the payment of Priority Claims is not applicable under a Chapter 7 scenario.

17      Includes NYS Self-Insured Unemployment payments and employee 507(a) Priority Claims being funded out of secured debt collateral under the Plan pursuant to the Unsecured Creditor Settlement. The Prepetition Bond Trustees' and ACA's contribution to the payment of Priority Claims is not applicable under a Chapter 7 scenario.

18      General Unsecured Claims.  $300k is being funded into Unsecured Creditor Trust for the benefit of General Unsecured Creditors out of secured debt collateral under the Plan pursuant to the Unsecured Creditor Settlement.  The Prepetition Bond Trustees' and ACA's contribution to the Unsecured Creditor Trust is not applicable under a Chapter 7 scenario.