**SILVERMANACAMPORA LLP**
Attorneys for Ronald J. Friedman, Esq.,
the Unsecured Creditor Trustee of Dowling
College f/d/b/a Dowling Institute f/d/b/a
Dowling College Alumni Association f/d/b/a
Cecom a/k/a Dowling College, Inc.
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
(516) 479-6300
Anthony C. Acampora
Ronald J. Friedman

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:

    DOWLING COLLEGE f/d/b/a DOWLING
    INSTITUTE f/d/b/a DOWLING COLLEGE
    ALUMNI ASSOCIATION f/d/b/a CECOM
    a/k/a DOWLING COLLEGE, INC.,

                 Debtor.
------------------------------------------------------------x
RONALD J. FRIEDMAN, ESQ., THE
UNSECURED CREDITOR TRUSTEE OF
DOWLING COLLEGE F/D/B/A
DOWLING INSTITUTE F/D/B/A DOWLING
COLLEGE ALUMNI ASSOCIATION F/D/B/A
CECOM A/K/A DOWLING COLLEGE, INC.,

                 Plaintiff,

      - against -

PATRICIA M. BLAKE, GERALD J. CURTIN,
DENISE FISCHER, MYRKA GONZALEZ,
JACK O'CONNOR, DENNIS O'DOHERTY,
RONALD PARR, JOSEPH K. POSILLICO,
MICHAEL P. PUORRO, JOHN RACANELLI,
DEBORAH K. RICHMAN, SCOTT RUDOLPH,
and RALPH CERULLO,
               Defendants.
------------------------------------------------------------x

Chapter 11

Case No. 16-75545 (REG)

Adv. Pro. No.

## **COMPLAINT**

Plaintiff, Ronald J. Friedman, Esq., the Unsecured Creditor Trustee of Dowling College

ACA/2143276.1/066648

f/d/b/a Dowling Institute f/d/b/a Dowling College Alumni Association f/d/b/a Cecom a/k/a Dowling College, Inc. ("Plaintiff"), by his attorneys, Silverman Acampora LLP, for his complaint against defendants Patricia M. Blake, Gerald J. Curtin, Denise Fischer, Myrka Gonzalez, Jack O'Connor, Dennis O'Doherty, Ronald Parr, Joseph K. Posillico, Michael P. Puorro, John Racanelli, Deborah K. Richman, Scott Rudolph, and Ralph Cerullo alleges as follows:

### Nature of the Adversary Proceeding

1.    This adversary proceeding is brought to recover damages based upon defendants' waste, mismanagement, and breach of fiduciary duty, each in their capacity as a Board Trustee of Dowling College f/d/b/a Dowling Institute f/d/b/a Dowling College Alumni Association f/d/b/a Cecom a/k/a Dowling College, Inc. ("Dowling").

### Jurisdiction and Venue

2.    The Court has jurisdiction over this adversary proceeding under 28 U.S.C. §1334.

3.    This adversary proceeding has been referred to the Court under 28 U.S.C. §157(a), and the Order of Reference from the United States District Court for the Eastern District of New York (Amon, C.J.), dated December 5, 2012.

4.    This adversary proceeding is a core proceeding under 28 U.S.C. §157(b)(2)(A), and (O).

5.    Venue of this adversary proceeding is proper in this district under 28 U.S.C. §§1408 and 1409.

### The Parties

#### Plaintiff

6.    On November 28, 2016 (the "Petition Date"), Dowling filed a voluntary petition for relief under chapter 11, title 11, United States Code (the "Bankruptcy Code") in this Court.

    ACA/2143276.1/066648

7.    Dowling was authorized to remain in possession of its property and to continue in the operation and management of its business as a debtor-in-possession under Bankruptcy Code §§1107 and 1108.

8.    On December 9, 2016, the Office of the United States Trustee filed a Notice of Appointment of Creditors' Committee (the "Committee") (ECF Doc. No. 85) appointing Ultimate Power Inc., Linda Ardito, and Lori Zaikowski to the Committee.

9.    By order dated December 20, 2018, the Bankruptcy Court confirmed Dowling's chapter 11 plan of reorganization and, among other things, established the Unsecured Creditor Trust and authorized the appointment of the Unsecured Creditor Trustee.

10.    Pursuant to the Unsecured Creditor Trust Agreement, Plaintiff Ronald J. Friedman was appointed the Unsecured Creditor Trustee and was authorized and given the right, and the discretion to pursue and to prosecute any and all claims and causes of action on behalf of Dowling's estate.

**Defendants**

11.    Upon information and belief, defendant Patricia M. Blake was, at all times relevant, an individual residing in the State of New York.

12.    At all times relevant, defendant Patricia M. Blake was a member of the Board of Trustees of Dowling.

13.    Defendant Patricia M. Blake, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was charged with the responsibility to ensure that Dowling's business was carefully managed.

14.    Defendant Patricia M. Blake was responsible for devising, maintaining, and implementing proper controls with respect to Dowling's business, operations, and financial affairs, including internal financial controls and operating procedures, and to ensure that Dowling's

ACA/2143276.1/066648

business, as conducted by its employees and representatives, including day-to-day management, complied with all laws applicable to Dowling's industry and to lawful business in general.

15.     Defendant Patricia M. Blake, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the establishment, implementation, and maintenance of Dowling's internal financial controls and operating procedures.

16.     Defendant Patricia M. Blake, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the proper maintenance of Dowling's books and records, and owed a fiduciary duty to Dowling as set forth in the New York Not-For-Profit Corporation Law as amended by the Not-For-Profit Revitalization Act of 2013 and common law.

17.     Upon information and belief, defendant Gerald J. Curtin was, at all times relevant, an individual residing in the State of New York.

18.     At all times relevant, defendant Gerald J. Curtin was a member of the Board of Trustees of Dowling.

19.     Defendant Gerald J. Curtin, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was charged with the responsibility to ensure that Dowling's business was carefully managed.

20.     Defendant Gerald J. Curtin was responsible for devising, maintaining, and implementing proper controls with respect to Dowling's business, operations, and financial affairs, including internal financial controls and operating procedures, and to ensure that Dowling's business, as conducted by its employees and representatives, including day-to-day management, complied with all laws applicable to Dowling's industry and to lawful business in general.

21.     Defendant Gerald J. Curtin, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the establishment, implementation, and

ACA/2143276.1/066648

maintenance of Dowling's internal financial controls and operating procedures.

22.   Defendant Gerald J. Curtin, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the proper maintenance of Dowling's books and records, and owed a fiduciary duty to Dowling as set forth in the New York Not-For-Profit Corporation Law as amended by the Not-For-Profit Revitalization Act of 2013 and common law.

23.   Upon information and belief, defendant Denise Fischer was, at all times relevant, an individual residing in the State of New York.

24.   At all times relevant, defendant Denise Fischer was a member of the Board of Trustees of Dowling.

25.   Defendant Denise Fischer, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was charged with the responsibility to ensure that Dowling's business was carefully managed.

26.   Defendant Denise Fischer was responsible for devising, maintaining, and implementing proper controls with respect to Dowling's business, operations, and financial affairs, including internal financial controls and operating procedures, and to ensure that Dowling's business, as conducted by its employees and representatives, including day-to-day management, complied with all laws applicable to Dowling's industry and to lawful business in general.

27.   Defendant Denise Fischer, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the establishment, implementation, and maintenance of Dowling's internal financial controls and operating procedures.

28.   Defendant Denise Fischer, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the proper maintenance of Dowling's books and records, and owed a fiduciary duty to Dowling as set forth in the New York Not-For-Profit

ACA/2143276.1/066648

Corporation Law as amended by the Not-For-Profit Revitalization Act of 2013 and common law.

29.    Upon information and belief, defendant Myrka Gonzalez was, at all times relevant, an individual residing in the State of New York.

30.    At all times relevant, defendant Myrka Gonzalez was a member of the Board of Trustees of Dowling.

31.    Defendant Myrka Gonzalez, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was charged with the responsibility to ensure that Dowling's business was carefully managed.

32.    Defendant Myrka Gonzalez was responsible for devising, maintaining, and implementing proper controls with respect to Dowling's business, operations, and financial affairs, including internal financial controls and operating procedures, and to ensure that Dowling's business, as conducted by its employees and representatives, including day-to-day management, complied with all laws applicable to Dowling's industry and to lawful business in general.

33.    Defendant Myrka Gonzalez, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the establishment, implementation, and maintenance of Dowling's internal financial controls and operating procedures.

34.    Defendant Myrka Gonzalez, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the proper maintenance of Dowling's books and records, and owed a fiduciary duty to Dowling as set forth in the New York Not-For-Profit Corporation Law as amended by the Not-For-Profit Revitalization Act of 2013 and common law.

35.    Upon information and belief, defendant Jack O'Connor was, at all times relevant, an individual residing in the State of New York.

36.    At all times relevant, defendant Jack O'Connor was a member of the Board of Trustees

6

of Dowling.

37.    Defendant Jack O'Connor, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was charged with the responsibility to ensure that Dowling's business was carefully managed.

38.    Defendant Jack O'Connor was responsible for devising, maintaining, and implementing proper controls with respect to Dowling's business, operations, and financial affairs, including internal financial controls and operating procedures, and to ensure that Dowling's business, as conducted by its employees and representatives, including day-to-day management, complied with all laws applicable to Dowling's industry and to lawful business in general.

39.    Defendant Jack O'Connor, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the establishment, implementation, and maintenance of Dowling's internal financial controls and operating procedures.

40.    Defendant Jack O'Connor, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the proper maintenance of Dowling's books and records and owed a fiduciary duty to Dowling as set forth in the New York Not-For-Profit Corporation Law as amended by the Not-For-Profit Revitalization Act of 2013 and common law.

41.    Upon information and belief, defendant Dennis O'Doherty was, at all times relevant, an individual residing in the State of New York.

42.    At all times relevant, defendant Dennis O'Doherty was a member of the Board of Trustees of Dowling.

43.    Defendant Dennis O'Doherty, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was charged with the responsibility to ensure that Dowling's business was carefully managed.

ACA/2143276.1/066648

44.    Defendant Dennis O'Doherty was responsible for devising, maintaining, and implementing proper controls with respect to Dowling's business, operations, and financial affairs, including internal financial controls and operating procedures, and to ensure that Dowling's business, as conducted by its employees and representatives, including day-to-day management, complied with all laws applicable to Dowling's industry and to lawful business in general.

45.    Defendant Dennis O'Doherty, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the establishment, implementation, and maintenance of Dowling's internal financial controls and operating procedures.

46.    Defendant Dennis O'Doherty, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the proper maintenance of Dowling's books and records, and owed a fiduciary duty to Dowling as set forth in the New York Not-For-Profit Corporation Law as amended by the Not-For-Profit Revitalization Act of 2013 and common law.

47.    Upon information and belief, defendant Ronald Parr was, at all times relevant, an individual residing in the State of New York.

48.    At all times relevant, defendant Ronald Parr was a member of the Board of Trustees of Dowling.

49.    Defendant Ronald Parr, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was charged with the responsibility to ensure that Dowling's business was carefully managed.

50.    Defendant Ronald Parr was responsible for devising, maintaining, and implementing proper controls with respect to Dowling's business, operations, and financial affairs, including internal financial controls and operating procedures, and to ensure that Dowling's business, as conducted by its employees and representatives, including day-to-day management, complied with all laws applicable to Dowling's industry and to lawful business in general.

ACA/2143276.1/066648

51.     Defendant Ronald Parr, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the establishment, implementation, and maintenance of Dowling's internal financial controls and operating procedures.

52.     Defendant Ronald Parr, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the proper maintenance of Dowling's books and records, and owed a fiduciary duty to Dowling as set forth in the New York Not-For-Profit Corporation Law as amended by the Not-For-Profit Revitalization Act of 2013 and common law.

53.     Upon information and belief, defendant Joseph K. Posillico was, at all times relevant, an individual residing in the State of New York.

54.     At all times relevant, defendant Joseph K. Posillico was a member of the Board of Trustees of Dowling.

55.     Defendant Joseph K. Posillico, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was charged with the responsibility to ensure that Dowling's business was carefully managed.

56.     Defendant Joseph K. Posillico was responsible for devising, maintaining, and implementing proper controls with respect to Dowling's business, operations, and financial affairs, including internal financial controls and operating procedures, and to ensure that Dowling's business, as conducted by its employees and representatives, including day-to-day management, complied with all laws applicable to Dowling's industry and to lawful business in general.

57.     Defendant Joseph K. Posillico, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the establishment, implementation, and maintenance of Dowling's internal financial controls and operating procedures.

58.     Defendant Joseph K. Posillico, as a Board Trustee of Dowling, and as a fiduciary of

ACA/2143276.1/066648

Dowling, was responsible to ensure and to oversee the proper maintenance of Dowling's books and records, and owed a fiduciary duty to Dowling as set forth in the New York Not-For-Profit Corporation Law as amended by the Not-For-Profit Revitalization Act of 2013 and common law.

59.    Upon information and belief, defendant Michael P. Puorro was, at all times relevant, an individual residing in the State of New York.

60.    At all times relevant, defendant Michael P. Puorro was a member of the Board of Trustees of Dowling.

61.    Defendant Michael P. Puorro, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was charged with the responsibility to ensure that Dowling's business was carefully managed.

62.    Defendant Michael P. Puorro was responsible for devising, maintaining, and implementing proper controls with respect to Dowling's business, operations, and financial affairs, including internal financial controls and operating procedures, and to ensure that Dowling's business, as conducted by its employees and representatives, including day-to-day management, complied with all laws applicable to Dowling's industry and to lawful business in general.

63.    Defendant Michael P. Puorro, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the establishment, implementation, and maintenance of Dowling's internal financial controls and operating procedures.

64.    Defendant Michael P. Puorro, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the proper maintenance of Dowling's books and records, and owed a fiduciary duty to Dowling as set forth in the New York Not-For-Profit Corporation Law as amended by the Not-For-Profit Revitalization Act of 2013 and common law.

65.    Upon information and belief, defendant John Racanelli was, at all times relevant, an

ACA/2143276.1/066648

individual residing in the State of New York.

66.    At all times relevant, defendant John Racanelli was a member of the Board of Trustees of Dowling.

67.    Defendant John Racanelli, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was charged with the responsibility to ensure that Dowling's business was carefully managed.

68.    Defendant John Racanelli was responsible for devising, maintaining, and implementing proper controls with respect to Dowling's business, operations, and financial affairs, including internal financial controls and operating procedures, and to ensure that Dowling's business, as conducted by its employees and representatives, including day-to-day management, complied with all laws applicable to Dowling's industry and to lawful business in general.

69.    Defendant John Racanelli, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the establishment, implementation, and maintenance of Dowling's internal financial controls and operating procedures.

70.    Defendant John Racanelli, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the proper maintenance of Dowling's books and records, and owed a fiduciary duty to Dowling as set forth in the New York Not-For-Profit Corporation Law as amended by the Not-For-Profit Revitalization Act of 2013 and common law.

71.    Upon information and belief, defendant Deborah K. Richman was, at all times relevant, an individual residing in the State of New York.

72.    At all times relevant, defendant Deborah K. Richman was a member of the Board of Trustees of Dowling.

73.    Defendant Deborah K. Richman, as a Board Trustee of Dowling, and as a fiduciary of

ACA/2143276.1/066648

Dowling, was charged with the responsibility to ensure that Dowling's business was carefully managed.

74.    Defendant Deborah K. Richman was responsible for devising, maintaining, and implementing proper controls with respect to Dowling's business, operations, and financial affairs, including internal financial controls and operating procedures, and to ensure that Dowling's business, as conducted by its employees and representatives, including day-to-day management, complied with all laws applicable to Dowling's industry and to lawful business in general.

75.    Defendant Deborah K. Richman, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the establishment, implementation, and maintenance of Dowling's internal financial controls and operating procedures.

76.    Defendant Deborah K. Richman, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the proper maintenance of Dowling's books and records, and owed a fiduciary duty to Dowling as set forth in the New York Not-For-Profit Corporation Law as amended by the Not-For-Profit Revitalization Act of 2013 and common law.

77.    Upon information and belief, defendant Scott Rudolph was, at all times relevant, an individual residing in the State of New York.

78.    At all times relevant, defendant Scott Rudolph was a member of the Board of Trustees of Dowling and had served as its interim President.

79.    Defendant Scott Rudolph, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was charged with the responsibility to ensure that Dowling's business was carefully managed.

80.    Defendant Scott Rudolph was responsible for devising, maintaining, and implementing proper controls with respect to Dowling's business, operations, and financial affairs, including

ACA/2143276.1/066648

internal financial controls and operating procedures, and to ensure that Dowling's business, as conducted by its employees and representatives, including day-to-day management, complied with all laws applicable to Dowling's industry and to lawful business in general.

81.    Defendant Scott Rudolph, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the establishment, implementation, and maintenance of Dowling's internal financial controls and operating procedures.

82.    Defendant Scott Rudolph, as a Board Trustee of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the proper maintenance of Dowling's books and records, and owed a fiduciary duty to Dowling as set forth in the New York Not-For-Profit Corporation Law as amended by the Not-For-Profit Revitalization Act of 2013 and common law.

83.    Upon information and belief, defendant Ralph Cerullo was, at all times relevant, an individual residing in the State of New York.

84.    At all times relevant, defendant Ralph Cerullo was the Chief Financial Officer of Dowling.

85.    Defendant Ralph Cerullo, as Chief Financial Officer of Dowling, and as a fiduciary of Dowling, was charged with the responsibility to ensure that Dowling's business was carefully managed.

86.    Defendant Ralph Cerullo was responsible for devising, maintaining, and implementing proper controls with respect to Dowling's business, operations, and financial affairs, including internal financial controls and operating procedures, and to ensure that Dowling's business, as conducted by its employees and representatives, including day-to-day management, complied with all laws applicable to Dowling's industry and to lawful business in general.

87.    Defendant Ralph Cerullo, as Chief Financial Officer of Dowling, and as a fiduciary of

ACA/2143276.1/066648

Dowling, was responsible to ensure and to oversee the establishment, implementation, and maintenance of Dowling's internal financial controls and operating procedures.

88.    Defendant Ralph Cerullo, as Chief Financial Officer of Dowling, and as a fiduciary of Dowling, was responsible to ensure and to oversee the proper maintenance of Dowling's books and records, and owed a fiduciary duty to Dowling as set forth in the New York Not-For-Profit Corporation Law as amended by the Not-For-Profit Revitalization Act of 2013 and common law.

## Allegations Common to All Claims for Relief

### Dowling's Business and Operations

89.    Dowling was established on September 27, 1968 as a private, not-for-profit 501(c)(3) educational corporation which, until 2016, provided undergraduate and graduate programs with significant concentrations in liberal arts, business, education, and aviation.

90.    Dowling's traditional sources of revenues were student tuition and fees often provided through loan programs subject to Title IV of the Higher Education Act of 1965 ("Federal Loan Program"), and donations that Dowling solicited from corporations and individuals.

91.    Dowling was accredited by the Middle States Commission on Higher Education ("MSCHE") which is responsible for periodically assessing and reviewing subject colleges based upon fourteen (14) "standards of excellence."

92.    At the time of its financial collapse, Dowling owned its main campus located 150 Idle Hour Boulevard, Oakdale, New York 11769, which was renamed the "Rudolph Campus" in honor of defendant Scott Rudolph (the "Rudolph Campus").

93.    The Rudolph Campus contained several improvements, including the former Vanderbilt mansion (subsequently renamed Fortunoff Hall), a student center, the Kramer Science Center, and a dormitory (the "Rudolph Dorm"), as well as the Racanelli Learning Resource Center which had been

ACA/2143276.1/066648

constructed in 1974.

94.   Dowling also owned thirty-two (32) parcels of predominantly residential real property and associated personal property within the neighborhood adjacent to the Rudolph Campus, most of which were improved by single family residences (the "Residential Real Property").

95.   Historically, Dowling either leased the Residential Real Property to third party residential tenants or used it for faculty offices and other ancillary college functions.

96.   In 1977, Dr. Victor P. Meskill ("Dr. Meskill") became Dowling's President and served in that position for 23 years.

97.   During his tenure, Dr. Meskill was one of the most highly compensated college presidents in the country.

98.   In 1992, Dowling purchased and installed Elucian's Banner system ("Banner"), a software package which Dowling used from 1992 through its demise to manage data relating to its financial, human resources, and student application functions.

99.   Dowling never used Banner to its full functionality and did not change its Banner configuration from the date of its original implementation in 1992 until Dowling abruptly closed its doors in 2016.

100.   Upon information and belief, according to an Inside Higher Education article published on December 16, 2014, in 1994, Dowling purchased the approximately 103 acres of land located at 1300 William Floyd Parkway, Shirley, Town of Brookhaven, New York (the "Brookhaven Campus").

101.   The Brookhaven Campus was home to (a) Dowling's School of Aviation and sports management program, (b) Dowling's NCAA Division II athletic program, and (c) a 289-bed dormitory facility (the "Brookhaven Dorm").

ACA/2143276.1/066648

102.  During his tenure, Dr. Meskill attempted to shift Dowling's focus from a small, local institution to a global university with an emphasis on the aviation-focused Brookhaven Campus.

103.  In 1996, Dowling engaged in a tax exempt bond funding (the "Series 1996 Bonds") in the principal amount of $7.22 million under a Trust Indenture dated June 1, 1996, among (a) Dowling, (b) the Suffolk County Industrial Development Agency ("SCIDA"), as issuer, and (c) United States Trust Company of New York ("US Trust").

104.  US Trust was eventually succeeded as trustee by the Bank of New York Mellon Trust Company, N.A. ("BNY") which was succeeded by UMB Bank, N.A. ("UMB").

105.  The 1996 Series Bonds were used to finance certain improvements and construction relating to the Rudolph Campus Kramer Science Center and the Rudolph Campus sewage treatment facility.

106.  In March 1998. Standard & Poor's lowered its rating for Dowling's debt from BBB to BBB-, or one step above a junk bond rating.

107.  After Dowling's debt had increased to $34 million and the school's credit rating had been downgraded, on the same day in June of 1999, Dr. Meskill fired five top-ranking college officials as a cost cutting measure.

108.  In 1999, Dowling's Board was concerned about undergraduate enrollment because tuition and other student generated revenues accounted for approximately 90% of Dowling's income. The 27-member Board was also concerned with Dr. Meskill's inability or disinclination to fundraise on Dowling's behalf.

109.  Dr. Meskill was forced to step down by Dowling's then Board and the officials that he had fired were reinstated.

110.  Dr. Meskill was replaced by former Dowling Provost, Albert E. Donor who was among

ACA/2143276.1/066648

the five officials fired by Dr. Meskill.

111.   The year 1999 represented the high point in Dowling's student enrollment with 6,746 undergraduate and graduate students.

112.   In 2002, Dowling engaged in another tax exempt bond funding (the "Series 2002 Bonds"), in the principal amount of $10.9 million under a Trust Indenture dated November 1, 2002 (the "2002 Indenture") among (a) Dowling, (b) the Brookhaven Industrial Development Agency ("BIDA"), as issuer, and (c) BNY at trustee.

113.   BNY was eventually succeeded as trustee by UMB.

114.   Dowling used the 2002 Series Bonds to finance the acquisition, renovation, and equipping of Dowling's 72,000 square foot Brookhaven Dorm and the renovation of the Brookhaven Campus.

## 2006 to 2016 – A Decade of Decline

115.   The year 2006 marked the beginning of a decade of decline for Dowling from which it never recovered.

116.   In 2006, Dowling engaged in its final round of tax exempt bond funding (the "Series 2006 Bonds") to finance certain improvements, construction, and equipping of (a) Dowling's athletic field complex on 33 acres of the Brookhaven Campus, (b) the Brookhaven Campus cafeteria, and (c) capital improvements to the Rudolph Campus.

117.   The Series 2006 Bonds were issued as Series 2006A bonds in the principal amount of $34,910,000 and Series 2006B bonds in the principal amount of $4,000,000 under a Trust Indenture dated June 1, 2006 (the "Series 2006 Indenture"), among (a) Dowling, (b) SCIDA, as issuer, and (c) BNY.

118.   Eventually Wilmington Trust, N.A. ("Wilmington") succeeded BNY as trustee.

ACA/2143276.1/066648

119.  In October 2006, former Suffolk County Executive, Robert Gaffney, became the President of Dowling College.

120.  At the time that Gaffney took office as Dowling's President, Dowling's total industrial development bond debt exceeded $57 million.

121.  On February 2, 2006, Moody's Investors Service ("Moody's") downgraded Dowling's long-term rating from Ba3 to Ba2 and noted that Dowling's outlook remained *negative*.

122.  On September 30, 2008, Moody's downgraded the 1996 Bonds and the 2002 Bonds from B1 to Ba3 and placed Dowling's rating on its watch list for further possible downgrades.

**Higher Education Metrics**

123.  First published in 1980, the series *Strategic Financial Analysis for Higher Education* (formerly entitled *Ratio Analysis in Higher Education*) ("*Strategic Financial Analysis*") has been acknowledged by leaders in the higher education industry as an important financial publication and has been used extensively by board trustees, senior managers, financial analysts, and credit analysts.

124.  *Strategic Financial Analysis* has been co-authored since 1995 by Dowling's long-time auditors, KPMG LLP ("KPMG"), and by the investment banking firm of Prager & Co., LLC, (formerly, Prager, McCarthy & Sealy, LLC and Prager, Sealy & Co., LLC).

125.  As explained in the 4th Edition of *Strategic Financial Analysis*, "[m]ost colleges and universities are transforming themselves to cope with significant external pressures and to position themselves for success in the 21st century. To analyze and measure the financial and operational success of an institution, leaders and interested observers should ask a number of high-order questions…. Central to all questions about change and transformation is *mission*.  In the world of higher education, then, the most important question is, *What is the institution's mission?* Mission should inform all decisions made by institutional stewards regarding 'what' and 'why' resources will

be used to accomplish their vision."

126. According to *Strategic Financial Analysis*, "mission" is best activated through a strategic plan.

127. Consequently, as KPMG and Prager explained, "a few high-level measures – financial and nonfinancial – are essential to understand the institution's performance in accomplishing its mission. Whatever measures are chosen, they should be maintained in a strategic plan and assessed periodically. Well-managed institutions use *mission* to drive success and *financial metrics* to determine affordability. The strategic plan should always support the mission; it is irrelevant otherwise."

128. In the 4th Edition of *Strategic Financial Analysis*, KPMG stated that KPMG was "dedicated to helping ensure that the full impact of financial information contained in reports is understood by our clients. Although the auditors' responsibility in an audit is to render an opinion as to the fairness of the financial information presented by management, principal users of such reports — senior management and the board — should understand the financial messages they contain. Financial ratios, which have been used for many years by financial analysts of other industries, can serve analysts of higher education as well. Most important, ratio analysis can measure success factors against institution-specific objectives and then give the institution the tools to improve its financial profile to carry out its vision and mission."

129. The 4th Edition of *Strategic Financial Analysis* focuses upon a few "core ratios that can provide answers to key questions for institutions moving into the 21st century."

130. According to *Strategic Financial Analysis*, those critically important financial ratios are the Primary Reserve Ratio, the Net Income Ratio, the Return on Net Assets Ratio, and the Viability Ratio.

ACA/2143276.1/066648

131.  The Primary Reserve Ratio identifies whether the institution's resources are sufficient and flexible enough to support its mission and indicates how long an institution could function using its expendable reserves without relying on additional net assets generated by operations. A ratio of 40% (which usually provides about 5 months of expenses) or more is advisable to give institutions the flexibility to manage operations.

132.  The Net Income Ratio measures whether operating results indicate that the institution is functioning within its available resources.

133.  As KPMG explained in *Strategic Financial Analysis*, a negative Net Income Ratio indicates a loss for the year and large deficits and structural deficits are almost always a bad sign, particularly if management, such as Dowling's Board and administration, has not identified initiatives to reverse the shortfall.

134.  Because of its expertise, KPMG *knew* that a pattern of large deficits can quickly sap an institution's financial strength to the point that it might have to make major adjustments to programs.

135.  A continuing decline or a pattern of deficits is a warning signal that management and the governing board should focus on restructuring the institution's income and expense streams to return to an acceptable Net Income Ratio.

136.  The Return on Net Assets Ratio indicates whether financial asset performance supports the institution's strategic direction.

137.  Finally, the Viability Ratio, which is one of the most basic determinants of clear financial health, measures whether debt is managed strategically to advance the institution's mission.

138.  KMPG knew that a Viability Ratio of 125% or greater indicated that the institution had sufficient reserves to satisfy all liabilities, including long-term debt and that, more importantly, as the Viability Ratio falls below 100%, the institution's ability to respond to adverse conditions from

ACA/2143276.1/066648

internal resources diminishes, as does its ability to attract capital from external sources and its flexibility to fund new objectives.

139.  For example, according to *Strategic Financial Analysis*, heavily tuition-dependent institutions which receive more than 60% of their revenue from tuition (Dowling received well in excess of 90%), are particularly sensitive to changes in enrollment patterns. Those institutions should track their degree of dependency by using the Net Tuition Dependency Ratio, which measures tuition and fees less all financial aid — both scholarship allowances and scholarships funded by various sources — as a percentage of operating income.

140.  Other ancillary ratios provide additional information regarding the strength of the funds available to an institution.

141.  The 4th Edition of *Strategic Financial Analysis* integrates the four basic ratios into an analytic model and combines them to deliver a single measure — the Composite Financial Index ("CFI").

142.  The CFI helps determine the overall level of financial health of the institution and is especially useful when making comparisons within the same organization over time.  The CFI *only* measures the financial component of an institution's well-being. It must be analyzed in context with other associated activities and plans to achieve an assessment of the overall health, not just financial health, of the institution.

143.  Throughout *Strategic Financial Analysis*, KPMG underscores the importance of CFI and states that "[i]nsights obtained from individual ratios are linked back to the institution's objectives to determine if the activities of the institution, separately or together, are aligned with its overall mission."

144.  The overall premise is that "[t]he principles of ratio analysis can serve as a yardstick to

    ACA/2143276.1/066648

measure the use of financial resources to achieve the institution's mission. Financial ratio analysis quantifies the status, sources, and uses of these resources and the institution's relative ability to repay current and future debt. Business officers and board members can use these measures to gauge institutional performance. Finally, ratios can focus planning activities on those steps necessary to improve the institution's financial profile in relation to its vision and mission."

145. According to KPMG, the CFI "is best used as a component of financial goals in the institution's strategic plan."

146. Indeed, *Strategic Financial Analysis* cautions that "[i]nstitutions that remain focused on their mission, and deploy resources to achieve mission-guided results, will be the ones best positioned to achieve long-term success. Institutions that fail to link their resources to their core mission will find it difficult to sustain a competitive advantage in deteriorating markets. Interestingly, it is not the absolute level of resources that dictates sufficiency, it is the deployment of resources against stated long-term objectives."

147. In the 7th Edition of *Strategic Financial Analysis*, published in 2010, KPMG asserted that "[w]e believe that strategic planning and implementation, institution risk management, and strategic financial analysis are inherently linked. In order to meet its mission, the institution prepares and implements a strategic plan with a series of action steps to attain the plan's goals. Institution risk management is a programmatic view of the potential risks, as well as the assessment of whether inhibitors exist that would make success more or less likely. An institution implements risk management activities to effectively achieve the plan while not creating or increasing risks beyond a tolerable level. Strategic financial analysis provides methods and tools to evaluate financial risks, conditions, and operations, and communicate this information effectively to institutional stewards."

148. According to *Strategic Financial Analysis*, the "alignment of strategic financial goals

ACA/2143276.1/066648

with actions and risk assessment will improve strategic decision making and chances of institutional success. The mission, as articulated in the strategic plan, is the institutional driver; financial capacity and affordability measure the feasibility of the institution's aspirations."

149.  Indeed, "[s]uccessful institutions link their strategic risks with operating, compliance, and other risks. Likewise, institutional responses to identify, manage, and monitor these risks should also be linked. Risk management, including financial risk management, is an integral part of everyone's job responsibility."

150.  Consequently, KPMG continued, "[i]nformation provided to and used by governing boards, senior management and financial management should identify the financial costs of implementing the strategic plan. We have seen circumstances where the financial discussion may not be complete, fully account for certain imbedded costs, or accurately convey assumptions or decision points. Often there is little accountability for or review of financial results from implementing the strategic plan, making ex post facto judgment of the financial success of the plan difficult. Information indicating whether the strategies employed have improved or weakened the institution's financial risk and risk capacity profile may not be provided. This is mainly due to institutions having separate processes for strategic planning, operating and capital budgeting, and financial reporting, combined with a general lack of assigned accountability for results…. Budgets and other resource allocation processes need to be integrated with the strategic and other planning processes to effectively operationalize the strategic plan and risk management processes. Key financial metrics must be integrated into the strategic plan and reported on periodically."

151.  KPMG was Dowling's auditor from at least 2009 through 2016 when Dowling closed its doors for the final time.

152.  Upon information and belief, Dowling's Board never implemented any of the

procedures, reporting, or financial metrics set forth by KPMG in *Strategic Financial Analysis*.

153.  Upon information and belief, KPMG never advised Dowling's Board, in writing or otherwise, to implement any of the procedures, reporting, or financial metrics in or offered any advice to Dowling's Board as to the manner in which Dowling could implement *Strategic Financial Analysis*.

**Dowling In 2010**

154.  Gaffney resigned as Dowling's President in 2010.

155.  In 2010, according to Dowling's IRS Form 990, Dowling's Board consisted of (a) Frank Boulton ("Boulton"), (b) defendant Gerald J. Curtin ("Curtin"), (c) Dennis Doherty ("Doherty"), (d) Dennis J. Fitzharris, Jr. ("Fitzharris"), (e) defendant Myrka Gonzalez ("Gonzalez"), (f) Stuart Henry ("Henry"), (g) Bruce Kelly ("Kelly"), (h) defendant Jack O'Connor ("O'Connor"), (i) defendant Dennis O'Doherty ("O'Doherty"), (j) defendant Ronald Parr ("Parr"), (k) defendant Joseph K. Posillico (Posillico"), (l) defendant Michael P. Puorro ("Puorro"), (m) defendant John Racanelli ("Racanelli"), (n) defendant Scott Rudolph ("Rudolph"), (o) John H. Speilberger ("Speilberger"), (p) Joseph E. Verderber, Sr. ("Verderber"), and (q) Drew Weidhorn ("Weidhorn").

156.  Dowling's IRS Form 990 identified defendant Ralph Cerullo ("Cerullo") as Dowling's Chief Financial Officer.

**September 2010**

157.  In September 2010, Rudolph took over from Gaffney as Dowling's President.

158.  According to Inside Higher Education, at that time, Rudolph was potentially the only college president in the United States who had ***not*** graduated from college.

159.  Rudolph had attended Dowling over a period of 4 years in the late 1970s and had 69 credits towards a degree.  In 2002, Dowling awarded Rudolph an honorary degree.

ACA/2143276.1/066648

160. By his own admission, Rudolph had been a largely absentee President for at least the first four (4) months of his tenure due to the sale of his company, Nature's Bounty Co.

161. During that time, Puorro, who was Chairman of the Board, "covered" for Rudolph.

162. During the September 14, 2010 Board meeting, Puorro, as Chairman of the Board, presented highlights from the August 17, 2010 Executive Committee meeting.

163. In 2010, Rudolph had gifted $4 million to Dowling.

164. According to the Board minutes, Cerullo, who had been on Dowling's Board in 2008 and 2009, and who was then acting as Dowling's *volunteer* financial advisor, reported that (a) $500,000 of Rudolph's $4 million contribution had to be used to cover Dowling's payroll, and (b) the remaining $3.5 million was being held to support Dowling's line of credit with TD Bank. He also reported that Dowling's 403(b) faculty pension payments had *not* been funded.

165. Cerullo advised the Board that Dowling's enrollment was "substantially behind" by at least five percent (5%) and that the budget that Dowling had built around the anticipated enrollment was "off" to such an extent that Dowling was "bleeding cash" and was, at best, break-even rather than sporting a $2.3 million surplus.

166. Indeed, although the prior administration forecasted $680,000 in anticipated profits in 2010, Dowling anticipated a $2.4 million loss.

167. Rudolph further advised that Dowling's revenue was "no where near budget" and that accounts receivable had been overstated by $2 million, all of which had to be written off.

168. Although the antiquated and under-utilized Banner system was not mentioned by name, Rudolph advised that Dowling needed to modernize its old systems and to modernize human resources and accounts payable to make those areas more efficient.

169. Upon information and belief, at that time, Banner was wholly unreliable, Dowling did

ACA/2143276.1/066648

not have any strategic plan, and its budget was not tied to any strategic plan as recommended by KPMG in *Strategic Financial Analysis.*

170.  Rudolph also advised that he intended to rectify the fraudulent concealment of financial issues allegedly engendered by Gaffney, to "break the cycle," and to build trust.

171.  As Rudolph stated with regard to Dowling's then condition, "there is a lot that needs to be corrected."

172.  Finally, as described in the Board minutes, the Board discussed Gaffney's performance as Dowling's President and expressed concern that there was "significant evidence that Mr. Gaffney had not provided accurate information to the Board about the financial position of the College in breach of his fiduciary duties."

173.  As part of the Board's discussion regarding Gaffney, undisclosed Board Trustees expressed concern regarding the circumstances surrounding Gaffney's resignation, including his unwillingness to work with Cerullo, as well as the manner in which Rudolph's $4 million donation was leveraged by the Gaffney administration in a manner contrary to the stated intent of the Board's Executive Committee.

### December 2010

174.  During the December 7, 2010 Executive Session, Puorro reported that, based upon the October 31, 2010 financials, Dowling was running $300,000 behind budget for the first four months of the fiscal year and that its cash flow was extremely strained.

175.  According to Puorro, undisclosed "plans" had been put into place to "ensure that Dowling does not stray further from the budget." He further advised that Dowling's operating cash was approximately $3 million for 2010 and almost $1.3 million would be utilized with Rudolph's $4 million gift used to temporarily fund Dowling's operations.

ACA/2143276.1/066648

176.  Despite Rudolph's substantial gift, Dowling continued to have a "net loss position of $2.9 million."

177.  Indeed, Puorro advised that Dowling had still *not* made its 403(b) pension contribution and that Rudolph, as Dowling's President, intended to donate an additional $4 million to fund the plan.

178.  Puorro acknowledged that Dowling was trying to increase enrollment and to attract donors during a period when Dowling was running at a financial deficit and that neither students nor donors may be interested in Dowling while it was in a deficit situation.

179.  Upon information and belief, despite Puorro's statement that Dowling had implemented undisclosed "plans," Dowling still did not have any strategic plan as recommended by KPMG in *Strategic Financial Analysis* by which it could evaluate those alleged "plans" against any measurable metrics or against Dowling's mission.

180.  Not surprisingly, Puorro reported that, on December 1, 2010, Moody's had placed Dowling on a negative Watch List.

181.  KPMG knew about, and in fact, maintained the Moody's report as part of its audit workpapers for Dowling.

182.  Simply stated, according to Puorro, as of at least December 7, 2010, Dowling had "lost credibility."

183.  During the Executive Board Session, Rudolph stated that, based upon the financial statements, Dowling needed to reduce in size and that the Board and the Administration "must look at everyone" including students, faculty, administration, and staff.

184. Although KPMG, Dowling's auditors, did not report any major deficiencies in Dowling's accounting practices, Puorro stated that "a lot of time was spent going over the financials

with KPMG.  KMPG is concerned over the condition of the College." He invited Board Trustees to meet with him to "go over the ratios."

185.  Upon information and belief, this represented the first and the *only* time that any financial ratios were mentioned at a Dowling Board meeting or appear in any of Dowling's Board documents or minutes.

186.  Moreover, upon information and belief, except for reporting Dowling's results and its poor ratio performance, KPMG never offered Dowling's Board any advice as promised in *Strategic Financial Analysis*.

187.  According to Rudolph's report, at the end of 2010, Dowling was facing its financial situation "head-on" and could fix that situation by making undisclosed "bold changes" and creating a more positive perception among high school guidance counselors and superintendents.

188.  Rudolph also reported that Dowling was forming an Ethics Committee to manage Board and other ethics situations because Dowling needed a "resolution which states that Trustees do not conduct business with the College" so that conflicts (more of which had arisen) could be managed and Dowling could determine the other affiliations of its senior management.

189.  After admitting that Dowling had experienced more Board and administration conflicts, Rudolph called for a significantly stricter policy regarding conflicts so that the Board could "do what is best for" Dowling.

190.  As of December 2010, Dowling's search for a full-time President was still underway.

191.  In 2010, as indicated by Puorro, Dowling's financial ratios did not equate favorably with industry averages or norms.

192.  More specifically, Dowling's Primary Reserve Ratio was 21% rather than the recommended 40% minimum.  Dowling's Viability Ratio, which would ideally be approximately

ACA/2143276.1/066648

125%, was a substandard 26%. Its Equity Ratio hovered around 25% when it should have been between 50% and 85%. Instead of a downward trend, Dowling's Net Tuition Dependency Ratio was flat and/or rising. Its General Support Ratio was 20%. Although positive, Dowling's Net Income Ratio was a meager 1%. Its Operating Income Ratio was 94% and was relatively flat. The Secondary Reserve Ratio was a mere 2%. Dowling's Debt Burden Ratio of 7% was either flat or rising when, in the ideal situation, it would have been declining.

193. Despite KPMG's pronouncement in the 4th Edition of *Strategic Financial Analysis* that the integration of the four basic ratios into the CFI was critically important and that, using the CFI, "[i]nsights obtained from individual ratios are linked back to the institution's objectives to determine if the activities of the institution, separately or together, are aligned with its overall mission," neither Dowling's records nor KPMG workpapers demonstrate that KPMG ever referred to the CFI in connection with its audit of Dowling's 2010 financial statements.

194. Further, according to Dowling's IRS Form 990, in 2010, Dowling spent (a) over $4.2 million on unspecified unspecified "consulting," (b) almost $2.9 million on "supplies," (c) $1.1 million on "athletics and library," and (d) almost $1 million on equipment rental and maintenance. In 2010 Dowling had a bad debt and collection expense of almost $1.34 million.

195. In 2010, upon information and belief, although widely recognized as a necessity among institutions of higher education, Dowling did not do any significant fundraising.

196. In 2010, Dowling, a college whose student tuition represented the bulk of its revenue, had a Development and Alumni Relations Department that was wholly inadequate and supported little or no activity.

197. In fact, according to Dowling's IRS Form 990, Dowling reported that on gross receipts of $675,455 for Board and Dowling fundraising events for the year 2010, Dowling *lost* $54,926.

ACA/2143276.1/066648

198.  Despite (a) Dowling's poor financial performance, (b) its position on Moody's watch list, (c) its failure to abide by any of KPMG's recommendations in *Strategic Financial Analysis*, and (d) the failure of Dowling's Board and administration (including defendants) to offer any coherent plan to manage its failing enrollment (and resultant financial decline) or to bolster its failed fundraising, upon information and belief, KPMG offered no advice.

199.  KPMG did not issue any going concern qualification in its audit report for Dowling.

200.  Under AU Section 341, entitled "The Auditor's Consideration of an Entity's Ability to Continue as a Going Concern,"

> The auditor has a responsibility to evaluate whether there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited (hereinafter referred to as *a reasonable period of time*). The auditor's evaluation is based on his or her knowledge of relevant conditions and events that exist at or have occurred prior to the date of the auditor's report. Information about such conditions or events is obtained from the application of auditing procedures planned and performed to achieve audit objectives that are related to management's assertions embodied in the financial statements being audited.

201.  Under applicable accounting standards, KPMG was required to consider the results of its procedures and, upon completing its audit, identify conditions and events that, when considered in the aggregate, indicate there could be substantial doubt about Dowling's ability to continue as a going concern for a reasonable period of time.

202.  Such conditions and events include (a) negative trends such as recurring operating losses, working capital deficiencies, negative cash flows from operating activities, adverse key financial ratios, (b) other indications of possible financial difficulties such as default on loan or similar agreements, need to seek new sources or methods of financing or to dispose of substantial assets, (c) internal matters such as labor difficulties, substantial dependence on the success of a

ACA/2143276.1/066648

particular project, uneconomic long-term commitments, need to significantly revise operations, and (d) external matters.

203. It is abundantly clear from Dowling's Board minutes and other documents that Dowling's management did not have any coherent plan to manage its failing enrollment (and resultant financial decline), to bolster its failed fundraising, or to pay its enormous Bond debt of $57 million.

204. Nevertheless, KPMG did not issue a going concern qualification.

205. According to Dowling's IRS Form 990, KPMG was paid $168,509 in 2010.

## Dowling In 2011

206. According to Dowling's IRS Form 990, in 2011, Dowling's Board consisted of (a) defendant Curtin, (b) defendant Gonzalez, (c) Kelly, (d) defendant O'Connor, (e) defendant O'Doherty, (f) defendant Parr, (g) defendant Posillico, (h) defendant Puorro, (i) defendant Racanelli, (j) defendant Deborah K. Richman ("Richman"), (k) defendant Rudolph, and (l) Weidhorn.

207. Dowling's IRS Form 990 identified defendant Cerullo as Dowling's Chief Financial Officer.

## January 2011

208. According to Dowling's Board minutes, although Cerullo had worked as Dowling's Chief Financial Officer since October 1, 2010 on a part-time/volunteer basis, he became Dowling's fulltime CFO beginning in January 2011.

## March 2011

209. During the March 9, 2011 Executive Board Session, Puorro, acting as Chairman of the Board, discussed the results obtained by Dowling's Presidential Search Committee and the

prospective candidates for the position of President of Dowling.

210.  After some discussion, Curtin suggested that the Board conduct a straw vote.

211.  The Board unanimously voted to hire Dr. Jeremy Brown ("Dr. Brown") as Dowling's next President effective June 1, 2011 and directed the Negotiating Committee, which consisted of Puorro and Rudolph, to negotiate an employment agreement with Dr. Brown.

212.  At the Board meeting on March 15, 2011, Puorro asked Cerullo to discuss Dowling's Statement of Activity as of January 31, 2011.

213.  Cerullo reported that Dowling's student tuition was relatively flat to its budget, but that the January 31, 2011 Statement of Activity did not reflect Spring 2011 tuition, which was $1.9 million below budget.

214.  Cerullo further reported that Dowling's total net revenue was $1.8 million below budget and that its expenses were $1.1 million below budget.

215.  As KPMG cautioned in the 4th Edition of SFA, "[i]n many organizations, the annual operating budget is a driving force for managing its finances. However, in most organizations that budget will not articulate to the audited financial statements. The greater the differences between the budget document and the financial statements, the less useful each document becomes."

216.  Dowling's finance and budget function clearly fell victim to that fatal disconnect from actual operating results.

217.  Upon information and belief, at that time, Banner was wholly unreliable, Dowling did not have any strategic plan, and its budget was not tied to any strategic plan as recommended by KPMG in *Strategic Financial Analysis*.

218.  According to Cerullo, there was substantial maintenance that needed to be done on the Brookhaven Campus (a new cooler at a cost of $152,000) and on the Rudolph Campus (new boilers

ACA/2143276.1/066648

at a cost of $125,000). When Cerullo suggested that Dowling would finance those repairs, Puorro directed that the Board be advised before Dowling financed those expenses.

219. As the Board meeting progressed, it was reported that Dowling continued to be on the watch list for the rating agencies and had been downgraded from a BB+ to a B by Standard & Poors, and had been downgraded by Moody's from a B3 to a B2 when in actuality Moody's had downgraded Dowling's Bonds to B1.

220. KPMG knew about, and in fact, maintained the Moody's report as part of its audit workpapers for Dowling.

221. Puorro reported that Dowling was projecting Spring revenue to fall between $1.5 million to $2 million behind budget and that Dowling was projecting a $4 million deficit for the 2011 fiscal year.

222. Thereafter, Rudolph discussed the hiring of Dr. Brown as his replacement as President and admitted that, despite concern regarding falling enrollment since 1999, 2011 was really the *first year* Dowling was actively recruiting.

## May 2011

223. In May 2011, after a mere nine (9) months in office as Interim President (for which he was admittedly absent for at least four (4) months), Rudolph was replaced as Dowling's President by Dr. Brown.

224. Although Rudolph had been hailed by Dowling as the person that would turn Dowling around and would solve its issues, those issues persisted when Rudolph left office and remained unresolved and under-addressed.

225. Dr. Brown was similarly lauded as the solution to Dowling's financial and enrollment dilemma.

ACA/2143276.1/066648

**June 2011**

226.  At the June 14, 2011 Board meeting, Puorro introduced Dr. Brown who noted that Dowling did not have a sufficient scholarship tracking system and that most colleges would have a committee to determine whether students met specific standards for academic or "need based" scholarships.

227.  Dr. Brown further advised the Board that he intended to provide Board members with clear and comprehensive reports and that he intended to concentrate his efforts on creating a better internal and external perception of Dowling, retaining new students, recruiting new students, and reviewing curriculum issues such as course offerings and distance learning.

228.  Dr. Brown also stated that he was formulating and clarifying "a long-term vision" for Dowling and that he was revising Dowling's recruitment process.

229.  Dr. Brown emphasized that Dowling needed "to move swiftly and strategically."

230.  In June 2011, Dowling remained on Moody's watch list.

231.  KPMG knew about, and in fact, maintained the Moody's report as part of its audit workpapers for Dowling.

232.  Upon information and belief, at that time, Banner was wholly unreliable, Dowling did not have any strategic plan, and its budget was not tied to any strategic plan as recommended by KPMG in *Strategic Financial Analysis.*

**September 2011**

233.  At the September 13, 2011 Board meeting, certain proposals to seek approval from the New York State Education Department to offer a Bachelor of Arts in Museum Sciences degree, a Bachelor of Science in Fitness Management degree, and a Bachelor of Science in Fitness and Wellness degree were stricken from the Consent Agenda pending receipt of data assessing the need

ACA/2143276.1/066648

for such programs.

234.  Curtin advised that Dr. Brown was reviewing classes and was "tightening the reins on new classes until he has some history and knows what to expect.  Anything proposed must be substantiated."  Moreover, according to Dr. Brown, the Board Committee on Academic Affairs and the Dean of Dowling were unaware of the proposed classes and degrees.

235.  Again, under KMPG's *Strategic Financial Analysis*, Dowling should ***not*** have been offering courses without a strategic plan tied to a budget and to financial metrics.

236.  The very notion that Dowling would offer new courses without any budgetary or strategic analysis simply highlights the Board's failure to implement and to follow any coherent decision-making process.

237.  During the meeting, Dr. Brown reported that (a) Dowling's Fall enrollment was down more than 10% from the prior year, which required Dowling to "right size" its budget, (b) it was "critical" that every effort be made to retain students, and (c) Dowling had been training the recruiters and providing them with the necessary tools to recoup the enrollment losses in recent years**.**

238.  Dr. Brown advised that there was a waiting list for the Rudolph Dorms but that the Brookhaven Dorms "do not have a good reputation."

239.  More importantly, Dr. Brown advised that U.S. News and World Report had ranked Dowling as a "second tier" school.

240.  Rather than focus upon the implementation of a strategic plan or the crucial (but failed) area of Board fundraising, Dr. Brown then discussed his visits to Taiwan and China and ways that Dowling could collaborate with universities in China.

241.  Thereafter, Cerullo delivered the financial report during which he advised the Board

ACA/2143276.1/066648

that Dowling had a $1.4 million deficit *after* Rudolph's $4 million donation.

**October 2011**

242.  On October 4, 2011, Moody's further downgraded Dowling's bonds from B3 to Caa1 and continued Dowling on the watch list for further possible downgrades.

243.  Moody's based the downgrade on Dowling's "further decline in enrollments, low liquidity relative to debt and operations, and thin operating margins." Moody's further noted that Dowling had missed its enrollment targets and that Dowling's balance sheet continued to decline.

244.  Moody's advised investors that Dowling's rating could be further downgraded in the event that Dowling did "not demonstrate significant progress towards improving its student market position" and that "borrowing without commensurate growth of financial resources, inadequate annual debt service coverage, and [an] inability to achieve at least balanced operating performance, absent unusual levels of philanthropic support from the board, could result in a downgrade."

245.  KPMG knew about, and in fact, maintained the Moody's report as part of its audit workpapers for Dowling.

**December 2011**

246.  Dowling's Executive Board Session of December 6, 2011, focused on the now familiar issue of Dowling's struggling enrollment and its potential, but unrealized, sources for fundraising.

247.  Dr. Brown advised the Board that he was working on a strategic plan that he would present to the Board for approval in the Spring.

248.  Cerullo reported that Dowling's (a) revenue was $1.6 million below budget and 14% below the previous year, (b) student tuition was $1.7 million below the previous year, (c) other revenue was trailing behind the budget and the previous year, and, not unexpectedly (d) total revenue was below the previous year.  At the same time, Dowling's personnel expense was higher

ACA/2143276.1/066648

than budgeted and Dowling was having issues with the faculty union.

249.  Based upon Dowling's audited financial statements as provided by KPMG, Dowling had lost almost $8 million since 2009.  Further, between 2010 and 2011, Dowling's (a) total assets declined by almost $7 million, (b) total net assets declined by almost $1 million, (c) revenue declined more than $4.6 million, and (d) unrestricted assets decreased by approximately $2.1 million.

250.  In 2011, Dowling's key ratios did not significantly improve.

251.  More specifically, Dowling's Primary Reserve Ratio was 23% rather than the recommended 40% minimum.  Dowling's Viability Ratio, which would ideally be approximately 125% was 29%.  Its Equity Ratio was 26% when it should have been between 50% and 85%.  Instead of a downward trend, Dowling's Net Tuition Dependency Ratio was increasing.  Its General Support Ratio was 19%.  Dowling's Net Income Ratio had fallen from 1% to a *negative* 2% when it should have been positive.  Its Operating Income Ratio was 93% and was relatively flat.  The Secondary Reserve Ratio was a mere 3%.  Dowling's Debt Burden Ratio of 7% was either flat or rising when, in the ideal situation, it would have been declining.

252.  Neither Dowling's records nor KPMG workpapers demonstrate that KPMG ever referred to the CFI in connection with its audit of Dowling's 2011 financial statements.

253.  Further, according to Dowling's IRS Form 990, Dowling spent (a) over $3.93 million on unspecified "consulting and outside services," (b) almost $1.5 million on "supplies," and (c) $900,000 on "athletics and library."  Dowling had a bad debt and collection expense of almost $1.1 million.

254.  In 2011, upon information and belief, although widely recognized as a necessity among institutions of higher education, neither Dr. Brown nor the Dowling Board did any significant

ACA/2143276.1/066648

fundraising.

255.  In 2011, Dowling, a college whose student tuition represented the bulk of its revenue had a Development and Alumni Relations Department that was wholly inadequate and supported little or no activity.

256.  In fact, according to Dowling's IRS Form 990, Dowling reported that, on gross receipts of $249,799 for Dowling fundraising events for the year 2011, Dowling *lost* $27,149.

257.  Despite (a) Dowling's poor financial performance, (b) its position on Moody's watch list, (c) its failure to abide by any of KPMG's recommendations in *Strategic Financial Analysis*, and (d) the failure of Dowling's Board and administration to offer any coherent plan to manage its failing enrollment (and resultant financial decline) or to bolster its failed fundraising, KPMG offered no advice and did not issue any going concern qualification in its audit report.

258.  According to Dowling's IRS Form 990, KPMG was paid $224,950 in 2011.

**Dowling In 2012**

259.  In 2012, according to Dowling's IRS Form 990, Dowling's Board consisted of (a) defendant Curtin, (b) defendant Fischer, (c) defendant Gonzalez, (d) defendant O'Connor, (e) defendant O'Doherty, (f) defendant Parr, (g) defendant Posillico, (h) defendant Puorro, (i) defendant Racanelli, (j) defendant Richman, (k) defendant Rudolph, and (l) Weidhorn.

260.  Dowling's IRS Form 990 identified defendant Cerullo as Dowling's Chief Financial Officer.

**January 2012**

261.  In its January 20, 2012 letter to Dowling's audit committee, prepared in connection with KPMG's audit of Dowling's June 30, 2011 financial statements, KPMG did not identify Dowling's abject failure to meet any of the critical financial ratios or measures as a concern.

ACA/2143276.1/066648

262.  Upon information and belief, KPMG did not discuss Dowling's CFI or discuss issuing a going concern qualification for Dowling.

**February 2012**

263.  On February 6, 2012, Moody's confirmed the Dowling bond downgrade and advised investors that the "Caa1 rating [was] based on a [sic] declining enrollments, low balance sheet reserves relative to debt and operations and thin operating margins, including heavy reliance on unusually large gifts from a board member in FY 2010 and 2011 in order to balance operations."

264.  KPMG knew about, and in fact, maintained the Moody's report as part of its audit workpapers for Dowling.

**March 2012**

265.  During Dowling's March 13, 2012 Board meeting, Dr. Michael Shapiro, the President of Dowling's Faculty, discussed faculty contract negotiations.  He advised the Board that he had promised Dowling's faculty that they would never lose their jobs and asked for Board guidance.

266.  Puorro advised that the faculty contract was an "albatross which greatly contributed to" Dowling's financial distress and that when an entity is in financial distress, "all factions have to be partners."

267.  Rudolph echoed Puorro's sentiment by advising Dr. Shapiro that significant financial and non-financial changes were needed in the faculty contract.

268.  After Dr. Shapiro was excused, Cerullo provided the Board with financial information. Although Puorro stated that the projected financial model looked "fine," he inquired as to the initiatives that had been put into place to insure that the projections would track.  More specifically, Puorro wanted to know what Dowling's administration had done differently from the previous year.

269.  Upon information and belief, at that time, Banner was wholly unreliable, Dowling did

ACA/2143276.1/066648

not have any strategic plan, and its budget was not tied to any strategic plan as recommended by KPMG in *Strategic Financial Analysis.*

270.  In response, Dr. Brown stated that it would be very difficult to "pin down the model" because it was "unstable due to the many things which are going on."

271.  During the March 13, 2012 Board meeting, Dr. Brown acknowledged that Dowling's enrollment continued to struggle as it had since 1999.

## June 2012

272.  During a "Trustee Only" Executive Board Session held on June 12, 2012, the Board approved the sale to Rudolph of two of Dowling's Residential Real Properties (a) 34 The Keep, East Islip, New York, for $900,000 and (b) 1600 Montauk Highway, Oakdale, New York for $1.1 million totaling $2 million.

273.  Upon information and belief, with the purchase of the two Residential Real Properties, Rudolph's contributions to Dowling approximated $10 million since 2012.   Yet, Dowling continued to experience crippling financial difficulties.

274.  Thereafter, copies of Dowling's "proposed" strategic plan were distributed to Board members by Dr. Brown, who advised that the strategic plan was for five (5) years and needed to be "finalized."

275.  At that same time Dowling (a) was struggling with declining enrollment, (b) was offering one hundred (100) fewer classes in the Fall, and (c) engaged in critical negotiations with the faculty (which at the time of the June 12, 2012 meeting had shrunk by at least eleven (11) people with more anticipated).

276.  Nevertheless, and despite all of the foregoing, to combat comments from parents and guidance counselors concerning Dowling's financial stability, Dowling put ***more*** academic programs

ACA/2143276.1/066648

into place to "indicate" that Dowling was "growing."

277.  Dowling instituted such new programs without any finalized strategic plan and again with no discernible financial metrics.

278.  Further, despite a financial report by Cerullo that projected a $5 million loss driven by revenue that was $7.3 million below budget, Dr. Brown discussed hiring a Vice President for Admissions and a Vice President for Advancement, each at a cost of approximately $150,000 annually, and a Provost at a cost of approximately $200,000 annually.

279.  During the June 12, 2012 Board meeting, Dr. Carlos Cunha, the Executive Chair of the Dowling Faculty, reported

> In my March Report I closed by hoping my June Report could be rosier.  Unfortunately, that is not the case….
>
> In my three years as Executive Chair I have served during the Presidencies of Gaffney, Rudolph and now Brown.  After years of poor leadership (for which the Board is partly responsible) we finally began to head on the correct path under Interim President Rudolph.  Discussions with faculty were lively and helped energize the community in general.  It is unfortunate that Mr. Rudolph has taken a less active role in the last year because the Board's open discussion with the faculty have ceased.
>
> The faculty as a whole was generally committed to the new path of seeking better students to improve the image of the college.  Our understanding, when we began this process under Mr. Rudolph, was that it would take approximately three years for the turnaround to bear fruit.  It was our understanding that Mr. Rudolph had committed himself to that process via institutional support during those years.
>
> Unfortunately, not only is that support now in question, but seeking better students has also stopped.  I have been informed that the registrar is now sending students that had been denied admittance to the college letters welcoming those same students after "reconsideration" of their file.
>
> The college is hemorrhaging good quality staff, faculty, and other personnel either from layoffs or because they abandon a ship that is

ACA/2143276.1/066648

> seen heading to the reefs in this stormy weather.  I suspect that
> quality younger faculty will also begin to look for other jobs given
> the recent austerity measures that have been imposed….
>
> I have lost my confidence in this institution as the Board appears to
> be again veering onto the "low road" rather than the "high road."

280.  In response, Puorro stated that he believed that there was an abundance of Board transparency and apologized if the faculty was of the opinion that the Board has been less transparent.  He stated that the Board would work on correcting and improving that perception.

281.  The day after the June 12, 2012 Board meeting, Dr. Brown sent an email to the Dowling community in which he stated that Dowling had been impacted by "poor economic conditions over the last several years" that had contributed to its financial challenges and declining enrollment.  He then advised Dowling's faculty and staff that, effective June 22, 2012, (a) base wages of all employees would be reduced by 5%, (b) Dowling would no longer make any discretionary pension contributions, (c) a further base wage reduction of 20% percent would be in effect until August 30, 2012 with a severance package offered to departing employees, and (d) each employee would be required to contribute12% of the health insurance premium cost.  He noted that the faculty union had accepted the foregoing changes to the compensation package together with other modifications and that ongoing discussions were being conducted with other campus unions.

282.  Dr. Brown explained Dowling's motivation for such changes by stating that "[s]imply put, over the past several years, the College has lost enrollment and did not react to the changing environment.  That path is, for obvious reasons, no longer viable.  In order to remain a vital institution – indeed, to reposition and fortify ourselves – significant changes must occur."  As a result, Dr. Brown continued, enrollment declines needed to be halted and Dowling's compensation model needed to be modified "in accordance with the new reality."

ACA/2143276.1/066648

283. On June 20, 2012, shortly after Dr. Brown's bombshell, Dowling's Executive Committee passed a resolution that approved the acceptance of a $2 million line of credit from Rudolph. Upon information and belief, with the provision of that line of credit, Rudolph had committed more than $12 million to Dowling since 2010.

284. Nevertheless, and despite Rudolph's financial help and commitment, Dowling continued to operate at a deficit.

**July 2012**

285. The minutes from the July 17, 2012 meeting of the Board Committee on Student Affairs highlights Dowling's dire situation.

286. Those minutes demonstrate that enrollment numbers were fluctuating on a daily basis and that Dowling was "working feverishly to achieve 3745" in enrollment. Nonetheless, as of July 17, 2012, Dowling was 1057 students short of that enrollment goal.

287. During the discussion regarding the Criminal Justice program, defendant Gonzalez was advised that the program had ***not*** been adequately marketed and that of the one hundred (100) students that were anticipated to participate in the program, only sixteen (16) had registered.

288. Moreover, as of the date of the meeting, only one hundred ninety-six (196) beds in the Rudolph Dorm and only one hundred twenty-two (122) beds in the Brookhaven Dorm had been filled. The attendees were advised that Stony Brook University had agreed to refer students to Dowling for housing when, and if, Stony Brook University reached its capacity.

289. In an article published by Moody's dated July 26, 2012 entitled "US Higher Education 2012 Mid-Year Outlook Remains Mixed," Moody's maintained a mixed outlook for the United States not-for-profit private and public higher education sector.

290. According to Moody's, leading universities with strong balance sheets and diversified

ACA/2143276.1/066648

revenue sources would face some new challenges but would be resilient enough to maintain a stable credit outlook.

291.  However, according to Moody's, institutions like Dowling, which were dependent upon student revenues and/or government funding, would continue to have a negative outlook because those institutions attract students regionally rather than nationally, retain less pricing power, and, like Dowling, had weaker balance sheets.

292.  KPMG knew about, and in fact, maintained the Moody's report as part of its audit workpapers for Dowling.

## August 2012

293.  On August 13, 2012, Dowling's auditors, KPMG, walked Dowling's audit committee through KPMG's audit plan for the upcoming fiscal year.

294.  According to Edward Lee, a partner at KPMG, there was "nothing much different in this audit plan than last year's plan."

295.  Despite KPMG's promise that it was "dedicated to helping ensure that the full impact of financial information contained in reports is understood by our clients," nothing in the Dowling record or in KPMG's workpapers indicates that KPMG shared its expertise with the Board or that KPMG utilized its considerable expertise to help Dowling "measure success factors against institution-specific objectives and then give the institution the tools to improve its financial profile to carry out its vision and mission."

## September 2012

296.  At the September 11, 2012 Board meeting, Dr. Brown reported that 2013 looked "brighter" for Dowling *if* there was appropriate retention, recruitment, and revenue in 2012.  He advised that Dowling's cash flow problems persisted.

ACA/2143276.1/066648

297. Shortly thereafter, and after 17 months at Dowling, Dowling's Board fired Dr. Brown as Dowling's President effective October 1, 2012.

**October 2012**

298. Dr. Brown's strategic plan was never completed.

299. Although Dr. Brown had been hailed by Dowling as the person that would turn Dowling around and would solve its issues, those issues persisted when Dr. Brown left office and remained unresolved and under-addressed.

300. Indeed, upon information and belief, Dr. Brown did not personally do any fundraising on Dowling's behalf or stop its enrollment slide.

301. Dr. Brown was replaced by Dr. Elana Zolfo ("Dr. Zolfo") who had been Dowling's interim Provost and the Vice President of Corporate Programs/Continuing Education who acted as Interim President commencing October 1, 2012.

**December 2012**

302. After the Executive Board Session of the December 4, 2012 Board meeting, Vice Chairman Weidhorn, who had been a Board Trustee since 1998, resigned from the Board due to personal family reasons. Dr. Zolfo then reported that enrollment continued to be down and was off by 26% compared to the previous year.

303. During the December 17, 2012 Audit Committee meeting, Edward Lee of KPMG reported that "there were no major issues and KPMG spent more time analyzing the College's ability to continue to exist." He further advised the committee members that "as indicated in the Auditor's Report KPMG has no concerns."

304. Interestingly, despite KPMG and the Board's optimism, Dowling's financial statements for the years ended 2011 and 2012 were dismal.

305.   Those financial statements, as audited by KPMG, showed that Dowling's total assets were down by approximately $6.8 million from 2010, its total liabilities were also down, and that its net assets were down by almost $1 million.

306.   According to the 2011financial statements, Dowling had lost almost $8 million since 2010.

307.   Dowling's 2012 financial statement painted an even bleaker picture.

308.   Dowling's net assets were down from 2011 by an additional $3.678 million as were its total assets (down almost $8 million).

309.   Dowling's total revenue was down a whopping $10.669 million from 2011.

310.   In 2012, Dowling's key ratios were again poor. More specifically, Dowling's Primary Reserve Ratio was 21% rather than the recommended 40% minimum.  Dowling's Viability Ratio, which would ideally be approximately 125% was 25%.  Its Equity Ratio was 24% when it should have been between 50% and 85%.   Instead of a downward trend, Dowling's Net Tuition Dependency Ratio was flat.  Its General Support Ratio was 21%.  Dowling's Net Income Ratio was a *negative* 6% when it should have been positive.  Its Operating Income Ratio was 93% and was relatively flat.  The Secondary Reserve Ratio was a mere 3%.  Dowling's Debt Burden Ratio of 8% was either flat or rising when, in the ideal situation, it would have been declining.

311.   Neither Dowling's records nor KPMG workpapers demonstrate that KPMG ever referred to the CFI in connection with its audit of Dowling's 2012 financial statements.

312.   Further, according to Dowling's IRS Form 990, Dowling spent (a) over $1.8 million on unspecified "consulting and outside service," (b) over $1 million on "supplies" and "equipment rental and maintenance, and (c) almost $1.4 million on "all other expenses."  Dowling had a bad debt and collection expense of $1.45 million.

ACA/2143276.1/066648

313.   In 2012, upon information and belief, Dowling did not do any significant fundraising.

314.   In 2012, Dowling, a college whose student tuition represented the bulk of its revenue had a Development and Alumni Relations Department that was wholly inadequate and supported little or no activity.

315.   According to Dowling's IRS Form 990, Dowling reported that on gross receipts of $190,153 for Dowling fundraising events for the year 2012, Dowling *lost* $28,622.

316.   Despite (a) Dowling's poor financial performance, (b) its position on Moody's watch list, (c) its failure to abide by any of KPMG's recommendations in *Strategic Financial Analysis*, and (d) the failure of Dowling's Board and administration to offer any coherent plan to manage its failing enrollment (and resultant financial decline) or to bolster its failed fundraising, KPMG offered no advice and did not issue any going concern qualification in its audit report.

317.   As of the end of 2012, even though Dowling's slide into financial oblivion was well underway and likely unstoppable, KPMG did not issue any going concern qualification in its audit report.

318.   According to Dowling's IRS Form 990, KPMG was paid $169,775 in 2012.

**Dowling In 2013**

319.   In 2013, according to Dowling's IRS Form 990, Dowling's Board consisted of defendants (a) Curtin, (b) Fischer, (c) Gonzalez, (d) O'Connor, (e) O'Doherty, (f) Parr, (g) Posillico, (h) Puorro, (i) Racanelli, (j) Richman, and (k) Rudolph.

320.   Dowling's IRS Form 990 identified defendant Cerullo as Dowling's Chief Financial Officer.

**March 2013**

321.   On March 7, 2013, Moody's confirmed Dowling's Caa1 rating and reported that

ACA/2143276.1/066648

Dowling's "continuous decline in enrollments" together with average operating margins between FY 2010 and FY 2012 of 0.3% (which had been inflated by Rudolph's $4 million gift) and Dowling's undiversified reliance on student tuition (94.4% of total revenue) were important factors in the rating. Moody's also noted that Dowling's high presidential turnover presented additional challenges.

322. Moody's indicated that a rating upgrade was "highly unlikely" and that Dowling's failure to find a permanent president, stabilize enrollment, and improve its student market position could drive its rating even lower.

323. KPMG knew about, and in fact, maintained the Moody's report as part of its audit workpapers for Dowling.

## May 2013

324. In May 2013, nine (9) months after she took office, Dr. Zolfo was replaced by Dr. Norman R. Smith ("Dr. Smith") as President of Dowling College.

325. Dowling's issues persisted when Dr. Zolfo left office and remained unresolved and under-addressed.

326. Indeed, upon information and belief, Dr. Zolfo did not personally do any fundraising on Dowling's behalf or stop its enrollment slide.

327. Dr. Smith was Dowling's fourth President in three and one-half (3½) years.

328. Dr. Smith, who was then sixty-seven (67) years old, described himself in a Newsday article as a "troubleshooter" who was hired to reverse Dowling's course.

329. According to Newsday, until Dr. Smith's arrival, MSCHE had serious questions concerning Dowling's management and characterized Dowling as a college constantly in "crisis mode."

ACA/2143276.1/066648

330. Once again, Dowling's incoming president was lauded as its savior – this time, it was Dr. Smith.

**June 2013**

331. At the June 11, 2013 Executive Board Session, Cerullo reported that, because undergraduate tuition was $2.7 below budget, Dowling was approximately $5.4 million behind its overall budget.

332. Although Dr. Smith has only been President of Dowling for approximately two (2) weeks, he reported to the Board that he had developed a "clear sense of the intensity of concern about [Dowling's] future and has attempted to convey a sense of optimism that the problems can be successfully addressed" with everyone's cooperation.

333. Unsurprisingly, Dr. Smith stated that the most immediate issues that required attention were Dowling's enrollment and student recruitment.

334. Simply stated, Dr. Smith advised the Board that Dowling had been admitting too many students who were academically unprepared and/or unmotivated to graduate from college and had admitted students who could not afford to attend Dowling except at rates that Dowling could not afford.

335. Dr. Smith noted that "massive numbers" of students dropped out (over 80%) and did not graduate, and that 40% of Dowling's freshmen students did not return for their sophomore year.

336. According to Dr. Smith, those extremely bleak statistics hurt Dowling's ability to enroll academically talented students whose families had the financial wherewithal to afford Dowling's reasonable rate of tuition.

337. The challenge was to change Dowling's student profile to a financially stable student body consisting of students with "a much higher persistence and graduation rate."

338. Dr. Smith further commented that Dowling's marketing program had not targeted the appropriate student audience and had not been directed to high school counselors who had the greatest influence over students. In short, guidance counselors did not perceive Dowling as a "college of choice."

339. Although Dowling's enrollment and image problems had persisted for years, neither the Board nor any administration formulated or implemented any plan to resolve those issues.

340. Dr. Smith's comments would be echoed one year later in KPMG's "2014 Higher Education Industry Outlook Survey" in which KMPG stated that "[w]e believe competition is one of the main factors that will be driving transformation among institutions of higher learning. If a college or university doesn't offer a student experience that is at least comparable to or better in some way than the next school, it stands to lose points among applicants. And, affirming the importance of first impressions, students and their parents will remember their campus tour and how the school presented itself. In the years ahead, it is likely that competition also will lead to more collaboration and consolidation, potentially leading to fewer institutions than exist today. We believe institutions will look more critically at themselves to determine where they want to distinguish themselves in the marketplace. That may mean eliminating some programs and focusing on areas of strength."

341. Finally, Dr. Smith noted that there were "substandard facets" of Dowling's campuses that needed to be addressed if Dowling was going to successfully compete for "college quality students capable of paying private college tuition."

342. Dr. Smith recommended that a "master plan" be designed for an "idealized undergraduate [Rudolph] campus at Oakdale that include[d] today's standard of student housing, a comprehensive student center and a complete recreation and sports facility," all of which needed to

ACA/2143276.1/066648

be funded by "major gifts from donors yet to be found."

343.  Dr. Smith recognized that Dowling might need to consolidate its campuses.

344.  Dr. Smith admonished the Board that they were the primary solicitors of major donors and that Dowling needed to build a Board heavily populated with prospective major donors.  He noted that few colleges, if any, realized major fundraising without a strong Board that took the lead in major giving.

345.  Despite Dr. Smith's and KPMG's caution, Dowling's Board never streamlined Dowling's operations, never underwent the "significant self-examination to improve academic and support services while lowering costs" as recommended by KPMG in *Strategic Financial Analysis*, and certainly never directed Dowling's available resources toward selected programs intended to enhance Dowling's success rather than spread Dowling's insufficient resources over many diverse programs.

346.  Indeed, Dowling, a college in continually fragile financial condition, found itself driven by fiscal, rather than programmatic decisions.  Those decisions, as indicated by Dowling's books and record and the Board minutes, were wholly uninformed.

347.  Moreover, none of Dr. Smith's recommendations were ever implemented by the Board which did not upgrade its campuses, did not engage in major fundraising or Board development, and did not solve its enrollment problems.

348.  Although all of Dowling's obvious issues were recognized by the Board and by its ever-changing administrations, neither the Board, those administrations, nor KPMG offered or implemented any coherent plan to pull Dowling out of its nosedive.

**July 2013**

349.  When Dowling's Audit Committee met on July 8, 2013, in addition to discussing the

ACA/2143276.1/066648

issues that had been addressed in previous audit planning meetings, Edward Lee of KPMG advised the Board that "due to the financial situation of the institution, KPMG will continue to monitor, will put validity around assumptions and projections and check on Board knowledge."

350.  Finally, Edward Lee advised that "currently management believes there to be a surplus, however management is in the preliminary stages of putting together June 30, 2013 financial statements which are subject to various year end accruals and unrealized gains and losses which are not yet calculated to date."

351.  Upon information and belief, at the time of Edward Lee's report, Dowling did not have any strategic plan and had not implemented most, if not all, of the recommendations in KPMG's *Strategic Financial Analysis*.

352.  Upon information and belief, at that time, Banner was wholly unreliable, Dowling did not have any strategic plan, and its budget was not tied to any strategic plan as recommended by KPMG in *Strategic Financial Analysis.*

## **August 2013**

353.  In August 2013, Dowling's Brookhaven Dorm (which was less than 30% occupied), bookstore, and cafeteria were closed due to Dowling's financial struggles.

354.  Clearly, although it had been a topic of discussion for many years that the Board ignored, the cost of operating two campuses with Dowling's limited enrollment was contributing to its financial woes.

355.  Nevertheless, and upon information belief, despite encouragement to consolidate Dowling's campuses by Dr. Smith and by Dr. Albert Inserra (who later became Dowling's last President), Dowling did not explore sale, development, or other options to consolidate.

356.  Moreover, on August 25, 2013. Newsday reported that, over a five-year period,

ACA/2143276.1/066648

Dowling paid to (a) Lessing's, a company tied to Curtin through his son-in-law, Peter Lessing, more than $4.5 million for cafeteria services, (b) Posillico Civil more than $27,000, (c) Farrell Fritz, Racanelli's law firm, more than $13,000, and (d) an undisclosed sum to Prime Visibility Media Group, a company in which former trustee Henry served as chief executive officer.

## September 2013

357.  During the September 10, 2013 Board meeting, Dr. Smith reported that Fall enrollment was down and could potentially drop below the Fall 2012 level of 3,400 students by 750-800 students. The weak enrollment was a result of a significantly smaller applicant pool because applications were down by over eight hundred (800).

358.  Quite disturbingly, Dr. David Marker, Dowling's Provost, expressed concern that Dowling's academic records had not been properly managed, thereby placing its accreditation and Federal financial aid potentially at risk.

359.  Although Dr. Marker was trying to correct the situation, at least five hundred (500) student files were not complete and students had been admitted without the proper documentation. Moreover, more than one hundred fifty (150) student files were missing.

360.  Dr. Marker also expressed concern that Dowling did not have a College Catalog which, from a "legal standpoint" was required to be current.  Dr. Smith noted that the individual who was working on the College Catalog was not qualified to do so.

361.  At the Executive Session on September 10, 2013, Cerullo reported that 2013-2014 revenue was down another $5 million.  The Board discussed invading Dowling's endowment to manage its cash shortfalls and the potential sale of twelve (12) more Residential Real Properties.

362.  Dr. Smith reported that Dowling was in discussions with Stony Brook University to sublet Dowling's Brookhaven Dorm.

ACA/2143276.1/066648

**October 2013**

363.  During the Executive Session held on October 23, 2013, Cerullo presented Dowling's operating budget for 2013-2014 based upon its actual enrollment which forecasted a three hundred (300) student increase in enrollment for the Spring 2014 semester.

364.  When the topic of staff cuts was discussed, Dr. Smith expressed concern that additional cuts would cast Dowling further into a negative light and would run contrary to its attempts to communicate an optimistic future to counter bad press.

365.  In 2013, Dowling's key ratios were again dismal.

366.  More specifically, Dowling's Primary Reserve Ratio was 26% rather than the recommended 40% minimum.  Dowling's Viability Ratio, which would ideally be approximately 125% was 27%.  Its Equity Ratio was 24% when it should have been between 50% and 85%.  Instead of a downward trend, Dowling's Net Tuition Dependency Ratio was flat.  Its General Support Ratio was 23%.  Dowling's Net Income Ratio was a 0% when it should have been positive.  Its Operating Income Ratio was 99% and had risen.  The Secondary Reserve Ratio was a mere 3%.  Dowling's Debt Burden Ratio of 9% and had risen when, in the ideal situation, it would have declined.

367.  Again, neither Dowling's records nor KPMG workpapers demonstrate that KPMG ever referred to the CFI in connection with its audit of Dowling's 2013 financial statements.

368.  Dowling continue to use Banner for its financial, human resources, and student applications.

369.  In 2013, Dowling had not changed its Banner configuration since its installation in 1992.

370.  In 2013, Dowling's personnel had very limited knowledge of the Banner system, did

ACA/2143276.1/066648

not have the proper skill set to extract or analyze data from Banner, and Dowling only used Banner to a fraction of its capacity.

371.    Moreover, in 2013, as a result of obvious deficiencies in Dowling's chart of accounts, Dowling was unable to extract or analyze revenue and expense data by academic program but only by department.

372.    In 2013, Dowling's Banner data was unreliable.

373.    Dowling did not have any reliable report to assess departmental and academic program financial results and had an insufficient chart of accounts that did not enable Dowling to adequately conduct its financial reporting and analysis.

374.    Consequently, Dowling's Board and Dowling's administration did not have the proper tools to evaluate Dowling's financial position or to make informed decisions.

375.    Dowling did not perform any academic profitability analysis for the fiscal year 2013.

376.    In 2013, Dowling needed to make a major investment in Information Technology including infrastructure, applications and human capital in order to improve that function and be more competitive with its peers.

377.    In 2013, Dowling undertook no such Information Technology investment.

378.    Further, according to Dowling's IRS Form 990, Dowling spent (a) over $3.6 million on unspecified "outside services," (b) over $300,000 on "administration fees," and (c) over $400,000 on "athletics." Dowling had a bad debt and collection expense of $458,104.

379.    In 2013, upon information and belief, Dowling did not do any significant fundraising.

380.    In 2013, Dowling, a college whose student tuition represented the bulk of its revenue had a Development and Alumni Relations Department that was wholly inadequate and supported little or no activity.

ACA/2143276.1/066648

381.  In fact, according to Dowling's IRS Form 990, Dowling reported that on gross receipts of a mere $109,536 for Dowling fundraising events for the year 2013, Dowling *lost* $8,169.

382.  Despite (a) Dowling's poor financial performance, (b) its position on Moody's watch list, (c) its failure to abide by any of KPMG's recommendations in *Strategic Financial Analysis*, and (d) the failure of Dowling's Board and administration to offer any coherent plan to manage its failing enrollment (and resultant financial decline) or to bolster its failed fundraising, upon information and belief, KPMG offered no advice.

383.  KPMG did not issue any going concern qualification in its audit report.

**December 2013**

384.  On December 18, 2013, KPMG published its presentation to Dowling's audit committee regarding Dowling's June 30, 2013 and 2012 financial statements.

385.  Dowling's audited year-end financial statements for 2012-2013 continued to paint a bleak picture for Dowling's financial future.

386.  More specifically, in 2013, total assets were down an additional $4.3 million with total net assets losing approximately $876,000.

387.  Additionally, Dowling's revenue was down by approximately $7.2 million.

388.  Significantly, KPMG reported that in "connection with the June 30, 2013 audit, we performed procedures to evaluate certain events and conditions in order to assess whether there could be substantial doubt about the College's ability to continue as a going concern for a reasonable period of time.  These procedures included analyzing the College's fiscal year 2014 budgets, cash flow projections, and enrollment figures; as well as obtaining representations from management regarding plans and activities to remediate the financial concerns.  Based on the procedures performed, we concluded that the College appears to have the ability to continue as a going concern

ACA/2143276.1/066648

through July 1, 2014."

389. KPMG pointed out that Dowling's Primary Reserve Ratio was 27% in 2013 and had been 19% in 2011 and 2012 rather than the preferred 40% to 100%. Upon information and belief, other than stating those facts, and noting that the Primary Reserve Ratio was a "DOE financial responsibility ratio," KPMG offered no advice.

390. KPMG further reported that Dowling's Viability Ratio was 27% for 2012 and had been 24% and 23% for 2011 and 2012, respectively. Other than acknowledge that a Viability Ratio of 125% to 150% or higher was achieved by the most creditworthy institutions and that the Viability Ratio was a "DOE financial responsibility ratio," upon information and belief, KPMG offered no advice.

391. Similarly, KPMG advise Dowling's audit committee that Dowling's Net Income ratio was 0.00% in 2013 and *negative* 2% and *negative* 6% in 2011 and 2012 respectively. Other than note that a positive ratio would indicate that Dowling experienced a surplus for the year and that the Net Income Ratio was a "DOE financial responsibility ratio," upon information and belief, KPMG offered no advice.

392. KPMG reported that Dowling's Net Tuition Dependency Ratio had been 93% in 2011, 94% in 2012, and 100% in 2013. It advised Dowling's audit committee that a downward trend would be preferred yet offered no advice.

393. Regarding Dowling's Debt Service Coverage Ratios of 117% in 2011, 67% in 2012, and 141% in 2013, KPMG simply reported those ratios but offered no advice.

394. Again, despite KPMG's pronouncement in the 4th Edition of *Strategic Financial Analysis* that the integration of the four basic ratios into the CFI was critically important and that, using the CFI, "[i]nsights obtained from individual ratios are linked back to the institution's

ACA/2143276.1/066648

objectives to determine if the activities of the institution, separately or together, are aligned with its overall mission," neither Dowling's records nor KPMG workpapers demonstrate that KPMG ever referred to the CFI in connection with its audit of Dowling's 2014 financial statements.

395.  According to Dowling's IRS Form 990, KPMG was paid $241,000 in 2013.

**Dowling In 2014**

396.  In 2014, according to Dowling's IRS Form 990, Dowling's Board consisted of defendants (a) Patricia M. Blake ("Blake"), (b) Curtin, (c) Gonzalez, (d) O'Connor, (e) O'Doherty, (f) Parr, (g) Posillico, (h) Puorro, (i) Racanelli, (j) Richman, and (k) Rudolph.

397.  Dowling's IRS Form 990 identified defendant Cerullo as Dowling's Chief Financial Officer.

**March 2014**

398.  On March 10, 2014, Moody's downgraded Dowling's bonds from Caa1 to Ca with a negative outlook.

399.  Moody's reported that the ratings downgrade reflected "the magnitude of Dowling's financial challenges as well as the higher probability of default and expectation of impairment in the event of default."

400.  Moody's called Dowling's enrollment decline "unsustainable" after Dowling experienced a 20% enrollment drop in Fall 2013 (which Moody's noted was down 45% from 2008) and seriously questioned Dowling's continued viability.

401.  Moody's was concerned that Dowling's "operating cash flow [was] thin and had been variable" with "no access to external sources of liquidity to manage ongoing operational challenges." In short, Moody's predicted that Dowling's ability to return to financial stability was "difficult."

ACA/2143276.1/066648

402.   Finally, Moody's noted that Dowling's Bonds could be further downgraded as a result of a "debt restructuring, debt acceleration, payment default or bankruptcy filing."

403.   On March 13, 2014, Standard & Poor's lowered Dowling's rating from BBB- from BBB.

404.   Standard & Poor's rating reflects Dowling's high debt levels, its significant operating deficit, and its poor liquidity as well as Dowling's limited admissions flexibility, its weakening demand, and its lack of geographic diversity.

405.   KPMG knew about, and in fact, maintained the Moody's report and the Standard and Poor's report as part of its audit workpapers for Dowling.

**Spring 2014**

406.   In the Spring of 2014, MSCHE placed Dowling on "warning status" in relation to "Standard 3" concerning "Institutional Resources" because MSCHE was concerned about Dowling's ineffective and inefficient use of its resources to achieve its mission and goals.

407.   MSCHE's warning concerned Dowling because of the potential for loss of its accreditation, which would result in the loss of access to the Federal Loan Program and because of the impact that it would have upon enrollment.

408.   Upon information and belief, certain of Dowling's Board had deposited funds with Hanover Community Bank in order to secure a long term obligation on behalf of Dowling during its fiscal challenges.

**August 2014**

409.   In August 2014, Dr. Albert Inserra ("Dr. Inserra"), who had been a Dowling professor and the chief faculty union negotiator in 2012, replaced Dr. Smith as Dowling's President and would serve in that position until Dowling slipped under the financial waves in 2016.  Dr. Inserra was

ACA/2143276.1/066648

Dowling's third President in three (3) years.

410.   Although Dr. Smith had been hailed by Dowling as the person that would turn Dowling around and would solve its issues, those issues persisted when Dr. Smith left office and remained unresolved and under-addressed.

411.   Indeed, upon information and belief, Dr. Smith did not personally do any fundraising on Dowling's behalf or stop its enrollment slide.

**September 2014**

412.   After welcoming Dr. Inserra at the September 9, 2014 Board meeting, Dr. Inserra advised that he had met with various department heads, retained an admissions consultant, and was "marching toward stability." Dr. Inserra also advised that he had spoken to the faculty union about further modification of their contract.

413.   Cerullo reported that expenses were over budget by $300,000 and that enrollment was down to 1,989 students.

414.   During the September 9, 2014 Board meeting, Dr. Inserra reported that Dr. Brown's strategic plan had been scrapped and restarted by Dr. Smith who had submitted a "plan" to MSCHE in the form of minutes and a "framework."

415.   Upon information and belief, MSCHE rejected Dowling's half-hearted "strategic plan" and gave Dowling an extension to file a proper strategic plan.

416.   The Brookhaven Dorm, bookstore, and cafeteria were reopened in September 2014 after Dowling made arrangements for Dowling students to live alongside Stony Brook University's students.

417.   During the September 2014 meeting, it was reported that in 2009 Dowling's incoming freshman totaled five hundred twenty-five (525) students but that only seventy-seven (77) graduated.

In 2010, of the four hundred fifty-eight (458) incoming freshman, only fifty (50) graduated four (4) years later.  Dowling lost nearly 60% of the incoming freshman class for 2011 and more than 50% of the 2012 class.  After one year, Dowling lost 25% of the incoming class of 2013.

**November 2014**

418.  At the November 13, 2014 Board meeting, Cerullo reported that Fall 2014 enrollment was below projections by two hundred seventy-five (275) students.

419.  Cerullo further reported that Dowling's budget was based upon an enrollment of two thousand three hundred (2300) students and that the two hundred seventy-five (275) student shortfall would have a cash impact.

**December 2014**

420.  At the December 2, 2014 Board meeting, Cerullo reported that tuition was trailing the budget by $1.2 million and that total net revenue was trailing budget by $1.7 million.

421.  By December 2014, Dowling was selling more Residential Real Properties to prop up its failing finances.

422.  In 2014, Dowling's key ratios had not improved.   More specifically, Dowling's Primary Reserve Ratio had fallen to 20% rather than the recommended 40% minimum.  Dowling's Viability Ratio, which would ideally be approximately 125% had fallen to 19%.  Its Equity Ratio had dipped to 21% when it should have been between 50% and 85%.  Instead of a downward trend, Dowling's Net Tuition Dependency Ratio was up to 116%.  Its General Support Ratio was up to 23% to 28%.  Dowling's Net Income Ratio was a *negative* 12% when it should have been positive.  Its Operating Income Ratio was 87% and had risen.  The Secondary Reserve Ratio was a mere 4%.  Dowling's Debt Burden Ratio of 12% and had risen when, in the ideal situation, it would have been declining.

ACA/2143276.1/066648

423. Dowling continued to use Banner for its financial, human resources, and student applications.

424. In 2014, Dowling had not changed its Banner configuration since its installation in 1992.

425. In 2014, Dowling's personnel had very limited knowledge of the Banner system, did not have the proper skill set to extract or analyze data from Banner, and Dowling only used Banner to a fraction of its capacity.

426. Moreover, in 2014, as a result of obvious deficiencies in Dowling's chart of accounts, Dowling was unable to extract or analyze revenue and expense data by academic program but only by department.

427. In 2014, Dowling's Banner data was unreliable.

428. Dowling did not have any reliable report to assess departmental and academic program financial results and had an insufficient chart of accounts that did not enable Dowling to adequately conduct its financial reporting and analysis.

429. Consequently, Dowling's Board and its administration did not have the proper tools to evaluate Dowling's financial position or decisions.

430. Dowling did not perform any academic profitability analysis for the fiscal year 2014.

431. In 2014, Dowling needed to make a major investment in Information Technology including infrastructure, applications and human capital in order to improve that function and be more competitive with its peers.

432. In 2014, Dowling undertook no such Information Technology investment.

433. Further, according to Dowling's IRS Form 990, Dowling spent (a) over $1.0 million on "outside services," (b) almost $365,000 on "athletics," and (c) over $242,000 on "administration

ACA/2143276.1/066648

fees." Dowling had a bad debt and collection expense of $141,795.

434.  In 2014, upon information and belief, Dowling did not do any significant fundraising.

435.  In 2014, Dowling, a college whose student tuition represented the bulk of its revenue, had a Development and Alumni Relations Department that was wholly inadequate and supported little or no activity.

436.  In fact, according to Dowling's IRS Form 990, Dowling reported that on gross receipts of a mere $108,439 for Dowling fundraising events for the year 2014, Dowling *lost* $4,957.

437.  Despite (a) Dowling's poor financial performance, (b) its position on Moody's watch list, (c) its failure to abide by any of KPMG's recommendations in *Strategic Financial Analysis*, and (d) the failure of Dowling's Board and administration to offer any coherent plan to manage its failing enrollment (and resultant financial decline) or to bolster its failed fundraising, upon information and belief, KPMG offered no advice.

438.  KPMG did not issue any going concern qualification in its audit report.

439.  According to Dowling's IRS Form 990, KPMG was paid $231,000 in 2014.

## Dowling In 2015

440.  In 2015, Dowling's Board consisted of defendants (a) Blake, (b) Curtin, (c) Gonzalez, (d) O'Connor, (e) O'Doherty, (f) Parr, (g) Posillico, (h) Puorro, (i) Racanelli, (j) Richmond, and (k) Rudolph.

441.  Cerullo continued as Dowling's Chief Financial Officer.

## February 2015

442.  As of February 24, 2015, Dowling still had not completed its strategic plan to the satisfaction of MSCHE because Dowling had still only provided a "framework" and not a fully formed strategic plan.

ACA/2143276.1/066648

443. Dr. Inserra reported to the Board that MSCHE had placed Dowling into "warning status" because of Dowling's need to improve upon MSCHE standards concerning "Financial Resources," "Institutional Effectiveness," and "Institutional Assessment."

444. The Board moved to approve the submission of Dowling's strategic plan to MSCHE.

445. At that time, Dowling's revenue was $4.1 million under budget and its gross tuition was $3.4 million behind budget due to the loss of two hundred seventy-five (275) students from the Fall 2014 projections.

**March 2015**

446. In its March 27, 2015 "Presentation to the Audit Committee" of Dowling, KPMG reported that, for fiscal year 2014, net tuition and fees had decreased $10.5 million from 2013 levels principally because of falling enrollment.

447. KPMG also reported that Dowling's operating expenses had decreased primarily due to the reduction in employees.

448. KPMG further noted that Dowling's Primary Reserve Ratio for 2014 was 21% rather than the ideal 40% to 100% ratio. Despite Dowling's poor performance, KPMG, a leader in the higher institutional education field and the co-author of *Strategic Financial Analysis*, offered no advice.

449. According to KPMG, Dowling's Viability Ratio, which should have been at least 125% or higher, was a mere 20% and that Dowling's Net Income Ratio was a *negative* 12% rather than a healthy positive. Again, upon information and belief, KPMG offered no advice.

450. Not surprisingly, KPMG reported that Dowling's Net Tuition Dependency Ratio, which had been 94% in 2012 and 1.00 in 2013 was 93% in 2014. KPMG also stated that Dowling's "tuition and fees represents 89% of operating revenues" and that when "auxiliary revenues were

ACA/2143276.1/066648

included, student source revenues account for 96% of operating revenues and 86% of total expenses." Again, upon information and belief, KPMG offered no advice.

451. Finally, Dowling's 34% Debt Service Coverage Ratio in 2014 was enough to raise concerns about Dowling's inability to sustain its operations, especially in the face of future budgetary challenges. Again, upon information and belief, KPMG offered no advice.

452. Neither Dowling's records nor KPMG workpapers demonstrate that KPMG ever referred to the CFI in connection with its audit of Dowling's 2014 financial statements.

453. At the March 27, 2015 meeting of the Board Committee on Audit, KPMG partner, Edward Lee, finally discussed "going concern considerations" and that the issue of Dowling's ability to continue as a "going concern" needed to be assessed.

454. Despite Dowling's massive and continuing losses, its inability to attract and to keep students, and the public recognition of those undeniable facts by Moody's and Standard and Poors, Edward Lee reported that KPMG was "confident that Dowling" could continue as a going concern.

455. Regarding Dowling's ratios, Edward Lee simply advised the Board that the "graphs" in KPMG's report were "going down" and those graphs needed to move upward.

456. He provided the Board with KPMG's "2014 Higher Education Industry Outlook Survey" and advised that it addressed the "many things which impact a lot of decisions and mandates which higher education needs to deal with, including the true risks that impact" colleges and universities.

## April 2015

457. Dowling's financial statements for the years 2013 and 2014, which KPMG released on April 8, 2015, continued to paint a bleak picture.

458. For 2013, Dowling's total assets were down an additional $4.3 million and its total net

assets were down by more than $875,000 from 2012.

459.  For 2013, Dowling's total revenue was down by $7.2 million.

460.  For fiscal year 2014, Dowling's total assets were down another $8.486 million with total net assets falling by $4.8 million.

461.  Dowling's 2014 revenue was down $12.1 million with a massive decrease in unrestricted assets.

462.  In short, in 2009, Dowling's total assets exceeded $106.5 million while in 2014 total assets had fallen to $77.8 million.

463.  In 2009, Dowling's total revenue was $73.5 million while in 2014 total revenue was $43.8 million – a $29.7 million decline.

464.  Dowling's rapidly plummeting enrollment and exorbitant debt service continued to crush the college financially.

465.  During the April 20, 2015 meeting, Dowling's Executive Committee discussed Dowling's 2002 and 2006 Bonds.

466.  Dr. Inserra advised the Board that Oppenheimer & Co. ("Oppenheimer") had requested that Dowling conduct a full Board meeting on April 30, 2015 to review the proposed restructuring of the Bonds.

467.  During the Executive Committee meeting, the Board learned that Dowling had been involved in discussions regarding the 2006 Bonds with Oppenheimer, the largest bondholder. Oppenheimer owned 100% of the 2002 Bonds and a majority of the 2006 Bonds.  Dowling had entered into a confidentiality agreement with Oppenheimer in March 2015.

468.  The Board discussed the implications of Dowling's failure to make two (2) bond payments due on April 24, 2015.

ACA/2143276.1/066648

469.  ACA Financial Guaranty Corporation ("ACA"), the Bond insurer,  had agreed to issue a waiver for the 2006 Bonds and would not report a missed payment unless it was ultimately not paid.

470.  The Board discussed forbearance agreements with both ACA and Oppenheimer and that as a requirement of Oppenheimer's forbearance, Dowling would be required to hire an outside financial consultant and a turn-around consultant from a list provided by Oppenheimer. Oppenheimer insisted that by June 1, 2015, Dowling present a plan to get through the Summer.

471.  Dr. Inserra and Cerullo were concerned about Dowling retaining a turn-around consultant because prior consultants provided little or no results.

472.  Dr. Inserra and Cerullo then outlined various sources for additional loans that Dowling was pursuing and the fact that more of Dowling's Residential Real Properties were on the market.

**May 2015**

473.  On May 29, 2015, Dowling retained Cohn Reznick LLP ("Cohn Reznick") as the financial advisor recommended by the lenders.

**June 2015**

474.  During the June 9, 2015 Board meeting, it was announced that Dowling's final Spring 2015 enrollment was 1938 students.

475.  By no later than June 2015, Dowling had defaulted under various provisions of the Bonds and had entered into forbearance negotiations with its creditors, including UMB and Wilmington as successor Indenture Trustees.

476.  On or about June 15, 2015, Dowling entered into substantially similar forbearance agreements with the majority holders of the Bonds, the 2006 Bond Trustee and ACA as bond insurer of the Series 2006 Bonds.

ACA/2143276.1/066648

477.  In June 2015, Dowling financed its working capital and other needs by the Series 2015 Taxable Revenue Bonds issued in the principal amount of $6.7 million (the "Series 2015 Bonds") pursuant to a Trust Indenture dated June 15, 2015 (the "2015 Indenture") between Dowling, as issuer, and UMB Bank, as trustee (the "2015 Bond Trustee").

478.  The proceeds of the Series 2015 Bonds were utilized to, among other things, refinance in full Dowling's obligations to TD Bank, N.A., which previously held a lien on the Residential Real Property, and to provide certain working capital to fund operating expenses.

479.  Pursuant to the 2015 Indenture, the Series 2015 Bonds are secured by first position mortgage liens on all of the Residential Real Property and all revenue pledged by Dowling to the 2015 Bond Trustee.

480.  Additionally, in connection with the issuance of the Series 2015 Bonds, Dowling granted to the Series 1996 Bond Trustee and the 2002 Bond Trustee second position mortgage liens on the Residential Real Property.

## July 2015

481.  On July 23, 2015, Moody's reported that Dowling had entered into a forbearance agreement with the Bond Trustees and reported that Dowling's Ca rating reflected "the magnitude of Dowling's financial challenges," including a multi-year trend of declining enrollment, weak operating performance, and thin liquidity.

482.  KPMG knew about, and in fact, maintained the Moody's report as part of its audit workpapers for Dowling.

483.  Dowling continued to use Banner for its financial, human resources, and student applications.

484.  In 2015, Dowling had not changed its Banner configuration since its installation in

ACA/2143276.1/066648

1992.

485.  In 2015, Dowling's personnel had very limited knowledge of the Banner system, did not have the proper skill set to extract or analyze data from Banner, and Dowling only used Banner to a fraction of its capacity.

486.  Moreover, in 2015, as a result of obvious deficiencies in Dowling's chart of accounts, Dowling was unable to extract or analyze revenue and expense data by academic program but only by department.

487.  In 2015, Dowling's Banner data was unreliable.

488.  Dowling did not have any reliable report to assess departmental and academic program financial results and had an insufficient chart of accounts that did not enable Dowling to adequately conduct its financial reporting and analysis.

489.  Consequently, Dowling's Board and its administration did not have the proper tools to evaluate Dowling's financial position or make informed decisions.

490.  Dowling did not perform any academic profitability analysis for the fiscal year 2015.

491.  In 2015, Dowling needed to make a major investment in Information Technology including infrastructure, applications, and human capital in order to improve that function and be more competitive with its peers.

492.  In 2015, Dowling undertook no such Information Technology investment.

493.  In 2015, Dowling's Development and Alumni Relations were inadequate and supported little or no activity.

**August 2015**

494.  On August 18, 2015, CohnReznick issued its Phase 1 Assessment regarding Dowling.

495.  When Cohn Reznick extracted financial and student data from the Banner system to

ACA/2143276.1/066648

conduct the analysis for 2015, it discovered many anomalies in the extracted data that highlighted the deficiencies in Dowling's reporting, data extraction, and profitability analyses.

496.  For example, Dowling had education departments without tuition and fee revenue or personnel costs.  As a result, Cohn Reznick deemed the Banner data to be unreliable.

497.  Cohn Reznick also reported that Dowling's deferred maintenance had increased, that the cost of maintaining its facilities continued to rise, that its existing facilities required "significant expenditures to refurbish and restore," and that aesthetics and functionality were negatively impacting enrollment.

498.  According to Cohn Reznick, Dowling's Information Technology environment was "aging" and had "a very limited degree of effectiveness."

499.  Moreover, Cohn Reznick noted that Dowling's *management* indicated that Dowling's Information Technology infrastructure was "marginal" and that the accuracy of the data extracted from Banner was "always in question."

500.  Importantly, Cohn Reznick reported that Dowling's *management* did not believe that it could "readily access information to support decision making" and that it was difficult for Dowling to respond to data requests which often took days or weeks to generate.

501.  According to Cohn Reznick, "senior management of Dowling does not have confidence in the accuracy of extracted enrollment management related data."

502.  In sum, Cohn Reznick concluded that "the information technology area at Dowling does not compare favorably to industry best practices" and "when considering academic computing, the support for this function is not comparable to Dowling's peers."

503.  Cohn Reznick advised that Dowling would need to make a major investment in Information Technology including in infrastructure, applications, and human capital.

ACA/2143276.1/066648

504. According to Cohn Reznick, Dowling was "at a significant disadvantage by not having access to critical business data to manage key aspects of operations including enrollment management, student financial assistance, budgets and cash flow."

505. Regarding Dowling's facilities, Cohn Reznick met with Dr. Inserra and Cerullo who noted that Dowling's current facilities had tremendous challenges because the cost to maintain those facilities continued to rise and infrastructure costs such as HVAC, roofing, and electrical were anticipated to be high.

506. In the critical areas of Development and Alumni Relations, Cohn Reznick reported that its representatives discussed those areas with Inserra and discussed Inserra's intention to restore those functions to Dowling's operations.

507. Dr. Inserra reported to Cohn Reznick that Dowling had eliminated the Development and Alumni Relations Office as a result of staff turnover and a decision by Dowling not to refill vacant positions.

508. Inserra admitted that there had been little or no activity by Dowling in the area of Development and Alumni Relations.

509. According to Cohn Reznick, Dowling's Development and Alumni Relations operating "significantly departs from industry standards" because "many institutions have robust operations and have expended significant effort to build rapport with alumni and prospective donors." Dowling did not.

510. Although the Board and previous presidents deemed the retention of a Director of Alumni Relations as a "critical hire" and although the Board had directed previous administrations to pursue the reestablishment of that department, previous presidents did not follow upon the Board's directive.

ACA/2143276.1/066648

511. Dr. Inserra further acknowledged that Dowling needed to expand its efforts to increase fundraising and that Board development had been stressed with the need to attract new Board members that have the capacity and willingness to donate to Dowling as a particular emphasis.

512. Industry best practices dictated that an institution develop performance measures around each initiative and develop a projection of related revenues and costs for each so that there can be a measurement of success.

513. Regarding academic strategic plans, industry best practices were to create an environment in which the institution could assess the resources that would be required to implement the plan as well as the potential return on investment for each item in the strategic plan. The institution's strategic plan should be linked to outcome and then to project financial results based upon those anticipated outcomes.

514. Although Dowling had developed a strategic plan for 2014-2017, Dowling's Strategic Plan did not provide for any measurement of outcomes or any analysis of its financial impact upon Dowling.

515. That linkage was a key element necessary for Dowling to satisfy MSCHE's Standard 3.

516. Moreover, unlike other similarly situated institutions, Dowling did not have a department of Institutional Research ("IR") but rather "informal" research was conducted by faculty members or Dowling's deans.

517. Cohn Reznick noted that, despite declining enrollment, Dowling did not have any IR function to evaluate its programs and course offerings and that there had been turnover in key Enrollment Management positions including a director of admissions, an international recruiter, a freshman counselor, and a graduate recruiter.

518. As a result, Dowling conducted limited analysis or market research to assess current

72

academic programs or identify new course offerings to attract students.

519. Additionally, other institutional data relating to demographics, academic profile, retention, graduation, placement, and financial aid was not generated for regular use by Dowling's management.

520. Although Dowling appointed a Dean of Institutional Effectiveness in September 2014, who initially was focused on developing assessment standards for MSCHE accreditation, that individual's functions were never expanded to include more traditional IR functions.

521. As with other areas in Dowling, Cohn Reznick noted that there was limited financial data developed to project revenues and expenses for programs.

522. An industry best practice is to conduct analyses on the revenues and expenses by academic program. The analysis should be done considering both direct program costs as well as indirect program costs.

523. Cohn Reznick reported that Dowling's Vice President of Finance and Administration conducted an analysis of revenues and expenses by school during fiscal year 2013.

524. No similar analysis was conducted for FY 2014 or 2015 because Dowling did not complete its June 30, 2014 financial statement audit until May 2015.

525. As discussed earlier, Dowling's chart of accounts in its Banner system did not allow Dowling or Cohn Reznick to conduct any analysis on a program level but only as it related to Dowling's various majors.

526. In its report, Cohn Reznick concluded that Dowling's significant enrollment erosion was due "in large part due to its program offerings and its enrollment management team," which had tremendous turnover.

527. An industry best practice includes reviewing the status of all student accounts and

ACA/2143276.1/066648

determining how many students had financial holds on their accounts.

528.  Another industry best practice is to engage faculty to participate in outreach with continuing students in order to determine their intent to return to Dowling.

529.  Although Dowling indicated that it regularly performed these best practices as part of its normal operating procedures, Cohn Reznick reported that, as of mid-July 2015, those activities had not been aggressively undertaken.

530.  Regarding Dowling's financial management, Cohn Reznick suggested that a new position be considered, to handle the additional financial and budgeting requirements and to replace the employee resource that was lost to retirement in 2014.

531.  Cohn Reznick reported a glaring deficiency in Dowling's interim financial reporting.

532.  Dowling customarily closed its accounts monthly and prepared normal reconciliations, and GAAP adjustments.

533.  Dowling, however, did not close its books until mid-month rather than at month end. The purpose of a month end report is to provide the Board with a snapshot of Dowling's financial condition relating to P&L for the month and cumulatively (for current and prior years), as compared to the budget, enrollment statistics, accounts receivable and accounts payable information and cash management reporting.

534.  As of the date of Cohn Reznick's report, the financial information provided to Dowling's Board did not include balance sheets, which provide information as to monthly changes in financial condition, liquidity, and also represent a fundamental element of interim reporting.

535.  Regarding Dowling's Cash Management function, Cohn Reznick noted that due "to the current financial condition of Dowling, cash management is of the utmost importance."

536.  Cohn Reznick recommended enhanced daily cash management and that daily cash

reporting be integrated with other reporting already in use, to include summary totals of cash receipts and cash disbursements received and released, respectively.

537. The analysis Cohn Reznick performed based upon the limited information available from Banner revealed that Dowling had (a) departments without tuition and fee revenue, and (b) departments without labor costs. Cohn Reznick could not track tuition credits across majors.

538. Cohn Reznick found, and Dowling's management concurred, that "based upon Dowling's review of the Departmental Analysis it does not believe that the extracted data accurately portrayed the financial performance of each department."

**September 2015**

539. On September 30, 2015, Cohn Reznick issued a Preliminary Summary of Revenue and Expense that analyzed revenue and expense by major at Dowling.

540. Cohn Reznick presented its findings in its Phase 1 Assessment at the September 17, 2015 Board meeting.

541. At that meeting, Cohn Reznick partner, Chad Shandler, reiterated the advice in the Phase 1 Assessment and told the Board that Dowling's focus should be on recruitment and student retention.

**November 2015**

542. On November 19, 2015, MSCHE placed Dowling on "show cause" status based, in large measure, on Dowling's lack of financial resources.

**Dowling In 2016**

543. In 2016, Dowling's Board consisted of defendants (a) Blake, (b) Curtin, (c) Gonzalez, (d) O'Connor, (e) O'Doherty, (f) Parr, (g) Posillico, (h) Puorro, (i) Racanelli, (j) Richmond, and (k) Rudolph.

ACA/2143276.1/066648

544.  Cerullo continued as Dowling's Chief Financial Officer.

545.  Dowling's financial statements for the year 2015, which KPMG released on February 29, 2016 contained, finally, and for the first time, a going concern qualification.

546.  Dowling's total assets had slipped another $3.67 million to just over $74 million.

547.  Its net assets were down another $8 million.

548.  By 2015, Dowling's revenue had fallen over $5.7 million to $38 million and its expenses were almost $46 million.

**February 2016**

549.  On February 26, 2016, the Board's Audit Committee, which then consisted of Puorro, Blake, O'Connor, O'Doherty, Racanelli, and Cerullo, met to discuss KPMG's audit of Dowling's financial statements.

550.  During that meeting, KPMG partner, Edward Lee, discussed the changes in the accounting policies statement and noted that although there were no transactions that were both significant and unusual, at least one transaction was deemed to be significant and were disclosed in the June 30, 2015 financial statements.

551.  That significant transaction involved an undocumented "challenge pledge" of $3 million by a Board trustee which was conditioned upon Dowling raising $2 million in matching gifts and which was intended to inspire the Board to donate funds in order to strengthen Dowling.  Only $250,000 of the pledge had been paid in acknowledgment of the matching funds raised by Dowling.

552.  On February 29, 2016, KPMG issued its Independent Auditors' Report on Dowling June 30, 2015 and June 30, 2014 financial statements in which it opined that Dowling's financial statements presented fairly, in all material respects, Dowling's financial position

553.  After six (6) straight years of deficits and losses, KPMG's February 29, 2016 Audit

ACA/2143276.1/066648

Report also contained, for the first time, a going concern qualification as follows:

> The accompanying financial statements have been prepared assuming that the College will continue as a going concern. As discussed in note 1 to the financial statements, the College has experienced recurring losses resulting in decreases in net assets, primarily due to declining enrollment, that raise substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in note 1. The financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinion is not modified with respect to this matter.

## March 2016

554.  On March 1, 2016, Dowling issued its Show Cause Report to MSCHE in response to MSCHE's prior show cause to Dowling (the "Show Cause Report").

555.  In the Show Cause Report, Dowling attempted to present its case for continued accreditation.

556.  The Show Cause Report advised MSCHE that since November 19, 2015, Dowling had pursued "an aggressive path" to demonstrate compliance with MSCHE Standard 3 and had retained RBC Capital Markets to assist Dowling with the identification of an appropriate affiliation that could contribute to the resolution of Dowling's financial issues and that could help Dowling achieve ongoing compliance with MSCHE Standards.

557.  Interestingly, Dowling ***admitted*** that despite all of Dowling's problems and issues, that as of March 1, 2016, "***now***, [Dowling's Board] and leadership are focused on remediating the conditions identified in the Show Cause determination" and offered the Show Cause Report to document the actions that Dowling had undertaken to keep its accreditation.  (emphasis supplied)

558.  At the March 15, 2016 Board meeting, Cerullo discussed the January 2016 Financial Report and advised the Board that (a) no budget had been prepared for 2016 because of Dowling's deficit, (b) there would be a net deficit of $5 million by the end of June 2016, (c) there was an

ACA/2143276.1/066648

enrollment deficit of 1741 students, (d) the retention of Cohn Reznick put Dowling almost $700,000 over its predicted consultant costs, (e) Dowling had $3.5 million in accounts receivable which it was attempting to collect, and (f) Dowling had five (5) homes on the market.

**April 2016**

559.  On or about April 12, 2016, MSCHE provided Dowling with MSCHE's draft report that it prepared after its April 4 and 5, 2016 visits to Dowling.

560.  In the judgment of the on-site MSCHE team, Dowling had not complied with MSCHE Standard 3, which provides that "the human, financial, technical, facilities, and other resources necessary to achieve an institution's mission and goals are available and accessible. In the context of the institution's mission, the effective and efficient uses of the institution's resources are analyzed as part of ongoing outcomes assessment."

561.  The MSCHE draft report noted that (a) Dowling had an $8 million loss in fiscal year 2015, (b) Dowling had defaulted on certain bond covenants and had failed certain responsibility ratios required by the U.S. Department of Education, (c) circumstances described in KPMG's audit raised substantial doubt about Dowling's ability to continue as an ongoing concern, and (d) Dowling projected a deficit of $8.7 million for 2016 (which would be the 6th straight year of such deficits).

**June 2016**

562.  On June 23, 2016, MSCHE revoked Dowling's accreditation effective August 31, 2016.

**August 2016**

563.  On or about August 4, 2016 UMB and Wilmington entered into Conditional Funding Agreements under which certain protective advances were made under the Bonds in exchange for a grant of additional collateral in the form of a blanket lien on all assets of Dowling to secure new advances of funds.

ACA/2143276.1/066648

564.  Faced with the loss of its accreditation, Dowling's Board voted to cease providing educational services effective August 5, 2016.

**September 2016**

565.  Thereafter, and on or about September 20, 2016, Dowling entered into an Escrow Agreement pursuant to which the Bond Trustees and Series 2006 Bond Insurer caused certain protective advances to be made under applicable loan facilities to pay expenses otherwise due by Dowling (the "Escrow Advance Agreement").

566.  As a result of the foregoing financing transactions, all of Dowling's real property and substantially all of its personal property (excluding restricted assets), including the Rudolph Campus, the Brookhaven Campus, the Brookhaven Dorm, and the Residential Real Property, are subject to the liens and security interests of Dowling's prepetition secured creditors.

567.  Dowling continued to use Banner for its financial, human resources, and student applications.

568.  In 2016, Dowling had not changed its Banner configuration since its installation in 1992.

569.  In 2016, Dowling's personnel had very limited knowledge of the Banner system, did not have the proper skill set to extract or analyze data from Banner, and Dowling only used Banner to a fraction of its capacity.

570.  Moreover, in 2016, as a result of obvious deficiencies in Dowling's chart of accounts, Dowling was unable to extract or analyze revenue and expense data by academic program but only by department.

571.  In 2016, Dowling's Banner data was unreliable.

572.  Dowling did not have any reliable report to assess departmental and academic program

ACA/2143276.1/066648

financial results and had an insufficient chart of accounts that did not enable Dowling to adequately conduct its financial reporting and analysis.

573.  Consequently, Dowling's Board and its administration did not have the proper tools to evaluate Dowling's financial position or decisions.

574.  Dowling did not perform any academic profitability analysis for the fiscal year 2016.

575.  In 2016, Dowling needed to make a major investment in Information Technology including infrastructure, applications and human capital in order to improve that function and be more competitive with its peers.

576.  In 2016, Dowling undertook no such Information Technology investment.

**Dowling's Bankruptcy**

577.  Dowling filed for chapter 11 bankruptcy protection on November 28, 2016.

**Defendants' Breaches Of Fiduciary Duty**

578.  Board minutes and other Dowling documents demonstrate that defendants never discussed Dowling's mission or that any of defendants' decisions concerning Dowling's operations were ever informed by Dowling's mission.

579.  Indeed, for much of defendants' time at Dowling, Dowling did not have the strategic plan required by universities as indicated by KPMG in *Strategic Financial Analysis*.

580.  When Dowling did create a wholly inadequate "strategic plan", that plan did not provide for any measurement of outcomes or any analysis of the impact of the financial plan on Dowling, even though industry best practices were to create an environment in which the institution could assess the resources that would be required to implement the plan as well as the potential return on investment for each item in the strategic plan.

581.  When finally created, Dowling's attempt at a strategic plan should have been linked to

ACA/2143276.1/066648

outcomes and then should have projected financial results based upon those anticipated outcomes. Dowling's strategic plan was not and did not.

582.  The attempted strategic plan, which was created during defendants' tenure, did not contain the necessary linkage, which led Dowling to fail to satisfy MSCHE's Standard 3.

583.  Not only did defendants fail to ensure that Dowling had a strategic plan or that its strategic plan was linked to financial results and outcomes, Cohn Reznick's report demonstrates that Dowling's financial reporting under defendants' Board participation was woefully inadequate.

584.  More specifically, during defendants' service to Dowling, Dowling's use of the Banner system did not provide reliable or accurate information from which defendants could make informed business and financial decisions for Dowling.

585.  Upon information and belief, defendants knew that the Banner data and financial information was unreliable and, rather than remedy the situation, used such unreliable information to Dowling's detriment.

586.  During defendants' tenure, Dowling was "at a significant disadvantage by not having access to critical business data to manage key aspects of operations including enrollment management, student financial assistance, budgets and cash flow."

587.  Additionally, during defendants' service to Dowling, there were glaring deficiencies in Dowling's interim financial reporting which prevented defendants from a fulsome understanding of Dowling's financial condition relating to P&L for the month and cumulatively (for current and prior years), as compared to the budget, enrollment statistics, accounts receivable and accounts payable information, and cash management reporting.

588.  Historically, the financial information provided by Cerullo to the other defendants did not include balance sheets, which provide information as to monthly changes in financial condition

ACA/2143276.1/066648

and liquidity, and also represent a fundamental element of interim reporting, even though cash management was of utmost importance based upon Dowling's financial condition.

589.  During defendants' tenure, Dowling had education departments without tuition and fee revenue or personnel costs, thereby contributing to Dowling's inability to obtain reliable financial and other information and for defendants to make informed decisions.

590.  During defendants' tenure, Dowling's deferred maintenance had increased, the cost of maintaining its facilities continued to rise, its existing facilities required "significant expenditures to refurbish and restore," and Dowling's aesthetics and functionality were negatively impacting enrollment.

591.  Similarly, during defendants' service to Dowling, Dowling's Information Technology environment was "aging" and had "a very limited degree of effectiveness."

592.  Moreover, Dowling's management, including defendants, acknowledged that Dowling's Information Technology infrastructure was "marginal" and that the accuracy of the data extracted from Banner was "always in question."

593.  Importantly, Dowling's management, including defendants, did not believe that it could "readily access information to support decision making" and that it was difficult for Dowling to respond to data requests, which often took days or weeks to generate.  Indeed, "senior management of Dowling [did] not have confidence in the accuracy of extracted enrollment management related data."

594.  During defendants' tenure, the information technology area at Dowling did not compare favorably to industry best practices and, when considering academic computing, the support for this function was not comparable to Dowling's peers.

595.  Accordingly, Dowling needed to make a major investment in Information Technology

ACA/2143276.1/066648

including in infrastructure, applications, and human capital which, upon information and belief, was never authorized or even discussed by defendants.

596.  In the critical areas of Development and Alumni Relations, Dowling had previously eliminated the Development and Alumni Relations Office as a result of staff turnover and had made a decision not to refill vacant positions.

597.  Consequently, during defendants' service to Dowling, there had been little or no activity by Dowling in the area of Development and Alumni Relations.

598.  As a result of defendants' obvious inattention to that critical element of Dowling's finances, for the entirety of defendants' tenure at Dowling, Dowling's Development and Alumni Relations operations significantly departed from industry standards.

599.  Although defendants and previous Presidents deemed the retention of a Director of Alumni Relations as a "critical hire" and defendants, as well as previous Boards, had directed previous administrations to pursue the reestablishment of that department, previous Presidents did not follow upon the Board's directive.

600.  Nevertheless, defendants took no action to remedy that failure.

601.  Moreover, unlike other similarly situated institutions, Dowling did not have a department of Institutional Research but rather "informal" research was conducted by faculty members or Dowling's deans.

602.  Despite defendants' expressed concern regarding declining enrollment, defendants did not ensure that Dowling had an Institution Research function to evaluate its programs and course offerings nor did defendants replace the key Enrollment Management positions including a director of admissions, an international recruiter, a freshman counselor, and a graduate recruiter.

603.  As a result, under defendants' guidance, Dowling (a) conducted limited analysis or

ACA/2143276.1/066648

market research to assess current academic programs or identify new offerings, and (b) did not generate other institutional data relating to demographics, academic profile, retention, graduation, placement, and financial aid for regular use by Dowling's management.

604. In its report, Cohn Reznick concluded that Dowling's significant enrollment erosion was due "in large part due to its program offerings and its enrollment management team," which had tremendous turnover.

605. During defendants' tenure on the Board, Dowling's academic records had not been properly managed thereby placing its accreditation and Federal financial aid potentially at risk.

606. In fact, at least five hundred (500) student files were not complete and students had been admitted without the proper documentation. Moreover, more than one hundred fifty (150) student files were missing.

607. Nevertheless, defendants took no action.

608. Moreover, Dowling did not have a proper College Catalog and the individual working on the College Catalog was not qualified to do so.

609. Despite the foregoing and their awareness that Dowling was deficient in these key areas, defendants did not take any corrective action.

610. During defendants' tenure at Dowling, defendants neither discussed nor understood Dowling's critical financial ratios.

611. During their tenure at Dowling, defendants did not engage in any meaningful or sustainable fundraising.

612. Despite Dowling's continuing decline and pattern of deficits, which should have served as a warning signal that management and defendants should focus on restructuring Dowling's income and expense streams to return to an acceptable Net Income Ratio, defendants took no action.

ACA/2143276.1/066648

613. During defendants' tenure at Dowling, Board minutes do not reveal that defendants engaged in any discussion regarding the manner in which Dowling would, or could, repay the more than $57 million in industrial development bond debt that Dowling carried.

614. Although Dowling's enrollment and image problems had persisted for years, neither the Board nor any administration formulated or implemented any plan to resolve those issues, but simply replaced Dowling's Presidents on a revolving door basis.

615. Indeed, although it was obvious that Dowling could not sustain two campuses, defendants never streamlined Dowling's operations, never underwent any significant self-examination to improve Dowling's academics or support services, and never directed Dowling's available resources toward selected programs intended to enhance Dowling's success, rather than spread Dowling's insufficient resources over many diverse programs.

616. Instead, defendants accepted the cockeyed optimism of their presidential hires and continued to operate Dowling as if its problems would simply disappear.

617. In sum, defendants never accepted that Dowling was, and had been, operating in a "new reality" and that, as Board Trustees, it was their responsibility to actively manage Dowling's situation and create an environment in which Dowling's enrollment declines could be stemmed and its non-existent fundraising improved.

618. Defendants did not undertake the necessary active management.

### First Claim for Relief
**(incorporating all previous allegations)**

619. New York Not-For-Profit Corporation Law §717 provides as follows:

> (a) Directors and officers shall discharge the duties of their respective positions in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances. The factors set forth in <u>subparagraph one of</u>

ACA/2143276.1/066648

paragraph (e) of section 552 (Standard of conduct in managing and investing an institutional fund), if relevant, must be considered by a governing board delegating investment management of institutional funds pursuant to section 514 (Delegation of investment management).  For purposes of this paragraph, the term institutional fund is defined in section 551 (Definitions).

(b)  In discharging their duties, directors and officers, when acting in good faith, may rely on information, opinions, reports or statements including financial statements and other financial data, in each case prepared or presented by:  (1) one or more officers or employees of the corporation, whom the director believes to be reliable and competent in the matters presented, (2) counsel, public accountants or other persons as to matters which the directors or officers believe to be within such person's professional or expert competence or (3) a committee of the board upon which they do not serve, duly designated in accordance with a provision of the certificate of incorporation or the bylaws, as to matters within its designated authority, which committee the directors or officers believe to merit confidence, so long as in so relying they shall be acting in good faith and with that degree of care specified in paragraph (a) of this section. Persons shall not be considered to be acting in good faith if they have knowledge concerning the matter in question that would cause such reliance to be unwarranted.  Persons who so perform their duties shall have no liability by reason of being or having been directors or officers of the corporation.

620.  New York Not-For-Profit Corporation Law §720 provides as follows:

(a) An action may be brought against one or more directors, officers, or key employees of a corporation to procure a judgment for the following relief:

(1)  To compel the defendant to account for his official conduct in the following cases:

(A)  The neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge.

(B)  The acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties.

(2)  To set aside an unlawful conveyance, assignment or transfer of corporate assets, where the transferee knew of its unlawfulness.

ACA/2143276.1/066648

(3) To enjoin a proposed unlawful conveyance, assignment or transfer of corporate assets, where there are reasonable grounds for belief that it will be made.

621.  At all relevant times, defendants were Board Trustees of Dowling and its Chief Financial Officer, who owed a fiduciary duty to Dowling, and had a duty to Dowling and to its creditors to carefully manage Dowling's business operations, to devise, implement and maintain proper controls with respect to Dowling's business, operations, and financial affairs, and to insure that Dowling's business, as conducted by its employees and representatives complied with all laws applicable to Dowling's industry and to lawful businesses in general.

622.  Defendants were responsible for ensuring and overseeing the establishment, implementation, and maintenance of its internal financial controls and operating procedures.

623.  Defendants, and each of them, neglected and failed to perform his or her duties as a Board Trustee of Dowling or as its Chief Financial Officer in overseeing the management and disposition of Dowling's assets committed to his or her charge and thereby failed to discover the rampant waste and mismanagement occurring at Dowling, and thereby himself and herself wasted and mismanaged such corporate assets by failing to ensure, devise, implement, and maintain proper internal financial controls and operating procedures with respect to Dowling' affairs.

624.  As a direct result of defendants' misconduct and gross negligence in discovering the mismanagement and waste rampant in the conduct of business, they failed to discover that Dowling engaged in activities that resulted in its financial demise, substantial losses of funds, and diversion of funds to other parties.

625.  Defendants further neglected and failed to perform their duties in the management and disposition of the assets of Dowling committed to their charge and thereby wasted and mismanaged such corporate assets by failing to take action to preserve and safeguard Dowling's resources, and

ACA/2143276.1/066648

thereby recklessly and negligently dissipated such resources.

626.  As a result of all of the foregoing misconduct by defendants, Dowling suffered losses totaling at least $50,000,000, leaving Dowling with liabilities substantially in excess of its assets, which culminated in Dowling's financial ruin and ultimate bankruptcy.

627.  By reason of the foregoing, defendants are jointly and severally liable to plaintiff in an amount as yet undetermined, but in no event less than $50,000,000.

### Second Claim For Relief
**(incorporating all previous allegations)**

628.  Defendants were responsible for ensuring and overseeing the proper maintenance of Dowling's books and records and owed a fiduciary duty to Dowling and its creditors, as set forth in the New York Not-For-Profit Corporation Law as amended by the Not-For-Profit Revitalization Act of 2013 and common law.

629.  Defendants, and each of them, neglected and failed to perform their duties in the management and disposition of Dowling's assets committed to their charge, and thereby wasted and mismanaged such corporate assets.

630.  By reason of the foregoing, all defendants, and each of them, breached their fiduciary duty to Dowling under New York Not-For-Profit Corporation Law as amended by the Not-For-Profit Revitalization Act of 2013 and, by reason thereof, failed to discover the rampant waste and mismanagement occurring at Dowling.

631.  Dowling has been damaged in an amount as yet undetermined, but in no event less than the total sum of the $50,000,000.

632.  By reason of the foregoing, defendants are jointly and severally liable to plaintiff in an amount as yet undetermined, but in no event less than $50,000,000.

ACA/2143276.1/066648

**WHEREFORE**, plaintiff, Ronald J. Friedman, Esq., the Unsecured Creditor Trustee of Dowling College f/d/b/a Dowling Institute f/d/b/a Dowling College Alumni Association f/d/b/a Cecom a/k/a Dowling College, Inc., respectfully demands judgment against defendants Patricia M. Blake, Gerald J. Curtin, Denise Fischer, Myrka Gonzalez, Jack O'Connor, Dennis O'Doherty, Ronald Parr, Joseph K. Posillico, Michael P. Puorro, John Racanelli, Deborah K. Richman, Scott Rudolph, and Ralph Cerullo as follows:

a.   on plaintiff's first claim for relief, pursuant to New York Not-For-Profit Corporation Law §717 and New York common law, awarding judgment in an amount to be determined at trial but in no event less than $50,000,000;

b.   on plaintiff's second claim for relief, pursuant to New York Not-For-Profit Corporation Law as amended by the Not-For-Profit Revitalization Act of 2013 and common law awarding judgment in an amount to be determined at trial but in no event less than $50,000,000;

c.   for the costs and disbursements of this adversary proceeding; and

d.    for such other and further relief as the Court deems just and proper.

Dated:  Jericho, New York
      May 13, 2019

**Silverman Acampora LLP**
Attorneys for Ronald J. Friedman, Esq., the Unsecured Creditor Trustee of Dowling College f/d/b/a Dowling Institute f/d/b/a Dowling College Alumni Association f/d/b/a Cecom a/k/a Dowling College, Inc.

By:    s/ Anthony C. Acampora
       Anthony C. Acampora
       A Member of the Firm
       100 Jericho Quadrangle, Suite 300
       Jericho, New York 11753
       516-479-6300

ACA/2143276.1/066648